IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245T, 06-246T, and 06-247T
(Consolidated)

MURFAM FARMS, LLC,
By and Through Wendell H. Murphy, Jr.,
a Partner Other Than Tax Matters Partner,

PSM FARMS, LLC,
By and Through Stratton K. Murphy,
a Partner Other Than Tax Matters Partner,

MURPHY PORK PARTNERS, LLC,
By and Through Wendell H. Murphy, Jr.,
a Partner Other Than Tax Matters Partner,

Plaintiffs,

V.

UNITED STATES OF AMERICA,

Defendant.

and

IN THE UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

GARY V. WOODS, as Tax Matters Partner
of TESORO DRIVE PARTNERS, a
Texas General Partnership,

Plaintiff,

V. ) Case No. SA-05-CA-0216-XR

UNITED STATES OF AMERICA,

Defendant.

GOVERNMENT EXHIBIT 2



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Consolidated with

GARY V. WOODS, as Tax Matters Partner )
of SA TESORO INVESTMENT PARTNERS, )
a Texas General Partnership, )
)
Plaintiff, )
)
V. ) Case No.
) SA-05-CA-0217-XR
UNITED STATES OF AMERICA, )
)
Defendant. )

************************************************

VIDEOTAPED ORAL DEPOSITION OF
STUART A. SMITH
AUGUST 30, 2007
VOLUME 1

************************************************

ORAL DEPOSITION OF STUART A. SMITH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 30th day of August, 2007, from 9:59 a.m. to 4:08 p.m., before Dana Taylor, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Mr. Anthony Daddino, Meadows Collier, 901 Main Street, Suite 3700, Dallas, Texas 75202, pursuant to the Federal Rules of Civil Procedure.



A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. ANTHONY DADDINO
MEADOWS COLLIER
901 Main Street
Suite 3700
Dallas, Texas 75202
(214)744-3700

FOR THE DEFENDANT:
MR. DENNIS M. DONOHUE
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
P.O. Box 403
Washington, DC 20044
(202)307-6492



INDEX


Appearances 2
Stipulations 6

STUART A. SMITH
Examination by Mr. Donohue 6

Signature and Changes 195
Reporter's Certificate 196




EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 2408 | Plaintiffs' Expert Report of Stuart A. Smith | 7 |
| 2409 | Plaintiff's Expert Report of Stuart A. Smith | 7 |
| 2836 | Expert Report of Stuart A. Smith | 20 |
| 2351 | Correspondence dated 9/16/99 | 41 |
| 2325 | Agreement | 43 |
| 2353 | Correspondence dated 10/25/99 | 46 |
| 155 | COBRA Action Work Plan | 50 |
| 2846 | Memorandum dated 10/1999 | 55 |
| 2868 | Correspondence dated 2/17/00 | 56 |
| 159 | Correspondence dated 11/1999 | 68 |
| 2837 | Petitioners'/Plaintiffs' Expert Report of Stuart A. Smith | 73 |
| 2867 | Correspondence dated 3/9/00 | 91 |
| 2847 | Correspondence dated 11/12/99 | 95 |
| 2834 | 152 Federal Reporter, 3d Series | 106 |
| 2833 | Chamberlain v. C.I.R. | 108 |
| 2827 | Definitions and Special Rules | 138 |
| 2850 | Correspondence dated 1/17/00 | 166 |
| 2843 | Correspondence dated 10/8/99 | 176 |
| 2864 | Declaration of Robert B. Coplan | 177 |
| 2656 | Memorandum dated 11/17/99 | 178 |
| 2859 | Correspondence dated 12/5/99 | 182 |




Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

PROCEEDINGS

MR. DONOHUE: Let me state that this deposition is being taken pursuant to an agreement of the parties as to the time, place, and date, and also being taken pursuant to the Federal Rules of Civil Procedure.

STUART A. SMITH,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DONOHUE:

Q Mr. Smith, would you state your full name and spell your last name for the court reporter?

A Stuart A. Smith, S-m-i-t-h.

Q And where do you reside?

A In New York City.

Q And I know you had a deposition taken of yourself at least once. How many times has your deposition been taken in the past?

A Just that once.

Q Okay. And just in case sort of the ground rules were not explained to you, I'm going to take the time to explain that there is, as you know, right here a court reporter. She will take down my questions and your answers.

You need to wait obviously until I finish my question before you give your answer. And if for any reason my questions are not clear, please let me know, and I'll do



my best within my abilities to restate the question.

Is that clear?

A Yes.

(Exhibit Nos. 2408 and 2409 were marked.)

BY MR. DONOHUE:

Q Okay. Now, as I mentioned, the goal here is to finish today. And so what I'm going to do is pursue certain efficiencies. What we'll start off with is your Tesoro report, and that's been put right in front of you. It's been marked as an exhibit. It is deposition Exhibit 2409.

Do You see that exhibit in front of you?

A I do.

Q And is that the report you wrote in connection with the Tesoro report?

A It is.

Q And what you'll notice is is that right underneath that there is another report you wrote, which is the report in the Murphy case. That is Exhibit 2408. Do you see that report?

A I do.

Q And is that the report that you wrote in connection with the Murphy case?

A It is.

Q Now, what I'm going to do is start off with



questions on the Tesoro report. And even though there's a different legal opinion that you're opining on in connection with the Murphy case, unless you feel that the questions I ask somehow would be answered differently with respect to your Murphy report, then let me know, and I'll take the time to specifically inquire about any differences between the two reports.

Do you understand that?

A I do.

Q Okay. So if there are no differences, then we can then simply ultimately finish with the Tesoro report, and then I can end the deposition.

A Uh-huh.

Q Is that clear?

A I do.

Q Okay.

A I am.

Q You understand?

A I do.

Q All right. Now, this is just a formality. You're not under any type of drugs or anything else that would impair your ability to give full and complete answers today, are you?

A No.

Q All right. Let's begin. Could you tell me,



for purposes of your reports, what do you consider your field of expertise?

A Well, my field -- I consider my field of expertise to be taxation. That's what I've focused my entire career on that area of law with an emphasis in federal tax matters. I had government service that -- and a law clerkship on the tax court that focused me in that direction, and my government work involved federal tax matters.

I have also some state tax expertise because I have taught state taxation at Georgetown Law School, and I have represented people in state tax matters after I left the government that were not only focused on the law of the particular state involved but also involved what I would call broader constitutional objections to the imposition of a particular state tax.

I've done a lot of tax litigation, both on the government side and on the private side, so I -- and I've also reviewed, over the course of my private career, many tax opinions for clients who want to inquire as to whether the opinion warrants reliance for purposes of making an investment.

Q Would it be fair to sort of summarize what you just said is your field of expertise would be federal tax law?

A Correct. The only part of federal tax law





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 10

that I don't consider myself an expert or involved in is employee benefits because that -- that field has become so technical and so collateral that -- and so detailed that I don't really involve myself in the employee benefits work.
Q And more specifically with respect to this case -- and when I say this case, I'm really referring collectively to the COBRA litigation. Do you understand that?
A Uh-huh.
Q With respect to this litigation, what part of the federal tax law would you say lends itself to your particular field of expertise for purposes of testifying?
A Well -- well, I suppose this transaction precedes with an analysis of the provisions of Subchapter K, the partnership provisions, and I've had experience in dealing with that and giving advice and navigating the various provisions of Subchapter K.
And generally they -- I've also had experience in just appraising the quality of tax opinions of the sort that I have addressed in my reports.
Q And do you -- for purposes of your -- your expertise as a federal tax lawyer, do you also consider your ability to understand and interpret the case law, federal tax case law --
A Yes.

Page 11

Q -- is -- you have to wait.
A Oh, sorry.
Q -- is relevant to your experience?
A Yes.
Q Okay. You mentioned that you have tried some cases. Were these tax cases that you tried?
A Yes.
Q Could you tell us approximately how many cases you tried?
A I've tried a lot of cases in the tax court. It's hard to recall how many. I've tried some cases in the -- what is now called the court of federal claims, which used to be called the claims court, and I've tried some cases in the federal district courts.
I've also argued tax cases in the courts of appeals, both on the government side and on the private side, and I've also argued cases in the United States Supreme Court on the government side.
Q Have you ever retained expert witnesses yourself in connection with cases that you have tried?
A No.
Q Is there some reason for that?
A Well, actually, let me think about that. Let me revise my question -- my answer. I -- I did retain an expert witness once, I believe, in connection with some

Page 12

litigation over the tax benefits of a -- of a recycling machine.
I'm hard pressed to remember exactly what his -- he must have been an engineer. That's just my recollection. This was a long time ago. This was probably 20 years ago. So I -- so the answer to that is -- is yes.
Q And did this witness ultimately testify at trial?
A Yes, or he had a report and testified at trial, I believe. It's going back a long ways, so...
Q Of the cases that you tried, how many ultimately went to trial?
MR. DADDINO: Objection, form.
Go ahead; you can answer.
A I can't answer that question. I just know that in the '80s and '90s, I had a whole bunch of cases in the United States tax court that dealt with the litigating over the application of penalties in connection with this plastics recycling investment because a lot of people who ultimately paid the taxes and the interest litigated the applicability of what was then the negligence penalty under Section 6653(b), (a) or (b). The old penalties provision.
BY MR. DONOHUE:
Q Before the accuracy-related penalty provision?

Page 13

A Right, long before that, when it was just a five percent penalty.
Q But my question was --
A It may have been -- you want to -- you want to know the number?
Q Well, an approximation.
A It's got to be in the nature of 15 to 20, something like that, I think.
Q Are you familiar with Daubert motion?
A Yes.
Q What to your understanding is a Daubert motion?
A Well, the Daubert -- the Daubert motion is a -- it's, I think, named after a supreme court case. And what it basically says -- holds is that an expert witness can't -- is -- is not permitted to provide the court with his understanding of the law; that that is for the court to decide. But that he can give his expert opinion with respect to certain facts.
Let me revise my -- going back, I think you once asked -- I think you earlier asked me whether I ever was an expert witness, and I think I said no. Well, now that I think about it, I was an expert witness in a tax case that was tried in the United States bankruptcy court. No. I take that back.



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 14

I was not an expert witness. I hired an expert witness in that case. I was the lawyer. And I had -- I had -- the reason -- the reason your question about Daubert stimulated this recollection was that I remember that I had Daubert opposition to an accountant that I had hired as an expert witness.

The government -- the government was represented by the United States attorney in the Southern District of New York, and they objected to the testimony that my expert witness gave in connection with the taxpayer's treatment of something. The court said that he had taken tax cases in law school, and he could, you know, figure out the tax consequences. He would not, you know, admit that -- you know, that testimony.

Q He would admit that testimony?
A He would not; he would not.
Q He would not admit that testimony?
A Would not.
Q Do you recall the name of that case?
A Yeah, it's called Becker versus -- it went through the United States bankruptcy court, then I appealed the -- the adverse decision to the United States district court. If the district court affirmed the bankruptcy court, then I appealed it to the second circuit, and I lost two to one.

Page 15

MR. DADDINO: I think you answered his question.
THE WITNESS: Okay.
BY MR. DONOHUE:
Q Now, you mentioned that you had your deposition taken in the Klamath case; am I correct?
A Correct.
Q Okay. And you prepared an expert witness report in the Klamath case; correct?
A I did.
Q And you prepared two expert witness reports in connection with the COBRA litigation; am I correct?
A Yes, the -- the ones that are sitting on the table here, 2408 and 2409.
Q Okay. Have you prepared any other expert witness reports in your career?
A Yes, I have. I prepared an expert witness report in an -- in a private arbitration proceeding that was -- I mean the proceeding was confidential. Although the proceeding did not involve taxation as such, it raised certain tax questions. And as a result, the lawyer for one of the parties engaged me to render a report in that case, which I did do.
Q Any other reports?
A I also prepared an expert witness report in

Page 16

another arbitration proceeding that did involve -- it was a confidential arbitration proceeding that did involve a transaction like this.
Q That did involve?
A That did involve.

And then I have prepared an expert witness report in another pending litigation, which I think -- I think all in total -- just to -- just to be succinct, I think probably four or five to date.
Q Well, let's go back to that confidential arbitration proceeding that you said involved a transaction like this. When you say involved a transaction like this, what are you referring to?
A I'm referring to this COBRA transaction.
Q Okay.
A I don't remember the -- I -- it may have -- I don't remember the details of it because it was many months ago. But it was a transaction that I would just say, you know, without elaborating, that it was comparable to a transaction like this.

The -- the taxpayer had brought an action against the -- the advisor. So I -- I prepared an expert witness report about the advisor's conduct.
Q And, more specifically, are you referring to a transaction involving options?

Page 17

A It was -- I think it was an options transaction.
Q And is that -- is your report that was submitted in that proceeding, is it still confidential?
A Yes, I think so. I think the whole proceeding is confidential.
Q Are you permitted to provide information regarding who the counsel was that retained you in connection with that?
A You know, I tell you, quite frankly, I would be happy to tell you, but I think before I did, I would have to ask permission because the whole thing -- these -- these arbitration proceedings are by their very nature sort of confidential. And I think before I gave you any information about it, I would want to ask him.
Q All right. Why don't we do this. Ultimately when we complete the deposition, you'll have an opportunity to read the transcript. And if at that point in time that you're able to speak to counsel and he does permit you to provide his name or her name, then if you would, just put that information in the errata sheet of the deposition?
A Fine; fine.
Q Now, you mentioned about four or five reports. Any reports other than in -- other than Klamath in confidential arbitration proceedings?



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 18

A I'm working on one now, which is also a confidential arbitration proceeding, but it -- but I haven't completed it yet.
Q Any others?
A I have some -- I have some other -- when I said four or five, they included the ones that -- I have some others that have been -- that are in -- that are in court cases that I believe -- I think one of them has been filed or maybe -- but some of them are just prepared, but they're not filed yet because the deadline for filing them hasn't arrived.
Q How many are these?
A Well, I think that's part of the four or five that I -- number that I gave you. I think that's -- that's a good faith estimate.
Q Well, let's -- let's separate out the Klamath and the confidential arbitration proceedings. Now, with respect to those that you either have completed your report or in the process of preparing a report, how many -- how many reports have you prepared?
A I think five.
Q Now, of those five reports, how many of them involve a transaction like the COBRA transaction in the sense that they involved options, pairs with option transactions?
A I think one or two.

Page 19

Q And could you give me the names of those?
A Well, since they haven't been filed yet, I'm -- you know, I would have to consult with counsel about whether I could give you those names.
Q Who is the -- I assume in these cases that the government is a party?
A Yes.
Q And of the two, when you say it has not been filed, what specifically are you referring to?
A My report.
Q But when you say filed, are you talking about filed with the court or exchanged with --
A Exchanged with the -- with the other side.
Q The other side?
A Right. I think -- and then I have -- and then I have another one, but I think it's part of the five I mentioned, which is one I did in a tax court case, but -- but there's not even a trial date. So that -- that one hasn't been filed either.
Q But when you say filed, even though there has been no trial date set, you're aware that the parties usually have a date for the exchanging of the --
A Yeah, I know, and I don't think that date has come yet.
Q Okay. Now, to your knowledge, the reports

Page 20

that you have prepared in connection with court cases, to your knowledge, none of them -- as of yet none of your reports have been exchanged with the other side?
A I think one -- I think one of them has, but I would just want to check because, you know, I prepare these things, and then since I'm not the lawyer in charge of the litigation, I don't really pay close attention to, you know, when and if they get filed.
But if -- if -- I assume that if they're exchanged with the government -- I don't mean to run on like this -- that -- that it's something that -- that you're entitled to see.
Q And so, again, what I'm going to ask you to do is to consult with counsel for these other cases, and to the extent, find out if the report has been exchanged. And if it has been exchanged, to make an indication in the errata sheet as to what the name of the report is and who your -- what counsel --
A In fact, let me just revise my -- I just thought of another one that I hadn't thought of in my mental, you know, senses. So -- so probably the answer is six and not five.
Q Six. All right.
(Exhibit No. 2836 was marked.)
BY MR. DONOHUE:

Page 21

Q Let me show you what's been marked as Exhibit 2836. Does this report look familiar?
A Yeah, that was the one that I just thought of because -- and that's one that I -- that I worked on. And I believe that that has been exchanged -- obviously, it's been exchanged with the government because -- yes, I prepared this report.
Q Okay. And in connection with that report, that, am I correct, also does have a feature of that report, or at least a feature of the transaction offsetting options?
A Yes.
Q Can you estimate as to -- since I'm going to receive your bills later, about approximately how much time you spent in connection with the preparation of your reports?
A Well, I think it's easy to figure out by dividing my hourly rate by the amount of the bill. I mean I --
Q Would you have any rough estimate before we receive the bills as to --
A I haven't actually -- it's --
MR. DADDINO: Just to clarify, counselor, I presume you mean across both the Tesoro cases and the Murphy cases collectively?



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

MR. DONOHUE: That's correct.
MR. DADDINO: Thank you.
A This Tesoro case -- I'm just rounding because I don't do long division all that well in my head. This looks like it took me -- the Tesoro case looks like it took me about 40 hours to do.
BY MR. DONOHUE:
Q 40?
A 40.
Q Okay.
A And the MurFam one, 32, thereabouts.
Q Turn to Page 3 of your Tesoro report. You make reference there to the materials that you considered and relied upon in preparing your report. Could you just briefly summarize for me what materials that you considered and relied upon for purposes of preparing your report?
A Well, as -- as Page 3 -- as I say on Page 3, I -- there were two -- there were two opinions in this case. One issued by Jenkens & Gilchrist, and one issued by Brown & Wood. So I read all of those -- I read those.
I read the -- the authorities -- I reviewed the authorities that were cited in those opinions. I read the expert reports just for background of Dr. Hess and Dr. Chance. And then I read the expert reports of Dr. Hess in a related case in which I have filed another report in a



case called JZ Buckingham just to enhance my understanding of the economist prospective.
And then I -- I -- I reviewed the Treasury Circular 230, particularly Section Paragraph 1033 which establishes the Treasury's standards for issuing tax opinions, you know, for people who are enrolled as -- you know, to be able to practice before the Treasury.
Q You mentioned you read the authorities. Did you read each of the authorities --
A Yes.
Q -- and the legal opinions?
A Yes.
Q Or had you already read some of them, and you read the ones that you --
A Well --
Q You have to wait until I finish my question.
A Oh, sorry.
Q -- had already read some of them, and you read the authorities only that you had not previously read?
A No. It's my practice when I -- you know, because it's my practice when I approach an assignment like this is to re-read things because -- and not to rely on my recollections of -- of what the authorities say because they're so -- they involve such detail that it's better to have a fresh, you know, prospective.



Q Are you aware that there is a huge separate record in this case involving documents that were obtained either formally or informally from a variety of different third parties? Are you aware of that?
A Well, I was not aware of it until I saw the expert report of Dr. -- of Professor LaRue. I mean he filed a rebuttal to my report, which counsel gave me, and so I read that report. And then as a result of -- none of this is listed here because it was after my -- my filing -- my giving of my report.
And then in order to satisfy myself about some of the points Professor LaRue made in his rebuttal report because he had some cross references to his original report, so I read his original report to -- or at least I remember reading the references that he made because he made them succinctly in footnotes.
So that's how I became aware that there is another record -- I don't mean another record, but that the record has other things in it that -- that I was not aware about -- aware of when I rendered my report.
Q Do you recall as to what the size of that record is?
MR. DADDINO: Objection to the use of the word record.
MR. DONOHUE: Objection as to form.



BY MR. DONOHUE:
Q Are you aware of the size of that record?
A No.
Q You're not aware that that record comprises a multi-million page database of documents?
MR. DADDINO: Objection, form.
A I'm not -- I'm not aware of the size of the record, as I said.
BY MR. DONOHUE:
Q You mentioned that you read Dr. LaRue's rebuttal report, and then you read his opening report. As a result of that, did you at that point in time have occasion to review any of the documents in the record of this case?
MR. DADDINO: Objection, form; vague and ambiguous.
A No. What I did was simply -- I mean Dr. -- Dr. LaRue from -- his report would every once in a while quote from something that was in the record with an appropriate Bates stamp, I assumed, just the way I would, that those references were accurate. And I just -- I didn't feel the need to actually read, you know, an e-mail to see whether he was quoting it accurately. I just -- I took it as -- I accepted it on its face.
BY MR. DONOHUE:
Q Do you recall when you were retained in this





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

case?

A The answer is -- to that is no. Although, I would -- the answer is no. I mean I could -- I could -- I must -- I am sure I signed a retention agreement, but I don't have it with me. And I don't remember -- I don't like to speculate on -- and tell -- and make a guess.

Q All right. Who did you meet with, if anyone, in connection with your retention in this case?

A I met with Mr. Welty of the Meadows firm.

Q And was anyone else present at your meeting besides Mr. Welty?

A No.

Q And what at that meeting happened?

A Well, we discussed, you know -- you know, my background and what I might be able to -- to -- what kind of report I might be able to render. He may have -- but I don't remember for sure.

But he may have sent me the opinions that I would be asked to review so that I could review them -- review them in advance of the meeting. I don't remember whether he did or not. If he did, I reviewed them. If he didn't do it before, he certainly did it immediately thereafter and I read them.

Q And when you refer to opinions, I assume you're referring to --



A The -- the law firm --

MR. DADDINO: Let him finish.

THE WITNESS: Oh, sorry.

BY MR. DONOHUE:

Q -- the opinions of Jenkens & Gilchrist, Brown & Wood, and Proskauer & Rose?

A Correct.

Q At that meeting did Mr. Welty indicate to you as to what he wanted you to do?

A Well, what -- I don't remember specifically that he said what I want you to do is this. But I think what he was interested in -- my recollection was that he was interested in determining -- finding out from me whether I could prepare a report about these opinions in the same manner as my report that I prepared in the Klamath case.

Q And in Klamath you prepared, am I correct, a very similar report to the reports that you prepared in this case?

A When you say similar, in the Klamath case, it was -- it was a slightly different transaction. But when you say similar, it was similar to the extent that it preceded with an examination of an opinion of counsel that reached certain conclusions, and I -- and I prepared a report that addressed the question as to whether the -- whether the opinion was objectively reasonable and it was one that the



tax grant -- return preparer could reasonably rely on.

Q But you ultimately -- am I correct you rendered opinions in these cases that are very similar to the opinions you rendered in Klamath?

A Well, when you say similar, that's sort of -- I mean that's kind of a vague word. I mean -- I mean it's similar to the extent that they involve this intellectual process that I described.

They're similar insofar as they involve the examination of a -- of opinions of counsel and -- and measured them for adequacy and quality and character in accordance with professional standards and the Treasury standards.

And I suppose they're similar insofar as they reached the -- a similar conclusion that they were, like the opinions in the Klamath case, opinions that were of the character and quality that -- and were objectively reasonable so that the taxpayer and his preparer could -- return preparer could reasonably rely upon.

Q Getting back to Mr. -- your conversations with Mr. Welty at this first meeting, at that meeting did you indicate to Mr. Welty that you could provide an analysis that's similar to your analysis that you did in the Klamath case?

A Well, let me say this. That at that -- at



that meeting with Mr. Welty, to the extent that I looked at the opinions, I may have given him some preliminary observations about what I thought of them. But until I actually dug into them, I would not have told him that I could reach the same conclusion that I reached in the Klamath case because the Klamath case involved different opinions.

Q Did you have -- subsequent to that first meeting, did you have any other meetings with Mr. Welty?

A We talked on the phone. But the answer to that is I don't think I met him physically -- maybe I met him once more. I -- I really don't remember.

Q Where was your first meeting? Was that here in Dallas?

A No, it was in -- in my office.

Q In New York?

A Yes.

Q After this first meeting, at what point in time did you communicate to Mr. Welty that you could provide an opinion that's ultimately the opinions in your report?

A I don't remember when that was. I mean all I can do is -- you know, this -- this opinion -- my report is dated May 30th I think in both of these cases, yes. And so it took some time to -- to -- to write this report.

I can't tell you -- it had to be in advance -- it had to be before May 30th. When before May 30th I told





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

him I could do it, I -- I really don't remember. Perhaps let me put it to you this way. I wouldn't have started the report without telling him that I thought I could do it. When I started the report, I don't remember.

Q But your bills should reflect that; correct?

A Well, my bill -- my bill simply says for work done within a range of time, you know, from X. So the beginning part of the bill would probably say when I started working on it.

My diary would probably tell you or tell me when I started writing the report. So at or around that time or slightly before, I must have reached the conclusion that, based on my review, I could render the report that I did render.

Q Did you share your drafts with Mr. Welty?

A No.

Q You just gave him a final report?

A Well, we talked -- I talked to him on the phone several times about, you know, the details and the status, you know, the -- the shape that the report would take, the organization. I may have mentioned to him various little points that I was going to include in the report. But the answer to the sharing drafts is no.

Q Did Mr. Welty discuss with you at all the stage of discovery in the case?



A No, I don't -- I don't recall that he did. I mean, I -- I mean, he had his job to do, and I had my job to do.

Q Did he mention, for example, that the court in this case had permitted the parties to take 99 depositions? Did he mention that?

A No.

Q Did he mention the --

A We're talking about Tesoro now; right?

Q Tesoro and --

A We're talking about both of them.

Q Yes, we're talking about both sets of cases.

A Okay. Okay. The answer is no.

Q Did he discuss with you at all that there were pending criminal investigations of some of the promoters in this -- in this litigation?

MR. DADDINO: Objection. I'm going to instruct the witness not to answer. I think that this is getting dangerously close to specific details of conversations between counsel and expert witness.

MR. DONOHUE: There is no privilege in connection with a discussion with expert witness --

MR. DADDINO: To the extent that those discussions might constitute work product.

MR. DONOHUE: Counsel, let me finish.



There is no privilege with respect to communications by an expert witness and the attorney who retains them. That is not attorney-client. So I'm going to ask the question again.

BY MR. DONOHUE:

Q My question is did Mr. Welty discuss with you that there were any pending criminal investigations of the promoters in connection with any of this litigation?

A You're going to have to pin that down in terms of time.

Q At any point in time.

A Well, I think -- my recollection is no. Although, you know, I read the Trade Press, and I read newspapers, and I've become -- I've been aware of the fact that there are some criminal investigations of various people and who have been connected with these types of transactions, and I'm speaking very broadly.

But to the extent -- conversations with Mr. Welty about any of this, I don't recall any.

Q Are you aware of any of the individuals at either Ernst & Young, Jenkens & Gilchrist, Deutsche Bank that were involved in the COBRA transactions?

A Only to the extent that I obtained this information from the public press that I -- was I aware of these investigations.



(Discussion off the record.)

BY MR. DONOHUE:

Q In connection -- well, is it fair to say that you're rendering opinions regarding legal opinions which legal opinions discuss various tax benefits that are derived from a taxpayer entering into the COBRA transaction; is that a fair statement?

A Yes.

MR. DADDINO: Objection, form.

BY MR. DONOHUE:

Q In connection with your reports, did you feel that it was important in rendering your opinions that you have an understanding as to how the COBRA product was designed or developed?

A Well, the answer to your question is yes, because if I was going to judge the adequacy and objective reasonableness of the report, which was -- I mean of the -- of the opinion, which was addressing the tax consequences of the transaction, I felt the need to understand, you know, the nature of the transaction.

So the answer to your question is yes.

Q And what did you do to learn more about how the COBRA product was designed and developed?

A I just read the -- I just read the opinion, and the opinion's fairly explicit in the way -- in describing



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 34

the factual circumstances that -- and not only did -- let me say this.
Each opinion -- lawyers have different styles, and each -- reading each of the opinions was very helpful to me in enhancing my understanding of the transaction because each opinion, you know, constituted a different window of -- of clarity as to exactly what happened and how it happened.
Some of the opinions very handily list a summary of the facts after having written out the facts in prose form, which -- which is a fairly dense way in trying to absorb the transaction. Some -- some of them are just clear.
So the answer is that's how I -- that's how I was able to, you know, enhance my understanding of the transaction.
Q Is there anything in the legal opinions that you reviewed, the Jenkens & Gilchrist opinion or the Brown & Wood opinion, that discusses specifically how the COBRA product was designed and developed?
A No; no. It's -- it just states the -- the facts that -- it states -- the answer is no.
Q Okay. In rendering your opinions, did you feel important for you to have an understanding as to how the COBRA product was marketed?
A No; no. I had a -- I had a narrow mission. My mission was as a tax lawyer who's seen lots of these

Page 35

opinions, who understand the standards that the Treasury -- or that profession imposes and the more elaborate standards that the Treasury has in Circular 230 was to consider whether these opinions were objectively reasonable and were of the character and quality that the taxpayer could rely on.
I -- I was not -- I was neither -- I was not aware of how the transaction was marketed, nor did I think it was necessary to become aware of that in order to render the kind of report that I was asked to render.
Q In rendering your opinions, did you feel it was necessary to have an understanding as to how the COBRA product was implemented? And by that I mean what law firm or accounting firms actually prepared the underlying documents that ultimately were used for the -- for the transaction?
A Well, I think one of -- you know, and I don't remember which o. E, but I think one of these opinions -- maybe it was the Jenkens opinion, but don't hold me to that. But one of the opinions -- let me put it this way.
In one of my reports, I think I was -- stated that I was advised that the X law firm prepared the transactional documents, and I stated that. Although -- although, the opinion itself doesn't say we prepared the transactional documents. It's just what cites what the transactional documents provided.
Q And when you say you were advised, who advised

Page 36

you?
A It must have been Mr. Welty.
Q Could it have been anyone else?
A No.
Q Did you have communications with anyone besides Mr. Welty in connection with the preparation of your reports?
A Mr. Daddino. To the extent that Mr. Welty was unavailable and I needed to ask him something about something, I would ask -- I would speak to Mr. Daddino.
Q Did you feel it relevant rendering your opinions that you were informed that Jenkens & Gilchrist was involved in the implementation of the COBRA filing?
A Well, I think it's something I probably knew from the -- the press -- press reports of the -- of Jenkens & Gilchrist, and it's -- there was -- there's been a lot of publicity about Jenkens & Gilchrist. So I think it was something that I sort of just knew as an informed reader.
But the answer to your question is no, I just -- what I did was take this Jenkens & Gilchrist opinion, as well as the other opinions, and looked at them for -- in order to appraise their adequacy, professionalism, technical soundness, that sort of thing.
Q So then the answer to my question is even though you were informed that Jenkens & Gilchrist was

Page 37

involved in implementing the COBRA product, that was not relevant to any of the opinions you were rendering?
MR. DADDINO: Objection, misstates prior testimony.
A I'll answer it again. The answer is no, I didn't think it was relevant.
BY MR. DONOHUE:
Q Okay. And if you yourself, one of the taxpayers came to you personally and asked you to prepare a similar opinion as either the Jenkens & Gilchrist or the Brown & Wood opinion or Proskauer & Rose opinion, would you, in preparing such an opinion yourself, inquire about how the particular tax strategy was designed, developed, marketed, and implemented? Is that something you'd want to have knowledge of before writing such an opinion?
MR. DADDINO: Objection, vague and ambiguous.
A I'm not sure I understand -- I'm not I'm not sure I understand the question. Maybe you can just make it a little --
BY MR. DONOHUE:
Q All right. Do you understand what I'm asking you is you now are writing an opinion just like the Jenkens & Gilchrist and the Brown & Wood opinion --
A Uh-huh.
Q -- is that fair?

Gov. App. 35



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

A Okay. You're putting me in their shoes?
Q Yes.
A Okay.
Q And now I'm asking you now that you're in their shoes and a taxpayer comes to you and says can you prepare an independent opinion for me regarding this tax strategy, in connection with your work in preparing for to write such an opinion, would you consider it necessary to learn about how the tax strategy was designed, developed, marketed, and implemented?
MR. DADDINO: Same objection; vague and ambiguous.
A Well, let me -- let me answer it this way. Obviously the -- someone charged with the responsibility of writing one of these opinions is well advised to make the most far ranging inquiry possible in order to satisfy himself of all sorts of things.
However, that having been said -- and I might -- I might well do that in connection with such an assignment. But whether it would be relevant in making a determination of the more-likely-than-not conclusion that the opinion is bottomed on, that's a -- that's a wholly different question.
Let me -- let me suggest to you that if it came to my attention that this thing was being aggressively



marketed or whatever, well, that's an interesting fact. But the real question for the tax professional is whether the code and the law, you know, justify the conclusion. So even though it's aggressively marketed, that doesn't necessarily mean that the conclusion -- that you can't reach a more-likely-than-not conclusion.
So I hope I've answered your question, but that's about the best I can do because -- because without having a whole bunch of facts to -- to flesh out the hypothetical, it's difficult to give you a better answer.
Q Do you know approximately when the COBRA product was developed?
A No.
Q Do you know what E&Y's role was in the development of the product?
And so my question is clear for the record, when I refer to E&Y, I'm referring to Ernst & Young.
A Uh-huh.
Q And if I habitually resort to E&Y, let the record reflect I'm referring to Ernst & Young.
So my question was do you know what E&Y's role was in the development of the product?
A Not -- not -- not explicitly. I mean I know -- I know -- I know from just general reading that E&Y had a role in this strategy. But exactly when it was and



what it was, I don't know.
And I certainly -- I may have enhanced my understanding of E&Y's participation in just reading the public press, but that was after the -- after I rendered my report in this case.
Q Do you know whether E&Y was involved in designing, developing, and marketing other tax strategies prior to the COBRA product?
A Let me suggest to you again that the answer to that question is yes, but that I glean that information just from my reading of the -- of accounts and the Trade Press and the public press.
Q Have you heard of product CVS or Contingent Ver- --
A That -- that acronym has recently come to my attention in the course of some other work that I'm doing, but I never heard of it before.
Q And this other work, is this in connection with an opinion which you either have prepared but it hasn't been exchanged yet or you're in the process of preparing?
A It's in connection with sort of a confidential arbitration proceeding.
Q Have you ever heard of a person by the name of Robert or Bob Coplan?
A Again, I have heard of such a person. It --



that name came to my attention in reading the Trade Press.
Q What is your understanding as to Jenkens & Gilchrist's role in the development of the COBRA product?
A Not terribly much, other than the fact that they, I think, were active in the -- in -- in writing opinions like this -- like the -- like this one I reviewed. And I'm aware of this -- you know, the status of Jenkens & Gilchrist from reading the public press.
Q Do you know the current status of the firm of Jenkens & Gilchrist?
A Well, they -- it's dissolved.
Q Okay.
A That I learned from the public press.
(Exhibit No. 2351 was marked.)
BY MR. DONOHUE:
Q Let me hand you what's been marked as Deposition Exhibit 2351. And this is an exhibit I'm going to refer to from time to time, so you might keep it handy.
This is an internal -- if you turn to the first page of the document -- the second page of the document. I'm sorry. It's Bates stamped -- I'll just read the last three numbers -- 898. This is an internal PowerPoint presentation for Ernst & Young.
And my question -- my first question is have you ever seen this document before?





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

A No.
Q Turn to Page 902. It's entitled transaction team. Do you see that?
A Uh-huh.
Q And in the second diamond, it states Jenkens & Gilchrist provides tax opinion, consulting, previous knowledge of transaction, design assistance, oversees execution.
Do you know what Jenkens & Gilchrist's previous knowledge of the COBRA transaction was?
A Well, I only know that I think in this -- in the opinions that -- in the Jenkens & Gilchrist opinion that was rendered I suppose in the -- it was in the Tesoro case, I think I -- in my report I stated that they drafted the transaction documents. I -- I think it was Jenkens & Gilchrist.
So I was aware that they had a certain expertise in implementation and execution of the transactional documents. Seemed to me that that enhanced the -- their -- you know, their understanding of how the transaction worked.
Q Were you aware as to whether or not they were involved in marketing similar transactions prior to the COBRA transaction?
A I was --



MR. DADDINO: Objection, vague and ambiguous.
A I don't know what similar transactions means. I mean looking at -- looking at events through the comfortable lens of hindsight, you know, my reading of the public press suggests that they were active generally in these I'm going to say types of transactions in rendering opinions. But I don't know anything specific about what -- I have no specific knowledge of what they were doing.
Q It also makes reference to Jenkens & Gilchrist providing design assistance. Do you know specifically what design assistance Jenkens & Gilchrist provided?
A No, I don't.
Q Do you know whether the taxpayers who purchased the COBRA transaction, do you know if they were informed as to whether Jenkens & Gilchrist was involved in the development of the transaction?
A I don't know.
(Exhibit No. 2325 was marked.)
BY MR. DONOHUE:
Q Let me hand you what's been marked as Government Exhibit 2325. And if you would, as I mentioned before, you might keep that document close by.
A Okay.
Q Now, this document is a template



confidentiality agreement that Jenkens & Gilchrist -- on Jenkens & Gilchrist letterhead, and it was provided to COBRA clients or COBRA prospective clients.
And you'll notice -- if you would, take a look at the first page, the second sentence. It makes reference to that confidential proprietary information involves certain financing structures developed by J&G and/or its clients, consultants or co-counsel, that provide economic, financial, business and tax advantages for individuals and companies through the use of the Structures.
Were you aware that clients or prospective clients, by signing a J&G confidentiality agreement, were informed that J&G either developed or had the possibility of developing the product?
MR. DADDINO: Objection, misleading question.
A You want to try to -- try to just clarify that for me?
BY MR. DONOHUE:
Q Yes. You're aware that the document I handed you is a template of a J&G confidentiality agreement?
A Well, it appears -- it appears to be.
Q Okay. Yeah, I'm making that representation.
A Okay.
Q And that being said, in the second sentence of the document, it makes reference to the fact that the



confidential proprietary information was developed by J&G and/or, and it gives other references.
And my only question is were you aware that clients in connection with -- or prospective clients in connection with their being provided information regarding the product was being told that J&G may have developed the product?
MR. DADDINO: Objection, assumes facts.
A Well, let me -- let me answer it this way. I am -- since this is a deposition in this case, I am not aware of any evidence in this case as to whether the -- the plaintiffs in these cases signed such a confidentiality agreement.
That having been said, this kind of letter back in November 1999 was not unusual for people who felt that they had developed some propriety product. I'm just using that word.
So I don't find anything in this letter to be, even assuming through the purposes of our discussion that the clients -- that the plaintiffs in these cases signed such a letter to be -- to undermine the objective, you know, quality and -- of the -- of the Jenkens & Gilchrist opinion.
Q Okay. But that wasn't the question I asked you.
A Oh.



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Q Do you recall the question I asked you?
A Probably not.
Q The question I asked you was simply whether or not you were aware that clients or prospective clients were being informed that Jenkens & Gilchrist may have been involved in developing the product? That's my only question.
MR. DADDINO: Objection, assumes facts.
You can answer.
A The answer is no.
BY MR. DONOHUE:
Q Okay. You mentioned that you have read the Chance and Hess reports of the plaintiffs in this case; am I correct?
A A while back, yes.
Q Were you also provided the information of the plaintiffs' expert reports of a Mr. Gruner or a Mr. Jayger?
A No.
Q Could you provide us with any information you may have regarding how the COBRA product was marketed?
MR. DADDINO: Objection, vague and ambiguous.
Answer it if you can.
A I don't have any information about how it was marketed.
Q Okay.
(Exhibit No. 2353 was marked.)



BY MR. DONOHUE:
Q Okay. Let me happened hand you what's been marked as Exhibit 2353. It's just like Julia Child; we have everything right at our fingertips.
A You're not going to take a chicken out of there, are you?
Q Now, you've been handed what's been marked as Government Exhibit 2353. This is an e-mail dated October 25th, 1999 by Mr. Coplan to a number of separate E&Y individuals. And if you would, just read to yourself the first paragraph and half of the second paragraph, and let me know when you're finished.
A Okay.
Q Now, my first question is were you aware that E&Y began to market the product sometime in the latter part of October of 1999? Were you aware of that?
A No.
Q In the first sentence of this e-mail, it makes reference to the fact that E&Y was going to allow two presentations of the COBRA strategy to eligible targets. And there's a reference that the various E&Y individuals should determine for each of their areas who the two most likely purchasers of the strategy would be. And there was going to be a limit then of a total of 24 sales of the product.
Were you aware of that information?



A No.
Q In the second paragraph, it makes reference to the fact that each of the various E&Y individuals from the 12 areas were to make decisions on their COBRA candidates, and e-mail or voice mail information such as the client name, source of income to be offset, estimated amount of desired losses, and whether they were capital or ordinary, and whether the target had expressed interest in a loss generator.
Were you aware of that?
A No.
Q Do you know what a loss generator is?
A Well, I've never heard that term, but I'm always happy to learn new things. It seems to me that a loss generator is some kind of strategy or mechanism that will, if implemented, provide the implementee with the tax laws. So I'm just interpreting it literally.
Q In any of the materials that you reviewed, did you ever see a reference to the term desired loss?
A No.
Q What's your understanding of that term, desired loss?
A Well, it's not a term that -- you know, that is part of my lingua franca. But let me -- let me just suggest that I think it must mean that somebody is



approaching -- after examining his tax situation for a particular taxable year, determines that it might be desirable for him to have a loss of X amount that would serve to offset an income item of Y amount. So I think that's what desired loss must mean.
Q Did you feel that anything that you read in Exhibit 2353 would be at all relevant to any of the opinions that you rendered?
A No.
Q Okay. Were you aware as to the type of client that Ernst & Young considered to be the most eligible for the COBRA product?
MR. DADDINO: Objection, vague and ambiguous.
A Well, the answer is no. I mean I really -- I approach -- my -- my mission, as I said before, was to judge the -- the adequacy and professionalism of these opinions of counsel.
And what -- what happened in -- and I approached that project or -- or charge with an examination of the technical proficiency and soundness of its analysis and whether it, you know, justified the more-likely-than-not conclusion. How -- what was going on before all of this that was in the departments of marketing or design was nothing that I knew about or considered.
BY MR. DONOHUE:



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Q Take a look again at the document I said to keep that one aside, Exhibit 2351, and turn to Bates stamp 901. It states there, ideal client profile, and it refers to an individual that has previously recognized at least $50 million of ordinary and/or capital gain income, and you'll notice the third diamond says aggressive and willing to take economic and tax risks.
Were you aware that E&Y considered the ideal client for purposes of purchasing the COBRA product was an individual that had $50 million of income to offset and also was an aggressive individual willing to take economic and tax risks.
A No.
Q Okay. I'm going to hand you what's been marked as Government Exhibit 155.
(Exhibit No. 155 was marked.)
MR. DADDINO: Actually, before we get started, Dennis, do you mind if we take a quick break.
MR. DONOHUE: Oh, no; sure.
MR. DADDINO: Thank you.
(Break from 11:16 to 11:28.)
BY MR. DONOHUE:
Q And just for your information, I'm running quite a bit behind where I thought it would be at this point. My still goal is to finish today.



A Okay.
Q To the extent we can expedite this, it will certainly help.
I asked you to look at what's been marked as Government Exhibit 155. This is entitled --
MR. DADDINO: I'm sorry. 155?
MR. DONOHUE: Yes.
THE WITNESS: I don't think you gave me that.
MR. DONOHUE: Oh.
MR. DADDINO: I believe we took a break just as you were about to hand it to him.
MR. DONOHUE: Okay. Are you sure. Well, let's see here. Maybe it's right here. Yeah, it's right here. You're absolutely correct, but we're missing the top page. I have extra copies. There you go.
MR. DADDINO: Thank you.
BY MR. DONOHUE:
Q This is another document we're going to come back to, so if you would put it in a stack of documents that we're going to use again.
You'll notice that this is entitled COBRA action work plan.
A Uh-huh.
Q And there's handwritten above it McCombs. And



this is an internal document of E&Y that it used regarding the completion of various steps that the marketing salesmen would indicate.
And you'll notice on the first item, action item, there's a reference to qualify client. And you'll notice that that has been check marked, and it's been check marked with respect to McComb or McCombs. And there's a reference, among other things as I mentioned before, that the client was aggressive, willing to assume tax risk and had $50 million minimum income to be sheltered, ordinary preferable to capital.
Were you aware that this COBRA action work plan was being used in connection -- by E&Y in connection with the marketing of a COBRA product?
A No.
Q Were you aware specifically that Mr. McCombs was qualified to have the various ideal client profile that is referred to in Exhibit 155?
MR. DADDINO: Objection, foundation.
A I'm not sure what you mean by the word qualified. Do you mean qualified as a verb, so that you are asking me whether E&Y qualified him? Or do you mean as an adjective, that he qualified under the standards that E&Y put out?
BY MR. DONOHUE:



Q Well, I don't understand your difference, but let me just say that I'm referring to that he qualified under the standards that E&Y put out.
A I wasn't aware of the standards, and I wasn't aware that E&Y identified him as qualifying. I wasn't aware of it.
Q Okay. Would that have been -- had you known that, would that have been relevant to any opinion you were rendering in your reports?
A No.
Q Now, you can put that document to the side.
And take a look again at the Government Exhibit 2351, and if you would turn to Bates stamp No. 900. It's entitled marketing issues. And you'll notice the third diamond down it states, more-likely-than-not, MLTN, opinions from J&G and LS -- LL&S.
And my question is were you aware that at the marketing stage, that E&Y was indicating to clients that the product came with two more-likely-than-not opinions?
MR. DADDINO: Objection, assumes facts; vague and ambiguous.
A No, I was not aware.
BY MR. DONOHUE:
Q There's a reference to LL&S. Do you know what law firm that is?





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 54

A Well, I did -- I would not have known but for the fact that I had seen it in one of these other pages. Some law firm that began with Locke.
Q Okay.
A But I -- but that's the first I've ever heard of that firm.
Q Have you heard of the firm Locke Liddell & Sapp?
A I never heard of them before looking at this document.
Q You don't recall the Harriet Miers let's say --
A I'm aware -- I'm aware of Harriet --
Q -- controversy?
A Is that her law firm?
Q Yes.
A Well, it's -- although I'm a newspaper reader, I'm not that careful a newspaper reader. And while I know about Harriet Miers, I don't know about her law firm.
Q Okay. I assume you know ultimately that rather than Locke Liddell & Sapp, that Brown & Wood gave a second opinion in connection with the COBRA transaction. You're aware of that?
A Well, I'm aware of that from this case because there is a Brown & Wood opinion.

Page 55

Q Do you have any knowledge as to why it was that Locke Liddell & Sapp did not render a second opinion on this case?
A No.
Q Okay. Take a look on the same page. It states at the last diamond, J&G will provide technical memo if necessary; no draft opinion provided.
Were you aware that in connection with the marketing of the product, J&G, Jenkens & Gilchrist, would provide, if it became necessary in marketing the product, a technical memo?
A No.
(Exhibit No. 2846 was marked.)
BY MR. DONOHUE:
Q I'm going to hand you what's been marked as Government Exhibit 2846. What you've been handed, 2846, is a fax cover page from Paul Daugerdas to three individuals including Bob Coplan.
Do you know who Paul Daugerdas is?
A I've heard of his name from the public press that he was a partner in Jenkens & Gilchrist actively involved in what I would call tax advantage transactions.
Q Do you know what, if any, role he had in the preparing of the Jenkens & Gilchrist legal opinions in the COBRA strategy?

Page 56

A I'm not directly aware. I mean the -- when I viewed the -- when I read the Jenkens & Gilchrist opinion in this case that was issued I think to McComb and Woods, I just viewed it as a Jenkens & Gilchrist product without associating it with any particular person in that firm.
Q All right. Turn to the second page of the document. It's entitled memorandum. And just briefly take a look at that first page, in as much of what you see there, and tell me if any of that looks familiar to you.
A Well, without lining it up, it -- this looks -- it looks like some of the material that wound up in the opinion that I reviewed. But whether it's precisely word for word the same or whether it just represents a core element of the analysis, I can't tell without, you know, a more detail comparison.
Q When you say the opinion you reviewed, are you referring to the Jenkens & Gilchrist --
A Yes.
Q -- opinion?
A Yes.
(Exhibit No. 2868 was marked.)
BY MR. DONOHUE:
Q Let me hand you what's been marked as Government Exhibit 2868. And if you would -- first of all, is that the opinion that you reviewed in connection with the

Page 57

Tesoro product?
A It looks like it. But, again, I would have to look at my copy and make sure that it's the same. But I think for -- but it looks -- it looks like the opinion I reviewed.
Q Do you have your copy with you that you can make a comparison?
A Yeah. Well, let me -- let me say that the one I'm looking at, which I pulled out of my briefcase, is the one to Mr. Woods, but it looks like it's the same.
Q All right.
MR. DADDINO: Are there particular sections that you're interested in, and that might be easier for us to get a comparison.
MR. DONOHUE: Well, first --
A Well, let me -- let me just -- I'll just take a few sample pages. I would say it was the same.
BY MR. DONOHUE:
Q Okay. If you recall, there were -- in the Tesoro case, there were four opinions; do you recall that?
A Right.
Q And two opinions were issued in connection with one partnership called Tesoro Drive, and two opinions were issued in connection with the second partnership called SA Tesoro; do you recall that?



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

A Yes.
Q And if you recall, the two opinions that were issued with respect to each partnership were issued to a Mr. McCombs and a Mr. Woods; correct?
A Yes.
Q And what I have given you is just one opinion?
A Right, but they're -- they're identical opinions.
Q The opinions, except for the first few pages or the first page, I should say --
A Right.
Q -- are identical, are they not?
A Well, you know, to the extent that the opinion was addressed to Woods, it would have in the facts, you know, or the opinion, you know, references to Woods's own LLC. But -- but -- but you're right.
Q Okay.
A That apart from these slight differences of nomenclature, they are the same.
Q All right. Now, if you would, take a look at Section E of this opinion, which for the record is 2868.
A Yeah.
Q And --
MR. DADDINO: I'm sorry, counselor. Could you



give me a Bates number of the page?
MR. DONOHUE: Yeah, the Bates stamp number is 399.
BY MR. DONOHUE:
Q And the easiest way to determine what section it is is if you just page through, you'll notice at the bottom there are section page numbers beginning with E-1. And so what I'm asking you to do is just turn to Page E-1, which is at Bates stamp No. 399.
A Well Mr. Donohue, I'm looking at Page E-1 --
Q Oh, I'm sorry. I am so sorry. I'm giving you the Bates stamp number of a different opinion. They're all the same, so I'm using the --
A Well, I can look at -- I can look at Page -- I'm looking at Section E, and I'm looking at Page 1 of Section E.
Q Okay.
MR. DADDINO: Let's just state for the record what the witness is looking at is Bates labeled JG, dash, CL0159617.
THE WITNESS: Correct.
BY MR. DONOHUE:
Q All right. Now, would you compare the Page E-1 of Exhibit 2868 with the first page of Government Exhibit -- the second page, rather, of Government Exhibit



2846, starting with the words the internal revenue code. Do you notice that?
A Yeah, I mean on the -- on the -- let's just give the numbers. On Government Exhibit 2846, which is the memorandum, the first paragraph says -- or the second, there's a caption that says opinion writer taxation, generally. That's the same, and the opinion, the caption is underlined.
And then the -- the memo says, internal revenue code does not delineate. The opinions says the code does not delineate. But outside of that, it looks the same.
Q And, for example, if you look at the quote, which is at the bottom of the page, you'll notice that it appears that the quote is --
A The quote -- the quote is identical.
Q Now, my question is were you aware that in marketing the COBRA product, that a Jenkens & Gilchrist technical memo, which was identical to what has been marked as Government Exhibit 2846, would, if necessary, be provided to clients; were you aware of that?
MR. DADDINO: Objection, mischaracterizes the documents.
A No.
BY MR. DONOHUE:



Q Had you known that at the time that you were preparing your report, would that have made any difference in any of the opinions that you rendered?
A No.
Q Now, could you just briefly describe to me how COBRA worked?
MR. DADDINO: Objection, vague and ambiguous.
A Well, I think the COBRA worked -- or the mechanics of COBRA involved the tax, the client, buying options, positions, loans, insureds, ultimately contributing them to a partnership, and then the -- as I recall, the options then expired.
The partnership interests, the -- were ultimately transferred to an S corporation, which also -- which the -- which the clients also as shareholders contributed other assets to. And then the partnership liquidated into the S corporation. And then the S corporation ultimately sold all of its assets.
And then it was -- the tax consequences of that was that the -- that the basis of the -- of the assets inside the S corporation were -- you know, when the -- when the -- when the -- when the assets were sold, the -- the -- the fair market value of the assets was compared against the S corporation's basis in the assets. And if it was a loss, then the -- the taxpayers claimed a loss and conversely. I





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

mean I'm just -- I'm just more or less recalling how the opinion analyzed the transaction.
The -- as I say in my report, the heart of the -- of the opinion -- the heart of the transaction was an implementation of the fact that the liabilities on the short option were contingent because no one really knew how -- you know, they could not be measured. And as a result of Section 752(b), they didn't have to be counted as having -- as part of the basis in the partnership interest.
That's basically how I understand it.
BY MR. DONOHUE:
Q And how confident are you that that's the way COBRA worked?
A Pretty confident, yeah.
Q You mentioned that at one stage, there was a transfer of assets to the partnership; do you recall that?
A Uh-huh.
Q And what was the purpose or the reason why there was a transfer of assets to the partnership?
A I mean, when I say transfer of assets to the partnership, you -- are you talking about a transfer of the options to the partnership?
Q Well, what were you referring to?
A I was -- I was talking about the transfer of -- the transfer of the options of the partnership in the



first instance, and then ultimately I think the taxpayers also transferred -- the reason they represented that there was representation, I believe, in the opinion that -- that these were -- that these trans- -- that this part of the transaction was -- was done for substantial non-tax reasons. And there could be many such non-tax reasons that would be applicable to such a transfer. You want benefits of partnership arrangement or what have you.
So I think the opinion, to the extent that it discusses business purpose later on, relied on these, you know, taxpayer representations.
Q Do you recall my question?
A I'm not sure.
Q My question was, you mention there was a transfer of assets to the partnership. Without regard to the options, were you referring to a transfer of other assets to the partnership before it was ultimately dissolved?
A I believe there was a transfer of other assets to the partnership.
Q And my question was what was the reason or purpose for the transfer of assets to the -- those assets to the partnership?
A Well, I think --
MR. DADDINO: Objection, vague.
A I think -- I think -- I think that the reason



for this transfer was, as the taxpayers represented, rested on a -- on -- on a business purpose that they wanted to have these assets held in partnership form.
BY MR. DONOHUE:
Q And how confident are you that that was the reason for the transfer of the assets?
A Well, when you say how confident am I --
Q Yeah.
A -- let me -- let me say this, and perhaps this -- you will tell me this doesn't answer your question.
My -- my charge here was to judge the adequacy and professionalism of the opinion. The opinion recited that this transfer was accomplished, was done, and that it was done pursuant to the taxpayers' representation that they had a substantial business purpose to do it.
The opinion goes into great detail in discussing business purpose doctrine that, you know -- that a transaction that's been viewed with some non-tax business purpose can withstand a charge that it -- that it's -- that has no business purpose, and that seems to flow from a lot of the decisions.
So when you say how confident am I -- when you ask me how confident am I that that was their purpose, it was not my -- I did not regard it as my job to inquire as to the -- the veracity of the taxpayers' representations, nor



did I believe that it was the job of Jenkens & Gilchrist to inquire as to the veracity of their representations if they were made, you know -- you know, with knowledge and with good faith.
Once they were made, Jenkens & Gilchrist could proceed to analyze the transaction, and I could proceed to, you know, as a second, you know, viewer, if you will, to analyze Jenkens -- whether Jenkens & Gilchrist conclusion was objectively reasonable under the law.
Q You mentioned that there were ultimately assets sold by the S corporation?
A Right.
Q Do you recall that?
A Right.
Q What is the connection between those assets that were ultimately sold by the S corporation and the assets that you're referring to that were transferred to the partnership? Are they --
A Well, I think there was some -- there was some cash that was transferred to the partnership. And then once the partnership transferred its assets to the S corporation, I think the taxpayers transferred other assets to the S corporation, or they may have transferred it to the partnership which then liquidated into the, you know -- after the partnership interests were contributed to the S





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

corporation in exchange for stock, the -- the -- that might have included those other assets, or maybe the other assets came later. I actually don't recall.

Q Just so I understand, are you saying you don't recall if these assets were directly contributed to the S corp or whether they were first contributed to the partnership and then liquidated into the -- the S corp?

MR. DADDINO: Objection, vague.

BY MR. DONOHUE:

Q Do you understand my question?

A I think I understand your question.

It's -- it's either one or the other. I can look at the opinion and satisfy your question if you would like me to. Or -- ot I think the opinion just speaks for itself in terms of the chronology of what happened.

Q Although, what I'm now doing is asking for what your understanding is. Do you understand that?

A Right; right. No, I understand you're asking me for my understanding.

Q In order to get a stepped-up basis for the assets that were ultimately sold, a basis that would include a substituted basis of the partners' outside partnership interest --

A I think -- I think in order to --

Q You have to let me finish my question.



MR. DADDINO: Let him finish.

THE WITNESS: Oh, okay.

BY MR. DONOHUE:

Q -- would not those assets you're referring to had to have had been first contributed to the partnership?

A I believe you're right. So I suspect the answer is I suspect that the -- the assets were contributed to the partnership in the first instance.

Q Let me ask that you return --

A In fact, let me just -- let me just clarify my answer. Looking at the -- looking at page -- looking at the Jenkens & Gilchrist opinion, it's exactly -- that's exactly what happened.

The -- the partnership purchased these assets and then ultimately the partnership interest was contributed to the S corporation, and then the S corporation -- then the partnership was dissolved and liquidated into the S corporation.

Q Let me ask that you to return to Exhibit 2351 under marketing issues.

A Uh-huh.

Q Which is at Bates stamp No. 900.

A Uh-huh.

Q You notice that, if you count the diamonds down, there is -- let's see, one, two, three, four -- the



fifth diamond down is says, Use and -- and I believe that's a typo and should be a-n -- PowerPoint; do not leave with client.

Were you aware that the product as -- that the marketing of a product was -- let me strike that question.

Were you aware that PowerPoint's being used to market the product?

A No.

Q Take a look at Exhibit 155, and that is one of the documents that I asked you to keep in front of you. This is the COBRA action work plan for McCombs, and take a look at No. 4. It states, Present idea to client using client version of PowerPoint slides posted to toolkit. Then it states, Do not leave marketing materials with client under any circumstances.

Were you aware that E&Y salespeople were told not to leave any of the marketing materials with the client?

A No.

Q Do you have any knowledge as to why E&Y was telling its sales force not to leave marketing materials with the client?

A I have no direct knowledge.

(Exhibit No. 159 was marked.)

BY MR. DONOHUE:

Q Okay. Let me ask that you look at what's been



marked Exhibit 159. Turn to the second page of the document. This is a set of PowerPoint slides on this page. And just -- if you would, just briefly, Page 3 you'll notice that there is a reference, for example, at one point that's Step 1, which is on Bates stamp No. 753 or Page 3 of the document.

A Yes.

Q Do you see that?

A Yes, I do.

Q And then if you'll turn it, you'll notice that there's a Step 2?

A Uh-huh.

Q And if you turn to the next page, there's a Step 3?

A Uh-huh.

Q Turn to the next page, there's a Step 4, and then turn to the next page, there's a Step 5. Do you see those pages?

A I do.

Q Were you aware at all that the COBRA transaction was being marketed to clients using PowerPoint slides in which the slides were referring to the transaction is involving a variety of separate steps? Were you aware of that?

A No.

Q Okay. Would that have -- had you known that,





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

would that have made any difference to any of the opinions that you were rendering?
A No.
Q Take a look on the same document -- let's see. This would be at Page 11 of the document, which is -- now I'm referring to the pages of the document itself. For Bates stamp purposes, it's 731 -- or 761 rather.
A Uh-huh.
Q Do you notice under -- on that page it makes reference to the objective of COBRA, and the first diamond is to generate a $50 million loss. Do you see that?
A I do.
Q Were you aware that the client was being informed that the objective of the COBRA transaction was to generate a loss?
MR. DADDINO: Objection, misstates the document.
A You want to try to state it again. I'm not sure --
BY MR. DONOHUE:
Q Yes. By the way, for your purposes, there is no judge here, as you know; you're a lawyer.
A Right.
Q So there's no one ruling on these objections.
A Right.



Q They're just for the record.
But my question was were you aware that the product was being marketed with slides which slides were indicating that an objective of COBRA was to generated the loss. Were you aware of that?
A No.
Q Had you known that at the time you were preparing your opinions, would that have made any difference in any of the opinions that you were rendering?
A Well, again, as I said to you before, the possibility that something might be structured to provide the potential of a loss is not necessarily disabling under the case law, and I read the -- the tax opinions of Jenkens & Gilchrist and the other law firms knowing, as I do, that the -- that the transaction had some tax strategic factors imbued into it.
But I did not regard that fact as -- as determinative for purposes of the opinion to the -- in light of the taxpayer's representations and in light of the -- the tax opinions, discussion of the various -- discussions, which I must say were comprehensive, in terms of the -- the potential tax that might be launched on it.
Q So if I may then, the answer to my question is no; is that correct?
MR. DADDINO: Objection, misstates testimony.



A Can we just repeat what Mr. -- could you read back what Mr. Daddino said in his objection.
MR. DADDINO: I said objection, misstates testimony.
MR. DONOHUE: He said it misstates the testimony. It doesn't, but I'll repeat it.
BY MR. DONOHUE:
Q My question simply is is that had you known at the time you were preparing your report that slides were being used to market the COBRA product which indicate that the objective of COBRA was to generate a loss, would that have made any difference in the opinions you --
A And I think --
Q You have to wait until I finish.
A Oh.
Q Would that have made any difference in the opinions you were rendering?
MR. DADDINO: Objection, assumes facts; misstates the document.
You can answer.
BY MR. DONOHUE:
Q You may answer.
A Well, I was not aware of this marketing activity. But in answer to your question, even if I had been aware of it, I understood that the transaction had some



elements of tax advantage. And I did not regard that fact in light of the taxpayer's representations and in light of counsel's opinions discussing the potential -- the tax that might be made against it as disabling.
So if -- I suppose the one word to your question was -- I mean I suppose I would say no, because of the consideration that I gave to the entire context in which the transaction was implemented and described in the opinion.
Q Let me provide to you -- and if you would, take a look at your Tesoro report, which is Exhibit 2409. And I'm going to provide to you Exhibit 2837?
(Exhibit No. 2837 was marked.)
MR. DADDINO: Did you reference a page on 2409, Dennis?
MR. DONOHUE: Not yet.
MR. DADDINO: Okay.
BY MR. DONOHUE:
Q All right. Now, do you recognize what's been marked as Exhibit 2437 -- or 2837?
A 2837, yes, I do.
Q And what is 2837?
A It's my expert report in the Klamath case.
Q Now, if you would, turn to Page 3 of 2837 and the same page for 2409.
A Page 3 of 2409?





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Q Yes.
A Okay.
Q Now, do you notice any similarity in the reports?
A Well, there is some similarity to the reports, and there are some differences. I mean, for example --
Q I'm sorry. I said Page 3, and I meant Page 5 of your report in Tesoro, Exhibit 2409.
A Okay.
Q You'll notice it looks to me like the headings there are the same; am I correct?
A Yes.
Q And it looks to me -- if you read that, it looks to me like there's -- it looks to me almost identical, the first two pages there?
A Okay. Yes.
Q Am I right?
A Yes.
Q And then if you turn over to Page 7 of your report in Tesoro, which is 2409, and if you turn to Page 4 of your report in Klamath, it looks to me like again that it's virtually identical; am I right?
A It appears -- it appears to be.
Q So is it fair to say that your reports, in terms of the opinion portion in your reports, not the initial



section dealing with the factual portions, are either identical or very similar in these -- in these two reports?
A Well, these are -- these -- this is -- this was introductory material in order to assist the reader in understanding the context in which I was about to address, you know, the -- the opinions. The opinions -- the tax opinions in the Klamath and the tax opinions in these cases that we're discussing today are quite different.
They deal with a different transaction. But the general notion of a -- of taxpayers needing to go to an advisor for advice about tax law is equally germane in both contexts. And I thought that the -- the language in the Klamath case -- in the Klamath report was equally germane for purposes of these reports.
Q So did you use your Klamath report more or less as a template --
A No; no; no.
Q You have to let me finish my question.
A All right.
Q -- as a template in preparing your report in the COBRA cases?
A No, it did not -- no, it -- the use of the term template would be, you know, inaccurate. I mean what -- I mean obviously certain things are -- are givens, and to the extent that I wrote something in one that I thought was



appropriate to be included in the other, I did include it.
But it was not included -- I did not -- it would be inaccurate to say that I marked up my Klamath report and just repackaged it and used it as a template. That I thought about the context of these transactions and whether things I said before still stood up. For example, in this -- in these reports, when I rendered them, when I issued them, the Klamath case had already been decided.
So I thought that was germane to mention it, not because I was trying to lecture the court about the law, but I thought the court, you know, because it's -- because it seemed to me that it lent some support -- some additional support to the opinions that were written, you know, six, seven years before.
So the answer to your question is no, it was not a template.
Q Could you describe for me the process you used in preparing your reports in this case? And by that I mean did you read first the opinions of Jenkens & Gilchrist, Brown & Wood, and Proskauer & Rose, and then make some type of general determination as to these opinions as compared to other opinions or whatever?
That's what I'm referring to when I say could you describe for me the process you used in preparing your report.



MR. DADDINO: Objection, form.
You can answer.
A Well, the process was essentially that I would read -- I would read the tax -- I regarded it -- as I've said -- said several times this morning, regard it as my charge to render an opinion about the quality of the opinions.
So the first thing I did, of course, was to read the opinions. I read them very closely. I read the authorities in the opinions. I read all the authorities, whether I had read them before or not.
And then I began to think about the transaction and the -- whether something about the technical analysis of the opinions, although, as I say in my report, I was not trying to conclude what the correct answer was, but just basically to -- you know, to render an opinion about the -- about the quality and professionalism of the opinions.
So having said that, but I -- again, I had to understand the transaction, and then I had to understand to what extent the opinions technical analysis was objectively reasonable. Obviously if an opinion says -- relies on a bunch of cases that you know from your professional life have been overruled, you know, it would cause some doubt about the adequacy of the opinion.
So that having been said, having read all that





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

stuff, and -- and concluded that the -- the opinions were -- met the requirements and also took the opinions, again reviewed Treasury Circular 230, because I wanted to make sure that they complied in all respects to the standards of 230, although they didn't really have to. But the fact that they did comply would this more elaborate, you know, court treasury standards enabled me to then reach my conclusion.

And I had a draft. It got typed. It -- my general modus operandi is to write it out in long hand and have it typed, and then edit -- it goes through many edit processes before I'm satisfied that it represents something that I could sign my name to.

BY MR. DONOHUE:

Q But is it fair to say that in rendering your opinions in your report, that you relied upon your review, exclusively your review and analysis of these tax opinions?

A Yes. I mean I regarded that as what I was asked to do.

Q Now, you mentioned that you read all the authorities in the -- that were cited in the tax opinions; am I correct?

A Correct.

Q And by the way, when I use the term tax opinions, I'm sort of using that to refer to the three opinions.



A I understand.

Q Okay. Do you recall or are you familiar with a case by the name of Rice's Toyota World?

A Yes, it's -- it's a big economic substance case. I think it was decided by the Fourth Circuit.

Q Do you recall if that was cited in any of the opinions?

A I think it was cited in all of them, I think. I mean I -- you know, while I've read the opinions many times, I haven't committed them to memory.

Q Take a look at Exhibit 2832. That is the Tesoro opinion, I believe.

A 2832?

Q Well, maybe I have the wrong exhibit number, and let me -- it's this one right here.

A Okay.

Q And it is -- I'm sorry -- 2868. And turn to page M-10.

A Uh-huh.

Q And do you see the Tesoro opinion cited on that page -- the Rice's Toyota World cited on that page?

A Yes, I do.

Q Is that one of the opinions that you read in connection with your --

A Yes.



Q -- review of the Jenkens & Gilchrist opinion?

A Yes, it was. And -- and it -- it sort of rang true to my professional history because I actually argued the Frank Lyon case in the supreme court. So I'm well aware of that transaction which was a sale and leaseback transaction.

So it was -- it's always been of some interest to me professionally to see how the courts dealt with Frank Lyon -- how the lower courts dealt with Frank Lyon.

Q Turn to Page M-12 of Exhibit 2868.

A Uh-huh.

Q And right underneath the quote there is this sentence, The economic substance inquiry, according to the Fourth Circuit, requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits.

Does that represent your understanding of the holding of the Fourth Circuit?

A Well, it's been a while since I read Rice, but I -- but I think that it is -- it is an accurate description of Rice.

Q And --

A I mean Rice basically talked about two kinds of what I'm just going to call shams under the economic substance doctrine. One was just, you know, a sham and -- in



other words, where people just write numbers down on a piece of paper without any regard to anything happening.

And then the trans- -- you know, something that they -- that is deemed to be a -- not have any economic substance; that it's just a transaction that has no purpose other than to -- to obtain a tax benefit.

Q But my question more specifically was does the holding that the economic substance inquiry require an objective determination of a reasonable possibility of profit from the transaction existed apart from the tax benefits?

A Uh-huh.

Q Was that -- if you recall, was that the holding of the Fourth Circuit?

A I think --

MR. DADDINO: Objection, asked and answered.

You can answer again.

A I think the -- I think I answered yes.

BY MR. DONOHUE:

Q Okay. Now, do you -- do you know if other circuits have also held that the determination as to whether or not a reasonable possibility of profit exists from a transaction is an objective determination? Do you know if other circuits have --

A Well, my -- my recollection is that the courts are in disarray on this and that the Fifth Circuit has





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 82

decided the Compaq Computer case and the United Parcel Case, the -- what you call it -- the Eighth Circuit has decided a case called IES, something or other, in which tax -- the transactions that were imbued with tax motivation were upheld there, notwithstanding the fact that they were -- they seemed to be done for that -- that purpose.

So I mean the answer is that the -- that the -- that the Fourth Circuit -- the Fourth Circuit's decision is not -- I mean it needs to be addressed in an opinion, and Jenkens & Gilchrist did. But there -- there are other decisions that have been rendered since that time that offer a different kind of analysis.

Q Is it your testimony that, for example, in Compaq, the Fifth Circuit did not hold that the determination of whether there was a reasonable possibility of profit was not an objective does not require an objective determination?

A I don't remember. I haven't -- I haven't looked at it for a while.

Q Okay.

A So I really can't answer your question. I -- I don't like to hazard a guess.

Q Okay. So then, as you sit here now, you don't recall if other circuits have also adopted the Fourth Circuit test that the determination of a reasonable possibility of

Page 83

profit is an objective determination? You, as you sit here today, don't know if other circuits have adopted that test?

A My -- my recollection is that there -- there are other tests that have been offered by other -- that have been put out by other circuits. And the -- the -- the jury, if you will, is still out on what -- what the economic substance doctrine does.

In fact, the uncertainty of it is what keeps tax lawyers up at night thinking about things. I think a couple of years ago there were -- or maybe last year the government sought certiorari in one of these cases to try to -- to clarify what the -- what the economic substance and business purpose doctrines meant. But the supreme court didn't really think that it was -- it wanted to get into that.

Q Are you sure it was the government who sought the certiorari?

A Maybe it was the taxpayer; maybe it was the taxpayer.

Q Do you recall the name of the case where --

A I can't; I can't.

Q Does Dow Chemical, does that ring a bell?

A You know, I just don't remember the name of the case.

Q Okay.

Page 84

A But I do remember the development.

Q Let's get back to the Fourth Circuit.

A Okay. Okay.

Q My question simply deals with the objective determination test, and my only question was as you sit here today, do you recall if other circuits have also held that the determination of a reasonable possibility of profit under the economic substance test requires an objective determination? Do you know if other circuits have held that?

A I suspect that other circuits have, and -- but I suspect that other circuits have offered variations on that -- variations on that theme.

Q You say I suspect. I'm asking now for your personal knowledge today. Do you know today if other circuits have so held?

A You mean in conformity with the Fourth Circuit?

Q Yes.

A I can't answer that question, you know, accurately today.

Q All right.

A Only because I haven't reviewed the caseload with sufficient -- in sufficient -- you know, so recently that I could speak authoritatively.

Page 85

Q Okay. What about the case of ACM Partnership; have you heard of that case?

A I have.

Q And do you recall if that case is cited in any of the opinions?

A I believe it is. It's a Third Circuit case that dealt with this issue of business purpose.

Q Do you know when that case was --

A Well, actually, perhaps -- well, I don't remember when that case came down. So it may well be that these opinions antedated that -- that case. I know it was a Third Circuit case that involved -- it -- it's possible that these opinions didn't discuss ACM because ACM was -- may have been decided afterwards.

However, I seem to recall that ACM was cited in the IRS notice, and to the extent that the opinions and that IRS notice was in August I think of 2000, so that would make ACM probably before. I mean, that's...

So -- and so to that extent, I know -- I seem to recall that there was this -- that Brown & Wood put out or issued a supplement to its opinion addressing the notice. And then -- and the other opinions may have actually had a section on the notice.

Q Do you --

A If they did, they talked about ACM.



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 86

Q Do you feel that ACM is at all relevant to any of the opinions that are being rendered in the tax opinions?
A Oh, sure. It's got to be considered because it's -- it's -- it's -- it's a case that has to be considered. I think that I -- my recollection was that I read the -- I read the discussions and the opinions of -- of the IRS notice, which -- which must have -- well, let's put it this way.
Maybe my -- my memory's faulty about when ACM came down. But I know for sure that -- I think it must have come down before the notice. And I seem to recall that Brown & Wood must have discussed it in its supplemental. That's my recollection that it did.
Q Brown & Wood or Jenkens & Gilchrist?
A I think it was Brown & Wood.
Q Well, but --
A Oh, here it is. Well, here it -- it's right here on Page M-16 --
Q Sure.
A -- under Jenkens & Gilchrist. Okay. I didn't -- I didn't think this was a treasure hunt.
Q Now, let me ask you this. You mentioned that you thought that ACM should be handled in these opinions?
A Uh-huh.

Page 87

Q What to your recollection did ACM deal with?
A I think ACM was a transaction between the taxpayer and a foreign bank in which the goal of the structure was to try to make the foreign bank the recipient of income. Because it was a foreign bank, it would not be subject to US taxation.
And I believe that the court held in that case that the substance of the transaction was really not that the foreign bank was an equity participant in the transaction but rather was a lender, and that its return was more or less fixed and would be -- was in the nature of an interest payment.
As a result, I think the court upheld the commissioner's shift -- shifting of income back to the US taxpayer.
Q Have you ever heard of the term artificial loss?
A Yeah.
Q And what's your understanding of that term?
A I think artificial loss is -- I mean as a general matter, it would suggest that it's a loss that doesn't really involve an economic -- I'm going to use the word injury, but I don't really mean injury. I mean a decrement of -- in your fortunes, but for some reason may actually be germane for your tax -- you know, on your tax

Page 88

return.
Q Did ACM involve an artificial loss?
A I don't know if you call it an artificial loss as much as you might call it a question of -- you know, an analysis of what the banks -- what the role of the two parties to the transaction was.
I mean I could see somebody saying that -- you know, that it was an artificial -- you know, that this was an artificial loss, but I think maybe properly analyzed it's just a question of what -- what was the status of the bank.
Q Do you see -- you said you could see someone. Could you see the court making reference -- if not to the term artificial loss, but making reference to the fact that this was a loss that -- that was being claimed that was not consistent with the taxpayer's out-of-pocket cost? Do you recall that as being part --
A I seem to -- I seem to recall that, although it's been a while since I read ACM.
Q Do you know if in the J&G opinion you found there on Page M-16 where the case is cited, do you recall if J&G actually discusses this aspect of the ACM opinion?
A I think it did. I mean, you know, I'm...
Q Are you sure, though? I'm not asking you --
A I mean, I'm just looking at discussions -- there's a discussion on Page M-16 and M-17. It seems to

Page 89

be -- it seems to be consistent with -- it seems to be consistent. I mean basically on Page M-18 they say, The ACM case seems to -- appears to be an affirmation of the well developed case law, you know, citing, you know, Rice's Toyota World, and then they cite a whole bunch of other cases.
Q But do you --
A Including the Compaq Computer case tax court, which -- which was later reversed by the Fifth Circuit, and too I think the -- the United Parcel Case.
Q Do you see any discussion in the opinion as to a loss that was not consistent with the taxpayer's out-of-pocket cost? Do you see any discussion of that in the opinion?
A You mean in the tax opinion?
Q In the tax opinion.
A Sure. It says right here, in discussing the Third Circuit --
Q You have to mention what page you're on.
A Yeah, M-17, M-18.
Q Okay.
A It says here, the Third Circuit did acknowledge that it is well established that where a transaction objectively affects that taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded simply because it was motivated by

Gov. App. 48



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

tax considerations. The -- the Third Circuit did allow ACM to deduct economic losses it occurred in the transaction.
To me that means that the Third Circuit understood that -- you know, that economic losses were the -- were the things that were deductible.
Q Let me turn to a different subject.
What is your understanding as to whether J&G, Jenkens & Gilchrist, Brown & Wood, issued independent opinions? Is that your understanding that they both issued totally separate independent opinions?
A Yes.
MR. DADDINO: Objection, vague and ambiguous.
BY MR. DONOHUE:
Q You may answer.
A Well, I approached these opinions -- I mean, I have no -- I'm not aware of any evidence in the record that they collaborated together, and I just took it on face they're separate law firms with separate people working on things separately. They produce things that, you know, reach the same more-likely-than-not conclusion.
But they were issued under separate letterheads and represented in my view, without hearing anything to the contrary, separate opinions.
Q Would that make a difference to you if they did collaborate?



A No; no.
Q And why not?
A People talk all the time to each other about technical issues.
Q But two law firms that are issuing independent opinions, do you feel that there's nothing wrong with them collaborating in connection with their separate opinions?
MR. DADDINO: Objection, vague question.
A With Mr. Daddino's observations taken into account, I would simply say that the profession is -- people collaborate all the time in different offices. And they -- if people are engaged in the same process, they might speak to each other, but I have no -- I have no evidence that they did so.
BY MR. DONOHUE:
Q Take a look at the J&G Tesoro opinion. I believe that's 2868. And let me see if I can find a Brown & Wood opinion. This will be 2867.
(Exhibit No. 2867 was marked.)
BY MR. DONOHUE:
Q And if you would first turn to Page N-4 of the J&G opinion.
A M-4?
Q N as in Nancy.
A Oh, okay.



Q And specifically look at the first sentence in the second paragraph beginning with the word notwithstanding. Do you see that sentence?
A Right.
Q And just review to yourself that sentence.
Now, turn to Exhibit 2867.
A Uh-huh.
Q And turn to I believe it's at Page 56.
MR. DADDINO: Bates labeled ending in 056, counsel?
MR. DONOHUE: I'm looking at a different -- let me pull out your version that you're looking at, and -- but it would be at Page 56, and that would be ending -- or it will be at Page 57, and the Bates stamp No. ending 057.
MR. DADDINO: Thank you.
BY MR. DONOHUE:
Q Do you see the language notwithstanding a transaction -- oh, that's not the one I'm looking for either.
I was doing this with another opinion, and so let me see if I can find this quickly. Oh, yes, it's at Page 49.
Do you notice the second paragraph there starting with the words, Notwithstanding the parallel nature?
A Uh-huh.
Q And compare that to the same sentence that is



in the Jenkens & Gilchrist report. Do you notice any similarities in the language?
A Well, it's vaguely similar, although the -- the --
Q Did you say vaguely similar?
A I mean there is a similarity. The language is not exact. I mean they make the -- the paragraphs make the same point.
Q Well, but they --
A But the -- but the point is, you know, has legal cogency.
Q That's not my question.
A Oh.
Q My question is if you look at that, those sentences, aren't they essentially virtually identical?
MR. DADDINO: Objection, ambiguous.
A They're not virt- -- I don't know what -- what you mean by virtually identical. They're not -- they're not identical. They're not identical. The word -- the wording is slightly different.
BY MR. DONOHUE:
Q Let's just take a look. Other than at the end of -- take a look up to the word statutes.
A Imposed by the statutes.
Q Just take a look there.





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

A Yeah.
Q Do you see that?
A Okay. The -- the Brown & Wood's then adds i.e.
Q Right.
A All right.
Q That's right, they do add i.e.
A Okay. And then there's a little bit of difference in terms of Jenkens says, see Fox v. Commissioner. Brown & Wood says the first case that did so. That's a different point, and it's a helpful point to a reader that Fox is the first case to do so.
So I'm always reluctant to -- you know, to accept these vague adjectives like virtually and whatever. I would much rather say that the -- the analysis of Section 183 as compared to 165(c)(2) was the same by the -- by the two law firms, and they relied on the same authorities to make the point they made.
Q Well, what do you think the odds are that the author of these opinions simply churned out, Notwithstanding the parallel nature of Code Section dah-dah-dah, this language, which is up to the word statutes identical. I mean what are the odds of that happening?
MR. DADDINO: Objection, calls for speculation.



A I can't speculate as to how it happened. And from my prospective and my report, I didn't -- even if -- even if this was something that came to my attention, I would not regard it as ultimate conclusions in my report. I mean it -- either the point is right or it's wrong. I read the authorities, and I -- I concluded that it was -- it was part of their more-likely-than-not conclusion.
And whether they said it quite the same way or didn't doesn't -- I mean at the end of the day, these opinions were issued by two different law firms and who stood -- which stood behind these opinions and necessarily, you know, assumed, you know, the risk of having issued them.
(Exhibit No. 2847 was marked.)
BY MR. DONOHUE:
Q Let me hand you what's been marked as Government Exhibit 2847. This is another heavy exhibit.
A Okay.
Q And if you would just read just briefly the e-mail and specifically the first paragraph of the e-mail.
A Uh-huh.
Q For the record, Exhibit 2847 is an e-mail from Robert Coplan dated 11/12/1999, and which in the first sentence he asked, May I send a copy of your opinion letter to RJ Ruble at Brown & Wood so that he can begin checking issues for consistency of treatment.



And my question is -- my initial question is were you aware that E&Y was asking Jenkens & Gilchrist if, in fact, they could send their draft opinion letter to Brown & Wood? Were you aware of that?
A No, I was not aware of that. Can I -- I know you're supposed to ask questions and not me. But is the attachment to this --
Q Well, I'm getting to the attachment.
A Oh, okay.
Q Now, it states in the next sentence, do you need a NDA form from him, or is there a mutual respect among opinion writers? And in the next sentence, he asks, He asked me to send the attached copy -- referring to Ruble, He asked me to send the attached copy of his opinion to you, which describes the basic option spread strategy, but of course he has not had the facts tailored for our particular structure yet.
And my question is were you aware that Jenkens & Gilchrist and Brown & Wood were sharing their draft legal opinions?
MR. DADDINO: Objection, misstates the document.
A I don't think -- I wouldn't regard this as sharing. I think it suggests that E&Y was -- I mean I didn't know -- this was not a fact that was brought to my attention



that -- but I would -- you know, it -- I don't think it's the law firms sharing.
I think that E&Y is coordinating the opinion writing in a way which I don't -- and now having known it, I don't think it offers -- it -- it would alter my opinion about the quality of the -- of the opinions.
Q But is one aspect -- when you say objectively reasonable, is one aspect of your opinions that you're rendering based on the assumption that the two legal opinions are totally independent? Is that an assumption that you're making?
A Well, let's put it this way. I judged -- I judged each opinion as an opinion of a separate law firm. The fact that I've -- you've shown me 2847 doesn't alter my conclusion that they were two opinions of two separate law firms because the way law firms like these large law firms work is opinions that go out under their letterhead are not simply the product of one person, but they get reviewed up the line, and ultimately, you know, receive approval at a fairly high level before they're issued.
And so there were two different -- two different hierarchies here that were at work. So whether there's a paragraph that looks vaguely the same is not the critical issue, and it doesn't mean that this is an amalgamation and that the whole thing is just a product of,





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

you know, one person, one law firm, and then put out under separate letterheads. That's not the way law firms work.
Q But do you know?
A I don't --
MR. DADDINO: Objection, form.
A I don't know and nor did -- nor did I know about this coordination. I call it coordination rather than sharing.
BY MR. DONOHUE:
Q What in your opinion would it take to -- strike that question.
What is your understanding of the term independent opinions? Have you ever heard that term before?
A Yeah, well, it usually means the -- the opinion of an independent law firm. So in this particular case, these two opinions -- these two law firms were -- in my view were independent. They were separate structures.
They -- they were subject to their own rules of professionalism. They -- they had their own hierarchy of partners and structure, and they proceeded to do their work largely separately but with some coordination.
Let me -- let me suggest to you that when I did more appellate work, we -- we -- we always received some indication that an issue that was pending in two circuits and that had been argued and was waiting a decision was the --



the -- the subject of conversation between the judges and the two panels of the two circuits.
Now, I don't -- and then they would come out with two separate opinions on the same subject. Maybe they would be in tandem with each other; maybe they would be separate. But -- but the point is when the Fifth Circuit and the Ninth Circuit speak under their banner or rubric, so to speak, they speak as their independent institution.
And I don't regard it as -- as, you know, harmful to the system that they do speak. I think it's actually good that they do speak.
Q In your --
A It's just the same here. These are two separate institutions, and they -- to the extent that they conferred with each other about technical points, that's all to the good.
Q And earlier in your answer, you said that their work was largely separate with some coordination. What is your --
A Well, I didn't -- I didn't --
Q You have to wait until I finish my question.
A Oh, yeah.
Q What is your basis for your conclusion or your answer there that the work of these two firms was largely separate with some coordination? What's your basis?



A Well, I regard -- I regard the work of these two firms as separate. You, Mr. Donohue, have shown me Government 2847, which suggests that there was some coordination.
So that's why -- I mean I didn't want to -- I didn't want to -- you know, I didn't want to contradict your having sent me this thing. You would think that I hadn't really read it, and then you would ask me again why I hadn't read it.
So my -- my feeling is there was obviously, based on this e-mail, some coordination. I don't regard that as changing my view about the conclusions in my own report. The -- apart from this -- this fact, I think the -- you know, the coordination was useful and worthwhile for the ultimate quality of the -- of the analyses.
Q Take a look again at Exhibit 2847 where Mr. Coplan in the first sentence is making reference to begin checking issues for consistency of treatment.
A Uh-huh.
Q What would your understanding be of the meaning of that language of checking issues to make sure of the consistency of treatment?
A Well, I would suppose that since these two law firms are going about their work separately, that -- and since they -- since they're both going to be issuing opinions



to the Woods and the McCombs, that at the end of the day, if they had vast, you know, or sharp disparities in their conclusions or work product, that it would not be -- you know, because they -- because they were operating in hermetically sealed vacuums, that that would not be a desirable result.
So checking of these issues -- of issues is simply another way of ensuring that the work product of both these institutions was -- was -- was professional and appropriate. I think that's what it means.
Q What -- in your view, what would it take, in terms of collaboration, between two law firms before, in your view, their independence -- in their independent opinions would be impaired?
MR. DADDINO: Objection.
A I think that's a highly speculative -- I mean I -- I don't -- I'm not aware of any evidence in the record that would -- that would make -- that could cause me to speculate on the level of collaboration. I actually think that collaboration in general is a good thing because it enhances the understanding of both people.
So even if there was a high degree of collaboration, the fact that at the end of the day, these two separate institutions with their -- with their own separate assumptions of risk and liability for the issuance of their





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

opinions, I don't think that even a high degree of collaboration would impair the independence because independence is simply -- independence means that the law firm is not in the thrall of the client or the promoter or what have you, but is operating in accordance with its own best professional lights.

And if some other law firm says, you know, I think we better look at this ruling and discuss it, you know, in connection with section so and so, I don't think that that's -- that destroys independence.

BY MR. DONOHUE:

Q Do you know as to whether or not the COBRA product was marketed with clients being informed that they would receive two independent legal opinions regarding the tax treatment of the COBRA product? Do you know --

A I do not -- I do not -- I did not know that. I -- and I don't think that it's true.

Q And how is it that you have an opinion as to whether it was true or not, because you previously mentioned you were not provided --

A Well, I --

Q Wait; let me finish my question.

A Oh, sorry.

Q You weren't provided any of the records or documents that were retained in discovery. So why do you



think it's not true?

A I think it's not true because the -- because the MurFam -- the Murphys only got an opinion from Proskauer. So it's just --

Q It's not true as to Murphy; right?

A Well, right.

Q Okay.

A So -- so -- so I don't think you can generalize across the board.

Q Okay. Are you aware as to what year the Murphy transaction was -- took place?

A Not without looking at the opinion.

Q You're not aware that it was in 2000?

A Yeah, okay. Well, I'll certainly take your word for it.

Q Okay.

MR. DADDINO: Dennis, let me just interject for a minute here. Certainly I'm just curious if you are close to finishing a line of questioning so we can break for lunch.

MR. DONOHUE: All right. Well, let's break for lunch, but can we do this -- this is off the record.

(Discussion off the record.)

(Lunch break from 12:58 to 1:38.)

BY MR. DONOHUE:



Q Mr. Smith, turn to your report in the Tesoro case, Exhibit 2409 at Page 5, Section 1.

MR. DADDINO: Forgive me, Dennis. Did you say Page 5, Section 1?

MR. DONOHUE: Yes.

MR. DADDINO: Thank you.

A Uh-huh.

BY MR. DONOHUE:

Q And your heading for Section 1 is, Reliance upon professional advice is both reasonable and necessary. And in that section of your report, you then have a discussion and have some citations of case law.

What is the basis of your conclusion that reliance upon professional advice is both reasonable and necessary? Is it your understanding and interpretation of the case law?

A Yeah. Well, I mean, it's -- it's my understanding about, you know, the fact -- the fact of life that the tax law has become exceedingly complex. People -- a layperson cannot be -- a layperson, even an accomplished businessman who has not devoted his life to its study, can -- I don't mean that in a pretentious way -- cannot really understand it.

So as a result, you really have to go to an advisor, and you have to be able to -- be able to rely on the



advisor. That's what I think the supreme court said in Boyle.

Q All right. And after that first paragraph, though, you say, This basic, realistic fact has, of course, been widely recognized by the courts.

So at that point you have a discussion of what you believe to be applicable case law to support that point; am I correct?

A Correct.

Q And one of the cases that you cite on Page 6 is the Chamberlain case. Do you see that?

A Yes.

Q And in that case you have a quote, and in the middle of that quote there is this sentence: The record reflects no basis for a finding or conclusion that it was not reasonable for taxpayers to rely on the expert's advice.

And my question is, what is your understanding of the court's use of the term record in that quote?

A I think it -- I think it must be the testimony in that case and the documents that was submitted to the trial court.

Q Okay. So in that context, at least, the term record would have reflected all of the evidence in the case comprising both exhibits and testimony; would that be fair?

A Yes.





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Q And another case that you cite in the list of cases there is Stanford v. Commissioner, which is a Fifth Circuit case. Do you see that?
A Yes.
(Exhibit No. 2834 was marked.)
BY MR. DONOHUE:
Q I'm going to hand you what's been marked as Exhibit 2834, and I believe that's the copy of the Stanford case. Is this the case you were referring to?
A Yes.
Q And if you would in that case, turn to Page 461.
A Yes.
Q And in the first column, second paragraph, second sentence, do you see the sentence beginning with the language, Nothing in the record indicates that the heeded advice, and there's a reference to what that was, had as a purpose the facilitation of tax avoidance.
Do you see that sentence?
A Could you just -- is it on -- in the second column?
Q No, it's the first column.
A Oh.
Q First column. Do you see it now? First column, second paragraph, it's the second sentence. Nothing



in the record indicates. Do you see where I'm referring?
MR. DADDINO: Let me add, sixth line down in the second paragraph.
MR. DONOHUE: Why don't you just point to him where it is.
MR. DADDINO: Right there.
THE WITNESS: Uh-huh.
BY MR. DONOHUE:
Q Do you see that sentence?
A Okay. Yeah.
Q And the same question. What is your understanding of the court's use of the word record in that context in that sentence?
A It must be the testimony and the documents. Testimony -- you know, I'm just speculating, but the testimony of Mr. Stanford and perhaps his advisor.
Q Would it be fair to say that would be the court record, that all --
A Right; right.
Q You have to let me finish my question.
-- all of the evidence in the case?
A Correct.
Q Okay. Turn to the prior page. Well, before we turn to the prior page, let me give you what's been marked as Government Exhibit 2834. That's the Stanford case that



you had had a long quote from.
A No; no; no. You're just giving me the same thing.
MR. DADDINO: It's the same.
MR. DONOHUE: Oh, I'm sorry; so sorry.
THE WITNESS: You must want to give me the Chamberlain.
MR. DONOHUE: So sorry. I didn't mean to do that.
(Exhibit No. 2833 was marked.)
BY MR. DONOHUE:
Q Let me give you -- let me give you 2833. That's the Chamberlain case. That's what I meant. That's the Chamberlain case in which you cited and had the long quote from. And in that case turn to Page 732.
A Uh-huh.
Q And take a look at the second column, the last paragraph. Do you see that paragraph, Good faith reliance; do you see where I'm referring?
A Right.
Q It says, Good faith reliance on professional advice concerning tax laws is a defense. The reliance must be objectively reasonable.
Do you see that reference?
A I do.



Q You have also used the term objectively reasonable, am I correct, in your report?
A Correct.
Q What is your understanding of what the court's referring to when it says the reliance must be objectively reasonable?
A Well, I think what that means is that we don't -- the courts don't expect laypersons to understand every jot and tittle of the tax law. They do understand that, as a fact of life, people rely on professional advice.
The reliance -- when the -- when the court here says the reliance must be objectively reasonable, it must be that, to a person looking at this from outside, even if you don't have technical expertise, if you examine -- if you examine the relationship between the taxpayer and his advisor and you look at the advice, the advice has to be -- it has to sort of -- it has to -- it has to strike the objective reader as reasonable advice.
In other words, if the advice said black is white or something like that, that would not be objectively reasonable. If it says, however, that section so and so has been interpreted in a particular sort of way and as a result it is my conclusion that it's more likely than not that et cetera, et cetera, and that advice or the -- the nature of the analysis is correct or, let's put it this way, is more





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

likely than not correct, then the advice is reasonable, and the reliance upon that advice, you know, is objectively reasonable.

Q So, essentially, what you're saying is is that the term to you, objectively reasonable, is based on a review of the advice itself in a determination as to whether looking at that advice, and just that advice, whether it is objectively reasonable?

A Correct.

Q Take a look at the language right after the reference to the advice or the reliance must be objectively reasonable. It says, taxpayers may not rely on someone with an inherent conflict of interest.

Do you believe that the court was also incorporating that thought within its -- within its reference to objectively reasonable advice.

A Well --

MR. DADDINO: Objection, calls for speculation.

A Well, I don't know -- I don't know whether the court was incorporating that thought. I suspect that the semicolon might suggest it was a separate thought.

But putting that quibble, quote-unquote, aside, I think what the court in its footnote said in the Goldman case -- which I seem to recall, Goldman was a case in



which the taxpayer simply relied on the advice of the promoter. You know, if you rely on the advice of the promoter, I don't think there was anything that approach the comprehensive and elaborate opinions that we have in this case in Goldman.

So I think it was relatively simple. I don't mean simple. But -- but it was -- it was relatively easy for the court in Goldman in the Second Circuit to say, well, you just can't -- you can't just go to the promoter and the promoter says, look, this is a good deal, and it's going to work, et cetera, et cetera.

And the same way that the court later on says or someone with no knowledge concerning the matter upon which the advice was -- is given. Well, obviously, that's the Freytag case, which, you know, has its own permutations about special trial judges, which has nothing to do with this case.

My -- my point simply is is that the taxpayer has to go to somebody who's well versed in the law, and he has to make sure that the person is not simply just promoting a deal with -- without regard, you know, to -- without really an accompanying technical analysis but just is selling something.

BY MR. DONOHUE:

Q In your view was Jenkens & Gilchrist a promoter of the COBRA transaction?



A No, I don't think so.

Q And why not?

A Well -- well, let's put it this way. Back in 1999, or whenever this -- these -- this opinion was written, I mean -- I mean I think that the circular has gotten stricter since then in terms of kinds of fees that people can charge, et cetera, et cetera. But then I think Jenkens was an independent law firm that was providing an independent analysis of a transaction.

It's comprehensive; it meets the standards of the Treasury Circular; it was not enthralled with anyone, as far as I was -- I was aware of; and it, you know, rendered an objective conclusion without trying to curve favor with anybody in particular, as far as it understood, based upon its own technical analysis, that the -- that the -- that the transaction -- that the technical underpinnings of the transaction were sound.

Q You said it was not enthralled with anyone. What did you mean --

A Enthralled, I mean, in other words, in servitude. In other words, if -- if somebody comes to somebody and says, you know, I want you to write this opinion, and I want you to come out and say X, Y, Z, so that's what I want, and if you can't do that, forget it, well, that's not really the kind of, you know, opinion that



the courts would regard with, you know, favor or something that a -- that a taxpayer could -- you know, could rely upon.

But if it's -- but if it's an independent opinion, you know, which comprehensively goes through the entire analysis, and if the analysis is objectively reasonable insofar as it's based the case law, the code sections, et cetera, et cetera, and it doesn't -- and it doesn't -- and if it doesn't omit obvious lines of -- discussion of obvious lines of attack, then maybe you can say that it's not competent.

Q In your opinion, would an entity that was involved in the development and marketing of a tax strategy be a promoter?

MR. DADDINO: Objection, incomplete hypothetical.

BY MR. DONOHUE:

Q You may answer.

A Well, let me preface my answer by saying that I'm not aware of any evidence that Jenkens was -- when I wrote the report, was involved in the marketing or whatever.

But let me simply say that even to speculate -- I mean let me put it to you this way. Somebody who's involved in the marketing of a transaction who's also very well versed in the tax law is not necessarily disqualified from issuing, you know, an opinion.





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

And in Jenkens' case, to the extent it was involved -- marketing may be not the right term to describe Jenkens' involvement from what I've seen here today in terms of the exhibits you've shown me.

But to the extent that Jenkens was involved in structuring the transaction and drafting documents and things like that, I think it actually puts them in a unique position to be able to render an opinion because it understood -- it had -- it had a higher level of understanding of how the transaction worked than if you went down the street and gave this -- the bare bones of this thing to someone who had to start from scratch.

Q Okay. Do you recall my question?

A I think so.

Q Okay. And for your information, as an expert witness, I can ask you hypothetical questions. You understand that?

A Okay.

Q So my question is for purposes -- and I'll just slightly change my question.

Would you consider an entity that was involved in the design and development of a tax strategy to be a promoter?

MR. DADDINO: Objection, incomplete hypothetical.



You can answer, if you can.

A Not necessarily. Not necessarily because -- because -- because I view a promoter -- the term promoter as someone who's simply like a sales -- a salesman, someone who is promoting the sale of a product.

Jenkens, however, as far as I can see, and I see nothing to alter my view, was someone who was involved in putting this thing together and pondering at great length and with great understanding and comprehension the tax consequences of the transaction.

So that its opinion ultimately is -- can't be cast aside simply because of its participation in the design and structuring. So it -- so I suppose the answer to your question, I think if I remember it, is no.

BY MR. DONOHUE:

Q Okay. But I -- for your information, I didn't ask any question about putting an opinion aside. It was simply whether or not, in your opinion, an entity which is involved in the design and development of a product is a promoter.

And I believe your answer to that question is not necessarily; am I correct?

A Right, that's correct.

Q In your opinion, is Ernst & Young a promoter of the COBRA strategy?



A I don't -- I'm not sure.

Q Okay. If I told you to assume they were involved in the design, development, and marketing of a product, if I told you to assume that, would that change your answer?

A Not necessarily because they're also, you know, certified public accountants, and they have an ethical duty under the AICPA standards to assist their clients in -- to the extent they can, in minimizing their tax liability. The Cannon -- it's not the Cannons, but the standards say explicitly that no client should pay more taxes than it has to.

So to the extent that they were involved in -- in bringing this transaction opportunity to the attention of clients, they were -- they were conducting themselves in the way the accounting profession and their -- and their professional organization expected them to.

Q I thought you just said a minute ago that you viewed a promoter as someone who is promoting or marketing the product. I asked you to assume that Ernst & Young did in fact or was in fact involved with marketing the product, would you consider Ernst & Young to be a promoter, and you said not necessarily.

So based on --

A Well, I said.



Q Let me finish my question.

Based on that, could you provide me with your definition of a promoter?

A Well, you know, I would view a promoter -- at least a promoter for purposes of the -- of the law back in 1999, or at least the -- the feeling of the profession was someone who was simply a salesman, you know, pushing a particular product.

Ernst & Young did something a lot more. It was, from what I see today, involved in the technical underpinnings of the transaction. They were also tax adept. So to say that they were simply salesmen, is -- is not -- is to blink reality.

Q All right.

A I mean they were more than that.

Q And what do you base your understanding of the term promoter on your definition that this is someone who is simply a salesperson?

A Well, it's basically --

MR. DADDINO: Objection, form.

Go ahead.

A It's basically the -- the fellow that -- Mr. Goldman that -- in Second Circuit case.

BY MR. DONOHUE:

Q So is it fair to say your understanding of





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

the -- your definition of promoter is based on your understanding of the law?
A Right.
Q Okay.
A Right.
Q Go back to Exhibit 2833, and the same reference I gave on the second column where the court's saying taxpayers may not rely on someone with an inherent conflict of interest.
A Uh-huh.
Q Do you see that?
A Uh-huh.
Q Is that also your understanding of the law with respect to reliance, that is the taxpayer not -- may not rely on someone with an inherent conflict of interest? Is that also your understanding of the law?
A Yes, it is.
Q Okay. Now, let's take a look at Section 2 of your report. So if you would turn to your report 2409 at Page 7?
A Uh-huh.
Q And there's a reference in the title to the word standards. You state, The opinions involved in this case meet the standards for taxpayer reliance.
Are you opining in this case as to what are



the appropriate standards that are applicable to this case.
A I'm opining as to what the appropriate standards are for the issuance of an opinion that the taxpayer can rely on.
Q Okay. And what do you base your opinion on as to what are the appropriate standards a taxpayer can rely on?
A Well, they're -- you know, they're professional standards, which are less elaborate than the -- than the Treasury Circular. I believe it's ABA opinion 346 or whatever.
But putting that aside, the Treasury Circular is a more elaborate, you know, recitation of what constitutes proper standards for purposes of a person writing an opinion and being enrolled to practice before the Treasury or the Internal Revenue Service.
So I based my opinion -- what I did is I took these opinions, after I familiarized myself with the details of the transaction, and then -- and then I read them and appreciated their legal analysis.
And then I went through the opinion to see whether -- the opinions, rather, to see whether they met the five criteria that Treasury Circular 230, Paragraph 10.33 delineates. And -- and that's what I discuss in my opinion.



Q All right. So is it fair to say that you're opining that Treasury Circular 230, as well as what you refer to as common standards in the tax field, are applicable to this case? You're opining all that?
A Yes.
Q Okay.
A And -- and judging the adequacy and objective, you know, reliability, if you will, of the these opinions.
Q Now, with respect to your reference to -- on Page 7 in the first paragraph, to -- you refer to it as a common standard, and you also, in the last sentence in that paragraph, refer to the standards as widely accepted standards.
What specific standards are you referring to since you don't provide a cite?
A Well, I think what I was doing sort of impliedly was track -- you know, was just incorporating by reference the -- you know, the discussion in a case like Stanford.
So I was saying that, you know, they have to -- that the taxpayer has to choose somebody who's qualified, and -- and then I went on to more or less say, okay, here we have a handy guide to a very high level of compliance with professional standards. It's the Treasury Circular.



And then what I do -- what I basically do is cite, you know, the Treasury Circular. And then I basically say this was the standard that was extant when the opinions were written.
Q Okay. Well, you're getting a little bit off --
A Okay.
Q -- because I'm not asking you yet about the Treasury Circular. I'm simply now referring to what you referred to as common and widely accepted standards. And if I wanted to verify what the standards are, where would I go?
A I think I -- I know -- I didn't -- I didn't mention them because I actually -- in my report because I think I went on to just basically say, look, the higher degree of standard is Treasury Circular 230. So if you meet that, you've -- you've gone well beyond what's necessary. Most -- you know, most good tax lawyers track the Treasury Circular because it's a handy guide to what needs to be included.
However, if you decided to fall short of that for some reason, I would think, and my recollection is that there is an ABA opinion, I think it's 346 or something like that, that describes what you need to -- to -- or I think that was applicable at the time as to what you need to do to





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

write -- to write a tax opinion. It's far less elaborate than -- than the Treasury Circular.
Q Now, are you saying that this ABA standard is what you're referring to as common and widely accepted standards; is that what you're --
A I think in a legal profession, yeah.
Q That's what you're referring to as --
A I think so.
Q Some reason you didn't cite it?
A Well, I didn't cite it simply because I went on to discuss a stricter standard. You know, my feeling is -- you see, the Treasury -- the Treasury standard is a standard that the Treasury has set out for people who are -- who want -- who want -- who are enrolled to practice before the Treasury and obviously want to keep their enrollment.
If you start writing -- if you're enrolled to practice before the Internal Revenue Service and you start writing tax opinions that depart from the Treasury standard, you could potentially be removed from the Treasury roles. So now that's not to say that you have to be on the Treasury roles.
You can have a wonderfully productive life and never deal with the Treasury at all but also write tax opinions, in which case it wouldn't trouble you as you would just have to follow, in writing a tax opinion, a lower level



of I would just say detail, for want of a better word.
Q And the common and widely accepted reference in your report then, your reference to the use of those terms is to ABA --
A I believe that's what it was. I believe that's what it was. I didn't cite it because -- because I went on to discuss the stricter standard that, you know, most first-rate tax lawyers follow.
Q You refer to this common and widely accepted standards. You say that the taxpayers are expected to choose qualified advisors and retain opinions from them that are objectively and subjectively reasonable.
Is that what your common standard must comply with, an opinion which is both objectively and subjectively reasonable?
A I believe that that's both -- I mean that's basically what the -- you know, the -- the -- the -- when the -- when the case is, in discussing what -- whether a penalty is applicable or not, discuss reliance, they don't speak about the Treasury Circular. That doesn't interest them.
They just want to know whether the -- the fellow who wrote the opinion was competent, and whether he was -- had some inherent conflict of interest, and whether he wrote something that -- you know, that complies with the --



you know, the legal profession's standards. I mean obviously something short of the Treasury Circular would suffice for these standards.
Q Okay. I think you said that. But my question -- going back to my question is must the opinion for these common and widely accepted standards you're referring to, must the opinions be objectively and subjectively reasonable?
A Oh, yes.
Q Can you --
A Yes.
Q Okay. Yes?
A Yes, they have to -- they have to -- they have -- yes.
Q OKay.
A Okay. Sorry.
Q Okay.
A Sorry for being so long-winded.
Q Take a look at -- and I gave it to you before -- your report in the Fidelity case, Exhibit 2836.
A I think it's gotten --
Q And --
A Wait; wait; wait. Here it is. I've got it.
Q And turn to Page 4.
A Uh-huh.



Q Same heading; you're referring to opinions involved in this case meet the standards for taxpayer reliance. Do you see that?
A Yeah.
Q And you also make reference to a common standard in the tax field?
A Uh-huh.
Q But here you refer to the opinions that are objectively reasonable. You don't say objectively and subjectively reasonable. Do you see that?
A Right.
Q So it appears that there is a flexible standard, common standard. In one report it's subjectively and objectively. In another report it's just objectively.
A Well, I -- I thought maybe when I did the -- when I did the Fidelity report, I thought harder about the appropriateness of the word subjectively.
Q I thought so.
A And I -- and I -- and I thought that perhaps -- perhaps it was -- it would be impossible for someone reading this -- reading of a tax opinion, who is just an objective reader of it, like a court or whatever, to view it from the -- I mean you want to view the -- the opinion as -- you want to stand in the shoes of the taxpayer. But the taxpayer is a layman.





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

So you have -- you basically -- the court has got the job of seeing whether the opinion, you know, is legally sound and applies to the law appropriately. But it's -- it's difficult really for the court or for a reader to basically look at this from the eye of the -- the subjective view of the taxpayer.

Q So if you had the --

A So -- so probably if I had to say it again, you know, because I really, you know -- I mean, you're raising a point which I actually thought about at the time I did the Fidelity thing at some length. And I finally concluded that the word subjectively was -- introduced a level of confusion that was unnecessary.

Q Okay. So is there some reason why you didn't tell me that when I was asking you initially if you thought the opinions should be objectively and subjectively reasonable?

A Well, perhaps, you know -- you know, perhaps -- perhaps I -- I didn't have a firm recollection of my -- my thought process at the time I did the Fidelity case. But having -- your having brought it to my attention, it -- it made me recall it.

Q All right. Let's -- let's move on to your report, which I'd like to discuss, which is at Page 7, Exhibit 2409. Your reference to Treasury Circular 230,



Section 1033.

Now, are you opining in this case that Section 1033 of Treasury Circular 230 is applicable to this case?

A No.

Q You're not?

A No. I'm simply saying -- I'm simply saying that it -- the opinions met these requirements that were adopted for the Treasury's internal administrative practice.

Q But --

A So -- so if they do, that's -- that's even better than -- than just meeting the normal professional standards.

Q Don't you say on Page 8 of your report that because the opinions involved in these cases --

A Comply with both.

Q -- comply with both?

A Yeah.

Q But, in fact, these opinions unquestionably constitute opinions of the type and character upon which the plaintiffs could reasonable rely.

A Right.

Q Is that your conclusion?

A Right. Well --

Q So my question is if that's your ultimate



conclusion, aren't you then saying and opining that Treasury Circular 230 is applicable to this case?

MR. DADDINO: Objection, document speaks for itself, and it's clear what the expert --

MR. DONOHUE: Counsel, don't -- don't make statements on the record. Just make objections.

BY MR. DONOHUE:

Q You may answer.

A I think -- I think the document does speak for itself, insofar as I say it -- you know, it complies with both the standards. I don't really -- it is not my opinion that the standards established by Treasury Circular 230 apply. But -- but in point of fact, the opinions do meet those standards.

Q Okay. But if the opinions do meet the standards --

A Right. That doesn't mean that they're applicable.

Q Well, what do you mean then when you say the opinions which are the type and character the plaintiffs could reasonably rely? Isn't that what you mean?

A Well, I think what I'm saying is you have the professional standards which are -- which require a lesser degree of detail and inclusion, and then you have the Treasury Circular standards.



Now, the Treasury Circular standards are stricter than the professional standards. A fortiori, if you meet the Treasury Circular standards, you have automatically, you know, met the other one, so --

Q But that's not my point. My point simply is it appears you're saying you're not opining that Treasury Circular 230 -- which you're saying is the more difficult standard?

A Uh-huh.

Q You're not opining it's applicable here, but at the same time, you're saying they're opinions because they meet the Treasury Circular which the plaintiffs could reasonably rely.

So if you're not opining that they have any applicability here, how can you opine that the plaintiffs could reasonably rely upon them.

A Well, you know, again, I have to -- you know, I don't -- I don't want to prolong this by repeating what I said. But I think -- I think you have the Treasury standards, so, therefore -- I mean maybe I can say it this way.

If the opinions didn't meet the Treasury standards but had a complete, you know, for whatever reason, analysis of the thing, and I looked at it and I said, you know, they meet the professional standards, then I looked at





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

the Treasury Circular and I said, well, you know, they left out this or whatever, or they didn't say, you know, this, which the Treasury Circular wants, I could still say that the treasure -- that the taxpayers could be -- would be reasonable in relying on the opinion.

However, I don't need to do that here because I compared this opinion to the Treasury Circular, which is stricter.

Q Okay.

A So, therefore, I don't have to concede -- well, let's put it -- I don't mean to have an argument.

But I don't have to -- I don't have to state in this opinion because I don't think it -- in my report because I don't think it -- it is not my opinion that you have to meet the Treasury Circular. But rather if you do meet it, you've done, you know, better than you need to have done.

So if you've done better than you need to have done and you -- and the taxpayer relied upon something lesser, surely by -- you know, by dent of logic, it's something that the taxpayer can rely on. That's what I -- what I meant to say.

Q What is the purpose of Treasury Circular 230?

A The purpose of Treasury Circular 230, as I've



said, is to set out a bunch of standards for the issuance of tax opinions to people who are enrolled to practice before the Treasury. That means essentially that you're enrolled; you get a CAF number, I think is the -- what they give you.

And you can represent people who have -- before the Internal Revenue Service. You can make comments about proposed regs and write -- and you can represent taxpayers who have controversies and a whole bunch of things.

Q Okay. So is it fair to say that Treasury Circular 230 applies to opinion writers, people or --

A Well, it applies to opinion writers who are enrolled. And if you don't -- if the Treasury were to find out -- they have a director of practice. And if they find out that you've been writing opinions and you're enrolled and you haven't been following their guidelines in the circular, they could potentially -- you could potentially be removed from the rolls.

Q All right.

A So that's -- that's the purpose. Most tax lawyers I know are on the rolls, and as a result you don't want to be removed from the rolls because it -- you know, it's -- it deprives you of your ability to -- to represent somebody who has a controversy.

Q Are you aware that penalty adjustments were



made in the COBRA cases?

MR. DADDINO: Objection, vague.

BY MR. DONOHUE:

Q Are you aware of that?

A No.

Q You were not aware that accuracy-related penalties --

A When you say adjustments -- excuse me -- do you mean adjustments meaning determinations? You don't mean reductions?

Q Well, let me --

A Okay.

Q Let me ask a couple of -- you're aware that this is what is known as a TEFRA case? Are you aware of that?

A Well, sure, this is a TEFRA case because the caption indicates it's a TEFRA case.

Q And are you aware that there was a final partnership administrative adjustment, known also as FPAA, that was issued to the partnerships? Were you aware of that?

A Not -- not exactly; although, it's -- it's obvious to me that since this case has a court caption, that -- I mean I never saw any of the revenue agents work-up.

Q Okay. Are you aware that in a TEFRA suit, the



taxpayer files a petition or a complaint seeking a review --

A Of the FPAA?

Q -- of the FPAA? Are you aware of that?

A I am aware of that. I have done that myself.

Q Okay. So are you aware that one of the adjustments made in the FPAA was an adjustment with respect to the assertion of accuracy-related penalties? Are you aware of that?

A I am not -- I am not -- I have not specifically been made aware of it, but from what you tell me, it would not surprise me.

Q All right. Well, what is your understanding as to what use your expert witness reports were being made in this litigation?

A Well, I think my expert witness reports were being used -- were being made in this litigation for the very reason that I set forth in my -- you know, in my report as saying I was asked to comment on and give an opinion as to the objective, you know, reasonableness of the opinion.

So the taxpayer has able lawyers who can argue that he is entitled to a refund of the tax. One of the things that -- one of the arguments, based upon our conversation that we've been having for the last 15 minutes, suggests that if you rely on -- or let's put it this way.

I just happen to know, as I'm sure you do too,





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

that -- and these cases would indicate reliance upon an opinion of counsel might well constitute reasonable cause to -- you know, to constitute a basis for abatement of the penalty. So that -- so -- so I'm -- I am aware of that.
Q Okay. Take a look at Footnote 3 of your report. And you'll notice in Footnote 3?
MR. DADDINO: Page 13?
MR. DONOHUE: Well, let's see here. I have Page 7.
MR. DADDINO: Page 7?
MR. DONOHUE: Yeah.
MR. DADDINO: And this is Government Exhibit 2836, expert report of Stuart Smith -- oh, I'm sorry. I'm looking at -- forgive me. I'm looking at the wrong exhibit. Exhibit 2409.
MR. DONOHUE: Okay.
BY MR. DONOHUE:
Q Now, before we turn to Footnote 3, take a look at the sentence in the first -- the first sentence in the second paragraph where you make reference to the Treasury Department has applied a different and more complicated standard.
And am I correct that the different and more complicated standard you're referring to, and a more complicated standard, the more complicated standard, your



reference is to what you've been referring to previously as a common --
A Right.
Q -- and widely accepted standard?
A Right. It's more complicated than that.
Q Okay. Now, in Footnote 3 on the same page, you point out, am I correct, that Treasury Circular -- or Section 1033 of Treasury Circular 230 would not apply to Jenkens & Gilchrist and Brown & Wood; do you see that?
A Yeah.
Q And so you're saying, am I correct, that this is a Treasury Circular which Brown & Wood and -- and Jenkens & Gilchrist did not need to meet?
A Yes.
MR. DADDINO: Objection, asked and answered.
A Yes, that -- that is true.
BY MR. DONOHUE:
Q Okay. Now, in your opinion, based on your knowledge of the law, is there a difference between the standards that must be applied to the opinion writers for purposes of their rendering an opinion and the standards that must be met for purposes of a taxpayer's reliance for purposes of a defense of accuracy-related penalties? Is that the same, or is there a different sets of rules and standards?



A Well, the -- they're -- they're different only because if you're focusing on the opinion writer, you've got standards of, you know, competence, you know, absence of conflicts, things like that. The -- which the courts have elaborated on and which we have been discussing.
If you're talking about the taxpayer, the taxpayer doesn't need to be competent professionally. He just needs to assure himself that he's got himself an opinion by somebody who meets, you know, the standards I just mentioned.
So I think -- I'm not really -- they're not -- they're not the same standards because they're -- they're different people, and they're subjected to, you know, different lines of inquiry.
Q Take a look at Exhibit 2834. That was the opinion in the Stanford case that you cited.
A Yeah.
Q And turn to Page 461?
A The first column, first paragraph. And notice -- actually, even on Page 460. There's a reference at the bottom of the page, second column, to applicable regulations. And then it states -- it says, The extent of the taxpayer's effort to assess his proper tax liability is generally the most important factor in determining reasonable cause and good faith.



And then it goes on to state, Treasury Regulation Section 1.664-4(b), refers to some cases. And then the court states as follows: Additional circumstances that may indicate reasonable cause and good faith include, one, and it refers to an item in one. And then it says, two, reliance on the advice of a professional tax advisor if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.
And notice that the first cite that the court gives is id. And if you look at what is a prior reference, it is Treasury Regulation 1.664-4(b). Do you see that?
A Yeah.
Q And to your knowledge, is that Treasury Regulation specifically applicable in this case for purposes of making a determination as to whether the taxpayer reasonably relied upon the advice of others?
MR. DADDINO: Objection, calls for a legal conclusion.
A Well, it -- it calls for -- right, which I'm not sure that I'm authorized to give. I also don't have the Treasury Regulation in front of me. So even if I, you know, felt --
BY MR. DONOHUE:
Q The latter can be remedied.
A But even if I were to take the statement of





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

the court at face value and -- and accept it as -- as an accurate statement of the law, I'm not sure that there are -- there's any evidence that has been presented to me that would cast doubt on the notion or -- well, let's put it this way.

I wasn't asked to render an opinion about whether the taxpayer acted in good faith. Although, I would think that getting an opinion of the quality of this is something that constitutes, you know, acting in good faith.

But -- but I can say with -- with a high degree of certainty that getting opinions of the quality and professionalism and objective reasonableness of these opinions was -- you know, did justify reasonable reliance on them.

(Exhibit No. 2827 was marked.)

BY MR. DONOHUE:

Q Let me hand you what's been marked as Government Exhibit 2827, which is, in fact, Treasury Regulation 1.6664-4. And if you would take a look -- first of all, just briefly review the first sentence -- the first paragraph under Subsection (a).

Did you have a chance to read that?

A You just want me to read 4(a)?

Q 4(a).

A Okay.

Q And you'll notice here that it states that, No



penalty may be imposed under Section 6662 with respect to any portion of an underpayment upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to, such portion. Rules for determining whether the reasonable cause and good faith exception applies are set forth in Paragraphs (b) through (h) of this section.

Do you see that?

A I do.

Q Now, if you turn the page to the bottom, you'll notice --

A Bottom of what?

Q Bottom of the next page.

A Oh, okay.

Q You'll notice Subsection (c). Do you see that where it says, Reliance on opinion or advice?

A Yeah.

Q And you'll notice under there it says, facts and circumstances; minimum requirements. And it states, All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice, including the opinion of a professional tax advisor, as to the treatment of the taxpayer, or any entity, plan, or arrangement, under federal tax law.

Do you see that?



A I do.

Q Now, my question is do you feel that your reports and the opinions in your report are based on, quote, all facts and circumstances in connection with the COBRA cases?

A In answer to your question, I don't think there was -- that that was the nature of my charge. I was given a -- given the assignment to render an opinion on the quality and professionalism of these opinions. I -- I have no knowledge of the taxpayer's conduct vis-a-vis conduct at all.

I just know that he got these opinions -- or let's say they got these opinions. And I know that they relied upon them and their tax preparer -- return preparer relied upon the conclusions in preparing their tax returns.

And my -- my task in rendering an opinion was to say what were these opinions like. I mean were they the kinds of opinions that a taxpayer could reasonably rely on. And I examined them closely and concluded that they were such opinions.

It's -- it's going to be a different debate in the context of this case as to whether the -- you know, as to the nature of the taxpayer's conduct, you know, as to whether he's entitled to abatement of the penalties, and there are other things that have to be considered.



But I was not asked to nor -- I was not asked to consider them. I was simply asked for this one element, which is they got these opinions. Were they the kinds of opinions that somebody could rely on, or were they shoddy, ill-considered, et cetera.

Q So let me go back to my question. I understand your answer, but I need an answer to my question.

My question is in the preparation of your reports in rendering your opinions, is it fair to say that you did not take into account all facts and circumstances in connection with the COBRA cases? Is that a fair statement?

MR. DADDINO: Objection, vague.

A Let me answer the question by simply saying the only thing I took into account was the quality of these opinions. So I suppose the answer to your question is no.

Q All right.

A Okay.

Q Now, take a look again at Page 8 of your report, which is Exhibit 2409. And I read you this before, but you point out that these opinions unquestionably constitute opinions of the type and character upon which the taxpayer could reasonably rely; am I correct?

A Yes.

Q So you are concluding that the taxpayers can rely on these -- this advice that was provided to them in the



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

form of these opinions?
A Yes.
Q Take a look back at the Treasury Regulation, Section (c). Under that sentence -- under that paragraph, you see where I just read you the first sentence of that under sub -- under Subsection (c)? Do you see that?
A Right.
Q Notice in the third paragraph, starting with the language, In no event; do you see that language? It's the third sentence that begins, In no event will a taxpayer?
A Yeah, let me just read it.
Okay. You want me to just read the first sentence, or do you want --
Q Yes, just read the first sentence.
A Through the word satisfied?
Q Right. It says, In no event will a taxpayer be considered to have reasonably relied in good faith on advice, including an opinion, unless the requirements of this paragraph (c)(1) are satisfied.
Do you see that?
A I do.
Q Now, turn to the next page where there's a reference in Subparagraph (i) to all facts and circumstances considered. Do you see that?



A Yes.
Q And it makes reference in the first sentence, again, to all pertinent facts and circumstances and the law as it relates to those facts and circumstances. And then it gives an example. It says, For example, the advice must take into account the taxpayer's purposes, and the relative weight of such purposes, for entering into the transaction and for structuring a transaction in a particular manner.
Do you see that?
A Uh-huh.
Q And my question to you is do you -- in any of your reports, do you make any attempt to determine if the taxpayers and the opinions -- well, let's say the taxpayers and the opinions satisfied that requirement?
MR. DADDINO: Objection, asked and answered.
A I think I did answer it. But let me say again that the -- the scope of my report was simply to render an opinion with respect to the quality of the written opinion.
I also am aware of the fact that the taxpayers in these cases made elaborate representations to the opiners, which are set forth either in the body of the opinion or in separate -- separate statements that were -- you know, that were delivered to counsel.
So -- and I know that the opinions -- the text of the opinions say that the opiner was relying upon the



accuracy of these representations in rendering his more-likely-than-not conclusion. So I know all of that.
But that's -- you know, the compass of my consideration was the written opinions themselves and what they set forth in that document itself.
BY MR. DONOHUE:
Q Well, let me get back to what this says. It says, The advice -- and I assume in this context we're referring to the opinion.
The advice must be based on all pertinent facts and circumstances, and then it makes reference to, or among other things, it must take into account the taxpayer's purposes for entering into the transaction and structuring the transaction in a particular manner. And just let me take the latter part of that.
Do the opinions that you read, do they take into account why the transaction was structured -- the COBRA transaction was structured as it was?
A Yes, I think they do because they -- they recite -- they recite the taxpayer's purposes in the representations.
And then they then base their opinion upon, if I may just quote from the regulation, all pertinent facts and circumstances in the law as it relates to those facts, which is language almost taken from -- I'm not -- I don't know



whether the regulation writer had this in mind, but it -- but it has a striking resemblance to the second requirement of Treasury Circular 230.
So they related the facts to the law, and then ultimately reached a -- you know, a more-likely-than-not conclusion. So just on -- on the -- on the written text of the opinion itself, which was what I was asked to examine, I could with assurance conclude that it was the kind of opinion that they could rely on.
If you'll notice, the last -- well, that's all I have to say.
Q All right. You mentioned that, when you describe the COBRA transaction, that one step of the COBRA transaction was that the partnership was, in fact, partnership interests were transferred to the Subchapter S corporation, which, in turn, caused a liquidation of the partnership for tax purposes, and that the assets, in turn, of the partnership were distributed to the Subchapter S corporation.
Do you recall that?
A Yes.
Q Do the opinions that you reviewed, the Jenkens & Gilchrist and the Brown & Wood opinions, discuss why it was that the transaction was structured such that partnership was being dissolved and its assets were being





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

transferred to a Subchapter S corporation?
A Well, I think --
Q Did they discuss that?
A I think they discussed it to the extent that the taxpayer -- taxpayers made representations that -- I mean some of the opinions are more precise because they track everything the taxpayer did.
But the -- the net effect is that the taxpayer represented to the opiner that he had a substantial -- I'm just -- I'm not quoting, but I'm just recalling -- substantial business purpose for everything that he did in connection with the transaction.
So one -- it's not really for me -- although I could, but I think it would be improper for me to speculate as to why the taxpayer engaged in some of the steps. But I can certainly imaginatively think of reasonable and justifiable business purposes for doing what he did.
Q Did you see any reference in the opinions as to what was the substantial business purpose for forming a Subchapter S corporation and having the assets of the partnership distributed to it?
A I don't recall that particularly. Although, what I do recall is the fact that -- and there are two things about the opinions that are germane in answer to your question.



One, they talked about the fact that everything the taxpayer did; the taxpayer made these representations. The second thing they did was to talk about, you know, the legal consequences of such a trans and what code sections applied, I think it was 732(b) or whatever, so it would work in this particular way. So --
Q My question --
A So when you take those things and -- and consider them together, you have a transaction, you know, or an element of the transaction which -- and then, thirdly -- I knew there was a thirdly.
Thirdly, there's a whole discussion in all of the opinions about the business purpose doctrine with an elaborate recitation of all the case law and what constitutes, you know, a proper business purpose for -- for purposes of being honored by the courts.
So when you pull all of that together, it certainly constitutes an adequate, if not more than adequate, discussion of, you know, the -- both the reasons for and the consequences of the transfer to the S corporation.
Q Did you understand my question?
A I think I did.
Q Okay.
A I thought I answered -- I thought I answered it.



Q My question didn't deal with anything in the opinions themselves as to what the tax consequences were of forming an S corporation or whether a transaction which did have a legitimate business purpose was in fact a legitimate transaction for tax purposes. It didn't have anything to do with that. It was very confined too.
Did the Jenkens & Gilchrist or the Brown & Wood or the Proskauer & Rose opinions indicate in the opinions as to what was the business purpose for the liquidation of the partnership and the formation of the Subchapter S corporation?
A You mean precisely say the business purpose to do this was X, Y, Zed?
Q Yes; yes, that's exactly what I mean.
A Okay. I don't recall that they did. But -- but I don't think that -- I think that the taxpayer's representation for purposes of the opinion was sufficient because one can have many different business purposes for -- I mean I don't think that was the opiner's obligation.
If you remember, Treasury Circular 230 says that the -- the -- the opiner has to inquire as to -- you know, has to set out the facts, but he doesn't have to conduct an order to the taxpayer's affairs.
So if the taxpayer represents, I did this for, you know, a business purpose, I don't think the taxpayer has



to be grilled by the opiner as to what his business purpose was to do it.
Point of the fact is that he did do it, and there are certain tax consequences that flow from it if it has a business purpose.
Q All right. I understand all that, but I need a clean answer to my question.
My question is --
A I think your answer to your question is no.
Q Okay.
A Okay.
Q Thank you.
Now, did you interview any of the taxpayers in connection with these cases?
A No.
Q Did you read any depositions?
A No.
Q You mentioned a couple of times the taxpayer's representations. How do you know, for example with the Jenkens & Gilchrist opinion, that the taxpayers, in fact, made any representations?
A Well, they're sort forth in the opinions.
Q But how do you know as a fact that the taxpayers communicated those representations to Jenkens & Gilchrist?





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

A Well -- well, let's put Jenkens & Gilchrist to one side for a moment, and let's --
Q But that's my question.
A Oh, you want to talk about Jenkens & Gilchrist?
Q I want to talk about Jenkens & Gilchrist.
A Well, Jenkens & Gilchrist recited the representations at the -- at the beginning, I believe, of its -- of its opinion. And if -- if I recall, it probably said, because these careful opinions usually say this, is that -- well, it says you and your partners of the partnership and/or blah-blah-blah have represented the following, and then there's a whole list of, you know, five representations.
And, in fact, in answer to a couple of questions ago, it says very explicitly, your contribution, your interest in the partnership -- this is Representation C -- was made for substantial non-tax business reasons. And then at the end it says, based upon the foregoing and subject to the qualifications, limitations, and assumptions set herein. So the assumptions were, you know, the truth of the representations, so --
Q So my question is how do you know that the taxpayers, in fact, made those representations to Jenkens & Gilchrist?



A Well, because here's an opinion of Jenkens & Gilchrist, which is delivered to these various people. And it's got a punch of representations, and the opinion says --
Q Well, you read the opinion.
A No; no. Wait; wait.
Any -- any misstatement of a material fact or omission of any fact that may be material, or any change in any of the facts referred to, may require modification of all or part of our opinions. So that -- and then it sets forth the representation.
So -- oh, and then it goes on, more specifically on Page 5, For purposes of all the above opinions, we are relying on the truth of the representations of you and, slash, or partners and representatives of the partnership, so --
Q All you're doing is reading back to me what the opinion says. My question is how do you know that the taxpayers, in fact, made those representations to Jenkens & Gilchrist?
MR. DADDINO: Let me interject for just one second and say that the witness has been reading from Government Exhibit 2868.
MR. DONOHUE: All right.
MR. DADDINO: I'm sorry. Answer his question.



A Well, I think -- I think I know it because, you know, lawyers who render -- you know, who write these opinions and -- and address them to the taxpayer or the client and deliver them and set forth representations and say, we're relying on the truth of the representations, those representations necessarily had to be communicated before because that's how they got included in the opinion.
BY MR. DONOHUE:
Q And what if I told you to assume that there was no such representations made by the taxpayers to Jenkens & Gilchrist; if I told you to assume that, would that change your opinion in any way, any opinions in your reports?
A Well, let me say --
Q Can you answer that question yes or no? And then if you want to explain it, go ahead. But first --
A Well --
MR. DADDINO: Can you restate the question? I'm sorry. We kind of had a dialogue.
THE WITNESS: I think Mr. Donohue was saying that --
MR. DADDINO: Well, let him restate his question.
THE WITNESS: Oh, okay. All right.
BY MR. DONOHUE:



Q My question is -- and I'll make sure that I get it back. If I told you to assume that there was no such representations made by the taxpayers to Jenkens & Gilchrist, if I told you to assume that, would that changed your opinion or opinions in your report in any way?
A Well, since the opinion itself -- I think -- I think it would change my -- my view because the opinions themselves stand on the truth of the representations.
So if the representations were never made, although, I have seen no evidence to suggest they were never made, then I think the conclusions -- forget about my report. The conclusions of the opinion, I think by their own terms, would -- might well change.
Q All right.
MR. DONOHUE: Why don't we do this -- this is off the record.
(Break from 2:57 to 3:03.)
BY MR. DONOHUE:
Q Let's return to Exhibit 2827, which is the Treasury Regulation 1.6664-4, and turn again to --
A Wait; wait. I'm having trouble. Did I lose it?
Q There you go.
A Oh, thanks.
Q And I'm on the third page. At the top of the





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 154

page, you'll notice the Paragraph (i) we discussed. Now, turn to Paragraph (ii). Do you see where it says, No unreasonable assumptions?

A Uh-huh.

Q And it says, The advice must not be based on unreasonable factual or legal assumptions, including assumptions as to future events, and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person.

Do you see that?

A Uh-huh.

Q Then it says, For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into the transaction or for structuring the transaction in a particular manner.

Do you see that?

A Yes.

Q Did you make any analysis in your reports as to whether any of the representations made by the taxpayer were unreasonable or likely to be unreasonable? Did you make such an analysis?

MR. DADDINO: Objection, vague and ambiguous.

Page 155

A Well, I think I stated in my report that -- on Page 8 and 9, I state that in discussing the part of the Treasury Circular that talks about factual matters, I say that the firm -- and I'm talking about Jenkens & Gilchrist here at the bottom of Page 8 -- is fully familiar with the factual details. Jenkens & Gilchrist and Brown & Wood opinions set forth the taxpayer's representations, which the taxpayer's certify is true in their representation letters to Brown & Wood.

So you have the Jenkens & Gilchrist recitation of the -- of the taxpayer's representations. You have the taxpayer's communication, separate certifications. And I say later on that there are no representations as to future activities. And -- and so then I conclude that the law firms were amply justified in accepting these representations as true because there was nothing about them that would appear to be untrue or unreasonable.

MR. DADDINO: Let the record reflect the witness is reading from Government Exhibit 2409.

BY MR. DONOHUE:

Q And is that conclusion of yours based on, quote, all pertinent facts and circumstances?

A Well, it's based upon -- it's based upon --

Q Did you understand my question?

A I think so. I think so. It's based -- well,

Page 156

let me tell you what I think it's --

Q Can you answer my question yes or no, and then if you want to explain. Is it based on --

A I think, yes, because to me all pertinent facts and circumstances meant, you know, what the opinions and -- what the Jenkens & Gilchrist opinion recites, what the taxpayer's signed to Brown & Wood, and -- and then my own best lights as to whether these elements of the transaction were -- was there anything about them that seemed untrue or unreasonable; in other words, that it couldn't have happened, I mean, and there wasn't anything like that. And there wasn't anything -- anything about future events.

Q When I refer to all pertinent facts and circumstances, I didn't mean according to what your charge was. I meant all pertinent facts and circumstances based on the meaning of that same language in Treasury Regulation 1.664-(B)4(C)(i). That's what I was referring to.

And so the same question. Was your conclusion that there -- none of the representations appeared to you to be untrue or unreasonable, was it based on all pertinent facts and circumstances within the meaning of the Treasury Regulations?

MR. DADDINO: Objection, calls for a legal conclusion.

A Well, that -- I mean that's a legal conclusion

Page 157

about what's pertinent. I mean I was supposed to -- it was my charge to discuss the -- and opine upon the -- upon the adequacy and quality of the opinion. In my view, the opinion, which is -- which is advice, for purposes of the -- this regulation. It says, the advice must be based --

Q Aren't you giving an opinion of law there?

A Well, no. I think what I'm doing -- I think what I'm doing is --

Q I'm sorry.

A Okay. That's all right.

Q I'm just toying with you.

A That's fair. That's a fair comment. I think -- I think what my --

Q Let me change my question.

A Okay.

Q Was your conclusion that the representations that you reviewed, that there was nothing about them that would appear untrue or unreasonable, was it based on all facts in the record in this COBRA litigation, including all the documents that comprised the discovery that has taken place thus far?

A I didn't -- as I told -- as I said before, I wasn't -- I didn't examine all the documents that -- that comprised the discovery. When I -- when I rendered my report on May 30th, I -- that -- I looked at simply the opinion -- I



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 158

recite what I looked at in my report.
Q All right. So the answer to my question is no?
A No.
Q All right. Now, take a look at Exhibit 2867.
A 2867?
Q And that is the Brown & Wood legal opinion.
A Oh, you know, I had this other regulation. I don't know. Maybe it was stuck. So here you take this one back.
Q You get the prize; you get the prize.
A Okay. Now, what would you like me to look at?
Q We're at the Brown & Wood legal opinion. It's 2867. And turn to Page 48, which is Bates stamp No. also 0048.
A This is 2867; right?
Q Correct.
A And you want me --
Q Page 48.
A And you want me to turn to Page 48?
Q Same Bates stamp number, last two numbers.
A Okay.
Q If you'll notice the conclusion there, Based upon the representations provided by Investor in II, above, it is more likely than not that the transactions will have a

Page 159

requisite economic substance and business purpose to be respected under the authorities discussed above.
Do you see that?
A I do.
Q Take a look at the representations in Roman numeral II of the opinion. They would start on Page 2.
A Uh-huh.
Q Do you see, for example, the second representation, The Investor believed that the Investor had a reasonable opportunity to earn a reasonable profit.
A Uh-huh.
Q Do you see that?
A Uh-huh.
Q Do you consider that to be a relevant representation for purposes of compliance with the economic substance test?
A Well, I do because --
Q If you do?
A I do.
Q Okay.
A The answer is I do.
Q All right. Do you recall in the Jenkens & Gilchrist opinion they cited the Rice Toyota test which made it clear that -- and you agreed that was the holding of the case -- that the determination as to whether there is or was

Page 160

a reasonable possibility of profit is an objective determination. Do you recall that?
A I do recall that.
Q If a taxpayer in good faith believes he can make a profit from the transaction objectively, the transaction's a sham; there's no way you can make a profit, does the taxpayer's belief have relevance to allow the taxpayer to take the deductions?
MR. DADDINO: Objection, incomplete hypothetical.
A Well --
BY MR. DONOHUE:
Q Can you answer that question yes or no?
A I think the -- I think the answer is -- I think the proper answer is yes, because -- because a taxpayer who forms a mistaken belief that may be based upon objectively defective, you know, information that's given to him, I think that that belief has some significance under the business purpose doctrine.
Q But I asked you to assume that it wasn't an objective assessment. I just asked you to assume that the taxpayer subjectively believed mistakenly that the transaction was not a sham; that there was a reasonable possibility of profit. And I asked if that were the case, would that subjective belief have relevance to allow the

Page 161

taxpayer to deduct the tax benefits from the --
A I think it was -- I think if it was a subjective --
Q You have to wait until I finish my question.
A Oh.
Q -- from the transaction?
A I think if it was a subjective belief taken in good faith, it would have relevance.
Q All right. And can you cite me a case that supports your view?
A Not offhand. Well, let me --
Q That's fine.
A Perhaps -- perhaps -- perhaps the Heasley case might.
Q I'm sorry?
A The Heasley case in the Fifth Circuit might -- might be such an authority. That was a case in which a taxpayer was, you know, financially ill-equipped to judge the -- the financial aspects of an opinion -- I mean of a transaction and entered into it with every good faith, hope of being able to earn a profit.
And the Fifth Circuit -- the tax court, I think, upheld the penalty, and the Fifth Circuit, I think, abated the penalty.
Q And all I asked you for was the name of the



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 162

case.
A Oh, okay.
Q Not a discussion over it.
A Okay.
Q Let me turn to Page 13 of your report, Exhibit 2409, Footnote 7. Are you opining in this case that the transactions do have economic substance, the COBRA transactions?
A No. I think what I'm opining is that the -- is that the opinion of counsel that -- it was more likely than not that the -- the transaction would withstand an economic substance challenge was -- would -- was the case.
And I'm simply saying that that, based upon my understanding of the law and my reading of the -- of the tax opinions, of the opinions of counsel, that I concluded that -- that that -- that that conclusion was objectively reasonable.
Q In Footnote 7, you make reference to the fact that Dr. Hess confirms the economic substance of the transactions. Do you see that?
A Uh-huh.
Q And then you have a long quote. Do you see your quote there?
A Uh-huh.
Q Where in that quote do you believe that

Page 163

Dr. Hess confirms the economic substance of the transactions? If it's just a sentence that you think is relevant, just read me that sentence.
A Well, it says here, On their early termination dates, eight of the ten options were in-the-money and two were out-of-the-money. Had the options been left open until their original termination dates, the eight -- the eight that were in-the-money on their early termination date would have finished in-the-money on the original termination. It's -- it's that discussion.
Q And how does that confirm the economic substance of the transaction?
A Well, it confirms it because it suggests that an options, you know, expert concluded that these -- that there was a reasonable possibility of making a profit here.
Q Where do you see that conclusion in that sentence in that paragraph?
A (No verbal response.)
Q A reasonable possibility of making a profit, where do you see that?
A All the options -- on early termination, eight of the ten options were in-the-money and two were out-of-the-money. So that -- that -- that to me suggests that this -- there was a potential here to make a profit on these -- on this options trading.

Page 164

Q But I thought you said a reasonable possibility?
A Well, I don't -- you know, I don't remember -- I'm not an options expert, and I don't remember exactly. Dr. Hess filed the big report, and he had probability percentages and things like that. That's really something I think better addressed to him.
I just simply quoted this because I reviewed his report, and I thought it was germane for purposes of judging the -- you know, the economic potential of this transaction.
Q If a transaction does have a chance for making a profit but it's not a reasonable possibility, does that satisfy the economic substance test?
Yes or no would be helpful.
A Could you just repeat the question?
Q Yeah. If a transaction has a chance of making a profit but not a reasonable chance, would that satisfy the economic substance requirements?
MR. DADDINO: Objection, vague.
A I think it would. I think -- I think the answer's yes.
BY MR DONOHUE:
Q And what do you base that --
A I think -- you know, I can't cite you to a

Page 165

particular case, but I believe that the reasonable possibility is sufficient to -- in view of the transaction --
Q Maybe you misunderstood my question. I said has a chance but not a reasonable possibility of making a profit.
A Well, it depends. I mean --
Q And my question is if those are the facts, in your view, would such a transaction --
A Well --
Q -- satisfy the economic substance requirements?
A I think it would only because I have -- you know, I have known people who have taken, you know, aggressive, large positions in foreign currency trading who did things that were at variance with what people were doing at the time and wound up making a lot of money.
Q But --
A And may well be that at a certain -- at a certain point in time somebody might say, well, you know, maybe he has a chance but not a reasonable chance with these positions, and ultimately -- I mean, if you -- if you told me it was a infinite small chance, but -- but a chance, I think -- I mean the tax laws recognize that people just don't go out of their way to lose money willy-nilly because the rates are not 100 percent.



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 166

So if someone takes a -- you know, makes a bet on a particular, you know, foreign currency position and there's a chance of making money, there's some people who have a greater appetite for risk because there's a greater reward at the end.
Q But none of that was my question. My question is simply if, in fact -- these are the facts -- that the transaction -- on a transaction the taxpayer has a chance but not a reasonable chance of making a profit, in your view does that satisfy the economic substance test?
And I believe your answer to that question is -- and correct me if I'm wrong -- in your view, yes, it does?
A Yes.
Q Okay. And can you cite me -- all I need is a name -- of any authority that supports your --
A Not offhand, I can't.
(Exhibit No. 2850 was marked.)
BY MR. DONOHUE:
Q All right. Now, did you -- I'm going to give you Exhibit 2850 -- become aware at any point that various individuals within E&Y had differing views about the legality of the COBRA transaction? Did you come aware of that at any point?
A No.

Page 167

Q If you'll look at the second page, there's a memo, a preliminary draft memo of January 5th, 2000, by a person by the name of Jerred Blanchard, B-l-a-n-c-h-a-r-d.
A Uh-huh.
Q Do you know who Mr. Blanchard is?
A No.
Q Take a look in that memo on Page 3, and there's a reference on Page 3, you'll notice, to the offsetting option transaction. And in the middle of the first paragraph, Mr. Blanchard points out, This implies, of course, that there is also a 62 percent probability that the Euro would trade at or below, and gives a dollar figure, in which case the taxpayer loses its entire $4.75 million invested in the transaction. Thus, looking solely at the pre-tax economics of the proposed transaction, and ignoring any potential return on the additional $1 million cash to be invested by taxpayer in fund, it would appear the value of the downside risk exceeds the value of the upside potential, and it gives that amount.
Were you aware that someone at E&Y looked at the transaction and was indicating that on a pre-tax basis, there was not a reasonable possibility of profit?
A I was not.
Q Take a look at Page 8 of your Tesoro report, which is 2409, and let's assume that Treasury Circular 230

Page 168

has some applicability in this case.
If you turn to Page 8 of your Tesoro report, you point out under factual matters that one requirement contained in Circular is that the practitioner is to make inquiry as to all relevant facts and be satisfied that the material facts are accurately and completely described.
Now, am I correct that you concluded that the opinions complied with that requirement?
A Yes.
Q Okay. And am I correct that the reason -- or the basis of your conclusion is simply your reading the opinions themselves; nothing beyond the opinions?
A Correct.
Q Did you -- as we saw before, you recall J&G, Jenkens & Gilchrist, they were involved in the development of the product; you recall that?
A Well, you told me that.
Q Okay. And you recall that I also showed you a template confidentiality agreement in which J&G in fact made reference that it may have been involved in the development of the product; do you recall that?
A Well, I recall there was a template, but it wasn't clear to me who prepared it. But...
Q Assume Jenkens & Gilchrist prepared it.
A Okay.

Page 169

Q And assume further that the taxpayers in the Tesoro case, Mr. McCombs would sign such a confidentiality agreement. Assume that. Okay.
Would you consider that to be a relevant fact that should have been included in the opinion, the fact that Jenkens & Gilchrist was involved in the design and development of this product in which they were rendering an opinion on?
A No.
Q All right. Were you aware as to how Jenkens & Gilchrist were being compensated for their work in the COBRA strategy?
A No.
Q Do you -- as you sit here today, do you know how they were compensated?
A Somehow it's come to my attention; although, I really can't tell you how it came to my attention.
Q What is your -- what is your understanding as to how they were compensated?
A I think -- I think their fee was some percentage of the -- of the consideration for the long option. I believe that that was...
Q Do you know how you came to that understanding?
A You know, actually, I don't -- I don't recall



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

how I -- let's put it this way. When I rendered the report, I certainly didn't have any knowledge of -- of the fee -- who got, you know, the amount and, you know, the recipients of the fees.
Q Let's see if I can find it quickly. Well, we appear to have a missing exhibit.
So let me ask you just to assume for the moment that Jenkens & Gilchrist and the law firms received a fee based on three percent of the desired tax laws. Can you assume that? The taxpayers' desired tax laws was that Jenkens & Gilchrist fee was three percent.
A When you say the law firms, we're only talking about Jenkens & Gilchrist?
Q Well, Jenkens & Gilchrist and Brown & Wood, the combined fee to those two firms.
A Okay.
Q Assume that.
A I'll -- I'll assume that.
Q Yeah, assume that. And my question is if that -- if those were the facts, do you believe that is the type of fact that should have been in the legal opinion?
A No. I've seen many opinions of counsel over my career, and I have never -- you know, addressing tax consequences of complex transactions, I have never seen a reference to a fee for the...



Q I previously showed you the Chamberlain case at 2833. Do you recall that in which it pointed out that the tax -- there must -- the advisor must not have any inherent conflict of interest. Do you recall that language?
A I think so.
Q You can take a look at it again. It's 2833.
A Wait; I think it's here. Yeah, got it.
Q Okay. Do you see the language?
A Yes, it's the language on Page 732.
Q Right. And my question is, do you think that a law firm that is being paid or law firms that are being paid based on a percent of a desired tax loss in effect provides inherent conflict of interest in providing objective advice?
A Well, let me -- let me answer your question this way.
Q Can it be answered yes or no?
A No, it can't be answered yes or no.
Q Okay.
A Sorry.
Q Okay. That's fine.
A At the time that this -- these opinions were rendered -- I'm not -- I'm not sure what the dates are -- January 31st, 2000, I don't think that there was any -- any professional or governmental prohibition about charging --



you know, linking a fee to a tax result.
Subsequently, and I can't really say when, I know that -- it's my understanding that a -- some kind of prohibition did go into effect, whether it went into effect in the Treasury Circular, I know that -- I think that the Treasury Circular's current version, which was issued in June 2005, has a statement about prohibiting unconscionable fees. I don't know whether there's any law on what constitutes that.
But let me just say that at this point in time and for this magnitude of a transaction, which they were rendering an opinion on, and, you know, assuming the -- the normal kind of risk that an opiner, you know, provides -- you know, takes on, I'm not sure that -- not at all sure that -- let me state it more positively. I don't think that the fee itself, A, is problematic, and, B, I don't think that it needs to be disclosed in the opinion.
Let's -- I didn't -- I don't think it needed to be disclosed then. In fact, I don't think fees need to be disclosed in opinions. So I think if there are additional restrictions on this kind of calculation of a fee, the profession has now taken them into account and is abiding by them.
Q But is it possible that there can be an inherent conflict of interest, even though, for example,



there's not any specific rule about disclosure?
MR. DADDINO: Objection, vague.
A Well, I don't really -- you know --
BY MR. DONOHUE:
Q You understand my question?
A Yeah.
Q You seem to be based on whether there's a rule or not, and I'm -- I'm asking a question --
A Well, conflicts of interest are subject to all sorts of detailed rules. They're not -- they don't -- they don't spring out of natural law, you know, written by Thomas Aquinas. So -- so I would -- I would have to say that standing alone, I do not regard the size of the fee as inherent -- as constituting an inherent conflict of interest.
Q Okay.
A Of course, the taxpayer's free either to do it or not. I'm -- I'm assuming that when this was proposed to a taxpayer or the taxpayers in this case, they were made aware of the fees, and they -- they didn't find them to be objectionable.
Q But isn't there a possibility, speaking of a conflict of interest, that a law firm who's receiving a fee based on the size of the transaction and they're receiving a fee based on writing an opinion on the merits of their own



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

transaction which they developed and are receiving a fee in connection with that transaction, isn't it possible that they might color their analysis to, in fact, provide an opinion that passes -- that indicates the transaction passes muster?
MR. DADDINO: Objection.
BY MR. DONOHUE:
Q Isn't that a possibility?
MR. DADDINO: Objection, calls for pure speculation.
A Well, you know, it --
BY MR. DONOHUE:
Q It's a hypothetical question.
A It's a hypothetical question. I think, you know, there's always that possibility, but I actually think that in this case, that possibility has to be balanced against the quality and soundness of the analysis.
I mean if you showed me some woefully inappropriate and inadequate opinion and said that the taxpayer was being charged a percentage of the fee, I might conclude that the balance, you know, of the equities, or whatever you want to call it, would tip in the direction of -- of conflict of interest much like somebody who just charges a commission to do a deal.
Q Okay. So --



A But that's not the case here.
Q So in your view then, when you say the practitioner made inquiries to all relevant facts, as to this particular fact, you're saying it may or may not have some relevance. If the opinion was not well written, that would indicate to you it was relevant and should be disclosed. But if the opinion appears to be well written -- if the opinion appears to be well written, then in your view it should have been disclosed. Is that what you mean?
A No.
MR. DADDINO: Objection, form.
Q That's okay.
A No, that's not what I meant because when the Treasury Circular says that the tax -- that the opiner has to -- has to inquire as to all relevant facts, he's talking about it's -- it's -- it's obviously talking about looking at all relevant facts with respect to the transaction, not relevant facts as to the size of his fee.
BY MR. DONOHUE:
Q Do you know --
A That has nothing to do with the opinion.
Q Do you know whether E&Y had concerns about any legal opinion that was being rendered by Jenkens & Gilchrist? Do you know whether or not E&Y had that concern?
A I don't know anything about that.



Q Okay.
(Exhibit No. 2843 was marked.)
BY MR. DONOHUE:
Q I'm going to hand you what has been marked as Exhibit 2843. This is an e-mail by Mr. Coplan, and you'll notice that in the first sentence it makes reference to a memo by Ron Friedman. The memo Ron Friedman had prepared by someone in his group. Do you see that?
A Uh-huh.
Q And you see the date of that is 10/8/199.
And then if you would, turn to the second page. You'll see a memo dated July 16th, 2003. Do you see that?
A I do.
Q And then what you'll notice is on the third page of the memo, there's a reference to the bullet, These cases; do you see that?
A Uh-huh.
Q And is it says, These cases emphasize that reliance on an advisor's tax opinion may not be reasonable if the advisor had a direct or indirect interest in the investment. If the opinion originates from an interested party, a taxpayer, particularly one with sophisticated knowledge of business transactions, would be well-advised to seek additional input from another independent advisor.



Do you see that?
A Uh-huh.
Q Do you know how, if at all, E&Y took into account that type of analysis for -- in their deciding to have a second legal opinion in the case?
A I don't know anything about, you know, what E&Y did, and I've never -- you know, obviously never seen this before.
Q All right.
(Exhibit No. 2864 was marked.)
BY MR. DONOHUE:
Q Let me ask you to look at what's been marked as 2864. This is an affidavit by Mr. Coplan. And take a look at the 10th of his affidavit. Do you see that paragraph?
It says, J&G wrote a tax opinion for all except one of the COBRA transactions implemented by E&Y clients. Given the role played by J&G in working jointly with E&Y to plan and structure the COBRA transaction, E&Y did not believe that the IRS would view the J&G tax opinion as providing its clients with adequate protection from the accuracy-related penalties that could be imposed under the Internal Revenue Code. Accordingly, all of E&Y's COBRA transactions, except the one with which J&G was not involved, received an independent opinion from the law firm of Brown &



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Wood.

Do you see that language?

A Uh-huh.

Q Were you aware, at least according to Mr. Coplan, that that was the reason why Brown & Wood, a second opinion was in fact obtained for the COBRA transaction?

A I was not aware of this.

Q Does that make -- does that fact have any relevance to any of the opinions that you rendered?

A No.

Q Do you know whether J&G or Jenkens & Gilchrist itself did an analysis of whether a taxpayer could rely on its legal opinion?

A I don't know whether they did or not.

(Exhibit No. 2656 was marked.)

BY MR. DONOHUE:

Q Let me ask that you take a look at 2656. We're speeding up here.

This is a series of memorandums dated November 7th, 1999 on Jenkens & Gilchrist letterhead from Patrick L. O'Daniel. Do you know who Mr. O'Daniel was?

A No.

Q Assume that he was an associate, a rather brilliant associate, if you will -- he clerked for Clarence



Thomas.

A Okay.

Q -- at Jenkens & Gilchrist; can you assume that?

A I'd be happy to.

Q Okay. Take a look at the third page of the document, the memo. It makes reference in the last paragraph -- do you see where it starts with, In Horn, for example, the tax --

A What page -- what page are you on this time?

Q I'm on the third page.

A In Horn; In Horn?

Q Yes.

A Yeah.

Q It's on -- it's -- we're -- we're referring, again, to 2656, Exhibit 2656.

A Uh-huh.

Q It says, In Horn, and it gives a discussion of Horn. The Tax Court held that it was not reasonable to rely on the tax advice of the CPAs because they were being compensated by the promoter for the units sold to petitioners and, therefore, were not independent of the promotion.

Are you familiar with the Horn case?

A You know, sort of vaguely. I haven't read it in quite some time.



Q And it says, Similarly, in Ryback, the advisors were paid a commission by the promoters based on the dollars that taxpayers invested. The Tax Court held that it was not reasonable to rely on the advisors because they had a, quote, financial stake in the shelters, end of quote.

Are you familiar with the Ryback case?

A I have a recollection of having read the Ryback case at some point.

Q And then the last sentence says, These cases seem to stand for the proposition that a taxpayer may not reasonably rely on the sole opinion of a tax advisor who is compensated in some manner by reference to the investment itself.

Is that your understanding of the law?

A Well, notwithstanding, you know, Mr. O'Daniel's brilliance, I would offer -- I'll be terse -- some, you know, observation about this paragraph because it seems to me these cases that he cites deal with a situation in which CPAs simply got a -- I hate to use a crude term, but a kickback from the promoter.

So if they are giving their client advice to go into this sort of thing, they -- they have an inherent conflict of interest because if the client doesn't go into the thing, they're not going to get a fee.

You can't say that with such confidence that



this line of authority applies to Jenkens & Gilchrist because while they got a large fee -- how large, I'm not really sure, but I'll just assume it was large -- they actually, you know, provided an extraordinarily long and comprehensive opinion.

So it's not as if they were simply just getting money on the side. They got a fee for -- for doing their work. It was a large fee because it was a lot of work, and it involved a rather large transaction. Lawyers get, I'm told -- I don't do a lot of transactional work. But they get -- they get, you know, extra fees for certain sorts of things.

And so I'm not really sure that this -- this analysis, as interesting as it is, is particularly germane or particularly establishes that Jenkens & Gilchrist was somehow, you know, under some sort of disability here.

Q Were you aware that E&Y was being paid a fee also based on a percent of the desired tax loss of the taxpayer?

A Again, at the time I wrote my opinion, I was not aware about fees.

Q All right. Were you aware that the taxpayer, as part of the transaction, was required to make a contribution of two percent of the desired tax loss? Were you aware of that?

A I think I saw that in the PowerPoint



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 182

production that you --
Q Take a look at Exhibit 159, Step 2. And if you can't find it quickly -- because I'm going to do my best to finish here.
MR. DADDINO: If counsel doesn't have any objection, we can just share.
MR. DONOHUE: Sure.
THE WITNESS: This is Exhibit 159?
MR. DONOHUE: Yes.
MR. DADDINO: Just for the record, we're looking at document Bates labeled -- or Page 2003EY003754.
BY MR. DONOHUE:
Q And do you see in the second paragraph there --
A Uh-huh, I do.
Q -- there's a reference --
A I do.
Q Do you know what that two percent contribution was for?
A I'm not sure what it was for.
Q Do you think that's a relevant fact that should have been disclosed in the legal opinions?
A Not particularly, no. It wasn't mentioned in the legal opinion. I didn't know that it -- it's...
(Exhibit No. 2859 was marked.)

Page 183

BY MR. DONOHUE:
Q Let me give you what's been marked as 2859. This is an e-mail by Mr. Coplan. You'll see it's dated 12/5/1999. And in this e-mail, in this second paragraph, Trading activity in the partnerships.
A Uh-huh.
Q It says, As you know, in addition to the transfer of the option spread to the partnership, the clients transferred cash equal to two percent of the loss amount to the partnership. There has been some confusion as to what type of trading is expected to be done with respect to this cash during the life of the partnership. The trading activity is important to the maintenance of a business purpose for the partnership, i.e. investment activity.
Given that do you think that statement, that this should have been referred to in the opinions?
MR. DADDINO: Objection, form.
A Well, it -- it basically, I believe, was -- was mentioned in the sense that you got a sense that the partnership, after the options expired, continued to -- continued to operate and to engage in some kind of trading. So the -- the wherewithal had to come from something.
So it doesn't strike me as something that has to -- you know, in other words, it's important not to confuse the -- the -- the structure and analysis of a legal opinion

Page 184

with something which is a kind of a PowerPoint, you know. So we -- it was obvious to me that the -- that the partnership was doing something and obviously needed to do something.
Now, in -- in reviewing the, you know, business purpose, you know, authorities, it's obvious that what this memo is seeking to do is to -- is to structure the transaction in a way that will enhance the likelihood of -- of, as he says, the maintenance of a business purpose.
I mean lawyers do this all the time when they plan transactions, and somebody might say, well, you know, this element is missing; we need this. And that's a perfectly appropriate thing to do.
BY MR. DONOHUE:
Q Take a look at the same exhibit, page Bates stamp No. -- Page 13.
A I'm not sure --
MR. DADDINO: You must be referring to a different exhibit. We're on 2859.
MR. DONOHUE: Oh.
THE WITNESS: Oh, you're -- you're back on 159?
MR. DONOHUE: Yeah.
MR. DADDINO: What page?
MR. DONOHUE: Page 13. It's the same exhibit.
MR. DADDINO: Can you give me a Bates number,

Page 185

please?
MR. DONOHUE: Yeah, the Bates would be 3763.
MR. DADDINO: Thank you.
BY MR. DONOHUE:
Q Take a look at the one, two, three, four -- the fourth diamond down. Do you see that?
A Uh-huh.
Q Total cost including fees is 4.75 million.
A Uh-huh.
Q And then it says, cash investment is at no risk and is not a cost of transaction. Do you see that?
A Uh-huh.
Q Referring to the two percent, do you think that an amount that is to be contributed by the taxpayers to a transaction equal to two percent of their desired loss in which they're told is not to be at risk is a relevant fact and should be disclosed in the opinions?
A Well --
Q Can you answer that question yes or no?
A I don't think it is a relevant fact.
Q Okay. Now, do you think it's a relevant fact that these partnerships were to be in existence roughly about 30 days? Do you think that's a relevant fact for purposes of rendering a legal opinion?
A Well, the -- the opinion itself is -- recites



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

Page 186

the facts, and so you -- you know, the reader can -- knows how long the partnerships were in existence. So --

Q But would the --

A -- that sort of -- that sort of brief period of time is not necessarily fatal in -- in analyzing a -- you know, a transaction. There are many cases that -- that that brief kind of ownership, if you will, or life or what have you is --

Q All right. I understand the cases.

A Right.

Q But my question is if it was preplanned that these transactions would, in fact -- the partnership would stay in existence for 30 days, do you think that's the type of fact that should have been disclosed in the opinions?

A No.

Q Even if it was preplanned, you don't think that should have been --

A Well, no -- well, let me say this. I mean if -- when you use the term preplanned, you're assuming that, you know, we're -- we're beginning to wade into, you know, some murky waters of case law.

And to me there are cases that talk about, you know, taxpayers have an expectation that they -- that something could -- that they can do it if they want. But if they -- if they -- if they're not obligated to do it or if

Page 187

they're not, you know --

Q Well, even if they're not obligated, if they have an understanding that, in fact, this is the way the transaction is going to be structured such --

A Well --

Q Let me finish.

A Yeah.

Q -- such that the partnership would be in existence only about 30 days before the end of tax year, its assets would be distributed to a Subchapter S, if that was in fact what the structure of the transaction was to be, do you think that that's the type of fact that should have been disclosed in the opinions?

A Well, if the -- essentially I think -- I think the opinion -- the opinions, rather, discussed at great length, you know, the cases under the step transaction doctrine. So I think that that fact was -- was discussed with sufficient clarity and -- and comprehension that the opiner felt comfortable in saying that, notwithstanding the fact that these -- this partnership had a short life, was not necessarily something that was going to, you know, suffer an attack on the step transaction doctrine.

Q Didn't the analysis of the opinion writers, to the effect that the step transaction doctrine had not been violated, wasn't it based on a representation by the

Page 188

taxpayers?

MR. DADDINO: Objection, misstates the opinion conclusion.

A I don't think that --

BY MR. DONOHUE:

Q Take a look at the Brown & Wood opinion, 2867, Page 2 -- make that Page 3, Paragraph 8. There -- there existed no understanding -- just use that word -- to which any of the parties described herein committed to undertake any or all the transactions described above upon the happening of any other transaction.

Do you think that's an accurate statement?

A Yes, I think there was no understanding. Understanding, agreement, obligation, arrangement, those are all things in which --

Q I didn't ask for agreement or obligation or arrangement --

A Are you talking about --

Q I didn't -- I asked for the word understanding.

A Well --

Q Wasn't there an understanding by the taxpayers here that they were going to, in fact, complete the steps of these transactions all -- at least as to the 1999 transaction, all before the end of 1999? Wasn't that their

Page 189

understanding?

A That -- they had -- they knew they could have done this if they wanted to do it. They had -- there was no understanding that they were going to do it, and I think that that -- you know, that --

Q And what do you base that on, there was no understanding they were going to do it? Isn't that the only way they could have gotten their tax benefits is by doing that before the end of the year?

A Well, but -- yes. But -- but I think one of the things that's important to the legal analysis is the fact that they were free not to do it.

Q You mentioned before that there was an extensive discussion of step transaction doctrine?

A Right.

Q Do you recall any of the cases cited?

A Oh, they went through it in great length. The binding commitment --

Q Right. But do you remember any of the names of the cases?

A There's a case called Penrod, True, S-Mart --

Q Do you know who handled the True case by any chance?

A You did. All right.

Well, in any event, my -- my point simply is



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

is that it's not as simple as -- I mean you can't --
Q My point simply is is that the full purposes of the case law, isn't it sufficient if in fact the taxpayer has an understanding that he's going to complete a certain series of steps in a certain order; isn't that sufficient in order to require the applicability of the step transaction doctrine, the collapse steps?
MR. DADDINO: Objection, form.
A No, it's not -- it's not --
Q All right.
A It's not -- it's not sufficient.
BY MR. DONOHUE:
Q All right. Okay. I just have one or two other questions, and then we can finish.
Is there anything that you said today, even though we discussed for the most part -- not exclusively but for the most part the Tesoro -- your opinions in the Tesoro case, that would not apply equally to your report involving the Murphy case?
MR. DADDINO: Objection, misleading question; involves different opinion writers and different facts and circumstances.
A I would have to --
MR. DONOHUE: Counsel, again, only make an objection as to the form. Do not state -- a speaking



objection is not permitted under the Federal Rules of Civil Procedure, specifically Federal Rule 30(d).
A I -- I don't want to confidently say no.
Q Okay.
A Because I think that that, you know, would be irresponsible given -- given the -- the fact that they're different opinions with different styles and different discussions.
So I would like to reserve on that, and -- and I'm not suggesting that -- you know, that it's important for us to meet again, but -- but I would not, you know, object to it.
BY MR. DONOHUE:
Q Why don't we do this. You'll have an opportunity --
A To read the transcript.
Q -- to read the transcript. And in reading the transcript, if you note any errors in the transcription itself, would you on the errata sheet note what the error is?
A Sure.
Q You're also permitted -- I'm sure you know this. You're permitted to change the substantive portion of your answer. But if you do change the substance, you're required to state the reason for the change. And if you do



do this, that allows me to reopen the deposition to inquire about that change?
A Uh-huh.
Q But you're permitted to do it.
In addition, if between now and when you read it, as to my last question, if you feel as if there is something that you feel you would answer a question differently if you were referring to the Proskauer & Rose, then if you would make a note also to that --
A Sure.
Q -- in the errata sheet?
A Sure.
Q And that way it would allow me not to have to reopen the deposition if you just make a note, this is my change.
A Okay.
MR. DADDINO: Object to the counselor's request. I think it's unduly burdensome on the expert.
MR. DONOHUE: Well, it's also required by the Federal Rules of Civil Procedure.
MR. DADDINO: Not for him to go back and re-answer each one of your questions based upon a different opinion that you didn't ask about.
BY MR. DONOHUE:
Q Well, let's put it this way. If you consider



it burdensome and too onerous to do -- and I don't see that -- then you -- then I will feel it's necessary that somehow it's important for me to reopen the deposition. If I see that you have gone through that, then I don't see any point, unless I see any surprises, to reopen the deposition. Is that clear?
A Okay.
Q All right.
MR. DONOHUE: I have nothing further.
MR. DADDINO: Okay. I have no questions today.
(End of proceedings at 4:08.)





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

CHANGES AND SIGNATURE

PAGE/LINE CHANGE REASON



I, STUART A. SMITH, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________________
STUART A. SMITH

STATE OF _________ )
COUNTY OF ________ )

Before me, ______________________, on this day personally appeared STUART A. SMITH known to me (or proved to me under oath or through ______________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of ______________, 2007.

_________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ___________



IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Nos. 06-245T, 06-246T, and 06-247T
(Consolidated)

MURFAM FARMS, LLC, )
By and Through Wendell H. Murphy, Jr., )
a Partner Other Than Tax Matters Partner, )
)
PSM FARMS, LLC, )
By and Through Stratton K. Murphy, )
a Partner Other Than Tax Matters Partner, )
)
MURPHY PORK PARTNERS, LLC, )
By and Through Wendell H. Murphy, Jr., )
a Partner Other Than Tax Matters Partner, )
)
Plaintiffs, )
)
V. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )

and

IN THE UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

GARY V. WOODS, as Tax Matters Partner )
of TESORO DRIVE PARTNERS, a )
Texas General Partnership, )
)
Plaintiff, )
)
V. ) Case No.
) SA-05-CA-0216-XR
UNITED STATES OF AMERICA, )
)
Defendant. )



Consolidated with

GARY V. WOODS, as Tax Matters Partner )
of SA TESORO INVESTMENT PARTNERS, )
a Texas General Partnership, )
)
Plaintiff, )
)
V. ) Case No.
) SA-05-CA-0217-XR
UNITED STATES OF AMERICA, )
)
Defendant. )

REPORTER'S CERTIFICATION
DEPOSITION OF STUART A. SMITH
AUGUST 30, 2007

I, Dana Taylor, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, STUART A. SMITH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition was submitted on _________________, 2007 to the witness or to the attorney for the witness for examination, signature and return to me by ________________, 2007;

That the amount of time used by each party at the deposition is as follows:

Mr. Donohue - (5:11)
Mr. Daddino - (0:00)



Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFFS:

MR. ANTHONY DADDINO
MEADOWS COLLIER, 901 Main Street
Suite 3700
Dallas, Texas 75202
(214)744-3700
Taxable Cost: $__________________

FOR THE DEFENDANT:

MR. DENNIS M. DONOHUE
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION
P.O. Box 403
Washington, DC 20044
(202)307-6492
Taxable Cost: $__________________

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to me by this 10th day of September, 2007.

Dana Taylor

RealLegal. Notary for E-Transcript.

DANA TAYLOR, Texas CSR 6048
Expiration Date: 12/31/08
Henjum Goucher Reporting Services, P.C.
Firm No. Dallas: 69 Houston: 373
2501 Oak Lawn Avenue, Suite 435
Dallas, Texas 75219
(888)656-DEPO





Electronically signed by Dana Taylor (401-213-825-2798) 38894b34-4be0-477a-ae15-baf72ef5502b