PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
PARIS

December 29, 2000

HDM, LLC
P.O Box 970
Rose Hill, N.C. 28458

MDM Ventures, LLC
P.O Box 970
Rose Hill, N.C. 28458

SKM Ventures, LLC
P.O Box 970
Rose Hill, N.C. 28458

Gentlemen:

You have requested our opinion regarding certain federal income tax consequences of various investment transactions (the "Transactions"), described more fully below, that you are contemplating making, directly, through a limited liability company and through a subchapter S corporation, in foreign currency.

Our opinion is based upon certain representations and warranties of the Parties (defined below) and the facts contained in the Certificate of Facts provided by the Parties and described below, certain assumptions set forth below and on the provisions of the Internal Revenue Code of 1986. as amended (the "Code"), Treasury Regulations promulgated thereunder[1], and interpretations of the foregoing as expressed in court decisions, administrative determinations, and the legislative history as of the date of this opinion (collectively, the "Law"). The Law is subject to change, which may or may not be retroactive in effect, that might result in modifications of our opinion. We assume no obligation to update our opinion in light of any subsequent change in Law. Any variation of actual facts from the facts and assumptions set forth herein may also affect the continuing validity of our opinion. There can be no guarantee that following an audit, the Internal Revenue Service (the "IRS") will not take a position contrary to the opinion set forth

[1] All sections references herein are to the Code, unless otherwise indicated. All references to Regulations herein are to the Treasury Regulations promulgated pursuant to the Code, unless otherwise indicated.

herein. which ultimately may be sustained by the courts. since an opinion of counsel is binding on neither the IRS nor the courts.

In rendering our opinion, we have made factual and legal examinations, including an examination of statutes, regulations, records, certificates and other documents as we have considered necessary or appropriate. including the following: (1) the Certificate of Facts provided by the Parties and (2) the LLC Agreement of PSM Farms, LLC (collectively, these written representations and the documents described in the immediately preceding sentence are referred to herein as the "Transaction Documents").

In our review, we have assumed, with your consent, that all of the representations and statements set forth in the Transaction Documents are true and correct, and all of the obligations imposed by any such documents on the parties thereto have been and will be performed or satisfied in accordance with their terms. We also have assumed the genuineness of all signatures, the proper execution of all documents, the authenticity of all documents submitted to us as originals. the conformity to originals of documents submitted to us as copies, and the authenticity of the originals from which any copies were made.

For the purpose of our opinion, we have not made an independent investigation of the facts of this transaction. We consequently have assumed that the information presented or otherwise furnished to us accurately and completely describes all material facts relevant to our opinion. No facts have come to our attention, however, that would cause us to question the accuracy and completeness of such facts in a material way.

Each of the Parties has reviewed the description of the investment transactions described herein and such description is accurate and complete, and there are no pertinent facts relating thereto that have not been set forth in such description.

In rendering our opinion, we understand the facts to be as follows:

HDM, LLC is a Delaware limited liability company with Harry D. Murphy ("HDM") as its sole member.

MDM Ventures, LLC is a Delaware limited liability company with Marc D. Murphy ("MDM") as its sole member.

SKM Ventures, LLC is a Delaware limited liability company with Stratton K. Murphy ("SKM") as its sole member.

PSM Farms, LLC ("PSM LLC," also referred to as the "Partnership") is a Delaware limited liability company whose only members are HDM, MDM and SKM (collectively referred to as the "Parties").

On April 14, 2000, HDM contributed $360,000 to HDM, LLC. At this time, HDM was the sole member of HDM, LLC. HDM, LLC then purchased an over the counter, European-style European Union Euro put option (the "A Long Option") and sold an over the counter, European-

style European Union Euro put option (the "A Short Option"). Such options are exercisable only upon their expiration date and will result in a payout of a single lump sum payment on the settlement date if the fair market value of the European Union Euro is lower than the strike price on such date. The premium paid for, and value of the long position held by HDM. LLC was $12,000,000 and the premium received for, and value of the short position held by HDM, LLC was $11,640,000.

On the same date, MDM contributed $189,000 to MDM Ventures, LLC. At this time, MDM was the sole member of MDM Ventures, LLC. MDM Ventures, LLC then purchased an over the counter, European-style European Union Euro put option (the "B Long Option") and sold an over the counter, European-style European Union Euro put option (the "B Short Option"). Such options are exercisable only upon their expiration date and will result in a payout of a single lump sum payment on the settlement date if the fair market value of the European Union Euro is lower than the strike price on such date. The premium paid for, and value of the long position held by MDM Ventures, LLC was $6,300,000 and the premium received for, and value of the short position held by MDM Ventures, LLC was $6,111,000.

On the same date, SKM contributed $189,000 to SKM Ventures, LLC. At this time, SKM was the sole member of SKM Ventures, LLC. SKM Ventures, LLC then purchased an over the counter, European-style European Union Euro put option (the "C Long Option" and collectively with the A Long Option and the B Long Option, the "Long Options") and sold an over the counter, European-style European Union Euro put option (the "C Short Option" and collectively with the A Short Option and the B Short Option, the "Short Options"). Such options are exercisable only upon their expiration date and will result in a payout of a single lump sum payment on the settlement date if the fair market value of the European Union Euro is lower than the strike price on such date. The premium paid for, and value of the long position held by SKM Ventures, LLC was $6,300,000 and the premium received for, and value of the short position held by SKM Ventures, LLC was $6,111,000. The terms of the Long Options purchased were identical and the terms of the Short Options sold were identical. The purpose of the purchase and sale of these options is that each of the Parties believed that such investments could result in substantial profits with only limited downside risk.

Each of the Parties has not identified, and will not identify, the Options (defined below) as being part of a hedging transaction under Regulation Section 1.446-4. The Options can be transferred, sold or assigned independently.

On April 16, 2000, each of the Parties contributed their respective Long Option and Short Option to PSM LLC in exchange for membership interests in PSM LLC. At the time of their transfers to PSM LLC, the Short Options were "out of the money," meaning that the value of the European Union Euro was higher than the strike price.

Each of the Parties' primary motivation in participating in the Transactions was to attain, on a risk-adjusted basis, an attractive return on his investment through the Transactions, without regard to tax benefits. Each of the Parties anticipates earning, taking into account transaction expenses, a pre-tax return on his net investment in the Transactions significantly greater than investments offering comparable risk profiles.

On June 15, 2000, the Long Options and Short Options expired. Following this date, PSM LLC engaged in certain investment activities. It only traded in assets whose sale would produce gain or loss of a capital nature (the "Assets").

In August, 2000, each of the Parties transferred their membership interest in PSM LLC to PSM, Inc., a corporation formed under the laws of the State of Delaware (such corporation having elected to be treated as a subchapter S corporation) in exchange for common shares of PSM, Inc. In December, 2000, PSM, Inc. sold the Assets to an unrelated third party.

The decision to transfer their membership interests was at the sole discretion and control of each of the Parties. Each of the Parties' decisions was based on a variety of factors, including future market conditions, currency exchange rates, interest rates, the availability of alternative investments, and each of the Parties' financial situation.

Based on and subject to the descriptions and assumptions set out above and the analysis of the relevant statutory provisions and other legal authority in effect on the date hereof, as set out below, we are of the opinion that for federal income tax purposes, it would be more likely than not that:

1. Each of the Parties would not recognize gain or loss on the contributions of the Long Options and the Short Options (collectively known as the "Options") to PSM LLC.

2. Each of the Parties' basis in his PSM LLC interest would equal his respective basis in the Long Options purchased, reduced by the amount of liabilities assumed by PSM LLC and increased by each of the Parties' respective pro rata share of such liabilities after such assumption. The Short Options would not be considered liabilities for purposes of section 752 as currently enacted or as a result of recent legislative proposals. Each of the Parties' basis in the Assets would also equal his respective basis in the Long Options purchased, reduced by the amount of liabilities assumed by PSM LLC and increased by each of the Parties' respective pro rata share of such liabilities after such assumption.

3. Any gain or loss recognized by each of the Parties upon the sale of the Assets would equal the Parties' proportionate share of the total amount of proceeds received by PSM, Inc. for the Assets less his adjusted basis in the Assets sold by PSM, Inc.

4. Any gain or loss recognized by each of the Parties upon the sale of the Assets would be treated as capital gain or loss.

5. None of the Parties would be subject to accuracy related penalties as a result of the described treatment on their federal income tax returns of his investments in the Transactions.

ANALYSIS

**A. Contribution of Options to PSM LLC**

**1. In General**

The general rule of section 721(a) and Regulation § 1.721-1 is that no gain or loss is recognized by either the partnership or any partner in the case of a contribution of property to the partnership in exchange for a partnership interest. While neither the Code nor the Regulations define the term "property" under section 721, that section is similar to section 351 in the corporate context, where the term "property" is given a broad interpretation, and serves to distinguish services from property. *See, Stafford v. United States*, 611 F.2d 990 (5th Cir. 1980); PLR 8225069 (March 24, 1982); McKee, Nelson & Whitmire, Federal Taxation of Partnerships and Partners ¶4.02[1] (3rd ed.). Under both sections, a taxpayer does not recognize gain or loss on the contribution of property, but will recognize gain on the contribution of services in exchange for an ownership interest. The Long Options more likely than not would qualify as property. An important exception to this general rule exists in the case of transfers of property to an investment partnership.[2]

**2. Investment Parmership**

Section 721(b) provides that the nonrecognition rule of section 721(a) will not apply, and gain, but not loss, will be recognized, if property is contributed to a partnership that would be treated as an investment company (within the meaning of section 351) if the partnership were incorporated.

Section 351(e) provides that gain will be recognized on a transfer of property to an investment company. Regulation § 1.351-1(c)(1) elaborates on this provision by providing that property will be considered transferred to an investment company if:

(i) the transfer results, directly or indirectly, in diversification of the transferors' interests; and

(ii) the transferee is (a) a regulated investment company, (b) a real estate investment trust, or (c) a corporation more than 80% of the value of whose assets (excluding cash and nonconvertible debt obligations from consideration) are held for investment and are readily marketable stocks or securities, or investments in regulated investment companies or real estate investment trusts.

Regulation § 1.351-1(c)(5) clarifies that diversification occurs if two or more persons transfer nonidentical assets to the corporation, unless these assets are an insignificant portion of the total

---

[2] Section 1256(c) provides that gain or loss is recognized on the termination of a "section 1256 contract." As discussed below, the options more likely than not would not be section 1256 contracts, so this provision would not apply.

value of the assets transferred. Assets representing an insignificant portion of the total value of the assets transferred shall be disregarded in determining whether diversification has occurred. The second requirement is that the transferee must be a regulated investment company, a real estate investment trust, or a company more than 80% of the value of whose assets are held for investment. This determination is generally made immediately after the transfer. Treas. Reg. § 1.351-1(c)(2).

Stocks and securities are considered readily marketable if and only if they are part of a class of stock or securities that is traded on a securities exchange or traded or quoted regularly in the over the counter market. Treas. Reg. § 1.351-1(c)(3). In the Taxpayer Relief Act of 1997, Pub. L. 105-34, Congress amended section 351(e) to provide that the term "stock or securities" includes foreign currency, money, stocks, options, forward or futures contracts, notional principal contracts and derivatives. The IRS is granted authority to issue Regulations providing that other assets are included as "stock or securities," and also to provide the circumstances under which an asset is not considered a stock or security. To date, the IRS has not used its authority to issue any Regulations.

Additionally, when each of the Parties is the sole member of their respective limited liability company (e.g. HDM as the sole member of HDM, LLC), their limited liability company is disregarded as an entity separate from its owner. Regulation Section 301.7701-3. Also, each shareholder of a subchapter S corporation (a corporation having made a valid election pursuant to section 1362(a)(1) to be treated as a subchapter S corporation), such as PSM, Inc., is required to take into account personally their pro rata share of the subchapter S corporation's gains and losses.

Based on the foregoing facts and assumptions, PSM LLC more likely than not would not qualify as an investment company within the meaning of the Regulations. The contributions of the Long Options and the Short Options by the Parties more likely than not would not diversify any of the Parties' interests because each of the Parties is contributing identical assets to PSM LLC which does not result in diversification. Consequently, each of the Parties more likely than not would not recognize gain on the contributions of the Long Options to PSM LLC.

**a) Contribution of PSM LLC Interests to PSM, Inc.**

Each of the Parties more likely than note would not recognize gain on the contributions of their PSM LLC membership interests to PSM, Inc. pursuant to section 351. PSM, Inc. will not qualify as an investment company within the meaning of the Regulations and the Parties more likely than not would not diversify any of the Parties' interests as each of the Parties is contributing identical assets.

Another consequence of the transfer of the PSM LLC interests to PSM, Inc. is that the Assets held by PSM LLC will take on the Parties' adjusted basis in their contributed membership interests in PSM LLC. That is, following the contribution of the PSM LLC membership interests to PSM, Inc., PSM Inc.'s adjusted basis in the Assets will equal the Parties' adjusted basis in their contributed Partnership interests, before the contribution. Section 708, Reg. Sec. 1.708-1(b). Following a 'technical' termination of a partnership (occurring here when one entity (PSM,

Inc.) owns all of the outstanding partnership interests of a partnership (PSM LLC)), the former partners' adjusted basis in their contributed partnership interests is transferred to the contributed property (here, the Assets) owned by the new "partner" (here, PSM, Inc.).

3. **Taxation of Options Generally**

The tax consequences of the issuance of an option are set out not in the Code, but in cases and Rulings. In *Virginia Iron Coal & Coke Co. v. Comm'r*, 37 B.T.A. 195 (1938), a reviewed decision, the taxpayer granted Texas Gulf Sulphur Co. ("TGS") a four-year option to buy stock of a subsidiary in exchange for a one-time payment of $300,000 in 1930 and annual payments of $125,000. The payments were to be applied to the purchase price if TGS exercised the option. After paying $300,000 in 1930 and $125,000 in 1931, in 1933 TGS notified the taxpayer that TGS was abandoning the option. The taxpayer, who had not initially reported the receipt of the option premiums, thereupon filed amended returns for 1930 and 1931 reporting the premiums as income in the year received. The Commissioner asserted that the premiums were income in the year the option was abandoned, and the court agreed, adopting an "open transaction" approach:

> It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss which the property had in the hands of the seller. In that event they would not have been income and their return as income when received would have been improper. . . [citations omitted]. But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.
>
> Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.
>
> *Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a*

> *satisfactory determination of their character for income tax purposes can be made.* The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. Its property was then free of the option. It had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.
>
> The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. *Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised.* That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance. [Emphasis added.]

37 B.T.A. 197-199. A dissent argued that the taxpayer recognized income in the year of receipt because it had unfettered control of the premium at that time. The dissent added that the income could be included in the year the option was abandoned under only one of two theories, both of which the dissent felt were untenable. The first theory is that TGS "forfeited" the premiums only in 1933. That theory was untenable because the taxpayer had absolute control of the funds since 1930, so TGS had nothing to "forfeit". The second theory was that the value of the abandonment was income. However, if that were the case, the only income would be the difference between the value of the optioned property at the time of the abandonment and the price at which the taxpayer was obligated to convey it.

The first holding of I. T. 3835, 1947-1 C. B. 53, states that the premium received by the writer (issuer or optionor) of a put or call option which is not exercised constitutes a short-term capital gain, under section 117(g)(2) of the Internal Revenue Code of 1939, to be taken into account in computing his gross income, for federal income tax purposes, only for the taxable year in which the failure to exercise the option became final. Rev. Rul. 58-234, 1958-1 CB 279, notes that section 117(g)(2) of the Internal Revenue Code of 1939 specifically provided that "gains . . . attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains . . .", although the Internal Revenue Code of 1954 contained no provision treating such gains as capital gain, either short-term or long-term. Therefore, the Service held that the premium received by the writer of a put or call option which is not exercised constitutes ordinary income under section 61 of the 1954 Code, to be included in his gross income only for the taxable year in which the failure to exercise the option becomes final. Like the court in *Virginia Iron Coal*, the Service used an "open transaction" approach:

> An optionor, by the mere granting of an option to sell ("put"), or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date,

> so does the optionor become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for federal income tax purposes, in *A.E. Hollingsworth v. Comm'r*, 27 B.T.A. 621, acquiescence, C. B. XII-1, 6 (1933). It is manifest, from the nature and consequences of "put" or "call" option premiums and obligations, that there is no federal income tax incidence on account of either the receipt or the payment of such option premiums, i.e., from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor, seeking to minimize or conclude the eventual burden of his option obligation, might pay the optionee, as consideration for cancellation of the option, an amount equal to or greater than the premium. Hence, no income, gain, profits, or earnings are derived from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium. Therefore, it is considered that the principle of the decision in *North American Oil Consolidated v. Burnet*, 286 U.S. 417, Ct. D. 499, C. B. XI-1, 293 (1932), which involved the receipt of "earnings," is not applicable to receipts of premiums on outstanding options.

Rev. Rul. 78-182, *supra*, which deals with options on the Chicago Board Options Exchange, follows Rev. Rul. 58-234 in holding, inter alia, that as to the writer of a put or call, "there is no federal income tax incident on account of either the receipt or the payment of such option premium, that is, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss." Also, PLR 8038087, *infra*, PLR 7938018, *infra*, and PLR 8113024 hold that no gain or loss is recognized on the assumption of a warrant in a corporate reorganization.

In the instant case, each of the Parties will continually remain the counterparty with respect to their respective Options until their termination. As a result, the legal relationship of the optionor and optionee remain unchanged through out the Transactions until the Options terminate.

Based on the foregoing, it is more likely than not that no gain or loss would be recognized with respect to an option until the option terminates or settles in accordance with its terms or the parties to the option otherwise settle it.

### 4. Separate Properties

The Long Options and the Short Options more likely than not would be treated as separate properties.

Each option can be transferred or assigned independently, an important factor in determining if two instruments should be treated as one. For example, Congress needed to add section 269B to the Code to provide special rules for the treatment of a stapled entity. A stapled entity is one where the stock of one entity cannot be traded without trading the stock of the other entity. The legislative history of this provision indicates that the law in this regard was unclear. Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Tax Reform Act of 1984, 98th Cong., 2d Sess., 454 (1984). We are not aware of any efforts by Congress to treat non-stapled entities as a single entity.

Further, it is more likely than not that the Long Options and the Short Options would not be treated as "hedging transactions," which would have required the timing of income, gains, deduction and losses from the hedging transaction to match those of the hedged transaction. Treas. Reg. § 1.446-4. Regulation § 1.1221-2(b) provides that a hedge is a transaction entered into in the normal course of a taxpayer's trade or business. It is more likely than not that these Regulations would not apply to the Long Options and the Short Options because these options were entered into as an investment activity, not as a trade or business. Even if these Regulations were to apply, there is nothing in them that would cause the Long Options and the Short Options to be integrated. In addition, PSM LLC will retain real net economic risk in both the Long Options and the Short Options which will not be hedged.

In addition, Congress has recognized that separate instruments are generally given separate effect, even when one transaction may significantly offset the risk of the other. *See, e.g.*, Sec. 1092 (loss on one position of a straddle is deferred until gain is recognized on the offsetting position; the offsetting positions are not netted); Sec. 1258 (recharacterizing certain gain attributable to the time value of a taxpayer's investment as ordinary income, not purporting to recharacterize the transaction as a borrowing); Sec. 1259 (constructive sale provision).

Finally, case law recognizes that a taxpayer can hold long and short positions in property at the same time, and that each position is a separate property. In *Smith v. Commissioner*, 78 T.C. 350 (1982), *aff'd*, 820 F.2d 1220 (4th Cir. 1987), the court held that each leg of a straddle should be treated as separate property, whether the legs were acquired at different times or at the same time. *See also, Stoller v. Commissioner*, 994 F.2d 855 (D.C. Cir. 1993), *aff'g in part and rev'g in part*, 60 T.C.M. (CCH) 1554 (1990) (separate contracts were respected); *Richardson v. Commissioner*, 121 F.2d 1 (2d Cir. 1941) (can hold long and short positions at the same time).

**B. Basis of Partnership Interest**

**1. In General**

Section 722 provides, in general, that the basis of a partnership interest to the partner is equal to the amount of money plus the adjusted basis of the property contributed to the partnership, increased by the amount of gain, if any, recognized by the partner on the contribution under Section 721(b). Consequently, it is more likely than not that each of the Parties' basis in his PSM LLC interest would be equal to his basis in the Long Options. As no gain was recognized on any of the contributions to PSM LLC under section 721(b), no gain needs to be added to the basis of any of the Parties' membership interest.

Section 1012 provides that the basis of property shall be the cost of such property, subject to certain adjustments, none of which are applicable in this instance. The "cost" of property is generally the amount paid for such property in cash or other property. Treas. Reg. § 1.1012-1(a). Accordingly, it is more likely than not that each of the Parties' basis in their respective Long Option would equal the cost he incurred to acquire the Long Option, *i.e.*, the premium each of the Parties paid to the institutional counter-party to acquire each of the Long Options. *See*, Rev. Rul. 78-182, 1978-1 C.B. 265 (cost of a put is a nondeductible capital expenditure).

It is more likely than not that the transfers of the Options would be viewed as contributions of the Long Options to PSM LLC and PSM LLC's assumption of the Short Options. The IRS might assert that each of the Parties acquired economic units and that his total basis should be his net cost, that is $360,000 to HDM, LLC for the A Long Option and the A Short Option, $189,000 to MDM Ventures, LLC for the B Long Option and the B Short Option and $189,000 to SKM Ventures, LLC for the C Long Option and the C Short Option.

In addition, the IRS might assert that each of the Parties acquired their respective Long Option in exchange, in part, for undertaking their respective Short Option. The IRS would then assert that the undertaking is too contingent to provide basis in their respective Long Option, leaving each of the Parties with a total basis equal to the net cost, $360,000 for HDM, LLC, $189,000 for MDM Ventures, LLC and $189,000 for SKM Ventures, LLC. These positions are not supported by case law, which, as discussed above, recognizes and respects the separate nature of the transactions. As discussed above, each of the Long Option and Short Option pairs (the A Long Option and the A Short Option, the B Long Option and the B Short Option, etc.) are not economically a unit because they can be assigned or traded separately.

Section 752(b) provides that any decrease in a partner's share of the partnership liabilities or the assumption by the partnership of a partner's individual liabilities is treated as a distribution of money from the partnership to the partner. Any increase in a partner's share of the partnership's liabilities or the partner's assumption of the partnership's liabilities is treated as a deemed cash contribution by the partner to the partnership. Under section 733, a partner's basis in the partnership interest is decreased by the amount of money and the adjusted basis of property other than money distributed to a partner other than in liquidation of the partner's interest. Thus, if the Short Options are considered liabilities for purposes of section 752, each of the Parties' total

basis in his PSM LLC interests would be reduced by the amount of the "deemed distribution" and increased by the amount of the "deemed contribution."

**2. Definition of Liability**

Neither section 752 nor the Regulations issued under that section define the term "liabilities." In 1988, the IRS issued temporary and proposed Regulations under section 752 (T.D. 8237, December 30, 1988), concerning the treatment of partnership liabilities, and Temporary Regulation § 1.752-1T(g) and the corresponding proposed Regulation defined the term "liability" for purposes of section 752. The IRS, however, replaced these temporary and proposed Regulations with permanent Regulations in 1991. These new Regulations (T.D. 8380, December 23, 1991) eliminated, without explanation, the definition of "liability" that was contained in the temporary and proposed Regulations.

The IRS and courts have held that contingent or unquantifiable claims are not liabilities that create basis. Thus, Revenue Ruling 73-301, 1973-2 C.B. 215, held that a progress payment received by a partnership using the completed contract method of accounting was not a partnership liability for purposes of section 752 and thus did not increase the partners' basis. *See also*, Rev. Rul. 81-241, 1981-2 C.B. 146. The IRS reached a similar conclusion in Revenue Ruling 88-77, 1988-2 C.B. 128, holding that the accounts payable of a cash basis partnership did not increase the tax basis of the partnership interests under section 752. As a cash basis taxpayer, the partnership could not deduct the interest expense and services until the amounts were paid. Consequently, the accounts payable were not considered liabilities of the partnership under section 752. Revenue Ruling 88-77 revoked Revenue Ruling 60-345, 1960-2 C.B. 211, in which the IRS had concluded that the term "liabilities" included the accounts payable and accrued expenses of a cash method partnership. Revenue Ruling 88-77 was issued, in part, in response to Congress' disagreement with the holding of Revenue Ruling 60-345. H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess., 856-857 (1984); Staff of the Joint Committee on Taxation, General Explanation of the Deficit Reduction Act of 1984, 98th Cong., 2d Sess., 215 (1984).

The courts have also held that contingent claims or obligations are not liabilities under section 752. In *Long v. Commissioner*, 71 T.C. 1 (1978), *supp.* 71 T.C 724 (1979), *aff'd and remanded*, 660 F.2d 416 (10th Cir. 1981), the court considered whether contested liabilities were liabilities within the meaning of section 752. The partnership in this case was in the construction business and was sued for defects in a building. The suits were pending when the partnership was liquidated, raising the question of the partnership basis so that the taxpayer could compute gain or loss. The court rejected the argument that the contingent liabilities were liabilities for purposes of section 752:

> Although they may be considered "liabilities" in the generic sense of the term, *contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated.* This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. . . . We think that partnership liabilities should be treated in the same manner. . . . We see no logical reason for distinguishing the

> above cases solely because the asset involved is an interest in a partnership. and neither party suggests such a distinction. Those liabilities should be taken into account only when they are fixed or paid. . . .
>
> The Kansas City Life-TWA and USF&G *claims were too contingent at the death of the decedent to be included in the estate's initial computation of its basis* in the decedent's partnership interest. Liability for those claims had not been established and was in fact contested. Moreover, the amounts of damages sought were by no means definite or fixed.

71 T.C., at 7-8 [Emphasis added; citations omitted.]

The Tax Court again held contingent liabilities not to be liabilities within the meaning of section 752 in *La Rue v. Commissioner*, 90 T.C. 465 (1988). The taxpayers in this case were general partners of Goodbody & Co., a stock brokerage firm. Because of its inability to keep up with the trading volume, Goodbody incurred large "back-office" liabilities due to the following types of transactions: (i) the failure to purchase securities at a stated price; (ii) the failure to sell securities at a stated price; (iii) differences between the securities actually held and the securities the partnership should have held; and (iv) the failure to receive dividends or interest on securities held for customers. Goodbody was fully liable for the losses represented by these errors. Another firm acquired the assets and assumed the liabilities of Goodbody for an amount equal to the difference between the fair market value of the assets and the liabilities. In an attempt to minimize their gain, the partners sought to increase their basis in Goodbody by including the reserves for the back office claims as partnership liabilities under section 752. The court rejected this attempt, noting that the reserves were for potential liabilities, and that the amount of the liabilities was speculative and could not be determined with reasonable accuracy:

> Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. Essentially, Goodbody's books were in error because of the back office problems, and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. *Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.*
>
> *Petitioners have not shown that these amounts were determinable with reasonable accuracy.* As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. *In addition, the exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter*

> *because of the ready market for securities, but is not readily determinable until purchase or sale occurs.* The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with "reasonable accuracy." A loss is not determinable until the securities are actually purchased or sold and the transaction closed. We accordingly hold that *because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year.*

90 T.C. at 479. [Emphasis added.]

The court stated that the "all-events" test of section 461(a), which is used to determine when an expense can be accrued for deduction purposes, should also be applied to determine when a liability is fixed or definite and thus includable in basis. In *La Rue*, the liabilities were too speculative and contingent to be accrued as an expense, and therefore could not be included in basis. In the present situation, the obligations under the Short Options are entirely speculative and contingent, and the amount of the obligations cannot be determined. Therefore, it is more likely than not that the obligations under the Short Options would not be considered liabilities.

Each of the Parties' undertakings with respect to the Short Options upon expiration of such Short Options, are similar to the obligation in *La Rue*, but even more speculative. The undertaking, if any, can be determined by PSM LLC only upon the expiration of the options at the end of their term. Unlike the situation in *La Rue*, where Goodbody had an obligation to its customers, but was waiting to see if claims would be filed, PSM LLC under the Short Options has no way of determining what the ultimate obligation will be until the options expire. Economically, the Short Options will pay out only if the value of the European Union Euro declines below the strike price on the expiration date. Accordingly, it is more likely than not that the obligations under the Short Options would not be considered liabilities.

**a. Treatment of Short Sales**

Notwithstanding the foregoing rulings and cases, in two revenue rulings the IRS attempted to significantly broaden the definition of liability for purposes of section 752. In Revenue Ruling 95-26, 1995-1 C.B. 131, a partnership sold securities short, and left the cash proceeds with its broker. The partnership deposited additional cash with the broker, and was obligated to deliver identical securities to close the short sale. The IRS held that the obligation to deliver securities created by a short sale is a liability for purposes of section 752.

The ruling cited two distinguishable authorities and failed to discuss contrary authorities. First, the IRS cited Revenue Ruling 88-77 for the proposition that an obligation was a liability for purposes of section 752 to the extent that incurring the liability creates or increases the basis to the partnership of any asset, including cash. The logic of Revenue Ruling 95-26 seems to be that (i) a short sale creates an obligation on the part of the seller, (ii) the cash received in the short sale is a partnership asset which increases the basis of the partnership's assets, and therefore, (iii) the short sale obligation is a liability under section 752. This ruling fails to discuss whether the

obligation to deliver securities under the short sale is too contingent and speculative to be considered a liability under the previously discussed authorities.

Further, the ruling seems to confuse the nature of a short sale. A short sale is actually two transactions: a borrowing of securities with a concomitant obligation to return the securities, and a short sale with the receipt of cash. It is the short sale that results in the cash which increases the basis of the partnership assets. The borrowing does not result in an increase in the basis of partnership assets, but, rather, creates the obligation to return the securities. *See*, McKee, *supra*, at ¶7.01[I]; Cunningham, *Short-Sale Obligations and Basis in Partnership Interests*, 72 Tax Notes 1663, 1669 (September 23, 1996).

In addition, the ruling failed to address the fact that the amount of the obligation under a short sale is contingent and speculative. There is no way to determine the amount of the obligation until the securities are purchased and the transaction is closed. Revenue Ruling 95-26 is inconsistent with both Revenue Ruling 73-301 and Revenue Ruling 88-77, in which the IRS held that the obligations of a cash basis taxpayer were too contingent to be considered liabilities for purposes of section 752.

Also, the ruling cites *Deputy v. DuPont*, 308 U.S. 488 (1940), for the proposition that a short sale creates an obligation on the part of the seller. In *Du Pont*, the court held that a short sale obligation was not an indebtedness and that the carrying charges on the short sale obligation could not be deducted as interest. The IRS used *Du Pont* in the ruling for the proposition that because the obligation produced cash, the obligation is a liability for purposes of section 752. However, the case actually held that the obligation was not a liability.[3]

In *Salina Partnership LP, FPL Group, Inc. v. Comm'r*, T.C. Memo 2000-352, the taxpayer purchased a 98% interest in Salina Partnership LP, a Delaware limited partnership. Among the transactions that Salina had entered into prior to taxpayer's purchase was a short sale of U.S. Treasury bills. Under Regulations then in effect, the purchase of 50% or more of the interests in a partnership within a 12 month period caused a constructive termination of the partnership, involving a deemed liquidation of the "old" partnership and a contribution of the assets, subject to partnership liabilities to a "new partnership". As a result of the constructive termination, the

---

[3] In Revenue Ruling 95-8, 1995-1 C.B. 107, the IRS concluded that income from a short sale was not unrelated business income to a tax-exempt organization. In the ruling, the IRS stated that the income would be unrelated business income if the seller incurred "acquisition indebtedness" under section 514. In concluding that the income was not taxable, the IRS cited *Du Pont* for the proposition that the obligation was not indebtedness. Revenue Ruling 95-26 cross-references Revenue Ruling 95-8.

The IRS has asserted its theory that a short sale creates a liability for section 752 purposes in *Fulcrum Financial Partners v. Commissioner*, No. 3944-96 (Tax Court, filed March 5, 1996) and *FFP Acquisition Partners, L.P. v. Commissioner*, No. 3943-96 (Tax Court, filed March 5, 1996). The taxpayers have argued that the obligation is a contingent amount that could not be determined. The IRS used the same analysis as in Revenue Ruling 95-26. *FFP Acquisition Partners* was dismissed on May 22, 1997, because of jurisdictional issues.

"new" partnership received the Treasury bills subject to the "old" partnership's undertakings under the short sale. The IRS contended that such undertakings constituted liabilities for purposes of Code Section 752, whereas the taxpayer contended that the undertakings did not. The Court concluded that the partnership's obligation to close its short sale by replacing the Treasury bills that it had borrowed represented a partnership liability for purposes of Code Section 752.

In making its argument that the short sale did not create such a liability, the taxpayer relied upon *Helmer, infra*, for the proposition that an "open transaction" did not create a liability. The court distinguished the option in *Helmer* from a short sale, stating that a short sale transaction and the writing of an option are "materially different" because the option in *Helmer*, as is the case with the Short Options, created no claim for repayment or demand for further services. Thus the court implicitly affirmed its decision in *Helmer* that an option which may expire unexercised is not a liability for purposes of Code Section 752.

Based upon the foregoing, it is more likely than not that Rev. Rul. 95-26, *supra*, would be distinguishable from PSM LLC's indirect assumption of obligations under the Short Options, because as recognized in the *Salina* case, the short sale creates a legally enforceable obligation to deliver securities, whereas an option does not create a similar obligation. It is the creation of such an enforceable obligation, coupled with the receipt of sale proceeds by the partnership that allowed the IRS to bootstrap itself into the liability conclusion reached by the Ruling. *See*, Rev. Rul. 88-77, *supra*, cited in the Ruling, that also involved noncontingent, legally enforceable obligations. The requirement to perform under an option is not treated as fixed or legally enforceable at the time the option is entered into.

In the present situation, the Short Options are European-style options, which means that each could only be exercised or settled on its termination date, and at the date of transfer they were in the money. Thus, at the time of the transfer the claims of the counter-party to the Short Options were entirely speculative and contingent, because it was unknown whether any of the Short Options would still be in the money on termination.

**b. Treatment of Options**

In what appears to be the only decided case on point, the Tax Court agreed with the IRS that the obligation of the grantor of an option is not a liability within the meaning of section 752. In *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), a partnership sold an option to purchase land that it owned and distributed the premium to the partners. The taxpayer asserted that the partnership's undertaking under the option was a liability for purposes of section 752, and thus increased his basis in the partnership. If the option were not considered a liability, then the amount of the premium distributed would exceed the partner's basis in the partnership, and the partner would recognize gain on the excess under section 731. The court agreed with the IRS that the undertaking to perform under the option agreement did not create a liability to the partnership. The partnership had no obligation to return the premium, and the premium had no restriction on its use, other than that it would be credited against the purchase price if the option were exercised. "The option agreement, however, created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future. Therefore we hold

that no liability arose under section 752 and the partners' bases cannot be increased by such amounts." *Helmer*, at 731. Likewise, the Short Options' contracts create no obligation to return the premiums to the purchasers. Indeed, the premiums represent deferred income to the sellers and are not liabilities.

The undertaking of a grantor of a call option is clearly distinguishable from the undertaking created under a short sale. The short sale must always be closed by the seller purchasing and delivering the borrowed securities. The uncertain features are the price at which the securities will be acquired, and when the short sale will be closed. In contrast, the grantor of a call option does not know whether he will ever be called on to perform under the option. Most out-of-the-money options, like the Short Options, expire unexercised. The grantor's obligation is remote, contingent and speculative, similar to the obligations in *Long* and *La Rue*.

The IRS has recognized the distinction between selling a call option and engaging in a short sale. In Revenue Ruling 80-238, 1980-2 C.B. 76, the IRS stated that: "[t]he sale of a call option does not create in the seller an option to sell the underlying stock since consummation of the stock sale is under control of the person to whom the call was sold. *See*, Rev. Rul. 58-234, 1958-1 C.B. 279. Furthermore, the sale of a call option is not a short sale since it is the sale of the right to acquire stock rather than the sale of the stock itself."

In the context of a corporate reorganization, the IRS has concluded, without any discussion or citation of authority, that the obligation to issue stock under a warrant or stock option is a liability. Revenue Ruling 68-637, 1968-2 C.B. 158, amplified by Revenue Ruling 98-10, 1998-10 I.R.B. 11, held that the acquiring corporation's assumption of the acquired company's obligations under outstanding warrants and stock options was an assumption of liabilities. Consequently, the acquisition qualified as a tax-free reorganization. *See also*, PLR 8303028 (October 15, 1982); PLR 7951128 (September 24, 1979). The holding of these rulings should not be extended beyond their facts. Had the IRS concluded that the obligations were not liabilities for purposes of the reorganization provisions of the Code, the reorganization would have been rendered taxable, placing a major impediment in the way of most corporate reorganizations. The leading corporate tax commentators have stated that:

> It may be that the term "liability," for purposes of §§ 368(a)(1)(C), 357, and 358, is limited to passive obligations for the payment of money and does not include such active contractual obligations as the duty to perform services, supply or repair goods, . . . On the other hand, it does not seem to be necessary that the obligation be fixed or determinable. Thus, contingent liabilities should be counted, unless remote or speculative.

Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, (7th ed. 2000) ¶12.65[2][a]. [Footnotes omitted.]

**c. Administration's Fiscal Year 2001 Revenue Proposals**

**(i) Background**

On April 4, 2000, Senate Finance Committee Chairman Roth and Senator Moynihan (D-NY) introduced a bill ("2000 Bill") to be included in the Trade and Development Act of 1999 (otherwise known as the Africa/CBI trade bill). The 2000 Bill was ultimately not included in Africa/CBI trade bill, but there is possibility that a similar bill could be introduced for inclusion in other legislation. The 2000 Bill provided:

SECTION 1. PREVENTION OF DUPLICATION OF LOSS THROUGH ASSUMPTION OF LIABILITIES GIVING RISE TO A DEDUCTION.
(a) IN GENERAL.--Section 358 of the Internal Revenue Code of 1986 (relating to basis to Distributees) is amended by adding at the end of the following new subsection:

"(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.-

"(1) IN GENERAL.--If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability--

"(A) which is assumed in exchange for such property, and

"(B) with respect to which subsection (d)(1) does not apply to the assumptions.

"(2) EXCEPTIONS.--Except as provided by the Secretary, paragraph (1) shall not apply to any liability if--

"(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

"(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

"(3) LIABILITY.--For purposes of this subsection, the term 'liability' shall include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title."

(b) DETERMINATION OF AMOUNT OF LIABILITY ASSUMED.--Section 357(d)(1) of the Internal Revenue Code of 1986 is amended by inserting "section 358(h)," after "section 358(d),".
(c) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS AND S CORPORATIONS.--The Secretary of the Treasury or his delegate--(1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships, and

(2) may prescribe rules which provide appropriate adjustments under subchapter S of chapter 1 of such Code in transactions described in paragraph (1) involving S corporations rather than partnerships.

(d) EFFECTIVE DATES.--
(1) IN GENERAL.--The amendments made by this section shall apply to assumptions of liability after October 18, 1999.
(2) RULES.--The rules prescribed under subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

Previously, on February 7, 2000, the Administration released its Fiscal Year 2001 Budget ("2001 Budget"). On February 7, 2000, the Treasury Department released "General Explanations of the Administration's Revenue Proposals" ("2001 Revenue Proposals") describing in limited detail the various revenue raising provisions contained in the 2001 Budget. One such provision was entitled "PREVENT DUPLICATION OR ACCELERATION OF LOSS THROUGH ASSUMPTION OF CERTAIN LIABILITIES" and proposed legislation to halt this perceived abuse.

The provision reads as follows:

Current Law

Generally, no gain or loss is recognized when one or more persons contribute property in exchange for stock and immediately after the exchange such person or persons control the corporation. However, the person may recognize gain to the extent it receives money or other property ("boot") as part of the exchange. The assumption of liabilities by the controlled corporation generally is not treated as boot received by the transferor, except to the extent that the liabilities assumed exceed the total of the adjusted basis of the property transferred to the controlled corporation.

In general, the transferor's basis in the stock of the controlled corporation is the same as the basis of the contributed property, increased in the amount of gain recognized to the transferor on the exchange, and reduced by the amount of boot received. For this purpose, the assumption of a liability generally is treated as boot.

Special rules apply with respect to the assumption of a liability that would give rise to a deduction. These liabilities are not taken into account in determining whether the transferor has a gain on the exchange, and do not reduce the amount of the transferor's basis in the stock of the controlled corporation. In Rev. Rul. 95-74, 1995-2 C.B. 36, the Internal Revenue Service ruled that the assumption of certain contingent liabilities by an accrual basis corporation is subject to this rule.

Reasons for Change

The rules permitting certain liabilities or potential liabilities (*i.e.*, liabilities that would give rise to a deduction) to be excepted from the boot and basis reduction rules were intended to facilitate the incorporation of a business together with

associated liabilities, in situations where the transferor had not yet obtained the benefits of the tax deduction associated with the liability.

Relying on these special rules and other authority, however, some taxpayers have attempted to accelerate or duplicate deductions for certain losses by separating liabilities from the associated business or assets, having those liabilities assumed by a controlled corporation, and then selling stock in that corporation at a purported loss.

Proposal

If the basis of stock received by a transferor in an exchange involving a contribution to a corporation controlled by the transferor (and any other persons participating in the exchange) exceeds its fair market value (without regard to this proposal), then the basis of the stock received would be reduced (but not below its fair market value) by the amount (determined as of the date of the exchange) of any liability that is assumed by the controlled corporation and that did not otherwise reduce the transferor's basis in the stock of the controlled corporation.

For purposes of this proposal, the term "liability" would include any fixed or contingent obligation to make payment, without regard to whether such obligation or potential obligation otherwise is taken into account under the Code. Except as provided by the Secretary of the Treasury, however, the proposal would not apply where the trade or business or substantially all the assets with which the liability is associated also are transferred to the controlled corporation. The determination of whether a liability, as so defined, has been assumed is made in accordance with the provisions of section 357(d)(1) of the Code.

*Regulations would be issued to prevent the acceleration or duplication of losses through the assumption of liabilities in transactions involving partnerships*, and also may be issued to modify the rules of this proposal as applied to S corporations.

*The proposal and the regulations addressing transactions involving partnerships would be effective for assumptions of liability on or after October 19, 1999, the date that a substantially similar proposal was released for markup by the Chairman of the Senate Committee on Finance.* Regulations addressing transactions involving S corporations would be effective on or after October 19, 1999, or such later date as may be prescribed by such rules. No inference is intended as to the current law tax treatment of transactions affected by this proposal. [Emphasis added.]

As described in the foregoing provision, on October 19, 1999, the Joint Committee on Taxation released its "Description of Modified Chairman's Mark Relating to Expiring Tax Provisions." Section II of the thereof described Revenue Offset Provisions. Subsection M of Section II was entitled, as in the 2001 Revenue Proposals, "Prevent Duplication or Acceleration of Loss

Through Assumption of Certain Liabilities" ("1999 Proposal") and proposed legislation to halt this perceived abuse. The 1999 Proposal also included authority to promulgate Regulations for similar partnership transactions having the same October 19, 1999 effective date. On October 26, 1999, the Senate Finance Committee Chair, William Roth, introduced S. 1792 ("1999 Bill"). Section 213 of the 1999 Bill adopted statutory language implementing the 1999 Proposal by amending section 358. The effective date of such provision was October 19, 1999.

The Senate Finance Committee then prepared Report 106, "REPORT of the COMMITTEE ON FINANCE UNITED STATES SENATE to accompany S. ____" ("1999 Report"), which included an explanation of each of the provisions of the 1999 Bill, including section 213 of the 1999 Bill. The 1999 Report provided an illustration of the effect of the amendment in an example. The example provides:

> Assume a taxpayer transfers assets with an adjusted basis and fair market value of $100 to its wholly-owned corporation and *the corporation assumes $40 of liabilities (the payment of which would give rise to a deduction)*. Thus, the value of the stock received by the transferor is $60. Under present law, the basis of the stock would be $ 100. The provision requires that the basis of the stock be reduced to $60 (*i.e.*, a reduction of $40). The basis reduction would not be required if the transferred assets consisted of the trade or business with respect to which the liability arose. [Emphasis added.]

**(ii) Targeted Abuse: Transactions Relying Upon Revenue Ruling 95-74**

From the 2001 Revenue Proposals, the 1999 Proposal, and the 1999 Report, it appears that the targeted abuse consists of tax strategies that make affirmative use of section 357(c)(3), *i.e.*, liabilities that give rise to a deduction and, consequently, are not taken into account for purposes of sections 357 and 358. Such liabilities were those addressed in Revenue Ruling 95-74, 1995-2 C.B. 36, which was specifically referred in the 2001 Revenue Proposals and footnote 19 of the 1999 Proposal.

Section 357(c)(3)(A) provides that for purposes of Section 357(c), the term "liability" does not include any liability the payment of which would give rise to a deduction.[4] When section 357(c) was amended by adding section 357(c)(3), section 358(d) was also amended by adding section 358(d)(2). Section 358(d)(2) provides that liabilities excluded under section 357(c)(3) will not

---

[4] Section 357(c)(3)(A) states that if a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either (i) would give rise to a deduction, or (ii) would be described in section 736(a), then, for purposes of section 357(c)(1), the amount of such liability shall be excluded in determining the amount of liabilities assumed. Section 357(c)(1) provides that in the case of an exchange to which section 351 applies, if the sum of the amount of liabilities assumed exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of an asset.

be treated as money received by the transferor under section 358(d)(1).[5] The IRS specifically addressed a transaction involving such liabilities in Revenue Ruling 95-74, *supra*.

Revenue Ruling 95-74, involved the transfer by a corporation ("P") of an ongoing business to a newly formed subsidiary ("S") in an exchange governed by section 351. In connection with the transfer, S agreed to assume certain contingent environmental liabilities associated with the transferred business assets. The ruling provided that P had no plan or intention to dispose of the S stock it received in the exchange. Revenue Ruling 95-74 addressed two issues:

(a) Whether contingent environmental liabilities assumed by S should be treated as liabilities for purposes of sections 357(c)(1) and 358(d); and

(b) Whether S properly could deduct or capitalize any of the expenses it subsequently incurred in connection with the assumed contingent environmental liabilities?

The IRS ruled that because the contingent environmental liabilities had not been taken into account by P (*i.e.*, had not given rise to a deduction or resulted in the creation of, or increase in, the basis of any property) prior to the transfer, they were not liabilities for purposes of sections 357(c)(1) and 358(d). The IRS also ruled that the liabilities assumed by S in the section 351 exchange were deductible by it as business expenses under section 162 or were capital expenditures under section 263, as appropriate, under its method of accounting.

The ruling assumed a business purpose for the transfer, which included "all the assets of an entire business," so that section 357(b)(1) would not be an issue. The ruling effectively concluded that because the liabilities were inchoate, *i.e.*, they had not yet been taken into account by the transferor, they were not sufficiently "real" to be taken into account under sections 357 and 358.[6] The ruling provided that in enacting section 357(c)(3), Congress was concerned about the overstatement of liabilities and the consequent over-taxation in the context of an incorporation of an ongoing business. As a result, section 357(c)(3) was adopted to exclude liabilities from the calculation of gain recognition and basis if the liabilities would not give rise to a deduction. The ruling explicitly expanded that concept to liabilities that would give rise to capital expenditures as well.

The fact pattern contained in Revenue Ruling 95-74 is that of a transfer of a complete and ongoing business unit. In the ruling, the IRS permitted the transferee to deduct or capitalize expenses arising from such liabilities and stated that it would not follow *Holdcroft Transp. Co. v.*

---

[5] Section 358(a)(1) provides that the basis in the transferee stock received by the transferor in an exchange to which section 351 applies is equal to the basis of the property transferred, decreased by the amount of money received by the transferor in the transaction. Section 358(d)(1) provides that for this purpose, liabilities assumed in the transaction are treated as money received by the transferor. Accordingly, to the extent liabilities are assumed by the transferee, the transferor's basis in the transferee stock is correspondingly decreased.

[6] Before the transfer, the parent had neither deducted nor capitalized any of the new subsidiary's environmental liabilities.

*Commissioner*, 153 F.2d 323 (8th Cir. 1946), aff'g 4 T.C.M. (CCH) 508 (1945) in situations described in the ruling. In *Holdcroft*, the court held that a transferee corporation which assumed the transferor partnership's contingent and unliquidated tort liabilities could not deduct the settlement of those claims because they did not arise out of the transferee's business. Rather than being deductions, the assumed liabilities became part of the transferee's capitalized cost of the transferred assets, even though those assets represented the transferor's business from which the tort claims arose. It did not matter to the court that the liabilities were contingent in the hands of the transferor. What the court found critical was that, "[t]he events fixing the liability and making it the liability of the predecessor partnership had already occurred and were in no way changed by or after the transaction between the petitioner and its predecessor."[7] As a result, the court treated the assumption of such "fixed" liabilities as additional purchase price. In this regard, the ruling's facts were similar to those in *Holdcroft*. This is because the facts of the ruling indicated that events fixing the existence of the environmental liabilities had already occurred prior to the transfer, although the events fixing the amount and timing of the liabilities in terms of permitting the transferor to claim a deduction for or capitalize the expenses arising therefrom had not yet occurred.

The principal reviewer of Revenue Ruling 95-74, Victor Penico, chief of IRS Corporate Branch 3, told the ABA Corporate Tax Committee that Revenue Ruling 95-74 should not be read to allow the creation of a double deduction when less than an entire business is being transferred.[8] He stated that, when the ruling was drafted, the drafters were aware of the transaction that Congress was worried about, and took care to limit the benefit of the ruling to transfers of entire businesses. In its concluding paragraph, he noted, the ruling picks up the clear reflection of income concept, signaling the IRS' disapproval of transactions that dissociate the deductions for payments of liabilities from the underlying business assets from which the liabilities arose. In cases of dissociation, Penico warned, the IRS will continue to take the position that the transferee subsidiary does not get a deduction for payments of contingent liabilities according to *Holdcroft*.

Notwithstanding the premise of Revenue Ruling 95-74 and such warnings, it appears that transactions have been undertaken in the absence of the transfer of an ongoing business to achieve the same results. An example of what appears to be such a section 357(c)(3) tax strategy targeted by the 2000 Bill, 2001 Revenue Proposals, the 1999 Proposal, and the 1999 Bill is as follows:

> An accrual method corporation has a contingent liability reasonably estimated to be $90 million and transfers the liability to a newly formed subsidiary. The transferor also contributes a tradable debt security, issued by another group member and having a face amount and purchase price of $100 million, to the new subsidiary in a section 351 transfer. The transferor's basis in its subsidiary shares would be $100 million, because section 357(c) disregards the contingent liability. The transferor receives common and preferred shares in the section 351 exchange.

---

7 *Holdcroft Transp. Co. v. Commissioner*, 4 T.C.M. (CCH) at 510.

8 Lee A. Shepard, "News Analysis - Tinkering with Assumption of Liabilities," 1999 TNT 172-2 (September 7, 1999).

> The transferor immediately sells the preferred shares at a loss, because their value is much less than the transferor's basis, which does not take the contingent liability into account. (The transferor avoids the loss disallowance rule of Regulation § 1.1502-20 by funding the new subsidiary with the debt and shares of other members, which are not part of the duplicated loss calculation.) The subsidiary would then claim a deduction for the contingent environmental liabilities when they were paid.[9]

Such a transaction enabled the transferor corporation to both accelerate through a built-in loss, and duplicate, in the hands of the subsidiary, its deduction for payment of the contingent liability.

The 2000 Bill, 2001 Revenue Proposals, the 1999 Revenue Proposal, and the 1999 Bill effectively provide for a two-step analysis to determine whether it is necessary to adjust a shareholder's or partner's basis in its stock or partnership interest. The taxpayer must first determine whether the basis of stock (or partnership interest) received as part of a tax-free exchange exceeds its fair market value. If a shareholder's (or partner's) basis in its stock (or partnership interest) exceeds its fair market value, the shareholder (or partner) must adjust basis by the amount of any "liability" that is assumed in exchange for the stock (or partnership interest) and does not otherwise reduce the transferor's basis by reason of the assumption.

Under the 2000 Bill, 2001 Revenue Proposals, the 1999 Proposal, and the 1999 Bill, the term "liability" includes any obligation to make payment, without regard to whether the obligation is fixed or contingent or otherwise taken into account under the Code. The 2001 Revenue Proposals appear to expand the definition of a liability beyond the scope of the 1999 Proposal and the 1999 Bill to include "potential" liabilities. It is unclear whether such expanded definition of liability is intended to apply beyond the *Holdcroft*/Revenue Ruling 95-74 situation in which "[t]he events fixing the liability and making it the liability of the predecessor partnership had already occurred and were in no way changed by or after the transaction between the petitioner and its predecessor."[10] Given the abuse that is intended to be curtailed as described in the 1999 Bill, it is more likely than not that it does not. Thus, there must be an obligation constituting a liability of the transferor at the time of the transfer. Requirements to perform, such as the writer's requirements to perform under an option, may never arise, and if they were to, would not arise until a future date based upon external events that are not known until such time. It is more likely than not that such requirements to perform would fall outside of the scope of the 2000 Bill, 2001 Revenue Proposals, the 1999 Proposal, and the 1999 Bill, because they may never mature to the level of the obligations described in Revenue Ruling 95-74.

The 2000 Bill and 2001 Revenue Proposals also expand the exception to permit the assumption of such liabilities without adjustment in connection with the transfer of a trade or business beyond the scope of the 1999 Proposal, the 1999 Bill, and Revenue Ruling 95-74 to include a transfer of "all of the assets with which the liability is associated." Thus, except as provided in Regulations, no adjustment would be required under the corporate or partnership provisions in

---

9 *Id.*

10 *Holdcroft Transp. Co. v. Commissioner*, 4 T.C.M. (CCH) 508, 510 (1945).

the case of the assumption of fixed, contingent, or "potential" liabilities in connection with the transfer of "all of the assets with which the liability is associated."

(c) **Application to the Transactions**

As discussed above, it is more likely than not that the Short Options do not create an obligation on the part of any of the Parties until the time, if any, that any of the Parties would have been required to settle any of the Short Options pursuant to their terms. As such, it is more likely than not that the Short Options would not create an obligation under the *Holdcroft*/Revenue Ruling 95-74 approach prior to the time, if any, at which the Parties were required to make a payment to settle the Short Options in accordance with their terms. Furthermore, in the instant case, the Parties transferred all of the assets to which the Short Options were associated to PSM LLC. Consequently, it is more likely than not that the Short Options would not be considered to be obligations of the Parties that would be considered "liabilities" for purposes of the 2000 Bill, 2001 Budget and the 2001 Revenue Proposals.

Consequently, it is more likely than not that the Short Options would not be considered "liabilities" for purposes of section 358 (and therefore, under regulations to be issued, section 752) or for purposes of the 2001 Budget and the 2001 Revenue Proposals.

As noted above, the basis of each of the Long Options in the hands of each of the Parties was his cost. Section 1012. For purposes of section 752, it is more likely than not that the Short Options would not be considered liabilities. Accordingly, based on the foregoing facts and authority, it is more likely than not that each of the Parties' total adjusted basis in the PSM LLC interests received would equal the Parties' basis in the Long Options contributed, without adjustment for the Short Options.

3. **Amount of Liability**

Even if the undertakings under the Short Options are considered liabilities, it is more likely than not that each of the Parties' basis in his PSM LLC interests would not be affected. This is because the amount of the "liability" more likely than not would be considered zero. In Revenue Ruling 95-45, 1995-1 C.B. 53, the taxpayer sold securities short and contributed the $1,000x proceeds and the short sale obligation to a corporation in exchange for stock in a section 351 transfer. At the time of the transfer, the value of the securities was $800x. The IRS concluded that the short sale obligation was a liability, and that the amount of the liability was $1,000x.

If the IRS is correct that the amount of the liability is determined by the original value of the securities to be delivered, it is more likely than not that the Short Options would be distinguishable. At the time that the Short Options were created and at the time they were transferred to PSM LLC, they were out of the money. Consequently, the Parties would not have had to transfer anything to satisfy the undertakings. The IRS might assert that the amount of the liability is not the actual amount of the liability but the amount included in basis. This argument produces an incorrect result in other contexts, and it is more likely than not that it would be rejected here. To illustrate, assume that a taxpayer purchases an asset with $1,000x of borrowed funds, repays a portion of the loan with other assets, and then contributes the property and the

liability to a corporation. Under the IRS approach, the taxpayer's basis under section 358 in the stock received would be reduced by $1,000x, the original amount of the loan included in basis. This is clearly the incorrect result, and basis should be reduced only by the actual amount of the liability. In the case of an out of the money option, this most likely than not would be zero.

### C. Treatment of Foreign Currency Contracts

#### 1. Section 988 Transactions

Section 988 contains a complex set of rules prescribing the tax treatment of transactions in foreign currency. The general rule of section 988(a) is that gain or loss on a "section 988 transaction" is ordinary gain or loss. This rule applies notwithstanding any contrary provision providing for capital gain or loss treatment, such as sections 1233, 1234, or 1234A. Sec. 988(a) and Treas. Reg. § 1.988-3(a).

A "section 988 transaction" is (i) the disposition of a nonfunctional currency; or (ii) any of the following transactions if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency: (a) acquiring a debt instrument or becoming liable on a debt instrument; (b) accruing or otherwise taking into account any item of expense or gross income which is to be paid or received after the date it is accrued or taken into account; and (c) entering into or acquiring a forward contract, futures contract, option, warrant, or similar financial instrument. Sec. 988(c)(1) and Treas. Reg. § 1.988-1(a). The dollar is the functional currency for the Parties and PSM, LLC. Sec. 985(b) and Treas. Reg. § 1.985-1(b)(1). Therefore, the European Union Euro, and all other currencies, will be nonfunctional currencies. Treas. Reg. § 1.988-1(c).

Section 988(c)(1)(D) and Regulation § 1.988-1(a)(7)(i) exclude from the scope of a "section 988 transaction" a regulated futures contract and a nonequity option that would be marked to market under section 1256 if held on the last day of the taxable year. A taxpayer can make an election under Regulation § 1.988-1(a)(7)(ii) not to have this provision apply, and thus be subject to section 988. Under section 1256(g), a regulated futures contract and a nonequity option are contracts that are traded on or subject to the rules of a qualified board or exchange. Because the Options bought and sold by the Parties are traded over the counter, they are not subject to the rules of a qualified board or exchange. Consequently, section 988(c)(1)(D) more likely than not would not be applicable to the options discussed herein.

#### 2. Source of Gain or Loss

Section 988(a)(3) provides that the source of the gain or loss recognized on a section 988 transaction is sourced to the residence of the taxpayer. Because the Parties and PSM LLC are United States persons under section 7701(a)(30), any gain or loss will be United States source gain or loss.

### 3. Section 1256

Section 1256 creates an exception to the general rule that a taxpayer does not recognize gain or loss from property until the property is sold or otherwise disposed of. A taxpayer owning a "section 1256 contract" must mark to market the contract at the end of the taxable year. That is, the taxpayer must treat the contract as being sold for its fair market value on the last business day of the taxable year. Sec. 1256(a). The taxpayer will include in taxable income for such year the resulting gain or loss and will treat 40% of the gain or loss as short-term gain or loss and the balance of the gain or loss as long-term gain or loss.

Section 1256(b) defines a section 1256 contract as (i) a regulated futures contract within the meaning of section 1256(g)(1), (ii) a foreign currency contract within the meaning of section 1256(g)(2), (iii) a nonequity option within the meaning of section 1256(g)(3), and (iv) a dealer equity option within the meaning of section 1256(g)(4).

A futures contract is not defined in section 1256. However, the Commodities Future Trading Commission ("CFTC") has defined a futures contract as:

> [A]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at the initiation of the contract; (2) *which obligates each party to the contract* to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied by delivery or offset. [emphasis added]

See, CFTC Glossary: A Layman's Guide to the Language of the Futures Industry. Because an option is conditional, each party to the contract is not so obligated. As a result, it is more likely than not that the Options would not be treated as futures contracts for purposes of section 1256. Furthermore, even if the Options constituted futures contracts, over-the-counter futures contracts between two private parties, such as the Options, are not "regulated futures contracts" within the meaning of section 1256(g)(1). See, Rev. Rul. 87-43, 1987-1 CB 252. Consequently, it is more likely than not that the Options would not constitute regulated futures contracts within the meaning of section 1256(g)(1).

Section 1256(g)(3) defines a nonequity option as any listed option, within the meaning of section 1256(g)(5), that is not an equity option. Section 1256(g)(5) defines a listed option as any option listed on, or subject to the rules of, a qualified board or exchange. Section 1256(g)(7) defines a qualified board or exchange as a national securities exchange that is registered with the SEC; a domestic board of trade designated as a contract market by the CFTC; or any other exchange, board of trade or other market that the Treasury determines has certain rules. In the instant case, the Options are not listed on a CFTC-designated contract market. Consequently, it is more likely than not that the Options are not listed options within the meaning of section 1256(g)(5). Furthermore, section 1256(g)(6) defines an equity option as an option to buy or sell stock or an option the value of which is directly or indirectly determined by reference to one or more stocks or a stock index. It is more likely than not that the Options would be equity options under this

definition. As a result, it is more likely than not that the Options would be nonequity options within the meaning of section 1256(g)(3).

Section 1256(g)(4) defines a dealer equity option as an equity option that is purchased or granted by an options dealer and that is listed on the qualified board or exchange on which such options dealer is registered. The Options are not based upon equity investments, therefore, it is more likely than not that the Options would not be dealer equity options within the meaning of section 1256(g)(4).

A "foreign currency contract" is defined in section 1256(g)(2) as a contract (i) which requires the delivery of, or the settlement of which depends on the value of, a foreign currency in which positions are traded through regulated futures contracts; (ii) which is traded in the interbank market; and (iii) which is entered into at arm's-length at a price determined by reference to the price in the interbank market. Thus, to be a foreign currency contract within the meaning of this section, the contracts must be traded in the interbank market.

The Options are traded over the counter, not in the interbank market. The scope of this provision regarding foreign currency contracts is evidenced in the legislative history, which reflects the fact that interbank trading was substantially similar to regulated futures contracts:

> Trading in foreign currency for future delivery is conducted through regulated futures contracts, and is also conducted through contracts negotiated with any one of a number of commercial banks which comprise an informal market for such trading (bank forward contracts). . . . Although bank forward contracts differ from regulated futures contracts, the volume of trading through forward contracts in foreign currency in the interbank market is substantially greater than foreign currency trading on futures exchanges, and prices are readily available.

S. Rep. No. 475, 97th Cong., 2d Sess., 26 (1982).

The conference report further clarified the requirement of trading in the interbank market by stating that these contracts generally:

> include not only contracts between a commercial bank and another person but also contracts entered into with a futures commission merchant who is a participant in the interbank market. A contract between two persons neither of whom is a futures commission merchant or other similar participant in the interbank market is not a foreign currency contract under the provision.

H.R. Conf. Rep. No. 986, 97th Cong., 2d Sess., 25 (1982).

Because the Options are traded in the over the counter market, not in the interbank market, they more likely than not would not be considered foreign currency contracts within the meaning of this section. Consequently, section 1256 more likely than not would not apply to either the Long Options or the Short Options.

Were the Options section 1256 contracts that were subject to the mark-to-market rules, the transfer of the Options to PSM LLC would require the Parties to recognize any gain or loss that arose with respect to each of the options from the time the options were acquired to the date of such transfer. Because the period of time that the Parties held the Options was very short, it is not anticipated that any such gain or loss would be material. Were the Options section 1256 contracts that were subject to the mark-to-market rules upon their transfer to PSM LLC, it is possible that the IRS might content that the transfer should be treated either (i) as if the transferor sold the options to PSM LLC or (ii) as if the transferor closed its position in the options and PSM LLC entered into "new" options having the same terms. Were the IRS successful in making such contention, the transfer of the options to PSM LLC would not be subject to the rules regarding contributions to a partnership as discussed below. We believe that it is more likely than not that the IRS would not be successful were it to so contend.

The purpose of enacting section 1256 as part of the Economic Recovery Act of 1981 ("1981 Act") was to conform the tax treatment of regulated futures contracts to the daily cash settlement, mark-to-market system employed by U.S. commodity futures exchanges for purposes of determining margin requirements. Under this system, even though a trader does not close out a position, but continues to hold it, the trader receives any gain in the position in cash as a matter if right each trading day and the trader has the right to withdraw such amount. Correspondingly, if the position declines in value, the trader is required to deposit additional funds. Thus, Congress intended section 1256 to apply the doctrine of "constructive receipt" to the economic gains or losses realized by the taxpayer at year end even though the taxpayer continued to hold such positions. See, General Explanation of the Economic Recovery Act of 1981 (H.R. 4242, 97th Cong., P.L. 97-34) prepared by the Staff of the Joint Committee on Taxation (12/31/81)("1981 General Explanation") at 296. In Murphy v. U.S., 992 F.2d 929 (9th Cir. 1991), aff'g an unreported District Court decision, the court concluded that section 1256 was constitutional because Congress premised recognition of gain or loss under section 1256 on the existing doctrine of constructive receipt.

The 1981 General Explanation also provides:

> If a taxpayer holds futures contracts at the beginning of a taxable year, any gain or loss subsequently realized *on these contracts* must be adjusted to reflect any gain or loss taken into account *with respect to these contracts* in a prior year.

Although Congress could just as easily provide that the mark-to-market rules created a constructive sale and repurchase of the contracts to adjust the basis of the contracts to reflect the gains and losses triggered under section 1256(a)(1), it did not do so. Rather it chose to apply constructive receipt principles to merely trigger mark-to-market gain or loss with respect to a contract at a particular point in time and to adjust the amount of subsequent gain or loss with respect to such contract by reference to such previously recognized gain or loss.

Section 1256(a) as enacted pursuant to the 1981 Act only applied to contracts held by a taxpayer at year-end and did not address events occurring within the year, such as a termination or transfer

of a contract. To do so, Congress added section 1256(c) as part of the Technical Corretions Act of 1982 ("1982 Act"). Section 1256(c) provides relevant part:

> IN GENERAL. The rules or paragraphs (1) [income and loss recognition], (2) [proper adjustment], and (3) [character] of subsection (a) shall also apply to the termination (or transfer) during the taxable year of the taxpayer's obligation (or rights) with respect to a section 1256 contract by offsetting, by taking or making delivery, by exercise or being exercised, by assignment or being assigned, by lapse, or otherwise.

In enacting section 1256(c)(1) Congress clearly intended the rules of section 1256(a)(1). (2). and (3) to apply to transfers to by a partner to a partnership. See, JCS-20-82, Description of H.R. 6056, Technical Corrections Act of 1982, prepared for Use by the Committee for Ways and Means for a Hearing on April 27, 1982 by the Staff of the Joint Committee on Taxation ("Description"). At page 3, the Description provides: The bill would require expressly that gains and losses be taken into account when a taxpayer's rights in a regulated futures contract are transferred. Thus, section 1256(a) would apply when transfers of regulated futures contracts are made to and from partnerships and other flow through entities.

Although the legislation could have provided that a transfer to a partnership (or other flow through entity) would be deemed to be a sale by the partner to the partnership or rhe termination of the contract by the partner and the entering into a "new" contract by the partnership, it did not do so. Rather, it merely required that such a transfer trigger the mark-to-market gain recognition and other rules of section 1256(a).

Based on the foregoing, it is more likely than not that the application of section 1256(a)(1) upon the transfer of the Options to PSM LLC would not cause the transferors to be treated either (i) as selling the Options to PSM LLC or (ii) as closing the Parties' positions in the Options and PSM LLC entering into "new" options having the same terms, and that the transfer of the Options to PSM LLC would be subject to the rules regarding contributions to a partnership, as discussed below and a section 1256(a)(2) "proper adjustment" would be made with respect to any subsequent gain or loss recognized by PSM LLC with respect to the contributed Options.

**D. Partnership Income**

Under the general federal income tax rules regarding the taxation of the options, PSM LLC recognizes gain or loss when the Options expire or PSM LLC otherwise disposes of them in a taxable transaction, and it is more likely than not that gain or loss one of the Long Options would equal the difference between PSM LLC's basis therein and its value at the time of disposition or the consideration received for it. While no written guidance appears to exist on this issue, gain or loss on one of the Short Options would more likely than not equal the difference between (i) the original proceeds received by the grantor, reduced by any gain and increased by any loss recognized on the assignment to PSM LLC and (ii) the value of the Short Option to the counterparty at the time of disposition or expiration (or the amount paid by PSM LLC to relieve itself of the undertaking under the Short Option). Under sections 702 and 704 each member

would be allocated such member's distributive share of this gain or loss. and under section 705. each member's distributive share of this gain or loss will be reflected in such member's outside basis in his membership interest.

**1. Allowance of a Deduction**

Section 165 allows a taxpayer to deduct any loss incurred during the year. If a loss is deductible under section 165, the taxpayer deducts the loss in computing adjusted gross income. Sec. 62(a)(3) and Treas. Reg. § 1.62-IT(c)(4). In the case of an individual taxpayer. section 165(c) provides, in relevant part, that the loss is deductible only if it is incurred in a trade or business or in a transaction entered into for profit.

The Parties' investment activities do not constitute a trade or business. In *Higgins v. Commissioner*, 312 U.S. 212 (1941), the Supreme Court concluded that the management of the taxpayer's own investment securities is not a trade or business, even if the taxpayer incurs substantial costs for clerical services and office space. Therefore, the losses incurred by the Parties are deductible only as a transaction entered into for profit.

In determining whether the taxpayer entered the transaction for profit, some courts have held that the taxpayer's profit motive must be the "primary" motive for entering into the transaction. *See. Austin v. Commissioner*, 298 F.2d 583 (2d Cir. 1962); *Feine v. McGowan*, 188 F.2d 738 (2d Cir. 1951); *Fox v. Commissioner*, 82 T.C. 1001 (1984). This requirement was derived from a footnote in *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 289 n.5, *reh'g denied* 305 U.S. 669 (1938), which stated, in relevant part, that "the deductibility of losses under [section 165(c)(2)] may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit." The cases that emphasized the primary purpose test involved investments in commodity straddle transactions where (unlike here) the potential for profit, apart from the tax benefits, was minimal, *see, e.g., Fox*, at 1018, or to distinguish nondeductible personal losses from deductible losses. *Nickerson v. Commissioner*, 700 F.2d 402 (7th Cir. 1983).

In determining whether the taxpayer entered a transaction "for profit," the courts acknowledge that a taxpayer may have many reasons for entering into a transaction and weigh the various factors. Thus, in *Knetsch v. United States*, 348 F.2d 932 (Ct. Cl.), *cert. denied*, 383 U.S. 957 (1965), the court examined and weighted the factors motivating the transaction. In its opinion, the court held that a transaction is not entered into for profit if the only benefit is the tax savings to be realized from the transaction. *See also, Hager v. Commissioner*, 76 T.C. 759, 785 (1981) ("if an activity is engaged in solely to reduce Federal income taxes, the activity is not considered to be engaged in for profit"). In *Smith, supra*, 78 T.C. at 391, the Tax Court did not impose the "primary" test but rather stated that:

> The mere fact that petitioners may have had a strong tax avoidance motive in entering into their commodity tax straddles does not in itself result in a disallowance of petitioners' losses under section 165(c)(2), provided petitioner also had a nontax profit motive for their investments at the time. *See, Knetsch v. United States*, 172 Ct. Cl. 378, 348 F.2d 932, 936-937 (1965). Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so

long as it is bona fide. *See, Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), *aff'd*, 379 F.2d 252 (2d Cir. 1967).

Other cases have also weighed the taxpayer's motives in entering into a transaction. *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984), *aff'd*, 798 F.2d 65 (2d Cir. 1986).

A similar profit requirement is found in section 183, which denies a deduction for any loss incurred in any activity not engaged in for profit. The cases interpreting this standard have held that while "a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity or continued the activity with the objective of making a profit." *Dreicer v. Commissioner*, 665 F.2d 1292, 1299 (D.C. Cir. 1981). *See also, Burger v. Commissioner*, 809 F.2d 355 (7th Cir. 1987) ("only a good faith expectation of profit is required."); *Hagler v. Commissioner*, 86 T.C. 598, 622 (1986); Treas. Reg. § 1.183-2(a). The expectation of profit need not be reasonable but the profit motive must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), *aff'd without published opinion*, 742 F.2d 1441 (2d Cir. 1984).

Where the taxpayer had mixed motives, but the potential for economic gain was real, a loss deduction is allowable. *Wehrly v. United States*, 792 F.2d 878 (9th Cir. 1986); *Johnson v. United States*, 86-2 U.S.T.C. ¶9705 (Cl. Ct. 1986).

In the present case, based on the information and the supporting evidence we have received, each of the Parties entered into the Transactions with a reasonable possibility of making a reasonable profit from his investments in the options and in his investment in PSM LLC. Such a profit potential is analogous to the situation in *Smith*. Given the basis on which each of the Parties entered into the Transactions, it is more likely than not that each of the Parties would have the requisite profit motive, under section 165(c)(2), to support the deduction of any loss incurred by each of the Parties on the disposition of its membership interests in PSM LLC.

**2. Passive Activity Losses**

Section 469 provides, in general, that losses from a passive activity can be deducted only to the extent of the taxpayer's income from passive activities for the year. A loss that is disallowed for a year may be carried forward indefinitely.

Section 469(c)(1) provides that the term "passive activity" means any activity which involves the conduct of any trade or business and in which the taxpayer does not materially participate. The Regulations define a "passive activity" as any trade or business activity. Treas. Reg. § 1.469-IT(e)(2). "Trade or business activity" is defined in Regulation § 1.469-4(b)(1) as an activity that involves the conduct of a trade or business. As discussed previously, it is more likely than not that the Parties' investment activities would not constitute a trade or business.

Section 469(e)(6) provides that, to the extent provided in the Regulations, the term "trade or business" includes (i) any activity in connection with a trade or business, and (ii) any activity in which the expenses are deductible under section 212. In relevant part, section 212 allows a

deduction for expenses incurred for the production of income, or for the management or maintenance of property held for the production of income. The IRS has not exercised its authority under section 469(c)(6) to provide that any investment activity is a passive activity. Consequently, the Parties' investments more likely than not would not be a passive activity and the loss incurred more likely than not would not be subject to the restrictions of section 469.

### 3. Section 465

Generally, the "at risk" provisions limit the ability of certain taxpayers, including the Parties, to currently deduct the losses attributable to certain activities to the extent those losses exceed the taxpayer's "amount at risk" in the "activity". Section 465(a) provides that in the case of certain taxpayers engaged in an "activity" to which the section applies, any "loss from such activity" for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is "at risk for such activity" at the close of the taxable year.

For purposes of section 465, a taxpayer is considered "at risk" for an activity with respect to the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. Section 465(b) and Prop. Reg. §1.46-23(a)(1). Section 465(b)(4) adds that "notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements."

However, section 465 applies only to limit the deductibility of losses from the conduct of the covered activities. It has no effect on the determination of a taxpayer's adjusted basis. Prop. Reg. §1.465-1(e). Moreover, losses attributable to an activity under Section 465 do not include those from the disposition of that activity. Compare Prop. Reg. §1.465-12(a) with Prop. Reg. §1.465-13(a). Cf. Prop. Regs. §1.465-66(a) ("In general, this section will cause amounts disallowed by section 465 in previous taxable years to be allowed for the taxable year of transfer or disposition [of an activity or an interest in the activity].")

Based upon the foregoing, it is more likely than not that any loss that the Parties or PSM, Inc. incurs on the disposition of the Assets would not be limited by the "at risk" rules, because it is more likely than not that such loss would not exceed PSM, LLC's tax basis in the Assets, determined as discussed above. Furthermore, such loss was incurred upon disposition of PSM, Inc.'s interest in the activity.

## E. Possible IRS Attacks

The IRS might be able to make certain arguments that would result in the transactions being recharacterized for tax purposes.

### 1. Step Transaction Doctrine

In determining the tax consequences of a series of events, the courts use a step transaction analysis to determine what is the transaction to which the tax law should be applied. The step

transaction doctrine combines and treats a series of separate steps "as a single transaction if they are in substance integrated, interdependent and focused toward a particular end result." Bittker & Lokken, Federal Taxation of Income, Estates and Gifts (2d ed.). ¶ 4.3.5. The courts have articulated three different formulations of the step transaction doctrine: the "binding commitment" test, the "interdependence" test and the "end result" test. *Penrod v. Commissioner*, 88 T.C. 1415, 1429 (1987).

Under the "binding commitment" test, a series of transactions is amalgamated only if there is a binding legal commitment to undertake each of the steps. *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968). It is more likely than not that this formulation would not apply to the transactions above, as the Parties were not bound in any way to purchase or sell the options, to contribute the Long Options and Short Options to PSM LLC, PSM LLC was not bound in any way to contribute the Assets to PSM, Inc. and PSM, Inc. was not bound in any way to sell the Assets.

Under the "interdependence" test, a series of transactions is integrated only if the steps are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *Manhattan Building Co. v. Commissioner*, 27 T.C. 1032, 1042 (1957), *acq.*, 1957-2 C.B. 5. The interdependence test focuses on the relationship between the steps and whether the first step would have occurred without the second. For example, in *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517 (10th Cir. 1991), the court applied the interdependence test to integrate two purportedly independent transactions and deny the claimed loss because the two agreements were, by their terms, dependent on each other. Unlike the factual situation in *Associated Wholesale Grocers*, each transaction set out above (the purchase of the options, the Parties' investment in PSM LLC, the Parties' contribution of their PSM LLC partnership interests to PSM, Inc. and the sale of the Assets) was independently undertaken by the Parties, and each transaction presented the Parties with the potential for economic gain or loss. *See also, McDonald's Restaurants of Illinois, Inc. v. Commissioner*, 688 F.2d 520, 524 (7th Cir. 1982); *Security Industrial Ins. Co. v. United States*, 702 F.2d 1234 (5th Cir. 1983). Where each step has independent economic significance, the courts will not integrate the steps. *Redding v. Commissioner*, 630 F.2d 1169 (7th Cir. 1980), *cert. denied*, 450 U.S. 913 (1981). In Revenue Ruling 79-250, 1979-2 C.B. 256, *mod. by* Rev. Rul. 96-29, 1996-1 C.B. 50., the IRS agreed, but also inserted a requirement that each step must be "undertaken for valid business purposes and not mere avoidance of taxes."

Based upon the foregoing, each step undertaken by the Parties more likely than not would be viewed as independent from the others and, consequently, it is more likely than not that the "interdependence" formulation of the step transaction doctrine would not be applicable to the transactions. Furthermore, even adopting the position of the IRS in Revenue Ruling 79-250, based on the representations made to us, it is more likely than not that each of the transactions undertaken by the Parties, PSM, Inc. and PSM LLC would be supported by a reasonable expectation of profit.

The "end-result" formulation integrates a series of transactions into a single transaction "when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *King Enterprises, Inc. v. United States*,

418 F.2d 511, 516 (Ct. Cl. 1969). The courts, however, have limited the expansive scope of the end-result test.

In *Esmark, Inc. v. Commissioner*, 90 T.C. 171 (1988), *aff'd without published opinion*, 886 F.2d 1318 (7th Cir. 1989), the taxpayer wanted to dispose of certain businesses owned by one of its subsidiaries. Mobil, an unrelated company, acquired a portion of Esmark's outstanding shares from the public in a tender offer, and then tendered these shares to Esmark in exchange for stock of a wholly-owned subsidiary of Esmark. Under the law at the time, the exchange of the subsidiary's stock for the Esmark shares was tax-free at the corporate level. By contrast, a sale of the subsidiary's stock for cash, which could then have been used to buy back the Esmark shares, was taxable at the corporate level.

Although it recognized that the reduction of taxes was a significant factor in structuring the transaction, that Mobil's tender offer was part of an overall plan, and that Mobil, not Esmark, had borne the economic cost of the tender offer, the Tax Court held that Mobil's ownership of the Esmark shares, "however transitory," must be respected, and the transaction treated as a redemption of the Esmark shares. In rejecting the IRS' attempt to apply the step transaction doctrine to recast the transactions, the court stated:

> That Mobil's tender offer was but part of an overall plan is not in dispute. The existence of an overall plan does not alone, however, justify application of the step-transaction doctrine. Whether invoked as a result of the "binding commitment," "interdependence," or "end result" tests, *the doctrine combines a series of individually meaningless steps into a single transaction*. In this case, respondent has pointed to no meaningless or unnecessary steps that should be ignored.
>
> * * *
>
> Respondent proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. *This recharacterization does not simply combine steps; it invents new ones*. Courts have refused to apply the step-transaction doctrine in this manner.

*Esmark*, T.C. at 195-197. [Emphasis added]. The court further noted that each of the steps "had permanent economic consequences," and could not be combined. *Esmark*, 90 T.C. at 198.

*See also, Grove v. Commissioner*, 490 F.2d 241 (2d Cir. 1973) and *Carrington v. Commissioner*, 476 F.2d 704 (5th Cir. 1973). The Tax Court recently reaffirmed the *Esmark* step transaction analysis. *Turner Broadcasting System Inc. v. Commissioner*, 111 T.C. 315 (1998).

The IRS agrees that the step transaction doctrine does not permit the creation of new steps or the reordering of existing steps. *See*, Rev. Rul. 78-197, 1978-1 C.B. 83. In each of PLR 8815003 (December 11, 1987), PLR 8738003 (May 22, 1987), PLR 8735007 (May 18, 1987), and PLR 8735006 (May 18, 1987), an unrelated underwriter acquired a corporation's outstanding debt, exchanged that debt for other securities of the corporation, and then sold such other securities to

the public. In each technical advice memorandum, the IRS held that the step transaction doctrine cannot be applied to reverse the order of the transactions.

More recently, in *True v. United States*, 190 F.3d 1165 (10th Cir. 1999), the Court of Appeals affirmed a summary judgment granted by the District Court in favor of the IRS regarding the integration of one series of transactions under the "end result" test, where the evidence clearly showed that the end result of the transactions was the sole outcome intended from the outset. With respect to such series of transactions, the Court of Appeals also concluded that such integration would be appropriate under the "interdependence" test since the facts showed that each of the steps would have been fruitless without the subsequent steps. The Court, however, reversed the granting of a second summary judgment in favor of the IRS which integrated another series of transactions, concluding that there was a factual issue under the "end result" test because the evidence created a genuine factual issue as to whether the end result achieved was the sole intended result from the outset. The Court similarly concluded that there was a factual issue under the "interdependence" test because it appeared that each of the steps bore some indicia of independent economic significance. The conclusion that can be drawn from *True* appears to be that if the facts demonstrate that at the time of entering into a series of transactions, an investor has in mind a sole outcome and no other outcome can be discerned, a court can apply the "end result" test to disregard intermediate steps, particularly if those intermediate steps have so little independent economic significance within the "interdependence" test.

In both *Salomon, Inc. v. United States*, 976 F.2d 837 (2d Cir. 1992) and *Walt Disney, Inc. v. United States*, 4 F.3d 735 (9th Cir. 1993), the issue was whether a transfer of assets to a subsidiary as part of a divisive "D" reorganization resulted in the recapture of investment credit. While both courts seemed to apply the "end result" formulation to integrate the transfer of assets and subsequent spin-off, each court cited facts that would indicate a "binding commitment" or "mutual independence" test. In *Walt Disney*, the court cited an overall intention for the steps to occur, and the fact that the company had a legal obligation to transfer the assets and distribute the stock. In *Salomon*, the court based its conclusion in part of the fact that at the time of the asset transfer the taxpayer intended to spin-off the stock, establishing the interdependent nature of the steps. The District Court concluded that such interdependent relationship also existed in the series of transactions integrated under the step doctrine in *True*.

Each of the Parties was at risk with respect to each of his option investments. Each of the Parties bore the risk that his respective option of the Long Options or the Short Options might decline in value while the Parties owned them prior to contributing them to PSM LLC. Additionally, upon contribution of the options to PSM LLC, the Parties also bore the economic risk with regard to a change in the value of its interest in PSM LLC. Thus, the transactions had the type of economic significance lacking in the integrated transactions in *True* and *Salomon*. Consequently, based on *Esmark*, it is more likely than not that the "end result" test of the step-transaction doctrine would not apply to the transactions described above.

Based on the foregoing analysis, it is more likely than not that the step transaction doctrine would not apply to the transactions described above. Each transaction undertaken by the Parties had independent economic significance and placed the Parties at risk. There was no obligation or agreement between the Parties and PSM LLC obligating either of them to undertake any of the

transactions described herein.

**2. Sham Transaction, Lack of Business Purpose or Lack of Economic Substance**

It is well established that a transaction or series of transactions will not be respected for tax purposes unless the transaction or transactions have economic substance separate and distinct from the economic benefit derived from tax reduction. *Gregory v. Helvering*. 293 U.S. 465 (1935). Transactions failing to meet this standard are referred to as "sham transactions" or transactions that lack "economic substance." However, the Supreme Court has held that a transaction should not be disregarded if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*. 435 U.S. 561, 583-584 (1978).

Interpretation of this standard has resulted in case law holdings that held that, to be respected for tax purposes, a transaction must have a business purpose apart from the tax benefits and must have economic substance (a reasonable possibility of profit). "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985). A transaction will be held to have a business purpose unless "the only purpose for entering into the transaction was the tax consequences." *Friedman v. Commissioner*, 869 F.2d 785, 792 (4th Cir. 1989).

"A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages — may indeed have had no other interest in the transaction." *Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir. 1988). The Parties engaged in these transactions in the expectation that a change in the price of the European Union Euro would provide the Parties with the opportunity to earn a reasonable profit. So, it is more likely than not that the transactions described above would not be struck down as a sham.

Despite being inconsistent with the bulk of sham transaction cases, one case has indicated that there must be not only a reasonable possibility of making a profit, but also that the possibility must relate to a profit that is expected to be greater than de minimis. *Sheldon v. Commissioner*, 94 T.C. 738 (1990). Based on the information and economic analysis provided to us, it seems that there is a reasonable expectation that any profit from the Parties's trading, including the Parties's investment in PSM LLC and their investment in PSM, Inc., more likely than not would be greater than a de minimis amount.

As noted above, some courts have said that the existence of a tax motive for entering into a transaction does not negate the existence of economic substance or a profit motive as long as motivation for the transaction is economic profit. *Miller v. Commissioner*, 836 F.2d 1274 (10th Cir. 1988); *See*, *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 289, n.5, *reh'g denied*, 305 U.S. 669 (1938). A merely incidental profit motive is not sufficient for this purpose. *Fox, supra*, 82

T.C., at 1019, citing *Ewing v. Commissioner*, 20 T.C. 216, 233 (1953), *aff'd*, 213 F.2d 438 (2d Cir. 1954). However, also as noted above, the bulk of these cases involve transactions where there was no possibility of any profit.

It is clear that the taxpayer need not be correct in its judgment of possible economic benefits, only reasonable or rational. Profit motive depends on the taxpayer's subjective and good-faith intent to earn a profit. *Finoli v. Commissioner*, 86 T.C. 697, 722 (1986). The fact that a venture fails to produce a profit in the anticipated amount or at all does not indicate that the venture was not profit-motivated. *King v. United States*, 545 F.2d 700, 708 (10th Cir. 1976). A transaction can have economic substance if it is entered into for the purpose of furthering the taxpayer's business interests, even if not directly producing income. *Id.*, at 708.

In a recent case, the United States Tax Court restated the test as follows:

> Key to this determination [whether a transaction has economic substance] is that the transaction must be rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and useful in light of the taxpayer's economic situation and intentions. Both the utility of the stated purpose and the rationality of the means chosen to effectuate it must be evaluated in accordance with commercial practices in the relevant industry. *Cherin v. Commissioner*, 89 T.C. 986, 993-994 (1987). A rational relationship between purpose and means ordinarily will not be found unless there was a reasonable expectation that the nontax benefits would be at least commensurate with the transaction costs.

*ACM Partnership v. Commissioner*, 73 T.C.M. (CCH) 2189, 2217 (1997), *aff'd*, 157 F.3d 258 (3d Cir. 1998), *cert. denied*, 119 S.Ct. 1251 (1999). This case involved a foreign partnership that purchased Citicorp notes and then sold them three weeks later in a contingent installment sales transaction for cash and notes. Income from the sale of the Citicorp notes was principally allocated to the foreign partner. A capital loss from a related transaction was substantially allocated to Colgate-Palmolive, the United States partner. The Tax Court found that Colgate's only opportunity to earn a profit, after transaction costs, was either through an increase in the credit quality of the issuers of the notes, or through a 400-500 basis point increase in 3-month LIBOR interest rates, which increase had to be sustained for at least five years. The court concluded that no improvement in credit quality was possible because the debtors were extremely highly rated at the time of the transaction. The court analyzed the 3-month LIBOR rates over a six-year period, and did not find an increase of even 300 basis points in the necessary time frame. Because the historical data showed no reasonable basis for expecting a profit, the court held against ACM.

On appeal, the Third Circuit upheld the Tax Court's economic substance test, but clarified that in determining whether there was economic substance, a court must look at both the "objective economic substance of the transactions" and the "subjective business motivation" behind them. *ACM Partnership*, 157 F.3d, at 247. The court analyzed the purchase and sale of the Citicorp notes as the relevant transaction, and concluded that this transaction lacked economic substance and should not be respected for tax purposes.

The court found that the transaction lacked objective economic consequences because (i) the Citicorp notes were sold for their purchase price, a result that was inherent in the terms of the note and not the result of market forces, and (ii) the interest earned on the Citicorp notes was only nominally higher than the funds invested had earned in a deposit account, and was substantially less than the transaction costs. The transaction was a "fleeting and economically inconsequential investment . . . that left ACM in the same position it had occupied before engaging in the offsetting acquisition and disposition of those [Citicorp] notes." *ACM Partnership*, 157 F.3d, at 250.

The appellate court also upheld the Tax Court's conclusions that (i) the transactions lacked any nontax purposes, and (ii) the transactions were not reasonably designed to yield a pretax profit because the transactions were planned and executed without regard to their pretax consequences. Unlike the position in *ACM*, based upon the historical performance of the European Union Euro, it is more likely than not that the Parties would have a reasonable expectation of making a profit on the transactions in excess of all associated fees and costs and not including any tax benefits. Accordingly, in terms of the economic substance test set out in *ACM*, it is more likely than not that the transactions contemplated by the Parties would be treated as having economic substance.

Recently, the Service has asserted that even if a taxpayer has a reasonable expectation of economic profit, the transactions should be treated as lacking economic substance because the tax benefits substantially exceed the economic benefits. In *Saba Partnership*, the court accepted this rationale, stating:

> Relatively modest profits are insufficient, *standing alone*, to clothe the disputed CINS transactions with economic substance. In particular, even assuming for the sake of argument that the partnerships reasonably could have expected profits of up to $10,800,000 on a 5-year investment in the LIBOR notes, such profits would be inconsequential when compared with the capital losses of approximately $170,000,000 that the CINS transaction were designed to generate [for the investor] [emphasis added].

However, the court in *Saba* did not say that a transaction lacks economic substance merely because the ratio of tax benefits to economic benefits is high. Also, the Transaction has at least three significant elements lacking in the transaction at issue in *Saba*, all of which reduce the significance of this raw ratio and distinguish the instant case from *Saba*. First, in *Saba*, the partners could achieve a profit--if at all--only by holding on to the investment for five years, while here the Parties would have achieved the profit in a matter of weeks. Second, in *Saba*, the chance of this profit was at most remote, while here the weighted average statistical probability of the profit was substantial. Third, in *Saba*, the partners invested some $200 million in the transaction, so that the court viewed a potential profit of some $11 million in five years by as paltry. Here, the ratio between the potential profit, in a matter of weeks, and the Parties' net investment in the Transactions is far greater.

Moreover, the court in *Saba* cites three cases, *Sheldon v. Commissioner*, 94 T.C. 738, 767-768 (1990), and ACM Partnership, 157 F3d at 258, *Goldstein v. Commissioner*, 364 F2d 734, 739-740 (2d Cir. 1966), for the proposition that a potential profit of several million dollars is,

standing alone, inadequate to confer economic substance on a transaction. None of these cases, in fact, supports this proposition. In *Sheldon*, while the taxpayer made $18,000 on a small group of transactions, he lost $60,000 on other transactions, and the court noted that "there was insufficient potential in any gain to offset the losses locked in for the" larger transactions. Moreover, while the court also noted that the potential for gain was "infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions", this was because the potential for gain-apparently $18,000-was insignificant in an absolute sense and was to be compared with an interest deduction of $5 million, a ratio of some 300-1. In *ACM*, the court, citing only *Sheldon*, stated that "Even accepting ACM's assertion that it could have recovered its costs upon a significantly smaller rise in interest rates than that calculated by the Tax Court, this assertion is immaterial in the event of falling interest rates and at best demonstrates a prospect of a nominal, incidental pre-tax profit which would not support a finding that the transaction was designed to serve a non-tax profit motive." The court did not consider the ratio of the tax benefits to the economic benefits. And in *Goldstein*, the court discounted testimony that the investment could have resulted in an economic gain, not because tax benefits vastly exceeded it but because it was contradicted by a written memorandum prepared for the taxpayer for the transaction which asserted that there was no potential for economic gain at all.

For these reasons, it is more likely than not that the fact that the tax benefits in the Transactions substantially exceed the potential economic benefits will not preclude the Parties from realizing those tax benefits.

**a. Business Purpose**

For a transaction to have a business purpose, there must be a business or commercial reason for the taxpayer to engage in the transaction without regard to tax benefits. *Friedman v. Comm'r, supra; Rice's Toyota World, Inc. v. Comm'r, supra.* The existence of such a purpose was recently addressed in *United Parcel Service of America, Inc. v. Comm'r*, T.C. Memo. 1999-268.

In the *United Parcel Service* case, the taxpayer tried to avoid taxation with respect to certain fees by restructuring them as insurance. Economically, the taxpayer was in substantially the same position as before the restructuring, but through the arrangements was able to exclude the payments from income. The taxpayer put forth a number of commercial reasons for the restructuring of the fees. The taxpayer argued that (i) it was required to restructure the arrangements because such payments would fall afoul of restrictions under some state insurance laws; (ii) it intended to leverage the profits into the creation of a new reinsurer that could become a full-line insurer; (iii) by removing the fees from its operating ratios it could obtain larger rate increases than had it received the fees directly; and (iv) by restructuring the fees it protected its transportation business from the risk increased liabilities. However, the taxpayer offered no credible evidence that the restructuring would in fact achieve goals (i), (iii), and (iv). The court also found that goal (ii) could have been accomplished by merely making an investment in such a reinsurer.

Similarly, in *Winn-Dixie Stores Inc. v. Comm'r*, 113 T.C. No. 21 (1999), the court disallowed interest deductions on policy loans in a COLI program that insured the lives of approximately 30,000 workers. The program resulted in a pre-tax loss for the taxpayer. The taxpayer argued

that the program (i) enabled it to fund costs of one of its benefit programs, and (ii) increased the benefits it could offer to its employees. As to (i), the court found that there as no contemporary evidence that it had purchased the COLI policies to provide such funding; that the COLI policies were not designed to fund such benefits; that the taxpayer's CFO never told the entity that was planning the COLI transactions that the purpose was to fund the benefit program; and that projections showed that the cash flow from the program was needed to pay future interest and premiums as opposed to being available to fund the benefits plan. As to (ii), the court found that the described additional benefits were not related to the COLI program.

In *Compaq Computer Corp. v. Comm'r*, 113 T.C. 214 (1999) the court disallowed foreign tax credits associated with dividends on certain American Depositary Receipts. Among the factors taken into account was that the officer of the taxpayer in charge of the investments made no inquiry into the commercial aspects of the transactions.

In *ACM Partnership v. Comm'r, supra*, and *Saba Partnership v. Comm'r, supra*, involving similar transactions, the courts found that the purported business purposes of the transactions were unsupported by the evidence and, similar to the foregoing cases, the individuals involved with the execution of the transaction did not exhibit behavior consistent with trying to achieve the purported commercial purposes.

Lastly, in *Salina Partnership LP, FLP Group, Inc. v. Comm'r, supra*, a partnership had been previously formed by an investment bank and made a series of investments. Understanding from the investment bank that the purchase of 50% or more of the interests in the partnership would provide certain tax benefits, the taxpayer purchased 98% of the outstanding partnership interests. The IRS conceded that the partnership was profitable and such profitability provided the taxpayer with sufficient profit motive to imbue the post-purchase portion of the transaction with economic substance. However the IRS contended that the pre-purchase part of the transactions did not have sufficient economic substance and, accordingly the taxpayer's tax benefits achieved through the transaction should be denied. The court stated that although the purchase of the partnership interest provided the taxpayer with a perceived tax benefit, "this factor, standing alone, is insufficient to render the transaction a sham in substance." The court found that the investment in the partnership provided the taxpayer with a reasonable opportunity to earn profits independent of tax benefits, and that such opportunity imbued the entire transaction with a sufficiently valid business purpose to give the transaction the economic substance necessary to be respected.

The common thread in these cases is that to have the requisite business purpose to support the tax benefits achieved, there must be a commercial reason for engaging in the various transactions, the transaction must be consistent with such reason, and such reason must be supportable by contemporary evidence, including a showing that the transaction was handled in a business-like manner. This analysis is supported by a number of cases.

For example, in *Levy v. Comm'r*, 91 T.C. 838 (1988), the taxpayers entered into a sale-leaseback of computer equipment for the asserted reason of diversifying their business and investments. In upholding the tax benefits the court stated:

> Based upon our careful examinations of the relevant facts and evidence in this case, we conclude that petitioners entered into the transaction in issue for sound business reasons (namely to diversify their investments by entering into legitimate long-term investment involving the purchase and leaseback of computer equipment). Petitioners approached the decision to enter into this transaction in a businesslike manner. Petitioner's financial advisor thoroughly and in good faith investigated the proposed purchase-leaseback transaction. He prepared cash flow analyses which included the components of the transaction that were critical to earning a profit on the investment. Those components included the current fair market value and projected residual value of the equipment, the fair rental value of the lease, and the rent participation agreement. He explained to petitioners the significance of and risks associated with the projected residual value of the equipment and the rent participation agreement. In addition, he explained to petitioners the tax consequences of the transaction. Petitioners also retained a law firm with expertise in leasing transactions to investigate the financial status and creditworthiness of each participant involved in the transaction, to investigate each participant's business reputation and to handle the legal aspects of this complex transaction.
>
> We are satisfied that petitioners had a good faith and substantial business purpose for entering into the transaction. Petitioners participated in the purchase leaseback transaction only after they were convinced that the investment had a reasonable possibility of producing a profit.

91 T.C. 855-856. *See also, Pearlsten v. Comm'r*, T.C. Memo. 1989-621; *Rubin v. Comm'r*, T.C. Memo. 1989-484.

In *Caruth Corp. v. Comm'r*, 865 F.2d 644 (5th Cir. 1989), *aff'g* 688 F. Supp. 1129 (N.D. Tex. 1987), the issue was whether a charitable contribution would be allowed for a contribution of stock of a controlled corporation after the dividend was declared, but before the dividend record date. The court upheld the deduction in part upon finding that lag between the declaration and record dates had a business purpose:

> [Taxpayer] contends that the distinction between the two dates was designed to encourage his nephews...to sell their shares to him.... The lag between the declaration and record dates was designed to give the nephews an opportunity to sell. The plan failed in this respect; the nephews held their shares.
>
> The district court made factual findings that the [taxpayer] wished to buy out his nephews' interests in North Park Incorporated, and that he believed declaration of a dividend might facilitate this objective. We review these findings pursuant to

> the clearly erroneous standard, and find clear support in the record. With these factual findings in place, we believe it obvious that the distinction between declaration and record date did, as [taxpayer] contends, serve a legitimate business purpose.

865 F.2d at 650.

Lastly, it should be noted that a transacrion can have an appropriate business purpose even if the transaction itself does not generate a profit. *See, Caruth v. Comm'r, supra; Horn v. Comm'r*, 968 F.2d 1229 (D.C. Cir. 1992).

As stated above, the Parties believed that he had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits. Also as stated above, the Parties contributed the options to PSM LLC and subsequently contributed their partnership interests in PSM LLC to PSM, Inc. for substantial non-tax business reasons, including professional management. These reasons would more than likely not satisfy any business purpose requirement for the Parties' entering into the Transactions in the first instance and for contributing the options to PSM LLC and for contributing their Partnership interests to PSM, Inc. The IRS might assert that the Parties could have accomplished the same result by contributing cash to PSM LLC and having PSM LLC acquire the options, and that there was no business purpose for the form chosen by the Parties. However, the long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible." *Helvering v. Gregory*, 69 F2d 809 (2d Cir. 1934). Therefore, a taxpayer is free to choose the most tax-favored method of accomplishing an economic result without any business justification for the method chosen, so long as that method is no more circuitous than another and the transaction itself has the requisite business purpose.

**3. Disregard of Partnership**

In appropriate circumstances, a partnership can be ignored for federal income tax purposes although a valid partnership was formed under local law. In *Commissioner v. Culbertson*, 337 U.S. 733, 741 (1949), the Court stated that whether a partnership existed for tax purposes depends on "whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both."

In PLR 199914006 (December 23, 1998), a limited liability company ("LLC") was owned by a partnership and a corporation, all of the stock of which was owned by the partnership. Under the LLC agreement, the corporation was not entitled to receive any distributions, income, gain, profit, loss, deduction, credit, or other amount from the LLC. One of the issues in the ruling was whether the LLC was a partnership for tax purposes. The IRS cited *Culbertson, supra*, and *Commissioner v. Tower*, 327 U.S. 280 (1946) for the general principles to determine if a partnership exists. The ruling states that "[t]he primary inquiry is whether the parties intended to join together to operate a business and share in its profits and losses." Because the corporation in the ruling had no interest in the profits and losses of the LLC, the IRS concluded that the corporation was not a partner, and therefore the partnership was the sole owner of the LLC. Under Regulation § 301.7701-3, a single member entity is ignored for tax purposes. The critical

issue in this ruling was whether the purported partners joined together to conduct a business and share the profits and losses. In the present situation, the Parties invested in PSM LLC with the intent of jointly conducting a business (investing) and sharing the profits and losses.

*ASA Investerings Partnership v. Commissioner*, 76 T.C.M. (CCH) 325 (1998), *aff'd 201 F.3d 505* (D.C. Cir. 2000), involved the same issues as in *ACM* and concerned a substantially similar transaction. In *ASA Investerings*, Allied Signal became a partner in the partnership and claimed a capital loss. The court found that the partnership formed by Allied Signal and ABN, the foreign partner, was not a valid partnership arrangement for federal income tax purposes. The court based its holding, in part, on what it viewed as the two party's different investment objectives. In the court's view, Allied Signal only wanted the capital losses while ABN was only interested in earning a specified rate of return on its investment. ABN did not want to share in any losses. The court found that Allied Signal was obligated to pay all expenses and guarantee ABN a minimum profit and made all the critical management decisions. As a result, the court concluded that ABN was not a partner in a partnership but rather was a mere lender. The court noted that Allied Signal agreed to enter into the transaction before it even knew that ABN would be involved.

The Allied Signal case is distinguishable from the transactions described herein in several key respects. The Parties had the potential for profit or loss in respect of his investment in PSM LLC and in PSM, Inc. Each partner invested in PSM LLC, and subsequently in PSM, Inc., had the expectation of realizing profits. Each partner shared proportionately in the income, gain, loss and deductions of PSM LLC and in PSM, Inc., so it is more likely than not that there would be no issue of recharacterization as in *ASA Investerings*. Economically, the burden was shared by the partners through their investments.

**4. The Partnership Anti-Abuse Regulations**

In December 1994, the IRS issued Regulation § 1.701-2 (the "Anti-Abuse Regulations" or the "Rules") in an effort to stop what it perceived were abuses of the partnership form. These Regulations consist of two broad rules: the "abuse of subchapter K rule" and the "abuse of entity rule."

Notwithstanding literal compliance with the Code and Regulations, the IRS is authorized to recast a transaction for federal tax purposes as it deems appropriate if the requirements of the Anti-Abuse Regulations are satisfied. The IRS can: (1) disregard the partnership in whole or in part; (2) treat one or more partners as not partners; (3) adjust the method of accounting used by the partnership or a partner to clearly reflect the partnership's or the partner's income; (4) reallocate the partnership's income, gain, loss, credit, or deduction; or (5) otherwise adjust or modify the claimed tax treatment. Treas. Reg. § 1.701-2(b).

The Rules specifically provide that in addition to the powers granted by the Rules, the IRS can continue to assert and rely upon nonstatutory principles and other statutory and regulatory authorities to challenge transactions, and that the Rules were not intended to limit the applicability of such principles and authorities. Treas. Reg. § 1.701-2(i).

**a. Abuse of Subchapter K**

Regulation § 1.701-2(b), the abuse of subchapter K rule, provides that if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to *substantially reduce the present value of the partners' aggregate federal tax liability* in a manner that is inconsistent with the *intent of subchapter K* of the Code (the partnership rules), the IRS can recast the transaction as it deems appropriate to achieve tax results that are consistent with the intent of subchapter K. Compliance with the literal language of one or more of the provisions of the Code or Regulations promulgated thereunder does not prevent the IRS from wielding the powers granted to it under the Rules.

Thus, two requirements must be met to invoke this rule: a principal purpose of the transaction must be to substantially reduce the present value of the partners' aggregate tax liability, and the tax reduction must be inconsistent with the intent of subchapter K.

**(i) The Intent of Subchapter K**

The Anti-Abuse Regulations provide that the intent of subchapter K is "to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax." Treas. Reg. § 1.701-2(a). Implicit in this intent is the following requirements:

(1) The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively) must be entered into for a substantial business purpose;

(2) The form of each partnership transaction must be respected under substance over form principles; and

(3) Generally, the tax consequences under subchapter K to each partner of the partnership's operations and of transactions between the partner and the partnership must accurately reflect the partner's economic agreement and clearly reflect the partner's income (collectively, the "proper reflection of income"). *Id.*

The first implicit intent of subchapter K, that a partnership be bona fide and that transactions be entered into for a business purpose, seems to be a restatement of well established principles. *See, e.g., Culbertson, supra; Gregory, supra; Rice's Toyota World, supra.* However, the Rules do not elaborate on what is meant by these terms, and also insert the term "substantial" to the business purpose requirement. *Culbertson* held that a partnership would be respected for tax purposes if the parties had joined together to jointly conduct a business and share the profits. As Justice Frankfurter expressed in his concurring opinion:

> In plain English, if an arrangement among men is not an arrangement which puts them all in the same business boat, then they cannot get into the same boat merely to seek the benefits of [partnership tax provisions]. But if they are in the same

> business boat, although they may have varying rewards and responsibilities, they do not cease to be in it when the tax collector appears.

*Culbertson*, at 753. *Culbertson* only requires that the partnership and the transaction be real, and that there be "a" business purpose, not that there be a "substantial" business purpose.

The IRS elaborated on the business purpose requirement in Mimeo 6797, 1952-1 C.B. 111, 117 by stating "[t]he presence or absence of a tax avoidance motive is one of many factors to be weighed in the determination of the reality of an intra family gift, sale, or loan, and the existence of bona fide partnership intent. *The presence of a tax motive, however, is of no consequence if the reality of the transfer of interest and the good faith of the parties are satisfactorily satisfied.*" [Emphasis added.] Congress approved of the flexible nature of partnerships, and the broad business purpose requirement when, in 1951, it enacted the predecessor of section 704(e)(1), which provides that a person will be recognized as a partner if he owns a capital interest in a partnership in which capital is a material income producing factor, whether or not such interest was derived by purchase or gift from any other person. *See also*, S. Rep. No. 781, 82nd Cong, 1st Sess., 38 (1951).

These provisions are not limited to family partnerships but apply for all purposes of the Code.

The first implied intent of the Rules more likely than not would be interpreted in a manner consistent with the existing case law, such as *Culbertson, ACM*, and *ASA Investerings*. These cases require that the partnership conduct a business for the joint benefit of the partners, that there be a nontax reason for each transaction, and that the expected nontax benefits exceed the transaction costs. As already discussed, PSM LLC conducted investment activities for the benefit of the partners, each transaction was entered into for nontax reasons, and it was reasonably expected that the nontax benefits would exceed the transaction costs.

The second deemed intent of subchapter K is that the form of each transaction must be respected under the "substance over form principles." This appears to be a regulatory codification of the substance over form doctrine. As discussed previously, each transaction more likely than not would be respected under the substance over form doctrine.

The third implied intent of subchapter K is that the tax consequences of each transaction must clearly reflect income. The Rules, however, acknowledge that various provisions of subchapter K were adopted for policy reasons and administrative convenience, and that these provisions may produce results that do not clearly reflect income. In this situation, the third intent is satisfied if the first two intents are satisfied and if Congress clearly contemplated that the provision would be applied so as to produce the results. This requires a taxpayer to prove that Congress intended a particular result, rather than the normal rule of statutory construction that Congress is presumed to have meant what it said unless there is clear evidence to the contrary.

The legislative history of subchapter K indicates that Congress intended to provide simplicity, clarity and certainty with respect to the tax treatment of partnerships. S. Rep. No. 1622, 83rd Cong., 2d Sess., 89 (1954). In 1951, Congress stated that the presence of tax avoidance motives was by itself not important. S. Rep. No. 781, *supra*. The Rules also acknowledge that

subchapter K was intended to permit taxpayers to conduct joint business through flexible arrangements. This proper reflection of income standard must be applied in light of this Congressional mandate.

The Rules contain several examples, where the Code provision produces a distortion of income. but the result is upheld. *See*, Treas. Reg. 1.701-2, Ex. 6, 9, 10 and 11. Subchapter K requires certain "distortions" of income by not requiring a uniformity of inside and outside basis. This lack of uniformity, which is the general rule of subchapter K (basis adjustments are optional. section 734) requires the result described in this opinion letter. Therefore, it is more likely than not that the transactions described herein would not be considered to violate the proper reflection of income standard because the result clearly reflects Congressional intent.

**b. Substantial Reduction of Tax Liability as a "Principal Purpose"**

Determining whether a partnership was formed or availed of with a principal purpose to substantially reduce the present value of a partners' aggregate federal income tax liability in a manner inconsistent with the above described intent of subchapter K will be based on an examination of all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. Treas. Reg. § 1.701-2(c).

The Rules describe certain illustrative factors which may indicate (without being determinative) that a partnership was used with a principal purpose to substantially reduce a partners' federal tax liability in a manner inconsistent with the intent of subchapter K. Treas. Reg. § 1.701-2(c). The weight to be given to any one factor will depend on the facts and circumstances of a particular situation. *Id.* These factors include: (1) the present value of the partners' federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership activities directly; (2) the present value of the partners' federal tax liability is substantially less than would be the case if purportedly separate transactions designed to achieve a particular end result are integrated into a single transaction; (3) one or more partners necessary to achieve claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities, or have little or no participation in the partnership's profits other than a preferred return in the nature of a payment for the use of capital; (4) substantially all of the partners are directly or indirectly related; (5) partnership items are allocated in compliance with the literal language of Regulation sections 1.704-1 and 1.704-2, but with results that are inconsistent with the purpose of section 704(b) and those Regulations; (6) the benefits and burdens of ownership of property contributed to the partnership are in substantial part retained by the contributing partner or a related party; or (7) the benefits and burdens of ownership of partnership property are in substantial part shifted to the distributee partner before or after the property is actually distributed to the distributee partner or a related party. *Id.*

These factors are difficult to apply, even with the aide of the examples. The first factor appears to be a restatement of the substantially test of Regulation § 1.704-1(b)(2)(iii). In the instant case, it is difficult to determine how the activities within and without PSM LLC would be characterized in order to apply this test.

The second factor appears to be a restatement of the "end-result" formulation of the step transaction doctrine. As discussed above, it is more likely than not that each transaction would be treated as undertaken for independent reasons, no transaction would be dependent on another transaction, and the Parties would be at risk with respect to each transaction. Consequently, it is more likely than not that this factor would not be present.

Each of the Parties as a partner of PSM LLC shared proportionately in all items of PSM LLC's income, gain or loss, and no partner was substantially protected from risk of loss from PSM LLC's activities. Therefore, it is more likely than not that the third factor would not be present.

It is more likely than not that the fifth factor, which relates to the allocation of partnership income, would not be present. Each item of PSM LLC's income, gain, loss or deduction was allocated in accordance with the interests in PSM LLC, and each partner's capital account was appropriately charged. There was no special allocations of any item of income, gain, loss, credit, or deduction.

It is more likely than not that the sixth factor would not be present in this case. There was no property that was "nominally" contributed to PSM LLC by any partner. Further, all property contributed to PSM LLC was owned by PSM LLC, and no partner in substantial part retained the benefits and burdens of ownership of the contributed property.

Finally, it is more likely than not that the seventh factor would not be present. The benefits and burdens of ownership of PSM LLC's property were not shifted to any distributee partner before or after the property was actually distributed.

**c. The Abuse of Entity Rule**

The other part of the Anti-Abuse Regulations, the abuse of entity rule, is found in Regulation § 1.701-2(e). In addition, the IRS can treat a partnership as an aggregate of its partners "as appropriate to carry out the purpose of any provision" of the Code or Regulations. However, this rule will not apply to the extent that (a) a provision of the Code or Regulations prescribes the treatment of a partnership as an entity, and (b) entity treatment and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision.

It is more likely than not that the abuse of entity rule would not apply to PSM LLC. First, the examples in the Rules illustrating this rule are situations where the partnership is used in an attempt to avoid a statutory provision that would apply to a partner if the partner engaged in the activity directly. The examples conclude that the restrictions of the Code cannot be avoided by the use of the partnership form. The use of a partnership for these transactions would not avoid any statutory restriction. Second, Regulation § 301.7701-3(b), the entity classification Regulations, provides that unless PSM LLC elects otherwise, it is a partnership. This classification applies for all federal tax purposes. Treas. Reg. § 301.7701-3(a). In addition, PSM LLC satisfies the requirements to be respected as a partnership. *See, e.g., Culbertson* and *ACM Partnership*.

**d. The Validity of the Regulations**

While facially very broad, there is no clear guidance as to how the Rules will be applied by the IRS and there can be no assurances that the IRS will not attempt to apply the Rules to the Parties and/or PSM LLC, though there has been some indication from the IRS that the Rules were intended to affect a relatively small number of partnership transactions. 60 Fed. Reg. 23 (1995): Announcement 94-87, 1994-27 I.R.B. 124 (in an examination, the appropriateness of a section 1.701-2 determination must be coordinated with an Issue Specialist and the National Office).

The Rules were severely criticized by many practitioners and commentators when adopted and the controversy has not been resolved. *See, e.g.*, McKee, supra at ¶1.05; William P. Wasserman and Terence Floyd Cuff, "IRS Attempts to "Demonize" the Partnership: The Final Section 701 Regulations - Anti-Abuse Regulations or Simply Abusive Regulations?," 439 PLI/Tax 887 (June 1999) ("Wasserman & Cuff Article"); Sheryl Stratton, "They're Back . . . Washington Lawyers Attack Anti-Abuse Rules", 95 TNT 178-4 (September 12, 1995) ("Stratton Article"); Sheldon I. Banoff, "Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2," 95 TNT 56-84 (March 22, 1995) ("Banoff Article"). The thrust of the legal commentary is that the Rules are unworkable and invalid because they are inherently vague, excessively broad in scope, and lack clear and workable standards which can be reasonably utilized by practitioners to correctly and confidently apply the tax law. *Id.* Both supporters and detractors of the Rules agree that the apparent implied standard for application by the IRS of the Rules consists of "we'll know it when we see it." Banoff Article. This type of ambiguous standard for application of the Rules makes drawing the line between legitimate tax planning and prohibited tax abuse virtually impossible. *Id.* Courts have found Regulations to be invalid when they are so vague as to permit arbitrary and discriminatory enforcement due to a lack of explicit guidelines. *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C. Cir. 1980); *Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283 (1983). It is reasonable to believe that the validity of the Rules will be challenged in court.

In finalizing the Rules, the Treasury cited the provisions of subchapter K (sections 701 through 761) and section 7805 as providing the authority for the Rules. 60 Fed. Reg. 23 (1995). Section 7805(a) authorizes the Treasury Department to prescribe "all needful rules and regulations" required for the enforcement of the internal revenue laws. Such section has been held to authorize only interpretative Regulations, which are to be given less deference than "legislative" Regulations issued pursuant to a specific Congressional delegation of lawmaking authority. *See, e.g., United States v. Vogel Fertilizer*, 455 U.S. 16 (1982); *Bankers Life and Casualty Co. v. United States*, 142 F.3d 973 (7th Cir. 1998).

Interpretive Regulations will receive deference so long as they implement congressional mandates in some reasonable manner. *United States v. Cartwright*, 411 U.S. 546 (1973). As described above, the Rules apply only to transactions involving partnerships that are contrary to the "intent" of subchapter K. The Treasury Department derived this intent from the whole of subchapter K, even though the Rules themselves discuss how certain provisions contained in subchapter K do not meet this intent, resulting in the need for exceptions from the Rules. *See*, Treas. Reg. § 1.701-2(a)(3) (certain provisions of subchapter K were adopted to promote administrative convenience or other policy objectives). As a result, the scope of the Rules is uncertain and is not limited in application to clearly abusive transactions, despite statements from the IRS to the contrary. *See*, Wasserman & Cuff Article; Banoff Article.

Furthermore, in enacting subchapter K in 1954, Congress stated as its motivation its desire to eliminate confusion and provide certainty, flexibility, and equity with respect to the tax treatment of partnerships and partners. H.R. Rep. No. 1337, 83rd Congress, 2d Session 65 (1954); S. Rep. No. 1622, 83rd Congress, 2d Session 89 (1954). Thus, contrary to Congress' strong desire to provide certainty, flexibility, and equity in the area of the taxation of partnerships and partners, the Rules cannot be applied by practitioners to partnership transactions in a meaningful manner. *See*, Wasserman & Cuff Article; Roy Stroud and Hal Gann, "The Recent Evolution of AntiAbuse Rules," 95 TNT 36-98 (February 23, 1995). As a result of such uncertainty, voluntary compliance with the Code and commerce in general will be adversely affected. *Id.*

Though there was no express or implied grant of authority in section 701 or subchapter K in general to issue an anti-abuse rule, it is clear that the Rules did not merely restate current law, but instead extended existing law. *See*, Treas. Reg. § 1.701-2(h) (Commissioner can continue to assert and rely upon other statutory and regulatory authorities and nonstatutory principles; such principles and authorities are not limited by the Rules); *See also*, Banoff Article; Lee A. Sheppard, "News Analysis: Final Partnership Anti-Abuse Rule - Grudging Acceptance," 95 TNT 28-5 (February 10, 1995). In finding an interpretive Regulation invalid, the Tax Court has stated that "courts should be wary of broad-scale incorporation of the doctrine of 'tax avoidance,' or 'business purpose,' or 'sham'" and at the very least, such judicially developed doctrines should be limited to situations in which they were intended to apply. *Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283, 291 (1983). According, it would appear that, to the extent the Rules go beyond current law, their validity is in grave doubt. *See*, Banoff Article.

Further, it has been argued that the Rules are invalid as they were adopted in violation of Executive Order 12866. This Executive Order provides that all "significant regulatory actions" are subject to various procedural safeguards to ensure that the regulatory process is conducted so as to meet applicable statutory requirements and with due regard to the discretion entrusted to Federal agencies. Exec. Order No. 12866, 58 Fed. Reg. 51,735 (1993). Significant regulatory action, as defined in the Order, means any regulatory action likely to result in a rule that may: (1) have an annual effect on the economy of $100 million or more; (2) adversely affect the economy, or sector of the economy, in a material way; or (3) raise novel legal or policy issues. *Id.* It would appear that the Rules satisfy each of these requirements, yet in finalizing the Rules, the Treasury declared that the Rules were not a significant regulatory action as defined by Executive Order 12866. 60 Fed. Reg. 23 (1995).

As discussed above, in light of Congress' strong statement that partnerships, if they are real, are to be respected, and Congress' desire to provide certainty in the area of the taxation of partnerships and partners, the scope of the Rules and its associated remedies would seem grossly overbroad. Hence, to the extent the Rules were applied as broadly permitted, they would appear to be invalid. If the Rules were interpreted to override the clearly expressed intent of Congress as reflected in the provisions of subchapter K, it would also appear that the Rules would be invalid. *See, e.g.*, Wasserman & Cuff Article; Stratton Article; Banoff Article. Additionally, the Rules may be held to be invalid as a result of their vagueness, lack of authority for their issuance, or failure to comply with Executive Order 12866. *Id.*

Commentators also assert that the Rules are invalid because they are an unconstitutional usurpation of legislative and judicial powers. The Rules grant the IRS the power to disregard the language of the statue when literal compliance with specific provisions is not consistent with the "intent" of subchapter K, and then creates that intent without relying on anything of Congressional origin. Because the Rules attempt to supersede the statute and add restrictions not found in subchapter K nor based on any specific grant of authority, they are asserted to be invalid under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and *Rowan Cos. v. United States*, 452 U.S. 247 (1981). The Rules usurp judicial power by granting the IRS the power to apply the substantive law on a case by case basis, which is a judicial function. The courts are thus relegated to the role of determining whether the IRS has abused its discretion, rather than hearing the case *de novo* where the IRS and the taxpayer are on an equal footing.

It should be noted that the subchapter K rules do not prevent the transaction at issue from being sustained, and, in fact, the Parties are utilizing the section 1012 basis rules, not subchapter K, to achieve the desired result. Additionally, the Parties could have obtained the same income tax consequences by utilizing a corporation, rather than a partnership, further illustrating the nonabuse of subchapter K.

Accordingly, while the issue is not free from doubt, it is our opinion that it is more likely than not that the IRS would not be able to utilize the anti-abuse rules of Regulation section 1.701-2 to recharacterize the tax consequences described above resulting from the contributions of the Long Options and the Short Options by the Parties to PSM LLC and the Parties' subsequent contribution of their Partnership interests to PSM, Inc.

**5. Notice 2000-44**

**a. Description of Notice 2000-44**

On August 11, 2000, the IRS released Notice 2000-44, 2000-36 IRB 1. The Notice describes certain arrangements that the IRS and the Treasury believe "have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests."

One arrangement addressed in the Notice is described as follows:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a

> partnership which, using additional amounts contributed to the partnership, may engage in investment activities.
>
> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under section 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

Among other things, the Notice states that "[t]he purported losses resulting from the transaction described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of section 165."

**b. Authority to Issue Notice 2000-44**

IRS Notices are issued under the statutory authority of section 7805(a) which states: "the Secretary [of the Treasury]...shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. Furthermore, authority for the issuance of Notices exists in Reg. §301.7805-1(a) which states: "[t]he Commissioner [of the Internal Revenue Service], with the approval of the Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement of the Code ... including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." However, section 7805(b)(1)(C) limits the express statutory authority for Notices to those "substantially describing the expected contents of any temporary, proposed, or final regulation."

Under section 7805(b)(1)(C), a proposed, temporary, or final Treasury Regulation may be given retroactive effect to the date on which, among other things, "any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public." It appears that the rationale for granting this statutory authority was to enable the Treasury Departmenr and the IRS to secure retroactive effect for intended future Treasury Regulations by giving notice of its intent to issue such Regulations while affording it the appropriate time to properly substantially and procedurally issue such regulations. Therefore, we believe that the retroactive application of Treasury Regulations to the date of the issuance of the Notice as provided in section 7805(b)(1)(C) requires the Notice to contain some indication of an intent to issue Treasury Regulations. It does not appear that Notice 2000-44 contains such an intent since it neither describes in any detail the contents to be included in a future temporary, proposed, or

final regulation nor does it reference any specific intent to issue future regulations under any specific statutory provision. Compare, Notice 97-21, 1997-1 CB 407. Consequently, it is at least questionable whether Notice 2000-44 is properly issued under section 7805.

**c. Legal Weight Accorded an IRS Notice**

For purposes of the penalty provisions of section 6662, the IRS considers Notices authority that will be binding on the IRS and can be relied on by taxpayers to the same extent as a Revenue Ruling or a Revenue Procedure.[11] Revenue Rulings do not have the force or effect of Treasury Regulations. Treas. Reg. §601.601(d)(2)(v)(d).

There appears to be only one case in which a court weighed the effect to be given an IRS Notice, and in that case the court treated an IRS Notice as if it were a Revenue Ruling. *Constantino v. TRW, Inc.*, 13 F.3d 969, 980-981 (6th Cir. 1994). Even if one assumes the Sixth Circuit's approach of treating a Notice as a Revenue Ruling is correct, there nonetheless exists a lack of uniformity among the courts in their treatment of Revenue Rulings.

As a general matter, the Tax Court is inclined to treat a Revenue Ruling merely as the view of one of the parties to the litigation. See, e.g., *Trinova Corp. and Subsidiaries v. Comm'r*, 108 T.C. 68 (1997). The Tax Court has stated that it considers a Revenue Ruling to be "advisory only" and a mere "useful guide, outlining some of the factors to be considered" in interpreting the Code. *Burck v. Comm'r*, 63 T.C. 556 (1975) aff'd 533 F.2d 768 (2d Cir 1976). Rather than giving deference to Revenue Rulings, the Tax Court has treated the rulings as "merely the Commissioner's position with respect to a specific factual situation." *Pasqualini v. Comm'r*, 103 T.C. 1, 8 n. 8 (1994)(citing *Tandy Corp v. Comm'r*, 92 T.C. 1165, 1170 (1989)).

The circuit courts, however, have struggled with the exact deference, if any, to give to Revenue Rulings. The Fifth Circuit has recognized that "revenue rulings are odd creatures unconducive to precise categorization in the hierarchy of legal authorities. They are clearly less binding on the courts than treasury regulations or Code provisions, but probably (and in this circuit certainly) more so than the mere legal conclusions of the parties." *McLendon v. Comm'r*, 135 F.3d 1017 (5th Cir. 1998). Likewise, the Third Circuit Court of Appeals has stated that it will "give weight to IRS revenue rulings and [will] not disregard them unless they 'conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable.'" *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1145 (3rd Cir. 1993), cert. denied, 511 U.S. 1004 (1994) (quoting *Geisinger Health Plan v. Comm'r*, 985 F.2d 1210, 1216 (3rd Cir. 1993). Similarly, in

---

11 Rev. Rul. 90-91, 1990-2 CB 262. Also, the authority of the IRS to issue Revenue Rulings is derived directly from its regulatory authority. Treasury Regulation §601.201(a)(5) and §601.601(d)(2)(v) define what constitutes a Revenue Ruling and sets forth its effects. With the exception of section 7805(b)(1)(C), there is no such provision, statutory or regulatory, that provides for either the parameters for issuing Notices or their effect. Thus, for the reasons discussed above, we believe that an argument exists that the IRS does not have the requisite authority to bind taxpayers or courts to a Notice, though the IRS is free to bind itself as it did in Revenue Ruling 90-91.

discussing a Revenue Ruling, the Fourth Circuit in *Wood* noted, without holding, that "it is well established that considerable weight is to be given to an agency's construction of a statute that it is charged with administering." *Wood v. Comm'r*, 955 F.2d 908, 913 (4th Cir. 1992), cert. dismissed 505 U.S. 1231 (1992). Additionally, the Second Circuit has held that a Revenue Ruling is presumed to "have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code." *Gillespie v. U.S.*, 23 F.3d 36, 39 (2d Cir. 1994) (quoting *Salomon, Inc. V. U.S.*, 976 F.2d 837, 841 (2d Cir. 1992). However, the Second Circuit's decisions in *Gillespie* and *Salomon, Inc.* seem irreconcilable with its statement in *Canisius College v. United States* that "the statutory interpretation [of] a revenue ruling does not have the force of law and is of little aid in interpreting a tax statute." *Canisius College v. U.S.*, 799 F.2d 18 n. 8 (2d Cir. 1986) cert. denied 481 U.S. 1014 (1987) (eiting *Dixon v. United States*, 381 U.S. 68, 73 (1965); *Biddle v. Comm'r*, 302 U.S. 573, 582 (1938); *Temple University v. United States*, 769 F.2d 126, 137 ( 3d Cir. 1985) cert. denied 476 U.S. 1182 (1986)). The Ninth Circuit followed the Second Circuit's opinion in *Salomon, Inc.* and afforded Rev. Rul. 82-20 "great deference" where the Ruling was neither unreasonable nor inconsistent with the Code. *Walt Disney Inc. v. Comm'r.*, 4 F.3d 735 (9th Cir.1993)

Notwithstanding this lack of uniformity among the courts as to what weight, if any, to afford Revenue Rulings, the courts "have not looked favorably upon bootstrapping revenue rulings issued shortly prior to or after the initiation of litigation." *Ludwig v. Comm'r*, 68 T.C. 979 n. 4 (1977) (eiting *Fribourg Navigation Co. v. Comm'r*, 383 U.S. 272, 279 (1966), rev'g 335 F.2d 15 (2d Cir. 1964); *Busse v. Comm'r*, 479 F.2d 1147, 1152 n. 12 (7th Cir. 1973)). See also, *Silco, Inc. v. U.S.*, 779 F.2d 282 (5th Cir. 1986).

As a result, the weight given to a Revenue Ruling in litigation will generally depend upon the forum chosen. At best, Revenue Rulings will be given little or no weight and at worst a court will give significant deference to a Revenue Ruling. However, the amount of deference, if any afforded to a Revenue Ruling by a court will be further dependent upon the context in which it was issued. Moreover, if the Revenue Ruling is issued in connection with litigation, a court that would otherwise give deference to a Revenue Ruling may give it no weight at all. In addition, sueh weight would depend on the reasoning in the Revenue Ruling, and the Notice here is almost devoid of any reasoning. Consequently, were the IRS to contend that Notice 2000-44 were to apply to the Transactions and a court were to treat the Notice as if it were a Revenue Ruling, it is more likely than not that the Notice would not constitute authority that would bind a court, but could be given significant weight by the court in reaching its conclusion and in that case it would have to be distinguished on the basis of fact or by refuting the legal analysis upon which it relies.

**d. Application of Notice 2000-44 and the Authorities cited therein to the Transactions**

The IRS may assert that the Transactions parallel the version of the arrangements described in Notice 2000-44 and described above. Whether or not such an argument is successful, the Notice further states that "[t]he purported losses from these transaetions *(and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests)* are not allowable as deductions for federal income tax purposes."

[emphasis added]. Thus, the IRS might attempt to extend the application of the Notice to the Transactions, relying on this language.

As support for its position in Notice 2000-44 that the losses described therein were not "bona fide" and did not reflect "actual economic consequences", the Ruling cited *ACM Partnership v. Comm'r, supra; Scully v. U.S.*, 840 F.2d 478 (7th Cir. 1988); and *Shoenberg v. Comm'r*, 77 F.2d 446 (8th Cir. 1935), *cert. denied*, 296 U.S. 586 (1935). See also, Rev. Rul. 2000-12, 2000-11 IRB 1, Situation 1, and Notice 99-59, 1999-52 IRB 761, in which the IRS took the same position in reliance on the same authorities.

In *ACM Partnership v. Comm'r*, supra, the Third Circuit Court of Appeals did in fact adopt the concept of a bona fide loss. However, the taxpayer in *ACM* acknowledged in its own submissions that the transaction was structured so that the securities in issue were purchased and sold at the same price. The Court of Appeals stated:

> As the Supreme Court emphasized in *Cottage Savings*, deductions are allowable only where the taxpayer has sustained a "bona fide" loss as determined by its "[s]ubstance and not mere form." According to ACM's own synopsis of the transactions, the contingent installment exchange would not generate actual economic losses. Rather, ACM would sell the Citicorp notes for the same price at which they were acquired, generating tax losses which offset precisely the tax gains reported earlier in the transaction with no net gain or loss from the disposition. Tax losses such as these, which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses do not constitute the type of "bona fide" losses that are deductible under the Code and regulations. [citations omitted]

Thus, the Court of Appeals denied the allowance of a loss arising from the purchase and sale of a security in a manner akin to a "repo" or a "reverse repo" transaction, which is generally treated as a lending transaction rather than a sale upon which gain or loss is recognized.

Footnote 31 of the case helps to explain the Court of Appeals' concept of a bona fide loss. Footnote 31 provides:

> While it is clear that a transaction such as ACM's that has neither objective non-tax economic effects nor subjective non-tax purposes constitutes an economic sham whose tax consequences must be disregarded, and equally clear that a transaction that has both objective non-tax economic significance and subjective non-tax purposes constitutes an economically substantive transaction whose tax consequences must be respected, its is also well established that where a transaction objectively affects the taxpayers net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was

> motivated by tax considerations. See, e.g., *Gregory*, 293 U.S. at 468-69, 55 S. Ct. at 267 ("if a reorganization in reality was effected... the ulterior purpose will be disregarded"), *Northern Indiana Pub. Serv. Co.*, 115 F.3d at 512 (emphasizing that Gregory and its progeny "do not allow the Commissioner to disregard economic transactions ...which result in actual, non-tax-related changes in economic position regardless of tax avoidance motive" and refusing to disregard role of the taxpayer's foreign subsidiary which performed a "recognizable business activity" of securing loans and processing payments for parent in foreign markets in exchange for legitimate profit); *Kraft Foods Co. v. Comm'r*, 232 F.2d 118, 127-128 & n. 19 (2d Cir. 1956) ( refusing to disregard tax effects of debenture issue which "affected ... legal relations" between taxpayer and corporate parent by financing subsidiary's acquisition of venture used to further its non-tax business interests). In analyzing both the objective and the subjective aspects of ACM's transaction in this case where the objective attributes of an economically substantive transaction were lacking, we do not intend to suggest that a transaction which has actual, objective effects on a taxpayer's non-tax affairs must be disregarded merely because it was motivated by tax considerations.

In the instant case, as discussed above, the Transactions, including the purchase and contribution of the Long Options and the Short Options as well as the contribution of the PSM LLC membership interests, were motivated in part by non-tax reasons and so more likely than not would not be treated as "shams in substance." Also, the purchase and contribution of the Long Options and the Short Options and the subsequent contribution of the PSM LLC membership interests did not occur at predetermined prices that would insure no economic change of position for PSM LLC or the Parties, as was the case for the so-called Citicorp notes in the *ACM* case. Consequently, it is more likely than not that the reasoning set forth in ACM for concluding a loss is not "bona fide" would not be applicable to the loss sustained from the Transactions.

Notice 2000-44 also cited *Scully v. U.S.*, *supra*, and *Shoenberg v. Comm'r, supra*, for the proposition that the losses described in the Ruling were not "bona fide". In *Scully*, the Seventh Circuit Court of Appeals held that there was no deductible loss involving the sale of real estate by trustees of the family trust to other family trusts with the same fiduciaries, beneficiaries and remaindermen. This disposition merely resulted in a reshuffling of assets which resulted in no "genuine economic loss" because the taxpayer retained control over the property – *i.e.*, the sale was effectively a circular transaction with no economic substance. Citing from 7J. Mertens, Law of Federal Income Taxation §28.26 (1980), the Court of Appeals relied upon the following principle for its conclusion that the loss incurred on the sale of the real estate was not deductible:

> Losses will not be allowed which are claimed in connection with transactions which do not vary control or change the flow of economic benefits....[A taxpayer] will not be permitted to transfer assets from one pocket to another and take a loss thereby where he

> remains at the conclusion of the transfer the real owner of the property, either because of retention of title, command over the property, either directly or through the person who appears as the nominal vendee or transferee.

In the instant situation, neither the Parties, PSM, Inc. nor PSM LLC continued to own, beneficially or otherwise, the asset, the disposition of which generated a loss. Accordingly, the reasoning set forth in *Scully* for denying a loss deduction, is not applicable to the loss sustained from the Transactions.

In *Shoenberg*, the Eighth Circuit Court of Appeals held that there was no deductible loss where an investor sold stock at a loss and on the same day bought the same number of identical shares through his investment company. A little more than thirty days later, the investor purchased the shares from his investment company at a lower price than that for which he had originally sold them. The Court of Appeals denied the investor's loss deduction, stating that "where such sale is made as part of a plan whereby substantially identical property is to be reacquired and that plan is carried out, the realization of loss is not genuine and substantial; it is not real." Economically, the transaction was again a circular transaction with no economic substance. *Shoenberg*, like *Scully*, is a case in which the court held that a loss was not realized by the taxpayer because the taxpayer held the same beneficial interest in the purportedly sold assets both before and after the sales. As previously stated, in the instant situation neither the Parties nor PSM LLC nor PSM, Inc. continued to own, beneficially or otherwise, the asset the disposition of which resulted in a loss. Accordingly, the reasoning set forth in *Shoenberg* for denying a loss deduction also is not applicable to the loss sustained from the Transactions.

Although not cited in Notice 2000-44, Rev. Rul. 2000-12, *supra*, Situation 1, in which the IRS concluded that loss from the disposition of one of a pair of "bull/bear" structured notes was not bona fide, also cited *Lerman v. Comm'r*, 939 F.2d 44 (3rd Cir. 1991), *cert. denied*, 502 U.S. 984 (1991), and *Keane v. Comm'r*, 865 F.2d 1088 (9th Cir. 1989), for the proposition that courts have disallowed losses from option straddle transactions that were found to be devoid of economic substance, where the trades were prearranged to generate a loss for tax purposes while deferring offsetting gain. These cases are only two of many involving the so-called "London option transactions". In each of the cases in which the loss was denied, the denial was based upon the inability of the taxpayer to make a profit from the transaction, *i.e.* that the transactions did not meet the standards, discussed above, regarding economic substance and business purpose. In the instant situation, it is more likely than not that the Transactions, including the purchase and contribution of the Long Options and the Short Options as well as the contribution of the PSM LLC membership interests and the subsequent sale of the Assets did have the requisite economic substance and business purpose. Accordingly, the reasoning set forth in these cases for denying a loss deduction also is not applicable to the loss sustained in the Transactions.

Furthermore, there is no support for the implication in Rev. Rul. 2000-12, that the mere existence of offsetting position means a loss is not "bona fide". Code Section 1256 was added to the Internal Revenue Code by the Economic Recovery Tax Act of 1981. Among other reasons stated in the General Explanation of the Economic Recovery Tax Act of 1981 (the "General Explanation"), Congress enacted Code Section 1256 "to prevent taxpayers from claiming the tax

benefits which were allegedly obtained by using a futures straddle as a tax shelter." Thus, Code Section 1256 was enacted to address the abuse that the courts sought to address in the "London option transactions" cases. It did so not through an outright disallowance of any losses inherent in such positions, but rather by accelerating the tax consequences of holding such positions by marking to market the positions at the close of the taxable year or upon certain other events. Thus, in those situations in which the offsetting positions are entered into with the requisite economic substance and business purpose, it would appear that losses arising from the offsetting positions should be allowed unless they are restricted by Code Section 1256. Code Section 1092 was also adopted by the Economic Recovery Tax Act of 1981 to deal with offsetting positions. The Tax Court in *Smith v. Comm'r*, *supra*, refused to find a non-statutory wash sale rule that would deny the losses and looked to the adoption of section 1092 by the Economic Recovery Tax Act of 1981 as evidence that the mere existence of offsetting positions was not enough to deny a loss. Although ultimately finding for the IRS and against the taxpayer, the losses were denied on the grounds that there was an absence of a sufficient profit motive. Accordingly, it is more likely than not that the mere existence of offsetting positions would not be enough to allow the IRS to successfully contend that a loss arising therefrom is not "bona fide".

In the instant ease, where the Parties had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transactions, without regard to tax benefits, it is more likely than not that the authorities cited in Notice 2000-44 would not support the disallowanee of the loss arising from the Transactions.

**F. Application of Penalties**

**1. Substantial Understatement of Taxable Income**

Section 6662(b)(2) provides for a penalty of 20 percent of the portion of any underpayment of tax attributable to any substantial understatement of income tax on a return. For noncorporate taxpayers, an understatement is considered substantial for this purpose if it exceeds the greater of 10 percent of the correct tax, or $5,000. Sec. 6662(d)(1)(A). An understatement generally does not include deficiency amounts attributable to a position that is supported by "substantial authority" or for which there is adequate disclosure. Sec. 6662(d)(2)(B).

Substantial authority for a position exists only if the weight of authorities supporting the position is substantial in relation to the authorities against the position. Treas. Reg. § 1.6662-4(d)(3)(i). Authorities for this purpose include, but are not limited to, applicable provisions of the Code, proposed, temporary, and final Regulations, revenue rulings and revenue procedures, court cases, Congressional intent as reflected in certain legislative history, private letter rulings and technical advice memoranda issued after October 31, 1976, and actions on decision and general counsel memoranda issued after March 12, 1981. *See*, Treas. Reg. § 1.6662-4(d)(3)(iii). The weight of authority depends upon its relevance and persuasiveness, and the type of document providing the authority. *See*, Treas. Reg. § 1.6662-4(d)(3)(ii). There is substantial authority for a return position if substantial authority is present either on the last day of the taxable period covered by the taxpayer's return or on the date the return is filed. Treas. Reg. § 1.6662-4(d)(3)(iv)(C).

The "substantial authority" standard is more stringent than the "reasonable basis" standard, but less stringent than the "more likely than not" standard (the standard that is met when there is a greater than 50 percent likelihood that a position will be upheld if challenged by the IRS.) *See*, Treas. Reg. § 1.6662-4(d)(2). The "reasonable basis" standard is met when a position is significantly higher than not frivolous or not patently improper. Treas. Reg. § 1.6662-3(b)(3). The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. *Id.* The Internal Revenue Manual states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in-three likelihood of being sustained on the issue." *See*, IRM (20)535.1 (1997).

If the position involves a "tax shelter," there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed that the tax [position] . . . was more likely than not the proper treatment." Sec. 6662(d)(2)(C). The "reasonable belief" requirement can be satisfied if the taxpayer reasonably relies in good faith, *i.e.*, the taxpayer discloses all the facts it knows or should know, on the opinion of a qualified tax professional that unambiguously states that there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS. Treas. Reg. § 1.6662-4(g)(4). Prior to the Taxpayer Relief Act of 1997, a tax shelter was generally defined as any plan or arrangement the principal purpose of which was the avoidance or evasion of United States federal income tax. *See*, Treas. Reg. § 1.6662-4(g)(2). Tax avoidance or evasion was considered the principal purpose of an activity if that purpose exceeded any other purpose. *Id.* The 1997 Tax Act modified the definition of tax shelter by requiring only a "significant," rather than principal, tax avoidance or evasion purpose. *See*, Sec. 6662(d)(2)(C)(iii).

**2. Substantial Valuation Misstatement**

Section 6662(b)(3) provides for a 20 percent penalty to the portion of any underpayment of tax attributable to a substantial valuation misstatement on a return. Section 6662(e) provides that there is a substantial valuation misstatement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 200 percent or more of the amount determined to be the correct amount of such valuation/adjusted basis. Section 6662(h)(1) increases the penalty to 40 percent in the case of any gross valuation misstatement. Section 6662(h)(2) provides that there is a gross valuation misstatement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 400 percent or more of the amount determined to be the correct amount of such valuation/adjusted basis. The penalty does not apply, however, if the reasonable cause exception of section 6664(c) and Regulation § 1.6664-4 applies (discussed below).

Because the tax basis of the Long Options is more than 400% of the net basis of the options, the terms of section 6662(h)(2) might appear to apply, absent the section 6664(c) reasonable cause exception. However, the legislative history of section 6662(e) implies that the provision is intended to apply only where excessive basis arises as a result of an excessive valuation, i.e. an issue of fact, as opposed to an issue of law.

The gross valuation misstatement penalty is an extension of the 20% penalty under section 6662(e) for a "substantial valuation misstatement", which exists if the value or adjusted

basis claimed on the return is 200% or more of the correct amount. This penalty, which was part of the 1989 modification of the civil tax penalty regime, first entered the tax law in 1981 as section 6659, which imposed a penalty on an underpayment arising from a "valuation overstatement." Under section 6659(c), a "valuation overstatement" occurred where the value or adjusted basis claimed on a tax return was 150% or more of the correct amount. The amount of the penalty was 10% of the underpayment at an overstatement of 150% and rose to 30% of the underpayment for an overstatement of 250%.

A dispute with the IRS regarding the basis of an asset can arise either from an issue of fact or from an issue of law. The Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 discussion of the reasons for the new penalty made clear that Congress was concerned only with basis overstatement resulting form excessive valuations, not incorrect application or interpretation of law. It stated:

> The Congress believed that a specific penalty was needed to deal with various problems related to the valuation of property. The particular need is illustrated by the fact that there are about 500,000 tax disputes outstanding which involve property valuation questions of more than routine significance. Theses cases alone involve approximately $2.5 billion in tax attributable to the valuation issues.
>
> The Congress recognizes that valuation issues frequently involve *difficult issues of fact*. Often these issues seemed to be resolved simply by "dividing the difference" in the values asserted by the Internal Revenue Service and those claimed by the taxpayer. Because of this approach to valuation questions, the Congress believes that taxpayers were encouraged to overvalue certain types of property and to delay resolution of the valuation issues....
>
> In recognition of the fact that valuation issues often are difficult, especially where unique property is concerned, the Congress decided to adopt a test for the application of a new penalty under which on significant overvaluations will be penalized.

[Emphasis added.] Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981 at 332.

The Joint Committee provided two examples of situations that the provision was intended to address. One example involved an excessive valuation in the context of a charitable deduction and the other involved a basis adjustment arising form an excessive estate tax valuation. Neither example involved a disputed issue of law, although such disputes are common and would have expected that Joint Committee to mention them if it had intended to cover them, e.g., the taxpayer claims a cost basis in property and the IRS assets that the property has a (lower) carryover or substituted basis.

Furthermore, the amendments made in 1989 would indicate that no change in this view was intended. Thus a separate penalty provision, section 6662(e)(1)(B), was enacted to deal with valuation and basis adjustments arising from adjustments under section 482, which involves both issues of fact and issues of law.

Based upon the foregoing, a fair reading of the statute and its legislative history strongly suggest that a basis overstatement arising from issues of law, such as the Transactions, should not be the type of overstatement intended to be reached by section 6662(e)(1)(A).

**3. Reasonable Cause Exception**

Section 6664(c) provides a general exception to the section 6662 understatement penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts-and-circumstances determination made on a case-by-case basis. *See*, Treas. Reg. § 1.6664-4(b). The most important factor is the extent of the taxpayer's effort to determine proper tax liability. *Id.* For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. *Id.* All facts that are relevant to the tax treatment of a transaction must be considered.

The Regulations set forth certain general opinion requirements ("General Opinion Requirements") that must be satisfied in order for reliance on the advice of others, including opinion letters from professional tax advisors, to be considered reasonable and in good faith. Treas. Reg. § 1.6664-4(c)(1). The General Opinion Requirements, all of which must be satisfied, are as follows:

(i) The advice was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight for such purposes) for entering into the transaction and for structuring the transaction in a particular manner. In addition, reliance on advice will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item;

(ii) The advice was based on the law as it relates to those facts and circumstances;

(iii) The advice was not based on any unreasonable factual or legal assumptions (including assumptions as to future events); and

(iv) The advice did not unreasonable rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

Treas. Reg. § 1.6664-4(c)(1).

Although we have found no court case that has construed the General Opinion Requirements (which were issued in August of 1995; *see*, T.D. 8617), numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty. *See, e.g.*, *Mauerman v. Commissioner*, 22 F.3d 1001 (10th Cir. 1994) (the substantial underpayment penalty was not imposed where a physician reasonably relied in good faith upon his independent tax advisor); *Vorsheck v. Commissioner*, 933 F.2d 757 (9th Cir.), *cert. denied*, 502 U.S. 984 (1991) (unsophisticated taxpayers' reliance on their tax accountants precluded imposition of the substantial understatement penalty); *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990) (the taxpayers' efforts to assess their proper tax liability by consulting an accountant and their limited experience in tax matters precluded the application of the substantial understatement penalty); *Daoust v. Commissioner*, 67 T.C.M. (CCH) 2914 (1994) (the negligence and substantial understatement penalties were not imposed where the taxpayers reasonable relied upon qualified independent professional advisors); and *English v. Commissioner*, 65 T.C.M. (CCH) 2160 (1993) (the negligence and substantial understatement penalties were not imposed where the taxpayers relied upon the advice of their accountants on a complex tax matter).

The United States Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of an accountant or attorney to avoid penalties. *See*, *United States v. Boyle*, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on professionals as to questions of substantive law, which would). According to *Boyle*:

> "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place."

*Id.*, at 251.

In the instant case, as discussed previously, it is more likely than not that the Parties would have a recognizable business purpose for entering into the Transactions described herein. The Parties believe that they could realize significant profit from their investments in the Long Options and the Short Options. Based on the foregoing, it is more likely than not that the Parties would be found to have acted with reasonable cause and in good faith with respect to the treatment on its United Stated federal income tax returns of the transactions described herein because, as required by section 6664 and the Regulations promulgated thereunder, and based on such opinion, it is more likely than not that substantial authority for the tax treatment described in this opinion would be found to exist and that such treatment would be sustained if challenged by the IRS. Accordingly, it is more likely than not that the Parties would not be subject to penalties under section 6662.

***

We express no opinion, nor is any opinion implied, regarding any other tax issue or any other aspect of the relationship between and among the Parties, PSM LLC and PSM, Inc. This opinion letter speaks only as of the date hereof and we disclaim any obligation to modify or revise this opinion as a result of any change in law of facts on which this opinion is based. This opinion may be relied upon solely by the Parties in connection with the specific transactions described above and for no other purpose and by no other person without our prior written consent in each instance.

Very truly yours,

Proskauer Rose LLP

PROSKAUER ROSE LLP