# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## Nos. 06-245T, 06-246T, and 06-247T
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO PARTIALLY EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DON M. CHANCE**

DENNIS M. DONOHUE
Chief Senior Litigation Counsel
U.S. Department of Justice, Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 2

STATEMENT . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . 8

I. THE FEDERAL RULES OF EVIDENCE REQUIRE THAT AN EXPERT APPLY PRINCIPLES AND METHODS RELIABLY TO THE FACTS AT ISSUE . . . . . . . . . . 8

II. CHANCE'S OPINION THAT THE COBRA OPTIONS HAD A REASONABLE PROBABILITY OF PROFIT IS NOT BASED ON A RELIABLE METHODOLOGY . . . . . . . . . . 13

III. CHANCE'S METHOD FAILS TO SATISFY VARIOUS "RELIABILITY" FACTORS IDENTIFIED BY THE SUPREME COURT AND OTHER COURTS . . . . . . . . . . 17

1. Factor 1 - Testable Hypothesis . . . . . . . . . . 18

2. Factor 3 - Known or Potential Rate of Error . . . . . . . . . . 19

3. Factor 6 - Relationship of Technique to Reliable Methods . . . . . . . . . . 19

4. *Daubert II* Factor - Opinion for Purposes of Testing . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . 21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987) . . . . . . . . . . 10

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 . . . . . . . . . . 2

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) . . . . . . . . . . 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) . . . . 11, 12, 20, 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . 1, 9, 10, 18

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . 10

*Knetsch*, 364 U.S. 361 (1960) . . . . . . . . . . 2

*Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . 9, 10

*Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir.1998) . . . . . . . . . . 10, 11, 18

*Padilas v. Stork-Gameo, Inc.*, 186 F.3d 412 (3d Cir. 1999) . . . . . . . . . . 10

*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir 1994) . . . . . . . . . . 11, 18

*United States v. Fullwood*, 342 F.3d 409 (5th Cir. 2003) . . . . . . . . . . 10

*United States v. Vargas*, 471 F.3d 255 (1st Cir. 2006) . . . . . . . . . . 10

### FEDERAL STATUTES

Fed. R. Evid. 104(a) . . . . . . . . . . 10

Fed. R. Evid. 401 . . . . . . . . . . 9

Fed. R. Evid. 702 . . . . . . . . . . 1, 8, 9, 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 06-245T, 06-246T, and 06-247T**
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

**APPENDIX**

| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| 1 | May 8, 2007 Expert Report of Don M. Chance | 1 - 72 |
| 1 -B | Corrected Appendix C to Chance Report | 73 |
| 2 | Deposition of Don M. Chance | 74 - 191 |
| 3 | Declaration of Dr. Larry Kolbe | 192 - 209 |
| 4 | Rebuttal Report of Don M. Chance | 210 - 214 |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## Nos. 06-245T, 06-246T, and 06-247T
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION TO PARTIALLY EXCLUDE**
**THE EXPERT REPORT AND TESTIMONY OF DON M. CHANCE**

Plaintiffs seeks to rely on an improper opinion of a Professor of Finance, Don M. Chance ("Chance"), that there was a reasonable probability of profit from the digital option transactions at issue in this litigation. This opinion is improper because the methodology used in Chance's May 8, 2007 report ("Chance Report") to determine reasonable probability of profit cannot be *reliabl*y applied to the facts of this case. This opinion is therefore in violation of Fed. Evid. R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) which require

that the methodology used by an expert witness not only be scientifically valid but that it also be able to be applied *reliably* to the facts in issue. The United States therefore moves to exclude from evidence that part of the Chance Report, and any testimony from Chance, opining on whether the probabilities of profit on the foreign exchange digital option spreads involved in this case are *reasonable.*

**INTRODUCTION**

One of the issues in this case is whether or not certain non-publicly-traded digital option transactions ("COBRA Transactions") had a *reasonable* possibility of profit.[1] Chance is a Professor of Finance at Louisiana State University and has submitted an expert report to support plaintiff's position that the COBRA Transactions had a reasonable probability of profit.[2] In his report, Chance opines, *inter alia*, that the digital options at issue had a reasonable probability of profit because their probabilities of profit were equal to or better than those he observed in

[1]It is the position of the United States that the COBRA Transactions in this case lack economic substance. Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance will not be recognized. *Knetsch v.United States*, 364 U.S. 361, 365-366 (1960) (disregarding a transaction where the taxpayers paid a "fee for providing the façade of 'loans' whereby the [taxpayers] sought to reduce their ... taxes[,]" because "there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction"). There is a two-prong test for determining economic substance. The first prong examines whether the transaction "has no economic substance *because no reasonable possibility of a profit exists*" (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). *Id.* See also *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1356 and n. 16 (Fed. Cir. 2006). Although a split exists among the Circuits on the weight to give each prong, all courts appear to consider both. See *Compaq Computer Corp. v. Comm'r.,* 277 F.3d at 781-782.

[2]*See* Chance Report, attached as Gov. Ex. 1, p. 3.

Google and S&P 500 Options.[3] Chance's method of comparing probabilities of non-publicly-traded COBRA options with the publicly-traded Google and S&P 500 Options is not based on a reliable methodology as it applies to the COBRA Transactions. Chance's method is grounded in the principles of financial economics in the context of publicly-traded securities in well-functioning markets. That method cannot apply to the COBRA Transactions because they were not priced or traded at their market values. Indeed, the COBRA options traded at a price that was materially in excess of their market value.[4] This breaks the essential link between an option's profit probability and the price paid for the right to receive it potential profit. Even Chance admits his methodology does not tell one if the investment is a good investment or not.[5]

The method employed by Chance in determining reasonable probability of profit first evaluates the probability of each COBRA Transaction realizing revenues in excess of cost, which Chance defined as "profit."[6] Chance then determined whether or not the probabilities of profit on the digital options in the COBRA Transactions (which were not publicly-traded) were *reasonable* by comparing the probabilities of profit of the COBRA Transactions with the probabilities of

---

[3]Chance Report, Gov. Ex.1, pp. 3-4 and 34-35.

[4]*See* Declaration of A. Lawrence Kolbe dated March 7, 2008, attached as Gov. Ex. 3, (hereinafter "Kolbe Declaration") p. 10, n.16.

[5]*See* Deposition of Don C. Chance, dated September 6, 2007, attached as Gov. Ex. 2, pp. 166, ll. 2-23, and p. 204, ll. 17 to p. 205, ll. 11 (hereinafter "Chance Deposition").

[6]Although not stated in the Chance Report, Chance interpreted "possibility" as "probability." Chance Deposition, Gov. Ex. 2, p. 166, ll. 9-13. For purposes of this motion, the United States does not contest the methodology used in determining probability of profit of a publicly-traded option. But the United States does take the position that other costs than the ones considered by Chance should have been taken into consideration but that is not the subject of this motion.

profit observed on two publicly-traded options (Google and S&P 500).[7]

Chance's analysis in comparing the probabilities of making a profit on the non-publicly-traded options on foreign currency in the COBRA Transactions with the probabilities of making a profit on publicly-traded equity options is not based on reliable principles and methodology. Chance's methodology is therefore meaningless in helping the trier of fact determine whether, when viewed objectively, the COBRA Transactions could have generated a reasonable probability of profit. Chance's opinion provides no assistance in evaluating the objective economic perspective of the strategy. His method cannot be tested. He admits it does not provide insight into whether or not an investment is a good investment.[8] His judgment about *reasonable probability of profit*, which relies upon a fundamentally flawed comparison of publicly-traded option probabilities to non-publicly-traded option probabilities, is completely void of economic content. His report and testimony on reasonable probability of profit should be struck.

Accordingly, that portion of Chance's report, and any testimony he may give, regarding the COBRA Transactions having a *reasonable* probability of profit should be precluded from evidence in this case.

**STATEMENT**

Dr. Chance holds the William H. Wright, Jr. Endowed Chair for Financial Services at

---

[7]The digital option trades involved in this case were on various foreign currencies and were not publicly-traded on any market. They were priced by Deutsche Bank directly to the participants as part of the COBRA strategy, as discussed, *infra*, were significantly overpriced.

[8]Chance Deposition., Gov. Ex. 2, p. 166, ll. 16-23 ("But if you've got a 99 percent chance of winning, that sounds like a pretty good chance of winning but that doesn't mean it's a good investment though ...Because it could be unfavorably priced. You could have a 99 percent chance that it could be unfavorably priced").

Louisiana State University, where he has taught since 2003. From 1980 through 2003, he was a faculty member at Virginia Tech where he held the First Union Professorship in Financial Risk Management. He claims a specialization in derivatives and risk management.[9] He has written on the digital options. He has no practical experience in trading or otherwise engaging in digital option transactions.[10] Chance denies being a financial analyst but states he could be called a financial economist.[11]

According to Chance's report, he was asked to opine on several issues in this case. One of the specific issues was whether the digital options used in this case (the "COBRA Transactions") include a *reasonable* probability of profit.[12] In making this determination, Chance first explained that each COBRA Transaction strategy consisted of two option transactions, one a purchase of a digital currency option and the other a sale of another digital currency option, with the two options having the same expiration but different exercise prices.[13] Chance used the net of the

[9]Chance Report, Gov. Ex. 1, p. 3.

[10]*See* Chance Report, Exhibit 1, Supporting Appendix A, Curriculum Vita, p. 61-69. *See also,* Chance Deposition, Gov. Ex. 2, pp. 10, ll. 19 to p. 11, ll. 2.

[11]Chance Deposition, Ex. 2, p. 204, l. 25 to p. 205, l. 6. "Well, I'm not a financial analyst ......we can be called financial economists. But financial economists don't specifically make recommendations on individual investments").

[12]Chance also states he was asked to opine on ..."(2) whether the options were in the money or out of the money on certain dates (3) the amount that the assignor of the short options would pay an assignee to assume the obligation in an arms-length transaction on the date of contribution to the partnership, (4) and the profits for each transaction, each partnership, and the two partnerships combined." Chance Report, Gov. Ex. 1, p. 3. While not agreeing with many of his opinions, the United States has not made them a subject of this motion.

[13]Chance Report, Gov. Ex. 1, Section VIII.1, pp. 24-26.

premiums as the cost of the transaction.[14]

In his report, Chance computed the probability of the COBRA Transaction having revenues in excess of cost. He computed the probabilities of profit as to the individual options and as to the transactions undertaken in both SA Tesoro Partners and Tesoro Drive Partners.[15] His report calculates a range of probabilities of profit for each separate COBRA Transaction in each partnership involved in this case.[16] His original calculations ranged as follows:[17]

| | Murphy Pork Spreads on the CHF & EUR | PSM Farms Spreads on the CHF & EUR | MURFAM Farms Spread on CHF |
|---|---|---|---|
| Range of Probabilities on the Separate COBRA Transactions[18] | 12.04% to 22.26% | Same | Same |

Chance calculated the probabilities of profit (before fees) for the COBRA Transactions engaged in by each partnership involved in this case as follows:[19]

[14]Chance Report, Gov. Ex. 1, Section VIII.2, p. 26. Chance did not include any other fees or transaction costs in his probability calculations. In fact, Chance made no attempt to determine whether the COBRA transactions had any additional costs or fees. Chance Deposition, Gov. Ex. 2, p. 161, l.8 to 162, l. 8.

[15]Chance Report, Section IX.3.a, pp. 32-34

[16]In his opening report, Chance did not take into account any fees or other transaction costs in his probability calculations.

[17]The United States does not agree on Chance's probabilities number but that is not the subject of this motion.

[18]Chance Report, Gov. Ex. 1, Section IX.3, Table 5, pp. 33.

[19]In his Rebuttal Report Chance recomputed his probabilities using a set amount for fees and other transactions costs. Such consideration reduced his probabilities substantially to .22 (less than one percent) in all three partnerships. Chance stated in his rebuttal report he was told to consider fees of up to $.5 million in Murphy Pork, .35 million in PSM Farms and $1.375

| | Murphy Pork | PSM Farms | MURFAM Farms |
|---|---|---|---|
| Original Chance Report Probability (without fees or other transaction costs)[20] | | 37.56% to 40.02% | 20.36% to 26.55% |

Chance also calculated the probabilities of profit of two publicly-traded equity options.[21] He selected Google and S&P Options. His calculated range of probabilities of profit for the Google and S&P Options were between 1.56% and 44.10%.[22]

Chance presumed that the probability of the publicly-traded Google and S&P Options realizing revenues in excess of costs were reasonable. Based on this assumption, Chance compared the probabilities on the Google & S&P Options to the probabilities he had computed for the COBRA Transactions, receiving revenues in excess of costs. Chance concluded that the COBRA Transactions probabilities were quite reasonable in comparison to the probabilities of these two publicly-traded options. Specifically, he opined that the "comparative results using the options of two widely known underlying stocks, Google and the S&P 500, show that the probabilities of the digital currency options in this case are not at all out of line with commonly

million in MURFAM Farms. Chance Rebuttal Report, Gov. Ex. 4, pp. 1-3.

[20]See Chance Report, Gov. Ex. 1, Section IX.4, Table 9, at 38. Chance also calculated the probabilities by transaction. Those probabilities are not reproduced here but can be seen in Chance Report, Gov. Ex. 1, Section IX.4, Table 9, p. 38.

[21]The Google and S&P Options that Chance used as his comparable options, traded in 2007, whereas the COBRA options were executed in 1999. However, this timing difference is also not the subject of this motion.

[22]Chance Report, Section IX.3.b, Table 6, p. 25.

traded options and what option investors expect when buying and selling options."[23]

Based on this type of comparative analysis, Chance therefore concludes in his Summary of Findings:[24]

> I found that the transaction did have a reasonable probability of profit. I drew this conclusion on the basis of a comparison of the probability of earning a profit on the transaction in this case to the probability of earning a profit on standard option transactions that are conducted on U.S. Option exchanges. For example, I estimated the probabilities of profit of a large number of options of Google and the S&P 500 and found those probabilities to be comparable if not much lower than those of the transactions in this case.

## ARGUMENT

### I. The Federal Rules of Evidence Require That an Expert Apply Principles and Methods Reliably to the Facts at Issue.

Rule 702 of the Federal Rules of Evidence limit admissibility of expert testimony to situations where the expert's testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Any and all scientific or other specialized testimony or evidence must be relevant and reliable. If a witness has specialized knowledge that will be helpful to the trier of fact, and he qualifies as an expert, then the witness may testify to his specialized knowledge "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[25] Thus, "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is

---

[23]Chance Report, Gov. Ex. 1, Section IX.3.b, p. 35.

[24]*Id.*, p. 4.

[25]Fed. R. Evid. 702

not only relevant but reliable."[26]

The United States Supreme Court applied Rule 702 (as it read prior to amendment in 2000) to the proposed testimony of a scientific expert witness in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and established a two-prong test for admissibility of expert witness testimony. This test considers the relevance and the reliability of the expert's proposed testimony. With regard to the "relevance" prong, the Supreme Court referred to Rule 702.[27] With regard to the "reliability" prong, the Supreme Court stated that the

> Proposed testimony must be supported by appropriate validation – i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.[28]

The reliability determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[29] The Court later determined that these same considerations apply to expert testimony based on "technical" and "other specialized" knowledge.[30] Thus, the trial judge's "basic gatekeeping obligation," now applies to "all expert

[26] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[27] *Daubert*, 509 U.S. 579, 591. Citing Fed. R. Evid. 702, the Supreme Court noted that the requirement that the testimony "assist the trier of fact" means the evidence must be relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 591 (1993). Rule 401 defines relevant evidence as that which has "any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

[28] *Daubert*, 509 U.S. at 590.

[29] *Daubert*, 509 U.S. at 592-93.

[30] *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)

testimony," and not only to scientific testimony.

The *Daubert* analysis is "flexible" and must take account of "the nature of the issue, the expert's particular expertise, and the subject of his testimony." The Supreme Court has stated (*Daubert*, 509 U.S. at 594-95):

> (t)he inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity - - and thus the evidentiary relevance and reliability - - of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*See also*, *Kumho Tire*, 526 U.S. at 150. Further, the proponent of expert testimony must demonstrate admissibility by a preponderance of evidence.[31] Trial courts have great latitude in deciding whether to admit or exclude expert testimony.[32]

In *Daubert*, the Supreme Court set forth four "general observations," or factors, which may be pertinent to evaluating the reliability of expert evidence: (1) whether the method used is susceptible to testing; (2) whether the method has been published or is otherwise susceptible to peer review;[33] (3) the potential error rate of the method; and, (4) whether the method has gained general acceptance in the scientific community. *See Daubert*, 509 U.S. at 593-94. *See also Moore*

---

[31]*Daubert*, 509 U.S. at 592 n. 10; *see also* Fed. R. Evid. 702 advisory committee's note (2000 amendments) (stating that, under Federal Rule of Evidence 104(a), "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence"); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987) (holding the offering party must prove admissibility requirements by a preponderance of the evidence). *See also*, *Padilas v. Stork-Gameo, Inc.*,186 F.3d 412, 417-418 (3d Cir. 1999); *United States v. Fullwood*, 342 F.3 409 (5th Cir. 2003); *United States v. Vargas*, 471 F.3d 255, 261, 266 (1st Cir. 2006). *Accord*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, (1999).

[32]*General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997).

[33]The court reasoned that "submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2797.

*v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir.1998) (en banc). The Supreme Court emphasized that the factors used in *Daubert* "neither necessarily nor exclusively appl[y] to all experts or in every case" and that those factors were merely "meant to be helpful, not definitive."

Following *Daubert*, the Third Circuit Court of Appeals utilized an additional four factors, which it maintains are also pertinent to evaluating the reliability of expert testimony: (5) the existence of standards controlling the method's operation; (6) the relationship of the method used to other methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and, (8) non-judicial uses to which the method has been put. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 at 742 (3rd Cir. 1994). Depending on the facts of the case, a district court may employ none, some, or all of the eight enumerated factors, or may employ relevant unenumerated factors. See *id.*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 43 F3d 1311 (9th Cir. 1995) ("*Daubert II*"), the court specifically noted an additional factor: whether the expert is proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation, or whether the expert's opinion has been developed expressly for purposes of testifying. *Daubert II*, 43 F.3d at 1317. In noting this factor, the court reasoned:

> [I]n determining whether the proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.
>
> That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science. For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of

> business and must normally satisfy a variety of standards to attract funding and institutional support ... That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were "derived by the scientific method.

*Id*. (footnote and citation omitted). The court further observed that if the proffered expert testimony is not based on independent research, the party must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles," e.g., peer review and publication. *Id.* at 1318.

*Daubert II* suggests that the two principal ways for a proponent of expert specialized testimony to show that the proffered evidence satisfies the reliability prong of Rule 702 are to show: (1) that an expert's proffered testimony grows out of pre-litigation research, or (2) that the expert's research has been subjected to peer review. *Id.* Where such evidence is unavailable, *Daubert II* instructs that the proponent of the expert testimony may attempt to satisfy its burden through the testimony of its own experts. *Id.* at 1318-19. For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source-a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like-to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field. *Id.* at 1319.

As we shall next demonstrate, Chance's opinion that the COBRA options had a reasonable probability of profit is not based on a reliable methodology.

## II. Chance's Opinion That the COBRA Options Had a Reasonable Probability of Profit Is Not Based on a Reliable Methodology.

A. Lawrence Kolbe is a financial economist with three decades of experience in the field. He has a Ph.D. in economics from the Massachusetts Institute of Technology and is the co-author of three books on the subject of financial economics.[34] The United States asked Dr. Kolbe to comment on Dr. Chance's methodology that he used in reaching his opinion that the probability of profit on the COBRA Transactions was *reasonable*. Specifically, Dr. Kolbe was asked whether the methodology used in the Chance Report to determine reasonableness is scientifically valid and properly can be applied to the facts at issue in this litigation.[35]

As previously discussed, the Chance Report states that one of its purposes is to discover whether the COBRA digital options had a reasonable probability of profit."[36] The Chance Report describes the methodology it used to determine whether the profit probability was reasonable as follows:

> I found that the transactions did have a reasonable probability of profit. I drew this conclusion on the basis of a comparison of the probability of earning a profit on the transactions in this case to the probability of earning a profit on standard option transactions that are conducted on U. S. options exchanges. For example, I estimated the probabilities of profit of a large number of options on Google and the S&P 500 and found those probabilities to be comparable if not much lower than those of the transactions in this case.[37]
>
> The results [of analyses of the profit probabilities on exchange-traded options on Google and the S&P 500 stock index] are shown in Table 6. Note how the probabilities of profit are inversely related to the exercise price. All

---

[34]Kolbe Declaration, Gov. Ex. 3, p. 1.

[35]Kolbe Declaration, Gov. Ex. 3, p. 1.

[36]Chance Report, Gov. Ex.1, p, 3.

[37]Chance Report, Gov. Ex.1, p. 4; Kolbe Declaration, Gov. Ex. 3, p. 3.

> probabilities are less than 50%. Note that the probabilities for the three deepest out-of-the-money options for Google are less than 3%. For the three deepest out-of-the-money S&P 500 options, the probabilities are less than 6% and yet over 100,000 of those contracts traded.
>
> These comparative results using the options of two widely known underlying stocks, Google and the S&P 500, show that the probabilities of the digital currency options in this case are not at all out of line with commonly traded options and what option investors expect when buying and selling options.[38]

As Dr. Kolbe notes, Chance's methodology can therefore be described in syllogistic form as follows: (1) to calculate profit probabilities on a selection of publicly-traded options, (2) to compare those calculated probabilities with those the Chance Report calculates for the options at issue in this dispute, and (3) to conclude that the probability of profit is reasonable if the calculated probabilities for the options in this dispute lie within the range of probabilities determined for publicly-traded options.[39]

In his Declaration, Dr. Kolbe sets forth the basic economic principles defining the relationship of *value* and *risk* of publicly-traded securities:

> A central task of finance is the valuation of risky investments, such as common stocks, corporate bonds, or corporate investment projects. In well-functioning capital markets, securities trade at prices that offer an expected rate of return that compensates investors for the risk they bear.... All else equal, the higher an investment's risk, the lower the price investors will be willing to pay in capital markets for that investment.[40] The market price of capital assets, such as stocks and

---

[38]Chance Report, Gov. Ex. 1, pp. 34-35; Kolbe Declaration, Gov. Ex. 3, p. 3.

[39]Kolbe Declaration, Gov. Ex. 3, p. 4. This interpretation of the Chance Report's methodology is consistent with statements in Dr. Chance's deposition in this matter, taken September 6, 2007. See, for example, the Chance Deposition at pp. 163, 164, and 172-175.

[40]To support this fundamental principle, Dr Kolbe cites the leading graduate textbook in the field, Richard A. Brealey, Stewart C. Myers, and Franklin A. Allen, *Principles of Corporate Finance*, 8th ed., New York: McGraw-Hill/Irwin (2006) ("Brealey, Myers and Allen"). As Dr Kolbe notes, the textbook devotes the first six of its 35 chapters to a section called "Value" and

bonds, therefore equilibrates to reflect the risk associated with a particular asset.[41]

The Chance Report calculates and reports the profit probabilities of various publicly-traded options. The Report notes that the higher the exercise price, the lower the calculated probability of profit.[42] As Dr. Kolbe observes, this occurs because the higher the exercise price on a call option (all else equal), the greater the risk that the option will finish "out-of-the-money," *i.e.*, that the investor will have to let the option expire unexercised and lose the money used to purchase the option.[43] In other words, in well-functioning capital markets, a higher exercise price means that there is a higher risk of loss, which produces a lower *expected* payoff, which, in turn, will be reflected in the market prices at which the options in question trade. Thus, the market price equilibrates so that investors are compensated for bearing the higher risk by paying less for the asset. The resulting market value for the option embodies the risk-return tradeoff that the market requires. Put differently, the profit probability associated with any given option is economically reasonable for that particular option in well-functioning capital markets *because* the option's price itself reflects that probability.[44] Dr. Kolbe provides a concrete example to explain this basic economic principle:

> That is, suppose two options were identical in every respect, including the expected payoff *if* a payoff occurs, except that one had a lower probability of getting that payoff. No

---

the next three to a section called "Risk." Kolbe Declaration, Gov. Ex. 3, p. 4.

[41]Kolbe Declaration, Gov. Ex. 3, p. 5.

[42]Chance Report, Gov. Ex. 1, pp. 33-35. This corresponds to the payoff on call options. With put options, it is lower exercise prices that correspond to lower probabilities of payoff, all else equal.

[43]Kolbe Declaration, Gov. Ex. 3, p. 5.

[44] Kolbe Declaration, Gov. Ex. 3, pp. 5-6.

> economically rational investor would buy the one with a lower payoff probability unless it were offered at a lower price. If the two instead were initially offered at the same price, the expected profit on the option with the higher payoff probability would be higher and no one would buy the one with the lower payoff probability.... In a well-functioning capital market, this would drive up the price of the higher-probability option and/or drive down the price of the lower-probability option until both were priced to offer the risk-return tradeoff the market required. Thus, the profit probabilities and the market prices of publicly-traded options are inexorably linked."[45]

But, as previously discussed in the Statement, the options in the present dispute did not trade at market values. The Chance Report nonetheless concludes that their calculated profit probabilities were reasonable *because* those probabilities were within the wide range of profit probabilities observed in the market as to Google and S&P options. This conclusion misapplies the basic economic principles just discussed. As Dr. Kolbe explains:

> It is standard practice in investment project valuation and selection to trust market prices if they are available, unless there is a specific reason not to.[46] Thus, the premises that underlies the Chance Report's methodology, that it is reasonable to trust that the profit probabilities observed in the market are economically reasonable for options traded in the market, is in accord with standard practice in finance. But the *reason* that it is consistent with standard practice to trust market-derived profit probabilities is that those probabilities affect not merely the expected payoff, but also the price observed in the market and paid for the right to receive that expected payoff.[47]

But here, that essential link is broken. The logic that would lead someone schooled in finance to accept a probability from well-functioning capital markets as economically "reasonable" (*e.g.*, one at which unrelated, informed parties would voluntarily trade when acting in their own economic self-interest, focusing only on the transaction at hand) does not apply if the

---

[45]Kolbe Declaration, Gov. Ex. 3, p. 6.

[46]For example, Brealey, Myers and Allen starts Chapter 11, "Strategy and the Capital Investment Decision," with a section entitled, "Look First to Market Values." Brealey, Myers and Allen, pp. 275-80.

[47]Kolbe Declaration, Gov. Ex. 3, p. 7.

price at which that trade takes place is not the market value that corresponds to that probability. For the options in this dispute, the requisite correspondence between profit probability and trade price does not exist. This is because the options here were priced by Duesche Bank at amounts that were materially in excess of their market values, as even Chance admitted.[48] Thus, the economic principles that lead one to accept market-based profit probabilities as economically reasonable do not apply to the profit probabilities for the present materially overvalued option trades. As Dr. Kolbe observed, the fact that a particular probability of profit is reasonable for an option trading at market value says nothing about whether it would be reasonable for an option trading at some other value.[49]

In short, although the Chance Report's methodology to assess whether the profit probabilities were reasonable relies on standard economic principles in the context of options that trade at market value, these principles cannot *reliably* be applied to the present set of facts in the way done in the Chance Report because the present options did not trade at market value.

## III. Chance's Method Fails to Satisfy Various "Reliability" Factors Identified by the Supreme Court and Other Courts.

A nonexclusive list of "reliability" factors, drawn from the Supreme Court and other courts include:

> (1) whether a method consist of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

---

[48]Kolbe Declaration, Gov. Ex. 3, p. 10, n.16.

[49]Kolbe Declaration, Gov. Ex. 3, p. 7.

*Daubert*, 509 U.S. at 593-94.[50] Although the Supreme Court has emphasized that some or all of these factors may not be pertinent in assessing reliability of expert methodologies, three of these factors are highly relevant in assessing the reliability of Dr. Chance's method of determining whether the COBRA options had a reasonable probability of profit.

### 1. Factor 1 – Testable Hypothesis.

Dr. Chance's method fails to satisfy the first factor because it does not have a testable hypothesis. This is because the Chance Report's method embodies a test for whether a "reasonable probability of a profit" exists that is effectively impossible to fail. That is, under the Chance Report's method, a probability of profit is "reasonable" if it falls within the range of profit probabilities observed in the market, regardless of anything else. But, as Dr. Kolbe observes, financial markets are immense, so some option, somewhere, can be found with almost any probability of profit.[51] Chance seems to recognize this, noting that it may extend as low as .2%.[52] Therefore, under the Chance Report's method for determining if a profit probability is "reasonable," it is meaningless to speak of testing a method that embodies a standard that is impossible to fail. Put another way, it is impossible to test the reliability of the Chance Report's method of determining reasonable probability of profit because he has adopted a method which concludes that all options, whether publicly-traded or not or whether overvalued or not, have a reasonable probability of profit. For this reason alone, his method of assessing reasonableness of profit on a option transaction is fatally flawed.

---

[50]*See also Moore v. Ashland Chem. Inc.*, 151 F.3d 26 at 275 ; *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 742, n. 8.

[51]Kolbe Declaration, Gov. Ex. 3, p. 9.

[52]Chance Deposition, Gov. Ex. 2, pp. 242-245.

### 2. Factor 3 – Known or Potential Rate of Error

Dr. Chance's method also fails to satisfy factor 3, the potential error rate of the method. This factor addresses how often the method will reach an erroneous conclusion. As just discussed, the Chance Report's method will essentially never find an option that will not have a "reasonable possibility of profit."[53] Therefore, Chance's method does not allow for any possibility of reaching an erroneous conclusion. That is, unless it is assumed, contrary to his method's ultimate findings, that options can be traded which will *not* have a "reasonable probability of profit." For example, it is the Government's position in this litigation, as supported by a financial economist, Dr. Kolbe, and an options expert, Dr. David F. DeRosa, that, when viewed from an objective perspective, the options at issue did *not* have a reasonable possibility of profit.[54]

Thus, if it is assumed that options do exist in the actual world which do *not* have a reasonable possibility of profit, (*e.g.*, options, as here, which are priced materially in excess of their market values), then it logically follows that the Chance Report's method will reach an erroneous conclusion. Moreover, in a sample of options that all fail to have a "reasonable probability of profit," the error rate of the Chance Report's method will be 100 percent.[55] Here again, this factor also emphasizes the total unreliability of the Chance Report's method, particularly as applied to the facts of this case.

---

[53]Kolbe Declaration, Gov. Ex. 3, p. 9.

[54]Kolbe Declaration, Gov. Ex. 3, p. 10.

[55]Kolbe Declaration, Gov. Ex. 3, p. 10.

### 3. Factor 6 – Relationship of Technique to Reliable Methods

The sixth factor, how the method relates to other methods, is also not satisfied. As discussed, the Chance Report's approach is grounded in standard economic principles, but it does not take account of the fact that the essential link between profit probability and the price paid for the right to receive the potential profit is broken for the options in this dispute, since they did not trade at market value. Thus, as Dr. Kolbe observes, these basic principles have not been shown to be reliable in the way the Chance Report's method applies them.[56]

### 4. *Daubert II* Factor – Opinion Developed for Purposes of Testifying.

In *Daubert II*, the Ninth Circuit mentioned an additional factor: whether the expert is proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation, or whether the expert's opinion has been developed expressly for purposes of testifying.[57] Here there has been no showing that the Chance Report's method of evaluating reasonable probability of profit has ever been applied outside of this litigation. While, as Dr. Kolbe notes, "[t]he fact that a standard principle or tool is being applied to a novel situation does not, *by itself*, in any way impair the economic validity of the analysis," as just discussed, the reliability of Dr. Chance's method is already fatally suspect by virtue of its failure of various other bedrock "reliability" factors.[58]

Given these circumstances, the fact there has been no showing that the Chance Report's method was published in some objective source "such as a learned treatise, the policy statement

---

[56]Kolbe Declaration, Gov. Ex. 3, p. 9.

[57]*Daubert II*, 43 F.3d at 1317.

[58]Kolbe Declaration, Gov. Ex. 3, p. 8-9 (Emphasis added.)

of a professional association, a published article in a reputable scientific journal or the like-to show that they have followed the ...method" is certainly relevant to its reliability. *Id.* at 1319. Equally relevant to its reliability is the fact that there has been no showing that Dr. Chance's method was not developed expressly for purposes of testifying in this litigation. *Daubert II*, 43 F.3d at 1317.

In sum, the foregoing analysis makes eminently clear that the Chance Report's method is not based on a reliable method of determining reasonable probability of profit as applied to the facts of this litigation.

**CONCLUSION**

Dr. Chance's opinion that there existed a reasonable possibility of profit is not based on a reliable method. The Court should preclude Plaintiffs from introducing at trial that portion of Chance's expert report and any accompanying testimony regarding reasonableness.

Respectfully submitted,

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2008, I electronically filed the foregoing United States' Memorandum in Support of its Motion to Partially Exclude the Expert Report and Opinions of Don A. Chance with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

/s/ Dennis M. Donohue
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov