# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**Nos. 06-245T, 06-246T, and 06-247T**
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

## APPENDIX

| | | |
|---|---|---|
| Exhibit 1 | Expert Report of Melvin F. Jager, June 29, 2007. | Pages 001-032 |
| Exhibit 2 | Deposition Transcript of Melvin Jager, August 2, 2007. | Pages 033-087 |
| Exhibit 3 | Pages 51 through 53, deposition of Gary Woods, June 21, 2007. | Pages 088-089 |
| Exhibit 4 | Powerpoint presentation presented to Gary Woods. | Pages 090-104 |

OCEAN TOMO

INTELLECTUAL CAPITAL EQUITY

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

**EXPERT REPORT OF MELVIN F. JAGER**

**June 29, 2007**

GOVERNMENT EXHIBIT 1

PENGAD-Bayonne, N. J.

INTELLECTUAL CAPITAL EQUITY

## TABLE OF CONTENTS


1. FIRM BACKGROUND AND QUALIFICATIONS ..... 1
2. ASSIGNMENT ..... 3
3. SUMMARY OF OPINIONS ..... 4
4. INVESTMENT AND TAX STRATEGY OVERVIEW ..... 5
5. INTELLECTUAL PROPERTY ..... 5
   - 5.1 OVERVIEW ..... 5
   - 5.2 PATENTS ..... 5
   - 5.3 TRADEMARKS ..... 6
   - 5.4 COPYRIGHTS ..... 6
   - 5.5 TRADE SECRETS ..... 7
6. TRADE SECRET CONSIDERATIONS ..... 9
   - 6.1 NOVELTY ..... 9
   - 6.2 SECRECY ..... 10
   - 6.3 SECURITY ..... 11
   - 6.4 VALUE ..... 12
7. COMPENSATION FOR USE OF TRADE SECRETS ..... 14
   - 7.1 INVESTMENT AND TAX STRATEGY COMPENSATION STRUCTURE ..... 14
   - 7.2 THE 25% RULE OF THUMB ..... 14
   - 7.3 PUBLICLY AVAILABLE TRADE SECRET LICENSING ..... 15
   - 7.4 TRADE SECRET LICENSING AS A RESULT OF LITIGATION ..... 16
8. CONCLUSION ..... 19
9. SIGNATURE ..... 20

## 1. FIRM BACKGROUND AND QUALIFICATIONS

My name is Melvin F. Jager. I am of Counsel for Ocean Tomo, an integrated intellectual capital merchant banc providing expert services, valuation services, asset management, M&A advisory, and risk management services. Ocean Tomo assists clients – corporations, law firms, governments, and institutional investors – in maximizing their Intellectual Capital Equity™ value. Ocean Tomo seeks to maximize the value and benefits inherent within the rapid growth of intellectual property as an asset class.

Prior to joining Ocean Tomo I engaged for 42 years in the private practice of intellectual property law in Washington, D.C. and Chicago, Illinois. The majority of my time practicing was as a partner/shareholder of the Chicago-based intellectual property firm of Brinks Hofer Gilson and Lione and its predecessors. During this time I advised and consulted with clients on a full range of intellectual property issues. I have engaged extensively in the preparation and prosecution of patent applications before the U.S. Patent and Trademark Office. I also have been engaged as an attorney in a variety of patent infringement suits as the attorney for the plaintiff to enforce patents, and as an attorney for the defendant to defend against allegations of patent infringement.

My practice of intellectual property law also included advising, consulting and litigation in related legal areas involving trade secrets, trademarks, copyrights and unfair competition. I also regularly have engaged throughout my practice in all aspects of the licensing of intellectual property, including the negotiation and drafting of license agreements, the analysis of existing licenses, the enforcement of licenses and consultation with clients on matters related to licensing. I have also served as an expert witness in patent and trade secret litigation, and have been an arbitrator in an international licensing dispute.

I have been active in teaching intellectual property courses throughout my career. From 1992 to 2004 I held the position of an adjunct professor of law in the College of Law at the University of Illinois in Champaign, Illinois, where I have taught courses in Patent Law and Patent Litigation. Before that I taught Trade Secrets Law in the Masters Level Program at The John Marshall Law School in Chicago, Illinois. I also taught Patent Law at the Northern Illinois (Lewis) College of Law. I have lectured on Patents, Trade Secrets and Licensing as a visiting adjunct professor and guest lecturer at the University of Victoria College of Law in Victoria, B.C., and at St. Peter's College of Law, Oxford University, in Oxford, U.K.

I have written articles and treatises on intellectual property law topics. I am the author of a three volume treatise, TRADE SECRETS LAW, published by West Group Publishing in New York. I am also the author of an annual LICENSING LAW HANDBOOK and the editor of a three volume treatise TRADE SECRETS THROUGHOUT THE WORLD, both of which are also published by West Group Publishing. I further have authored or edited articles on intellectual property law and licensing which have been published in *Les Nouvelle*, the scholarly publication of the Licensing Executives Society, in American Bar Association Monographs, in Developments in Intellectual Property, published by The John Marshall Law School and in books on intellectual property published by the Practicing Law Institute.

Throughout my career I also have been an active participant in the educational and professional activities of professional associations relating to intellectual property and licensing. In 2002-2003, I was President of the Licensing Executives Society International, a professional association of 12,000 members in 30 countries who are engaged in the creation, protection and transfer of technology on a worldwide basis. As the president and a member of LESI, I lectured on patent, trade secret and licensing issues in many countries, including the United States, Japan, Europe, China, Korea, Australia, South Africa and Mexico.

In 1994 I held the position of President of the Licensing Executive Society US and Canada, the largest society within LESI, and was a regular lecturer at the association's annual Technology Transfer Institute. I am a founding member and Past President of the Licensing Executive Society Foundation, a not-for-profit foundation dedicated to educational and outreach programs relating to intellectual property creation, licensing and technology transfer.

I have also been active in the more traditional professional associations concerned with intellectual property. I am past president of the Intellectual Property Law Association of Chicago, and formerly was Chair of the Intellectual Properties Litigation Committee of the American Bar Association Litigation Section, and Chair of the Illinois Bar Association Patent Trademark and Copyright Council. As an active member of these and other professional associations I have given speeches and made presentations on a variety of topics relating to intellectual property procurement, protection, enforcement and licensing. I further presented speeches and papers on licensing in the new global economy and on using patent licensing to manage patent litigation risks at the 2004 and 2005 Annual Meetings of the Japan Institute for Invention & Innovation in Tokyo, Japan.

I am a graduate of the University of Illinois, with a B.S. degree in General Mechanical Engineering. I also hold a degree as a Juris Doctor of Law from the College of Law at the University of Illinois.

I have included a copy of my CV along with this report.

Ocean Tomo is presently being compensated for my work in this matter at a rate of $595 per hour. Other Ocean Tomo consultants are assisting me in this engagement and are being compensated at various rates under $595. No part of my compensation depends upon the outcome of this litigation.

## 2. ASSIGNMENT

Ocean Tomo was retained by counsel for the plaintiffs, Murfam Farms, LLC, PSM Farms, LLC, and Murphy Pork Partners, LLC (hereafter referred to as "the Murphys"), in connection with this matter. I was asked to provide analysis and possible testimony regarding the intellectual property value of certain investment transactions (the "Investment and Tax Strategy") associated with this case. Specifically, my report discusses (1) whether the Investment and Tax Strategy can be categorized as intellectual property, and (2) whether an appropriate compensation structure for use of intellectual property is a percent of the potential benefit it enables.

A detailed listing of documents reviewed by Ocean Tomo in connection with this litigation to date is attached as Exhibit B.

The following report and accompanying analyses summarize my current opinions whether the Investment and Tax Strategy can be categorized as intellectual property, and whether an appropriate compensation structure for use of such intellectual property is a percent of the benefit enabled by the intellectual property. The information in this report is based upon discovery to date and other currently available information. Accordingly, my opinions described herein should be considered preliminary and subject to change based on any new documents, as well as future discovery, the testimony of other experts, and other case developments. In addition to this report, I may rely on excerpts taken from video taped depositions and/or demonstrative exhibits that illustrate the concepts and conclusions contained in this report.

## 3. SUMMARY OF OPINIONS

I have reviewed Professor Gruner's expert report and am in agreement with his conclusions regarding the Investment and Tax Strategy's trade secret characteristics. At trial, I will offer my opinion that the Investment and Tax Strategy had the characteristics of a trade secret at the time the strategy was implemented. Also, I will offer my opinion that compensation in the form of a percentage of the potential benefits, such as cost savings, enabled by intellectual property is a common structure in intellectual property licensing.

My opinion is based on my understanding of the facts and circumstances of this case and my review of the produced documentation, testimony, and third party information available to date. The analyses and opinions described herein are subject to change based upon additional discovery or other developments.

## 4. INVESTMENT AND TAX STRATEGY OVERVIEW

I understand this case primarily involves a dispute with the Investment and Tax Strategy over the validity of the investor's treatment of a short option for tax purposes. I have not formed an opinion on this issue, and I was asked to assume by counsel that the plaintiff entered into an Investment and Tax Strategy similar to the one described by counsel in a letter dated March 19, 2007 and in the COBRA Slideshow.[1] This Investment and Tax Strategy was known as "COBRA" – Currency Options Bring Reward Alternatives.

I assume the anticipated benefits of implementation of the Investment and Tax Strategy are comprised of two components; investment returns and tax savings. It is my understanding that one potential benefit was that the investor reaped tax benefits by using a loss generated with this Investment and Tax Strategy to offset income reported on his tax return, and another benefit was the potential investment returns on the invested monies.

## 5. INTELLECTUAL PROPERTY

### 5.1 Overview

The term *intellectual property* refers to patents, trademarks, copyrights, and trade secrets or know-how. Intellectual property is a special classification of intangible property and is unique because the owner of intellectual property is protected by law from unauthorized exploitation of it by others. Merriam-Webster's dictionary defines intellectual property as "property (as an idea, invention, or process) that derives from the work of the mind or intellect; *also*: an application, right, or registration relating to this."[2] The intellectual property owner can either internally use its benefits, or transfer interests in the intellectual property to others who may exploit it.

An overview of the main classes of intellectual property is provided in the following sections, as well as discussion on the applicability of each to this case.

### 5.2 Patents

A patent is the legal process whereby technology, ideas, or proprietary methods may be turned into property with defined rights associated with ownership. In the U.S., a patent is the grant of a property right by the U.S. government to the inventor (or assignee) by action of the Patent and Trademark Office.

According to 35 U.S.C. § 154 (Contents and Term of Patent), patent rights provide the owner with the right to exclude others from manufacturing, using, or selling the invention. For patents filed on or after June 8, 1995, these rights extend for twenty years from the date of patent filing. Competitors legally cannot, without license, commercially employ the patented elements of a product or process. The patent

[1] COBRA Slideshow, DOJ007654 *et seq.*
[2] http://www.merriam-webster.com/dictionary/intellectual%20property .

owner enjoys commercial and competitive advantages by making, marketing, or licensing the patented invention for the useful life of the patent.

**5.2.1 Patentability of Tax Strategies**

As stated by James Toupin, General Counsel for the U.S. Patent and Trademark Office before the House Committee on Ways and Means "The current Act that details the standards of patentability, the Patent Act of 1952, specifies four basic statutory requirements that must be met to obtain a patent: (1) the claimed invention must define eligible subject matter and have utility, (2) it must be novel, (3) it must not have been obvious to a person having ordinary skill in the art at the time the invention was made, and (4) it must be fully and unambiguously disclosed in the text [specification] of the patent application to show that the inventor has possession of the claimed invention upon filing and that the skilled practitioner would be able to practice the claimed invention without undue experimentation."[3]

Furthermore, Mr. Toupin indicates that a new subclass has been dedicated to tax strategies. "Recently, subclass 36T in [patent] Class 705 has been established and dedicated to tax strategies. We have identified 41 issued patents related to tax strategy. Further, 61 published applications, not yet examined, relate to tax strategy."[4]

Additionally, legal tax strategies need not be patented to insure protection; they could be kept as trade secrets. For instance, as Mr. Toupin stated regarding tax strategies per se "An alternative strategy to patenting is to keep [tax] strategies as trade secrets. Now those trade secrets may be known to some advisers and not other advisers. The existence of a patent – the trade-off for the existence of a patent is to make it known to the world...So, in terms of whether a patent would make a strategy more or less available, it is a bit of trade-off between whether the cost of the license that might be requested outweighs the cost of each tax adviser inventing the same strategy for each client."[5]

I am not aware of patents associated with the Investment and Tax Strategy.

**5.3 Trademarks**

According to 15 U.S.C. § 1127, a trademark is any word, name, symbol, or device, or any combination thereof—[used by a person] to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown. A trademark also serves as an assurance of quality – the consumer comes to associate a level of quality with the goods and services being given a trademark.

I am not aware of trademarks associated with the Investment and Tax Strategy.

**5.4 Copyrights**

According to § 102 of Title 17 of the U.S. Code, a copyright is defined as follows: copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of

[3] EX000035.
[4] EX 000036-037.
[5] EX000080-081.

expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

The Investment and Tax Strategy idea per se would not be copyrightable; however, documents memorializing the idea may be copyrightable. I am not aware of registered copyrights associated with the Investment and Tax Strategy.

## 5.5 Trade Secrets

Trade secrets have been defined in several ways:[6]

- "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [Section 1(4) of the Uniform Trade Secrets Act][7]
- A trade secret is any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others. [New Restatement of the Law Third, Unfair Competition, § 39]
- A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving material, a pattern for a machine or other device, or a list of customers. [Restatement of Torts, §757 (1939)]

These sources, as well as judicial decisions, suggest a number of factors to be considered in assessing whether the requisite elements are present to classify something as a trade secret. From this array of information, it is possible to synthesize some fundamental concepts. A trade secret has four aspects:[8]

- It must consist of qualifying information; that is, one must be able (at least in general terms) to articulate what it is in such a way that it may be distinguished from general knowledge and skill;
- It must be secret, in the sense that it is not well known or easy to compile;
- The owner must have made reasonable efforts to preserve secrecy; and
- The secret must have value as reflected in some competitive advantage that it gives to the owner.

Said differently, the key elements of a trade secret include that it: (1) is novel in the sense of not being generally known in the industry, (2) is sufficiently secret and is not readily ascertainable by proper means (e.g., reverse engineering), (3) is subject to reasonable security measures and (4) has economic value.

Trade secrets are different from the other forms of intellectual property in that the protection of trade secrets requires appropriate secrecy and maintenance. Trade secrets require a continuous effort to

---

[6] http://my.execpc.com/~mhallign/tradesec.html.
[7] Most states have modified their laws to conform to the provisions of the Uniform Trade Secrets Act.
[8] Pooley, James. §4.01 [1], Trade Secrets, 4-3. Law Journal Press, 1997.

maintain secrecy in order to allow defense by lawsuits against misappropriators at a later time, rather than a single application and grant by a government agency (e.g., the U.S. Patent and Trademark Office).

Yet trade secret protection offers much broader scope than other intellectual property such as patents. Although some trade secrets are patentable, they are often not patented in order to avoid making them public and to avoid limiting their rights to the statutory life of a patent. Trade secret rights can exist as long as the information is maintained secret.

To determine whether the Investment and Tax Strategy had the characteristics of a trade secret at the time of implementation, I discuss each of the four fundamental elements of a trade secret in the following section.

## 6. TRADE SECRET CONSIDERATIONS

As stated previously, the key characteristics of a trade secret are:

- **Novelty** – the information is novel in the sense of not being generally known in the industry;
- **Secrecy** – the information is sufficiently secret and is not readily ascertainable by proper means;
- **Security** – the information is subject to reasonable security measures; and
- **Value** – the information provides value or potential value to the user of the information.

Based on my analysis presented in this section and my understanding the facts and circumstances of this case, I concluded that, at the time the Investment and Tax Strategy was implemented, it had the essential characteristics of a trade secret.

### 6.1 Novelty

In order to be patentable, an invention must be "novel"; that is, in relation to all that is known in the relevant field of the technology, it must be seen as new. This novelty requirement is not applicable to trade secrets. Most judicial opinions do not even mention it as an element. Trade secret protection does require, however, that the matter not be generally known. Thus, there must be something at least modestly "special" about the information—the law will not intervene to protect matter that is only trivially different from the known art.[9]

Based on the information reviewed, it appears the parties involved believed the Investment and Tax Strategy was not generally known in the financial and tax services industry. This is evidenced by the following:

- *Advisor Confidentiality Agreements.* Before a presentation about the Investment and Tax Strategy, it was the standard practice of Ernst & Young to require its advisors to sign a confidentiality agreement.[10]
- *Clear Statement That Information Is Confidential From Ernst & Young.* Example language in the Ernst & Young engagement letter is "All advice and other services pursuant to this arrangement are intended solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communications made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent."[11]
- *Enhancements Were Added By Ernst & Young.* An Ernst & Young email states, "Our fee is fare (sic) based on the consultation. the enhancements we have made to the strategy to give more business purpose to the partnership and economics... (sic)"[12]

---

[9] Pooley, James. §4.03 [1], Trade Secrets, 4-19. Law Journal Press, 1997.
[10] 2003EY00009 – template agreement used by Ernst & Young for marketing.
[11] DOJ040280, DOJ040265, DOJ049822, DOJ049816, DOJ049807, DOJ049813, DOJ049810, DOJ049819.
[12] DOJ005334.

- *Ernst & Young Was The Only Company Providing The COBRA Investment and Tax Strategy.* I am not aware of any other primary service providers other than E&Y who were offering the specific COBRA Investment and Tax Strategy, although I am aware that other service providers may have been offering similar strategies. This belief is based on my review of the available documentation and my discussions with counsel.
- *Ernst & Young and Jenkens & Gilchrist Entered Into a Non-Disclosure Agreement.* Sample language from an agreement states that "Undersigned agrees that all Confidential Information is, and shall remain, proprietary to J&G, and that Undersigned will disclose such information only to such of its internal personnel to whom such disclosure is necessary to evaluate the [financial] Structures."[13]

## 6.2 Secrecy

An important characteristic of a trade secret is that it is, in fact, secret. The secrecy element of trade secret law is not just a requirement that the subject matter not be generally known. It also reflects the assumption that anything sufficiently important to take to court should already have been the subject of adequate attention and care by its owner.[14]

The examination of secrecy involves a dual path. One path is concerned with the extent to which the secret is known (i.e., relative secrecy), and the second path is the extent to which the secret could be known with but a modicum of effort (i.e., ready ascertainability). Establishing that something is not generally known and that it has been guarded aids in convincing a trier of fact that the trade secret is valuable.[15]

My opinion, based on the information reviewed, is that the Investment and Tax Strategy was adequately maintained as secret. This is evidenced by the following (and discussed in the following sections):

- *Advisor Confidentiality Agreements.* Before a presentation about the Investment and Tax Strategy, it was the standard practice of Ernst & Young to require its advisors to sign a confidentiality agreement.[16]
- *Clear Statement That Information Is Confidential From Ernst & Young.* Example language in the Ernst & Young engagement letter is "All advice and other services pursuant to this arrangement are intended solely for your benefit and that of the Partnership and are not for the benefit on anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, any content of any oral or written communications made by us in connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent."[17]
- *Investment and Tax Strategy Not Publicly Available.* Based on the information reviewed, the specific Investment and Tax Strategy was not publicly accessible or well-known in the financial

[13] CANC01623 – CANC01625
[14] Pooley, James. §4.04 [1], Trade Secrets, 4-24. Law Journal Press, 1997.
[15] Pooley, James. §4.04 [1], Trade Secrets, 4-24 and 4-25. Law Journal Press, 1997.
[16] 2003EY00009 – template agreement used by Ernst & Young for marketing.
[17] DOJ040280, DOJ040265, DOJ049822, DOJ049816, DOJ049807, DOJ049813, DOJ049810, DOJ049819.

and tax services industry. In fact Ernst & Young only implemented the COBRA Investment and Tax Strategy 16 times.[18]

- *The Trade Secret Remains A Trade Secret Even If Disclosed To The IRS.* According to 26 U.S.C § 6103, taxpayer information remains confidential. I understand this confidentiality protects taxpayer return information from disclosure, including requests filed under the Freedom of Information Act.[19] Also it should be noted that information provided to other governmental agencies may be kept confidential. For instance, patent applications filed at the U.S. Patent and Trademark Office are not published for 18 months.[20] This gives the filer the ability to abandon a patent application for his invention while simultaneously maintaining trade secret status for this same invention within this 18 month window.

### 6.2.1 Degree of Secrecy Required

The only perfect secret is that which is known to but one person. However, trade secret law was developed to accommodate the realities of the industrial and information ages. Thus the concept of "relative secrecy": a secret remains protectable even when it is shared, so long as it has not escaped into the mainstream of public knowledge or commonly known to people in the relevant industry. As a result, it is well settled that a trade secret owner may without fear of losing its rights reveal trade secrets to employees and others in a similar confidential relationship. Secrets may also be shared with vendors and other business partners with a common interest in the matter, who either by contract or implication will be held to a standard of trust. I understand the correct rule is that a secret can be reasonably shared with anyone who has a need to know it and who knows it is confidential.[21]

### 6.2.2 Ready Ascertainability

Ready ascertainability depends on the nature of the matter to be protected, rather than the owner's efforts to protect it. It is clear that a formula or process that cannot be revealed by examination of the end product may be an impenetrable secret. However, a secret less than impenetrable may yet be exceedingly difficult and time consuming to "reverse engineer". As the difficulty of ascertainment increases, the information becomes qualified as a trade secret.[22]

That something is not readily ascertainable can be proved by circumstantial evidence. The precautions taken by the trade secret owner to protect the information are relevant to the issue. The apparent inability of potential competitors to duplicate the information as well as the willingness of others to pay for it may be considered.[23]

## 6.3 Security

[18] Robert Hanson Deposition, 5/24/2007, pp. 7.
[19] 26 U.S.C § 6103.
[20] http://www.uspto.gov/web/offices/com/speeches/00-72.htm
[21] Pooley, James. §4.04 [2][a], Trade Secrets, 4-25 and 4-26. Law Journal Press, 1997.
[22] Pooley, James. §4.04 [4], Trade Secrets, 4-40 to 4-43. Law Journal Press, 1997.
[23] Pooley, James. §4.04 [4], Trade Secrets, 4-44. Law Journal Press, 1997.

Under the Uniform Trade Secrets Act, the plaintiff must prove that "reasonable efforts" were taken to protect against loss.

My opinion, based on the information reviewed, is that adequate security was in-place for the Investment and Tax Strategy. This is evidenced by the same reasons as discussed in Section 6.2.

The standard of reasonable efforts is flexible, and in considering what are "efforts that are reasonable under the circumstances", one must focus on the particular facts at hand.[24] The guiding principles seem to boil down to what is reasonable and practical under the circumstances. Within a very broad band of discretion, the trade secret owner is to consider the value of the secret, the nature of the threat to disclosure, and the cost and practicality of any particular security mechanism. It is recognized that no security system is perfect, and the people who put it to use certainly are not perfect; therefore, some mistakes are permitted.

Nondisclosure agreements ("NDAs") are a common trade secret practice. They fundamentally define the nature of the information as valuable, and the relationship as a trust. While not many courts will say that the use of nondisclosure agreements is alone sufficient to meet the reasonable efforts requirement, many will see it as probative evidence of secrecy.

Court cases have established the importance of adequate security precautions as an element of proof in a trade secret case. Based on the information reviewed in this case (e.g., the engagement letter, confidentiality agreement) and nature of the service provider's business, it is my current opinion that adequate security measures were in-place to protect the Investment and Tax Strategy.

Please refer to section 6.2 for a list of the security measures taken to insure the secrecy of the Investment and Tax Strategy. Given these measures, it is apparent that the Investment and Tax Strategy generally exhibited the characteristics of a trade secret at the time of the Investment and Tax Strategy's implementation.

### 6.4 Value

As far as the law is concerned, secrets are protectable if they have some actual or potential commercial value. A fundamental element of trade secrecy is that the information be shown to provide some advantage over the competition. The Uniform Trade Secrets Act requires that a plaintiff prove the claimed secret "derives independent economic value, actual or potential, from not being generally known." In order for information to qualify, its secrecy must provide some real advantage over what is generally known. Slight variations on similar processes used throughout an industry may not suffice. It is also not enough that the secret is merely different, "unique" or "unorthodox". However, the incremental value of the secret need not be great, just not trivial.[25]

My opinion is that, at the time the Investment and Tax Strategy was implemented, it had sufficient value to meet the value-related characteristic of a trade secret. This is evidenced by the fact that *clients paid to use the Investment and Tax Strategy*. The Murphys paid a percent of their overall loss as fees to Ernst & Young. It should also be noted that for the Murphys, Ernst & Young agreed to represent them in front of the IRS, should the need arise.[26] This valuable service is directly related to the Investment and Tax

[24] Pooley, James. §4.04 [2][b], Trade Secrets, 4-27 and 4-28. Law Journal Press, 1997.
[25] Pooley, James. §4.05 [1], Trade Secrets, 4-45 to 4-47. Law Journal Press, 1997.
[26] DOJ040280, DOJ040265, DOJ049822, DOJ049816, DOJ049807, DOJ049813, DOJ049810, DOJ049819

Strategy and is included in the fee structure as a percent of the benefits. The Murphys agreed to an estimated fee of 2.0% of the total tax loss prior to implementation of the Investment and Tax Strategy. As shown in the following table provided by counsel, the actual fees for the Murphys were 2.21% of the loss.

**Fee Paid as a Percentage of Tax Savings**

| | | |
|---|---|---|
| Ordinary Loss/Short Term Capital Loss | $ | 13,919,961 |
| Long Term Capital Loss | $ | 86,074,896 |
| Total Loss Amount | $ | 99,994,857 |
| Ernst and Young Fee - 2.0% of Loss | $ | 1,999,897 |
| Flat Fee Paid to Proskauer Rose | $ | 200,000 |
| Total Actual Fees Paid | $ | 2,206,000 |
| STCL Tax Savings | $ | 5,512,304 |
| LTCL Tax Savings | $ | 17,214,979 |
| Combined Anticipated Tax Savings | $ | 22,727,284 |
| **Fees Paid as a Percentage of Tax Savings** | | **9.71%** |

[27]

For the Murphys the total losses were nearly $100 million, and this translates to approximately $22.7 million in anticipated tax savings. Given that anticipated tax savings were one of the benefits derived from the use of the Investment and Tax Strategy, it is useful to determine the percent of the benefits paid as a fee for use of the Investment and Tax Strategy, as opposed to a percent of the total losses. In the case of the Murphys 9.71% of the tax benefits were paid to utilize the Investment and Tax Strategy. It should be noted that the performance of the underlying investments are not included as an aspect of this calculation.

[27] EX000147

## 7. COMPENSATION FOR USE OF TRADE SECRETS

The second part of my assignment is to opine on whether it is common to provide compensation for the use of intellectual property, including trade secrets, in the form of a percent of the benefit or potential benefit, such as cost savings, provided by using the intellectual property.

Based on my licensing and intellectual property experience, analysis presented in this section, and my understanding of the facts and circumstances of this case, I conclude that the aforementioned compensation arrangement is commonplace for the use of intellectual property, including trade secrets.

### 7.1 Investment and Tax Strategy Compensation Structure

As has been previously discussed, the users of the Investment and Tax Strategy paid a percent of their overall loss to utilize the trade secret. That is, the users implicitly paid some portion (i.e., a royalty rate) of the expected benefits of the transaction to the providers and implementors of the trade secret.

A concept generally accepted by intellectual property practitioners is that the owner of property should receive some portion of the potential benefits (e.g., an allocation of the profits, revenue, cost savings) enabled by the intellectual property they have created and given someone else the right to use. This concept is clearly stated in the well-known "25% rule of thumb", which is discussed in the following section.

### 7.2 The 25% Rule of Thumb

The need to split or share the anticipated benefits "pool" between an intellectual property owner/licensor and the user/licensee of intellectual property has been recognized and endorsed by licensing practitioners, Tax Court case law,[28,29,30] and Internal Revenue Service regulations.[31] Several methodologies have been used or suggested for achieving an appropriate split, and most of these approaches, ultimately, attempt to accomplish the same result: a division of anticipated benefits that is commensurate with the nature of the intellectual property and the functions performed and risks assumed by each party to the transaction.

Within the aforementioned cases and regulations, profits have been apportioned using both objective and subjective methods. A common rule of thumb is referred to as the 25% Rule.

The so-called "25% rule of thumb" suggests a licensee might regard one-fourth of its expected profits from products incorporating a given intellectual property as a starting point in negotiating a license for that property. The theoretical foundation of "this rule of thumb is that the licensor and licensee should share in the profitability of products embodying the patented technology [or other type of intellectual property]. The *a priori* assumption is that the licensee should retain a majority (i.e., 75%) of the profits because it has undertaken substantial development, operational and commercialization risks, contributed other technology/IP and/or brought to bear its own development, operational and commercialization

[28] *Ciba-Geigy v. Comm'r*, 85 T.C. 172, 229 (Tax Court, 1985).
[29] *Bausch & Lomb v. Comm'r*, 92 T.C. 525, 608, aff'd 91-1 USTC 50, 244 (Tax Court, 1989).
[30] *Hospital Corporation of America v. Comm'r*, 81 T.C. 520, 601 (Tax Court, 1983).
[31] Section 482 of the Internal Revenue Code (§482).

contributions."[32]

This "rule of thumb" has been frequently discussed and debated in licensing publications, particularly with respect to determining how widely it is used or reflected in actual licensing practice and the most appropriate method for its application. Robert Goldscheider has been one of the most prolific proponents of the "rule of thumb". He has acknowledged that it is a "rough tool" to be used in conjunction with other methods of analyses. In addition, Goldscheider et al. note, "IP is often priced based on the enhanced revenues and/or reduced costs that it generates versus the next best alternative. The extent of that excess (or incremental value), holding all else constant, may form the upper bound for the appropriate price." Regardless of the royalty implied by application of the "rule of thumb," a rational licensee will typically consider the net returns anticipated from employment of the patent and the net cost of implementing the next best alternative to the patent as highly informative of a reasonable royalty.

The "rule of thumb" is not a rigid "rule of law" or a precise term of art.[33] Use of the "rule of thumb" necessarily implies the intellectual property in question makes some quantifiable contribution to the realization of profits, which is not always the case. However, it is not the only method used to determine a reasonable royalty. As Goldscheider et al. observe, "The Rule...is one of many tools. Ultimate royalty rates often are higher or lower than 25 per cent of profits, depending on a host of quantitative and qualitative factors that can and should affect a negotiation (or litigation)."[34] Said another way, the "rule of thumb" is one potential starting point only, and further analysis should then be performed.

## 7.3 Publicly Available Trade Secret Licensing

In addition to considering trade secret compensation in litigation that is discussed in a subsequent section, I have also considered publicly available licensing data. In that regard, I have reviewed summaries of 20 publicly available license agreements that I obtained from Royalty Source, a company that maintains an intellectual property license database. In five of the licenses, patents comprised a significant portion of the licensed property. In an effort to focus on trade secret licensing, I chose to exclude these five agreements. Ultimately, I summarized fifteen license agreement summaries in the following table; these demonstrate that trade secrets are commonly licensed by sharing a portion of the benefits.

---

[32] Goldscheider, R. Jarosz, J., Mulhern, C., "Use Of The 25 Per Cent Rule in Valuing IP," *les Nouvelles*, December 2002. I will refer to this article hereafter as "the Goldscheider et al. article."
[33] Razgaitis, R., Valuation and Pricing of Technology-based Intellectual Property, 2003.
[34] *Georgia Pacific v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) modified and affirmed, 446 F.2d (2d Cir. 1971) This case list 15 factors which should be considered in determining a reasonable royalty. These factors include, but are not limited to the commercial relationship between the licensor and licensee, rates paid in comparable market transactions, the commercial success of the product utilizing the subject technology, the utility and advantages of the invention, the benefits of the invention conveyed to the licensee, the probable extent of use of the invention by the licensee, and the amount that a willing buyer and a willing seller would agree to in a hypothetical negotiation.

**Trade Secret Licensing**

| Licensor | Licensee | Date | License Property | Royalty Rate | Notes |
|---|---|---|---|---|---|
| Australian Pure Fruits Ltd. | Bill Express Ltd. | 9/9/2005 | Bill payment system | 0.16% | Royalty Base: Audited Gross Revenue |
| Chipwich Inc. | Hexagon AB | 5/3/1988 | Sandbox sales and distribution techniques | 1.00% | Upfront Fee: $500,000; Royalty Base: Net Selling Price; Maximum Royalty: $200,000 |
| Crump Barter Systems Inc. | Bentley Communications Corp. | 8/1/2003 | Business methods related to barter systems; trademark "Crump Barter"; website "www.crumpbarter.com" | 3.00% | Royalty Base: Barter Fees; 10,000,000 shares of restricted common stock; $30,000; Minimum royalty fee of $5,000 and Maximum of $10,000 |
| DP Enterprises Inc. | Teleservices International Group, Inc. | 7/13/1998 | The concept of using a pre-paid "MusicCard" to purchase music; trademarks. | 1.00% | Royalty Base: Net Income |
| Fuddruckers Inc. | Various | 5/29/1986 | Management know-how | 5.00% | Royalty Base: Gross Sales; Additional 3% royalty fee on Gross Sales as base management fee; Incentive management fee of 25% of net profits |
| InfoCast Corp | InfoCast (Australasia) Limited | 2/14/2000 | Know-how relating to application service provider, virtual cell center, teleworks, and distance learning technologies | 0.50% | Royalty Base: Revenue; Upfront Fee: $250,000 |
| IQ Net Corp. | Virtual Telecom Inc. | 2/27/1998 | Software | 20.00% | Royalty Base: Net Sales |
| MetaMetrics Inc. | Scholastic Inc. | 1997 | Lexile reading difficulty scale | 12.50% | Royalty Base: Gross Sales. This is a variable royalty rate ranging from 10% to 15%. |
| Metric Consultancy Ltd. | Various | 12/17/2003 | Market research know-how | 15.00% | Royalty Base: Sales |
| NationsRx Inc. | Eclipse Entertainment Group Inc. | 4/6/2003 | Business model, proprietary information, and trademarks | 2.00% | Royalty Base: Net Revenue; 150,000 Class A convertible preferred shares |
| Sodexho Alliance S.A. | Sodexho Marriott Services Inc. | 3/1/1998 | Management know-how | 0.15% | Royalty Base: Gross Revenue |
| Starbucks Corp. | Host International Inc. | 1/3/1998 | Management know-how | 2.50% | Royalty Base: Gross Revenue; 5% royalty rate on gross sales of proprietary biscotti |
| Synvasive | Exactech Inc. | 3/31/1998 | Technical assistance and know-how | 3.50% | Royalty Base: Gross Sales. This is a variable royalty rate ranging from 2% to 5%. |
| Teleport Communications Group Inc. | Cox Communications | 3/29/1997 | Management know-how and trademarks | 8.00% | Royalty Base: Collected Revenues |

Source: RoyaltySource Intellectual Property Database search on April 11, 2007 for "Business Method".

As evidenced from the above table, which also appears in Exhibit C, in real-world arms-length licensing situations the royalty base is commonly some measure of the potential benefits enabled by the trade secret. Additionally, some percentage of this benefit, however the specific parties choose to measure it, is allocated between the licensor and the licensee through use of a royalty rate.

In much the same way the COBRA Investment and Tax Strategy allocates the benefits between the owner and those utilizing the strategy.

## 7.4 Trade Secret Licensing as a Result of Litigation

After investigating the "25% rule of thumb" and publicly available trade secret licenses, I next looked at the methodologies employed by the Courts in cases involving the misappropriation of trade secrets. While I understand this case does not involve the misappropriation of any trade secret, the following information indicates the Courts often emulate what is seen in real world licensing scenarios in assessing trade secret damages – an allocation of the benefits enabled by the asset between the licensor and licensee. This reinforces, once again, that a percent of the benefits, such as cost saving, realized by utilizing a trade secret is an appropriate and widespread licensing technique.

By at least 1978, 80% to 94% of technology licenses utilize a running royalty rate to compensate the licensor.[35] Additionally, the majority of technology that is transferred within the U.S. is not patented. Such unpatented technology is defined and protected by the trade secret laws of the 50 states in the United States. The value of trade secret protection was summarized by Judge Posner of the Seventh Circuit Court of Appeals in *Rockwell Graphic Systems Inc. v. Dev. Indus. Inc.* He discussed trade secrets and stated: "It is an important case because trade secret protection is an important part of intellectual property, a form of property that is a growing importance to the competitiveness of American Industry."[36]

An excerpt from the 1985 Amendments to the Uniform Trade Secrets Act discusses damages quantification using royalty rates:[37]

> In lieu of damages measured by any other methods, the damages caused be misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Furthermore, it is clear that case law agrees that "damages recoverable in action for misappropriation of trade secrets may be measured either by plaintiff's losses or by profits unjustly received by defendant."[38] This sentiment is reiterated in many cases, including:

- *University Computing Company v. Lykes-Youngstown Corporation*;[39]
  - "Generally, proper measure of damages in case of a trade secret appropriation is to be determined by reference to analogous line of cases involving patent infringement, just as patent infringement cases are used by analogy to determine damages for copyright infringement."
  - "If defendant enjoyed actual profits from misappropriation of trade secret, a type of restitutionary remedy can be afforded plaintiff , either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution plaintiff's trade secret made to defendant's commercial success."
- *Vermont Microsystems, Inc v. Autodesk, Inc.*;[40]
  - "To approximate the parties agreement, had they bargained in good faith at the time of the misappropriation, the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes."

---

[35] Finnegan, Marcus B., Mintz, Herbert H., "Determination of a Reasonable Royalty in Negotiating a License Agreement: Practical Pricing for Successful Technology Transfer" *Licensing Law and Business Report*, June-July 1978.
[36] Jager, M., Licensing Law Handbook, 2006-2007 Edition, 41-42.
[37] Section 3(a) of the 1985 Amendments to Uniform Trade Secrets Act.
[38] *A.F.A. Tours Inc. v. Whitchurch*; 937 F.2d 82. (C.A.2 (N.Y.), 1991).
[39] *University Computing Co. v. Lykes-Youngstown Corp.*; 504 F.2d518. (C.A.Ga., 1974).
[40] *Vermont Microsystems, Inc v. Autodesk, Inc.*; 88 F.3d 142. (C.A.2 (Vt.), 1996).

- *Linkco, Inc. v. Fujitsu, Ltd.*;[41]
    - "There are two obvious ways to calculate plaintiff's damages. First, damages may be measured according to any losses plaintiff suffered... Second, damages may be measured by the defendant's unjust enrichment as a result of the misappropriation. Unjust enrichment is measured by the profits the defendant obtained from using the trade secret."
    - "A reasonable royalty may be computed in various ways, including a lump sum royalty based on expected sales or a running royalty based on a percentage of actual sales."
- *Softel, Inc. v. Dragon Medical and Scientific Communications Ltd.*;[42]
    - "Both plaintiff and defendants suggest in their pre-trail briefs that a 'reasonable royalty' or license fee determination might be an appropriate measure of damages."

The cases above illustrate that reasonable royalties are regularly utilized in legal settings. Additionally, it is clear that a portion of the expected or realized benefits is frequently used to value trade secrets. It should come as no surprise that this method is conceptually similar to the benefit allocation described by the 25% rule, and to the benefit allocation through use of a royalty rate as seen previously above in the publicly available trade secret licenses.

---

[41] *Linkco, Inc. v. Fujitsu, Ltd.*; 232 F.Supp.2d 182. (S.D.N.Y., 2002).
[42] *Softel, Inc. v. Dragon Medical and Scientific Communications Ltd.*; 891 F.Supp 935. (S.D.N.Y., 1995).

## 8. CONCLUSION

It is my opinion, based on the information reviewed to date, that the Investment and Tax Strategy implemented on behalf of the Murphys had the characteristics of a trade secret at the time the strategy was implemented. The COBRA transaction was apparently not generally known in the financial and tax services industry and it was apparently sufficiently secret as evidenced by the confidentiality statements. Further, reasonable security measures appeared to be in place, and the Investment and Tax Strategy had not only potential value, but real value, as illustrated by the Murphys' willingness to pay for the invention.

Additionally, it is evident from the preceding discussions of the 25% Rule, trade secret litigation, and arms-length trade secret licensing agreements, that apportioning a percent of the benefits enabled by trade secrets between a licensee and a licensor is a common formula utilized in trade secret licenses.

The 25% Rule is one of the most commonly used techniques in licensing. While it is frequently used as a starting point to determine royalty rates for patent licensing, it is also applicable to trade secrets. Furthermore, the benefits allocation concept embedded in the "25% Rule" is actually practiced in real world arms-length transactions. The trade secret licensing examples from the Royalty Source database unequivocally demonstrate that licensors and licensees regularly enter into trade secret licensing that utilize a royalty rate that represents a portion of the benefits. Lastly, it is instructive to look to the Courts to determine a value assessment methodology. Research indicates that the Courts have regularly looked to resolve misappropriation disputes by allocating a portion of the benefits to the owner of the trade secret.

From the preceding analysis and based on the information reviewed, my opinion is the Investment and Tax Strategy had the characteristics of a trade secret at the time the strategy was used. Moreover, assuming the Investment and Tax Strategy was believed to provide real or potential benefits, an appropriate way to compensate for use of the tax aspect of the Investment and Tax Strategy would have been to charge a percent of the realized or potential tax benefits in the form of a royalty rate applied to a royalty base.

## 9. SIGNATURE

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Melvin F. Jager

6/29/07
Date

OCEAN TOMO
INTELLECTUAL CAPITAL EQUITY

200 West Madison, 37th Floor
Chicago, Illinois 60606
(312) 327-4400 Ph
(312) 327-4401 Fx
www.oceantomo.com

INTELLECTUAL CAPITAL EQUITY

# Exhibit A

# MELVIN F. JAGER
# CURRICULUM VITAE

January 1, 2007

**Melvin F. Jager** is a practicing intellectual property lawyer, consultant and expert witness. He is the past president of The Licensing Executives Society International; the Licensing Executives Society US and Canada; and the LES (US and Canada) Licensing Foundation. In 2004-2005 he was a Managing Director of Ocean Tomo LLC, an Intellectual Capital Merchant Bank and Financial Consulting firm. From 1965 through 2004 he was engaged in the private practice of intellectual property law for 35 years as a senior member of the firm of Brinks Hofer Gilson and Lione in Chicago, Illinois, where he was chair of the Licensing Practice Group. His law practice concentrated in IP litigation, patent prosecution, licensing and general IP counseling. He has participated in litigation and licensing activities throughout the United States and in other countries. He also continues to act as an expert witness in patent and trade secret lawsuits, and as an arbitrator in international licensing disputes.

Mr. Jager is the author of a leading three-volume treatise on *Trade Secrets Law* which has been published annually by West Publishing of New York since 1981. He is also an author and editor of the three-volume treatise entitled *Trade Secrets Throughout the World.* This international treatise involves contributing authors from 36 countries and was introduced by West Publishing in 2005. He is further the author of the *Licensing Law Handbook* published by West in 2005. Each of the treatises and texts are updated annually. Mr. Jager has written other numerous additional articles on patents, trade secrets and licensing. He also has presented speeches on IP and licensing in many countries throughout the world, including presentations and articles for The Licensing Executives Society, the Practicing Law Institute, the John Marshall Intellectual Property Law Institute, the LES Technology Transfer Institute, and the Japan Institute for Invention and Innovation. Mr. Jager was an adjunct professor of Patent Law and Litigation in the College of Law at the University of Illinois at Urbana-Champaign, and formerly taught Trade Secrets Law in the Masters Level Program at The John Marshall Law School in Chicago. He also has been an adjunct professor and guest lecturer in patents, trade secrets and licensing at the Law School at the University of Victoria, in Victoria B.C. and at St Peters College of Law at Oxford University in Oxford, UK.

In his positions in the Illinois Bar and the American Law Institute he was the major proponent of the Illinois Trade Secrets Act and an advisor for the Restatement of the Law of Unfair Competition (1995) codifying the modern common law of trade secrets.

Prior to becoming active in The Licensing Executives Society, Mr. Jager was chair of the IP Litigation Committee for the Litigation Section of the American Bar Association, chair of the Patent Trademark and Copyright Section of the Illinois Bar Association and president of the Intellectual Property Law Association of Chicago. He is also a member of the American Law Institute.

---

**EDUCATION** B.S. in Mechanical Engineering, University of Illinois Urbana-Champaign, 1960

University of Illinois College of Law, JD in Law, 1962

---

**EXPERIENCE** Managing Director, I|C|M|B Ocean Tomo, 2004 -2005

Partner/Shareholder, Brinks Hofer Gilson and Lione, Chicago, Illinois, 1965-1980 and 1985 to 2004.

Partner, Niro, Jager and Scavone, Chicago, Illinois, 1984-1985.

Partner, Lee, Smith and Jager, Chicago, Illinois, 1981-1984.

Associate, Irons, Birch Swindler and McKie, Washington D.C., 1962-1965

Member, Illinois and District of Columbia Bars; admitted to practice before the United States Supreme Court, the Court of Appeals for the Federal Circuit and other District and Appellate Courts, and the United States Patent and Trademark Office.

---

**TEACHING POSITIONS**

Adjunct Professor of Law, University of Illinois College of Law, Champaign Urbana, Illinois (Patent Law and Patent Litigation) 1992 to 2004.

Adjunct Professor, The John Marshall Law School, Chicago, Illinois (Masters Level Trade Secrets Law) 1991-1992.

Adjunct Professor of Law, Northern Illinois (Lewis) College of Law (Patent Law), 1978-1979.

Visiting Adjunct Professor of Law, University of Victoria College of Law (Trade Secrets and Licensing Law), 2003.

Visiting Adjunct Professor of Law, St. Peter's College of Law, Oxford University (Patent, Trade Secret and Licensing Law), 2003.

---

**PROFESSIONAL ACTIVITIES**

**Licensing Executives Society International,** Past President 2003-2004, President 2002-2003; President Elect 2001-2002; Treasurer 1998-2001, International Delegate 1988-1998; Co-Chair, International Activities Committee (LESIAC), 1994-1998; Co-Chair Endowment Committee 2004-present; speaker on Patent and Trade Secret Licensing at LESI International Conferences or meetings in the United States, Japan, Korea, Germany, Australia, Hong Kong, Singapore, South Africa and Mexico.

**Licensing Executives Society US and Canada,** Past President 1994-1995; President 1993- 1994; President Elect 1992-1993; Vice President, Central Region 1990-1992; Trustee 1988-89; Chair, Annual LES Meeting in Hawaii on Technology Protection and Transfer in the Pacific Rim, 1989; Workshops Chair, LES Annual Meeting in Los Angeles, 1986; Co-Chair, LES Regional Meeting 1982; Lecturer on Patent and Trade Secret Licensing at LES Technology Transfer Institute, 1986-1995;

**Licensing Executives Society Foundation,** Founding member and President, 2000 to 2004.

**American Bar Association Litigation Section,** Chair of Intellectual Properties Litigation Committee, 1985-1989; Chair and Moderator of seminars on trial

procedures and demonstrations in patent, trade secret and copyright trials and the examination of expert witnesses; lecturer, Computer Law Seminar.

**American Bar Association Intellectual Property Law Section**, Chair, Tax and Environmental Law Committees, Chair and Moderator for Seminar on Jury Selection in Patent Cases; Annual Meeting Speaker on The Protection of Confidential Information between Employers and Employees.

**American Bar Association Fellow**

**Illinois Bar Association**, Chair of Patent Trademark and Copyright Council, 1983-1984; Chair, Trade Secrets Law Committee, 1984-1985; Chair of Committee to Revise and Propose the Illinois Uniform Trade Secrets Act, 1987-1988.

**American Intellectual Property Law Association**, Speaker at AIPLA Computer Law Institute, 1992 and Mid-Winter Meetings, 1989 and 1991.

**Intellectual Property Law Association of Chicago**, President, 1997-1998; President Elect 1996-1997; member of the Board of Governors 1995-1997; Chair, IPLAC Annual Dinner in Honor of the Federal Judges.

**Practicing Law Institute**, Chair, Trade Secrets Law Symposium, 1987-1989; Speaker, Technology Licensing Symposium, 1987-1990; Member of PLI Intellectual Property Law Advisory Board.

**The Southwest Legal Foundation**, Speaker on Trade Secrets Law Update, 1982-1983.

**The John Marshall Intellectual Property Law Institute**, Speaker on Review of Trade Secrets Law, 1984, 1987, 1990 and 1998.

**American Law Institute**, Consultant on the Restatement (Third) of the Law of Unfair Competition restating Trade Secrets Common Law, 1995.

**Japan Institute for Invention and Innovation**, speaker on Patents and Licensing, 2003-2004

---

**PUBLICATIONS**

M. Jager, **TRADE SECRETS LAW**, three volume treatise published by West Publishing, Inc. of New York.

M. Jager, **TRADE SECRETS THROUGHOUT THE WORLD**, three volume treatise published by West Publishing, Inc. of New York

M. Jager, **LICENSING LAW HANDBOOK**, published by West Publishing, Inc, of New York

M. Jager, A Comparison of Trade Secrets Laws in Asia, *Les Nouvelles* (June 1997).

M. Jager, The Enforcement of Hybrid Patent and Trade Secret Licenses, *Les Nouvelles* (1984).

M. Jager, The Rights to the Trade Secrets and Ideas of Employees and Third Parties, ABA Monograph (1980).

Contributing Editor, Developments in Intellectual Property, The John Marshall Law School (1984, 1987, and 1990).

Contributing Editor, Technology Licensing and Litigation, Practicing Law Institute (1989-1991).

Editor, Protecting Trade Secrets, Practicing Law Institute (1986, 1989).

---

**PROFESSIONAL LISTINGS**

*Who's Who in the World*, 1984 - present

*Who's Who in American Law*, 1983-present

*World's Leading Patent Law Experts*, 1997-2001

**CONTACT**

Melvin F. Jager
2302 Wulfert Road
Sanibel, Florida 33957

239 472 5706 Direct
239 472 0773 Facsimile
mjager@oceantomo.com
mfjager@msn.com

INTELLECTUAL CAPITAL EQUITY

# Exhibit B

Highly Confidential Information Subject to the Protective Order - Attorney's Eyes Only

**Documents Reviewed**
***Tax Patenting & Cobra Materials***

| | Document Range From | Document Range To |
|---|---|---|
| **TAX PATENT MATERIALS** | | |
| Background and Issues Relating to the Patenting of Tax Advice - July 12, 2006 | EX000001 | EX000030 |
| List of Witnesses to Appear Before Committee On Ways and Means Subcommittee On Select Revenue Measures On Hearing On Issues Relating to the Patenting of Tax Advice | EX000031 | |
| Advisory - From the Committee On Ways and Means - Subcommittee on Select Revenue Measures - June 27, 2006 | EX000032 | EX000033 |
| House Committee on Ways and Means - Statement of James Toupin, General Counsel, U.S. Patent and Trademark Office - Testimony Before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means - July 13, 2006 | EX000034 | EX000040 |
| House Committee on Ways and Means - Statement of the Honorable Mark Everson, Commissioner, Internal Revenue Service - Testimony Before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means - July 13, 2006 | EX000041 | EX000044 |
| House Committee on Ways and Means - Statement of Richard S. Gruner, Professor of Law, Whittier Law School, Costa Mesa, California - Testimony Before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means - July 13, 2006 | EX000045 | EX000057 |
| House Committee on Ways and Means - Statement of Ellen Aprill, Associate Dean of Academic Programs, Professor of Law, and John E. Anderson, Chair in Tax Law, Loyola Law School, Los Angeles, California - Testimony Before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means - July 13, 2006 | EX000058 | EX000064 |
| House Committee on Ways and Means - Statement of Dennis I. Belcher, Partner, McGuireWoods LLP, Richmond, Virginia - Testimony Before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means - July 13, 2006 | EX000065 | EX000072 |
| House Committee on Ways and Means - Hearing on Issues Relating to the Patenting of Tax Advice - July 13, 2006 | EX000073 | |
| Roster: Committee on Ways and Means and Subcommittee on Select Revenue Measures | EX000074 | |
| Hearing on Issues Relating to the Patenting of Tax Advice - July 13, 2006 | EX000075 | EX000102 |
| Practive Development - Patenting Tax Strategies | EX000103 | EX000105 |
| Bloomberg Wealth Manager - Patent Pending - May 2005 | EX000106 | EX000112 |
| Wealth Transfer Group, LLC, a Delaware limited liability company, Plaintiff, v. John W. Rowe, Defendant, Action for Infringement of United States Patent 6,567,790 Injunctive Relief Requested | EX000113 | EX000116 |
| US Patent No. 6,567,790 B1 | EX000117 | EX000129 |
| Corporate Taxation - May/June 2004 - *3 The 2003 'Confidential Transaction' Regulations: Another Chapter in the Tax Shelter Regulation Saga | EX000130 | EX000144 |
| **COBRA MATERIALS** | | |
| C.O.B.R.A. (Currency Options Bring Reward Alternatives) | DOJ 007654 | DOJ 007668 |
| Correspondence: Robert B. Coplan to (Various) - October 26, 1999 | 2003EY001599 | |
| Advison Nondisclosure Agreement - February 10, 2003 | 2003EY00009 | |
| Correspondence: Paul M. Daugerdas to Robert Coplan - September 24, 1999 | CANC01623 | CANC01625 |
| Engagement Letter Template | DOJ 007650 | DOJ 007651 |
| Dispute Resolution Procedures | DOJ 007652 | DOJ 007653 |
| Correspondence: Brian L. Vaughn to Robert B. Coplan - October 21, 1999, Robert B. Coplan to (Various) - October 21, 1999, and Richard J. Joyner to Robert B. Coplan - October 19, 1999 | DOJ 005334 | DOJ 005335 |

Highly Confidential Information Subject to the Protective Order - Attorney's Eyes Only

**Documents Reviewed**
***MURFAM Farms, LLC v. United States***

| | Document Range From | To |
|---|---|---|
| **COMPLAINT** | | |
| PSM Farms, LLC, By and Through Stratton K. Murphy a Partner Other Than Tax Matters Partner, Plaintiff, v. The United States, Defendant - ORDER | | |
| MURFAM Farms, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner, Plaintiff, v. United States of America, Defendant - Complaint for Readjustment of Partnership Items Under Code Section 6226 | | |
| Notice of Final Partnership Administrative Adjustment - December 16, 2005 - Murfam Farms, LLC | | |
| Form 870-PT - Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts - Murfam Farms, LLC | | |
| Exhibit A - Explanation of Items - MURFAM FARMS, LLC | | |
| PSM Farms, LLC, By and Through Stratton K. Murphy a Partner Other Than Tax Matters Partner, Plaintiff, v. The United States, Defendant - Complaint for Readjustment of Partnership Items Under Code Section 6226 | | |
| Notice of Final Partnership Administrative Adjustment - December 15, 2005 - PSM Farms, LLC | | |
| Form 870-PT - Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts - PSM Farms, LLC | | |
| Exhibit A - Explanation of Items - PSM Farms, LLC | | |
| Correspondence: Deborah L. Bennett to Harry D. Murphy and Lynn C. Murphy - December 15, 2005 - Untimely Notice Letter - TEFRA Proceeding is Ongoing | | |
| Correspondence: Joel N. Crouch to Jerry Arthur - April 5, 2005 - Re: Cash Deposit Under IRC § 6603 - Harry D. Murphy (Social Security No. 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) and Lynn C. Murphy (Social Security No. 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) | | |
| Copy of Official Check # 762926891 - April 1, 2005 - Harry D. Murphy and Lynn C. Murphy to US Treasury in the amount of $3,500,000.00 | | |
| Correspondence: Joel N. Crouch to Jerry Arthur - April 5, 2005 - Re: Cash Deposit Under IRC § 6603 - Marc D. Murphy (Social Security No. 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) | | |
| Copy of Official Check # 762926893 - April 1, 2005 - Marc D. Murphy and to US Treasury in the amount of $1,440,000.00 | | |
| Correspondence: Joel N. Crouch to Jerry Arthur - April 5, 2005 - Re: Cash Deposit Under IRC § 6603 - Stratton K. Murphy (Social Security No. 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) | | |
| Copy of Official Check # 762926892 - April 1, 2005 - Stratton K. Murphy and to US Treasury in the amount of $1,440,000.00 | | |
| Murphy Pork Partners, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner, Plaintiff, v. United States of America, Defendant - Complaint for Readjustment of Partnership Items Under Code Section 6226 | | |
| Notice of Final Partnership Administrative Adjustment - December 15, 2005 - Murphy Pork Partners, LLC | | |
| Form 870-PT - Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts - Murphy Pork Partners, LLC | | |
| Exhibit A - Explanation of Items - Murphy Pork Partners, LLC | | |
| Correspondence: Deborah L. Bennett to Wendell H. Murphy and Linda G. Murphy - December 15, 2005 - Untimely Notice Letter - TEFRA Proceeding is Ongoing | | |
| Correspondence: Joel N. Crouch to Jerry Arthur - October 28, 2004 - Re: Wendell H. Murphy Sr. (Social Security No. 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) and Linda G. Murphy (Social Security No. 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) | | |
| Copy of Official Check # 639133053 - Wendell H. Murphy Sr. and Linda G. Murphy to US Treasury in the amount of $10,221,000.00 | | |
| Correspondence: Joel N. Crouch to Jerry Arthur - October 28, 2004 - Re: Wendell H. Murphy Jr. (Social Security No. 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) and Wendy F. Murphy (Social Security No. 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) | | |
| Copy of Official Check # 639133054 - Wendell H. Murphy Jr. and Wendy F. Murphy to US Treasury in the amount of $5,180,000.00 | | |
| Correspondence: Joel N. Crouch to Jerry Arthur - April 5, 2005 - Re: Cash Deposit Under IRC § 6603 - Harry D. Murphy (Social Security No. 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) and Lynn C. Murphy (Social Security No. 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) | | |
| Copy of Official Check # 762926891 - Harry D. Murphy and Lynn C. Murphy to US Treasury in the amount of $3,500,000.00 | | |
| **ANSWER** | | |
| MURFAM Farms, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner, Plaintiff, v. United States of America, Defendant - ANSWER | | |
| PSM Farms, LLC, By and Through Stratton K. Murphy a Partner Other Than Tax Matters Partner, Plaintiff, v. United States of America, Defendant - ANSWER | | |
| Murphy Pork Partners, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner, Plaintiff, v. United States of America, Defendant - ANSWER | | |
| **ENGAGEMENT LETTERS** | | |
| Correspondence: Ernst & Young LLP to Wendy M. Crumpler - December 13, 1999 | DOJ 049822 | DOJ 049824 |
| Correspondence: Ernst & Young LLP to Wendell H. Murphy - December 13, 1999 | DOJ 049816 | DOJ 049818 |
| Correspondence: Ernst & Young LLP to Stratton K. Murphy - December 13, 1999 | DOJ 049806 | DOJ 049805 |
| Correspondence: Ernst & Young LLP to Marc D. Murphy - December 13, 1999 | DOJ 049807 | DOJ 049809 |
| Correspondence: Ernst & Young LLP to Harry D. Murphy - December 13, 1999 | DOJ 049813 | DOJ 049815 |
| Correspondence: Ernst & Young LLP to Harry D. Murphy - December 13, 1999 | DOJ 049810 | DOJ 049812 |
| Correspondence: Ernst & Young LLP to Angela N. Brown - December 13, 1999 | DOJ 049819 | DOJ 049821 |
| Correspondence: IAKselrod@proskauer.com to Robert B. Coplan/National/TAX/EYLLP/US@EY-Namerica - March 29, 2000 - Re: Murphy Farms | DOJ046906 | |
| Murphy Fee Allocation | DOJ 046954 | |
| Correspondence: Robert B. Coplan to/cc (Various) - February 11, 2000 | DOJ 031356 | |
| Engagement letter of Joyce Brown with Ernst & Young dated December 13, 1999 | DOJ040280 | DOJ040282 |
| Engagement letter of Wendell H. Murphy, Jr. with Ernst & Young dated December 13, 1999 | DOJ040265 | DOJ040267 |
| **TAX OPINIONS** | | |
| Correspondence: Proskauer Rose LLP to WMC LLC, WHM Ventures LLC, WHMJ LLC, JMN Ventures LLC, and ANB LLC - December 29, 2000 | | |
| Correspondence: Proskauer Rose LLP to HDM LLC, WHM Ventures LLC, and WHMJ LLC - December 29, 2000 | MPR 000818 | |
| Correspondence: Proskauer Rose LLP to HDM LLC, MDM Ventures LLC, and SKM Ventures LLC - December 29, 2000 | MPR 000747 | MPR 000816 |
| **OTHER** | | |
| Correspondence: Sarah Q. Winkye to Melvin F. Jager - March 19, 2007 - Re: Expert Engagement - The Murphy Family | | |
| Correlation between fees paid and tax savings - COBRA Transactions | EX000147 | |

Highly Confidential Information Subject to the Protective Order - Attorney's Eyes Only

# Exhibit C

*Trade Secret License Summary Analysis*
SUMMARY OF COMPARABLE ROYALTY RATES

**Trade Secret Licensing**

| Licensor | Licensee | Date | License Property | Royalty Rate | Notes |
|---|---|---|---|---|---|
| Australian Pure Fruits Ltd. | Bill Express Ltd. | 9/9/2005 | Bill payment system | 0.16% | Royalty Base: Audited Gross Revenue |
| Chipwich Inc. | Hexagon AB | 5/3/1988 | Sundborn sales and distribution techniques | 1.00% | Upfront Fee: $500,000; Royalty Base: Net Selling Price; Maximum Royalty: $200,000 |
| Crump Barter Systems Inc. | Bentley Communications Corp. | 8/1/2003 | Business methods related to barter systems; trademark "Crump Barter"; website "www.crumpbarter.com" | 3.00% | Royalty Base: Barter Fees; 10,000,000 shares of restricted common stock; $30,000; Minimum royalty fee of $5,000 and Maximum of $10,000 |
| DP Enterprises Inc. | Teleservices International Group, Inc. | 7/13/1998 | The concept of using a pre-paid "MusicCard" to purchase music; trademarks. | 1.00% | Royalty Base: Net Income |
| Fuddruckers Inc. | Various | 5/29/1986 | Management know-how | 5.00% | Royalty Base: Gross Sales; Additional 3% royalty fee on Gross Sales as base management fee; Incentive management fee of 25% of net profits |
| InfoCast Corp | InfoCast (Australasia) Limited | 2/14/2000 | Know-how relating to application service provider, virtual cell centre, teleworks, and distance learning technologies | 0.50% | Royalty Base: Revenue; Upfront Fee: $250,000 |
| IQ Net Corp. | Virtual Telecom Inc. | 2/27/1998 | Software | 20.00% | Royalty Base: Net Sales |
| MetaMetrics Inc. | Scholastic Inc. | 1997 | Lexile reading difficulty scale | 12.50% | Royalty Base: Gross Sales. This is a variable royalty rate ranging from 10% to 15%. |
| Metric Consultancy Ltd. | Various | 12/17/2003 | Market research know-how | 15.00% | Royalty Base: Sales |
| NationsRx Inc. | Eclipse Entertainment Group Inc. | 4/6/2003 | Business model, proprietary information, and trademarks | 2.00% | Royalty Base: Net Revenue; 150,000 Class A convertible preferred shares |
| Sodexho Alliance S.A. | Sodexho Marriott Services Inc. | 3/1/1998 | Management know-how | 0.15% | Royalty Base: Gross Revenue |
| Starbucks Corp. | Host International Inc. | 1/3/1998 | Management know-how | 2.50% | Royalty Base: Gross Revenue; 5% royalty rate on gross sales of proprietary biscotti |
| Synvasive | Exactech Inc. | 3/31/1998 | Technical assistance and know-how | 3.50% | Royalty Base: Gross Sales. This is a variable royalty rate ranging from 2% to 5%. |
| Teleport Communications Group Inc. | Cox Communications | 3/29/1997 | Management know-how and trademarks | 8.00% | Royalty Base: Collected Revenues |

Source: RoyaltySource Intellectual Property Database search on April 11, 2007 for "Business Method".