IN THE UNITED STATES DISTRICT COURT

| | |
|---|---|
| IN RE: COBRA TAX SHELTERS LITIGATION | * |
| ------------------------ | * |
| CARMEL PARTNERS, et al, | * |
| Plaintiffs, | * |
| VS. | * NO.: 1:06 cv 8001 (S.D. Ind.) |
| UNITED STATES, | * |
| Defendant. | * |
| ------------------------ | * |
| JS BUCKINGHAM INVESTMENTS, LLC, et al, | * |
| Plaintiffs, | * |
| Vs. | * NO: 05-231 (Ct. Fed Claims) |
| UNITED STATES, | * |
| Defendant. | * |
| ------------------------ | * |
| MURFAM FARMS, LLC, | * |
| Plaintiff, | * |
| Vs. | * NO: 06-245T through 06-247T (Ct. Fed Claims.) |
| USA, NO, | * |
| DEFENDANT. | * |

*******************************************************

ORAL DEPOSITION OF

MELVIN F. JAGER

AUGUST 2ND, 2007

*******************************************************

PENGAD-Bayonne, N. J. GOVERNMENT EXHIBIT 2



33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 2

ORAL DEPOSITION OF MELVIN F. JAGER, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 2nd of August, 2007, from 10:10 a.m. to 4:47 p.m., before Tammy Staggs, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Meadows Collier, LLP, 901 Main Street, Suite 3700, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 3

APPEARANCES

FOR THE PLAINTIFFS:
Laura L. Gavioli, Esq.
Sarah Q. Wirskye, Esq.
MEADOWS COLLIER, LLP
901 Main Street
Suite 3700
Dallas, Texas 75202
214.744.3700
214.747.3732 - Fax

FOR THE DEFENDANT, UNITED STATES GOVERNMENT:
Dennis M. Donohue, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
Tax Division
PO Box 403
Washington, D.C. 20044
202.307.6492
202.307.2504 - Fax

Joe Pitzinger, III, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201
214.880.9728
214.880.5741 - Fax

Page 4

INDEX


| | PAGE |
|---|---|
| Appearances.................................... | 2 |
| Exhibit List.................................... | 5 |
| Stipulations.................................... | 7 |
| MELVIN F. JAGER: | |
| EXAMINATION BY MR. DONOHUE................. | 7 |
| Signature and Changes.......................... | 208 |
| Reporter's Certificate.......................... | 210 |


REQUESTED DOCUMENTS/INFORMATION
(None)

CERTIFIED QUESTIONS
(None)

Page 5

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 155 | COBRA action work plan (Revised 11/03/99) | 107 |
| 2351 | E-mail by Brian Vaughn with attached COBRA document........................... | 107 |
| 2368 | Set of COBRA slide numbers 14-15......... | 49 |
| 2394 | Mr. Jager's expert report in the Buckingham case dated 6/29/07............ | 7 |
| 2396 | Mr. Jager's expert report in the MURFAM Farms, LLC case dated 6/29/07............ | 7 |
| 2398 | Mr. Jager's report in the Gary Woods, as Tax Matter Partner of Tesoro Drive Partners................................. | 7 |
| 2417 | Report of Dr. DaRosa..................... | 25 |
| 2432 | Report of Dr. Larue...................... | 25 |
| 2436 | Expert witness report of Larry Colby..... | 26 |
| 2437 | Indictment of various former KPMG employees in connection with their design, marketing, and implementation of tax strategies.......................... | 122 |
| 2438 | Decision in a case called United States vs. The Glaxo Group..................... | 203 |
| 2439 | Indictment against Robert Coplan, Martin Nissenbaum, Richard Shapiro, and Brian Vaughn, ................................. | 65 |
| 2440 | Decision in a lawsuit by the Diversified Group against Paul Daugerdas and Jenkins & Gilchrist.................................. | 139 |
| 2441 | Responses by the United States to the plaintiff's interrogatories second set in the JZ Buckingham case.................. | 71 |
| 2443 | Engagement letter between E&Y and Mr. Gary Woods........................... | 105 |






33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 6


2447 COBRA document known as the steps of COBRA.................................. 47
2452 Letter dated March 19th, 2007 signed by Sarah Q. Wirskye........................ 45
2453 E-mail chain by Brian Vaughn dated 10/21/99.............................. 113
2458 Letter to Mr. Robert Coplan from Jenkins & Gilchrist............................ 104
2463 Advisor Nondisclosure Agreement.......... 102
2465 Background and issues relating to the Patenting of tax advice dated July 12th, 2006................................. 80
2467 Notice 2044, reference to tax avoidance using artificially high basis, released in August of 2000....................... 165
2469 Template of an Ernst & Young engagement letter................................ 179
2470 E-mail by Brian Vaughn dated 10/22/99.... 183
2472 Engagement letter from Meadows Owens to Ocean Tomo in the Gary Woods case........ 21
2473 Engagement letter from Meadows Owens to Ocean Tomo in the JZ Buckingham case..... 21
2474 Engagement letter from Meadows Owens to Ocean Tomo in the MURFAM Farms, LLC case. 21
2475 Mr. Jager's bills for March 1 - March 31, 2007................................... 23
2476 Mr. Jager's bills for April 1 - April 30, 2007................................... 30
2477 Mr. Jager's bills for May 1 - May 31, 2007................................... 30
2478 E-mail to Stephen Powaga from Laura Gavioli................................ 17
2479 Mr. Jager's bills for June 1 - June 30,


Page 7

PROCEEDINGS

(Exhibits 2472 through 2479 marked.)

MELVIN F. JAGER,

Having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DONOHUE:

Q. Mr. Jager, would you state your full name and spell your last name for the court reporter?

A. My name is Melvin F. Jager, J-A-G-E-R.

Q. And where do you reside?

A. My home is 2302 Wulfert Road, W-U-L-F-E-R-T, Road, Sanibell, Florida.

MR. DONOHUE: I would like to state for the record that this deposition is being taken pursuant to an agreement of the parties as to time, place, and date. It is also being taken pursuant to the Federal Rules of Civil Procedure.

Q. (BY MR. DONAHUE) Mr. Jager, I'm going to hand you what has been marked as Exhibits 2394, 2396, and 2398.

MR. DONOHUE: What I will do is give you-all copies. This is the second set.

MS. WIRSKYE: Oh, I see. These are all just a duplicate.

Q. (BY MR. DONAHUE) And are those your reports?

Page 8

A. Yes, they are.

Q. Okay. Before we start the questions regarding any of your reports, could you give me a brief background as -- first as to your educational background.

A. Okay. I went to engineering school at the University of Illinois and I have a BS degree in mechanical engineering. And then I proceeded to law school at the University of Illinois. I have a JD in law. I graduated there in 1962. And then I went to work in Washington, D.C. as a -- with a law firm for three years and then returned to Chicago, my hometown, and practiced law basically ever since in Chicago until I retired from law in the beginning of 2005.

And then I at that time for two years went to work with -- an expert with this consulting -- financial consulting firm called Ocean Tomo, and I worked there for a couple of years. And they are principally the financial aspects of intellectual property law is what they deal with including expert witnessing and reasonable royalty and patent damages cases, that kind of thing. And then in 2006 I retired from there and now I'm just, so to speak, of counsel with Ocean Tomo. I'm retired and an independent contractor, if you will.

Page 9

Q. Okay. Have you had your deposition taken before?

A. Yes, I have.

Q. Do you know approximately how many times?

A. Over the years about ten times.

Q. Okay.

A. The last couple of years, twice.

Q. And you know the procedure. The procedure is there's a court reporter here and she will take down my questions and your answers. If you have any question regarding my questions, please let me know and I'll do my best to reword the question.

A. Certainly.

Q. And you also know that you and I cannot speak at the same time, so you'll have to wait until I finish the question.

Now, my first question to you was to give me a brief description of your educational background. In fact, you gave me more than that. You gave me also a brief description of your employment background. Is there anything more that your employment background that -- besides the brief description that you've already given me and that you would like to state?

A. Well, I think I've shown in my CV that's attached as an exhibit to these reports, I've also done

Page 10

a fair amount of teaching of law as an adjunct professor. I did that, so to speak, on the side. I taught patent law and patent litigation strategies at the University of Illinois for about 12 years. Then I taught for one year or more at John Marshall Law School trade secrets law in their master's level program. And then I've been a guest lecturer at a couple of other universities: University of Victoria Law School in Victoria and then St. James College in Oxford in London -- or in Oxford, England.

And then I've -- I've spoke on intellectual property, licensing and litigation and trade secrets and patents quite often in different places in America than other places outside of America.

Q. Could you look at what's been marked as 2398? Now, am I correct that's your report in the -- your title here is Gary Woods, as Tax Matter Partner of Tesoro Drive Partners?

A. That's correct.

Q. And I'm going to refer to that report as your Tesoro report. Do you understand that?

A. Yes.

Q. Okay. Now, what I plan to do is to ask questions initially about this report, your Tesoro report. At the end of those questions, I'm going to ask

Page 11

you if your answers would be different if I asked the same questions with respect to the other two reports. If you tell me they would be, then we'll spend the time to go through those other reports. If you tell me no, the answers would be the same, we will be finished. Do you understand that?

A. Yes, that's fine. If I may go back a bit, I forgot to mention that I've also written a few books.

Q. Okay.

A. That are avocations that I didn't add about employment. I guess you would call that employment. But I've written a trade secret treatise for West Publishing called Trade Secrets Law, a very cleaver name. Then I edited a three-volume treatise called Trade Secrets Law throughout World. And then I wrote a licensing law handbook for West, so I think that's it.

Q. Okay. And those publications are referred to in your CV, am I correct?

A. Yes, they are.

Q. And your CV is attached to your report, am I correct?

A. That's correct.

Q. Okay. Is it fair to say that your experience with respect to patents, trademarks, copy rights, and trade secrets are principally legal -- from a legal

Page 12

perspective?

A. That would be true in most part, but the last couple of years at Ocean Tomo it got into more of the business aspects of intellectual property law and how to monetize the intellectual property, how to turn it into value either by licensing or by patent damages in a patent lawsuit, for example, or getting damages or having to pay damages or selling them at auction even. So in that respect, that was kind of a non-law business aspect as well as a law aspect.

Q. Where is Ocean Tomo located?

A. Their principle office is in Chicago.

Q. And you mentioned previously what the general nature of the business of Ocean Tomo is. Could you be more specific as to what their business is?

A. Well, they call themselves an intellectual property merchant bank, and that is to mean that they provide whatever financial services you would seek related to intellectual property. Part of their business is expert witnessing. They have an expert witnessing department, which is what I was involved with. I was a managing director in that department. They have an IP valuation department. If you have a patent or a group of patents, for example, that you want to have some value placed on it, they will work in that

Page 13

area.

There's a -- recently they have a patent auction department. They have held four of the first ever patent auctions open-quite auctions where your patent property or copyright or trademark property can be sold in an open auction. And they've held one in San Francisco, Chicago, New York, and London now. And that's been fairly successful. It's kind of a new concept.

They also have developed what's called the Ocean Tomo 300 Index. They have -- they have a proprietary software program that uses regression analysis, I think they call it. I'm not a statistician, so I don't fully understand it. They use this program to value and rate the value of patents. And in using that program, they have identified the top 300 companies of America in terms of their perceived, not actual, but perceived value of their intellectual property as compared to other bricks in the mortar and their factories.

And those 300 companies, valued strictly on the basis of IP, form what they have identified as an Ocean Tomo 300 Index. And now it's on the New York Exchange much like the Standard and Poors Index. And the idea is that people in the financial area can use





33536769-e7b1-4f38-a24d-ef5ac1ee2103

that as a tool to determine the value of their -- their investments. They haven't gotten off the ground yet, but their -- Ocean Tomo is starting a hedge fund based upon the OT-300 Index. It hasn't -- it hasn't gotten off the ground.

I'm not a financial man, and I'm not directly involved. I've worked with them in these areas in terms of consulting and how it should be done and things like that, but I'm not -- I'm not a hedge fund man or anything like that.

Q. You mentioned that you were manager of their expert witness program. In that capacity, what did you do?

A. Well, it's kind of a misnomer because I basically managed lawsuits. I was an expert witness working on cases, and I would manage myself and associates just like in a law firm working on those various cases. So I didn't direct anybody. It was kind of like a partner in a law firm is what it amounts to.

Q. And approximately how many times did you appear as an expert witness in a case?

A. In the last two years I've testified and given deposition twice -- the last four years twice. Over the last 20 years I've appeared three or four times. And as I've mentioned before, I've been deposed before about



ten times.

Q. But under the Federal Rules of Civil Procedure your report was supposed to provide us with the cases in which you appeared as a witness in the last four years. Do you know what the names of those cases are?

A. Yes, I think we have that to provide to you.

MS. GAVIOLI: Yes, I think we've E-mailed you that list, I believe.

MR. DONOHUE: I didn't receive it.

(Sotto voce discussion.)

A. We worked on several cases that never really went anywhere, but these are the two that ended up in depositions or testimony at trial.

Q. (BY MR. DONAHUE) And the E-mail that was given to me has been marked as 2478. Do you have a copy of that in front of you?

THE WITNESS: Do you want to mark that as 2478?

MS. GAVIOLI: Sure.

A. Yes, I have 2478.

Q. (BY MR. DONAHUE) Let's take the lower case, Kinzebaw, K-I-N-Z-E-B-A-W. I'm sure I'm not pronouncing that correctly.

A. Kinzebaw.

Q. Kinzebaw and Kinze Manufacturing, Inc. vs.



CASE.

A. Yes.

Q. What was the subject matter of your testimony in that case?

A. That was a patent infringement case on an offset center frame for a planter in a patent case. Kinzebaw and Kinze had invented this offset planter and had sued CASE IH for patent infringement. And I testified on behalf of the defendant CASE that there was no infringement. I mean, that was my position. I was testifying as a patent expert. And that was testimony in Iowa -- the Northern District of Iowa before a jury trial.

Q. And just briefly, what was the basis of your position that there was no infringement?

A. Well, I had done -- as I had done many times before -- analyzed the patent, looked at what's called the file history of the patent, looked at what's called the prior art, and determined that if the claims of the patent or the patent itself was read properly, what CASE was doing did not infringe that patent. It was a legal opinion.

Q. It was --

A. I stated so at trial.

Q. It was a legal opinion?



A. It was an opinion that they -- CASE as -- as a manufacturer was not doing anything that infringed their -- the other guy's patent. It was a combin- -- I guess you would say it was a combination of applying my mechanical engineering skills using their technology and knowledge that they communicated to me and my knowledge of the patent law, coming to the conclusion that there was no infringement based upon my experience as a patent attorney.

Q. Okay. So you wouldn't necessarily call that, would you, a legal opinion, but rather your analysis of the patent and ultimately arriving at essentially an opinion as an expert witness that there was no infringement?

A. That's the better way to say it, yes.

Q. You were, I assume, qualified as an expert witness in that case to testify?

A. Yes.

Q. And what was the outcome of that case?

A. To my delight, the jury found no infringement.

Q. That's the best way. You win.

A. A very astute jury.

Q. Okay. Let's take the case above it. And help me, how do you pronounce that? Minebea (pronouncing).

A. Minebea.

Q. Minebea Company, Precision Motors Deutsch Minebea, and Nippon, N-I-P-P-O-N, vs. George Papst, P-A-P-S-T.
A. Yes.
Q. What was the nature of your testimony in that case?
A. In that case Minebea was a Japanese manufacturer of hard disk drive motors, the motors that drive your computer, hard disks. And Papst was a German company that owned hundreds of patents on hard disk drive motors. And the issue was whether the particular license agreements – and they had like 10 or 15 patent license agreements between the two companies -- permitted Minebea to make hard disk drive motors only or also make and sell hard disk drives that incorporated the motors. That was the technical patent issue.
And my intended role was to, as a licensing expert -- I've spent a lot of time in licensing intellectual property, as you will see -- was to review the situation and review their products, review the licenses, and interpret the licenses and state an opinion on what I think the licenses meant and whether they would -- would or would not give Minebea, the Japanese manufacturing company, the right to sell these motors for their intended purpose of being used in



hard disk drives.
Does that make sense? I would be glad to explain it. It was a complex case. It went on for like nine years.
Q. We don't have that much time here.
A. No, thank God. I don't have that much time maybe period.
Q. And was that a bench trial or a jury trial?
A. It started out as a jury trial and ended up as a bench trial. I did not testify at trial. I testified by deposition and at a Daubert hearing where every witness in the case was -- has to attend a Daubert hearing.
Q. They were challenged as expert witnesses?
A. They just made a blind -- every -- the Judge in that case did an unusual thing and said I'm just going to listen to everybody's discussions about the patent experts on both sides. So they were all -- we all spent the day explaining what we were going to do if permitted to do so.
MR. DONOHUE: And Daubert is D-A-U-B-E-R-T.
Q. (BY MR. DONAHUE) Did you -- were you challenged though as an expert witness in that matter?
A. Well, not as -- yes and no in the sense that



the other side said the licenses were clear and needed to be interpreted. The court -- the bottom line is that after the Daubert hearing of several days involving many witnesses, in addition to myself, he sorted out what he was going to do in terms of the trial testimony. And he determined that in his mind, the Judge's mind, that the license agreements were not ambiguous. They were unambiguous. So he could interpret them as a matter of law, and that he didn't need testimony from either side on what the agreements would say.
So he found that I was a patent expert and licensing expert, but that -- since it was a jury trial, he was not going to let us testify on what he determined to be a question of law.
Q. Okay.
A. Which made sense, I guess.
Q. When were you first contacted by counsel for the plaintiffs in these cases? Do you recall approximately when?
A. Somewhere earlier this year, February or thereabouts.
Q. Who were you contacted by?
A. Well, I was contacted by my associate or friend or contact at Ocean Tomo by the name of Rick Conroy. He had been contacted -- I think he had been



contacted by somebody from Meadows Owens, and it was a trade secret type, intellectual property type case. And that's why he called me and said would you like to help us on this.
Because I -- the people at Ocean Tomo are basically MBAs and accountants. I was the only patent lawyer, so to speak, or IP lawyer. So when intellectual property cases came along, they called me. That's how I got involved.
Q. And did he mention to you who from Meadows Owens called him?
A. He might have, but I later learned it was these two ladies here, but I don't -- I didn't remember at the time who it was.
Q. Okay. I'm going to hand you what's been marked as 2472.
MR. DONOHUE: This is off the record.
(Discussion held off the record.)
Q. (BY MR. DONAHUE) Mr. Jager, you've been handed what's been marked as 2472. Is this -- I should ask you, what is this document?
A. Well, this is an engagement letter from Meadows Owens to Ocean Tomo formalizing what we evidently -- which we obviously agreed to do, and that is to help them in this case as an expert witness.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 22

Q. And you'll notice it's dated February 27th of 2007; is that correct?
A. That's correct, yeah.
Q. Approximately how long before that do you recall receiving any contact from someone at Meadows Owens?
A. Oh, a week or two before that, somewhere in that time frame.
Q. And who contacted you directly from Meadows Owens?
A. I think it was -- I think it was Laura that I talked to directly.
MS. GAVIOLI: I believe so, so...
Q. (BY MR. DONAHUE) And for the record you're referring to Laura Gavioli?
MS. GAVIOLI: Yes.
Q. (BY MR. DONAHUE) G-A-V-I-O-L-I?
A. Yes.
Q. And what were you requested to do at that point in time?
A. Well, as I recall our initial conversation, is that we generally talked about what the situation was, the case that they were working on. They tried to determine to what extent I could help them, and then I would have to -- then I determined that well -- right up

Page 23

front I said I'm not a tax attorney, I'm not an accountant, but I'm an intellectual property expert, but I can help you on this area in that field if you would like me to consult with you.
So we finally said that yes, I would -- I would consult with them and then if necessary or if they want me to be a testifying expert -- then we proceeded to go through the facts and develop the more detailed analysis that I wanted to go through.
Q. But you didn't do that, I assume, that first conversation, am I correct?
A. No, I didn't. It was an evolving opinion.
Q. Let me show you what's been provided to me as your bills for March of 2007. It's been marked as Government Exhibit 2475. That indicates your services that were rendered in March of 2007. Is that when you first began to do work on your analysis of any issues in this matter?
A. Well, this -- I noticed that I'm not listed as billing any time. That's one of my unfortunate situations after I retired. I lose some time when I don't record it very well. But, yes, this is the time frame within which Rick and Steve and I and Laura started talking about the strategies and the questions that are presented in this case.

Page 24

Q. And when you say you're not shown as billing any time, are you referring to the third page where there's a reference to two other individuals who were billing hours in the case?
A. Yes. Rick Conroy is kind of the senior man above Steve, and then Steve. Steve is an associate assistant -- I guess you would call them associates at law firms.
Q. And -- but did you during the month of March also have any communications or do any work in connection with this matter?
A. Yes, I did.
Q. So they got a freebie?
A. Yeah, that's my loss and their gain. We might need to correct that.
Q. Were you at any point in time, either prior to the month or March or in March, provided with information regarding any of the positions or opinions or conclusions of the Government's expert witnesses?
A. Unless it was part and parcel of what they were communicated to me orally, I did not see any written reports.
Q. Did you ultimately at any time see any reports of the Government's expert witnesses?
A. I don't believe I have.

Page 25

Q. I'll show you their reports. They are, for the record, Exhibits 2436, 2432, and these are -- and 2417. This is 2417 and this is the report of Dr. DaRosa. For the record have you seen that report before?
A. There may be arguments or concepts or positions taken out of this report that we talked about with the counsel, but I have not seen this report before.
Q. And when you say there may have been arguments or positions, do you know what arguments or positions?
A. No, I don't. We just -- we really talked in terms of concepts and positions. I have not seen this report before.
Q. Let me show you what's been marked as Government Exhibit 2436. Let me first show you what's been marked as Government Exhibit 2432. This is the report of Dr. Larue, and have you seen that report before?
A. No, I have not. I'm sure I would have remembered. That's a big one.
Q. And finally, let's see if I can find 2436. It's hiding in the box.
MS. GAVIOLI: We don't do any light reading around here.

Page 26

THE WITNESS: No.

Q. (BY MR. DONAHUE) This is the expert witness report of Larry Colby. Have you seen that report before?

A. No, I have not.

Q. Do you -- as you sit here today, do you have any knowledge as to what are the opinions and conclusions of the Government's expert witnesses?

A. Well, I cannot tell you what any one of these reports say because I didn't read them, but my assignment was more in terms of principals or contingents, if you will, instead of specifically responding to any particular line of testimony or point of testimony.

My -- the assignment that I understood is what I addressed in the reports is to look at the -- the particular tax strategy from an intellectual property standpoint. And what exactly the Meadows people were going to do with that opinion afterwards, whether it's a rebuttal report or not, is something that I -- that's not my jurisdiction, if you will.

Q. Okay. Well, do you know whether any of the Government's expert witnesses opined on whether or not the tax strategy at issue in this litigation was or was not patentable or eligible for trade secret protection?

Page 27

A. Not directly. I was just asked to opine that it -- whether or not it was. And I wasn't told specifically that somebody was saying that it wasn't. This is not a patent case as I understand it. I would understand it more if you would turn it into a patent case.

Q. Could you briefly describe what the process was in terms of how you got your assignment in -- in these cases?

A. Well, we talked at length by phone with the attorneys, and then Rick and Steve and I talked at length together. And then we started thinking about our approach and what we could do to assist Meadows Owens.

And then at one point in time I got a batch of documents, three or four binders of documents to read through. As I recall we had taken a position at first that I was a consulting expert, and they didn't know whether I was going to be a testifying expert or not. So I read through all this material and wanted to see what we were dealing with.

And my general approach over the years when I was asked to consider being an expert is to determine whether or not I can agree with the position of the people asking me to be a witness. And I can't fully finally agree until I've seen what the facts are

Page 28

basically. So once I took a look at all those documents and had further discussions I felt like, okay, this is -- you know, the concepts we were talking about is something that I agree with in terms of intellectual property law.

So we went forward. And then I studied the materials more and then we started -- at one point in time, I don't remember, we started drafting up what ended up being these opinion letters.

Q. And just briefly describe that process. You said you don't know when you began to -- the writing process, but do you have a rough idea?

A. Well, I don't remember when these were filed. They were filed June --

THE WITNESS: Is that it?

MS. WIRSKYE: June 29th.

A. June 29th, oh. Well, the process -- they obviously started sometime in February and ended up in June. We would -- we would talk by phone. We would talk among ourselves, Rick and Steve and I by phone again. I would do some research. They would help me. I don't have a staff at home, so I couldn't do a lot of the mechanics of this or some of the research. The office in Chicago has those tools available to them, so they would do some things at my request.

Page 29

I would look at some cases. We would read something. I would have some questions from an economic standpoint that I didn't quite fully understand, and Rick and Steve were better equipped at that than I was because I'm an engineer and a lawyer and not an economist.

And then just slowly but surely the structure of our report came in place. And then we drafted it, reviewing it, and then finalizing it, and that's where we are.

Q. (BY MR. DONAHUE) And who was the principal author of the report?

A. Oh, everything was done under my supervision, but Steve and Rick helped me. It was kind of a joint effort by the three of us. But I had the final say and there isn't a word in here that I haven't looked at several times and many times. But I don't have, as I said, the facilities to generate documents very much anymore at home.

Q. Would it be fair to say that the drafts initially were generated by Rick or Steve and submitted to you for your review?

A. That's the general approach, yes. And then I would write sections and talk to them by phone and say no, we can't do that. I don't agree with that, add

this, and I would give them some directions on where to look. Like, here's some cases, take those cases and, you know, put this quote in here, put that quote in there, and that kind of thing. It was an evolving process, so it's -- it was like most reports, truly a joint effort.
Q. And at some point did you submit your drafts to Meadows Owens for their review?
A. Yes.
Q. And do you know when that process approximately began?
A. Well, that would have been kind of late in the process. It probably would be -- I would say beginning in May, May, mid-May. The records should show, maybe the billing records would show when that happened.
Q. I'm going to hand you your bills and --
A. They're pretty cryptic, the bills are.
Q. I'm going to hand you what's been marked as Exhibit 2476, 2477, and 2479, and see if you can tell me based on your review of the bills as to approximately when you began to submit your drafts to Meadows Owens.
A. Do we have an April? Oh, this is the April's. Yeah, in -- on the May report 2476, which reflected time spent in April I believe, it shows that by then I was spending a substantial amount of time. And if you look



at the very cryptic details of professional time, we had the preparation of the report and telecommunication conferences with counsel, so that would be -- certainly during April is when we started sharing our ideas and the nature of our report with counsel.
Q. Do you know whether you're -- when ultimately you completed the report?
A. The final report was pretty much mid-June, towards the -- we -- I remember that I was kind of rushing it because I had a trip to Zurich to get ready for in June, and I wanted to finish it before that.
THE WITNESS: Is that right? Yeah.
A. So we -- we finalized it the first couple of weeks in June for sure.
Q. (BY MR. DONAHUE) I noticed in your billing report for June 1st through the 30th, which has been marked as 2479, that you have timed -- or you're shown time consultation with Melvin Jager. Do you see where I'm referring? I don't -- I'm sorry -- not Melvin Jager. Strike that.
That's your time correct, that 13 hours?
A. Yes.
Q. And Conway -- con- -- Conroy, that time is -- who is Mr. Conway [sic] again?
A. Conroy is the second guy in command, so to



speak. I think he's a managing director at Ocean Tomo in the evaluation department. And Steve Powaga is one of his associates that does his go-to work for him, if you will.
Q. You mentioned in your -- I'm sorry. Have you read Dr. Gruner's expert witness report?
A. Yes, I think I say so in my report.
Q. You do?
A. Yes.
Q. And do you know when you were provided that report?
A. Let's see if it's reflected in the bills.
(Sotto voce discussion.)
A. Oh, yes, here we are. The May -- the May time reflected in 2477 says initial review of Gruner report, so that occurred sometime in May. And then the final review of the Gruner report occurred sometime in June. It was not done -- it was not in final form until June, so that's when I reviewed it.
Q. (BY MR. DONAHUE) And to what extent in your forming your conclusions did you either consider or rely upon Dr. Gruner's report?
A. Well, we work basically in parallel. My report in many respects and most respects is independent of what he has to say, but I wanted to make sure that he



wasn't in disagreement with me or vice versa. So it turns out that after we reviewed it, his general report, as I understand it, was addressing the question of can this kind of strategy have intellectual property characteristics such as patent or trade secrets. And he -- he said -- he agreed that they did, and I agreed with that position. So we could -- at least we were not inconsistent with each other.
Q. Did you -- after reviewing his report, did you make any changes in your report?
A. I'm sure we made changes in the report, but I don't recall making any changes based upon the Gruner report directly. I kind of did my own analysis and my own research.
Q. You mentioned that you were supplied a stack of materials.
A. Uh-huh.
Q. Turn to Exhibit B of the Tesoro report, which is 2398.
A. Yes.
Q. And are those the materials that -- or could you describe what in Exhibit B were materials that were provided to you by Meadows Owens?
A. This is pretty much those materials. I can't say that everything that I finally relied upon was in

Page 34

that stack of materials. I might have not relied upon some, but certainly this is what -- is the guts of what I was presented.
Q. And when you say this -- for example, I assume you don't mean, however, the tax patent materials, which are on the first page of Exhibit B. I assume that you don't mean they -- Meadows Owens provided you with those materials?
A. Where are you talking about?
Q. Take a look at the first page in the heading tax patent materials.
A. Yeah.
Q. Did they provide you with those materials?
A. The materials that's underneath here?
Q. Yes. Yes. That's under that section.
A. There was a whole stack of testimony before Congress, house hearings that I remember reviewing.
THE WITNESS: Is that what this refers to?
MS. GAVIOLI: Yes. I can -- all of those were provided by us, so...
A. Yeah, so I would not have --
MR. DONOHUE: Let me make a statement. I'm sorry to interrupt, but counsel cannot unfortunately help the witness with his responses.

Page 35

Q. (BY MR. DONAHUE) Mr. Jager, my question is: Do you recall if you were provided those documents by Meadows Owens or whether those are documents that either your own team provided to you or you, yourself, obtained?
A. Under the heading tax patent materials in Exhibit B, I was provided with those materials by Meadows Owens.
Q. Okay. So in other words, all the materials that are on this document, Exhibit B, were supplied to you by Meadows Owens?
A. Well, let me check. Yes, as far as I can determine with a review of it, all of those were provided by Meadows Owens.
Q. First, do you know, did you ask them to provide you with certain materials or did you simply wind up receiving materials that they provided to you?
A. Well, I asked in general terms. I said I can't reach any opinions until I know what the facts are.
Q. Okay.
A. So please provide me whatever you have that would give me a basis for understanding what the facts are. And then in general terms I asked for that, and then they provided me with this information.

Page 36

Q. At some point after you reviewed the information they provided to you, did you ask to see other materials in the record?
A. Other than the Gruner report, I can't remember asking to see anything else. I did insist on seeing the Gruner report before I finalized anything I was going to say because I wanted to make sure that we were in sync with each other. And if not, I couldn't say in my reports that I read his report and agreed with it.
Q. But other than the Gruner report, do you recall if after reviewing the materials they provided you, you asked as to whether or not there were other materials in the record that you would like to review?
A. I don't recall asking for other materials.
Q. You mentioned that they provided you with the materials under the heading tax patent materials in Exhibit B.
A. Yes, I did.
Q. Did you -- prior to receiving these materials from Meadows Owens, had you, yourself, had seen any of those particular documents or read any of those particular documents before?
A. No, I had not.
Q. How familiar were you with the issue of whether tax strategies could be patented before you

Page 37

received those materials?
A. I was very familiar with the law and the concepts relating to the patenting of business methods. That was related -- a very important development from the patent law standpoint in the last 15 years, and so you couldn't practice law without being aware of that. Business methods, financial methods, I know the first couple of cases that came down with this were financial method patents, some kind of mutual fund, I don't remember the exact case, but the theory of business methods being patentable came out of a financial patent that was filed and allowed. So I was very familiar with that concept.
I did not specifically -- I was not specifically focused on whether or not a tax strategy, per se, would be a business method that would be patentable before this case came up. I never had a reason to consider it. I hope I never do again.
Q. So is it fair to say, then, your analysis of whether or not a tax strategy could be patented was based on the materials that were under the section of Exhibit B called tax patent materials?
A. Well, it began there. I wanted to see what other people were saying. I was particularly interested in the statement by the general counsel for the patent

Page 38

office, James Toupin, just to see the -- the approach to -- to the patenting of tax strategies. And when I -- you know, when I saw there were 41 patents that had issued in that area and 60 or so pending, it became clear to me that there's not an issue about the patentability of it, at least under the current law. And that would have been the conclusion I would have come to independently.

When I first started practicing law, there was the old cliche that methods of doing business aren't patentable, but that changed with that Alapatt case or something like that 20 years ago. So they are patentable now and they have always been conceptually something you could keep as a trade secret, business methods, that is.

Q. If you look at in Exhibit 2398, footnote 20, I notice you cite the Robert Hanson deposition, page 7.

A. Yes.

Q. And I didn't see that listed in the materials relied on, unless I missed it, which is possible. Am I correct, you did rely on at least some portion of the deposition testimony Mr. Hanson, am I correct?

A. I've read excerpts of his deposition, yes. If it's not in that list, it probably should have been.

Q. Is there anything else, to your knowledge,

Page 39

that you relied on that's not listed in Exhibit B?

A. I can't think of anything else. If there is, then we could certainly correct the record.

Q. For example, any other depositions, do you recall reviewing any other depositions?

A. After this report was filed, I remember reviewing some documents and -- like a court packet and a deposition of Mr. Daugerdas -- Daugerdas -- how do you pronounce it?

Q. Daugerdas, yes.

A. Daugerdas. But I didn't have that in front of me at the time I prepared the report, and that would not be listed here.

Q. Was there anything in that deposition which had an affect on any of your opinions that you rendered in the report?

A. It does not change my opinion, no.

Q. Were you informed as to the fact that various third parties have produced numerous documents in discovery in this case, were you informed of that?

A. No, I wasn't.

Q. Okay. Are you aware -- for example, your own report cites, for example, E-mails, an Ernst & Young E-mail to take the one example. Were you aware, for example, numerous E-mails, not only from Ernst & Young

Page 40

and numerous other documents, were provided by the Deutsche Bank, Jenkins & Gilchrist, and various other third parties, were you aware of that?

A. I think you have to assume that there was an awful lot of E-mails that flew around in this case, but I did not see any E-mails, that I can recall, from Deutsche Bank or the places that you just mentioned.

Q. Turn to in Exhibit 2398 page 10.

A. Okay.

Q. And on the second bullet, the last sentence, you make reference to a -- your belief is based on my review of the available documentation.

Do you see that reference? It's the second bullet, last sentence.

A. Yes, I see it.

Q. And what did you mean by available documentation?

A. Well, I meant that the documentation that I had available to me and that I reviewed formed the basis for my belief. I did not form a belief based on the stuff that I didn't see.

Q. Okay. And did anyone tell you, for example, that there's well over a million pages of discovery documents that have been generated in connection with this matter?

Page 41

A. No, and I'm glad they didn't.

Q. I wish I had known.

Now, you mentioned you had discussions with counsel at various points in the preparation of your report. Did you at any point meet with counsel?

A. With -- yes, we met yesterday here in this office to discuss the deposition today with counsel. That was the first time I met these lovely ladies.

Q. And prior to that time you had -- you had no face-to-face meetings?

A. That's correct.

Q. All your communications were done by telephone?

A. That's correct.

Q. And approximately how many telephone conversations did you have with counsel?

A. Oh, between five and ten. I don't know exactly how many. There might have been communications with Rick that I was not -- participated in. See, I was down in Sanibell trying to enjoy the sun while a lot of this was going on.

Q. Turn back to page 10 of your report.

A. Yes.

Q. You make reference to the second -- and, again, in the second bullet -- to the COBRA Investment

Page 42

and Tax Strategy. Do you see where I'm referring in the heading?
A. Yes.
Q. Where you say (as read): Ernst & Young is the only company providing the COBRA investment tax strategy.
Could you, as you sit here today, give me your understanding of what the COBRA strategy is?
A. Probably not. It has been explained to me and I've been told to assume things, which I as an engineer and a noneconomic person did, in fact, assume. It had something to do -- and I think I mentioned it briefly in the assignment or the background in the report. It has something to do with a purchase of options and then the sale of options or puts and calls and then the conversion of those to a partnership and then to an S Corporation and then the generation of potential income profit and then potential tax savings. That's in general terms my understanding of it.
Q. But can you -- as you sit here today, can you give me a rather specific explanation of each of the separate steps of the COBRA strategy?
A. No, I can not.
MS. GAVIOLI: Objection. I would like to just have a running objection to the term "steps" of the

Page 43

transaction.
MR. DONOHUE: I believe your objection is to form. There are no speaking objections.
Q. (BY MR. DONAHUE) Mr. Jager, without looking at any documents, can you go through and describe to me the COBRA strategy?
A. No, I could not except what I just generally described.
Q. For example, you mentioned offsetting options. Do you recall that?
A. Yes.
Q. Do you -- can you describe what the nature of those options were?
A. It has been explained to me in general terms, but I can't describe them to you. As I've said many times, I'm not a tax man or an economic expert, so -- I'm just a patent lawyer.
Q. Do you know, for example, the strike prices and the difference in the strike prices between the long and short options in the strategy?
A. No, I do not.
Q. Do you know, what is the position of the taxpayer regarding the basis in the short option when the short option and long options are assigned to a partnership?

Page 44

A. No, I don't.
Q. Do you know the approximate term of the options?
A. No, I do not.
Q. Do you know why the strategy has as a step the assignment of the options to a partnership?
MS. GAVIOLI: Objection. Form.
A. Those are tax and economic questions that I can't answer. That was not my specific assignment.
Q. (BY MR. DONAHUE) Do you know what the business purpose is of the partnership to which the options are assigned?
MS. GAVIOLI: Objection. Form.
A. No, I do not.
Q. (BY MR. DONAHUE) Do you know what the purpose is for the formation of a subchapter S Corporation in connection with the strategy?
A. What the purpose is? Well, I've over the years myself had an S Corporation, and I understand the general purposes of an S Corporation based upon that experience. But specifically in this case, I don't understand why they would do it. I did it so that I would limit my liability and have the benefit of having the expenses be personal and the income be personal. The typical S Corporation approach.

Page 45

Q. Do you know what the business purpose was for the S Corporation?
MS. GAVIOLI: Objection. Form. I would like to state a running objection to the term "business purpose."
A. Well, I understand in general terms -- like I said in my report, I've assumed that there were economic profit potential benefits and tax saving potential benefits for this venture, and that's how I started out with my opinion. That was my assumption. I was told to assume that. Now, you're dealing with the details of that assumption, and I started with the assumption.
Q. (BY MR. DONAHUE) Okay. If your assumption turns out to be incorrect, how would that affect your opinion?
A. Well, if my assumptions are incorrect, I would have to review the whole thing and start -- maybe not start over again, but I would have to determine and confirm whether that change in my assumption is sufficient to change my opinion. But this is all at this point speculation.
Q. I'm going to show you what's been marked as Government Exhibit 2452. For the record, this is a letter dated March 19th, 2007. It's addressed to you and it is signed by Sarah Q. Wirskye --

Page 46

MS. GAVIOLI: Wirskye.
Q. (BY MR. DONAHUE) -- Wyrskie, W-Y-R-S-K-I-E. Did you receive this letter?
A. I recall receiving it. I think I refer to that in my opinion, don't I?
Q. You do.
A. Okay. Yes. This was -- this was the description of the COBRA strategy to me, as I remember.
Q. And --
A. Yes, it was.
Q. Did you request this description or was it just provided to you?
A. I frankly don't recall, but it's certainly something that I would like to have a basic understanding of before I started. So somehow this -- either they gave it to me or I requested knowledge of this because it's kind of -- it's one thing to describe something on the phone. It's another thing to put it down on paper and understand it where you can refer to it. So this is -- they provided this to me for background information
Q. And to what extent after you received this did you make any attempt to verify any of the factual allegations in this document?
A. I did not make any independent examination of

Page 47

this. I relied upon this document.
Q. So in other words, is it fair to say you assumed the facts in this document were true?
A. That's true.
Q. For example, the first sentence refers to COBRA as an investment strategy. Do you see that?
A. Yes.
Q. And did you assume that COBRA was an investment strategy?
A. Yes, I did.
Q. For example, in the second sentence there's a reference to the fact that the short and long options were at different strike prices. Did you make any attempt to determine, for example, what the difference in the strike prices were?
A. No, I did not.
Q. Okay. I'm going to hand you what's been marked as Government Exhibit 2447. Do you recognize this document?
A. I've seen this before, yes. It's part of the materials that I reviewed, yes.
Q. Okay. Do you -- other than review it, did you attempt to understand the various steps that are referred to starting on page 3 of the document. Do you see where it says, step one option contract?

Page 48

A. Uh-huh.
Q. Did you make an attempt to review -- the steps go on. But did you make an attempt to actually understand what those steps were?
A. Not in any depth. And this is -- this is kind of where we come out with the assumptions because I made it clear to Meadows Owens' people that I'm not a tax attorney. I'm not a tax expert. I'm not an accountant of any sort. I'm, as I said, a lawyer and an engineer. So I could not speak to the detailed aspects of this as an expert. So I said I'm just going to have to assume that this is as stated. And I did not make any independent examination of this -- this document. I did see this document.
Q. But when you said I am just going to have to assume that this is as stated, what are you referring to "this is"?
A. Well, that the COBRA strategy is as stated, like it is on this letter of 2452.
Q. So in other words, even though you did review Exhibit 2447, you still -- for purposes of rendering your opinion, you relied upon the factual presentation that's in Exhibit 2452?
A. I did. That's a fair statement.
Q. Okay. Let's turn again to your Tesoro report

Page 49

at page 3. You make reference there to your assignment. And in the second sentence you make reference to the fact that you've been asked to provide analysis and possible testimony regarding the intellectual property value of certain investment transactions, which you referred to as the Investment and Tax Strategy associated with this case.
Is the term "investment" and "tax strategy" something you saw in Exhibit 2452?
A. I don't -- I don't recall whether those words are specifically here, but that's what we -- we at Ocean Tomo gave as a name for this strategy. Instead of calling it generically COBRA. It was generically an Investment and Tax Strategy.
Q. Investment tax strategy takes into account, am I correct, both the investment aspects of the strategy and the tax aspects, am I correct?
A. That's what I think it was meant to convey. Yes, it has two prongs.
Q. Did you make any analysis as to which would be and which were the principal focus of the strategy, the investment side or the tax side?
A. No, I did not.
Q. I'm going to give you what's been marked as Government Exhibit 2368. It's probably 2268. Let me

take a look. I think I'm looking -- that's -- yes, you're absolutely right. I saw an E-mail.

MR. DONOHUE: Off the record.

(Discussion held off the record.)

Q. (BY MR. DONAHUE) Take a look at 2368.

A. One of the millions of documents. Wow, what is this?

Q. Now, if you -- if you turn to the second page of 2368, you'll see what that is is simply another set of COBRA slides. Do you see that?

A. The second page?

Q. Yes, of Exhibit 2368.

A. Yes, I was just comparing it to 2447. It looks similar to what I saw before.

Q. Take a look at the second last page of the document. It's Bates stamp No. 3766.

A. Yes.

Q. You'll notice that there is a table there of the various consequences of -- and an ordinary loss of $50 million. Do you see that?

A. Well, this is -- yes, I see it now, but I have not studied it. Yes, I see it.

Q. It is somewhat similar to, for example, a table which is in the back of the set of slides, which is Government Exhibit 2447, that you did review.



A. Okay.

Q. You'll notice that there is similar slides -- or similar tables in the last two pages?

A. Yes.

Q. So if you look at, for example, 24 -- Exhibit 2368, you'll notice that under the first column Win Bet/Win Tax percent return after fees, do you see the number 31.58 percent?

A. Uh-huh.

Q. In other words, a return of 31 -- roughly about 32 percent. Do you see that?

A. Yes, I do.

Q. And then below that it gives an after tax return. And do you notice that the after tax return is roughly about 513 percent. Do you see that?

A. Yes, I do.

Q. Did you in any of your analysis make any effort to determine as to -- for this transaction, as to which was the predominant feature of the strategy, the investment feature or the tax feature?

A. No, I didn't. I assumed that it had both aspects.

Q. Okay. Let's turn back to your report and, again, on page 3. And am I correct that you on page 3 make reference to addressing two separate questions?



A. Excuse me a minute.

Q. Sure.

A. Would you please repeat the question?

Q. Yes. The question is if you turn to page 3 of your report, which has been marked as 2398, I'll ask as to whether or not your report addresses two separate questions.

A. That's correct.

Q. And the first question is whether the Investment and Tax Strategy can be categorized as intellectual property. Am I right?

A. That's correct.

Q. Now, on that -- your first opinion, am I right that there's two parts to that opinion, from reading your report? That the first part deals with what are the legal characteristics of, for example, a trade secret and the second part is whether or not the tax strategy -- tax and investment strategy has such characteristics?

A. And well, then there's a third part of the report that what's a fair way -- a typical way of evaluating or placing a value on intellectual property, that's point two here.

Q. Right. But I haven't gotten to the point two yet. I'm just --



A. I'm sorry.

Q. -- trying to understand point one. And is point one really divided into two parts based on your report? Is it one part dealing with what are the legal characteristics of a trade secret and two, whether or not the COBRA strategy had such characteristics?

A. Well, I analyzed it a little broader. It was intellectual property, whether or not this strategy had the characteristics of intellectual property. Trade secrets is one form of intellectual property, for example. As we went through this, we looked at it quickly from the patent standpoint, from the copyright standpoint, the trademark standpoint, and the trade secret standpoint. And those are the four basic components of intellectual property, if you will.

I'm not aware of any copyrights. I'm not aware of any trademarks in this case. I'm not aware of any patent that has issued on this strategy. So it came down with a question: Does this qualify in my judgment as a trade secret or would it have the characteristics of a trade secret? Characteristics -- you know, the attributes of a trade secret and that's where I addressed. So yes, that was the scenario.

First, is it the type of information that could be intellectual property. And then secondly, of

Page 54

those four components of intellectual property, where does it fall? It's not a trademark. It's not a copyright. It wasn't patentable. So it falls in the category of a trade secret -- potential trade secret.
Q. All right. But my question really deals with, in making that analysis it appears that your report first lays out what are the legal characteristics of the various intellectual property that you referred to in your report: the patents, the trademarks, the copyrights, and trade secrets. Am I correct that that's the first part --
A. That's the --
Q. -- is the layout with the legal characteristics on it?
A. That's the general approach, yes.
Q. And then after you've laid out the legal characteristics, then you opined on whether or not the strategy -- the COBRA strategy had such characteristics?
A. That's the general approach, yes.
Q. Have you ever as an expert witness testified before in a case in which you provided the Court with what are the legal characteristics of intellectual property?
A. Yes, I have testified in a trade secret case on whether a particular subject matter was -- would

Page 55

qualify as a trade secret based on my experience as a patent lawyer or intellectual property lawyer for 40 years, whether or not the -- in my experience this kind of information would qualify as a trade secret.
Q. But my question was: Did you as part of that case also initially tell the Court what were the legal characteristics of a trade secret?
A. Well, in part and parcel of analysis, so, you know, you have to understand the law before you can apply the facts that you know to the law. I don't know if that's what you mean, but you explain -- like when I testified, for example, in this patent case a couple of years ago, the question was infringement. I had to explain in general terms to the jury what infringement was. And ultimately the Court is the arbiter of the law, but I explained to them infringement occurs if this happens, and infringement doesn't occur if this doesn't happen and those kind of things. So I guess in general terms you do that as part of your expert opinion.
Q. In that case where you were providing testimony regarding whether an infringement occurred, weren't you there making an analysis of the facts and ultimately concluding that based on your analysis of the facts an infringement did not occur?
A. Yes, but it's awful hard to -- I couldn't

Page 56

unlearn the law, so I was also testifying part and parcel of my opinion based upon the facts of my knowledge of the law. So it's a mixed bag, if you will.
Q. Turn to page 6 of Government Exhibit 2398, the Section 5.2.1 in the third paragraph. Do you see the first sentence of the third paragraph starting with the word "additionally"?
A. Yes, I do.
Q. Could you read that sentence?
A. Oh, I mean, out loud? Do you want me to read it out loud?
Q. Unless you don't want to.
A. No, that's fine. I didn't know whether you wanted me to read it to myself or read it out loud.
(As read): Additionally, legal tax strategies need not be patented to ensure protection. They can be kept as trade secrets.
Q. And the word I'm looking at there is "legal." Is your assumption, for purposes of rendering your opinion, that the Cobra's tax strategy was legal?
MS. GAVIOLI: Objection. To clarify the term "legal."
MR. DONOHUE: You can go ahead and answer it.
A. Okay. Not necessarily. I call this a legal

Page 57

tax strategy. It's applying the law to the strategy. So whether or not -- the keyword was legal -- you can't separate the two. It's legal tax strategy. The business method, the method of having potential investment return and at the same time tax savings was the strategy I was talking about. And we're talking here about patentable inventions and whether or not it's patentable. And I've often said talking about trade secrets is that every patentable idea is born as a trade secret. Until you disclose it in a patent, that concept is protectable as a trade secret. So if it's -- even if it's not patentable or patented, these ideas can be trades secrets, the ideas themselves.
Q. (BY MR. DONAHUE) But getting back to the word "legal" here, am I right that the word "legal" modifies tax strategy?
A. Well, I'm talking about in that --
MS. GAVIOLI: Objection to clarify the term "legal."
A. The strategy I'm referring to in that -- in that comment is the, quote, Investment and Tax Strategy that I referred to in my assignment page on page 3.
Q. (BY MR. DONAHUE) Okay. So am I correct that for purposes of rendering your opinion, you're assuming that the COBRA strategy was a legal strategy?





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 58

MS. GAVIOLI: Objection. Form.
A. I didn't consider whether or not it was. It was a strategy that would permit it by law as a tax strategy. So that was the context of the word "legal." I'm not a judge. I'm just saying that what I meant by that statement is the Investment and Tax Strategy that we refer to in quotes on page 3 of my assignment, that's what I meant.
Q. (BY MR. DONAHUE) I understand that. But I don't believe you have yet answered my question, and if you have, forgive me. My question is: For purposes of rendering your opinion, did you assume that the COBRA strategy was legal?
MS. GAVIOLI: Objection to clarify the term "legal."
Q. (BY MR. DONAHUE) I'm using the term, Mr. Jager, "legal" in the same sense you used it there.
A. Well --
MS. GAVIOLI: Objection to clarify the term "legal."
A. Well, it is called the Investment and Tax Strategy. And as I sit here today, I've not ever been advised that it's illegal. So it's kind of a -- I guess it's an assumption that it's legal, but I did not specifically look into the law to see whether or not

Page 59

this specific strategy can be categorized as anything else. But I understand as it is today, it's legal.
Q. (BY MR. DONAHUE) If you --
A. Legal in the sense that it's not illegal.
Q. Okay.
A. A very general term.
Q. If you were to learn that the strategy was contrary to the tax laws, how would that affect your opinion?
A. That all depends.
MS. GAVIOLI: Objection to contrary to the tax laws. Are we talking civil or criminal liability?
MR. DONOHUE: You may answer.
Please Counsel, objection as to form. Do not make speaking objections. They're improper on the record.
MS. GAVIOLI: I would disagree that speaking objections are improper.
MR. DONOHUE: Do you want me to get the Federal Rules? We can stop and we can get them. Speaking objections are improper.
Go ahead, Mr. Jager.
A. Could you repeat the question?
Q. (BY MR. DONAHUE) Yes. The question is: If

Page 60

you were to learn that the tax strategy, the COBRA -- let's call it the COBRA strategy violated tax laws, how would that affect your opinion?
A. I guess I would have to ask at what point in time you're talking about. If you'll see from my report, I was opining on the fact that in my opinion in the 1999, 2000 era when these transactions occurred, it was my opinion that the strategy had the characteristics of a trade secret. And as a result of those characteristics, the next step was can it be valuated in a certain way.
So, you know, if it was later after the fact declared illegal or immoral or whatever, that would not necessarily change -- that would not change my opinion as to what happened based upon the facts I know right now in 1999 and 2000.
Q. Are you aware, for example, how the Internal Revenue Service goes about auditing returns? They -- are you aware, for example, that they'll audit a return in a later year even though it relates to an earlier year?
A. I'm not aware of their audit procedures. Thank God.
Q. But you're aware that they can can't audit the return until they have it. You're aware of that?

Page 61

A. I assume so, but I don't know for --
Q. And are you --
A. I don't know the procedures you're talking about.
Q. Assume, if you will, then that the Internal Revenue Service sometimes doesn't audit a return for years after its filed. Would you assume that?
A. Yes, I will.
Q. Now, if the Internal Revenue Service, for example, audits returns and ultimately declares that the tax consequences of the COBRA strategy are contrary to the tax laws and a court agreed with that, and said yes, that's true, how would that affect your opinion?
MS. GAVIOLI: Objection. Form.
A. That's an interesting question. I think in general conceptual terms a strategy can still be a trade secret even if a court declared it didn't fit within the tax laws. So it may not affect my opinion. But it certainly didn't affect my opinion based upon what I know now, which is what is in this report.
I would have to go back after the fact and look at all the facts that you just said might occur. But as of right now, in 1999 and 2000 my opinion is that this has the characteristics of a -- of intellectual property in the form of a trade secret.

Page 62

And then I went on to take that conclusion and state also that applying a certain percentage of value as a fee is reasonable. That's -- that was the whole nature of my assignment, so to speak. I wasn't asked to opine on audits or taxes. I would not be qualified to do so.
Q. (BY MR. DONAHUE) Let me go back to the very first sentence of your answer. You said: I think in general conceptual terms a strategy can still be a trade secret even if the Court declared it didn't fit within the tax laws.
What do you base that statement on?
A. Well, I've never seen the issue presented in all the cases I've read in the trade secret field on this question, so I've not seen a direct answer to your question that, can something that a court later says shouldn't have been done be in the meantime protected as a trade secret or characterized as a trade secret?
There's often a lot of cases where ultimately after trial the Court says, well, that's not a trade secret. So ultimately it's not protectable under the law, but in the meantime it's been characterized as a trade secret and has the characteristics of a trade secret.
Q. Well, let me give you, since you're an expert witness, a hypothetical. If I conceive of a very fine

Page 63

business plan which ultimately defrauds someone of a lot of money, and I brought that to the patent office and said this is my business plan. And it's clear I'm defrauding someone for a lot of money, is that type of strategy patentable?
A. Well, that keyword there is defraud. I'm looking at it from a trade secret standpoint. Do the elements have -- the elements of a trade secret. You could use a legally protectable type of intellectual property in an illegal manner and that -- that would not be a -- probably like I could get a trade secret on a gambling device or a trade secret on a gun, both of which could be used illegally to shoot people or to gamble in states where it's illegal, but that doesn't mean that it doesn't necessarily have the inherited characteristics of a trade secret, but it just was used in an illegal manner.
Q. Mr. Toupin in his prepared statement, in fact, used such an analogy, am I right?
A. I might have -- that might have been where I got my idea, but I don't remember that now.
Q. And that's why I gave you a hypothetical as I did in which you have a situation in which to clear. I said to assume it. That a person develops a business strategy which has the effect, and only effect, of

Page 64

defrauding someone of money. And my question to you was: Would that type of strategy be patentable?
MS. GAVIOLI: Objection. Form.
A. Well, the -- I guess that would be up to the patent office basically in the long run, but there are -- that would be up to Mr. Toupin to decide.
Q. (BY MR. DONAHUE) But provide me with your opinion since you're the expert.
A. Well, like there's a -- there's situations where like people try to patent what turns out to be a perpetual motion machine. And the patent office will say, well, you've got whistles and bells and things that work, but this is not possible. So you have to prove that you can, in fact, create perpetual motion by this invention which in effect has the characteristics of a patentable invention but it doesn't satisfy the requirement of utility.
Now, the patent office could come up with a rule in your scenario that if the only scheme -- if the only purpose of a particular invention is to defraud somebody, that -- for public policy reasons, they won't permit patenting on it. So, you know, that's in effect above my pay grade, if you will.
Q. I'm going to mark -- or I'm going to hand you what's been marked as Exhibit 2439.

Page 65

MS. WIRSKYE: I'm sorry. What was the exhibit number?
MR. DONOHUE: 2439.
Q. (BY MR. DONAHUE) Have you seen -- this is an indictment. Have you seen this indictment before?
A. No, I have not.
Q. Are you aware of the indictment?
A. Only after you gave it to me this instant, but not before.
Q. Are you at all aware that various former and even current Ernst & Young employees were indicted in connection with their involvement in -- among other tax strategies -- the COBRA strategy?
A. No, I was not.
Q. Take a look at page 16 of Exhibit 2439. Do you see the heading on that page where it makes reference to the fraudulent COBRA shelters?
A. I see that reference, yes.
Q. And, for example, if you look at paragraph 26 it makes reference to the fact that (as read): The objective of COBRA was the complete and permanent elimination of all tax liability on whatever amount of ordinary income or capital gain a client might chose.
It goes on to state (as read): COBRA, which involved the manipulation of basis in foreign





33536769-e7b1-4f38-a24d-ef5ac1ee2103

currency items, was E&Y's brand of strategy also known as the Short Option Strategy.
Are you aware of the Short Option Strategy?
A. No, I'm not.
Q. Were you aware that, in fact, the Government has taken the position that the COBRA strategy is a fraudulent tax strategy and has indicted four individuals who were former employees with E&Y in connection with their participation of that tax strategy?
A. Is the strategy alleged to be fraudulent as softwares at the activity of the people, fraudulent in the way they carry it out. It says fraudulent tax strategies. Is that your position in the Government?
Q. You recall when you were taking depositions --
A. You ask the questions.
Q. I ask the questions.
A. It was worth a try, wasn't it?
Q. It certainly was.
MS. GAVIOLI: Objection. Form. Please clarify the question.
Q. (BY MR. DONAHUE) Now, my question to you is: Were you aware that the Government has indicted four individuals who were former employees of Ernst & Young



in connection with their participation in activities with respect to the COBRA strategy?
A. Not until --
MS. GAVIOLI: Objection.
A. -- you mentioned it here.
Q. (BY MR. DONAHUE) Okay.
A. I think there was something in the newspapers about some -- no, I don't have any specific knowledge until you just mentioned it.
Q. Based on your awareness, as you sit here today, of the fact that there has been an indictment of four individuals of E&Y in connection with their participation of a COBRA tax strategy, in your opinion how would such an indictment affect the patentability of the COBRA strategy today?
A. The patentability?
Q. Yes.
A. Well, that's why I asked you a question that you refused to answer. There are -- like I said before, there are patentable legal -- patentable inventions that can be used in an illegal manner. There are patentable, I assume, strategies or business plans that can be used in a fraudulent manner. Business plans can generally be patentable, but if they're used to carry out a fraudulent scheme, that's a different question.



The label -- if you're saying that the COBRA shelters themselves, per se, are fraudulent, I would think that that's kind of -- that doesn't make sense to me because it's the activity of people using something that is a fraudulent activity. So to the extent -- I would have to -- I would have to study all of this and determine what the -- what the facts are and what activity is alleged to be fraudulent and see if that would affect my opinion. I guess that's the answer.
Q. Assume, if you will, that the indictment states that the shelter itself is fraudulent, and --
MS. GAVIOLI: Objection. Form.
MR. DONOHUE: Please let me finish my question.
Q. (BY MR. DONAHUE) Let me start over. Assume, if you will, that the indictment states that the COBRA strategy is fraudulent in that it's all -- its only purpose is, in fact, to defraud the Internal Revenue Service of taxes. Assume that as you will. If that -- based on that assumption, how would that affect your opinion as to whether or not this tax strategy today would be patentable?
MS. GAVIOLI: Objection. Form.
A. You're saying the scheme, per se, as compared



to the activities of the people using the business plan or using the patentable method or whatever, the method itself is fraudulent?
Q. (BY MR. DONAHUE) Yes.
A. I always understood people had to commit the fraudulent acts not something -- some object or some scheme. To go back to my opinion, as you can see from my opinion, I made the assumption that I've had investment aspects, potential profit aspects, as well as tax saving aspects, and that was the basis for my assumption.
If you're telling me that the assumption is that there was no purpose whatsoever but a fraudulent purpose, then you would obviously have to go back and review the whole situation. But it all depends on what -- what the fraudulent act is, and I don't know what that is right now. I would be glad to study this -- this indictment. Are these the people involved in this case? No, they're not.
THE WITNESS: Are these...
A. These are not the Woods people, are they?
Q. (BY MR. DONAHUE) Mr. Jager, turn to page 19 of Government Exhibit 2439, paragraph 29. And you will notice in paragraph 29 it points out that (as read): The defendants and their co-conspirators were aware that





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 70

if the IRS were to discover all the facts surrounding the design, marketing, and implementation of COBRA and that the COBRA clients were primarily or exclusively motivated by desire to eliminate huge tax liabilities, the IRS would aggressively challenge the claimed tax benefits. Accordingly, among other steps they took to prevent the IRS from learning those facts, the conspirators falsely and misleadingly represented the COBRA clients' motivations for entering into the transaction and for taking the various steps necessary to create the huge artificial losses.
Do you see that?
A. Yes, you read it accurately.
Q. Do you know what the nature of the loss is that's generated by the COBRA tax strategy?
A. No, I do not.
Q. Do you know -- have you ever seen a reference to an artificial loss before?
A. I don't remember that reference at all, no.
Q. Do you know, for example in the COBRA tax strategy, what the relationship is between the taxpayers' out-of-pocket cost in their ultimate deduction of a tax loss?
A. I have not dug into that at all.
MR. DONOHUE: Do you want to take a short

Page 71

break?
THE WITNESS: Sure, that's fine.
(Recess held, 12:01 p.m. to 12:22 p.m.)
Q. (BY MR. DONAHUE) Mr. Jager, I'm handing you what's been marked as Government Exhibit 2441, and this exhibit are responses by the United States to the plaintiff's interrogatories second set in the JZ Buckingham case. Had -- and are you aware as to -- well, let me ask you. Have you seen these responses before?
A. No, I have not.
Q. Okay. Are you aware at all as to what the Government's position is in this litigation regarding the legality of the tax losses?
MS. GAVIOLI: Objection. Form.
A. The only aspect that I'm aware of is the propriety of the fees and whether or not the fees are reasonable vis-a-vis the value of the property. I don't know what your other contingents are.
Q. (BY MR. DONAHUE) Is it your opinion that it is the position of the Government in this case that the fees are not reasonable in relation to the value of the strategy?
MS. GAVIOLI: Objection. Form.
A. No, I don't think that's quite accurate. Let

Page 72

me look at my report. What I tried to address was the general concept that the fees are reasonable in relation to the -- let's start over again. That the strategy that we call the investment tax strategy has intellectual property characteristics and that as a part of that characteristic, it would be appropriate to charge money to use that property or use that concept during that strategy. And that the fees that I've been told were charged based upon the typical approaches in intellectual property law appear to be reasonable.
Now, if the Government's not opposing that position, fine, then we're in agreement. That's -- I don't know the nature of your arguments, per se, in your -- in your lawsuit or whatever. I haven't tried to understand the tax aspects of this case because that's not within my jurisdiction or expertise.
Q. (BY MR. DONAHUE) Look at Government Exhibit 2441, page 4, under the quote on page 4, it states (as read): The United States contends that the Internal Revenue Service correctly determined that even if JBJZ Partners existed as a partnership under state law, this entity was a sham for federal income tax purposes.
Were you aware that the Government's position in this litigation was that the partnerships in

Page 73

which the offsetting options were transferred were a sham for federal income tax purposes?
A. No, I was not.
Q. Take a look at the next paragraph where it states (as read): The United States also contends that the Internal Revenue Service correctly determined that the purchase of the offsetting option transactions in their contribution to JBJZ Partners was an economic sham.
Were you aware that it's the Government's position in this litigation that the purchase of the offsetting options, as well as their transfers to the partnership, were economic shams? Were you aware that the Government -- that's the Government's position in this litigation?
MS. GAVIOLI: Objection. Form.
A. I was not aware of the position as stated here, no.
Q. (BY MR. DONAHUE) Were you aware that the Government takes position in this litigation that the losses claimed by the various taxpayers, in fact, are not proper losses under the tax laws? Were you aware of that?
A. In general terms, yes. As I understand the situation that the -- that the tax aspect or the tax





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 74

deductibility of the transactions was rejected or denied by the Government, and that's the basis -- that's one of the bases of the lawsuit.
Q. Do you have any understanding of the law -- the tax law regarding economic substance?
A. Regarding what case?
Q. Economic substance.
A. No, I do not.
Q. Do you have any understanding of the tax laws regarding the requirement that business entities, like partnerships, must have a business purpose? Do you have any understanding of that area of law?
A. Only in very general terms. No, I don't.
Q. Are you aware of a doctrine in the tax law referred to as the Step Transaction Doctrine?
A. The what?
Q. Step Transaction Doctrine.
A. No, I'm not.
Q. Let's turn to your Tesoro report, Exhibit 2398 page 5.
A. Okay.
Q. At page 5 you point out in the first sentence under heading 4 that you understand this case primarily involves a dispute with the investment tax strategy over the validity of the investors' treatment of a short

Page 75

option for tax purposes.
Who provided you with that understanding?
A. Well, that came out of the discussions we had with counsel and the conversations we were talking about earlier with counsel. And that's kind of a summary of -- as we understand the dispute. So the understanding came from counsel.
Q. And, for example, I just mentioned to you two, among various other, positions of the Government. You were not aware of those positions of the Government in this litigation, am I correct?
A. Not those specific positions, no.
Q. If you turn to page 4, you point out in the first sentence you reviewed Professor Gruner's expert report and are in agreement with his conclusions regarding the Investment and Tax Strategies trade secret characteristics.
And am I correct that when you said you had a reference to Professor Gruner's -- your review of his report, in your report, that's the reference you were referring to?
MS. GAVIOLI: Objection. Form.
A. Say that again.
Q. (BY MR. DONAHUE) Well, if you recall you mentioned that there was a reference in your report that

Page 76

you reviewed Mr. Gruner's report. Do you recall that?
A. Oh, yes. This was the reference I was referring to.
Q. Okay. And in the next sentence you state (as read): At trial I will offer my opinion that the investment tax strategy had the characteristics of a trade secret at the time this strategy was implemented.
So am I correct that's your first opinion that you will render in this case, that the tax strategy had the characteristics of a trade secret?
A. Yes.
Q. Okay. If you turn to page -- again, I'm referring to what's been marked as 2398 -- to page 6. You have a discussion in your report as to the patentability of tax strategies. Do you see that?
A. Yes, I do.
Q. What was the reason you included that discussion in your report since ultimately you conclude that the COBRA strategy had the characteristics of a trade secret? Why did you include a discussion of the patentability of tax strategies in general?
A. Well, our general approach was to look at this from -- initially from a broad perspective of whether or not it was intellectual property, and patents are one aspect of intellectual property. As you'll notice, I

Page 77

went through trademarks and copyrights and trade secrets in addition to patents. So I answered for my own benefit, yes, it has patentable characteristics. It's an -- it's IP that has patentable characteristics as well as trade secrets characteristics. That was part of the analysis.
Q. You make reference to on page 6 under the patentability of tax strategies Mr. Toupin's -- his statement before the House Committee on Ways and Means. Do you see that?
A. Yes, I do.
Q. Are you -- at the point that you're referring to his statement, are you providing these four items that he refers to as the requirements that must be met for a patent before -- for an item to qualify for a patent?
A. Where are you referring to, please?
Q. I'm referring to page 6 under 5.2.1 where it makes reference to the current Act that details the standards of patentability.
A. Oh, I see.
Q. It specifies four basic statutory requirements. Do you see that?
A. Yes, I do.
Q. So are you referring to that to indicate what

is the law regarding the characteristics of a patent?
A. Well, that's -- those are the comments that Mr. Toupin made to the Congress. There is one element that he didn't include that's minor and irrelevant to our purposes, but the patent application also has to satisfy what's called the Best Mode Requirement.
Q. The best what?
A. Best Mode, M-O-D-E.
Q. Okay.
A. He didn't mention that, but it's not relevant to what we're saying. So yes, that's generally a very good summary of the items that have to be -- or the points that have to be met for the patent -- for the idea to be patentable.
Q. So this is the statutory criteria, is that what you're saying?
A. Yes.
Q. So your first part of your analysis here is to lay out what the statutory criteria is for a patent to be obtained?
A. As stated by Mr. Toupin.
Q. Well, do you disagree with his statement?
A. No, I do not.
Q. So you're simply saying that you agree with his statement that these are the statutory criteria for



a patent?
A. This is a general -- this is a good general summary of those criteria, yes.
Q. Okay. In the next paragraph you make reference to the fact that Mr. Toupin indicates that a new subclass has been dedicated to tax strategies. And you point out that this subclass is 36T in patent Class 705, has been established and dedicated to tax strategies.
What's your understanding as to the nature of the tax strategies that have thus far been patented?
A. There -- well, the -- the initial -- well, I have not read those 41 patents, so I guess I can't tell you exactly what's been patented. But I -- I was referring to -- to me it was significant in itself that 41 patents had issued in this area. I did not go beyond that to study what the 41 patents showed, if that's what you're asking me.
Q. Okay. So as you sit here today, you have no knowledge of what the nature of those tax strategy patents are?
A. Those --
MS. GAVIOLI: Objection. Form.
A. I have no specific knowledge of what those 41



patents show.
Q. (BY MR. DONAHUE) I'm going to hand you what's been marked as Deposition Exhibit 2465.
THE WITNESS: What is that? Is that part of what I've read?
Q. (BY MR. DONAHUE) Have you seen this exhibit before?
A. I'm trying to determine that. July 13th...
MS. WIRSKYE: Dennis, for the record, can you just clarify that this is Government Exhibit 2465 we're looking at. I think you said something different.
MR. DONOHUE: Yes, it is Government Exhibit 2465.
MS. WIRSKYE: Okay.
A. Well, my report was dated June 29th and this is July -- oh, 2006, I'm sorry. I would have to check my Exhibit B to see if I've seen this before.
Q. (BY MR. DONAHUE) If you take a look at the Bates stamped numbers at the bottom, does that help you?
A. Well, I'll check.
Q. I'm referring to the bottom of Government Exhibit 2465. It starts with EX --
A. One.
Q. -- one. Does that help you?
A. Well, let me check my Exhibit B if I can find



it on there. Yes, it's the first item on the report. Okay.
Q. So this is --
A. Yes, I've seen it before.
Q. This is a document that you listed in your report as a document that you considered, am I correct?
A. Yes.
Q. And what did you do -- what is your understanding of this report?
A. Let me see who's testifying. It's a -- it's a good summary of the patent laws as of this time, and the procedures for getting patents. And I see where it summarizes some of the types of tax strategy patents that have issued. I didn't remember that, but I see it here now.
Q. Do you know -- am I correct, this is a report prepared by the staff of the Joint Committee on Taxation?
A. I assume that it was. I don't see any particular authors stated.
Q. Are you familiar with the Joint Committee on Taxation?
A. No, I'm not.
Q. Do you -- do you know why this report was prepared?

Page 82

A. Well, yeah, on page 3 of the report it says they were preparing for a public hearing on July 13th.
Q. And do you know why -- or the purpose of a public hearing in connection with tax strategy patents? Do you know what the purpose of that hearing is?
A. I think one of the -- wasn't Mr. Toupin's statements that we talked about earlier part of that July 13th hearing? I think Congress was reviewing the law with respect to the patentability of particular subject matter, particularly business method patents.
Q. Was it a business matter patents or was it specifically focused on tax strategy patents?
A. I think it was both. It was business method and specifically tax strategies, patentability of tax strategies.
Q. And do you know why Congress was reviewing the tax strategy patents?
A. I can't speak to why Congress was doing that, no.
Q. Well, based on your review of the materials, do you know why?
A. Well, based on the materials that I reviewed, there was a lot of people, tax specialists, a lot of lobbyists, or -- it's just like the open source movement in the software field. There are people that say

Page 83

software shouldn't be patentable, and there are people that say software should be patentable. Bill Gates is one of those, for example, with Microsoft. And there's a great movement afoot to make software patents unpatentable because the people that want to use the open source of software don't want to have to worry about patents.
And the analogy -- that occurred to me when I was reading this. There are people that don't want patents on tax strategies also. Just like there's a lot of people that don't want business methods patented, period. That was -- there's a big percentage of people that we talk about over the years since the business method patents became patentable that, you know, they don't like this at all. They would rather not have it had happened. So you start out with that general principal of business method patents being questioned, and then you get down to the tax questions.
Q. If you turn in Government Exhibit 2465 to page 22.
MS. GAVIOLI: I'm sorry. Dennis, are you referring to the EX numbers or the page numbers?
MR. DONOHUE: I'm referring to the page number. The EX number would be 24.
A. Okay. Got it.

Page 84

Q. (BY MR. DONAHUE) You'll notice that there is a reference to tax patents and tax avoidance, and it states (as read): An initial concern is that tax shelter promoters might use tax protection as a means of circumventing the reportable action regulations.
Are you familiar with the reportable transaction regulations?
A. Not in specific terms, no, I'm not.
Q. Well, did you generally know that the -- that there may be some concern about the patentability of tax strategies of the patentability of abusive tax strategies, were you aware after you read these materials that there was concern regarding the patentability of the use of tax strategies?
A. Well, I think the general principal that's what the hearings or the subcommittee was looking into.
Q. Did you see any statements by any of the witnesses that were directed to that specific issue?
A. Yes, I think there were -- I've seen witnesses that have appeared before Congress. I think that's part of the documents that I read in association with the James Toupin documents that took the position that the tax strategy should not be patentable. I don't remember their names or their positions. Some of them I recall were professors. There might be others.

Page 85

Q. Did you feel that their views had any effect whatsoever on the opinion you were rendering?
A. Well, I took all of this into account and just like I referred to the open source movement, I've addressed or at least considered the issue of whether or not particular things should be patentable, you know, all my life. And when business methods became patentable, there was a lot of people that had concerns with that. When software was first found to be patentable back in the '70s, that was a new thing because software is very close to a mathematical formula, an algorithm, and people -- particularly mathematics professors would say, how can you patent a mathematical algorithm.
And so I'm familiar with the general principals of the debate, and it was -- it was a similar type of ebb and flow when I read this concern about taxes that there are some people who very strongly feel like it should not be patentable and, you know, that's a policy decision I guess Congress will eventually have to make.
Q. If you turn to page 6 of your report, 2398, you point out you're not aware of patents associated with the Investment and Tax Strategy.
A. Yes.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 86

Q. Do you know why the promotors of the COBRA strategy did not attempt to obtain a patent?
MS. GAVIOLI: Objection. Form.
A. No, I would have no idea as to -- on how to know that. I don't know that.
Q. (BY MR. DONAHUE) Well, based on the -- your review of the materials that you saw and some documents I showed you this morning, do you have any opinion as to why the promoters of this tax strategy did not attempt to obtain a patent for the COBRA strategy?
MS. GAVIOLI: Objection. Form. I would like to make a running objection to the term "promoter."
A. Well, it's been my experience that there are a lot of situations where people chose not to get patents on things that wouldn't have been patentable for various reasons. It's all over the lot. You know, they don't want to spend the money, they want to keep it secret, they don't realize that it could be done, et cetera, et cetera. So I didn't draw any specific conclusions for my purpose from the fact that it wasn't patented.
If it had been patented, I would have had to look at the patent and review the patent and understand that and opine more specifically about patents -- the patent characteristics of this idea as compared to the trade secret characteristics. So I

Page 87

considered it in that respect, and it wasn't necessarily unusual for me to hear that there was an idea that somebody didn't get a patent on.
Q. (BY MR. DONAHUE) If you turn to page 6 of your report, in your discussion of trademarks you cite 15 U.S. Section 1127. Do you see where I'm referring to?
A. Yes.
Q. And am I correct that there you're citing the law regarding trademarks?
A. That should be a reference to the LANAMAC. If I cited it incorrectly, I apologize. But the LANAMAC is a big body of law that sets up a procedure for protecting trade secrets -- I'm sorry -- trademarks. It's a federal statute for protecting trademarks.
Q. Okay.
A. And I think that's Title 15 of the Code.
Q. And so what you're doing there is simply setting forth what the law is regarding trademarks?
A. Correct.
Q. 5.4 under copyrights you make reference to Section 102 of Title 17 of the U.S. Code.
A. Yes.
Q. And then you go on to, based on that citation, define a copyright?

Page 88

A. Yes.
Q. Am I right there that what you're doing is defining the law of copyrights?
A. Yes, I am.
Q. Under -- page 7 under trade secrets, you first make reference to the definition of trade secrets and under the three bullets you have three separate definitions. Am I right there that you're providing a statement as to what is -- what are the legal -- the scope of the legal definitions of trade secrets?
A. Yes. The first paragraph is a Uniform Trade Secrets Act statement, the second paragraph is the new restatement for competition definition of a trade secret, and the third was the replacement -- was the old restatement of torts definition of a trade secret.
Q. And then in -- after those definitions you make reference to judicial decisions, do you see that, starting, these sources as well as judicial decisions.
A. Yes.
Q. And am I correct there that what you're doing is you're taking from the legal decisions what you believe to be the four characteristics of trade secrets?
MS. GAVIOLI: Objection. Form.
A. I'm not quite certain if I understand the question, but...

Page 89

Q. (BY MR. DONAHUE) Do you want me to repeat it?
A. Well, please do.
Q. Okay. You'll notice after the paragraph you have a statement -- a sentence that begins with "a trade secret has four aspects." Do you see that?
A. Yes, I do.
Q. Okay. Now am I right that what you have done is based on the above legal definitions of a trade secret, as well as judicial decisions, you have set forth what you believe to be the four characteristics -- the four legal characteristics of a trade secret?
A. These are four general -- you mean the following bullet points, four?
Q. Yes.
A. Yeah, those are the general categories of trade secrets. See, trade secret law developed initially as common law. It wasn't statutory law. It wasn't until the early '70s or early '80s that it became the statutes in various states, and now there are still eight or nine states that have statute defining trade secrets. It's still common law. So to really cover all bases, you have to look at the decisions -- the judicial decisions as well as the statutes.
Q. But what I'm trying to do is find out -- this is your interpretation of the law. You, based on your

review of the law, are saying that these are what I believe to be the four characteristics of trade secrets. Is that what you're saying here?
A. Well, this is based upon my understanding of the law and based upon my 40 years of experience analyzing fact situations and applying the law to the facts, so these are four bullet points that summarize in principal the four characteristics you really should look at.
Q. And when you say "characteristics," you're referring to legal characteristics, correct?
A. Well, they're factual as well as legal.
Q. Well...
A. In some cases -- in some states the question of whether or not a trade secret exists is a question of law and in some states it's a question of facts, so it's got to be considered as both.
Q. But you -- you obtain this from your analysis, among other aspects, of legal decisions, correct?
A. Oh, that's where you get the --
MS. GAVIOLI: Objection. Form.
A. Well, that's the foundation of the understanding, yes, it has to be.
Q. (BY MR. DONAHUE) And am I correct that below that you then have restated these four elements as to a



trade secret and you've restated them in a way that's -- refers to No. 1, a trade secret being novel. Am I correct?
A. Novelty is not a requirement of trade secret law. I don't think I say novel. It has to be distinguishable from general knowledge. Novelty is a concept used in patent law, but a trade secret cannot -- can be something that is not novel enough to be patentable but can still be a trade secret.
Q. Well, what do you mean when you say (as read): The key elements of a trade secret include that it, one, is novel in the sense of being generally known in the industry?
A. Well, that's what -- see, I use novel in two ways. As a patent attorney, Section 102 of the Patent Code defines novelty in a very specific way. That's one kind of novelty. Novel in the sense of not being generally known to those in the trade is a subset of that novelty, and that means that there are many trade secrets that would not have been patentable, but they're still protectable as trade secrets. So they have to be novel in the sense that they're not generally known to the people in the relevant area.
Q. And am I correct that you have arrived at that as a characteristic of a trade secret based on in part



your analysis of legal decisions?
MS. GAVIOLI: Objection. Form.
A. I was trying to apply the facts to the law, so yeah, the legal decisions had to be part and parcel of my opinion.
Q. (BY MR. DONAHUE) All right. And your second element is sufficiently secret. It is not readily ascertainable by proper means.
How did you arrive at that element of a trade secret?
A. Well, those words are taken right out of the Uniform Trade Secret Act.
Q. So --
A. When the -- readily ascertainable by proper means is right out of the Trade Secret Act. See on page 7 of the report under 5.5, bullet point one, that's the act.
Q. So you are saying that based on your reading of the Trade Secret Act, that is a legal characteristic of a trade secret?
A. Yeah, that's how I read the act.
MS. GAVIOLI: Objection. Form.
Q. (BY MR. DONAHUE) Okay. And three -- a third element of a trade secret you say is subject to reasonable security measures. How did you --



A. Would you tell me where you're reading, please?
Q. Oh, yes.
A. I'm not following you specifically.
Q. Well, I don't want to show you my version, but why don't I show you where -- right there.
A. Okay. I was looking up here. Yes, I'm sorry.
These are -- I attempted to just kind of in a very general non-laymen's terms summarize what was stated up above is what I was trying to do there.
Q. And how did you arrive at: This third element is subject to reasonable security measures?
A. Well, that's what the cases have said for 200 years and that's what the statutes say, that in order to be a protectable trade secret under the law, it must be subject to reasonable security measures. It just can't be under -- it can't be not subject to reasonable security measures. I don't know how else to say it.
Q. And am I right that again though, it's based on your analysis of the law?
MS. GAVIOLI: Objection. Form.
A. That is my understanding of what the legal -- one of the legal requirements, yes.
Q. (BY MR. DONAHUE) Okay. And the fourth is has economic value. How did you arrive at that as being a

characteristic of a trademark -- a trade secret?
A. Again, that's right out of the Uniform Trade Secrets Act that it has independent, actual or potential economic value. That's one of the characteristics in the act.
Q. Now, you -- in the report here you have laid out four elements of a trade secret, am I correct?
A. I've summarized it as four key categories, yes.
Q. And why four as opposed to five, six, or seven?
A. Oh, I probably could have made five, six, or seven, or ten. I was just trying to keep things simple. You would have a lot of subsets under each one of these four points.
Q. Or could you -- is it possible that there is another -- the case law refers to some other legal characteristic that you did refer to?
MS. GAVIOLI: Objection. Form.
A. Well, I guess you would have to answer that question yes, because there's a lot of different ways cases look at it. For example, there's a famous case in Minnesota that says a trade secret must have a degree of unknowness. From an analytical standpoint, it's nice to quote that, but I don't have the faintest idea what they



mean by that. A degree of unknowness is one way courts have analyzed the characteristics, so I didn't bother listing that for example.
Q. (BY MR. DONAHUE) So your four characteristics are, from your perspective, your analysis of what you believe to be the pertinent legal characteristics of --
MS. GAVIOLI: Objection. Form.
A. Those are the -- those are the --
Q. (BY MR. DONAHUE) You have to wait until I finish my question, and if there's an objection, you have to wait until the objection -- let me see if I can think of what I was saying here.
So your four characteristics are from your perspective your analysis of what you belive to be the pertinent legal characteristics of a trade secret?
MS. GAVIOLI: Objection. Form.
A. I guess I would have to say those are the four main categories, but for example in one of my sections in the book under -- My Trade Secret book under security precautions I go through a list of criteria that you should follow that has 10 or 15 points. So I can't say that -- you know, like they have you use passwords for your software, have you done this and that. So there are many elements I could have summarized, but this is my effort to make this simple and keep it simple and



summarize the four key components of a trade secret. I hope that helps.
Q. (BY MR. DONAHUE) Let's turn to page 9 of Exhibit 2398. Now, you point out that -- the key characteristics of trade secret are, and then you have four bullets. And the first is novelty. And then you point out under novelty that the novelty requirement is not applicable to trade secrets.
Do you see that?
A. Yes. That's what I was referring to before. To me as a patent lawyer novelty has a very specific meaning. That means novel under Section 102 of the Patent Code. So that is not a requirement of a trade secret. So that's what I meant by this novelty requirement is not part of trade secrets. You can have something that's a trade secret that's not patentably novel, that's what I meant to say.
Q. And if I wanted, for example, to verify that you're correct on this point, how would I go about doing that?
A. You could read James Pooley's book that we cite on trade secrets or it's in -- I think it's chapter 3 or 5 of My Trade -- I'd refer you to my book, if nothing else.
Q. Okay. And in your book do you in turn rely on



citations to statutes and Judicial decisions?
A. Of course, yes.
Q. So if I wanted to, let's say, go to the first source, how would I verify that statement?
MS. GAVIOLI: Objection. Form. What is the first source?
A. You mean like James Pooley?
Q. (BY MR. DONAHUE) Well, no, I assume that's secondary source, am I correct? Since you're a lawyer I'm using the term "source" in terms of authority. In other words, if I wanted to know that you're correct on this point of novelty, how would I verify that you're correct?
A. Well, you would look at the statute and then you would look at the restatement of laws that I've quoted. You either look at the comments under the statute, you could look at the comments under the restatement of laws that The American Law Institute has provided. And then of course you would look at the judicial decisions and see how they've interpreted that novelty requirement.
Q. You make reference to this novelty requirement in the context of the trade secret means that it is not generally known in the industry.
A. Uh-huh.

Page 98

Q. Specifically, how would I verify that requirement?
A. Well, that's one of the difficulties that people in our business deal with. The best you can is you -- you -- unlike patent law, you don't have a patent office search office or a library that you can go to and see if something has been discussed or printed before or in the public domain, so to speak. You just have to investigate the aspects of the business the best you can to determine if this material is unknown in the industry to the extent that it has at least a level of economic value that people place value on the fact that it's being kept secret. You look at the cases. You look at the totality of circumstances.
Q. Actually, you didn't quite answer the question I asked, but the answer you gave was the question I was going to ask.
A. Okay. Why don't you ask the question -- please ask the second question first.
Q. You saved us some time by answering a question I was going to ask. Let me restate the question I did ask. My question is: If I wanted to verify that there is a novelty requirement for a trade secret, which is essentially defined as novel in the sense not generally known in the industry, how would I verify that? What

Page 99

authority do you have for that statement?
A. Well, it's the statute. It's the restatement. It's the case law. For example, one very traditional analysis done by the courts is to look at the six factors set forth in Section 757 of the Restatement of Torts back in 1939, and there are six elements that they list. Things like to the extent to which it is known in the business, to the extent to which it's known outside the business, the -- I don't have them all memorized, but how much it was -- how much effort did it take to create the information, would it be readily obtained from the phone book, you know, like customer list cases, for example. Is a customer list a trade secret? Well, if it's a list of everybody under A in the phone book, the answer is no, it's not.
But there are six criteria in the restatement that the courts constantly refer to as a way to start, and they look for those characteristics. And it's -- it's -- really you look at the totality of all the circumstances.
Q. All right. Now, let's go to the factual aspects of this characteristic. How did you determine that the COBRA strategy did not quote or was not quote generally known in the industry?
MS. GAVIOLI: Objection. Form.

Page 100

A. Well, as best I could I looked at all the documents and facts that I had before me and saw, as I stated in the report, some written evidence of facts that this strategy was considered to be valuable, economically valuable, considered to be confidential. The people involved in the transaction were willing to charge money for it, and other people weren't willing to pay substantial money for it. So when you look at all these circumstances, I came to the conclusion that on the facts that I knew, I think that this investment tax strategy had the sufficient novelty to have the characteristics of a trade secret.
Q. (BY MR. DONAHUE) For purposes of your analysis, how were you defining the industry?
A. I didn't really come to any specific definition of the industry. It's really -- I guess you would have to say it would include people who have a reason to provide and receive investment and tax information and advice. It's a pretty big, broad industry. Industry is probably less appropriate than people who have reason to have the information. It's easy to talk about. Like the automobile industry, that's pretty well defined. But in terms of this industry, it would include accountants, I would assume, it would include tax lawyers. And obviously in view of

Page 101

your presence here, it includes the IRS. It includes taxpayers in general.
Q. Are you --
A. So I guess it's a pretty amorphous industry.
Q. Are you aware that there is an industry of tax shelter promoters, are you aware of that?
MS. GAVIOLI: Objection. Form.
A. I've never heard that term "tax shelter promoters." I guess the answer is no, I'm not aware of that -- of that specific industry. Tax shelter promoters, no. I'm aware of the fact that there are accountants and lawyers that work providing various sophisticated tax advice and strategies, but I don't know what -- what the banner is that they have professional associates or whatever.
Q. (BY MR. DONAHUE) Under novelty on page 9 of Government Exhibit 2398.
A. Yes.
Q. You in the first bullet make reference to advisor confidentiality agreements.
A. Yes.
Q. What was the basis of your relying on confidentiality agreements for purposes of rendering this opinion that the COBRA strategy met this novelty requirement?





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 102

A. Well, as part of the traditional analysis when you go through an analysis trying to determine if something is, for example, a trade secret, you don't need agreements. You and I sitting here today can -- it can be either implicit or explicitly agreed that what I'm going to tell you is confidential or what I'm telling you now isn't, obviously, confidently. She's recording it. But we can reach an oral agreement or an understanding or in many situations an implicit understanding. But then you go to the next step, and if there is a written understanding of the confidentiality, then that's a further indicia of the fact that this is confidential information. So that's what you -- in part of your analysis and investigation you look for.
Q. I'm going to hand you what's been marked as Exhibit 2463. Do you recognize this document?
A. It looks familiar. I don't know if I specifically cite this, but it looks like it's part of the E&Y agreement that they would ask their individual clients to sign. I could check Exhibit B if you would like and see if I've seen this specific document. Yes, it's on Exhibit B.
Q. In your report you point out that (as read): It was standard practice of Ernst & Young to require its advisors to sign a confidentiality agreement.

Page 103

Who are you referring to when you say advisors?
A. That's the term they used. I would use the word -- term "clients" or it would -- I don't remember the exact thing that this is attached to, but if they -- if they are using other people to advise them, then this would be -- meaning of the word "advisor to." If people are coming to Ernst & Young with advice, they want to keep it confidential. Or if Ernst & Young was advising clients, they would want to keep it confidential.
Q. Do you know how this document, which has been marked as Government Exhibit 2463, was being used by Ernst & Young in connection with their marketing of the COBRA strategy?
MS. GAVIOLI: Objection. Form.
A. It is my understanding that it was part of their usual and traditional methodology. Exactly how they were using it, I can't answer that question.
Q. (BY MR. DONAHUE) Do you know what the reasons were as to why Ernst & Young required clients to sign a nondisclosure agreement?
A. I don't know what their reasoning might be, no.
Q. Did you make any attempt to explore if in part the reason was is to conceal the transaction from the

Page 104

Internal Revenue Service?
MS. GAVIOLI: Objection. Form.
A. No, I did not.
Q. (BY MR. DONAHUE) Did you consider in ultimately rendering your opinion that that could have been one of the reasons that Ernst & Young had their clients sign a nondisclosure agreement?
A. No, not generally. My understanding or conclusion from seeing documents such as this is that they considered it to be confidential and asked their clients and advisors to treat it as confidential. To me that means it doesn't necessarily follow that you don't disclose it to any particular person for sure, but it means you maintain it confidential. Their exact motivation I can't speak to. I don't know anything about it.
Q. Well, would that be relevant to your ultimate opinion?
A. It would be a factor that I would consider as part of this totality of circumstances, but I did not have it in front of me.
Q. Let me give you what's been marked as Exhibit 2458. Have you seen this document before?
A. Yes, I've seen this document before.
Q. And what is this document?

Page 105

A. It's a letter to Mr. Robert Coplan from Jenkins & Gilchrist.
Q. Well, I mean, did you rely on this document for purposes of rendering your opinion?
A. It was part of the statement about confidentiality that I used as part of my analysis, yes. They have a statement in here that you will maintain things in confidence, so that's part of my analysis.
Q. Let me give you what's been marked as Government Exhibit 2442 -- let me correct that -- 2443. And have you seen this document before?
A. Yes, I have.
Q. And what is this document?
A. This is an engagement letter between E&Y and Mr. Gary Woods.
Q. And did you rely on this in rendering your opinion?
A. Yes. Again, it was part of my analysis that I relied upon. There are statements in here about confidentiality.
Q. And based on these confidentiality agreements, what conclusion did you draw regarding whether or not the COBRA strategy was generally known in the, quote, industry?
A. Well, the first conclusion I came to was that





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 106

the parties involved, Mr. Woods, E&Y, others at E&Y, and Jenkins & Gilchrist, clearly considered it to be confidential or proprietary, if you will, and they treated this as much. And -- but I -- with the record I have available to me, I looked to see if there were other indicia of that confidentiality, and I came to the conclusion that, as I stated in my report, that this subject matter possessed in my mind all the characteristics of a trade secret. I can then go to the next step and say then, therefore, that would be the kind of thing that a reasonable royalty could be applied to.
Q. But I mean more specifically, weren't you relying on the confidentiality agreements for the basis of your conclusion that the COBRA strategy was not generally known in the industry?
A. Well, that's part of the -- as the Court's say -- totality of circumstances you use to look at. There are -- there are -- I didn't see oral agreements that that had because you can't do that, but the implication is that these people really had some understandings above and beyond the written understanding that this is valuable confidential information that I'm giving to you and you're going to pay for it. And then you look at other facts and circumstances, and they charged money

Page 107

for it and they were willing -- in addition to the person to whom it was disclosed was willing to pay money for it or pay a fee. And then they also agreed that in some circumstances, I forget which one, that if I told it to others I would pay -- pay you a substantial sum of money. So the bottom line is when I looked at all the circumstances that I had available to me, I concluded that it had the characteristics of a trade secret and then I did go to the next step.
Q. Well, except the only requirement now I'm looking at is your requirement of novelty. Do you understand that?
MS. GAVIOLI: Objection.
A. No, I didn't understand that.
Q. (BY MR. DONAHUE) That's -- right now I'm on your novelty requirement. And I believe you said as to your novelty requirement that you define that as not generally known in the industry. That's how you define it, correct?
A. Yeah.
Q. Now --
A. And all these facts I was speaking to address that point.
Q. Okay. So my question now is just limited to that requirement. And how is it that you're saying that

Page 108

because there are these confidentiality agreements, that somehow means that the COBRA strategy was not generally known in the industry?
MS. GAVIOLI: Objection. Form.
A. Well, it's -- it's indicia of the fact that it was not known in the industry. That's part of the analysis.
Q. (BY MR. DONAHUE) Previously I asked you if you were aware that there could have been some other reasons as to why, for example, Ernst & Young would want to keep confidential the COBRA tax strategy. And you said, am I correct, that you didn't inquire as to their motivations?
A. That's correct, I did not.
Q. Now, let me hand you what's been marked as Government Exhibit 2351. And while I'm doing it, I'll also hand you what's been marked as Government Exhibit 155. Have you seen either of these documents before?
A. What was your question again, please?
Q. Have you seen these documents before?
A. They don't appear on my Exhibit B, and I don't recall seeing them, so I guess probably not.
Q. Okay. Take a look, first of all, at Exhibit 2351, Bates stamp No. 900.

Page 109

A. 900?
MS. GAVIOLI: I think it's 7900.
THE WITNESS: Oh, 790.
A. Okay.
Q. (BY MR. DONAHUE) And there are some reference there to marketing issues, and if you'll take a look at the fifth triangle down, it says (as read): Use in PowerPoint. Do not leave with client.
Do you see that?
A. Yes, I do.
Q. And then take a look at Exhibit 155 and take a look at paragraph 4, and it says (as read): Present idea to client using client version of PowerPoint slides as opposed to Toolkit. Do not leave marketing materials with client under any circumstances.
Were you aware that there was this directive to E&Y marketing people not to leave the marketing materials with the client?
MS. GAVIOLI: Objection. Form.
A. Well, I have not seen these documents before, so I was not aware of that specific point.
Q. (BY MR. DONAHUE) Do you know why E&Y would be directing its sales force not to leave the PowerPoint slides with the client?
MS. GAVIOLI: Objection. Form.





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 110

A. Why --
Q. (BY MR. DONAHUE) Yes.
A. -- they wouldn't?
Q. Why wouldn't the --
A. Do I know why specifically?
Q. Yes.
A. I have no idea what was their motivation. Is that what you're asking?
Q. Yes.
A. I don't -- I don't know what E&Y's motivation would be.
Q. In the documents that you reviewed, am I correct, that you were provided, you didn't see any basis for that direction?
MS. GAVIOLI: Objection. Form.
A. Basis for their -- I don't quite understand what you mean by that.
Q. (BY MR. DONAHUE) Let me restate my question. In the documents that you reviewed, did you see any reason expressed as to why E&Y, Ernst & Young, would direct its sales force not to leave the PowerPoint slides with the client?
A. Well, in general principal I saw documents where they were attempting the best they could to maintain the confidentiality of this information. And

Page 111

one standard approach that I've even advised clients over the years you number documents. You don't hand it out. You make sure that when you go to a meeting, you get them all back. You don't have them available for free distribution. You want to -- you want to maintain the confidentiality, and that's the -- that's part of this analysis called reasonable security precautions.
So in very general terms they might be saying let's not disclose these documents to everybody, and let's control the access and the -- and the possession of these documents to maintain that adequate security. Exactly what their motivation was, I can't speak to that because I've never talked to anybody about that motivation.
Q. Well, even though you didn't talk to anyone, as I mentioned to you, there are well over a million pages of documents that have been obtained.
A. Yes.
Q. Am I correct that you didn't review any of those documents for purposes of making such a determination?
MS. GAVIOLI: Objection. Form.
A. Determine -- what -- what --
Q. (BY MR. DONAHUE) Determination --
A. When you say such determination, please tell

Page 112

me what you mean.
Q. Yeah. Making a determination as to whether or not or what was the purpose of the direction not to leave the PowerPoint slides with the client.
A. No, I did not look into that issue.
Q. If I told you that a reason for -- and I asked you to assume that a reason for that direction was to conceal the transaction from the Internal Revenue Service, would that make any difference in your opinion?
MS. GAVIOLI: Objection. Form.
A. To conceal...
Q. (BY MR. DONAHUE) The transaction from the Internal Revenue Service.
A. Well, it seems to me that -- that any -- just using general concepts or common sense, if I'm seeking a tax deduction, I would have to disclose it to the IRS to obtain that tax deduction. So I would not be concealing anything from the IRS. Isn't that right? I mean, you would know. I file a tax return and you know it. So I haven't concealed anything from you.
Q. Well, is there a difference between concealing the ultimate deduction and concealing the source of the deduction?
A. I've never thought about that possibility. There may well be, but I'm not aware of any.

Page 113

Q. At page 10 of 2398, the first bullet, you state that enhancements were added by Ernst & Young.
A. What page, please?
Q. Page 10.
A. Yes, I see that reference.
Q. And what is your basis for that conclusion?
A. I quote DOJ 5334, obviously I've seen documents that include that quote.
Q. Let me provide you with that document. I'm handing you what has been marked as Government Exhibit 2453. How did you obtain that document?
A. The only source for documents was my counsel -- well, not my counsel, but these counsel. So that -- we did not seek this in any other way, so it had to come from counsel.
Q. Did -- did counsel send this document to you initially as part of a packet of documents or did you later in your analysis say, are there any documents that may indicate as to whether E&Y provided any unique enhancements and they provided it at a later time. Do you know when you received the document?
A. I do not recall when I received this document.
Q. But do you recall if it was something you later specifically requested or it was part of the original batch of documents?





33536769-e7b1-4f38-a24d-ef5ac1ee2103

Page 114

A. My recollection is it was part of the whole package that I got. Whether it came earlier or later, I -- it may have, but I have no recollection about that.
Q. Do you know if you received all the documents at once or did they come in stages?
A. We received a big batch all at once, and then there were documents that I received after we got involved in the analysis, but exactly when this showed up, I can't tell you.
Q. Directing your attention to Exhibit 2453, do you know who Brian Vaughn is?
A. No, I do not.
Q. Where in this document are you relying on -- what in this document are you relying on for your position that there were enhancements added by E&Y?
(Sotto voce discussion.)
MR. DONOHUE: Excuse me, Counsel, please do not make any statements on the record. That is totally improper.
MS. WIRSKYE: I was just doing it in the interest of time. It's almost an exact quote, but I understand.
MR. DONOHUE: It's totally improper. And if it happens again, I will have to terminate the deposition.

Page 115

Q. (BY MR. DONAHUE) I'm sorry?
A. Well, I was just -- I had just found the word "enhancements" when you made your comments. Yeah, I quoted from this document. I was just checking to make sure that I had the proper quote. Yeah, the fee is fair based as bullet point 3 on this Document 2453.
Q. Okay. Now, are you referring to paragraph 3 where it says (as read): Our fee is fair based on consultation, the enhancements we have made to the strategy to give more business purpose to the partnership and economics for ACM compact arguments and the defense aspect.
Do you see that?
A. Yes, I do.
Q. Do you know what that means?
A. I know what some of it means.
Q. Okay. What portion of it do you know what it means?
A. Well, they're consulting with the client. They've made enhancements to the strategy to give it more business purpose to the partnership and economics for the ACM -- I don't recall what ACM is -- compact arguments, I don't know what the compact arguments -- and then the defense aspect. I assume the defense aspect means -- as I recall, E&Y agreed that they

Page 116

would -- would represent the client before the IRS if this was challenged as part of their engagement process. I don't know what ACM is. Now, it might be an acronym for something that we've talked about, but I don't recall.
Q. Specifically referring to the enhancements we have made to the strategy, what's your understanding as to the enhancements that Ernst & Young made to the strategy?
A. I couldn't describe what they are. I was relying only from my very general purposes of the fact that they added enhancements or at least they said they added enhancements. I couldn't tell you what those enhancements might be.
Q. If a client came to you and said, can we receive trade secret protection for this idea, what level of investigation would you be required to do in order to determine as to whether or not the idea was generally known in the industry?
A. What level of investigation?
Q. Yes.
A. Well, as I mentioned generally before, if the issue was patents, it would be a different approach because there is a library where you could go search for a lot of prior articles. There's no such thing in other

Page 117

non-patentable situations, such as trade secrets. So you do the best you can to get information from the client and information from your own independent resources as much as you can to test whether or not this is sufficiently confidential or in the public domain and then you would reach an opinion.
Q. All right. Would you have done anything more if a client came to you and asked, can my idea of receive trade secret protection than what you did in your preparation of your expert report here?
MS. GAVIOLI: Objection. Form.
A. More? Well, in great part I've found over the years that you have to depend quite a bit on your client and the client's representations and what he knows because he's in the industry and you're not, or he's in the area and you're not. So you -- you would probe him, ask for what documents he has, and then look at the documents he provided, and ask further questions. And then maybe he'll go get more. It all depends on how deep you're going to go.
What I was looking for here was a little different in the sense that my ultimate goal was to determine whether it had the characteristics of a trade secret so that it could be categorized as intellectual property, and that's a little different than my -- what





33536769-e7b1-4f38-a24d-ef5ac1ee2103