# In The United States Court of Federal Claims

## MURFAM FARMS, LLC

Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner

## PSM FARMS, LLC

Through Stratton K. Murphy, a Partner Other Than Tax Matters Partner

## MURPHY PORK PARTNERS, LLC

Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner

Plaintiffs

v.

## UNITED STATES OF AMERICA

Defendant

Nos. 06-245T, 06-246T, and 06-247T (Consolidated)

# Expert Report of David W. LaRue, Ph.D.

McIntire School of Commerce
University of Virginia

June 1, 2007

EXHIBIT

tabbies

3

# Table of Contents

I. Background and Qualifications ....1
II. Scope and Objectives of Report ....2
III. Introductory ....10
A. Conventions Used in This Report ....10
B. Table 1: Taxpayers, Entities, and Murphy Loss Allocations ....11
C. Table 2: Bates Reference Numbers to Partnership and S Corporation Tax Returns for 2000 ....13
D. Tables 7, 8, and 9 ....15
E. BT Alex Brown Client Statements ....15
IV. Description of the Transactions-at Issue ....15
A. Step 1: Creation of the Entities ....15
1. The Taxpayers and their Single-Member Limited Liability Companies ....15
(a) The LLCs ....15
(1) MDM Ventures, LLC ["MDM"] ....15
(2) SKM Ventures, LLC ["SKM"] ....16
(3) HDM, LLC ["HDM"] ....16
(4) WHM Ventures, LLC ["WHM"] ....16
(5) WHMJ, LLC ["WHMJ"] ....17
(6) WMC, LLC ["WMC"] ....17
(7) JMN Ventures, LLC ["JMN"] ....17
(8) ANB, LLC ["ANB"] ....18
(b) SS-4 ....18
(c) Single-Member LLC as "Disregarded Entity" ....19
(d) Table 3: Cash and Asset Flow Summary ....20
(e) Purpose and Effect of Using the LLCs in the Implementation of the COBRA Strategy ....22
(f) Opinion ....24
2. The Partnerships ....24
(a) PSM Farms, LLC ["$PSM_{LLC}$"] ....24
(1) Contributions ....26
(2) Activities ....27

(3) LLCs' Assignment of $PSM_{LLC}$ Partnership Interests to Their Respective Sole Owners ............. 28

(4) Liquidation ............. 28

(b) Murphy Pork Partners, LLC ["$MPP_{LLC}$"] ............. 29

(1) Contributions ............. 31

(2) Activities ............. 32

(3) LLCs' Assignment of $MPP_{LLC}$ Partnership Interests to Their Respective Sole Owners ............. 33

(4) Liquidation ............. 33

(c) MURFAM Farms, LLC ["$MURFAM_{LLC}$"] ............. 35

(1) Contributions ............. 37

(2) Activities ............. 37

(3) LLCs' Assignment of $MURFAM_{LLC}$ Partnership Interests to Their Respective Sole Owners ............. 38

(4) Liquidation ............. 38

3. The S Corporations ............. 40

(a) PSM, Inc. ["$PSM_{INC}$"] ............. 40

(1) Contributions ............. 42

(2) Activities ............. 43

(3) Liquidation ............. 43

(b) MP, Inc. ["$MP_{INC}$"] ............. 43

(1) Contributions ............. 45

(2) Activities ............. 46

(3) Liquidation ............. 46

(c) MURFAM, Inc. ["$MURFAM_{INC}$"] ............. 47

(1) Contributions ............. 48

(2) Activities ............. 50

(3) Liquidation ............. 50

(d) Effect of Use of S Corporation ............. 50

(1) Coplan E-Mails ............. 51

(2) Opinion ............. 52

B. Description of Transaction ............. 57

1. Step 2: April 14th /17th, 2000 Purchase (and Sale) of the Long (and Short Options) ............. 57

2. Step 3: April 17, 2000 Assignment of the Long Options and Short Options by the LLCs to the Partnerships and the Creation of the Inflated Tax Bases ........ 59

3. Step 4: Acquisition of the Investment Assets to Which the Greatly Inflated Tax Basis Amounts Would Be Assigned ........ 60

(a) Overview ........ 60

(b) The Bonds ........ 62

(c) $PSM_{LLC}$ ........ 62

(d) $MURFAM_{LLC}$ ........ 62

(e) $MPP_{LLC}$ ........ 62

4. Step 5: Assignment of Partnership Interests to the S Corporations and the Termination and Liquidation of the Partnerships ........ 63

(a) $PSM_{LLC}$ to $PSM_{INC}$ ........ 63

(b) $MPP_{LLC}$ to $MP_{INC}$ ........ 68

(c) $MURFAM_{LLC}$ to $MURFAM_{INC}$ ........ 72

5. Step 6: December 29, 2000 Sale of the COBRA Loss Assets and the Recognition of the Murphy Losses ........ 77

(a) Sale of the Bonds by $PSM_{INC}$ [the "$PSM_{INC}$ LTCL"] ........ 77

(b) Sale of the Euros by $MP_{INC}$ [the "$MP_{INC}$ Ordinary Loss"] ........ 77

(c) Sale of the Bonds by $MURFAM_{INC}$ [the "$MURFAM_{INC}$ LTCL"] ........ 78

C. Transaction-Related Fees ........ 78

1. Table 5: Summary of Legal and Accounting Fees ........ 78

2. Nondisclosure of Fees on the 2000 Returns ........ 84

(a) The E&Y Fees ........ 84

(1) The April 27th E&Y Fees ........ 84

(2) The December 21st E&Y Fees ........ 84

(3) The Coplan E-Mails ........ 85

(b) The Proskauer Rose Fees ........ 86

(4) The May 5th Fees Paid by the LLCs ........ 86

(5) The Coplan E-Mails ........ 87

D. Tables 7, 8, and 9: Derivation of Tax Basis Claimed by the S Corporations in the COBRA Loss Assets ..... 89

V. Reporting of the Transactions on the 2000 Federal Income Tax Returns ..... 97

A. PSMLLC and PSMINC ..... 97

1. $PSM_{LLC}$'s Partnership Return ..... 97

(a) Description ..... 97

(b) Opinion ..... 103

2. $PSM_{INC}$'s 2000 S Corporation Return ..... 106

(a) Description ..... 106

(b) Opinion ..... 114

B. MPPLLC and MPINC ..... 119

1. $MPP_{LLC}$'s Partnership Return ..... 119

(a) Description ..... 119

(b) Opinion ..... 126

2. $MP_{INC}$'s 2000 S Corporation Return ..... 129

(a) Description ..... 129

(b) Opinion ..... 136

C. MURFAMLLC and MURFAMINC ..... 140

1. $MURFAM_{LLC}$'s Partnership Return ..... 140

(a) Description ..... 140

(b) Opinion ..... 148

2. $MURFAM_{INC}$'s 2000 S Corporation Return ..... 151

(a) Description ..... 151

(b) Opinion ..... 160

D. Individual Form 1040s of the Taxpayers ..... 165

1. Description ..... 165

(a) Harry D. Murphy ..... 165

(b) Marc D. Murphy ..... 167

(c) Stratton D. Murphy ..... 170

(d) Wendell H. Murphy ..... 171

(e) Wendell H. Murphy, Jr. ..... 174

(f) Wendy Crumpler ..... 176

(g) Joyce M. Norman ........ 179
(h) Angela N. Brown ........ 181
2. Nondisclosure of Transaction-Related Information ........ 183
3. Opinion ........ 185
VI. Sufficiency of Combined Disclosures ........ 186
VII. Communications Relating to Disclosure of the Transactions ........ 189
VIII. Summary of Conclusions ........ 190

-----

Appendix A: Curriculum Vita
Appendix B: Depositional and Court Testimony Within Last Four Years
Appendix C: Documents Considered (or Available in Databases)

# I. Background and Qualifications

1. I am an Associate Professor of Commerce at the McIntire School of Commerce at the University of Virginia, where I teach graduate and undergraduate courses on several subjects in the fields of finance, accounting, and taxation. I hold a Bachelor of Business Administration degree (production logistics management), a Master of Science in Accountancy degree (accounting and taxation), and a Ph.D. degree (accounting, taxation, and economics (with honors)).

2. Throughout most of the last twenty-six years, I have also regularly taught continuing education courses covering a wide range of topics for each of several public accounting firms and for others. I have published a number of technical and policy articles in prominent journals, and I have prepared and presented invited testimony before the Ways and Means Committee of the U.S. House of Representatives and the Treasury Department. I have chaired or served on several committees and task forces of the American Taxation Association, the American Accounting Association, and the Federal Tax Division of the American Institute of CPAs. I currently serve as an outside director on the Board of Directors of MicroStrategy, a publicly traded corporation, and as the Chairman and "financial expert" of that firm's Audit Committee.

3. I have been recognized as an expert in accounting by the U.S. Tax Court in five cases involving accounting issues. I was also recognized as an expert in two U.S. District Court cases. Additionally, I have served as an expert in several other cases which were settled prior to trial.

4. A copy of my current Curriculum Vita is attached to this *Report* as Appendix A. It includes all of my publications, including publications within the last 10 years.

5. Appendix B includes a listing of all of the cases in which I have given depositional and trial testimony within the past 4 years.

6. Many of the documents upon which I have relied in preparing this *Report* are referenced in the footnotes that accompany the text.

- The "IRSADMIN" Bates stamped documents that are referenced in this *Report* are included in a PDF File **["Selected Murphy Documents"]** attached to this *Report*
- Appendix C includes a description of the documents that were provided to me by the U.S. Department of Justice in connection with this case

7. I am being compensated for my work on this case at $295/hour.

## II. Scope and Objectives of Report

8. I was retained by the U.S. Department of Justice to examine the documentary and testimonial evidence pertaining to the interrelated series of transactions[1] **[the "Transactions" or "Transactions-at-issue"]** that took place in 2000, and that ultimately resulted:

- **The "PSM Transaction":**
  - In the reporting of a **$24,531,884 long-term capital loss** by PSM, Inc. **["PSM$_{INC}$"]** on its 2000 Form 1120S **[the "PSM$_{INC}$ LTCL"]**,
  - In the allocation of the $24,531,884 PSM$_{INC}$ LTCL to and among PSM$_{INC}$'s three individual stockholders **[the "PSM Taxpayers"]**, and,
  - In the deduction of these PSM$_{INC}$ LTCLs by the PSM Taxpayers on their respective 2000 Form 1040s.
- **The "MP Transaction":**

---

1 See, for example, the Ernst & Young **["E&Y"]** PowerPoint presentation titled "COBRA" ("Currency Options Bring Reward Alternatives") **[the "*E&Y COBRA Presentation*"]**, which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent ... losses." Bates: 2003EY001565 through 2003EY001583, and 2003-EY004119 through 2003EY4124

See also 12/28/99 e-mail from Robert B. Coplan (E&Y) to Michael Kelley (E&Y) and others in which he describes the COBRA strategy as a "permanent loss generator" and summarizes each of the steps involved. Bates: DOJ 031656 through DOJ 031659

- In the reporting of a **$13,919,961 ordinary loss** by Murphy Pork, Inc. **["$MP_{INC}$"]** on its 2000 Form 1120S **[the "$MP_{INC}$ Ordinary Loss"]**,
- In the allocation of the $13,919,961 $MP_{INC}$ Ordinary Loss to and among $MP_{INC}$'s three individual stockholders **[the "MP Taxpayers"]**, and,
- In the deduction of these $MP_{INC}$ Ordinary Losses by the MP Taxpayers on their respective 2000 Form 1040s.

- **The "MURFAM Transaction":**
  - In the reporting of a **$61,543,012 long-term capital loss** by MURFAM, Inc. **["$MURFAM_{INC}$"]** on its 2000 Form 1120S **[the "$MURFAM_{INC}$ LTCL"]**,
  - In the allocation of the $61,543,012 $MURFAM_{INC}$ LTCL to and among $MURFAM_{INC}$'s five individual stockholders **[the "MURFAM Taxpayers"]**, and,
  - In the deduction of these $MURFAM_{INC}$ LTCLs by the MURFAM Taxpayers on their respective 2000 Form 1040s.
- These Losses will be referred to collectively as the **"Murphy Losses."**

9. I was asked to examine:

- **The PSM Transaction:** The 2000 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of PSM Farms, LLC **["$PSM_{LLC}$"]** (Form 1065), PSM, Inc. **["$PSM_{INC}$"]** (Form 1120S), and of the individual stockholders of $PSM_{INC}$ (Form 1040s) **[the "PSM Returns"]**,[2] and, based on that examination:

[2] Unless otherwise stated, references to any of these tax returns are references to the return and all of the forms, schedules, statements and attachments included with the return at the time of its filing.

- To determine whether or not any of the PSM Returns identified and/or explained the source[3] of the $PSM_{INC}$ LTCL (or, if not, to determine whether or not the information disclosed on or with the PSM Returns (either individually or collectively) otherwise provided any indication, or any reasonably discernable indication, of the source of the $PSM_{INC}$ LTCL);
- To determine whether or not, based solely on the information included on or with the PSM Returns (either individually or collectively), the IRS could have determined that the $PSM_{INC}$ LTCL was the result of the assignment of a greatly inflated tax basis[4] to the Bonds that $PSM_{INC}$ sold to produce the $PSM_{INC}$ LTCL; and
- To determine whether or not the PSM Returns (either individually or collectively) disclosed (or otherwise provided any reasonably discernable indication) that approximately $614,999 in accounting and legal fees had been incurred and paid (indirectly) by the PSM

---

3 By "source," I mean the interrelated series of transactions that culminated in $PSM_{INC}$'s acquisition of certain bonds **[the "Bonds"]** that were sold by $PSM_{INC}$ to produce the $PSM_{INC}$ LTCL, the identities and roles of the participants in those transactions, and/or the method and/or rationale applied in calculating $PSM_{INC}$'s tax basis in the Bonds and, therefore, in determining the amount of the $PSM_{INC}$ LTCL

4 The tax basis assigned by $PSM_{INC}$ to the Bonds it received as a liquidating distribution from $PSM_{LLC}$ on or about December 27, 2000 was $24,583,205 This tax basis was 481 02 times greater than the $51,000 par value of those Bonds

$PSM_{INC}$ had determined its tax basis in the Bonds by reference to the "carryover" tax bases that the $PSM_{LLC}$ partners claimed to have had in the $PSM_{LLC}$ partnership interests that they had transferred to $PSM_{INC}$ in exchange for the stock of $PSM_{INC}$

The tax bases that the $PSM_{LLC}$ partners (and then $PSM_{INC}$) claimed to have had in the $PSM_{LLC}$ partnership interests had been based on the $PSM_{LLC}$ partners' treatment of certain foreign currency options contracts **["Long Options" and "Short Options"]** that they had assigned to $PSM_{LLC}$ on or about April 17, 2000 as contributions to its capital The $PSM_{LLC}$ partners had increased their tax bases by the amount of premiums "charged" for the Long Options, but did not decrease those bases for the amount of the premiums "credited" for the related Short Options As a result, the aggregate net increase in the partners' basis in the $PSM_{LLC}$ partnership interests was $24,600,000, which was $23,862,000, or 32 33 times, greater than the $738,000 net premiums actually paid for these Options See Table 4 at p 58

$PSM_{INC}$'s basis in the Bonds was also inflated by an additional $614,999 as a result of the capitalization of Transaction-related fees paid to E&Y and to the law firm of Proskauer Rose

Taxpayers in 2000 in connection with the implementation of a strategy **[the "COBRA Strategy"]** that was designed *from the outset* to generate permanent tax losses **["COBRA Losses"]**,[5] and that did in fact generate claimed permanent tax losses of $24,531,884

- **The MP Transaction:** The 2000 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of Murphy Pork Partners, LLC **["$MPP_{LLC}$"]** (Form 1065), Murphy Pork, Inc **["$MP_{INC}$"]** (Form 1120S), and of the individual stockholders of $MP_{INC}$ (Form 1040s) **[the "MP Returns"]**,[6] and, based on that examination:
  - To determine whether or not any of the MP Returns identified and/or explained the source[7] of the $MP_{INC}$ Ordinary Loss (or, if not, to determine whether or not the information disclosed on or with the MP Returns (either individually or collectively) otherwise provided any indication, or any reasonably discernable indication, of the source of the $MP_{INC}$ Ordinary Loss);
  - To determine whether or not, based solely on the information included on or with the MP Returns (either individually or collectively), the IRS could have determined that the $MP_{INC}$ Ordinary

---

5 See, for example, the *E&Y COBRA Presentation* Bates: 2003EY001565 through 2003EY001583 Specifically, for example, "What is Cobra? Permanent ordinary/short-term capital loss strategy" (Bates: 2003EY001566) and "Currency Linked Digital Swap Example[:] Objective is to generate $50M loss" (Bates: 2003EY001579) See also 2003-EY004119 through 2003EY4124

The *pro forma* illustration that was included in that Presentation shows how, based on certain assumptions, an investment of $4,750,000 (i.e., $2,250,000 in fees and $2,500,000 in capital) could generate federal and state income tax savings of over $23 Million (by generating losses of $50 Million ($47.5 Million in excess of the capital investment), and by allowing for a miscellaneous itemized deduction of the fees). Bates: 2003EY001582

6 Unless otherwise stated, references to any of these tax returns are references to the return and all of the forms, schedules, statements and attachments included with the return at the time of its filing.

7 By "source," I mean the interrelated series of transactions that culminated in $MP_{INC}$'s acquisition of certain Euros that were sold by $MP_{INC}$ to produce the $MP_{INC}$ Ordinary Loss, the identities and roles of the participants in those transactions, and/or the method and/or rationale applied in calculating $MP_{INC}$'s tax basis in the Euros and, therefore, in determining the amount of the $MP_{INC}$ Ordinary Loss

Loss was the result of the assignment of a greatly inflated tax basis[8] to the Euros that $MP_{INC}$ sold to produce the $MP_{INC}$ Ordinary Loss; and

- To determine whether or not the MP Returns (either individually or collectively) disclosed (or otherwise provided any reasonably discernable indication) that approximately $349,999 in accounting and legal fees had been incurred and paid (indirectly) by the MP Taxpayers in 2000 in connection with the implementation of the COBRA Strategy that was designed *from the outset* to generate permanent tax losses, and that did in fact generate claimed permanent tax losses of $13,919,961.

- **The MURFAM Transaction:** The 2000 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of MURFAM Farms, LLC **["$MURFAM_{LLC}$"]** (Form 1065), MURFAM, Inc. **["$MURFAM_{INC}$"]** (Form 1120S), and of the individual

---

8 The tax basis assigned by $MP_{INC}$ to the Euros it received as a liquidating distribution from $MPP_{LLC}$ on or about December 27, 2000 was $14,230,000. This tax basis was 46.43 times greater than $MPP_{LLC}$'s $300,000 cost of those Euros.

$MP_{INC}$ had determined its tax basis in the Euros by reference to the "carryover" tax bases that the $MPP_{LLC}$ partners claimed to have had in the $MPP_{LLC}$ partnership interests that they had transferred to $MP_{INC}$ in exchange for the stock of $MP_{INC}$.

The tax bases that the $MPP_{LLC}$ partners (and then $MP_{INC}$) claimed to have had in the $MPP_{LLC}$ partnership interests had been based on the $MPP_{LLC}$ partners' treatment of certain foreign currency options contracts **["Long Options" and "Short Options"]** that they had assigned to $MPP_{LLC}$ on or about April 17, 2000 as contributions to its capital. The $MPP_{LLC}$ partners had increased their tax bases by the amount of premiums "charged" for the Long Options, but did not decrease those bases for the amount of the premiums "credited" for the related Short Options. As a result, the aggregate net increase in the partners' basis in the $MPP_{LLC}$ partnership interests was $14,000,000, which was $13,580,000, or 32.33 times, greater than the $420,000 net premiums actually paid for these Options. See Table 4 at p. 58.

$MPP_{LLC}$'s basis in the Euros was also inflated by an additional $349,999 as a result of the capitalization of Transaction-related fees paid to E&Y and to the law firm of Proskauer Rose.

stockholders of $MURFAM_{INC}$ (Form 1040s) **[the "MURFAM Returns"]**,[9] and, based on that examination:

- To determine whether or not any of the MURFAM Returns identified and/or explained the source[10] of the $MURFAM_{INC}$ LTCL (or, if not, to determine whether or not the information disclosed on or with the MURFAM Returns (either individually or collectively) otherwise provided any indication, or any reasonably discernable indication, of the source of the $MURFAM_{INC}$ LTCL);

- To determine whether or not, based solely on the information included on or with the MURFAM Returns (either individually or collectively), the IRS could have determined that the $MURFAM_{INC}$ LTCL was the result of the assignment of a greatly inflated tax basis[11] to the Bonds that $MURFAM_{INC}$ sold to produce the $MURFAM_{INC}$ LTCL, and

---

9 Unless otherwise stated, references to any of these tax returns are references to the return and all of the forms, schedules, statements and attachments included with the return at the time of its filing

10 By "source," I mean the interrelated series of transactions that culminated in $MURFAM_{INC}$'s acquisition of certain bonds **[the "Bonds"]** that were sold by $MURFAM_{INC}$ to produce the $MURFAM_{INC}$ LTCL, the identities and roles of the participants in those transactions, and/or the method and/or rationale applied in calculating $MURFAM_{INC}$'s tax basis in the Bonds and, therefore, in determining the amount of the $MURFAM_{INC}$ LTCL

11 The tax basis assigned by $MURFAM_{INC}$ to the Bonds it received as a liquidating distribution from $MURFAM_{LLC}$ on or about December 27, 2000 was $61,670,815 This tax basis was 484 60 times greater than the $127,000 par value of those Bonds.

$MURFAM_{INC}$ had determined its tax basis in the Bonds by reference to the "carryover" tax bases that the $MURFAM_{LLC}$ partners claimed to have had in the $MURFAM_{LLC}$ partnership interests that they had transferred to $MURFAM_{INC}$ in exchange for the stock of $MURFAM_{INC}$

The tax bases that the $MURFAM_{LLC}$ partners (and then $MURFAM_{INC}$) claimed to have had in the $MURFAM_{LLC}$ partnership interests had been based on the $MURFAM_{LLC}$ partners' treatment of certain foreign currency options contracts **["Long Options" and "Short Options"]** that they had assigned to $MURFAM_{LLC}$ on or about April 17, 2000 as contributions to its capital The $MURFAM_{LLC}$ partners had increased their tax bases by the amount of premiums "charged" for the Long Options, but did not decrease those bases for the amount of the premiums "credited" for the related Short Options As a result, the aggregate net increase in the partners' basis in the $MURFAM_{LLC}$ partnership interests was

- o To determine whether or not the MURFAM Returns (either individually or collectively) disclosed (or otherwise provided any reasonably discernable indication) that $1,542,500 in accounting and legal fees had been incurred and paid (indirectly) by the MURFAM Taxpayers in 2000 in connection with the implementation of the COBRA Strategy that was designed *from the outset* to generate permanent tax losses, and that did in fact generate claimed permanent tax losses of $61,543,012

10. I was also asked, based on my review of the record, to determine whether or not it would be reasonable to conclude:

- That the various elements of the PSM Transaction were divided between and reported on the various PSM Returns in a manner that was designed to reduce, minimize, or eliminate the risk of detection[12] and audit by the IRS, and/or
- That the various elements of the MP Transaction were divided between and reported on the various MP Returns in a manner that was designed to reduce, minimize, or eliminate the risk of detection and audit by the IRS, and/or
- That the various elements of the MURFAM Transaction were divided between and reported on the various MURFAM Returns in a manner that was designed to reduce, minimize, or eliminate the risk of detection and audit by the IRS

---

$61,700,000, which was $59,849,000, or 32 33 times, greater than the $1,851,000 net premiums actually paid for these Options See Table 4 at p 58

MURFAM$_{INC}$'s basis in the Bonds was also inflated by an additional $1,542,500 as a result of the capitalization of Transaction-related fees paid to E&Y and to the law firm of Proskauer Rose

12 By "detection," I refer to detection of the fact that the respective Murphy Losses ultimately resulted from the greatly inflated tax bases that the various S Corporations(i e , PSM, Inc., Murphy Pork, Inc , and MURFAM, Inc.) and their stockholders, the Taxpayers, claimed to have resulted from the contribution of the Long Options and the Short Options previously made by those stockholders, through their respective single-member LLCs, to the capital of the Partnerships (i e , PSM Farms, LLC, Murphy Pork Partners, LLC, and MURFAM Farms, LLC)

11 I was also asked, based on my review of the record, to determine whether or not it would be reasonable to conclude that the Transaction-related fees paid to Ernst & Young and to Proskauer Rose with respect to each of the Transactions-at-issue were reflected on the respective Returns in a manner that was designed to reduce, minimize, or eliminate to the risk of detection[13] and audit by the IRS.

12. The principal facts and circumstances upon which I relied in conducting my analyses and formulating my opinions are presented below and are based, in part, on information set forth in the documents referenced in the footnotes to this *Report*.

13. As of the date of this *Report*, I have received only those documents referenced in the footnotes to the text and those documents listed in Appendix C.

- If and when any additional documentation, deposition testimony, or other information becomes available to me, I will review that information and determine the impact, if any, that it may have on any of the facts, analyses, or opinions set forth in this *Report*.

- Additionally, although I have been provided with the hundreds of thousands of pages of documents and depositions described in Appendix C, the sheer volume of these materials and the limitations of "optical character recognition" and "key word search" technologies have precluded a comprehensive review and evaluation of all of these documents. If I subsequently discover any additional facts that appear to have a bearing on the facts presented in this *Report*, I will review that information and determine the impact, if any, that that information may have on any of the analyses or opinions set forth herein

---

13 By "detection," I refer to detection of the fact that very large tax and legal fees (totaling $2,507,498) were incurred and paid in connection with the Transactions that generated the various Murphy Losses that were allocated to and among the Taxpayers and then deducted by the Taxpayers on their respective Form 1040s

- Consequently, I reserve the right to amend or update this *Report*.

14 I have no personal interest or bias with respect to any of the parties involved in this litigation and my compensation is not in any way contingent upon the nature of my findings, the opinions expressed in this *Report*, or the outcome of this case

15. No one else provided any significant professional assistance to me in the preparation of this *Report*.

# III. Introductory

## A. Conventions Used in This Report

16. Except where otherwise designated, unqualified dates refer to dates occurring in 2000

17 Throughout this *Report*, I use **"the Partnership,"** or, collectively, **"the Partnerships"** to refer to PSM Farms, LLC, Murphy Pork Partners, LLC, and MURFAM Farms, LLC, each of which was classified as a partnership for federal income tax purposes I generally refer to their members as **"partners,"** or collectively, as **"the Partners,"** and the member equity interests in them as **"partnership interests,"** or collectively, as **"the Partnership Interests."**

18 Throughout this *Report*, I use **"the S Corporations"** to refer collectively to PSM, Inc , Murphy Pork, Inc., and MURFAM, Inc.

19 Throughout this *Report*, I use **"the LLCs"** to refer collectively to the single-member LLCs owned by the various individual Taxpayers. See Table 1, below.

20 In the text that follows, I have used "Step 1," Step 2," etc , to designate the component steps that made up the Transaction-at-issue These "Step" designations differ from those used in the E&Y COBRA Presentation.[14]

---

[14] *Supra* , footnote 1

## B. Table 1: Taxpayers, Entities, and Murphy Loss Allocations

21. Table 1 on the following page presents the names and tax identification numbers of the individual Taxpayers, their respective single-member LLCs, the Partnerships, and the S Corporations.

- Table 1 also shows the relative ownership interests of each of the Taxpayers (and their respective single-member LLCs) in each of the Partnerships and S Corporations, the total amounts of the $PSM_{INC}$ LTCL, the $MP_{INC}$ Ordinary Loss, and the $MURFAM_{INC}$ LTCL, and how each of these Losses were allocated between and among the individual Taxpayers Table 1 also shows the Social Security Numbers of each of the Taxpayers, and the Employer Identification Numbers of each of the LLCs, Partnerships, and S Corporations

# Table 1

| | | | The Taxpayers & Their Single-Member LLCs | | | | | | | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name and Social Security Number of Owner: | | 1<br>2 | Marc D. Murphy ["M_Murphy"] 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 | Stratton K. Murphy ["S_Murphy"] 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 | Harry D. Murphy ["H_Murphy"] 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 | Wendell H. Murphy ["W_Murphy"] 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 | Wendell H. Murphy, Jr. ["W_Murphy_Jr"] 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 | Wendy M. Crumpler ["W_Crumpler"] 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 | Joyce Murphy Norman ["J_Norman"] 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 | Angela N. Brown ["A_Brown"] 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 | |
| Single-Member LLC and Its Employer Identification Number: | | 3<br>4 | MDM Ventures, LLC ["MDM"] 56-2198337 | SKM Ventures, LLC ["SKM"] 56-2198466 | HDM, LLC ["HDM"] 56-2198334 | WHM Ventures, LLC ["WHM"] 56-2198463 | WHMJ, LLC ["WHMJ"] 56-2198332 | WMC, LLC ["WMC"] 56-2198464 | JMN Ventures, LLC ["JMN"] 56-218467 | ANB, LLC ["ANB"] 56-2198469 | |
| | | | A | B | C | D | E | F | G | H | I |
| PSM Farms, LLC | ["$PSM_{LLC}$"] EIN = 56-2198330 | 5 | 25.61% | 25.61% | 48.78% | | | | | | 100.00% |
| PSM, Inc. | ["$PSM_{Inc}$"] EIN = 56-2210818 | 6 | 25.61% | 25.61% | 48.78% | | | | | | 100.00% |
| $PSM_{Inc}$ LTCL | | 7 | ($6,282,615) | ($6,282,615) | ($11,966,653) | | | | | | ($24,531,884) |
| Murphy Pork Partners, LLC | ["$MPP_{LLC}$"] EIN = 56-2198329 | 8 | | | 14.2857% | 57.1428% | 28.5715% | | | | 100.00% |
| Murphy Pork, Inc. | ["$MP_{Inc}$"] EIN = 56-2210828 | 9 | | | 14.2857% | 57.1428% | 28.5715% | | | | 100.00% |
| $MP_{Inc}$ Ordinary Loss | | 10 | | | ($1,988,564) | ($7,954,255) | ($3,977,142) | | | | ($13,919,961) |
| MURFAM Farms, LLC | ["$MURFAM_{LLC}$"] EIN = 56-2198459 | 11 | | | | 42.79% | 28.04% | 8.59% | 15.72% | 4.86% | 100.00% |
| MURFAM, Inc. | ["$MURFAM_{Inc}$"] EIN = 56-2210840 | 12 | | | | 42.79% | 28.04% | 8.59% | 15.72% | 4.86% | 100.00% |
| $MURFAM_{Inc}$ LTCL | | 13 | | | | ($26,334,255) | ($17,256,661) | ($5,286,545) | ($9,674,561) | ($2,990,990) | ($61,543,012) |

### C. Table 2: Bates Reference Numbers to Partnership and S Corporation Tax Returns for 2000

22. Table 2 on the following page lists the Bates numbers of the copies of the *Alex Brown Client Statements* and the Partnerships' and the S Corporations' Form SS-4s and 2000 Tax Returns that I refer to throughout this *Report*.

# Table 2

| | | DB Alex.Brown Client Statements | Form SS-4 | 2000 Federal Income Tax Return | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Income Tax Return | Schedule B | Schedule K | Schedules L, M-1, & M-2 | Schedule D | Form 4797 | Member/ Shareholder Summary | Schedule K-1s | Section 351 Statement |
| | | A | B | C | D | E | F | G | H | I | J | K |
| PSM Farms, LLC ["PSM$_{LLC}$"] | 1 | Acct. 222-10825 — IRSADMIN000819 through IRSADMIN000859 | MUCO00212 | IRSADMIN000739 to IRSADMIN000767 | IRSADMIN000751 | IRSADMIN000752 | IRSADMIN000753 | IRSADMIN000754 and IRSADMIN000755 | IRSADMIN000756 and IRSADMIN000759 (Stmt 2) | IRSADMIN000760 | IRSADMIN000761 through IRSADMIN000767 | |
| PSM, Inc. ["PSM$_{Inc}$"] | 2 | Acct. 222-11894 — IRSADMIN000156 through IRSADMIN000160 | MUEY00592 | IRSADMIN000005 to IRSADMIN000027 | IRSADMIN000006 | IRSADMIN000008 and IRSADMIN000009 | IRSADMIN000010 | IRSADMIN000011 and IRSADMIN000014 (Stmt 3) | None | IRSADMIN000015 | IRSADMIN000016 through IRSADMIN000027 | None |
| Murphy Pork Partners, LLC ["MPP$_{LLC}$"] | 3 | Acct. 222-10826 — IRSADMIN000438 through IRSADMIN000473 and MUDB00121 through MUDB00124 | MUCO00214 | IRSADMIN000316 to IRSADMIN000349 | IRSADMIN000332 | IRSADMIN000333 | IRSADMIN000334 | IRSADMIN000335 and IRSADMIN000336 | IRSADMIN000337 and IRSADMIN000340 (Stmt 2) | IRSADMIN000341 | IRSADMIN000342 through IRSADMIN000349 | |
| Murphy Pork, Inc. ["MP$_{Inc}$"] | 4 | Acct. 222-11895 — MUDB00032 through MUDB00036 and IRSADMIN002736 through IRSADMIN002741 | MUEY00594 | IRSADMIN002637 to IRSADMIN002657 | IRSADMIN002640 | IRSADMIN002640 and IRSADMIN002641 | IRSADMIN002642 | None | IRSADMIN002643 and IRSADMIN002647 (Stmt 3) | IRSADMIN002648 | IRSADMIN002649 through IRSADMIN002657 | None |
| MURFAM Farms, LLC ["MURFAM$_{LLC}$"] | 5 | Acct. 222-10824 — IRSADMIN001459 through IRSADMIN001503 | MUCO00194 | IRSADMIN002001 to IRSADMIN002241 | IRSADMIN002217 | IRSADMIN002218 | IRSADMIN002219 | IRSADMIN002220 and IRSADMIN002221 | IRSADMIN002222 and IRSADMIN002225 (Stmt 2) | IRSADMIN002226 | IRSADMIN002232 through IRSADMIN002241 | |
| MURFAM, Inc. ["MURFAM$_{Inc}$"] | 6 | Acct. 222-11893 — IRSADMIN001822 through IRSADMIN001827 | MUEY00593 | IRSADMIN002419 to IRSADMIN002448 | IRSADMIN002420 | IRSADMIN002420 and IRSADMIN002421 | IRSADMIN002422 | IRSADMIN002423 and IRSADMIN002427 (Stmt 2) | None | IRSADMIN002428 | IRSADMIN002429 through IRSADMIN002446 | None |

### D. Tables 7, 8, and 9

23 Tables 7, 8, and 9 are referenced throughout this *Report*. The manner in which the amounts presented in these Tables is discussed at ¶199, *et seq*.

- Table 7: "Derivation of Tax Basis Claimed by $PSM_{INC}$ in the Bonds" is presented at page 94.
- Table 8: "Derivation of Tax Basis Claimed by $MP_{INC}$ in the Euros" is presented at page 95.
- Table 9: "Derivation of Tax Basis Claimed by $MURFAM_{INC}$ in the Bonds" is presented at page 96.

### E. BT Alex Brown Client Statements

24. In the "BT Alex Brown Client Statements" **[*"Alex Brown Client Statements"* or "Alex Brown"]** referred to below, the frequent use of "A/O" (followed by a date) appears to have been an abbreviation for "as of" the specified date, which was, in all cases referenced in this Report, a date prior to the date the amount or transaction was posted.

## IV. Description of the Transactions-at Issue

### A. Step 1: Creation of the Entities

#### 1. The Taxpayers and their Single-Member Limited Liability Companies

##### (a) The LLCs

##### (1) MDM Ventures, LLC ["MDM"]

25. MDM Ventures, LLC **["MDM"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Mr. Marc D. Murphy **["M_Murphy"]** as its sole member.[15] The mailing address for MDM was 4134 U.S. Highway # 117, Rose Hill, NC 28458.[16]

---

[15] Bates: IRSADMIN000929 to IRSADMIN000930, and MUEY02373 to MUEY02375

[16] Bates: IRSADMIN000763.

26 MDM was classified as a "disregarded entity" for federal income tax purposes.[17]

(2) **SKM Ventures, LLC ["SKM"]**

27. SKM Ventures, LLC **["SKM"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Mr. Stratton K. Murphy **["S_Murphy"]** as its sole member.[18] The mailing address for SKM was 4134 U S Highway # 117, Rose Hill, NC 28458.[19]

28 SKM was classified as a "disregarded entity" for federal income tax purposes.[20]

(3) **HDM, LLC ["HDM"]**

29. HDM, LLC **["HDM"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Mr. Harry D. Murphy **["H_Murphy"]** as its sole member.[21] The mailing address for HDM was 4134 U.S. Highway # 117, Rose Hill, NC 28458.[22]

30 HDM was classified as a "disregarded entity" for federal income tax purposes.[23]

(4) **WHM Ventures, LLC ["WHM"]**

31. WHM Ventures, LLC **["WHM"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Mr. Wendell H. Murphy **["W_Murphy"]** as its sole member.[24] The

---

17 See ¶43

18 Bates: IRSADMIN000931 to IRSADMIN000932, and MUEY02320 to MUEY02322

19 Bates: IRSADMIN000766

20 See ¶43

21 Bates: IRSADMIN000927 to IRSADMIN000928, and MUEY02347 to MUEY02349

22 Bates: IRSADMIN000761

23 See ¶43

24 Bates: MPR000069 and MPR000070. and MUEY02441 to MUEY02443

mailing address for WHM was 4134 U S. Highway # 117, Rose Hill, NC 28458 [25]

32 WHM was classified as a "disregarded entity" for federal income tax purposes.[26]

(5) **WHMJ, LLC ["WHMJ"]**

33. WHMJ, LLC **["WHMJ"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Mr Wendell H. Murphy, Jr. **["W_Murphy_Jr"]** as its sole member.[27] The mailing address for WHMJ was 4134 U.S. Highway # 117, Rose Hill, NC 28458 [28]

34 WHMJ was classified as a "disregarded entity" for federal income tax purposes.[29]

(6) **WMC, LLC ["WMC"]**

35. WMC, LLC **["WMC"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Ms. Wendy M Crumpler **["W_Crumpler"]** as its sole member [30] The mailing address for WMC was 4134 U.S Highway # 117, Rose Hill, NC 28458 [31]

36. WMC was classified as a "disregarded entity" for federal income tax purposes [32]

(7) **JMN Ventures, LLC ["JMN"]**

37 JMN Ventures, LLC **["JMN"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Ms

25 Bates: IRSADMIN002234

26 See ¶43

27 Bates: MPR000065 and MPR000066

28 Bates: IRSADMIN002236.

29 See ¶43

30 Bates: IRSADMIN001602, and MUEY02270 to MUEY02272

31 Bates: IRSADMIN002232

32 See ¶43

Joyce M Norman **["J_Norman"]** as its sole member.[33] The mailing address for JMN was 4134 U S. Highway # 117, Rose Hill, NC 28458.[34]

38 JMN was classified as a "disregarded entity" for federal income tax purposes.[35]

### (8) ANB, LLC ["ANB"]

39. ANB, LLC **["ANB"]** was a single-member limited liability company formed on April 6, 2000 under the laws of the State of Delaware by Ms Angela N Brown **["A_Brown"]** as its sole member.[36] The address listed for ANB address on its/her Schedule K-1 of $MURFAM_{LLC}$'s 2000 Form 1065 was 152 River Ridge, Wallace NC 28466.[37] The address listed on ANB's Form SS-4 was 4134 U.S. Highway # 117, Rose Hill, NC 28458.[38]

40. ANB was classified as a "disregarded entity" for federal income tax purposes.[39]

### (b) SS-4

41. Each of these single-member LLCs filed a Form SS-4 ("Application for Employer Identification Number"), dated June 5, 2000 and signed by Brewer M. Ezzell, CPA (as "LLC Assistant Manager."[40]

- On Line 13 of Form SS-4, each of these LLCs represented that it did not expect to have any employees during the succeeding 12-month period
- The Employer Identification Number **["EIN"]** assigned to the LLCs differed from the Social Security Numbers of their respective owners.[41]

---

33 Bates: IRSADMIN001601
34 Bates: IRSADMIN002238
35 See ¶43
36 Bates: MPR000061 and MPR000062
37 Bates: IRSADMIN002240
38 Bates: MUCO00196.
39 See ¶43
40 Bates: MUCO00195 through MUCO00210.

42. It does not appear that any of these disregarded, single-member LLCs were required to file a Form SS-4 or to obtain an EIN [42]

### (c) Single-Member LLC as "Disregarded Entity"

43. An LLC that is classified as a "disregarded entity" is disregarded for the purpose of filing a federal income tax return

- If the only member of an LLC is an individual, the LLC's income and expenses are reported directly on the Form 1040 of the owner [43]
- Except as otherwise provided, an LLC that is classified as a "disregarded entity" is disregarded for all "federal tax purposes." [44]
- Form 1065 ("U.S. Partnership Return of Income") requires the disclosure of the names, addresses, and tax identification numbers, etc. of each of the partnership's partners. [45]
  - It would appear that where a partner is a disregarded single-member LLC, the single-member owner of that LLC, and not the LLC itself, must be identified and disclosed as the partner [46]

---

[41] See Table 1, Rows 1 through 4

[42] *Instructions for Form SS-4 (Rev. February 1998)*, at p. 2 ("Who Must File")
See also *Instructions for Form SS-4 (Rev. December 2001)*, page 4:

> A single-member domestic LLC that accepts the default classification [i.e., to be classified as a disregarded entity] *does not need an EIN* and generally *should not file Form SS-4*. Generally, *the LLC should use the name and EIN of its owner for all federal tax purposes*. [Emphasis supplied.]

[43] Treasury Reg. Secs. 301.7701-2(a) and -3(a) (generally effective on and after January 1, 1997)

[44] Treasury Reg. Sec. 301.7701-2(c) and -2(c)(2)(i) (generally effective on and after January 1, 1997): "For federal tax purposes ... [a] business entity that has a single owner and is not a corporation ... is disregarded as an entity separate from its owner."

[45] See Schedule K-1 ("Partner's Share of Income, Credits, Deductions, etc.")

[46] See also e-mail from Robert Coplan (E&Y) to Amy Keating (E&Y) (dated February 19, 2000) in which Coplan states, in part:

> Here are my responses to your attached questions, but I look forward to seeing Donna's
>
> 1) I don't have a copy of the proforma return, and will have to look at a 1065 when in the office

### (d) Table 3: Cash and Asset Flow Summary

44. In early April, 2000, separate accounts were established for each of the LLCs at DB Alex. Brown. The following Table 3 summarizes the activity reported on the Alex Brown Client Statements for each account from April 1 through December 31

---

> 2) I would have expected that the partners would be listed as the individuals on the returns and would not reference the LLCs I will be interested to see what Donna says about this
>
> [Bates DOJ-000196 ]

"Donna" is Donna Guerin (J&G) and the "returns" are the partnership Form 1065s See also "WNK Tax Return Review Notes" (Amy Keating) attached to a 2/19/00 e-mail from Amy Keating to Donna Guerin and Robert Coplan, which states, in part:

> 2 I can't find any instruction supporting the treatment on the 1065, form k-1, with respect to the type of entity the partner is classified as. Specifically, do you want to see the individual's name, ss# and individual classification on the top of the k-1 As an alternative, we can put the llc name, ein and then what would you put as the entity classification type on line b? Since a single-member llc is a disregarded entity for federal purposes, my logic goes to the first option, but I'd like some clarification
>
> [Bates: DOJ-000196 through DOJ-000198 ]

I have been unable to locate a response from Donna Guerin that explains why the partnership returns were to list the disregarded single-member LLCs, rather than the single-member owners of the LLCs, as the partners However, one *effect* of identifying the LLC, rather than its single-member owner, as the partner would be to prevent someone reviewing the partnership's Form 1065 from readily identifying the single-member owner on whose Form 1040 the greatly inflated tax basis amount (*supra* , footnotes 3 through 11) was ultimately deducted as an unidentified component of the COBRA Losses allocated to that owner

# Table 3

| Date | Description | | | # | MDM 222-10822 | SKM 222-10823 | HDM 222-10821 | WHM 222-10817 | WHMJ 222-10818 | WMC 222-10816 | JMN 222-10819 | ANB 222-10820 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | The LLCs & Alex Brown Account Numbers | | | | | | | | |
| | | | | | A | B | C | D | E | F | G | H | I |
| | Balance at March 31 | | | 1 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| April 12 | Initial Cash Contribution | | | 2 | $459,700 | $459,700 | $1,025,600 | $2,526,500 | $1,562,500 | $386,800 | $707,800 | $218,900 | $7,347,500 |
| April 19 | Payment of Net Premium(s) for Currency Options | Euro | | 3 | n/a | n/a | [illegible] | ($1,012,000) | n/a | [illegible] | n/a | n/a | ($1,551,000) |
| | | CHF | | 4 | [illegible] | [illegible] | ($368,000) | n/a | [illegible] | n/a | [illegible] | ($90,000) | ($1,458,000) |
| April 26 | Payment of E&Y Fee | | | 5 | [illegible] | ($175,000) | ($280,000) | ($684,000) | [illegible] | [illegible] | [illegible] | ($60,000) | ($2,306,000) |
| | Funds Wire | | | 6 | ($10) | [illegible] | ($10) | ($10) | [illegible] | [illegible] | [illegible] | ($10) | ($80) |
| May 16-17 | Transfer of Options | To $PSM_{LLC}$ | | 7 | CHF | CHF | EUR | n/a | n/a | n/a | n/a | n/a | |
| | | To $MPP_{LLC}$ | | 8 | n/a | n/a | CHF | EUR | CHF | n/a | n/a | n/a | |
| | | To $MURFAM_{LLC}$ | | 9 | n/a | n/a | n/a | EUR | CHF | EUR | CHF | CHF | |
| May 17 | Payment of PR Fee | | | 10 | [illegible] | [illegible] | ($28,100) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | ($200,000) |
| | Funds Wire | | | 11 | ($10) | ($10) | ($10) | [illegible] | [illegible] | [illegible] | [illegible] | ($10) | ($80) |
| May 19 | Transfer of Cash | To $PSM_{LLC}$ | | 12 | [illegible] | [illegible] | ($253,700) | n/a | n/a | n/a | n/a | n/a | ($526,705) |
| | | To $MPP_{LLC}$ | | 13 | n/a | n/a | [illegible] | [illegible] | [illegible] | n/a | n/a | n/a | ($390,417) |
| | | To $MURFAM_{LLC}$ | | 14 | n/a | n/a | n/a | ($567,970) | [illegible] | [illegible] | [illegible] | ($63,000) | ($1,317,252) |
| Early November | Receipt of Bonds from LLC Owner (at Par) | | | 15 | $13,000 | $13,000 | $25,000 | $54,000 | $35,000 | $11,000 | $20,000 | $7,000 | $178,000 |
| On or About December 5 | Transfer of Bonds (at Par) | To $PSM_{LLC}$ | | 16 | [illegible] | [illegible] | ($25,000) | n/a | n/a | n/a | n/a | n/a | ($51,000) |
| | | To $MPP_{LLC}$ | | 17 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | |
| | | To $MURFAM_{LLC}$ | | 18 | n/a | n/a | n/a | [illegible] | [illegible] | [illegible] | [illegible] | ($7,000) | ($127,000) |
| | Income Earned in 2000 | | | 19 | $816 | $816 | $1,829 | $4,520 | $2,791 | $687 | $1,256 | $389 | $13,104 |
| | Reported Balance as of December 31 | | | 20 | $439 | $439 | $987 | $2,444 | $1,508 | $369 | $676 | $209 | $7,071 |
| | Calculated Balance as of December 31 | | | 21 | [illegible] | [illegible] | $987 | $2,444 | [illegible] | [illegible] | [illegible] | [illegible] | $7,071 |
| | Bates References | | | 22 | IRSADMIN000974 through IRSADMIN001004 | IRSADMIN001005 through IRSADMIN001035 | IRSADMIN000942 through IRSADMIN000973 | IRSADMIN000541 through IRSADMIN000573 | IRSADMIN000574 through IRSADMIN000606 | IRSADMIN001718 through IRSADMIN001748 | IRSADMIN001688 through IRSADMIN001717 | IRSADMIN001749 through IRSADMIN001779 | |

45. The total combined amount of cash contributed to the LLCs by their owners in 2000 was $7,347,500. (Table 3, Column I, Row 2.)

46. The total combined par value of the Bonds contributed to the LLCs by their owners in 2000 was $178,000. (Table 3, Column I, Row 15.)

47. The total combined amount of income that was earned during 2000 in all of these accounts combined was $13,104. (Table 3, Column I, Row 19.)

48. The total combined account balances as of December 31, 2000 was $7,071. (Table 3, Column I, Row 20.)

### (e) Purpose and Effect of Using the LLCs in the Implementation of the COBRA Strategy

49. As far as I can determine from the documents that I have reviewed, the only activities that the LLCs respectively engaged in were:

- The receipt of cash from their respective owners (Table 3, Row 2),
- The purchase (and sale) of the Long (and Short Options) (Table 3, Rows 3 and 4),
- The payment of Transaction-related fees to E&Y and to Proskauer Rose (Table 3, Rows 5 & 6 and 10 & 11),
- The transfer of cash and the assignment of the Long and Short Options to $PSM_{LLC}$, $MPP_{LLC}$, and/or $MURFAM_{LLC}$, in exchange for a partnership interest or as a contribution to capital (Table 3, Rows 7 through 9 and 12 through 14),
- The receipt of the Bonds and the respective transfers of those Bonds to $PSM_{LLC}$ or to $MURFAM_{LLC}$ (Table 3, Rows 15 through 18),and, finally,
- The respective assignments of the membership interests in $PSM_{LLC}$, $MPP_{LLC}$, and/or $MURFAM_{LLC}$ to (or back to) their respective owners for transfer by those owners to $PSM_{INC}$, $MP_{INC}$, and/or $MURFAM_{INC}$

50. It does not appear from the documents I have reviewed that the LLCs ever engaged in any business activities or, aside from temporary investments in

a tax-exempt "Cash Reserve Fund" that yielded a total combined income of $13,104 in 2000 (Table 3, Row 19), in any other investment activities or transactions.

- As far as I can determine, none of the LLCs had any employees or paid any salaries

51. As noted in Part V., below, each of the Partnerships identified the LLCs, and not individual sole owners of the LLCs, as its partners on the "Partner Summar[ies]" and on the Schedule K-1s that each of the Partnerships filed with its 2000 Form 1065

- As previously observed, disregarded single-member LLCs are to be disregarded for federal tax purposes.
- Each of these Schedule K-1s filed by each of the Partnerships described the LLC-partner as a domestic "LIMITED LIAB CO"
- None of these Schedule K-1s or the Form 1065s identified or otherwise described any of the LLC-partners as a single-member LLC or as a "disregarded" entity
- Other than the signatures of "Harry D Murphy" ($PSM_{LLC}$) and "Wendell Murphy" ($MPP_{LLC}$ and $MURFAM_{LLC}$),[47] neither the names nor the Social Security Numbers of any of the individual sole owners of the LLCs (i e., the Taxpayers) appeared anywhere on any of the Partnerships' 2000 Form 1065s.
- As noted below, the "Limited Liability Company Agreement[s] . " of each of the Partnerships designated the individual sole owners of the LLCs, and not the LLCs themselves, as its partners There was no mention of any of the LLCs anywhere in any of these Agreements.

[47] These signatures were legible, but they were not accompanied by typed or printed name of the signatory or by the signatory's Social Security Number

#### (f) Opinion

52 In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS might have been minimized or significantly reduced through (1) the use of the LLCs to acquire and hold the Partnership Interests, (2) the assignment of entity names to the LLCs that did not include the full names or surnames of their single-member owners, (3) the procurement of EINs for each of the LLCs,[48] and (4) the identification of the LLCs (by name and EIN), and not the Taxpayers (by name or by SSN), as the partners of the Partnerships on the Partnerships' 2000 Form 1065s

53. In my opinion, it would be reasonable to conclude that one of the purposes, perhaps the principal purpose, for the creation and use of the LLCs in connection with the implementation of the COBRA Strategy was to minimize or reduce the risk of detection and audit by reducing the possibility that the IRS might trace the ownership of the Partnerships *from* the Partnerships' 2000 Form 1065s *to* the 2000 Form 1040s of their ultimate Partners (i e., the Taxpayers, on whose 2000 Form 1040s the various Murphy Losses were deducted).[49]

### 2. The Partnerships

#### (a) PSM Farms, LLC ["$PSM_{LLC}$"]

54 PSM Farms, LLC **["$PSM_{LLC}$"]** was a limited liability company formed on or about April 4, 2000 under the laws of the State of Delaware [50]

---

48 *Supra* , footnote 42

49 Since, other than the signatures of H_Murphy ($PSM_{LLC}$) and Wendell Murphy ($MPP_{LLC}$ and $MURFAM_{LLC}$), neither the names nor the SSNs of any of the sole individual owners of the LLC-partners appeared anywhere on any of the Partnerships' 2000 Form 1065s, someone examining one of these partnership returns would presumably have had to gain access to the LLC-partners' Form SS-4s (or to the information included on them) to be able to identify the ultimate taxpaying entities (i e., the Taxpayers), and would presumably have had to take the time and trouble to do so

50 Bates: MUPR00523 & MUPR00524. The "Certificate of Formation" was dated April 4, 2000, whereas the "Limited Liability Company Agreement of PSM Farms, LLC" was dated April 10, 2000 Bates: IRSADMIN000802 through IRSADMIN000809 The April 10th date was used on $PSM_{LLC}$'s 2000 Form 1065 as

- According to PSM$_{LLC}$'s 2000 Form 1065 (page 1) and its *Alex Brown Client Statements*, PSM$_{LLC}$ terminated, dissolved, and liquidated on December 27, 2000 [51]

55. In the "Limited Liability Company Agreement of PSM Farms, LLC":[52]

- H_Murphy, M_Murphy, and S_Murphy, and not their respective LLCs, were listed as the members of PSM$_{LLC}$.
  - On PSM$_{LLC}$'s 2000 Form 1065, HDM, SKM, and MDM, and not H_Murphy, M_Murphy, and S_Murphy, were listed as PSM$_{LLC}$'s partners
  - I have been unable to find any documents that transferred, assigned, or otherwise conveyed the PSM$_{LLC}$ partnership interests to the LLCs.[53]
- "Schedule"/"Exhibit" A was to "set out . . [a]ny contributions, in cash or other property, made by the Members to the Company . . ." However, the spaces provided in Exhibit A for "Capital Contribution" were all blank.

---

the first day of its first taxable year and as the business start date Bates: IRSADMIN000739

51 However, the 12/27/00 posting on the Alex Brown Client Statement shows the liquidating distributions to PSM$_{INC}$ (of cash and Bonds) to be "AS OF 12/26/00." Bates: IRSADMIN000857 and IRSADMIN000858

As noted later in this *Report*, H_Murphy, M_Murphy, and S_Murphy each appear to have assigned their PSM$_{LLC}$ partnership interests to PSM$_{INC}$ as of an unspecified date in August, 2000

52 Bates: IRSADMIN000802 through IRSADMIN000809 Note that this signed copy of the Agreement was apparently provided to the IRS by PSM$_{LLC}$ in response to the IRS's request for a copy of the Partnership Agreement

53 Section 3 2 of the PSM$_{LLC}$ LLC Agreement states, in part, that "No member shall have the right to transfer, sell, assign, pledge to hypothecate its interest in the Company without the consent of the other Members, which consent may be withheld in each other Members sole discretion." Bates: IRSADMIN000805

Section 6 1 of that Agreement states that "This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members." Bates: IRSADMIN000806

- I have been unable to find any copy of this document or any other document that sets forth the amounts of these "Capital Contribution[s]."

- Exhibit B disclosed "Distribution Percentages" of "33a%" for each of $PSM_{LLC}$'s three individual members
  - However, $PSM_{LLC}$'s 2000 Form 1065 listed HDM as a 48.78% partner, SKM as a 25.61% partner, and MDM as 25.61% partner
  - I have been unable to find any copy of this Agreement (or any modification to this Agreement) that reflects the ownership percentages reported on $PSM_{LLC}$'s 2000 Form 1065

56. $PSM_{LLC}$ was classified as a "partnership" for federal income tax purposes.[54]

57. The mailing address of $PSM_{LLC}$ was C/O Murphy Farms, 4134 U.S. Highway # 117, Rose Hill, NC 28458.[55]

58. $PSM_{LLC}$'s Form SS-4 and its Form 1065 identified a principal activity of "INVESTMENTS."[56]

59. On Line 13 of Form SS-4, $PSM_{LLC}$ represented that it did not expect to have any employees during the succeeding 12-month period.

60. The business code on Line C of page 1 of its Form 1065 was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice")[57]).[58]

### (1) Contributions

61. On May 16-17, $PSM_{LLC}$ received a contribution of the HDM Options, the MDM Options, and the SKM Options.[59] (Table 3, Row 7; Table 7, Rows 2 through 4.)

---

[54] Bates: MUCO00212 and IRSADMIN000739

[55] Bates: IRSADMIN000739

[56] Bates: MUCO00212 and IRSADMIN000739

[57] *Instructions for Form 1065* (2000), p. 33

[58] Bates: IRSADMIN000739

62 On May 19, $PSM_{LLC}$ received cash contributions from HDM, MDM, and SKM totaling $520,705 (Table 3, Row 12, Table 7, Row 1.)

63. On December 5, $PSM_{LLC}$ received Bonds having a total par value of $51,000) (Table 3, Row 16; Table 7, Row 9.)

(2) **Activities**

64. **Expiration of the Options:**

- On June 13, 2000, $PSM_{LLC}$'s Long and Short Option positions terminated in accordance with their terms. The Options expired "out of the money" and were therefore not exercised.
- As a result, $PSM_{LLC}$ recognized and reported a total net ordinary loss of $738,000 on its Form 4797 (Table 7, Row 5.)

65 **Purchase and Sale of Short-Term Investments:**[60]

- On May 22, 2000, $PSM_{LLC}$ purchased the stock of eight different corporations and then sold that stock three weeks later on June 14, 2000
- On July 31, 2000, $PSM_{LLC}$ purchased the stock of seven different corporations and then sold that stock eight days later on August 7, 2000
- The total net short-term capital gain $PSM_{LLC}$ recognized and reported from the purchase and sale of these stock investments was $11,560. (Table 7, Row 8.)

66. **Investment Income:** On its 2000 Form 1065, $PSM_{LLC}$ reported earnings of $60 in dividends and $9,836 in tax exempt interest income

67 **Payment of Transaction-related legal fees:** On October 2, 2000, $PSM_{LLC}$ wired $55,205 (including a $10 wire fee) to Proskauer Rose in payment of an invoices dated September 14 for Transaction-related legal services

---

[59] Bates: IRSADMIN000860 through IRSADMIN000868

[60] See Schedule D of $PSM_{LLC}$'s 2000 Form 1065.

### (3) LLCs' Assignment of $PSM_{LLC}$ Partnership Interests to Their Respective Sole Owners

68. Each of the LLC-partners (HDM, MDM, and SKM) assigned its $PSM_{LLC}$ partnership interest to its sole member (H_Murphy, M_Murphy, and S_Murphy).[61]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[62]

### (4) Liquidation

69. H_Murphy, M_Murphy, and S_Murphy each assigned his interest in $PSM_{LLC}$ to $PSM_{INC}$ "in exchange for stock" of $PSM_{INC}$.[63]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[64]
- It is my understanding that an assignment of 100% of the partnership interests in $PSM_{LLC}$ to $PSM_{INC}$ for $PSM_{INC}$ stock would have resulted in an immediate "termination" of $PSM_{LLC}$ for federal income tax purposes.[65]
- Although these assignments of the $PSM_{LLC}$ partnership interests to $PSM_{INC}$ were dated "as of the __th day of August, 2000," the $PSM_{LLC}$'s *Alex Brown Client Statements* do not record any distributions from $PSM_{LLC}$ to $PSM_{INC}$ until December 27, 2000 (but "AS OF 12/26/00").

---

61 Bates IRSADMIN001099 through IRSADMIN001103, and MUEY00969 & MUEY00970

62 I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

63 Bates IRSADMIN001114 through IRSADMIN001119 I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

64 I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

65 Section 708(b)(1)(B)

- $PSM_{LLC}$ filed a short-year Form 1065 for 2000 for the period beginning "04/10, 2000 and ending 12/27/2000 "[66]

70. On December 27, 2000 (but "AS OF 12/26/00"), $PSM_{LLC}$ made liquidating distributions of $485,339 in cash and Bonds (par value of $51,000) to $PSM_{INC}$ An additional distribution of $1,616.25 in cash was made by $PSM_{LLC}$ to $PSM_{INC}$ on December 29.

71. As far as I can determine from the documents that I have reviewed, the only activities that $PSM_{LLC}$ engaged in during the less-than-nine-month period of its existence are those described above.

- It does not appear that $PSM_{LLC}$ ever engaged in any business activities or, aside from temporary investments described above, in any other investment activities or transactions.

- As far as I can determine, $PSM_{LLC}$ had no employees and paid no salaries.

72. The termination and liquidation of $PSM_{LLC}$ before the end of 2000 was preordained as of the date of its formation and was essential to the generation of the permanent $PSM_{INC}$ LTCL claimed by $PSM_{INC}$ and by H_Murphy, M_Murphy, and S_Murphy on their respective 2000 Form 1040s [67]

### (b) Murphy Pork Partners, LLC ["$MPP_{LLC}$"]

73. Murphy Pork Partners, LLC **["$MPP_{LLC}$"]** was a limited liability company formed on or about April 4, 2000 under the laws of the State of Delaware [68]

---

[66] Bates: IRSADMIN000739

[67] See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent losses " Bates: 2003EY001565 through 2003EY001583, and 2003EY004119 through 2003EY004123 See also *supra* , footnote 4, which summarizes the sequence of events that generated the $PSM_{INC}$ LTCL

[68] Bates: MUPR00519 & MUPR00520 The "Certificate of Formation" was dated April 4, 2000, whereas the "Limited Liability Company Agreement of Murphy Pork Partners, LLC" was dated April 10, 2000 Bates: IRSADMIN000422 through IRSADMIN000428 The April 10th date was used on $MPP_{LLC}$'s 2000 Form 1065 as

- According to $MPP_{LLC}$'s 2000 Form 1065 (page 1) and its *Alex Brown Client Statements*, $MPP_{LLC}$ terminated, dissolved, and liquidated on December 27, 2000.[69]

74 In the "Limited Liability Company Agreement of Murphy Pork Partners, LLC":[70]

- H_Murphy, W_Murphy, and W_Murphy_Jr, and not their respective LLCs, were listed as the members of $MPP_{LLC}$.
  - On $MPP_{LLC}$'s 2000 Form 1065, HDM, WHM, and WHMJ, and not H_Murphy, W_Murphy, and W_Murphy_Jr, were listed as $MPP_{LLC}$'s partners
  - I have been unable to find any documents that transferred, assigned, or otherwise conveyed the $MPP_{LLC}$ partnership interests to the LLCs.[71]
- "Schedule"/"Exhibit" A was to "set out . . . [a]ny contributions, in cash or other property, made by the Members to the Company . . ." However, the spaces provided in Exhibit A for "Capital Contribution" were all blank.

---

the first day of its first taxable year and as the business start date Bates: IRSADMIN000318

69 However, the 12/27/00 postings on the *Alex Brown Client Statements* show the liquidating distributions to $MP_{INC}$ (of cash and Euros) to be "AS OF 12/26/00." Bates: IRSADMIN000472 (US$) and MUDB00123(€)

As noted later in this *Report*, H_Murphy, M_Murphy, and S_Murphy each appear to have assigned their $MPP_{LLC}$ partnership interests to $MP_{INC}$ as of an unspecified date in August, 2000

70 Bates: IRSADMIN000421 through IRSADMIN000428 Note that this signed copy of the Agreement was apparently provided to the IRS by $MPP_{LLC}$ in response to the IRS's request for a copy of the Partnership Agreement

71 Section 3 2 of the $MPP_{LLC}$ LLC Agreement states, in part, that "No member shall have the right to transfer, sell, assign, pledge to hypothecate its interest in the Company without the consent of the other Members, which consent may be withheld in each other Members sole discretion." Bates: IRSADMIN000424

Section 6 1 of that Agreement states that "This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members." Bates: IRSADMIN000425

- I have been unable to find any copy of this document or any other document that sets forth the amounts of these "Capital Contribution[s]."

- Exhibit B disclosed "Distribution Percentages" of "33a%" for each of $MPP_{LLC}$'s three individual members
  - However, $MPP_{LLC}$'s 2000 Form 1065 listed HDM as a 14.28% partner, WHM as a 57.15% partner, and WHMJ as 28.57% partner
  - I have been unable to find any copy of this Agreement (or any modification to this Agreement) that reflects the ownership percentages reported on $MPP_{LLC}$'s 2000 Form 1065

75. $MPP_{LLC}$ was classified as a "partnership" for federal income tax purposes.[72]

76. The mailing address of $MPP_{LLC}$ was C/O Murphy Farms, 4134 U.S. Highway # 117, Rose Hill, NC 28458.[73]

77. $MPP_{LLC}$'s Form SS-4 and its Form 1065 identified a principal activity of "INVESTMENTS."[74]

78. On Line 13 of Form SS-4, $MPP_{LLC}$ represented that it did not expect to have any employees during the succeeding 12-month period.

79. The business code on Line C of page 1 of its Form 1065 was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice")[75]).[76]

### (1) Contributions

80. On May 16-17, $MPP_{LLC}$ received a contribution of the HDM Options, the WHM Options, and the WHMJ Options.[77] (Table 3, Row 8; Table 8, Rows 2 through 4.)

---

[72] Bates: MUCO00214 and IRSADMIN000318

[73] Bates: IRSADMIN000318

[74] Bates: MUCO00214 and IRSADMIN000318

[75] *Instructions for Form 1065* (2000), p. 33

[76] Bates: IRSADMIN000318

81. On May 19, $MPP_{LLC}$ received cash contributions from HDM, WHM, and WHMJ totaling $300,417. (Table 3, Row 13; Table 8, Row 1.)

**(2) Activities**

82. **Expiration of the Options:**

- On June 13, 2000, $MPP_{LLC}$'s Long and Short Option positions terminated in accordance with their terms. The Options expired "out of the money" and were therefore not exercised.
- As a result, $MPP_{LLC}$ recognized and reported a total net ordinary loss of $420,000 on its Form 4797. (Table 8, Row 5.)

83. **Purchase and Sale of Short-Term Investments:**[78]

- On May 22, 2000, $MPP_{LLC}$ purchased the stock of eight different corporations and then sold that stock three weeks later on June 14, 2000.
- On July 31, 2000, $MPP_{LLC}$ purchased the stock of seven different corporations and then sold that stock eight days later on August 7, 2000.
- The total net short-term capital gain $MPP_{LLC}$ recognized and reported from the purchase and sale of these stock investments was $5,878. (Table 8, Row 8.)

84. **Investment Income:** On its 2000 Form 1065, $MPP_{LLC}$ reported earnings of $35 in dividends and $5,767 in tax exempt interest income. (Table 8, Rows 6 & 7.)

85. **Purchase of Euros:** On December 21, $MPP_{LLC}$ purchased Euros for $300,000. (Table 8, Column O, Row 9.)

---

[77] Bates: IRSADMIN000474 through IRSADMIN000483

[78] See Schedule D of $MPP_{LLC}$'s 2000 Form 1065

86 **Payment of Transaction-Related Legal Fees:** $MPP_{LLC}$ did not make any payments to Proskauer Rose. Apparently, any amounts allocable to $MPP_{LLC}$ were paid by $PSM_{LLC}$ and $MURFAM_{LLC}$.

### (3) LLCs' Assignment of $MPP_{LLC}$ Partnership Interests to Their Respective Sole Owners

87 Each of the LLC-partners (HDM, WHM, and WHMJ) assigned its $MPP_{LLC}$ partnership interest to its sole member (H_Murphy, W_Murphy, and W_Murphy_Jr).[79]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[80]

### (4) Liquidation

88 H_Murphy, W_Murphy, and W_Murphy_Jr each assigned his interest in $MPP_{LLC}$ to $MP_{INC}$ "in exchange for stock" of $MP_{INC}$.[81]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[82]
- It is my understanding that an assignment of 100% of the partnership interests in $MPP_{LLC}$ to $MP_{INC}$ for $MP_{INC}$ stock would have resulted in an immediate "termination" of $MPP_{LLC}$ for federal income tax purposes.[83]
- Although these assignments of the $MPP_{LLC}$ partnership interests to $MP_{INC}$ were dated "as of the __th day of August, 2000," the $MPP_{LLC}$'s

---

79 Bates: MUEY02017 & MUEY02018, IRSADMIN001780 & IRSADMIN001781, and MUEY02468 & MUEY02469.

80 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

81 Bates IRSADMIN000703 through IRSADMIN000708. I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

82 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

83 Section 708(b)(1)(B).

*Alex Brown Client Statements* do not record any distributions from $MPP_{LLC}$ to $MP_{INC}$ until December 27, 2000 (but "AS OF 12/26/00")

- $MPP_{LLC}$ filed a short-year Form 1065 for 2000 for the period beginning "04/10, 2000 and ending 12/27/2000."[84]

89. On December 27, 2000 (but "AS OF 12/26/00"), $MPP_{LLC}$ made liquidating distributions of $11,217.61 in cash and Euros (approximate value of $310,039.05) to $MP_{INC}$. An additional distribution of $879.55 in cash was made by $MPP_{LLC}$ to $MP_{INC}$ on December 29.

90. As far as I can determine from the documents that I have reviewed, the only activities that $MPP_{LLC}$ engaged in during the less-than-nine-month period of its existence are those described above

- It does not appear that $MPP_{LLC}$ ever engaged in any business activities or, aside from temporary investments described above, in any other investment activities or transactions.

- As far as I can determine, $MPP_{LLC}$ had no employees and paid no salaries.

91. The termination and liquidation of $MPP_{LLC}$ before the end of 2000 was preordained as of the date of its formation and was essential to the generation of the permanent $MP_{INC}$ Ordinary Loss claimed by $MP_{INC}$ and by H_Murphy, W_Murphy, and W_Murphy_Jr on their respective 2000 Form 1040s.[85]

---

84 Bates: IRSADMIN000318

85 See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent losses." Bates: 2003EY001565 through 2003EY001583, and 2003EY004119 through 2003EY004123. See also *supra*, footnote 8, which summarizes the sequence of events that generated the $MP_{INC}$ Ordinary Loss.

### (c) MURFAM Farms, LLC ["$\text{MURFAM}_{\text{LLC}}$"]

92 MURFAM Farms, LLC **["$\text{MURFAM}_{\text{LLC}}$"]** was a limited liability company formed on or about April 4, 2000 under the laws of the State of Delaware [86]

- According to $\text{MURFAM}_{\text{LLC}}$'s 2000 Form 1065 (page 1) and its *Alex Brown Client Statements*, $\text{MURFAM}_{\text{LLC}}$ terminated, dissolved, and liquidated on December 27, 2000.[87]

93 In the "Limited Liability Company Agreement of MURFAM Farms, LLC":[88]

- W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown, and not their respective LLCs, were listed as the members of $\text{MURFAM}_{\text{LLC}}$
  - On $\text{MURFAM}_{\text{LLC}}$'s 2000 Form 1065, WHM, WHMJ, WMC, JMN, and ANB, and not W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown, were listed as $\text{MURFAM}_{\text{LLC}}$'s partners
  - I have been unable to find any documents that transferred, assigned, or otherwise conveyed the $\text{MURFAM}_{\text{LLC}}$ partnership interests to the LLCs.[89]

---

86 Bates: MUPR00521 & MUPR00522 The "Certificate of Formation" was dated April 4, 2000, whereas the "Limited Liability Company Agreement of MURFAM Farms, LLC" was dated April 10, 2000 Bates: IRSADMIN001437 through IRSADMIN001443 The April 10th date was used on $\text{MURFAM}_{\text{LLC}}$'s 2000 Form 1065 as the first day of its first taxable year and as the business start date Bates: IRSADMIN002201

87 However, the 12/27/00 posting on the *Alex Brown Client Statements* show the liquidating distributions to $\text{MURFAM}_{\text{INC}}$ (of cash and Bonds) to be "AS OF 12/26/00 " Bates: IRSADMIN001500 & IRSADMIN001501

As noted later in this *Report*, W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown each appear to have assigned their $\text{MURFAM}_{\text{LLC}}$ partnership interests to $\text{MURFAM}_{\text{INC}}$ as of an unspecified date in August, 2000.

88 Bates: IRSADMIN001436 through IRSADMIN001443 Note that this signed copy of the Agreement was apparently provided to the IRS by $\text{MURFAM}_{\text{LLC}}$ in response to the IRS's request for a copy of the Partnership Agreement

89 Section 3 2 of the $\text{MURFAM}_{\text{LLC}}$ LLC Agreement states, in part, that "No member shall have the right to transfer, sell, assign, pledge to hypothecate its interest in the Company without the consent of the other Members, which consent may be withheld in each other Members sole discretion " Bates: IRSADMIN001440

Section 6 1 of that Agreement states that "This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace

- "Schedule"/"Exhibit" A was to "set out . [a]ny contributions, in cash or other property, made by the Members to the Company . . " However, the spaces provided in Exhibit A for "Capital Contribution" were all blank.
    - I have been unable to find any copy of this document or any other document that sets forth the amounts of these "Capital Contribution[s]."
- Exhibit B disclosed "Distribution Percentages" of "20%" for each of $MURFAM_{LLC}$'s five individual members.
    - However, $MURFAM_{LLC}$'s 2000 Form 1065 listed WHM as a 42.79% partner, WHMJ as 28.04% partner, WMC as 8.59% partner, JMN as 15.72% partner, and ANB as 4.86% partner.
    - I have been unable to find any copy of this Agreement (or any modification to this Agreement) that reflects the ownership percentages reported on $MURFAM_{LLC}$'s 2000 Form 1065.

94. $MURFAM_{LLC}$ was classified as a "partnership" for federal income tax purposes.[90]

95. The mailing address of $MURFAM_{LLC}$ was C/O Murphy Farms, 4134 U S Highway # 117, Rose Hill, NC 28458.[91]

96. $MURFAM_{LLC}$'s Form SS-4 and its Form 1065 identified a principal activity of "INVESTMENTS."[92]

97. On Line 13 of Form SS-4, $MURFAM_{LLC}$ represented that it did not expect to have any employees during the succeeding 12-month period.

---

and supersede all prior written and oral agreements among the Members." Bates: IRSADMIN001441

90 Bates: MUCO00194 and IRSADMIN002201

91 Bates: IRSADMIN002201

92 Bates: MUCO00194 and IRSADMIN002201

98. The business code on Line C of page 1 of its Form 1065 was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice")[93]) [94]

(1) **Contributions**

99. On May 16-17, MURFAM$_{LLC}$ received a contribution of the WHM Options, the WHMJ Options, the WMC Options, the JMN Options, and the ANB Options.[95] (Table 3, Row 9; Table 9, Rows 2 through 4.)

100. On May 19, MURFAM$_{LLC}$ received cash contributions from HDM, WHM, and WHMJ totaling $1,317,252. (Table 3, Row 14, Table 9, Row 1.)

101. On December 5, MURFAM$_{LLC}$ received Bonds having a total par value of $127,000) (Table 3, Row 18; Table 9, Row 9.)

(2) **Activities**

102. **Expiration of the Options:**

- On June 13, 2000, MURFAM$_{LLC}$'s Long and Short Option positions terminated in accordance with their terms. The Options expired "out of the money" and were therefore not exercised.
- As a result, MURFAM$_{LLC}$ recognized and reported total net ordinary loss of $1,851,000 on its Form 4797. (Table 9, Row 5.)

103. **Purchase and Sale of Short-Term Investments:**[96]

- On May 22, 2000, MURFAM$_{LLC}$ purchased the stock of eight different corporations and then sold that stock three weeks later on June 14, 2000.

---

93 *Instructions for Form 1065* (2000), p. 33.
94 Bates: IRSADMIN002201
95 Bates: IRSADMIN001604 through IRSADMIN001621
96 See Schedule D of MURFAM$_{LLC}$'s 2000 Form 1065.

- On July 31, 2000, $MURFAM_{LLC}$ purchased the stock of seven different corporations and then sold that stock eight days later on August 7, 2000.
- The total net short-term capital gain $MURFAM_{LLC}$ recognized and reported from the purchase and sale of these stock investments was $26,429. (Table 9, Row 8.)

104. **Investment Income:** On its 2000 Form 1065, $MURFAM_{LLC}$ reported earnings of $150 in dividends and $24,712 in tax exempt interest income. (Table 9, Rows 6 & 7.)

105. **Payment of Transaction-related legal fees:** On October 2, 2000, $PSM_{LLC}$ wired $152,315 (including a $10 wire fee) to Proskauer Rose in payment of an invoice dated September 14 for Transaction-related legal services.

### (3) LLCs' Assignment of $MURFAM_{LLC}$ Partnership Interests to Their Respective Sole Owners

106. Each of the LLC-partners (WHM, WHMJ, WMC, JMN, and ANB) assigned its $MURFAM_{LLC}$ partnership interest to its sole member (W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown).[97]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[98]

### (4) Liquidation

107. W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown each assigned his/her interest in $MURFAM_{LLC}$ to $MURFAM_{INC}$ "in exchange for stock" of $MURFAM_{INC}$.[99]

---

97 Bates: MUEY02410 & MUEY02411, and IRSADMIN001782 through IRSADMIN001789

98 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

99 Bates IRSADMIN001790 through IRSADMIN001799. I could find no copies of these documents that have the date typed or written into the blank space.

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[100]

- It is my understanding that an assignment of 100% of the partnership interests in $\text{MURFAM}_{\text{LLC}}$ to $\text{MURFAM}_{\text{INC}}$ for $\text{MURFAM}_{\text{INC}}$ stock would have resulted in an immediate "termination" of $\text{MURFAM}_{\text{LLC}}$ for federal income tax purposes.[101]

- Although these assignments of the $\text{MURFAM}_{\text{LLC}}$ partnership interests to $\text{MURFAM}_{\text{INC}}$ were dated "as of the __th day of August, 2000," the $\text{MURFAM}_{\text{LLC}}$'s *Alex Brown Client Statements* do not record any distributions from $\text{MURFAM}_{\text{LLC}}$ to $\text{MURFAM}_{\text{INC}}$ until December 27, 2000 (but "AS OF 12/26/00").

- $\text{MURFAM}_{\text{LLC}}$ filed a short-year Form 1065 for 2000 for the period beginning "04/10, 2000 and ending 12/27/2000."[102]

108. On December 27, 2000 (but "AS OF 12/26/00"), $\text{MURFAM}_{\text{LLC}}$ made liquidating distributions of $1,212,190.36 in cash and Bonds (par value of $127,000) to $\text{MURFAM}_{\text{INC}}$. An additional distribution of $4,036.81 in cash was made by $\text{MURFAM}_{\text{LLC}}$ to $\text{MURFAM}_{\text{INC}}$ on December 29.

109. As far as I can determine from the documents that I have reviewed, the only activities that $\text{MURFAM}_{\text{LLC}}$ engaged in during the less-than-nine-month period of its existence are those described above.

- It does not appear that $\text{MURFAM}_{\text{LLC}}$ ever engaged in any business activities or, aside from temporary investments described above, in any other investment activities or transactions.

---

provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

100 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

101 Section 708(b)(1)(B).

102 Bates: IRSADMIN002201

- As far as I can determine, $MURFAM_{LLC}$ had no employees and paid no salaries

110 The termination and liquidation of $MURFAM_{LLC}$ before the end of 2000 was preordained as of the date of its formation and was essential to the generation of the permanent $MURFAM_{INC}$ LTCL claimed by $MURFAM_{INC}$ and by W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown on their respective 2000 Form 1040s [103]

### 3. The S Corporations

#### (a) PSM, Inc. [“$PSM_{INC}$”]

111. PSM, Inc. **[“$PSM_{INC}$”]** was a corporation formed under the laws of the State of Delaware on or about June 22, 2000 [104]

112. The name and mailing address of the incorporator was Matthew Sabloff, Esq., c/o Proskauer Rose, LLC, 1585 Broadway, New York, New York 10036 [105]

113 $PSM_{INC}$ filed an election to be taxed as an S corporation on Form 2553 (“Election by a Small Business Corporation”). This Form was signed by Harry D Murphy as President, and included the signed consents of all three of $PSM_{INC}$'s shareholders. [106]

- The stock ownership disclosed on Form 2553 (as of 6/23/00) was: [107]
    - Harry D Murphy 10 shares.
    - Marc D. Murphy: 10 shares

---

[103] See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent . losses " Bates: 2003EY001565 through 2003EY001583, and 2003EY004119 through 2003EY004123 See also *supra* , footnote 11, which summarizes the sequence of events that generated the $MURFAM_{INC}$ LTCL

[104] Bates: MUEY02712 through MUEY02715

[105] *Ibid* , and MUEY02082

[106] Bates: IRSADMIN000107 Harry D Murphy, President, was the designated "officer or legal representative" on Form 2553, Line E

[107] See also $PSM_{INC}$'s "Consent of Directors " Bates: WC002575 & WC002576

- Stratton K Murphy: 10 shares

- The stock ownership disclosed on $PSM_{INC}$'s 2000 Form 1120S (under "Beginning Shares" of the "Shareholder Summary," and on the shareholders' respective Schedule K-1s) was:
  - Harry D. Murphy 48.78 shares (48.78%)
  - Marc D. Murphy: 25.61 shares (25.61%)
  - Stratton K. Murphy 25.61 shares (25.61%)

- I have been unable to find any copies of any actual $PSM_{INC}$ stock certificates that were, under $PSM_{INC}$'s Bylaws, to have been issued to its shareholders [108]

- Nor have I been able to find any amendment, modification, assignment, or agreement that would explain how the equal stock ownership specified in the Consent of Directors and on the signed Form 2553 morphed into the disproportionate amounts disclosed on the Shareholder Summary and the Schedule K-1s filed with $PSM_{INC}$'s 2000 Form 1120S.

114. For federal income tax purposes, $PSM_{INC}$ elected the calendar year and the cash method of accounting.

115. $PSM_{INC}$'s Form SS-4 ("Application for Employer Identification Number") identified a principal activity of "INVESTMENT."[109]

- The business code on Line B of page 1 of its Form 1120S was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice")[110]).

- $PSM_{INC}$'s mailing address was "C/O Murphy Family Farms, 4134 U.S. Highway # 117, Rose Hill, NC 28458."

---

108 Bates: WC002560 through WC002574

109 Bates: MUCO00259

110 *Instructions for Form 1120S* (2000), p. 30

- $PSM_{INC}$'s Employer Identification Number was 56-2210818
- On Line 13 of Form SS-4, $PSM_{INC}$ represented that it did not expect to have any employees during the succeeding 12-month period

#### (1) Contributions

116. Prior to December 27, 2000 (but "AS OF 12/26/00"), $PSM_{INC}$ does not appear to have held any assets, earned any income, paid any expenses, or engaged in any business or investment activities.[111]

117 H_Murphy, M_Murphy, and S_Murphy each assigned his interest in $PSM_{LLC}$ to $PSM_{INC}$ "in exchange for stock" of $PSM_{INC}$ [112]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[113]
- Although these assignments of the $PSM_{LLC}$ partnership interests to $PSM_{INC}$ were dated "as of the __th day of August, 2000," the $PSM_{LLC}$'s *Alex Brown Client Statements* do not record any distributions from $PSM_{LLC}$ to $PSM_{INC}$ until December 27, 2000 (but "AS OF 12/26/00").
- As subsequently observed, I have seen no evidence that $PSM_{INC}$ included a "Regulation Section 1.351-3(b) statement" with its 2000 Form 1120S.
- As subsequently observed, I have seen no evidence that H_Murphy, M_Murphy, or S_Murphy included a "Regulation Section 1.351-3(a) statement" with their respective Form 1040s 2000 Form 1120S.

118. On December 27, 2000 (but "AS OF 12/26/00"), $PSM_{INC}$ received liquidating distributions of $485,339 in cash and Bonds (par value of

---

[111] Bates: IRSADMIN000156 through IRSADMIN000160

[112] Bates IRSADMIN001114 through IRSADMIN001119 I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

[113] I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

$51,000) from $PSM_{LLC}$ An additional distribution of $1,616 25 in cash was received by $PSM_{INC}$ from $PSM_{LLC}$ on December 29.

(2) **Activities**

119. As far as I can determine from the documents that I have reviewed, the only activities that $PSM_{INC}$ engaged in during 2000 were:

- The sale of the Bonds on December 29 for a claimed long-term capital loss of $24,531,884 **[the "$PSM_{INC}$ LTCL"]**,
- The payment of $22,725 (including a $10 wire fee) to E&Y on December 29, and
- The investment of cash in the Deutsche Bank Alex Brown Cash Reserve Fund (which earned $802 40 of tax exempt interest in 2000).
- The only income, gain, loss, deduction, etc. that $PSM_{INC}$ reported on its 2001 Form 1120S was tax exempt interest income of $11,115.[114]

(3) **Liquidation**

120 $PSM_{INC}$ liquidated in 2001.[115]

(b) **MP, Inc. ["$MP_{INC}$"]**

121. Murphy Pork, Inc **["$MP_{INC}$"]** was a corporation formed under the laws of the State of Delaware on or about June 22, 2000[116]

122 The name and mailing address of the incorporator was Matthew Sabloff, Esq., c/o Proskauer Rose, LLC, 1585 Broadway, New York, New York 10036.[117]

123. $MP_{INC}$ filed an election to be taxed as an S corporation on Form 2553 ("Election by a Small Business Corporation"). This Form was signed by

---

114 Bates: IRSADMIN000078 through IRSADMIN000098
115 Bates: IRSADMIN000078 through IRSADMIN000098
116 Bates: MUEY00935 through MUEY00938
117 *Ibid*

Wendell Murphy as President, and included the signed consents of all three of $MP_{INC}$'s shareholders.[118]

- The stock ownership disclosed on Form 2553 (as of 6/23/00) was:[119]
  - Harry D. Murphy 10 shares.
  - Wendell H. Murphy: 10 shares
  - Wendell H. Murphy, Jr.: 10 shares.
- The stock ownership disclosed on $MP_{INC}$'s 2000 Form 1120S (under "Beginning Shares" of the "Shareholder Summary," and on the shareholders' respective Schedule K-1s) was.
  - Harry D. Murphy 14.2857 shares (14.2857%).
  - Wendell H. Murphy. 57.1428 shares (57.1428%).
  - Wendell H. Murphy, Jr.: 28.5715 shares (28.5715%).
- I have been unable to find any copies of any actual $MP_{INC}$ stock certificates that were, under $MP_{INC}$'s Bylaws, to have been issued to its shareholders.[120]
- Nor have I been able to find any amendment, modification, assignment, or agreement that would explain how the equal stock ownership specified in the Consent of Directors and on the signed Form 2553 morphed into the disproportionate amounts disclosed on the Shareholder Summary and the Schedule K-1s filed with $MP_{INC}$'s 2000 Form 1120S

124. For federal income tax purposes, $MP_{INC}$ elected the calendar year and the cash method of accounting.

---

[118] Bates: IRSADMIN002733. Wendell H. Murphy, President, was the designated "officer or legal representative" on Form 2553, Line E

[119] See also $MP_{INC}$'s "Consent of Directors." Bates: MUEY00897 & MUEY00898

[120] Bates: MUEY01664 through MUEY01678.

125. $MP_{INC}$'s Form SS-4 ("Application for Employer Identification Number") identified a principal activity of "INVESTMENT."

- The business code on Line B of page 1 of its Form 1120S was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice")[121]).
- $MP_{INC}$'s mailing address was "C/O Murphy Family Farms, 4134 U.S. Highway # 117, Rose Hill, NC 28458."
- $MP_{INC}$'s Employer Identification Number was 56-2210828.
- On Line 13 of Form SS-4, $MP_{INC}$ represented that it did not expect to have any employees during the succeeding 12-month period.

**(1) Contributions**

126. Prior to December 27, 2000 (but "AS OF 12/26/00"), $MP_{INC}$ does not appear to have held any assets, earned any income, paid any expenses, or engaged in any business or investment activities.[122]

127. H_Murphy, W_Murphy, and W_Murphy_Jr each assigned his interest in $MPP_{LLC}$ to $MP_{INC}$ "in exchange for stock" of $MP_{INC}$.[123]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[124]
- Although these assignments of the $MPP_{LLC}$ partnership interests to $MP_{INC}$ were dated "as of the __th day of August, 2000," the $MPP_{LLC}$'s *Alex Brown Client Statements* do not record any distributions from $MPP_{LLC}$ to $MP_{INC}$ until December 27, 2000 (but "AS OF 12/26/00").

---

121 *Instructions for Form 1120S* (2000), p. 30.

122 See $MP_{INC}$ *Alex Brown Client Statements*.

123 Bates IRSADMIN000703 through IRSADMIN000708. I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

124 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

- As subsequently observed, I have seen no evidence that $MP_{INC}$ included a "Regulation Section 1 351-3(b) statement" with its 2000 Form 1120S.
- As subsequently observed, I have seen no evidence that H_Murphy, W_Murphy, or W_Murphy_Jr included a "Regulation Section 1.351-3(a) statement" with their respective Form 1040s 2000 Form 1120S.

128. On December 27, 2000 (but "AS OF 12/26/00"), $MP_{INC}$ received liquidating distributions of 11,217 61 in cash and Euros (approximate value of $310,039.05) from $MPP_{LLC}$. An additional distribution of $879.55 in cash was received by $MP_{INC}$ from $MPP_{LLC}$ on December 29.[125]

### (2) Activities

129. As far as I can determine from the documents that I have reviewed, the only activities that $MP_{INC}$ engaged in during 2000 were:

- The sale of the Euros on December 29 for a claimed ordinary loss of $13,919,961 **[the "$MP_{INC}$ Ordinary Loss"]**,
- The payment of $14,570 (including a $10 wire fee) to E&Y on December 29, and
- The investment of cash in the Deutsche Bank Alex Brown Cash Reserve Fund (which earned $0 in 2000).
- The only income, gain, loss, deduction, etc. that $MP_{INC}$ reported on its 2001 Form 1120S was tax exempt interest income of $6,453 [126]

### (3) Liquidation

130. $MP_{INC}$ liquidated in 2001.[127]

---

[125] See $MP_{INC}$ *Alex Brown Client Statements*

[126] Bates: IRSADMIN002713 through IRSADMIN002732

[127] Bates: IRSADMIN002713 through IRSADMIN002732.

### (c) MURFAM, Inc. [“MURFAM$_{INC}$”]

131. MURFAM, Inc. **[“MURFAM$_{INC}$”]** was a corporation formed under the laws of the State of Delaware on or about June 22, 2000.[128]

132. The name and mailing address of the incorporator was Matthew Sabloff, Esq., c/o Proskauer Rose, LLC, 1585 Broadway, New York, New York 10036.[129]

133. MURFAM$_{INC}$ filed an election to be taxed as an S corporation on Form 2553 (“Election by a Small Business Corporation”) This Form was signed by Wendell Murphy as President, and included the signed consents of all five of MURFAM$_{INC}$'s shareholders.[130]

- The stock ownership disclosed on Form 2553 (as of 6/23/00) was:[131]
  - Wendy M Crumpler 10 shares.
  - Wendell H. Murphy. 10 shares
  - Wendell H. Murphy, Jr.: 10 shares
  - Joyce Murphy Norman 10 shares
  - Angela N. Brown 10 shares.
- The stock ownership disclosed on MURFAM$_{INC}$'s 2000 Form 1120S (under “Beginning Shares” of the “Shareholder Summary,” and on the shareholders' respective Schedule K-1s) was:
  - Wendy M. Crumpler 8 59 shares (8.59%).
  - Wendell H Murphy. 42 79 shares (42 79%).
  - Wendell H. Murphy, Jr. 28 04 shares (28 04%)

---

[128] Bates: MUEY00931 through MUEY00934

[129] *Ibid.*

[130] Bates: IRSADMIN002055 Wendell H Murphy, President, was the designated “officer or legal representative” on Form 2553, Line E

[131] See also MURFAM$_{INC}$'s “Consent of Directors.” Bates: MUEY00955 & MUEY00956.

- Joyce Murphy Norman 15.72 shares (15.72%).
- Angela N. Brown 4.86 shares (4.86%)

- I have been unable to find any copies of any actual $\text{MURFAM}_{\text{INC}}$ stock certificates that were, under $\text{MURFAM}_{\text{INC}}$'s Bylaws, to have been issued to its shareholders [132]
- Nor have I been able to find any amendment, modification, assignment, or agreement that would explain how the equal stock ownership specified in the Consent of Directors and on the signed Form 2553 morphed into the disproportionate amounts disclosed on the Shareholder Summary and the Schedule K-1s filed with $\text{MURFAM}_{\text{INC}}$'s 2000 Form 1120S

134. For federal income tax purposes, $\text{MURFAM}_{\text{INC}}$ elected the calendar year and the cash method of accounting

135. $\text{MURFAM}_{\text{INC}}$'s Form SS-4 ("Application for Employer Identification Number") identified a principal activity of "INVESTMENT."

- The business code on Line B of page 1 of its Form 1120S was 523900 ("Other Financial Investment Activities (including portfolio management & investment advice")[133])
- $\text{MURFAM}_{\text{INC}}$'s mailing address was "C/O Murphy Family Farms, 4134 U.S. Highway # 117, Rose Hill, NC 28458."
- $\text{MURFAM}_{\text{INC}}$'s Employer Identification Number was 56-2210840.
- On Line 13 of Form SS-4, $\text{MURFAM}_{\text{INC}}$ represented that it did not expect to have any employees during the succeeding 12-month period.

---

132 Bates: MUEY00940 through MUEY00954

133 *Instructions for Form 1120S* (2000), p. 30

### (1) Contributions

136. Prior to December 27, 2000 (but "AS OF 12/26/00"), $\text{MURFAM}_{\text{INC}}$ does not appear to have held any assets, earned any income, paid any expenses, or engaged in any business or investment activities [134]

137. W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown each assigned his/her interest in $\text{MURFAM}_{\text{LLC}}$ to $\text{MURFAM}_{\text{INC}}$ "in exchange for stock" of $\text{MURFAM}_{\text{INC}}$. [135]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[136]
- Although these assignments of the $\text{MURFAM}_{\text{LLC}}$ partnership interests to $\text{MURFAM}_{\text{INC}}$ were dated "as of the __th day of August, 2000," the $\text{MURFAM}_{\text{LLC}}$'s *Alex Brown Client Statements* do not record any distributions from $\text{MURFAM}_{\text{LLC}}$ to $\text{MURFAM}_{\text{INC}}$ until December 27, 2000 (but "AS OF 12/26/00").
- As subsequently observed, I have seen no evidence that $\text{MURFAM}_{\text{INC}}$ included a "Regulation Section 1.351-3(b) statement" with its 2000 Form 1120S.
- As subsequently observed, I have seen no evidence that W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, or A_Brown included a "Regulation Section 1 351-3(a) statement" with their respective Form 1040s 2000 Form 1120S

138. On December 27, 2000 (but "AS OF 12/26/00"), $\text{MURFAM}_{\text{INC}}$ received liquidating distributions of $1,212,190.36 in cash and Bonds (par value of

---

134 See $\text{MURFAM}_{\text{INC}}$ *Alex Brown Client Statements*

135 Bates IRSADMIN001790 through IRSADMIN001799. I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

136 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

$127,000) from $\text{MURFAM}_{\text{LLC}}$ An additional distribution of $4,036.81 in cash was received by $\text{MURFAM}_{\text{INC}}$ from $\text{MURFAM}_{\text{LLC}}$ on December 29.

(2) **Activities**

139. As far as I can determine from the documents that I have reviewed, the only activities that $\text{MURFAM}_{\text{INC}}$ engaged in during 2000 were:

- The sale of the Bonds on December 29 for a claimed long-term capital loss of $61,543,012 **[the "$\text{MURFAM}_{\text{INC}}$ LTCL"]**,
- The payment of $56,735 (including a $10 wire fee) to E&Y on December 29, and
- The investment of cash in the Deutsche Bank Alex Brown Cash Reserve Fund (which earned $1,998 of tax exempt interest in 2000).
- The only income, gain, loss, deduction, etc. that $\text{MURFAM}_{\text{INC}}$ reported on its 2001 Form 1120S was tax exempt interest income of $27,752 [137]

(3) **Liquidation**

140. $\text{MURFAM}_{\text{INC}}$ liquidated in 2001.[138]

(d) **Effect of Use of S Corporation**

141. From the documents that I have reviewed in this case, it is not apparent that, tax considerations aside, the S Corporations served any function that could not just as readily have been served by the Partnerships (e.g., sale of the Bonds or the Euros, payment of fees to E&Y, and the investment of cash proceeds in short-term investments).

- From a tax standpoint, it is my understanding that the respective transfers of the Partnership Interests to the S Corporations was not essential to the ultimate objective of the COBRA Strategy, i.e., the

[137] Bates: IRSADMIN002058 through IRSADMIN002085

[138] Bates: IRSADMIN002058 through IRSADMIN0020858

generation of the permanent Murphy Losses that were allocated to and deducted by the Taxpayers' on their respective 2000 Form 1040s.[139]

- It is my understanding that this same result could have been achieved by simply liquidating the Partnerships and distributing its assets to the LLCs or the Taxpayers, in which case a descriptions and calculations of the losses resulting from sales of the Bonds and/or the Euros would have had to have been disclosed on the respective Form 1040s of the Taxpayers

### (1) Coplan E-Mails

142. Several statements made by Coplan (E&Y National Office) in e-mails sent to E&Y personnel involved in the COBRA Transaction lend support to this opinion. For example.

- January 10, 2000 from Coplan to the Quickstrike Team:

> It is preferable to leave the S corporation in place through the end of the year 2000 to *enhance the substance of the transaction* – i.e., so that the entire structure is not closed down within 2 months . . . We would recommend that the S corporation continue holding the value that was in the trading account just before the options expired last month – i.e., the final value of the account into which 2% of the long position was transferred . . .
>
> *As for activity in the* account, *"The more the better."*[140] [Emphasis supplied.]

- March 17, 2000 e-mail from Coplan to Amy Keating (Subject. Re. COBRA):

> We want them [the S corporations] to maintain some investment activity this year, *so it looks a little more like a bona fide entity*. They should all be aware of this and

[139] *E&Y COBRA Presentation*, *supra* , footnote 1

[140] Bates: 2003EY000870

> there should actually be some assets in the S corp after the fees are paid."[141] [Emphasis supplied.]

- March 27, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to six E&Y tax professionals ("Subject: RE: WRB Lake, Inc.").

> On a separate note, it had been our strong recommendation that the S corp be kept alive this year for some trading *to add to its 'bona fides.'* Although we told John Bean that a client could shut it down if he insisted, we did convey the message that this would *greatly heighten the risks associated with the transaction.*[142] [Emphasis supplied.]

- September 5, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to James A. Cox and Richard J. Shapiro (E&Y) ("Subject: RE: S corp terminations for COBRA transactions", responding to a question from James Cox regarding when to terminate an S corporation used in a COBRA transaction):

> There is no rule. The longer it stays running, *the better it looks* from a business purpose standpoint as to why the thing was formed. *But the main thing was to get it into this year* [2000].[143] [Emphasis supplied.]

**(2) Opinion**

143 In my opinion, it would be reasonable to conclude that one of the principal functions served by the S Corporations (and the single-member LLCs) was to further distance:

- The transactions
  - That created the inflated basis amounts, and

---

[141] Bates: 2003EY010723

[142] Bates: DOJ031721 & DOJ031722

[143] Bates: 2003EY003912

- That were used to capitalize the Transaction-related accounting and legal fees,[144]

- From the individual Taxpayers who would ultimately deduct the resulting Murphy Losses against unrelated gains and income on their respective Form 1040s

144 In my opinion, it would be reasonable to conclude that another principal function served by the S Corporations was to remove the sale of the COBRA Loss Assets from the Form 1040s of the individual Taxpayers, and to thereby reduce the possibility of detection and audit by the IRS.

- Had the distributions of these assets been made directly to the respective individual Taxpayers, sold by them, and then reported on their individual Form 1040s, the order of magnitude between the claimed tax basis and the selling price would have been so great (especially given the nature of the asset ("Municipal Bonds") and/or the holding period of the asset (eight days for the Euros)), that it is reasonable to assume that the risk of detection and audit would have increased substantially.

- **The Bonds:**

  - The tax basis assigned to the Bonds distributed to and then sold by $PSM_{INC}$ was **478 times greater**[145] than the price these Bonds sold for, and **481 time greater than their par value**.[146]

---

[144] These transactions included (1) the formation of the single-member LLCs and the acquisition of Employer Identification Numbers for each of them, (2) the purchase of the offsetting Options by the LLCs, (3) the transfer of the offsetting Options by the LLCs to the Partnerships, (4) the acquisition of the COBRA Loss Assets (Bonds/Euros) by the Partnerships shortly before their liquidation, (5) the distribution of those COBRA Loss Assets to the S Corporations, and the assignment of a tax basis to the COBRA Loss Assets comprised of $97,291,000 of artificial, noneconomic built in losses (Table 4, Column I) and $2,507,498 of unidentified built-in deductions for Transaction-related accounting and legal fees (Table 6)

[145] 478 01 = ($24,531,884 divided by $51,321) - 1

[146] 481 02 = ($24,531,884 divided by $51,000) - 1.

- The tax basis assigned to the Bonds distributed to and then sold by $\text{MURFAM}_{\text{INC}}$ was **482 times greater**[147] than the price these Bonds sold for, and **485 times greater than their par value**.[148]
- The losses from the sale of the Bonds by the Taxpayers would have had to have been reported, in detail, on Line 8 (columns (a) through (f)) of Part II of Schedule D of the Taxpayers' respective Form 1040s. Line 8 required disclosure of:
  - "(a) Description of the property,"
  - "(b) Date acquired (mo., day, yr.),"
  - "(c) Date sold (mo., day, yr.),"
  - "(d) Sales price,"
  - "(e) Cost or other basis," and finally
  - "(f) Gain or (loss)"
- Column (e) of Line 8 required the disclosure of the "Cost or other basis (see page D-6)." *2000 Instructions for Schedule D (Form 1040)* stated:

  > **Column (e)—Cost or other basis.** . . . If you do not use the actual cost, attach an explanation of your basis.[149]

  - Since the tax basis that would have been used by each of the respective Taxpayers to calculate his/her loss on the sale of the Bonds would not have been the "actual cost" of the Bonds, each of the Taxpayers would have been required to attach to their 2000 Form 1040 an explanation of how they had determined their tax basis in the Bonds

- **The Euros:**

---

[147] 481.55 = ($61,670,815 divided by $127,803) - 1

[148] 484.60 = ($61,670,815 divided by $127,000) - 1

[149] *2000 Instructions for Schedule D (Form 1040)*, at page D-6

- The tax basis assigned to the Euros distributed to and then sold by $MP_{INC}$ was **45 times greater**[150] than the price these Euros sold for, and **46 times greater** than their actual cost when purchased eight days earlier.[151]
- The losses from the sale of the Euros by the Taxpayers would have had to have been reported, in detail, on Form 4797 of the Taxpayers' respective Form 1040s. Form 4797 would have required disclosure of:
  - "(a) Description of the property,"
  - "(b) Date acquired (mo., day, yr.),"
  - "(c) Date sold (mo., day, yr.),"
  - "(d) Gross sales price,"
  - "(f) Cost or other basis, plus improvements and expense of sale," and finally
  - "(g) Gain or (loss)"

- Since the COBRA Loss Assets (the Bonds and the Euros) were instead distributed to and sold by the newly-formed S Corporations, these required, detailed disclosures were effectively moved from the shareholders' respective Form 1040s to the Form 1120s of the respective S Corporations.[152]
  - As subsequently observed, on their 2000 Form 1040s, the shareholders of $PSM_{INC}$ and $MURFAM_{INC}$ simply deducted all or part of the long-term capital loss allocated to them by their S Corporation on a single line (Line 12) of their Schedule Ds.

---

150 44.90 = ($14,230,000 divided by $310,039) - 1

151 46.43 = ($14,230,000 divided by $300,000) - 1

152 As subsequently observed, however, none of the S Corporations attached or otherwise included any explanation or description of how the tax basis it claimed to have had in its COBRA Loss Asset had been determined.

- None of these Form 1040s disclosed the dollar amount of the long-term capital loss that was allocated to that shareholder by $PSM_{INC}$ or $MURFAM_{INC}$ [153]

- None of these Form 1040s identified, by name or by EIN, $PSM_{INC}$ or $MURFAM_{INC}$ as the source of some or all of the net long-term capital loss amount deducted on Line 12.

- None of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition or sale, or the tax basis used to compute the amount of the loss.

- None of these Form 1040s disclosed any information or description regarding the source[154] of these losses or the rationale or method used to determine the tax basis claimed by the S Corporations in calculating the amounts

o The reporting of the $MP_{INC}$ Ordinary Loss on the Schedule Es included with the 2000 Form 1040s of the shareholders of $MP_{INC}$ (H_Murphy, W_Murphy, and W_Murphy_Jr), disclosed the shareholder's allocated amount of the $MP_{INC}$ Ordinary Loss, together with the name and EIN of $MP_{INC}$ as the entity from which that loss was allocated. However,

- None of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition or sale, or the tax basis used to compute the amount of the loss, and

- None of these Form 1040s disclosed any information or description regarding the source[155] of these losses or the

153 As subsequently observed, these losses may have been netted out against unrelated long-term capital gains allocable to the shareholders' from other partnerships, S corporations, etc

154 *Supra* , footnotes 3 and 10

155 *Supra* , footnote 7

rationale or method used to determine the tax basis claimed by the S Corporations in calculating the amounts

## B. Description of Transaction

### 1. Step 2: April 14th /17th, 2000 Purchase (and Sale) of the Long (and Short Options)

145. On Friday, April 14th (or, in some cases, on Monday, April 17th), each of the single-member LLCs entered into certain 60-day over-the-counter, non-publicly traded European-style digital option positions with counterparty Deutsche Bank AG New York Branch **["DeutscheBank"]**.[156]

146. Each of these options had a "Trade Date" of April 14th, and "Initial Exchange Date" of April 18th, a "Termination Date" of June 13th, and a "Final Exchange Date" of June 15th

147. Table 4, below, summarizes the details of each of the option transactions

[156] DeutscheBank was also the "calculating agent "

# Table 4

## Summary of the Option Transactions

| Partnership-Transferee | LLC-Transferor | Reference | | Currency Pair | Long Positions: Strike Price | Long Positions: Premium "Charged" | Long Positions: Payout | Offsetting Short Positions: Strike Price | Offsetting Short Positions: Premium "Credited" | Offsetting Short Positions: Payout | Net Premium Paid | "Inflated Basis Amount": In Dollars | "Inflated Basis Amount": As a Percentage of Actual Net Cash Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A | B | C | D | E | F | G | H | I | J |
| $PSM_{LLC}$ — IRSADMIN000810 Through IRSADMIN000818 — and — IRSADMIN000860 Through IRSADMIN000868 | MDM (M_Murphy) | "MDM Options" | 1 | USD/CHF | 1.5839 | $6,300,000 | $12,600,000 | 1.5837 | $6,111,000 | $12,174,750 | $189,000 | $6,111,000 | 3233% |
| | SKM (S_Murphy) | "SKM Options" | 2 | USD/CHF | 1.5839 | $6,300,000 | $12,600,000 | 1.5837 | $6 111,000 | $12,174,750 | $189,000 | $6,111,000 | 3233% |
| | HDM (H_Murphy) | "HDM Euro Options" | 3 | EUR/USD | 0.9207 | $12,000,000 | $24,000,000 | 0.9205 | $11,640,000 | $23,190,000 | $360,000 | $11,640,000 | 3233% |
| | $PSM_{LLC}$ Total: | | 4 | | | $ 24,600,000 | | | | | $738,000 | $23,862,000 | 3233% |
| $MPP_{LLC}$ — IRSADMIN000429 Through IRSADMIN000437 — and — IRSADMIN000474 Through IRSADMIN000483 | HDM (H_Murphy) | "HDM CHF Options" | 5 | USD/CHF | 1.5839 | $2,000,000 | $4,000,000 | 1.5837 | $1,940,000 | $3,865,000 | $60,000 | $1,940,000 | 3233% |
| | WHM (W_Murphy) | "WHM OptionsMPP" | 6 | EUR/USD | 0.9207 | $8,000,000 | $16,000,000 | 0.9205 | $7,760,000 | $15,460,000 | $240,000 | $7,760,000 | 3233% |
| | WHMJ (W_Murphy_Jr) | "WHMJ OptionsMPP" | 7 | USD/CHF | 1.5839 | $4,000,000 | $8,000,000 | 1.5837 | $3,880,000 | $7,730,000 | $120,000 | $3,880,000 | 3233% |
| | $MPP_{LLC}$ Total: | | 8 | | | $14,000,000 | | | | | $420,000 | $13,580,000 | 3233% |
| $MURFAM_{LLC}$ — IRSADMIN001444 Through IRSADMIN001458 — and — IRSADMIN001604 Through IRSADMIN001621 | WHM (W_Murphy) | "WHM OptionsMURFAM" | 9 | EUR/USD | 0.9207 | $26,400,000 | $52,800,000 | 0.9205 | $25,608,000 | $51,018,000 | $792,000 | $25,608,000 | 3233% |
| | WHMJ (W_Murphy_Jr) | "WHMJ OptionsMURFAM" | 10 | USD/CHF | 1.5839 | $17,300,000 | $34,600,000 | 1.5837 | $16,781,000 | $33,432,250 | $519,000 | $16,781,000 | 3233% |
| | WMC (W_Crumpler) | "WMC Options" | 11 | EUR/USD | 0.9207 | $5,300,000 | $10,600,000 | 0.9205 | $5,141,000 | $10,242,250 | $159,000 | $5,141,000 | 3233% |
| | JMN (J_Norman) | "JMN Options" | 12 | USD/CHF | 1.5839 | $9,700,000 | $19,400,000 | 1.5837 | $9,409,000 | $18,745,250 | $291,000 | $9,409,000 | 3233% |
| | ANB (A_Brown) | "ANB Options" | 13 | USD/CHF | 1.5839 | $3,000,000 | $6,000,000 | 1.5837 | $2,910,000 | $5,797,500 | $90,000 | $2,910,000 | 3233% |
| | $MURFAM_{LLC}$ Total: | | 14 | | | $61,700,000 | | | | | $1,851,000 | $59,849,000 | 3233% |

### 2. Step 3: April 17, 2000 Assignment of the Long Options and Short Options by the LLCs to the Partnerships and the Creation of the Inflated Tax Bases

148. On April 17, 2000, the LLCs assigned their respective option positions to one (or two) of the Partnerships in exchange for a Partnership Interest (or as a contribution to capital).

- Table 4, above, identifies the option positions that were assigned by each of the LLC-Transferors, and the Transferee-Partnership to which these option positions were assigned

149. Each of the Transferors increased its/his/her tax basis in its/his/her Partnership Interest by the stated premium "paid" ("charged") for the assigned Long Option (Table 4, Column C), but did not decrease that basis by any of the amount of the stated premium "received" ("credited") for the Short Option (Table 4, Column F).

150 This treatment resulted in a greatly inflated tax basis **["inflated tax basis amount"]** that each LLC claimed to have had in its Partnership Interest(s) (Table 4, Column I.)

- In each instance, the tax basis that the LLC claimed to have had in its partnership interest was 32 33 times greater than the LLC's actual net cost of the options to the LLC. (Table 4, Column J.)

151. These greatly inflated tax basis amounts would subsequently be allocated to the Bonds or the Euros that the respective S Corporations would receive as liquidating distributions from their respective Partnerships ("Step 5," below).

- The sales of these Bonds and Euros (the COBRA Loss Assets) by the respective S Corporations would generate the permanent ordinary losses (the $MP_{INC}$ Ordinary Loss) and long-term capital losses (the $PSMI_{nc}$ LTCL and the $MURFAM_{INC}$ LTCL) that the S Corporations would claim on their 2000 Form 1120Ss, that they would allocate to

and between their respective shareholders, and that the shareholders would claim as deductions on their respective 2000 Form 1040s.

152. On June 13, the Options terminated in accordance with their terms The options expired "out of the money" and were therefore not exercised

- As a result, each of the Partnerships reported an ordinary loss equal to the actual amount of net cash that its LLC partners had paid to acquire their respective option positions. (Table 4, Column H, Rows 4, 8, and 14, respectively, Row 5 of Tables 7, 8, and 9 )
- On its 2000 Form 1065, these ordinary losses were allocated by the Partnerships to and between their respective LLC partners on the partners' Schedule K-1s.
- The tax basis of each LLC in its Partnership Interest was reduced by the amount of the ordinary loss allocated to that LLC (Row 5 of Tables 7, 8, and 9.)
- Each of the sole owners of the LLC-partners deducted his/her share of these ordinary losses on their 2000 Form 1040.

### 3. Step 4: Acquisition of the Investment Assets to Which the Greatly Inflated Tax Basis Amounts Would Be Assigned

#### (a) Overview

153 As described in the E&Y COBRA Presentation, at some time after the termination of the option positions, the Partnership Interests were to be contributed to a newly-formed S Corporation in exchange for the stock of that S Corporation

- The stock of the S Corporation was, or would be, owned by the individual owners of the single-member LLCs in the same proportions as their respective LLCs had owned the Partnership.

- This exchange would result in a technical termination of the Partnership,[157] immediately after which the Partnership would be liquidated and its remaining assets would be transferred to the S Corporation.

154. Prior to the assignment of the Partnership Interests to the S Corporation, the Partnership would purchase (or the single-member LLCs would contribute) one or more capital assets and/or foreign currency **[the "COBRA Loss Assets"].** The COBRA Loss Assets would be retained by the Partnership until it terminated, liquidated, and distributed those Assets to the S Corporation

155. Upon the termination and liquidation of the Partnership, the tax basis that the Partnership had in the COBRA Loss Assets would disappear

- The S Corporation would instead assign the aggregate tax bases that the transferor-partners claimed to have had in their Partnership Interests (less the amount of the cash distributed by the Partnership to the S Corporation) to those Assets
- Consequently, the tax basis that the S Corporation claimed to have had in the COBRA Loss Assets would include the greatly inflated tax basis amounts that the transferor-partners respectively claimed to have had in their Partnership Interests.

156. Shortly after the receipt of the COBRA Loss Assets, the S Corporation would then sell those Assets and claim the COBRA Capital Loss(es) and/or the COBRA Ordinary Loss(es) that the S Corporation would allocate to and between its shareholders. These shareholders would then deduct their allocated share of the COBRA Loss(es) on their individual Form 1040s.

---

157 Section 708(b)(1)(B)

### (b) The Bonds

157. Sometime in early November, 2000, each of the owners of the eight single-member LLCs transferred certain North Carolina State Bonds **[the "Bonds"]** to their LLC's DB Alex Brown account. (Table 3, Row 15.)

- These Bonds had apparently been acquired by W_Murphy 10/15/93.[158]
- Sometime after March 29, 2000, but before the transfer of these Bonds to the LLCs, W_Murphy (and his wife, Linda) apparently gifted the Bonds to some or all of the other owners of the LLCs.[159]

### (c) $PSM_{LLC}$

158. In early November, 2000, MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy) transferred Bonds having a total par value of $51,000 to $PSM_{LLC}$ as a contribution to capital. Table 3, Row 16.

### (d) $MURFAM_{LLC}$

159. In early November, 2000, WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), and ANB (A_Brown) transferred Bonds having a total par value of $127,000 to $MURFAM_{LLC}$ as a contribution to capital. Table 3, Row 18.

### (e) $MPP_{LLC}$

160. On December 21, 2000, $MPP_{LLC}$ purchased Euros for $300,000.

---

[158] On their 2000 Form 1120s ("Statement 3" accompanying their respective Schedule Ds), $PSM_{INC}$ and $MURFAM_{INC}$ reported an acquisition date for the Bonds of "10/15/93."

[159] Bates: IRSADMIN001821

### 4. Step 5: Assignment of Partnership Interests to the S Corporations and the Termination and Liquidation of the Partnerships

#### (a) $PSM_{LLC}$ to $PSM_{INC}$

161 Each of the LLC-partners (HDM, MDM, and SKM) assigned its $PSM_{LLC}$ partnership interest to its sole member (H_Murphy, M_Murphy, and S_Murphy) [160]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000 "[161]

162 H_Murphy, M_Murphy, and S_Murphy each assigned his interest in $PSM_{LLC}$ to $PSM_{INC}$ "in exchange for stock" of $PSM_{INC}$.[162]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[163]
  - o $PSM_{LLC}$'s *Alex Brown Client Statements* do not record any distributions from $PSM_{LLC}$ to $PSM_{INC}$ until December 27, 2000 (but "AS OF 12/26/00")
  - o $PSM_{INC}$'s *Alex Brown Client Statements* do not record the receipt of any cash or other property from $PSM_{LLC}$ (or anyone else) until December 27, 2000 (but "AS OF 12/26/00")
- The Proskauer Rose tax opinion letter (dated December 29, 2000) also identified August, 2000 as the date that H_Murphy, M_Murphy, and

---

[160] Bates: IRSADMIN001099 through IRSADMIN001103, and MUEY00969 & MUEY00970

[161] I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

[162] Bates IRSADMIN001114 through IRSADMIN001119 I could find no copies of these documents that have the date typed or written into the blank space provided Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

[163] I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments

S_Murphy each exchanged his interest in $PSM_{LLC}$ for stock in $PSM_{INC}$ That opinion letter also opined that the exchange would qualify as a nontaxable exchange under Section 351 of the Internal Revenue Code [164]

- It is my understanding that an assignment of 100% of the partnership interests in $PSM_{LLC}$ to $PSM_{INC}$ for $PSM_{INC}$ stock would have resulted in an immediate "termination" of $PSM_{LLC}$ for federal income tax purposes [165]
  - $PSM_{LLC}$ did not file a tax return for a short tax year ending in August, 2000 $PSM_{LLC}$ instead filed a single Form 1065 for 2000 for the period beginning "04/10, 2000 and ending 12/27/2000 "[166]
  - HDM, MDM, and SKM (and not H_Murphy, M_Murphy, and S_Murphy) were identified (by name and their Employer Identification Number) as the partners of $PSM_{LLC}$ on the "Partner Summary" and on the Schedule K-1s that $PSM_{LLC}$ filed with its first and final 2000 Form 1065
- It is my understanding that a statement disclosing the information detailed in Regulation Section 1.351-3(b) must be filed with a corporation's federal income tax return for any year in which it

---

164 See also the following excerpts from the Proskauer Rose opinion regarding the federal income tax consequences of the PSM Transaction Bates: IRSADMIN000136 through IRSADMIN001098

> In August, 2000, each of the Parties transferred their membership interest in PSM LLC to PSM, Inc , a corporation formed under the laws of the State of Delaware (such corporation having elected to be treated as a subchapter S corporation) in exchange for common shares of PSM, Inc
>
> (Bates: IRSADMIN001039 )
>
> Each of the Parties more likely than note [sic] would not recognize gain on the contribution of their PSM LLC membership interests to PSM, Inc pursuant to section 351
>
> (Bates: IRSADMIN001041 )

165 Section 708(b)(1)(B)

166 Bates: IRSADMIN000739

exchanged its stock for property in a transaction that qualified under Section 351 [167]

- As far as I can determine from the copies of $PSM_{INC}$'s 2000 Form 1120S that I have reviewed, $PSM_{INC}$ did not include a Reg. Sec 1.351-3(b) Statement with its return. [168]

- It is my understanding that a statement disclosing the information detailed in Regulation Section 1.351-3(a) must also be filed with a transferor-shareholder's federal income tax return for any period in which he, she, or it received stock in exchange for property in a transaction that qualified under Section 351. [169]

---

167 Regulation Section 1.351-3(b) (prior to removal by T.D. 9264, May 26, 2006) stated, in part:

(b) Every such controlled corporation shall file with its income tax return for the taxable year in which the exchange is consummated—

(1) A complete description of all the property received from the transferors

(2) A statement of the cost or other basis thereof in the hands of the transferors adjusted to the date of transfer

(3) The following information with respect to the capital stock of the controlled corporation—

(i) The total issued and outstanding capital stock immediately prior to and immediately after the exchange, with a complete description of each class of stock;

(ii) The classes of stock and number of shares issued to each transferor in the exchange, and the number of shares of each class of stock owned by each transferor immediately prior to and immediately after the exchange, and

(iii) The fair market value of the capital stock as of the date of exchange which was issued to each transferor

(7) The following information as to the transferor's liabilities assumed by the controlled corporation in the exchange—

(i) The amount and a description thereof,

(ii) When and under what circumstances created, and

(iii) The corporate business reason or reasons for assumption by the controlled corporation

168 A Reg. Sec. 1.351-3(b) statement was apparently prepared for $PSM_{INC}$, but does not appear to have been included with the 2000 Form 1120S that $PSM_{INC}$ filed with the IRS. Bates: WC006934 and WC006935

169 Regulation Section 1.351-3(a) (prior to removal by T.D. 9264, May 26, 2006) stated, in part:

- As far as I can determine from the copies of the 2000 Form 1040s filed by M_Murphy, S_Murphy, and H_Murphy that I have reviewed, none of these individuals included a Reg. Sec. 1 351-3(a) Statement with their individual federal income tax returns

- The exchanges between $PSM_{INC}$ and M_Murphy, S_Murphy and H_Murphy were not otherwise disclosed or described, in either general or specific terms, on any of the 2000 Returns (or on any of the accompanying forms, schedules, statements, or attachments)

163. On December 27, 2000 (but "AS OF 12/26/00"), $PSM_{LLC}$ made liquidating distributions of $485,339 in cash and Bonds (par value of $51,000) to $PSM_{INC}$. An additional distribution of $1,616 25 in cash was made by $PSM_{LLC}$ to $PSM_{INC}$ on December 29

- The tax basis that $PSM_{INC}$ assigned to these Bonds was not a carryover of $PSM_{LLC}$'s tax basis in the Bonds as of the date of its termination, liquidation, and distribution

---

(a) Every person who received the stock or securities of a controlled corporation, or other property as part of the consideration. in exchange for property under section 351, shall file with his income tax return for the taxable year in which the exchange is consummated a complete statement of all facts pertinent to such exchange, including—

(1) A description of the property transferred, or of his interest in such property, together with a statement of the cost or other basis thereof, adjusted to the date of transfer

(2) With respect to stock of the controlled corporation received in the exchange, a statement of—

(i) The kind of stock and preferences, if any;

(ii) The number of shares of each class received; and

(iii) The fair market value per share of each class at the date of the exchange

(6) With respect to liabilities of the transferors assumed by the controlled corporation, a statement of—

(i) The nature of the liabilities;

(ii) When and under what circumstances created;

(iii) The corporate business reason for assumption by the controlled corporation;

- As discussed below, the tax basis that $PSM_{INC}$ assigned to these Bonds was instead the aggregate tax bases that its stockholders had respectively claimed in their $PSM_{LLC}$ partnership interests (reduced by the cash distributed by $PSM_{LLC}$ to $PSM_{INC}$, and increased by the Transaction-related accounting and legal fees paid to E&Y and to Proskauer Rose).

164. The termination and liquidation of $PSM_{LLC}$ before the end of 2000 was preordained as of the date of its formation and was essential to the generation of the permanent $PSM_{INC}$ LTCL claimed by $PSM_{INC}$ and by H_Murphy, M_Murphy, and S_Murphy on their respective 2000 Form 1040s.[170]

165. The tax bases that M_Murphy, S_Murphy, and H_Murphy each claimed to have had in their $PSM_{LLC}$ partnership interests was not disclosed on $PSM_{LLC}$'s 2000 Form 1065, or on $PSM_{INC}$'s 2000 Form 1120S, or on any of the Taxpayers' 2000 Form 1040s.

- From the identification and analysis of other documents, I was able to work backwards from the amount of the tax basis that $PSM_{INC}$ used to compute the $PSM_{INC}$ LTCL to derive the tax basis that $PSM_{INC}$, M_Murphy, S_Murphy and H_Murphy effectively claimed in the $PSM_{LLC}$ partnership interests
- These computations are presented in Table 7. See ¶199, *et seq.* for a description of the manner in which the amounts presented were determined

166. The tax basis that $PSM_{INC}$ effectively claimed to have had in the $PSM_{LLC}$ partnership interest that it received from each of its three shareholders included.

---

170 See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent losses." Bates: 2003EY001565 through 2003EY001583, and 2003EY004119 through 2003EY004123. See also *supra*, footnote 4, which summarizes the sequence of events that generated the $PSM_{INC}$ LTCL

- The inflated tax basis amount that the transferor-shareholder claimed to have had in that partnership interest, plus
- The accounting fees that had been incurred and paid by the transferor's LLC to E&Y, plus
- The legal fees that had been incurred and paid by the transferor's LLC to Proskauer Rose, plus
- The legal fees that had been incurred by the transferor's LLC to Proskauer Rose but paid by $PSM_{LLC}$, plus
- The additional fees subsequently paid by $PSM_{INC}$ to E&Y (which were also deducted as "Professional Fees" on $PSM_{INC}$'s 2000 Form 1120S)

**(b) $MPP_{LLC}$ to $MP_{INC}$**

167. Each of the LLC-partners (HDM, WHM, and WHMJ) assigned its $MPP_{LLC}$ partnership interest to its sole member (H_Murphy, W_Murphy, and W_Murphy_Jr).[171]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[172]

168. H_Murphy, W_Murphy, and W_Murphy_Jr each assigned his interest in $MPP_{LLC}$ to $MP_{INC}$ "in exchange for stock" of $MP_{INC}$.[173]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[174]

---

171 Bates: MUEY02017 & MUEY02018, IRSADMIN001780 & IRSADMIN001781, and MUEY02468 & MUEY02469

172 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

173 Bates IRSADMIN000703 through IRSADMIN000708. I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

174 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

- o $MPP_{LLC}$'s *Alex Brown Client Statements* do not record any distributions from $MPP_{LLC}$ to $MP_{INC}$ until December 27, 2000 (but "AS OF 12/26/00").
- o $MP_{INC}$'s *Alex Brown Client Statements* do not record the receipt of any cash or other property from $MPP_{LLC}$ (or anyone else) until December 27, 2000 (but "AS OF 12/26/00").

- The Proskauer Rose tax opinion letter (dated December 29, 2000) also identified August, 2000 as the date that H_Murphy, W_Murphy, and W_Murphy_Jr each exchanged his interest in $MPP_{LLC}$ for stock in $MP_{INC}$ That opinion letter also opined that the exchange would qualify as a nontaxable exchange under Section 351 of the Internal Revenue Code.[175]
  - o It is my understanding that an assignment of 100% of the partnership interests in $MPP_{LLC}$ to $MP_{INC}$ for $MP_{INC}$ stock would have resulted in an immediate "termination" of $MPP_{LLC}$ for federal income tax purposes.[176]
    - $MPP_{LLC}$ did not file a tax return for a short tax year ending in August, 2000 $MPP_{LLC}$ instead filed a single Form 1065 for 2000 for the period beginning "04/10, 2000 and ending 12/27/2000."[177]
    - HDM, WHM, and WHMJ (and not H_Murphy, W_Murphy, and W_Murphy_Jr) were identified (by name and their Employer

---

175 See also the following excerpts from the Proskauer Rose opinion regarding the federal income tax consequences of the MP Transaction Bates: IRSADMIN000640 through IRSADMIN000720

> In August, 2000, each of the Parties transferred their membership interest in MP LLC to MP, Inc , a corporation formed under the laws of the State of Delaware (such corporation having elected to be treated as a subchapter S corporation) in exchange for common shares of MP, Inc (Bates: IRSADMIN000643 )
>
> Each of the Parties more likely than note [sic] would not recognize gain on the contribution of their MP LLC membership interests to MP, Inc pursuant to section 351 (Bates: IRSADMIN000645 )

176 Section 708(b)(1)(B)

177 Bates: IRSADMIN000318

Identification Number) as the partners of $MPP_{LLC}$ on the "Partner Summary" and on the Schedule K-1s that $MPP_{LLC}$ filed with its first and final 2000 Form 1065

- o It is my understanding that a statement disclosing the information detailed in Regulation Section 1.351-3(b) must be filed with a corporation's federal income tax return for any year in which it exchanged its stock for property in a transaction that qualified under Section 351 [178]
  - ▪ As far as I can determine from the copies of $MP_{INC}$'s 2000 Form 1120S that I have reviewed, $MP_{INC}$ did not include a Reg. Sec. 1.351-3(b) Statement with its return.
- o It is my understanding that a statement disclosing the information detailed in Regulation Section 1.351-3(a) must also be filed with a transferor-shareholder's federal income tax return for any period in which he, she, or it received stock in exchange for property in a transaction that qualified under Section 351 [179]
  - ▪ As far as I can determine from the copies of the 2000 Form 1040s filed by H_Murphy, W_Murphy, and W_Murphy_Jr that I have reviewed, none of these individuals included a Reg. Sec. 1.351-3(a) Statement with their individual federal income tax returns.
- o The exchanges between $MP_{INC}$ and H_Murphy, W_Murphy, and W_Murphy_Jr were not otherwise disclosed or described, in either general or specific terms, on any of the 2000 Returns (or on any of the accompanying forms, schedules, statements, or attachments).

169. On December 27, 2000 (but "AS OF 12/26/00"), $MPP_{LLC}$ made liquidating distributions of $11,217.61 in cash and Euros (approximate value of

---

178 *Supra* , footnote 167

179 *Supra* , footnote 169

$310,039.05) to $MP_{INC}$. An additional distribution of $879.55 in cash was made by $MPP_{LLC}$ to $MP_{INC}$ on December 29

- The tax basis that $MP_{INC}$ assigned to these Euros was not a carryover of $MPP_{LLC}$'s tax basis in the Euros as of the date of its termination, liquidation, and distribution
- As discussed below, the tax basis that $MP_{INC}$ assigned to these Euros was instead the aggregate tax bases that its stockholders had respectively claimed in their $MPP_{LLC}$ partnership interests (reduced by the cash distributed by $MPP_{LLC}$ to $MP_{INC}$, and increased by the Transaction-related accounting and legal fees paid to E&Y and to Proskauer Rose).

170. The termination and liquidation of $MPP_{LLC}$ before the end of 2000 was preordained as of the date of its formation and was essential to the generation of the permanent $MP_{INC}$ Ordinary Loss claimed by $MP_{INC}$ and by H_Murphy, W_Murphy, and W_Murphy_Jr on their respective 2000 Form 1040s.[180]

171 The tax bases that H_Murphy, W_Murphy, and W_Murphy_Jr each claimed to have had in their $MPP_{LLC}$ partnership interests was not disclosed on $MPP_{LLC}$'s 2000 Form 1065, or on $MP_{INC}$'s 2000 Form 1120S, or on any of the Taxpayers' 2000 Form 1040s.

- From the identification and analysis of other documents, I was able to work backwards from the amount of the tax basis that $MP_{INC}$ used to compute the $MP_{INC}$ Ordinary Loss to derive the tax basis that $MP_{INC}$, H_Murphy, W_Murphy, and W_Murphy_Jr effectively claimed in the $MPP_{LLC}$ partnership interests.

---

180 See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent losses " Bates: 2003EY001565 through 2003EY001583, and 2003EY004119 through 2003EY004123 See also *supra* , footnote 8, which summarizes the sequence of events that generated the $MP_{INC}$ Ordinary Loss

- These computations are presented in Table 8. See ¶199, *et seq.* for a description of the manner in which the amounts presented were determined.

172. The tax basis that $MP_{INC}$ effectively claimed to have had in the $MPP_{LLC}$ partnership interest that it received from each of its five shareholders included:

- The inflated tax basis amount that the transferor-shareholder claimed to have had in that partnership interest, plus
- The accounting fees that had been incurred and paid by the transferor's LLC to E&Y, plus
- The legal fees that had been incurred and paid by the transferor's LLC to Proskauer Rose, plus
- The legal fees that had been incurred by the transferor's LLC to Proskauer Rose, but paid by $PSM_{LLC}$ and/or $MURFAM_{LLC}$, apparently on $MPP_{LLC}$'s behalf, plus
- The additional fees subsequently claimed by $MP_{INC}$ as having been paid to E&Y in 2000 (which were also deducted as "Professional Fees" on $MP_{INC}$'s 2000 Form 1120S).

### (c) $MURFAM_{LLC}$ to $MURFAM_{INC}$

173. Each of the LLC-partners (WHM, WHMJ, WMC, JMN, and ANB) assigned its $MURFAM_{LLC}$ partnership interest to its sole member (W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown).[181]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[182]

---

181 Bates: MUEY02410 & MUEY02411, and IRSADMIN001782 through IRSADMIN001789.

182 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

174. W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown each assigned his/her interest in $MURFAM_{LLC}$ to $MURFAM_{INC}$ "in exchange for stock" of $MURFAM_{INC}$.[183]

- These "Assignment of Interest" agreements were dated "as of the __th day of August, 2000."[184]
  - $MURFAM_{LLC}$'s *Alex Brown Client Statements* do not record any distributions from $MURFAM_{LLC}$ to $MURFAM_{INC}$ until December 27, 2000 (but "AS OF 12/26/00").
  - $MURFAM_{INC}$'s *Alex Brown Client Statements* do not record the receipt of any cash or other property from $MURFAM_{LLC}$ (or anyone else) until December 27, 2000 (but "AS OF 12/26/00").
- The Proskauer Rose tax opinion letter (dated December 29, 2000) also identified August, 2000 as the date that W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown each exchanged his/her interest in $MURFAM_{LLC}$ for stock in $MURFAM_{INC}$. That opinion letter also opined that the exchange would qualify as a nontaxable exchange under Section 351 of the Internal Revenue Code.[185]

---

183 Bates IRSADMIN001790 through IRSADMIN001799. I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

184 I could find no copies of these documents that have the date typed or written into the blank space provided. Nor could I find any copies of these documents that otherwise modify "August, 2000" as the effective date of these assignments.

185 See also the following excerpts from the Proskauer Rose opinion regarding the federal income tax consequences of the MURFAM Transaction. Bates: IRSADMIN001828 through IRSADMIN001891.

> In August, 2000, each of the Parties transferred their membership interest in MURFAM LLC to MURFAM, Inc., a corporation formed under the laws of the State of Delaware (such corporation having elected to be treated as a subchapter S corporation) in exchange for common shares of MURFAM, Inc. (Bates: IRSADMIN001831.)
>
> Each of the Parties more likely than note [sic] would not recognize gain on the contribution of their MURFAM LLC membership interests to MURFAM, Inc pursuant to section 351. (Bates: IRSADMIN001834.)

- It is my understanding that an assignment of 100% of the partnership interests in $MURFAM_{LLC}$ to $MURFAM_{INC}$ for $MURFAM_{INC}$ stock would have resulted in an immediate "termination" of $MURFAM_{LLC}$ for federal income tax purposes [186]
  - $MURFAM_{LLC}$ did not file a tax return for a short tax year ending in August, 2000 $MURFAM_{LLC}$ instead filed a single Form 1065 for 2000 for the period beginning "04/10, 2000 and ending 12/27/2000."[187]
  - WHM, WHMJ, WMC, JMN, and ANB (and not W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown) were identified (by name and their Employer Identification Number) as the partners of $MURFAM_{LLC}$ on the "Partner Summary" and on the Schedule K-1s that $MURFAM_{LLC}$ filed with its first and final 2000 Form 1065.
- It is my understanding that a statement disclosing the information detailed in Regulation Section 1.351-3(b) must be filed with a corporation's federal income tax return for any year in which it exchanged its stock for property in a transaction that qualified under Section 351 [188]
  - As far as I can determine from the copies of $MURFAM_{INC}$'s 2000 Form 1120S that I have reviewed, $MURFAM_{INC}$ did not include a Reg. Sec. 1.351-3(b) Statement with its return.
- It is my understanding that a statement disclosing the information detailed in Regulation Section 1.351-3(a) must also be filed with a transferor-shareholder's federal income tax return for any period in

---

186 Section 708(b)(1)(B)

187 Bates: IRSADMIN002201

188 *Supra* , footnote 167

which he, she, or it received stock in exchange for property in a transaction that qualified under Section 351.[189]

- As far as I can determine from the copies of the 2000 Form 1040s filed by W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown that I have reviewed, none of these individuals included a Reg. Sec. 1.351-3(a) Statement with their individual federal income tax returns.

- The exchanges between $MURFAM_{INC}$ and W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown were not otherwise disclosed or described, in either general or specific terms, on any of the 2000 Returns (or on any of the accompanying forms, schedules, statements, or attachments).

175. On December 27, 2000 (but "AS OF 12/26/00"), $MURFAM_{LLC}$ made liquidating distributions of $1,212,190.36 in cash and Bonds (par value of $127,000) to $MURFAM_{INC}$. An additional distribution of $4,036.81 in cash was made by $MURFAM_{LLC}$ to $MURFAM_{INC}$ on December 29.

- The tax basis that $MURFAM_{INC}$ assigned to these Bonds was not a carryover of $MURFAM_{LLC}$'s tax basis in the Bonds as of the date of its termination, liquidation, and distribution.

- As discussed below, the tax basis that $MURFAM_{INC}$ assigned to these Bonds was instead the aggregate tax bases that its stockholders had respectively claimed in their $MURFAM_{LLC}$ partnership interests (reduced by the cash distributed by $MURFAM_{LLC}$ to $MURFAM_{INC}$, and increased by the Transaction-related accounting and legal fees paid to E&Y and to Proskauer Rose).

176. The termination and liquidation of $MURFAM_{LLC}$ before the end of 2000 was preordained as of the date of its formation and was essential to the generation of the permanent $MURFAM_{INC}$ LTCL claimed by $MURFAM_{INC}$

---

[189] *Supra*, footnote 169

and by W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown on their respective 2000 Form 1040s [190]

177. The tax bases that W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown each claimed to have had in their $MURFAM_{LLC}$ partnership interests was not disclosed on $MURFAM_{LLC}$'s 2000 Form 1065, or on $MURFAM_{INC}$'s 2000 Form 1120S, or on any of the Taxpayers' 2000 Form 1040s.

- From the identification and analysis of other documents, I was able to work backwards from the amount of the tax basis that $MURFAM_{INC}$ used to compute the $MURFAM_{INC}$ LTCL to derive the tax basis that $MURFAM_{INC}$, W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown effectively claimed in the $MURFAM_{LLC}$ partnership interests.
- These computations are presented in Table 9. See ¶199, *et seq* for a description of the manner in which the amounts presented were determined.

178. The tax basis that $MURFAM_{INC}$ effectively claimed to have had in the $MURFAM_{LLC}$ partnership interest that it received from each of its five shareholders included.

- The inflated tax basis amount that the transferor-shareholder claimed to have had in that partnership interest, plus
- The accounting fees that had been incurred and paid by the transferor's LLC to E&Y, plus
- The legal fees that had been incurred and paid by the transferor's LLC to Proskauer Rose, plus

190 See, for example, the *E&Y COBRA Presentation* which describes and illustrates the interrelated sequence of "steps" to be followed in order to "generate" "permanent . losses." Bates: 2003EY001565 through 2003EY001583, and 2003EY004119 through 2003EY004123 See also *supra* , footnote 11, which summarizes the sequence of events that generated the $MURFAM_{INC}$ LTCL

- The legal fees that had been incurred by the transferor's LLC to Proskauer Rose but paid by $MURFAM_{LLC}$, plus
- The additional fees subsequently paid by $MURFAM_{INC}$ to E&Y (which were also deducted as "Professional Fees" on $MURFAM_{INC}$'s 2000 Form 1120S)

### 5. Step 6: December 29, 2000 Sale of the COBRA Loss Assets and the Recognition of the Murphy Losses

#### (a) Sale of the Bonds by $PSM_{INC}$ [the "$PSM_{INC}$ LTCL"]

179. $PSM_{INC}$ sold the Bonds on December 29, 2000 for $51,321.[191] $PSM_{INC}$ reported a long-term capital loss of $24,531,884 **[the "$PSM_{INC}$ LTCL"]** from this sale on its 2000 Form 1120S.

180. As noted above, the $24,531,884 $PSM_{INC}$ LTCL included, among other things, the $23,862,000 aggregate inflated basis amount that had previously been claimed by the $PSM_{INC}$ stockholders in computing their respective tax bases in their $PSM_{LLC}$ partnership interests.

#### (b) Sale of the Euros by $MP_{INC}$ [the "$MP_{INC}$ Ordinary Loss"]

181. $MP_{INC}$ sold the Euros on December 29, 2000 for $310,039.[192] $MP_{INC}$ reported an ordinary loss of $13,919,961 **[the "$MP_{INC}$ Ordinary Loss"]** from this sale on its 2000 Form 1120S

182. As noted above, the $13,919,961 $MP_{INC}$ Ordinary Loss included, among other things, the $13,580,000 aggregate inflated basis amount that had previously been claimed by the $MP_{INC}$ stockholders in computing their respective tax bases in their $MPP_{LLC}$ partnership interests

---

[191] Bates: IRSADMIN000014

[192] Bates: IRSADMIN002427

#### (c) Sale of the Bonds by $\text{MURFAM}_{\text{INC}}$ [the "$\text{MURFAM}_{\text{INC}}$ LTCL"]

183 $\text{MURFAM}_{\text{INC}}$ sold the Bonds on December 29, 2000 for $127,803.[193] $\text{MURFAM}_{\text{INC}}$ reported a long-term capital loss of $61,543,012 **[the "$\text{MURFAM}_{\text{INC}}$ LTCL"]** from this sale on its 2000 Form 1120S.

184. As noted above, the $61,543,012 $\text{MURFAM}_{\text{INC}}$ LTCL included, among other things, the $59,849,000 aggregate inflated basis amount that had previously been claimed by the $\text{MURFAM}_{\text{INC}}$ stockholders in computing their respective tax bases in their $\text{MURFAM}_{\text{LLC}}$ partnership interests

## C. Transaction-Related Fees

### 1. Table 5: Summary of Legal and Accounting Fees

185 The Table 5, below, presents that amounts of the Transaction-related accounting and legal fees that were incurred and paid to E&Y and Proskauer Rose in 2000.

- The amounts in **Column A** are the total premium(s) "paid" for the Long Options acquired by the LLC (and which were the source of the inflated basis amounts that were ultimately deducted as unidentified components of the various Murphy Losses).
- **Column B** lists the amounts that were invoiced by E&Y on April 27th to the individual owners of the LLCs. These invoices were "[f]or professional services rendered in connection with the following: Tax Consulting Services," and they were paid to E&Y by the invoicee's LLC.[194]
  - o The amounts charged by E&Y on the April 27th invoices were 2% of the respective Long Option Premium(s)

193 Bates: IRSADMIN000014

194 Bates: IRSADMIN001111 through IRSADMIN001113, IRSADMIN000715 through IRSADMIN00717, and IRSADMIN001810 through IRSADMIN001814

- The Long Option Premiums were the amounts that the Taxpayers used to generate the inflated basis amounts the S Corporations claimed to have had in the COBRA Loss Assets, and then to generate the artificial losses that the Taxpayers claimed as deductions on their Form 1040s.

- **Column C** lists the total amounts that were invoiced to the LLCs by Proskauer Rose in two invoices (May 12th and September 14th).[195]
  - The May 12th invoices were paid by the LLCs and were for "FOR PROFESSIONAL SERVICES RENDERED in connection with structuring and formation of LLC, drafting, preparation and revision of documents and agreements, correspondence with Deutsche Bank and Ernst & Young, preparation of opinion letter, and correspondence, meetings and telephone calls with respect to the foregoing."
  - The total amounts invoiced to the LLCs on the September 24th invoices were paid by $PSM_{LLC}$ and $MURFAM_{LLC}$
    - These invoices were "FOR PROFESSIONAL SERVICES RENDERED . . . in connection with preparation of documents, preparation and review of opinion, research and telephone calls with respect thereto."
    - The amounts invoiced on the September 12th invoices were the same as the corresponding amounts invoiced on the May 12th invoices, plus an additional amount for "Miscellaneous charges and disbursements."
  - The amounts charged by Proskauer Rose totaled 00.41% (00.40% without the miscellaneous charges on the September 14 invoice) of the respective Long Option Premium(s).

---

195 Bates: IRSADMIN001105 through 1110, and IRSADMIN001801 through IRSADMIN001809

- The Long Option Premiums were the amounts that the Taxpayers used to generate the inflated basis amounts the S Corporations claimed to have had in the COBRA Loss Assets, and then to generate the artificial losses that the Taxpayers claimed as deductions on their Form 1040s

- **Column D** lists the amounts that were invoiced by E&Y on December 21 "[f]or professional services rendered in connection with the following Estate and financial planning."[196]
  - These amounts were deducted twice on the 2000 Form 1040s of the Taxpayers.
    - First as "Professional Services" reported on the Schedule Ks (and Schedule K-1s) of the S Corporations' 2000 Form 1120Ss, and
    - Again as unidentified components of the respective Murphy Losses that were recognized and reported by the S Corporations, allocated between and among their respective shareholders, and then deducted by those shareholders as ordinary losses and/or as long-term capital losses on the shareholders' respective 2000 Form 1040s.

| **E&Y Fees Deducted as "Professional Fees" on the S Corporations' Form 1120Ss (and also Deducted as Unidentified Components of the Respective Murphy Losses):** | | |
|---|---|---|
| **$PSM_{INC}$:** | $22,725 | |
| **$MP_{INC}$:** | $14,570 | No record of this payment on December 2000 Alex Brown Client Statements of either $MP_{INC}$ or $MPP_{LLC}$ |
| **$MURFAM_{INC}$:** | $56,735 | |
| **Total:** | **$94,030** | |

196 Bates: IRSADMIN002803

# Table 5

## Summary of Transaction Related Legal and Accounting Fees

| LLC (Owner) | Long Option Premium(s) | Fees Paid by LLCs to E&Y | | Fees Paid by LLCs and Partnerships to Proskauer Rose | | Fees Paid by the S Corporations to E&Y | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | | C | | D | | E | |
| HDM (H_Murphy): | $14,000,000 | $280,000 | 2.00% | $57,050 | 0.41% | $13,166 | 0.09% | **$350,216** | **2.50%** |
| MDM (M_Murphy): | $6,300,000 | $126,000 | 2.00% | $25,672 | 0.41% | $5,820 | 0.09% | **$157,492** | **2.50%** |
| SKM (S_Murphy): | $6,300,000 | $126,000 | 2.00% | $25,672 | 0.41% | $5,820 | 0.09% | **$157,492** | **2.50%** |
| WHM (W_Murphy): | $34,400,000 | $688,000 | 2.00% | $139,773 | 0.41% | $32,602 | 0.09% | **$860,375** | **2.50%** |
| WHMJ (W_Murphy_Jr): | $21,300,000 | $426,000 | 2.00% | $86,390 | 0.41% | $20,072 | 0.09% | **$532,462** | **2.50%** |
| WMC (W_Crumpler): | $5,300,000 | $106,000 | 2.00% | $21,598 | 0.41% | $4,874 | 0.09% | **$132,472** | **2.50%** |
| JMN (J_Norman): | $9,700,000 | $194,000 | 2.00% | $39,120 | 0.40% | $8,919 | 0.09% | **$242,039** | **2.50%** |
| ANB (A_Brown): | $3,000,000 | $60,000 | 2.00% | $12,225 | 0.41% | $2,757 | 0.09% | **$74,982** | **2.50%** |
| **Totals:** | **$100,300,000** | **$2,006,000** | **2.00%** | **$407,500** | **0.41%** | **$94,030** | **0.09%** | **$2,507,530** | **2.50%** |

186. Table 6 takes the amounts calculated in Tables 7, 8, and 9 and shows that all of the E&Y Fees and all of the Proskauer Rose Fees were capitalized as increases to the tax bases that the S Corporations claimed to have had in the COBRA Loss Assets (i e , the Bonds and the Euros).

- These tax bases were used by the S Corporations to calculate the various Murphy Losses that resulted from the sales of those Assets just two days after they had been received from the respective Partnerships (and just three days before the end of the S Corporations' tax years).
- These Fees were, therefore, ultimately deducted as unidentified components of the various Murphy Losses that were allocated to and claimed by the shareholders on their individual 2000 Form 1040s.

# Table 6

**E&Y and Proskauer Rose Fees Were Unidentified Components of the Various Murphy Losses**

| | $PSM_{LLC}/PSM_{INC}$ ($PSM_{INC}$ LTCL) | $MPP_{LLC}/MP_{INC}$ ($MP_{INC}$ Ordinary Loss) | $MURFAM_{LLC}/MURFAM_{INC}$ ($MURFAM_{INC}$ LTCL) | Totals |
|---|---|---|---|---|
| S Corporations' Claimed Tax Basis in Cobra Loss Assets (As Reported on the 2000 Form 1120Ss): | $24,583,205 | $14,230,000 | $61,670,815 | |
| Add Back Tax Basis Allocated to Cash Received from Partnership: | $486,955 | $12,097 | $1,216,228 | |
| EQUALS: | $25,070,160 | $14,242,097 | $62,887,043 | **$ 102,199,300** |
| Tax Basis in Partnership Interest As Derived in Column N, Row 10 of Tables 7, 8, and 9 ): | ($24,455,161) | ($13,892,098) | ($61,344,543) | $ (99,691,802) |
| DIFFERENCE: | $614,999 | $349,999 | $1,542,500 | **$ 2,507,498** |
| | | | Less All Fees Paid by LLCs to E&Y: | $ (2,006,000) |
| | | | Less All Fees Paid by LLCs to Proskauer Rose: | $ (407,500) |
| | | | Less All Fees Paid By the S Corporations to E&Y Net of $30 Wire Fees: | $ (94,000) |
| | | | Balance/Unexplained Amount: | $ - |

### 2. Nondisclosure of Fees on the 2000 Returns

#### (a) The E&Y Fees

##### (1) The April 27th E&Y Fees

187. None of the Partnerships' 2000 Form 1065s (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the April 27th E&Y Fees or to their payment by the LLC-partners -- there was no general or specific description of these Fees, there were no disclosures of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted.

188. None of the S Corporations' 2000 Form 1120Ss (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the April 27th E&Y Fees or to their payment by the LLC-partners -- there was no general or specific description of these Fees, there was no disclosure of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted There were no disclosures of the fact that these Fees had been capitalized by the respective S Corporations to the tax basis they claimed to have had in their COBRA Loss Asset

189. None of the Taxpayers' 2000 Form 1040s (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the April 27th E&Y Fee or to its payment by their respective LLCs -- there was no general or specific description of these Fees, there was no disclosure of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted.

##### (2) The December 21st E&Y Fees

190. None of the Partnerships' 2000 Form 1065s (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the December 21st E&Y Fees or to their payment by the S Corporations -- there was no general or specific description of these Fees,

there were no disclosures of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted.

191. The December 21st E&Y Fees were deducted by each of the S Corporations as "Other deductions: Professional Fees" on their 2000 Form 1120Ss. There were no general or specific disclosures of the fact that these Fees had also been capitalized by the respective S Corporations to the tax basis they claimed to have had in their COBRA Loss Asset.

192. The amount of the December 21st E&Y Fees that was allocated to each of the shareholders was deducted on Part II of Schedule E of that shareholder's 2000 Form 1040. There was no general or specific description of these Fees, and there was no disclosure of the identity of the payee.

**(3) The Coplan E-Mails**

193. A December 23, 1999 e-mail from Robert B. Coplan (E&Y National Tax) (to over forty E&Y personnel ("Subject: Deductibility of COBRA Fees") confirms E&Y's policy of capitalizing the fees paid to it by its clients in connection with the COBRA transaction:

> After several discussions internally and with counsel, we have concluded that there is a return filing position that can be taken for *capitalizing the E&Y fees into the basis of the partnership, thereby enabling a capital or ordinary loss to be claimed for this amount*. We recommended previously that the E&Y invoice be sent to the individual partners or the LLCs in order to support the premise that the fees were paid as an expense of setting up the partnership and advising on its activities. Because the fees will be significant, the clients would likely need to have substantial authority to avoid having to disclose the position as a protection against a section 6662 penalty. We believe substantial authority exists for this positions.
>
> If you have yet to send one out, the E&Y invoice may read, "For professional services rendered to __(individual or LLC)__ during

2000 in connection with the formation and operation of the partnership and the purchase of foreign currency options."[197]

- I have seen no documentation in this case that identifies or otherwise discusses the "substantial authority" referred to above and on the basis of which the E&Y Fees were capitalized by the S Corporations to the tax bases in the Partnership Interests (and then to the tax bases of the COBRA Loss Assets).
- The Proskauer Rose tax opinion did not identify or in any way addressed this issue.[198]

**(b) The Proskauer Rose Fees**

**(1) The May 5th Fees Paid by the LLCs**

194. None of the Partnerships' 2000 Form 1065s (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the May 5th Proskauer Rose Fees or to their payment by the LLC-partners -- there was no general or specific description of these Fees, there was no disclosure of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted.

195. None of the S Corporation's 2000 Form 1120Ss (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the May 5th Proskauer Rose Fees or to their payment by the LLC-partners -- there was no general or specific description of these Fees, there was no disclosure of the identity of the payee, and the amounts of these Fees were not separately stated or

---

197 Bates: 2003EY000878 See also a November 11, 1999 e-mail from Brian Upchurch of E&Y, in which he states: "*The [E&Y] fee may be a flag that we do not want on the return this year* What flexibility do we have and what do you recommend " [Emphasis supplied ] Bates: 2003EY010640

See also the *E&Y COBRA Presentation* which would have classified the E&Y Fees and the fees paid to the law firm as miscellaneous itemized deductions ("*Deduction for fees only available after application of 2% floor* ") Bates: 2003EY001582 & 2003EY001583

198 Bates: IRSADMIN000136 through IRSADMIN001098, IRSADMIN000640 through IRSADMIN000720, and IRSADMIN001828 through IRSADMIN00189

otherwise deducted. There was no disclosure of the fact that these Fees had been capitalized by the respective S Corporations to the tax basis they claimed to have had in their COBRA Loss Asset.

196 None of the Taxpayers' 2000 Form 1040s (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the April 27th E&Y Fees or to its payment by the LLC-partners -- there was no general or specific description of these Fees, there was no disclosure of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted

**(2) The Coplan E-Mails**

197 A March 13, 2000 e-mail from Robert B. Coplan (E&Y National Tax) to over twenty E&Y tax professionals ("Subject: Further (and close to final) Update on COBRA Returns") confirms E&Y's policy of capitalizing the fees paid to J&G by its clients in connection with the COBRA transaction:[199]

> J&G Fee Capitalized. This is to further advise you that the returns reflect a decision made late last week *to capitalize the Jenkens & Gilchrist legal fees into the basis of the partnership interest, which in turn gets included in the basis of the S corporation out of which the payments are ultimately made*. We concluded that there was reasonable support for taking this position, in that the key services J&G rendered were the structuring of the partnership, the document preparation and the formation of the entities. The legal opinion was not the main reason for the payment of the fee, since a separate tax opinion was being obtained from Brown & Wood. Therefore, *the J&G fees will produce an additional K-1 loss in the same manner as the E&Y fees*. The final S corp returns and K-1s reflect this position. *The significance of this is that the returns will not force the individuals to show the large payment to J&G as a miscellaneous itemized deduction, which could be a flag on the 1040*.[200] [Emphasis supplied.]

199 "J&G" refers to "Jenkens & Gilchrist," a law firm that had participated with E&Y in other COBRA transactions that had taken place in 1999. Proskauer Rose, rather than J&G, wrote the tax opinion letters for the COBRA transactions described and discussed in this Report

200 Bates: 2003EY011725 & 2003EY011726

- An earlier e-mail from Coplan (December 23, 1999) to over forty E&Y personnel ("Subject. Deductibility of COBRA Fees")), had expressed reservations about the propriety of capitalizing the J&G Fees:

> We believe there is less support for similarly capitalizing the fees for the law firms with respect to their opinion letters. The greatest part of the Jenkens fee is for the opinion letter, which is to be provided to assist the S corporation in preparing K-1s for its shareholders. . .
>
> As you know, we did not believe there was adequate support for claiming a section 162 deduction at the S corporation level for fees paid by the S corporation for the opinion letters, etc These fees will be treated as section 212 expenses on the individuals' returns [201]

- I have seen no documentation in this case that identifies or otherwise discusses the "reasonable support" referred to in the March 13, 2000 e-mail, above, and on the basis of which the Proskauer Rose Fee was capitalized to the Partnership Interests and then to the Bonds and Euros

- The Proskauer Rose tax opinions did not identify or in any way address this issue [202]

198. None of the 2000 Form 1040s of the Taxpayers (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the Proskauer Rose Fees As noted above, the Proskauer Rose Fees and the E&Y Fees were buried in the respective amounts of the various Murphy Losses that were allocated to the Taxpayers and deducted by them on their respective 2000 Form 1040s

---

201 Bates: 2003EY000878 See also a December 9, 1999 e-mail sent from Coplan to the "Quickstrike Team": "We are not comfortable treating the [J&G Fee and the B&W Fee] as section 162 expenses, but are exploring the potential for capitalizing them into the basis of the S corp assets, which would increase the size of the loss on the sale of the assets " Bates: 2003EY000868 See also Bates: 2003EY010648 (language repeated in e-mail dated 12/22/99)

See also the *E&Y COBRA Presentation* which would have classified the E&Y Fees and the J&G Fee as miscellaneous itemized deductions ("*Deduction for fees only available after application of 2% floor* ") Bates: 2003EY001582 & 2003EY001583

202 Bates: IRSADMIN000136 through IRSADMIN001098, IRSADMIN000640 through IRSADMIN000720, and IRSADMIN001828 through IRSADMIN00189

## D. Tables 7, 8, and 9: Derivation of Tax Basis Claimed by the S Corporations in the COBRA Loss Assets

199. As noted above, the tax basis that each of the S Corporations assigned to its COBRA Loss Asset was.

- The aggregate tax basis that the S Corporation claimed that its stockholders had had in the Partnership Interests at the time they transferred those Partnership Interests to the S Corporation, reduced by
- The amount of cash distributed by the Partnership to the S Corporation, and increased by
- The accounting and legal fees paid to E&Y and Proskauer Rose.

200. As discussed in more detail in Section V , below, the S Corporations' 2000 Form 1120Ss did not disclose the manner in which the S Corporations acquired the COBRA Loss Assets, did not disclose the source from which the S Corporations acquired those Assets, and did not disclose how the S Corporations determined their respective tax bases that they claimed to have had in those Assets as of the date of their sale on December 29, 2000.

- Nor was any such information disclosed on any of the 2000 Returns filed by the Partnerships or the Taxpayers
- Even with all of the information disclosed on all of the 2000 Returns, it would have been difficult or impossible to determine the manner in which any of the S Corporations acquired their COBRA Loss Asset, the source from which that Asset had been acquired, and how the S Corporation had determined its tax basis in that Asset

201 In Table 7 ($PSM_{LLC}$/$PSM_{INC}$), Table 8 ($MPP_{LLC}$/$MP_{INC}$), and Table 9 ($MURFAM_{LLC}$/$MURFAM_{INC}$), I took the tax basis that each S Corporation used to compute the loss it reported on its 2000 Form 1120S from the sale of its COBRA Loss Asset, and worked backwards to determine how this amount must have been calculated

202. Most of the information that was required to determine how the S Corporation calculated its tax basis in its COBRA Loss Asset was not disclosed on or with any of the 2000 Returns and was not ascertainable or reasonably ascertainable from the information presented on or with those Returns, individually or collectively[203] Essential information that was not disclosed/ascertainable (and that, therefore, had to first be identified as relevant, and then located or derived from other sources) included:

- **$PSM_{INC}$:**
  - The fact that $PSM_{INC}$ had acquired the Bonds from $PSM_{LLC}$ upon $PSM_{LLC}$'s termination/liquidation,
  - The fact that $PSM_{INC}$ had acquired all of the partnership interests in $PSM_{LLC}$ as a contribution to its capital from its stockholders in exchange for its stock,
  - The fact that the tax basis claimed by $PSM_{INC}$ in the Bonds had been determined by reference to the tax basis that $PSM_{INC}$ claimed that the $PSM_{LLC}$ partners had had in their $PSM_{LLC}$ partnership interests (and without regard to the tax basis that $PSM_{LLC}$ (or H_Murphy, M_Murphy, and S_Murphy) had had in those Bonds),
  - The fact that the tax bases that $PSM_{INC}$ claimed that the $PSM_{LLC}$ partners had in their $PSM_{LLC}$ partnership interests had been determined, in part, by increasing those bases by the amount of the stated premium "charged" for the Long Options and without regard to the premiums "credited" for the offsetting Short Options (and, therefore, without regard to the actual net cash cost of the Options);
  - The fact that MDM (M_Murphy), SKM (S_Murphy), HDM (H_Murphy), and $PSM_{LLC}$ had paid Transaction-related accounting and legal fees to E&Y and Proskauer Rose, and that $PSM_{INC}$ increased its tax basis in the Bonds by the amounts of these fees (and by the amount of the

[203] See Tables 7, 8, and 9, Columns A and B

December 21st fee to E&Y that $PSM_{INC}$ also claimed as a deduction on its 2000 Form 1120S) These fees were capitalized as unidentified components of the tax basis that $PSM_{INC}$ claimed to have had in the Bonds, and, therefore, as an unidentified component of the $PSM_{INC}$ LTCL.

- **$MP_{INC}$:**
  - The fact that $MP_{INC}$ had acquired the Euros from $MPP_{LLC}$ upon $MPP_{LLC}$'s termination/liquidation;
  - The fact that $MP_{INC}$ had acquired all of the partnership interests in $MPP_{LLC}$ as a contribution to its capital from its stockholders in exchange for its stock;
  - The fact that the tax basis claimed by $MP_{INC}$ in the Euros had been determined by reference to the tax basis that $MP_{INC}$ claimed that the $MPP_{LLC}$ partners had in their $MPP_{LLC}$ partnership interests (and without regard to $MP_{INC}$'s actual cost of those Euros);
  - The fact that the tax bases that $MP_{INC}$ claimed that the $MPP_{LLC}$ partners had had in their $MPP_{LLC}$ partnership interests had been determined, in part, by increasing those bases by the amount of the stated premium "charged" for the Long Options and without regard to the premiums "credited" for the offsetting Short Options (and, therefore, without regard to the actual net cash cost of the Options);
  - The fact that HDM (H_Murphy), WHM (W_Murphy), WHMJ (W_Murphy_Jr), and $PSM_{LLC}$ and/or $MURFAM_{LLC}$ had paid Transaction-related accounting and legal fees to E&Y and Proskauer Rose, and that $MP_{INC}$ increased its tax basis in the Euros by the amounts of these fees (and by the amount of the December 21st fee to E&Y that $MP_{INC}$ also claimed as a deduction on its 2000 Form 1120S) These fees were capitalized as unidentified components of

the tax basis that $MP_{INC}$ claimed to have had in the Euros, and, therefore, as an unidentified component of the $MP_{INC}$ Ordinary Loss

- **$MURFAM_{INC}$:**
  - The fact that $MURFAM_{INC}$ had acquired the Bonds from $MURFAM_{LLC}$ upon $MURFAM_{LLC}$'s termination/liquidation;
  - The fact that $MURFAM_{INC}$ had acquired all of the partnership interests in $MURFAM_{LLC}$ as a contribution to its capital from its stockholders in exchange for its stock;
  - The fact that the tax basis claimed by $MURFAM_{INC}$ in the Bonds had been determined by reference to the tax basis that $MURFAM_{INC}$ claimed that the $MURFAM_{LLC}$ partners had had in their $MURFAM_{LLC}$ partnership interests (and without regard to the tax basis that $MURFAM_{LLC}$ (or W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown) had had in those Bonds);
  - The fact that the tax bases that $MURFAM_{INC}$ claimed that the $MURFAM_{LLC}$ partners had in their $MURFAM_{LLC}$ partnership interests had been determined, in part, by increasing those bases by the amount of the stated premium "charged" for the Long Options and without regard to the premiums "credited" for the offsetting Short Options (and, therefore, without regard to the actual net cash cost of the Options);
  - The fact that WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), ANB (A_Brown), and $MURFAM_{LLC}$ had paid Transaction-related accounting and legal fees to E&Y and Proskauer Rose, and that $MURFAM_{INC}$ increased its tax basis in the Bonds by the amounts of these fees (and by the amount of the December 21st fee to E&Y that $MURFAM_{INC}$ also claimed as a deduction on its 2000 Form 1120S) These fees were capitalized as unidentified components of the tax basis that $MURFAM_{INC}$ claimed to

have had in the Bonds, and, therefore, as an unidentified component of the $\text{MURFAM}_{\text{INC}}$ LTCL

203. Tables 7, 8, and 9 are organized as follows.

- Column A identifies the items of information that were and that were not disclosed on the 2000 Returns.
- Column B evaluates whether or not the effect of those items on the tax bases the partners' claimed to have had in their partnership interests or in the tax basis that the S Corporation claimed to have had in the Bonds or Euros was disclosed on any of the 2000 Returns or was otherwise ascertainable or reasonably ascertainable from the information provided on or with any of those Returns.
- Working backwards from the tax basis that the S Corporation assigned to the Bonds or the Euros (Column M, Row 17), Column M identifies the items and the amounts that appear to have been taken into consideration in computing that basis (and, ultimately, in computing the amount of the respective Murphy Losses)
  - In Columns C though H (Tables 7 and 8[204]) and Columns C through L (Table 9), the totals shown in Column M, Rows 1 through 15 are broken out among the partners.
  - Columns C, E, G, I and K identify the items and amounts that were *excluded* from the determination of the partner's tax basis in the partnership interest
  - Columns D, F, H, and J identify the items and amounts that were *included* in the determination of the tax bases.
- Columns N and O respectively show the effect of the item on the Partnership's income or loss, and on its cash flows

---

[204] Note that there are no Columns I, J, K, or L in Tables 7 or 8

# Table 7

## Derivation of Tax Basis Claimed by $PSM_{INC}$ in the Bonds

| Description | | Disclosure on 2000 Returns? | | HDM (H_Murphy) 48.780% | | MDM (M_Murphy) 25.610% | | SKM (S_Murphy) 25.610% | | Totals 100% | $PSM_{LLC}$ | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Was this Item Disclosed On or Ascertainable (or Reasonably Ascertainable) From Disclosures on any of the 2000 Returns? | Was the Effect of this Item on the Partners' Tax Bases in the $PSM_{LLC}$ Partnership Interests (or on $PSM_{INC}$'s Tax Basis in the Bonds) Disclosed On or Reasonably Ascertainable From Any of the 2000 Returns? | Calculation of Tax Basis in $PSM_{LLC}$ Partnership Interest | | Calculation of Tax Basis in $PSM_{LLC}$ Partnership Interest | | Calculation of Tax Basis in $PSM_{LLC}$ Partnership Interest | | Aggregate Tax Basis in $PSM_{LLC}$ Partnership Interests | Income & Loss | Cash Flows |
| | | | | Amounts Not Included | Amounts Included | Amounts Not Included | Amounts Included | Amounts Not Included | Amounts Included | | | |
| Cash Contributions | 1 | No | No | | $255,790 | | $132,457 | | $132,457 | $520,705 | | $520,705 |
| Assigned Option Positions: Cash Cost of Options | 2 | No | No | $360,000 | $0 | $189,000 | $0 | $189,000 | $0 | $0 | | |
| Assigned Option Positions: Long Option Premium "Charged" | 3 | Amounts Disclosed, Descriptions Ambiguous [$PSM_{LLC}$ Form 1065] | No | | $12,000,000 | | $6,300,000 | | $6,300,000 | $24,600,000 | | |
| Assigned Option Positions: Short Option Premium "Credited" | 4 | | | [illegible] | $0 | [illegible] | $0 | [illegible] | $0 | $0 | | |
| Loss from Termination of Options | 5 | Yes [$PSM_{LLC}$ Form 1065] | Yes [$PSM_{LLC}$ Form 1065] | | [illegible] | | [illegible] | | [illegible] | [illegible] | [illegible] | $0 |
| Ordinary Dividend Income | 6 | | | | $29 | | $16 | | $16 | $61 | $61 | $61 |
| Tax Exempt Interest Income | 7 | | | | $4,798 | | $2,519 | | $2,519 | $9,836 | $0 | $9,836 |
| Net Short Term Capital Gains from Short Term Stock Investments | 8 | | | | $5,639 | | $2,960 | | $2,961 | $11,560 | $11,560 | $11,560 |
| Contribution of Bonds (at Par) | 9 | No | No | | $25,000 | | $13,000 | | $13,000 | $51,000 | | |
| **Claimed Tax Basis in $PSM_{LLC}$ Partnership Interests** | 10 | No | No | | **$11,931,260** | | **$6,261,950** | | **$6,261,951** | **$24,455,162** | | |
| Payment of E&Y Fee by LLCs | 11 | No | No | | $288,916 | | $126,000 | | $126,000 | $592,262 | | |
| Payment of Prokauer Rose Fee By LLCs | 12 | No | No | | | | $12,600 | | $12,600 | | | |
| Payment of Prokauer Rose Fee By $PSM_{LLC}$ | 13 | No | No | | | | $13,073 | | $13,073 | | | [illegible] |
| Payment of E&Y Fee by $PSM_{INC}$ | 14 | Yes [$PSM_{INC}$ Form 1120S] | No | | $11,085 | | $5,820 | | $5,820 | $22,725 | | |
| **Tax Basis Claimed by $PSM_{INC}$ in $PSM_{LLC}$ Partnership Interests** | 15 | No | No | | **$12,231,261** | | **$6,419,450** | | **$6,419,450** | **$25,070,161** | | |
| Cash Distributed by $PSM_{LLC}$ to $PSM_{INC}$ | 16 | No | No | | | | | | | [illegible] | | [illegible] |
| **$PSM_{INC}$'s Claimed Basis in Bonds As of Date of Sale** | 17 | Amount Disclosed [$PSM_{INC}$ Form 1120S] | No Disclosure of Manner in Which the Bonds Were Acquired, the Source from Which They Were Acquired, the Partnership's Tax Basis in the Bonds as of the Date of Their Distribution to $PSM_{INC}$, or How This Amount was Determined. | | | | | | | **$24,583,205** | | **Cash Flows Net Out To $0** |

# Table 8

## Derivation of Tax Basis Claimed by $MP_{INC}$ in the Euros

| Description | | # | Disclosure on 2000 Returns?: Was this Item Disclosed On or Ascertainable (or Reasonably Ascertainable) From Disclosures on any of the 2000 Returns? | Disclosure on 2000 Returns?: Was the Effect of this Item on the Partners' Tax Bases in the $MPP_{LLC}$ Partnership Interests (or on $MP_{INC}$'s Tax Basis in the Euros) Disclosed On or Reasonably Ascertainable From Any of the 2000 Returns? | HDM (H_Murphy) 14.290%: Calculation of Tax Basis in $MPP_{LLC}$ Partnership Interest – Amounts Not Included | HDM (H_Murphy) 14.290%: Amounts Included | WHM (W_Murphy) 57.140%: Calculation of Tax Basis in $MPP_{LLC}$ Partnership Interest – Amounts Not Included | WHM (W_Murphy) 57.140%: Amounts Included | WHMJ (W_Murphy_Jr.) 28.570%: Calculation of Tax Basis in $MPP_{LLC}$ Partnership Interest – Amounts Not Included | WHMJ (W_Murphy_Jr.) 28.570%: Amounts Included | Totals 100%: Aggregate Tax Basis in $MPP_{LLC}$ Partnership Interests | $MPP_{LLC}$: Income & Loss | $MPP_{LLC}$: Cash Flows |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Contributions | | 1 | No | No | | $42,632 | | $172,083 | | $85,702 | $300,417 | | $300,417 |
| Assigned Option Positions | Cash Cost of Options | 2 | No | No | $60,000 | $0 | $240,000 | $0 | $120,000 | $0 | $0 | | |
| Assigned Option Positions | Long Option Premium "Charged" | 3 | Amounts Disclosed, Descriptions Ambiguous [$MPP_{LLC}$ Form 1065] | No | | $2,000,000 | | $8,000,000 | | $4,000,000 | $14,000,000 | | |
| Assigned Option Positions | Short Option Premium "Credited" | 4 | Amounts Disclosed, Descriptions Ambiguous [$MPP_{LLC}$ Form 1065] | No | [illegible] | $0 | | $0 | [illegible] | $0 | $0 | | |
| Loss from Termination of Options | | 5 | Yes [$MPP_{LLC}$ Form 1065] | Yes [$MPP_{LLC}$ Form 1065] | | [illegible] | | [illegible] | | [illegible] | [illegible] | [illegible] | $0 |
| Ordinary Dividend Income | | 6 | Yes [$MPP_{LLC}$ Form 1065] | Yes [$MPP_{LLC}$ Form 1065] | | $5 | | $20 | | $10 | $35 | $35 | $35 |
| Tax Exempt Interest Income | | 7 | Yes [$MPP_{LLC}$ Form 1065] | Yes [$MPP_{LLC}$ Form 1065] | | $824 | | $3,295 | | $1,648 | $5,767 | $0 | $5,767 |
| Net Short Term Capital Gains from Short Term Stock Investments | | 8 | Yes [$MPP_{LLC}$ Form 1065] | Yes [$MPP_{LLC}$ Form 1065] | | $840 | | $3,359 | | $1,679 | $5,878 | $5,878 | $5,878 |
| Purchase of Euros | | 9 | No | No | | | | | | | | | [illegible] |
| **Claimed Tax Basis in $MPP_{LLC}$ Partnership Interests** | | 10 | No | No | | **$1,984,301** | | **$7,938,757** | | **$3,969,039** | **$13,892,097** | | |
| Payment of E&Y Fee by LLCs | | 11 | No | No | | | | | | | | | |
| Payment of Prokauer Rose Fee By LLCs | | 12 | No | No | | $47,919 | | $191,675 | | $95,838 | $335,432 | | |
| Payment of Prokauer Rose Fee By $MPP_{LLC}$ | | 13 | No | No | | | | | | | | | $0 |
| "Payment" [?] of E&Y Fee By $MP_{INC}$ (No record of this payment on 2000 $MP_{INC}$ Alex Brown Client Statement) | | 14 | Yes [$MP_{INC}$ Form 1120S] | No | | $2,081 | | $8,326 | | $4,163 | $14,570 | | |
| **Tax Basis Claimed by $MP_{INC}$ in $MPP_{LLC}$ Partnership Interests** | | 15 | No | No | | **$2,034,301** | | **$8,138,758** | | **$4,069,040** | **$14,242,098** | | |
| Cash Distributed by $MPP_{LLC}$ to $MP_{INC}$ | | 16 | No | No | | | | | | | [illegible] | | [illegible] |
| **$MP_{INC}$'s Claimed Basis in Euros As of Date of Sale** | | 17 | Amount Disclosed [$MP_{INC}$ Form 1120S] | No Disclosure of Manner in Which the Euros Were Acquired, the Source from Which They Were Acquired, the Partnership's Tax Basis in the Euros as of the Date of Their Distribution to $MP_{INC}$, or How This Amount was Determined. | | | | | | | **$14,230,000** | | **Cash Flows Net Out To $0** |

# Table 9

## Derivation of Tax Basis Claimed by $MURFAM_{INC}$ in the Bonds

| Description | Disclosure on 2000 Returns? | | WHM (W_Murphy) 42.750% | | WHMJ (W_Murphy_Jr.) 28.040% | | JMN (J_Norman) 15.720% | | WMC (W_Crumpler) 6.590% | | ANB (A_Brown) 4.860% | | Totals 100% | $MURFAM_{LLC}$ | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Was this Item Disclosed On or Ascertainable (or Reasonably Ascertainable) From Disclosures on any of the 2000 Returns? | Was the Effect of this Item on the Partners' Tax Bases in the $MURFAM_{LLC}$ Partnership Interests (or on $MURFAM_{INC}$'s Tax Basis in the Bonds) Disclosed On or Reasonably Ascertainable From Any of the 2000 Returns? | Calculation of Tax Basis in $MURFAM_{LLP}$ Partnership Interest | | Calculation of Tax Basis in $MURFAM_{LLP}$ Partnership Interest | | Calculation of Tax Basis in $MURFAM_{LLP}$ Partnership Interest | | Calculation of Tax Basis in $MURFAM_{LLP}$ Partnership Interest | | Calculation of Tax Basis in $MURFAM_{LLP}$ Partnership Interest | | Aggregate Tax Basis in $MURFAM_{LLC}$ Partnership Interests | Income & Loss | Cash Flows |
| | | | Amounts Not Included | Amounts Included | Amounts Not Included | Amounts Included | Amounts Not Included | Amounts Included | Amounts Not Included | Amounts Included | Amounts Not Included | Amounts Included | | | |
| Cash Contributions | No | No | | $567,873 | | $370,661 | | $204,161 | | $111,487 | | $63,060 | $1,317,252 | | $1,317,252 |
| Assigned Option Positions: Cash Cost of Options | No | No | $792,000 | $0 | $519,000 | $0 | $291,000 | $0 | $122,000 | $0 | $90,000 | $0 | $0 | | |
| Assigned Option Positions: Long Option Premium "Charged" | Amounts Disclosed. Descriptions Ambiguous [$MURFAM_{LLC}$ Form 1065] | No | | $26,400,000 | | $17,300,000 | | $9,700,000 | | $5,300,000 | | $3,000,000 | $61,700,000 | | |
| Assigned Option Positions: Short Option Premium "Credited" | Amounts Disclosed. Descriptions Ambiguous [$MURFAM_{LLC}$ Form 1065] | No | [illegible] | $0 | [illegible] | $0 | [illegible] | $0 | [illegible] | $0 | | $0 | $0 | | |
| Loss from Termination of Options | Yes [$MURFAM_{LLC}$ Form 1065] | Yes [$MURFAM_{LLC}$ Form 1065] | | [illegible] | | [illegible] | | [illegible] | | [illegible] | | [illegible] | [illegible] | [illegible] | $0 |
| Ordinary Dividend Income | Yes [$MURFAM_{LLC}$ Form 1065] | Yes [$MURFAM_{LLC}$ Form 1065] | | $64 | | $42 | | $23 | | $11 | | $8 | $150 | $150 | $150 |
| Tax Exempt Interest Income | Yes [$MURFAM_{LLC}$ Form 1065] | Yes [$MURFAM_{LLC}$ Form 1065] | | $10,575 | | $6,928 | | $3,885 | | $2,123 | | $1,201 | $24,712 | $0 | $24,712 |
| Net Short Term Capital Gains from Short Term Stock Investments | Yes [$MURFAM_{LLC}$ Form 1065] | Yes [$MURFAM_{LLC}$ Form 1065] | | $11,309 | | $7,411 | | $4,155 | | $2,270 | | $1,284 | $26,429 | $26,429 | $26,429 |
| Contribution of Bonds (at Par) | No | No | | $54,000 | | $35,000 | | $20,000 | | $11,000 | | $7,000 | $127,000 | | |
| **Claimed Tax Basis in $MURFAM_{LLC}$ Partnership Interests** | No | No | | **$26,251,778** | | **$17,201,022** | | **$9,841,247** | | **$5,267,902** | | **$2,982,594** | **$61,344,543** | | |
| Payment of E&Y Fee by LLCs | No | No | | $635,724 | | $416,592 | | $194,000 | | $106,000 | | $60,000 | $1,455,259 | | |
| Payment of Prokauer Rose Fee By LLCs | No | No | | | | | | $13,200 | | $10,600 | | $6,000 | | | |
| Payment of Prokauer Rose Fee By $MURFAM_{LLC}$ | No | No | | | | | | $13,920 | | $10,338 | | $6,225 | | | [illegible] |
| Payment of E&Y Fee By $MURFAM_{INC}$ | Yes [$MURFAM_{INC}$ Form 1120S] | No | | $24,276 | | $15,909 | | $8,919 | | $4,874 | | $2,757 | $56,735 | | |
| **Tax Basis Claimed by $MURFAM_{INC}$ in $MURFAM_{LLC}$ Partnership Interests** | No | No | | **$26,911,778** | | **$17,633,523** | | **$9,883,747** | | **$5,400,402** | | **$3,057,594** | **$62,887,044** | | |
| Cash Distributed by $MURFAM_{LLC}$ to $MURFAM_{INC}$ | No | No | | | | | | | | | | | [illegible] | | [illegible] |
| **$MURFAM_{INC}$'s Claimed Basis in Bonds As of Date of Sale** | Amount Disclosed [$MURFAM_{INC}$ Form 1120S] | No Disclosure of Manner in Which the Bonds Were Acquired, the Source from Which They Were Acquired, the Partnership's Tax Basis in the Bonds as of the Date of Their Distribution to $MURFAM_{INC}$, or How This Amount was Determined. | | | | | | | | | | | **$61,570,815** | | **Cash Flows Net Out To $0** |

# V. Reporting of the Transactions on the 2000 Federal Income Tax Returns

## A. $PSM_{LLC}$ and $PSM_{INC}$

### 1. $PSM_{LLC}$'s Partnership Return[205]

#### (a) Description

204. $PSM_{LLC}$ timely filed an "initial" and "final" 2000 short-year Form 1065 ("U S Partnership Return of Income").

- The short year reported on $PSM_{LLC}$'s Form 1065 began on 4/10/00 and ended on 12/27/00
- This Return was signed by Harry D Murphy and was dated March 14, 2001
- Ray A. Knight signed this Return as Preparer. This signature was dated March 1, 2001, and identified Mr Knight's employer as Ernst & Young, LLP, 1150 18th Street N.W., Suite 500, Washington, DC.
- $PSM_{LLC}$ elected the cash method of accounting.

205. Question 2 of Schedule B ("Are any partners in this partnership also partnerships?") was checked "Yes."

- However, the partners that were listed on the "Partnership Summary and on the Schedule K-1s filed with $PSM_{LLC}$'s Form 1065 were not partnerships, but were rather single-member LLCs that were treated as disregarded entities for federal tax purposes.
  - The fact that these LLCs were single-member LLCs was not disclosed on $PSM_{LLC}$'s Form 1065
  - The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on $PSM_{LLC}$'s Form 1065.

[205] See Table 2 for the Bates numbers to copies of the 2000 Form 1065s

206. Question 4 of Schedule B ("Is the partnership subject to the consolidated audit procedures . . .") was checked "No" and "Designation of Tax Matters Partner" (which would have disclosed the name, tax identification number and address of that partner) was left blank.[206]

207. On its Schedule K of Form 1065 for 2000, $PSM_{LLC}$ reported:

- "Ordinary . . . (loss) from trade or business activities" of $738,000 (Line 1),
- "Ordinary dividends" of $60 (Line 4b),
- "Net short-term capital gain" of $11,560 (Line 4d), and
- "Tax-exempt interest income" of $9,836 (Line 19)
- No other items of income, gain, deduction, or loss were reported on Schedule K.

208. The $738,000 ordinary loss reported on Schedule K was also reported on Line 10 of Form 4797 ("Sales of Business Property"), and cross-referenced to "STATEMENT 2."

- "STATEMENT 2" listed the gains and losses resulting from each of four "Currency Contract[s]."
- The term "Currency Contract" is nebulous. It could refer to any of several different types of currency transactions, including options, forward contracts, futures contracts, or currency swaps.[207]

---

206 Note that Question 4 must be checked "Yes" if any partner was "other than an individual, an estate, or a C corporation." See *2000 Instructions for Form 1065* (p. 19). Although the $PSM_{LLC}$'s three LLC partners (MDM, SKM, and HDM) were disregarded entities that were respectively owned by M_Murphy, S_Murphy, and H_Murphy, the LLCs, and not their respective individual owners, were listed as $PSM_{LLC}$'s partners on the Schedule K-1s and on the "Partner Summary."

207 For example, the owner of a forward, futures, or swap contract has a obligation to perform. By contrast, the purchase of an option gives the owner a right, but not an obligation.

- Statement 2 did not disclose the fact that that the "Currency Contracts" included paired Long Options and offsetting Short Options in each of two foreign currencies
- There is no indication, in STATEMENT 2 or on any form, schedule, or statements attached to $PSM_{LLC}$'s Form 1065, as to how these "Currency Contracts" were acquired:
  - Whether they were purchased by $PSM_{LLC}$ using cash contributed to it by its partners,
  - Whether they were purchased by $PSM_{LLC}$ using borrowed funds,
  - Whether they were acquired by $PSM_{LLC}$ in exchange for a partnership interest or as a contribution to its capital, or
  - Whether they were acquired by some other means.
- There is nothing on $PSM_{LLC}$'s Form 1065, on any of the Schedule K-1s, or on any other accompanying form, schedule, or statement that would indicate or otherwise suggest that the Long Options and the offsetting Short Options were contributed to $PSM_{LLC}$ by its partners as contributions to capital, or that the contributions of these Options would result in the greatly inflated basis amounts (totaling $23,862,000 (see Table 4, Column I, Row 4)) that the partners (and $PSM_{INC}$) claimed to have had in their $PSM_{LLC}$ partnership interests, and that were subsequently allocated to the Bonds and used by $PSM_{INC}$ in computing the $PSM_{INC}$ LTCL.

209 As previously observed, none of the accounting and legal fees paid to E&Y and to Proskauer Rose were identified, described, or otherwise disclosed or deducted on Form 1065, on any of the partners' Schedule K-1s, or on any other form, schedule, or statement that accompanied $PSM_{LLC}$'s Form 1065.

210. A "Partner Summary" was attached to Form 1065

- This summary listed the single-member LLCs as $PSM_{LLC}$'s partners and disclosed their respective tax identification numbers and their respective beginning ratios of profit, loss, and ownership As previously observed.
  - The names and tax identification numbers of the single-member LLCs differed from the names and tax identification numbers of the individuals who owned these LLCs
  - The "Limited Liability Company Agreement" of $PSM_{LLC}$ listed M_Murphy, S_Murphy, and H_Murphy as its members (partners) and did not make any reference to MDM, SKM, or HDM.
  - The ownership percentages set forth in Exhibit B of the "Limited Liability Company Agreement" of $PSM_{LLC}$ listed "Distribution Percentages" of "33a%" for M_Murphy, S_Murphy, and H_Murphy
  - The $PSM_{LLC}$ Partner Summary listed Profit/Loss/Ownership Ratios of
    - 25 61% for MDM,
    - 25 61% for SKM, and
    - 48.78% for HDM.
- The identities of the individual owners of these LLC partners was not disclosed, by name or by tax identification number, on this Partner Summary
- The columns titled "Beginning Capital," "Capital Contributions," "Cash Distributions," and "Property Distributions" were left blank
- The Partner Summary did not make any reference to (or provide any description or information relating to) the contributions of the Long Options, the offsetting Short Options, or the Bonds by the LLC-partners to $PSM_{LLC}$'s capital during 2000.
  - More specifically, the Partner Summary did not disclose or otherwise allude to the fact that the tax bases that the $PSM_{LLC}$ partners

claimed to have had in their $PSM_{LLC}$ partnership interests had been determined, in part, by increasing those bases by the amount of the stated premium "charged" for the Long Options and without regard to the premiums "credited" for the offsetting Short Options (and, therefore, without regard to the actual net cash cost of the Options)

211. A separate Schedule K-1 was prepared for each of $PSM_{LLC}$'s three partners

- Although each of the single-member LLC partners were expressly designated for treatment as "disregarded entities" on the Form SS-4s that were filed by their respective single-members (¶25, *et seq.*), $PSM_{LLC}$ identified the LLCs, and not M_Murphy, S_Murphy, and H_Murphy, as its partners on the Schedule K-1s that $PSM_{LLC}$ filed with its Form 1065.[208]
  - Each of these Schedule K-1s described the LLC-partner as a domestic "LIMITED LIAB CO."[209]
    - The fact that these LLCs were single-member LLCs was not disclosed on $PSM_{LLC}$'s Schedule K-1s or elsewhere on its Form 1065.
    - The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on $PSM_{LLC}$'s Schedule K-1s or elsewhere on its Form 1065.
    - Neither the names nor the Social Security Numbers of M_Murphy, S_Murphy, or H_Murphy[210] appeared anywhere on any of the Schedule K-1s or elsewhere on $PSM_{LLC}$'s Form 1065

208 See *supra*, footnote 46 (e-mail from Amy Keating to Robert Coplan and Donna Guerin questioning the reference to the LLCs, rather than to their single-member owners, as the partners on the COBRA partnership returns) See also ¶43

209 Response to Question B ("What type of entity is this partner?")

210 However, as previously noted, H_Murphy legibly signed $PSM_{LLC}$'s Form 1065 His signature was not accompanied by his Social Security Number

- The space provided for the response to Item G ("Tax shelter registration number") was left blank on each of the Schedule K-1s.
- The amounts of ordinary income, net short-term capital loss, and tax-exempt interest income that were separately reported on $PSM_{LLC}$'s Schedule K were allocated to and between the LLC-partners and separately reported on their respective Schedule K-1s
- Line 25 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s. Line 25 is used, among other things, to provide adequate disclosure of the relevant facts relating to the tax treatment of any item that may cause an understatement of income tax.[211]

212. $PSM_{LLC}$'s Form 1065 (including all accompanying forms, schedules, statements, and attachments) did not disclose or otherwise provide any indication of:

- The contribution of the Long Options and the offsetting Short Options to $PSM_{LLC}$ as contributions to its capital,
- The contribution of the Bonds to $PSM_{LLC}$ as a contribution to its capital,
- The fact that $PSM_{LLC}$ had ever held the Bonds,
- The fact that the 100% of the $PSM_{LLC}$ partnership interests had been transferred by $PSM_{LLC}$'s partners to an S corporation ($PSM_{INC}$) as a contribution to its capital (and that this transfer had resulted in a technical termination of $PSM_{LLC}$ for federal income tax purposes),
- The type, identity, tax basis, or fair market value of the noncash asset (i e , the Bonds) distributed upon the termination/liquidation of $PSM_{LLC}$, or

[211] See *2000 Instructions for Form 1065* (p 29), and *2000 Instructions for Schedule K-1 (Form 1065)* (p 10)

- The identity of the distributee of that asset ($PSM_{INC}$) (or the fact that that asset had not been distributed to the partners identified in the "Partner Summary" and on the Schedule K-1s filed with $PSM_{LLC}$'s Form 1065).

213. $PSM_{LLC}$'s Form 1065 did not contain any references (by name or by tax identification number) to

- Any of the individual owners of its single-member LLC partners,[212] or to
- $PSM_{INC}$, the distributee of $PSM_{LLC}$'s assets upon its termination/ liquidation

### (b) Opinion

214. In my opinion, the information and disclosures made on and with the $PSM_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication.

- That foreign currency options (i.e., the Long Options and the offsetting Short Options) were acquired outside $PSM_{LLC}$ by its partners and then contributed to its capital by those partners.
- That the acquisitions of the Long Options and the offsetting Short Options by the LLCs and the subsequent contributions of these Options to $PSM_{LLC}$ was the source of the greatly inflated tax bases claimed.
  - In the $PSM_{LLC}$ partnership interests respectively held by the partners, and, subsequently,
  - In the Bonds distributed by $PSM_{LLC}$ to $PSM_{INC}$ (and then sold by $PSM_{INC}$ for a reported long-term capital loss of $24,531,884), and
  - In the $PSM_{INC}$ stock held by $PSM_{INC}$'s stockholders.

[212] Note, however, that $PSM_{LLC}$'s Form 1065 was legibly signed by Harry D Murphy However, his signature was not accompanied by his Social Security Number

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $PSM_{LLC}$'s Form 1065 had disclosed this information.

215 In my opinion, the information and disclosures made on the $PSM_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication that:

- MDM (M_Murphy), SKM (S_Murphy), HDM (H_Murphy), $PSM_{LLC}$ and $PSM_{INC}$ had paid Transaction-related accounting and legal fees totaling approximately $614,999 (see Table 6) to E&Y and Proskauer Rose, or that
- These fees were ultimately recognized and reported as unidentified components of the $PSM_{INC}$ LTCL (and as unidentified components of the amount of that LTCL that was allocated to and deducted by M_Murphy, S_Murphy, and H_Murphy on their respective 2000 Form 1040s).
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $PSM_{LLC}$'s Form 1065 had disclosed this information.

216. In my opinion, the information and disclosures made on the $PSM_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication.

- That $PSM_{LLC}$ had received the Bonds as a contribution to its capital from its three partners,
- That $PSM_{LLC}$ had ever held the Bonds,
- That all of $PSM_{LLC}$'s outstanding partnership interests had been contributed by its partners to another conduit entity ($PSM_{INC}$),

- That the Bonds had been distributed by $PSM_{LLC}$ to that conduit entity upon its termination/liquidation,
- That the distributee of these Bonds was $PSM_{INC}$, or
- That $PSM_{INC}$ was an S corporation owned in the same proportions by the same individuals who had, directly or indirectly through their respective single-member LLCs, been the partners of $PSM_{LLC}$ throughout the less-than-nine-month period of its existence.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $PSM_{LLC}$'s Form 1065 had disclosed this information

217. In my opinion, the information and disclosures made on the $PSM_{LLC}$'s Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication that the greatly inflated tax bases that resulted from the creation, capital funding, termination, and liquidation of $PSM_{LLC}$ were subsequently used by an undisclosed S corporation (i.e., $PSM_{INC}$) to report a $24,531,884 long-term capital loss that was allocated to and deducted by undisclosed individual taxpayers (i.e., H_Murphy, M_Murphy, and S_Murphy) on their individual 2000 Form 1040s.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increase significantly if $PSM_{LLC}$'s Form 1065 had disclosed this information.

218 In my opinion, it is reasonable to conclude that the risk of detection and audit by the IRS would have increased substantially had the accounting and legal fees paid to E&Y and Proskauer Rose had been identified and described on $PSM_{LLC}$'s Form 1065.

219. Neither the name nor the tax identification number of $PSM_{INC}$ was disclosed anywhere on $PSM_{LLC}$'s Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments).[213]

220. Neither the names nor tax identification numbers of H_Murphy,[214] M_Murphy, or S_Murphy were disclosed anywhere on $PSM_{LLC}$'s Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments).

- As previously stated, in my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS might have been minimized or significantly reduced[215] through (1) the use of the LLCs to acquire and hold the $PSM_{LLC}$ partnership interests, (2) the assignment of entity names to the LLCs that did not include the full names or surnames of their single-member owners, (3) the procurement of EINs for each of the LLCs,[216] and (4) the identification of the LLCs (by name and EIN), and not the Taxpayers (by name or by SSN), as the partners of $PSM_{LLC}$ on its Form 1065.

### 2. $PSM_{INC}$'s 2000 S Corporation Return[217]

#### (a) Description

221. $PSM_{INC}$ filed its "initial" short-year Form 1120S ("U.S. Income Tax Return for an S Corporation") for the period beginning June 22, 2000 and ending December 31, 2000, on which it adopted a calendar tax year and elected the cash method of accounting.

---

213 However, as previously observed, both $PSM_{LLC}$ and $PSM_{INC}$ had the same address.

214 As previously observed, however, $PSM_{LLC}$'s Form 1065 was legibly signed by Harry D. Murphy. However, his signature was not accompanied by his Social Security Number. As previously observed, that the addresses of the LLC-partners were the same as the addresses of $PSM_{LLC}$ and $PSM_{INC}$.

215 More specifically, the possibility that the IRS might trace the ownership of $PSM_{LLC}$ *from* $PSM_{LLC}$'s 2000 Form 1065 *to* the 2000 Form 1040s of its ultimate partners (i.e., the Taxpayers on whose 2000 Form 1040s the $PSM_{INC}$ LTCLs were deducted) was minimized or reduced.

216 *Supra*, footnote 42.

217 See Table 2 for the Bates numbers to copies of the 2000 Form 1120Ss.

222. No items of income, gain, loss, or deduction were reported on the first page of Form 1120S.

223. On its Schedule K of Form 1120S, $PSM_{INC}$ reported:

- "Ordinary income (loss) from trade or business activities" of "NONE" (Line 1),
- "Net long-term capital . . . (loss)" of $24,531,884 (Line 4e(2)),
- "Other deductions" for "Professional Fees" of $22,725 (Line 10), and
- "Tax-exempt interest income" of $802 (Line 17).
- No other items of income, gain, deduction, or loss were reported on Schedule K.

224. None of the accounting and legal fees paid to E&Y and Proskauer Rose by $PSM_{LLC}$, MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy) were identified, described, or otherwise disclosed or deducted on $PSM_{INC}$'s 2000 Form 1120S, on any of the stockholders' Schedule K-1s, or on any other forms, schedules, statements, or attachments filed with that return.

225. The accounting fees paid by $PSM_{INC}$ to E&Y were identified as "Professional Fees" and, as noted above, deducted on Line 10 of Schedule K.

- As previously observed, this amount was also capitalized as an increase to the tax basis that $PSM_{INC}$ claimed to have had in the Bonds and was therefore deducted a second time as an unidentified component of the $PSM_{INC}$ LTCL.

226. On Schedule L of Form 1120S ("Balance Sheet per Books"), $PSM_{INC}$ did not disclose any opening account balances for its assets, liabilities, or shareholders' equity. If the opening account balances as of December $26^{th}/27^{th}$ had been determined under generally accepted accounting principles and disclosed on $PSM_{INC}$'s 2000 Form 1120S, Schedule L would have disclosed.

- "Cash" of $486,955 (Line 1(b)) [218]
- "Other current assets(attach schedule)" on Line 6(b)) and/or ("Other investments (attach schedule)" on Line 8(b)) of approximately $51,000 [219] The required "attach[ed] schedule[s]" would have disclosed the existence and value of the Bonds
- "Capital stock" of $100 (Line 22(b))
- "Additional paid-in capital" of approximately $537,855 (Line 23(b)). [220]
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule L of $PSM_{INC}$'s 2000 Form 1120S

227. On Schedule L of Form 1120S, $PSM_{INC}$ listed the following closing balances:

- "Cash" of $516,354 (Line 1(d)),
- "Capital stock" of $100 (Line 22(d)),
- "Additional paid-in capital" of $25,070,061 (Line 23(d)),
- Negative "Retained earnings" of $24,553,807 (Line 24(d)).
- No other assets, liabilities, etc were listed on Schedule L.

228. $PSM_{INC}$'s Form 1120S did not identify, describe, or otherwise disclose the source of the $25,070,061 of additional paid-in capital (or any description or calculations that would indicate or explain how that amount had been determined)

- Under generally accepted accounting principles,[221]

---

218 Table 7, Column M, Row 16

219 Table 7, Column M, Row 9

220 $537,855 = $51,000 + $486.955 - $100

221 See, for example, *Financial Accounting Standards Board Current Text* at B51 104 and B51 105

- As noted above, the amount recorded by $PSM_{INC}$ as "Additional paid-in capital" would have been the net amount of cash and the fair market value of the $PSM_{LLC}$ noncash assets (i.e., the Bonds) received by $PSM_{INC}$ upon the termination/liquidation of $PSM_{LLC}$, net of any liabilities of $PSM_{LLC}$ or the transferor-stockholders that were assumed by $PSM_{INC}$, and net of the $100 recorded as "Capital Stock."
  - As noted above, this amount would have been approximately $537,855 (or approximately 2.15% of the $25,070,061 ending balance actually shown by $PSM_{INC}$ on its 2000 Schedule L[222]).
- The gain or loss resulting from the sale of the Bonds (and reflected in the ending balance of "Retained earnings" on Schedule L) would have been computed by subtracting the fair market value of the Bonds, as of the date of the contribution of the $PSM_{LLC}$ partnership interests to $PSM_{INC}$, from the sales price of the Bonds. The amount of the gain or loss that would have been recognized by $PSM_{INC}$ under these principles would likely have been *di minimis*.

229. On Schedule M-1 ("Reconciliation of Income (Loss) per Books With Income (Loss) per Return"), "[n]et . . . (loss) per books" was shown as $24,553,807. The only item shown as an adjustment to this amount was a $802 adjustment for the tax exempt interest income (Line 5) reported on Schedule K.

- Under generally accepted accounting principles,
  - The "[n]et income (loss)" resulting from the sale of the Bonds would have been computed by subtracting the fair market value of the Bonds, as of the date of the contribution of the $PSM_{LLC}$ partnership interests to $PSM_{INC}$, from the sales price of the Bonds.

---

222 2.15% = $537,855 divided by $25,070,061

- The "[n]et . (loss) per books" that would have been recognized under these principles would likely have been *di minimis* (Schedule M-1, Line 1), and a negative adjustment of approximately the full amount of the $24,531,884 $PSM_{INC}$ LTCL would have been made on Line 6 of Schedule M-1. However, no such amounts or adjustments were identified or made on $PSM_{INC}$'s Schedule M-1.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule M-1 of $PSM_{INC}$'s 2000 Form 1120S

230. Part II of $PSM_{INC}$'s Schedule D ("Capital Gains and Losses and Built-In Gains") to Form 1120S reported a "Net long-term capital . . (loss)" of $24,531,884. Schedule D (Line 7) referred to "STATEMENT 3" for the calculations supporting the net amount shown on Lines 7, 11, and 14.

231. STATEMENT 3 presented the calculation for the sale of "Municipal Bonds" with an acquisition date of 10/15/1993 and a sale date of 12/29/2000 STATEMENT 3 disclosed a "Sales Price" of $51,321, an aggregate "COST" of $24,583,205, and a resulting loss of $24,531,884.

- The term "COST" that $PSM_{INC}$ used to describe the tax basis that it claimed to have had in the "Municipal Bonds" and that it used to compute the $PSM_{INC}$ LTCL was misleading and contrary to the instructions for disclosing and computing capital gains and losses on Schedule D.
  - Gains and losses from the sale of capital assets are generally calculated and disclosed on Lines 1 and 7 (columns (a) through (f)) of Parts I and II of Schedule D. Column (e) of Lines 1 and 7 require the disclosure of the "Cost or other basis (see instructions)." *2000 Instructions for Schedule D (Form 1120S)* states:

> **Column (e)—Cost or other basis.** In determining gain or loss, the basis of property is generally its cost (see section 1012 and related regulations) Special rules for determining basis are provided in sections in subchapters C, K, O, and P of the Code . . . Attach an explanation if you use a basis other than actual cash cost of the property [223]

- In my opinion, the use of the word "COST" rather than "Other Basis" (or some other description indicating that the amounts so labeled were not the "actual cash cost" of the Bonds) is misleading and contrary to the IRS's express instructions for disclosing sales of capital assets on Schedule D
- $PSM_{INC}$ did not include any "explanation" or other description of the amount that it reported on Statement 3 as its "COST" of the Bonds.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed with $PSM_{INC}$'s 2000 Form 1120S

232 A "SHAREHOLDER SUMMARY" was attached to $PSM_{INC}$'s 2000 Form 1120S. This Shareholder Summary listed each of $PSM_{INC}$'s individual stockholders (H_Murphy, M_Murphy, and S_Murphy) and their respective "Beginning Shares" and "Ownership Percentage " This "Shareholder Summary" did not:

- Disclose any information relating to any of the stockholders' tax basis in his/her respective shares of $PSM_{INC}$, or
- Identify, describe, or otherwise disclose the fact of or any details or description relating to the contribution of the $PSM_{LLC}$ partnership interests to $PSM_{INC}$ as a contribution to its capital by H_Murphy, M_Murphy, and S_Murphy in exchange for the stock of $PSM_{INC}$

---

223 *2000 Instructions for Schedule D (Form 1120S)*, at page 3

- Nor was any of this information presented elsewhere on $PSM_{INC}$'s 2000 Form 1120S (or on any accompanying forms, schedules, statements, or attachments).

233. As previously observed, $PSM_{INC}$ filed an election to be taxed as an S corporation on Form 2553 ("Election by a Small Business Corporation"). This Form was signed by Harry D. Murphy as President, and included the signed consents of all three of $PSM_{INC}$'s shareholders.[224]

- The stock ownership disclosed on Form 2553 (as of 6/23/00) was:[225]
    - Harry D. Murphy: 10 shares
    - Marc D. Murphy: 10 shares.
    - Stratton K. Murphy: 10 shares.
- The stock ownership disclosed on $PSM_{INC}$'s 2000 Form 1120S (on the Shareholder Summary, and on the shareholders' respective Schedule K-1s) was:
    - Harry D. Murphy: 48.78 shares (48.78%).
    - Marc D. Murphy: 25.61 shares (25.61%).
    - Stratton K. Murphy: 25.61 shares (25.61%).

234. A Schedule K-1 for each of $PSM_{INC}$'s three individual stockholders accompanied $PSM_{INC}$'s 2000 Form 1120S. Each of these Schedule K-1s disclosed:

- The stockholder's name, address,[226] tax identification number, percentage of stock ownership in $PSM_{INC}$, and the IRS Service Center where $PSM_{INC}$'s tax return was filed (Cincinnati, Ohio),

---

224 Bates: IRSADMIN000107. Harry D. Murphy, President, was the designated "officer or legal representative" on Form 2553, Line E.

225 See also $PSM_{INC}$'s "Consent of Directors." Bates: WC002575 & WC002576.

226 The address listed for each of these individual stockholders was "C?O Murphy Family Farms, 4134 U.S. Highway # 117, Rose Hill, NC 28458."

- The stockholder's share of $PSM_{INC}$'s
  - $24,531,884 long-term capital loss,
  - $22,725 of "other deductions" (for "Professional Fees"), and
  - $802 of tax exempt interest

235. As previously observed, none of the accounting and legal fees paid to E&Y and Proskauer Rose by $PSM_{LLC}$, MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy) were identified, described, or otherwise disclosed or deducted on any of the stockholders' Schedule K-1s

236. Line 23 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s. Line 23 is used, among other things, to provide adequate disclosure of the relevant facts relating to the tax treatment of any item that may cause an understatement of income tax.[227]

237. As previously observed, $PSM_{INC}$'s Form 1120S was not accompanied by a Regulation Section 1 351-3(b) Statement[228] and, except for the stockholders' names and the stock ownership percentages disclosed on the Schedule K-1s and the "Shareholder Summary," did not otherwise disclose any of the information required by that Regulation.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $PSM_{INC}$ had filed a Regulation Section 1.351-3(b) Statement with its 2000 Form 1120S.

238. $PSM_{INC}$'s Form 1120S (including all accompanying forms, schedules, statements, and attachments):

- Did not make any reference to any aspect of the PSM Transaction that created the greatly inflated tax basis assigned by $PSM_{INC}$ to the Bonds

---

227 See 2000 *Instructions for Form 1120S* (p 25), and 2000 *Instructions for Schedule K-1 (Form 1120S)* (p 8)

228 *Supra* , footnote 167

(i.e., no reference was made to any of the Long and Short Options that were first acquired by $PSM_{LLC}$'s LLC partners, that were then contributed by those partners to $PSM_{LLC}$, and that ultimately expired on June 13, 2000, prior to $PSM_{LLC}$'s termination/liquidation),

- Did not identify, describe, or otherwise disclose the source from which $PSM_{INC}$ had received the "Municipal Bonds" (i.e., from $PSM_{LLC}$, and before $PSM_{LLC}$, as a contribution to $PSM_{LLC}$'s capital from MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy)),
- Did not disclose the fact that these Bonds had been received as a liquidating distribution from a partnership (or that the distributing partnership had been owned in the same proportions by the same individuals who owned $PSM_{INC}$'s stock);
- Did not disclose the par value of the Bonds,
- Did not disclose the $PSM_{LLC}$'s tax basis the Bonds,
- Did not provide any description, explanation, or calculation showing or indicating how $PSM_{INC}$ determined its tax basis in the Bonds
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on $PSM_{INC}$'s 2000 Form 1120S.

239. $PSM_{INC}$'s 2000 Form 1120S (including all accompanying forms, schedules, statements, and attachments) did not contain any references whatsoever, by name or by tax identification number, to $PSM_{LLC}$ or to any of the single-member LLCs that $PSM_{LLC}$ had identified as its partners on the Schedule K-1s it filed with its Form 1065.

**(b) Opinion**

240. In my opinion, the information and disclosures made on the $PSM_{INC}$ 2000 Form 1120S (including all accompanying forms, schedules, statements,

and attachments), individually and collectively, failed to provide any indication:

- That $PSM_{INC}$ had received an interest in $PSM_{LLC}$ as a contribution to its capital from its shareholders in exchange for its stock,
- That $PSM_{INC}$ had ever held an interest in any partnership, or, more specifically, that it had ever held an interest in $PSM_{LLC}$,
- That $PSM_{INC}$ had received the Bonds as a result of the termination/liquidation of a partnership, or that the partnership that terminated/liquidated was $PSM_{LLC}$,
- That the Bonds, prior to their contribution to $PSM_{LLC}$ and their subsequent distribution by $PSM_{LLC}$ to $PSM_{INC}$, had been owned by $PSM_{INC}$'s stockholders,
- That the tax bases claimed by $PSM_{INC}$ in the Bonds resulted from:
  - The assignment and allocation to those Bonds of the greatly inflated tax bases that had previously been assigned to the $PSM_{LLC}$ partnership interests as a result of (1) the acquisition of the Options by the LLC-partners, (2) the subsequent contribution of those Options by those partners to $PSM_{LLC}$, and (3) the claimed increase in the tax bases of the $PSM_{LLC}$ partnership interests by the amount of the premiums "charged" for the Long Options (and without regard to either the amount of the premiums "credited" for the offsetting Short Options or the actual net cash costs of the Options), and from
  - The capitalization of $614,999 of accounting and legal fees paid to E&Y and Proskauer Rose by $PSM_{INC}$, $PSM_{LLC}$, MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy)
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on $PSM_{INC}$'s 2000 Form 1120S.

241 As previously stated, in my opinion it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if (1) the "Net income(loss) per books" (Line 1) had been computed by subtracting the sales price of the Bonds from the fair market value of the Bonds, as of the date of their distribution to $PSM_{INC}$ by $PSM_{LLC}$, and if (2) the resulting difference between this amount of gain/loss and the amount of the $PSM_{INC}$ LTCL had been shown as an adjustment on Line 6 of Schedule M-1

242 As previously observed, the use of the word "COST" rather than "Other Basis" (or some other description indicating that the amounts so labeled were not the "actual cash cost" of the Bonds) is misleading and contrary to the IRS's express instructions for disclosing sales of capital assets on Schedule D

- $PSM_{INC}$ did not include any "explanation" or other description of the amount that it reported on Statement 3 as its "COST" of the Bonds.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed with $PSM_{INC}$'s 2000 Form 1120S.

243 In my opinion, other than a common address and signature, there was nothing on $PSM_{INC}$'s Form 1120S (or on any of the accompanying forms, schedules, statements, or attachments) to connect $PSM_{INC}$ to $PSM_{LLC}$, or to connect $PSM_{INC}$ to HDM, MDM, or SKM

244 In my opinion, it would be reasonable to conclude that one of the principal functions served by the $PSM_{INC}$ was to further distance:

- The transactions
    - That created the inflated basis amounts, and

  - o That were used to capitalize the Transaction-related accounting and legal fees,[229]

- From M_Murphy, and S_Murphy, and H_Murphy, each of whom would ultimately deduct his allocated share of the resulting $PSM_{INC}$ LTCL against unrelated gains on his Form 1040.

245. In my opinion, it would be reasonable to conclude that another principal function served by $PSM_{INC}$ was to remove the sale of the Bonds from the respective Form 1040s of M_Murphy, S_Murphy, and H_Murphy, and to thereby significantly reduce the possibility of detection and audit by the IRS.

- Had the distributions of these Bonds been made directly to M_Murphy, and S_Murphy, and H_Murphy, sold by them, and then reported on their individual Form 1040s, the order of magnitude between the claimed tax basis ($24,583,205) and the selling price ($51,321) would have been so great (especially given the nature of the asset ("Municipal Bonds" with a par value of $51,000)), that it is reasonable to assume that the risk of detection and audit would have increased substantially

  - o The tax basis assigned to the Bonds was **478 times greater than the price these Bonds sold for**, and **481 time greater than their par value**.

  - o The disclosures that M_Murphy, and S_Murphy, and H_Murphy would have had to make on their respective sales of the Bonds (on

---

229 These transactions included (1) the formation of the single-member LLCs and the acquisition of Employer Identification Numbers for each of them, (2) the purchases of the offsetting Options by MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy), (3) the transfer of those offsetting Options by those LLCs to $PSM_{LLC}$, (4) the transfer of the Bonds by MDM (M_Murphy), SKM (S_Murphy), and HDM (H_Murphy) to $PSM_{LLC}$ shortly before $PSM_{LLC}$'s liquidation, (5) the liquidation of $PSM_{LLC}$ and distribution of those Bonds to $PSM_{INC}$, and (6) $PSM_{INC}$'s assignment of a tax basis to the Bonds that was comprised of $23,862,000 of artificial, noneconomic built in losses (Table 4, Column I, Row 4), and $631,999 of unidentified built-in losses for Transaction-related accounting and legal fees (Table 6)

the Schedule Ds filed with their respective Form 1040s) would have included.

- "(a) Description of the property,"
- "(b) Date acquired (mo., day, yr.),"
- "(c) Date sold (mo., day, yr.),"
- "(d) Sales price,"
- "(e) Cost or other basis," and finally
- "(f) Gain or (loss)"

  - Column (e) of Line 8 have required the disclosure of the "Cost or other basis (see page D-6)." *2000 Instructions for Schedule D (Form 1040)* states.

    **Column (e)—Cost or other basis.** If you do not use the actual cost, attach an explanation of your basis.[230]

- Since the Bonds were instead distributed to and sold by the newly-formed S Corporation, these required, detailed disclosures were effectively moved from the shareholders' respective Form 1040s to the $PSM_{INC}$'s Form 1120.[231]
  - As subsequently observed, on their 2000 Form 1040s, the shareholders of $PSM_{INC}$ simply deducted all or part of the long-term capital loss allocated to them by $PSM_{INC}$ on a single line (Line 12) of their Schedule Ds

---

230 *2000 Instructions for Schedule D (Form 1040)*, at page D-6

231 As subsequently observed, however, $PSM_{INC}$ did not attach or include any explanation or description of how the tax basis it claimed to have had in these Bonds had been determined

- None of these Form 1040s disclosed the dollar amount of the long-term capital loss that was allocated to that shareholder by $PSM_{INC}$ [232]
- None of these Form 1040s identified, by name or by EIN, $PSM_{INC}$ as the source of some or all of the net long-term capital loss amount deducted on Line 12
- None of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition or sale, or the tax basis used to compute the amount of the loss
- None of these Form 1040s disclosed any information or description regarding the source[233] of these losses or the rationale or method used to determine the tax basis claimed by the S Corporations in calculating the amounts.

## B. $MPP_{LLC}$ and $MP_{INC}$

### 1. $MPP_{LLC}$'s Partnership Return[234]

#### (a) Description

246. $MPP_{LLC}$ timely filed an "initial" and "final" 2000 short-year Form 1065 ("U.S. Partnership Return of Income")

- The short year reported on $MPP_{LLC}$'s Form 1065 began on 4/10/00 and ended on 12/27/00.
- This Return was signed by Wendell Murphy and was dated March 14, 2001.

---

232 As subsequently observed, these losses may have been netted out against unrelated long-term capital gains allocable to the shareholders' from other partnerships, S corporations, etc

233 *Supra* , footnote 3

234 See Table 2 for the Bates numbers to copies of the 2000 Form 1065s

- Ray A Knight signed this Return as Preparer This signature was dated March 1, 2001, and identified Mr Knight's employer as Ernst & Young, LLP, 1150 18th Street N.W., Suite 500, Washington, DC
- $MPP_{LLC}$ elected the cash method of accounting.

247. Question 2 of Schedule B ("Are any partners in this partnership also partnerships?") was checked "Yes."

- However, the partners that were listed on the "Partnership Summary and on the Schedule K-1s filed with $MPP_{LLC}$'s Form 1065 were not partnerships, but were rather single-member LLCs that were treated as disregarded entities for federal tax purposes.
    - The fact that these LLCs were single-member LLCs was not disclosed on $MPP_{LLC}$'s Form 1065
    - The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on $MPP_{LLC}$'s Form 1065.

248. Question 4 of Schedule B ("Is the partnership subject to the consolidated audit procedures . . .") was checked "No" and "Designation of Tax Matters Partner" (which would have disclosed the name, tax identification number and address of that partner) was left blank[235]

249. On its Schedule K of Form 1065 for 2000, $MPP_{LLC}$ reported:

- "Ordinary . . . (loss) from trade or business activities" of $420,000 (Line 1),
- "Ordinary dividends" of $35 (Line 4b),
- "Net short-term capital gain" of $5,878 (Line 4d), and

[235] Note that Question 4 must be checked "Yes" if any partner was "other than an individual, an estate, or a C corporation." See *2000 Instructions for Form 1065* (p 19) Although the $MPP_{LLC}$'s three LLC partners (HDM, WHM, and WHMJ) were disregarded entities that were respectively owned by H_Murphy, W_Murphy, and W_Murphy_Jr, the LLCs, and not their respective individual owners, were listed as $MPP_{LLC}$'s partners on the Schedule K-1s and on the "Partner Summary."

- "Tax-exempt interest income" of $5,767 (Line 19).
- No other items of income, gain, deduction, or loss were reported on Schedule K

250. The $420,000 ordinary loss reported on Schedule K was also reported on Line 10 of Form 4797 ("Sales of Business Property"), and cross-referenced to "STATEMENT 2."

- "STATEMENT 2" listed the gains and losses resulting from each of four "Currency Contract[s]."
- The term "Currency Contract" is nebulous. It could refer to any of several different types of currency transactions, including options, forward contracts, futures contracts, or currency swaps.[236]
- Statement 2 did not disclose the fact that that the "Currency Contracts" included paired Long Options and offsetting Short Options in each of two foreign currencies.
- There is no indication, in STATEMENT 2 or on any form, schedule, or statements attached to $MPP_{LLC}$'s Form 1065, as to how these "Currency Contracts" were acquired:
  - Whether they were purchased by $MPP_{LLC}$ using cash contributed to it by its partners,
  - Whether they were purchased by $MPP_{LLC}$ using borrowed funds,
  - Whether they were acquired by $MPP_{LLC}$ in exchange for a partnership interest or as a contribution to its capital, or
  - Whether they were acquired by some other means
- There is nothing on $MPP_{LLC}$'s Form 1065, on any of the Schedule K-1s, or on any other accompanying form, schedule, or statement that would

[236] For example, the owner of a forward, futures, or swap contract has a obligation to perform. By contrast, the purchase of an option gives the owner a right, but not an obligation

indicate or otherwise suggest that the Long Options and the offsetting Short Options were contributed to $MPP_{LLC}$ by its partners as contributions to capital, or that the contributions of these Options would result in the greatly inflated basis amounts (totaling $13,580,000 (see Table 4, Column I, Row 8)) that the partners (and $MP_{INC}$) claimed to have had in their $MPP_{LLC}$ partnership interests, and that were subsequently allocated to the Euros and used by $MP_{INC}$ in computing the $MP_{INC}$ Ordinary Loss.

251. As previously observed, none of the accounting and legal fees paid to E&Y and to Proskauer Rose were identified, described, or otherwise disclosed or deducted on Form 1065, on any of the partners' Schedule K-1s, or on any other form, schedule, or statement that accompanied $MPP_{LLC}$'s Form 1065.

252. A "Partner Summary" was attached to Form 1065.

- This summary listed the single-member LLCs as $MPP_{LLC}$'s partners and disclosed their respective tax identification numbers and their respective beginning ratios of profit, loss, and ownership. As previously observed.
    - The names and tax identification numbers of the single-member LLCs differed from the names and tax identification numbers of the individuals who owned these LLCs.
    - The "Limited Liability Company Agreement" of $MPP_{LLC}$ listed H_Murphy, W_Murphy, and W_Murphy_Jr as its members (partners) and did not make any reference to HDM, WHM, or WHMJ
    - The ownership percentages set forth in Exhibit B of the "Limited Liability Company Agreement" of $MPP_{LLC}$ listed "Distribution Percentages" of "33a%" for H_Murphy, W_Murphy, and W_Murphy_Jr
    - The $MPP_{LLC}$ Partner Summary listed Profit/Loss/Ownership Ratios of

- 14 2857% for HDM,
- 57 1428% for WHM, and
- 28 5715% for WHMJ.

- The identities of the individual owners of these LLC partners was not disclosed, by name or by tax identification number, on this Partner Summary.
- The columns titled "Beginning Capital," "Capital Contributions," "Cash Distributions," and "Property Distributions" were left blank.
- The Partner Summary did not make any reference to (or provide any description or information relating to) the contributions of the Long Options or the offsetting Short Options by the LLC-partners to $MPP_{LLC}$'s capital during 2000.
  - More specifically, the Partner Summary did not disclose or otherwise allude to the fact that the tax bases that the $MPP_{LLC}$ partners claimed to have had in their $MPP_{LLC}$ partnership interests had been determined, in part, by increasing those bases by the amount of the stated premium "charged" for the Long Options and without regard to the premiums "credited" for the offsetting Short Options (and, therefore, without regard to the actual net cash cost of the Options).

253 A separate Schedule K-1 was prepared for each of $MPP_{LLC}$'s three partners.

- Although each of the single-member LLC partners were expressly designated for treatment as "disregarded entities" on the Form SS-4s that were filed by their respective single-members (¶25, *et seq.*), $MPP_{LLC}$ identified the LLCs, and not H_Murphy, W_Murphy, and

W_Murphy_Jr , as its partners on the Schedule K-1s that $MPP_{LLC}$ filed with its Form 1065 [237]

- Each of these Schedule K-1s described the LLC-partner as a domestic "LIMITED LIAB CO "[238]
  - The fact that these LLCs were single-member LLCs was not disclosed on $MPP_{LLC}$'s Schedule K-1s or elsewhere on its Form 1065.
  - The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on $MPP_{LLC}$'s Schedule K-1s or elsewhere on its Form 1065
  - Neither the names nor the Social Security Numbers of H_Murphy, W_Murphy,[239] or W_Murphy_Jr appeared anywhere on any of the Schedule K-1s or elsewhere on $MPP_{LLC}$'s Form 1065

- The space provided for the response to Item G ("Tax shelter registration number") was left blank on each of the Schedule K-1s.
- The amounts of ordinary income, net short-term capital loss, and tax-exempt interest income that were separately reported on $MPP_{LLC}$'s Schedule K were allocated to and between the LLC-partners and separately reported on their respective Schedule K-1s.
- Line 25 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s Line 25 is used, among other things, to provide adequate disclosure of the

---

237 See *supra* , footnote 46 (e-mail from Amy Keating to Robert Coplan and Donna Guerin questioning the reference to the LLCs, rather than to their single-member owners, as the partners on the COBRA partnership returns) See also ¶43

238 Response to Question B ("What type of entity is this partner?")

239 However, as previously noted, W_Murphy legibly signed $MPP_{LLC}$'s Form 1065 His signature was not accompanied by his Social Security Number

relevant facts relating to the tax treatment of any item that may cause an understatement of income tax [240]

254. $MPP_{LLC}$'s Form 1065 (including all accompanying forms, schedules, statements, and attachments) did not disclose or otherwise provide any indication of:

- The contribution of the Long Options and the offsetting Short Options to $MPP_{LLC}$ as contributions to its capital,
- The purchase of the Euros by $MPP_{LLC}$,
- The fact that $MPP_{LLC}$ had ever held the Euros,
- The fact that the 100% of the $MPP_{LLC}$ partnership interests had been transferred by $MPP_{LLC}$'s partners to an S corporation ($MP_{INC}$) as a contribution to its capital (and that this transfer had resulted in a technical termination of $MPP_{LLC}$ for federal income tax purposes),
- The type, identity, tax basis, or fair market value of the noncash asset (i.e., the Euros) distributed upon the termination/liquidation of $MPP_{LLC}$, or
- The identity of the distributee of that asset ($MP_{INC}$) (or the fact that that asset had not been distributed to the partners identified in the "Partner Summary" and on the Schedule K-1s filed with $MPP_{LLC}$'s Form 1065)

255. $MPP_{LLC}$'s Form 1065 did not contain any references (by name or by tax identification number) to

- Any of the individual owners of its single-member LLC partners,[241] or to
- $MP_{INC}$, the distributee of $MPP_{LLC}$'s assets upon its termination/liquidation

---

240 See *2000 Instructions for Form 1065* (p 29), and *2000 Instructions for Schedule K-1 (Form 1065)* (p 10)

241 Note, however, that $MPP_{LLC}$'s Form 1065 was legibly signed by Wendell Murphy However, his signature was not accompanied by his Social Security Number

(b) Opinion

256 In my opinion, the information and disclosures made on and with the $MPP_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication.

- That foreign currency options (i.e , the Long Options and the offsetting Short Options) were acquired outside $MPP_{LLC}$ by its partners and then contributed to its capital by those partners
- That the acquisitions of the Long Options and the offsetting Short Options by the LLCs and the subsequent contributions of these Options to $MPP_{LLC}$ was the source of the greatly inflated tax bases claimed:
  - In the $MPP_{LLC}$ partnership interests respectively held by the partners, and, subsequently,
  - In the Euros purchased and then distributed by $MPP_{LLC}$ to $MP_{INC}$ (and then sold by $MP_{INC}$ for a reported ordinary loss of $13,919,961), and
  - In the $MP_{INC}$ stock held by $MP_{INC}$'s stockholders
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MPP_{LLC}$'s Form 1065 had disclosed this information

257 In my opinion, the information and disclosures made on the $MPP_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication that:

- HDM (H_Murphy), WHM (W_Murphy), WHMJ (W_Murphy_Jr), and the other Partnerships and S Corporations (apparently on $MPP_{LLC}$'s behalf) had paid Transaction-related accounting and legal fees totaling

approximately $349,999 (see Table 6) to E&Y and Proskauer Rose, or that

- These fees were ultimately recognized and reported as unidentified components of the $MP_{INC}$ Ordinary Loss (and as unidentified components of the amount of that Ordinary Loss that was allocated to and deducted by H_Murphy, W_Murphy, and W_Murphy_Jr on their respective 2000 Form 1040s)

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MPP_{LLC}$'s Form 1065 had disclosed this information.

258 In my opinion, the information and disclosures made on the $MPP_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication:

- That $MPP_{LLC}$ had purchased the Euros,

- That all of $MPP_{LLC}$'s outstanding partnership interests had been contributed by its partners to another conduit entity ($MP_{INC}$),

- That the Euros had been distributed by $MPP_{LLC}$ to that conduit entity upon its termination/liquidation,

- That the distributee of these Euros was $MP_{INC}$, or

- That $MP_{INC}$ was an S corporation owned in the same proportions by the same individuals who had, directly or indirectly through their respective single-member LLCs, been the partners of $MPP_{LLC}$ throughout the less-than-nine-month period of its existence.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MPP_{LLC}$'s Form 1065 had disclosed this information

259. In my opinion, the information and disclosures made on the $MPP_{LLC}$'s Form 1065 (including all accompanying forms, schedules, statements, and

attachments), individually and collectively, failed to provide any reasonably discernable indication that the greatly inflated tax bases that resulted from the creation, capital funding, termination, and liquidation of $MPP_{LLC}$ were subsequently used by an undisclosed S corporation (i e , $MP_{INC}$) to report a $13,919,961 ordinary loss that was allocated to and deducted by undisclosed individual taxpayers (i e , H_Murphy, W_Murphy, and W_Murphy_Jr) on their individual 2000 Form 1040s.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increase significantly if $MPP_{LLC}$'s Form 1065 had disclosed this information

260. In my opinion, it is reasonable to conclude that the risk of detection and audit by the IRS would have increased substantially had the accounting and legal fees paid to E&Y and Proskauer Rose had been identified and described on $MPP_{LLC}$'s Form 1065

261. Neither the name nor the tax identification number of $MP_{INC}$ was disclosed anywhere on $MPP_{LLC}$'s Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments).[242]

262. Neither the names nor tax identification numbers of H_Murphy, W_Murphy, or W_Murphy_Jr were disclosed anywhere on $MPP_{LLC}$'s Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments).

- As previously stated, in my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS might have been minimized or significantly reduced[243] through (1) the use of the LLCs to acquire and hold the $MPP_{LLC}$ partnership interests, (2) the assignment of entity names to the LLCs that did not include the full names or surnames of their single-member owners, (3) the procurement of EINs

---

[242] However, as previously observed, both $MPP_{LLC}$ and $MP_{INC}$ had the same address

[243] More specifically, the possibility that the IRS might trace the ownership of $MPP_{LLC}$ *from* $MPP_{LLC}$'s Form 1065 *to* the 2000 Form 1040s of its ultimate partners (i e., the Taxpayers on whose 2000 Form 1040s the $MP_{INC}$ Ordinary Losses were deducted) was minimized or reduced

for each of the LLCs,[244] and (4) the identification of the LLCs (by name and EIN), and not the Taxpayers (by name or by SSN), as the partners of $MPP_{LLC}$ on its Form 1065

### 2. $MP_{INC}$'s 2000 S Corporation Return[245]

#### (a) Description

263 $MP_{INC}$ filed its "initial" short-year Form 1120S ("U S Income Tax Return for an S Corporation") for the period beginning June 22, 2000 and ending December 31, 2000, on which it adopted a calendar tax year and elected the cash method of accounting

264 On page 1 of its 2000 Form 1120S, $MP_{INC}$ reported a "Net . . (loss) from Form 4797 . ." of $13,919,961

265 On its Schedule K of Form 1120S, $MP_{INC}$ reported:

- "Ordinary (loss) from trade or business activities" of $13,919,961 (Line 1),
- "Other deductions" for "Professional Fees" of $14,570 (Line 10), and
- "Tax-exempt interest income" of $0 (Line 17).
- No other items of income, gain, deduction, or loss were reported on Schedule K.

266 Other than the $14,570 fee to E&Y that $MP_{INC}$ deducted on Line 10 of Schedule K, none of the $349,999 in accounting and legal fees paid to E&Y and Proskauer Rose by HDM (H_Murphy), WHM (W_Murphy), WHMJ (W_Murphy_Jr), and the other Partnerships and S Corporations (apparently on $MPP_{LLC}$'s behalf) were identified, described, or otherwise disclosed or deducted on $MP_{INC}$'s 2000 Form 1120S, on any of the stockholders' Schedule K-1s, or on any other forms, schedules, statements, or attachments filed with that return

---

244 *Supra* , footnote 42

245 See Table 2 for the Bates numbers to copies of the 2000 Form 1120Ss

267. As noted above, $MP_{INC}$ deducted $14,570 in fees to E&Y and described those fees as "Professional Fees."

- As previously observed, this amount was also capitalized as an increase to the tax basis that $MP_{INC}$ claimed to have had in the Euros and was therefore deducted a second time as an unidentified component of the $MP_{INC}$ Ordinary Loss.
- As previously observed, I could find no record of this payment having been made by $MP_{INC}$ on $MP_{INC}$'s December 2000 *Alex Brown Client Statement*

268. On Schedule L of Form 1120S ("Balance Sheet per Books"), $MP_{INC}$ did not disclose any opening account balances for its assets, liabilities, or shareholders' equity. If the opening account balances as of December 26th/27th had been determined under generally accepted accounting principles and disclosed on $MP_{INC}$'s 2000 Form 1120S, Schedule L would have disclosed:

- "Cash" of $12,097 (Line 1(b)).[246]
- "Other current assets(attach schedule)" on Line 6(b)) and/or ("Other investments (attach schedule)" on Line 8(b)) of approximately $300,000.[247] The required "attach[ed] schedule[s]" would have disclosed the existence and value of the Euros.
- "Capital stock" of $100 (Line 22(b)).
- "Additional paid-in capital" of approximately $311,997 (Line 23(b)).[248]
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule L of $MP_{INC}$'s 2000 Form 1120S.

---

246 Table 8, Column M, Row 16

247 Table 8, Column M, Row 9

248 $311,997 = $300,000 + $12,097 - $100.

269 On Schedule L of Form 1120S, $MP_{INC}$ listed the following closing balances:

- "Cash" of $307,567 (Line 1(d)),
- "Capital stock" of $100 (Line 22(d)),
- "Additional paid-in capital" of $14,241,998 (Line 23(d)),
- Negative "Retained earnings" of $13,934,531 (Line 24(d)).
- No other assets, liabilities, etc. were listed on Schedule L.

270 $MP_{INC}$'s Form 1120S did not identify, describe, or otherwise disclose the source of the $14,241,998 of additional paid-in capital (or any description or calculations that would indicate or explain how that amount had been determined).

- Under generally accepted accounting principles,[249]
  - As noted above, the amount recorded by $MP_{INC}$ as "Additional paid-in capital" would have been the net amount of cash and the fair market value of the $MPP_{LLC}$ noncash asset (i.e., the Euros) received by $MP_{INC}$ upon the termination/liquidation of $MPP_{LLC}$, net of any liabilities of $MPP_{LLC}$ or the transferor-stockholders that were assumed by $MP_{INC}$, and net of the $100 recorded as "Capital Stock."
    - As noted above, this amount would have been approximately $311,997 (or approximately 2.19% of the $14,241,998 ending balance actually shown by $MP_{INC}$ on its 2000 Schedule L[250])
  - The gain or loss resulting from the sale of the Euros (and reflected in the ending balance of "Retained earnings" on Schedule L) would have been computed by subtracting the fair market value of the Euros, as of the date of the contribution of the $MPP_{LLC}$ partnership interests to $MP_{INC}$, from the sales price of the Euros. The amount of

[249] See, for example, *Financial Accounting Standards Board Current Text* at B51.104 and B51.105

[250] 2.19% = $311,997 divided by $14,241,998

the gain or loss that would have been recognized by $MP_{INC}$ under these principles would likely have been *di minimis*.

271 On Schedule M-1 ("Reconciliation of Income (Loss) per Books With Income (Loss) per Return"), "[n]et . . (loss) per books" was shown as $13,934,531.

- Under generally accepted accounting principles,
  - The "[n]et income (loss)" resulting from the sale of the Euros would have been computed by subtracting the fair market value of the Euros, as of the date of the contribution of the $MPP_{LLC}$ partnership interests to $MP_{INC}$, from the sales price of the Euros
  - The "[n]et . . (loss) per books" that would have been recognized under these principles would likely have been *di minimis* (Schedule M-1, Line 1), and a negative adjustment of approximately the full amount of the $13,919,961 $MP_{INC}$ Ordinary Loss would have been made on Line 6 of Schedule M-1. However, no such amounts or adjustments were identified or made on $MP_{INC}$'s Schedule M-1
  - In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule M-1 of $MP_{INC}$'s 2000 Form 1120S.

272 Part II of $MP_{INC}$'s Schedule D ("Capital Gains and Losses and Built-In Gains") to Form 1120S reported a "Net long-term capital . . (loss)" of $13,919,961. Schedule D (Line 7) referred to "STATEMENT 3" for the calculations supporting the net amount shown on Lines 7, 11, and 14.

273. STATEMENT 3 presented the calculation for the sale of a "Currency Contract" with an acquisition date of 12/27/00 and a sale date of 12/29/2000. STATEMENT 3 disclosed a "Sales Price" of $310,039, a "COST OR OTHER BASIS . ." of $14,230,000, and a resulting loss of $13,919,961

- $MP_{INC}$ did not include any explanation or other description of the amount that it reported on Statement 3 as its "COST OR OTHER BASIS . " of the Euros.
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed with $MP_{INC}$'s 2000 Form 1120S

274. A "SHAREHOLDER SUMMARY" was attached to $MP_{INC}$'s 2000 Form 1120S. This Shareholder Summary listed each of $MP_{INC}$'s individual stockholders (H_Murphy, W_Murphy, and W_Murphy_Jr) and their respective "Beginning Shares" and "Ownership Percentage." This "Shareholder Summary" did not:

- Disclose any information relating to any of the stockholders' tax basis in his/her respective shares of $MP_{INC}$, or
- Identify, describe, or otherwise disclose the fact of or any details or description relating to the contribution of the $MPP_{LLC}$ partnership interests to $MP_{INC}$ as a contribution to its capital by H_Murphy, W_Murphy, and W_Murphy_Jr in exchange for the stock of $MP_{INC}$.
- Nor was any of this information presented elsewhere on $MP_{INC}$'s 2000 Form 1120S (or on any accompanying forms, schedules, statements, or attachments)

275 As previously observed, $MP_{INC}$ filed an election to be taxed as an S corporation on Form 2553 ("Election by a Small Business Corporation"). This Form was signed by Wendell Murphy as President, and included the signed consents of all three of $MP_{INC}$'s shareholders.[251]

- The stock ownership disclosed on Form 2553 (as of 6/23/00) was.[252]
  - Harry D. Murphy: 10 shares.

---

[251] Bates: IRSADMIN000107 Wendell Murphy, President, was the designated "officer or legal representative" on Form 2553, Line E

[252] See also $MP_{INC}$'s "Consent of Directors." Bates: MUEY00897 & MUEY00898

  - Wendell H Murphy: 10 shares
  - Wendell H Murphy, Jr. 10 shares.

- The stock ownership disclosed on $MP_{INC}$'s 2000 Form 1120S (on the Shareholder Summary, and on the shareholders' respective Schedule K-1s) was:
  - Harry D. Murphy: 14.2857 shares (14.2857%)
  - Wendell H. Murphy. 57.1428 shares (57.1428%).
  - Wendell H. Murphy, Jr.: 28.5715 shares (28.5715%).

276 A Schedule K-1 for each of $MP_{INC}$'s three individual stockholders accompanied $MP_{INC}$'s 2000 Form 1120S. Each of these Schedule K-1s disclosed:

- The stockholder's name, address,[253] tax identification number, percentage of stock ownership in $MP_{INC}$, and the IRS Service Center where $MP_{INC}$'s tax return was filed (Cincinnati, Ohio), and
- The stockholder's share of $MP_{INC}$'s:
  - $13,919,961 long-term capital loss; and
  - $14,570 of "other deductions" (for "Professional Fees").

277. As previously observed, other than the $14,570 that $MP_{INC}$ claimed as a deduction for "Professional Fees," none of the accounting and legal fees paid to E&Y and Proskauer Rose by HDM (H_Murphy), WHM (W_Murphy), WHMJ (W_Murphy_Jr), and, apparently on $MPP_{LLC}$'s behalf, by $PSM_{LLC}$ and/or $MURFAM_{LLC}$ were identified, described, or otherwise disclosed or deducted on any of the stockholders' Schedule K-1s.

278. Line 23 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s. Line 23 is used, among other things, to provide adequate disclosure of the relevant

253 The address listed for each of these individual stockholders was "C?O Murphy Family Farms, 4134 U S Highway # 117. Rose Hill, NC 28458."

facts relating to the tax treatment of any item that may cause an understatement of income tax.[254]

279 As previously observed, $MP_{INC}$'s Form 1120S was not accompanied by a Regulation Section 1.351-3(b) Statement[255] and, except for the stockholders' names and the stock ownership percentages disclosed on the Schedule K-1s and the "Shareholder Summary," did not otherwise disclose any of the information required by that Regulation.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MP_{INC}$ had filed a Regulation Section 1.351-3(b) Statement with its 2000 Form 1120S.

280 $MP_{INC}$'s Form 1120S (including all accompanying forms, schedules, statements, and attachments):

- Did not make any reference to any aspect of the MP Transaction that created the greatly inflated tax basis assigned by $MP_{INC}$ to the Euros (i.e., no reference was made to any of the Long and Short Options that were first acquired by $MPP_{LLC}$'s LLC partners, that were then contributed by those partners to $MPP_{LLC}$, and that ultimately expired on June 13, 2000, prior to $MPP_{LLC}$'s termination/liquidation),
- Did not identify, describe, or otherwise disclose the source from which $MP_{INC}$ had received the Euros (i.e., from $MPP_{LLC}$),
- Did not disclose the fact that these Euros had been received as a liquidating distribution from a partnership (or that the distributing partnership had been owned in the same proportions by the same individuals who owned $MP_{INC}$'s stock);
- Did not disclose the actual cost of the Euros to $MPP_{LLC}$,

---

254 See 2000 *Instructions for Form 1120S* (p. 25), and 2000 *Instructions for Schedule K-1 (Form 1120S)* (p. 8)

255 *Supra*, footnote 167.

- Did not provide any description, explanation, or calculation showing or indicating how $MP_{INC}$ determined its tax basis in the Euros
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on $MP_{INC}$'s 2000 Form 1120S.

281. $MP_{INC}$'s 2000 Form 1120S (including all accompanying forms, schedules, statements, and attachments) did not contain any references whatsoever, by name or by tax identification number, to $MPP_{LLC}$ or to any of the single-member LLCs that $MPP_{LLC}$ had identified as its partners on the Schedule K-1s it filed with its Form 1065

(b) **Opinion**

282. In my opinion, the information and disclosures made on the $MP_{INC}$ 2000 Form 1120S (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication:

- That $MP_{INC}$ had received an interest in $MPP_{LLC}$ as a contribution to its capital from its shareholders in exchange for its stock,
- That $MP_{INC}$ had ever held an interest in any partnership, or, more specifically, that it had ever held an interest in $MPP_{LLC}$,
- That $MP_{INC}$ had received the Euros as a result of the termination/liquidation of a partnership, or that the partnership that terminated/liquidated was $MPP_{LLC}$,
- That the tax bases claimed by $MP_{INC}$ in the Euros resulted from:
  - The assignment and allocation to those Euros of the greatly inflated tax bases that had previously been assigned to the $MPP_{LLC}$ partnership interests as a result of (1) the acquisition of the Options by the LLC-partners, (2) the subsequent contribution of those Options by those partners to $MPP_{LLC}$, and (3) the claimed increase in

the tax bases of the $MPP_{LLC}$ partnership interests by the amount of the premiums "charged" for the Long Options (and without regard to either the amount of the premiums "credited" for the offsetting Short Options or the actual net cash costs of the Options), and from

  - The capitalization of $349,999 of the accounting and legal fees paid to E&Y and Proskauer Rose by HDM (H_Murphy), WHM (W_Murphy), and WHMJ (W_Murphy_Jr) and, apparently on $MPP_{LLC}$'s behalf, by $PSM_{LLC}$ and/or $MURFAM_{LLC}$

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on $MP_{INC}$'s 2000 Form 1120S.

283 As previously stated, in my opinion it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if (1) the "Net income(loss) per books" (Line 1) had been computed by subtracting the sales price of the Euros from the fair market value of the Euros, as of the date of their distribution to $MP_{INC}$ by $MPP_{LLC}$, and if (2) the resulting difference between this amount of gain/loss and the amount of the $MP_{INC}$ Ordinary Loss had been shown as an adjustment on Line 6 of Schedule M-1

284. In my opinion, other than a common address and signature, there was nothing on $MP_{INC}$'s 2000 Form 1120S (or on any of the accompanying forms, schedules, statements, or attachments) to connect $MP_{INC}$ to $MPP_{LLC}$, or to connect $MP_{INC}$ to HDM, WHM, or WHMJ.

285. In my opinion, it would be reasonable to conclude that one of the principal functions served by the $MP_{INC}$ was to further distance:

- The transactions
  - That created the inflated basis amounts, and

- That were used to capitalize the Transaction-related accounting and legal fees,[256]

- From H_Murphy, W_Murphy, and W_Murphy_Jr each of whom would ultimately deduct his allocated share of the resulting $MP_{INC}$ Ordinary Loss against unrelated gains on his Form 1040

286 In my opinion, it would be reasonable to conclude that another principal function served by $MP_{INC}$ was to remove the sale of the Euros from the respective Form 1040s of H_Murphy, W_Murphy, and W_Murphy_Jr and to thereby significantly reduce the possibility of detection and audit by the IRS.

- Had the distributions of these Euros been made directly to H_Murphy, W_Murphy, and W_Murphy_Jr, sold by them, and then reported on their individual Form 1040s, the order of magnitude between the claimed tax basis ($14,230,000) and the selling price ($310,039) would have been so great (especially given that the Euros had been purchased on December 21, 2000 for $300,000, just eight days before they were sold), that it is reasonable to assume that the risk of detection and audit would have increased substantially.

  - The tax basis assigned to the Euros was **45 times greater than the price these Euros sold for**, and **46 time greater than their par value**.

  - The disclosures that W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown would have had to make on their

[256] These transactions included (1) the formation of the single-member LLCs and the acquisition of Employer Identification Numbers for each of them, (2) the purchases of the offsetting Options by HDM (H_Murphy), WHM (W_Murphy), WHMJ (W_Murphy_Jr), (3) the transfer of those offsetting Options by those LLCs to $MPP_{LLC}$, (4) the transfer of the Euros by HDM (H_Murphy), WHM (W_Murphy), WHMJ (W_Murphy_Jr) to $MPP_{LLC}$ shortly before $MPP_{LLC}$'s liquidation, (5) the liquidation of $MPP_{LLC}$ and distribution of those Euros to $MP_{INC}$, and (6) $MP_{INC}$'s assignment of a tax basis to the Euros that was comprised of $13,580,000 of artificial, noneconomic built in losses (Table 4, Column I, Row 8), and $349,999 of unidentified built-in losses for Transaction-related accounting and legal fees (Table 6)

respective sales of the Euros (on the Form 4797s filed with their respective Form 1040s) would have included:

- "(a) Description of the property,"
- "(b) Date acquired (mo., day, yr.),"
- "(c) Date sold (mo., day, yr.),"
- "(d) Gross sales price,"
- "(f) Cost or other basis, plus improvements and expense of sale," and finally
- "(g) Gain or (loss)"

- The reporting of the $MP_{INC}$ Ordinary Loss on the Schedule Es included with the 2000 Form 1040s of the shareholders of $MP_{INC}$ (H_Murphy, W_Murphy, and W_Murphy_Jr), disclosed the shareholder's allocated amount of the $MP_{INC}$ Ordinary Loss, together with the name and EIN of $MP_{INC}$ as the entity from which that loss was allocated. However,
  - None of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition or sale, or the tax basis used to compute the amount of the loss, and
  - None of these Form 1040s disclosed any information or description regarding the source[257] of these losses or the rationale or method used to determine the tax basis claimed by the S Corporations in calculating the amounts

257 *Supra* , footnote 7

## C. MURFAM$_{LLC}$ and MURFAM$_{INC}$

### 1. MURFAM$_{LLC}$'s Partnership Return[258]

#### (a) Description

287 MURFAM$_{LLC}$ timely filed an "initial" and "final" 2000 short-year Form 1065 ("U.S. Partnership Return of Income")

- The short year reported on MURFAM$_{LLC}$'s Form 1065 began on 4/10/00 and ended on 12/27/00.
- This Return was signed by Wendell Murphy and was dated March 14, 2001.
- Ray A. Knight signed this Return as Preparer. This signature was dated March 1, 2001, and identified Mr. Knight's employer as Ernst & Young, LLP, 1150 18th Street N.W., Suite 500, Washington, DC
- MURFAM$_{LLC}$ elected the cash method of accounting.

288 Question 2 of Schedule B ("Are any partners in this partnership also partnerships?") was checked "Yes."

- However, the partners that were listed on the "Partnership Summary and on the Schedule K-1s filed with MURFAM$_{LLC}$'s Form 1065 were not partnerships, but were rather single-member LLCs that were treated as disregarded entities for federal tax purposes.
    - o The fact that these LLCs were single-member LLCs was not disclosed on MURFAM$_{LLC}$'s Form 1065.
    - o The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on MURFAM$_{LLC}$'s Form 1065

289. Question 4 of Schedule B ("Is the partnership subject to the consolidated audit procedures . . .") was checked "No" and "Designation of Tax Matters

[258] See Table 2 for the Bates numbers to copies of the 2000 Form 1065s

Partner" (which would have disclosed the name, tax identification number and address of that partner) was left blank.[259]

290. Question 5 of Schedule B[260] was answered "Yes," notwithstanding the fact that $MURFAM_{LLC}$'s total assets at the time of its liquidation exceeded $600,000.

- At the time of its termination and liquidation, $MURFAM_{LLC}$ held cash of $1,216,228[261] and Bonds having an approximate value of $127,000.
- Since $MURFAM_{LLC}$'s total assets (as of the reported end of its tax year) exceeded the thresholds set forth in Question 5, $MURFAM_{LLC}$ was not exempt from the requirement that the following schedules and items be completed:
  - Schedule L ("Balance Sheet per Books"),
  - Schedule M-1 ("Reconciliation of Income (Loss) per Books With Income (Loss) per Return"), and
  - Schedule M-2 ("Analysis of Partners' Capital Account"),
  - Item F on page 1 of Form 1065 ("Total assets"), and
  - Item J on Schedule K-1 ("Analysis of partner's capital account")

---

259 Note that Question 4 must be checked "Yes" if any partner was "other than an individual, an estate, or a C corporation." See *2000 Instructions for Form 1065* (p. 19). Although the $MURFAM_{LLC}$'s five LLC partners (WHM, WHMJ, WMC, JMN, and ANB ) were disregarded entities that were respectively owned by W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown, the LLCs, and not their respective individual owners, were listed as $MURFAM_{LLC}$'s partners on the Schedule K-1s and on the "Partner Summary."

260 Question 5 read as follows:

> 5 Does the partnership meet ALL THREE requirements?
>
> a The partnership's total receipts for the tax year were less than $250,000;
>
> b The partnership's total assets at the end of the tax year were less than $600,000;
>
> If 'Yes,' the partnership is not required to complete Schedules L, M-1, and M-2 ... or Item J on Schedule K-1

261 See Table 9, Column M, Rows 16 and 9.

Nevertheless, all of these schedules and items were left blank on $MURFAM_{LLC}$'s 2000 Form 1065

- Had Schedule L been completed showing the assets and liabilities of $MURFAM_{LLC}$ as of the moment of its reported termination and liquidation, it would have disclosed:
  - The ending balance of "Cash" ($1,216,228).
  - The existence of and a description of the Bonds on Line 5(d) ("Tax-exempt securities"), 6(d) ("Other current assets (attach schedule)," or Line 8(d) ("Other investments (attach schedule)"), and a book value for those Bonds of approximately $127,000[262] (far less than the $61,670,815 that $MURFAM_{INC}$ would claim as its tax basis in those Bonds when it sold them less than a week later on December 29)
  - The ending balance of the "Partners' capital accounts." [?]

291. On its Schedule K of Form 1065 for 2000, $MURFAM_{LLC}$ reported.

- "Ordinary . . (loss) from trade or business activities" of $1,851,000 (Line 1),
- "Ordinary dividends" of $150 (Line 4b),
- "Net short-term capital gain" of $26,429 (Line 4d), and
- "Tax-exempt interest income" of $24,712 (Line 19).
- No other items of income, gain, deduction, or loss were reported on Schedule K

292 The $1,851,000 ordinary loss reported on Schedule K was also reported on Line 10 of Form 4797 ("Sales of Business Property"), and cross-referenced to "STATEMENT 2."

- "STATEMENT 2" listed the gains and losses resulting from each of four "Currency Contract[s]."

262 *Ibid*

- The term "Currency Contract" is nebulous. It could refer to any of several different types of currency transactions, including options, forward contracts, futures contracts, or currency swaps [263]
- Statement 2 did not disclose the fact that that the "Currency Contracts" included paired Long Options and offsetting Short Options in each of two foreign currencies.
- There is no indication, in STATEMENT 2 or on any form, schedule, or statements attached to $\text{MURFAM}_{\text{LLC}}$'s Form 1065, as to how these "Currency Contracts" were acquired:
  - Whether they were purchased by $\text{MURFAM}_{\text{LLC}}$ using cash contributed to it by its partners,
  - Whether they were purchased by $\text{MURFAM}_{\text{LLC}}$ using borrowed funds,
  - Whether they were acquired by $\text{MURFAM}_{\text{LLC}}$ in exchange for a partnership interest or as a contribution to its capital, or
  - Whether they were acquired by some other means
- There is nothing on $\text{MURFAM}_{\text{LLC}}$'s Form 1065, on any of the Schedule K-1s, or on any other accompanying form, schedule, or statement that would indicate or otherwise suggest that the Long Options and the offsetting Short Options were contributed to $\text{MURFAM}_{\text{LLC}}$ by its partners as contributions to capital, or that the contributions of these Options would result in the greatly inflated basis amounts (totaling $59,849,000 (see Table 4, Column I, Row 14)) that the partners (and $\text{MURFAM}_{\text{INC}}$) claimed to have had in their $\text{MURFAM}_{\text{LLC}}$ partnership interests, and that were subsequently allocated to the Bonds and used by $\text{MURFAM}_{\text{INC}}$ in computing the $\text{MURFAM}_{\text{INC}}$ LTCL.

---

[263] For example, the owner of a forward, futures, or swap contract has a obligation to perform. By contrast, the purchase of an option gives the owner a right, but not an obligation

293 As previously observed, none of the accounting and legal fees paid to E&Y and to Proskauer Rose were identified, described, or otherwise disclosed or deducted on Form 1065, on any of the partners' Schedule K-1s, or on any other form, schedule, or statement that accompanied $MURFAM_{LLC}$'s Form 1065

294 A "Partner Summary" was attached to Form 1065

- This summary listed the single-member LLCs as $MURFAM_{LLC}$'s partners and disclosed their respective tax identification numbers and their respective beginning ratios of profit, loss, and ownership As previously observed:
    - The names and tax identification numbers of the single-member LLCs differed from the names and tax identification numbers of the individuals who owned these LLCs
    - The "Limited Liability Company Agreement" of $MURFAM_{LLC}$ listed H_Murphy, W_Murphy, W_Murphy_Jr as its members (partners) and did not make any reference to WHM, WHMJ, WMC, JMN, or ANB
    - The ownership percentages set forth in Exhibit B of the "Limited Liability Company Agreement" of $MURFAM_{LLC}$ listed "Distribution Percentages" of "20%" for W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown
    - The $MURFAM_{LLC}$ Partner Summary listed Profit/Loss/Ownership Ratios of
        - 42 79% for WHM,
        - 28 04% for WHMJ,
        - 8 590% for WMC,
        - 15 72% for JMN, and
        - 4 860% for ANB

- The identities of the individual owners of these LLC partners was not disclosed, by name or by tax identification number, on this Partner Summary
- The columns titled "Beginning Capital," "Capital Contributions," "Cash Distributions," and "Property Distributions" were left blank
- The Partner Summary did not make any reference to (or provide any description or information relating to) the contributions of the Long Options, the offsetting Short Options, or the Bonds by the LLC-partners to $MURFAM_{LLC}$'s capital during 2000
  - More specifically, the Partner Summary did not disclose or otherwise allude to the fact that the tax bases that the $MURFAM_{LLC}$ partners claimed to have had in their $MURFAM_{LLC}$ partnership interests had been determined, in part, by increasing those bases by the amount of the stated premium "charged" for the Long Options and without regard to the premiums "credited" for the offsetting Short Options (and, therefore, without regard to the actual net cash cost of the Options).

295. A separate Schedule K-1 was prepared for each of $MURFAM_{LLC}$'s five partners.

- Although each of the single-member LLC partners were expressly designated for treatment as "disregarded entities" on the Form SS-4s that were filed by their respective single-members (¶25, *et seq.*), $MURFAM_{LLC}$ identified the LLCs, and not W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown., as its partners on the Schedule K-1s that $MURFAM_{LLC}$ filed with its Form 1065 [264]

---

[264] See *supra* , footnote 46 (e-mail from Amy Keating to Robert Coplan and Donna Guerin questioning the reference to the LLCs, rather than to their single-member owners, as the partners on the COBRA partnership returns) See also ¶43

- o Each of these Schedule K-1s described the LLC-partner as a domestic "LIMITED LIAB CO."[265]
  - The fact that these LLCs were single-member LLCs was not disclosed on MURFAM$_{LLC}$'s Schedule K-1s or elsewhere on its Form 1065
  - The fact that each of these LLCs was classified as a "disregarded entity" was not disclosed on MURFAM$_{LLC}$'s Schedule K-1s or elsewhere on its Form 1065
  - Neither the names nor the Social Security Numbers of W_Murphy,[266] W_Murphy_Jr, W_Crumpler, J_Norman, or A_Brown, appeared anywhere on any of the Schedule K-1s or elsewhere on MURFAM$_{LLC}$'s Form 1065.
- The space provided for the response to Item G ("Tax shelter registration number") was left blank on each of the Schedule K-1s.

296 Since MURFAM$_{LLC}$'s total assets (as of the reported end of its tax year) exceeded the thresholds set forth in Question 5 of Schedule B of Form 1065, MURFAM$_{LLC}$ was not exempt from the requirement that Items J(a) through J(e) of Schedule K-1 be completed.

- Nevertheless, the spaces provided for the responses to Items J(a) through J(e) ("Analysis of partner's capital account") were left blank on each of the Schedule K-1s
- Consequently, information regarding the partners' respective capital account balances (i.e., (a) the beginning capital account balance, (b) the amount of capital contributed during the year, (c) the amount of adjustments for the partner's share of income, gain, loss, etc., (d) withdrawals and distributions made by and to the partner during the

---

[265] Response to Question B ("What type of entity is this partner?")

[266] However, as previously noted, W_Murphy legibly signed MURFAM$_{LLC}$'s Form 1065. His signature was not accompanied by his Social Security Number

year, and (e) the ending capital account balance) was not disclosed on the Schedule K-1s (or anywhere else on $MURFAM_{LLC}$'s 2000 Form 1065).

- The amounts of ordinary income, net short-term capital loss, and tax-exempt interest income that were separately reported on $MURFAM_{LLC}$'s Schedule K were allocated to and between the LLC-partners and separately reported on their respective Schedule K-1s
- Line 25 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s Line 25 is used, among other things, to provide adequate disclosure of the relevant facts relating to the tax treatment of any item that may cause an understatement of income tax.[267]

297. $MURFAM_{LLC}$'s Form 1065 (including all accompanying forms, schedules, statements, and attachments) did not disclose or otherwise provide any indication of:

- The contribution of the Long Options and the offsetting Short Options to $MURFAM_{LLC}$ as contributions to its capital,
- The contribution of the Bonds to $MURFAM_{LLC}$ as a contribution to its capital,
- The fact that $MURFAM_{LLC}$ had ever held the Bonds,
- The fact that the 100% of the $MURFAM_{LLC}$ partnership interests had been transferred by $MURFAM_{LLC}$'s partners to an S corporation ($MURFAM_{INC}$) as a contribution to its capital (and that this transfer had resulted in a technical termination of $MURFAM_{LLC}$ for federal income tax purposes),

[267] See *2000 Instructions for Form 1065* (p 29), and *2000 Instructions for Schedule K-1 (Form 1065)* (p 10)

- The type, identity, tax basis, or fair market value of the noncash asset (i.e., the Bonds) distributed upon the termination/liquidation of $MURFAM_{LLC}$, or
- The identity of the distributee of that asset ($MURFAM_{INC}$) (or the fact that that asset had not been distributed to the partners identified in the Partner Summary and on the Schedule K-1s filed with $MURFAM_{LLC}$'s Form 1065)

298 $MURFAM_{LLC}$'s Form 1065 did not contain any references (by name or by tax identification number) to

- Any of the individual owners of its single-member LLC partners,[268] or to
- $MURFAM_{INC}$, the distributee of $MURFAM_{LLC}$'s assets upon its termination/liquidation

**(b) Opinion**

299. In my opinion, the information and disclosures made on and with the $MURFAM_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication:

- That foreign currency options (i.e., the Long Options and the offsetting Short Options) were acquired outside $MURFAM_{LLC}$ by its partners and then contributed to its capital by those partners.
- That the acquisitions of the Long Options and the offsetting Short Options by the LLCs and the subsequent contributions of these Options to $MURFAM_{LLC}$ was the source of the greatly inflated tax bases claimed:
  - In the $MURFAM_{LLC}$ partnership interests respectively held by the partners, and, subsequently,

[268] Note, however, that $MURFAM_{LLC}$'s Form 1065 was legibly signed by Harry D Murphy. However, his signature was not accompanied by his Social Security Number.

- In the Bonds distributed by $MURFAM_{LLC}$ to $MURFAM_{INC}$ (and then sold by $MURFAM_{INC}$ for a reported long-term capital loss of $61,543,012), and
- In the $MURFAM_{INC}$ stock held by $MURFAM_{INC}$'s stockholders.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MURFAM_{LLC}$'s Form 1065 had disclosed this information.

300. In my opinion, the information and disclosures made on the $MURFAM_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication that.

- WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), ANB (A_Brown), $MURFAM_{LLC}$ and $MURFAM_{INC}$ had paid Transaction-related accounting and legal fees totaling approximately $1,542,500 (see Table 6) to E&Y and Proskauer Rose, or that
- These fees were ultimately recognized and reported as unidentified components of the $MURFAM_{INC}$ LTCL (and as unidentified components of the amount of that LTCL that was allocated to and deducted by W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown on their respective 2000 Form 1040s).
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MURFAM_{LLC}$'s Form 1065 had disclosed this information.

301. In my opinion, the information and disclosures made on the $MURFAM_{LLC}$ Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication.

- That $MURFAM_{LLC}$ had received the Bonds as a contribution to its capital from its five partners,

- That $MURFAM_{LLC}$ had ever held the Bonds,
- That all of $MURFAM_{LLC}$'s outstanding partnership interests had been contributed by its partners to another conduit entity ($MURFAM_{INC}$),
- That the Bonds had been distributed by $MURFAM_{LLC}$ to that conduit entity upon its termination/liquidation,
- That the distributee of these Bonds was $MURFAM_{INC}$, or
- That $MURFAM_{INC}$ was an S corporation owned in the same proportions by the same individuals who had, directly or indirectly through their respective single-member LLCs, been the partners of $MURFAM_{LLC}$ throughout the less-than-nine-month period of its existence
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MURFAM_{LLC}$'s Form 1065 had disclosed this information.

302. In my opinion, the information and disclosures made on the $MURFAM_{LLC}$'s Form 1065 (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication that the greatly inflated tax bases that resulted from the creation, capital funding, termination, and liquidation of $MURFAM_{LLC}$ were subsequently used by an undisclosed S corporation (i e., $MURFAM_{INC}$) to report a $61,543,012 long-term capital loss that was allocated to and deducted by undisclosed individual taxpayers (i e., W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown) on their individual 2000 Form 1040s

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increase significantly if $MURFAM_{LLC}$'s Form 1065 had disclosed this information

303. In my opinion, it is reasonable to conclude that the risk of detection and audit by the IRS would have increased substantially had the accounting

and legal fees paid to E&Y and Proskauer Rose been identified and described on $MURFAM_{LLC}$'s Form 1065.

304. Neither the name nor the tax identification number of $MURFAM_{INC}$ was disclosed anywhere on $MURFAM_{LLC}$'s Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments) [269]

305. Neither the names nor tax identification numbers of W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, or A_Brown were disclosed anywhere on $MURFAM_{LLC}$'s Form 1065 (or on any of the accompanying forms, schedules, statements, or attachments)

- As previously stated, in my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS might have been minimized or significantly reduced[270] through (1) the use of the LLCs to acquire and hold the $MURFAM_{LLC}$ partnership interests, (2) the assignment of entity names to the LLCs that did not include the full names or surnames of their single-member owners, (3) the procurement of EINs for each of the LLCs,[271] and (4) the identification of the LLCs (by name and EIN), and not the Taxpayers (by name or by SSN), as the partners of $MURFAM_{LLC}$ on its Form 1065

### 2. $MURFAM_{INC}$'s 2000 S Corporation Return[272]

#### (a) Description

306. $MURFAM_{INC}$ filed its "initial" short-year Form 1120S ("U.S. Income Tax Return for an S Corporation") for the period beginning June 22, 2000 and ending December 31, 2000, on which it adopted a calendar tax year and elected the cash method of accounting

---

269 However, as previously observed, both $MURFAM_{LLC}$ and $MURFAM_{INC}$ had the same address

270 More specifically, the possibility that the IRS might trace the ownership of $MURFAM_{LLC}$ *from* $MURFAM_{LLC}$'s Form 1065 *to* the 2000 Form 1040s of its ultimate partners (i e , the Taxpayers on whose 2000 Form 1040s the $MURFAM_{INC}$ LTCLs were deducted) was minimized or reduced

271 *Supra* , footnote 42

272 See Table 2 for the Bates numbers to copies of the 2000 Form 1120Ss

307 No items of income, gain, loss, or deduction were reported on the first page of Form 1120S

308 On its Schedule K of Form 1120S, $MURFAM_{INC}$ reported:

- "Ordinary income (loss) from trade or business activities" of "NONE" (Line 1),
- "Net long-term capital (loss)" of $61,543,012 (Line 4e(2)),
- "Other deductions" for "Professional Fees" of $56,735 (Line 10), and
- "Tax-exempt interest income" of $1,998 (Line 17).
- No other items of income, gain, deduction, or loss were reported on Schedule K

309 None of the accounting and legal fees paid to E&Y and Proskauer Rose by $MURFAM_{LLC}$, W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown were identified, described, or otherwise disclosed or deducted on $MURFAM_{INC}$'s 2000 Form 1120S, on any of the stockholders' Schedule K-1s, or on any other forms, schedules, statements, or attachments filed with that return

310. The accounting fees paid by $MURFAM_{INC}$ to E&Y were identified as "Professional Fees" and, as noted above, deducted on Line 10 of Schedule K.

- As previously observed, this amount was also capitalized as an increase to the tax basis that $MURFAM_{INC}$ claimed to have had in the Bonds and was therefore deducted a second time as an unidentified component of the $MURFAM_{INC}$ LTCL

311. On Schedule L of Form 1120S ("Balance Sheet per Books"), $MURFAM_{INC}$ did not disclose any opening account balances for its assets, liabilities, or shareholders' equity If the opening account balances as of December 26th/27th had been determined under generally accepted accounting

principles and disclosed on $MURFAM_{INC}$'s 2000 Form 1120S, Schedule L would have disclosed.

- "Cash" of $1,216,228 (Line 1(b)) [273]
- "Other current assets(attach schedule)" on Line 6(b)) and/or ("Other investments (attach schedule)" on Line 8(b)) of approximately $127,000 [274] The required "attach[ed] schedule[s]" would have disclosed the existence and value of the Bonds
- "Capital stock" of $100 (Line 22(b))
- "Additional paid-in capital" of approximately $1,343,128 (Line 23(b)). [275]
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule L of $MURFAM_{INC}$'s 2000 Form 1120S

312. On Schedule L of Form 1120S, $MURFAM_{INC}$ listed the following closing balances.

- "Cash" of $1,289,294 (Line 1(d)),
- "Capital stock" of $100 (Line 22(d)),
- "Additional paid-in capital" of 62,886,943 (Line 23(d)),
- Negative "Retained earnings" of $61,597,749 (Line 24(d))
- No other assets, liabilities, etc. were listed on Schedule L

313 $MURFAM_{INC}$'s Form 1120S did not identify, describe, or otherwise disclose the source of the $62,886,943 of additional paid-in capital (or any description or calculations that would indicate or explain how that amount had been determined).

---

273 Table 9, Column M. Row 16

274 Table 9, Column M, Row 9

275 $1,343,128 = $1,216,228 + $127,000 - $100

- Under generally accepted accounting principles,[276]
  - As noted above, the amount recorded by $MURFAM_{INC}$ as "Additional paid-in capital" would have been the net amount of cash and the fair market value of the $MURFAM_{LLC}$ noncash assets (i.e., the Bonds) received by $MURFAM_{INC}$ upon the termination/liquidation of $MURFAM_{LLC}$, net of any liabilities of $MURFAM_{LLC}$ or the transferor-stockholders that were assumed by $MURFAM_{INC}$, and net of the $100 recorded as "Capital Stock."
    - As noted above, this amount would have been approximately $1,343,128 (or approximately 2.14% of the $62,886,943 ending balance actually shown by $MURFAM_{INC}$ on its 2000 Schedule L[277]).
  - The gain or loss resulting from the sale of the Bonds (and reflected in the ending balance of "Retained earnings" on Schedule L) would have been computed by subtracting the fair market value of the Bonds, as of the date of the contribution of the $MURFAM_{LLC}$ partnership interests to $MURFAM_{INC}$, from the sales price of the Bonds. The amount of the gain or loss that would have been recognized by $MURFAM_{INC}$ under these principles would likely have been *di minimis*.

314. On Schedule M-1 ("Reconciliation of Income (Loss) per Books With Income (Loss) per Return"), "[n]et ... (loss) per books" was shown as $61,597,749. The only item shown as an adjustment to this amount was a $1,998 adjustment for the tax exempt interest income (Line 5) reported on Schedule K.

- Under generally accepted accounting principles,

---

276 See, for example, *Financial Accounting Standards Board Current Text* at B51.104 and B51.105.

277 2.14% = $1,343,128 divided by $62,886,943

- The "[n]et income (loss)" resulting from the sale of the Bonds would have been computed by subtracting the fair market value of the Bonds, as of the date of the contribution of the $MURFAM_{LLC}$ partnership interests to $MURFAM_{INC}$, from the sales price of the Bonds.

- The "[n]et (loss) per books" that would have been recognized under these principles would likely have been *di minimis* (Schedule M-1, Line 1), and a negative adjustment of approximately the full amount of the $61,543,012 $MURFAM_{INC}$ LTCL would have been made on Line 6 of Schedule M-1. However, no such amounts or adjustments were identified or made on $MURFAM_{INC}$'s Schedule M-1.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on Schedule M-1 of $MURFAM_{INC}$'s 2000 Form 1120S

315. Part II of $MURFAM_{INC}$'s Schedule D ("Capital Gains and Losses and Built-In Gains") to Form 1120S reported a "Net long-term capital . (loss)" of $61,543,012 Schedule D (Line 7) referred to "STATEMENT 3" for the calculations supporting the net amount shown on Lines 7, 11, and 14

316. STATEMENT 3 presented the calculation for the sale of "Municipal Bonds" with an acquisition date of 10/15/1993 and a sale date of 12/29/2000. STATEMENT 3 disclosed a "Sales Price" of $127,803, an aggregate "COST" of $61,670,815, and a resulting loss of $61,543,012

- The term "COST" that $MURFAM_{INC}$ used to describe the tax basis that it claimed to have had in the "Municipal Bonds" and that it used to compute the $MURFAM_{INC}$ LTCL was misleading and contrary to the instructions for disclosing and computing capital gains and losses on Schedule D

- Gains and losses from the sale of capital assets are generally calculated and disclosed on Lines 1 and 7 (columns (a) through (f)) of Parts I and II of Schedule D. Column (e) of Lines 1 and 7 requires the disclosure of the "Cost or other basis (see instructions)." *2000 Instructions for Schedule D (Form 1120S)* states:

  > **Column (e)—Cost or other basis.** In determining gain or loss, the basis of property is generally its cost (see section 1012 and related regulations). Special rules for determining basis are provided in sections in subchapters C, K, O, and P of the Code . . . Attach an explanation if you use a basis other than actual cash cost of the property.[278]

- In my opinion, the use of the word "COST" rather than "Other Basis" (or some other description indicating that the amounts so labeled were not the "actual cash cost" of the Bonds) is misleading and contrary to the IRS's express instructions for disclosing sales of capital assets on Schedule D.

- MURFAM$_{INC}$ did not include any "explanation" or other description of the amount that it reported on Statement 3 as its "COST" of the Bonds.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed with MURFAM$_{INC}$'s 2000 Form 1120S.

317. A "SHAREHOLDER SUMMARY" was attached to MURFAM$_{INC}$'s 2000 Form 1120S. This Shareholder Summary listed each of MURFAM$_{INC}$'s individual stockholders (W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown) and their respective "Beginning Shares" and "Ownership Percentage." This "Shareholder Summary" did not:

---

[278] *2000 Instructions for Schedule D (Form 1120S)*, at page 3.

- Disclose any information relating to any of the stockholders' tax basis in his/her respective shares of $MURFAM_{INC}$, or
- Identify, describe, or otherwise disclose the fact of or any details or description relating to the contribution of the $MURFAM_{LLC}$ partnership interests to $MURFAM_{INC}$ as a contribution to its capital by W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown in exchange for the stock of $MURFAM_{INC}$
- Nor was any of this information presented elsewhere on $MURFAM_{INC}$'s 2000 Form 1120S (or on any accompanying forms, schedules, statements, or attachments)

318. As previously observed, $MURFAM_{INC}$ filed an election to be taxed as an S corporation on Form 2553 ("Election by a Small Business Corporation"). This Form was signed by Wendell Murphy as President, and included the signed consents of all five of $MURFAM_{INC}$'s shareholders [279]

- The stock ownership disclosed on Form 2553 (as of 6/23/00) was:[280]
  - Wendy M. Crumpler 10 shares.
  - Wendell H. Murphy. 10 shares
  - Wendell H. Murphy, Jr.: 10 shares.
  - Joyce Murphy Norman 10 shares
  - Angela N. Brown 10 shares
- The stock ownership disclosed on $MURFAM_{INC}$'s 2000 Form 1120S (under "Beginning Shares" of the "Shareholder Summary," and on the shareholders' respective Schedule K-1s) was:
  - Wendy M. Crumpler: 8.59 shares (8.59%).

---

[279] Bates: IRSADMIN002055. Wendell H. Murphy, President, was the designated "officer or legal representative" on Form 2553, Line E

[280] See also $MURFAM_{INC}$'s "Consent of Directors." Bates: MUEY00955 & MUEY00956

- Wendell H Murphy: 42 79 shares (42.79%).
- Wendell H. Murphy, Jr.: 28 04 shares (28.04%)
- Joyce Murphy Norman: 15.72 shares (15 72%)
- Angela N. Brown: 4 86 shares (4.86%).

319 A Schedule K-1 for each of $MURFAM_{INC}$'s five individual stockholders accompanied $MURFAM_{INC}$'s 2000 Form 1120S. Each of these Schedule K-1s disclosed.

- The stockholder's name, address, tax identification number, percentage of stock ownership in $MURFAM_{INC}$, and the IRS Service Center where $MURFAM_{INC}$'s tax return was filed (Cincinnati, Ohio),
- The stockholder's share of $MURFAM_{INC}$'s:
  - $61,543,012 long-term capital loss,
  - $56,735 of "other deductions" (for "Professional Fees"), and
  - $1,998 of tax exempt interest

320. As previously observed, none of the accounting and legal fees paid to E&Y and Proskauer Rose by $MURFAM_{LLC}$, WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), and ANB (A_Brown) were identified, described, or otherwise disclosed or deducted on any of the stockholders' Schedule K-1s.

321. Line 23 ("Supplemental information required to be reported separately to each partner") was left blank on each of the Schedule K-1s Line 23 is used, among other things, to provide adequate disclosure of the relevant facts relating to the tax treatment of any item that may cause an understatement of income tax.[281]

---

281 See 2000 *Instructions for Form 1120S* (p 25), and 2000 *Instructions for Schedule K-1 (Form 1120S)* (p 8)

322. As previously observed, $MURFAM_{INC}$'s Form 1120S was not accompanied by a Regulation Section 1 351-3(b) Statement[282] and, except for the stockholders' names and the stock ownership percentages disclosed on the Schedule K-1s and the "Shareholder Summary," did not otherwise disclose any of the information required by that Regulation.

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if $MURFAM_{INC}$ had filed a Regulation Section 1 351-3(b) Statement with its 2000 Form 1120S.

323. $MURFAM_{INC}$'s Form 1120S (including all accompanying forms, schedules, statements, and attachments):

- Did not make any reference to any aspect of the MURFAM Transaction that created the greatly inflated tax basis assigned by $MURFAM_{INC}$ to the Bonds (i e , no reference was made to any of the Long and Short Options that were first acquired by $MURFAM_{LLC}$'s LLC partners, that were then contributed by those partners to $MURFAM_{LLC}$, and that ultimately expired on June 13, 2000, prior to $MURFAM_{LLC}$'s termination/liquidation),
- Did not identify, describe, or otherwise disclose the source from which $MURFAM_{INC}$ had received the "Municipal Bonds" (i.e., from $MURFAM_{LLC}$, and before $MURFAM_{LLC}$, as a contribution to $MURFAM_{LLC}$'s capital from WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), and ANB (A_Brown));
- Did not disclose the fact that these Bonds had been received as a liquidating distribution from a partnership (or that the distributing partnership had been owned in the same proportions by the same individuals who owned $MURFAM_{INC}$'s stock),
- Did not disclose the par value of the Bonds,

---

282 *Supra* , footnote 167

- Did not disclose the $MURFAM_{LLC}$'s tax basis the Bonds;
- Did not provide any description, explanation, or calculation showing or indicating how $MURFAM_{INC}$ determined its tax basis in the Bonds
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on $MURFAM_{INC}$'s 2000 Form 1120S.

324. $MURFAM_{INC}$'s 2000 Form 1120S (including all accompanying forms, schedules, statements, and attachments) did not contain any references whatsoever, by name or by tax identification number, to $MURFAM_{LLC}$ or to any of the single-member LLCs that $MURFAM_{LLC}$ had identified as its partners on the Schedule K-1s it filed with its Form 1065

**(b) Opinion**

325. In my opinion, the information and disclosures made on the $MURFAM_{INC}$ 2000 Form 1120S (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any indication.

- That $MURFAM_{INC}$ had received an interest in $MURFAM_{LLC}$ as a contribution to its capital from its shareholders in exchange for its stock,
- That $MURFAM_{INC}$ had ever acquired an interest in any partnership, or, more specifically, that it had ever acquired an interest in $MURFAM_{LLC}$,
- That $MURFAM_{INC}$ had received the Bonds as a result of the termination/liquidation of a partnership, or that the partnership that terminated/liquidated was $MURFAM_{LLC}$,
- That the Bonds, prior to their contribution to $MURFAM_{LLC}$ and their subsequent distribution by $MURFAM_{LLC}$ to $MURFAM_{INC}$, had been owned by $MURFAM_{INC}$'s stockholders,
- That the tax bases claimed by $MURFAM_{INC}$ in the Bonds resulted from.

- The assignment and allocation to those Bonds of the greatly inflated tax bases that had previously been assigned to the $\text{MURFAM}_{\text{LLC}}$ partnership interests as a result of (1) the acquisition of the Options by the LLC-partners, (2) the subsequent contribution of those Options by those partners to $\text{MURFAM}_{\text{LLC}}$, and (3) the claimed increase in the tax bases of the $\text{MURFAM}_{\text{LLC}}$ partnership interests by the amount of the premiums "charged" for the Long Options (and without regard to either the amount of the premiums "credited" for the offsetting Short Options or the actual net cash costs of the Options), and from
- The capitalization of $1,542,500 of accounting and legal fees paid to E&Y and Proskauer Rose by $\text{MURFAM}_{\text{INC}}$, $\text{MURFAM}_{\text{LLC}}$, WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), and ANB (A_Brown)

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed on $\text{MURFAM}_{\text{INC}}$'s 2000 Form 1120S

326. As previously stated, in my opinion it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if (1) the "Net income(loss) per books" (Line 1) had been computed by subtracting the sales price of the Bonds from the fair market value of the Bonds, as of the date of their distribution to $\text{MURFAM}_{\text{INC}}$ by $\text{MURFAM}_{\text{LLC}}$, and if (2) the resulting difference between this amount of gain/loss and the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL had been shown as an adjustment on Line 6 of Schedule M-1.

327. As previously observed, the use of the word "COST" rather than "Other Basis" (or some other description indicating that the amounts so labeled were not the "actual cash cost" of the Bonds) is misleading and contrary to the IRS's express instructions for disclosing sales of capital assets on Schedule D

- $MURFAM_{INC}$ did not include any "explanation" or other description of the amount that it reported on Statement 3 as its "COST" of the Bonds
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information had been disclosed with $MURFAM_{INC}$'s 2000 Form 1120S

328 In my opinion, other than a common address and signature, there was nothing on $MURFAM_{INC}$'s Form 1120S (or on any of the accompanying forms, schedules, statements, or attachments) to connect $MURFAM_{INC}$ to $MURFAM_{LLC}$, or to connect $MURFAM_{INC}$ to WHM, WHMJ, WMC, JMN, or ANB.

329 For reasons stated previously, in my opinion, it would be reasonable to conclude that one of the principal functions served by the $MURFAM_{INC}$ was to further distance

- The transactions
  - That created the inflated basis amounts, and
  - That were used to capitalize the Transaction-related accounting and legal fees,[283]
- From W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown, each of whom would ultimately deduct his/her allocated share of the resulting $MURFAM_{INC}$ LTCL against unrelated gains on his/her Form 1040

---

[283] These transactions included (1) the formation of the single-member LLCs and the acquisition of Employer Identification Numbers for each of them, (2) the purchases of the offsetting Options by WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), and ANB (A_Brown), (3) the transfer of those offsetting Options by those LLCs to $MURFAM_{LLC}$, (4) the transfer of the Bonds by WHM (W_Murphy), WHMJ (W_Murphy_Jr), WMC (W_Crumpler), JMN (J_Norman), and ANB (A_Brown) to $MURFAM_{LLC}$ shortly before $MURFAM_{LLC}$'s liquidation, (5) the liquidation of $MURFAM_{LLC}$ and distribution of those Bonds to $MURFAM_{INC}$, and (6) $MURFAM_{INC}$'s assignment of a tax basis to the Bonds that was comprised of $59,849,000 of artificial, noneconomic built in losses (Table 4, Column I, Row 14), and $1.542,500 of unidentified built-in losses for Transaction-related accounting and legal fees (Table 6)

330 In my opinion, it would be reasonable to conclude that another principal function served by MURFAM$_{INC}$ was to remove the sale of the Bonds from the respective Form 1040s of W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown, and to thereby significantly reduce the possibility of detection and audit by the IRS.

- Had the distributions of these Bonds been made directly to W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown, sold by them, and then reported on their individual Form 1040s, the order of magnitude between the claimed tax basis ($61,670,815) and the selling price ($127,803) would have been so great (especially given the nature of the asset ("Municipal Bonds" with a par value of $127,000)), that it is reasonable to assume that the risk of detection and audit would have increased substantially.
    - The tax basis assigned to the Bonds was **482 times greater than the price these Bonds sold for**, and **485 time greater than their par value**.
    - The disclosures that W_Murphy, W_Murphy_Jr, W_Crumpler, J_Norman, and A_Brown would have had to make on their respective sales of the Bonds (on the Schedule Ds filed with their respective Form 1040s) would have included.
        - "(a) Description of the property,"
        - "(b) Date acquired (mo., day, yr.),"
        - "(c) Date sold (mo., day, yr.),"
        - "(d) Sales price,"
        - "(e) Cost or other basis," and finally
        - "(f) Gain or (loss)"

- Column (e) of Line 8 have required the disclosure of the "Cost or other basis (see page D-6)." *2000 Instructions for Schedule D (Form 1040)* states:

  > **Column (e)—Cost or other basis.** . If you do not use the actual cost, attach an explanation of your basis [284]

- Since the Bonds were instead distributed to and sold by the newly-formed S Corporation, these required, detailed disclosures were effectively moved from the shareholders' respective Form 1040s to the $\text{MURFAM}_{\text{INC}}$'s Form 1120.[285]
  - As subsequently observed, on their 2000 Form 1040s, the shareholders of $\text{MURFAM}_{\text{INC}}$ simply deducted all or part of the long-term capital loss allocated to them by $\text{MURFAM}_{\text{INC}}$ on a single line (Line 12) of their Schedule Ds.
    - None of these Form 1040s disclosed the dollar amount of the long-term capital loss that was allocated to that shareholder by $\text{MURFAM}_{\text{INC}}$[286]
    - None of these Form 1040s identified, by name or by EIN, $\text{MURFAM}_{\text{INC}}$ as the source of some or all of the net long-term capital loss amount deducted on Line 12.
    - None of these Form 1040s disclosed a description of the property sold, the sales price, the dates of acquisition or sale, or the tax basis used to compute the amount of the loss.
    - None of these Form 1040s disclosed any information or description regarding the source[287] of these losses or the

---

284 *2000 Instructions for Schedule D (Form 1040)*, at page D-6

285 As subsequently observed, however, $\text{MURFAM}_{\text{INC}}$ did not attach or include any explanation or description of how the tax basis it claimed to have had in these Bonds had been determined

286 As subsequently observed, these losses may have been netted out against unrelated long-term capital gains allocable to the shareholders' from other partnerships, S corporations, etc

rationale or method used to determine the tax basis claimed by the S Corporations in calculating the amounts

## D. Individual Form 1040s of the Taxpayers

### 1. Description[288]

#### (a) Harry D. Murphy[289]

331. For their 2000 tax year, Harry D. Murphy (H_Murphy) and his wife, Lynn C Murphy, filed a joint Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after the filing of the original return) These Returns were prepared by the Raleigh Office of Ernst & Young.

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $21,522 and referred to "Statement 5" for detail
  - Of this total amount, Statement 5 described $21,326 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount.
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose
- On Schedule D, Line 12, the H_Murphys' reported a "[n]et long-term . . . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $10,428,602.
  - This amount differs from the $11,966,653 $PSM_{INC}$ LTCL that was allocated to H_Murphy on his Schedule K-1 from $PSM_{INC}$ (Table 1, Column C, Line 7).

---

287 *Supra* , footnote 10

288 All of the Taxpayers' Form 1040s (and Form 1040Xs), all of the Partnerships' Form 1065s, and all of the S Corporations' 2000 Form 1120Ss were prepared by E&Y

289 Bates: MUMI00460 through MUMI00545 (as amended)

- From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts.
  - The H_Murphys' Schedule D did not reference any statement that would have disclosed the source of the long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.
  - Nor was any such statement or disclosure otherwise included with the H_Murphys' 2000 Form 1040
- The difference between the amount reported on Line 12 and the larger amount of $PSM_{INC}$ LTCL allocated to H_Murphy could have been the result of netting the $PSM_{INC}$ LTCL against $1,538,051 of long-term capital gains (or net long-term capital gains) from other partnerships, etc.
- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $PSM_{INC}$ LTCL allocated to H_Murphy
  - Note that the H_Murphys did not have enough capital gains in 2000 to be able to use all of the $PSM_{INC}$ LTCL.
  - They reported a net capital loss carryover from 2000 of $85,747.
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 12.85% less than the amount of the $PSM_{INC}$ LTCL allocated to H_Murphy on his $PSM_{INC}$ Schedule K-1.
  - As noted below, each of the eight Taxpayers' reported a long-term capital loss carryover from 2000, and each of the Schedule Ds filed with their 2000 Form 1040s showed

an amount on Line 12 that was between 12.79% to 13.38% less than the amount of the $PSM_{INC}$ LTCL or the $MURFAM_{INC}$ LTCL that had been allocated to them

- On Line 28b(i) of Part II of Schedule E, the H_Murphys' reported "nonpassive losses from Schedule K-1" of $4,254,060. The Statements 9 through 18 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 10 and 17, the names and EINs of $PSM_{LLC}$, $PSM_{INC}$, $MPP_{LLC}$, and $MP_{INC}$ were disclosed. The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included.
    - $PSM_{INC}$: \$ 11,085 (H_Murphy's allocation of the "Professional Fees" claimed by $PSM_{INC}$. As previously observed, this amount had already been included in the $PSM_{INC}$ LTCL that was allocated to and deducted by the H_Murphys. The deduction of this amount on Schedule E was a double-deduction of the same fee).
    - $MP_{INC}$: \$1,988,564 (H_Murphy's allocation of the $MP_{INC}$ Ordinary Loss)
    - $MP_{INC}$: \$ 2,081 ( H_Murphy's allocation of the "Professional Fees" claimed by $MP_{INC}$. As previously observed, this amount had already been included in the $MP_{INC}$ Ordinary Loss that was allocated to and deducted by the H_Murphys. The deduction of this amount on Schedule E was a double-deduction of the same fee).

**(b) Marc D. Murphy[290]**

332 For his 2000 tax year, Mark D. Murphy (M_Murphy) filed a Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s

[290] Bates: MUMI00698 through MUMI00761 (as amended)

that had been received after the filing of the original return). These Returns were prepared by the Raleigh Office of Ernst & Young

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $10,788 and referred to "Statement 5" for detail
  - Of this total amount, Statement 5 described $10,786 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount.
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose.
- On Schedule D, Line 12, M_Murphy reported a "[n]et long-term (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $5,478,791
  - This amount differs from the $6,282,615 $PSM_{INC}$ LTCL that was allocated to M_Murphy on his Schedule K-1 from $PSM_{INC}$ (Table 1, Column A, Line 7)
  - From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts
    - M_Murphy's Schedule D did not reference any statement that would have disclosed the source of the long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.
    - Nor was any such statement or disclosure otherwise included with M_Murphy's 2000 Form 1040
  - The difference between the amount reported on Line 12 and the larger amount of $PSM_{INC}$ LTCL allocated to M_Murphy could have been the result of netting the $PSM_{INC}$ LTCL

against $803,824 of long-term capital gains (or net long-term capital gains) from other partnerships, etc.

- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $PSM_{INC}$ LTCL allocated to M_Murphy
  - Note that M_Murphy did not have enough capital gains in 2000 to be able to use all of the $PSM_{INC}$ LTCL
  - He reported a net capital loss carryover from 2000 of $881,060
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 12 79% less than the amount of the $PSM_{INC}$ LTCL allocated to M_Murphy on his $PSM_{INC}$ Schedule K-1.

- Line 28b(i) of Part II of Schedule E reported "nonpassive losses from Schedule K-1" of $425,012. The Statements 8 through 15 presented the detail of the aggregated amounts shown on Part II of Schedule E On Schedules 8 and 15, the name and EIN of $PSM_{LLC}$ and $PSM_{INC}$ were disclosed The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included.
  - $PSM_{INC}$. $5,820 (M_Murphy's allocation of the "Professional Fees" claimed by $PSM_{INC}$. As previously observed, this amount had already been included in the $PSM_{INC}$ LTCL that was allocated to and deducted by M_Murphy The deduction of this amount on Schedule E was a double-deduction of the same fee)

### (c) Stratton D. Murphy[291]

333 For his 2000 tax year, Stratton K. Murphy (S_Murphy) filed a Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after the filing of the original return). These Returns were prepared by the Raleigh Office of Ernst & Young

- On Schedule D, Line 12, S_Murphy reported a "[n]et long-term . . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $5,478,790.
  - This amount differs from the $6,282,615 $PSM_{INC}$ LTCL that was allocated to S_Murphy on his Schedule K-1 from $PSM_{INC}$ (Table 1, Column B, Line 7.
  - From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts.
    - S_Murphy's Schedule D did not reference any statement that would have disclosed the source of long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.
    - Nor was any such statement or disclosure otherwise included with S_Murphy's 2000 Form 1040
  - The difference between the amount reported on Line 12 and the larger amount of $PSM_{INC}$ LTCL allocated to S_Murphy could have been the result of netting the $PSM_{INC}$ LTCL against $803,825 of long-term capital gains (or net long-term capital gains) from other partnerships, etc.

[291] Bates: MUFOIA00121 through MUFOIA00163

- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $PSM_{INC}$ LTCL allocated to S_Murphy
  - Note that S_Murphy did not have enough capital gains in 2000 to be able to use all of the $PSM_{INC}$ LTCL
  - He reported a net capital loss carryover from 2000 of $879,1160
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 12.79% less than the amount of the $PSM_{INC}$ LTCL allocated to S_Murphy on his $PSM_{INC}$ Schedule K-1

- Line 28b(i) of Part II of Schedule E reported "nonpassive losses from Schedule K-1" of $425,013. The Statements 6 through 11 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 6 and 10, the name and EIN of $PSM_{LLC}$ and $PSM_{INC}$ were disclosed. The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included:
  - $PSM_{INC}$: $5,820 (S_Murphy's allocation of the "Professional Fees" claimed by $PSM_{INC}$. As previously observed, this amount had already been included in the $PSM_{INC}$ LTCL that was allocated to and deducted by S_Murphy. The deduction of this amount on Schedule E was a double-deduction of the same fee).

**(d) Wendell H. Murphy[292]**

334 For their 2000 tax year, Wendell H. Murphy (W_Murphy) and his wife, Linda G. Murphy, filed a joint Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after

---

[292] Bates: MUMI00604 through MUMI00671 (as amended)

the filing of the original return). These Returns were prepared by the Raleigh Office of Ernst & Young.

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $38,760 and referred to "Statement 8" for detail.
  - Of this total amount, Statement 8 described $38,537 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose
- On Schedule D, Line 12, the W_Murphys' reported a "[n]et long-term . . . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $22,743,387.
  - This amount differs from the $26,334,255 $MURFAM_{INC}$ LTCL that was allocated to W_Murphy on his Schedule K-1 from $MURFAM_{INC}$ (Table 1, Column D, Line 13).
  - From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts.
    - The W_Murphys' Schedule D did not reference any statement that would have disclosed the source of long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.
    - Nor was any such statement or disclosure otherwise included with the W_Murphys' 2000 Form 1040.
  - The difference between the amount reported on Line 12 and the larger amount of $MURFAM_{INC}$ LTCL allocated to W_Murphy could have been the result of netting the

MURFAM$_{INC}$ LTCL against $3,590,868 of long-term capital gains (or net long-term capital gains) from other partnerships, etc.

- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the MURFAM$_{INC}$ LTCL allocated to W_Murphy.
  - Note that the W_Murphys did not have enough capital gains in 2000 to be able to use all of the MURFAM$_{INC}$ LTCL
  - They reported a net capital loss carryover from 2000 of $7,595,356
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 13.64% less than the amount of the MURFAM$_{INC}$ LTCL allocated to W_Murphy on his MURFAM$_{INC}$ Schedule K-1.

- On Line 28b(i) of Part II of Schedule E, the W_Murphys' reported "nonpassive losses from Schedule K-1" of $9,609,614. The Statements 15 through 22 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 15 and 21, the names and EINs of MURFAM$_{LLC}$, MURFAM$_{INC}$, MPP$_{LLC}$, and MP$_{INC}$ were disclosed. The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included:
  - MURFAM$_{INC}$: $ 24,276 (W_Murphy's allocation of the "Professional Fees" claimed by MURFAM$_{INC}$. As previously observed, this amount had already been included in the MURFAM$_{INC}$ LTCL that was allocated to and deducted by the W_Murphys. The deduction of this amount on Schedule E was a double-deduction of the same fee)

- $MP_{INC}$: $ 7,954,255 (W_Murphy's allocation of the $MP_{INC}$ Ordinary Loss)
- $MP_{INC}$ $ 8,326 ( W_Murphy's allocation of the "Professional Fees" claimed by $MP_{INC}$ As previously observed, this amount had already been included in the $MP_{INC}$ Ordinary Loss that was allocated to and deducted by the W_Murphys. The deduction of this amount on Schedule E was a double-deduction of the same fee)

**(e) Wendell H. Murphy, Jr.**[293]

335. For their 2000 tax year, Wendell H. Murphy (W_Murphy_Jr) and his wife, Wendy F Murphy, filed a joint Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after the filing of the original return). These Returns were prepared by the Raleigh Office of Ernst & Young

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $25,776 and referred to "Statement 7" for detail.
  - Of this total amount, Statement 7 described $25,026 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose.
- On Schedule D, Line 12, the W_Murphy_Jrs' reported a "[n]et long-term . . . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $14,774,646
  - This amount differs from the $17,256,661 $MURFAM_{INC}$ LTCL that was allocated to W_Murphy_Jr on his Schedule K-1 from $MURFAM_{INC}$ (Table 1, Column E, Line 13)

293 Bates: MUMI00216 through MUMI00312 (as amended)

- From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts.
  - The W_Murphy_Jrs' Schedule D did not reference any statement that would have disclosed the source of long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount
  - Nor was any such statement or disclosure otherwise included with the W_Murphy_Jrs' 2000 Form 1040.
- The difference between the amount reported on Line 12 and the larger amount of $\text{MURFAM}_{\text{INC}}$ LTCL allocated to W_Murphy_Jr could have been the result of netting the $\text{MURFAM}_{\text{INC}}$ LTCL against $2,482,015 of long-term capital gains (or net long-term capital gains) from other partnerships, etc.
- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL allocated to W_Murphy_Jr
  - Note that the W_Murphy_Jrs did not have enough capital gains in 2000 to be able to use all of the $\text{MURFAM}_{\text{INC}}$ LTCL.
  - They reported a net capital loss carryover from 2000 of $5,483,590
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 14.83% less than the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL allocated to W_Murphy_Jr on his $\text{MURFAM}_{\text{INC}}$ Schedule K-1

- On Line 28b(i) of Part II of Schedule E, the W_Murphy_Jrs' reported "nonpassive losses from Schedule K-1" of $4,871,073 The Statements 13 through 24 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 14 and 22, and 24, the names and EINs of $\text{MURFAM}_{\text{LLC}}$, $\text{MURFAM}_{\text{INC}}$, $\text{MPP}_{\text{LLC}}$, and $\text{MP}_{\text{INC}}$ were disclosed The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included:
  - $\text{MURFAM}_{\text{INC}}$: $ 15,909 (W_Murphy_Jr's allocation of the "Professional Fees" claimed by $\text{MURFAM}_{\text{INC}}$ As previously observed, this amount had already been included in the $\text{MURFAM}_{\text{INC}}$ LTCL that was allocated to and deducted by the W_Murphy_Jrs. The deduction of this amount on Schedule E was a double-deduction of the same fee)
  - $\text{MP}_{\text{INC}}$. $ 3,977,142 (W_Murphy_Jr's allocation of the $\text{MP}_{\text{INC}}$ Ordinary Loss)
  - $\text{MP}_{\text{INC}}$. $ 4,163 ( W_Murphy_Jr's allocation of the "Professional Fees" claimed by $\text{MP}_{\text{INC}}$. As previously observed, this amount had already been included in the $\text{MP}_{\text{INC}}$ Ordinary Loss that was allocated to and deducted by the W_Murphy_Jrs The deduction of this amount on Schedule E was a double-deduction of the same fee).

### (f) Wendy Crumpler[294]

336 For their 2000 tax year, Wendy Crumpler (W_Crumpler) and her husband, Kelly Crumpler, filed a joint Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after the filing of the original return) These Returns were prepared by the Raleigh Office of Ernst & Young

---

294 Bates: MUMI01061 through MUMI01124 (as amended)

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $7,780 and referred to "Statement 4" for detail
  - Of this total amount, Statement 4 described $7,350 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount.
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose.
- On Schedule D, Line 12, the W_Crumplers' reported a "[n]et long-term . . . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $4,555,524
  - This amount differs from the $5,286,545 $\text{MURFAM}_{\text{INC}}$ LTCL that was allocated to W_Crumpler on his Schedule K-1 from $\text{MURFAM}_{\text{INC}}$ (Table 1, Column F, Line 13)
  - From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts
    - The W_Crumplers' Schedule D did not reference any statement that would have disclosed the source of long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.
    - Nor was any such statement or disclosure otherwise included with the W_Crumplers' 2000 Form 1040
  - The difference between the amount reported on Line 12 and the larger amount of $\text{MURFAM}_{\text{INC}}$ LTCL allocated to W_Crumpler could have been the result of netting the $\text{MURFAM}_{\text{INC}}$ LTCL against $731,021 of long-term capital

gains (or net long-term capital gains) from other partnerships, etc.

- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $MURFAM_{INC}$ LTCL allocated to W_Crumpler
  - Note that the W_Crumplers did not have enough capital gains in 2000 to be able to use all of the $MURFAM_{INC}$ LTCL.
  - They reported a net capital loss carryover from 2000 of $1,489,565.
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 13.83% less than the amount of the $MURFAM_{INC}$ LTCL allocated to W_Crumpler on her $MURFAM_{INC}$ Schedule K-1.

- On Line 28b(i) of Part II of Schedule E, the W_Crumplers' reported "nonpassive losses from Schedule K-1" of $217,191. The Statements 9 through 15 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 9 and 14, the names and EINs of $MURFAM_{LLC}$ and $MURFAM_{INC}$, were disclosed. The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included $4,874, W_Crumpler's allocation of the "Professional Fees" claimed by $MURFAM_{INC}$. As previously observed, this amount had already been included in the $MURFAM_{INC}$ LTCL that was allocated to and deducted by the W_Crumplers. The deduction of this amount on Schedule E was a double-deduction of the same fee.

### (g) Joyce M. Norman[295]

337 For their 2000 tax year, Joyce M. Norman (J_Norman) filed a Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after the filing of the original return). These Returns were prepared by the Raleigh Office of Ernst & Young

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $13,178 and referred to "Statement 5" for detail.
  - Of this total amount, Statement 5 described $13,131 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount.
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose.
- On Schedule D, Line 12, J_Norman reported a "[n]et long-term . . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $8,373,813.
  - This amount differs from the $9,674,561 $\text{MURFAM}_{\text{INC}}$ LTCL that was allocated to J_Norman on his Schedule K-1 from $\text{MURFAM}_{\text{INC}}$ (Table 1, Column G, Line 13).
  - From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts.
    - J_Norman's Schedule D did not reference any statement that would have disclosed the source of long-term capital loss shown on Line 12 or that would have disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.

---

295 Bates: MUMI01962 through MUMI02017 (as amended)

  - Nor was any such statement or disclosure otherwise included with J_Norman's 2000 Form 1040
- The difference between the amount reported on Line 12 and the larger amount of $\text{MURFAM}_{\text{INC}}$ LTCL allocated to J_Norman could have been the result of netting the $\text{MURFAM}_{\text{INC}}$ LTCL against $1,300,748 of long-term capital gains (or net long-term capital gains) from other partnerships, etc
- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL allocated to J_Norman.
  - Note that J_Norman did not have enough capital gains in 2000 to be able to use all of the $\text{MURFAM}_{\text{INC}}$ LTCL.
  - They reported a net capital loss carryover from 2000 of $3,103,287.
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 13.45% less than the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL allocated to J_Norman on her $\text{MURFAM}_{\text{INC}}$ Schedule K-1.

- On Line 28b(i) of Part II of Schedule E, J_Norman reported "nonpassive losses from Schedule K-1" of $757,631. The Statements 9 through 14 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 9 and 13, the names and EINs of $\text{MURFAM}_{\text{LLC}}$ and $\text{MURFAM}_{\text{INC}}$, were disclosed. The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included $8,919, J_Norman's allocation of the "Professional Fees" claimed by $\text{MURFAM}_{\text{INC}}$. As previously observed, this amount had already been included in the $\text{MURFAM}_{\text{INC}}$ LTCL that was allocated to and

deducted by J_Norman. The deduction of this amount on Schedule E was a double-deduction of the same fee.

### (h) Angela N. Brown[296]

338. For their 2000 tax year, Angela N. Brown (A_Brown) and her husband, Robert L. Brown, filed a joint Form 1040 and a Form 1040X (to amend the original return for unspecified Schedule K-1s that had been received after the filing of the original return). These Returns were prepared by the Raleigh Office of Ernst & Young.

- On Schedule A, Line 22, reported total miscellaneous itemized deductions of $4,038 and referred to "Statement 4" for detail.
  - This total amount was described on Statement 4 as "Partnership, S corporation and estate and trust," but did not otherwise describe or elaborate on this amount.
  - Consequently, I could not determine whether or not any of this amount was for any of the fees paid to E&Y or Proskauer Rose.
- On Schedule D, Line 12, the A_Browns' reported a "[n]et long-term . (loss) from partnerships, S Corporations, estates, and trusts from Schedule(s) K-1" of $2,590,759.
  - This amount differs from the $2,990,990 $MURFAM_{INC}$ LTCL that was allocated to A_Brown on his Schedule K-1 from $MURFAM_{INC}$ (Table 1, Column H, Line 13).
  - From the documents that I reviewed, I was unable to determine the source of or the reason for the discrepancy between these two amounts.
    - The A_Browns' Schedule D did not reference any statement that would have disclosed the source of long-term capital loss shown on Line 12 or that would have

296 Bates: MUMI01768 through MUMI01832 (as amended)

disclosed the sources and details of the individual long-term capital gains and losses that may have made up that net amount.

- Nor was any such statement or disclosure otherwise included with the A_Browns' 2000 Form 1040

- The difference between the amount reported on Line 12 and the larger amount of $\text{MURFAM}_{\text{INC}}$ LTCL allocated to A_Brown could have been the result of netting the $\text{MURFAM}_{\text{INC}}$ LTCL against $400,231 of long-term capital gains (or net long-term capital gains) from other partnerships, etc
- Alternatively, the difference between these two amounts could have been the result of claiming less than the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL allocated to A_Brown.
  - Note that the A_Browns did not have enough capital gains in 2000 to be able to use all of the $\text{MURFAM}_{\text{INC}}$ LTCL.
  - They reported a net capital loss carryover from 2000 of $940,687.
  - The amount of the net long-term capital loss reported on Line12 of Schedule D was 13.38% less than the amount of the $\text{MURFAM}_{\text{INC}}$ LTCL allocated to A_Brown on her $\text{MURFAM}_{\text{INC}}$ Schedule K-1.

- On Line 28b(i) of Part II of Schedule E, the A_Browns' reported "nonpassive losses from Schedule K-1" of $114,289. The Statements 10 through 13 presented the detail of the aggregated amounts shown on Part II of Schedule E. On Schedules 10 and 12, the names and EINs of $\text{MURFAM}_{\text{LLC}}$ and $\text{MURFAM}_{\text{INC}}$, were disclosed. The amounts included in the total nonpassive loss amount shown on Line 28b(i) of Schedule E included $2,757, A_Brown's allocation of the "Professional Fees" claimed by $\text{MURFAM}_{\text{INC}}$. As previously observed, this amount had already

been included in the $MURFAM_{INC}$ LTCL that was allocated to and deducted by the A_Browns The deduction of this amount on Schedule E was a double-deduction of the same fee.

### 2. Nondisclosure of Transaction-Related Information

339. None of the Taxpayers' 2000 Form 1040s disclosed, identified, described, or otherwise referred to (by name or by tax identification number) the single-member LLC through which the Taxpayer owned his or her interest in the Partnership(s) and in the name of which the Partnership's(s') Schedule K-1(s) had been filed

340. None of the Taxpayers' 2000 Form 1040s disclosed any description, explanation, calculation, or any other information pertaining to:

- The determination of the tax basis that the Taxpayer claimed to have had in his/her Partnership Interest(s), or
- The determination of the tax basis that the Taxpayer claimed to have had in his/her stock of the S Corporation(s).

341. None of the Taxpayers' 2000 Form 1040s disclosed any description, explanation, calculation, or any other information pertaining to that individual's.

- Acquisition or cost of the Long Options and the offsetting Short Options by his/her single-member LLC,
- The transfer of those Options to the Partnership(s) as a contribution to its capital,
- The transfer of the Bonds (the COBRA Loss Assets) to $PSM_{LLC}$ or to $MURFAM_{LLC}$ as a contribution to its capital,
- The transfer of the Partnership Interest(s) to the S Corporation(s) in exchange for the stock of the S Corporation(s), or
- The termination and liquidation of the Partnership(s)

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information been disclosed on or with the Taxpayers' 2000 Form 1040s

342 As noted above, on each of the Schedule Ds of the Taxpayers' 2000 Form 1040s, only the net amount of long-term capital loss was shown.

- There is no reference to a separate statement for a breakdown of that net loss into the long-term capital gains and the long-term capital losses Nor were any such statements (or supplemental disclosures or explanations) included with any of these Form 1040s Consequently, neither the source (by name or by EIN) nor the amount of the $PSM_{INC}$ LTCL or the $MURFAM_{INC}$ LTCL were disclosed anywhere on the Taxpayers' 2000 Form 1040s

343. None of the Taxpayers' 2000 Form 1040s included.

- A Form 8275 ("Disclosure Statement")[297] or a Form 8275-R ("Regulation Disclosure Statement");[298, 299]
- A Form 8271 ("Investor Reporting of Tax Shelter Registration Number") that reported any of the Partnerships or S Corporations as tax shelters,

---

297 Form 8275 is used by taxpayers and income tax preparers to disclose items or positions, except those contrary to a regulation, that are not otherwise adequately disclosed on a tax return to avoid certain penalties This form is filed to avoid the portions of the accuracy-related penalty due to disregard of rules or to a substantial understatement of income tax if the return position has a reasonable basis

298 Form 8275-R is used by taxpayers and income tax preparers to disclose positions taken on a tax return that are contrary to Treasury regulations. This form is filed to avoid the portions of the accuracy-related penalty due to disregard of regulations or to a substantial understatement of income tax for non-tax shelter items if the return position has a reasonable basis

299 See 3/10/00 e-mail from Robert Coplan (E&Y) to Martin Nissenbaum and Richard Shapiro (both of E&Y) (Subject: RE: COBRA Returns): "Please confirm to me that we are agreed that the opinion letter means no 8275 is needed, since it should indicate more than substantial authority I can't hink [sic] of any other disclosures And we have concluded (have we not) that COBRA is not a tax shelter requiring registration?"

- A transferor-shareholder "Regulation Section 1 351-3(a) Statement" to disclose the exchange(s) of the Partnership Interest(s) for the stock of the S Corporation(s).[300]

### 3. Opinion

344. In my opinion, the information and disclosures made on the Taxpayers' respective 2000 Form 1040s (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication.

- That the Long-Term Capital Losses (and, in the case of H_Murphy, W_Murphy, and W_Murphy_Jr, the Ordinary Losses) that were deducted on those Returns--
  - Resulted from an interrelated series of steps involving several conduit entities (the single-member LLCs, the Partnerships, and the S Corporations), or that, according to the parties,
  - These various steps resulted in the creation of greatly inflated tax bases:
    - In the Partnership Interests, and then
    - In the S Corporation stock, and
    - In the Bonds (or, in the case of $MP_{INC}$, the Euros), the sale of which by the S Corporations resulted in the Murphy Losses that were allocated to and among these individuals and that they each deducted on their respective 2000 Form 1040s
- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information been disclosed on or with the Taxpayers' 2000 Form 1040s

[300] *Supra* , footnote 169 See 3/10/00 e-mail from Amy Keating (Compliance Manager, E&Y) to John Nord (E&Y Minneapolis) (regarding one of the other COBRA transactions) in which she confirmed Mr Nord's conclusion that Reg. Section 1 351-3(a) Statements should be attached to the shareholders' Form 1040s

345. In my opinion, the information and disclosures made on the Taxpayers' respective 2000 Form 1040s (including all accompanying forms, schedules, statements, and attachments), individually and collectively, failed to provide any reasonably discernable indication that in connection with these transactions (and the creation and recognition of the $99,994,857 of Murphy Losses), Transaction-related fees of $2,100,000 (to E&Y) and of $407,500 (to Proskauer Rose) had been incurred and paid

- In my opinion, it would be reasonable to conclude that the risk of detection and audit by the IRS would have increased significantly if this information been disclosed on or with the Taxpayers' 2000 Form 1040s.

## VI. Sufficiency of Combined Disclosures

346 Based on the foregoing analyses, in my opinion, even if all of the 2000 Returns had been identified and reviewed together, it would have been unlikely or impossible, based solely on the information disclosed on or with those Returns, for the IRS to have been able to determine or reasonably discern:

- That the Taxpayers had purchased, through their respective single-member LLCs, Long Options and offsetting Short Options in foreign currency,
- That the net cash premiums paid for these Options were only 3% of the amounts by which the LLCs increased their tax bases in their respective Partnership Interests,[301]
- That these Options had been contributed to the Partnerships as contributions to capital by the LLC-partners,
- That each LLC had determined its tax basis in its Partnership Interest(s) by reference to the stated premium "charged" for the Long Option and

[301] Table 4, amounts in Column L divided by amounts in Column C = 3%

without regard to the premiums "credited" for the offsetting Short Option,

- That, shortly before the liquidation of $PSM_{LLC}$ and of $MURFAM_{LLC}$, Bonds were contributed to the Partnerships' capital by the Taxpayers,
- That $PSM_{LLC}$ and $MURFAM_{LLC}$ ever held the Bonds that were subsequently sold by $PSM_{INC}$ and $MURFAM_{LLC}$ to produce the $PSM_{INC}$ LTCL and the $MURFAM_{INC}$ LTCL,
- That, shortly before the liquidation of $MPP_{LLC}$, $MPP_{LLC}$ purchased Euros,
- That $MPP_{LLC}$ ever held the Euros that were subsequently sold by $MP_{INC}$ to produce the $MP_{INC}$ Ordinary Loss,
- That the Partnerships, upon their termination/liquidation, distributed the Bonds ($PSM_{LLC}$ and of $MURFAM_{LLC}$) and the Euros ($MPP_{LLC}$) to the respective S Corporations,
- That the S Corporations received 100% of the respective Partnership Interests in exchange for their stock,
- That the S Corporations had ever held an interest in the Partnerships,
- That the S Corporations had ever received a liquidating distribution of property from any partnership or, more specifically, from the Partnerships,
- That the "Municipal Bonds" sold by $PSM_{INC}$ and $MURFAM_{INC}$ had been received as liquidating distributions from $PSM_{LLC}$ and $MURFAM_{LLC}$,
- That the Euros sold by $MP_{INC}$ had been received as liquidating distributions from $MP_{LLC}$,
- That the Partnerships had had determined their respective tax bases in the COBRA Loss Assets (the Bonds and the Euros) by reference to the greatly inflated tax bases that their stockholders had claimed for their Partnership Interests as of the date they had transferred those interests to the S Corporations in exchange for stock,

- That the tax bases claimed by $PSM_{INC}$ and $MURFAM_{INC}$ in their Bonds was greater than 480 times the par value of those Bonds,[302] and that the tax basis claimed by $MP_{INC}$ in the Euros was over 46 times $MP_{INC}$'s cost of those Euros [303]
- That the tax basis that the S Corporations assigned to their respective COBRA Loss Asset resulted in:
  - For $PSM_{INC}$, the conversion of a $321 economic gain into a claimed Long-Term Capital Loss of $24,531,884,[304]
  - For $MP_{INC}$, the conversion of a $10,039 economic gain into a claimed Ordinary Loss of $13,919,961,
  - For $MURFAM_{INC}$, the conversion of a $803 economic gain into a claimed Long-Term Capital Loss of $61,543,012,[305]
- That any fees were incurred and/or paid with respect to the Transaction, or, more specifically, that Transaction-related fees totaling $2,507,498 were incurred by the Taxpayers and paid to E&Y and Proskauer Rose

347. Based on my examination of the 2000 Returns and for the reasons detailed above, it would, in my opinion, be reasonable to conclude:

- That the various elements of the Transaction were divided between and reported on the various 2000 Returns in a manner that was designed to minimize or eliminate the risk of detection[306] and audit by the IRS, and
- That the Transaction-related fees paid to E&Y and Proskauer Rose were reflected on the 2000 Returns in a manner that was designed to minimize or eliminate the risk of detection[307] and audit by the IRS

---

302 Tables 7 and 9, Column M, Row 17, divided by Column M, Row 9 minus 1

303 Table 8, Column M, Row 17, divided by Column O, Row 9, minus 1

304 This calculation assumes that the Bonds had been purchased at Par Value

305 This calculation assumes that the Bonds had been purchased at Par Value

306 *Supra* , footnote 12

307 *Supra* , footnote 13

# VII. Communications Relating to Disclosure of the Transactions

348 The record contains several additional E&Y internal communications that corroborate the opinions I expressed above These communications indicate (or, in some cases, seem to indicate) that the parties planned and implemented (or attempted to implement) strategies designed to minimize the possibility that the Transaction might be detected and audited by the IRS For example:

- January 21, 2000 e-mail from William P Murphy (E&Y) to Robert B. Coplan (E&Y National Tax) **["Coplan"]** ("Subject: COBRA S Corp Returns"):

> I know we talked in the last conference call about preparing the S Corp and Pshp returns for the COBRA transaction out of New York. I just wanted to confirm that they will also prepare the K-1 for both entities such that we can file our clients returns by April 15th I know we have *expressed a strong preference* to our client that they should file their returns by April 15th *with "the masses"*.[308] [Emphasis supplied.]

- March 10, 2000 e-mail from Amy Keating (Compliance Manager, National, E&Y) to Robert B. Coplan (E&Y National Tax):

> I'm glad everyone seems to be okay with the returns - I haven't heard anything about the ones that have gone out *As far as the signatures go, I think it's best that* they're *all different b/c if one is picked up, they'll surely run a ss# analysis to identify other returns for review* Amy.[309] [Emphasis supplied.]

---

[308] Bates: 2003EY010689

[309] Bates: DOJ 000818 and DOJ 000819 This e-mail was in response to a 3/9/00 e-mail from Mr Coplan to Ms Keating, which stated, in part, "So far, I have not heard a peep from anyone on the receiving end of these returns about the returns themselves or having to sign them Maybe I'll hear the complaints later, but for now, I'm satisfied with our decision " The "decision" that Mr Coplan referred to appears to have been the decision to have each of the local practice office contact persons sign the COBRA returns, as the preparer, rather than having Amy Keating sign them all Bates: DOJ 000471 through DOJ 000474

- May 8, 2000 e-mail from Thomas A. Dougherty to three E&Y tax professionals ("Subject. Cobra Transaction Feedback"):

> 3 Our decision to use a coordinated preparation of transaction tax returns was well received. Our clients liked the fact that we were paying close attention to *coordinating the reporting of similar transactions* and achieving efficiency in *determining proper wording and disclosure issues*. This was a major task by the compliance people involved and for Bob Coplan to review all of them. An excellent job by all! Thanks![310] [Emphasis supplied.]

- August 30, 2000 e-mail from Coplan to James E Ryan (E&Y) ("Subject: RE: [REDACTED] COBRA Materials").

> DO not use the netting approach on the grantor trust return. *It is too risky at this point, even though the theory is that by doing so, the Service will have a hard time catching the return.*[311] [Emphasis supplied.]

- May 19, 2004 e-mail from Nancy Thibadeau (E&Y Mid-Atlantic Tax Compliance) to Regina K Wall (E&Y Philadelphia) ("Subject: Fees paid for Mellow Investors"):

> Here is yet another question about the COBRA transactions- this is for Mellow Investors and Mellow Partners for 1999
>
> We have been asked to do an analysis for William Melton and Myer Berlow, for which we need the fees that were paid for the transaction. E&Y fees, attorney fees, etc. *We aren't able to determine that from the returns. Can you help us with finding those amounts?*[312] [Emphasis supplied.]

## VIII. Summary of Conclusions

349. In my opinion, the 2000 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) of the

[310] Bates: 2003EY004091

[311] Bates: 2003EY010786

[312] Bates: DOJ001046

Partnerships (Form 1065s), the S Corporations (Form 1120Ss), and of the Taxpayers (Form 1040s), individually and collectively, ---

- Failed to identify and/or explain the sources[313] of any of the various Murphy Losses, and failed to disclose information that was sufficiently descriptive or complete to provide any reasonably discernable indication of the sources of those Losses, and
- Failed to identify, separately state, or otherwise describe, in general or in specific terms, the $2,006,000 in fees that were paid to E&Y (by the LLCs and the Partnerships) in 2000, and failed to disclose information that was sufficiently descriptive or complete to provide any reasonably discernable indication that such fees had been incurred and paid in connection with the generation of the various Murphy Losses,
- Failed to identify, separately state, or otherwise describe, in general or in specific terms, the $407,500 in fees paid to Proskauer Rose (by the LLCs and the Partnerships) in 2000, and failed to disclose information that was sufficiently descriptive or complete to provide any reasonably discernable indication that such fees had been incurred and paid in connection with the generation of the various Murphy Losses,
- Failed to disclose the fact that the $94,000 total amount of "Professional Fees" that were claimed as "other deductions" on the S Corporations' Form 1120Ss were also included in the various Murphy Losses that were allocated to and deducted by the respective

350. In my opinion, it would not have been possible, based solely on the information included on or with any or all of the 2000 Returns, for the IRS to determine that:

- The various Murphy Losses were the result of the assignment of a greatly inflated tax basis to the various COBRA Loss Assets that were sold by the S Corporations to produce those Losses, or that

---

313 *Supra* , footnotes, 3, 7, and 10

- Accounting and legal fees totaling $2,507,498 had been incurred and paid in connection with the Transactions that produced the Murphy Losses

351 In my opinion, based on my review of the record, it would be reasonable to conclude that.

- The various elements of the Transactions were divided between and reported on the various 2000 Returns in a manner that was designed to minimize or eliminate the risk of detection and audit by the IRS, and that
- The Transaction-related fees paid to E&Y and Proskauer Rose were reflected on the 2000 Returns in a manner that was designed to minimize or eliminate to the risk of detection and audit by the IRS.

Respectfully submitted,

David W LaRue, Ph D
June 1, 2007

# Appendix A

# VITA

## David Wayne LaRue, Ph.D.

**HOME ADDRESS**

1358 Huntersfield Close
Keswick, VA 22947
(434) 979-5496
(434) 825-9081 (cell)

**PERSONAL DATA**

Birth Date: September 3, 1950
Marital Status: Divorced,
Three children

**OFFICE ADDRESS**

McIntire School of Commerce
University of Virginia
Charlottesville, VA 22904
(434) 924-3235
e-mail: dlarue@virginia.edu
UVa website: http://gates.comm.virginia.edu/dwl2c

**FORMAL EDUCATION**

| | | |
|---|---|---|
| Ph.D. (with honors): | Fall, 1983 | University of Houston |
| M.S. Accountancy: | Fall, 1977 | University of Houston |
| B.B.A.: | Fall, 1974 | University of Houston |

**DOCTORAL PROGRAM**

| | |
|---|---|
| Major Field of Study: | Federal Taxation and Financial Accounting |
| Supporting Field of Study: | Economics/Tax Policy |
| Dissertation Title: | Corporate Reorganizations under the Internal Revenue Code of 1954: A Critical Analysis of the Legislative, Administrative, and Judicial Development of Sections 368(a)(1)(D) and (F) and Issues Relating Thereto [532 pp.] |

## ACADEMIC EXPERIENCE

| | |
|---|---|
| Director, Graduate Accounting Program | University of Virginia, 2000 to 2005 |
| Associate Professor | University of Virginia, 1989 to present |
| Assistant Professor | University of Virginia, 1983 to 1989 |
| Lecturer | University of Maryland, 1979 to 1983 |
| Instructor | University of Houston, 1976 to 1978 |

## UNIVERSITY COURSES DEVELOPED AND TAUGHT

### Graduate

| | |
|---|---|
| GCOM 761D | Forensic Analysis, Due Diligence, and Litigation Support |
| GCOM 749 | Federal Tax Research, Procedure, Administration, and Policy |
| GCOM 748 | Federal Income Taxation of Partnerships and S Corporations |
| GCOM 747 | International Taxation and Strategic Tax Planning |
| GCOM 745 | Taxation of Corporate Mergers and Acquisitions, Corporate Recapitalizations and Divisions, and Consolidated Tax Returns |
| GCOM 744 | Accounting, Tax, and Legal Dimensions of International Business and Investment Transactions [conducted throughout Europe (1997, 1998, and 1999) and then Japan/China (2000 and 2001)] |
| GCOM 742 | Tax Jurisprudence |
| GCOM 544 | Federal Tax Aspects of Business, Investment, and Personal Decisions |

Special Topics Courses (Graduate):

Federal Tax Accounting Periods and Methods
Executive Compensation Strategies
Accounting for Derivatives

### Undergraduate

| | |
|---|---|
| COMM 546 | Federal Income Taxation of Corporations, Partnerships, Trusts and Estates |
| COMM 474 | International Finance and Taxation (2000 & 2001) [conducted in Japan/China], (2003) [conducted in Australia and New Zealand] |
| COMM 474A | Special Topics in International Finance and Taxation (2002) [conducted in Brazil] |
| COMM 445/545 | Federal Income Taxation of Individuals and Property Transactions |
| COMM 386 | The Business of Saving Nature (2003) [conducted in Union of So. Africa] |
| COMM 384 | International Business |
| COMM 311/312 | Intermediate Accounting I & II |
| COMM 201/202 | Introductory Accounting I & II |

## AWARDS AND HONORS

Virginia Society of CPAs Outstanding Educator Award (June, 2000)

National Register's Who's Who in Executives and Professionals

KPMG Peat Marwick, "Instructor Excellence Award," 1999.

KPMG Peat Marwick, "Instructor Excellence Award," 1998.

Commendation from U.S. Department of Justice for "dedication, independence, and expert analysis and testimony" as the government's forensic analyst, accounting expert, and tax expert in _U.S. v. Perlman_, 1997.

Commendation from Criminal Investigation Division of the Internal Revenue Service for service as an independent forensic analyst, accounting expert, and tax expert in _U.S. v. Perlman_, 1997.

KPMG Peat Marwick, "Instructor Excellence Award," 1994.

Nominated for University of Virginia Alumni Outstanding Educator Award (Spring, 1991)

Ernst and Young Tax Literature Award, 1990. (Awarded for publication of "A Case for Neutrality In the Design and Implementation of the Merger and Acquisition Statutes: The Post-Acquisition Net Operating Loss Carryback Limitations," 43 *Tax Law Review* (Fall, 1987): pp. 85-240.)

"Dean's Award for Scholastic Excellence -- Ph.D.," 1983

The 1978 Mortar Board "Top Prof" for the College of Business Administration (University of Houston)

Haskins and Sells Fellowship for Doctoral Students, 1977

Peat, Marwick, Mitchell and Co. Tax Research Fellowship, Spring and Fall, 1975. Responsibilities included the research and writing of portions of the American Institute of CPA's *Statement of Tax Policy #3. Elimination of Double Tax on Dividends*, published in 1976, 38 pages.

Beta Gamma Sigma (Honorary Business Fraternity)

Beta Alpha Psi (Honorary Accounting Fraternity)

## RESEARCH AND PUBLICATIONS

### Published Research

"LIFO Recapture on C-to-S Conversions: Filling the Gaps and Ameliorating the Deficiencies of Section 1363(d)," 59 *The Tax Lawyer* (Fall, 2005): pp. 1-106.

"Thomas Asked To Consider Changes For LIFO S Corporations," 2005 *Tax Notes* 168-10 (August 31, 2005). Comments on H.R. 3376, the *Tax Technical Corrections Act of 2005*.

**RESEARCH AND PUBLICATIONS (continued)**

**Published Research (continued)**

"Business Bad Debts: Failure to Prove Worthlessness" (with S. Thompson), *Journal of Accounting* (September, 2005).

"Harnessing Multimedia And Interactive-Assessment Technologies To Promote And Evaluate Cognitive Progression And Critical Thinking In The Classroom" (with Lynda S. Hodgson), *International Journal of Case Method Research and Application*, World Applied Case Research Association, 2005, vol. XVIII, Issue 2: pp. 330 to 340.

"Proposed LIFO Recapture Regulations." 2004 *Tax Notes* 233-14 (December 3, 2004) (Doc 2004-22607).

"Intercompany Investments Between Affiliates Of Multinational Enterprises: Applying the Substance-Over-Form Doctrine to Distinguish 'Equity' From 'Debt'" (with S. Thompson), 2 *Journal of Business and Economics Research* (October, 2004): pp. 55-68.

"Anatomy of a Corporate Tax Shelter: Electron Industries, Inc.," *Case Method Research and Application*, World Applied Case Research Association, 2003, vol. XVI: pp. 457-469.

"Eluding the LIFO Recapture Provisions of Subchapter S After the Eleventh Circuit's Decision in *Coggin Automotive*: Part II" (with J. Dawson), 5 *Business Entities* (September/October, 2003): pp. 22-27, 56.

"Eluding the LIFO Recapture Provisions of Subchapter S After the Eleventh Circuit's Decision in *Coggin Automotive*: Part I" (with J. Dawson), 5 *Business Entities* (July/August, 2003): pp. 40-53.

*The International Chamber of Commerce's Executive Guide to Best Corporate Practices in Combating Corruption and Bribery*, Chapter 4: Accounting Polices, Practices, Controls and Disclosures (with Mritunjay Singh), International Chamber of Commerce, Paris (April, 1999).

"Funding Opportunities for Tax Grant Proposals," in *A Guide to Tax Research Databases*, American Taxation Association, 1993, pp. 114-124, (with S. Luttman).

"An Empirical Examination of the Influence of Selected Economic and Non-Economic Variables on Decision Making by Tax Professionals," (with W. Duncan and P. Reckers) 2 *Advances in Taxation* (1989): pp. 91-106.

*Hearings on Tax Policy Aspects of Mergers and Acquisitions Before the Ways and Means Committee of the U.S. House of Representatives*, 101st Congress, 1st Session (February 2, 1989): pp. 569-580.

**RESEARCH AND PUBLICATIONS (continued)**

**Published Research (continued)**

"An Empirical Examination of the Influence of Selected Factors on Professional Tax Preparers' Decision Processes," (with P. Reckers) 7 *Advances in Accounting*, 1989, pp. 35-48.

"A Case for Neutrality In the Design and Implementation of the Merger and Acquisition Statutes: The Post-Acquisition Net Operating Loss Carryback Limitations," 43 *Tax Law Review* (Fall, 1987): pp. 85-240. (Funded by grants from the Arthur Young Foundation, the Ralph E. Kent Fund, and the McIntire Associates Program.)

*Hearings on Carryover of Net Operating Losses and Other Tax Attributes of Corporations before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means*, 99th Congress, 1st Session, (May 22, 1985): pp. 60-110.

"What You Should Know About Protecting Your Tax Exemption," (with A. Lawler), *Association Management* (November, 1981): pp. 71-75

"New Credit for Child and Dependent Care Expenses: Congress Revamps and Liberalizes a Tax Benefit Provision," (with R. Sapp), *TAXES-The Tax Magazine* (June, 1977): pp. 373-376.

"Investment Tax Credit: Pass-Through Provisions More Attractive as Rate Increases," (with J. Pratt), *Taxation for Accountants* (May, 1975): pp. 304-307.

**Book Reviews**

Tang, Roger Y.W., *"Intrafirm Trade and Global Transfer Pricing Regulation,"* Quorum Books, 1997. 73 *Accounting Review* 413-414, July, 1998.

Marvin A. Chirelstein, "*Federal Income Taxation, A Guide to Leading Cases and Concepts*," Seventh Edition, in *Journal of the American Taxation Association*, Spring, 1995, Vol. 17, No. 1, pp. 117-118.

Steuben and Turnier, "*Problems in the Fundamentals of Federal Income Taxation*," Third Edition, *Journal of the American Taxation Association*, Spring, 1995, Vol. 17, No. 1, pp. 116-117.

**Proceedings**

"'Debt' or 'Equity'? *Laidlaw Transportation, Inc.*" (with S. Thompson), European Applied Business Research Conference, Edinburgh, Scotland (June 14-18, 2004), 12 page case, 23 page teaching note. ("Best Paper Award").

"The Art of Storytelling: Using Technology to Design, Animate, Narrate, and Distribute Engaging Presentations for the Classroom and for Distance Learning," European College Teaching & Learning Conference, Edinburgh, Scotland (June 14-18, 2004), 7 pages.

## RESEARCH AND PUBLICATIONS (continued)

### Proceedings (continued)

"Rethinking Business-School Curriculums: Integrating Tax Concepts and Strategies into Finance and Management Courses," European College Teaching & Learning Conference, Edinburgh, Scotland (June 14-18, 2004), 9 pages.

"Taxation of Distributions from Partnerships and Limited Liability Companies," 46th Annual William and Mary Tax Conference, Williamsburg, VA (December 2, 2000), 98 pages.

"Current Developments in Financial Accounting Standards: Accounting for Derivatives, Hedges, and Corporate Acquisitions," 45th Annual William and Mary Tax Conference, Williamsburg, VA (December 4, 1999), 48 pages.

"A Macroeconomic Analysis of the Western European Welfare State Crisis: Revenue-Side Solutions," University of Madrid (Spain), Conference on European Public Finance, *Perspectivas Fiscales De Los 90*, San Lorenzo de el Escorial, Spain (July 18, 1994), 26 pages.

"Accounting for Stock-Based Compensation and Environmental Remediation Expenditures," 39th Annual William and Mary Tax Conference, Williamsburg, VA (December 4, 1993), 42 pages.

"Accounting for Federal Income Taxes under FASB Statement 109: Analysis, Perspective, and Application," 38th Annual William and Mary Tax Conference, Williamsburg, VA (December 5, 1992) 50 pages. Reported and summarized in 92 *Tax Notes* 244-H (December 8, 1992)

"Post-Acquisition Loss Carrybacks," Tenth Arthur Young Professors' Roundtable, Washington (April 25, 1986, 160 pages).

"The Archer Amendment: Congress Flirts with An Inflation-Neutral Tax System," (with T. Reveley), *1980 Mid-Atlantic American Accounting Association Proceedings*, Martinsburg, W.Va. (April, 1980), pp. 167-183.

### Research In Process

"The Lower of Cost or Market Method of Inventory Valuation: Rethinking an Accounting Anomaly"

**Abstract:**

The "lower-of-cost-or-market" method, as described in and allowed by Reg. Sections 1.471-2(c) and -4, distorts the measurement of taxable income by allowing current deductions for unrealized opportunity costs. In the opinion of the author, LCM should be repealed on the grounds that it is incongruent with accepted tenets of federal income taxation and that it provides tax benefits that cannot be reconciled with sound tax policy, tax equity or administrative considerations

## RESEARCH AND PUBLICATIONS (continued)

### Research In Process (continued)

"The Effect of Implicit Tax Assets and Implicit Tax Liabilities on Exchange Values in Corporate Mergers and Acquisitions: An Analytical Framework"

**Abstract:**

In most corporate acquisition structures the ultimate incidence of most or all of the tax burdens and tax benefits built into the values of the target corporation's assets as of the transaction date together with most or all of the tax burdens and benefits inherent in the target's tax attributes shift from the shareholders of the target corporation to the shareholders of the acquiring corporation Some, but not all, of these incidence-shifting acquisition structures also trigger the creation of "phantom built-in gains" (or losses) and "phantom built-in earnings" (or earnings deficits) that can eventually give rise to additional tax burdens (or benefits) to the acquiring corporation and its shareholders Like any other liability, the acquiring corporation's assumption of the target's built-in tax burdens and where applicable, the creation of phantom built-in gains and phantom built-in earnings, diminish the value of the target corporation to the acquiring corporation and its shareholders Conversely like any other asset the acquirer's acquisition of the built-in tax benefits, and where applicable, the creation of phantom built-in losses and phantom built-in earnings deficits enhance the target corporation's value

This article identifies these "implicit" tax assets and "implicit" tax liabilities It explores the murky interface between economics, corporate finance, financial accounting standards and the intricacies of the tax law to develop a analytical framework for quantifying their impact on the value of the target corporation's stock (or assets) It suggests how this framework can be integrated with traditional discounted cash flow and "economic value added" analyses and with other valuation techniques to assist the seller and the buyer in establishing more informed ask and bid prices, in identifying and exploiting opportunities for value enhancement through tax arbitrage and in identifying the optimal acquisition structure The author also identifies several anomalies and inequities inherent in the current tax regime and suggest alternatives which would enhance economic efficiency and produce a more neutral and credible system for taxing corporate mergers and acquisitions

"Adam Smith Revisited: "Functional Neutrality" in the Design, Implementation, and Interpretation of the Tax Statutes."

**Abstract:**

A voluntary-compliance-based income tax system claims its legitimacy from a consensus as to the broad qualitative policy objectives the system should be simultaneously designed to achieve, from the general acceptance of the individual and collective components of its logical infrastructure and from the consistency and effectiveness with which that infrastructure manifests itself in identifying similarities in economically (or legally) similar situations identifying dissimilarities in economically (or legally) dissimilar situations and then treating these similar vis-à-vis dissimilar situations accordingly The less generally accepted the broad qualitative policy objectives and/or foundational precepts, the more vulnerable the system is to challenges to its authority Legitimacy may likewise suffer when the logical ordering and consistent application of the system's internal rules breaks down i e where similar situations are treated as though they were entirely unrelated (or where dissimilar situations are subjected to the same treatment)

"Functional neutrality," as that term is used throughout this article, calls for impartiality in the tax recognition and treatment of transactions which are functional equivalents of one another Implicit in this criterion is the necessity of first identifying the legal and economic attributes which distinguish one transactional form another, and then isolating those differences which, for one policy reason or another, ought likewise to distinguish such transactions in the assessment of the income tax Once a class of transactions has been designated for partial treatment, the relevant inquiry becomes: Are all transactional variations which achieve the "public purpose" supporting the initial departure from neutrality themselves treated impartially inter se? Conversely, are those transactional structures which fail to evidence the achievement of that purpose denied the benefits (or spared the detriments) of discrimination? Consequently, "functional neutrality" has little, if anything, to do with the formulation of policy, and everything to do with the design of rules intended to implement policy once formulated

Functional neutrality should be the standard for evaluating both the adequacy of the statutory implementation of tax policy objectives and the validity of subsequent administrative and judicial interpretations Once the objectives have been unambiguously stated, it is the duty of the legislators and their staffs to identify attributes which either enhance or detract from those objectives Absent overriding administrative considerations, the statute should be designed so as to affirmatively discriminate between alternative courses of action on the basis of whether they possess or fail to possess such attributes It should be neutral as to the presence or absence of attributes which neither enhance nor detract from the fundamental objective Clearly, perfection is unattainable But it is the frequent failure to embark on its quest which has resulted in so much uncertainty and inconsistency, and which has thus contributed so greatly to the erosion of the tax system's credibility

## PROFESSIONAL ACTIVITIES

### MicroStrategy, Inc.

Member of the Board of Directors (Outside Director) (from February 22, 2006)

Member of the Audit Committee (from February 22, 2006)

Chairman and "Financial Expert" (Regulation S-X Item 401(h)(2)) of Audit Committee (from June 1, 2006)

### Invited Congressional Testimony (oral):

*Hearings on Tax Policy Aspects of Mergers and Acquisitions Before the Ways and Means Committee of the U.S. House of Representatives*, 101st Congress, 1st Session (February 2, 1989): 89 *Tax Notes* 27-4 (February 3, 1989) (Doc 89-928).

*Hearings on Carryover of Net Operating Losses and Other Tax Attributes of Corporations before the Subcommittee on Select Revenue Measures of the House Committee on Ways and Means*, 99th Congress, 1st Session (May 22, 1985): 85 *Tax Notes* 103-3 (May 23, 1985) (Doc 85-4423).

### Testimony Before Internal Revenue Service Office of Chief Counsel (oral):

*Comments on Proposed Regulations Under Section 1363(d).* (Washington, December 8, 2004). Reported in: "S Corporations Rules on Indirectly Owned LIFO Recaptures Not Airtight, Possibly Invalid, Witness to Say" 2004 *BNA Daily Tax Report* No. 234 (December 6, 2004); "S Corporations: Hearing Witness Describes Avenues Around Rules on Indirectly Owned LIFO Recaptures" 2004 *BNA Daily Tax Report* No. 236 (December 9, 2004); "Academic Comments On Proposed LIFO Recapture Regs," 2004 *Tax Notes* 233-14 (December 3, 2004) (Doc 2004-22607); "Professor At Reg Hearing Lectures IRS On LIFO Recapture Rules," 2004 *Tax Notes* 237-3 (December 9, 2004); "Professor Suggests Changes To LIFO Recapture Rules As Recorded In Unofficial Transcript Of IRS Hearing." 2004 *Tax Notes* 241-25 (December 15, 2004).

### Comments Submitted to House Ways and Means Committee

"Thomas Asked To Consider Changes For LIFO S Corporations," 2005 *Tax Notes* 168-10 (August 31, 2005). Comments on H.R. 3376, the *Tax Technical Corrections Act of 2005*.

### External Committee Memberships

Member, Editorial Board, *Journal of the American Taxation Association (Legal Research)* (2006 - 2009)

Chairman, American Taxation Association: Tax Policy: Accounting Period and Methods Committee (2004 - 2006).

Member, American Taxation Association: Tax Policy Oversight Committee (2004 - 2005).

Member, American Taxation Association: Tax Policy: Accounting Period and Methods Committee (2001 - 2004). Report of Committee: "ATA Suggests Changes To Change Of Accounting Method Guidance." 2002 *Tax Notes* 48-24 (March 12, 2002).

## PROFESSIONAL ACTIVITIES (continued)

### External Committee Memberships (continued)

Member, Committee on Taxation of Corporations and Shareholders, AICPA Federal Tax Division (1995-1998).

Member, Tax Faculty Advisory Group, Coopers & Lybrand (1993-1998).

Member, Editorial Advisory Board, *The Journal of Accounting, Taxation and Finance for Business* (1993-1998).

Member, American Taxation Association: Corporate Tax Policy Subcommittee (1991-1992).

Chairman, American Taxation Association: Committee on Relations with the IRS and Treasury Department (1989-1990).

Member, Steering Committee for the 1989 Ernst and Whinney Symposium on Graduate Tax Program Administration.

Member, AICPA's Federal Tax Division Task Force to Re-Evaluate The Institute's Position on the Elimination of Double Taxation of Corporate Source Income (*Statement of Tax Policy #3*) (1981 to 1984).

Member, American Accounting Association Federal Taxation Committee (1982 to 1983). Report of the Committee published as "Indexing the Tax Law to Adjust for Inflation," in *TAXES-The Tax Magazine*, (February, 1984): pp. 125-137.

## TAX INSTITUTE, ETC. PRESENTATIONS

"Harnessing Multimedia And Interactive-Assessment Technologies To Promote And Evaluate Cognitive Progression And Critical Thinking In The Classroom" (with Lynda S. Hodgson), World Applied Case Research Association, July 4, 2005, Brno, The Czech Republic.

"'Debt' or 'Equity'? *Laidlaw Transportation, Inc.*," *European Applied Business Research Conference*, Edinburgh, Scotland (June 14-18, 2004).

"The Art of Storytelling: Using Technology to Design, Animate, Narrate, and Distribute Engaging Presentations for the Classroom and for Distance Learning," *European College Teaching & Learning Conference*, Edinburgh, Scotland (June 14-18, 2004).

"Rethinking Business-School Curriculums: Integrating Tax Concepts and Strategies into Finance and Management Courses," *European College Teaching & Learning Conference*, Edinburgh, Scotland (June 14-18, 2004).

"The Effect of Explicit and Implicit Taxes on Exchange Values in Corporate Mergers and Acquisitions: Part III (Acquisitions of Foreign Corporations)," 36 pages, October, 2003, *Financial Management Association International*, Denver.

"Electron Industries, Inc." *World Applied Case Research Association*, Bordeaux, France, July 2, 2003.

**TAX INSTITUTE, ETC. PRESENTATIONS (continued)**

"The Effect of Explicit and Implicit Taxes on Exchange Values in Corporate Mergers and Acquisitions: Part II (Implicit Tax Assets)," 22 pages, April, 2002, *Eastern Finance Association*, Baltimore, Maryland.

"The Effect of Explicit and Implicit Taxes on Exchange Values in Corporate Mergers and Acquisitions: Part I (Implicit Tax Liabilities)," 24 pages, October, 2001, *Financial Management Association International*, Toronto, Canada.

"Taxation of Distributions from Partnerships and Limited Liability Companies," *46th Annual William and Mary Tax Conference*, Williamsburg, VA (December 2, 2000).

"Current Developments in Financial Accounting Standards: Accounting for Derivatives, Hedges, and Corporate Acquisitions," *45th Annual William and Mary Tax Conference*, Williamsburg, VA (December 4, 1999).

Thomas Jefferson Chapter of the Virginia Society of CPAs, 2-4 hour seminars on a variety of technical topics, Each year from 1986 through 2005.

"A Macroeconomic Analysis of the Western European Welfare State Crisis: Revenue-Side Solutions," University of Madrid (Spain), *Conference on European Public Finance, Perspectivas Fiscales De Los 90*, San Lorenzo de el Escorial, Spain (July 18, 1994).

"Accounting for Stock-Based Compensation and Environmental Remediation Expenditures," *39th Annual William and Mary Tax Conference*, Williamsburg, VA (December 4, 1993).

"Accounting for Federal Income Taxes under FASB Statement 109: Analysis, Perspective, and Application," *38th Annual William and Mary Tax Conference*, Williamsburg, VA (December 5, 1992). Reported and summarized in 92 Tax Notes 244-H (December 8, 1992)

"An Empirical Examination of the Influence of Selected Factors on Professional Tax Preparers' Decision Processes," *Mid-Atlantic Region American Accounting Association Meeting*, Atlantic City (April 15, 1987). Co-authored with P. Reckers.

"Corporate Business Acquisitions: Tax and Non-Tax Legal Criteria For Evaluating Alternative Acquisition Techniques," presented at both the *Seventeenth Annual University of Hartford Tax Institute* (November 1, 1985), and the *University of Tennessee Federal Tax Conference* (November 8, 1985).

"Current Tax Developments for Individuals," *Sixteenth Annual University of Hartford Tax Institute* (October 11, 1984).

"Selection of a Business Entity After 1982--How Has It Changed?" *Seventh Annual Portland State University Tax Executives Institute* (June 15, 1984).

"Estate Freezing Techniques," *Roanoke Valley Estate Planning Council* (March 5, 1984).

"Current Developments in Taxation," *15th Annual University of Hartford Tax Institute* (September 12, 1983).

## ARTICLE REVIEWER

*Journal of the American Taxation Association* (1989-1996)

*Advances in Taxation* (1990-1996)

*Advances in Accounting* (1985-1986)

*Georgia Journal of Accounting* (1984-1985)

## INTERNAL (UNIVERSITY OF VIRGINIA) COMMITTEE MEMBERSHIPS

Director, Graduate Accounting Program (Tax Consulting), University of Virginia (2000 to 2005)

Chairman, Graduate Admissions Committee (2000-2005)

Chairman, Undergraduate Admissions Committee (1992-2000)

Member, President's International Activities Planning Commission (1998–2000)

Member, Academic Rules Committee (1997 to 1998)

Member, Undergraduate Curriculum Committee (1998–2000)

Member, Admissions Committee (1988-1991)

**CONSULTING: Expert Witness Consulting [See Appendix B]**

**CONSULTING: Professional Development**

*American Institute of CPAs National Tax Training Program*

Advanced Corporate Taxation. Champagne, Il (July 17-20, 2004)

*Citigroup*

Basic Strategic Tax Planning, New York, London (March/April, 2003)

International Tax Planning Strategies, New York (2001-2002)

*New York University Law School Continuing Legal Education/Internal Revenue Service--Office of Chief Counsel Tax Training Program:* Developed and instructed the following courses:

Federal Tax Accounting, Washington, D.C., Spring, 1992. (Course outline and cases: 112 pages)

Advanced Consolidated Federal Income Tax Returns, Washington, D.C., Fall, 1989. (Course outline and cases: 76 pages)

Basic Consolidated Federal Income Tax Returns, Washington, D.C., Fall, 1989. (Course outline and cases: 93 pages)

Federal Income Taxation of Inventories, Washington, D.C., Summer, 1988 and Fall, 1992. (Course outline and cases: 195 pages)

***Deloitte Touche***: 2000 to present. Instructed in-house tax training programs covering the following topics:

International Taxation

Corporate Taxation

Advanced Corporate Taxation

Tax Research

***KPMG Peat Marwick***: 1980 to 1999. (Average instructor evaluation: approx. 4.85/5.0) Instructed in-house tax training programs covering the following topics:

*Tax Management Seminars (partner-level programs)*

International Tax Strategies for Tax Generalists (co-developed and taught program w/Hanna Carvey)

Corporate Mergers and Acquisitions: Advanced Concepts and Strategies

**CONSULTING: Professional Development (continued)**

*KPMG Peat Marwick (continued)*:

*Tax Strategies Seminar (senior/manager-level programs):*

International Tax Compliance for Tax Generalists (co-developed and taught program w/Hanna Carvey)

Tax Accounting Periods and Methods for Tax Generalists

Tax Accounting Periods and Methods for Financial Services Line of Business

Federal Income Taxation of Partnerships: Basic and Advanced

Federal Income Taxation of S Corporations: Basic and Advanced

Corporate Mergers and Acquisitions (developed and taught program)

*Partner TAP:* Six-month accelerated program designed to convert audit partners into tax partners (Summer, 1982)

*Level IV:* Advanced Corporate Taxation (Corporate Reorganizations, Liquidations, and Consolidated Returns (Part II)

*Level III:* Partnership Taxation and Consolidated Returns (Part I)

*Level I:* Taxation of Individuals and Property Transactions

*Arthur Andersen and Co.*: 1980 to 1997. (Average instructor evaluation: 4.87/5.0.) Instructed in-house tax training programs covering the following topics:

*Basic:* Federal Income Taxation of Individuals and Property Transactions

*Intermediate A*: Taxation of Qualified and Nonqualified Compensation Arrangements; Subchapter S Corporations; Section 351 Transfers

*Intermediate B:* Corporate Liquidations, Mergers and Acquisitions

*Tax-Pac IV:* Taxation of Estates and Trusts; Federal Estate and Gift Taxation

*Tax-Pac VI:* Uniform Capitalization; Section 481; Taxation of Partners and Partnerships

*Tax-Pac VIII:* Advanced Corporate Taxation; Foreign Tax Credit; Original Issue Discount

*International Taxation:* Foreign Tax Credit

*Ernst and Young*: 1989 to 1995. (Average instructor evaluation: approx. 4.73/5.0) Instructed in-house tax training programs covering the following topics:

Tax Entities

Taxation of Corporate Operations and Consolidated Returns

Seminar on the Taxation of Partners and Partnerships

Seminar on the Taxation of S Corporations and Their Shareholders

Seminar on Advanced Corporate Taxation

**OTHER**

Faculty Advisor: National Association of Black Accountants (2006 - 2007)

Invited Participant, PriceWaterhouseCoopers University for Faculty, New Jersey (June 14-17, 2005).

Judge, 2005 Navigant-McIntire Case Competition, Charlottesville, VA (February 24, 2005)

Faculty Advisor: PWC *xTax* Competition (2004)

Faculty Advisor: Virginia Entrepreneur Organization (University of Virginia) (September 2004 to May 2005)

Invited Participant, Deloitte Tax Faculty Symposium, Herndon, VA (May 6-7, 2004).

Invited Participant, KPMG Tax Faculty Symposium, Washington (May 20-21, 2004).

Invited Participant, PriceWaterhouseCoopers Tax Educators, San Antonio, Texas (August, 2002).

Invited Participant, Ernst & Young Seminar for Tax Educators (Partnership Taxation), Washington, D.C. (March 18-19, 1999).

Invited Participant, Ernst & Young Seminar for Tax Educators (Mergers and Acquisitions), Washington, D.C. (March 13-14, 1997).

Invited Participant, Ernst & Young Seminar for Tax Educators (Tax Practice and Procedure), Washington, D.C. (March 14-15, 1996).

Invited Participant, Ernst & Young Seminar for Tax Educators (Accounting Methods), Washington, D.C. (March 25-26, 1995).

Participant, Fourth International Conference on Principles of Reasoning and Knowledge Representation, Bonn, Germany (May 30-June 3, 1994).

Invited Participant, Ernst and Young Seminar for Tax Educators' (International Taxation), Washington, D.C. (March 20-22, 1991).

Invited Participant, Touche Ross Tax Symposium, ("Critical Tax Issues for the 1990's"), Washington, D.C. (June 12-13, 1989).

Invited Participant, Ernst and Whinney Symposium on Graduate Tax Program Administration, Washington, D.C. (June 8-9, 1989).

Invited Participant, Ernst and Whinney Seminar for Tax Educators, (Personal Financial Planning), Washington, D.C. (March 15-17, 1989).

Invited Participant and discussion leader, Arthur Andersen Tax Professor's Symposium, St. Charles, IL. (October 9-11, 1988).

Invited Participant, Ernst and Whinney Seminar for Tax Educators, (Consolidated Returns), Washington, D.C. (March 16-18, 1988).

Discussant, "Neutrality in the Taxation of Mergers and Acquisitions in the United States," Peat, Marwick, Mitchell & Co. Tax Research Symposium, Washington (May 5-6, 1988).

**OTHER (continued)**

Discussant, "Artificial Intelligence/Expert Systems in Taxation," Peat, Marwick, Mitchell & Co. Tax Research Symposium, Washington (May 14-15, 1987).

Participant, Touche Ross Tax Symposium, Washington (June 11, 1987).

Guest speaker, 1987 Touche Ross Southeastern Leadership Seminar, "Tax Policy and Transition Under the 1986 Act," Seabrook, SC (May 15-17, 1987).

Arthur Andersen and Co., Faculty Resident, National Tax Office, Washington, D.C. (Summer, 1980).

Research assistant, 1977-1979, AICPA Federal Tax Division Task Force on the Taxation of the Formation and Combination of Business Enterprises. (Responsible for the research and writing of Federal Tax Division of the American Institute of CPA's *Statement of Tax Policy #5 - Taxation of the Formation and Combination of Business Enterprises*, 1979, 76 pages.)

Research assistant, 1976, AICPA Federal Tax Division Task Force on the Elimination of Double Taxation of Corporate-Source Income. (Responsible for the research and writing of Federal Tax Division of the American Institute of CPA's *Statement of Tax Policy #3 Elimination of Double Tax on Dividends*, published in 1976, 38 pages.)

**PROFESSIONAL ORGANIZATION MEMBERSHIPS [Past and current]**

Academy of Certified Fraud Examiners

Academy of International Business

Aircraft Owners and Pilots Association

American Accounting Association

American Bar Association (non-attorney Associate member)

American Taxation Association

Beta Alpha Psi (Honorary Accounting Fraternity)

- Faculty Advisor, 1997/1998 (University of Virginia)
- Faculty Advisor, 1990/1991 (University of Virginia)
- Faculty Advisor, 1986, 1992 (University of Virginia)
- Faculty Advisor, 1979 to 1981 (University of Maryland)
- Chapter President, 1977/1978 (University of Houston)

Federal Taxation Division of the AICPA (1979-1985, 1995-1998) [Committee Member]

Financial Executive Institute

Financial Management Association International

National Tax Association

**PROFESSIONAL ORGANIZATION MEMBERSHIPS (continued)**

Southern Finance Association

World Applied Case Research Association

**OTHER INTERESTS**

Salt-water reef fish and coral aquarium [350 gal.]
Pre-Revolutionary Russian History and Art
Civil War History
European History
Aviation (Instrument-rated pilot)
Eagle Scout

# Appendix B

## Court and Depositional Testimony Within Last Four Years

*Hans a. Quaak, et. al. v. Dexia, Janet Baker et. al. v. Dexia, Gary B. Filler et. al. v. Dexia; and Stonington Partners, Inc. et. al. v. Dexia.* Civil action against Dexia Bank of Belgium in connection with certain violations of U.S. securities laws, U.S. SEC regulations, U.S. generally accepted accounting principles, and U.S. generally accepted auditing standards by Lernout & Hauspie Speech Products and several of its senior officers. Deposed (2007), trial pending.

*Procter & Gamble v. U.S., (2006-2007)*: Analysis and evaluation of principles used to account for an "Advance Payment Transaction(s)" involving certain sales of U.S. manufactured inventory to a wholly owned Canadian subsidiary through a wholly-owned foreign sales corporation. Deposed (2006), trial pending.

*Tyson Foods, Inc. and Subsidiaries v. U.S., (2005-2007)*: Analysis and evaluation of the cost accounting and financial principles applied to the dressed poultry ending inventory of certain Tyson subsidiaries No deposition, testified at trial (2006), recognized by the Court as an expert.

*TransCapital Leasing Associates 1992-VIII, L.P. v. U.S., (2002-2006)*: Economic analyses of certain leasing transactions. Deposed (2006), settled out-of-court prior to trial.

*TransCapital Leasing Associates 1990-II, L.P. v. U.S. (2002-2005)*: Economic analyses of certain leasing transactions. Deposed (2003); testified at trial (2005), recognized by the Court as an expert.

*Retained as an independent expert by Ernst and Young in a malpractice suit that was litigated in a binding arbitration proceeding (Summer, 2002)*: Testified and recognized as a tax and accounting expert. [Details subject to confidentiality agreement.]

*Coggin Automotive Corporation. v. Commissioner (1999)*: Tax, legal, and financial analysis of taxpayer's dollar value LIFO inventories. No deposition, testified at trial, recognized by the Court as an expert.

LaRue, David W.

# Appendix C

## Documents Considered (or Available in Databases)[1]

| Database | Bates Reference Numbers | | PDF File on CD Attached to LaRue Report? |
|---|---|---|---|
| | Beginning | Ending* | |
| Murphy Database | IRSADMIN000001 | IRSADMIN004125 | Murphy Transactions Report |
| | MUCO00001 | MUCO00299 | no |
| | MUDB00002 | MUDB00393 | no |
| | MUEY00003 | MUEY04872 | no |
| | MUFOIA00022 | MUFOIA04424 | no |
| | MUMI00111 | MUMI02153 | no |
| | MUMR00018 | MUMR00431 | no |
| | MUMU12301 | MUMU23271 | no |
| | MUPR00001 | MUPR001793 | no |
| | WC000001 | WC006972 | no |
| | EY-MBCM011998 | EY-MBCM012006 | no |
| | EY-MBCM011020 | EY-MBCM011053 | no |
| | EY-MBCM012016 | EY-MBCM012114 | no |
| | EY-MBCM018980 | EY-MBCM019067 | no |
| Carmel Database | CT00001 | CT00909 | Carmel Transaction Report |
| | HC00001 | HC00893 | |
| | IRS00001 | IRS07251 | |
| | JA00001 | JA00893 | no |
| | JM00001 | JM00885 | no |
| | MICHENER-00001 | MICHENER-00126 | no |
| Buckingham Database | ADMIN000001 | ADMIN006569 | Buckingham Transaction Report |
| | PACE00001 | PACE00978 | no |
| Tesoro Database | INTERROGS00001 | INTERROGS00048 | no |
| | IRS00007 | IRS03482 | no |
| | JGMB00001 | JGMB01301 | no |
| | JGWG0001 | JGWG0356 | no |
| | MCJG00001 | MCJG01294 | no |
| | RETURNS-000001 | RETURNS-000195 | no |
| | WODB000001 | WODB00431 | no |
| | WOEY00001 | WOEY01518 | no |
| | WOJG00001 | WOJG02536 | no |
| | Documents Described on Following Page and Contained in PDF File on CD Accompanying LaRue Report on Tesoro Transactions [Bates Numbers are out of sequence; Documents described in "Bookmarks" to that PDF File] | | |
| COBRA Database | 2003EY000863 | 2003EY020971 | no |
| | C00045 | C00057 | no |
| | CANC00001 | CANC00339-111 | no |
| | DB-COBRA-00000001 | DB-COBRA-00246221 | no |
| | DBCOBRA00001 | DBCOBRA06097 | no |
| | DELAWARE-0001 | DELAWARE-0236 | no |
| | DGI-V-JG-0001 | DGI-V-JG-1618 | no |
| | DOJ-00001 | DOJ-065073 | no |
| | DOJ_V_ROSS-0001 | DOJ_V_ROSS-0487 | no |
| | EY00001 | EY03675 | no |
| | JG-CL0000001 | JG-CL0672960 | no |
| | JG-N0020862086 | JG-N0020862298 | no |
| | JG000001_0001 | JG017040_0011 | no |
| | LL&S00001 | LL&S00043 | no |
| | PSI-EY000001 | PSI-EY027430 | no |
| | S&S0056 | S&S1070 | no |
| | S&S_D00001 | S&S_D01088 | no |
| | SIDL000001 | SIDL477174 | no |

* Many of these Bates sequences have gaps in the numbering

1 See also footnotes to text of *Report*

# Description of Documents in the Tesoro Database Documents Included (and Bookmarked) in the PDF File on the CD Attached to the LaRue Report on the Tesoro Transactions

#1 9-24-99 J&G Confidentiality Agreement pdf
10-28-99 email frm vaughn 2 daugherdas pdf
3-14-00 email from coplan to E&Y managers pdf
3-8-00 email from guerin to amy keating of E&Y pdf
3-8-00 email from guerin to coplan pdf
3-9-00 email from sodano to apillera pdf
#10 10-26-99 J&G notes pdf
#11 10-27-99 J&G notes pdf
#12 10-28-99 J&G notes pdf
#16 11-3-99 J&G notes pdf
#18 11-4-99 J&G notes pdf
#19 11-5-99 daugerdas notes pdf
#2 9-24-99 J&G notes pdf
#20 11-5-99 fax frm brian upchurch pdf
#21 11-8-99 J&G notes pdf
#22 11-9-99 J&G notes pdf
#23 11-9-99 BT Alex Brown Partnership Acct Authorization pdf
#24 11-12-99 email frm coplan 2 daugerdas pdf
#25 11-19-99 email frm coplan 2 E&Y managers pdf
#26 12-9-99 email frm coplan 2 E&Y managers pdf
#27 12-19-99 email frm coplan 2 ruble grady dagerdas pdf
#28 12-20-99 fax of amended confirmation pdf
#3 9-27-99 J&G notes pdf
#33 1-4-00 email frm guerin to coplan pdf
#34 1-4-00 letter frm ruble to john felkamp pdf
#35 1-5-00 memo by blanchard re viper cobra tax opinion pdf
#36 2-11-00 1015 am email from coplan to E&Y managers pdf
#37 2-11-00 1018 am email from coplan to E&Y managers pdf
#38 2-19-00 email re cobra return presentation pdf
#39 2-29-00 email from coplan to guerin re cobra opinion pdf
#4 10-1-99 email E&Y pdf
#40 3-3-00 engagement letters from B&W to Michener pdf
#46 3-21-00 email from sodano to jones pdf
#47 4-7-00 J&G memo re use of 7609 pdf
#48 4-11-00 thru 5-8-00 email between E&Y and B&W pdf
#49 7-20-00 letter via fax frm helms of scheef&Stone to odaniel pdf
#5 10-11-99 email frm brian vaughn to grady dickens pdf
#50 8-1-00 & 8-10-00 B&W transmittal letters pdf
#53 11-13-00 email chain re killing COBRA corporations pdf
#54 1-17-01 email from coplan to ruble of SAB&W pdf
#59 10-31-01 email from Carl Rhodes of E&Y pdf
#6 10-14-99 fax frm odaniel to daugerdas pdf
#60 4-3-02 email from coplan to daugerdas pdf
#61 Affidavit of Willaim Hart pdf
#7 10-18-99 J&G notes pdf
#8 10-21-99 J&G notes pdf
#9 10-25-99 J&G notes pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_12-27-99 letter Parse from BJM pdf

LaRue, David W.
Appendix C
Description of Tesoro Documents

SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_1-31-02 letter pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agreement BMJ SA Tesoro Inves2 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agreement BMJ SA Tesoro Invest pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agreement GW SA Tesoro Investm pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Partnership Interest BMJ pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Partnership Interest GW pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $25000000 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $34400000 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 GW $6600000 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option Deutsche Bank 11-10-99 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Dow Jones 11-10-99 Multiple Currency Conv pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Form pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Response Question 10 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction Confirmation ex27741A BMJ $25 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction Confirmation ex27745A GW $660 pdf
SA Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction Confirmation ex27746A BMJ $34 pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_10-31-02 letter conlon to falk pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_1120S 12-31-99 not signed pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_1999 Activity Sheet pdf
SA Tesoro Drive Investors Inc IDR 2 1120S S Corp_Incorporation in Delaware pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_11-18-02 letter pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_1-2-03 letter pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_1999 Activity Sh pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_2000 S Corporati pdf
SA Tesoro Drive Investors Inc IDR 3 Financial Statement 2000 S Corporation 1120S_Deutsche Bank De pdf
SA Tesoro Drive Investors Inc IDR 4 Promotional Materials Loan Docs_No response pdf
SA Tesoro Drive Investors Inc IDR 5 Repeat Request IDR 3_Repeat Deutsche Bank December 1999 pdf
SA Tesoro Drive Investors Inc IDR 5 Repeat Request IDR 3_Response pdf
SA Tesoro Drive Investors Inc IDR 5 Repeat Request IDR 3_SA Tesoro Investors 1999 Activity Sheet pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_1999 Activity Sheet pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Deutsche Bank January 2000 pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Page 3 of 6 for December 1999 Deutsche Bank pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Repeat Deutsche Bank December 1999 pdf
SA Tesoro Drive Investors Inc IDR 6 Sun Microsystems_Response pdf
SA Tesoro Drive Investors Inc IDR 7 Smith Barney account opening_3-24-03 letter from goodson to f pdf
SA Tesoro Drive Investors Inc IDR 7 Smith Barney account opening_Smithi Barney initial doc 1-30-2 pdf
SA Tesoro Drive Investors Inc IDR Repeat IDR Source of Funding_3-24-2003 letter from goodson to f pdf
SA Tesoro Drive Investors Inc IDR Repeat IDR Source of Funding_Frost Bank for McCombs Enterprises pdf
SA Tesoro Drive Investors Inc IDR Repeat IDR Source of Funding_Frost Bank statement for Woods 12- pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_10-31-2002 letter from conlon to falk pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_12-27-99 letter to Parse frm McCombs SA T pdf

LaRue, David W.
Appendix C
Description of Tesoro Documents

SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement BJM SA Tesoro Inves2 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement BJM SA Tesoro Invest pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement BJM SATI Partners ex pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement GW SA Tesoro Investm pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Agreement GW SATI Partners ex2 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Partnership interest in SA Te2 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignment Partnership interest in SA Tes pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Assignmnt Agrmnt BJM SATI Partners ex2774 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Deutsche Bank digital Option 11-10-99 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $25000000 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $34400000 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Digital Option 11-18-99 GW $6600000 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Dow Jones 11-10-99 Multiple Currency Conv pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Response to Question 1 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Response to Question 10 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Transaction Confirmation ex27741A BMJ $25 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Transaction Confirmation ex27745A GW $660 pdf
SA Tesoro Investment Partners IDR 1 Listed Transactions_Transaction Confirmation ex27746A BMJ $34 pdf
SA Tesoro Investment Partners IDR 10 Option Purchase_Response pdf
SA Tesoro Investment Partners IDR 11 IRS Request for Answer work paper_1999 Activity pdf
SA Tesoro Investment Partners IDR 11 IRS Request for Answer work paper_Response pdf
SA Tesoro Investment Partners IDR 12 Sun Microsystem_response pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_10-29-03 letter goodson to falk pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_Bloomberg Cross Currency rates 12-20-99 pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_Digital Option values BJM GW 12-16-99 & pdf
SA Tesoro Investment Partners IDR 13 follow up on IDR 10_Newspaper clippings 11-99 & 12-99 pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_10-29-03 letter goodson to falk pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_Bloomberg Cross Currency reates 12-20-99 pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_Digital Option values BJM GW 12-16-99 an pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_foreign currency exchange Sun Microsyste pdf
SA Tesoro Investment Partners IDR 13 follow up on IRD 10_Newspaper clippings 11-99 & 12-99 pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_4-6-04 Pratt Falk pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SAT2 pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SAT3 pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SATe pdf

LaRue, David W.
Appendix C
Description of Tesoro Documents

SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Tes2 pdf
SA Tesoro Investment Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Teso pdf
SA Tesoro Investment Partners IDR 14 Memorandums_10-29-03 letter goodson young pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_10-31-02 letter conlon falk pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_1065 SA Tesoro not signed pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_Agreement of General Partnership pdf
SA Tesoro Investment Partners IDR 2 1065 Partnership Return 1999_SA Tesoro Activity Sheet 1999 pdf
SA Tesoro Investment Partners IDR 3 Details BJM GW_11-18-02 letter conlon to falk pdf
SA Tesoro Investment Partners IDR 3 Details BJM GW_1-2-03 letter conlon to falk pdf
SA Tesoro Investment Partners IDR 3 Details BJM GW_Response to IDR 3 pdf
SA Tesoro Investment Partners IDR 3 Power of Attorney_No response pdf
SA Tesoro Investment Partners IDR 4 1040 Woods 1999 and BJM 2000_1-2-03 letter pdf
SA Tesoro Investment Partners IDR 4 1040 Woods 1999 and BJM 2000_response pdf
SA Tesoro Investment Partners IDR 5 Financial Documents_1-2-03 letter re IDR 3 through 6 pdf
SA Tesoro Investment Partners IDR 5 Financial Documents_1999 Activity pdf
SA Tesoro Investment Partners IDR 5 Financial Documents_Deutsche Bank 12-99 SA Tesoro pdf
SA Tesoro Investment Partners IDR 6 Request for Party info Promoting_1-2-03 letter pdf
SA Tesoro Investment Partners IDR 6 Request for Party info Promoting_response to question 1 pdf
SA Tesoro Investment Partners IDR 6 Request for Party info Promoting_response to question 6 pdf
SA Tesoro Investment Partners IDR 7 Promotional Materials Loan Doc Value of Option_Response pdf
SA Tesoro Investment Partners IDR 8 Repeat Request IDR 5_Repeat Deutsche Bank 12-99 pdf
SA Tesoro Investment Partners IDR 8 Repeat Request IDR 5_Response 1999 Activity pdf
SA Tesoro Investment Partners IDR 8 Repeat Request IDR 5_Response1999 Activity pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_bank account statement of GW $165000 pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Deutsche Bank SA Tesoro 12-99 payment to pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_McCombs Enterprises check to E&Y $525000 pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Payment to Brown & Wood $30000 pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Response pdf
SA Tesoro Investment Partners IDR 9 Payments to Parties_Tesoro Drive Investors Inc Payment to Bro pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_4-6-04 Pratt Falk pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SATI Partners ex2774 pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Tesoro Drive Partne2 pdf
SATI Partners IDR 13 Supplement to follow up on IDR 10_Termination Agreement Tesoro Drive Partner pdf
SATI Partners IDR 6 Request for Party info Promoting_1-2-03 letter pdf
SATI Partners IDR 6 Request for Party info Promoting_response to question 1 pdf
SATIInc IDR 1 Listed Transactions_Assignmnt Agrmnt BMJ SATI Partners ex27741A pdf
SATIInc IDR 1 Listed Transactions_Digital Option DB 11-10-99 pdf
SATIPartners IDR 13 Supplement to follow up on IDR 10_Termination Agreement SATesoro Investment P pdf
SATIPartners IDR 13 Supplement to follow up on IDR 10_Termination Agrmnt SATesoro Investment Part pdf
Settlement Initiative Docs_11-30-99 E&Y invoice $165000 to GW pdf
Settlement Initiative Docs_12-1-99 invoice to SATIInc by J&G $1320000 pdf
Settlement Initiative Docs_3-23-04 ltr frm Pratt to Falk re IDR 8 & 9 for GW pdf
Settlement Initiative Docs_3-9-00 invoice to SATIInc B&W $30000 pdf
Settlement Initiative Docs_3-9-00 invoice to TDIInc by B&W $30000 pdf

LaRue, David W.
Appendix C
Description of Tesoro Documents

Settlement Initiative Docs_6-25-04 ltr to Woods frm Falk re Settlement Initivative pdf
Settlement Initiative Docs_8-18-04 ltr to Falk frm Goodson E&Y re supporting docs pdf
Settlement Initiative Docs_8-23-04 FedEx slip to Falk frm McCombsLLC E&Y pdf
Settlement Initiative Docs_Attachment 1 Schedule E detail $281893 expense pdf
Settlement Initiative Docs_Attachment 1 statement 12-31-99 WoodsLLC interest dealership pdf
Settlement Initiative Docs_Attachment 2 to 3-23-04 ltr re IDR 8 & 9 pdf
Settlement Initiative Docs_Check frm GW for $165000 to E&Y pdf
Settlement Initiative Docs_DBAlexBrown statement for SATIInc Dec 99 pdf
Settlement Initiative Docs_Form K-1 of Form 1065 for SATIPartners 12-31-99 pdf
Settlement Initiative Docs_Form K-1 of Form 1065 for TDPartners EIN 74-2936193 12-31-99 pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for SATIInc Tax year 2000 pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for SATIInc12-31-99 pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for TDIInc tax year 2000 pdf
Settlement Initiative Docs_Form K-1 of Form 1120S for TDIInc12-31-99 pdf
Settlement Initiative Docs_Frost Natl Bank acct of GW showing paid $165000 pdf
Settlement Initiative Docs_SATIInc payment to B&W $30000 pdf
Settlement Initiative Docs_TDIInc payment to B&W $30000 3-30-00 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_10-31-02 Letter Conlon to Falk pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_10-31-02 ltr Conlon to Falk pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_12-27-99 letter to Parse signed BJM pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment agreement bmj Tesoro Drive Partne pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment agreement GW Tesoro Drive Partner pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment Agrmnt BJM Tesoro Drive Partners pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment agrmnt GW Tesoro Drive Partners e pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment of Partnership Interest Tesoro D2 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignment of Partnership Interest Tesoro Dr pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignmnt of Partnership Interest TD Partne2 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Assignmnt of Partnership Interest TD Partner pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_DB Digital Option 11-10-99 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Deutsche Bank Digital Option 11-10-99 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 BMJ $10000000 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Digital Option 11-18-99 gw $16000000 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Dow Jones Multiple Currency conversion 11-10 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Response to question 1 Response to question pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Response to question 1Response to question 1 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirm ex27740A BMJ $10000000 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirm ex27744A GW $16000000 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirmation ex27740A BMJ $10000 pdf
Tesoro Drive Investors Inc IDR 1 Listed Transactions_Transaction confirmation ex27744A gw $160000 pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_10-31-02 letter conlon to falk & table of cont pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_1120S S Corporation Tesoro Drive Investors Inc pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_Certificate of Incorporation Tesoro Drive Inve pdf
Tesoro Drive Investors Inc IDR 2 1120S Corporation_CTDI Inc 99 Activity Sheet pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_11-18-02 letter conlon to falk pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_1-2-03 letter to falk pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_2000 S Corp 1120S TDI signed pdf

Tesoro Drive Investors Inc IDR 3 Financial Statement_Deutsche Bank December 99 TDI Inc Partners s pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_Deutsche Bank December 99 TDI Inc pdf
Tesoro Drive Investors Inc IDR 3 Financial Statement_Repeat TDI Inc 99 Activity Sheet pdf
Tesoro Drive Investors Inc IDR 4 Promotional Materials_Response pdf
Tesoro Drive Investors Inc IDR 5 Repeat Request on IDR 3_Repeat Deutsche Bank 12-1999 TDI Inc pdf
Tesoro Drive Investors Inc IDR 5 Repeat Request on IDR 3_Response to IDR 2 & 3 pdf
Tesoro Drive Investors Inc IDR 6 Check to E&Y and Smith Barney_12-2-99 Check from GW to E&Y $1650 pdf
Tesoro Drive Investors Inc IDR 6 Check to E&Y and Smith Barney_3-24-03 letter frm goodson E&Y to pdf
Tesoro Drive Investors Inc IDR 6 Check to E&Y and Smith Barney_Smith Barney initial document 1-30 pdf
Tesoro Drive Partners IDR 1_10-31-2002 letter frm conlon to falk pdf
Tesoro Drive Partners IDR 1_12-27-99 letter Parse McCombs Tesoro Drive Partners pdf
Tesoro Drive Partners IDR 1_12-27-99 letter Parse McCombsTDPartners pdf
Tesoro Drive Partners IDR 1_Assign Agreement GW TDrive Partners ex27744A option pdf
Tesoro Drive Partners IDR 1_Assign Agreement TDrive Partners Gary Woods pdf

Tesoro Drive Partners IDR 1_Assign Agrment BMJ Tesoro Drive Partners ex27740A option pdf
Tesoro Drive Partners IDR 1_Assign of Partnership Interest Tesoro Drive Partners BMJ pdf
Tesoro Drive Partners IDR 1_Assignment Agreement BMJ Tesoro Drive Partners ex27740A option pdf
Tesoro Drive Partners IDR 1_Assignment Agreement GW Tesoro Drive Partners ex27744A option pdf
Tesoro Drive Partners IDR 1_Assignment Agreement Tesoro Drive Partners GW Gary Woods pdf
Tesoro Drive Partners IDR 1_Assignment of Partnership Interest Tesoro Drive Partners BMJ pdf
Tesoro Drive Partners IDR 1_DB Tesoro Drive Partners December 99 pdf
Tesoro Drive Partners IDR 1_Deutsche Bank Digital Option 11-10-99 pdf
Tesoro Drive Partners IDR 1_Deutsche Bank Tesoro Drive Partners December 99 pdf
Tesoro Drive Partners IDR 1_Digital Option 11-18-1999 for BMJ $10000000 pdf
Tesoro Drive Partners IDR 1_Digital Option 11-18-1999 for GW $16000000 pdf
Tesoro Drive Partners IDR 1_Dow Jones 11-10-99 Multiple Currency Conversion pdf
Tesoro Drive Partners IDR 1_IDR Form Listed Transactions pdf
Tesoro Drive Partners IDR 1_TD Partners 1999 Activity Sheet pdf
Tesoro Drive Partners IDR 1_Tesoro Drive Partners 1999 Activity Sheet pdf
Tesoro Drive Partners IDR 1_Transaction Conf ex27740A BMJ $10000000 pdf
Tesoro Drive Partners IDR 1_Transaction Conf ex27744A GW $16000000 pdf
Tesoro Drive Partners IDR 1_Transaction Confirmation ex27740A BMJ $10000000 pdf
Tesoro Drive Partners IDR 1_Transaction Confirmation ex27744A GW $16000000 pdf
Tesoro Drive Partners IDR 1_written response to question 1 pdf
Tesoro Drive Partners IDR 1_written response to question 10 Promoters pdf
Tesoro Drive Partners IDR 10 Option_Form pdf
Tesoro Drive Partners IDR 10 Option_Response pdf
Tesoro Drive Partners IDR 11 Request IRS work paper analysis_Form with analysis pdf
Tesoro Drive Partners IDR 11 Request IRS work paper analysis_Response pdf
Tesoro Drive Partners IDR 11 Request IRS work paper analysis_Tesoro Drive Investors Inc 1999 Acti pdf
Tesoro Drive Partners IDR 12 follow up Option purchase_10-29-2003 letter Goodson Falk pdf
Tesoro Drive Partners IDR 12 follow up Option purchase_form pdf
Tesoro Drive Partners IDR 12 Supplement_4-6-2004 letter Pratt to Falk pdf
Tesoro Drive Partners IDR 12 Supplement_form pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement SA Tesoro Investment Partners ex 27 pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement SATesoro Investment Partners ex 272 pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement SATesoro Investment Partners ex 277 pdf

Tesoro Drive Partners IDR 12 Supplement_Termination Agreement Tesoro Drive Partners ex 27740A pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agreement Tesoro Drive Partners ex 27744A pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt SA Tesoro Investment Partners ex 27741 pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt SATesoro Investment Partners ex 27745A pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt SATesoro Investment Partners ex 27746A pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt Tesoro Drive Partners ex 27740A pdf
Tesoro Drive Partners IDR 12 Supplement_Termination Agrmnt Tesoro Drive Partners ex 27744A pdf
Tesoro Drive Partners IDR 13 Agreements_10-29-2003 letter frm goodson E&Y to Falk pdf
Tesoro Drive Partners IDR 13 Agreements_form pdf
Tesoro Drive Partners IDR 13 Agreements_Jenkens & Gilchrist Opinion pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_10-31-2002 letter Conlon to Falk pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_1065 Tesoro Drive Partners 12-27-199 pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_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 Agreement of General Par pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_12-12-1999 Agrmnt of General Partner pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_1999 Activity Sheet pdf
Tesoro Drive Partners IDR 2 1065 Partnership Tax 1999 - 2000_form pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_11-18-2002 Letter from Conlon to Falk pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_1-2-2003 Letter from Conlon to Falk pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Info Authorization GW Lightholder J&G pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Info Autthorization Lightholder J&G pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Information Authorization GW Lighthold pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_8821 Tax Information Autthorization Lightholder pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Alex Brown 11-1999 for BMJ pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Alex Brown 11-1999 for GW pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Application for EIN for BMJ pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Application for EIN GW pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Cancellation BMJ pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Cancellation GW pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Formation for BMJ pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Certificate of Formation for GW pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_DB 12-1999 for BMJ pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Deutsche Banc 12-1999 for BMJ pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Deutsche Banc 12-1999 for GW pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Form pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Parts of two bank statements for wire transfers pdf
Tesoro Drive Partners IDR 3 Details of BMJ and GW_Wire transfer Alex Brown All First Bank $242900 pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_1040 amended 1999 Woods not signed pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_1040 amended 2000 McCombs signed pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_1-2-2003 Letter frm conlon to Falk pdf
Tesoro Drive Partners IDR 4 1040 Woods 1999 McCombs 2000_Form pdf
Tesoro Drive Partners IDR 5 Financial Documents_1-2-2003 letter from conlon to falk pdf
Tesoro Drive Partners IDR 5 Financial Documents_DB December 1999 for Tesoro Drive Partners 2nd ac pdf
Tesoro Drive Partners IDR 5 Financial Documents_DB December 1999 for Tesoro Drive Partners pdf

Tesoro Drive Partners IDR 5 Financial Documents_Deutsche Bank December 1999 for Tesoro Drive Par2 pdf
Tesoro Drive Partners IDR 5 Financial Documents_Deutsche Bank December 1999 for Tesoro Drive Part pdf
Tesoro Drive Partners IDR 5 Financial Documents_IDR form pdf
Tesoro Drive Partners IDR 5 Financial Documents_TDIPartners 1999 Activity Sheet pdf
Tesoro Drive Partners IDR 5 Financial Documents_Tesoro Drive Investment Partners 1999 Activity Sh pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_1-2-2003 letter pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter E&Y to BJM $525000 fee pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter E&Y to Woods $165000 fee pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter Ernst & Young to McCombs $525 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter Ernst & Young to Woods $16500 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter J&G McCombs fee $995740 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Engagement Letter J&G Woods fee $324260 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_IDR form pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to Mccombs Enterprises from Ernst Young pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to McCombsLLC frm E&Y $525000 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SA Tesoro Investors by B&W $30000 Ag pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SA Tesoro Investors Inc from J&G $13 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SA Tesoro Investors Inc fromJ&G $132 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to SATIInc frm J&G $1320000 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to TDIInc from B&W $30000 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Invoice to Tesoro Drive Investors Inc from B&W pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Response to IDR 1 Question 1 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Waiver of conflict letter & representation B&W pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Waiver of conflict letter & representation B&W2 pdf
Tesoro Drive Partners IDR 6 Promoting Tax Shelter_Waiver of conflict ltr & representation B&W to pdf
Tesoro Drive Partners IDR 7 Organization Question BJM_IDR 7 Form pdf
Tesoro Drive Partners IDR 7 Organization Question BJM_Response pdf
Tesoro Drive Partners IDR 7 Promotional Materials Loan Value of Option_IDR 7 Form no response pdf
Tesoro Drive Partners IDR 7 Shortened Request Promotional Materials Loan_IDR 7 Form pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_form pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Repeat DB December 1999 Tesoro Drive Partners pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Repeat Deutsche Bank December 1999 Tesoro Drive pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Repeat TD Partners 1999 Activity Sheet pdf
Tesoro Drive Partners IDR 8 Repeat Request IDR 5_Written response pdf
Tesoro Drive Partners IDR 9 Payments_bank acct Woods $165000 pdf
Tesoro Drive Partners IDR 9 Payments_DB SATIInc 12-1999 J&G $1320000 pdf
Tesoro Drive Partners IDR 9 Payments_Deutsche Bank SA Tesoro Investors Inc 12-1999 J&G $1320000 pdf
Tesoro Drive Partners IDR 9 Payments_McCombs Enterprises check to E&Y $525000 pdf
Tesoro Drive Partners IDR 9 Payments_Response to E&Y J&G B&W pdf
Tesoro Drive Partners IDR 9 Payments_SA Tesoro Brown and Wood $30000 pdf
Tesoro Drive Partners IDR 9 Payments_TDIInc Brown and Wood $30000 pdf
Tesoro Drive Partners IDR 9 Payments_Tesoro Drive Investors Inc Brown and Wood $30000 pdf
0-TES2 pdf

LaRue, David W.
Appendix C
Description of Tesoro Documents

0-Original File Names
10-28-99 email frm vaughn 2 daugherdas pdf
3-14-00 email from coplan to E&Y managers pdf
3-8-00 email from guerin to amy keating of E&Y pdf
3-8-00 email from guerin to coplan pdf
3-9-00 email from sodano to apillera pdf
10-29-99 J&G notes pdf
1040 Billy J & Charline H McCombs_1999 signed pdf
1040 Billy J & Charline H McCombs_2000 Signed pdf
1040 Gary and Glenda Woods Amended_1999 Not Signed pdf
1040 Gary and Glenda Woods_2000 Signed pdf
1065 SA Tesoro Investment_12-27-99 Signed pdf
1065 Tesoro Drive Partners_12-31-99 Signed pdf
1120S S Corp Tesoro Drive_12-31-99 Signed pdf
1120S SA Tesoro Drive Investors_12-31-99 Signed pdf
11-2-99 J&G notes pdf
11-3-99 email frm coplan 2 daugerdas pdf
12-21-99 email frm daugerdas 2 coplan grady ruble merck pdf
12-21-99 fax J&G pdf
12-22-99 email fwd frm o'daniel to daugerdas email pdf
12-23-99 email frm coplan to E&Y managers pdf
12-28-99 sheef & Stone invoice to J&G re BAMC pdf
1-24-01 letter frm ruble to neidus pdf
1-30-01 email from ruderman to coplan pdf
2-21-01 emails frm ruble to coplan and sodano pdf
3-14-00 email from E&Y to sodano pdf
3-15-01 email from coplan to zmoira of E&Y pdf
6-4-01 email from welty re disclosure of J&G options pdf
7-15-01 email from E&Y to J&G pdf
8-10-00 email chain with other emails 8-7-00 & 6-7-00 pdf
9 3 99 memo frm J&G pdf
Additional Documents_9-25-02 Power of Atty for SATIPartners signed by GW pdf
Billy J McCocmbs and Charline H McCombs IDR 3 Power of Attorney_1-2-2003 letter from conlon to fa pdf
Billy J McCocmbs and Charline H McCombs IDR 3 Power of Attorney_Power of attorney with language pdf
Billy J McCocmbs and Charline H McCombs IDR 4 Promotional Materials Loan and Option_1-2-2003 lett pdf
Billy J McCocmbs and Charline H McCombs IDR 4 Promotional Materials Loan and Option_spot option G pdf
Billy J McCocmbs and Charline H McCombs IDR 4 Promotional Materials Loan and Option_spot option S pdf
Billy J McCocmbs and Charline H McCombs IDR 5 COBRA Presentation_No response pdf
Billy J McCocmbs and Charline H McCombs IDR 6 Repeast of 4 Promotional_No response pdf
Gary Woods & Glenda Woods IDR 8 questions GW 1999 Form 1040_3-23-2004 letter from Pratt to Falk pdf
Gary V Woods & Glenda M Woods IDR 8 questions woods 1999 Form 1040_9-10-2004 fax behnke to falk pdf
Gary V Woods & Glenda M Woods IDR 8 questions woods 1999 Form 1040_9-28-2004 fax colmenero to fal pdf
Gary V Woods & Glenda M Woods IDR 8 questions woods 1999 Form 1040_Schedule D detail pdf
Gary V Woods and Glenda M Woods IDR 1 Listed Transactions_1-2-2003 letter conlon to falk pdf
Gary V Woods and Glenda M Woods IDR 1 Listed Transactions_response pdf
Gary V Woods and Glenda M Woods IDR 2 1040 income taxes_1-2-2003 letter pdf
Gary V Woods and Glenda M Woods IDR 2 1040 income taxes_response pdf

Gary V Woods and Glenda M Woods IDR 3 Power of Atty_1-2-2003 pdf
Gary V Woods and Glenda M Woods IDR 3 Power of Atty_power of atty with language pdf
Gary V Woods and Glenda M Woods IDR 4 Promotional loan option_1-2-2003 pdf
Gary V Woods and Glenda M Woods IDR 4 Promotional loan option_spot option deutschmark12-20-1999 pdf
Gary V Woods and Glenda M Woods IDR 4 Promotional loan option_spot option swiss franc 12-20-1999 pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_10-23-00 letter Woods Brown and Wood op pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_2-17-2000 letter Woods frm Daugerdas r2 pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_2-17-2000 letter Woods frm Daugerdas re pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_Opinion J&G 1-31-2000 to BJM pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_Opinion J&G 1-31-2000 to Woods pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_Opinion J&G 3-9-2000 to Woods pdf
Gary V Woods and Glenda M Woods IDR 5 Cobra Presentations_response pdf
Gary V Woods and Glenda M Woods IDR 6 Repeat request for IDR 4_response pdf
Gary V Woods and Glenda M Woods IDR 7 E&Y invoices_response pdf
Gary V Woods and Glenda M Woods IDR 9 participation in other listed transactions_3-23-2004 pratt pdf
GW and Glenda M Woods IDR 8 questions GW 1999 Form 1040_schedule e detail pdf
J&G invoice to BAMC Inc in the amt of $25000 - missing pdf
Jenkens and Gilchrist Summons_11-11-99 Fax Berry J&G Susie for McCombs pdf
Jenkens and Gilchrist Summons_11-11-99 ltr to GW & BJM frm Daugerdas forward SS-4 pdf
Jenkens and Gilchrist Summons_11-11-99 notes from meeting with E&Y re COBRA pdf
Jenkens and Gilchrist Summons_11-12-99 Agrmnt General Partnership SATIPartners unsigned pdf
Jenkens and Gilchrist Summons_11-12-99 Agrmnt General Partnership TDPartners unsigned pdf
Jenkens and Gilchrist Summons_11-12-99 Certificate for BJM shares stock SATIInc pdf
Jenkens and Gilchrist Summons_11-12-99 Certificate for GW shares stock SATIInc signed BJM pdf
Jenkens and Gilchrist Summons_11-12-99 Consent of Sole Director SATIInc signed BJM pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN SATIInc EIN 74-2936189 BJM pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN SATIPartner EIN 74-2936192 BJM pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN TDIInc EIN 74-2936191 BJM pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application EIN TDPartner EIN 74-2936193 BJM pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application McCombsLLC EIN 74-2936195 BJM pdf
Jenkens and Gilchrist Summons_11-12-99 SS-4 Application WoodsLLC EIN 74-2936194 BJM pdf
Jenkens and Gilchrist Summons_11-16-99 Fax frm Beery to Cummings for BJM & GW Partnership Inv Sum pdf
Jenkens and Gilchrist Summons_11-16-99 Fax frm Beery to Cummings for BJM & GW pdf
Jenkens and Gilchrist Summons_11-17-04 Fac frm LightholderL to IRS Austin pdf
Jenkens and Gilchrist Summons_11-19-99 J&G AlexA agrmnt GW DB pdf
Jenkens and Gilchrist Summons_11-19-99 ltr J&G AlexanderA agmt McCombs & DB pdf
Jenkens and Gilchrist Summons_11-19-99 ltr J&G AlexanderA agreement BJM DB pdf
Jenkens and Gilchrist Summons_11-19-99 ltr J&G AlexanderA agrmnt GW DB pdf
Jenkens and Gilchrist Summons_11-23-99 fax confrmation Guerin to GW and BJM pdf
Jenkens and Gilchrist Summons_1-21-1999 Engagement letter daugerdas to woods signed agreed pdf
Jenkens and Gilchrist Summons_12-1-1999 Engagement ltr Daugerdas to BJM signed agreed pdf
Jenkens and Gilchrist Summons_1-21-2004 letter from borders to falk pdf
Jenkens and Gilchrist Summons_12-15-99 ltr to BJM & GW frm Guerin pdf
Jenkens and Gilchrist Summons_12-15-99 Sun stock sold Tesoro Drive Partners $216000 pdf
Jenkens and Gilchrist Summons_12-20-1999 memo Cummings to Guerin re ownership SA Tesoro pdf
Jenkens and Gilchrist Summons_12-27-99 letter Guerin Cummings response to 12-20-99 pdf
Jenkens and Gilchrist Summons_12-27-99 ltr Parse BJM SATI transferred SA Tesoro Investors inc pdf
Jenkens and Gilchrist Summons_12-27-99 ltr Parse BJM Tesoro Drive Partners transf Tesoro Drive In pdf

Jenkens and Gilchrist Summons_12-28-99 ltr BJM to Parse authorizing sell SATIInc pdf
Jenkens and Gilchrist Summons_12-28-99 ltr BJM to Parse authorizing sell TDI Inc pdf
Jenkens and Gilchrist Summons_12-2-99 ltr frm Lightholder to IRS Austin SATIInc pdf
Jenkens and Gilchrist Summons_12-2-99 ltr frm Lightholder to IRS Austin TDIInc pdf
Jenkens and Gilchrist Summons_12-2-99 ltr Lightholder to IRS Austin SATIInc pdf
Jenkens and Gilchrist Summons_12-2-99 ltr lightholder to IRS Austin TDI Inc pdf
Jenkens and Gilchrist Summons_12-29-99 Sun stock sold SATI Inc $690862 pdf
Jenkens and Gilchrist Summons_12-3-99 Sun stock bought SA Tesoro Invest Partners $633618 pdf
Jenkens and Gilchrist Summons_12-3-99 Sun stock bought Tesoro Drive Partners cancelled pdf
Jenkens and Gilchrist Summons_12-6-99 Sun stock bought Tesoro Drive Partners $210949 pdf
Jenkens and Gilchrist Summons_Alex Brown Acct Agrmnt McCombsLLC 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown acct agrmnt SATIInc by BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown acct agrmnt SATIPartners signed BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown Acct Agrmnt to WoodsLLC signed 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown corp acct authorization for BJM SATIInc signed pdf
Jenkens and Gilchrist Summons_Alex Brown Corp Acct Authorization TDIInc pdf
Jenkens and Gilchrist Summons_Alex Brown CorpAcct Agrmnt TDIInc BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct GGSA pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct GWSA Partners pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct info McCombsLLC pdf
Jenkens and Gilchrist Summons_Alex Brown New acct info SATIInc pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct info WoodsLLC pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct McCombsLLC pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct SATIPartners pdf
Jenkens and Gilchrist Summons_Alex Brown new acct TD Partners pdf
Jenkens and Gilchrist Summons_Alex Brown New Acct TDIInc pdf
Jenkens and Gilchrist Summons_Alex Brown new acct WoodsLLC pdf
Jenkens and Gilchrist Summons_Alex Brown non corp resolution authorizging GW signed 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown non Corp resolution McCombsLLC signed 11-12-99 pdf
Jenkens and Gilchrist Summons_Alex Brown partnership acct autho & indemnity for SATIPartners pdf
Jenkens and Gilchrist Summons_AlexBrown acct agmt TDPartners signed BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_AlexBrown new acct info TDPartners pdf
Jenkens and Gilchrist Summons_AlexBrown partnership acct author TDPartners BJM & GW pdf
Jenkens and Gilchrist Summons_Assgmnt Agrmnt 11-19-99 McCombsLLC DB SATIPartners BJM ex27746A pdf
Jenkens and Gilchrist Summons_Assgmnt Agrmnt 11-19-99 Woods LLC DB SATIPartners ex27745A pdf
Jenkens and Gilchrist Summons_Assgmnt Agrmnt 11-19-99 Woods LLC DB TDPartners ex27744A pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 BMJ SATIPartners unsigned 27741A pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 BMJ SATIPartners unsigned 27746A pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 BMJ TDPartners unsigned 27740A pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 SATIPartners unsigned 27745A pdf
Jenkens and Gilchrist Summons_Assgnmnt Agrmnt 11-19-99 TDPartners unsigned 27744A pdf
Jenkens and Gilchrist Summons_Assignmnt Agrmnt 11-19-99 BJM DB SATIPartners McCombsB ex27741A pdf
Jenkens and Gilchrist Summons_Assignmnt Agrmnt 11-19-99 BJM DB TD Partners McCombsB ex27740A pdf
Jenkens and Gilchrist Summons_blank Alex Brown Acct Agrmnt to McCombsLLC pdf
Jenkens and Gilchrist Summons_blank Guaranty Agrmnt frm Alex Brown pdf
Jenkens and Gilchrist Summons_Blank page Bates MW395 pdf
Jenkens and Gilchrist Summons_COBRA client questionnaire McCombs pdf
Jenkens and Gilchrist Summons_Cobra Client Questionnaire pdf
Jenkens and Gilchrist Summons_Confirmation 11-16-99 Fax frm Beery to Cummings pdf
Jenkens and Gilchrist Summons_DB Dec 1999 SA Tesoro Investment Partners 222-10031 pdf
Jenkens and Gilchrist Summons_DB Dec 1999 Tesoro Drive Investors 222-10033 Canadian pdf
Jenkens and Gilchrist Summons_DB Dec 1999 Tesoro Drive Partners 222-10032 Canadian pdf

Jenkens and Gilchrist Summons_DB Digital Opt 27744A WoodsLLC 11-18-99 $16000000 pdf
Jenkens and Gilchrist Summons_DB Digital Opt 27745A $6600000 pdf
Jenkens and Gilchrist Summons_DB Digital Option 27740A McCombsLLC 11-18-99 $10000000 pdf
Jenkens and Gilchrist Summons_DB Digital Option 27746 McCombsLLC 11-18-99 $34400000 pdf
Jenkens and Gilchrist Summons_DB digital Option confirm ex27741A 11-18-99 $25000000 pdf
Jenkens and Gilchrist Summons_DB January 2000 SA Tesoro Investment Partners 222-10031 pdf
Jenkens and Gilchrist Summons_DB January 2000 Tesoro Drive Investors Inc 222-10033 pdf
Jenkens and Gilchrist Summons_DB Nov 1999 BJM Tesoro Drive Investments 222-10029 pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 BJMTesoro Investments 222-10029 pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 GWTesoro Investments 222-10030 pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 SA Tesoro Investors 222-10034 pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 Tesoro Drive Investors 222-10033 pdf
Jenkens and Gilchrist Summons_Deutsche Bank Dec 1999 Tesoro Drive Partners 222-10032 pdf
Jenkens and Gilchrist Summons_Deutsche Bank January 2000 SA Tesoro Investors Inc 222-10034 pdf
Jenkens and Gilchrist Summons_Deutsche Bank January 2000 Tesoro Drive Partners 222-10032 pdf
Jenkens and Gilchrist Summons_Deutsche Bank Nov 1999 GW Tesoro Investments LLC 222-10030 pdf
Jenkens and Gilchrist Summons_Fed Ex ship slip to frm J&W pdf
Jenkens and Gilchrist Summons_financial capital Tesoro Drive Partners and SATI Partners pdf
Jenkens and Gilchrist Summons_Form 2553 election for SATIInc signed BJM pdf
Jenkens and Gilchrist Summons_Form 2553 Election for SATIInc signed pdf
Jenkens and Gilchrist Summons_Form 2553 election for TDIInc signed BJM pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt Alex Brown signed BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt Alex Brown signed BJM 12-12-99 pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt AlexBrown signed BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt frm Brown to GW 11-12-99 pdf
Jenkens and Gilchrist Summons_Guaranty Agrmnt unsigned frm Alex Brown pdf
Jenkens and Gilchrist Summons_Instructions by BJM wire funds 2 DBAlexBrown for SATIInc pdf
Jenkens and Gilchrist Summons_Instructions to BJM wire DBAlexBrown for SATIInc $1041000 pdf
Jenkens and Gilchrist Summons_Internal fax AlexBrownDB frm Yackee to Burnside re new accts pdf
Jenkens and Gilchrist Summons_Summons to J&G Woods pdf
Jenkens and Gilchrist Summons_Termination Agmt SATIPartners DB 12-20-99 27741A pdf
Jenkens and Gilchrist Summons_Termination Agmt SATIPartners DB 12-20-99 27745A pdf
Jenkens and Gilchrist Summons_Termination Agmt SATIPartners DB 12-20-99 27746A pdf
Jenkens and Gilchrist Summons_Termination Agmt TDPartners DB 12-20-99 27740A pdf
Jenkens and Gilchrist Summons_Termination Agmt TDPartners DB 12-20-99 27744A pdf
Jenkens and Gilchrist Summons_undated ltr frm Parse wire transfer BJMLLC to DB pdf
Jenkens and Gilchrist Summons_undated ltr frm Parse wire transfer GWLLC to DB pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 Consent of Sole Director SATIInc pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 consent of Sole Director TDIInc pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 Statement of Incorporation SATIInc pdf
Jenkens and Gilchrist Summons_Unsigned 11-12-99 Statement of Incorporation TDIInc pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 Asgn Agrmnt WoodsLLC DB SATIPartners 27745 pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 Assgn Agrmnt McCombsLLC DB SATI 27741 pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse BJM assigned SATIPartners pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse BJM transfer to SATIPartners pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse frm McCombsLLC TDPartners transfer pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse frm McCombsLLC TDPartners pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse WoodsLLC assigned to SATIPartners pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse WoodsLLC transfer to SATIPartners pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 ltr to Parse WoodsLLC transfer to TDPartners pdf
Jenkens and Gilchrist Summons_Unsigned 11-19-99 to Parse transfer WoodsLLC to TDPartners pdf

Jenkens and Gilchrist Summons_Unsigned 12-1-99 Engagement ltr frm Daugerdas to BJM legal advice pdf
Jenkens and Gilchrist Summons_Unsigned Agrmnt 11-19-99 McCombsLLC DB TDPartners 27740A pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt form to TDIInc pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown acct agrmnt GGSA pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt GWSA Partners pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt TDPartners pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Acct Agrmnt to WoodsLLC pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown corp acct autho BJM TDIInc pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown corp act for GW of GGSA pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown Guaranty Agrmnt pdf
Jenkens and Gilchrist Summons_Unsigned Alex Brown non Corp resolution BJM pdf
Jenkens and Gilchrist Summons_unsigned Asgnment Agrmnt McCombsLLC DB TDPartners 27740 pdf
Jenkens and Gilchrist Summons_Unsigned Ass Agrmnt 11-19-99 GWLLC DB SATIP 27745A pdf
Jenkens and Gilchrist Summons_Unsigned Ass Agrmnt 11-19-99 WoodsLLC DB TDPartners pdf
Jenkens and Gilchrist Summons_Unsigned Assgn Agrmnt 11-19-99 WoodsLLC DB TDPartn 27744A pdf
Jenkens and Gilchrist Summons_Unsigned Assgn Agrmnt McCombsLLC DB SATIPartners 27746A pdf
Jenkens and Gilchrist Summons_Unsigned Assgnmnt Agrmnt 11-19-99 27746A pdf
Jenkens and Gilchrist Summons_Unsigned Assgnmnt Agrmnt 11-19-99 McCombsLLC DB SATIPartners pdf
Jenkens and Gilchrist Summons_Unsigned BJM digital Option 27740A 11-18-99 $10000000 pdf
Jenkens and Gilchrist Summons_Unsigned BJM Digital Option 27741 $25000000 pdf
Jenkens and Gilchrist Summons_Unsigned BJM Digital Option 27746A 11-18-99 $34400000 pdf
Jenkens and Gilchrist Summons_Unsigned by GW Digital Option 27744A $16000000 pdf
Jenkens and Gilchrist Summons_Unsigned Certificate BJM shares stock of SATIInc pdf
Jenkens and Gilchrist Summons_Unsigned Certificate McCombs stock SA Tesoro Investors Inc pdf
Jenkens and Gilchrist Summons_Unsigned Certificate stock TDIInc BJM 11-12-99 pdf
Jenkens and Gilchrist Summons_Unsigned Certificate stock TDIInc GW 11-12-99 pdf
Jenkens and Gilchrist Summons_Unsigned Certificate Woods shares stock SATIInc pdf
Jenkens and Gilchrist Summons_Unsigned Certificate Woods stock SA Tesoro Investors Inc pdf
Jenkens and Gilchrist Summons_Unsigned Consent of Sole Director SA Tesoro Investors Inc pdf
Jenkens and Gilchrist Summons_Unsigned Digital Option 27745 11-18-99 pdf
Jenkens and Gilchrist Summons_Unsigned Engagement ltr frm Daugerdas to GW $324260 pdf
Jenkens and Gilchrist Summons_Unsigned Form 2553 election TDIInc pdf
Jenkens and Gilchrist Summons_Unsigned Form 2553 GGSA pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 McCombsLLC pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 re GGSA for LightholderL pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 re GWSA LightholderL pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 re WoodsLLC for LightholderL pdf
Jenkens and Gilchrist Summons_Unsigned form 8821 Tax TDPartners LightholderL pdf
Jenkens and Gilchrist Summons_Unsigned Form 8821 TDIInc LightholderL pdf
Jenkens and Gilchrist Summons_Unsigned Guaranty Agrmnt Alex Brown pdf
Jenkens and Gilchrist Summons_Unsigned Guaranty Agrmnt frm Alex Brown pdf
Jenkens and Gilchrist Summons_Unsigned Guaranty Agrmnt pdf
Jenkens and Gilchrist Summons_Unsigned ltr 11-15-99 to Roak frm Guerin confirm consult with inves pdf
Jenkens and Gilchrist Summons_Unsigned non corp resolution GW to act in behalf pdf
Jenkens and Gilchrist Summons_Unsigned partnership acct autho & indemnity for GWSA pdf
Jenkens and Gilchrist Summons_Unsigned partnership acct authorization & indemnity TDPartners pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 App EIN McCombsLLC pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 App EIN TDPartners pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 Application for EIN for WoodsLLC pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 EIN GGSA Investors pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 EIN GWSA Partners pdf
Jenkens and Gilchrist Summons_Unsigned SS-4 EIN TDIInc pdf
Jenkens and Gilchrist Summons_Unsigned Term Agrmnt Tesoro Drive Partners 12-20-99 ex27740A pdf

Jenkens and Gilchrist Summons_Unsigned Terminat Agrmnt SATI Partners DB 12-20-99 ex27741A pdf
Jenkens and Gilchrist Summons_Unsigned Terminat Agrmnt TD Partners & DB 12-20-99 ex27744A pdf
Jenkens and Gilchrist Summons_Unsigned Termination Agreement SA Tesoro Investment Partners Deuts2 pdf
Jenkens and Gilchrist Summons_Unsigned Termination Agreement SA Tesoro Investment Partners Deutsc pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership SATIInc from BJM LLC pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership SATIInc from WoodsLLC pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership TDPartn frm McCombsLLC pdf
Jenkens and Gilchrist Summons_Unsigned undated Assgn of Partnership TDPartn frm WoodsLLC pdf
Jenkens and Gilchrist Summons_Unsigned undated ltr to Parse frm McCombs LLC pdf
Jenkens and Gilchrist Summons_Unsigned undated ltr to Parse frm McCombsLLC pdf
JMJ JL J&G DOCS_ #1 9-24-99 J&G Confidentiality Agreement pdf
JMJ JL J&G DOCS_ 10-28-99 email frm vaughn 2 daugherdas pdf
JMJ JL J&G DOCS_ 3-14-00 email from coplan to E&Y managers pdf
JMJ JL J&G DOCS_ 3-8-00 email from guerin to amy keating of E&Y pdf
JMJ JL J&G DOCS_ 3-8-00 email from guerin to coplan pdf
JMJ JL J&G DOCS_ 3-9-00 email from sodano to apillera pdf
JMJ JL J&G DOCS_#10 10-26-99 J&G notes pdf
JMJ JL J&G DOCS_#11 10-27-99 J&G notes pdf
JMJ JL J&G DOCS_#12 10-28-99 J&G notes pdf
JMJ JL J&G DOCS_#16 11-3-99 J&G notes pdf
JMJ JL J&G DOCS_#18 11-4-99 J&G notes pdf
JMJ JL J&G DOCS_#19 11-5-99 daugerdas notes pdf
JMJ JL J&G DOCS_#2 9-24-99 J&G notes pdf
JMJ JL J&G DOCS_#20 11-5-99 fax frm brian upchurch pdf
JMJ JL J&G DOCS_#21 11-8-99 J&G notes pdf
JMJ JL J&G DOCS_#22 11-9-99 J&G notes pdf
JMJ JL J&G DOCS_#23 11-9-99 BT Alex Brown Partnership Acct Authorization pdf
JMJ JL J&G DOCS_#24 11-12-99 email frm coplan 2 daugerdas pdf
JMJ JL J&G DOCS_#25 11-19-99 email frm coplan 2 E&Y managers pdf
JMJ JL J&G DOCS_#26 12-9-99 email frm coplan 2 E&Y managers pdf
JMJ JL J&G DOCS_#27 12-19-99 email frm coplan 2 ruble grady dagerdas pdf
JMJ JL J&G DOCS_#28 12-20-99 fax of amended confirmation pdf
JMJ JL J&G DOCS_#3 9-27-99 J&G notes pdf
JMJ JL J&G DOCS_#33 1-4-00 email frm guerin to coplan pdf
JMJ JL J&G DOCS_#34 1-4-00 letter frm ruble to john felkamp pdf
JMJ JL J&G DOCS_#35 1-5-00 memo by blanchard re viper cobra tax opinion pdf
JMJ JL J&G DOCS_#36 2-11-00 1015 am email from coplan to E&Y managers pdf
JMJ JL J&G DOCS_#37 2-11-00 1018 am email from coplan to E&Y managers pdf
JMJ JL J&G DOCS_#38 2-19-00 email re cobra return presentation pdf
JMJ JL J&G DOCS_#39 2-29-00 email from coplan to guerin re cobra opinion pdf
JMJ JL J&G DOCS_#4 10-1-99 email E&Y pdf
JMJ JL J&G DOCS_#40 3-3-00 engagement letters from B&W to Michener pdf
JMJ JL J&G DOCS_#46 3-21-00 email from sodano to jones pdf
JMJ JL J&G DOCS_#47 4-7-00 J&G memo re use of 7609 pdf
JMJ JL J&G DOCS_#48 4-11-00 thru 5-8-00 email between E&Y and B&W pdf
JMJ JL J&G DOCS_#49 7-20-00 letter via fax frm helms of scheef&Stone to odaniel pdf
JMJ JL J&G DOCS_#5 10-11-99 email frm brian vaughn to grady dickens pdf
JMJ JL J&G DOCS_#50 8-1-00 & 8-10-00 B&W transmittal letters pdf
JMJ JL J&G DOCS_#53 11-13-00 email chain re killing COBRA corporations pdf
JMJ JL J&G DOCS_#54 1-17-01 email from coplan to ruble of SAB&W pdf
JMJ JL J&G DOCS_#59 10-31-01 email from Carl Rhodes of E&Y pdf
JMJ JL J&G DOCS_#6 10-14-99 fax frm odaniel to daugerdas pdf
JMJ JL J&G DOCS_#60 4-3-02 email from coplan to daugerdas pdf

LaRue, David W.
Appendix C
Description of Tesoro Documents

JMJ JL J&G DOCS_#61 Affidavit of Willaim Hart.pdf
JMJ JL J&G DOCS_#7 10-18-99 J&G notes pdf
JMJ JL J&G DOCS_#8 10-21-99 J&G notes pdf
JMJ JL J&G DOCS_#9 10-25-99 J&G notes pdf
JMJ JL J&G DOCS_10-11-99 email frm brian vaughn to grady dickens pdf
JMJ JL J&G DOCS_10-14-99 fax frm odaniel to daugerdas pdf
JMJ JL J&G DOCS_10-18-99 J&G notes pdf
JMJ JL J&G DOCS_10-1-99 email E&Y pdf
JMJ JL J&G DOCS_10-21-99 J&G notes pdf
JMJ JL J&G DOCS_10-25-99 J&G notes pdf
JMJ JL J&G DOCS_10-28-99 email frm vaughn 2 daugerdas pdf
JMJ JL J&G DOCS_10-29-99 J&G notes pdf
JMJ JL J&G DOCS_10-31-01 email from Carl Rhodes of E&Y pdf
JMJ JL J&G DOCS_11-12-99 email frm coplan 2 daugerdas pdf
JMJ JL J&G DOCS_11-13-00 email chain re killing COBRA corporations pdf
JMJ JL J&G DOCS_11-2-99 J&G notes pdf
JMJ JL J&G DOCS_11-3-99 email frm coplan 2 daugerdas pdf
JMJ JL J&G DOCS_11-3-99 J&G notes pdf
JMJ JL J&G DOCS_11-4-99 J&G notes pdf
JMJ JL J&G DOCS_11-5-99 fax frm brian upchurch pdf
JMJ JL J&G DOCS_1-17-01 email from coplan to ruble of SAB&W pdf
JMJ JL J&G DOCS_11-8-99 J&G notes pdf
JMJ JL J&G DOCS_11-9-99 BT Alex Brown Partnership Acct Authorization pdf
JMJ JL J&G DOCS_12-19-99 email frm coplan 2 ruble grady daugerdas pdf
JMJ JL J&G DOCS_12-20-99 fax of amended confirmation pdf
JMJ JL J&G DOCS_12-21-99 email frm daugerdas 2 coplan grady ruble merck pdf
JMJ JL J&G DOCS_12-21-99 fax J&G pdf
JMJ JL J&G DOCS_12-22-99 email fwd frm o'daniel to daugerdas email pdf
JMJ JL J&G DOCS_12-23-99 email frm coplan to E&Y managers pdf
JMJ JL J&G DOCS_12-28-99 sheef & Stone invoice to J&G re BAMC pdf
JMJ JL J&G DOCS_1-24-01 letter frm ruble to neidus pdf
JMJ JL J&G DOCS_1-30-01 email from ruderman to coplan pdf
JMJ JL J&G DOCS_1-4-00 email frm guerin to coplan pdf
JMJ JL J&G DOCS_1-4-00 letter frm ruble to john felkamp pdf
JMJ JL J&G DOCS_1-5-00 memo by blanchard re viper COBRA tax opinion pdf
JMJ JL J&G DOCS_2-21-01 emails frm ruble to coplan and sodano pdf
JMJ JL J&G DOCS_2-29-00 email from coplan to guerin re cobra opinion pdf
JMJ JL J&G DOCS_3-14-00 email from E&Y to sodano pdf
JMJ JL J&G DOCS_3-15-01 email from coplan to zmoira of E&Y pdf
JMJ JL J&G DOCS_3-21-00 email from Sodano to Jones pdf
JMJ JL J&G DOCS_3-3-00 engagement letters from B&W to Michener pdf
JMJ JL J&G DOCS_4-11-00 thru 5-8-00 email between E&Y and B&W pdf
JMJ JL J&G DOCS_4-3-02 email from coplan to daugerdas pdf
JMJ JL J&G DOCS_4-7-00 J&G memo re use of 7609 pdf
JMJ JL J&G DOCS_6-4-01 email from welty re disclosure of J&G options pdf
JMJ JL J&G DOCS_7-15-01 email from E&Y to J&G pdf
JMJ JL J&G DOCS_7-20-00 letter via fax frm helms of Scheef&Stone to Odaniel pdf
JMJ JL J&G DOCS_8-10-00 email chain with other emails 8-7-00 & 6-7-00 pdf
JMJ JL J&G DOCS_9 3 99 memo frm J&G pdf
JMJ JL J&G DOCS_9-24-99 J&G Confidentiality Agreement pdf
JMJ JL J&G DOCS_9-24-99 J&G notes pdf
JMJ JL J&G DOCS_9-27-99 J&G notes pdf
JMJ JL J&G DOCS_Affidavit of William Hart pdf

JMJ JL J&G DOCS_March 11 2005 ltr frm jlindquist pdf

March 11 2005 ltr frm jlindquist pdf
Penalty IDRs BJM_11-11-99 Jones of E&Y engagement ltr BJM pdf
Penalty IDRs BJM_12-13-04 ltr to Jodeh frm Couch pdf
Penalty IDRs BJM_3-3-00 signed off representation to B&W by HJM and GW pdf
Penalty IDRs BJM_Item 6 is blank pdf
Penalty IDRs BJM_McCombs tax refund Examination Years 1986-1990 pdf
Penalty IDRs BJM_Notes frm meeting & partnership investments to AlexBrown wiring pdf
Penalty IDRs BJM_Options - 11-18-99 fax to Cummings from Parse of DBAlexBrown pdf
Penalty IDRs BJM_Options - Brooks reports valuation 12-16-99 & 12-17-99 both LLCs pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 McCombsLLC $10000000 pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 McCombsLLC $25000000 pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 McCombsLLC $34400000 pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 WoodsLLC $16000000 pdf
Penalty IDRs BJM_Options - DB Digital Option 11-18-99 WoodsLLC $6600000 pdf
Penalty IDRs BJM_Options - Partnership investments BJM and GW pdf
Penalty IDRs BJM_Options - Various currency reports 11-19-99 to 12-20-99 pdf
Penalty IDRs BJM_Red McCombs biographical data pdf
Penalty IDRs BJM_Various Currency calculators pdf
Penalty IDRs GW_Penalty IDR Exam 1999 and 2002 Form 1040 pdf

## Depositions

Michael Dell
Paula B. Kennedy
Jeannette T. K. Martin
Richard Kramer
Robert Johnson
Robert C. Schlemmer
Thomas Tahl
Susan Henry
Janet Lee Robinson
Christopher T. Chilcoat
Jeanette Michaels
Dawn Forbes
Joseph Nicosia
Kenneth Hooker
Joyce Bauchner
Kenneth Hughes
Shari R. Fessler-Tepper
Susan M. Parson
Michael Szalkowski
Alexander Eckman
Gary Duboff
Andrew Kyriacou
Stuart G. Goodson

## Other

Buckingham: Complaint For Readjustment Of Partnership Items Under 26 U S C Section 6226

Buckingham: Objections And Responses To United States' First Set Of Interrogatories

Buckingham: Plaintiff's First Set Of Requests For Admissions

Buckingham: United States' Corrected Response To Plaintiff's First Set Of Requests For Production

Buckingham: Unites States' First Set Of Interrogatories

Buckingham: Plaintiff's First Supplemental Objections And Responses To United States' First Set Of Interrogatories

Buckingham: Plaintiff's RCFC 26(a)(1) Initial Disclosures

Buckingham: Plaintiff's Second Request For Production

Buckingham. Plaintiff's Supplemental Responses To United States' First Requests For Production Of Documents

Cobra (Carmel): Petitioners' Combined Responses To United States' Second And Third Sets Of Interrogatories

Letter From Mr. Crouch To Mr. Donohue (April 4, 2006)

Plaintiff's First Set Of Interrogatories

Tesoro. Billy J. McCombs' Objections And Responses To United States' Subpoena Duces Tecum

Tesoro: Objections And Responses To United States' First Request For Production Of Documents

Tesoro. Objections And Responses To United States' First Set Of Interrogatories