Checkpoint Contents
Federal Library
Federal Source Materials
IRS Rulings & Releases
Private Letter Rulings & TAMs, FSAs, SCAs, CCAs, GCMs, AODs & Other FOIA Documents
Other FOIA (Freedom of Information Act) Documents
Chief Counsel Notices
2003
CC 2003-020

# CC 2003-020

## Headnote:

EXHIBIT
tabbies
B.26.

***Reference(s):***

## FULL TEXT:

June 25, 2003

Notice 2000-44

Upon Incorporation

Subject:: Son of Boss Tax Shelter Cancellation Date: Into CCDM

Purpose

The purpose of this Notice is to assist Chief Counsel attorneys in advising field personnel in the development of cases involving the type of transaction described in the second fact pattern of Notice 2000-44, 2000-2 C.B. 255, and substantially similar transactions (referred to herein as Son of Boss transactions).

## Summary

The Son of Boss transaction involves the contribution of a purchased option to a partnership and the assumption by the partnership of a separate written option which the taxpayer incurred. A taxpayer engaged in a Son of Boss transaction claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call option but is not reduced under Internal Revenue Code § 752 for the assumption of the obligation under the written call option. Subsequently, taxpayer claims a loss on the disposition of the partnership interest even though taxpayer has incurred no corresponding economic loss. It is the position of Counsel that:

(1) For written options assumed by partnerships after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T of the Income Tax Regulations to reduce the outside basis in the partnership of the taxpayer from whom the written call option was assumed. [1]

In a Son of Boss transaction that involves the assumption of a short sale obligation by a partnership, the Service will continue to follow Rev. Rul. 95-26, 1995-1 C.B. 131. Revenue Ruling 95-26 provides that a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under § 752. Further, for Son of Boss transactions in which the short sale obligation was assumed by a partnership after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T to reduce the outside basis in the partnership of the taxpayer from whom the short sale was assumed.

(2) The Service may apply § 1.701-2 to a partnership formed or availed of in connection with a Son of Boss transaction as the principal purpose of the transaction is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. The Service may determine, based on the facts and circumstances, that to achieve results that are consistent with the intent of subchapter K the purported partnership should be disregarded in whole or in part, one or more of the purported partners of the partnership should not be treated as a partner, the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income, the partnership's items of income, gain, loss, deduction, or credit should be reallocated, or the claimed tax treatment should otherwise be adjusted or modified. In the case of a partnership formed in connection with a Son of Boss transaction, disregarding the partnership is also consistent with existing case law. ASA Investerings P'ship v. Commissioner, 201 F.3d 505 (D.C. Cir. 2000).

(3) For an individual partner, the loss that a partner claims resulting from the artificial inflation of the partner's outside basis in a partnership used in a Son of Boss transaction may be disallowed under § 165(c)(2) because the partner lacked the requisite economic profit objective.

(4) Under § 465(b)(4), taxpayers are not considered at risk for amounts invested in the economically offsetting option positions contributed to and assumed by a partnerships formed or availed of in connection with a Son of Boss transaction as such amounts are protected against loss.

## Background

On September 5, 2000, the Service issued Notice 2000-44, 2000-2 C.B. 255, listing the Son of Boss transaction as an abusive tax shelter. In the second fact pattern in Notice 2000-44, a taxpayer purchases call options for a cost of $1,000X and simultaneously writes call options which virtually economically offset the purchased call options in exchange for a premium of slightly less than $1,000X. The written call options have a slightly higher strike price but the same expiration date as the purchased options. The purchased and written option positions are then transferred to a partnership that, using additional amounts contributed to the partnership, engages in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752(b) as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in these facts), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest is nominal or zero. On the disposition of the taxpayer's partnership interest, the taxpayer claims a tax loss ($1,000X in these facts), even though neither the taxpayer nor the partnership has incurred a corresponding economic loss. In a variation of this transaction, the partnership distributes an asset to a partner in complete liquidation of his interest in the partnership. Under § 732(b) the distributed asset picks up the artificially increased outside basis. On the subsequent sale of the distributed asset, the partner claims a loss. [2]

## Discussion

(1) Section 752 applies to the Son of Boss transaction to reduce the partner's basis in the partnership.

A. For Son of Boss transactions involving the contribution of offsetting option positions after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T to reduce the outside basis in the partnership of the taxpayer who contributed the options. Section 1.752-6T(a) provides that if, in a transaction described in § 721(a), a partnership assumes a liability (defined in § 358(h)(3)) of a partner (other than a liability to which § 752(a) and (b) apply), then, after application of § 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of § 1.752-6T, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under § 1.752-1 through § 1.752-5. Section 358(h)(3) defines liability to include any fixed or contingent obligation to make a payment, without regard to whether the obligation is otherwise taken into account for federal tax purposes. Under § 1.752-6T, the reduction in a partner's basis is not required after an assumption of a liability to which § 752(a) and (b) do not apply, if the trade or business with which the liability is

associated is transferred to the partnership assuming the liability as part of the transaction. However, the Son of Boss transaction described above does not involve the transfer of a trade or business and therefore, does not meet the exception.

In addition, § 1.752-6T(b)(1) includes another exception contained in § 358(h)(2)(B), which provides that the reduction in basis is not required after an assumption of a liability (described in § 358(h)(3)) if substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange. This exception does not apply to Son of Boss transactions. § 1.752-6T(b)(2).

In a Son of Boss transaction involving the purchase and sale of economically offsetting option positions, each contribution of a written call option to the partnership after October 18, 1999, but before June 24, 2003, is an assumption of liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest. § 1.752-6T (a).

B. For Son of Boss transactions involving the contribution of a short sale to a partnership, § 752 and the regulations thereunder apply to adjust the partner's basis in a manner that eliminates the artificial loss.

In Son of Boss transactions involving short sales, § 752 applies to treat the short sale obligation as a § 752 liability. Revenue Ruling 95-26, 1995-1 C.B. 131, provides that a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under § 752. In Salina Partnership v. Commissioner, T.C. Memo 2000-352, the Tax Court held that the partnership's obligation to close its short sale by replacing the Treasury bills that it borrowed represented a partnership liability within the meaning of § 752. The effect of treating the short sale obligation as a § 752 liability will be that on the satisfaction of the obligation, the partners will be deemed to have received a distribution equal to the amount received for selling short. The deemed distribution will cause a reduction in the partner's basis in the partnership under § 705(a)(2). This reduction in basis will eliminate the artificial loss.

Alternatively, under § 1.752-6T, in a Son of Boss transaction involving the contribution of a partner's short sale obligation by the partnership, each short sale obligation contributed after October 18, 1999, but before June 24, 2003, is a liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest. § 1.752-6T(a). As discussed above, the exception to the application of § 1.752-6T that applies in the event of the transfer of a trade or business to a partnership that assumes a liability associated with the trade or business as part of the transaction does not apply to the facts presented. Similarly, the substantially all the assets exception in § 358(h)(2)(B) does not apply to the contribution of a short sale obligation to the partnership in a Son of Boss transaction.

2. The Service may recast a Son of Boss transaction involving a partnership formed or availed of in connection with such transaction to achieve results that are consistent with the intent of subchapter K.

Section 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements:

> (1) the partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose;
> (2) the form of each partnership transaction must be respected under substance over form principles; and
> (3) except as otherwise provided, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Section 1.701-2(b) provides that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in § 1.701-2(a). Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is

inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K:

(1) the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

Section 1.701-2(c) provides that whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. Section 1.701-2(c) lists factors that may be considered in making the determination but those factors do not create a presumption that a partnership was or was not used in a manner inconsistent with subchapter K.

One of the factors on the list indicative of a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is that the present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership assets and conducted the partnership's activities directly. The loss generated (or the gain eliminated) in a Son of Boss transaction is achieved through the inflated outside basis in the partnership. This inflated basis is not supported by the underlying economics of the transaction.

Thus, if the investors in a Son of Boss transaction held the options and engaged in the minor investment activities outside the partnership, the tax loss would not have been generated. This is true whether the partnership was formed to engage in a Son of Boss transaction or an existing partnership was used to engage in the Son of Boss transaction.

A partnership formed or availed of in connection with a Son of Boss transaction does not operate in a manner consistent with the intent of subchapter K. First, the requirement that each partnership transaction or series of related transactions be entered into with a substantial business purpose is not met. A partnership formed or availed of in connection with a Son of Boss transaction engages in minor investment activities. The partnership engages in the investment transactions to generate the appearance of a business purpose in the event the transaction is challenged. The real purpose of the partnership is the generation of the loss or elimination of gain through the Son of Boss transaction. Although establishment of substantial business purpose is a fact specific inquiry, the reasonably expected pre-tax profit from both the economically offsetting option positions and the investment transactions is minimal when compared to the purported reduction in tax liability achieved through the Son of Boss transaction.

Second, the requirement that the tax consequences to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partner's income is not met. In a Son of Boss transaction, a large tax loss is generated through an inflated basis in the partnership interests received by the contribution of offsetting option positions to a partnership. The interest is later sold for a loss, or the property that is distributed and acquires the artificially high outside basis is later sold for a loss. For the tax consequences of a Son of Boss transaction to clearly reflect the partners' income, the partners or the partnership would have to have experienced a net economic loss at least equal to the claimed tax loss or the tax loss would need to be clearly contemplated by a provision in the Code or regulations. The tax loss generated in the transaction does not accurately reflect an underlying economic loss experienced by either the partners or the partnership. Further, no provision in subchapter K contemplates the creation of the large non-economic losses generated in the Son of Boss transaction.

Section 1.701-2(b) gives the Service broad authority to recast a transaction or series of transactions in the event that a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is

inconsistent with the intent of subchapter K. In light of this, the partnership anti-abuse rule should be applied either to disregard the partnership or some of the partners, to disregard the contributions of the options to the partnership, or to reduce the partners' bases in the partnership to the net amount invested in the options, depending on the particular facts of the transaction.

If a partnership is formed in connection with a Son of Boss transaction, the Service may disregard the partnership and recast the transaction in a manner that is consistent with the partners engaging in the activities directly. This approach will eliminate the discrepancy between outside basis and inside basis, and eliminate the purported loss (or restore the purportedly eliminated gain).

Other authorities support the Service's disregarding of the purported partnership. Under § 761 a partnership includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. See also, § 7701(a)(2). The Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, 742 (1949), stated that a partnership is created for federal income tax purposes if:

> [C]onsidering all the facts — the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent — the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

The Tax Court in Luna v. Commissioner, 42 T.C. 1067, 1077-78 (1964) set forth the following nonexclusive list of factors relevant to the consideration of whether a partnership is created:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party had made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and co-proprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over the assumed mutual responsibilities for the enterprise.

In ASA Investerings P'ship v. Commissioner, the Court of Appeals for the D.C. Circuit found that a partnership formed for a tax purpose and which engages in de minimis business activity in furtherance of that tax purpose is not a valid partnership. ASA at 512; See also Boca Investerings P'ship v. United States, 2003 U.S. App. LEXIS 429. Moreover, the ASA Court stated that whether "the `sham' be in the entity or the transaction . . . the absence of a nontax business purpose is fatal." Id.

Applying this analysis to the facts before it, the court of appeals in ASA found that even though the "investment in LIBOR Notes might have had a business purpose, the prior three-week investment in and subsequent sale of the private placement notes (PPNs) was . . . a business activity merely conducted for tax purposes." Id. at 513. The court of appeals realized that the taxpayer may have had an interest in potential gain from its investments, but those interests were "dwarfed by its interest in the tax benefit." Id. at 513. In concluding that ASA Investerings was not a legitimate partnership, the court further clarified that "[a]lthough a taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." Id. (quoting, Zamuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984)). Hence, the standard in the D.C. Circuit is that a de minimis business purpose will not validate a partnership whose true purpose is the pursuit of tax benefits. Rather, the relevant legal inquiry, as found by the Court of Appeals for the D.C. Circuit, is a comparison of the purported business purpose to the expected tax benefit. Id. at 513. The weight placed upon this legal factor led the D.C. Circuit to disregard the partnership entity. Id. at 516.

On the issue of risk, the court of appeals in ASA allowed for the existence of de minimis risk in the transaction noting that "no investment is entirely without risk." Id. at 514. The court of appeals further concluded that a

carve out of de minimis risk is consistent with the Supreme Court's view that "a transaction will be disregarded if it did not appreciably affect [taxpayer's] beneficial interest except to reduce his tax.'" Id. (quoting Knetsch v. United States, 364 U.S. 361, 366 (1960)).

As with the transactions in ASA and Boca, de minimis risk exists in the Son of Boss transactions. The Son of Boss transactions are structured specifically to generate a tax benefit while limiting each partner's risk of loss to the difference between the premium received for writing the option and the premium paid for the long option. The minor investment activities engaged in by the partnerships are de minimis compared to the amount of the claimed tax savings. Further, the modicum of business purpose asserted by the promoters for the formation of the partnership in a Son of Boss transaction does not alter the fact that the true purpose for the partnership is the reduction of tax liability. Thus, the partnership entity should be disregarded.

In cases in which an operating partnership engages in a Son of Boss transaction it may not be appropriate to disregard the partnership. In these cases, § 1.701-2 applies to permit the Service to recast the transaction in a manner consistent with the intent of subchapter K.

A Son of Boss transaction, whether engaged in through a partnership formed primarily for use in the transaction or through a previously operating partnership, reduces substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. The fact that such reduction was a principal purpose of engaging in the transaction is apparent from the lack of legitimate economic purpose for the transaction. As noted above, a comparison of the tax gain generated by the transaction to the economic benefit that the transaction could be reasonably expected to generate, as well as the fact that the exposure to risk is limited in a Son of Boss transaction, are significant factors indicating that the principal, if not sole, purpose for engaging in a Son of Boss transaction is the tax reduction generated by the transaction.

It follows from this that the Service may recast either by, among other things, treating the offsetting option positions as though they were not contributed to the partnership or reducing the partners' bases in their partnership interests to reflect the net investment in the offsetting option positions. In either case, the purported tax loss generated by the Son of Boss transaction will be eliminated.

3. Individual taxpayers may not claim losses from investments in partnerships unless such investments are made with an economic profit objective.

Section 165(a) allows as a deduction any loss sustained during the year and not compensated by insurance or otherwise.

Losses claimed by individuals, other than casualty losses, are limited by § 165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. The requirements of § 165(c)(2) were applied to certain straddle transactions in Fox v. Commissioner, 82 T.C. 1001 (1984). The Tax Court there found that § 165(c)(2) required that the taxpayer enter into the transaction "primarily for profit." 82 T.C. at 1019-21. See also Dewees v. Commissioner, 870 F.2d 21, 33 (1st Cir. 1989), and the cases cited therein. This "primarily profit" motive test has its origins in the Supreme Court decision, Helvering v. National Grocery Co., 304 U.S. 282 (1938), which interpreted a predecessor of § 165(c).

The application of § 165(c) does not require a finding that the transaction lacks economic substance. For example, the Tax Court in Fox found that because the taxpayer did not meet the requirements of § 165(c)(2), it did not have to find that the transaction was a sham. See also Smith v. Commissioner, 78 T.C. 350 (1982), aff'd without published opinion, 820 F.2d 1220 (4th Cir. 1987), where the Tax Court found certain straddles not to be shams, but at the same time disallowed the resulting losses because the taxpayers lacked the requisite economic profit objective under § 165(c)(2). In applying § 165(c), we may look to the individual taxpayer's motivation for entering the partnership, see Howell v. Commissioner, 41 T.C. 13 (1963), aff'd, 332 F.2d 428 (3d Cir. 1964), or we may look at the motivation for entering the specific transactions. See Andros v. Commissioner, T.C. Memo 1996-133.

If an individual invests in a Son of Boss transaction, any loss generated either through the disposition of the partnership interest or through the disposition of assets distributed to the individual in complete liquidation of the individual's partnership interest may be limited or denied under § 165(c)(2) because of the lack of an

economic profit objective.

4. The losses that a taxpayer sustains and deducts are limited by § 465 to the amount for which the taxpayer is at risk.

Section 465(a)(1) provides that in the case of an individual engaged in an activity identified in § 465(c), any loss from the activity for the taxable year is allowed only to the extent of the aggregate amount with respect to which the taxpayer is at-risk for such activity at the close of the taxable year. Section 465(c)(3) provides that § 465 applies to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.

Section 465(b)(1) provides that a taxpayer is considered at-risk for an activity with respect to amounts including the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and amounts borrowed with respect to such activity. Under § 465(b)(2), a taxpayer is considered at risk for an activity with respect to amounts including amounts borrowed for use in an activity to the extent that the taxpayer either is personally liable for the repayment of such amounts, or has pledged property, other than property used in such activity, as security for such borrowed amount.

Section 465(b)(4) provides that notwithstanding the other provisions of § 465, a taxpayer is not considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Under § 465(b)(4), the legislative history provides that in evaluating the amount at-risk, it should be assumed that a loss-protection guarantee, repurchase agreement or other loss limiting mechanism will be fully paid to the taxpayer. Id. (citing S.Rep. No. 938, 94th Cong., 2d Sess. 50 n.6 (1976)); see also, Moser v. Commissioner, 914 F.2d 1040 (8th Cir. 1990) (A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of [465(b)(4)].; Levien v. Commissioner, 103 T.C. 120 (1994)).

The case law is not in complete accord on this issue. In Emershaw v. Commissioner, 949 F.2d 841, 845 (6th Cir. 1991), the court adopted a worst-case scenario approach and determined that the issue of whether a taxpayer is "at risk" for purposes of § 465(b)(4) "must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt." quoting Levy v. Commissioner, 91 T.C. 838, 869 (1988).

In contrast, the Second, Eighth, Ninth, and Eleventh Circuits look to the underlying economic substance of the arrangements under § 465(b)(4). Waters v. Commissioner, 978 F.2d 1310, 1316 (2nd Cir. 1992) (citing American Principals, 904 F.2d at 483; Young v. Commissioner, 926 F.2d 1083, 1089 (11th Cir. 1991); Moser, 914 F.2d at 1048-49.) The view, as adopted by the Second, Eighth, Ninth, and Eleventh Circuits is that, in determining who has the ultimate liability for an obligation, the economic substance and the commercial realities of the transaction control. See Waters, 978 F.2d at 1316; Levien, 103 T.C. 120; Thornock v. Commissioner, 94 T.C. 439, 448 (1990), Bussing v. Commissioner, 89 T.C. 1050, 1057 (1987). To determine whether a taxpayer is protected from ultimate liability, a transaction should be examined to see if it "is structured - by whatever method - to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." American Principals, 904 F.2d at 483, see Young, 926 F.2d at 1088, Thornock, 94 T.C. at 448-49, Owens v. United States, 818 F. Supp. 1089, 1097 (E.D. Tenn. 1993), Bussing, 89 T.C. at 1057-58. "[A] binding contract is not necessary for [465(b)(4)] to apply." American Principals, 904 F.2d at 482-83. In addition, "the substance and commercial realities of the financing arrangements presented . . . by each transaction" should be taken into account under § 465(b)(4). Thornock, 94 T.C. at 449. To avoid the application of § 465(b)(4), there must be more than "a theoretical possibility that the taxpayer will suffer economic loss." American Principals, 904 F.2d at 483.

In presenting a § 465 argument, it is important that the Service address Laureys v. Commissioner, 92 T.C. 101 (1989), nonacq. 1990-2 C.B. 1. Laureys dealt with an individual who traded straddles rather than options. The Laureys Court limited the application of § 465(b)(4) in cases involving straddles on the basis that a separate regime exists for the regulation of straddle transactions and that it is unlikely that Congress intended to include straddles in the term "similar arrangement" given the other provisions of the Code regulating straddles.

For three reasons, the Service may assert § 465(b)(4) in Son of Boss cases even in light of Laureys. First, depending on the facts of the case, the virtually offsetting option positions may not constitute a straddle.

Section 1092 provides that the term straddle means offsetting option positions with respect to actively traded personal property. In some cases, the economically offsetting option positions may not meet the definition provided in § 1092(c) or may qualify for an exception provided in § 1092(d) or the regulations.

Second, even if the option positions do constitute a straddle, the loss which the Son of Boss transaction generates is not the type of loss to which § 1092 is directed. Section 1092 addresses the timing of recognition of the loss generated on one leg of a straddle. The loss generated in a Son of Boss transaction is related to the artificial increase in a partner's outside basis. In this way, Laureys is not applicable to the Son of Boss transaction.

Third, the Service has a longstanding position that the decision in Laureys with regard to § 465(b)(4) is erroneous. See nonacq. at 1990-2 C.B. 1. Thus, even in cases in which the virtually offsetting option positions constitute a straddle, the Service will challenge the Laureys Court's holding that § 465(b)(4) does not apply to straddle transactions.

In a Son of Boss transaction, the investor purchases and writes economically offsetting option positions and contributes the option positions to a partnership. The effect of this structure is that through the partnership, the investor in a Son of Boss transaction is exposed to risk only to the extent of the cash contributed and the difference between the premium paid for the purchased option and the premium received for the written option. Because the values of the options move in opposite directions in economically offsetting amounts, the amount that can be lost by an investor in a Son of Boss transaction is fixed at the time the options are written and purchased. Which one of the offsetting options finishes in the money is irrelevant to determining the maximum amount that the investor can lose. As a result, in Son of Boss cases, the Service will treat the economically offsetting option positions as an arrangement under § 465(b)(4) to limit the taxpayers' exposure to risk of loss.

This notice may be updated in accordance with future published guidance.

If you have any questions concerning this notice, please contact James M. Gergurich, Passthroughs and Special Industries, at (202) 622-3070.

HEATHER MALOY

Associate Chief Counsel

(Passthroughs & Special Industries)

---

1

The Temporary regulations are effective for this period. § 1.752-6T(d). Proposed regulations also have been issued that apply to assumptions of liabilities by partnerships on or after June 24, 2003. As described in the preamble to § 1.752-1 of the proposed regulations, the definition of liability contained in the proposed regulations does not follow Helmer v. Commissioner, T.C. Memo 1975-160.

---

2

The facts presented in this memo describe the loss generation type Son of Boss transaction. Some Son of Boss transactions are structured as gain elimination transactions rather than as loss generation transactions. In a gain elimination transaction, the partner contributes an asset with significant built in gain to the partnership and, following the closing of the option positions, the partnership distributes the asset to the partner in a liquidating transaction. Under § 732(b), the contributed asset picks up the artificially increased outside basis. The effect of this is that the gain in the contributed asset is eliminated. In gain elimination Son of Boss transactions, the Service will assert the same arguments as will be presented in the loss generation Son of Boss transaction except that the § 165 and § 465 arguments can not be asserted in those transactions in which no loss is generated.

END OF DOCUMENT -

© 2008 Thomson/RIA. All rights reserved.