**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
Nos. 06-245T, 06-246T, and 06-247T (Consolidated)

---

| | |
|---|---|
| MURFAM FARMS, LLC, | § |
| By and Through Wendell H. Murphy, Jr., | § |
| a Partner Other Than Tax Matters Partner, | § |
| | § |
| PSM FARMS, LLC, | § |
| By and Through Stratton K. Murphy, | § |
| a Partner Other Than Tax Matters Partner, | § |
| | § |
| MURPHY PORK PARTNERS, LLC | § |
| By and Through Wendell H. Murphy, Jr. | § |
| a Partner Other Than Tax Matters Partner, | § |
| Plaintiffs, | § |
| | § |
| v. | § |
| | § |
| UNITED STATES OF AMERICA, | § |
| | § |
| Defendant. | § |

---

**UNITED STATES OF AMERICA'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE GOVERNMENT EXPERT DAVID LARUE**

---

Respectfully submitted,

DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

# TABLE OF CONTENTS

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. Dr. LaRue's Expert Reports and Testimony are Admissible, and the Proper Means of Challenging Them are Cross-Examination and Competing-Expert Testimony . . . . . . . . 5

II. Despite the Plaintiffs' Misrepresentations Regarding Dr. LaRue's Conclusions, Dr. LaRue Is Supremely Qualified to Opine on Tax-Return Preparation and the IRS's Tax-Return-Selection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. The Plaintiffs' Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B. Dr. LaRue's Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. Dr. LaRue's Analyses, Reports, and Testimony Are Crucial to a Full Adjudication of This Case and Provide Necessary Assistance for the Court in Analyzing the COBRA Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. Dr. LaRue's Required Factual Summaries Provide the Necessary Context and Support for His Conclusions and Also Enable the Plaintiffs to Properly Evaluate the Accuracy and Completeness of the Facts on Which Dr. LaRue's Conclusions are Based . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. The Plaintiffs Misconstrue Dr. LaRue's Reports and Testimony as Providing an Opinion on the "Risk of Detection" Issue – Dr. LaRue is Not Merely Opining on Whether the Transaction was Reported In a Manner to Avoid the Risk of Detection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C. Dr. LaRue's Expert "Observations" Are Germane to His Analyses, Conclusions, and Opinions – Nowhere Does He Opine in Any Witnesses' Intent . . . . . . . . . . 26

D. Dr. LaRue Does not Opine About "Legal Issues" . . . . . . . . . . . . . . . . . . . . . . . . 28

IV. Dr. LaRue's Analyses, Reports, and Testimony Are Relevant For Both the Determination of Whether Penalties are Applicable and the Determination of Whether the COBRA Transaction Lacked Economic Substance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V. The "Standard" Dr. LaRue Applied Is Perfectly Consistent with the Appropriate Legal Standard Employed in Determining the Applicability of the Negligence Penalty . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. Commissioner*, 925 F.2d 348 (9th Cir. 1991) . . . . . . . . . . 32

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 . . . . . . . . . . 36

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) . . . . . . . . . . 35, 36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . 6, 7, 12, 28

*Hansen v. Commissioner*, 471 F.3d 1021 (9th Cir. 2006) . . . . . . . . . . 32, 37

*Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) . . . . 21

*International Adhesive Coating Co. v. Bolton Emerson International, Inc.*, 851 F.2d 540 (1st Cir. 1988) . . . . . . . . . . 7

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (Ct. Cl. 2007) . . . . . . . . . . 35

*Knetsch v. United States*, 364 U.S. 361 (1960) . . . . . . . . . . 35

*Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) . . . . . . . . . . 6

*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004) . . . . . 34, 35

*McMurray v. Commissioner*, 985 F.2d 36 (1st Cir. 1993) . . . . . . . . . . 32

*Neonatology Associates, P.A. v. Commissioner*, 299 F.3d 221 (3d. Cir. 2002) . . . . . . . . . . 32

*Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003) . . . . . . . 7

*In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) . . . . . . . . . . 28

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) . . . . . . . . . . 7

*Securities and Exch. Commission v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill 1998) . . . . . . . . . . 22

*Shrum v. Commissioner*, 33 F.3d 426 (4th Cir. 1994) . . . . . . . . . . 32

*Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir. 2000) . . . . . . . . . . 12

*United States v. Mahone*, 453 F.3d 68 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Stone*, 222 F.R.D. 334 (E.D. Tenn. 2004), *aff'd*, 432 F.3d 651 (6th Cir. 2005), *cert. denied*, 127 S.Ct. 129 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. West*, 58 F.3d 133 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 7

*Wilmington v. J.I. Case Co.*, 793 F.2d 909 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## FEDERAL STATUTES

26 U.S.C.:

§6662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

§6662(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

§6662(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

§6662(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

§6662(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

§6662(d)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

§6662(d)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

§6662(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

§ 6664(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Treas. Reg. § 1.6662-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Treas. Reg. §1.6662-3(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

Treas. Reg. §1.6662-3(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Treas. Reg. §1.6664-4 (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Treas. Reg. § 301.6221-1T(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Treas. Reg. § 301.6226(f)-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## MISCELLANEOUS

Federal Rules of Civil Procedure, Rule 26(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Federal Rules of Evidence , Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12, 21, 22

Federal Rules Of Evidence, Rule 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Michael I. Saltzman, *IRS Practice and Procedure* (2d ed. 2005) ¶ 8.03 . . . . . . . . . . . . . . . . . . . . 10

U.S. Gen. Accounting Office, *Tax Administration: IRS' Return Selection Process* (1999) . . . . 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Nos. 06-245T, 06-246T, and 06-247T**
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

**UNITED STATES OF AMERICA'S OPPOSITION**
**TO PLAINTIFFS' MOTION TO EXCLUDE**
**GOVERNMENT EXPERT DAVID LARUE**

The plaintiffs' motion is simply the plaintiffs' early commencement of a cross-examination, coupled with an airing of its unhappiness with the expert conclusions described and supported in Dr. David W. LaRue's expert report. The plaintiffs' attempt to support its motion with nothing more than inappropriate and frequent misrepresentations of Dr. LaRue's reports and testimony. Given its unhappiness, the plaintiffs are sure to, and of course free to, cross examine Dr. LaRue at trial. But, a motion to exclude is not a substitute for that cross examination, and the plaintiffs' attempt to make it so should be rejected and their motion denied.

As noted in his report, in this case, Dr. LaRue examined and opined on the following tax

returns (including all accompanying forms, schedules, statements, and attachments) relating to three separate transactions (the "PSM Transaction," the "MP Transaction" and the "MURFAM Transaction"). With respect to the PSM Transaction, Dr. LaRue reviewed the 2000 federal income tax returns of (i) PSM Farms, LLC (Form 1065), and (ii) PSM, Inc. (Form 1120S). With respect to the MP Transaction, Dr. LaRue reviewed the 2000 federal income tax returns of (i) Murphy Pork Partners, LLC (Form 1065), and (ii) Murphy Pork, Inc. (Form 1120S). Finally, with respect to the MURFAM Transaction, Dr. LaRue reviewed the 2000 federal income tax returns of (i) MURFAM Farms, LLC (Form 1065), and (ii) MURFAM, Inc. (Form 1120S). As to all three transactions, Dr. LaRue also reviewed the 2000 federal income tax returns (Forms 1040) of the following individual taxpayers: Wendy M. Crumpler, Wendell H. Murphy, Wendell H, Murphy, Jr., Joyce Murphy Norman, Angela N. Brown, Harry D. Murphy, Marc D. Murphy, and Stratton K. Murphy.[1]

These are exceptionally complex returns, with numerous schedules and attachments. The Tax Returns were used to report income-related and loss-related items, including those resulting from certain non-publicly-traded digital option transactions (the "COBRA Transaction" or the "Transaction") which is at issue in this case. It is beyond dispute that the COBRA Transaction was designed to be exceedingly complex. It would be impossible for a non-expert, without the assistance of an expert like Dr. LaRue, to properly examine the Tax Returns and to make informed decisions about the manner in which they were prepared and the items therein reported.

Specifically, it would be impossible, without the assistance of an expert, for a layperson to determine the following: (1) how the combined Murphy "losses" of approximately $100 million

[1]For purposes of this Response, the federal tax returns listed above will be referred to collectively as the "Tax Returns," and Wendy M. Crumpler, Wendell H. Murphy, Wendell H, Murphy, Jr., Joyce Murphy Norman, Angela N. Brown, Harry D. Murphy, Marc D. Murphy, and Stratton K. Murphy will be referred to collectively as the "taxpayers."

arising from paired "foreign currency" option trades and the over $2.5 million in fees paid to the promoters of this transaction were reported on the Tax Returns; (2) whether, based solely on the information on or with the Tax Returns, either individually or collectively, the Internal Revenue Service ("IRS") could have determined that the deduction of the Murphy "losses" at issue in this case were based on a set of paired offsetting options which were being used to generate a greatly inflated tax bases in the taxpayers' partnership interests in PSM Farms, LLC, Murphy Pork Partners, LLC, and MURFAM Farms, LLC (collectively, the "Murphy partnerships"); (3) whether the Tax Returns, individually or collectively, disclosed (or otherwise provided any reasonably discernable indication) that the taxpayers incurred and paid transaction-related fees of approximately $2.5 million to [accounting firm] Ernst & Young and to [law firms] Proskauer Rose in connection with the implementation of a strategy that the taxpayers purchased in 2000, that generated approximately $100 million in permanent ordinary and long term capital tax losses that the taxpayers claimed on their 2000 Form 1040s; and (4) whether, based on objective factors, it would be reasonable to conclude that the various elements of the COBRA Transaction were reported on the Tax Returns in a manner that was designed to reduce, minimize, or eliminate the risk of detection and audit by the IRS.

As explained in greater detail below and in the attached declaration, Dr. LaRue is a supremely qualified accounting and federal-taxation expert (and a finance expert).[2] He has decades of academic and professional experience, which has enabled him to gain an in-depth knowledge and understanding of, among many other things, the manner in which transactions and activities are to

[2]Government Exhibit 1, Declaration of Dr. David W. LaRue in Opposition to Plaintiffs' Motion to Exclude, (hereinafter, "LaRue Declaration"), ¶¶ 1, 16-22. The United States has submitted the declaration of Dr. LaRue in support of this opposition. This Declaration, to the extent appropriate, responds in detail to the plaintiffs' various assertions.

be reported on the relevant tax returns (*i.e.*, "tax compliance"), and how those tax returns would be evaluated by knowledgeable and experienced tax professionals.[3] Dr. LaRue has an impressive academic background which includes a Ph.D. degree (with honors) with major fields of study in accounting and taxation, and a supporting field of study in economics.[4] His decades of professional experience include teaching taxation and accounting to graduate and undergraduate students and to CPAs and other accounting professionals. Dr. LaRue's consulting experience includes retention by three of the "Big-4" international public accounting firms– KPMG, Ernst & Young, and Deloitte & Touche.[5] The consulting also included engagements by Arthur Andersen and by the Washington National Office of the IRS Chief Counsel.[6] Dr. LaRue has also testified before Congress, and has been recognized as an expert in tax, accounting, and/or finance in ten court cases.[7] No challenge to his recognition as an expert has ever been successful.[8]

Given Dr. LaRue's academic and professional background, he is supremely qualified to assist the Court in making its determinations as to how the COBRA Transaction and the Transaction-related fees were reported on the Tax Returns and whether this Transaction was in fact reported in such a manner as to reduce, minimize, or eliminate the risk of detection. Such determinations are essential to a full adjudication of this case, and are impossible without the assistance of a qualified expert.

---

[3]LaRue Declaration, ¶ 18.

[4]LaRue Declaration, ¶ 17.

[5]LaRue Declaration, ¶ 20.

[6]LaRue Declaration, ¶ 20-21.

[7]LaRue Declaration, ¶ 21.

[8]*Id.*

The plaintiffs' challenges to Dr. LaRue's conclusions and the manner in which he prepared his reports are just as misguided as their attempts to convince the Court that Dr. LaRue is not an expert. The allegations, attacking the reports and Dr. LaRue as biased, are baseless, or worse, reckless. The allegations are based on misrepresentations of fact and/or law, and are often manufactured out of whole cloth to create the appearance of impropriety. Even if the allegations were true, however, they would merely affect the weight to be given to Dr. LaRue's testimony and reports, not their admissibility. Even so, for the reasons described below, Dr. LaRue's reports are of the highest quality and impartiality, and are based on unrestricted access to all of the available documentary evidence. His opinions are the unbiased opinions of a supremely qualified professional. The expert reports, like Dr. LaRue's testimony, are entitled to full weight.

The Court certainly has a "gatekeeper" role, but that role is not as urged by the plaintiffs– which is less a keeper of the gate than that of a fence, used to keep out all expert testimony the plaintiffs dislike. The gatekeeper's role is to ascertain whether the provisions of Federal Rule of Evidence 702 are met. They are certainly met here, where there is no doubt that Dr. LaRue's reports and testimony are reliable and relevant. As such, the plaintiffs' motion should be denied.

## ARGUMENT

### I. Dr. LaRue's Expert Reports and Testimony are Admissible, and the Proper Means of Challenging Them are Cross-Examination and Competing-Expert Testimony.

Federal Rule of Evidence ("Rule") 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[9] the Supreme Court applied Rule 702 to the proposed testimony of a scientific expert witness and established a two prong test for admissibility of expert witness testimony – (1) relevance and (2) reliability. In *Kuhmo Tire Co., Ltd. v. Carmichael*,[10] the Supreme Court concluded that this two-prong test was equally applicable to expert testimony based on "technical" and "other specialized" knowledge. With regard to the "relevance" prong, the Supreme Court referred to Rule 702.[11] With regard to the "reliability" prong, the Supreme Court stated that the

> Proposed testimony must be supported by appropriate validation – i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.[12]

The reliability determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[13]

There is no doubt whatsoever, as described in detail below and in the expert reports, that Dr. LaRue has technical and specialized knowledge gained during decades of academic and professional experience. He put that knowledge to work here to come to his opinions and conclusions about the manner in which the COBRA Transaction was reported on the Tax Returns.

The manner in which this Transaction was reported is of extreme relevance, and indeed

---

[9]509 U.S. 579, 589 (1993).

[10]526 U.S. 137, 119 S.Ct. 1167 (1999).

[11]*Daubert*, 509 U.S. 579, 591.

[12]*Id.* at 590.

[13]*Id.* at 592-93.

important to this case, which involves the taxpayers' entitlement to claimed tax benefits resulting from their participation in the COBRA Transaction. Whether the Transaction was disclosed in a meaningful way on the Tax Returns is at the heart of this case. Indeed, the plaintiffs themselves invoke the relevance of the way the COBRA Transaction was reported on the Tax Returns. In response to an interrogatory from the United States regarding whether penalties should be asserted, the plaintiffs state in their response that penalties should not apply "because the parties *properly reported the tax treatment of the Transactions on the relevant federal tax returns for tax year 2000*."[14] It is precisely this type of issue that necessitates Dr. LaRue's assistance.

As relevant and reliable, Dr. LaRue's testimony is admissible. The United States need not prove now that Dr. LaRue's opinions are correct, and the plaintiffs' allegations that they are incorrect will be proven wrong another day. Right now, so long as Dr. LaRue's opinions rest upon "good grounds, based on what is known,"[15] they "should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded . . . ."[16] That is because the plaintiffs' allegations, even if true, which they are not, go only to the weight to be accorded to, and not to the admissibility of, Dr. LaRue's reports and testimony.[17] Nonetheless, it

---

[14]*See* Response to Interrogatory 93, Plaintiffs' Objections and Responses to the United States' Interrogatories (Nos. 71 Through 95), attached hereto as Gov. Ex. 2 (emphasis added).

[15]*Daubert*, 509 U.S. at 590 (internal quotation marks omitted).

[16]*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F3d. 1333, 1345 (11th Cir. 2003) (quoting *Ruiz-Troche*);

[17]*See, e.g., Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (In general, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility); *see also Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 544-545 (1st Cir. 1988) ("The burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the

will become clear to the Court, if it is not already, that Dr. LaRue's reports and testimony should be afforded full weight.

## II. Despite the Plaintiffs' Misrepresentations Regarding Dr. LaRue's Conclusions, Dr. LaRue Is Supremely Qualified to Opine on Tax-Return Preparation and the IRS's Tax-Return-Selection Process.

### A. The Plaintiffs' Misrepresentations

The plaintiffs' allegations that Dr. LaRue is not qualified to opine on the "Risk of Audit Issues" is based on either a straw man the plaintiffs set up to knock down, or on a genuine misunderstanding of Dr. LaRue's conclusions and the IRS's processes. Either way, the arguments should be rejected. The plaintiffs argue that Dr. LaRue is not qualified to opine on the "Risk of Audit Issues" because "he has no specialized experience or knowledge in how the IRS selects returns for audit."[18] The plaintiffs argue that to be qualified to opine on the "Risk of Audit Issues" one must be qualified to opine on how the IRS selects returns for audit.[19] The plaintiffs desperately attempt to bolster their argument that Dr. LaRue is unqualified to opine on the "Risk of Audit Issues" by cherry-picking (and misconstruing) his deposition testimony relating to a Government

---

expert's opinion. . . .When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony. . . .") (internal citations omitted). *See also*, *United States v. Mahone*, 453 F.3d 68, 72 (1st Cir. 2006) (Admissible expert testimony need not be unassailable, and cross-examination and competing expert testimony are the proper methods of testing admissible expert testimony); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 920 (8th Cir. 1986) ("Virtually all the inadequacies in the expert's testimony urged here by [Defendant] were brought out forcefully at trial . . . These matters go to the weight of the expert's testimony rather than to its admissibility.") (citation omitted).

[18] Plaintiffs' Memorandum in Support of Motion to Exclude Government Expert David LaRue, ("Plaintiffs' Memorandum" or "Pl. Mem."), p. 20.

[19] *Id.* p. 21.

Accounting Office ("GAO") report Dr. LaRue reviewed prior to his deposition.[20] Finally, the plaintiffs conclude their arguments by asserting that Dr. LaRue "does not really know what an auditor's training consists of or what an auditor is taught to look at when reviewing returns" and by making cryptic assertions to Dr. LaRue's lack of experience relating to "classifiers."[21] The fatal flaw in this argument is the fact that Dr. LaRue's opinions do not in any way relate to how the IRS selects returns for audit.

To understand the complete fallacy of the plaintiffs' predicate here, it is important to understand the actual process the IRS follows in reviewing a tax return, and to understand the portion of that process relevant to Dr. LaRue's conclusions. When a tax return is filed, the IRS Service Center assigns a so-called DIF score.[22] As Dr. LaRue stated in response to questions asked of him at deposition, the specific types of tax-return information and data that is captured and used in calculating a tax return's DIF score and the formula for calculating that score are closely guarded secrets within the IRS and are not otherwise publicly available or independently ascertainable.[23]

While the DIF process is a highly classified computer formula and very few people inside or outside of the IRS know anything about how the formula operates or how it is derived, the next part of the selection process is well known. Tax returns receiving a high DIF score are then reviewed at the IRS Service Center by what are known as "classifiers," as mentioned in the

[20]LaRue Declaration, ¶ 13.

[21]Plaintiffs' Memorandum pp. 19-20.

[22]DIF" stands for "discriminate inventory function, or simply "discriminant function." It is a computer-generated score assigned to a tax return and used by the IRS in the process of selecting returns for audit. LaRue Declaration, ¶ 14.2 n 17.

[23]LaRue Dep. Tr., Vol. 2, 80:25-81:14.

Plaintiffs' Memorandum. This review process initially takes place at the Service Center level. This review process by classifiers can be relatively quick. Classifiers may be able to review many tax returns in a day to determine whether any of them merit further review. The classifiers determine whether a return is to be accepted as filed or sent on for possible further review (and also determine the nature of that further review, each level of that review process making a similar determination as to whether further review or audit may be warranted and the nature of any further review or audit, e.g., correspondence audit, office audit, field audit, *et cetera*), and potential full-scale audit.

The IRS district office review process is the next step of the process but it only reviews returns that are first selected for further review at the classification stage. Under the old nomenclature, each district office can order a certain number of returns (in the batch selected by classifiers) from the Service Center for audit. At the district office (or sub offices), there is another level of review of the returns – with Case Managers ultimately reviewing the batch of tax returns sent from the Service Centers and deciding which tax returns should be assigned for an office or a full-scale field audit – or even whether the tax return should be audited at all.[24]

Dr. LaRue's opinion that it would be reasonable to conclude, based on objective factors, that the Tax Returns were prepared in a manner to minimize the risk of detection and audit is referring to this multiple-level review process at the IRS Service Center and at the district office level. Dr. LaRue opines on whether the reporting on the various components of the Transaction on the Tax Returns made it more difficult or impossible to detect at the multi-level-review selection process and before a return is actually assigned for a full-scale field audit.

---

[24]Michael I. Saltzman, *IRS Practice and Procedure* (2d ed. 2005) ¶ 8.03; U.S. Gen. Accounting Office, *Tax Administration: IRS' Return Selection Process* (1999), at pp. 3-5; LaRue Declaration, ¶¶ 28-31.

Moreover, Dr LaRue's opinions as to whether, based on objective factors the Tax Returns were prepared in a manner to minimize an actual or perceived risk of detection are from the perspective of a knowledgeable and experienced tax professional who is not an IRS classifier or examiner.[25] That is, he is not putting himself in the shoes of an IRS classifier or IRS auditor and opining on whether the elements of the Transactions would have been discovered on their review of the returns. Rather, Dr. LaRue's opinions and conclusion are based on the perceptions of professionals who would have the same level of knowledge and experience as those who were involved in the design of the Transaction and the reporting of the various elements of the Transaction on the returns.[26] The plaintiffs' complete misunderstanding of Dr. LaRue's analysis and opinions is at the root of most of their misguided arguments.

In sum, Dr. LaRue opined on the manner in which the COBRA Transaction and activities were reported on the Tax Returns, and whether, on the multi-level review of those returns by knowledgeable and experienced tax professionals, it would be objectively reasonable to conclude that the reporting was done in such a way as to reduce the risk of detection and potential audit. Despite the contrary allegations, Dr. LaRue's expertise in these areas speaks for itself.

**B. Dr. LaRue's Qualifications**

Dr. LaRue is supremely qualified to render opinions regarding preparation of tax returns and the tax-return review/selection process. Dr. LaRue has considerable experience with the preparation of, and with the rules and procedures relating to the preparation of, all types of tax returns, whether for partnerships, individuals, or other entity types. He is also quite familiar with the audit selection

---

[25]LaRue Declaration, ¶ 23.4.

[26] LaRue Declaration, ¶ 23.4.

process for tax returns. The plaintiffs simply ignore Dr. LaRue's vast experience in favor of attacking him for his alleged lack of formal audit training and experience relating to IRS "classifiers." [27]

The education, training, knowledge, skill, and experience that Dr. LaRue has gained in over thirty years of study and practice in this field includes regular, sustained professional interactions with hundreds of graduate and undergraduate accounting students, and with thousands of tax professionals and tax return preparers working for three of the largest public accounting firms in the world and for others. A brief summary of Dr. LaRue's academic and professional education and experience is presented in his Report at page one. His Curriculum Vita is attached to that Report as Appendix A. Some of the highlights of the descriptions set forth in Dr. LaRue's report and Curriculum Vita are set out below.

Dr. LaRue holds a Bachelor of Business Administration degree (majoring in production logistics management); a Master of Science in Accountancy degree, majoring in accounting and federal taxation; and a Ph.D. degree (with honors), with major fields of study in accounting and taxation, and a supporting field of study in economics.[28] Throughout his career, he has consistently

---

[27]Even if the plaintiffs were not so terribly wrong about its allegations regarding IRS experience, the law is clear that a lack of such experience would not affect admissibility. As described by the Seventh Circuit Court of Appeals, "The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific) in character. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness. Fed.R.Evid. 702; Advisory Committee's Notes to 1972 Proposed Rule 702." *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (internal citations omitted).

[28]LaRue Declaration, ¶ 17.

engaged in a wide range of academic and professional activities to further develop, refine, and expand his knowledge, skill, and experience in his fields of expertise.[29] Those activities have enabled him to gain an in-depth knowledge and understanding of, among much else, the manner in which transactions and activities are to be reported on tax returns ("tax compliance") and how those returns would be evaluated by knowledgeable and experienced tax professionals.[30]

Dr. LaRue is currently an Associate Professor of Commerce at the McIntire School of Commerce at the University of Virginia, where, throughout the past twenty-four years, he has taught graduate and undergraduate courses on a wide range of subjects in the fields of taxation, accounting, and finance.[31] He also served as the Director of the Graduate Accounting Program from 2000 through 2005.[32] In May, 2008, he will retire with promotion to Professor Emeritus at the University of Virginia.[33]

Each of the graduate and undergraduate tax courses Dr. LaRue has developed and taught at the University of Virginia have included lectures and case studies that have addressed the manner in which the covered transactions and activities were required to be reported and disclosed on the various federal income tax returns and attachments thereto.[34] Some of those classes addressed the

---

[29]LaRue Declaration, ¶ 18.

[30]*Id.*

[31]LaRue Declaration, ¶ 19.

[32]*Id.*

[33]*Id.*

[34]*Id.*

procedures and processes used by the IRS to determine which returns it will select for audit.[35] In this context, Dr. LaRue taught, reviewed, and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions.[36]

Since 1979, Dr. LaRue has been retained as a consultant by three of the "Big-4" international public accounting firms.[37] Those retaining firms are KPMG, Ernst & Young, and Deloitte & Touche.[38] He was also retained by Arthur Andersen, by the Washington National Office of the IRS Chief Counsel (retained by NYU Graduate School of Law), by the American Institute of CPAs, by Citigroup, and by several others.[39] His work for these firms primarily involved the teaching and/or development of over two hundred 1-day, 3-day, and 5-day technical in-house training programs in the fields of individual income taxation, taxation of property transactions, partnership taxation, corporate taxation, international taxation, taxation of corporate mergers and acquisitions, taxation of consolidated corporate tax returns, accounting periods and methods, and in other subject areas.[40] Most or all of these programs included coverage of the manner in which the transactions and activities were to be reported on the tax returns and coverage of other compliance issues. Some programs covered IRS tax administration and the process by which tax returns are reviewed and

---

[35]*Id.*

[36]*Id.*

[37]LaRue Declaration, ¶ 20.

[38]*Id.*

[39]*Id.*

[40]*Id.*

selected for audit.[41] Most of these programs were developed and taught to the staff-level and senior-level accountants who were responsible for the initial preparation and review of the tax returns prepared for the firms' individual, corporate, and partnership clients.[42] Some of these programs were developed and taught to management-level and partner-level tax accountants, whose responsibilities typically included the final review of the clients' tax returns and the signing of those returns on behalf of the firm.[43] Many of these participants, particularly manager-level and partner-level participants, were involved in tax controversies with the IRS and represented the firms' clients at various levels before the IRS.[44] In this context, Dr. LaRue taught, reviewed, and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions.[45] Additionally, participants to these seminars regularly sought Dr. LaRue's advice on various technical and tax-compliance issues that arose in connection with pending client-related tax returns, tax controversies, and other projects.[46] Over the years, Dr. LaRue evaluated and informally advised on hundreds of client-specific issues for the tax professionals who attended his seminars.[47]

Since 1994, Dr. LaRue has been retained as an expert in several cases, many of which were

---

[41]*Id.*

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]*Id.*

[46]*Id.*

[47]*Id.*

settled prior to trial, and some of which are still pending.[48] In each of the cases for which he agreed to serve as an expert, it has been with the explicit understanding that he would review the facts and render his opinions objectively, independently, and without bias.[49] Dr. LaRue was retained as an expert by various government agencies including the IRS Chief Counsel's Office, but also by private firms such as Ernst & Young and the law firms Clifford Chance, Fox Rothschild, Heller Ehrman, and Lash & Goldberg.[50] Dr. LaRue has been recognized as an expert in taxation, accounting, economics, and/or finance in ten cases.[51]

As the above discussion demonstrates, Dr. LaRue is eminently qualified to opine on the issues he addressed in his Report and in his Rebuttal Report. His education, knowledge, training, skill, and experience are the product of his graduate and post-graduate education and study, and of the wide range of sustained academic and professional activities and accomplishments that have characterized the past thirty years of his professional career.[52]

To support their argument that Dr. LaRue is unqualified to opine on factual issues of tax compliance and the return selection process, plaintiffs assert that "the beginning and the end of LaRue's knowledge about [how the IRS selects returns for audit] is derived from a publicly-available GAO report that he reviewed a couple of days before the deposition and months after

[48]LaRue Declaration, ¶ 21.

[49]*Id.*

[50]*Id.*

[51]*Id.*

[52]LaRue Declaration, ¶ 22.

issuing his expert report."[53] This assertion is not only belied by Dr. LaRue's vast and varied experience, as detailed above, in the whole area of tax compliance but also is a gross mischaracterization of his deposition testimony. What Dr. LaRue made clear at his deposition was that the *GAO Report* merely provided additional confirmation of what he had already known about the IRS's return selection process in his 30 years of experience in the field. [54]

> Q. Is this GAO report the source of your knowledge of the IRS examination function?
>
> A. It is ***a*** source of my knowledge. I've been in the tax business for the last 30 years of my life. Over that period of time, in connection with my teaching and in connection with my normal reading and understanding of the tax law, reading the tax literature and so forth, the subject of IRS selection of returns for audit comes up frequently.
>
> Q. When did you review this GAO report?
>
> A. I reviewed this report on Saturday.
>
> Q. Did you review it before preparing your expert opinions here?
>
> A. No.
>
> Q. So is it fair to say in rendering your opinions, which are Exhibits 1, 3 and 6, you relied on your past experience, but not this GAO report?
>
> A. My past experience was **confirmed** by this GAO report.[55]

---

[53]Plaintiffs' Memorandum, p. 20.

[54]As he stated at this deposition:
Q. Have you ever studied the return selection process within the IRS?
A. I have.
Q. You have?
A. Of course.
Q. When did you do that?
A. Over the last 30 years. It's something that comes up frequently. LaRue Dep. Tr., Vol. 1, 31:21-32:4.

[55]LaRue Dep. Tr., Vol. 1, 34:25-35:18. Emphasis supplied.

Plaintiffs also argue that Dr. LaRue can only speculate regarding the training of IRS classifiers.[56] This argument is based on a faulty premise. Although he was asked about the education and training of IRS classifiers at his deposition, Dr. LaRue's opinions on the "Risk of Audit Issues" are not focused on the specific training or the decision processes of IRS classifiers. This is because IRS classifiers obviously had no involvement in the design of the Transaction or the preparation of the Returns reporting the various elements of the Transaction. Rather, Dr. LaRue's opinions and conclusion are based on the perceptions of professionals who would have the same level of knowledge and experience as those who were involved in the design and reporting of the COBRA Transaction. It is these individuals who were responsible for how the various elements of the Transaction were divided between and reported on the various Tax Returns. In any event, for obvious reasons, any detailed "checklists" of what classifiers are to look for when reviewing tax returns are all closely guarded secrets within the IRS and are not publicly available.[57] In short, plaintiffs totally misconceive the focus of Dr. LaRue's opinions.

In preparing his reports in this case, Dr. LaRue applied his knowledge, training, skill, experience, and cumulative insights, particularly the insights gained from the regular, sustained professional interactions he had with hundreds of graduate and undergraduate accounting students, and with thousands of tax professionals and tax-return preparers throughout the past thirty years to: (1) review the various Tax Returns and other documents in this case; (2) analyze and evaluate the manner in which the COBRA Transaction (and the various elements of the Transaction) and "losses" were respectively reported on the Tax Returns; (3) determine whether or not a reasonably diligent

---

[56]Plaintiffs' Memorandum pp. 20-21.

[57]LaRue Declaration, ¶ 14.

and independent review of the information disclosed on or with these respective returns by an experienced tax professional would have or should have revealed or provided any reasonably discernable indication of certain specified elements of the COBRA Transaction and "losses" (*e.g.*, existence and magnitude of the Transaction-related fees that were accrued and paid, the source of the taxpayers' tax bases in the Murphy partnerships, etc.); (4) opine as to whether or not, taking into account all of these factors, it would be objectively reasonable to conclude that these returns were, from the perspective of a knowledgeable and experienced tax professional, prepared in a manner that could reasonably be expected to reduce or to minimize the risk that the tax consequences of the Transaction would be detected by the IRS, and, ultimately, that the tax returns would be selected for audit by the IRS; and (5) opine as to whether or not certain amounts were properly reported on the various schedules on the Tax Returns, and whether or not the manner in which these amounts were reported could have reasonably been expected to increase the risk of detection and audit by the IRS.[58] Thirty years at the highest levels of the profession have more than qualified Dr. LaRue to lend his expertise to this case. Only by misrepresenting Dr. LaRue's experience and conclusions do the plaintiffs manage to challenge his qualifications.

## III. Dr. LaRue's Analyses, Reports, and Testimony Are Crucial to a Full Adjudication of This Case and Provide Necessary Assistance for the Court in Analyzing the COBRA Transaction.

The plaintiffs' generic allegations that Dr. LaRue's Report and testimony "are not helpful" to the Court are based principally on the following false and legally incorrect allegations: (1) Dr. LaRue impermissibly summarized factual evidence; (2) he considered information irrelevant to his inquiry; (3) he testifies about witnesses' states of mind; and (3) he opines about legal issues.

[58]LaRue Declaration, ¶¶ 4-5, 16-22.

### A. Dr. LaRue's Required Factual Summaries Provide the Necessary Context and Support for His Conclusions and Also Enable the Plaintiffs to Properly Evaluate the Accuracy and Completeness of the Facts on Which Dr. LaRue's Conclusions are Based.

Regarding the plaintiffs' "factual summary" argument, Dr. LaRue's factual descriptions of the Tax Returns and other related documents were essential for the sake of the readers. Dr. LaRue's Report contains detailed descriptions of the Tax Returns and certain of the participants' own documents that he deemed relevant to his analyses, conclusions, and opinions. Dr. LaRue appropriately included those descriptions and factual summaries in his Report for two essential reasons: to provide the context, background, and support for his analyses, conclusions, and opinions; and to provide the transparency that would enable the plaintiffs, its attorneys, and its proffered experts to independently evaluate the accuracy and the completeness of the facts on which Dr. LaRue's analyses, conclusions, and opinions are based.[59]

Dr. LaRue's analyses and conclusions, and the terms used and facts reported, were entirely unbiased. The reporting of the COBRA Transaction was extremely complex. More than two million pages of documents were produced and provided to Dr. LaRue for review and analysis. In analyzing the record, Dr. LaRue endeavored to provide an accurate, complete, readable, understandable, and objective description of these facts in order to provide the background and support for his analyses, conclusions, and opinions.[60] No doubt, had he failed to do so, the plaintiffs would be arguing that his conclusions were unsupported.

Furthermore, such factual support is *required* by the Federal Rules of Evidence and the

---

[59] LaRue Declaration, ¶ 26.

[60] *Id.*

Federal Rules of Civil Procedure. The Federal Rules of Evidence require experts to base their testimony on "sufficient facts or data." Rule 702 expressly provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) **the testimony is based upon sufficient facts or data,** (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. (Emphasis added).

Rule 703 is even more instructive. That rule provides, in part, that:

> The **facts or data in the particular case upon which an expert bases an opinion or inference** may be those perceived by or made known to the expert at or before the hearing. If of a **type reasonably relied upon** by experts in the particular field in forming opinions or inferences upon the subject, **the facts or data** need not be admissible in evidence in order for the opinion or inference to be admitted.[61]

(Emphasis added).

Finally, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires an expert to specify in his or her report the "data or information" considered by the expert in formulating his or her opinions. The Rule provides in pertinent part that

> The [expert] report must contain:
>
> (i) a complete statement of all opinions the witness will express **and the basis and reasons for them**;
> (ii) **the data or other information considered by the witness in forming them**.

(Emphasis added).

The plaintiffs' blanket assertion that it is improper for experts to summarize evidence is

---

[61]*See also*, *Highland Capital Management, L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005) ("an expert must of course rely on facts or data in formulating an expert opinion" (citing Rule 703));

legally incorrect. To the contrary, Rule 702 expressly specifies that one of the two fundamental roles of an expert is to "**assist the trier of fact to understand the evidence or** to determine a fact in issue." (Emphasis added.) Plaintiffs cite the *Securities and Exch. Comm'n v. Lipson*[62] for the proposition that "[e]xpert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand." Although this principle is correct, it has no applicability here. Indeed, the very reason why Dr. LaRue's testimony is so important is because the issues upon which he opines are *not* so easily or readily understandable. Given the lengths to which the taxpayers and promoters went to conceal the COBRA Transaction on the Tax Returns, the Court would have an extremely difficult (if not impossible) task in trying to understand the various elements of the COBRA Transaction and how it was reported on the Tax Returns. Dr. LaRue's report represent the culmination of the hundreds of hours he spent painstakingly analyzing the COBRA Transaction and determining how the Transaction was reported on the Tax Returns. In short, Dr. LaRue's reports and testimony are the hallmark of expert witness analysis from someone with his skills.

Moreover, in contrast to the plaintiffs' assertions, courts have expressly allowed tax experts to testify as summary expert witnesses in the context of complex issues in tax cases. For example, in *United States v. West*,[63] the United States introduced the testimony of an IRS agent as a summary expert witness in a criminal trial for conspiracy to avoid federal gasoline excise taxes. The Fifth Circuit held that the district court did not commit manifest error in admitting the testimony of the IRS agent. Specifically, the Fifth Circuit held that the agent "has specialized training and experience

---

[62] 46 F.Supp.2d 758, 763 (N.D. Ill 1998).

[63] 58 F.3d 133, 139-40 (5th Cir. 1995)

which made her adequately suited to assist the jury in understanding the large amount of documentary evidence presented by the government and the tax implications."[64] Thus, even assuming that Dr. LaRue was merely summarizing factual evidence (which he is clearly not), this would be a proper role for an expert witness.

In attempting to paint Dr. LaRue as merely a "summary" witness, the plaintiffs criticize one of Dr. LaRue's conclusions regarding why the taxpayers may have used single-member limited liability companies as part of the COBRA Transaction. The plaintiffs fault Dr. LaRue for failing to consider that it was the Deutsche Bank, one of the promoters of the COBRA Transaction and the financial entity executing the digital option trades, that suggested the use of limited liability companies for purposes of executing the digital option trades. Apart from the fact that this criticism is solely addressed to the weight that should be given to this conclusion, plaintiffs once again mischaracterize Dr. LaRue's analysis.

In fact, as the plaintiffs even concede in their Memorandum, Dr. LaRue stated in his report that it "would be reasonable to conclude that *one of the purposes*, perhaps the principal purpose, for the creation and use of the LLCs in connection with the implementation of the COBRA Strategy was to minimize or reduce the risk of detection and audit by reducing the possibility that the IRS might trace the ownership" of the Murphy partnerships.[65] Thus, Dr. LaRue clearly did not foreclose the possibility that it was Deutsche Bank that suggested the use of limited liability companies to execute

---

[64] *Id.* at 140. *See also United States v. Stone*, 222 F.R.D. 334, 337-39 (E.D. Tenn. 2004) (listing cases in which IRS agents have provided admissible "summary expert" testimony), *aff'd*, 432 F.3d 651 (6th Cir. 2005), *cert. denied*, 127 S.Ct. 129 (2006).

[65] Expert Report of David W. LaRue, Ph.D., dated June 1, 2007 (the "LaRue Report"), p.24, ¶45 (emphasis added).

the digital option trades, a fact which he made clear in his deposition testimony, and as to which plaintiffs noticeably fail to cite.[66]

**B. The Plaintiffs Misconstrue Dr. LaRue's Reports and Testimony as Providing an Opinion on the "Risk of Detection" Issue – Dr. LaRue is Not Merely Opining on Whether the Transaction was Reported In a Manner to Avoid the Risk of Detection.**

The plaintiffs' assertion that Dr. LaRue is merely opining on the "Adequate Disclosure Issues" represents yet another mischaracterization of Dr. LaRue's reports and testimony. To begin with, as discussed *infra*, Dr. LaRue never uses the term "adequate disclosure" in his reports and is not opining on such an issue.[67] Furthermore, it is important to note that Dr. LaRue was given *two* tasks with regard to this matter. First, Dr. LaRue was asked to review the documentary evidence pertaining to the COBRA Transaction and review the Tax Returns in an attempt to determine how the taxpayers reported the COBRA Transaction on the Tax Returns.[68] Second, Dr. LaRue was asked to determine whether it was reasonable to conclude, based on how the COBRA Transaction was reported on the Tax Returns, that the Transaction was reported in a manner designed to avoid the risk of detection or audit by the IRS.[69] One problem with the plaintiffs' analysis is that they solely focus on the latter part of Dr. LaRue's assignment. That is, they focus (and misconstrue) the "risk of detection" part of his assignment. They fail to grasp that it was first necessary for Dr. LaRue to analyze both the documentary evidence and the Tax Returns in an attempt to determine how the

[66]LaRue Dep. Tr., Vol. 1, 73:21:75:20.

[67]LaRue Declaration, ¶ 37.1.

[68]LaRue Declaration, ¶ 4.

[69]LaRue Declaration, ¶ 5.

COBRA Transaction was reported.

Even a cursory reading of Dr. LaRue's report indicates that his report consists of an extensive and acute analysis of *all* facts germane to his analyses and conclusions, which, as noted above, is required by the Federal Rules of Evidence and of Civil Procedure. To the extent Dr. LaRue reviewed documents other than the Tax Returns, these documents were clearly germane to his analyses and conclusions.[70] Had Dr. LaRue merely looked at the Tax Returns, to the exclusion of the thousands of pages of documents relevant to Dr. LaRue's inquiry, this surely would have been the basis of the plaintiffs' motion.

For example, one aspect of Dr. La Rue's analysis was to determine how and where on the returns the taxpayers reported the huge fees paid to the promoters. Since these amounts were nowhere described on any of the Tax Returns, Dr LaRue was required to determine whether these amounts (or portions thereof) were included in the tax bases that the taxpayers claim to have had in the assets that were sold to produce the claimed losses. To perform this analysis, he took the tax basis that each S Corporation used to compute the loss it reported on its 2000 Form 1120S from the sale of its COBRA Loss Asset, and worked backwards to determine how this amount was calculated. Critically, most of the information that was required to make these tedious and somewhat intricate calculations was not disclosed on or with any of the 2000 returns and was not ascertainable or reasonably ascertainable from the information presented on or with those returns.[71]

---

[70]LaRue Declaration, ¶ 32.

[71]LaRue Declaration ¶ 32. As Dr. LaRue observes, "[i]t would not have been possible from the information disclosed on or with the Returns, individually or collectively, to determine that substantial Transaction-related Fees had been paid to the Plaintiffs' legal and accounting advisors. *Id.*

The plaintiffs' nonsensical argument that Dr. LaRue's analysis "should begin and end with a review of nothing other than the tax returns"[72] also highlights the plaintiffs' inconsistency throughout their Memorandum regarding the documents plaintiffs' assert Dr. LaRue should have reviewed and considered. On the one hand, the plaintiffs criticize Dr. LaRue for his conclusions as to why the taxpayers may have used single-member limited liability companies as part of the COBRA Transaction. In particular, as previously noted, the plaintiffs criticize Dr. LaRue for allegedly not considering evidence that it was Deutsche Bank which suggested using a limited liability company to execute the option trades. On the other, though, the plaintiffs assert that that Dr. LaRue's analysis should "begin and end with a review of nothing other than the tax returns." The plaintiffs certainly need more than their "heads I win, tails you lose" arguments as the basis to exclude Dr. LaRue's reports and testimony.

### C. Dr. LaRue's Expert "Observations" Are Germane to His Analyses, Conclusions, and Opinions – Nowhere Does He Opine in Any Witnesses' Intent

Dr. LaRue does not render any opinion as to the state of mind, motivation, or subjective intent of the taxpayers, the promoters, those involved in the preparation and filing of the Tax Returns, or any other party involved in the COBRA Transaction.[73] Rather, he opines, based on the application of an objective standard, on the significance or potential significance of the information that was or was not disclosed on the Tax Returns (and how and where that information was or was not disclosed). This is clearly shown by the unambiguous language used in Dr. LaRue's Report to express his opinions, by the analyses and descriptions presented in his Report in support

---

[72] Plaintiffs' Memorandum, p. 9

[73] LaRue Declaration, ¶¶ 33-35.

of his opinions, and by his conclusions and opinions regarding whether or not various other elements of the COBRA Transaction were reasonably ascertainable from the disclosures made on or with the Tax Returns. Moreover, it cannot be stated more clearly than Dr. LaRue did at his deposition, in which he stated, without qualification or equivocation, that he was not testifying as to the subjective state of mind of the plaintiffs or of any of the parties involved in the COBRA Transaction.[74]

Dr. LaRue's opinions described above in this section are based on the application of an objective standard that looks to the decision processes and perceptions of knowledgeable and experienced tax professionals.[75] In applying this standard, Dr. LaRue evaluated the significance or potential significance of the information that was disclosed on the Tax Returns, evaluated how and where that information was disclosed.[76] He also evaluated the significance or potential significance of information that could have, or should have, been disclosed on or with those Tax Returns, but that was not disclosed.[77] Based on that review and analysis, Dr. LaRue concluded that the manner in which the COBRA Transaction and "losses" were reported on the Tax Returns was not sufficiently complete, descriptive, or, in some cases, accurate, to have enabled a knowledgeable and experienced tax professional to determine the nature of the Transaction and the source of the "loss" from an independent review of the filed tax returns.[78] On that basis, Dr. LaRue concluded that it would be objectively reasonable to conclude that the COBRA Transaction and "losses" were reported on the

[74]LaRue Declaration, ¶ 34. *See also* LaRue Dep. Tr., Vol. 1, 72:7-20.

[75]LaRue Declaration, ¶ 35.

[76]*Id.*

[77]*Id.*

[78]*Id.*

Tax Returns in a manner that could reasonably be expected to reduce or to minimize the risk that they would be detected by the IRS,[79] and, ultimately, that the Tax Returns would be selected for audit by the IRS.

Dr. LaRue used his decades of experience in applying objective standards to the facts of this case, which are contained in millions of pages of documents. That bears no resemblance to the facts of the case the plaintiffs rely on, albeit wastefully and incompletely, in its motion to exclude. The case the plaintiffs rely on primarily with respect to this argument is so easily distinguished from the instant case that one is left to question only the plaintiffs' motives in not fully describing them and their inapplicability. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) deals with three doctors opining on ethical standards and breaches of those standards. In each instance, the witness admitted that his opinion concerning ethical standards are based on personal, subjective views or "personal opinions," and lacked any reliable foundation. That court also found that the proffered testimony was unhelpful because the ethical considerations were irrelevant to the case, and related only perhaps to liability in the "court of public opinion . . . or before a divine authority."[80] In short, the *Rezulin* testimony failed both the relevance and reliability tests of *Daubert*. Furthermore, we are aware of no law or rule (and predictably, the plaintiffs do not cite one), or even a logical argument for the proposition, that an expert cannot make a neutral observation that is not essential to a particular opinion or opinions.

**D. Dr. LaRue Does not Opine About "Legal Issues."**

For good measure, the plaintiffs throw in the argument that Dr. LaRue's report is

[79] *Id.*

[80] *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 542-544.

> replete with opinions about legal issues and suggestions that the taxpayers did not comply with the Internal Revenue Code and the regulations. His final conclusions are, at their heart, legal conclusions about whether the taxpayers fulfilled the adequate disclosure standard set forth in 26 U.S.C. § 6662(d)(2)(B)(ii) and whether there was an effort to conceal certain positions from the IRS, which informs the question of whether the taxpayers should be penalized or not.[81]

Not surprisingly, the plaintiffs do not include any cites to Dr. LaRue's Report or deposition testimony where he opines on a "legal issue." That is because it is clear that Dr. LaRue is not opining on any legal issue, a point that Dr . LaRue emphatically makes in his deposition.[82] Dr. LaRue's opinions on the taxpayers' reporting of the COBRA Transaction are grounded upon the rules and instructions relating to the reporting of transactions on tax returns.

Moreover, plaintiffs misconstrue Dr. LaRue's opinions regarding "adequate disclosure" under Internal Revenue Code (26 U.S.C.) Section 6662(d)(2)(B)(ii). Dr. LaRue is not opining that the reporting of the COBRA Transaction on the Tax Return failed the standards for adequate disclosure under that provision. This is ultimately a legal issue that the Court will decide; Dr. LaRue *is not and cannot* opine on whether there was adequate disclosure within the meaning of the statute. Rather, Dr. LaRue's analysis consists of an explanation as to how the COBRA Transaction was reported on the Tax Returns and an opinion on whether, based on that reporting, it is reasonable to conclude that the Transaction was reported in such a manner so as to avoid the risk of detection or audit by the IRS. Nowhere in his report or testimony does Dr. LaRue give his opinion on whether the COBRA Transaction was adequately disclosed under any statutory provision and the plaintiffs' assertions are incorrect.

---

[81]Plaintiffs' Memorandum, p. 14.

[82]LaRue Dep. Tr., Vol. 1, 83:9-15. *See also* LaRue Declaration, ¶¶ 36-38.

Take, for example, Dr. LaRue's analysis of the Transaction-related fees paid by the taxpayers and the reporting of these fees on the Tax Returns. Dr. LaRue observes that the Transaction-related fees were capitalized and that, as a result, it would not have been possible for an experienced tax professional to have discerned the fact that these fees had been paid. Dr. LaRue did not opine on the legal issue of whether or not the Transaction-related fees *should have been* capitalized to the options or whether or not these fees were adequately disclosed.

## IV. Dr. LaRue's Analyses, Reports, and Testimony Are Relevant For Both the Determination of Whether Penalties are Applicable and the Determination of Whether the COBRA Transaction Lacked Economic Substance.

Incredibly, the plaintiffs assert that "the Adequate Disclosure Issues and the Risk of Audit Issues are both irrelevant to the issues that the Court must determine at trial ***because penalties are not at issue in this*** **case**."[83] Thus, according to the plaintiffs, because Dr. LaRue's report and testimony solely address these issues, his testimony is irrelevant and must be stricken. This contention is flatly wrong for multiple reasons. First, Dr. LaRue's analysis and conclusions relate not just to the penalty issues but also to the economic substance issue. Second, and even more fundamentally, penalties are indisputably at issue in this litigation. In three separate Notices of Final Administrative Adjustments ("FPAA"), the IRS asserted four separate accuracy-related penalties under I.R.C. §6662 against each Murphy partnership.[84] Assuming plaintiffs are not now conceding

[83] Plaintiffs' Memorandum, p.15 (emphasis added).

[84] The Murphy partnerships' FPAAs were attached as exhibits to the plaintiffs' complaints. *See* ¶ 10 of the FPAA attached to the complaints. The FPAAs asserted the following penalties:

(1) a 40% penalty for a gross valuation misstatement (§ 6662(b)(3) and (h));
(2) a 20% penalty for substantial valuation misstatement ( § 6662(b)(3));
(3) a 20% penalty for substantial understatement of income tax (§ 6662(b)(2)); and
(4) a 20% penalty for negligence or disregard of rules and regulations (§ 6662(b)(1)).

There is no stacking of penalties, so the maximum penalty is either 20% or 40% of the

the Murphy partnerships' liability for these penalties, then Dr. LaRue's analysis and conclusions are highly relevant to the issue of their applicability and/or any reasonable cause-good faith defense they plan to assert under I.R.C. § 6664(c).

In the first place, how the Transaction was reported on the Tax Returns as well as the "Risk of Audit Issue" are both directly relevant to the applicability of the negligence penalty under Section 6662(b)(1). This penalty applies if the taxpayer acted negligently or disregarded rules or regulations (hereinafter "negligence penalties"). Negligence is defined in Section 6662(c) to include, "any failure to make a reasonable attempt to comply with the provisions of this title." 26 U.S.C. § 6662(c). The Treasury regulations further define negligence to mean "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to *exercise ordinary and reasonable care in the preparation of a tax return*." Treas. Reg. §1.6662-3(b)(1).(Emphasis added.) Disregard is defined in Section 6662(c) to mean "careless, reckless, or intentional disregard" of rules or regulations.[85] The Treasury Regulations further define "careless," "reckless," and "intentional" as follows:

> A disregard … is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation. A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe. A disregard is "intentional" if the taxpayer knows of the rule or regulation that is disregarded.

Treas. Reg. § 1.6662-3(b)(2).

---

underpayment of tax, even if an underpayment is attributable to more than one type of misconduct. *See* Treas. Reg. § 1.6662-2(c).

[85] Rules and regulations are defined to include notices issued by the IRS. Treas. Reg. § 1.6222-3(b)(2).

In determining the applicability of this penalty, courts evaluate whether a taxpayer was negligent in his return positions under an objective standard. As recently explained by the Ninth Circuit, "The Code defines negligence as 'any failure to make a reasonable attempt to comply with the provisions of [the Code],' and requires the taxpayer to prove he acted with due care. Due care is an objective standard by which the taxpayer must show that he acted as a reasonable and prudent person would act under similar circumstances." *Hansen v. Comm'r,* 471 F.3d 1021, 1028 (9th Cir. 2006) (internal citations omitted); *see also McMurray v. Comm'r,* 985 F.2d 36, 42 (1st Cir. 1993) ("Negligence in this context is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances" (citing *Allen v. Comm'r*, 925 F.2d 348, 353 (9th Cir. 1991)); *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 233 (3d. Cir. 2002) ("Generally speaking, the negligence standard as in the tort context is objective, requiring a finding of a lack of due care or a failure to do what a reasonable and prudent person would do under analogous circumstances."); *Shrum v. Comm'r*, 33 F.3d 426, 437 (4th Cir. 1994).

Thus, whether the taxpayers made a "reasonable attempt" to comply with the internal revenue laws in reporting the COBRA Transaction, exercised "reasonable care" and "reasonable diligence" in preparing their tax returns relating to the Transaction, and engaged in "the standard of conduct that a reasonable person would observe" in reporting the COBRA Transaction on these returns are all fundamental issues in this litigation. These issues all directly relate to the applicability of the negligence penalty. Dr. LaRue's analysis and conclusions as to how the COBRA Transaction was reported on the Tax Returns is relevant to each of these basic issues. Moreover, contrary to plaintiffs' unsupported and unsupportable position, a taxpayer can be liable for the negligence penalty even where he has no personal knowledge of any reporting errors if he failed to "*exercise*

*ordinary and reasonable care"*[86] in overseeing the preparation of the returns.[87] In sum, Dr. LaRue's analsyis and conclusions regarding how the COBRA Transaction was reported on the Tax Returns and whether based on objective factors, the returns were prepared in a manner to minimize or eliminate the actual or perceived risk of detection of the Transaction are highly relevant issues to the applicability of the negligence penalty.

Secondly, the "Adequate Disclosure" and "Risk of Audit" issues are also relevant to the applicability of the substantial understatement penalty under Section 6662(b)(2). Section 6662(d)(2)(B)(ii) reduces the substantial understatement penalties to the extent that the facts underlying the item(s) giving rise to the understatement are "adequately disclosed" either in the return or in a statement attached to the return. Plaintiffs' argue that the "adequate disclosure" issue is irrelevant to this penalty because they are "not relying on [the adequate disclosure provision in] 26 U.S.C. § 6662(d)(2)(B)(ii) to reduce the amount of any potential understatement."[88] To support this argument, plaintiffs assert that they did not file a Form 8275, which they say is voluntary, and therefore cannot rely on this provision. Plaintiffs cite no authority for this position and, insofar as we can tell, there is none. Although the reduction in the understatement penalty for adequate disclosure does not apply to any item which is attributable to a "tax shelter,"[89] plaintiffs have never conceded that the COBRA Transaction is a tax shelter within the meaning of § 6662(d)(2)(C). Thus,

[86]Treas. Reg. §1.6662-3(b)(1).

[87]Plaintiffs' Memorandum p. 12. Critically, the evidence adduced at trial will show that the taxpayers entrusted the responsibility for preparing and ensuring the accuracy and correctness of their COBRA returns to Ernst & Young, the same promoter who was intricately involved in the design, marketing, and implementing of their COBRA Transactions, and to whom they paid an enormous fee based on their desired tax losses.

[88]Plaintiffs' Memorandum p. 14.

[89]§ 6662(d)(2)(C).

the "adequate disclosure" provision appears to remain at issue in this litigation and, if so, Dr. LaRue's analysis and conclusions are also directly related to this issue.

Thirdly, the manner of reporting the COBRA Transaction is also critically relevant to any determination of the taxpayers' already-proffered good-faith and reasonable-reliance defense to penalties. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances."[90] "Reliance on professional advice . . . or other facts . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."[91]

In *Long Term Capital Holdings*, the court rejected Long Term's "good faith" defense to penalties because of Long Term's attempt to conceal the transaction on its partnership tax return.[92] That court described the plaintiff's "apparent steps to conceal the tax losses . . . on the tax returns to thereby potentially win the audit lottery and evade IRS detection."[93] The "apparent steps to conceal" included Long Term's reporting of its tax losses as "Net Unrealized Gains" on line 6 of Schedule M-1 of its 1997 tax return.[94] The court described the purpose of Schedule M-1 "to notify the IRS of differences in book income/loss and tax income/loss," and describes the process by which Long Term combined on one line of a tax return the income recorded on the books not included in tax income and deductions not charged against book income, which should have been separately

---

[90]26 C.F.R 1.6664-4 (b)(1).

[91]*Id.*; *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 206 (D. Conn. 2004); *aff'd by unpublished order*, 150 Fed. Appx. 40 (2d Cir. 2005).

[92]*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d at 192-193.

[93]*Id.*

[94]*Id.*

reported.[95] For this Court to determine whether similar acts of concealment or misstatements exist on various lines and in various portions of the Tax Returns, it is essential to have the assistance of an expert who can testify as to the hundreds of pages of tax returns and attachments.[96]

Finally, the manner in which the plaintiffs reported the COBRA Transaction on the Tax Returns is relevant to the determination of whether the COBRA Transaction lacked economic substance. It is the position of the United States that the COBRA Transactions in this case lack economic substance. Under the economic substance doctrine, transactions that are invented solely to create tax deductions and otherwise have no economic substance will not be recognized. *Knetsch v. United States*, 364 U.S. 361, 365-366 (1960) (disregarding a transaction where the taxpayers paid a "fee for providing the facade of 'loans' whereby the [taxpayers] sought to reduce their ... taxes[,]" because "there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction"). There is a two-prong test for determining economic substance. The first prong examines whether the transaction "has no economic substance because no reasonable possibility of a profit exists" (an objective inquiry). *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781-82 (5th Cir. 2001) (internal citation omitted; emphasis added). The second prong looks to whether there existed a tax-independent business purpose for the transaction (a subjective

[95] *Id.*

[96] We note, for the sake of completeness, that this Court may lack jurisdiction to determine whether, in defense to penalties, the taxpayers acted with reasonable cause and in good faith. In short, a court presiding over a TEFRA partnership-level case like this one does not have jurisdiction to consider partner-level defenses to any penalty. Treas. Reg. § 301.6226(f)-1(a); *See also, Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, *7, *163 (Ct. Cl. 2007). Partner-level defenses are limited to those that are personal to the partner or are dependent on the partner's separate return. Temp. Treas. Reg. § 301.6221-1T(d) (1999). In that regard, a partner's reasonable belief that the tax treatment of an item was more likely than not the proper treatment is in the nature of a partner-level defense, the availability of which this Court may not have jurisdiction to determine.

inquiry). *Id. See also Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1356 and n. 16 (Fed. Cir. 2006). Although a split exists among the Circuits on the weight to give each prong, all courts appear to consider both. *See Compaq Computer Corp. v. Comm'r.*, 277 F.3d at 781-782.

The reporting of the COBRA Transaction on the Tax Returns and the lengths to which taxpayers and promoters went to conceal the COBRA Transaction is certainly relevant to the determination of whether the COBRA Transaction had a *tax-independent business purpose*. For example, the Court could certainly question why the plaintiffs and promoters attempted to conceal the COBRA Transaction on the Tax Returns if the Transaction was truly entered into for a legitimate business purpose. Dr. LaRue's Report, analyses and testimony is certainly relevant and will unquestionably aid the Court in this endeavor.

In sum, the manner of reporting of the COBRA Transaction on the Tax Returns is critical to many issues in this case, including whether there is evidence that the taxpayers engaged in an abusive tax shelter and took steps to conceal it or, alternatively, whether they failed to "*exercise ordinary and reasonable care*" in overseeing the preparation of the returns.

## V. The "Standard" Dr. LaRue Applied Is Perfectly Consistent with the Appropriate Legal Standard Employed in Determining the Applicability of the Negligence Penalty.

The plaintiffs once again misunderstand the tasks which Dr. LaRue was requested to perform with regard to analyzing the COBRA Transaction and the opinions resulting from his analyses. To repeat, Dr. LaRue was requested to perform, and in fact performed, two tasks: first, Dr. LaRue was asked to review the documentary evidence pertaining to the COBRA Transaction and review the Tax Returns in an attempt to determine how the COBRA Transaction was reported on the Tax Returns; second, Dr. LaRue was asked to determine whether it was reasonable to conclude, based on how the COBRA Transaction was reported on the Tax Returns, that the Transaction was reported in a

manner designed to avoid the risk of detection or audit by the IRS. As previously noted, the plaintiffs' arguments in its Memorandum seemingly focus on the second task.

With respect to Dr. LaRue's first task, there is obviously no "standard" to be applied to Dr. LaRue's review of the Tax Returns and supporting documentation. The reporting of the COBRA Transaction can best be described as of byzantine complexity, a fact evidenced by the more than two-million pages of documents produced and provided to Dr. LaRue for review and analysis. In analyzing the record, Dr. LaRue endeavored to provide an accurate, complete, readable, understandable, and objective description of the Transaction to provide the background and support for his analyses, conclusions, and opinions in an attempt to piece together how the COBRA Transaction was reported on the Tax Returns.

With respect to Dr. LaRue's second task, Dr. LaRue's opinions are based on the application of an objective standard that looks to the decision processes and perceptions of knowledgeable and experienced tax professionals.[97] As noted above, in determining the applicability of the negligence penalty, courts also evaluate whether a taxpayer exercised due care in his return positions under an objective standard. "Due care is an objective standard by which the taxpayer must show that he acted as a reasonable and prudent person would act under similar circumstances." *Hansen v. Comm'r*, 471 F.3d 1021, 1028 (9th Cir. 2006).

Dr. LaRue used the same standard in evaluating the significance or potential significance of the information that was disclosed on the tax returns, and how and where that information was disclosed.[98] Applying that standard, Dr. LaRue concluded that the manner in which the COBRA

---

[97]LaRue Declaration, ¶¶ 35, 39, 41.

[98]*Id.* Dr. LaRue also evaluated the significance or potential significance of information that could have, or should have, been disclosed on or with those Tax Returns, but that was not

Transaction and "losses" were reported on the Tax Returns was not sufficiently complete, descriptive, or, in some cases, accurate, to have enabled a knowledgeable and experienced tax professional to determine the nature of the transaction and the source of the "loss" from an independent review of the filed returns.[99] On that basis, Dr. LaRue concluded that it would be objectively reasonable to conclude that the COBRA Transaction and "losses" were reported on the Tax Returns in a manner that could reasonably be expected to reduce or to minimize the risk that they would be detected by the IRS,[100] and, ultimately, that the Tax Returns would be selected for audit by the IRS. In short, the "standard" Dr. LaRue applied is perfectly consistent with the appropriate legal standard employed in determining the applicability of the negligence penalty.

The plaintiffs further attempt to manufacture out of whole cloth an argument that Dr. LaRue somehow used the "wrong standard" through the discussion of "generally accepted accounting principles" ("GAAP"). The plaintiffs quote incomplete portions of Dr. LaRue's deposition in an attempt to create an inconsistency between Dr. LaRue's Report and his deposition. Dr. LaRue recognizes that the taxpayers did not use GAAP in completing the Tax Returns or in keeping their books and records.[101] As evidenced by the more complete version of Dr. LaRue's deposition testimony cited in his Declaration, essentially what Dr. LaRue was indicating that it does not matter what method of accounting was used; whether the taxpayers used GAAP or some other method of accounting, in his experience, he has not seen the accounting employed by the taxpayers in this

---

disclosed. *Id.*

[99]*Id.*

[100]*Id.*

[101]LaRue Declaration, ¶¶ 42-43.

case.[102] That is, Dr. LaRue has not seen any method of accounting that allows a taxpayer to record an asset at a value which is far in excess of its actual value, which is how the COBRA Loss Assets were reported on Schedule L of the taxpayers' Subchapter S Tax returns.[103]

**CONCLUSION**

The United States retained Dr. LaRue to testify as an expert in return preparation, reporting, and return compliance and in accounting to assist the Court in making its own determinations relating to the manner in which certain Transaction-related items were reported on the Tax Returns. Informed determinations relating to the reporting on these complex Tax Returns would be impossible without an expert's assistance, and those determinations lie at the heart of this tax case.

Dr. LaRue was provided with, and in fact demanded, access to all evidence obtained in discovery in this case. He examined the evidence without interference. He thoroughly examined the Tax Returns, along with other documents in the vast database of documents. Based on his review and analysis, Dr. LaRue reached his conclusions, and presented them in an unbiased fashion and in accordance with the applicable rules which require the inclusion in reports of supporting data.

The plaintiffs' allegations are baseless and in many instances gross mischaracterizations of his analysis or deposition testimony. Even so, at best they go to the weight and not the admissibility of Dr. LaRue's testimony and reports. We respectfully request the Court to read Dr. LaRue's reports in their entirety. The Court will find Dr. LaRue's qualifications, outlined in the Appendix and in the attached Declaration of Dr. LaRue, to be outstanding. It will also be clear that Dr. LaRue's clear

---

[102] *Id.*

[103] *Id.*

and well-reasoned and well-supported conclusions will assist the Court in making important determinations in this case. Finally, it will be clear that the plaintiffs' allegations are meritless, and that its motion to exclude should be denied.

Respectfully submitted,

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2008, I electronically filed the foregoing **UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE GOVERNMENT EXPERT DAVID LARUE** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

/s/ Dennis M. Donohue
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov