**UNITED STATES COURT OF FEDERAL CLAIMS**

**Nos. 06-245T, 06-246T, and 06-247T**
**(Consolidated)**

| | |
|---|---|
| MURFAM FARMS, LLC, | § |
| By and Through Wendell H. Murphy, Jr., | § |
| a Partner Other Than Tax Matters Partner | § |
| | § |
| PSM FARMS, LLC | § |
| By and Through Stratton K. Murphy, | § |
| a Partner Other Than Tax Matters Partner | § |
| | § |
| MURPHY PORK PARTNERS, LLC | § |
| By and Through Wendell H. Murphy, Jr., | § |
| a Partner Other Than Tax Matters Partner | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § |
| | § |
| UNITED STATES OF AMERICA, | § |
| | § |
| Defendant. | § |

**DECLARATION OF DR. DAVID W. LARUE**
**IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE**

I, David W. LaRue, Ph.D., declare:

1. I am an expert in the fields of taxation, accounting, and finance. My expertise in the field of taxation includes tax compliance and reporting of transactions and events on federal income tax returns, including the Form 1065 (Partnership), the Form 1120S (S Corporation) and the Form 1040 (Individual).

2. I was retained by the Department of Justice and designated as an expert in the above-styled consolidated cases.



GOVERNMENT EXHIBIT 1

## My Assignment in These Consolidated Cases

3. I was asked to examine the documents produced in this case, including the 2000 federal income tax returns (including all accompanying forms, schedules, statements, and attachments) **[“the Returns”]** of:

   3.1. PSM Farms, LLC **[“$PSM_{LLC}$”]** (Form 1065), PSM, Inc. **[“$PSM_{Inc}$”]** (Form 1120S), and of the individual stockholders of $PSM_{INC}$ (Form 1040s);

   3.2. Murphy Pork Partners, LLC **[“$MPP_{LLC}$”]** (Form 1065), Murphy Pork, Inc. **[“$MP_{Inc}$”]** (Form 1120S), and of the individual stockholders of $MP_{INC}$ (Form 1040s); and

   3.3. MURFAM Farms, LLC **[“$MURFAM_{LLC}$”]** (Form 1065), MURFAM, Inc. **[“$MURFAM_{Inc}$”]** (Form 1120S), and of the individual stockholders of $MURFAM_{INC}$ (Form 1040s),[1] and

4. Based on my examination of these Returns and other documents, I was asked, for each of these three sets of Returns, to:

   4.1. To determine and describe how the various elements of the Transactions-at-Issue [the “**Transactions**”] and the Losses-at-Issue [the “**Losses**”] were reported on these Returns;

   4.2. To determine whether or not any of the Returns identified and/or explained the source[2] of the Losses (or, if not, to determine whether or not the information disclosed on or with the Returns (either individually

---

[1] I refer to PSM, Inc., Murphy Pork, Inc. and MURFAM, Inc., collectively, as “the S Corporations.”

I refer to PSM Farms, LLC, Murphy Pork Partners, LLC, and MURFAM Farms, LLC, collectively, as “the LLCs.”

I refer to the individual stockholders of the S Corporations (Wendy M. Crumpler, Wendell H. Murphy, Wendell H, Murphy, Jr., Joyce Murphy Norman, Angela N. Brown, Harry D. Murphy, Marc D. Murphy, and Stratton K. Murphy) as the “Taxpayers.”

[2] By “source,” I mean the interrelated series of transactions that culminated in acquisition and sale of certain assets by the respective S Corporations to produce the Losses, the identities and roles of the participants in those transactions, and/or the method and/or rationale applied in calculating the S Corporations’ tax bases in their respective assets and, therefore, in determining the amount of their respective Losses.

or collectively) otherwise provided any indication, or any reasonably discernable indication, of the source of the Losses);

4.3. To determine whether or not, based solely on the information included on or with the Returns (either individually or collectively), the IRS could have determined that the Losses were the result of the assignment of a greatly inflated tax basis to certain bonds[3,4] and foreign currency[5] ["COBRA Loss Assets"] that the S Corporations sold to produce the Losses; and

4.4. To determine whether or not the Returns (either individually or collectively) disclosed (or otherwise provided any reasonably discernable indication) that accounting and legal fees totaling $2,507,530 had been incurred and paid, directly or indirectly, by the Taxpayers in 2000 in connection with the implementation of a strategy [the "COBRA Strategy"] that was designed from the outset to generate permanent tax losses,[6] and that did in fact generate claimed permanent tax losses in this case totaling approximately $100 Million.

4.5. Plaintiffs refer to these issues as the **"Adequate Disclosure Issues."**

5. I was also asked to determine whether or not, based on objective factors and on my review and analysis of the Returns and of the record in this case, it would be reasonable to conclude:

5.1. That the various elements of the Transactions were divided between and reported on the various Returns in a manner that was designed to

---

3 The tax basis assigned by $PSM_{INC}$ to the Bonds it received as a liquidating distribution from $PSM_{LLC}$ on or about December 27, 2000 was $24,583,205. This tax basis was 481.02 times greater than the $51,000 par value of those Bonds.

4 The tax basis assigned by $MURFAM_{INC}$ to the Bonds it received as a liquidating distribution from $MURFAM_{LLC}$ on or about December 27, 2000 was $61,670,815. This tax basis was 484.60 times greater than the $127,000 par value of those Bonds.

5 The tax basis assigned by $MP_{INC}$ to the Euros it received as a liquidating distribution from $MPP_{LLC}$ on or about December 27, 2000 was $14,230,000. This tax basis was 46.43 times greater than $MPP_{LLC}$'s $300,000 cost of those Euros.

6 See, for example, the *E&Y COBRA Presentation*. Bates: 2003EY001565 through 2003EY001583. ("What is Cobra? Permanent ordinary/short-term capital loss strategy" and "Currency Linked Digital Swap Example[:] Objective is to generate $50M loss").

reduce, minimize, or eliminate the risk of detection[7] and audit by the IRS, and/or

5.2. That the Transaction-related Fees paid to Ernst & Young and to Proskauer Rose with respect to each of the Transactions were reflected on the respective Returns in a manner that was designed to reduce, minimize, or eliminate the risk of detection[8] and audit by the IRS.

5.3. Plaintiffs refer to these issues as the **"Risk of Audit Issues."**

6. I submitted two written reports in these consolidated cases: an opening *Report* submitted on June 1, 2007, and a *Rebuttal Report,* submitted on July 2, 2007, to the *Expert Report of Stuart A. Smith* (May 30, 2007).

6.1. Although *Plaintiffs' Motion* requests that "all [of my] testimony and reports" be excluded, *Plaintiffs' Motion* does not refer to, discuss, question, or otherwise criticize anything in my *Rebuttal Report*.

7. I was deposed in this case on Monday and Tuesday, August 20 - 21, 2007 in Washington, D.C. at the U.S. Department of Justice.

## My Responses To Plaintiffs' Assertions

### Criticism #1: Qualifications as an Expert

8. In their *Motion*, Plaintiffs challenge my qualifications and experience as an expert in this case.

9. As I explain below, I am well qualified to opine on the issues that I have addressed in my *Report* and in my *Rebuttal Report.*

[7] By "detection," I refer to detection of the fact that the respective Losses ultimately resulted from the greatly inflated tax bases that the S Corporations and their stockholders, the Taxpayers, claimed to have resulted from the contribution of the Long Options and the Short Options previously made by those stockholders, through their respective single-member LLCs, to the capital of the LLCs.

[8] By "detection," I refer to detection of the fact that very large tax and legal fees (totaling $2,507,498) were incurred and paid in connection with the Transactions that generated the various Losses that were allocated to and among the Taxpayers and then deducted by the Taxpayers on their respective Form 1040s.

9.1. My education, my knowledge, my training, my skill, and my experience are the product of my graduate and post-graduate education and study, and of the wide range of sustained academic and professional activities and accomplishments that have characterized the past thirty years of my professional career.

## My Qualifications as an Expert

10. Plaintiffs assert that I am not qualified to opine on the "Risk of Audit Issues" since I have "no specialized experience or knowledge in how the IRS selects returns for audit." Plaintiffs contend that since "there is not a good fit between [my] assignment regarding the Risk of Audit Issues and [my] qualifications, the Court should exclude [my] expert report and testimony on these issues."[9]

10.1. Plaintiffs do not assert that I am not qualified to opine on the "Adequate Disclosure Issues."

11. Plaintiffs base their contention, in part, on the fact that I am a "finance and accounting" professor, and that I "do not have any relevant experience with or knowledge about how the IRS selects returns for audit."[10]

12. Plaintiffs consistently refer to me as a "finance and accounting" professor, and never as a "tax professor."

12.1. Plaintiffs fail to observe that throughout the past 30 years of my professional career the vast majority of the graduate and undergraduate courses that I have developed and taught were in courses in various fields of federal income taxation, including the taxation of partnerships and S corporations.

12.2. Plaintiffs also fail to observe that I have developed and taught hundreds of tax courses for each of the Big-4 public accounting firms (and others) throughout the past 28 years, that most of my research and publications are on federal income tax issues, that my testimony

9 *Plaintiffs' Motion*, at page 19.
10 *Plaintiffs' Motion*, at pages 19 and 20.

before Congress and the Treasury have been on federal income tax issues, and that I have been recognized as a tax expert in three[11] Federal District Courts.

13. Plaintiffs mischaracterize my deposition testimony when they state that "*the beginning and the end of LaRue's knowledge about [how the IRS selects returns for audit] is derived from a publicly-available GAO report that he reviewed a couple of days before the deposition and months after issuing his expert report.*"[12]

13.1. First, although I was asked several questions relating to the actual IRS return selection process at my deposition, my opinions on the "Risk of Audit Issues" are *not focused on the actual IRS return selection process, but rather on the perceptions (of that process) of tax professionals having the same level of knowledge and experience as those who were involved in the design of the Transaction and in the reporting of the various elements of the Transaction on the Returns.*[13]

13.2. Second, as I clearly stated at my deposition, the *GAO Report* merely provided additional confirmation of what I had already known about the IRS's return selection process. [14]

11 Since the filing of my *Report* in this case, I have been recognized as an expert in taxation, financial accounting, finance and economics by the Federal District Court (Newark, NJ) in *Schering-Plough Corporation v. U.S.*

12 *Plaintiffs' Motion*, at page 20. Emphasis in the original text.

13 See also discussion at ¶14.1 and ¶23.4 of this *Declaration*.

14 In a nutshell, the tax return selection process is a multi-step process that involves (a) quantitative and qualitative factors, such as the DIF score, and (b) the judgment and subjective decision processes of one or more IRS classifiers and examiners, each with his or her own unique educational background, scope and depth of experience, aptitude, etc.

While DIF scores and other tools and techniques are used by the IRS to help identify many of the tax returns that should be manually reviewed and considered for an IRS audit, the decision to either accept a particular tax return "as filed" or, conversely, to select that return for further evaluation and possible audit, is ultimately made by IRS personnel who are knowledgeable and experienced tax professionals.

Although the manner in which a taxpayer's transactions and activities are reported and disclosed (or not disclosed) on the tax return will affect the "actual" likelihood that that particular return will be selected for an IRS audit, it is generally impossible to know with certainty whether any specific disclosure (or nondisclosure) or whether the cumulative or combined effect of two or more disclosures (and/or nondisclosures) will necessarily increase

Q. Have you ever studied the return selection process within the IRS?

A. I have.

Q. You have?

A. Of course.

Q. When did you do that?

A. Over the last 30 years. It's something that comes up frequently.[15]

---

Q. Is this GAO report the source of your knowledge of the IRS examination function?

A. It is _a_ source of my knowledge. I've been in the tax business for the last 30 years of my life. Over that period of time, in connection with my teaching and in connection with my normal reading and understanding of the tax law, reading the tax literature and so forth, the subject of IRS selection of returns for audit comes up frequently.

Q. When did you review this GAO report?

A. I reviewed this report on Saturday.

Q. Did you review it before preparing your expert opinions here?

A. No.

Q. So is it fair to say in rendering your opinions, which are Exhibits 1, 3 and 6, you relied on your past experience, but not this GAO report?

A. My past experience was _*confirmed*_ by this GAO report.[16]

14. Plaintiffs also base their contention on the fact I do not have concise and definitive knowledge as to how IRS tax return "classifiers" are trained or what they are "taught to look at when reviewing returns."

---

the actual risk of detection and audit (and, if so, by what order of magnitude), decrease the actual risk of detection and audit (and, if so, by what order of magnitude), or have no effect on the risk of detection and audit. This is because:

- The specific types of tax return information and data that is captured and used in calculating a return's DIF score and the formula for calculating that score are closely guarded secrets within the IRS and are not otherwise publicly available or independently ascertainable, and, as noted above,
- The tax return selection process is ultimately based on the judgments and subjective decision processes of knowledgeable and experienced tax professionals.

15 *LaRue Deposition*, Volume 1, 31:22 – 32:4.

16 *LaRue Deposition*, Volume 1, 34:25 – 35:18. Emphasis supplied.

14.1. First, although I was asked several questions relating to IRS classifiers at my deposition, my analyses and opinions that address the "Risk of Audit Issues" are *not focused on the specific training or the decision processes of IRS classifiers, but rather on the perceptions of tax professionals having the same level of knowledge and experience as those who were involved in the design of the Transaction and in the reporting of the various elements of the Transaction on the Returns.*[17] For example:

> "In my opinion, based on my review of the record, it would be reasonable to conclude that:
>
> - "The various elements of the Transactions were divided between and reported on the various 2000 Returns in a manner *that was designed* to minimize or eliminate the risk of detection and audit by the IRS, and that
> - "The Transaction-related fees paid to E&Y and Proskauer Rose were reflected on the 2000 Returns in a manner *that was designed* to minimize or eliminate ~~to~~ the risk of detection and audit by the IRS."[18]

14.2. Second, for obvious reasons, the specific types of tax return information and data that is captured and used in calculating a tax return's DIF score,[19] the formula for calculating that score, and any detailed "checklists" of what classifiers are to look for when reviewing tax returns are all closely guarded secrets within the IRS and are not, to the best of my knowledge and belief, otherwise publicly available.

14.2.1. As I observed at my deposition, I have never seen any public disclosure that details the specific types of training that IRS classifiers receive or what they are specifically trained to look for on the tax returns that they review.[20]

---

[17] See also discussion at ¶23.4 of this *Declaration*.

[18] *LaRue Report*, ¶351, at page 192. Emphasis supplied.

[19] "DIF" stands for "discriminate inventory function, or simply "discriminant function." It is a computer-generated score assigned to a tax return and used by the IRS in the process of selecting returns for audit.

[20] *LaRue Deposition*, Volume 1, 40:9 – 41:11.

15. As I will discuss below, I am very knowledgeable regarding the manner in which transactions and activities are to be reported on the tax returns and how these returns would be evaluated by knowledgeable and experienced tax professionals.

**Educational Background, Professional Training, and Experience**

16. A brief summary of my academic and professional education and experience in presented in my *Report* at ¶1 through ¶3. My Curriculum Vita is attached to that *Report* as Appendix A.

17. **Formal Education:** I hold a Bachelor of Business Administration degree (majoring in production logistics management), a Master of Science in Accountancy degree (majoring in accounting and federal taxation), and a Ph.D. degree (with honors) (with major fields of study in accounting and taxation, and a supporting field of study in economics).

18. **Post-Doctoral Education, Research, Publication, and Service:** Throughout my career, I have consistently engaged in a wide range of academic and professional activities to further develop, refine, and expand my knowledge, skill, and experience in my fields of expertise. These activities are described in some detail below, as well as in my Curriculum Vita. These activities have enabled me to gain an in-depth knowledge and understanding of, among much else, the manner in which transactions and activities are to be reported on the tax returns ("tax compliance") and how these returns would be evaluated by knowledgeable and experienced tax professionals.

19. **University of Virginia:** I am currently an Associate Professor of Commerce at the McIntire School of Commerce at the University of Virginia, where, throughout the past twenty-four years I have taught graduate and undergraduate courses on a wide range of subjects in the fields of taxation,

accounting, and finance.[21] I also served as the Director of the Graduate Accounting Program from 2000 through 2005. In May, 2008, I will retire with promotion to Professor Emeritus of the University of Virginia.

19.1. Each of the graduate and undergraduate tax courses that I have developed and taught at the University of Virginia have included lectures and case studies that have addressed the manner in which the covered transactions and activities were required to be reported and disclosed on the various federal income tax returns and attachments thereto. Some of these classes addressed the procedures and processes used by the IRS to determine which returns it will select for audit.

19.2. In this context, I have taught, reviewed, and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions.

20. **Consulting Experience (Development and Teaching of Continuing Professional Education Programs)**: Since 1979, I have been retained as a consultant by three of the "Big-4" international public accounting firms (KPMG, Ernst & Young, and Deloitte & Touche), by Arthur Andersen, by the Washington National Office of the IRS Chief Counsel (retained by NYU Graduate School of Law), by the American Institute of CPAs, by Citigroup, and by several others.

20.1. My work for these firms primarily involved the teaching and/or development of over two hundred 1-day, 3-day, and 5-day technical in-house training programs in the fields of individual income taxation, taxation of property transactions, partnership taxation, corporate taxation, international taxation, taxation of corporate mergers and

[21] Prior to joining the faculty of the University of Virginia, I taught undergraduate tax and accounting classes at the University of Maryland and the University of Houston.

acquisitions, taxation of consolidated corporate tax returns, accounting periods and methods, and in other subject areas.

20.2. Most or all of these programs included coverage of the manner in which the transactions and activities were to be reported on the tax returns and coverage of other compliance issues. Some programs covered IRS tax administration and the process by which tax returns are reviewed and selected for audit.

20.3. Most of these programs were developed and taught to the staff-level and senior-level accountants who were responsible for the initial preparation and review of the tax returns prepared for the firms' individual, corporate, and partnership clients. Some of these programs were developed and taught to management-level and partner-level tax accountants, whose responsibilities typically included the final review of the clients' tax returns and the signing of those returns on behalf of the firm. Many of these participants, particularly manager-level and partner-level participants, were involved in tax controversies with the IRS and represented the firm's clients at various levels before the IRS.

20.4. In this context, I have taught, reviewed and evaluated hundreds of tax returns, tax schedules, and other disclosures required by the various provisions of the Internal Revenue Code, the Treasury Department Regulations, and IRS instructions. Additionally, participants to these seminars regularly sought my advice on various technical and compliance issues that arose in connection with pending client-related tax returns, tax controversies, and other projects. Over the years, I have evaluated and informally advised on literally hundreds of client-specific issues for the tax professionals who attended my seminars.

20.5. The education, training, knowledge, skill, and experience that I have gained in over thirty years of study and practice in this field includes regular, sustained professional interactions with hundreds of graduate and undergraduate accounting students, and with literally thousands of

tax professionals and tax return preparers working for three of the largest public accounting firms in the world and for others.

21. **Consulting Experience (Expert Witness)**: Since 1994, I have been retained as an expert in several cases, many of which were settled prior to trial, and some of which are still pending. In each if the cases for which I have agreed to serve as an expert, it has been with the explicit understanding that I would review the facts and render my opinions objectively, independently, and without bias.

21.1. I have been retained as an expert by the IRS Chief Counsel's Office, the Department of Justice (Tax Division), Department of Justice (Economic Crimes), Ernst and Young, and the law firms of Clifford Chance, Fox Rothschild, Heller Ehrman, and Lash & Goldberg.

21.2. I have been recognized as an expert in taxation, accounting, finance and/or economics in ten cases.[22] As of the date of this *Declaration*, and excluding the challenges in these COBRA cases, my recognition as an expert was challenged in five of these cases[23] and in two cases that have yet to go to trial.[24] One of these pre-trial challenges is pending,[25] but each of these other challenges was denied by the presiding court.

[22] *Schering-Plough Corporation v. U.S.* (2007-2008), U.S. Federal District Court; and *Consolidated Edison Company of New York, Inc. & Subsidiaries v. U.S.* (2007), U.S. Federal Claims Court; *Tyson Foods, Inc. and Subsidiaries v. U.S.* (2006), U.S. Tax Court; *TransCapital Leasing Associates 1990-II, L.P. v. U.S.* (2005), Federal District Court; *Ernst and Young, arbitration panel* (2002); *Coggin Automotive Corporation v. Commissioner* (1999), U.S. Tax Court; *Wal-Mart v. Commissioner* (1996), U.S. Tax Court *U.S. v. Perlman* (1996), U.S. Federal District Court; *The Kroger Company v. Commissioner* (1995), U.S. Tax Court; *Dayton Hudson Corporation v. Commissioner* (1994), U.S. Tax Court.

[23] *Schering-Plough Corporation v. U.S.* (pre-trial motion); *Consolidated Edison* (at trial); *TransCapital Leasing Associates 1990-II* (pre-trial motion); *Coggin Automotive Corporation* (pre-trial motion), *Dayton Hudson Corporation* (at trial).

[24] *Fidelity International Currency Advisor A Fund v. U.S.* (2008-trial pending), U.S. Federal District Court; and *Procter & Gamble v. U.S.* (2006 – trial pending), U.S. Federal District Court.

[25] *Fidelity International Currency Advisor A Fund v. U.S.* (2008-trial pending), U.S. Federal District Court.

22. As the above discussion has shown, I am well qualified to opine on issues that I have addressed in my *Report* and in my *Rebuttal Report.* My education, my knowledge, my training, my skill, and my experience are the product of my graduate and post-graduate education and study and of the wide range of sustained academic and professional activities and accomplishments that have characterized the past thirty years of my professional career.

**My Methodology**

23. In preparing my reports in this case, I applied my knowledge, training, skill, experience, and cumulative insights, particularly the insights gained from the regular, sustained professional interactions that I have had with hundreds of graduate and undergraduate accounting students, and with thousands of tax professionals and tax return preparers throughout the past thirty years:

23.1. To impartially review the various tax Returns and other documents in this case;

23.2. To impartially analyze and evaluate the manner in which the Transaction (and the various elements of the Transaction) and Losses were respectively reported on the Returns;

23.3. To determine whether or not *a reasonably diligent and independent review of the information disclosed on or with these respective returns by a knowledgeable and experienced tax professional would have or should have revealed or provided any reasonably discernable indication of certain specified elements of the Transaction and Losses* (e.g., existence and magnitude of the Transaction-related Fees that were accrued and paid, the source of the tax bases the S Corporations claimed to have had in the bonds and foreign currency that they sold to produce the claimed Losses);[26] and

[26] See, for example, the conclusions and opinions set forth in my *Report* at ¶214 - ¶217, ¶240, ¶256 - ¶259, ¶282, ¶299 - ¶302, ¶325, ¶344 - ¶346, and ¶349. As previously observed, Plaintiffs refer to these issues as the “Adequate Disclosure Issues.”

23.4. To opine as to whether or not, taking into account all of these factors, it would be *objectively reasonable* to conclude that these returns were, *from the perspective of a tax professional who would have had the same level of knowledge and experience as those involved in the design of the Transaction and in the reporting of the various elements of the Transaction on the Returns*, prepared in a manner that could reasonably be expected to reduce or to minimize the risk that the Transaction or the Losses would be detected by the IRS, and, ultimately, that the Returns would be selected for audit by the IRS.[27, 28]

**Criticism #2: Summary of Factual Evidence Is Appropriate and Necessary**

24. In their *Motion*, Plaintiffs contend that I have impermissibly summarized factual evidence and that my *Report* is "nothing but a summary of factual evidence disguised as an expert opinion."[29]

25. My *Report* contains detailed descriptions and analyses of the Returns and of the information and documents on which these descriptions and analyses are based.

26. I included these descriptions and factual summaries in my *Report* for two reasons.

26.1. First, they provide the factual basis, background, and context for my analyses, they provide the requisite support for my conclusions, and they are essential to understanding the rationale of my opinions.

26.2. Second, I make every effort to write reports that clearly describe my understanding of the facts on which I ultimately base my analyses, conclusions, and opinions.

---

27 As previously observed, Plaintiffs refer to these issues as the "Risk of Audit Issues."

28 Of course, if the Returns had been selected for a full audit, the Transaction and the Losses would almost certainly have been detected. But that is not an issue that I addressed anywhere in my *Report*.

29 *Plaintiffs' Motion*, page 6.

26.2.1. One of my objectives in doing so is to provide the transparency that should enable opposing counsel and its experts to independently evaluate the accuracy and the completeness of the facts on which my analyses, conclusions, and opinions are based.

26.2.2. If, notwithstanding my best efforts, I am in some way mistaken in my understanding of the facts, or if I have inadvertently overlooked a relevant fact, I believe that it is important that any such mistakes or oversights to be evident to anyone that might peruse and evaluate that report.

27. It does not appear that *Plaintiffs' Motion* challenges the accuracy of the facts on which I relied in conducting my analyses or in forming my opinions.

28. Nor does it appear that Plaintiffs challenge the authenticity or reliability of any of the source documents referenced in my *Reports*.

29. Plaintiffs assert that my "summaries are incomplete" and "partisan," but offer only one example that they contend supports these assertion.[30]

29.1. Plaintiffs also argue that I fail to "summariz[e] any evidence favorable to the taxpayers,"[31] but they do not provide any example or examples of any omitted facts or circumstances to support this argument.[32]

**Criticism #3: The Scope of My Review of the Documents Produced in This Case Was Appropriate and Necessary**

30. In their *Motion*, Plaintiffs contend that certain opinions in my *Report* are based on my consideration of materials that are "irrelevant to [my] assignment" and that my analysis should have included nothing other than a review of the Returns. This is not true.

---

30 *Plaintiffs' Motion*, at pages 7 through 9. I do not agree that this example supports the Plaintiffs' contention.

31 *Plaintiffs' Motion*, page 12.

32 I do not agree that I have failed to summarize evidence favorable to the taxpayers.

31. The Transactions at issue in these cases were complex and they involved numerous elements, numerous entities, and numerous individuals.

32. As I explained in my *Report*, several of the elements of the Transaction were not disclosed (or were not properly disclosed) on the Returns.

32.1. It would not have been possible to evaluate the completeness or the accuracy of the disclosures made on the Returns, individually or collectively, without an understanding of the relevant underlying facts and circumstances. For example:

32.1.1. It would not have been possible from the information disclosed on or with the Returns, individually or collectively, to determine how the amounts of the tax bases that the Plaintiffs claim to have had in the assets ["COBRA Loss Asset"] that were sold to produce the claimed Losses had been derived.

32.1.1.1. As observed in my *Report*, in Table 7 ($PSM_{LLC}$/$PSM_{INC}$), Table 8 ($MPP_{LLC}$/$MP_{INC}$), and Table 9 ($MURFAM_{LLC}$/$MURFAM_{INC}$),[33] I took the tax basis that each S Corporation used to compute the Loss it reported on its 2000 Form 1120S from the sale of its COBRA Loss Asset, and worked backwards to determine how this amount must have been calculated.

32.1.1.2. Most of the information that was required to make these tedious and somewhat intricate calculations was not disclosed on or with any of the 2000 Returns and was not ascertainable or reasonably

[33] See Tables 7, 8, and 9 of my *Report*, pages 94 through 96.

ascertainable from the information presented on or with those Returns, individually or collectively.[34]

32.1.2. It would not have been possible from the information disclosed on or with the Returns, individually or collectively, to determine that substantial Transaction-related Fees had been paid to the Plaintiffs' legal and accounting advisors.

32.1.2.1. None of the LLCs' 2000 Form 1065s (including the accompanying forms, schedules, statements, and attachments), none of the S Corporations' 2000 Form 1120Ss (including the accompanying forms, schedules, statements, and attachments), and none of the Taxpayers' 2000 Form 1040s (including the accompanying forms, schedules, statements, and attachments) disclosed any information pertaining to the Transaction-related Proskauer Rose Fees or the April 27th Transaction-related E&Y Fees -- there was no general or specific description of these Fees, there was no disclosure of the identity of the payee, and the amounts of these Fees were not separately stated or otherwise deducted.

32.1.2.2. Instead, as my analyses show, these amounts were buried in the tax bases that the S Corporations used to compute the amounts of the Losses that they respectively claimed in 2000 and

[34] See Tables 7, 8, and 9 of my *Report*, pages 94 through 96, at Columns A and B. See also ¶202 at pages 90 through 93 for a long listing of the essential information that was not disclosed/ascertainable (and that, therefore, had to first be identified as relevant, and then located or derived from other sources).

that the Taxpayers deducted on their respective 2000 Form 1040s.[35]

32.1.3. It would not have been possible from the information disclosed on or with the Returns, individually or collectively, to have determined that $94,030 of the Transaction-related Fees that had been paid to E&Y had been deducted twice on the 2000 Form 1040s of the Taxpayers.[36]

32.1.4. It would not have been possible from the information disclosed on or with the Returns to have ascertained how the various elements of the Transaction were divided between the Taxpayers' respective single-member LLCs, the respective (multi-member) LLCs, and the S Corporations, or how or where these elements were reflected on the various Returns.

32.2. Without an understanding of the relevant underlying facts and circumstances, it would not have been possible for me:

32.2.1. To have evaluated the manner in which the various elements of the respective Transactions had been divided between and reported on the various Returns;

32.2.2. To have determined whether or not it would be objectively reasonable to conclude that the manner in which the various elements were reported on the various Returns was designed to reduce or minimize the risk of detection and audit by the IRS; or

32.2.3. To determine whether or not it would be objectively reasonable to conclude that the Transaction-related Fees were reflected on the Returns in a manner designed to

35 *LaRue Report*, ¶185 through ¶198 (pages 78 through 88).

36 *LaRue Report*, ¶185 and ¶192 (pages 78 and 85).

reduce or minimize the risk of detection and audit by the IRS.

32.3. Finally, several of the contemporaneous documents and communications referenced, quoted, and/or discussed in my *Report* also address some of the reporting and disclosure issues on which I have opined and are therefore highly relevant to the analyses, conclusions, and opinions expressed in my *Report*.

**Criticism #4: No Opinions Were Rendered on Plaintiffs' State of Mind or Intent**

33. Throughout their *Motion*, Plaintiffs contend that I have opined on the Plaintiffs' state of mind and intent and that I "speculate about what the witnesses were thinking,"[37] but they do not identify any specific opinion or statement in my *Report* that does so.

33.1. Plaintiffs base this contention, in part, on their unelaborated assertion that my "report is replete with 'observations.'"[38]

33.2. Plaintiffs do not explain or suggest how any of these "observations" support their contention that I have opined on the Plaintiffs' states of mind or their intent, or that I have speculated on what they were thinking.

33.3. Plaintiffs do not appear to contend that any of these observations are incorrect.

33.4. These observations are part of the background, context, and description presented in my *Report,* and they provide support for the analyses, conclusions, and opinions set forth therein.

34. Nowhere in my *Report*, in my *Rebuttal Report*, or in my deposition do I express any opinion or conclusion regarding the "state of mind," "intent," or the credibility of the Plaintiffs, of those involved in the preparation of any of

37 *Plaintiffs' Motion*, at page 12.
38 *Plaintiffs' Motion*, at page 10.

the Returns, or of any other individual. Nowhere in my *Report* do I "speculate about what the witnesses were thinking."

35. Rather, my opinions on the "Risk of Audit Issues" are based on my understanding of the underlying relevant facts and circumstances, on a thorough review and detailed analysis of the Returns, and on my application of an *objective standard that looks to the decision processes and perceptions of knowledgeable and experienced tax professionals*.

35.1. In applying this standard:

35.1.1. I evaluated the significance or potential significance of the information that was disclosed on the Returns (and how and where that information was disclosed); and

35.1.2. I evaluated the significance or potential significance of information that could have, or should have, been disclosed on or with those Returns, but that was not disclosed.

35.2. Based on this review and analysis, I concluded that the manner in which the Transaction and Losses were reported on the Returns was not sufficiently complete, descriptive, or, in some cases, accurate, to have enabled a knowledgeable and experienced tax professional to determine the nature of the Transaction and the source of the Losses from an independent review of the filed Returns.

35.3. On this basis, I concluded that it would be objectively reasonable to conclude that the manner in which the Transaction and Losses were reported on the Returns was designed to reduce or to minimize the actual or the perceived risk that the Transaction and Losses would be detected by the IRS, and, ultimately, that the Returns would be selected for audit by the IRS.

**Criticism #5: I Have Not Rendered Any Legal Opinions**

36. While acknowledging that I have "repeatedly stated that [I have] not considered or opined on legal issues,"[39] Plaintiffs nevertheless contend that I have "improperly opine[d] about legal issues,"[40] and that my "report and deposition testimony is replete with opinions about legal issues and suggestions that the taxpayers did not comply with the Internal Revenue Code and the regulations."[41]

37. In making these assertions, Plaintiffs do not, however, point to any specific statement or statements anywhere in my *Report* that they claim to be a "legal opinion."[42]

37.1. However, although I never use the term "adequately disclosed" anywhere in my *Report* and although I never cite 26 U.S.C. §6662(d)(2)(B)(ii) anywhere in my *Report*, Plaintiffs assert that "[my] final conclusions are, at their heart, legal conclusions about whether the taxpayers fulfilled the adequate disclosure standard set forth in 26 U.S.C. §6662(d)(2)(B)(ii) . . ."[43]

37.2. Later in their *Motion*, Plaintiffs are actually critical of the fact that I "did not bother to research the applicable standard [of 26 U.S.C. §6662]," or to apply that standard in stating my conclusions and rendering my opinions.

> "The reality is that no matter how LaRue answers these questions, he has been asked to review the tax returns in this case and offer an opinion about whether the transactions fulfilled the requirements of 26 U.S.C. §6662(d)(2)(B)(ii) . . . This issue is a legal issue that has discernable standards, which LaRue apparently did not

39 *Plaintiffs' Motion*, at page 13.

40 *Plaintiffs Motion*, at pages 13 and 14.

41 *Plaintiffs Motion*, at pages 13 and 14.

42 Nor do Plaintiffs point to any specific statement or statements in my *Deposition* that they claim to be legal opinions. While I do not express any legal opinion in my *Report*, Plaintiffs' counsel may have asked me for legal opinions at my deposition.

43 *Plaintiffs' Motion*, at page 13.

bother to understand before he formed his opinions in this case."[44]

38. As I stated at my *Deposition*,[45] nowhere in my *Report* or in my *Rebuttal Report* have I expressed an opinion on any of the legal issues before the Court in this case.

**Criticism #6: My Analyses, Conclusions, and Opinions Are Based On An Identifiable Standard - They Are Not Based on the "Adequate Disclosure" Standard of Section 6662**

39. In their *Motion*, Plaintiffs assert that my opinions are not based on an "identifiable standard," and they contend that I have based my conclusions and opinions on an "adequate disclosure" standard that I failed to define in my *Report*.

39.1. These assertions are not true. As I stated previously in this *Declaration*, my opinions on the "Risk of Audit Issues" are based on my understanding of the underlying relevant facts and circumstances, on a thorough review and detailed analysis of the Returns, and on my application of an *objective standard that looks to the decision processes and perceptions of knowledgeable and experienced tax professionals*.

40. Plaintiffs further contend that I have offered an opinion as to whether the requirements of 26 U.S.C. § 6662(d)(2)(B)(ii) have been fulfilled and that I "apparently did not bother to understand [that provision] before [I] formed my opinions in this case."[46]

41. Plaintiffs' assertions mischaracterize my *Report* and are erroneous.

41.1. I was not asked to opine, and did not opine, as to whether or not the Transactions and Losses were "adequately disclosed" within the meaning of 26 U.S.C. Section 6662(d)(2)(B)(ii).

---

44 *Plaintiffs' Motion*, at page 17.

45 *LaRue Deposition*, Volume 1, 83:5-13, 85:3-5, 99:21-25, 192:24-193:1, Volume 2, 95:7-20. See also *LaRue Deposition* excerpts in *Plaintiffs' Motion*, at page 17.

46 *Plaintiffs' Motion*, at page 17.

41.2. I applied my knowledge, training, skill, experience, and cumulative insights:

41.2.1. To impartially review the various tax returns and other relevant documents in this case,

41.2.2. To impartially analyze and evaluate the manner in which the Transaction (and the various elements of the Transaction) and Losses were reported on the Returns, and

41.2.3. To determine whether or not a reasonably diligent and independent review of the information disclosed on or with these respective returns by an experienced tax professional would have or should have revealed or provided any reasonably discernable indication of certain specified elements of the Transaction and Losses.[47]

42. Plaintiffs' also assert that I applied "the wrong standard" when, in my Report, they contend that I stated that "'generally accepted accounting principles' (commonly known as 'GAAP') *require* the disclosure of certain information on the partnership tax return . . ."[48]

43. In making this assertion, Plaintiffs misstate my *Report* and mischaracterize my deposition testimony.

43.1. I never made any such statement in my *Report*[49] that either GAAP or the instructions to the partnership tax return require that the amounts disclosed in Schedules L and M-1 be determined under GAAP.

43.2. In the description of the S Corporations' Form 1120s, I showed the amounts that would have been reported on these schedules if GAAP had been applied.

[47] See, for example, the conclusions and opinions set forth in my *Report* at ¶214 - ¶217, ¶240, ¶256 - ¶259, ¶282, ¶299-¶302, ¶325, ¶344 - ¶346, and ¶349.

[48] *Plaintiffs' Motion*, at page 18 and 19. Emphasis added.

[49] See my *Report* at ¶226, ¶228, ¶229, ¶268, ¶270, ¶271, ¶311, ¶313, and ¶314.

43.3. At my deposition, I noted that:

> "[I]n 30 years of experience in the accounting area, I have never seen anything that would condone, or suggest or imply that recording an asset under the cash method of accounting, or under any method of accounting -- recording an asset that has a value of, let's say, one million dollars, recording that on a balance sheet at a sixty million dollar amount. That's clearly impermissible under GAAP.
>
> And there are no definitive, authoritative standards that apply to cash method taxpayers outside of the tax law. But in all of the textbooks and all of the teaching, and all of the in-house training materials, in everything that I've ever looked at in the last 30 years of my career, I have never seen anything that would permit or suggest it would be proper to record an asset worth one million dollars as having a book value of sixty million dollars. And that's basically what was done by these cash method taxpayers."[50]

**Criticism #7: I Am Not A "Partisan" For the Government**

44. In their *Motion*, Plaintiffs make repeated references to me as "partisan," [51] and my interpretation of the documents as "horribly partisan and skewed completely toward the Government."[52]

45. This characterization is simply untrue.

45.1. As an academic and as a member of the profession, there is nothing more important to me than my reputation for honesty, integrity, and competence—in the classroom, in my research and writing, in my consulting work, and in my expert witness engagements.

45.2. In all of my expert witness engagements, including this one, I have made it explicitly clear to the attorneys seeking to retain me that, if retained, I would "let the chips fall where they may," that I would be independent, unbiased, and objective in my review the facts, in the

---

50 *LaRue Deposition*, Volume 2, 36:9-37:4.

51 See *Plaintiffs' Motion* at page 5 ("LaRue's lengthy partisan summaries of the evidence"), page 9 ("LaRue's partisan assistance is not necessary"), and page 12 ("LaRue's interpretation of the documents he has reviewed is horribly partisan and skewed completely toward the Government").

52 *Plaintiffs' Motion*, at page 12.

design and execution of my analyses, and in the expression of my conclusions and opinions.

46. As I previously observed, I make every effort to write reports that clearly describe my understanding of the facts on which I ultimately base my analyses, conclusions, and opinions.

46.1. One of my objectives in doing so is to provide the transparency that should enable opposing counsel and its experts to independently evaluate the accuracy and the completeness of the facts on which my analyses, conclusions, and opinions are based.

47. As I stated in my *Report* at ¶14, I have no personal interest or bias with respect to any of the parties involved in this litigation and my compensation is not in any way contingent upon the nature of my findings, the opinions expressed in this *Report*, or the outcome of this case.

48. In this case, as in all others, I have made every effort to inform the Court with analyses, conclusions, and opinions that are competent, unbiased, understandable, and complete.

-----

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Respectfully submitted,

David W. LaRue, Ph.D.
April 21, 2008