IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245T, 06-246T, and 06-247T
(Consolidated)

| | |
|---|---|
| MURFAM FARMS, LLC, | § |
| By and Through Wendell H. Murphy, Jr., | § |
| a Partner Other Than Tax Matters Partner, | § |
| | § |
| PSM FARMS, LLC, | § |
| By and Through Stratton K. Murphy, | § |
| a Partner Other Than Tax Matters Partner, | § |
| | § |
| MURPHY PORK PARTNERS, LLC, | § |
| By and Through Wendell H. Murphy, Jr., | § |
| a Partner Other Than Tax Matters Partner, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § |
| | § |
| UNITED STATES OF AMERICA, | § |
| | § |
| Defendant. | § |

**PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION TO PARTIALLY EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DON M. CHANCE**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 2

II. STATEMENT OF FACTS .......... 4

A. Summary of Dr. Chance's Methodology .......... 4

B. The Methodology Used By Dr. Chance Does Not Assume Or Require That Options Trade At Market Value To Produce Accurate Results .......... 6

C. The Government's Expert Witnesses Used the Same Methodology That the Government Now Claims is Unreliable .......... 7

III. ARGUMENTS .......... 8

A. The Government's Motion is Based Entirely on a Late Rebuttal of its Expert Witness .......... 8

B. Dr. Chance's Report and Testimony Are Admissible Under the Federal Rules of Evidence and Controlling Supreme Court Precedent .......... 9

1. The Government Contradicts Itself on the Treatment of the Alleged Excess Amount Paid For the Digital Options .......... 10

2. The Government Incorrectly Assumes That an Investor Will Pay More For An Option With a Higher Probability of Profit .......... 12

3. Factor 1: The Government Erroneously Argues That Dr. Chance's Methodology Does not Have a Testable Hypothesis .......... 14

4. Factor 3: The Government Erroneously Applies the "Known or Potential Rate of Error" Standard .......... 15

5. Factor 5: Dr. Chance's Methodology Includes The Existence of Standards Controlling His Method's Operation .......... 17

6. Factor 6: Dr. Chance's Methodology is Based on a Reliable and Widely Accepted Technique .......... 17

7. Dr. Chance's Methodology is Premised on a Model That Was Not Developed Solely For Purposes of Testifying .......... 19

IV. CONCLUSION .......... 20

CERTIFICATE OF SERVICE .......... 21

# TABLE OF AUTHORITIES

## Federal Cases

Daubert v. Merrell Dow Pharmaceuticals, Inc. 43 F.3d 1311 (9th Cir. 1995) ........ 9
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ........ 2, 9, 15, 16
In re Paoli R.R. Yard PcL Litigation, 35 F.3d 717 at 742 (3d Cir. 1994) ........ 9

## Federal Rules

Fed. R. Evid. 104(a) ........ 9
Fed. R. Evid. 702 ........ 1
Fed. R. Civ. Proc. 16(b)(4) ........ 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245T, 06-246T, and 06-247T
(Consolidated)

| | |
|---|---|
| MURFAM FARMS, LLC,<br>By and Through Wendell H. Murphy, Jr.,<br>a Partner Other Than Tax Matters Partner, | §<br>§<br>§<br>§ |
| PSM FARMS, LLC,<br>By and Through Stratton K. Murphy,<br>a Partner Other Than Tax Matters Partner, | §<br>§<br>§<br>§ |
| MURPHY PORK PARTNERS, LLC,<br>By and Through Wendell H. Murphy, Jr.,<br>a Partner Other Than Tax Matters Partner, | §<br>§<br>§<br>§ |
| Plaintiffs, | §<br>§ |
| v. | §<br>§ |
| UNITED STATES OF AMERICA, | §<br>§ |
| Defendant. | § |

**<u>PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION TO PARTIALLY EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DON M. CHANCE</u>**

Plaintiffs hereby file this Response to the United States Motion to Partially Exclude the Expert Report and Testimony of Don M. Chance (the "Government's Motion") and in support thereof shows the Court as follows:

1. The Government's Motion is based solely on the Declaration of its expert witness, A. Lawrence Kolbe. Dr. Kolbe's Declaration reflects an untimely rebuttal to Plaintiffs' expert witness report, which must be rejected.

2. The testimony and expert report of Don M. Chance is admissible under Rule 702 of the Federal Rules of Evidence because it constitutes "scientific, technical or other specialized

knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."

3. The testimony and expert report of Don M. Chance satisfies the standard for admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

4. The Government's allegations that Dr. Chance's opinion is not based on a reliable methodology – a methodology that is premised on a model that the Government experts themselves used – is wholly incorrect.

For the above reasons, Plaintiffs request that this Court deny the Government's Motion and uphold the admissibility of Dr. Chance's expert witness report.

## I. INTRODUCTION

The Government seeks to partially exclude the testimony of Plaintiffs' expert, Don M. Chance. The Government challenges only Dr. Chance's testimony that there was a reasonable probability of profit from the digital option transactions at issue in this litigation and does not appear to challenge other aspects of Dr. Chance's report.[1] Parsing through the Government's hyper-technical arguments establishes that the Government's challenge to Dr. Chance's expert testimony is primarily based on one sole and potentially erroneous premise – that the digital options at issue in this case did not trade at market value. The Government also argues that Dr. Chance's Report does not satisfy several of the "Daubert" standards of admissibility and Rule 702.

As an initial matter, Plaintiffs note that the Government's Motion is based solely on the Declaration of its expert, Lawrence Kolbe ("Dr. Kolbe"), which is attached as Exhibit 3 to the

[1] *See* Government Motion to Exclude Brief Motion at p. 5n.12.

Government's brief. The Declaration amounts to nothing more than an additional rebuttal to Plaintiffs' expert witness reports. This Court revised its scheduling order on April 16, 2007, giving the Government until June 15, 2007 to file rebuttal reports.[2] The parties agreed by letter to extend that deadline to July 1, 2007.[3] Because the Declaration was not filed within that time period, it is untimely and must be disallowed. The Government's Motion should likewise be disallowed as it is based solely on Dr. Kolbe's late rebuttal. Without in any way limiting this objection, Plaintiffs respond to Dr. Kolbe's assertions and to the related Government's Motion.

The error in the Government's challenge to Dr. Chance's expert report and testimony becomes apparent when one considers several important facts in this case: (i) the Government's argument requires it to treat the alleged excess amount paid for the digital options as part of the option price, which directly contradicts the Government's own expert witness testimony as to how that excess amount should be characterized, (ii) the methodology used by Dr. Chance in arriving at his conclusions is premised on a widely accepted model that was even used by the Government's expert witnesses in their expert reports in this case; and (iii) the methodology used by Dr. Chance in determining profit probabilities and the reasonableness of those probabilities does not assume or require that the digital options trade at market value. In addition, the Government also seems to misunderstand the relationship between the value of options and their profit probabilities, which undermines the basis for its arguments. Moreover, Dr. Chance does not assume, acknowledge or concede that the digital options at issue did not trade at market value, as the Government claims.

---

[2] *See* Court Order at pl.dc.app. 417.

[3] *See* Letter Agreement at pl.dc.app. 415.

In any event, Dr. Chance's expert report and testimony easily satisfy the standards for admissibility under Rule 702. For these reasons, the arguments raised by the Government in its Motion must be rejected and the Motion denied.

## II. STATEMENT OF FACTS

The Government properly notes that one of the issues in this case is whether or not certain non-publicly-traded digital option transactions ("COBRA Transactions") had a reasonable possibility of profit.[4] Dr. Chance is a highly qualified expert in the area of derivatives and risk management, who has researched and written material on digital options.[5] He was asked to provide an expert opinion on several issues relating to the COBRA Transactions at issue in this case. One of the issues that Dr. Chance opined on and which is at issue in the Government's Motion is "whether the foreign exchange digital option spread strategies include a reasonable probability of profit."[6]

### A. Summary of Dr. Chance's Methodology

In determining whether the digital options had a reasonable probability of generating a profit, Dr. Chance first estimated the probability of the profitability of each transaction individually and on a group basis.[7] He then considered the reasonableness of these probabilities.[8] Dr. Chance utilized a methodology adapted from the Black-Scholes-Merton ("BSM") Model, which was published in 1973 and is widely used for valuing options to

[4] *See* Gov't. Motion to Exclude Brief at p. 2.
[5] *See* Expert Report of Don M. Chance, attached as Exhibit 1 to the Government's Motion Brief (the "Chance Report") at gov app. 3.
[6] *See id.*
[7] *See id* at gov app 30, 34-36.
[8] *See id.* at gov app 34-36.

determine the probability of profit.[9] Dr. Chance first determined the "critical level" where the exchange rate must be for the transaction to be profitable.[10] He then estimated the probability that the exchange rate would be at or beyond this critical level at a certain date focusing on several factors, including (i) the current exchange rate, (ii) the critical level, (iii) the amount of time and (iv) the volatility.[11]

In determining the reasonableness of the profit probabilities for the digital options, Dr. Chance compared them to profit probabilities for Google and S&P 500 Options.[12] Dr. Chance was careful to select for comparison purposes only options with a time to expiration roughly corresponding to those of the digital options at issue and only options that were well-known in the market.[13] He collected data only for options that traded at least 100 contracts that day to ensure that options selected for comparison purposes reflected options that were regularly purchased and sold on a daily basis.[14] After reviewing these options, he determined the probability of profit for each by using the same adaptation of the BSM Model.[15] He then compared the probability of profit for each of the COBRA Transaction options to the Google and S&P 500 Options.[16] Based on this comparison, Dr. Chance concluded that the probabilities of profit for the COBRA Transaction digital options at issue in this case are not out of line with those of commonly traded options and with what options investors expect when buying and selling options and are therefore reasonable.[17]

---

[9] *See id.* at gov.app 30-31.
[10] *See id* at. gov.app 31.
[11] *See id.*
[12] *See id.* at gov.app. 30, 34-36.
[13] *See id.* at gov.app. 34-35, 46
[14] *See id.*
[15] *See id.* at gov.app 34-35.
[16] *See id.* at gov.app 34-35, 46.
[17] *See id.* at gov.app p. 35.

Notwithstanding the widely accepted model that Dr. Chance used as the basis for determining the reasonableness of the profit probabilities for the digital options (the BSM Model), the Government argues that Dr. Chance's methodology is unreliable and must be excluded. The Government incorrectly states that Dr. Chance has admitted that the digital options were priced at amounts that were materially in excess of their market values.[18] Dr. Chance explains in the attached Declaration that he did not value the digital options and therefore cannot affirm that they traded in excess of market value.[19] But even if the Government's underlying premise – that the digital options did not trade at market value -- is correct, this fact alone would not render Dr. Chance's methodology unreliable because that methodology does not assume, nor does it require, that the options at issue trade at fair market value.

## B. The Methodology Used By Dr. Chance Does Not Assume Or Require That Options Trade At Market Value To Produce Accurate Results

Dr. Chance's methodology for determining the probability of generating a profit on the digital options takes into account the exchange rate for the digital options on two different levels: (i) the exchange rate that the underlying currency must reach to be profitable; and (ii) the current exchange rate for the underlying currency.[20] Dr. Chance explains that the probabilities of profit for the digital options are affected by these statistical properties of the underlying currencies, but not by the price paid for the options.[21] Thus, the methodology used by Dr. Chance clearly does not assume or require that the options trade at market value to provide accurate results.

---

[18] *See* Gov't Motion to Exclude Brief at p. 17.
[19] *See* Declaration of Don M. Chance ("Chance Declaration") at pl dc app. 421.
[20] *See* Chance Report at gov.app. 31.
[21] *See* Chance Declaration at pl dc app. 424.

In determining the reasonableness of the probabilities of profit, Dr. Chance applies a fairly simple approach. He compares the unknown (*i.e.*, the reasonableness of the profit probabilities of the digital option transactions) to the known (the reasonableness of the profit probabilities of two publicly traded options--the Google and S&P 500 Options). This comparison likewise does not require or assume that the digital options trade at any particular value – it is simply a comparison. The Government's expert himself recognizes the appropriateness of this approach by acknowledging that "[T]he premises that underlies the Chance Report's methodology, that it is reasonable to trust that the profit probabilities observed in the market are economically reasonable for options traded in the market, is in accord with standard practice in finance."[22]

Thus, it is clear that the methodology used by Dr. Chance does not require or assume that the digital options trade at market value to provide reliable results.

**C. The Government's Expert Witnesses Used the Same Methodology That the Government Now Claims is Unreliable**

Dr. Chance makes a particularly important observation in his Declaration noting that the Government's expert witnesses themselves used the BSM Model in (i) arriving at their conclusions regarding the value of the digital options and (ii) arriving at their conclusions regarding the probabilities of profit.[23] Thus, *if the Government's argument that Dr. Chances' methodology is rendered unreliable because the digital options did not trade at market value, the expert testimony of the Government's experts would likewise be rendered unreliable because they use the same BSM Model.*[24]

[22] *See* Gov't Motion to Exclude Brief at p. 16; Kolbe Declaration at gov.app. 199
[23] *See* Chance Declaration at pl.dc.app 423-24; *see also, e.g.*, Kolbe Report at pl.dc.app. 42-83, 47n.159.
[24] *See* Chance Declaration at pl.dc.app 423-24.

## III. ARGUMENTS

### A. The Government's Motion is Based Entirely on a Late Rebuttal of its Expert Witness

The Government's Motion is based entirely on the Declaration of its Expert Witness, Dr. Kolbe, which is attached as Exhibit 3 to the Government's brief. The Declaration provides a lengthy analysis addressing the reliability of Dr. Chance's Report. Dr. Kolbe's Declaration is inadmissible and should be rejected.

This Court revised its scheduling order on April 16, 2007, giving the Government until June 15, 2007 to file rebuttal reports[25]. The parties agreed by letter to extend that deadline to July 1, 2007.[26] Dr. Kolbe's Declaration amounts to nothing more than an additional rebuttal of Dr. Chance's expert report and, as such, should have been submitted on or before that date. Dr. Kolbe's Declaration was not submitted by that date. Rule 16(b)(4) states that a court's scheduling order may be modified only for good cause and with the judge's consent.[27] The Government has not requested consent of the Court to modify its scheduling order to permit it to file a late rebuttal report. The Government has also not bothered to show good cause for modifying the Court's scheduling order or in any way to explain why it should be permitted to file a late report. For this reason, Dr. Kolbe's Declaration should be rejected. Because it provides the sole basis for the Government's Motion, the Government's Motion should likewise be rejected and denied.

Without in any way diminishing this argument, Plaintiffs will nevertheless undertake to address the allegations made by Dr. Kolbe and the Government's Motion.

---

[25] *See* Court Order at pl.dc.app. 417.
[26] *See* Letter Agreement at pl.dc.app. 415.
[27] Fed. R. Civ. Proc. 16(b)(4).

## B. Dr. Chance's Report and Testimony Are Admissible Under the Federal Rules of Evidence and Controlling Supreme Court Precedent

The Supreme Court has set forth the standard for determining the reliability (and therefore the admissibility) of testimony under Rule 702 of the Federal Rules of Evidence.[28] Under FRE 104(a) and 702, a trial judge must determine whether the expert is proposing to testify to (i) scientific knowledge that (ii) will assist the trier of fact to understand or determine a fact in issue.[29] The Court has identified four factors that are relevant, although not controlling, to this analysis, including (i) whether the theory or technique can be and has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) the known or potential rate of error; and (iv) whether the technique or theory has received "general acceptance."[30] The Government quotes other factors in its brief, citing to cases from the Third and Ninth Circuits, including (v) the existence of standards controlling the method's operation, (vi) the relationship of the method used to other methods which have been established to be reliable, (vii) the qualifications of the expert testifying based on the methodology, and (viii) non-judicial uses to which the method has been put, and (ix) whether the expert testimony relates research conducted independent of the litigation.[31] Without conceding that the Third or Ninth Circuit decisions are controlling in this case, we note that all of the factors that the Government claims are relevant to this case weigh in favor of admitting Dr. Chance's testimony.[32]

---

[28] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).
[29] *See id.* at 592.
[30] *See id.* at 593-94.
[31] *See* Gov't Motion to Exclude Brief at p. 11-12 (citing *In re Paoli R.R. Yard PcL Litigation*, 35 F.3d 717 at 742 (3d Cir. 1994); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 43 F.3d 1311 (9th Cir. 1995))
[32] The Government claims that only Factors 1, 3 and 6 have applicability to the facts of this case. *See* Kolbe Declaration at gov.app.201

### 1. The Government Contradicts Itself on the Treatment of the Alleged Excess Amount Paid For the Digital Options

As an initial matter, we note that the Government's argument contradicts the prior testimony of its expert Dr. Kolbe on how the alleged excess amount paid for the options should be characterized. The Government's primary basis for challenging Dr. Chance's report is premised on its conclusion that the options were sold for more than their value. In essence, the Government and its expert, Dr. Kolbe, treat the alleged excess amount paid for the digital options as part of the option price in arguing that the options sold for more than market value. This treatment of the alleged overpayment, however, contradicts Dr. Kolbe's position on how the excess amount paid should be treated in his initial expert report.

In his report dated June 1, 2007, Dr. Kolbe analyzes the amount paid to Deutsche Bank, A.G. for the digital options and concludes that the amount paid to DB exceeded the "basic value" of the options.[33] Dr. Kolbe notes that DB was one of the participants in the COBRA transaction and that its fee for participating in the transactions came in the form of an amount paid to DB for the digital options in excess of their value.[34] Dr. Kolbe states in his report as follows:

> Deutsche Bank, A.G. ("DB") was the participants' counterparty for the offsetting option positions. DB apparently had invested time and effort to help find a basic structure of the option positions that had features Ernst & Young appeared to value, but unlike Ernst & Young (and attorneys also working with Ernst & Young), DB did not get an explicit fee for its services in a given transaction. Accordingly, its fee had to come through the way the options were priced. It turns out that the prices for both the participants' long (sold to them by DB) *and short* (bought from them by DB) options were well in excess of their basic value as measured by DB itself and as confirmed by calculations in my report. DB still received its fee from the net transaction, since the dollar amount above basis value stated for the long option exceeded the dollar amount above basic value stated for

[33] *See* Expert Report of A. Lawrence Kolbe, June 1, 2007, attached as Exhibit "A" (the "Kolbe Report") at pl.dc.app.4, 58, 60.
[34] *See id.* at 4.

> the short option. Nonetheless, DB's overpayment for the short option is unusual because the normal way to make money is to "buy low and sell high" not to "buy high and sell even higher." This unusual pricing pattern turns out to be the only way DB could get a fee while maintaining the structure of the COBRA transaction. In fact, this pattern is inherent in the basic COBRA structure at any non-negative fee level for DB.[35]

In essence, Dr. Kolbe concludes that the purported overpayment to DB reflected a fee for its professional services in connection with the transactions at issue, rather than a price paid for the digital options. Thus, under Dr. Kolbe's analysis in his initial expert report, the amount paid to DB consists of two parts (i) an amount paid for the options (based on the value of the options) and (ii) an amount paid to DB for its professional services (based on the amount paid in excess of the value of the options). But in the Declaration that he provided in support of the Government's Motion, Dr. Kolbe takes an entirely contrary position. In claiming that Dr. Chance's comparison of profit probabilities for the digital options cannot be properly compared to profit probabilities for publicly traded options because the digital options did not trade at market value, Dr. Kolbe essentially takes the position that the alleged excess amount paid for the options should be regarded as part of the option price. As such, Dr. Kolbe has taken two entirely inconsistent positions: (i) in his initial report, he claims that the options should be treated as having been sold at market value; and (ii) in his Declaration he claims that the options did not sell at market value. He offers no explanation for these inconsistent positions.

Dr. Kolbe should not be permitted to flip-flop on his position regarding the proper treatment of the excess amount allegedly paid for the digital options simply to serve the whims of the Government. In his original expert report, Dr. Kolbe claims that the options should regarded as having been sold at their market value, which completely undermines the

---

[35] *Id.* at 4.

Government primary basis for claiming that Dr. Chance's methodology is unreliable. The Government should be held to Dr. Kolbe's original expert report, particularly in light of the fact that the Declaration amounts to nothing more than an additional rebuttal to Dr. Chance's expert report that was not timely submitted.

**2. The Government Incorrectly Assumes That an Investor Will Pay More For An Option With a Higher Probability of Profit**

The Government bases its challenge to the expert report of Dr. Chance on its argument that the digital options at issue did not trade at market value. The Government attempts to explain a connection between the market value of options and the profit probabilities on page 15 of its brief summarizing as follows: "[T]he profit probability associated with any given option is economically reasonable for that particular option in well-functioning capital markets because the options' price itself reflects that probability."[36]

The Government then provides the following example developed by the Government's expert Dr. Lawrence:

> That is, suppose two options were identical in every respect, including the expected payoff if a payoff occurs, except that one had a lower probability of getting that payoff. No economically rational investor would buy the one with a lower payoff probability unless it were offered at a lower price. If the two instead were initially offered at the same price, the expected profit on the option with the higher payoff probability would be higher and no one would buy the one with the lower payoff probability . . . . In a well-functioning capital market, this would drive up the price of the higher-probability option and/or drive down the price of the lower-probability option until both were priced to offer the risk-return tradeoff the market required. Thus, the profit probabilities and the market prices of publicly-traded options are inexorably.[37]

Dr. Chance notes in his Declaration that this example has two inherent problems due to Dr. Kolbe's vague use of the phrase "identical in every respect." If read literally, Dr. Chance

[36] *See* Gov't Motion to Exclude Brief at 15.
[37] *See id* at gov.app. 15-16.

explains that the Government's example is incoherent.[38] If two options are in fact identical in every respect, then the two options would be on the same underlying asset and have the same exercise price and expiration.[39] As Dr. Chance explains, under these circumstances, "it is not possible for the condition of equivalent probability of a payoff between the two and yet one have a higher probability of getting that payoff."[40] The incoherency of this example only highlights the Government's apparent confusion regarding the relationship between the value of options and their expected payoff.

On the other hand, if the statement means that the two options have different underlying assets, Dr. Kolbe's statement is simply incorrect. Dr. Chance explains in his Declaration that an investor will not necessarily pay more for an option that has higher probability.[41] This is because options are valued using the principle of arbitrage and risk neutrality and not on the basis of payoff probabilities. Dr. Chance provides an example in an Attachment to his Declaration in which an option on one stock, "Stock 1," would trade at a higher amount than an option on a second stock, "Stock 2," notwithstanding that the option on Stock 2 has a higher profit probability and concludes as follows:

> How can this be when Dr. Kolbe has attested that the option with the higher probability should be worth more? *The Government and its experts repeatedly make the mistake that options are valued using expected payoffs.* Options are valued using the principle of arbitrage and risk neutrality and not by discounting the expected payoffs based on true probabilities.[42]

Thus, the Government's underlying assumption regarding the value of options – that the value is directly tied to the probability of generating a profit – is clearly incorrect, as Dr.

---

[38] *See* Chance Declaration at pl.dc.app. 426.
[39] *See id.*
[40] *See id.*
[41] *See id.* at 427.
[42] *See id.*

Chance's example makes clear. The connection between option value and its probability of profit that the Government claims to exist – and which the Government alleges renders Dr. Chance's method unreliable – is simply not there. The Government's misunderstanding regarding the relationship between the market value of options and the probability of generating a profit undercuts its argument that Dr. Chance's report is rendered unreliable because the options did not trade at market value.

### 3. Factor 1: The Government Erroneously Argues That Dr. Chance's Methodology Does not Have a Testable Hypothesis.

The Government argues erroneously that Dr. Chance's method fails to satisfy the first factor because it does not have a testable hypothesis. The Government bases its assertion on Dr. Kolbe's observation that financial markets are immense, so some options, somewhere, can be found with almost any probability of profit.[43] The Government fails to note that Dr. Chance did not just seek any publicly traded options for comparison with the profit probabilities of the digital options. He selected only options with a time to expiration roughly corresponding to those of the digital options in question that were well recognized in the market and collected data only for options that traded at least 100 contracts that day.[44] The high trading volume of these options clearly establishes that they reflect commonly traded options. The Government's expert himself acknowledges as much by noting:

> Thus, the premises that underlie[] the Chance Report's methodology, that it is reasonable to trust that the profit probabilities observed in the market are economically reasonable for options traded in the market, is in accord with standard practice in finance.[45]

---

[43] *See* Gov't Motion to Exclude Brief at p. 18.
[44] *See* Chance Report at gov app. at 34-35, 46
[45] *See* Gov't Motion to Exclude Brief at p. 16; Kolbe Declaration at gov app. 199.

The Government's assertion to the effect that Dr. Chance's methodology embodies a test that is effectively impossible to fail because under it all options have a reasonable probability of profit is wholly without merit. Dr. Chance's methodology identifies and quantifies parameters for profit probabilities on transactions that have been proven by the market to be reasonable as the Government's expert himself acknowledges.[46] Any profit probabilities that fall outside these parameters would fall outside the range of probabilities that have been proven to be reasonable by the market and would therefore fail this test. The Government's suggestion that all options would pass this test is incorrect.

Moreover, the mere fact that a profit probability could be as low as .2% and still be reasonable under this methodology does not render the methodology used by Dr. Chance unreliable as the Government suggests. The conclusions of a methodology that are reliable and properly applied are not rendered inadmissible simply because the opposing party does not like the results. The Supreme Court has made this abundantly clear noting that the focus in determining the admissibility of expert testimony must be solely on principles and methodology, *not on the conclusions* that they generate.[47]

### 4. Factor 3: The Government Erroneously Applies the "Known or Potential Rate of Error" Standard

The third *Daubert* factor focuses on the known or potential rate of error of the methodology in question. The Government argues that Dr. Chance's report "will never find an option that will not have a 'reasonable possibility of profit'" and therefore "does not allow for any possibility of reaching an erroneous result."[48] Essentially, the Government argues that, because Dr. Chance's methodology does not produce "erroneous" conclusions, it is unreliable.

[46] *See id*
[47] *See Daubert*, 509 U.S. at 595.
[48] *See* Gov't Motion to Exclude Brief at 19-20.

This most obvious problem with this reasoning is quite simply that it turns the third *Daubert* test on its head.

The focus of the third *Daubert* test is to examine the reliability of the methodology in question by determining how often it has been known to produce erroneous results.[49] A test is not rendered unreliable on the basis that it does not produce erroneous results. On the contrary, its reliability is affirmed under those circumstances. The Government's argument that Dr. Chance's report is unreliable "because it does not allow for any possibility of reaching an erroneous conclusion" must be rejected. The Government's tortured logic simply highlights its desperate attempt to find any basis, regardless of how incredible, to exclude Dr. Chance's testimony.

A closer look at the Government's allegation regarding the known or potential rate of error makes clear that the Government is not really challenging Dr. Chance's methodology, but rather is asserting a challenge to his conclusions. The Government essentially objects to Dr. Chance's conclusion that a probability of generating a profit as low as .2% could be viewed as reasonable in the market. Because of this low percentage, the Government argues that Dr. Chance's methodology will "never find an option that will not have a 'reasonable possibility of profit.'"[50] Even if true, which as noted above Plaintiffs do not agree with, this argument challenges Dr. Chance's conclusions as to probability rates rather than challenging his methodology. Again, the Supreme Court has made clear that the focus of applying the *Daubert* standards must be solely on principles and methodology, not on the conclusions that they generate.[51]

---

[49] *See Daubert*, 509 U.S. at 594.
[50] *See* Gov't Motion to Exclude Brief at p. 19
[51] *See Daubert*, 509 U.S. at 595.

### 5. Factor 5: Dr. Chance's Methodology Includes The Existence of Standards Controlling His Method's Operation

For some reason, Dr. Kolbe does not believe that Factor 5 does not shed light on the issue of reliance.[52] We respectively disagree. As noted above, the Government fails to note that, in computing the probabilities, Dr. Chance used an adapted version of the widely used BSM Model.[53] In addition, in determining of these probabilities are reasonable, Dr. Chance compared the probability rates for the digital options to carefully selected publicly traded options. In particular, Dr. Chance selected only options with a time to expiration roughly corresponding to those of the digital options in question that were well recognized in the market and collected data only for options that traded at least 100 contracts that day.[54] The high trading volume of these options clearly establishes that they reflect commonly traded options. The Government's expert himself acknowledges as much by noting:

> Thus, the premises that underlie[] the Chance Report's methodology, that it is reasonable to trust that the profit probabilities observed in the market are economically reasonable for options traded in the market, is in accord with standard practice in finance.[55]

Thus, Factor 5 weighs heavily in favor of admissibility. There were adequate standards controlling the operation of Dr. Chance's methodology.

### 6. Factor 6: Dr. Chance's Methodology is Based on a Reliable and Widely Accepted Technique

The next factor discussed by the Government is the relationship of the technique to methods that have been established to be reliable. The Government argues that Dr. Chance's report fails this test because "it does not take account of the fact that the essential link between

---

[52] *See* Kolby Declaration at gov app. 201.
[53] *See* Chance Report at gov app. 30-31.
[54] *See* Chance Report at gov.app. at 34-35, 46.
[55] *See* Gov't Motion to Exclude Brief at p. 16; Kolbe Declaration at gov app. 199.

profit probability and the price paid for the right to receive the potential profit is broken for the options in this dispute, since they did not trade at market value."[56] The Government is again wrong.

This standard is clearly satisfied in this case. Dr. Chance's report makes clear that he used an adaptation of the BSM Model in calculating the probabilities of generating profit for the digital options.[57] He again affirms this in his Declaration.[58] The validity of the BSM Model is so widely known as to require little elaboration. The Model was published in 1973 and has been widely used since then to value options.[59] In 1997, Scholes and Merton received the Nobel Prize for this contribution.[60] The Government's experts themselves used the BSM Model in determining both the value of the options and the probabilities of generating a profit.[61] Dr. Kolbe observes in his report "[T]he Black-Scholes model is a standard and (Nobel-Prize-winning) way to price options."[62] Dr. DeRosa also clearly subscribes to the BSM Model. Dr. Chance notes in his Declaration that the BSM Model assumptions "are discussed at great length on pp. 53-54 of Dr. DeRosa's book, 2d edition, and used extensively by him from that point forward and to virtually the last page of his book."[63]

The second aspect of Dr. Chance's methodology reflects nothing more than a simple comparison. Dr. Chance simply compared the profit probabilities of the digital options to those

---

[56] *See* Gov't Motion to Exclude Brief at p. 20.
[57] *See* Chance Report at gov.app. 30-31. Dr. Chance observes in his expert report that the BSM Model can be adapted to provide the probability that the exchange rate will be above or below a certain level by a certain date. *See* Chance Report at gov.app. 30.
[58] *See* Chance Declaration at pl.dc app. 423.
[59] *See* Chance Report at gov.app. 30.
[60] *See id.*
[61] *See* Chance Declaration at pl.dc.app. 423-24; *see also, e.g.*, Kolbe Report at pl dc.app. 33n.121, 39-56.
[62] *See* Kolbe Report at p. 47, n 159.
[63] *See* Chance Declaration at pl dc app. 424.

of publicly traded options, which, as even the Government's expert acknowledges, reflect economically reasonable probabilities.[64]

So clearly Dr. Chance's methodology relates to a technique that has been established to be reliable. In addition, the widely accepted nature of the BSM Model establishes that Dr. Chance's methodology is premised on a technique or theory that has been subjected to peer review and publication and has also received "general acceptance." Thus, factors, 2, 4 and 6 weigh heavily in favor of admitting Dr. Chance's expert report and testimony.

**7. Dr. Chance's Methodology is Premised on a Model That Was Not Developed Solely For Purposes of Testifying**

The Government's claims that Dr. Chance's methodology has not been used outside of this litigation is simply incredulous. The methodology used by Dr. Chance, as already discussed above, is premised on the BSM Model – a model that won its authors the Nobel Prize, a model that has been widely used, as noted by the Government's experts themselves, a model that was used by the Government's expert themselves in determining the value of the options and in determining the probabilities of generating a profit, and a model that the Government's expert witness DeRosa subscribes to and discusses at length in his book. Dr. Chance notes in his Declaration as follows:

> The Government claims that this methodology is not acceptable because it is not the result of research and was contrived for the case only. This is not true. Calculating probabilities is an essential part of finance. These formulas derive from the standard model assumptions of the Black-Scholes-Merton framework, assumptions they also used, assumptions that were involved in the awarding of a Nobel Prize, and assumptions that are openly used and discussed in DeRosa's book.[65]

---

[64] *See* Kolbe Declaration at gov app. 199.

[65] *See* Chance Declaration at pl dc app. 426.

The Government's assertion that Dr. Chance's methodology has never been used outside of litigation is clearly incorrect and must be rejected along with all of the other specious arguments raised by the Government.

## IV. CONCLUSION

For the above reasons, the Governments Motion must be denied.

Respectfully submitted,

By: s/Joel N. Crouch
Joel N. Crouch
Texas State Bar No.05144220

MEADOWS, COLLIER, REED
COUSINS & BLAU, L.L.P.
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile
jcrouch@meadowscollier.com

ATTORNEYS FOR PLAINTIFFS MURFAM FARMS, LLC, PSM FARMS, LLC AND MURPHY PORK PARTNERS, LLC

**CERTIFICATE OF SERVICE**

On this 21st day of April, 2008, a copy of the foregoing Plaintiffs' Response to the United States Motion to Partially Exclude the Expert Report and Testimony of Don M. Chance was served upon the following persons via electronic notification.

Dennis Donahue, Esq.
United States Department of Justice
Tax Division
P.O. Box 55 Ben Franklin Station
Washington, D.C. 20044

Joseph Pitzinger, Esq.
Jonathan Blacker, Esq.
United States Department of Justice
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201

s/Joel N. Crouch
Joel N. Crouch