IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245T, 06-246T, and 06-247T
(Consolidated)

MURFAM FARMS, LLC, §
By and Through Wendell H. Murphy, Jr., §
a Partner Other Than Tax Matters Partner, §
§
PSM FARMS, LLC, §
By and Through Stratton K. Murphy, §
a Partner Other Than Tax Matters Partner, §
§
MURPHY PORK PARTNERS, LLC, §
By and Through Wendell H. Murphy, Jr., §
a Partner Other Than Tax Matters Partner, §
§
Plaintiffs, §
§
v. §
§
UNITED STATES OF AMERICA, §
§
Defendant. §

## APPENDIX

| DESCRIPTION | PAGES |
|---|---|
| Expert Report of a. Lawrence Kolbe, June 1, 2007 | 000001-000102 |
| Appendices to the Expert Report of A. Lawrence Kolbe | 000103-000269 |
| Expert Report of David F. DeRosa, Ph.D., May 31, 2007 | 000270-000414 |
| Letter dated 5/14/2007 Regarding Extension of Expert Report and Other Discovery Deadlines | 000415-000416 |
| Order dated 4/16/07 Revising Deadlines | 000417-000418 |
| Declaration of Don M. Chance PH.D. CFA, April 21, 2008 | 000419-000431 |
| Exhibit A-1 to Declaration of Don M. Chance | 000432-000434 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245 T, 06-246 T, and 06-247 T
(Consolidated)

MURFAM FARMS, LLC, By and Through Wendell H. Murphy Jr., a Partner Other Than the Tax Matters Partner,

PSM FARMS, LLC, By and Through Stratton K. Murphy, a Partner Other Than the Tax Matters Partner,

MURPHY PORK PARTNERS, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than the Tax Matters Partner,

Plaintiffs,

v.

United States of America,

Defendant.

---

# EXPERT REPORT OF A. LAWRENCE KOLBE

ON

# ECONOMIC ANALYSES OF THE TRANSACTIONS BY PARTICIPANTS IN MURFAM FARMS, LLC, PSM FARMS, LLC, AND MURPHY PORK PARTNERS, LLC

Prepared for the
U.S. Department of Justice

*The Brattle Group*
44 Brattle Street
Cambridge, MA 02138-3736
617.864.7900 voice
617.864.1576 fax

June 1, 2007

## Table of Contents


INTRODUCTION AND SUMMARY . . . . . 1
- Purpose of Report . . . . . 1
- Disclosure Compliance . . . . . 2
- Summary of Findings . . . . . 2
- Organization of Report . . . . . 7

SUMMARY OF THE TRANSACTIONS . . . . . 8
- Basic Structure . . . . . 8
- Actual Transactions . . . . . 14
  - Ownership Structure . . . . . 15
  - Steps Taken . . . . . 20
- Check of COBRA Presentation as Template . . . . . 41

ANALYSES OF RETURNS . . . . . 42
- Risk-Return Principles . . . . . 42
- Pricing of Offsetting Option Position Components . . . . . 44
- Expected Return Analysis of Positions in These Cases . . . . . 61
  - Single-Option Payoff . . . . . 61
  - Identification of the "Investment" . . . . . 66
  - Expected Returns . . . . . 68
- Check One: Actual Outcomes for Option Pairs . . . . . 82
- Check Two: Return Analysis of Similar Positions . . . . . 86
- Did a Reasonable Possibility of a Non-Tax Profit Exist? . . . . . 94

ANALYSES OF ECONOMIC RATIONALITY OF STATED NON-TAX BUSINESS PURPOSES . . . . . 96
- Single-Member LLC Formation . . . . . 97
- MMLLC and S Corp Formation and Option Contribution . . . . . 98

ANALYSES OF DECISION TO CONTRIBUTE OPTION PAIRS TO MMLLCS . . . . . 100

ANALYSES OF WHETHER OFFSETTING OPTION POSITIONS WERE ONE INVESTMENT OR TWO . . 100

# I. INTRODUCTION AND SUMMARY

My name is A. Lawrence Kolbe. My business address is The Brattle Group, 44 Brattle Street, Cambridge, Massachusetts 02138. I am a Principal of The Brattle Group, Inc. ("Brattle"), an economic, environmental and management consulting firm with offices in Cambridge, San Francisco, Washington, Brussels and London.

My work concentrates on financial and regulatory economics. I hold a B.S. in International Affairs (Economics) from the U.S. Air Force Academy (1968) and a Ph.D. in Economics from the Massachusetts Institute of Technology (1979). I left active duty in the Air Force in 1977. Before co-founding Brattle in 1990, I was a Director of Putnam, Hayes and Bartlett, and before that, a Vice President of Charles River Associates.

I am co-author of three books and author or co-author of a number of articles. The principal topics of these publications involve investment issues such as the cost of capital, risk, and valuation. My latest book is entitled *Capital Investment and Valuation*. It is one of a two-volume set that lists "The Brattle Group" as third author with Professors Richard A. Brealey and Stewart C. Myers. The set adapts their leading textbook, *Principles of Corporate Finance*, now in its eighth edition,[1] for business professionals, rather than graduate students.[2]

Clients for my work have included federal, state and local government agencies, industry organizations, and numerous private firms, in a variety of industries. I have testified on financial and regulatory issues in many forums. These include international arbitrations in The Hague, London and Melbourne, Australia; lawsuits in U.S. courts; U.S. arbitrations; and regulatory proceedings before U.S. and Canadian federal, state and provincial regulatory bodies.

Appendix A provides more detail on my professional qualifications.

## A. Purpose of Report

I have been asked by counsel for the U.S. Department of Justice ("DOJ") to: (a) analyze the risk-return characteristics of the offsetting option transactions at issue independently of any claimed tax benefits, and, viewing the offsetting option transactions objectively, to determine whether a reasonable possibility of profit existed apart from any tax benefit, taking into account all transaction costs; (b) assess the economic rationality of the stated non-tax business purposes for the transactions, (c) examine, both before and after taxes, the economic implications of a decision by the participating taxpayers (the "participants") to contribute offsetting option positions, bought through participant-specific, single-member limited liability companies ("LLCs"), to multiple-member limited liability companies ("MMLLCs"), along with the subsequent transfer of the LLCs' interests in the MMLLCs to S corporations ("S Corps"); and (d) analyze whether, from an economic perspective, the offsetting option positions contributed to the MMLLCs are one or two investments.

---

[1] Prof. Franklin Allen has joined Profs. Brealey and Myers as an author of the eighth edition. The full citation is Brealey, Myers and Allen, *Principles of Corporate Finance*, 8th ed., New York: McGraw-Hill/Irwin (2006).

[2] The companion volume, *Financing and Risk Management*, was adapted by another Brattle Principal. Both of these volumes are published by McGraw-Hill.

My examination of the evidence concerning these transactions is from the standpoint of a financial economist. I do not address questions concerning purely legal, accounting or operational issues. My understanding of the facts of this case comes from the record in this case and publicly available reports and information. I am not testifying as to the accuracy of that material, and I have no personal knowledge of these events. In particular, I understand that there is controversy concerning the dates at which certain events did or did not happen. In this report, I sometimes cite record evidence regarding dates, but no statement in this report should be taken to represent a conclusion as to the actual date on which some specific event occurred. In a similar vein, while I cite record evidence regarding the features of the transactions at issue here, I have not studied and have no opinion on who is responsible for the design or implementation of these features. Finally, from time to time my report makes reference to certain aspects of the tax issues that are the subject of these disputes. I am not an attorney, and I have only a lay understanding of the legal issues involved here. I refer to these issues only as context for the economic analyses that are the subject of this report, and nothing I say is intended to express a legal opinion.

I also understand that additional material that might bear on the topics of my report may yet be discovered. This report reflects my analyses and findings to date. However, my work is ongoing, and if necessary, I may update my results as new information becomes available.

### B. Disclosure Compliance

Appendix A includes my publications for the last ten years and lists the trials, depositions and regulatory hearings at which I have testified during the last four years. The materials I considered in preparing my report are listed in Appendix B. Brattle has been compensated for my time in this case at a rate of $475 per hour.

### C. Summary of Findings

My report (1) reviews the structure of the transactions, (2) analyzes whether a reasonable possibility of profit existed absent any tax benefit, (3) assesses the economic rationality of the stated non-tax business purposes for the transactions, (4) examines the economic implications of the decision to contribute offsetting option positions to MMLLCs and subsequently transfer the MMLLC interests to S corporations, and (5) determines whether the offsetting option positions are one investment or two, economically.

**Structure of Transactions:** The basic structure of the transactions that are the subject of my report is described in an Ernst & Young presentation entitled "C.O.B.R.A. (Currency Options Bring Reward Alternatives)" -- "COBRA Presentation."[3] The COBRA Presentation provides a useful framework for summarizing the structure of the relevant transactions. In particular, it identifies the

---

3 The statements in this section are summaries of detailed discussions in the body of my report. It is prepared only for the convenience of the reader, and this section cannot and is not intended to replace the subsequent, more detailed discussions. For this reason, this summary does not contain references to documents or data sources. Footnotes that provide the sources of the information on which I rely appear in the body of the report.

five "steps" to be followed in a "30-day strategy". The steps identified in the COBRA Presentation are:[4]

**Step One - Purchase/Sale of Offsetting Option Contracts:** Each individual simultaneously buys (goes long) and sells (goes short) foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options.

**Step Two - Transfer of Offsetting Options to Partnership:** The individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership."[5] In addition, the individuals contribute cash equal to 2 percent of the "desired loss" (i.e., the stated premium on the long option) to the partnership.

**Step Three - Termination of Options and Acquisition of Assets:** The foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, "[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased."

**Step Four - Transfer of Partnership Interests to S Corp:** The individuals transfer their entire interest in the partnership to a newly formed S corporation.

**Step Five - Distribution of Partnership Assets to S Corp and Their Sale:** The partnership liquidates and distributes its assets (i.e., capital assets, such as stocks or bonds, and/or foreign currency) to the S corporation. The S corporation then "sells the stepped-up assets [i.e., the foreign currency or capital assets] to [an] unrelated third party, generating a loss for tax purposes."

In addition to the above five steps, the COBRA Presentation describes fees of approximately 4.5 percent of the ordinary or capital loss (i.e., the cost of the long option), one-third of which go to Ernst & Young itself.[6] It does not identify a "step" in which these fees are to be paid. The COBRA Presentation also refers to legal opinions, but does not list them as part of a "step," either. For convenience, my report identifies such actions as occurring in "Step Six - Payment of Fees and Issuance of Legal Opinions."

The transactions that are the subject of this report did follow these six steps, as did 15 other sets of transactions that I use to check my findings.

---

[4] Some of the details of the present transaction differ from those in the COBRA Presentation, in ways that largely offset one another. The largest difference, from an economic standpoint, is that here, the net premiums, fees to Ernst & Young and attorneys, and potential payoffs are all a smaller fraction of the stated value of a quantity that the COBRA Presentation calls the "desired loss."

[5] Here, MMLLCs are used rather than partnerships. This difference does not affect my analysis.

[6] In these cases, the fee is 2.5 percent, rather than 4.5 percent, of the stated cost of the long option, i.e., of the quantity the COBRA Presentation calls the "desired loss." Also, the net premium is 3 percent rather than 5 percent of this "desired loss." However, the potential payoff is smaller, too, at only 6.75 percent rather than 12.5 percent of the "desired loss." As noted earlier, these changes largely offset one another.

**Possibility of Profit Absent Any Tax Benefit:** Most investments, including the securities that underlie the dispute in this case, have uncertain outcomes. Economically rational investors do not premise an investment strategy on the belief that they will do spectacularly well on each such investment.

Deutsche Bank A.G. ("DB") was the participants' counterparty for the offsetting option positions. DB apparently had invested time and effort to help find a basic structure of the option positions that had features Ernst & Young appeared to value, but unlike Ernst & Young (and attorneys also working with Ernst & Young), DB did not get an explicit fee for its services in a given transaction. Accordingly, its fee had to come through the way the options were priced. It turns out that the prices for both the participants' long (sold to them by DB) *and short* (bought from them by DB) options were well in excess of their basic value as measured by DB itself and as confirmed by calculations in my report. DB still received its fee from the net transaction, since the dollar amount above basic value stated for the long option exceeded the dollar amount above basic value stated for the short option. Nonetheless, DB's overpayment for the short option is unusual because the normal way to make money is to "buy low and sell high," not to "buy high and sell even higher." This unusual pricing pattern turns out to be the only way DB could get a fee while maintaining the structure of the COBRA transaction. In fact, this pattern is inherent in the basic COBRA structure at any non-negative fee level for DB.

There are two effects of the pricing pattern selected. First, it means that the stated value of the long option is materially in excess of its basic value. This problem should have been apparent at the time, since an example in the COBRA Presentation prices the long option as though there were a 50-50 chance of its paying off (a feature retained in all the actual COBRA long options), but the COBRA Presentation also states that the option pair, and hence the long option, had only a 38 percent chance of paying off. Thus, a long option with a payoff worth $100 million should have been worth no more than $38 million, but the COBRA Presentation puts its value at $50 million. This overstates the actual value of the long option premium (i.e., the "desired loss") under the COBRA Presentation's assumptions by $12 million (or a bit more, if the time value of money is factored in). (A similar problem exists for the short option, but the numbers for the short option in the example are not as simple as the long option's coin toss.)

Second, the actual pricing pattern turns out to produce a fee for DB that averages about 1.5 percent of the "desired loss" across a number of sets of COBRA transactions in 1999, and also about 1.5 percent in the present sets of transactions. This creates an extra, economically material, hurdle to the participants' realization of profits on the offsetting option positions, absent the claimed tax benefits.

My report calculates expected rates of return on the offsetting option positions before and after fees to Ernst & Young and to attorneys. Absent the tax benefits, the 2.5 percent in fees to Ernst & Young and attorneys are a pure loss, not an "investment" in something that can make money. Accordingly, the appropriate denominator for calculation of an expected rate of return is the net premium invested in the offsetting option positions, not the sum of that net premium and these fees. (The COBRA Presentation considers the sum as the amount invested, but the COBRA Presentation explicitly considers returns based on investment outcome *and* tax savings, which I have been asked to put aside.) Nonetheless, in addition to the expected rates of return on the actual amounts invested, I

report expected rates of return on the sum of the net premium and the fees, for comparison with the calculations in the COBRA Presentation.

Before fees to Ernst & Young and attorneys, the expected rate of return on the offsetting option positions was a *loss* of about 48 percent of the amount actually invested in the option pairs in each of the MMLLCs. After these fees, the expected rate of return was a loss of about 131 percent of the amount actually invested in these options. (The 131 percent equals the sum of the expected 48 percent loss on the investment itself and an 83 percent loss due to the fees.)

I check these conclusions against the expected rates of return on the offsetting option positions in other COBRA transactions, which produce expected values in the same negative range. I also check these conclusions against the actual performance of the offsetting option positions in this case and those in the other COBRA transactions. These checks confirm that my calculations of expected rates of return have the right magnitudes. In fact, the option positions in this case turn out to produce lower (more negative) expected rates of return than those of the other COBRA transactions, despite the lower fees to Ernst & Young and the attorneys. The reason is unusually large implicit fees to Deutsche Bank, through the amounts charged for the options in these transactions.

Therefore, absent the claimed tax savings, the participants' expected rate of return on each option position was a loss of *more* than the amount they invested to buy the position. This is an extraordinarily bad investment on its own merits (i.e., absent tax considerations). If the claimed tax savings are ignored, the materially negative expected returns on the individual offsetting option positions make them gambles, not investments.

Another consequence of the negative expected rates of return is that it is actually harmful to combine the "investments" by contributing them to the MMLLCs, since that helps narrow the distribution of possible outcomes. A narrower distribution around a negative expected return increases the chance of realizing a loss. (This is why the casino always wins if someone gambles long enough.) A sign that this holds true for the COBRA transactions is that four of the participants' 43 limited liability corporations in the 15 COBRA transactions in 1999 would have made money after fees had they not contributed their offsetting option positions to partnerships. Yet after contributing the options to partnerships, none of the LLCs made money after fees.

In short, if the claimed tax loss is ignored, these transactions make no economic sense. They cannot be said to provide a "reasonable possibility of a non-tax profit" under any economically sensible definition of the term, "reasonable possibility." Absent tax considerations, these "investments" are not even good gambles, let alone investments with a "reasonable possibility" of non-tax profits.

**Economic Rationality of Stated Non-Tax Business Purposes:** The Plaintiffs state certain non-tax business purposes for the various steps: for the formation of the LLCs, limiting risk exposure to only the amount invested, and for the formation of the MMLLCs, diversification, creating a larger pool of capital, and centralizing decisionmaking. I am unaware of any stated non-tax business purpose for the formation of the S Corps. They state similar reasons for the contribution of the option pairs to the MMLLCs. These do not constitute economically rational non-tax business purposes for these transactions.

First, the explanation for the formation of the LLCs is not economically logical. The offsetting option positions in this case are designed so the participant can never owe more than the net premiums used to buy them. This automatically eliminates any exposure to the risk of additional capital demands on the participant, both to the participant *and* to the bank acting as counterparty to the transactions (here DB). (Even with different investments, no rational counterparty would permit a participant's use of the LLC form to provide the participant with a "free lunch" in risk reduction, since the participant's limited risk exposure comes at the counterparty's expense.)

Second, the MMLLCs are unnecessary and redundant for the stated non-tax benefits. Exactly the same benefits stated for the MMLLCs might equally well be stated for the S Corps, but are not. It would have saved paperwork, if nothing else, to have omitted the MMLLCs altogether and to have done everything that was actually done within the MMLLCs within the S Corps instead.

Third, the mere existence of a larger pool of capital offers no automatic advantage, and there is no evidence it conveyed any advantage here. Fourth, there was little potential to achieve, or evidence of, any benefit from centralized decision making. Finally, as noted earlier, the expected outcome on the individual option positions was materially negative, so diversifying these bets was economically harmful to the participants, not helpful.

Thus, the stated non-tax business purposes for the formation of these entities and the contribution of the offsetting option positions to the MMLLCs are sometimes illusory, sometimes merely without any factual support, and sometimes flatly illogical. They do not provide economically rational non-tax reasons for undertaking these transactions.

**Decision to Contribute Offsetting Option Positions to MMLLC:** "Step Two" of the COBRA Presentation was contribution of the offsetting option positions to a partnership. Without the hope of a tax deduction, these transactions are economically senseless. I understand that the contribution of the offsetting option positions to the MMLLC is a necessary step in being able to claim the tax losses. If that is true, it would be economically foolish (to say the very least) to fail to make the contribution, having undertaken the process in the first place. (And as noted above, absent tax considerations, the contribution does economic harm by making a loss for the participants more likely.)

**Whether Offsetting Option Positions were One Investment or Two, Economically:** From an economic perspective, the offsetting option positions in this case are a single investment, not two separate investments. There are two reasons for this, one based on the different characteristics of the two option components together and apart, and the other based on DB's pricing of the components. The latter is the more important, for the COBRA transactions.

Consider how the economics of the offsetting option positions would change if the long and short calls were written separately, with two different, independent banks as counterparties, instead of a single counterparty (here DB). In that case, the bank buying the short option would demand security to insure payment, which would increase the costs to the participant manyfold. It is highly unlikely that a rational investor would be indifferent between keeping these offsetting option positions together and splitting them.

Of course, in the COBRA transactions, there is an even more fundamental problem with trying to split the option position components. The structure of the COBRA transactions meant that the stated value at any positive fee for DB had to be not only more than the long option in a pair was worth (e.g., under the COBRA Presentation's example, a stated premium of $50 million for a long option worth at most $38 million), it also had to be more than the short option was worth. DB's actual implicit fees in the present case would require a bank not simultaneously selling the long option to pay a participant an excess in the range of 96 to 144 percent more than the basic value of the short option, which would be irrational in a stand-alone transaction. In a stand-alone transaction, no one tries to make money by "buying high."

Thus, in the COBRA transactions, the offsetting option pairs are irretrievably tied together by the COBRA structure generally and the way DB's options implemented it specifically, quite apart from the amount of capital that might be required to separate them. From an economic perspective, the offsetting option positions in this case are unquestionably single investments.[7]

### D. Organization of Report

Section II summarizes the transactions that are the subject of my analyses. Section III reviews the relevant risk-return principles, analyzes the return characteristics of the offsetting option transactions, and determines whether a reasonable probability of profit existed from these transactions apart from any tax benefits. Section IV assesses the economic rationality of the stated non-tax business purposes for the transactions. Section V examines the implications of a decision to contribute the offsetting option positions to the MMLLCs. Section VI analyzes whether, from an economic perspective, the offsetting option positions are one investment or two.

My report is supported by five appendices. Appendix A contains additional data on my qualifications, and Appendix B lists the materials I considered. Appendix C contains a review of approximately contemporaneous, similar transactions that I use to check my conclusions in Sections II and III. Appendix D contains workpapers that support the findings and calculations in Section III regarding the transactions that are the subject of these cases. Lastly, Appendix E analyzes the broader set of transactions discussed in Appendix C to check my Section III conclusions regarding the present cases.

## II. Summary of the Transactions

This section first outlines the basic structure of the transactions, using a simplified format from a presentation created by Ernst & Young. It then uses this simplified structure to review the actual transactions in this case. The understanding gained from this section underlies later sections of my report.

---

[7] For the record, this conclusion concerns the essential economic nature of the offsetting option position. It is not a legal opinion (which I am unqualified to form), nor is it a statement about the number of securities (documents) used to construct the offsetting option position.

### A. Basic Structure

An Ernst & Young presentation entitled "C.O.B.R.A. (Currency Options Bring Reward Alternatives)"[8] provides a useful framework for summarizing the structure of the relevant transactions.[9] In particular, it identifies the five "steps" to be followed in a "30-day strategy".[10] As discussed below, these steps generally correspond to the transactions in this case that are the subject of my analyses, although some details differ.[11] The steps identified in the COBRA Presentation follow.[12]

---

8 I considered two versions of this presentation: the longer version, 2003EY001565-83, undated, and the shorter version, DOJ 049106-21, dated 11/11/1999. (Note: references to numbers such as "2003EY001565-83" are to Bates numbers throughout my report.) The latter version omits four pages that appear in the former version, and the words vary in places. Also, the tables at the end of the shorter version include taxes owed on the proceeds of the currency trades, if any, which the longer version's do not. When a difference in wording exists, my report cites the longer version and footnotes the difference in the shorter version. Hereafter, I refer to both versions collectively as the "COBRA Presentation." If only one Bates number is cited, the reference is to a chart that appears in the longer version only, not the shorter version.

9 As discussed further below, there are a number of cases that follow the basic steps in the COBRA Presentation. In some instances (but not in the present cases), a "COBRA Action Work Plan" (see e.g. DOJ 055279-83) also exists that specifies the actions to take in more detail than in the COBRA Presentation. The COBRA Presentation provides the best overall summary for present purposes, however.

10 COBRA Presentation, 2003EY001566 (longer version) and DOJ 049108 (shorter version). The word "investment" appears between "day" and "strategy" in the shorter version. The word "steps" does not appear on these pages, but "step" in this sense is used pervasively in the presentation, as the immediately following discussion demonstrates.

11 The largest difference, from an economic standpoint, is that (a) the net amount paid for the offsetting option positions that give rise to the claimed tax deductions, (b) the net potential payoff on those positions, and (c) the net fees paid by the taxpayers, are all three a smaller proportion of a quantity the COBRA Presentation designates as the "desired loss" in these transactions than in those described in the COBRA Presentation itself. My report discusses the implications of these differences below. To preview the results, these differences tend to offset one another and therefore do not lead to materially different economic conclusions than would have resulted had these transactions and those in the COBRA Presentation had identical structures.

12 A slight variant on the COBRA Presentation exists for a year 2000 version of COBRA. This transaction modifies some of the terms associated with the transaction slightly, but carries out the same six steps discussed for in the COBRA Presentation for the 1999 transaction. For example, this 2000 version of the COBRA Presentation states that the transaction would "generate a possible return of approximately 39% in 90 days with about a 34% probability of success." (DOJ 038597-99) In contrast, the shorter version of the 1999 COBRA Presentation represents that the transaction would "generate a possible 31% return in 30 days with a 38% probability of success." (DOJ 049108) In response to DOJ interrogatories, the participants in this case state that E&Y represented to them that the "probable outcome of the Transactions was a 38% likelihood of making 31% on the investment at the conclusion of a 30-day

(continued...)

**Step One - Purchase/Sale of Offsetting Option Contracts:**[13] In this step, each individual[14] simultaneously buys (goes long) and sells (goes short) foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options. The COBRA Presentation specifies that "[e]ach individual invests in [a] different type of foreign currency options....".[15]

The COBRA Presentation specifies use of "digital" option contracts.[16] These options are called "digital" because the investor either wins or loses a prespecified amount in full. Thus, the option is either "on" or "off," like a digital (binary) one or zero. If the value of the underlying asset (here, a currency exchange rate, the amount of one currency you can buy with another) is at or beyond a specified "strike" (or "exercise") price at the "maturity" (or "exercise") date, the holder gets the specified cash payout. If not, the holder gets nothing.[17]

The COBRA Presentation contains numerical illustrations of the options it envisions with a $50 million value for the long option.[18] The strike price difference between the long and short options in the illustrations is two "pips," which is the difference in the digital option positions used in the present case.[19] For one of the currencies at issue in the present case (the Euro), a pip has a value on

---

12 (...continued)
period." MURFAM Farms, LLC, PSM Farms, LLC, and Murphy Pork Partners LLC, Plaintiffs' Objections and Responses to the United States' First Set of Interrogatories, Response to Interrogatory number 26 (hereafter, "Response to Interrogatory X", where "X" is the number of the interrogatory).

13 COBRA Presentation, 2003EY001571 (longer version) and DOJ 049109 (shorter version).

14 The COBRA Presentation specifies that multiple partners are needed. 2003EY001567-68 (longer version).

15 COBRA Presentation, 2003EY001571 (longer version) and DOJ 049109 (shorter version).

16 COBRA Presentation, 2003EY001579-80, 82-83 (longer version) and DOJ 0491117-18, 20-21 (shorter version).

17 Some additional terminology: a digital option like the ones here, with a payout of a pre-specified amount, is called a "cash-or-nothing" option; one with a payout equal to the value of the underlying asset at expiration is called an "asset-or-nothing" option. A digital "call" option on an asset pays cash to the owner if the price of the underlying asset is at or above the strike price, and a digital "put" option pays cash to the owner if the price of the underlying asset is at or below the strike price. If it is profitable (unprofitable) to exercise a call option -- i.e., if the spot price of the asset exceeds (is less than) a call's strike price -- the option is said to be "in (out of) the money." Equivalently, puts are in (out of) the money when the asset price is less (greater) than the strike price. The initial seller of an option is said to "write" the option. Finally, note that there is no payment of an "exercise price" at maturity in these digital options, a feature that is common in other types of options.

18 COBRA Presentation, 2003EY001579-80, 82-83 (longer version) and DOJ 0491117-18, 20-21 (shorter version).

19 A "pip" is the smallest unit at which an exchange rate is ordinarily specified. In the present case, it is the fourth digit to the right of the decimal place in the exchange rate. Although the pip is defined as the
(continued...)

the order of 1/100th of a U.S. cent (i.e., 1/10,000th of a U.S. dollar),[20] which means the strike price differences envisioned in the COBRA Presentation and used in two of the option pairs in the present case were on the order of 1/5,000th of a U.S. dollar. For the other currency (the Swiss franc), a pip has a value of less than 1/160th of a U.S. cent,[21] so the strike price difference in dollars is even smaller.

**Step Two - Transfer of Offsetting Options to Partnership:**[22] In this step, the individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership."[23] The COBRA Presentation states that the individuals "receive tax basis for long position but do not reduce basis for short position."[24] In addition, the individuals contribute cash equal to 2 percent of the "desired loss" to the partnership.[25]

The Step Two chart does not specify a relationship between the size of the "desired loss" and the size of the net premium used to buy the offsetting option position. However, numerical examples of possible outcomes for the option positions that appear later in the COBRA Presentation show a net premium equal to 5 percent of the "desired loss," i.e., the cost of the long option.[26] This interpretation is confirmed by an Ernst & Young email dated November 5, 1999 that transmits "the spreadsheet file, as shown in the COBRA PowerPoint presentation."[27] The email indicates that the amount of the "desired loss" is to be entered in one cell of the spreadsheet and "the other calculations will be performed automatically." The "Amount of Capital Loss" or "Amount of

---

19 (...continued) smallest increment in which foreign currency is traded, spot rates are sometimes stated in half-pip increments. This can arise when reporting the "mid-rate," which is the midpoint of the bid and ask spreads. For example, a midpoint of a bid-ask spread of 1.0000 and 1.0003 would be 1.00015.

20 See Appendix E, Workpaper E-26.

21 See Appendix E, Workpaper E-26.

22 COBRA Presentation, 2003EY001572 (longer version) and DOJ 049110 (shorter version).

23 *Ibid.* Note that in the present cases, an MMLLC is used instead of a partnership. I discuss this difference below.

24 COBRA Presentation, 2003EY001572 (longer version).

25 *Ibid.* The shorter version replaces the words "desired loss" with "cost of the long option." DOJ 049110. However, the shorter version does use the phrase "desired loss" in this context in the "Economic Summary" section of the presentation, at DOJ 049119. This chart is equivalent to 2003EY001581 in the longer version.

26 COBRA Presentation, 2003EY001579-83 (longer version) and DOJ 0491117-21 (shorter version).

27 DOJ 035669-72.

Ordinary Loss" equals the premium on the long call in the example, and the "Capital Invested" is equal to 5 percent of that value.[28]

I understand that no electronic copies of this spreadsheet file have been identified in the materials supplied to DOJ. I have been asked by counsel to verify that such a spreadsheet can be constructed and, if so, to replicate the calculations in the COBRA Presentation if possible. It is in fact straightforward to construct such a spreadsheet, and I am providing a Microsoft Excel file that does so along with this report. This file uses the parameters of the present transactions rather than those in the COBRA Presentation. The details are contained in Appendix C, Workpapers C-3 to C-12, which provide some examples of the kind of output that results when different values are entered for "desired loss." The first examples compare $50 million value used in the COBRA Presentation's tables with the COBRA Presentation's and the present parameters.[29]

**Step Three - Termination of Options and Acquisition of Assets:**[30] In this step, the foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, "[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased."[31]

**Step Four - Transfer of Partnership Interests to S Corp:**[32] In this step, the individuals transfer their entire interest in the partnership to a newly formed S corporation, which is said to cause a "technical termination" of the partnership under what I understand to be a provision of tax law.[33]

**Step Five - Distribution of Partnership Assets to S Corp and Their Sale:**[34] After receiving the partnership interests in Step 4, the partnership liquidates and distributes its assets (i.e., capital assets, such as stocks or bonds, and/or foreign currency) to the S corporation.[35] The "[l]iquidation results in a step-up in tax basis of assets distributed by the partnership equal to cost of the long option ([plus

---

28 *Ibid.* COBRA Presentation, 2003EY001579 (longer version) and DOJ 049117 (shorter version).

29 DOJ 049120-21 (shorter version). Recall that only the shorter version included taxes owed on the proceeds of the trades, which I include on the replicated spreadsheets in Appendix C. As noted earlier, the longer version's examples omit these taxes, but the Excel file I am providing with this report includes them.

30 COBRA Presentation, 2003EY001573 (longer version) and DOJ 049111 (shorter version).

31 *Ibid.*

32 COBRA Presentation, 2003EY001574 (longer version) and DOJ 049112 (shorter version).

33 *Ibid.* The shorter version omits mention of the provision, which is "Code section 708(b)(1)(B)."

34 COBRA Presentation, 2003EY001575 (longer version) and DOJ 049113 (shorter version).

35 *Ibid.* The shorter version's discussion is much shorter.

or minus] profit or loss on [the offsetting option position])."[36] The S corporation then "sells the stepped-up assets [i.e., the foreign currency or capital assets] to [an] unrelated third party, generating a loss for tax purposes."[37]

**Step Six - Payment of Fees and Issuance of Legal Opinions [not identified as a "step" in COBRA Presentation]:** The COBRA Presentation describes fees of approximately 4.5 percent of the ordinary or capital loss (i.e., the cost of the long option), one third of which go to Ernst & Young itself.[38] It does not identify a "step" in which these fees are to be paid. The COBRA Presentation also refers to legal opinions, but does not list them as part of a "step," either.[39] Accordingly, for convenience, I identify such actions as occurring in "Step Six."

Figure 1, on the next page, depicts these six steps. Later figures use the same general layout, but with specific details supplied, to depict the transactions in this case. The process starts at the top, with the purchase of the options, moves to the middle with the contribution of the options and the purchase of either foreign currency or capital assets, and finishes at the bottom with the payment of the fees and issuance of the legal opinions. In the figure, "cash" means amounts in U.S. dollars. "Assets" refers to "capital assets" as used in the COBRA Presentation. Entities not controlled by the participants are named in italics. Please note that since the details of the fee payments and legal opinions are not linked to the other steps in the COBRA Presentation, there are no arrows linking that box to the others in Figure 1.

---

36 COBRA Presentation, 2003EY001575 (longer version).

37 COBRA Presentation, 2003EY001575 (longer version) and DOJ 049113 (shorter version). The shorter version does not use the phrase "stepped-up" and adds "profit or" after "generating a".

38 COBRA Presentation, 2003EY001567, 79, 81-83 (longer version) and DOJ 049117, 19-21 (shorter version). See also 2003EY007040.

39 COBRA Presentation, 2003EY001567, 69 (longer version).




**Figure 1**

Please note that in Figure 1, the "individuals" consist of both (a) the individual participants and (b) their LLCs. The COBRA Presentation does not distinguish the LLCs from the individual participants. However, the actual series of transactions involved in following these six steps (which for brevity, I will henceforth refer to as "COBRA transactions") do involve LLCs as well as individual participants. The LLCs are funded by the participants, and the LLCs are the entities that actually buy the offsetting option positions and contribute them to the General Partnership.

## B. Actual Transactions

The actual transactions in this case involve a series of entities and steps that are similar to those depicted in Figure 1. These basic steps are repeated for each of the three Murphy Farms COBRA transactions. However, there are some differences between the three actual COBRA transactions in this case and the transactions described in the COBRA Presentation. These differences include the following:[40]

- The actual transactions at issue in these cases use MMLLCs in place of partnerships. However, this difference does not appear to be material for purposes of my analysis. For example, in their Complaints for Readjustment of Partnership Items, the Plaintiffs refer to the MMLLCs as "partnerships" and note that the MMLLC in a particular case should be treated as a partnership for tax purposes.[41] In addition, the legal opinions discuss the tax treatment of the MMLLCs as partnerships.[42] As a result, I will use the terms "partnership(s)" and "MMLLC(s)" interchangeably in this report.
- The fees charged in the transactions at issue in these cases appear to be lower than those described in the COBRA presentation, at 2.5 percent instead of 4.5 percent of the cost of the long option..
- The net option premium paid in these cases was only 3 percent of the "desired loss," whereas the COBRA Presentation assumed a net option premium of 5 percent.
- The time to expiration of the options in these cases was 60 days, while the COBRA Presentation discussed a 30-day investment.
- The net potential payout in these cases is 225 percent of the net premium (i.e., relative to the stated value of the long option, 6.75 percent net potential payoff divided by 3 percent net premium), instead of 250 percent of the net premium (i.e., 12.5 percent divided by 5 percent).

This section first describes the ownership structure of these entities and then the steps undertaken. Figures 3A, 3B and 3C, which appear at the end of this discussion, depict the actual steps in this case using the layout in Figure 1.

---

40 The sources of my information on the quantitative information in these points -- e.g., the fees -- appear in the detailed discussion below.

41 See MURFAM Farms, LLC By and Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner, v. U.S., Case No. 06-245T, Complaint for Readjustment of Partnership Items Under Code Section 6226, March 28, 2006 at paragraphs 9 and 10 (hereafter "MURFAM Farms MMLLC Complaint for Readjustment of Partnership Items"), Murphy Pork Partners, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than Tax Matters Partner v. U.S., Case No. 06-247T, Complaint for Readjustment of Partnership Items Under Code Section 6226, March 28, 2006 at paragraphs 7 and 8 (hereafter "Murphy Pork MMLLC Complaint for Readjustment of Partnership Items"), PSM Farms, LLC, By and Through Stratton K. Murphy, a Partner Other Than Tax Matters Partner v. U.S., Case No. 06-246T, Complaint for Readjustment of Partnership Items Under Code Section 6226, March 28, 2006 at paragraphs 7 and 8 (hereafter "PSM MMLLC Complaint for Readjustment of Partnership Items").

42 See, for example, DOJ 042133-96, 054421-83.

### 1. Ownership Structure

**Single Member LLCs:**

The three COBRA transactions in these cases involve eight participants, some of which were involved in more than one of the Murphy Farms COBRA transactions. Each of the eight participants was the sole owner[43] of one of eight Single Member LLCs (abbreviated in my report simply as "LLCs", as in the COBRA Presentation). The LLCs were formed in Delaware on April 6, 2000.[44] The LLCs involved in this case were:

- WHM Ventures LLC ("WHM LLC") is wholly owned by Wendell H. Murphy[45]
- WHMJ LLC is wholly owned by Wendell H. Murphy, Jr.[46]
- JMN Ventures LLC ("JMN LLC") is wholly owned by Joyce Murphy Norman[47]
- WMC LLC is wholly owned by Wendy M. Crumpler[48]
- ANB LLC is wholly owned by Angela N. Brown[49]
- HDM LLC is wholly owned by Harry D. Murphy[50]
- MDM Ventures LLC ("MDM LLC") is wholly owned by Marc D. Murphy[51]
- SKM Ventures LLC ("SKM LLC") is wholly owned by Stratton K. Murphy[52]

---

43 See DOJ 042135-6, 54422-3.

44 MUPR01401 - 16.

45 MURFAM Farms MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 3.

46 MURFAM Farms MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 1.

47 MURFAM Farms MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 6.

48 MURFAM Farms MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 5.

49 MURFAM Farms MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 7.

50 PSM MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 3. Harry D. Murphy is also at times referred to as "Pete Murphy." See for example, DOJ 040271-3.

51 PSM MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 5.

52 PSM MMLLC Complaint for Readjustment of Partnership Items at Complaint paragraph 1.

**Multiple Member LLCs and S Corps:**

These eight participants executed three different COBRA transactions. The COBRA Presentation envisioned the use of a partnership and an S Corporation in each COBRA transaction. In this transaction, the partnership was replaced with the MMLLC. Since these cases involve three COBRA transactions, there were three MMLLCs and three S Corporations.

The MMLLCs were formed on April 4, 2000[53] and the S Corporations were formed on June 22, 2000[54] by the eight participants. The ownership shares in the MMLLCs are as follows:[55]

A. MURFAM Farms LLC ("MURFAM MMLLC"):[56]
   - WHM LLC (42.79%)
   - WHMJ LLC (28.04%)
   - JMN LLC (15.72%)
   - WMC LLC (8.59%)
   - ANB LLC (4.86%)

B. PSM Farms LLC ("PSM MMLLC"):[57]
   - HDM LLC (48.78%)
   - SKM LLC (25.61%)
   - MDM LLC (25.61%)

C. Murphy Pork Partners ("Murphy Pork MMLLC"):[58]
   - WHM LLC (57.1428%)
   - WHMJ LLC (28.5715%)
   - HDM LLC (14.2857%)

The participants also have a similar ownership share in the S Corps:

---

53 MUPR00519 - 24.

54 MUPR00002 - 13.

55 Note that HDM LLC had ownership shares in both PSM Farms LLC and Murphy Pork Partners and WHM LLC and WHMJ LLC had ownership shares in both MURFAM Farms LLC and Murphy Pork Partners.

56 DOJ 053108. See also DOJ 032707 and MUCO00251.

57 IRSADMIN000760. See also DOJ 032714 and MUCO00251.

58 IRSADMIN000341. See also DOJ 032710 and MUCO00251.

A. MURFAM Inc. ("MURFAM S Corp"):[59]
Wendell H. Murphy (42.79%)
Wendell H. Murphy, Jr. (28.04%)
Joyce Murphy Norman (15.72%)
Wendy M. Crumpler (8.59%)
Angela N. Brown (4.86%)

B. PSM Inc. ("PSM S Corp"):[60]
Harry D. Murphy (48.78%)
Stratton K. Murphy (25.61%)
Marc D. Murphy (25.61%)

C. Murphy Pork Inc. ("Murphy Pork S Corp"):[61]
Wendell H. Murphy (57.1428%)
Wendell H. Murphy, Jr. (28.5715%)
Harry D. Murphy (14.2857%)

These ownership structures are depicted in Figures 2A, 2B and 2C, respectively.

59 DOJ 042112 and DOJ 032708.

60 IRSADMIN000015 and DOJ 032716.

61 DOJ 053038 and DOJ 032712.




Ownership Shares Sources:
MURFAM Farms, LLC: DOJ 053108, 032707.
MURFAM, Inc.: DOJ 042112, 032708.

**Figure 2A**




**Figure 2B**




**Figure 2C**

### 2. Steps Taken

This section traces the activities undertaken, organized according to the steps described in the COBRA Presentation.

**Step One - Purchase/Sale of Offsetting Option Contracts:** On April 12, 2000,[62] the eight LLCs' accounts with Deutsche Bank Alex. Brown ("DBAB") posted the following fund transfers by the participants:

- Wendell H. Murphy transfers $2,526,500 from his personal account to WHM LLC.[63]
- Wendell H. Murphy, Jr. transfers $1,562,500 from his personal account to WHMJ LLC.[64]
- Joyce Norman Murphy transfers $707,800 from her personal account to JMN LLC.[65]
- Wendy M. Crumpler transfers $386,800 from her personal account toWMC LLC.[66]
- Angela N. Brown transfers $218,900 from her personal account to ANB LLC.[67]
- Harry D. Murphy transfers $1,025,600 from his personal account to HDM LLC.[68]
- Stratton K. Murphy transfers $459,700 from his personal account to SKM LLC.[69]
- Marc D. Murphy transfers $459,700 from his personal account to MDM LLC.[70]

The offsetting option positions apparently were purchased/sold on April 14, 2000 in transactions with Deutsche Bank A.G. ("DB"), and are shown in Tables 1A, 1B and 1C, respectively.[71] These transactions produce offsetting option positions (also called "option pairs," as in Table 1) on (a) the U.S. dollar ("USD") to the Euro ("EUR") exchange rate, and (b) the Swiss franc ("CHF") to USD exchange rate. In total, there were eleven option pairs purchased. This included four USD/EUR

---

62 The authorization or as of dates are not known.

63 DB-DOJ-COBRA-00013478.

64 DB-DOJ-COBRA-00013540.

65 DB-DOJ-COBRA-00013588.

66 DB-DOJ-COBRA-00019626.

67 DB-DOJ-COBRA-00013639.

68 DB-DOJ-COBRA-00013680.

69 DB-DOJ-COBRA-00013779.

70 DB-DOJ-COBRA-00013733.

71 All the options have a trade date of April 14, 2000. The options' confirmations are dated April 14, 2000 for ANB LLC, HDM LLC and WMC LLC; April 17, 2000 for JMN LLC, MDM LLC and SKM LLC; and July 2, 2003 for WHM LLC and WHMJ LLC. See DB-DOJ-COBRA-00010364-69, 73-81, 18888-99 and DOJ 042210. Note that the options first appear in the DBAB accounts on the settlement date of April 18, 2000. See DB-DOJ-COBRA-00013640, 3681, 3589, 3734, 3780, 3479, 3541, 9627.

option pairs that were identical in all respects other than the premiums and the payouts and seven CHF/USD option pairs that were identical in all respects other than the premiums and payouts.

**Table 1A. Individual Participants' Options Positions, MURFAM Farms**

| *Option Pair #:* | WHM LLC [1] | WHMJ LLC [2] | JMN LLC [3] | WMC LLC [4] | ANB LLC [5] | Total [6] |
|---|---|---|---|---|---|---|
| **Characteristics of Option Pair** | | | | | | |
| Underlying Currencies | USD/EUR | CHF/USD | CHF/USD | USD/EUR | CHF/USD | - |
| Option Type | Put | Put | Put | Put | Put | - |
| Spot Rate | 0.95705 | 1.6448 | 1.6448 | 0.95705 | 1.6448 | - |
| Purchase Date | 14-Apr-00 | 14-Apr-00 | 14-Apr-00 | 14-Apr-00 | 14-Apr-00 | - |
| Exercise Date | 13-Jun-00 | 13-Jun-00 | 13-Jun-00 | 13-Jun-00 | 13-Jun-00 | - |
| **Long Options** | | | | | | |
| Premium | $26,400,000 | $17,300,000 | $9,700,000 | $5,300,000 | $3,000,000 | $61,700,000 |
| Strike Price | 0.92070 | 1.5839 | 1.5839 | 0.92070 | 1.5839 | - |
| Payout | $52,800,000 | $34,600,000 | $19,400,000 | $10,600,000 | $6,000,000 | $123,400,000 |
| **Short Options** | | | | | | |
| Premium | $25,608,000 | $16,781,000 | $9,409,000 | $5,141,000 | $2,910,000 | $59,849,000 |
| Strike Price | 0.92050 | 1.5837 | 1.5837 | 0.92050 | 1.5837 | - |
| Payout | $51,018,000 | $33,432,250 | $18,745,250 | $10,242,250 | $5,797,500 | $119,235,250 |
| **Net Option Premiums** | $792,000 | $519,000 | $291,000 | $159,000 | $90,000 | $1,851,000 |
| **Option Pairs Contributed to:** | MURFAM Farms, LLC | MURFAM Farms, LLC | MURFAM Farms, LLC | MURFAM Farms, LLC | MURFAM Farms, LLC | |

Notes: Contributions from DB-DOJ-COBRA-00013486, 3548, 3594, 3645, 9632.
All other values from DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777.
The DB account statements for WHM LLC and WMC LLC indicate that the USD/EUR options are calls (DB-DOJ-COBRA-00013486, 9632). The DB deal sheets indicate that they are puts (DB-DOJ-COBRA 00240679 - 89, 767 - 777). The relationship of the strike rate to the spot rate (strike < spot) supports the options being puts. Additionally, the options finishing out-of-the-money supports the options being puts (DB-DOJ-COBRA-00044052 - 4). The analysis treats these options as puts throughout.
The Complaint for Readjustment of Partnership Items for MURFAM Farms at #35 and the option confirmation for the ANB LLC option pair list a short option payout of $5,797,500. See DOJ 042210 - 2. The deal sheet and RMSRPT list a payout of $5,979,500. See DB-DOJ-COBRA 00240723 - 33, DB-DOJ-COBRA-00241725 - 8. The value of $5,797,500 is consistent with the net payout to net premium ratio of 2.25 for all other Murphy Farms option pairs and is used throughout this analysis.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

**Table 1B. Individual Participants' Options Positions, PSM Farms**

| *Option Pair #:* | HDM LLC [1] | SKM LLC [2] | MDM LLC [3] | Total [4] |
|---|---|---|---|---|
| **Characteristics of Option Pair** | | | | |
| Underlying Currencies | USD/EUR | CHF/USD | CHF/USD | - |
| Option Type | Put | Put | Put | - |
| Spot Rate | 0.95705 | 1.6448 | 1.6448 | - |
| Purchase Date | 14-Apr-00 | 14-Apr-00 | 14-Apr-00 | - |
| Exercise Date | 13-Jun-00 | 13-Jun-00 | 13-Jun-00 | - |
| **Long Options** | | | | |
| Premium | $12,000,000 | $6,300,000 | $6,300,000 | $24,600,000 |
| Strike Price | 0.92070 | 1.5839 | 1.5839 | - |
| Payout | $24,000,000 | $12,600,000 | $12,600,000 | $49,200,000 |
| **Short Options** | | | | |
| Premium | $11,640,000 | $6,111,000 | $6,111,000 | $23,862,000 |
| Strike Price | 0.92050 | 1.5837 | 1.5837 | - |
| Payout | $23,190,000 | $12,174,750 | $12,174,750 | $47,539,500 |
| **Net Option Premiums** | $360,000 | $189,000 | $189,000 | $738,000 |
| **Option Pairs Contributed to:** | PSM Farms, LLC | PSM Farms, LLC | PSM Farms, LLC | |

Notes: Contributions from DB-DOJ-COBRA-00013687 - 8, 739, 785;
All other values from DB-DOJ-COBRA 00240734 - 55, 89 - 99.
The DB account statements for HDM LLC indicate that the USD/EUR options are calls (DB-DOJ-COBRA-00013687 - 8). The DB deal sheets indicate that they are puts (DB-DOJ-COBRA 00240789 - 99). The relationship of the strike rate to the spot rate (strike < spot) supports the options being puts. Additionally, the options finishing out-of-the-money supports the options being puts (DB-DOJ-COBRA-00044052 - 4). The analysis treats these options as puts throughout.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

**Table 1C. Individual Participants' Options Positions, Murphy Pork**

| *Option Pair #:* | WHM LLC [1] | WHMJ LLC [2] | HDM LLC [3] | Total [4] |
|---|---|---|---|---|
| **Characteristics of Option Pair** | | | | |
| Underlying Currencies | USD/EUR | CHF/USD | CHF/USD | - |
| Option Type | Put | Put | Put | - |
| Spot Rate | 0.95705 | 1.6448 | 1.6448 | - |
| Purchase Date | 14-Apr-00 | 14-Apr-00 | 14-Apr-00 | - |
| Exercise Date | 13-Jun-00 | 13-Jun-00 | 13-Jun-00 | - |
| **Long Options** | | | | |
| Premium | $8,000,000 | $4,000,000 | $2,000,000 | $14,000,000 |
| Strike Price | 0.92070 | 1.5839 | 1.5839 | - |
| Payout | $16,000,000 | $8,000,000 | $4,000,000 | $28,000,000 |
| **Short Options** | | | | |
| Premium | $7,760,000 | $3,880,000 | $1,940,000 | $13,580,000 |
| Strike Price | 0.92050 | 1.5837 | 1.5837 | - |
| Payout | $15,460,000 | $7,730,000 | $3,865,000 | $27,055,000 |
| **Net Option Premiums** | $240,000 | $120,000 | $60,000 | $420,000 |
| **Option Pairs Contributed to:** | Murphy Pork Partners, LLC | Murphy Pork Partners, LLC | Murphy Pork Partners, LLC | |

Notes: Contributions from DB-DOJ-COBRA-00013485-6, 547-8, 688;
All other values from DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788.
The DB account statements for WHM LLC indicate that the USD/EUR options are calls (DB-DOJ-COBRA-00013485 - 6). The DB deal sheets indicate that they are puts (DB-DOJ-COBRA 00240778 - 788). The relationship of the strike rate to the spot rate (strike < spot) supports the options being puts. Additionally, the options finishing out-of-the-money supports the options being puts (DB-DOJ-COBRA-00044052 - 4). The analysis treats these options as puts throughout.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

In all cases, the strike price differences quoted on the transaction confirmations between the long and short positions are the two pips previewed in the COBRA Presentation.[72] As noted in Part A above, in U.S. dollars this represents a difference of about 1/5,000th of a U.S. dollar, or about 1/50th of a U.S. cent, for the USD/EUR option pairs.[73] The strike price difference is even smaller for the

[72] See, for example, DB-DOJ-COBRA-00018882-4.

[73] See Appendix E, Workpaper E-26.

other option pairs, about 1/80th of a U.S. cent for the CHF/USD exchange rate.[74] Note that while the COBRA Presentation presents an example with a net premium equal to 5 percent of the "desired loss" -- the cost of the long option -- the transactions in this case all had a net premium equal to 3 percent of this amount.[75] However, this lower net premium also came at a "cost" of having a lower net payout if the options hit. Thus, while the COBRA Presentation expected a payout equal to 12.5 percent of the "desired loss," the options in this case provided a net payout of only 6.75 percent of the "desired loss."[76] As noted earlier, this means the ratio of potential net payout to net premium has been reduced to 225 percent (6.75 / 3) in these transactions, rather than 250 percent (12.5 / 5) as in the COBRA Presentation.

**Step Two - Transfer of Offsetting Options to MMLLC:** Recall that while the COBRA Presentation described the transfer of the options to a partnership, the actual structure here substituted an MMLLC for the partnership. The options and cash in this case apparently were transferred to the MMLLCs on April 17, 2000, (before the options' settlements[77] with the LLCs on April 18, 2000), although the transfers were not recorded in the MMLLCs' accounts until May 19, 2000.[78] The apparent transfers are as follows:

**Multiple Member LLCs:**

A. MURFAM MMLLC:[79]
- WHM LLC transfers $567,873.06 and one USD/EUR option pair (with the $26,400,000 long option premium)
- WHMJ LLC transfers $370,661.34 and one CHF/USD option pair (with the $17,300,000 long option premium)
- JMN LLC transfers $204,160.60 and one CHF/USD option pair
- WMC LLC transfers $111,497.30 and one USD/EUR option pair
- ANB LLC transfers $63,059.57 and one CHF/USD option pair

---

74 See Appendix E, Workpaper E-26.

75 For example, the net option premium on WHM LLC's euro option position in the MURFAM Farms transaction was $792,000 on a long option with a stated premium $26.4 million. The net option premium is therefore 3 percent of the long option's stated premium. The same is true for all of the other options presented in Tables 1A, 1B, and 1C.

76 For example, the net payout if both the long and short options are in-the-money on WHM LLC's euro position in the MURFAM Farms transaction would be $1.782 million (long payout of $52.8 million *less* short option payout $51.018 million). This net payout is equal to 6.75% of the $26.4 million stated long option premium. The same is true for all of the other options presented in Tables 1A, 1B, and 1C.

77 DB-DOJ-COBRA-00013640, 3681, 3589, 3734, 3780, 3479, 3541, 9627.

78 The as of date is April 17, 2000 while the cash transfers were posted May 19, 2000. The option transfers settled on May 16 and May 17, 2000. Part of the contribution came in the form of bonds, which were contributed in November, 2000, as discussed in Step Three below.

79 DB-DOJ-COBRA-00013818-21, 17054, 59, 60, 62, 64, 17218-20, 22, 24.

B. PSM MMLLC:[80]

- HDM LLC transfers $255,790.39 and one USD/EUR option pair
- SKM LLC transfers $132,457.10 and one CHF/USD option pair
- MDM LLC transfers $132,457.10 and one CHF/USD option pair

C. Murphy Pork MMLLC:[81]

- WHM LLC transfers $172,082.74 and one USD/EUR option pair (with the $8,000,000 long option premium)
- WHMJ LLC transfers $85,702.05 and one CHF/USD option pair (with the $4,000,000 long option premium)
- HDM LLC transfers $42,631.73 and one CHF/USD option pair

On May 17, 2000, all option pair transfers were recorded in the LLCs' accounts with DBAB while all cash transfers were recorded on May 19, 2000.[82]

It is worth noting at this point that the amount of cash and bonds contributed to the individual LLCs in excess of that used to buy the offsetting option positions exceeds the two percent of the premium of the long options that was called for in the COBRA Presentation by an amount necessary to pay the fees.[83] Specifically, the sum of the values of (1) the cash in excess of the amounts used to purchase the option pairs; and (2) the bonds subsequently contributed to the MMLLCs, is equal to approximately 4.5 percent of the "desired loss."[84] As discussed in "Step Six" below, 2.5 percent of the stated long option premiums were paid in fees using cash from these contributions. Thus, the part not going to fees is essentially equal to the 2 percent cash contribution called for by the COBRA Presentation.

**Step Three - Termination of Options and Acquisition of Assets:** In this step, the COBRA Presentation focuses on the expiration and cashout of the option positions and the type of assets (capital assets versus foreign currency) that remain in the MMLLC afterwards.

---

80 DB-DOJ-COBRA-00013859-61, 17055-7, 17214-6.

81 DB-DOJ-COBRA-00013903-6, 17058, 61, 63, 17217, 21, 23.

82 DB-DOJ-COBRA-00013645, 13687-8, 13594, 13739, 13785, 13485-6, 13547-8, 19632.

83 COBRA Presentation, 2003EY001572 (longer version) and DOJ 049110 (shorter version). This calculation is shown later, in Tables 3A to 3C and Table 4, in connection with the "Step Six" discussion.

84 All but one of the individual LLCs contributed 4.50 or 4.51 percent of the long option premium, and one (ANB, the smallest) 4.54 percent. (This calculation values the bonds that were contributed in November, 2000 on their sale dates in December, 2000, not on their contribution dates; to date, I have not been able to locate the bonds' precise values on their contribution dates.) See Appendix D, Workpaper D-22A, D-18B, or D-18C.

*Option Positions*: The options positions were held through their June 13, 2000 expiration. All eleven option pairs expired out of the money.[85] This is documented in Tables 2A to 2C.

**Table 2A. Actual Offsetting Option Position Outcomes, MURFAM Farms**

| *Contributor* | *Option Currencies* [1] | *Original Net Premium* [2] | *Payout If Both Options Hit* [3] | *Actual Payout Amount* [4] |
|---|---|---|---|---|
| *WHM LLC* | USD/EUR | $ (792,000) | $ 1,782,000 | $ - |
| *WHMJ LLC* | CHF/USD | $ (519,000) | $ 1,167,750 | $ - |
| *JMN LLC* | CHF/USD | $ (291,000) | $ 654,750 | $ - |
| *WMC LLC* | USD/EUR | $ (159,000) | $ 357,750 | $ - |
| *ANB LLC* | CHF/USD | $ (90,000) | $ 202,500 | $ - |
| *Total* | | $ (1,851,000) | $ 4,164,750 | $ - |

Notes: [1], [2], [3]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777; [4]: DB-DOJ-COBRA-00044052 - 4.
All of the options are puts.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

**Table 2B. Actual Offsetting Option Position Outcomes, PSM Farms**

| *Contributor* | *Option Currencies* [1] | *Original Net Premium* [2] | *Payout If Both Options Hit* [3] | *Actual Payout Amount* [4] |
|---|---|---|---|---|
| *HDM LLC* | USD/EUR | $ (360,000) | $ 810,000 | $ - |
| *SKM LLC* | CHF/USD | $ (189,000) | $ 425,250 | $ - |
| *MDM LLC* | CHF/USD | $ (189,000) | $ 425,250 | $ - |
| *Total* | | $ (738,000) | $ 1,660,500 | $ - |

Notes: [1], [2], [3]: DB-DOJ-COBRA 00240734 - 55, 89 - 99; [4]: DB-DOJ-COBRA-00044052 - 4. All of the options are puts.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

[85] The payouts of zero had settlement dates of June 16 or June 20, 2000 for each MMLLC. See DB-DOJ-COBRA-00013827-8, 13911-2, 13867-8.

**Table 2C. Actual Offsetting Option Position Outcomes, Murphy Pork**

| *Contributor* | *Option Currencies* [1] | *Original Net Premium* [2] | *Payout If Both Options Hit* [3] | *Actual Payout Amount* [4] |
|---|---|---|---|---|
| *WHM LLC* | USD/EUR | $ (240,000) | $ 540,000 | $ - |
| *WHMJ LLC* | CHF/USD | $ (120,000) | $ 270,000 | $ - |
| *HDM LLC* | CHF/USD | $ (60,000) | $ 135,000 | $ - |
| *Total* | | $ (420,000) | $ 945,000 | $ - |

Notes: [1], [2], [3]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788; [4]: DB-DOJ-COBRA-00044052 - 4.
All of the options are puts.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

The acquisition of capital assets and/or foreign exchange, the other focus of Step Three of the COBRA Presentation, involved the contributions of bonds and the purchase of what are designated as "Euro Dollars." The transactions occurred as follows.

*Assets Associated with Tax Loss*: Between November 2, 2000 and November 9, 2000,[86] the LLCs received[87] varying quantities of North Carolina State municipal debt with a value of approximately $180,000.[88] These bonds were transferred from the LLCs to MURFAM MMLLC and PSM

---

[86] The authorization date of the transactions is not known. JMN LLC, WHM LLC and WMC LLC received varying quantities of North Carolina municipal debt on November 2, 2000. See DB-DOJ-COBRA-00014034, 13454, 19647. ANB LLC, MDM LLC and SKM LLC received varying quantities of the same bonds on November 3, 2000. See DB-DOJ-COBRA-00013614, 14063, 13759. HDM LLC and WHMJ LLC received varying quantities of the same bonds on November 9, 2000. See DB-DOJ-COBRA-00014049, 13511.

[87] The bonds were contributed to the LLCs by the individual participants. See MURFAM Farms MMLLC and PSM MMLLC Complaints for Readjustment of Partnership Items at paragraphs 41 and 35, respectively.

[88] See Appendix D, Workpaper D-22A.

MMLLC on December 5, 2000.[89] Recall that capital assets, such as the bonds in these two MMLLCs, give rise to capital losses according to the COBRA Presentation.[90,91]

On December 19, 2000, Murphy Pork MMLLC purchased $300,000 worth of "Euro Dollars"[92] at a rate of 0.8936 per USD.[93] Recall that foreign exchange amounts, such as the foreign exchange in Murphy Pork MMLLC, give rise to ordinary losses according to the COBRA Presentation.[94]

**Step Four - Transfer of Partnership Interests to S Corp:** On December 27, 2000, the participants assigned their partnership interests in the MMLLCs to the S Corps.[95] Under the COBRA Presentation, the transfer of partnership interests causes a "technical termination" of the partnership

---

89 DB-DOJ-COBRA-00013810, 13853. The transaction is settled in the MMLLC accounts on December 5, 2000 while the as of date is not known. Note the authorization letters are signed but not dated; however, they have a fax machine date stamp of December 1, 2000. See DB-DOJ-COBRA-00017014-5.

90 COBRA Presentation, 2003EY001573 (longer version) and DOJ 049111 (shorter version).

91 All three MMLLCs engaged in some limited securities transactions. All MMLLCs purchased common stocks on May 22, 2000 and sold them on June 14, 2000, then bought more on July 31, 2000 and sold them on August 7, 2000. In rounded numbers, on the first date, MURFAM Farms purchased stocks for $657 thousand and subsequently sold them for $670 thousand. On the second date, MURFAM Farms purchased stocks for $1.33 million and subsequently sold them for $1.35 million, for a total gain on the two sets of transactions of $26 thousand. For PSM Farms, again in rounded terms, the corresponding numbers are $258 thousand with a $264 thousand sale and $529 thousand with a $534 thousand sale, for a total gain $12 thousand. The equivalent values for Murphy Pork are $149 thousand with a sale of $152 thousand and $303 thousand with a $307 thousand sale, for a total gain of $6 thousand. See DB-DOJ-COBRA-00018804-33, 839-870, 936-964, 967. See Appendix D, Workpapers D-4A, 4B and 4C, for details.

92 The conventional definition of a "eurodollar" is a U.S. dollar held in an overseas bank, initially in Europe and subsequently in other countries as well. See, for example, Robert W. Kolb, *Futures, Options and Swaps*, 4th ed., Oxford, U.K.: Blackwell Publishing (2003) at p. 130, as well as numerous web sites (for example, http://financial-dictionary.thefreedictionary.com/Eurodollar) that may be found by searching on the words, "definition: eurodollar."

93 DB-DOJ-COBRA-00013892, 18835. The settlement date is December 21, 2000 while the trade date is December 19, 2000. Since a eurodollar is just another type of U.S. dollar, its value will be USD 1.00, not 0.8936 per USD. Nor is a eurodollar a form of "foreign exchange" to a U.S. consumer, at least from an economic perspective. Therefore, the existence of this exchange rate implies that the term "Euro Dollars" simply means "euros."

94 COBRA Presentation, 2003EY001573 (longer version) and DOJ 049111 (shorter version).

95 MURFAM Farms MMLLC, PSM MMLLC, and Murphy Pork MMLLC Complaints for Readjustment of Partnership Items at paragraphs 42, 36 and 36, respectively. Note that there are also three letters sent from the MMLLCs to Deutsche Banc Alex. Brown authorizing the transfer of all interests in the MMLLCs to the S Corps. See DB-DOJ-COBRA-00017016-8.

for tax purposes.[96] According to the Complaints, once interests in MMLLCs are transferred to a "single person" -- the S Corp -- the MMLLC liquidates and dissolves "as a matter of law."[97]

**Step Five - Distribution of MMLLC Assets to S Corp and Their Sale:** On December 27, 2000, the MMLLCs were liquidated and their assets were distributed to the S Corps.[98] The S Corps then sold the non-cash assets received from the MMLLCs. On December 28, 2000, MURFAM S Corp and PSM S Corp sold their North Carolina State municipal bonds.[99] On December 28, 2000, Murphy Pork S Corp sold all of its "Euro Dollars" at 0.9235 USD/EUR.[100] The proceeds on the foreign currency sale were $310,039.05.[101]

**Step Six - Payment of Fees and Issuance of Legal Opinions [not identified as a "step" in COBRA Presentation]:** As depicted in Figure 1 above, activities not identified as "steps" in the COBRA Presentation also took place. From an economic perspective, the most important of these involve the payment of the fees mentioned in the COBRA Presentation. Additionally, legal opinions were provided.

On April 26, 2000, the LLCs wired a total sum of $2,006,000 to Ernst & Young in fees.[102] On May 17, 2000, the LLCs wired a total sum of $200,000 to Proskauer Rose in fees.[103] On October 2, 2000, MURFAM MMLLC and PSM MMLLC paid a total sum of $207,500 to Proskauer Rose in fees.[104]

---

96 COBRA Presentation, 2003EY001574 (longer version) and DOJ 049112 (shorter version).

97 MURFAM Farms MMLLC, PSM MMLLC, and Murphy Pork MMLLC Complaints for Readjustment of Partnership Items at paragraphs 43, 37 and 37, respectively.

98 The transactions are dated as of December 26, 2000 but were posted and settled in the DB accounts on December 27, 2000. See DB-DOJ-COBRA-00013809, 810, 852-3, 893, 897, 933, 964, 994, 999. Note that the authorization letter for PSM Farms is dated December 22, 2000. See DB-DOJ-COBRA-00017017.

99 DB-DOJ-COBRA-00013932, 3963, 8798, 8799. Note that the settlement date is December 29, 2000 while the trade date is December 28, 2000.

100 DB-DOJ-COBRA-00013994, 18800. Note that the trade date is December 28, 2000 while the settlement date is December 29, 2000.

101 DB-DOJ-COBRA-00013994, 18800.

102 DB-DOJ-COBRA-00013639, 13681, 13588, 13733, 13779, 13479, 13541, 19626. The payments were authorized on April 25, 2000 and they were posted on April 26, 2000. See DB-DOJ-COBRA-00016950.

103 DB-DOJ-COBRA-00013645, 13687, 13594, 13739, 13785, 13485, 13547, 19632. The payments were authorized on May 16, 2000 and they were posted on May 17, 2000. See DB-DOJ-COBRA-00017043.

104 DB-DOJ-COBRA-00014083, 13848. Note this is the posting date for the payments.

On December 29, 2000, the S Corps paid a total sum of $94,000 to Ernst & Young in fees.[105] Each of the four sets of payments are detailed below, and the amounts for the individual partnerships are contained in Tables 3A to 3C.

The fee to Ernst & Young paid on April 26, 2000 was allocated in a proportion equal to each MMLLC's share of the combined premiums assigned to all the long options in the offsetting option positions in these transactions. The proportion of the total fee paid by each LLC was as follows:

- WHM LLC, $688,000 (34.30%)[106]
- WHMJ LLC, $426,000 (21.24%)[107]
- JMN LLC, $194,000 (9.67%)[108]
- WMC LLC, $106,000 (5.28%)[109]
- ANB LLC, $60,000 (2.99%)[110]
- HDM LLC, $280,000 (13.96%)[111]
- SKM LLC, $126,000 (6.28%)[112]
- MDM LLC, $126,000 (6.28%)[113]

The fee paid to Proskauer Rose on May 17, 2000 was also allocated in similar proportions:[114]

- WHM LLC, $68,600 (34.30%)[115]
- WHMJ LLC, $42,400 (21.20%)[116]

---

[105] DB-DOJ-COBRA-00013933, 64, 95. Note this is the posting date for the payments.

[106] DB-DOJ-COBRA-00013479.

[107] DB-DOJ-COBRA-00013541.

[108] DB-DOJ-COBRA-00013588.

[109] DB-DOJ-COBRA-00019626.

[110] DB-DOJ-COBRA-00013639.

[111] DB-DOJ-COBRA-00013681.

[112] DB-DOJ-COBRA-00013779.

[113] DB-DOJ-COBRA-00013733.

[114] Note that the LLCs' fee allocation differs slightly from their share of the combined premiums assigned to all the long options in the offsetting option positions.

[115] DB-DOJ-COBRA-00013485.

[116] DB-DOJ-COBRA-00013547.

- JMN LLC, $19,200 (9.60%)[117]
- WMC LLC, $10,600 (5.30%)[118]
- ANB LLC, $6,000 (3.00%)[119]
- HDM LLC, $28,000 (14.00%)[120]
- SKM LLC, $12,600 (6.30%)[121]
- MDM LLC, $12,600 (6.30%)[122]

On September 14, 2000, Proskauer Rose sent invoices to the LLCs for a total sum of $207,500. The fees were allocated in a percentage similar to previous payments made to Ernst & Young on April 26, 2000 and to Proskauer Rose on May 17, 2000:

- WHM LLC, $71,172.50 (34.30%)[123]
- WHMJ LLC, $43,990 (21.20%)[124]
- JMN LLC, $19,920 (9.60%)[125]
- WMC LLC, $10,997.50 (5.30%)[126]
- ANB LLC, $6,225 (3.00%)[127]
- HDM LLC, $29,050 (14.00%)[128]
- SKM LLC, $13,072.50 (6.30%)[129]
- MDM LLC, $13,072.50 (6.30%)[130]

---

[117] DB-DOJ-COBRA-00013594.

[118] DB-DOJ-COBRA-00019632.

[119] DB-DOJ-COBRA-00013645.

[120] DB-DOJ-COBRA-00013687.

[121] DB-DOJ-COBRA-00013785.

[122] DB-DOJ-COBRA-00013739.

[123] MUCO00268.

[124] DB-DOJ-COBRA 00241275.

[125] DB-DOJ-COBRA 00241273.

[126] MUCO00267.

[127] DB-DOJ-COBRA 00241277.

[128] DB-DOJ-COBRA 00241276.

[129] DB-DOJ-COBRA 00241272.

[130] DB-DOJ-COBRA 00241274.

These payments were made by MURFAM MMLLC and PSM MMLLC on October 2, 2000 in the form of two payments. MURFAM MMLLC paid $152,305 and PSM MMLLC paid $55,195.[131]

Proskauer Rose in turn wrote legal opinions for the transactions for ANB LLC, JMN LLC, WHM LLC, WHMJ LLC and WMC LLC[132] -- LLCs with ownership shares in MURFAM MMLLC. Similarly, Proskauer Rose wrote legal opinions for the transactions for HDM LLC, MDM Ventures LLC and SKM LLC -- LLCs with ownership shares in PSM MMLLC – and for WHM LLC, WHMJ LLC, and HDM LLC -- LLCs with ownership shares in Murphy Pork MMLLC .[133]

Ernst & Young invoices dated December 21, 2000[134] were for a total sum of $94,000, and these payments were made by the S Corps on December 29, 2000.[135] Of this total, MURFAM S Corp paid $56,725, Murphy Pork S Corp paid $14,560 and PSM S Corp paid $22,715.[136]

The participants paid a combined total of $2,507,500 million in fees to Ernst & Young and Proskauer Rose. The total fees in the COBRA Presentation were identified as 4.5 percent of the "transaction,"[137] i.e., the premium of the long option in the pair, and this is the amount of fees paid in the 1999 COBRA transactions. The actual fees identified in these cases amount to 2.5 percent of the amount charged by DB for the long options in the offsetting option positions, which reflect the (largely offsetting) differences in the net premium, potential payoff and fee percentages between these transactions and the 1999 COBRA transactions.[138] Thus, once these differences in

---

131 DB-DOJ-COBRA-00017019, 13848, 14083.

132 DOJ 042133-96.

133 DOJ 054421-83 and IRSADMIN000640-702.

134 DB-DOJ-COBRA-00019525-7.

135 Note that the invoices list the entities as "MURFAM", "Murphy Pork" and "PSM". It is not clear from these invoices if they are the MMLLCs or the S Corps. The bank statements show the payments being made from the S Corps. See DB-DOJ-COBRA-00013933, 64, 95.

136 DB-DOJ-COBRA-00013933, 95, 64. The allocation of these fees across the S Corporations differs somewhat from their relative proportions of the total "desired loss" across all of the Murphy Farms transactions, resulting in a total of slightly more than 2.5% in fees for the Murphy Pork transaction, and slightly less than 2.5% in fees for the PSM and MURFAM transactions. This can be see based on the fees and long option premiums presented in Tables 3A, 3B and 3C.

137 COBRA Presentation, 2003EY001567, 79, 81-83 (longer version) and DOJ 049117, 19-21 (shorter version). See also 2003EY007040.

138 The participants may also have consulted personal counsel concerning the COBRA transactions, in which case the fees paid for such advice are also part of the associated transaction costs. However, I am unable to document such fees. In this regard, I would note that there is a letter from Richard Burrows at Burrows & Hall to Carl Roark at Deutsche Banc Alex. Brown, dated April 11, 2000, which states that Burrows & Hall "consulted with" Wendell H. Murphy, Harry D. Murphy and Joyce M. Norman "concerning the

(continued...)

implementation parameters are considered, the quantities identified as the "transaction" and the "desired loss"[139] in the COBRA Presentation correspond to the dollar value of the long options in the offsetting option positions in the present cases.

Tables 3A to 3C calculate the fees for the three partnerships as percentages of the long option premiums, identified in the tables as the "desired loss." The fees were paid from the assets (cash and bonds) that the participants first contributed to the LLCs. Some of the fees were paid directly from the LLCs, and some from the assets subsequently contributed to the MMLLCs or S Corps. Table 4, which immediately follows Table 3C, calculates the cash and bond contribution percentages of the "desired loss" for all three partnerships. Table 4 matches the LLC-paid fees to the partnerships by assuming that for each MMLLC, the value of the contributed bonds counts dollar for dollar in determining the cash contribution required of an individual LLC.[140] As noted above, the initial contributions are almost exactly 4.5 percent, which exceeds the 2 percent called for in the COBRA Presentation by amounts that are essentially the 2.5 percent that went to fees.[141]

---

138 (...continued)
foreign currency investment and related strategies that have been proposed," and concluded that the individuals (and apparently their families) understood "the uncertainties of the financial and tax consequences and ramifications of such investment strategies." (MUCO00001-2.) No documentation regarding any fees paid to Burrows & Hall appears to be available.

139 COBRA Presentation, 2003EY001967, 72 (longer version).

140 See Appendix D, Workpapers 19-A, 15-B, and 15-C, for the details.

141 The small differences from 4.5 percent might be due to differences in bond valuation amounts between my calculations, which value the bonds as of their sale date, and the (so far, unidentified) bond valuation procedures actually used by the participants at the time.

**Table 3A. Summary of Fees, MURFAM Farms**

| | | *WHM LLC* | *WHMJ LLC* | *JMN LLC* | *WMC LLC* | *ANB LLC* | *All Participants* |
|---|---|---|---|---|---|---|---|
| | Fees Paid | | | | | | |
| [1] | *Ernst & Young** | $ 528,000 | $ 346,000 | $ 194,000 | $ 106,000 | $ 60,000 | $ 1,234,000 |
| [2] | *Ernst & Young*** | $ 24,271 | $ 15,905 | $ 8,918 | $ 4,873 | $ 2,758 | $ 56,725 |
| [3] | *Proskauer Rose**** | $ 52,647 | $ 34,438 | $ 19,200 | $ 10,600 | $ 6,000 | $ 122,884 |
| [4] | *Proskauer Rose***** | $ 54,621 | $ 35,729 | $ 19,920 | $ 10,998 | $ 6,225 | $ 127,492 |
| [5] | Total | $ 659,539 | $ 432,072 | $ 242,038 | $ 132,470 | $ 74,983 | $ 1,541,101 |
| | Net Option Premium | | | | | | |
| [6] | *USD/EUR Positions* | $ 792,000 | $ - | $ - | $ 159,000 | $ - | $ 951,000 |
| [7] | *CHF/USD Positions* | $ - | $ 519,000 | $ 291,000 | $ - | $ 90,000 | $ 900,000 |
| [8] | Total | $ 792,000 | $ 519,000 | $ 291,000 | $ 159,000 | $ 90,000 | $ 1,851,000 |
| | "Desired Loss" | | | | | | |
| [9] | *Amount* | $ 26,400,000 | $ 17,300,000 | $ 9,700,000 | $ 5,300,000 | $ 3,000,000 | $ 61,700,000 |
| [10] | *% of Total for all Participants* | 42.8% | 28.0% | 15.7% | 8.6% | 4.9% | 100.0% |
| [11] | Fees as a % of "Desired Loss" | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |

Notes: [1]: DB-DOJ-COBRA-00013479, 3541, 3588, 3639, 9626; [2]: DB-DOJ-COBRA-00013933, 19527; [3]: DB-DOJ-COBRA-00013485, 3547, 3594, 3645, 9632; [4]: DB-DOJ-COBRA-00014083, DB-DOJ-COBRA 00241273, 75, 77; MUCO00267 - 8; [5] = [1] + [2] + [3] + [4]; [6], [7], [9]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777, Table 1A; [8]: [6] + [7]; [10] = [9] / the sum of [9] for all participants; [11] = [5] / [9]. USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*WHM LLC made one payment of $688,000 to Ernst & Young on April 26, 2000. WHMJ LLC made one payment of $426,000 to Ernst & Young on April 26, 2000. See Appendix D, Workpaper D-19A for the allocation of these payments between MURFAM Farms, LLC and Murphy Pork Partners, LLC.

**MURFAM, Inc. made one payment of $56,725 to Ernst & Young on Dec. 29, 2000. This payment is allocated among the participants based on [10].

***WHM LLC made one payment of $68,600 to Proskauer Rose on May 17, 2000. WHMJ LLC made one payment of $42,400 to Proskauer Rose on May 17, 2000. See Appendix D, Workpaper D-19A for the allocation of these payments between MURFAM Farms, LLC and Murphy Pork Partners, LLC.

****MURFAM Farms, LLC made one payment of $152,305 to Proskauer Rose on Oct. 2, 2000 on behalf of WHM LLC, WHMJ LLC, JMN LLC, WMC LLC, and ANB LLC. See Appendix D, Workpaper D-19A for the allocation of the WHM LLC and WHMJ LLC portions of this payment between MURFAM Farms, LLC and Murphy Pork Partners, LLC.

**Table 3B. Summary of Fees, PSM Farms**

| | | *HDM LLC* | *SKM LLC* | *MDM LLC* | *All Participants* |
|---|---|---|---|---|---|
| | Fees Paid | | | | |
| [1] | *Ernst & Young** | $ 240,000 | $ 126,000 | $ 126,000 | $ 492,000 |
| [2] | *Ernst & Young*** | $ 11,080 | $ 5,817 | $ 5,817 | $ 22,715 |
| [3] | *Proskauer Rose**** | $ 24,000 | $ 12,600 | $ 12,600 | $ 49,200 |
| [4] | *Proskauer Rose***** | $ 24,900 | $ 13,073 | $ 13,073 | $ 51,045 |
| [5] | Total | $ 299,980 | $ 157,490 | $ 157,490 | $ 614,960 |
| | Net Option Premium | | | | |
| [6] | *USD/EUR Positions* | $ 360,000 | $ - | $ - | $ 360,000 |
| [7] | *CHF/USD Positions* | $ - | $ 189,000 | $ 189,000 | $ 378,000 |
| [8] | Total | $ 360,000 | $ 189,000 | $ 189,000 | $ 738,000 |
| | "Desired Loss" | | | | |
| [9] | *Amount* | $ 12,000,000 | $ 6,300,000 | $ 6,300,000 | $ 24,600,000 |
| [10] | *% of Total for all Participants* | 48.8% | 25.6% | 25.6% | 100.0% |
| [11] | Fees as a % of "Desired Loss" | 2.5% | 2.5% | 2.5% | 2.5% |

Notes: [1]: DB-DOJ-COBRA-00013681, 733, 779; [2]: DB-DOJ-COBRA-00013964, 19525; [3]: DB-DOJ-COBRA-00013687, 739, 785; [4]: DB-DOJ-COBRA-00013848, DB-DOJ-COBRA 00241272, 74, 76; [5] = [1] + [2] + [3] + [4]; [6], [7], [9]: DB-DOJ-COBRA 00240734 - 55, 89 - 99, Table 1B; [8]: [6] + [7]; [10] = [9] / the sum of [9] for all participants; [11] = [5] / [9].
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*HDM LLC made one payment of $280,000 to Ernst & Young on April 26, 2000. See Appendix D, Workpaper D-15B for the allocation of this payment between PSM Farms, LLC and Murphy Pork Partners, LLC.

**PSM, Inc. made one payment of $22,715 to Ernst & Young on Dec. 29, 2000. This payment is allocated among the participants based on [10].

***HDM LLC made one payment of $28,000 to Proskauer Rose on May 17, 2000. See Appendix D, Workpaper D-15B for the allocation of this payment between PSM Farms, LLC and Murphy Pork Partners, LLC.

****PSM Farms, LLC made one payment of $55,195 to Proskauer Rose on Oct. 2, 2000 on behalf of HDM LLC, SKM LLC, and MDM LLC. See Appendix D, Workpaper D-15B for the allocation of the HDM LLC portion of this payment between PSM Farms, LLC and Murphy Pork Partners, LLC.

**Table 3C. Summary of Fees, Murphy Pork**

| | | *WHM LLC* | *WHMJ LLC* | *HDM LLC* | *All Participants* |
|---|---|---|---|---|---|
| | Fees Paid | | | | |
| [1] | *Ernst & Young** | $ 160,000 | $ 80,000 | $ 40,000 | $ 280,000 |
| [2] | *Ernst & Young*** | $ 8,320 | $ 4,160 | $ 2,080 | $ 14,560 |
| [3] | *Proskauer Rose**** | $ 15,953 | $ 7,962 | $ 4,000 | $ 27,916 |
| [4] | *Proskauer Rose***** | $ 16,552 | $ 8,261 | $ 4,150 | $ 28,963 |
| [5] | Total | $ 200,825 | $ 100,383 | $ 50,230 | $ 351,439 |
| | Net Option Premium | | | | |
| [6] | *USD/EUR Positions* | $ 240,000 | $ - | $ - | $ 240,000 |
| [7] | *CHF/USD Positions* | $ - | $ 120,000 | $ 60,000 | $ 180,000 |
| [8] | Total | $ 240,000 | $ 120,000 | $ 60,000 | $ 420,000 |
| | "Desired Loss" | | | | |
| [9] | *Amount* | $ 8,000,000 | $ 4,000,000 | $ 2,000,000 | $ 14,000,000 |
| [10] | *% of Total for all Participants* | 57.1% | 28.6% | 14.3% | 100.0% |
| [11] | Fees as a % of "Desired Loss" | 2.5% | 2.5% | 2.5% | 2.5% |

Notes: [1]: DB-DOJ-COBRA-00013479, 541, 681; [2]: DB-DOJ-COBRA-00013995, 19526; [3]: DB-DOJ-COBRA-00013485, 547, 687; [4]: DB-DOJ-COBRA-00014083, DB-DOJ-COBRA 00241275 - 76; MUCO00268; [5] = [1] + [2] + [3] + [4]; [6], [7], [9]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788, Table 1C; [8]: [6] + [7]; [10] = [9] / the sum of [9] for all participants; [11] = [5] / [9].
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*WHM LLC made one payment of $688,000 to Ernst & Young on April 26, 2000. WHMJ LLC made one payment of $426,000 to Ernst & Young on April 26, 2000. HDM LLC made one payment of $280,000 to Ernst & Young on April 26. See Appendix D, Workpaper D-15C for the allocation of these payments between MURFAM Farms, LLC, PSM Farms, LLC, and Murphy Pork Partners, LLC.

**Murphy Pork, Inc. made one payment of $14,560 to Ernst & Young on Dec. 29, 2000. This payment is allocated among the participants based on [10].

***WHM LLC made one payment of $68,600 to Proskauer Rose on May 17, 2000. WHMJ LLC made one payment of $42,400 to Proskauer Rose on May 17, 2000. HDM LLC made one payment of $28,000 to Proskauer Rose on May 17, 2000. See Appendix D, Workpaper D-15C for the allocation of these payments between MURFAM Farms, LLC, PSM Farms, LLC, and Murphy Pork Partners, LLC.

****MURFAM Farms, LLC made one payment of $152,305 to Proskauer Rose on Oct. 2, 2000. See Appendix D, Workpaper D-15C for the allocation of the WHM LLC and WHMJ LLC portions of this payment between MURFAM Farms, LLC and Murphy Pork Partners, LLC.

**Table 4. Net Cash Contributed to LLCs by Participants in Each MMLLC**

| | LLCs in MMLLC: | | | |
|---|---|---|---|---|
| | *MURFAM MMLLC* | *PSM MMLLC* | *Murphy Pork MMLLC* | *Total* |
| [1] Initial Cash Contributed to LLCs | $ 4,501,962 | $ 1,794,836 | $ 1,050,703 | $ 7,347,500 |
| [2] Cash Paid for Option Premiums | $ (1,851,000) | $ (738,000) | $ (420,000) | $ (3,009,000) |
| [3] *Net Cash Contribution* | $ 2,650,962 | $ 1,056,836 | $ 630,703 | $ 4,338,500 |
| [4] *"Desired Loss"* | $ 61,700,000 | $ 24,600,000 | $ 14,000,000 | $ 100,300,000 |
| [5] Net Cash as a % of "Desired Loss" | 4.297% | 4.296% | 4.505% | 4.326% |
| [6] Bonds Contributed* | $ 129,802 | $ 52,123 | $ - | $ 181,925 |
| [7] Additional Capital Assets as a % of "Desired Loss" | 0.210% | 0.212% | 0.000% | 0.181% |
| [8] Net Cash & Capital Assets Contributed | $ 2,780,763 | $ 1,108,959 | $ 630,703 | $ 4,520,425 |
| [9] Net Cash & Capital Assets as a % of "Desired Loss" | 4.507% | 4.508% | 4.505% | 4.507% |

Notes:
See Appendix D, Workpaper D-22A, Appendix D, Workpaper D-18B, and Appendix D, Workpaper D-18C for details by LLC.
[1]: DB-DOJ-COBRA-00013478, 13540, 13588, 13639, 13680, 13733, 13779, 19626; See also Appendix D, Workpaper D-19A, Appendix D, Workpaper D-15B, and Appendix D, Workpaper D-15C; [2]: DB-DOJ-COBRA-00013478, 13540, 13588, 13639, 13680, 13733, 13779, 19626; See also Table 1A, Table 1B, Table 1C; [3] = [1] + [2]; [4]: Values from DB deal sheets. See DB-DOJ-COBRA 00240679 - 799; See also Table 1A, Table 1B, Table 1C; [5] = [3] / [4];
[6]: DB-DOJ-COBRA-00013810, 13853, 18798 - 9; [7] = [6] / [4]; [8] = [3] + [6]; [9] = [8] / [4].
*Value at sale date (Dec. 28, 2000).

My subsequent economic analyses are based on the above economic features of the transactions. First, however, it is useful to summarize the features just discussed in a manner similar to the COBRA Presentation summary in Figure 1. The existence of three partnerships and S corporations means that three elaborations of the simplified Figure 1 illustration are required to depict all of the steps in these transactions. Figures 3A to 3C, on the following three pages, provide this information.

Please note that the MURFAM and PSM transactions (Figures 3A and 3B) attach the partnership tax basis to contributed bonds, while the Murphy Pork transactions (Figure 3C) attach the partnership tax basis to the "Euro Dollars" (i.e., euros, denoted as "FX," for "foreign exchange," in Figure 3C). The figures also use abbreviations to make reference to Ernst & Young ("E&Y") and Deutsche Bank AG ("DB").

The step numbers in the figures follow those from the COBRA Presentation as illustrated in Figure 1 above, with the elements of each step indicated by lower-case letters (*e.g.*, a "1a" in a circle indicates the first part of Step 1 from the COBRA Presentation). Step 6 in these figures refers to the payment of fees and other actions taken to wind up the transactions. As noted earlier, these activities are not called a "step" in the COBRA Presentation, but the fees are discussed elsewhere in the COBRA Presentation.

## MURFAM Farms Transactions




**Steps:**

1a. Participants fund LLCs

1b. LLCs purchase/sell offsetting options

2. LLCs inject cash and options into Partnership

3a. MMLLC does short round trip in securities with cash from LLCs

3b. Options expire; payout is zero

3c. Participants inject bonds through LLCs to MMLLC

4. LLCs transfer MMLLC interest to S Corp

5a. Liquidate MMLLC and distribute assets to S Corp

5b. S Corp sells bonds

**Pay Fees/Get Opinions:**

6a. Pay fees to E&Y

6b. Pay fees to Proskauer Rose for legal opinion

6c. Pay fees to Proskauer Rose

6d. Pay fees to E&Y

6e. Change DBAB accounts

Source documents: DOJ 042133-96; DB-DOJ-COBRA-00013639-40, 13478-9, 13540-1, 19626-7, 13816-21, 13827-8, 14087-9, 14082-3, 13809-10, 13804, 19527, 13943, 13614, 13618, 14034, 13567, 13454, 13458, 13511, 13515, 19647, and 19651.

**Figure 3A**


PSM Farms Transactions
Participants
Cash 1a
3c Bonds
LLCs
Cash
1b
Options
DB
3b Cash
6a Fees
E & Y
6d Fees
3c Bonds
2 Options
2 Cash
PSM Farms, LLC ("PSM MMLLC")
3a Buy/Sell securities
5a Cash & Bonds
4 Transfer MMLLC interest
PSM, S Corp
5b Sell bonds
DBAB Account
6e Change Accounts
New DBAB Account
6b Fees/Get Opinions
6c Fees
Proskauer Rose
Steps:
1a. Participants fund LLCs
1b. LLCs purchase/sell offsetting options
2. LLCs inject cash and options into Partnership
3a. MMLLC does short round trip in securities with cash from LLCs
3b. Options expire; payout is zero
3c. Participants inject bonds through LLCs to MMLLC
4. LLCs transfer MMLLC interest to S Corp
5a. Liquidate MMLLC and distribute assets to S Corp
5b. S Corp sells bonds
Pay Fees/Get Opinions:
6a. Pay fees to E&Y
6b. Pay fees to Proskauer Rose for legal opinion
6c. Pay fees to Proskauer Rose
6d. Pay fees to E&Y
6e. Change DBAB accounts
Source documents: DOJ 054421-83; DB-DOJ-COBRA-00013680-1, 14098-9, 13733-4, 13779-80, 19525, 13857-62, 13866-8, 13877-9, 13847-8, 13852-4, 13843, 13963-4, 14049, 13644, 14063, 13712, 13759, 13763, and 14103.

**Figure 3B**

## Murphy Pork Partners Transactions

**Steps:**

1a. Participants fund LLCs
1b. LLCs purchase/sell offsetting options
2. LLCs inject cash and options into Partnership
3a. MMLLC does short round trip in securities with cash from LLCs
3b. Options expire; payout is zero
3c. MMLLC buys Euros
4. LLCs transfer MMLLC interest to S Corp
5a. Liquidate MMLLC and distribute assets to S Corp
5b. S Corp sells Euros

**Pay Fees/Get Opinions:**

6a. Pay fees to E&Y
6b. Pay fees to Proskauer Rose for legal opinion
6c. Pay fees to E&Y
6d. Change DBAB accounts




Source documents: DB-DOJ-COBRA-0001 3680-1, 13478-9, 13540-1, 19526, 13901-6, 13910-12, 13916, 13921-23, 13892-3, 13897, 13888, 13994-5, 13999, 13989-90, and 14008.

**Figure 3C**

### C. Check of COBRA Presentation as Template

The COBRA Presentation outlines a general multi-step process, and the previous section concludes that these steps were in fact followed in the present cases, with a few, largely offsetting variations. As it happens, internal documents identify 15 COBRA transactions undertaken near the end of 1999, the same time as these transactions were initially discussed,[142] by Ernst & Young but with different law firms and participants.[143] As a check on the conclusion that the COBRA Presentation provides a valid template for understanding the transactions undertaken here, I reviewed these transactions to see if they, too, contained components that naturally fell within the COBRA Presentation's steps.

Appendix C, Workpaper C-1 contains the details. It also includes the equivalent information for the transactions in the current cases. Some points to note:

- The six basic steps were followed in all 15 transactions and in these, albeit with the largely offsetting variations already identified.
- A detailed "COBRA ACTION WORK PLAN" checklist that is consistent with the six steps has been identified for the other 15 transactions undertaken near the end of 1999.[144]
- A COBRA client questionnaire from Jenkens & Gilchrist has been identified for 25 of the 43 participants in these 15 transactions undertaken near the end of 1999.[145]

---

142 E&Y documents appear to group the Murphy transaction with the 1999 COBRA transactions. An E&Y document entitled the "Cobra Talking Points" states that there were "15 transactions during 1999 involving 43 individuals" and "[o]ne transaction during 2000....with 8 family members." The 2000 transaction referred to appears to describe the Murphy transactions. 2003EY018120-22. While the Murphy transactions were done in 2000, after E&Y's January 5, 2000 decision to discontinue further COBRA transactions, the E&Y engagement letters for the Murphy participants were dated December 13, 1999. 2003EY001046, DOJ 040262-85.

143 2003EY012551 makes reference to "16 transactions during 1999." However, other documents indicate there were 15 (for example, DOJ 031605-06 and JG-NC055922), and transaction data appear to be available only for 15. The change in law firms appears to have been part of an effort to improve the payoff for Ernst & Young. DOJ 032597-9.

144 See, for example, DOJ 055279-83. This work plan, identified as "Revised 11/03/99", lists 28 "Action Item[s]" for Ernst & Young, to be marked "Completed" as they are accomplished. The items run from "1) Qualify client" to "28) If audited, EY will provide defense through appeals within the IRS". Appendix C, Workpaper C-2 matches items in a version of this work plan identified as "Revised 11/05/99" (DOJ 054573-77), which contains 29 "Action Item[s]," to the above COBRA Presentation steps.

145 See, for example, JG-CL0160423, 30. The questionnaire asks for information such as client name, contact information, social security number, amount of transaction (with sub-categories for "Ordinary Income" and "ST Capital Gain"), bank information, approximate annual household income and approximate net worth excluding residence. Additionally, in three of the transactions for which questionnaires with a "Jenkens & Gilchrist" header have not been identified, questionnaires without such (continued...)

Thus, the basic steps outlined in the COBRA Presentation correspond not merely to the instant transactions, but to a broad set of similar transactions.[146] I view this finding as confirming that (a) I can validly rely on the COBRA Presentation as a template for understanding the nature of these transactions, and (b) the larger set of COBRA transactions are a source of information that can be used to check my analyses of the present transactions (providing the differences in the implementation details are taken into account).

## III. ANALYSES OF RETURNS

This section first presents the relevant risk-return principles. It then describes the pricing pattern for the offsetting option components that produced fees to DB for these transactions, a factor that must be considered in the analysis of expected returns. Third, it analyzes the expected returns on the transactions in this case. Next, it provides two checks on that analysis by examining the actual outcome here and by analyzing a much broader set of similar transactions. Finally, it presents my conclusions on whether these transactions provided a reasonable opportunity for profit, apart from any tax benefits.

### A. Risk-Return Principles

Most investments, including the securities that underlie the disputes in these cases, have uncertain outcomes. Economically rational investors do not premise an investment strategy on the belief that they will do spectacularly well on each such investment. The outcome that rational investors will expect will be the mean of the distribution of these outcomes.[147]

---

145 (...continued)
a header, and with a somewhat different format, do exist for eight participants. Bates numbers 0000297-298, 00000300-301, 00000303-304, 00000317-318, DOJ 038585, 057114.

146 See also a November 4, 1999 email from R. Craig Brubaker at DBAB to Eric Gallinek at DB, forwarding an October 27, 1999 email from Mr. Brubaker to several addressees. (DB-DOJ-COBRA-00030347-50.) This email refers specifically to Mr. Brubaker's working with David Parse of DBAB and Dan Brooks at DB. It describes a series of steps that, on their face (but without reference to Ernst & Young or COBRA), detail steps that correspond to the parts of the COBRA Presentation that lead to the requirement for support from DB or DBAB, and it lays out DB's and DBAB's roles in the transactions.

147 In fact, that is how "expected value" is defined in statistics. One text describes the basis of the term as follows:

> . . .the idea of expectation of a random variable is closely connected with the origin of statistics in games of chance. Gamblers were interested in how much they could "expect" to win in the long run in a game, and in how much they should wager in certain games if the game was to be "fair." Thus, expected value originally meant the expected long-run winnings (or losings) over repeated play; this term has been retained in mathematical statistics to mean the long-run average value for any random variable over an indefinite number of samplings. This holds whether a large number of samplings will actually be conducted or whether the situation is a one-trial affair and we consider hypothetical repetitions of the situation. Over a long series of trials, we can

(continued...)

That is, the expected rate of return rational investors require to induce them to commit capital depends on the level of risk the investment requires the investor to bear. A risk-free investment (*e.g.*, a U.S. Treasury bill) has a low rate of return. Higher risk investments require higher expected rates of return to attract capital. But investors do not have to bear all risks. Risks that are uncorrelated with other risks become increasingly unimportant as the number of randomly selected securities in a portfolio increases. Such "diversifiable" risks command no risk premium in the rate of return investors expect to receive on average.[148]

Therefore, the standard for an economically rational investment is an expected rate of return on the amount invested that at least equals, and ideally exceeds, the "cost of capital," which is the expected rate of return in capital markets on alternative investments of equivalent risk. The cost of capital for an investment equals a risk-free rate plus a risk premium that depends on one or more factors representing the risk or risks that investors cannot diversify in large portfolios.

What would the rationally expected rate of return be on the offsetting option positions in these cases? There is a simple answer to that question because both of the components of each offsetting option position have fixed cash payoffs if exercised. With this payoff structure, the expected *dollar* return equals the probability of getting the cash payoff, times the amount of cash if you do get it, less the initial cost of the option:

E[$Return] = [(Probability of Payoff) × ($Payoff)] − $Cost of Option [1]

where E[...] indicates the "expected value" (in the statistical sense) of the quantity in the brackets. The expected *rate* of return is the expected dollar return divided by the cost of the option:

E[%Return] = E[$Return] / $Cost of Option [2]

The cost of the option and an appropriate value for the probability of getting the dollar return can be calculated using standard Black-Scholes option pricing technique, given data on the risk-free

---

147 (...continued)
"expect" to observe the expected value. At any *single* trial, we in general cannot "expect" the expected value; usually the expected value is not even a possible value of the random variable for any single trial. . . .

W. L. Hays, and R. L. Winkler, Statistics, Vol. I , New York: Holt Rinehart & Winston (1970) at 136-137.

148 Roulette provides an example of diversifiable risk. Betting on roulette is risky for an individual. But roulette by itself is not risky for the casino, because the dozens of spins per wheel per night, over many nights and many roulette wheels, are uncorrelated with one another. The random outcomes of individual spins are inconsequential because of the huge number of spins. This makes the casino's roulette rate of return per dollar bet very predictable. The casino's expected roulette rate of return per dollar bet is positive and the gambler's is negative, which is why gambling is not considered an investment. The casino's risk depends not on the spins of the wheel, but on how many people come to bet and how much they bet when they arrive, which in turn depend on major, non-diversifiable economic factors such as the state of the economy.

interest rate, the forward exchange rate, and the volatility of the exchange rate in question. In the present case, these data are available from internal bank records prepared by DB, known as "option deal entry" forms,[149] and which here I call "deal sheets."[150]

### B. Pricing of Offsetting Option Position Components

DB apparently had invested time and effort to help find a basic structure of the option positions that had features Ernst & Young appeared to value,[151] but unlike Ernst & Young and the attorneys, DB did not get an explicit fee for its services in a given transaction. It would be expected that DB would require some sort of fees for its role in the transactions, and the fact that it did not get fees directly would mean they could only come through the pricing of the options. Thus, an investor in these transactions would logically expect that the stated prices of the options would differ from their basic economic value, in order to provide a fee to DB.

There were definite signs that this was in fact true. For example, please refer again to Tables 1A to 1C, beginning on page 21 above, and note in particular how many zeros appear at the end of each of the premiums for the digital options that comprise the offsetting positions in these cases. Such round numbers follow the example in the COBRA Presentation, but there is nothing in option

---

[149] These are also known as the "ODETs" or "option deal entry tool". Deposition of Jeanette Michaels, July 25, 2006 ("Michaels Deposition"), p. 19.

[150] The precise values for the risk-free interest rate, the forward rate, and the volatility of an exchange rate vary with time and according to the source from which the data are taken. The values used in the DB deal sheets are generally consistent with those from publicly available sources. To prevent immaterial and unnecessary differences between my calculations and DB's, I use the DB data whenever possible. An example of a deal sheet can be seen at DB-DOJ-COBRA 00240679 - 89.

[151] See a November 1, 1999 email from Robert B. Coplan to numerous Ernst & Young addresses, subject "COBRA-Revisions to Minimum Investment and Relaxa" [sic], 2003EY001586-87, which begins,

> We have been working closely with Deutsche Bank to reduce the amount that the client must put at risk from the 10% of the loss amount we previously announced. As you know, the present deal requires the client to invest 10% of the desired loss amount with a 50% chance of doubling that amount if he wins his bet, and a 50% chance of losing the entire investment if he loses the bet, with a 38% rate of return (after fees) if he wins.
>
> The new arrangement we are expecting to get final confirmation of from Deutche [sic] Bank tomorrow is as follows. The amount that must be invested has been reduced to 5% of the desired loss, with fees remaining at 4.5%. The probability of winning the bet has been reduced slightly to about 37%. Therefore, on a $50M transaction, the minimum investment is $2.5M, and the fees are $2.25M. If the client wins the bet, they get $6.25M and if they lose the bet they still get nothing. The $6.25M represents a return of $1.5M (6.25 - (2.5+2.25), or a rate of return of 31%. All this with a 37% chance of winning the bet. ...

[Note: a number the periods and decimal points are illegible in this email, even though the spaces where they belong are present; to make the preceding quotation easier to read, I put them in without resort to the use of brackets for each instance.]

pricing theory that calls for option values to be so round. It is effectively impossible that any model of the underlying basic value of these options would produce twenty-two option values all ending in so many zeros.[152]

Also, the COBRA Presentation's own example signals a material overpricing of the stated premium for the long option (i.e., of the "desired loss"). While I next spell this out formally as a preface to my later calculations, this conclusion about the COBRA Presentation's example requires no special technical understanding, only the ability to evaluate a coin toss.

Formally, first note that the basic value of each of these digital options is the present value of the payout if it finishes in the money, times the probability that it will finish in the money. (For example, the value of a bet that immediately pays $1 if a coin toss comes up heads should be 50 cents.) In equation form,

$$\text{\$Value of Option} \quad = \quad \text{PV[\$Payoff]} \times \text{Probability of Payoff} \qquad [3]$$

where PV[...] indicates the present value of the amount in brackets.[153] In the case of the example in which there is an immediate payment of a dollar if a fair coin comes up "heads", the value of the coin toss is

$$\text{\$Value of Toss} \quad = \quad \$1.00 \times 50\% \quad = \quad \$0.50$$

Now consider the long option value in the COBRA Presentation's example, which offered a payoff of $100 million a month later and a stated 38 percent chance that it would finish in the money. By equation [3], that value should be:[154]

$$\text{\$Value of Long Option} \quad = \quad \text{PV[\$100 million in one month]} \times 38\%$$

$$= \quad \text{\$38 million.}$$

But the COBRA Presentation states the premium for the long option is $50 million, not $38 million. A $50 million value for a chance at a $100 million payoff would be right only if odds of winning were 50 percent, a requirement that holds true for all of the actual long options used in the COBRA transactions. On its face, the COBRA Presentation's long option is an offer to price a $100 million

---

152 For example, using different bid-ask prices or different volatilities in a standard option pricing formula, to create a difference between buy and sell prices, would not automatically produce such round numbers.

153 For example, for a payment in one month (1/12th of a year), with an annual interest rate of $r$, the present value of the payment will be [$\$Payment / (1+r)^{(1/12)}$]. (This is the familiar discrete-time version of the present value formula; for completeness, I should note that in option pricing formulas, continuous-time discounting is the norm.)

154 The calculations in this section of the report ignore the fact that $100 million one month from now is worth a little bit less than $100 million immediately, because there is a month's less time to earn interest on the money.

bet as though the outcome were to be decided by a fair coin toss, but to announce that a weighted coin will be used that only lets the other person win 38 percent of the time. This is not a bet that a rational person would accept, absent some offsetting benefit that was distinct from the bet itself. Nor would the person need an advanced degree to see that there was a problem.[155]

As previewed by the COBRA Presentation's example, the Equation [3] relationship in fact does not hold for the DB stated premiums charged to or paid to the participants. In the event, the premiums for both the long *and short* options were much more than their basic values, as determined by this equation. This statement is in fact supported by DB's own internal pricing of these options in the 1999 COBRA transactions and in one of offsetting option positions in these transactions, which I have independently confirmed. These internal DB prices are identified in the deal sheets as the "(Theo.) Premium Amount" ("DB theoretical premium").

The DB deal sheets contain information on the individual options in an offsetting option position, one element of which is the DB theoretical premium, a measure of the option's basic value.[156] It should be noted that the DB theoretical premium is sometimes far out of line with any economically reasonable value for the option. For example, the DB theoretical premiums sometimes are the same for two otherwise identical options with widely varying payoff amounts. For the 1999 COBRA

---

[155] A similar problem arises for the short option, but the odds are not as easy to assess as the long option's coin toss. By Equation [3], the short option should be worth no more than ("no more than" because at a less favorable strike price, its payoff odds would be somewhat lower than 38 percent)

$Value of Short Option = PV[$93.75 million in one month] × 38%
= $35.625 million, if the delay in payoff receipt is ignored.

Yet the COBRA Presentation values it at $47.5 million, another material overstatement. Thus, an overstatement of the value of both the long and the short option is intrinsic to the structure of the COBRA transactions.

[156] The salesperson would put the basic details into ODET, such as buy or sell, put or call, expiry date, strike price, and all the market information (spot, forwards, etc.) Then, he or she would send spreadsheets to a sales assistant with the names of clients and notional and premium amounts. The sales assistant would finish the entries into ODET based upon the spreadsheet. (Michaels Deposition, pp. 19-20, 42.) Additionally, DB-DOJ-COBRA 00046975 states that "[s]ales use ODET (Option Deal Entry Tool) to enter their trade. This flags to the Trader the trade details and allows the Trader to check he is in agreement with the Salesperson before accepting it into his book." The ODET system is also described in a DB document prepared for the "DB New York & DB Frankfurt FX Options Consolidation Planning Workshop," held in London on December 14, 2000. DB-DOJ-COBRA 00047005-15. This document states that "ODET (Option Deal Entry Tool) is an Excel spreadsheet based application that exports completed Vanilla and Exotic deals from the Option Pricer to the Trading risk management systems (FNX/RMS) via the Web Deal database." DB-DOJ-COBRA 00047009. This document also notes that the "Option Pricer is the main Vanilla and Exotic option pricing tool used by the global FX Sales teams at Deutsche Bank." DB-DOJ-COBRA 00047009. DB document production includes a document called the "FX Option Pricer User Guide." DB-DOJ-COBRA 00049120-70. This manual describes a model that calculates theoretical option values. The introduction to the manual notes that the price given by the Option Pricer represents "the 'Theoretical Value' (TV) of that specific option or structure," and that the "TV is calculated according to the Black-Scholes (Merton) Formula". DB-DOJ-COBRA 000049126.

transactions, this problem does not appear to affect the first option entered into a deal sheet for each exchange rate.[157] In the cases in which the DB theoretical premium for one of the offsetting option positions appears to be in error, I replace the deal sheet value with a value based on the ratio between an unaffected option's DB theoretical premium and stated premium, scaled to the affected option's stated premium.[158]

As a separate check of DB's determination of the basic value for these options, I have also determined their pricing with the Black-Scholes option pricing model.[159] The result is two separate calculations of the basic value of the options in almost all cases.[160] While not identical, my own calculations are consistent with DB's calculations of the basic option value, sometimes somewhat higher, and other times somewhat lower. Please note also that such measures of basic value do not include a fee for the issuing bank, which might come through a bid-ask spread between the prices used to value the two options.[161]

In the present cases, the Swiss franc option pairs all have the same value for the theoretical premiums regardless of the payoff amounts. The same is true for the euro option pairs. For the Swiss franc option pairs, the value is reasonable for the largest of the options, so I apply the

---

157 As discussed further below, contemporaneous data exist on a number of 1999 COBRA transactions. In this expanded data set, there is one exception to this statement, in that it is an option pair other than the first that has the economically reasonable value. Also, for four of the 56 option pairs, the DB theoretical premiums do not appear to be reliable and no correction is possible. See Appendix E, Workpaper E-7.

158 Appendix E, in Workpapers E-10, 11, 16, and 17, explains this correction.

159 As noted earlier, the Black-Scholes model is a standard (and Nobel-Prize-winning) way to price options. (Prof. Robert Merton shared the Nobel Prize for related work done at the same time but published separately.) The inputs required to use the Black-Scholes model, as also discussed above, are generally supplied in the DB deal sheets. One important input is the volatility of the exchange rate in question, and the deal sheets report a high and a low value for this volatility. The two are not far apart, and I use their average. I follow the same procedure for the "forward points to expiry," the difference between the spot exchange rate and the forward exchange rate for the exercise date. I also use U.S. dollar interest rates to measure the time value of money, since the payoffs to these options are in U.S. dollars. (The deal sheets appear to report non-dollar interest rates in some cases as the "depo rate to expiry," but since the options in question are so short-lived, this issue makes very little difference to the estimate of the theoretical premium.) Appendix D reports the details of my calculations.

160 The two calculations are not identical, but the differences are small relative to the differences between the two measures of basic value and the DB stated premiums for the option position components. The reasons for the difference are not entirely clear, but might be due to use of inputs that vary somewhat from those in the deal sheets or to a fine-tuning by DB of the basic Black-Scholes formula in the calculation of the final theoretical value of the options. (That is, the DB Option Pricer manual discussed above notes that "[g]iven the fact that [assumptions in the Black-Scholes model] don't hold in real life trading, the existence of transaction costs, volatility smiles, etc. have to be taken into account and the TV has to be adjusted once a tradable price is requested." DB-DOJ-COBRA 000049126.)

161 That is, the bank would use the price that gave the lower value for the option it purchased and the one that gave the higher value for the one it sold, thereby making a fee by "buying low and selling high."

correction discussed above to obtain the DB theoretical premiums for the other Swiss franc options. Unfortunately, the single value for the DB theoretical premium in the DB deal sheets for the euro options is far out of line with any economically sensible value for *all* of the pairs.[162] Accordingly, my analysis reports only my own calculations of basic value for the euro options.

Tables 5A to 5C compare the stated DB premiums with these two estimates of the basic value of these options. (The options in which the DB theoretical premium needed to be rescaled for the reasons just described are shown in boxes in the table and already reflect the rescaling; the absence of economically meaningful values for the DB theoretical premiums for the euro options is signified by an "N/A.") A discussion of the import of these tables appears immediately after Table 5A.

[162] The stated DB theoretical premium reported in the ODETs for the euro long options dramatically exceeds my estimates of the basic value of these options and even exceeds the DB stated premium of the largest euro long option. This particular pattern appeared in none of the 1999 COBRA transactions, although there are four 1999 option pairs for which actual or corrected DB basic value could not be obtained, either. This pattern does not appear for the Swiss franc options in the present case, for which the DB and Kolbe basic values for the largest option pair are in very close agreement.

**Table 5A. Stated/Actual Premiums Charged/Paid Verus Basic Values, MURFAM Farms**

| Currencies: | *WHM LLC USD/EUR** | *WHMJ LLC CHF/USD* | *JMN LLC CHF/USD** | *WMC LLC USD/EUR** | *ANB LLC CHF/USD** | *All Participants* |
|---|---|---|---|---|---|---|
| [1] Stated Long Premium | $ 26,400,000 | $ 17,300,000 | $ 9,700,000 | $ 5,300,000 | $ 3,000,000 | $ 61,700,000 |
| [2] DB Basic Value | N/A | $ 8,818,185 | $ 4,944,300 | N/A | $ 1,529,165 | N/A |
| [3] *$ Excess of Stated Over Basic* | N/A | $ 8,481,815 | $ 4,755,700 | N/A | $ 1,470,835 | N/A |
| [4] *% Excess of Stated Over Basic* | N/A | *96.2%* | *96.2%* | N/A | *96.2%* | N/A |
| [5] Kolbe Basic Value | $ 10,841,277 | $ 8,816,618 | $ 4,943,422 | $ 2,176,468 | $ 1,528,893 | $ 28,306,678 |
| [6] *$ Excess of Stated Over Basic* | $ 15,558,723 | $ 8,483,382 | $ 4,756,578 | $ 3,123,532 | $ 1,471,107 | $ 33,393,322 |
| [7] *% Excess of Stated Over Basic* | 143.5% | *96.2%* | *96.2%* | 143.5% | *96.2%* | 118.0% |
| [8] Stated Short Premium | $ 25,608,000 | $ 16,781,000 | $ 9,409,000 | $ 5,141,000 | $ 2,910,000 | $ 59,849,000 |
| [9] DB Basic Value | N/A | $ 8,519,998 | $ 4,777,109 | N/A | $ 1,477,456 | N/A |
| [10] *$ Excess of Stated Over Basic* | N/A | $ 8,261,002 | $ 4,631,891 | N/A | $ 1,432,544 | N/A |
| [11] *% Excess of Stated Over Basic* | N/A | 97.0% | 97.0% | N/A | 97.0% | N/A |
| [12] Kolbe Basic Value | $ 10,413,392 | $ 8,492,925 | $ 4,761,929 | $ 2,090,567 | $ 1,472,762 | $ 27,231,575 |
| [13] *$ Excess of Stated Over Basic* | $ 15,194,608 | $ 8,288,075 | $ 4,647,071 | $ 3,050,433 | $ 1,437,238 | $ 32,617,425 |
| [14] *% Excess of Stated Over Basic* | *145.9%* | 97.6% | 97.6% | *145.9%* | 97.6% | 119.8% |
| [15] Actual Net Premium Paid | $ 792,000 | $ 519,000 | $ 291,000 | $ 159,000 | $ 90,000 | $ 1,851,000 |
| [16] Net DB Basic Value | N/A | $ 298,187 | $ 167,192 | N/A | $ 51,709 | N/A |
| [17] *$ Excess of Actual Over Basic* | N/A | $ 220,813 | $ 123,808 | N/A | $ 38,291 | N/A |
| [18] *% Excess of Actual Over Basic* | N/A | 74.1% | 74.1% | N/A | 74.1% | N/A |
| [19] Net Kolbe Basic Value | $ 427,885 | $ 323,693 | $ 181,492 | $ 85,901 | $ 56,132 | $ 1,075,103 |
| [20] *$ Excess of Actual Over Basic* | $ 364,115 | $ 195,307 | $ 109,508 | $ 73,099 | $ 33,868 | $ 775,897 |
| [21] *% Excess of Actual Over Basic* | *85.1%* | *60.3%* | *60.3%* | *85.1%* | *60.3%* | *72.2%* |

Notes: [1], [8]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777; [2], [9]: Appendix D, Workpaper D-21A; [3] = [1] - [2]; [4] = [1] / [2] - 1; [5]: Appendix D, Workpaper D-1A; [6] = [1] - [5]; [7] = [1] / [5] - 1; [10] = [8] - [9]; [11] = [8] / [9] - 1; [12]: Appendix D, Workpaper D-2A; [13] = [8] - [12]; [14] = [8] / [12] - 1; [15] = [1] - [8]; [16] = [2] - [9]; [17] = [15] - [16]; [18] = [15] / [16] - 1; [19] = [5] - [12]; [20] = [15] - [19]; [21] = [15] / [19] - 1.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*The DB premiums (or "basic values") for the each of the option pairs other than the WHMJ LLC CHF/USD option pair with the $17.3m long option premium were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

As Table 5A verifies, my calculations are consistent with the DB theoretical premiums in cases in which a direct comparison is possible, which includes the largest Swiss franc option in the present cases.[163] There are only two actual positions taken with the eleven offsetting option pairs in these

[163] As shown in Appendix E, Workpaper E-4, my estimate of the basic value and the DB theoretical premium are consistent across the option pairs used in the 1999 COBRA transactions. In fact, in this case, my estimate of the basic value of the largest long Swiss franc option differs by less than $1,600 from the DB value, at $8.8166 million for my value versus $8.8182 million for DB's value. (Compare rows [2] and [5] of the second column of numbers in Table 5A.) The values differ by just over $27,000 for the short option (compare rows [9] and [12]), but this could well be because my values in Table 5A use the stated strike price for the short option while DB's apparently do not. If I use the long option's strike price to (continued....)

transactions because all the euro options are making the same bet and all of the Swiss franc options are making the same bet.

The CHF/USD position produces the smaller overpayment, and the long options have smaller overstatements than the short options. The overpayments thus run from 96.2 percent of the basic value of the long Swiss franc options to 145.9 percent of the basic value of the short euro options. (For convenience, the numbers discussed in this paragraph are italicized in Table 5A, but they appear in the other two tables as well.) Of course, the net overpayment relative to theoretical value is lower, because DB overstates the value of the short option (the one it buys from the LLC) at the same time as it overstates the value of the long option (i.e., the one it sells to the LLC). The smaller measure of the net overpayment on the Swiss franc options is 60.3 percent (Kolbe basic value), and the net overpayment on the euro options is 85.1 percent, for a weighted-average excess of the net premium paid over the net basic value of the position of 72.2 percent, 71.5 percent, and 73.6 percent in Tables 5A (MURFAM), 5B (PSM) and 5C (Murphy Pork), respectively. (The latter two values are italicized in those tables, which appear next.)

---

163 (...continued)
value the largest Swiss franc short option, my value increases from $8.4929 million to $8.5191 million. (See Appendix D, Workpaper D-16A.) This differs by less than $1,000 from DB's Table 5A value. I discuss this issue in more detail below, in part C.1 of this section.

**Table 5B. Stated/Actual Premiums Charged/Paid Verus Basic Values, PSM Farms**

| Currencies: | *HDM LLC USD/EUR** | *SKM LLC CHF/USD** | *MDM LLC CHF/USD** | *All Participants* |
|---|---|---|---|---|
| [1] Stated Long Premium | $ 12,000,000 | $ 6,300,000 | $ 6,300,000 | $ 24,600,000 |
| [2] DB Basic Value | N/A | $ 3,211,247 | $ 3,211,247 | N/A |
| [3] *$ Excess of Stated Over Basic* | N/A | $ 3,088,753 | $ 3,088,753 | N/A |
| [4] *% Excess of Stated Over Basic* | N/A | 96.2% | 96.2% | N/A |
| [5] Kolbe Basic Value | $ 4,927,853 | $ 3,210,676 | $ 3,210,676 | $ 11,349,205 |
| [6] *$ Excess of Stated Over Basic* | $ 7,072,147 | $ 3,089,324 | $ 3,089,324 | $ 13,250,795 |
| [7] *% Excess of Stated Over Basic* | 143.5% | 96.2% | 96.2% | 116.8% |
| [8] Stated Short Premium | $ 11,640,000 | $ 6,111,000 | $ 6,111,000 | $ 23,862,000 |
| [9] DB Basic Value | N/A | $ 3,102,658 | $ 3,102,658 | N/A |
| [10] *$ Excess of Stated Over Basic* | N/A | $ 3,008,342 | $ 3,008,342 | N/A |
| [11] *% Excess of Stated Over Basic* | N/A | 97.0% | 97.0% | N/A |
| [12] Kolbe Basic Value | $ 4,733,360 | $ 3,092,799 | $ 3,092,799 | $ 10,918,959 |
| [13] *$ Excess of Stated Over Basic* | $ 6,906,640 | $ 3,018,201 | $ 3,018,201 | $ 12,943,041 |
| [14] *% Excess of Stated Over Basic* | 145.9% | 97.6% | 97.6% | 118.5% |
| [15] Actual Net Premium Paid | $ 360,000 | $ 189,000 | $ 189,000 | $ 738,000 |
| [16] Net DB Basic Value | N/A | $ 108,588 | $ 108,588 | N/A |
| [17] *$ Excess of Actual Over Basic* | N/A | $ 80,412 | $ 80,412 | N/A |
| [18] *% Excess of Actual Over Basic* | N/A | 74.1% | 74.1% | N/A |
| [19] Net Kolbe Basic Value | $ 194,493 | $ 117,877 | $ 117,877 | $ 430,246 |
| [20] *$ Excess of Actual Over Basic* | $ 165,507 | $ 71,123 | $ 71,123 | $ 307,754 |
| [21] *% Excess of Actual Over Basic* | 85.1% | 60.3% | 60.3% | *71.5%* |

Notes: [1], [8]: DB-DOJ-COBRA 00240734 - 55, 89 - 99; [2], [9]: Appendix D, Workpaper D-17B. [3] = [1] - [2]; [4] = [1] / [2] - 1; [5]: Appendix D, Workpaper D-1B; [6] = [1] - [5]; [7] = [1] / [5] - 1; [10] = [8] - [9]; [11] = [8] / [9] - 1; [12]: Appendix D, Workpaper D-2B; [13] = [8] - [12]; [14] = [8] / [12] - 1; [15] = [1] - [8]; [16] = [2] - [9]; [17] = [15] - [16]; [18] = [15] / [16] - 1; [19] = [5] - [12]; [20] = [15] - [19]; [21] = [15] / [19] - 1.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*The DB premiums (or "basic values") for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

**Table 5C. Stated/Actual Premiums Charged/Paid Verus Basic Values, Murphy Pork**

| Currencies: | *WHM LLC USD/EUR** | *WHMJ LLC CHF/USD** | *HDM LLC CHF/USD** | *All Participants* |
|---|---|---|---|---|
| [1] Stated Long Premium | $ 8,000,000 | $ 4,000,000 | $ 2,000,000 | $ 14,000,000 |
| [2] DB Basic Value | N/A | $ 2,038,887 | $ 1,019,443 | N/A |
| [3] *$ Excess of Stated Over Basic* | N/A | $ 1,961,113 | $ 980,557 | N/A |
| [4] *% Excess of Stated Over Basic* | N/A | 96.2% | 96.2% | N/A |
| [5] Kolbe Basic Value | $ 3,285,235 | $ 2,038,524 | $ 1,019,262 | $ 6,343,022 |
| [6] *$ Excess of Stated Over Basic* | $ 4,714,765 | $ 1,961,476 | $ 980,738 | $ 7,656,978 |
| [7] *% Excess of Stated Over Basic* | 143.5% | 96.2% | 96.2% | 120.7% |
| [8] Stated Short Premium | $ 7,760,000 | $ 3,880,000 | $ 1,940,000 | $ 13,580,000 |
| [9] DB Basic Value | N/A | $ 1,969,942 | $ 984,971 | N/A |
| [10] *$ Excess of Stated Over Basic* | N/A | $ 1,910,058 | $ 955,029 | N/A |
| [11] *% Excess of Stated Over Basic* | N/A | 97.0% | 97.0% | N/A |
| [12] Kolbe Basic Value | $ 3,155,573 | $ 1,963,682 | $ 981,841 | $ 6,101,097 |
| [13] *$ Excess of Stated Over Basic* | $ 4,604,427 | $ 1,916,318 | $ 958,159 | $ 7,478,903 |
| [14] *% Excess of Stated Over Basic* | 145.9% | 97.6% | 97.6% | 122.6% |
| [15] Actual Net Premium Paid | $ 240,000 | $ 120,000 | $ 60,000 | $ 420,000 |
| [16] Net DB Basic Value | N/A | $ 68,945 | $ 34,473 | N/A |
| [17] *$ Excess of Actual Over Basic* | N/A | $ 51,055 | $ 25,527 | N/A |
| [18] *% Excess of Actual Over Basic* | N/A | 74.1% | 74.1% | N/A |
| [19] Net Kolbe Basic Value | $ 129,662 | $ 74,842 | $ 37,421 | $ 241,925 |
| [20] *$ Excess of Actual Over Basic* | $ 110,338 | $ 45,158 | $ 22,579 | $ 178,075 |
| [21] *% Excess of Actual Over Basic* | 85.1% | 60.3% | 60.3% | *73.6%* |

Notes: [1], [8]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788;
[2], [9]: Appendix D, Workpaper D-17C; [3] = [1] - [2]; [4] = [1] / [2] - 1;
[5]: Appendix D, Workpaper D-1C; [6] = [1] - [5]; [7] = [1] / [5] - 1; [10] = [8] - [9];
[11] = [8] / [9] - 1; [12]: Appendix D, Workpaper D-2C; [13] = [8] - [12];
[14] = [8] / [12] - 1; [15] = [1] - [8]; [16] = [2] - [9]; [17] = [15] - [16]; [18] = [15] / [16] - 1;
[19] = [5] - [12]; [20] = [15] - [19]; [21] = [15] / [19] - 1.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*The DB premiums (or "basic values") for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

Tables 5A to 5C are fairly detailed, so it is useful to depict the information in steps. Figures 4A to 4C, 5A to 5C, and 6A to 6C take DB's perspective for payment amounts (but define "long" and "short" in the same way used elsewhere) and depict:

**Figures 4A-4C, for each of the long options and in total:**

- The stated amount DB charged the participants
- The Kolbe basic value
- The excess of the stated amount DB charged the participants over the Kolbe basic value.

**Figure 5A-5C, for each of the short options and in total:**

- The stated amount DB paid to the participants
- The Kolbe basic value
- The excess of the stated amount DB paid to the participants over the Kolbe basic value.

**Figure 6A-6C, for each of the actual offsetting option positions and in total:**

- The actual net amount DB charged the participants
- The Kolbe basic net value
- The excess of the actual net amount DB charged the participants over the Kolbe basic net value.

Note that Figures 5A to 5C show negative amounts because DB is paying rather than receiving money.

To depict the relationships most clearly, it is better to show all three pieces for each partnership next to one another. Therefore, the following pages first show figures 4A, 5A and 6A, and then use the equivalent order for the other two partnerships. There is a short discussion of the implications of the figures for each partnership before the next set of figures appears.




**Figure 4A, MURFAM Farms**




**Figure 5A, MURFAM Farms**




**Figure 6A, MURFAM Farms**

Two points are worth special note here. First, look at Figure 4A: the excess of the stated amount over the Kolbe basic value is *$34.4 million*, out of a total "desired loss" of $61.7 million. By this measure, fully *54 percent* of the "desired loss" represents a simple overstatement of the long options' actual basic values. Or measured from the basic value, the participants got 118 percent more "desired loss" than their long options were actually worth, based on the basic values in Table 5A. Of course, as noted earlier, the fact that something of the sort was contemplated was implicit in the unfair coin toss in the COBRA Presentation's own long option pricing example.

Second, the excess of the net premium DB charged over the net basic value in Figure 6A is about 72 percent of the basic value of the offsetting option positions. This is less than for the long and short option components because the DB stated value is proportionately higher for the options it buys than for those it sells.[164] (Compare the percentage excesses on the long and short options in Table 5A.) Nonetheless, it is a positive amount in DB's favor because the long components of the option position are larger.

Since the *actual* probability of receiving a cash payout from an offsetting option position depends on the factors that govern its basic value, not on the premiums DB charged, this 72 percent average

---

164 However, as discussed in the expected returns section below, the way DB manages the offsetting option positions means DB overpays for the short half of the position by less than it first appears. An alternative version of Figure 6A, which depicts the results under the way DB manages the positions, appears below.

difference represents an additional, and economically material, cost to the participants in these transactions. The excesses of the net premiums actually paid over the basic values of the option positions thus is in fact a fee to DB, which needs to be considered in assessing the expected rates of return on these positions.




**Figure 4B, PSM Farms**




**Figure 5B, PSM Farms**




**Figure 6B, PSM Farms**

This time, look at Figure 4B: the excess of the stated amount over the basic value is *$13.3 million*, out of a total "desired loss" of $24.6 million. By this measure, again fully *54 percent* of the "desired loss" represents a simple overstatement of the long options' actual basic values. Or measured from basic value, the participants in PSM Farms got 117 percent more "desired loss" than their long options were actually worth, based on the basic values in Table 5B.

The excess of the net premium DB charged over the net basic value in Figure 6B is just under 72 percent of the basic value of the offsetting option positions. This is less than for the long and short option components because the DB stated value is proportionately higher for the options it buys than for those it sells.[165] (Compare the percentage excesses on the long and short options in Table 5B.) Nonetheless, it is a positive amount in DB's favor because the long components of the option position are larger. Thus, this nearly 72 percent average difference again is in fact a fee to DB, which needs to be considered in assessing the expected rates of return on these positions.

---

[165] However, as noted in connection with the discussion of Figure 6A, the way DB manages the offsetting option positions will lead to an alternative version of Figure 6B, below.




**Figure 4C, Murphy Pork**




**Figure 5C, Murphy Pork**




**Figure 6C, Murphy Pork**

Figure 4C again depicts the excess stated "desired loss." Here, the excess of the stated amount over the basic value is *$7.7 million*, out of a total "desired loss" of $14.0 million. By this measure, fully *55 percent* of the "desired loss" represents a simple overstatement of the long options' actual basic values. Or measured from average basic value, the Murphy Pork participants got 121 percent more "desired loss" than their long options were actually worth, based on the basic values in Table 5B.

The excess of the net premium DB charged over the net basic value in Figure 6C is almost 74 percent of the basic value of the offsetting option positions. This is less than for the long and short option components because the DB stated value is proportionately higher for the options it buys than for those it sells.[166] (Compare the percentage excesses on the long and short options in Table 5C.) Nonetheless, it is a positive amount in DB's favor because the long components of the option position are larger. This nearly 74 percent average difference is also a fee to DB, which needs to be considered in assessing the expected rates of return on these positions.

[166] However, as noted also in connection with the discussion of Figures 6A and 6B, the way DB manages the offsetting option positions will lead to an alternative version of Figure 6C, below.

### C. Expected Return Analysis of Positions in These Cases

Equations [1] and [2] above show that to analyze the expected returns in these cases, the probabilities of obtaining a cash payout must be multiplied times the amount of the cash payout. The data needed to calculate the probabilities are available from the deal sheets, as described above. (Additionally, the COBRA Presentation uses a uniform probability of 38 percent for the payoff of the two components of an offsetting option position, which I consider below for comparison.[167]) However, two issues should be addressed before calculating expected returns: (a) the possibility of a single option's paying off, and (b) determination of what constitutes the "investment" on which a return could be earned, absent tax considerations. This section reports the expected return calculations after discussions of these two issues.

#### 1. Single-Option Payoff

In addition to both or neither option's paying off, the COBRA Presentation mentions the theoretical possibility that only one of the two options will pay off.[168] If this were to happen, it would provide an extremely high payoff for the participant at DB's expense. However, the COBRA Presentation neglects this possibility entirely in its calculations of possible payoffs.[169] I have concluded that neglecting this possibility is appropriate in these circumstances, for several reasons.

First, the strike price difference between the offsetting options, at only two pips, implies that almost any bid-ask exchange rate difference used by DB to value the options at the exercise date would eliminate the single-option payoff. In this regard, the option confirmations merely state that the spot rate is the rate "at 10:00 a.m. local time in New York," without stating whether that spot rate is a bid or ask rate or what bank's or other source's exchange rate quotation is to be used. Moreover, it provides that "... a particular spot rate shall be disregarded if the Calculation Agent [DB], acting in good faith considers that it would not be commercially reasonable to take account of it."[170] There is no long history of established trading between the LLCs and DB that could have worked out, over the years, the details of just which exchange rate to use as the spot rate at an option's expiration. Nor does the record reveal any other agreements between DB and the LLCs that would specify the exchange rate value used to determine whether the options are in the money in sufficient detail to require DB to select a particular, pre-specified exchange rate as the spot rate at option expiration. This is significant because there are multiple banks quoting multiple (bid-ask) exchange rates. In fact, a DB email explains that DB routinely polls five banks for their exchange rate ranges at 10:00 a.m., and DB chooses that day's rate based on that information (a process that the email

---

[167] COBRA Presentation, 2003EY001580-81 (longer version) and DOJ 049118-9 (shorter version).

[168] COBRA Presentation, 2003EY001580 (longer version) and DOJ 049118 (shorter version).

[169] COBRA Presentation, 2003EY001582-83 (longer version) and DOJ 049120-1 (shorter version).

[170] See, for example, DB-DOJ-COBRA 00018882.