characterizes as an "industry standard" practice).[171] The email contains an example, and the exchange rate ranges from all five banks in this example exceed two pips, with a total range of six pips.[172] All of this implies that DB has discretion over which exchange rate to use.

Second, DB of course would be aware of the potentially very high costs to itself of a single-option payoff in these circumstances. In fact, in a closely related context, a DB document makes this point explicitly: "Strike[ price]s on both options are about the same. Any spread must fall within DB's ability to set a bid/ask spread. Both options must either pay off or not."[173] Given this confirmation of DB's awareness and the acknowledgment that use of bid-ask spreads could in fact achieve such an end, it seems clear that DB would be able to use the very narrow strike price difference to avoid a single-option payoff, and that it would have very material economic incentives to do so.[174]

Third, in these cases, and unlike in the 1999 COBRA transactions, the DB deal sheets themselves show the *same* strike price for the short as the long option in the section where the option pricing input parameters are entered.[175] As noted earlier in my discussion of Table 5A (page 49 above), my estimate of the basic value of the short option in the largest Swiss franc option pair (the WHMJ LLC position contributed to MURFAM Farms) differs by just over $27 thousand from DB's (versus under $1,600 for the long option values) when I use a strike price that differs by two pips from the long option's, but by less than $1,000 when I use the long option's strike price. This is consistent with DB's having priced the short option in its theoretical value calculation using the strike price stated in this deal sheet's input parameters.[176]

Finally, additional evidence that a single-option payoff would not actually occur comes from DB's "Risk Management System" ("RMS"), which the above-referenced DB planning workshop document describes as "the main risk management system for all Vanilla, Exotic and structured FX options."[177] The document also states that "RMS is a central system for the global FX Options business and obtains direct feeds of new trades from ODET [i.e., the DB deal sheets], GEOS, and

---

[171] DB-DOJ-COBRA 00052674-75.

[172] *Ibid.*

[173] DB-DOJ-COBRA-00030723.

[174] For the record, no option pair in any of the transactions discussed in Appendix C did in fact finish with a single-option payout.

[175] See, for example, DB-DOJ-COBRA 00240685, 89. Other ODETs for the present case are contained in DB-DOJ-COBRA 00240679-799. For completeness, I would add that a strike price reflecting the two-pip spread does appear in comments made in the "confirmation details" field in the short options' deal sheets.

[176] DB-DOJ-COBRA 00240689.

[177] DB-DOJ-COBRA 00047005-15. Quotation on DB-DOJ-COBRA 00047009. Again, the document was produced for the "DB New York & DB Frankfurt FX Options Consolidation Planning Workshop," held in London on December 14, 2000.

FNX."[178] The record for this proceeding includes printouts from the RMS system consisting of "RMSRPT" worksheets for all of the options used in the 1999 known COBRA transactions, as well as for the present transactions. The RMSRPT sheets can be linked back to the ODET sheets (i.e., the DB deal sheets) and the option confirmations. For example, the ANB, LLC ODETs report a field entitled "GEOS Structure ID." The entry for this field on both the long and short ODET sheets for the ANB, LLC options is 32935.[179] In one set of RMS sheets, the field "TRADEID" contains entries for 32935A and 32935B, which describe trades that have characteristics that are generally consistent with the ANB, LLC long and short CHF/USD options, respectively.[180] Additionally, the confirmation letter for the ANB, LLC CHF/USD option pair can be linked back to the ODET sheets (and hence the RMS sheets). The ANB, LLC ODETs report a field entitled "Deal Number." The entry on both the long and short ODET sheets for the ANB, LLC options is 24626.[181] The confirmation letter for the ANB, LLC CHF/USD option pair has a reference number "ex24626."[182]

In the present context, the important point is that while the comments part of the DB deal sheets show a two-pip spread between the long and the short options in these transactions, the short option in the RMS reports always has a strike price equal to that of the long option, as was the case in the parameters part of the DB deal sheets. This eliminates the two-pip spread. (See Appendix E, Workpaper E-23, for details.) If there is no two-pip spread, a single option payout is impossible. This matters because the RMS could only perform its function as "the main risk management system"[183] for DB if it accurately reflected the risks to which DB was *actually* exposed. The fact that the RMS reports did not include the possibility of a strike price difference for the two parts of the option position thus implies that DB assessed its own risks under the assumption that a single-option payout was impossible. Given the factors already discussed regarding the selection of a spot price at expiration, it was within DB's control to assure that this assumption would always prove valid, and DB had strong economic incentives to do so.

Thus in these circumstances, the expected single-option payoff probability is zero, and it would be seen as effectively zero by an economically rational investor.[184] This means that the short options are more valuable and the net position is less valuable than indicated in Tables 5A to 5C (starting on page 49 above). Appendix D provides revised versions of Table 5A to 5C in which the short

---

[178] DB-DOJ-COBRA 00047009.

[179] DB-DOJ-COBRA 00240723-33.

[180] DB-DOJ-COBRA-00241725-28.

[181] DB-DOJ-COBRA 00240723-33.

[182] DOJ 042210-12.

[183] DB-DOJ-COBRA 00047009.

[184] That said, even if all of the above reasons to disregard the possibility were put aside and I were to include this probability in my calculations, my basic conclusions would not change.

options' strike prices are equal to those of the long options'.[185] There is a relatively small percentage difference in the short options' basic values, but this translates into a much bigger percentage difference in the basic values for the net premium. Figure 7A shows how Figure 6A (page 55 above) changes when the strike prices for both the long and short options are the same.




**Figure 7A. MURFAM Farms**

The total excess of the actual net premiums DB charged over the Kolbe net basic value (i.e., DB's fee) goes from the $776,000 (rounded) value depicted in Figure 6A to $896,000 in Figure 7A.[186] The Figure 7A excess over net basic value is 94 percent, versus the 72 percent in Figure 6A. (Please note also that the Figure 7A excess over average basic value is 1.5 percent of the "desired loss," i.e., of the Partnership's total stated long option premium of $61.7 million; I return to this topic in Part E of this section, below.)

The same considerations apply for the other partnerships as well. Figures 7B and 7C depict the equivalent information for them. The proportionate changes and percentage values are almost

185 Appendix D, Workpapers D-16A, D-12B, and D-12C.

186 See Appendix D, Workpaper D-16A and Table 5A for the underlying numerical calculations.

identical to those just discussed in connection with Figure 7A.[187] (In these cases, the final excesses of the net premiums over basic values are 1.4 percent and 1.5 percent of the long option's stated value, respectively, comparable to MURFAM Farms's 1.5 percent value.)




**Figure 7B. PSM Farms**

---

[187] See Appendix D, Workpapers D-12B and D-12C as well as Tables 5B and 5 C.




**Figure 7C. Murphy Pork**

### 2. Identification of the "Investment"

The next question in estimation of expected non-tax returns and rates of return is expected rate of return *on what amount*?

The COBRA Presentation's calculations take the viewpoint of someone contemplating a return through the combination of (a) a risky bet on an offsetting option position and (b) a safe reduction in income taxes.[188] As a result, the calculations consider the rate of return on the sum of (a) the net

---

[188] There is also the two percent cash contribution after fees. Because I have been instructed to limit my expected profit analysis to offsetting options transactions -- which I am told is the transaction that gives rise to the claimed tax benefit here -- my calculations, like the COBRA Presentation's calculations, ignore the cash contribution. However, even if I had taken this two percent cash investment into account for purposes of determining the overall expected profit, I would have concluded that it was economically irrelevant, for three reasons. First, the trades with the cash contribution, discussed in footnote 91, involved a combined investment in common stocks of about $1.1 million for 23 days and of about $2.2 million for 7 days, with a net return on all investments of $44 thousand. This activity is economically inconsequential relative to the transactions with the offsetting option positions. (Recall that the offsetting option payoffs are measured in millions of dollars. In millions, the net change in the three partnerships' combined worth due to these trades was $0.044 million.) Second, this conclusion is consistent with the COBRA Presentation's statement that the two percent cash contribution "is at no risk and is not a cost
(continued....)

premium invested in the option position, which is the investment in the risky bet and (b) the fees paid to the tax strategy providers, which is the investment in the claimed tax savings.[189]

However, I have been asked to analyze the *non-tax* risk-return characteristics of the offsetting option positions, taking transaction costs into account. The fees to the law firms and Ernst & Young did not buy additional offsetting option positions. They did not and could not generate any non-tax investment returns. Absent the claimed tax savings, these fees are simply a deadweight loss, i.e., an increase in transaction costs. If the claimed tax savings are put aside, the only way to make money on the offsetting option positions over and above the transaction costs would be to earn a return *on the amount invested in the option positions*. Since the fees amount to 83.3 percent of the net premium amount (2.5 percent versus 3 percent of the long option premium for the fees and net premium, respectively), the implication is that just to break even on the amount invested in the offsetting option positions, the participants first had to earn 83.3 percent of the net premium amount, merely to recover the fees. Therefore the appropriate denominator for my calculation of the expected rate of return is the net premium paid for the offsetting option position.

An analogy may be useful at this point. Suppose two gamblers each have $55 in their pockets and a choice of two casinos. The casinos are identical in every respect except that one charges $25 to walk in the door. The first gambler chooses that casino, and he pays the $25, goes to the roulette wheel, bets $30 on "red", wins or loses, and walks out. The second gambler chooses the other casino. She walks in without the charge at the door, bets $30 on "red," wins or loses, and walks out with the other $25 still in her pocket either way.

---

188 (...continued)
of the transaction," -- COBRA Presentation, 2003EY001581 (longer version) and DOJ 049119 (shorter version).

Third, this conclusion is also supported by an Ernst & Young email entitled "COBRA Matters - URGENT" (dated 12/5/99). This email states,

> As you know, in addition to the transfer of the option spread to the partnership, the clients transferred cash equal to two percent of the loss amount to the partnership. There has been some confusion as to what type of trading is expected to be done with this cash during the life of the partnership. The trading activity is important to the maintainance [sic] of a business purpose for the partnership -- i.e., investment activity. We have not developed precise rules for the investment of the funds, but here are some guidelines. The money should not sit in a money market account. The more trading activity the better, and preferably in an investment that can reasonably be expected to provide a potential for a good return, although "speculative" investments are not encouraged. If one wanted to move in and out of different market indexes, that would be acceptable. Because there are only about three weeks left till [sic] the liquidation of the partnerships, it is essential that if no activity has yet commenced, that it be begun immediately through David Parse at Alex Brown. (DOJ-C-00267-69, also identified as EY02938-40.)

Market indexes offer expected returns that are economically immaterial in the present context, as do common stocks generally.

189 COBRA Presentation 2003EY001582-83 (longer version) and DOJ 049120-21 (shorter version).

How do the gamblers compare rates of return on the evening's gambling activities? Both gamblers have actually bet $30. In both cases, the gambler's hope for a positive outcome for the casino visit depends on winning enough on the amount actually bet to make back the $30. In the case of the gambler entering the first casino, however, to turn a profit on the evening he must also make back the $25 he paid at the door. The expected rate of return on his gambling activity is much lower, because the $25 is a deadweight loss, not an "investment" in roulette. That gambler's $30 bet starts with an 83.3 percent loss to make up, due to the wasted $25.

Now suppose that the gambler chooses the first casino because the $25 buys not merely entry, but also a $1,000 tax deduction. (Note that $30 is 3 percent of $1,000 and $25 is 2.5 percent of $1,000.) If the tax deduction is considered, the gambler's whole $55 is an "investment," $30 on a roulette spin with a small negative expected rate of return and $25 on the tax deduction with a high positive expected rate of return.[190] But if the tax deduction is ignored, the gambler entering the first casino "invests" only the $30, and the $25 is simply a wasted outlay with no possibility of a return.

### 3. Expected Returns

Resolution of these issues permits the calculation of expected returns and rates of return. To start, Tables 6A to 6C provide the probabilities that the offsetting option pairs will pay off for both the deal sheets' basic option values (when available) and my basic values, using the RMS reports' (and the deal sheets' parameter section's) assumption that the strike price of the short option equals that of the long option. The tables also show the COBRA Presentation's illustrative 38 percent.

---

190 As noted above, this is the perspective taken in the COBRA Presentation.

**Table 6A. Probabilities of Option Payout, MURFAM Farms**

| *Outcome* | | *Payout** | Probability | | |
|---|---|---|---|---|---|
| | | | *E&Y COBRA Presentation* | *DB*** | *Kolbe* |
| | | [1] | [2] | [3] | [4] |
| **WHM LLC (USD/EUR)** | | | | | |
| Both Options Hit | $ | 1,782,000 | 38.0% | N/A | 20.7% |
| Neither Option Hits | $ | - | 62.0% | N/A | 79.3% |
| **WHMJ LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 1,167,750 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |
| **JMN LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 654,750 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |
| **WMC LLC (USD/EUR)** | | | | | |
| Both Options Hit | $ | 357,750 | 38.0% | N/A | 20.7% |
| Neither Option Hits | $ | - | 62.0% | N/A | 79.3% |
| **ANB LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 202,500 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |

Notes: [1]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777, Table 2A;
[2]: Plaintiffs' Objections & Responses to the United States' 1st Set of Interrogatories at #41;
[3]: Appendix D, Workpaper D-3A; [4]: Appendix D, Workpaper D-1A.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*Payouts exclude the net premiums for the options.

**The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3A. The DB premiums for the each of the option pairs other than the WHMJ LLC CHF/USD option pair with the $17.3m long option premium were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

**Table 6B. Probabilities of Option Payout, PSM Farms**

| *Outcome* | | *Payout** | **Probability** | | |
|---|---|---|---|---|---|
| | | | *E&Y COBRA Presentation* | *DB*** | *Kolbe* |
| | | [1] | [2] | [3] | [4] |
| **HDM LLC (USD/EUR)** | | | | | |
| Both Options Hit | $ | 810,000 | 38.0% | N/A | 20.7% |
| Neither Option Hits | $ | - | 62.0% | N/A | 79.3% |
| **SKM LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 425,250 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |
| **MDM LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 425,250 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |

Notes: [1]: DB-DOJ-COBRA 00240734 - 55, 89 - 99, Table 2B;
[2]: Plaintiffs' Objections & Responses to the United States' 1st Set of Interrogatories at #41;
[3]: Appendix D, Workpaper D-3B; [4]: Appendix D, Workpaper D-1B.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*Payouts exclude the net premiums for the options.

**The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3B. The DB premiums for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

**Table 6C. Probabilities of Option Payout, Murphy Pork**

| *Outcome* | | *Payout** | Probability | | |
|---|---|---|---|---|---|
| | | | *E&Y COBRA Presentation* | *DB*** | *Kolbe* |
| | | [1] | [2] | [3] | [4] |
| **WHM LLC (USD/EUR)** | | | | | |
| Both Options Hit | $ | 540,000 | 38.0% | N/A | 20.7% |
| Neither Option Hits | $ | - | 62.0% | N/A | 79.3% |
| **WHMJ LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 270,000 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |
| **HDM LLC (CHF/USD)** | | | | | |
| Both Options Hit | $ | 135,000 | 38.0% | 25.7% | 25.7% |
| Neither Option Hits | $ | - | 62.0% | 74.3% | 74.3% |

Notes: [1]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788, Table 2C;
[2]: Plaintiffs' Objections & Responses to the United States' 1st Set of Interrogatories at #41;
[3]: Appendix D, Workpaper D-3C; [4]: Appendix D, Workpaper D-1C.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.
*Payouts exclude the net premiums for the options.
**The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3B. The DB premiums for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

Tables 7A to 7C draw on these probabilities to calculate expected returns and rates of return for the largest Swiss franc option pairs in each partnership, described in Tables 1A to 1C, respectively (which start on page 21). Use of a Swiss franc pair permits the tables to display DB expected returns as well as my own. For comparability with the COBRA Presentation's calculations, these tables report not only the expected rates of return on the actual amount invested, but also the expected rates of return on the combination of the actual investment plus the fees to Ernst & Young and attorneys. I walk through the calculations in Table 7A before presenting the other two.

**Table 7A. Expected Returns on WHMJ LLC's MURFAM Farms (CHF/USD) Option Pair**

| | | Probabilities | | |
|---|---|---|---|---|
| | | *E&Y COBRA Presentation* | *DB* | *Kolbe* |
| | **Net Option Position** | | | |
| [1] | *Payout if Options Finish in the Money* | $ 1,167,750 | $ 1,167,750 | $ 1,167,750 |
| [2] | *Probability of Both Options Hitting* | 38.0% | 25.7% | 25.7% |
| [3] | *Expected Payout Before Premium & Fees* | $ 443,745 | $ 300,567 | $ 300,513 |
| [4] | *Net Option Premium Paid by LLC* | $ 519,000 | $ 519,000 | $ 519,000 |
| [5] | Net Expected Return on Net Premium Before Fees | $ (75,255) | $ (218,433) | $ (218,487) |
| [6] | Net Expected Return as a % of Net Premium Before Fees | -14.5% | -42.1% | -42.1% |
| [7] | *Outside Advisor Fees* | $ 432,500 | $ 432,500 | $ 432,500 |
| [8] | Net Expected Return on Net Premium After Fees | $ (507,755) | $ (650,933) | $ (650,987) |
| | *Net Expected Return After Fees* | | | |
| [9] | As a % of Net Premium & Fees | -53.4% | -68.4% | -68.4% |
| [10] | As a % of Net Premium | -97.8% | -125.4% | -125.4% |

Notes: [1], [4]: DB-DOJ-COBRA 00240679 - 89, Table 2A; [2]: Table 6A; [3]: [1] x [2]; [5]: [3] - [4]; [6]: [5] / [4]; [7]: 2.5% of the long option premium paid by the LLC. Long option premium is from DB-DOJ-COBRA 00240682. The long option premium paid is: $ 17,300,000
[8]: [5] - [7]; [9]: [8] / ([4] + [7]); [10]: [8] / [4].
Calculation does not adjust for the present value of expected returns due to the uncertain timing of future cash flows. The impact of such an adjustment would be minimal.

Table 7A starts (row [1]) with the payout if both options finish in the money. This amount times the probability that the option pairs will in fact finish in the money (row [2]) is the expected payout before premium and fees (row [3]). Three probabilities are considered, the COBRA Presentation's, DB's, and my own (the three columns). The net expected dollar return before fees is the expected payout (row [3]) less the net premium paid (row [4], which as noted earlier, materially exceeds the basic value of the option position). The percentage expected return before fees (row [6]) is the dollar net expected return (row [5]) divided by the net premium paid (row [4]). As shown in the table, the net premium always embodies an expected loss. The expected loss is clearly material, about 42 percent of the net premium paid for the offsetting option position when realistic probabilities are used, whether from the DB deal sheets or my own calculations.[191]

---

[191] An expected loss still exists even when using the COBRA Presentation's illustrative 38 percent. However, while the COBRA Presentation's illustrative no-fee expected loss is on the order of losing one-seventh of all money bet, the actual expected loss is a good deal higher.

Finally, the last part of Table 7A subtracts outside advisor fees (row [7]], calculated as 2.5 percent of the "desired loss," i.e., the long option's premium), which are transaction costs that must be recovered from the return on the option positions if tax savings are to be ignored. After these fees, the expected rate of return is materially negative in all cases, whether calculated on the sum of the actual investment and the fees (line [9]), as in the COBRA Presentation, or on the actual non-tax investment (line [10]). The "bottom line" is that on the actual amount invested in the net option position, the consideration of fees always subtracts the above-mentioned 83.3 percentage points from the expected rate of return (since the 2.5-percent-of-desired-loss fees are 83.3 percent of the 3-percent-of-desired-loss net premium). Before taxes, participants therefore have more than a 100 percent expected loss with the realistic payoff probabilities and nearly a 100 percent loss even with the illustrative 38 percent probability from the COBRA Presentation.

**Table 7B. Expected Returns on SKM LLC's PSM Farms (CHF/USD) Option Pair**

| | | Probabilities | | |
|---|---|---|---|---|
| | | *E&Y COBRA Presentation* | *DB** | *Kolbe* |
| | **Net Option Position** | | | |
| [1] | *Payout if Options Finish in the Money* | $ 425,250 | $ 425,250 | $ 425,250 |
| [2] | *Probability of Both Options Hitting* | 38.0% | 25.7% | 25.7% |
| [3] | *Expected Payout Before Premium & Fees* | $ 161,595 | $ 109,455 | $ 109,435 |
| [4] | *Net Option Premium Paid by LLC* | $ 189,000 | $ 189,000 | $ 189,000 |
| [5] | Net Expected Return on Net Premium Before Fees | $ (27,405) | $ (79,545) | $ (79,565) |
| [6] | Net Expected Return as a % of Net Premium Before Fees | -14.5% | -42.1% | -42.1% |
| [7] | *Outside Advisor Fees* | $ 157,500 | $ 157,500 | $ 157,500 |
| [8] | Net Expected Return on Net Premium After Fees | $ (184,905) | $ (237,045) | $ (237,065) |
| | *Net Expected Return After Fees* | | | |
| [9] | As a % of Net Premium & Fees | -53.4% | -68.4% | -68.4% |
| [10] | As a % of Net Premium | -97.8% | -125.4% | -125.4% |

Notes: [1], [4]: DB-DOJ-COBRA 00240745 - 55, Table 2B; [2]: Table 6B; [3]: [1] x [2]; [5]: [3] - [4]; [6]: [5] / [4]; [7]: 2.5% of the long option premium paid by the LLC. Long option premium is from DB-DOJ-COBRA 00240748. The long option premium paid is: $ 6,300,000
[8]: [5] - [7]; [9]: [8] / ([4] + [7]); [10]: [8] / [4].
Calculation does not adjust for the present value of expected returns due to the uncertain timing of future cash flows. The impact of such an adjustment would be minimal.

*The DB premiums (or "basic values") for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

**Table 7C. Expected Returns on WHMJ LLC's Murphy Pork (CHF/USD) Option Pair**

| | | Probabilities | | |
|---|---|---|---|---|
| | | *E&Y COBRA Presentation* | *DB** | *Kolbe* |
| | **Net Option Position** | | | |
| [1] | *Payout if Options Finish in the Money* | $ 270,000 | $ 270,000 | $ 270,000 |
| [2] | *Probability of Both Options Hitting* | 38.0% | 25.7% | 25.7% |
| [3] | *Expected Payout Before Premium & Fees* | $ 102,600 | $ 69,495 | $ 69,483 |
| [4] | *Net Option Premium Paid by LLC* | $ 120,000 | $ 120,000 | $ 120,000 |
| [5] | Net Expected Return on Net Premium Before Fees | $ (17,400) | $ (50,505) | $ (50,517) |
| [6] | Net Expected Return as a % of Net Premium Before Fees | -14.5% | -42.1% | -42.1% |
| [7] | *Outside Advisor Fees* | $ 100,000 | $ 100,000 | $ 100,000 |
| [8] | Net Expected Return on Net Premium After Fees | $ (117,400) | $ (150,505) | $ (150,517) |
| | *Net Expected Return After Fees* | | | |
| [9] | As a % of Net Premium & Fees | -53.4% | -68.4% | -68.4% |
| [10] | As a % of Net Premium | -97.8% | -125.4% | -125.4% |

Notes: [1], [4]: DB-DOJ-COBRA 00240690 - 700, Table 2C; [2]: Table 6C; [3]: [1] x [2]; [5]: [3] - [4]; [6]: [5] / [4]; [7]: 2.5% of the long option premium paid by the LLC. Long option premium is from DB-DOJ-COBRA 00240693. The long option premium paid is: $ 4,000,000
[8]: [5] - [7]; [9]: [8] / ([4] + [7]); [10]: [8] / [4].
Calculation does not adjust for the present value of expected returns due to the uncertain timing of future cash flows. The impact of such an adjustment would be minimal.

**The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3B. The DB premiums for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data.

Since all the Swiss franc bets have identical terms, apart from size, the above conclusions for Table 7A follow also for Tables 7B and 7C. In short, absent the claimed tax savings, the participants' expected rate of return on this option position was a loss of *more* than the amount they invested to buy the position. These option pairs are extraordinarily bad investments on their own merits (i.e.,

absent tax considerations). For example, even lottery tickets have an expected loss of "only" about 50 percent of the money used to buy them.[192]

Workpapers in Appendix D provide the same information for the other offsetting option positions. Tables 8A to 8C summarize the results for all positions, including those in Tables 7A to 7C, and the combined result for the entire set of offsetting option positions. The same overall pattern emerges: after fees, the expected return on each of these offsetting option positions was a loss of *more* than the net premium invested to buy them. Since the expected rate of return of each component is materially negative, the expected rate of return of the entire series of offsetting option positions is materially negative, too.

---

[192] A lottery ticket apparently offers expected returns on the order of minus 50 percent. It would be worse, except that (unlike the case with the offsetting option positions here) it is possible to have partial lottery payoffs without winning the whole jackpot. (See http://www.durangobill.com/PowerballOdds.html.)

**Table 8A. Expected Returns on All MURFAM Farms Offsetting Option Pairs**

| | | Long Option Premium | Probabilities E&Y COBRA Presentation | DB* | Kolbe |
|---|---|---|---|---|---|
| [1] | WHM LLC (USD/EUR Option Position) | $26,400,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [2] | Net Premium Before Fees | | -14.5% | N/A | -53.3% |
| [3] | Net Premium & Fees After Fees | | -53.4% | N/A | -74.6% |
| [4] | Net Premium After Fees | | -97.8% | N/A | -136.7% |
| [5] | WHMJ LLC (CHF/USD Option Position) | $17,300,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [6] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [7] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [8] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [9] | JMN LLC (CHF/USD Option Position) | $9,700,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [10] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [11] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [12] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [13] | WMC LLC (USD/EUR Option Position) | $5,300,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [14] | Net Premium Before Fees | | -14.5% | N/A | -53.3% |
| [15] | Net Premium & Fees After Fees | | -53.4% | N/A | -74.6% |
| [16] | Net Premium After Fees | | -97.8% | N/A | -136.7% |
| [17] | ANB LLC (CHF/USD Option Position) | $3,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [18] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [19] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [20] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [21] | Total Long Option Premiums | $61,700,000 | | | |
| | **Net Expected Return for Entire Transaction as a % of** | | | | |
| [22] | Net Premium Before Fees | | **-14.5%** | **-42.1%** | **-47.9%** |
| [23] | Net Premium & Fees After Fees | | **-53.4%** | **-68.4%** | **-71.6%** |
| [24] | Net Premium After Fees | | **-97.8%** | **-125.4%** | **-131.2%** |

Notes: [1], [5], [9], [13], [17]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777;
[2] - [4]: Appendix D, Workpaper D-5A; [6] - [8]: Table 7A;
[10] - [12]: Appendix D, Workpaper D-6A; [14] - [16]: Appendix D, Workpaper D-7A;
[18] - [20]: Appendix D, Workpaper D-8A; [21] = [1] + [5] + [9] + [13] + [17];
[22] = ([1] x [2] + [5] x [6] + [9] x [10] + [13] x [14] + [17] x [18]) / [21];
[23] = ([1] x [3] + [5] x [7] + [9] x [11] + [13] x [15] + [17] x [19]) / [21];
[24] = ([1] x [4] + [5] x [8] + [9] x [12] + [13] x [16] + [17] x [20]) / [21];
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3A. The DB premiums for the each of the option pairs other than the WHMJ LLC CHF/USD option pair with the $17.3m long option premium were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data. The USD/EUR options are excluded from the DB calculations in [22], [23], and [24].

**Table 8B. Expected Returns on All PSM Farms Offsetting Option Pairs**

| | | Long Option Premium | Probabilities | | |
|---|---|---|---|---|---|
| | | | *E&Y COBRA Presentation* | *DB** | *Kolbe* |
| [1] | HDM LLC (USD/EUR Option Position) | $12,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [2] | Net Premium Before Fees | | -14.5% | N/A | -53.3% |
| [3] | Net Premium & Fees After Fees | | -53.4% | N/A | -74.6% |
| [4] | Net Premium After Fees | | -97.8% | N/A | -136.7% |
| [5] | SKM LLC (CHF/USD Option Position) | $6,300,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [6] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [7] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [8] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [9] | MDM LLC (CHF/USD Option Position) | $6,300,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [10] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [11] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [12] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [13] | Total Long Option Premiums | $24,600,000 | | | |
| | **Net Expected Return for Entire Transaction as a % of** | | | | |
| [14] | Net Premium Before Fees | | **-14.5%** | **-42.1%** | **-47.6%** |
| [15] | Net Premium & Fees After Fees | | **-53.4%** | **-68.4%** | **-71.4%** |
| [16] | Net Premium After Fees | | **-97.8%** | **-125.4%** | **-130.9%** |

Notes: [1], [5], [9]: DB-DOJ-COBRA 00240734 - 55, 89 - 99; [2] - [4]: Appendix D, Workpaper D-5B; [6] - [8]: Table 7B; [10] - [12]: Appendix D, Workpaper D-6B; [13] = [1] + [5] + [9]; [14] = ([1] x [2] + [5] x [6] + [9] x [10]) / [13]; [15] = ([1] x [3] + [5] x [7] + [9] x [11]) / [13]; [16] = ([1] x [4] + [5] x [8] + [9] x [12]) / [13]; USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3B. The DB premiums for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data. The USD/EUR options are excluded from the DB calculations in [14], [15], and [16].

**Table 8C. Expected Returns on All Murphy Pork Offsetting Option Pairs**

| | | *Long Option Premium* | Probabilities | | |
|---|---|---|---|---|---|
| | | | *E&Y COBRA Presentation* | *DB* | *Kolbe* |
| [1] | WHM LLC (USD/EUR Option Position) | $8,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [2] | Net Premium Before Fees | | -14.5% | N/A | -53.3% |
| [3] | Net Premium & Fees After Fees | | -53.4% | N/A | -74.6% |
| [4] | Net Premium After Fees | | -97.8% | N/A | -136.7% |
| [5] | WHMJ LLC (CHF/USD Option Position) | $4,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [6] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [7] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [8] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [9] | HDM LLC (CHF/USD Option Position) | $2,000,000 | | | |
| | *Net Expected Return as a % of* | | | | |
| [10] | Net Premium Before Fees | | -14.5% | -42.1% | -42.1% |
| [11] | Net Premium & Fees After Fees | | -53.4% | -68.4% | -68.4% |
| [12] | Net Premium After Fees | | -97.8% | -125.4% | -125.4% |
| [13] | Total Long Option Premiums | $14,000,000 | | | |
| | **Net Expected Return for Entire Transaction as a % of** | | | | |
| [14] | Net Premium Before Fees | | **-14.5%** | **-42.1%** | **-48.5%** |
| [15] | Net Premium & Fees After Fees | | **-53.4%** | **-68.4%** | **-71.9%** |
| [16] | Net Premium After Fees | | **-97.8%** | **-125.4%** | **-131.9%** |

Notes: [1], [5], [9]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788;
[2] - [4]: Appendix D, Workpaper D-6C; [6] - [8]: Table 7C;
[10] - [12]: Appendix D, Workpaper D-7C; [13] = [1] + [5] + [9];
[14] = ([1] x [2] + [5] x [6] + [9] x [10]) / [13]; [15] = ([1] x [3] + [5] x [7] + [9] x [11]) / [13];
[16] = ([1] x [4] + [5] x [8] + [9] x [12]) / [13];
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

*The DB probabilities in this column are calculated using DB's premiums (or "basic values"). See Appendix D, Workpaper D-3B. The DB premiums for the each of the option pairs in this transaction were incorrect. The "corrected" DB premiums for the other CHF/USD option pairs were estimated based on the ratio of the DB premium to the stated premium from the WHMJ LLC CHF/USD option pair with the $17.3m long option premium from the MURFAM Farms, LLC transaction. The USD/EUR option pairs have DB premiums which are available, but they appear incorrect and no correction is available with the other available data. The USD/EUR options are excluded from the DB calculations in [14], [15], and [16].

## D. Check One: Actual Outcomes for Option Pairs

My above conclusions on expected returns can be checked in two ways. The first is to see how the investments actually turned out. This is a weak test, since it represents the combined results of only the two "bets" placed by the participants in these cases (since the four euro bets have the same probability of paying off, as do the seven Swiss franc bets). However, when combined with a second check described below, it turns out to be instructive.

As noted above, the participants in these cases waited for the final outcomes for their offsetting option positions, all of which expired out of the money. Their actual result was thus a 100 percent loss on the offsetting option positions before fees and a larger loss after fees, a result that is consistent with the conclusion that the investments had a negative expected rate of return. These outcomes are recorded in Tables 9A to 9C.

After accounting for fees, these transactions lost approximately 183 percent of their net option investment.[193]

**Table 9A. Achieved Returns on the MURFAM Farms Offsetting Option Positions**

| | *WHM LLC* | *WHMJ LLC* | *JMN LLC* | *WMC LLC* | *ANB LLC* | *All Participants* |
|---|---|---|---|---|---|---|
| [1] Payout from Options | $ - | $ - | $ - | $ - | $ - | $ - |
| [2] Net Option Premium | $ (792,000) | $ (519,000) | $ (291,000) | $ (159,000) | $ (90,000) | $ (1,851,000) |
| [3] Fees Paid | $ (659,539) | $ (432,072) | $ (242,038) | $ (132,470) | $ (74,983) | $ (1,541,101) |
| [4] *Total Costs* | $ (1,451,539) | $ (951,072) | $ (533,038) | $ (291,470) | $ (164,983) | $ (3,392,101) |
| **[5] Gain (Loss) on Transaction** | **$ (1,451,539)** | **$ (951,072)** | **$ (533,038)** | **$ (291,470)** | **$ (164,983)** | **$ (3,392,101)** |

Notes: [1]: DB-DOJ-COBRA-00044052 - 4; [2]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777; [3]: DB-DOJ-COBRA-00013479, 3485, 3541, 3547, 3588, 3594, 3639, 3645, 9626, 9632, 3933, 4083; See also Table 3A & Appendix D, Workpaper D-19A; [4] = [2] + [3]; [5] = [1] + [4].

[193] From Table 9A: $3,392,101 total loss / $1,851,000 total net premium = 183% loss. Similar calculations for the PSM and Murphy Pork cases based on the data in Tables 9B and 9C (which follow) produce nearly identical rates of return. The returns are not completely identical because the fees were not allocated precisely as 2.5 percent of the "desired loss" among the three MMLLCs, although the total fees come to exactly 2.5 percent of the total "desired loss." See Appendix D, Workpaper D-23A, 19-B or 19-C.

**Table 9B. Achieved Returns on the PSM Farms Offsetting Option Positions**

| | *HDM LLC* | *SKM LLC* | *MDM LLC* | *All Participants* |
|---|---|---|---|---|
| [1] Payout from Options | $ - | $ - | $ - | $ - |
| [2] Net Option Premium | $ (360,000) | $ (189,000) | $ (189,000) | $ (738,000) |
| [3] Fees Paid | $ (299,980) | $ (157,490) | $ (157,490) | $ (614,960) |
| [4] *Total Costs* | $ (659,980) | $ (346,490) | $ (346,490) | $ (1,352,960) |
| [5] Gain (Loss) on Transaction | **$ (659,980)** | **$ (346,490)** | **$ (346,490)** | **$ (1,352,960)** |

Notes: [1]: DB-DOJ-COBRA-00044052 - 4; [2]: DB-DOJ-COBRA 00240734 - 55, 89 - 99; [3]: DB-DOJ-COBRA-00013681, 687, 733, 739, 779, 785, 848, 964; See also Table 3B & Appendix D, Workpaper D-15B; [4] = [2] + [3]; [5] = [1] + [4].

**Table 9C. Achieved Returns on the Murphy Pork Offsetting Option Positions**

| | *WHM LLC* | *WHMJ LLC* | *HDM LLC* | *All Participants* |
|---|---|---|---|---|
| [1] Payout from Options | $ - | $ - | $ - | $ - |
| [2] Net Option Premium | $ (240,000) | $ (120,000) | $ (60,000) | $ (420,000) |
| [3] Fees Paid | $ (200,825) | $ (100,383) | $ (50,230) | $ (351,439) |
| [4] *Total Costs* | $ (440,825) | $ (220,383) | $ (110,230) | $ (771,439) |
| [5] Gain (Loss) on Transaction | **$ (440,825)** | **$ (220,383)** | **$ (110,230)** | **$ (771,439)** |

Notes: [1]: DB-DOJ-COBRA-00044052 - 4; [2]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788; [3]: DB-DOJ-COBRA-00013479, 3485, 3541, 3547, 3681, 3687, 3995, 4083; See also Table 3C & Appendix D, Workpaper D-15C; [4] = [2] + [3]; [5] = [1] + [4].

Note also that the participants owned parts of multiple offsetting option position bets, each with a negative expected rate of return. Even if some of the options had not finished out of the money, to win overall, the participants had to win both currency bets, not just one. This is shown in Tables 10A to 10C.

**Table 10A. Option Position Wins MURFAM Farms Needed to Win Overall**

| | | | *Direction of Bet* |
|---|---|---|---|
| [1] | Total Net Premium | $1,851,000 | |
| [2] | Total Fees at 2.5% of "Desired Loss" | $1,542,500 | |
| [3] | *Total Costs* | $3,393,500 | |
| | Total Potential Payout by Currency | | |
| [4] | USD/EUR Puts | $2,139,750 | Stronger USD |
| [5] | CHF/USD Puts | $2,025,000 | Weaker USD |
| [6] | *Total* | $4,164,750 | |
| [7] | Option Payouts Needed for Positive Profit | All | |

Notes: [1], [4], [5]: DB-DOJ-COBRA 00240679 - 689, 701 - 711, 723 - 733, 756 - 777, Table 2A; [2] = 2.5% of the total long option premium for the group; See Table 3A; [3] = [1] + [2]; [6] = [4] + [5];
[7]: Combinations of payouts producing values greater than [3];
Direction of bet: USD/FX puts and FX/USD calls bet that the USD will strengthen relative to the foreign currency; USD/FX calls and FX/USD puts bet that the USD will weaken.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

**Table 10B. Option Position Wins PSM Farms Needed to Win Overall**

| | | | *Direction of Bet* |
|---|---|---|---|
| [1] | Total Net Premium | $738,000 | |
| [2] | Total Fees at 2.5% of "Desired Loss" | $615,000 | |
| [3] | *Total Costs* | $1,353,000 | |
| | Total Potential Payout by Currency | | |
| [4] | USD/EUR Put | $810,000 | Stronger USD |
| [5] | CHF/USD Puts | $850,500 | Weaker USD |
| [6] | *Total* | $1,660,500 | |
| [7] | Option Payouts Needed for Positive Profit | All | |

Notes: [1], [4], [5]: DB-DOJ-COBRA 00240734 - 55, 89 - 99, Table 2B.
[2] = 2.5% of the total long option premium for the group; See Table 3B; [3] = [1] + [2]; [6] = [4] + [5];
[7]: Combinations of payouts producing values greater than [3];
Direction of bet: USD/FX puts and FX/USD calls bet that the USD will strengthen relative to the foreign currency; USD/FX calls and FX/USD puts bet that the USD will weaken.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

**Table 10C. Option Position Wins Murphy Pork Needed to Win Overall**

| | | | *Direction of Bet* |
|---|---|---|---|
| [1] | Total Net Premium | $420,000 | |
| [2] | Total Fees at 2.5% of "Desired Loss" | $350,000 | |
| [3] | *Total Costs* | $770,000 | |
| | Total Potential Payout by Currency | | |
| [4] | USD/EUR Put | $540,000 | Stronger USD |
| [5] | CHF/USD Puts | $405,000 | Weaker USD |
| [6] | *Total* | $945,000 | |
| [7] | Option Payouts Needed for Positive Profit | All | |

Notes: [1], [4], [5]: DB-DOJ-COBRA 00240690 - 700, 712 - 722, 778 - 788, Table 2C; [2] = 2.5% of the total long option premium for the group; See Table 3C; [3] = [1] + [2]; [6] = [4] + [5];
[7]: Combinations of payouts producing values greater than [3];
Direction of bet: USD/FX puts and FX/USD calls bet that the USD will strengthen relative to the foreign currency; USD/FX calls and FX/USD puts bet that the USD will weaken.
USD: U.S. dollar, EUR: Euro, and CHF: Swiss franc.

The sizes of the individual bets differed, but the totals put on the two currencies within each partnership were almost the same. To obtain a positive payout, the participants therefore needed to win both the euro and Swiss franc bets, for all three partnerships.

Consider what this means, given the earlier tables. Even if their euro *or* their Swiss franc bet had paid off, they still would have lost money, *unless* the other option paid off, too. The participants in this series of transactions lost completely, but even if they had beat the odds on one investment, they would still have lost overall. The need to win both bets simultaneously, each of them priced with a materially negative expected rate of return, is a very high hurdle. (As discussed further in Section IV, below, this issue also has relevance for the economic merits of the stated non-tax business purposes for these transactions.)

### E. Check Two: Return Analysis of Similar Positions

As noted earlier, the COBRA transactions in these cases are similar to a much larger set of transactions undertaken shortly before, at the end of 1999. This permits a second check on the above expected return calculations, since it provides a much bigger sample. Of course, if all the bets were the same (like the four euro or seven Swiss franc bets in these transactions), the larger sample would be of little or no value for such a purpose, since the outcome for the entire set of bets would simply reflect the good or bad luck for that one position. However, as shown in Appendix E, within the standard offsetting option position format, the directions and details of the foreign currency bets did vary materially among the various transactions.[194]

Table 11 summarizes the Appendix E calculations of the expected returns on all of the 1999 offsetting option positions for which sufficient data exist. Note that the structure of these transactions differed somewhat, most importantly in that the net premium was 5 percent of the long option's stated premium (the "desired loss") rather than 3 percent, the fee was 4.5 percent rather than 2.5 percent, and the potential payoff was 250 percent of the net premium (12.5 percent of the "desired loss") rather than 225 percent (6.75 percent of the "desired loss"). However, the basic structure of the offsetting option positions was the same, i.e., long and short digital foreign exchange options with a stated two-pip spread and stated face values much larger than the net premium. They were all written with DB, and all had stated values well in excess of their basic values (although not as much in excess, on average, as in the present cases, a topic discussed further below). The methodology used to calculate the expected returns in Table 11 is the same as that used in the present cases for Figures 7A-7C and 8A-8C.

[194] See Appendix E, Workpaper E-21. I discuss other implications of this fact below, in part F of this Section of my report.

**Table 11. Expected Return Statistics on 1999 COBRA Transactions with Adequate Data**

| | Expected Return | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | *Before Fees as a % of Net Premium* | | | *After Fees as a % of Net Premium & Fees* | | | *After Fees as a % of Net Premium* | | |
| | E&Y COBRA Present-ation | DB* | Kolbe Calculated | E&Y COBRA Present-ation | DB* | Kolbe Calculated | E&Y COBRA Present-ation | DB* | Kolbe Calculated |
| *Minimum Across All Option Pairs* | -5.0% | -36.7% | -35.9% | -50.0% | -66.7% | -66.3% | -95.0% | -126.7% | -125.9% |
| *Maximum Across All Option Pairs* | -5.0% | -17.4% | -14.4% | -50.0% | -56.5% | -54.9% | -95.0% | -107.4% | -104.4% |
| *Median Across All Option Pairs* | -5.0% | -30.1% | -30.0% | -50.0% | -63.2% | -63.2% | -95.0% | -120.1% | -120.0% |
| *Simple Average Across All Option Pairs (52 with DB data, 56 with Kolbe data)* | -5.0% | -29.1% | -28.5% | -50.0% | -62.7% | -62.4% | -95.0% | -119.1% | -118.5% |
| *Weighted Average Across All Option Pairs (52 with DB data, 56 with Kolbe data)* | -5.0% | -27.4% | -29.0% | -50.0% | -59.2% | -62.7% | -95.0% | -112.5% | -119.0% |
| *Simple Average of the 15 Sets of 1999 COBRA Transactions*** | -5.0% | *-29.8%* | *-29.1%* | -50.0% | -63.0% | -62.7% | -95.0% | *-119.8%* | *-119.1%* |

Sources and Notes:
Data exclude transactions with incomplete data.
See calculations and notes in Appendix E, Workpaper E-18.
Expected return after premiums & before fees as a % of net premium is calculated as expected payout on options / total net premium.
Expected return after premiums & fees as a % of net premium & fees is calculated as (expected payout on options less fees) / (total net premium + total fees).
Expected return after premiums & fees as a % of net premium is calculated as (expected payout on options less fees) / total net premium.
* Uses the "corrected" DB Theoretical Premiums when necessary. Corrections were not available for four options (three from WNK Partners and one from CMC Austin Partners), which are excluded from the DB calculations.
** Value for each set of transactions is the weighted average of the option pairs for that set.

Please note that Table 11 reports three averages for the 1999 COBRA transactions, the simple average of all their option pairs, the weighted average of all their option pairs, and the simple average of the 15 individual sets of 1999 COBRA transactions. The last of these is the simple average over the 15 1999 COBRA transactions of the weighted average of the offsetting option positions in that particular set.[195] The simple average of the 15 sets of transactions is the most reliable measure, in my view, since it is consistent with two features of the COBRA transactions:

[195] The averages for a particular set of transactions are equivalent to the values reported above in rows [22] to [24] in Table 8A, page 77 above, and in rows [14] to [16] of Tables 8B and 8C.

- The participants in an individual set of transactions end up pooling their options and sharing a weighted-average rate of return even if their LLCs start off with materially different option positions,[196] but
- There is no reason to believe that mere size differences among transaction sets convey additional information about overall rates of return on the COBRA transactions.[197]

However, I also report the other two averages for comparison.

Note that the expected returns in Table 11 are somewhat higher (less negative) than those in Tables 8A to 8C. To test the merits of the methodology used to calculate these expected returns (and used here as well), Table 12 reports the actual outcomes for the 1999 COBRA transactions.

---

[196] This issue is important in part because differences between the options' stated and basic value that produce DB's fees could differ materially for different offsetting option positions and therefore for different LLCs (see Appendix E, Workpaper E-4), and the sizes of the offsetting option positions could differ materially, too. Yet the LLCs' ultimate returns came on a pooled, weighted-average basis because of the contributions to the partnerships. Therefore, a simple average of the offsetting option positions within a set of transactions could be materially misleading about the actual risks facing the participants in that set.

[197] This issue just recognizes that the expectations or outcomes for a transaction set that happens to be bigger tell us no more about the underlying economics of the COBRA transactions than the expectations or outcomes for a transaction set that happens to be smaller.

**Table 12. Realized Returns on 1999 COBRA Transactions**

| Returns for All Option Pairs: | Before Fees as a % of Net Premium | After Fees as a % of Net Premium & Fees | After Fees as a % of Net Premium |
|---|---|---|---|
| *Minimum Across All 56 Option Pairs* | -100% | -100% | -190% |
| *Maximum Across All 56 Option Pairs* | 150% | 32% | 60% |
| *Median Across All 56 Option Pairs* | -100% | -100% | -190% |
| *Simple Average Across All 56 Option Pairs* | -35.3% | -66.0% | -125.3% |
| *Weighted Average Across All 56 Option Pairs* | -23.7% | -59.9% | -113.7% |
| *Simple Average of the 15 Sets of 1999 COBRA Transactions** | *-39.4%* | -68.1% | *-129.4%* |

| Option Pair Outcomes: | Total | % of Total |
|---|---|---|
| *# of Option Pairs* | 56 | |
| *# of Option Pairs Sold Early* | 9 | 16% |
| *# of Option Pairs Expired In the Money (ITM)* | 9 | 16% |
| *# of Option Pairs Expired Out of the Money (OTM)* | 38 | 68% |

Sources and Notes:
Premium information is from the DB deal sheets (DB COBRA 04058 - 04389). Payout information is from DB-DOJ-COBRA-00000019, 00000025, 00009771, 00009773, 00010136, 00015768, 00043899 and 00044046-7. See Appendix E, Workpaper E-20.
* Value for each set of transactions is the weighted average of the option pairs for that set.

This table shows that the actual average outcomes were slightly worse than expected, at the transaction level. Based on the most reliable measure, the simple average of the 1999 COBRA transactions, the actual outcome before fees was a loss of about *39 percent* of the net premium amounts, somewhat worse than the 29-30 percent loss that Table 11 finds to be expected.[198] After fees, the actual average outcome was a loss of approximately *129 percent* of the net premium amounts, somewhat worse than the 119-20 percent loss expected.[199] Fully 68 percent of the 56 option pairs finished out of the money, losing the entire net premium, and that number might well be somewhat higher had nine of the option pairs not been sold early, prior to expiration.[200] The most

198 This discussion rounds such percentage values from those in Tables 11 and 12; for clarity, the values discussed are shown in italics in Tables 11 and 12.

199 Please note again that the after-fees return for the 1999 transactions is always exactly 90 percentage points below the no-fees return in each case, since the fees are a guaranteed loss of an amount equal to 90 percent of the net premium on every offsetting option transaction.

200 What about the fact that nine of the individual offsetting option positions did pay off (which is responsible for positive "maximum" returns in Table 12)? Given that there are 56 offsetting option positions and odds of a payoff that are generally in the 25-35 percent range (see Appendix E, Workpaper E-1), it is unsurprising that some pairs did in fact do so. Yet *no* participant's LLC in the 1999 (continued...)

basic conclusion of Table 12, however, is that the methodology used in Table 11 is in fact consistent with the evidence on how the offsetting option positions in the 1999 COBRA transactions turned out.

Of course, one reason for these negative expected and actual rates of return was the excess of the DB net premiums over the net basic values of the offsetting option positions. In this regard, it is interesting that the RMS worksheets also report the DB "markups" on the transaction. It is not clear how these markups were calculated.[201] It turns out that the DB markups reported in the RMS worksheets for the 1999 COBRA transactions are all on the order of 1 percent of the participants' combined "desired loss."[202] The RMS reports in the present cases report a markup for only one of the 11 option pairs, which amounts to about two-thirds of one percent of the associated "desired loss."

However, in the discussion of Figures 7A to 7C (which start on page 64 above), I noted that the excess of the DB net premium over the net basic value was 1.4 percent to 1.5 percent of the combined long option stated premium (i.e., of the "desired loss").[203] The average for this quantity in the 1999 COBRA transactions is 1.5 percent.[204] As noted earlier, this excess is the mechanism by which DB gets a fee, and it appears to be at the same general level in these transactions as the average value in the 1999 COBRA transactions, relative to the "desired loss," despite the fact that the net premium and the other fees are smaller percentages in the present transactions. Thus, the total transaction costs associated with the 1999 COBRA transactions were on the order of 6 percent on average, not 4.5 percent, part of which were embedded in the prices DB charged. The same effect is present here, with total transaction costs on the order of 4 percent rather than 2.5 percent of the "desired loss."[205]

---

200 (...continued)
transactions made money after fees (again, see Appendix E, Workpaper E-25). In part this is due to the materially negative expected rates of return on the individual options, since by definition that means the actual outcomes will be negative on average in a large enough sample. But it is also due to the fact that the participants' LLCs combined their options in the partnerships, and good performance on one option is not enough to insure a good outcome overall once the options are combined.

201 The reason is at least in part the impossibility of perfectly replicating the calculations underlying the RMS worksheets. Please recall the issues discussed in footnote 159.

202 See Appendix E, Worksheet E-24.

203 The total excess net premium in the present cases rounds to 1.5 percent of the total "desired loss." See Appendix D, Workpapers D-23A, D-19B, or D-19C.

204 See Appendix E, Workpaper E-36.

205 Even with the smaller "markups" shown in the RMS worksheets, the total fees in the 1999 COBRA transactions would be on the order of 5.5 percent, and in the present transactions between 3 and 3½ percent (based on the sole reported RMS worksheet markup here, which, unlike the excess of DB's stated net premium over the net basic value of the options, is smaller here than for the 1999 COBRA transactions).

To explore the meaning of the 1999 evidence for the present cases further, note that it is possible to calculate the expected returns on the 1999 option transactions with the fee and payoff structure used in the Murphy transactions. This is possible because for a given fee and payoff structure, the calculation of expected rates of return using that structure as implemented by DB requires only the stated amount of the long option premium and the probability of the long option payoff.[206] Table 13 compares the 1999 and current transactions on this basis.

206 For example, for the COBRA Presentation's example of a \$50 million long option value, a net premium of 3 percent instead of 5 percent would imply a dollar amount of \$1.5 million instead of \$2.5 million. A fee of 2.5 percent instead of 4.5 percent would imply fees of \$1.25 million instead of \$2.25 million. And a payoff of 225 percent of the net premium (= 6.75 percent of stated long option value) instead of 250 percent of the net premium (= 12.5 percent of long option value) would imply a payoff if successful of \$3.375 million instead of \$6.25 million. To simplify the example, assume a round number for the long option payoff probability, say 30 percent. Then the expected dollar return would be \$3.375 million × 0.30 = \$1.0125 million, instead of \$6.25 million × 0.30 = \$1.875 million. The expected pre-fee rate of return would be [(\$1.0125 - \$1.5) million / \$1.5 million] = -32.5 percent instead of [(\$1.875 - \$2.5) million / \$2.5 million] = -25 percent. The rate of return after fees would just subtract the fees as well as the net premium in the numerator of the previous calculation, and it would always be 83.3 percent lower rather than 90 percent lower than those just shown (because the \$1.25 million in fees is 83.3 percent of the \$1.5 million net premium, versus the \$2.25 million in fees' being 90 percent of the \$2.5 million net premium). The after-fee expected rate of return would thus be (- 32.5 percent - 83.3 percent) = -115.8 percent instead of (- 25 percent - 90 percent) = -115 percent.

**Table 13. Comparison of Expected Returns on 1999 COBRA Transactions, Restated to the Murphy Farm Terms, with the Murphy Farm Transactions**

| | Expected Return Using Kolbe Basic Values | | |
|---|---|---|---|
| | *Before Fees as a % of Net Premium* | *After Fees as a % of Net Premium & Fees* | *After Fees as a % of Net Premium* |
| **Restated 1999 Transactions** | | | |
| *Minimum Across All 56 Option Pairs* | *-42.3%* | -68.5% | -125.7% |
| *Maximum Across All 56 Option Pairs* | -22.9% | -58.0% | -106.3% |
| *Median Across All 56 Option Pairs* | -37.0% | -65.6% | -120.3% |
| *Simple Average Across All 56 Option Pairs* | -35.7% | -64.9% | -119.0% |
| *Weighted Average Across All 56 Option Pairs* | -36.1% | -65.2% | -119.5% |
| *Simple Average of the 15 Sets of 1999 COBRA Transactions** | *-36.2%* | -65.2% | *-119.6%* |
| **Murphy Farms Transactions** | | | |
| *Minimum Across All 11 Option Pairs* | -53.3% | -74.6% | -136.7% |
| *Maximum Across All 11 Option Pairs* | *-42.1%* | -68.4% | -125.4% |
| *Median Across All 11 Option Pairs* | -42.1% | -68.4% | -125.4% |
| *Simple Average Across All 11 Option Pairs* | -46.2% | -70.6% | -129.5% |
| *Weighted Average Across All 11 Option Pairs* | -47.9% | -71.6% | -131.2% |
| *Simple Average of the 3 Sets of Murphy Farms Transactions** | *-48.0%* | -71.6% | *-131.3%* |

Sources and Notes:
Data exclude transactions with incomplete data.
See calculations and notes in Appendix E, Workpaper E-32.
Expected return after premiums & before fees as a % of net premium is calculated as expected payout on options / total net premium.
Expected return after premiums & fees as a % of net premium & fees is calculated as (expected payout on options less fees) / (total net premium + total fees).
Expected return after premiums & fees as a % of net premium is calculated as (expected payout on options less fees) / total net premium.
* Value for each set of transactions is the weighted average of the option pairs for that set.

Table 13 reveals several facts about these transactions. To start, compare the top half of Table 13 with Table 11 (page 87 above). The expected rate of return before fees in Table 13 is lower (more negative) than in Table 11, at minus 36 percent instead of minus 29 percent for the most reliable average using the Kolbe basic values.[207] This is because the payoff if successful is a smaller multiple of net fees, 225 percent (6.75 percent of the "desired loss", relative to a 3 percent net premium) rather than 250 percent (12.5 percent relative to 5 percent). Second, the expected rate of

[207] Again, the Table 13 values discussed in the text are rounded and are italicized in the table itself.

return after fees is almost the same in the two tables, a negative 120 percent versus a negative 119 percent. This is because the fee level is only 83.3 percent of the net premium instead of 90 percent of the premium, which offsets the worsened pre-fee rate of return.

Next, compare the top and bottom halves of Table 13. The participants in the present transactions clearly have materially lower (more negative) expected rates of return than in the 1999 transactions on an apples-to-apples basis. This is because the excess of the DB net premiums over basic net value is higher than typical in the 1999 transactions (recall the discussion in connection with Figures 7A to 7C above, starting on page 64). The average expected rate of return is about 12 percentage points worse, at a negative 48 percent rather a negative 36 percent. In fact, the maximum (least negative) expected rates of return here (negative 42.1 percent) are barely better than the minimum (most negative) expected rates of return in the 1999 transactions (negative 42.3 percent), still on an apples-to-apples basis. The result is that while the fees paid to other advisors are lower as a percentage of the "desired loss" in these cases than in the 1999 cases (2.5 percent versus 4.5 percent), the implicit fees paid to DB relative to the "desired loss" are of the same magnitude, about 1.5 percent on average.[208]

This happens because the payoff probabilities in these cases are unusually low, relative to the 1999 cases.[209] Tables 6A-6C (starting on page 69 above) report payoff probabilities of 25.7 percent and 20.7 percent for the Swiss franc and euro options, respectively, which produces an overall average of 23.9 percent (simple average) 23.2 percent (weighted average).[210] The worst payoff probability for the 1999 options, calculated in the same way, is 25.6 percent, and the average is 28.4 percent (weighted average) or 28.6 percent (simple average).[211]

---

208 See Appendix E, Workpaper E-36.

209 As discussed earlier, the structure of the COBRA transaction parameters left DB with no choice but to overprice the stated values of both the long and the short options if it was to earn a positive fee through the option prices. Moreover, the size of the fee turns out to be uniquely and inversely related to the payoff probabilities on the underlying options. For example, the COBRA parameters would completely constrain DB's pricing flexibility if it wanted to achieve a fee equal to a given percentage of the "desired loss," as Ernst & Young and the attorneys did. Thus, to achieve a fee of 1.50 percent of the "desired loss" with the 1999 COBRA parameters (and with the same strike price for the long and short options), the payoff probability on those options must be exactly 28 percent. Lower probabilities would produce higher implicit fees, and conversely. With the 2000 COBRA parameters, the payoff probability must be exactly 2/9ths, i.e., 22.222 percent. See Appendix E, Workpaper E-37. (To make the calculation in the workpaper easier to follow, these values assume the payoff is received immediately, rather than in one or two months; this assumption reduces these calculated probabilities slightly from those actually required to produce a given fee, since the payoff would be more costly to DB if it had to be paid immediately and a lower payoff probability would be needed to compensate for that fact.) Finally, for completeness, Appendix E, Workpaper E-38, demonstrates that the stated values of the long and short options are overpriced under the COBRA structure even if DB earns no fee at all.

210 See Appendix E, Workpaper E-1.

211 *Ibid.* The actual payoff probabilities in the 1999 and 2000 COBRA transactions thus are slightly higher on average than the respective values discussed in footnote 208 (even taking the precise timing of the (continued...)

Thus, the "bottom line" of the preceding analysis is that the transactions in the present cases have very low (i.e., unusually negative) expected rates of return, absent tax considerations.

**F. Did a Reasonable Possibility of a Non-Tax Profit Exist?**

If the claimed tax savings are ignored, the materially negative expected returns on the individual offsetting option positions make them gambles, not investments, and bad gambles at that. Every time the participants placed such a bet, ignoring the claimed tax benefits, their rationally expected return (i.e., the return they would actually get on average over many such bets) was a loss of *more than the money bet.* Tax benefits aside, the participants in the COBRA transactions would have been better off on average if they had given the money away than they were from "investing" in the offsetting option positions, and the participants in the present transactions had unusually poor expected returns even relative to those in other COBRA transactions. As noted earlier, even lottery tickets offer a much less negative expected rate of return, "only" losing about half the money bet, on average.

Moreover, an internal Ernst & Young document raised questions about the expected performance of the offsetting option positions. A draft Confidential Memorandum from Jerred Blanchard of Ernst & Young dated January 5, 2000 ("Blanchard Memorandum") discusses the numerical example in the COBRA Presentation, taking the stated values of the long ($50 million) and short ($47.5 million) options as the "fair market value" for each option.[212] The Blanchard Memorandum also accepts the 38 percent probability of a $6.25 million net payout.[213] Of course, as explained at some length in part B of this Section, the basic option values are well below the levels DB actually charged, and the actual payoff probabilities are well below 38 percent. Yet despite the unwarranted assumption that the COBRA Presentation's example's input values are correct, the Blanchard Memorandum still expresses concern about the "investment" payoff to the offsetting option transaction:[214]

> The marketing materials[215] indicate that there is a 38% probability that the Euro will trade at $1.0693 or higher on the settlement date, in which case Taxpayer will receive a net amount of $6.25 million .... This implies, of course, that there is also a 62% probability that the Euro will trade at or below $1.0691,[*] in which case Taxpayer loses its entire $4.75 million invested in the transaction. Thus, looking

---

211 (...continued)
payoff into account), which is why the DB fees average slightly less than 1.50 percent of the "desired loss."

212 2003EY007041.

213 2003EY007041-42.

214 *Ibid.*

215 The "marketing materials" are not specifically identified as corresponding to the documents I've identified as the "COBRA Presentation," but the numerical example the Blanchard Memorandum discusses has the same values as that in the COBRA Presentation.

> solely at the pre-tax economics of the proposed transaction, and ignoring any potential return on the additional $1 million cash [i.e., the 2 percent additional investment called for in the COBRA Presentation[216]] to be invested by Taxpayer in [the Partnership], it would appear that the value of the downside risk ($2.945 million, or 62% of $4.75 million) exceeds the value of the upside opportunity ($2.375 million, or 38% of $6.25 million) by $570,000. [Footnote omitted that shows how reducing the fees would improve the Taxpayer's "bet".]
>
> ---
>
> [*]It is assumed that the likelihood of the Euro trading at exactly $1.0692 is negligible.

As shown by Tables 7A-7C, 8A-8C, 11 and 13 above (starting on or on pages 72, 77, 87 and 92, respectively), the actual risk-reward tradeoff is materially worse than that about which the Blanchard Memorandum expressed concern, since the actual probabilities of "winning" the bets are materially worse than Ernst & Young's assumed 38 percent. That is, the expected percentage losses are materially worse than those implied by the COBRA Presentation and discussed in the Blanchard Memorandum, and they are particularly bad for the present set of transactions.

Moreover, the odds of achieving an extremely good outcome (and thereby avoiding the negative expected rate of return) were reduced by the fact that the parties engaged in multiple offsetting option transactions under the COBRA Presentation's template.[217] Diversification is beneficial when investing, but it is not beneficial when gambling, since the house always wins if you place enough bets. That is, every time a participant placed another bet, it reduced the uncertainty surrounding the ultimate outcome the participant faced. A reduction of uncertainty is good if the expected return is positive (which is why diversification is generally seen as a good *investment* strategy), but bad if the expected return is negative.

For example, in the above roulette analogy, it would not help the gambler who bet on "red" to partner with someone who bet the same amount on "black," since this would simply guarantee a loss for the two gamblers. Nor would it help to divide the amount initially bet among a series of small bets instead of one big one, since this approach just makes a loss more probable.[218] Here, the

---

[216] COBRA Presentation, 2003EY001572 (longer version) and DOJ 049110 (shorter version).

[217] COBRA Presentation, 2003EY001571 (longer version) and DOJ 049109 (shorter version).

[218] That is, if someone bets $30 on red for one spin, s/he needs to win once to make money. If the $30 is divided equally between two or three spins, s/he needs to win twice to come out ahead. With four or five spins, three wins are needed. Since losing is more likely than winning, the more bets needed to come out ahead, the less likely it is to happen. The gambler's best chance to win at roulette when betting a fixed amount is to follow the above strategy, i.e., to make one bet and walk out. Put differently, the true *investor* in roulette is the casino, not the gambler, and the more the gambler "diversifies" his or her bets by splitting them into smaller amounts, the narrower the likely range of outcomes and the more likely the casino is to make money. (I will note for completeness that an individual who made a bet with bad odds -- say the slot machines instead of roulette -- could be helped by partnering with someone who made a less odious bet. But that is not diversification, that is an attempt to remedy a bad decision. Please recall (continued...)

expected outcome on the option positions was materially negative. Therefore, here diversification is a harmful strategy for the participants, not a helpful one.[219]

To see this point more clearly, it may help to note that the corollary of this conclusion is that a gambler's "diversification" does help the casino. In this regard, recall the finding at the start of the previous part of this Section, that the entire set of 1999 COBRA transactions represents a wide variety of bets, which permits inferences to be drawn regarding the underlying economics of the COBRA transactions. Such diversity also represents diversification for DB. DB's expected return on these investments was the reverse of the participants' returns, i.e., materially positive, as is true for the investments that normally underlie recommendations to diversify. Thus this diversification benefits DB for the traditional reason, i.e., it narrows the range of actual returns so that an outcome close to the (positive) expected return is more likely. The problem for the participants is that their negative expected returns make such an outcome harmful, not helpful.

Thus, if the claimed tax loss is ignored, these transactions make no economic sense. They cannot be said to provide a "reasonable possibility of a non-tax profit" under any economically sensible definition of the term, "reasonable possibility." These "investments" are not even good gambles, let alone investments with a "reasonable possibility" of non-tax profits.

## IV. ANALYSES OF ECONOMIC RATIONALITY OF STATED NON-TAX BUSINESS PURPOSES

My understanding of the stated non-tax business purposes of the transactions in this case is from the Plaintiffs' responses to interrogatories. After a series of initial objections, one response states that:

> [W]ith respect to WHM Ventures, LLC, WHMJ, LLC, HDM, LLC, WMC, LLC, JMN Ventures, LLC, ANB, LLC, MDM Ventures, LLC, and SKM Ventures, LLC, each such Additional Participant was formed for the purposes of purchasing and managing investments in stock, securities, foreign currency, and other investments, which had the business purpose of limiting each Individual Participant's risk

---

218 (...continued)
that the contribution of the offsetting option positions to the partnership is pre-planned, as Step Two of the COBRA Presentation. It would make no sense to claim that the intended benefit of that contribution would be to remedy a pre-planned, unusually odious bet for the option pair selected in Step One. Moreover, taxes aside, it would make no sense for the participants who made less odious bets in Step One to go along with such a plan.)

219 Recall that all of the participants here would have had to win both the euro and the Swiss franc bets to make money, after the contributions to the MMLLCs. (See Tables 10A to 10C, starting at page 84.) Yet all but one of the individual LLCs (i.e., all but the HDM LLC -- see Response to Interrogatory 41) purchased a single type of option and so could have made money after fees and ignoring taxes *if* that one bet had won, *absent* the contribution to the MMLLC. Note also that of the 43 LLCs involved in the 1999 COBRA transactions, four would actually have made money after fees and ignoring taxes *if* their offsetting option positions had not been contributed to the partnerships. None of the LLCs made money after fees after the contributions to the partnerships, if the claimed tax deduction is ignored. See Appendix E, Workpaper E-25.

> exposure to such investments to the amount of capital contributed to the company. Because the Individual Participants were then-contemplating investments in foreign currency derivatives, it was critical that they have limited liability, considering the significant risk of loss inherent in such investments.
>
> Relatedly, [MURFAM MMLLC, PSM MMLLC, and Murphy Pork MMLLC were] formed for the purpose of (i) diversifying the members' respective investments (without the need of purchasing additional investments), (ii) creating a larger pool of capital from which other investments could be made, and (iii) centralizing investment decision making in the hands of a single manager that could effectively and efficiently manage the overall portfolio of collective assets.[220]

The Plaintiffs also state the reasons for the decision to contribute the net options positions and the bonds to the MMLLCs. These purposes, which overlap with the stated non-tax reasons for the formation of the MMLLCs, are as follows:

> The purpose of these contributions was twofold: (i) pool the members' investments into a single investment portfolio to diversify specific investment risk, and (ii) centralize investment decision-making in the hands of a single investment manager.[221]

This section analyzes these stated purposes in turn. I would note that I am unaware of a stated non-tax business purpose for the decision to transfer the LLCs' membership interests in the MMLLCs to the S Corps. In response to an interrogatory about the reasons for this action, the Plaintiffs state only that the "parties consulted with Ernst & Young advisor Dan Slagle regarding the transfers of said partnership interests."[222]

### A. Single-Member LLC Formation

The above explanation for the formation of the LLCs is not economically logical. First, individuals do not ordinarily require an LLC to hold securities, as anyone with a brokerage account can readily verify. Second, the exposure to large losses for the actual offsetting option positions bought by the eight LLCs in the Murphy transactions was intrinsically and automatically limited to the net premium amounts paid initially, because the LLCs could *never* owe money to DB unless DB owed

---

[220] Response to Interrogatory 15.

[221] Response to Interrogatories 4, 5, and 6.

[222] Response to Interrogatory 42. A Supplemental Response to this interrogatory transmitted by a letter dated May 1, 2007 states that the participants

> consulted with, and relied upon the advice of, Ernst & Young advisor Dan Slagle regarding the transfers of said partnership interests. Ernst & Young represented to the Individual Participants that Ernst & Young had vetted the Transactions and determined that each aspect of the Transactions, including the aforesaid transfers, had legitimate business purposes.

the LLC even more money. This is because the long position, in which the LLC gets paid money by DB, always had a bigger payoff than the short position, in which the LLC pays DB money.[223]

Finally, note that the limitation of risk exposure for the LLC comes at the counterparty's expense. Were one of the LLCs actually to have tried to sell a foreign currency derivative for which the LLC's loss exposure was not automatically limited, DB would have been economically negligent, to say the very least, to have permitted such a purchase or sale without the provision of additional, adequate collateral ("margin") from the LLC.[224] DB, or any bank that the LLC might have wanted to use as a counterparty, would be aware of the extent to which the LLC could limit liability on the part of its owner. It would be economically foolish for such a bank to ignore this issue in a transaction with the LLC. The bank's demand for the margin required to remove the bank's exposure to losses due to the LLC's limited liability would automatically eliminate the stated economic benefit to the LLC owner from use of the LLC form.

In short, the stated non-tax business purposes for forming the LLCs are not economically rational reasons to have done so.

### B. MMLLC and S Corp Formation and Option Contribution

I would note several points about the non-tax purposes given for the formation of the MMLLC .

First, *exactly the same benefits stated for the MMLLC might equally well be stated for the S Corp, but are not.* As far as the identified economic benefits are concerned, the MMLLCs are an entirely redundant and unnecessary step. It would have saved paperwork, if nothing else, to have omitted the MMLLCs altogether and to have done everything that was actually done within the MMLLCs within the S Corps instead. (Relatedly, recall that the Plaintiffs have not stated a non-tax business reason to form the S Corps.)

Second, the mere existence of a larger pool of capital offers no automatic advantage. A larger capital pool *can* be valuable, if it permits lower transaction costs, but I have found nothing in the record to suggest that any of the counterparties to transactions undertaken with the MMLLCs offered

---

[223] Also, the options were structured so that any time the obligation to the short position existed, the payoff from the long position would also exist.

[224] Note also that an uncovered short position of this sort would appear to run directly contrary to the statement in the Ernst & Young email entitled "COBRA Matters - URGENT" (dated 12/5/99), that "'speculative' investments are not encouraged" with the 2 percent cash contribution; (DOJ-C-00267-69, also identified as EY02938-40). Additionally, a November 4, 1999 email from R. Craig Brubaker at DBAB to Eric Gallinek at DB, forwarding an October 27, 1999 email from Mr. Brubaker to several addressees (DB-DOJ-COBRA-00030347-50), makes specific reference to the fact that since a client acting through an LLC "will have transferred cash sufficient to fund the purchase of the option in advance, we should be comforted that full payment will not be a concern". (DB-DOJ-COBRA-00030348.) This just demonstrates that DB, like any rational bank, will want to make sure it is paid in full in its transactions.

them a discount on fees because any of the transactions were larger than they would have been with the LLCs alone.[225]

Third, there was little potential to achieve, or evidence of, any benefit from centralized decision making. For one thing, Murphy net options positions had a 60-day term. Additionally, by far the biggest investments in the MMLLCs were the offsetting option positions purchased at the LLC level, before MMLLC decision making was relevant at all. The same is true of the North Carolina municipal bonds to which the claimed capital losses were attached for the MURFAM and PSM transactions under the COBRA Presentation's template. The Murphy Pork partnership did buy euros ("Euro Dollars," in the documentation), to which the Murphy Pork transaction tax claims were attached under this template. But centralized decision making was hardly required for that, since the purchase of such assets was one of the COBRA Presentation's planned steps, envisioned from before the MMLLCs were even formed.[226] In short, there were almost no activities within the MMLLCs that might have benefitted in any way from "centralized decision making."

Finally, as noted above in Section III, part F (starting part way through the discussion, on page 95), diversification narrows the range of investment outcomes around the expected value. This is beneficial when investing, but it is not beneficial when gambling, since gambling has a negative expected payoff. This matters here because the materially negative expected returns on the individual offsetting option positions make them gambles, not investments. Since the expected outcome on the individual option positions was materially negative, diversification of these bets was economically harmful, not helpful.[227]

These problems with the stated non-tax purposes for formation of the MMLLCs apply also to the stated reasons for contributing the options to the MMLLCs.

In short, the stated non-tax business purposes for the formation of these MMLLCs and the contribution of the options are sometimes illusory, sometimes merely without any factual support,

---

[225] Moreover, if size were a *per se* advantage, why have multiple MMLLCs? In this case, the participants started with eleven entities, the LLCs, moved on to three MMLLCs, and finished in three S Corps. Similarly, instead of buying one large bet on the Swiss franc, the WHMJ LLC bought two smaller ones and split them up between MMLLCs. These participants did not act as if they valued consolidation of capital.

[226] The only other trading activity consisted of two brief periods in which the MMLLCs invested in the common stock of various firms. These trades are detailed in footnote 91. Footnote 187 further notes that this activity was economically immaterial in the present context.

[227] I would also note that the parties here had eleven offsetting option positions in total, purchased in the eight LLCs. These eleven positions represented only two currency bets, however, because the terms of the four euro positions and seven Swiss franc positions were identical except for size. The stated advantage of the contribution to avoid "the need of purchasing additional investments" could have been more directly achieved by buying single positions reflecting these bets within a partnership, rather than multiple positions beforehand. At most six (rather than eleven) offsetting option positions would have been needed had the positions been bought within the three MMLLCs instead.

and sometimes flatly illogical. They do not provide economically rational non-tax reasons for undertaking these transactions.

## V. Analyses of Decision to Contribute Option Pairs to MMLLCs[228]

As discussed in Section II, the COBRA Presentation outlines a series of steps that produce claimed tax savings, and the transactions in this case follow these steps. As discussed in Section III, the offsetting option positions in this case are priced to offer materially negative expected rates of return without fees, and expected rates of return that project losing more than 100 percent of the net premiums invested in the offsetting option positions after fees. As discussed in Section IV, the stated non-tax reasons for engaging in this series of transactions are not economically rational, and they are not economically rational non-tax reasons to contribute the investments to the partnership, either.

Without the hope of a tax deduction, these transactions thus are economically senseless. In fact, with an economically rational expected rate of return involving a loss of more than all of their net premium investment, the participants would have expected to be better off simply giving away the money used to pay the net option premiums, absent the hope of a material tax deduction.

I understand that the contribution of the offsetting option positions to the MMLLCs is a necessary step in being able to claim the tax losses. If that is true (and if it is not, why would the participants have bothered with the MMLLCs, since all of their stated goals for them could have been accomplished directly through the S Corps?), the contribution is a "no brainer" if there ever was one.

On the other hand, if the claimed tax benefits are ignored, the contribution actually harms the participants, by diversifying the gambles (and thereby making a negative outcome for the participants more likely) and by incurring costs that could have been avoided by skipping the Partnership and contributing directly to the S Corp.

## VI. Analyses of Whether Offsetting Option Positions were One Investment or Two

From an economic perspective, the offsetting option positions in these cases are a single investment, not two separate investments. There are two reasons for this, one based on the different characteristics of the two option components together and apart, and the other based on DB's pricing of the components under the COBRA structure. The latter is the more important, for the COBRA transactions.

**Characteristics of the Options Together or Apart:** The offsetting option transactions in this case have the a variant of the basic structure set out in the COBRA Presentation. The COBRA

[228] For clarity, I will note that the previous section addressed the stated non-tax business purposes for the contribution of the offsetting option positions to the Partnership. This section addresses the economics of the contribution more generally, drawing on that discussion among others.

Presentation provided an example[229] which was largely restated to the present terms above, in footnote 205. The COBRA Presentation's example using the structure of the present transactions would involve:

- A net premium payment of $1.5 million, and a $3.375 million net payoff if both options are exercised, which,[230]

- With the COBRA Presentation's stated long-option premium of $50 million with a $100 million payoff, implies a short option with a stated premium of $48.5 million and with a $96.625 million payoff.

The participant in this (restated to the present structure) version of the COBRA Presentation's example only needs to make the net premium payment of $1.5 million, because whenever DB was owed $96.625 million for the short option, DB would also owe the participant $100 million for the long option.

However, if the two components of the offsetting option position were written separately, with two different banks as counterparties, the bank buying the short option would not know that the participant would be receiving $100 million from another bank whenever the participant owed this bank $96.625 million. An economically rational bank would worry whether the participant could make good on the $96.625 million payment in the event that the short option finished in the money. The bank would therefore demand that the participant supply margin sufficient to remove the bank's risk of non-payment.[231]

These are short-term options, and the only way for the bank that bought the short option to be completely safe would be for it to have the entire $96.625 million available. This could consist of a withholding of the bank's promised $48.5 million payment for the short option plus a demand that the participant supply ($96.625 million - $48.5 million) = $48.125 million in margin to the bank. I am not a trader, and I cannot say exactly how much margin a bank would require in these circumstances, but I can say that it would be financially imprudent not to require a material margin deposit in such circumstances (particularly if the counterparty were an LLC without additional assets that might be recovered in a subsequent lawsuit).

Suppose the bank required margin sufficient to cover the full potential amount owed. In that case, to separate the components of the offsetting option position, the participant would have to supply the $50 million to buy the long option from one bank and supply $48.125 million in margin to the second bank, the one buying the short option from the participant. This would require [($50 +

---

229 COBRA Presentation, 2003EY001579-80, 82-83 (longer version) and DOJ 0491117-18, 20-21 (shorter version).

230 For reasons discussed earlier, the theoretical possibility of the exercise of only one option should be ignored, as it is in the COBRA Presentation's numerical example.

231 For example, recall from Table 12 that 16 percent of the COBRA transaction option pairs did expire in the money, and that another 16 percent were bought out by DB before expiration.

$48.125) =] $98.125 million in capital to get the same ultimate payoff as achieved with $1.5 million in the COBRA Presentation's restated example, a ratio of 65 to 1.[232] Also, the investor in such a transaction would face potentially material transaction costs[233] associated with coming up with the required capital (and for a 60-day investment), unless the investor happened to keep such amounts of money in a highly liquid form.

Whether the margin requirement were the entire amount or something less, however, the fact that this is a digital option affects the risks the option-purchasing bank would face, and hence the margin it would require. With an ordinary option, the value at expiration depends on just how far above the strike price the spot rate turns out to be. Therefore, options only slightly in the money do not pay off very much relative to options deep in the money, and a buyer's risk exposure (and margin demands) are affected accordingly. Here, the digital option is either in the money or not, which implies the bank should demand more margin for options close to the money and less margin for options deep in the money than it would for a standard option.

Another possible concern is a difference of opinion between the two independent counterparties as to whether its own option had paid off. If (1) the bank from whom the participant bought the option believed its exercise price had not been reached, but (2) the bank to whom the participant sold the option believed its exercise price had been reached, the first bank would send no money to pay off the long option even as the second announced that the participant was required to pay off the short option (possibly by forfeiting the payment for the sold option and the margin).[234] The participant would be out the sum of the long call premium and the payoff on the short call.

Given the above problems, it is highly unlikely that a rational investor would be indifferent between keeping the options together and splitting them.[235]

---

232 The participant might well be paid some interest on its account with the bank buying the short option, but the ultimate payoff on the combined option position would be the same, $3.375 million or nothing.

233 The importance of transaction costs in economic affairs was recognized, for example, in the award of the 1991 Nobel Prize in economics to Prof. Ronald Coase. (See http://nobelprize.org/economics/laureates/1991/press.html.)

234 Recall the DB email (DB-DOJ-COBRA 00052674-75) in which it described its "industry standard" exercise price determination as based on price quotations from five banks, each of which had a bid-ask spread that exceeded two pips, with a total range of six pips. This suggests that this outcome -- i.e., one in which (1) a long call (put) with one counterparty is said not to be in the money while (2) a short call (put) with another counterparty and with a two-pip higher (lower) strike price is said to be in the money -- is not impossible.

235 The consideration of alternatives that produce indifference in the decision maker is a fundamental tool of economics that has long been taught even in introductory courses. (See, for example, Paul A. Samuelson, *Economics*, 9th edition, New York: McGraw-Hill Book Company (1973) at pp. 441-42, or Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th ed., Upper Saddle River, NJ: Pearson Prentice Hall (2005), pp. 67-71.)

**Impact of the COBRA Structure and DB's Receipt of Fees through Pricing:** Of course, in the COBRA transactions, there is an even more fundamental problem with trying to split the option position components. As noted earlier (see Appendix E, Workpaper E-38), the stated values of *both* the long and short options are overpriced under the COBRA structure even if DB earns no fee at all, and DB did price the options in a way that provided itself with a fee. The result is that DB not only charged too much for the long option, it paid too much for the short option. Consider what this implies for an attempt to split the components of the option between two different banks.

First, the fact that tens of millions of dollars in long option value are involved both in the COBRA Presentation and in the actual transactions in these cases means any participant contemplating splitting the options should know how to calculate basic option values or should have access to an independent advisor who does. Someone contemplating such an investment might well want to compare quotes from different banks. Tax considerations aside, a rational participant would not pay to a bank an excess in the range of 96 to 144 percent more than the basic value of the long option.[236]

Even more telling, a bank not simultaneously selling the long option would not pay to a participant an excess in the range of 97-144 percent more than the basic value of the short option.[237] In a stand-alone transaction, no one tries to make money by "buying high."

Thus, in the COBRA transactions, the offsetting option pairs are irretrievably tied together by their intrinsic structure and by the way DB actually priced them, quite apart from the amount of capital that might be required to separate them.[238] From an economic perspective, the offsetting option positions in this case are unquestionably single investments.[239]

This completes the body of my report. The appendices follow.

A. Lawrence Kolbe — 5/31/2007 (Date)

[236] Please see Table 5A (or 5B or 5C), starting on page 49 above.

[237] The overpayment range on the short options in Table 5A (or 5B or 5C) would be slightly higher. However, as discussed in connection with Figure 7A (page 72 above), DB's overpayment is smaller when the short option is valued at the long option's strike price, as DB does in its RMS worksheets.

[238] In this context, please note also that the "Binary Option Strategy" document stated that "FX desk will not accept an order unless both trades are requested at the same time." DB-DOJ-COBRA-00030721.

[239] For the record, this conclusion concerns the essential economic nature of the offsetting option position. It is not a legal opinion (which I am unqualified to form), nor is it a statement about the number of securities (documents) used to construct the offsetting option position.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-245 T, 06-246 T, and 06-247 T
(Consolidated)

MURFAM FARMS, LLC, By and Through Wendell H. Murphy Jr., a Partner Other Than the Tax Matters Partner,

PSM FARMS, LLC, By and Through Stratton K. Murphy, a Partner Other Than the Tax Matters Partner,

MURPHY PORK PARTNERS, LLC, By and Through Wendell H. Murphy, Jr., a Partner Other Than the Tax Matters Partner,

Plaintiffs,

v.

United States of America,

Defendant.

---

# APPENDICES TO THE EXPERT REPORT OF A. LAWRENCE KOLBE

ON

# ECONOMIC ANALYSES OF THE TRANSACTIONS BY PARTICIPANTS IN MURFAM FARMS, LLC, PSM FARMS, LLC, AND MURPHY PORK PARTNERS, LLC

Prepared for the
U.S. Department of Justice

*The Brattle Group*
44 Brattle Street
Cambridge, MA 02138-3736
617.864.7900 voice
617.864.1576 fax

June 1, 2007

# Appendix A

# Qualifications

# Appendix A: QUALIFICATIONS OF A. LAWRENCE KOLBE

## EDUCATION

B.S. in International Affairs (Economics), U.S. Air Force Academy, 1968.
Ph.D. in Economics, Massachusetts Institute of Technology, 1979.

## EMPLOYMENT

U.S. Air Force, 1963-1977
Charles River Associates, 1978-1985
Putnam, Hayes and Bartlett, 1985-1990
The Brattle Group, 1990-

## HONORS AND AWARDS

Sears Foundation National Merit Scholarship, 1963 (declined).
Fairchild Award, U.S. Air Force Academy, 1968 (for standing first in his class, academically).
National Science Foundation Graduate Fellowship in economics, MIT, 1968-1971.
Joint Service Commendation Medal, 1975.

## PROFESSIONAL AFFILIATIONS

American Economic Association
American Finance Association
The Econometric Society
Served as Referee for *The Rand Journal of Economics*, *Land Economics*, *The Journal of Industrial Economics*

## PAPERS AND PUBLICATIONS IN THE LAST TEN YEARS

"Measuring Return on Equity Correctly: Why current estimation models set allowed ROE too low," *Public Utilities Fortnightly* (with Michael J. Vilbert and Bente Villadsen), August 2005.

"The Effect of Debt on the Cost of Equity in a Regulatory Setting," (with Michael J. Vilbert and Bente Villadsen, and with "The Brattle Group" listed as author), published by the Edison Electric Institute (dated January 2005, issued April 2005)

*Capital Investment and Valuation*, (with Richard A. Brealey and Stewart C. Myers, with "The Brattle Group" listed as third author), New York: McGraw-Hill/Irwin (2003).

"The True Hourly Rate for Private Counsel in the State of Louisiana Tobacco Lawsuit," (with August J. Baker and Bin Zhou), Brattle report prepared for private counsel to the Louisiana

Attorney General in the state's lawsuit to recover health care costs from the tobacco industry (July 2000).

"The Cost of Capital for the Dampier to Bunbury Natural Gas Pipeline," (with M. Alexis Maniatis and Boaz Moselle) Brattle report submitted to the Office of Gas Access Regulation, Western Australia (October 1999).

"Compensation for Asymmetric Risks," (with others) Brattle report prepared for GPU PowerNet, Melbourne, Australia (October 1999).

"A Non-Practitioner's Guide to the State of the Art in Cost of Capital Estimation," (with others) Brattle report prepared for GPU PowerNet, Melbourne, Australia (June 1999).

"A Note on the Pre-tax Weighted Average Cost of Capital in a Regulatory Context with Australian Dividend Tax Credits and Alternative Debt Refinancing Policies" (with M. Alexis Maniatis), Working Paper in Progress.

"The Impact of Stranded-Cost Risk on Required Rates of Return for Electric Utilities: Theory and An Example" (with Lynda S. Borucki). *Journal of Regulatory Economics* Vol. 13 (1998), 255-275.

**TRIAL TESTIMONY AND DEPOSITIONS IN LAST FOUR YEARS**

**2003**

| | |
|---|---|
| Case: | Alberta Energy and Utilities Generic Cost of Capital Hearing, Proceeding No. 1271597 |
| Party: | NOVA Gas Transmission Ltd. |
| Forum: | Alberta Energy and Utilities Board |

| | |
|---|---|
| Case: | Coltec Industries, Inc. v. The United States of America, Fed. Cl. No. 01-72T |
| Party: | The United States of America |
| Forum: | The United States Court of Federal Claims |

**2004**

| | |
|---|---|
| Case: | Coltec Industries, Inc. v. The United States of America, Fed. Cl. No. 01-72T |
| Party: | The United States of America |
| Forum: | The United States Court of Federal Claims |

| | |
|---|---|
| Case: | Liberty Digital, Inc. v. AT&T Broadband, LLC and Comcast Corporation, Civil Action No. 03-CV-95 |
| Party: | AT&T Broadband, LLC and Comcast Corporation |
| Forum: | Colorado District Court, County of Arapahoe, 18th Judicial District |

| | |
|---|---|
| Case: | West Virginia-American Water Company, Case No. 04-0373-W-42T |
| Party: | West Virginia-American Water Company |
| Forum: | Public Service Commission of West Virginia |

| | |
|---|---|
| Case: | Koch Industries, Inc., and Subsidiaries v. The United States, Fed. Cl. No. 02-8T |
| Party: | The United States |
| Forum: | The United States Court of Federal Claims |

| | |
|---|---|
| Case: | United States of America v. Anne (Sandy) Batchelor-Robjohns, a/k/a/ Anne O'Neill Batchelor; Daniel J. Ferraresi; Marvin C. Gutter; and Father Patrick O'Neill, Co-Personal Representatives of the Estate of George E. Batchelor, Case No. 03-20164-CIV-Ungaro-Benages/Brown |
| Party: | United States of America |
| Forum: | United States District Court for the Southern District of Florida, Miami Division |

**2005**

| | |
|---|---|
| Case: | TransCanada PipeLines Limited 2004 Mainline Tolls and Tariff (Phase 2), RH-2-2004 |
| Party: | TransCanada PipeLines Limited |
| Forum: | [Canadian] National Energy Board |

| | |
|---|---|
| Case: | Polymer Dynamics, Inc. v. Bayer Corporation |
| Party: | Polymer Dynamics, Inc. |
| Forum: | U.S. District Court for the Eastern District of Pennsylvania |

| | |
|---|---|
| Case: | Jade Trading, LLC, by and through Robert W. Ervin and Laura Kavanaugh Ervin on Behalf of Ervin Capital, LLC, Partners Other than the Tax Matters Partner, v. The United States, Case No. 03-2164T |
| Party: | The United States |
| Forum: | The United States Court of Federal Claims |

**2006**

| | |
|---|---|
| Case: | Arizona-American Water Company, Inc., for Utility Service by its Paradise Valley Water District, Docket No. WS-01303A-05-0405 |
| Party: | Arizona-American Water Company, Inc. |
| Forum: | Arizona Corporation Commission |

| | |
|---|---|
| Case: | K2 Trading Ventures, LLC, New Vista, LLC, Tax Matters Partner, v. The United States of America, by and through the Internal Revenue Service, Case No. 04-1419T |
| Party: | The United States of America |
| Forum: | The United States Court of Federal Claims |

| | |
|---|---|
| Case: | Garco Investments LLP, et al. v. Sprint Corporation, Case No. 04 CV 01714 |
| Party: | Garco Investments LLP, et al. |
| Forum: | District Court of Johnson County, Kansas, Civil Court Department |

# Appendix B

# Murphy Farms
# Documents Considered

**Documents Considered for Murphy Farms**

| | Bates Number | | Document Description |
|---|---|---|---|
| | Start | End | |
| 1 | 2003EY001046 | 2003EY001047 | E-Mail from Robert B Coplan on 1-6-00 (also located at 2003EY001046-2003EY001047) |
| 2. | 2003EY001060 | 2003EY001064 | E-Mail from Robert B. Coplan on 8-11-00 (also located at PSI-EY007974) |
| 3. | 2003EY004119 | 2003EY004124 | E-Mail & Attachments from Robert M. Haynie (also located at PSI-EY004328-PSI-EY004333) |
| 4. | 2003EY018120 | 2003EY018122 | Meeting Notes - Cobra Talking Points (also located at PSI-EY018204-PSI-EY018206) |
| 5. | 2003EY018120 | 2003EY018122 | Meeting Notes - Cobra Talking Points (also located at PSI-EY018204-PSI-EY018206) |
| 6. | DB-DOJ-03090 | DB-DOJ-03092 | Securities Purchase & Sale Confirmations from Alex. Brown & Sons Incorporated |
| 7 | DB-DOJ-COBRA-00002155 | DB-DOJ-COBRA-00002155 | E-Mail from Alex Alexander on 4-14-00 |
| 8 | DB-DOJ-COBRA-00002849 | DB-DOJ-COBRA-00002850 | E-Mail from Richard Ignacio on 12-27-00 w/ word doc. attachment |
| 9. | DB-DOJ-COBRA-00002976 | DB-DOJ-COBRA-00002976 | E-Mail from Carrie Yackee on 12-5-00 |
| 10. | DB-DOJ-COBRA-00002979 | DB-DOJ-COBRA-00002979 | E-Mail from Carrie Yackee on 8-30-01 |
| 11. | DB-DOJ-COBRA-00002995 | DB-DOJ-COBRA-00003000 | E-Mail from Carrie Yackee on 1-24-01 with attached spreadsheet |
| 12 | DB-DOJ-COBRA-00003330 | DB-DOJ-COBRA-00003330 | E-Mail from Daniel Brooks on 4-14-00 |
| 13. | DB-DOJ-COBRA-00009388 | DB-DOJ-COBRA-00009391 | E-Mail from David Parse on 4-26-00 |
| 14 | DB-DOJ-COBRA-00009743 | DB-DOJ-COBRA-00009743 | E-Mail from Carrie Yackee on 10-25-01 |
| 15. | DB-DOJ-COBRA-00009835 | DB-DOJ-COBRA-00009835 | E-Mail from David Parse on 4-14-00 |
| 16. | DB-DOJ-COBRA-00009856 | DB-DOJ-COBRA-00009856 | E-Mail from Carrie Yackee on 10-23-00 |
| 17. | DB-DOJ-COBRA-00009861 | DB-DOJ-COBRA-00009864 | E-Mail from Carrie Yackee on 12-22-00 w/ word doc. attachments |
| 18. | DB-DOJ-COBRA-00009865 | DB-DOJ-COBRA-00009866 | E-Mail from Carrie Yackee on 8-27-01 |
| 19. | DB-DOJ-COBRA-00009868 | DB-DOJ-COBRA-00009869 | E-Mail from Carrie Yackee on 11-10-00 |
| 20. | DB-DOJ-COBRA-00009870 | DB-DOJ-COBRA-00009870 | E-Mail from Carrie Yackee on 8-14-00 |
| 21. | DB-DOJ-COBRA-00009871 | DB-DOJ-COBRA-00009871 | E-Mail from Carrie Yackee on 8-11-00 |
| 22. | DB-DOJ-COBRA-00009872 | DB-DOJ-COBRA-00009872 | E-Mail from Carrie Yackee on 6-13-00 |
| 23. | DB-DOJ-COBRA-00009873 | DB-DOJ-COBRA-00009874 | E-Mail from Ray Knight on 1-21-02 |
| 24. | DB-DOJ-COBRA-00009873 | DB-DOJ-COBRA-00009874 | E-Mail from Ray Knight on 1-21-02 w/ word doc. Attachment |
| 25 | DB-DOJ-COBRA-00010016 | DB-DOJ-COBRA-00010017 | E-Mail from Amy W Keating on 1-18-01 |
| 26. | DB-DOJ-COBRA-00010076 | DB-DOJ-COBRA-00010076 | E-Mail from Carrie Yackee on 10-25-01 |
| 27 | DB-DOJ-COBRA-00010169 | DB-DOJ-COBRA-00010169 | E-Mail from Carrie Yackee on 5-30-00 |
| 28. | DB-DOJ-COBRA-00010179 | DB-DOJ-COBRA-00010179 | E-Mail from Carrie Yackee on 8-27-01 |
| 29. | DB-DOJ-COBRA-00010180 | DB-DOJ-COBRA-00010180 | E-Mail from Carrie Yackee on 12-6-00 |
| 30. | DB-DOJ-COBRA-00010181 | DB-DOJ-COBRA-00010181 | E-Mail from Carrie Yackee on 12-4-00 |
| 31. | DB-DOJ-COBRA-00010182 | DB-DOJ-COBRA-00010182 | E-Mail from Carrie Yackee on 12-4-00 |
| 32. | DB-DOJ-COBRA-00010183 | DB-DOJ-COBRA-00010185 | E-Mail from Carrie Yackee on 11-28-00 w/ word doc. attachments |
| 33 | DB-DOJ-COBRA-00010186 | DB-DOJ-COBRA-00010187 | E-Mail from Carrie Yackee on 11-9-00 |
| 34. | DB-DOJ-COBRA-00010219 | DB-DOJ-COBRA-00010241 | E-Mail from Daniel Brooks on 4-14-00 w/ word doc. Attachments |
| 35. | DB-DOJ-COBRA-00010243 | DB-DOJ-COBRA-00010243 | E-Mail from Carrie Yackee on 5-17-00 re: Digital Option Transfers |
| 36. | DB-DOJ-COBRA-00010244 | DB-DOJ-COBRA-00010244 | E-Mail from Carrie Yackee on 5-19-00 re: Cash Transfers |
| 37 | DB-DOJ-COBRA-00010285 | DB-DOJ-COBRA-00010286 | E-Mail from Carrie Yackee on 2-12-01 |
| 38 | DB-DOJ-COBRA-00010364 | DB-DOJ-COBRA-00010384 | DB Foreign Exchange Digital Option Transaction Acknowledgement Sheets |
| 39 | DB-DOJ-COBRA-00010388 | DB-DOJ-COBRA-00010399 | DB Foreign Exchange Digital Option Transaction Acknowledgement Sheets |
| 40. | DB-DOJ-COBRA-00013451 | DB-DOJ-COBRA-00013460 | WHM Ventures, LLC Client Statements dated 10/1/00 - 12/31/00 for Acct #222-10817 |
| 41. | DB-DOJ-COBRA-00013461 | DB-DOJ-COBRA-00013465 | WHM Ventures, LLC Client Statements dated 1/1/02 - 2/28/02 for Acct #222-10817 |
| 42. | DB-DOJ-COBRA-00013466 | DB-DOJ-COBRA-00013470 | WHM Ventures, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10817 |
| 43. | DB-DOJ-COBRA-00013471 | DB-DOJ-COBRA-00013474 | WHM Ventures, LLC Client Statements dated 3/1/02 - 3/31/02 for Acct #222-10817 |
| 44. | DB-DOJ-COBRA-00013475 | DB-DOJ-COBRA-00013492 | WHM Ventures, LLC Client Statements dated 4/1/00 - 6/30/00 for Acct #222-10817 |
| 45 | DB-DOJ-COBRA-00013493 | DB-DOJ-COBRA-00013497 | WHM Ventures, LLC Client Statements dated 4/1/01 - 6/30/01 for Acct #222-10817 |
| 46 | DB-DOJ-COBRA-00013498 | DB-DOJ-COBRA-00013502 | WHM Ventures, LLC Client Statements dated 7/1/00 - 9/30/00 for Acct #222-10817 |
| 47. | DB-DOJ-COBRA-00013503 | DB-DOJ-COBRA-00013507 | WHM Ventures, LLC Client Statements dated 7/1/01 - 9/30/01 for Acct #222-10817 |
| 48. | DB-DOJ-COBRA-00013508 | DB-DOJ-COBRA-00013517 | WHMJ, LLC Client Statements dated 10/1/00 - 12/31/00 for Acct #222-10818 |
| 49. | DB-DOJ-COBRA-00013518 | DB-DOJ-COBRA-00013527 | WHMJ, LLC Client Statements dated 10/1/01 - 2/28/02 for Acct #222-10818 |
| 50. | DB-DOJ-COBRA-00013528 | DB-DOJ-COBRA-00013532 | WHMJ, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10818 |
| 51. | DB-DOJ-COBRA-00013533 | DB-DOJ-COBRA-00013536 | WHMJ. LLC Client Statements dated 3/1/02 - 3/31/02 for Acct #222-10818 |
| 52. | DB-DOJ-COBRA-00013537 | DB-DOJ-COBRA-00013543 | WHMJ, LLC Client Statements dated 4/1/00 - 4/30/00 for Acct #222-10818 |
| 53. | DB-DOJ-COBRA-00013544 | DB-DOJ-COBRA-00013554 | WHMJ, LLC Client Statements dated 5/1/00 - 6/30/00 for Acct #222-10818 |
| 54 | DB-DOJ-COBRA-00013555 | DB-DOJ-COBRA-00013564 | WHMJ, LLC Client Statements dated 4/1/01 - 9/30/01 for Acct #222-10818 |
| 55 | DB-DOJ-COBRA-00013565 | DB-DOJ-COBRA-00013569 | JMN Ventures, LLC Client Statements dated 12/1/00 - 12/31/00 for Acct #222-10819 |
| 56. | DB-DOJ-COBRA-00013570 | DB-DOJ-COBRA-00013572 | JMN Ventures, LLC Client Statements dated 10/1/01 - 12/31/01 for Acct #222-10819 |
| 57. | DB-DOJ-COBRA-00013574 | DB-DOJ-COBRA-00013579 | JMN Ventures, LLC Client Statements dated 10/1/01 - 2/28/02 for Acct #222-10819 |
| 58. | DB-DOJ-COBRA-00013580 | DB-DOJ-COBRA-00013584 | JMN Ventures, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10819 |
| 59 | DB-DOJ-COBRA-00013585 | DB-DOJ-COBRA-00013600 | JMN Ventures, LLC Client Statements dated 4/1/00 - 6/30/00 for Acct #222-10819 |
| 60 | DB-DOJ-COBRA-00013601 | DB-DOJ-COBRA-00013610 | JMN Ventures, LLC Client Statements dated 4/1/01 - 6/30/01 for Acct #222-10819 |
| 61 | DB-DOJ-COBRA-00013611 | DB-DOJ-COBRA-00013620 | ANB, LLC Client Statements dated 10/1/00 - 12/31/00 for Acct #222-10820 |
| 62. | DB-DOJ-COBRA-00013621 | DB-DOJ-COBRA-00013630 | ANB, LLC Client Statements dated 10/1/01 - 2/28/02 for Acct #222-10820 |
| 63. | DB-DOJ-COBRA-00013631 | DB-DOJ-COBRA-00013635 | ANB, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10820 |

## Documents Considered for Murphy Farms

| | Bates Number | | Document Description |
|---|---|---|---|
| | Start | End | |
| 64 | DB-DOJ-COBRA-00013636 | DB-DOJ-COBRA-00013651 | ANB, LLC Client Statements dated 4/1/00 - 6/30/00 for Acct #222-10820 |
| 65. | DB-DOJ-COBRA-00013652 | DB-DOJ-COBRA-00013656 | ANB, LLC Client Statements dated 4/1/01 - 6/30/01 for Acct #222-10820 |
| 66. | DB-DOJ-COBRA-00013657 | DB-DOJ-COBRA-00013661 | ANB, LLC Client Statements dated 7/1/00 - 9/30/00 for Acct #222-10820 |
| 67. | DB-DOJ-COBRA-00013662 | DB-DOJ-COBRA-00013666 | HDM, LLC Client Statements dated 12/1/00 - 12/31/00 for Acct #222-10821 |
| 68. | DB-DOJ-COBRA-00013667 | DB-DOJ-COBRA-00013671 | HDM, LLC Client Statements dated 10/1/01 - 12/31/01 for Acct #222-10821 |
| 69. | DB-DOJ-COBRA-00013672 | DB-DOJ-COBRA-00013676 | HDM, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10821 |
| 70. | DB-DOJ-COBRA-00013677 | DB-DOJ-COBRA-00013694 | HDM, LLC Client Statements dated 4/1/00 - 6/30/00 for Acct #222-10821 |
| 71. | DB-DOJ-COBRA-00013695 | DB-DOJ-COBRA-00013699 | HDM, LLC Client Statements dated 4/1/01 - 6/30/01 for Acct #222-10821 |
| 72. | DB-DOJ-COBRA-00013700 | DB-DOJ-COBRA-00013704 | HDM, LLC Client Statements dated 7/1/00 - 9/30/00 for Acct #222-10821 |
| 73 | DB-DOJ-COBRA-00013705 | DB-DOJ-COBRA-00013709 | HDM, LLC Client Statements dated 7/1/01 - 9/30/01 for Acct #222-10821 |
| 74. | DB-DOJ-COBRA-00013710 | DB-DOJ-COBRA-00013714 | MDM Ventures, LLC Client Statements dated 12/1/00 - 12/31/00 for Acct #222-10822 |
| 75 | DB-DOJ-COBRA-00013715 | DB-DOJ-COBRA-00013724 | MDM Ventures, LLC Client Statements dated 10/1/01 - 2/28/02 for Acct #222-10822 |
| 76. | DB-DOJ-COBRA-00013725 | DB-DOJ-COBRA-00013729 | MDM Ventures, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10822 |
| 77 | DB-DOJ-COBRA-00013730 | DB-DOJ-COBRA-00013750 | MDM Ventures, LLC Client Statements dated 4/1/00 - 9/30/00 for Acct #222-10822 |
| 78. | DB-DOJ-COBRA-00013751 | DB-DOJ-COBRA-00013755 | MDM Ventures, LLC Client Statements dated 7/1/01 - 9/30/01 for Acct #222-10822 |
| 79 | DB-DOJ-COBRA-00013756 | DB-DOJ-COBRA-00013765 | SKM Ventures, LLC Client Statements dated 10/1/00 - 12/31/00 for Acct #222-10823 |
| 80. | DB-DOJ-COBRA-00013766 | DB-DOJ-COBRA-00013770 | SKM Ventures, LLC Client Statements dated 1/1/02 - 2/28/02 for Acct #222-10823 |
| 81. | DB-DOJ-COBRA-00013771 | DB-DOJ-COBRA-00013775 | SKM Ventures, LLC Client Statements dated 1/1/01 - 3/31/01 for Acct #222-10823 |
| 82 | DB-DOJ-COBRA-00013776 | DB-DOJ-COBRA-00013796 | SKM Ventures, LLC Client Statements dated 4/1/00 - 9/30/00 for Acct #222-10823 |
| 83. | DB-DOJ-COBRA-00013797 | DB-DOJ-COBRA-00013801 | SKM Ventures, LLC Client Statements dated 7/1/01 - 9/30/01 for Acct #222-10823 |
| 84 | DB-DOJ-COBRA-00013802 | DB-DOJ-COBRA-00013806 | MURFAM Farms, LLC Client Statements dated 1/1/01 - 1/31/01 for Acct #222-10824 |
| 85. | DB-DOJ-COBRA-00013807 | DB-DOJ-COBRA-00013812 | MURFAM Farms, LLC Client Statements dated 11/1/00 - 12/31/00 for Acct #222-10824 |
| 86. | DB-DOJ-COBRA-00013813 | DB-DOJ-COBRA-00013835 | MURFAM Farms, LLC Client Statements dated 5/1/00 - 7/31/00 for Acct #222-10824 |
| 87. | DB-DOJ-COBRA-00013836 | DB-DOJ-COBRA-00013840 | MURFAM Farms, LLC Client Statements dated 9/1/00 - 9/30/00 for Acct #222-10824 |
| 88 | DB-DOJ-COBRA-00013841 | DB-DOJ-COBRA-00013844 | PSM Farms, LLC Client Statements dated 1/1/01 - 1/31/01 for Acct #222-10825 |
| 89. | DB-DOJ-COBRA-00013845 | DB-DOJ-COBRA-00013854 | PSM Farms, LLC Client Statements dated 10/1/00 - 12/31/00 for Acct #222-10825 |
| 90. | DB-DOJ-COBRA-00013855 | DB-DOJ-COBRA-00013885 | PSM Farms, LLC Client Statements dated 5/1/00 - 9/30/00 for Acct #222-10825 |
| 91. | DB-DOJ-COBRA-00013886 | DB-DOJ-COBRA-00013889 | Murphy Pork Partners, LLC Client Statements dated 1/1/01 - 1/31/01 for Acct #222-10826 |
| 92. | DB-DOJ-COBRA-00013890 | DB-DOJ-COBRA-00013898 | Murphy Pork Partners, LLC Client Statements dated 10/1/00 - 12/31/00 for Acct #222-10826 |
| 93. | DB-DOJ-COBRA-00013899 | DB-DOJ-COBRA-00013924 | Murphy Pork Partners, LLC Client Statements dated 5/1/00 - 8/31/00 for Acct #222-10826 |
| 94. | DB-DOJ-COBRA-00013925 | DB-DOJ-COBRA-00013929 | MURFAM Inc, Client Statements dated 1/1/01 - 1/31/01 for Acct #222-11893 |
| 95. | DB-DOJ-COBRA-00013930 | DB-DOJ-COBRA-00013935 | MURFAM Inc, Client Statements dated 12/1/00 - 12/31/00 for Acct #222-11893 |
| 96 | DB-DOJ-COBRA-00013936 | DB-DOJ-COBRA-00013945 | MURFAM Inc, Client Statements dated 10/1/01 - 2/28/02 for Acct #222-11893 |
| 97. | DB-DOJ-COBRA-00013946 | DB-DOJ-COBRA-00013960 | MURFAM Inc, Client Statements dated 2/1/01 - 9/30/01 for Acct #222-11893 |
| 98. | DB-DOJ-COBRA-00013961 | DB-DOJ-COBRA-00013966 | PSM Inc, Client Statements dated 12/1/00 - 12/31/00 for Acct #222-11894 |
| 99. | DB-DOJ-COBRA-00013967 | DB-DOJ-COBRA-00013971 | PSM Inc, Client Statements dated 10/1/01 - 12/31/01 for Acct #222-11894 |
| 100 | DB-DOJ-COBRA-00013972 | DB-DOJ-COBRA-00013986 | PSM Inc, Client Statements dated 2/1/01 - 9/30/01 for Acct #222-11894 |
| 101. | DB-DOJ-COBRA-00013987 | DB-DOJ-COBRA-00013991 | Murphy Pork Inc, Client Statements dated 1/1/01 - 1/31/01 for Acct #222-11895 |
| 102 | DB-DOJ-COBRA-00013992 | DB-DOJ-COBRA-00014000 | Murphy Pork Inc, Client Statements dated 12/1/00 - 12/31/00 for Acct #222-11895 |
| 103. | DB-DOJ-COBRA-00014001 | DB-DOJ-COBRA-00014010 | Murphy Pork Inc, Client Statements dated 10/1/01 - 2/28/02 for Acct #222-11895 |
| 104. | DB-DOJ-COBRA-00014011 | DB-DOJ-COBRA-00014020 | Murphy Pork Inc, Client Statements dated 2/1/01 - 6/30/01 for Acct #222-11895 |
| 105. | DB-DOJ-COBRA-00014021 | DB-DOJ-COBRA-00014025 | WHM Ventures, LLC Client Statements dated 10/1/01 - 12/31/01 for Acct #222-10817 |
| 106 | DB-DOJ-COBRA-00014026 | DB-DOJ-COBRA-00014030 | WHMJ, LLC Client Statements dated 7/1/00 - 9/30/00 for Acct #222-10818 |
| 107. | DB-DOJ-COBRA-00014031 | DB-DOJ-COBRA-00014035 | JMN Ventures, LLC Client Statements dated 10/1/00 - 11/30/00 for Acct #222-10819 |
| 108 | DB-DOJ-COBRA-00014036 | DB-DOJ-COBRA-00014040 | JMN Ventures, LLC Client Statements dated 7/1/00 - 9/30/00 for Acct #222-10819 |
| 109. | DB-DOJ-COBRA-00014041 | DB-DOJ-COBRA-00014045 | ANB, LLC Client Statements dated 7/1/01 - 9/30/01 for Acct #222-10820 |
| 110. | DB-DOJ-COBRA-00014046 | DB-DOJ-COBRA-00014050 | HDM, LLC Client Statements dated 10/1/00 - 11/30/00 for Acct #222-10821 |
| 111. | DB-DOJ-COBRA-00014051 | DB-DOJ-COBRA-00014055 | HDM, LLC Client Statements dated 1/1/02 - 2/28/02 for Acct #222-10821 |
| 112 | DB-DOJ-COBRA-00014056 | DB-DOJ-COBRA-00014059 | HDM, LLC Client Statements dated 3/1/02 - 3/31/02 for Acct #222-10821 |
| 113 | DB-DOJ-COBRA-00014060 | DB-DOJ-COBRA-00014064 | MDM Ventures, LLC Client Statements dated 10/1/00 - 11/30/00 for Acct #222-10822 |
| 114. | DB-DOJ-COBRA-00014065 | DB-DOJ-COBRA-00014069 | MDM Ventures, LLC Client Statements dated 4/1/01 - 6/30/01 for Acct #222-10822 |
| 115. | DB-DOJ-COBRA-00014070 | DB-DOJ-COBRA-00014074 | SKM Ventures, LLC Client Statements dated 10/1/01 - 12/31/01 for Acct #222-10823 |
| 116. | DB-DOJ-COBRA-00014075 | DB-DOJ-COBRA-00014079 | SKM Ventures, LLC Client Statements dated 4/1/01 - 6/30/01 for Acct #222-10823 |
| 117 | DB-DOJ-COBRA-00014080 | DB-DOJ-COBRA-00014084 | MURFAM Farms, LLC Client Statements dated 10/1/00 - 10/31/00 for Acct #222-10824 |
| 118 | DB-DOJ-COBRA-00014085 | DB-DOJ-COBRA-00014090 | MURFAM Farms, LLC Client Statements dated 8/1/00 - 8/31/00 for Acct #222-10824 |
| 119. | DB-DOJ-COBRA-00014091 | DB-DOJ-COBRA-00014095 | Murphy Pork Partners, LLC Client Statements dated 9/1/00 - 9/30/00 for Acct #222-10826 |
| 120. | DB-DOJ-COBRA-00014096 | DB-DOJ-COBRA-00014000 | PSM Inc, Client Statements dated 1/1/01 - 1/31/01 for Acct #222-11894 |
| 121. | DB-DOJ-COBRA-00014101 | DB-DOJ-COBRA-00014105 | PSM Inc, Client Statements dated 1/1/02 - 2/28/02 for Acct #222-11894 |
| 122 | DB-DOJ-COBRA-00014106 | DB-DOJ-COBRA-00014110 | Murphy Pork Inc, Client Statements dated 7/1/01 - 9/30/01 for Acct #222-11895 |
| 123 | DB-DOJ-COBRA-00016950 | DB-DOJ-COBRA-00016950 | Corporate Documents - Letters of Auth. for transferring options from the single member LLCs to the multi member LLCs |
| 124. | DB-DOJ-COBRA-00016952 | DB-DOJ-COBRA-00016957 | Corporate Documents - MDM Ventures, LLC |
| 125. | DB-DOJ-COBRA-00016963 | DB-DOJ-COBRA-00016964 | Deutsche Bank Corporate Documents MURFAM Farms, LLC |