Dealers quote foreign exchange in the form of bid prices and ask prices. The bid is the price where a dealer is willing to buy. The ask is the price where a dealer is willing to sell. The difference between the bid and the ask is called the "spread" or "bid-ask spread." For example, a dealer might quote EUR/USD as 1.0500 - 1.0502. This means the dealer is willing to buy euros (for dollars) at 1.0500 or, alternatively, sell euros at 1.0502.

### *II.C. Spot Transactions*

The most basic transaction done in the foreign exchange market is called a spot deal. Spot deals in foreign exchange are done for a multitude of purposes, some commercial, some financial, and some pure speculation on the future direction of exchange rates. In a spot deal, counterparties agree to exchange sums of different currencies at a time in the future called the value date. Market convention is that the spot value date is two bank business days after the trade date. Local holidays do not count as valid value dates. An example of a spot deal is a U.S.-based company selling computers to a company in Germany for payment in euros. The euro proceeds of the sale can be converted to dollars by doing a spot deal. Euros would be sold for dollars for settlement in two bank-business days. The euro part of the transaction would be settled locally in Germany, or at another European banking center with local euro settlement facilities. The dollar side would be settled at any banking center in the United States. Although the national currency of the United Kingdom is the pound sterling, both pound and euro transactions can be settled in London.

### *II.D. Forward Transactions*

Forward foreign exchange deals are done for extended settlement beyond the spot value day. Forward foreign exchange is routinely quoted for value in one week, one month, two months, three, six, or twelve months, and sometimes even longer than 12 months. Forwards are employed by hedgers to manage foreign exchange risk. An example of a hedger would be a U.S.-based manufacturer who makes a deal to sell oil drilling equipment to a company in England. Suppose the English company agrees to pay the manufacturer 100 million pounds in one month's time. If the manufacturer wanted to "lock in" the dollar value of the proceeds of the sale -- so as to avoid the risk of the pound falling in value – it would sell pounds forward for value in one month. This would immunize the manufacturer against fluctuations in the pound against the dollar. At settlement, in one month's time, the forward deal would require the manufacturer to deliver pounds for which it would receive dollars. Presumably, the manufacturer would use the pounds received from the sale of the drilling equipment to satisfy pound side of the forward transaction.

Forward exchange rates, called "outrights," are quoted for virtually any future valid spot value date for major currencies, such as the euro, the pound sterling, the yen, and the Swiss franc, and the Deutschmark before the introduction of the euro. Forward outrights necessarily differ from the spot exchange rate because of differences in the interest rates between the buying and selling currencies. By way of illustration, during all of 1999 and 2000, 1-year interest rates for euro deposits were significantly lower than those for dollars. The forward exchange rate for euros could not be the same as the spot exchange rate because that would create a riskless but profitable arbitrage trade: Traders could borrow in euros (the currency with the lower interest rate), sell the euros for dollars (which will be invested at an interest rate higher than the euro), and complete the transaction by selling the dollars for euros forward at a date coinciding with the expiration of the original euro loan. The use of the forward in the last step would hedge the currency risk associated with movements in the exchange rate during the period of the outstanding euro loan. Earning income on the interest rate differential while eliminating currency risk would be a profitable yet riskless transaction, which would be extremely unusual in the highly efficient foreign

exchange markets. Indeed, the market precludes this by setting the forward outright away from the spot by just enough to remove the riskless profit opportunity.[5]

[5] This principle is called "covered interest parity" in the economics literature.

*II.E. Options on Foreign Exchange*

Directly relevant to this case are put and call options on foreign currency pairs. Most currency options are traded on the interbank market where the same banks and investment banks that deal spot and forward foreign exchange also deal currency options. A call on a currency is the right but not the obligation to buy a specified amount of that currency (called the face amount) on or before the option expiration date at a fixed strike price. Likewise a put is the right but not the obligation to sell foreign currency. These standard options are called "vanilla" options to distinguish them from other forms of options, some of which are called "exotic" options. When a trader buys a call or put, he or she pays the seller of the option a price, called the "premium." The seller (the seller is called the "writer" of the option) of a call option is obligated to deliver the face amount of foreign currency in exchange for the option strike if the option owner chooses to exercise the option. Similarly, the writer of a put option is obligated to buy a sum of foreign currency in exchange for the option strike if the option owner chooses to exercise the option.

Most interbank currency options are "European" exercise, meaning these options can be exercised only in the final twenty-four hours of their lives. At expiration, an option that is a call on the euro (equivalently a put on the dollar) is "in-the-money" if the spot bid is above the option strike.[6] For example, suppose an investor owned a euro call struck at 1.1000 having a face of €1,000,000 (equivalently $1,100,000). If the spot exchange rate at expiration were quoted 1.2000-1.2005 the option would be "in-the-money." The investor would be correct to exercise the option because it gave him the right to buy euros (sell dollars) through the exercise of the option at 1.1000 which can in turn be sold at the bid price of 1.2000. In exercising the option the investor would exchange $1,100,000 (1,000,000 * 1.1000) for €1,000,000. He could hold the euros or he could simultaneously sell €1,000,000 for $1,200,000 (1,000,000 * 1.2000). His gross profit, not counting the cost of the option, would be $100,000 ($1,200,000 - $1,100,000).

The bulk of currency options expire at 10:00am EST on their expiration dates. This expiration is called the "New York cut." The window for exercise on a European-exercise

[6] A currency call option that is in-the-money-forward refers to the case where the prevailing forward exchange outright exceeds the option strike.

vanilla option is the 24-hours that precede the expiration time.

The Bank for International Settlements estimates that the average daily notional value of interbank foreign exchange option trading in April of 2001 was $60 billion.[7]

[7] Bank for International Settlements Triennial Central Bank Survey of Foreign Exchange and Derivatives Market Activity in 2001. (Final global results March 2002). p. 78

### *II.F. Digital Options*

The specific type of foreign currency options in this case are digital options (also sometimes referred to as "binary" options). A digital option is a cash-settled lump-sum payoff option. If a digital option is out-of-the-money at expiration it pays nothing. But if a digital option is in-the-money at expiration it pays a fixed amount, the lump-sum, regardless of by how much it is in-the-money. This differs from a plain vanilla option in that the plain vanilla option will be worth more if it is deeper into-the-money.

Digital options can be either American or European exercise. They can also be either puts or calls. Unlike vanilla options, which may be exercised in the 24-hour period which precedes their 10:00am EST cutoff, digital options are only exercised at exactly 10:00am EST on expiration date. Regardless of the style of exercise, digital options produce only one of two payoff scenarios: either a specific at- or in-the-money cash payoff, or, if out-of-the-money, zero.

Digital options present a special administrative problem in that only one of the involved parties can be the final word on whether the option is at- or in- or out-of-the-money at expiration. In practice exotic options like digitals are created at the request of customers by sophisticated foreign exchange dealing banks. These dealers reserve the right for they themselves to be calculation agents, or "barrier determination agents," as it is sometimes written. The practical significance of this is that the dealing bank has complete say over whether, on one hand, there will be a payment at expiration, or on the other hand, there will be no payment. In the case at hand the dealer, DEUTSCHE BANK, designated itself to be the calculation agent.

In the Participants' digital options, the strike prices are set so as to create what I refer to as a "sweet spot." The sweet spot occurs with offsetting digital options, when the strike price on the long option is attained, but the strike price of the offsetting short option is not attained. Hence the long option can be exercised without the short option being exercised. That range, where the long option holder receives the lump-sum payoff at expiration, but is not obligated to the payoff on the short option, is called

the "sweet spot." The payoff to hitting the sweet spot is therefore the payoff from the long option alone.

## III. OPINIONS AND BACKGROUND FOR OPINIONS

### *III.A. The Offsetting Options Reflected Irregular Pricing.*

In discussing option valuations, some definitions will be useful. I will refer to the price paid or received for an option as its "stated premium."[8] I will use the term "theoretical value" for a number derived from option pricing theory that is the fair value of a digital currency option before consideration of its bid-ask spread. DEUTSCHE BANK calculated its own theoretical values for the options in each of the Participants' transactions. The printouts of the bank's internal trade capture system, called ODET,[9] show these values as well as other details pertaining to the option trades.

As discussed in Section III.E below, the ODETs for the Murphy transactions show each pair of long and short offsetting options as having the same strike. This stands in contradiction to the strikes stated in the confirmations that DEUTSCHE BANK prepared and sent to the Participants.

[8] The "net stated premium" is the actual price purportedly paid in cash by the participants for the offsetting options. I will reference this later in the text.

[9] ODET is an acronym for Option Deal Entry Tool. It is a proprietary option trade capture system used by DEUTSCHE BANK to process option trading activity.

It also stands in contradiction to the 1999 COBRA transactions, where DEUTSCHE BANK included the sweet spot in its calculations of theoretical values.

Separately, I calculated theoretical values for the same options using a mathematical option pricing model.[10] Since the theoretical values are based on the component options having the same strike, my theoretical values are likewise calculated, for comparative purposes.

My investigation into the offsetting options in this case has revealed a number of anomalies in respect to the valuation of the options. Besides the first anomaly above (the ODET strikes being the same for both the long and short options), two other anomalies are apparent from comparisons between both sets of theoretical values, meaning my theoretical values as well as DEUTSCHE BANK's theoretical values, and DEUTSCHE BANK's stated premiums for the offsetting options.

The first anomaly I found was that the offsetting option components were priced at levels that far exceeded their

[10] Theoretical option pricing model: Reiner, Eric and Mark Rubenstein. "Breaking Down the Barriers." Risk 4 (September 1991a): 29-35, and "Unscrambling the Binary Code." Risk 4 (October 1991b): 75-83. I also used pricing tools from Bloomberg, LP to obtain a third set of theoretical values for the options. These values were similar and sometimes identical to my theoretical calculations.

theoretical values. According to the stated premiums, DEUTSCHE BANK charged the Participants $48,600,000 (DB-DOJ-DB-DOJ-COBRA 00018888 - DB-DOJ-COBRA 00018909) in option premium for the USD/CHF long digital currency options on April 14, 2000, and paid the Participants $47,142,000 (DB-DOJ-COBRA-00018888 - DB-DOJ-COBRA-00018909) in premium for the corresponding short EUR/USD digital currency options on that same date (Table 2). These stated premiums were significantly higher than the theoretical values in my analysis. I calculated the theoretical value of the long positions to be $24,804,021 and the short to be $23,966,886. The premiums were also significantly higher than DEUTSCHE BANK's theoretical values: the bank shows a long theoretical value of $24,772,474 and a short theoretical value of $23,934,792.[11] DEUTSCHE BANK's theoretical values were within 0.5% of my theoretical calculations, a difference small enough to be explained by minor variations in the pricing inputs.

[11] The DEUTSCHE BANK ODET trade printouts: DB-COBRA-04213, DB-COBRA-04215.

**Murphy Participants**

USD/CHF

| | Deutsche Stated Premium | DeRosa Theoretical Value | Stated Premium as a % of DeRosa Theoretical Value | Deutsche Theoretical Premium | Stated Premium as a % of Deutsche Theoretical Value |
|---|---|---|---|---|---|
| Long Option Value | $48,600,000 | $24,804,021 | 195.94% | $24,772,474 | 196.19% |
| Short Option Value | $47,142,000 | $23,966,886 | 196.70% | $23,934,792 | 196.96% |

Table 2

The stated premiums for the USD/CHF offsetting options were 95.94% and 96.70% higher, respectively, than the theoretical values I calculated for the same offsetting options, and 95.94% and 96.96% higher, respectively, than DEUTSCHE BANK's own theoretical value calculations.

Table 3 compares the value of the USD/CHF and EUR/USD options without the sweet spot.

| Murphy Participants | Deutsche Stated Premium | DeRosa Theoretical Value without Sweet Spot | % by which Stated Premium Exceeds DeRosa Theoretical Value |
|---|---|---|---|
| Long Option Value USD/CHF | $48,600,000 | $24,804,021 | 95 94% |
| Short Option Value USD/CHF | $47,142,000 | $23,966,886 | 96.70% |
| Long Option Value EUR/USD | $51,700,000 | $20,981,568 | 146.41% |
| Short Option Value EUR/USD | $50,149,000 | $20,276,854 | 147.32% |
| Total Long Option Value | $100,300,000 | $45,785,589 | 119 06% |
| Total Short Option Value | $97,291,000 | $44,243,740 | 119.90% |

Table 3

Table 3 shows that the stated premiums of the USD/CHF digital options were approximately 95% greater than my theoretical values. The EUR/USD options were approximately 147% greater than my theoretical values, and the stated premium for both sets was on average approximately 120% greater than my theoretical values.

Moreover, my calculations of theoretical values are within a small fraction of DEUTSCHE BANK's theoretical calculations of the same digital options. The Participants did seven sets of USD/CHF digital options that were identical in all respects but the notional size. The stated premiums for the USD/CHF offsetting options ranged

from $2,000,000 to $17,300,000 on the long options, and $1,940,000 to $16,781,000 on the short options (DB-DOJ-COBRA-00018888 - DB-DOJ-COBRA-00018909)(Table 4a). Table 4a indicates that the stated premiums were over 95% greater than my theoretical values. My theoretical values again are all within 0.5% of the bank's theoretical values. (DB-DOJ-COBRA 00240679 - DB-DOJ-COBRA 00240745).

**Murphy Participants**

| | Deutsche Stated Value | DeRosa Theoretical Value | Stated Premium as a % of DeRosa Theoretical Value | Deutsche Theoretical Value | Stated Premium as a % of Deutsche Theoretical Value |
|---|---|---|---|---|---|
| WHMJ, LLC USD/CHF | | | | | |
| Long Option Value | $17,300,000 | $8,829,415 | 195.94% | $8,818,185 | 196 19% |
| Short Option Value | $16.781,000 | $8,531,422 | 196 70% | $8,519,998 | 196.96% |
| WHMJ, LLC USD/CHF | | | | | |
| Long Option Value | $4,000,000 | $2,041.483 | 195 94% | $2,038,887 | 196 19% |
| Short Option Value | $3,880,000 | $1,972,583 | 196 70% | $1,969,942 | 196.96% |
| JMN Ventures, LLC USD/CHF | | | | | |
| Long Option Value | $9,700,000 | $4,950,597 | 195 94% | $4,944,300 | 196.19% |
| Short Option Value | $9,409,000 | $4,783,514 | 196 70% | $4,777,109 | 196 96% |
| HDM, LLC USD/CHF | | | | | |
| Long Option Value | $2,000,000 | $1,020,742 | 195.94% | $1,019,443 | 196 19% |
| Short Option Value | $1,940,000 | $986,292 | 196 70% | $984,971 | 196.96% |
| ANB, LLC USD/CHF | | | | | |
| Long Option Value | $3,000,000 | $1,531,112 | 195 94% | $1,529,165 | 196 19% |
| Short Option Value | $2,910,000 | $1,479.437 | 196.70% | $1,477,456 | 196 96% |
| MDM Ventures, LLC USD/CHF | | | | | |
| Long Option Value | $6,300,000 | $3,215,336 | 195.94% | $3,211,247 | 196 19% |
| Short Option Value | $6,111,000 | $3,106,819 | 196.70% | $3,102,658 | 196 96% |
| SKM Ventures, LLC USD/CHF | | | | | |
| Long Option Value | $6,300,000 | $3,215,336 | 195 94% | $3,211,247 | 196.19% |
| Short Option Value | $6,111,000 | $3,106,819 | 196 70% | $3,102,658 | 196 96% |

Table 4a

Due to incorrect values as reported on the DEUTSCHE BANK ODET sheets[12], I am unable to discuss or analyze the

[12] The deposition of Jeanette Michaels (DEUTSCHE BANK middle office) reveals that the DEUTSCHE BANK option traders utilized two separate trading systems: the ODET system (system used to capture the details of each trade) and the RMS system (system used to manage trading risks).

DEUTSCHE BANK theoretical values for the four EUR/USD offsetting options. The stated premiums for the four EUR/USD long and short offsetting options were 146.41% and 147.32% higher, respectively, than the theoretical values I calculated for the same offsetting options. (Table 4b)

**Murphy Participants**

| | Deutsche Stated Value | DeRosa Theoretical Value | Stated Premium as a % of DeRosa Theoretical Value |
|---|---|---|---|
| WHM Ventures, LLC EUR/USD | | | |
| Long Option Value | $26,400,000 | $10,713,992 | 246.41% |
| Short Option Value | $25,608,000 | $10,354,138 | 247.32% |
| WHM Ventures, LLC EUR/USD | | | |
| Long Option Value | $8,000,000 | $3,246,664 | 246.41% |
| Short Option Value | $7,760,000 | $3,137,618 | 247.32% |
| HDM, LLC EUR/USD | | | |
| Long Option Value | $12,000,000 | $4,869,996 | 246.41% |
| Short Option Value | $11,640,000 | $4,706,427 | 247.32% |
| WMC, LLC EUR/USD | | | |
| Long Option Value | $5,300,000 | $2,150,915 | 246.41% |
| Short Option Value | $5,141,000 | $2,078,672 | 247.32% |

Table 4b

Appendix III compares the DEUTSCHE BANK stated premiums for the 1999 COBRA transactions (52 pairs of offsetting options) to my theoretical values, and to DEUTSCHE BANK's

theoretical values.[13] The differences between my theoretical values and the stated premiums range from 46.11% to 95.32%. The average of the differences for the 1999 COBRA long and short options is 75.74% and 79.37%, respectively. The differences between DEUTSCHE BANK's theoretical calculations and the stated premiums range from 51.92% to 99.29%, with the average differences for the 1999 COBRA long and short options being 77.19% and 80.98%, respectively. This mispricing of stated premiums versus theoretical values is consistent with my discussion of the first anomaly for the Murphy transactions, in which the stated premiums exceeded the theoretical values by approximately 120% - see Table 3 and 7. The average differences between my theoretical values and DEUTSCHE BANK's theoretical calculations for the 1999 COBRA long and short options are 1.65% and 1.72%, respectively.[14]

The second anomaly I found was that the net stated premium of each combination of offsetting options was also considerably overvalued when compared to the theoretical values. DEUTSCHE BANK charged the Participants $1,458,000 in net stated premium for the offsetting USD/CHF options.

[13] DEUTSCHE BANK's theoretical values for the 1999 COBRA transactions include the possibility of hitting the sweet spot. Accordingly, my theoretical values for those transactions also include hitting the sweet spot.
[14] These do not include options for which we do not have DEUTSCHE BANK theoretical values.

I calculated a theoretical net value of $837,135, using mid-level volatilities and deposit rates. The bank's net theoretical value was $837,682 (DB-DOJ-COBRA 00240679 - DB-DOJ-COBRA 00240789). The bank's net theoretical values are virtually the same as my net theoretical valuation.

Table 5 provides a comparison between the DEUTSCHE BANK net stated premiums and the net theoretical values from DEUTSCHE BANK and me for the USD/CHF offsetting options.

**Murphy Participants**

| | Stated Net Premium | DeRosa Net Theoretical Value | Stated Net Premium as a % of DeRosa Theoretical Value | Deutsche Net Theoretical Premium | Stated Net Premium as a % of Deutsche Theoretical Value |
|---|---|---|---|---|---|
| USD/CHF | ($1,458,000) | ($837,135) | 174 17% | ($837,682) | 174.05% |

Table 5

As shown in Table 5 the net stated premiums received by DEUTSCHE BANK for the USD/CHF offsetting options were 74.17% higher than my net theoretical value calculation (as calculated without the sweet spot), and 74.05% higher than DEUTSCHE BANK's own theoretical values.

Table 6 provides a comparison between the DEUTSCHE BANK net stated premiums and the net theoretical calculations for each Participant's offsetting options.[15]

**Murphy Participants**

Net Premium

| | Stated Net Premium | DeRosa Net Theoretical Value | Stated Net Premium as a % of DeRosa Theoretical Value | Deutsche Net Theoretical Premium | Stated Net Premium as a % of Deutsche Theoretical Value |
|---|---|---|---|---|---|
| WHMJ, LLC USD/CHF | ($519,000) | ($297,993) | 174 17% | ($298,187) | 174.05% |
| WHMJ, LLC USD/CHF | ($120,000) | ($68,900) | 174 17% | ($68,945) | 174.05% |
| JMN Ventures, LLC USD/CHF | ($291,000) | ($167,083) | 174.16% | ($167,192) | 174.05% |
| HDM, LLC USD/CHF | ($60,000) | ($34,450) | 174 17% | ($34,473) | 174.05% |
| ANB, LLC USD/CHF | ($90,000) | ($51,675) | 174.17% | ($51,709) | 174 05% |
| MDM Ventures, LLC USD/CHF | ($189,000) | ($108,518) | 174.16% | ($108,588) | 174.05% |
| SKM Ventures, LLC USD/CHF | ($189,000) | ($108,518) | 174.16% | ($108,588) | 174.05% |
| WHM Ventures, LLC EUR/USD | ($792,000) | ($359,854) | 220 09% | | |
| WHM Ventures, LLC EUR/USD | ($240,000) | ($109,047) | 220.09% | | |
| HDM, LLC EUR/USD | ($360,000) | ($163,570) | 220.09% | | |
| WMC, LLC EUR/USD | ($159,000) | ($72,243) | 220 09% | | |

Table 6a

[15] The DEUTSCHE BANK net theoretical values are derived using the methodology described on page 29.

Again, due to incorrect values as reported on the DEUTSCHE BANK ODET sheets, I am unable to discuss or analyze the DEUTSCHE BANK net theoretical values for the four EUR/USD offsetting options. The net stated premiums for the four EUR/USD offsetting options were 120.09% higher than the theoretical values I calculated for the same offsetting options.

Table 6b shows the stated net premiums for the USD/CHF options were 74% greater than both DEUTSCHE BANK's and my own theoretical values. For the EUR/USD options they were 120% greater, and for both sets of options the stated net premium was 95% greater than my theoretical values, on a weighted average basis.

**Murphy Participants**

Net Premiums

| | Stated Net Premium | DeRosa Net Theoretical Value | Percentage by which Stated Net Premium Exceeds DeRosa Theoretical Value | Deutsche Net Theoretical Premium | Percentage by which Stated Net Premium Exceeds Deutsche Theoretical Value |
|---|---|---|---|---|---|
| USD/CHF | ($1,458,000) | ($837.135) | 74 17% | ($837,682) | 74.05% |
| EUR/USD | ($1,551,000) | ($704,714) | 120.09% | | |
| Total Net Premium | ($3,009,000) | ($1,541,849) | 95 16% | | |

Table 6b

Appendix IV compares the DEUTSCHE BANK net stated premiums for the 1999 COBRA transactions versus the net theoretical values I calculated, and those provided in DEUTSCHE BANK's ODET printouts. The differences between my theoretical values and the DEUTSCHE BANK net stated premium range from 6.41% to 64.09%, while the average difference across all COBRA transactions was 27.33%. The differences between the DEUTSCHE BANK theoretical calculations and the DEUTSCHE BANK net stated premium range from 10.26% to 43.52%, while the average difference across the 1999 COBRA transactions was 26.92% The average difference between my net theoretical calculations and the DEUTSCHE BANK net theoretical calculations across the 1999 COBRA transactions was 0.05%.[16]

The comparison of the DeRosa theoretical value of the net premium to DEUTSCHE BANK's net stated premium for the 2000 Murphy transactions is dramatic. The net stated premium was actually 95% greater than the theoretical net value of the offsetting options (see Table 6b). This compares with approximately 27% for the 1999 COBRA transactions. As previously stated, the Murphy structure was similar to the

[16] Calculations in this paragraph exclude trades for which complete information is not available.

1999 COBRA structure, except the Murphy's were overcharged even more than the 1999 COBRA Participants.

Table 7 displays a comparison of the total DEUTSCHE BANK stated premiums versus the total theoretical values for all the Partnerships' offsetting options on both the stated long and short, as well as net stated bases. Table 7 shows that the DEUTSCHE BANK stated premiums exceeded their theoretical values by approximately 120%. Table 7 also shows DEUTSCHE BANK's net stated premiums exceeded my theoretical values by 95%.

**Murphy Participants**

Premium Analysis

| | Stated Premium | DeRosa Theoretical Value | Percentage by which Stated Premium Exceeds DeRosa Theoretical Value | Deutsche Theoretical Value | Percentage by which Stated Premium Exceeds Deutsche Theoretical Value |
|---|---|---|---|---|---|
| USD/CHF | | | | | |
| Long Currency Options | $48,600,000 | $24,804,021 | 95 94% | $24,772,474 | 96 19% |
| Short Currency Options | $47,142,000 | $23,966,886 | 96.70% | $23,934,792 | 96.96% |
| Net Premium USD/CHF | $1,458,000 | $837,135 | 74 17% | $837,682 | 74 05% |
| EUR/USD | | | | | |
| Long Currency Options | $51,700,000 | $20,981,568 | 146 41% | | |
| Short Currency Options | $50,149,000 | $20,276,854 | 147 32% | | |
| Net Premium EUR/USD | $1,551,000 | $704,714 | 120.09% | | |
| Murphy Participants | | | | | |
| Long Currency Options | $100,300,000 | $45,785,589 | 119.06% | | |
| Short Currency Options | $97,291,000 | $44,243,740 | 119 90% | | |
| Net Premium: Murphy Participants | $3,009,000 | $1,541,849 | 95.16% | | |

Table 7

The differences between the stated premiums and the theoretical values are too large to be explained away through bid-ask spreads and/or minor pricing input variances. They are indicative of a divergence between the pricing strategy DEUTSCHE BANK used to derive their stated premiums and its own internal theoretical pricing model (as well as mine).

As mentioned in section III.A, the stated premium of an option may vary marginally from its theoretical value. That said, I can think of no market-related explanation to account for the significant pricing differences between the stated premiums the Participants paid and received and the theoretical valuations derived by both DEUTSCHE BANK and myself. Thus, in my opinion the stated and net stated prices were materially overstated.

One possible non-market explanation for pricing anomalies can be found in Robert Coplan's email to his associates at Ernst & Young in their national tax practice, dated December 28, 1999:

> Each of at least two individuals sells (writes) a short option on foreign currency that is out of the money and receives a premium for it. Then, he takes the premium and an additional cash investment (equal to 5% of the desired tax loss), and buys a long option on the same foreign currency but at a different strike price.[17]

Here Coplan essentially claimed that option pricing should be based on 5% of the desired tax loss. For all the 1999 COBRA transactions, the "five percent rule" (premium divided by desired tax loss) was

[17] DOJ-031656.

consistently employed. For the eleven Murphy transactions from 2000, the percentage was changed to 3%, but with the same consistency. I have no opinion on why the percentage was altered. Table 8 provides a comparison between premiums calculated with the 3% methodology and DEUTSCHE BANKS' stated premiums.

**Murphy Partnerships**
Premium Analysis

| | Stated Net Premium Rec/(Paid) | Long Premium (Net ÷ 3%) | Short Premium (Long (-) Net) | Deutsch Long Stated Premium | Deutsche Short Stated Premium | Long Variance 3% vs Stated Premium | Short Variance 3% vs Stated Premium |
|---|---|---|---|---|---|---|---|
| MURFAM Farms, LLC | ($1,851,000) | ($61,700,000) | $59,849,000 | ($61,700,000) | $59,849,000 | $0 | $0 |
| Murphy Pork Partners, LLC | ($420,000) | ($14,000,000) | $13,580,000 | ($14,000,000) | $13,580,000 | $0 | $0 |
| PSM Farms, LLC | ($738,000) | ($24,600,000) | $23,862,000 | ($24,600,000) | $23,862,000 | $0 | $0 |
| TOTAL | ($3,009,000) | ($100,300,000) | $97,291,000 | ($100,300,000) | $97,291,000 | $0 | $0 |

Table 8

In aggregate the Participants paid a net stated premium of $3,009,000. The mathematics embedded in Coplan's statement indicated that the long option stated premium, and hence the desired tax loss, would have been equal to $100,300,000 ($3,009,000 divided by 3%). Moreover the short option premium would have had to be $97,291,000 ($100,300,000 minus $3,009,000). Indeed these numbers were indicative of

the premiums paid (stated and stated net) for the Participants' offsetting options, meaning that what Coplan described was in fact a reality, also for the Murphy transactions.

Since the stated and net stated premiums coincide with Coplan's expressed intention for the net stated premium of the offsetting options to always be a specific percentage of the long option payoff (5% in 1999; 3% in 2000), it seems clear that DEUTSCHE BANK was intentionally pricing the offsetting options in a manner that was totally at odds with how options are priced in the market. Accordingly, it is not surprising that the stated and net stated option premiums would be so significantly different from their true values.

Coplan's "five percent rule" is congruent with all the 1999 COBRA transactions that I reviewed. Each transaction has a net stated premium equal to 5% of the long digital currency option premium.

Similarly, what I call a "three percent rule" applies to all eleven Murphy transactions. Additionally, there are a

number of other similarities in the architecture of these eleven transactions:

- The net payoff on every pair of offsetting options was always 2.25 times the net stated premium paid for the pair (for the 1999 COBRA transactions, the payoff was consistently 2.5 times the net stated premium).

- The stated premium for the long component option was always 50% of the payoff which would have been received if the option were to expire in-the-money, while the stated premium for the short component option always was 50.194% of the payoff that would have been owed if the option were to expire in-the-money (for the 1999 COBRA transactions, this percentage was consistently 50.67%).

- The spread between the strike of the option purchased and the strike of the option sold short was always 2 pips, in spite of the fact that different currencies were used (consistently for the 1999 COBRA transactions, as well as for the eleven Murphy transactions).

The Partnership transactions are structurally similar to the 1999 COBRA transactions, as illustrated in Appendix V.

These similarities support my finding that the offsetting options in this case were priced on the basis of non-market principles.

A third, tangentially-related anomaly exists, which specifically applies to the value of the offsetting options contributed by the Participants to the Partnerships. The documents I have reviewed indicate the options were contributed from the Participants to the Partnerships on April 17-18, 2000, and the contribution was valued at the original stated premium. The net stated premium paid by each Participant, as a percentage of the aggregate net stated premium paid and received by all of the Participants, matched the original partnership percentage interests. As noted earlier, the Participants contributed offsetting options on the EUR/USD and USD/CHF. Even though the contribution occurred four days after the offsetting options were purchased, some movement in the prices of the various offsetting options must have occurred as a result of underlying movements in the values of the EUR/USD and USD/CHF. This is doubly unusual. In the first instance

investment partnerships usually do not accept anything other than cash. An exception would be so-called "exchange funds."[18] The Participants were not an exchange fund. In the second instance the offsetting options should be valued at their respective marked-to-market value, not their original cost, to assure all of the partners were being treated equitably.

***III.B. The Offsetting Options Held Long By Each Participant, Or Partnership, Would Never Be Exercised Without The Offsetting Options Held Short by the Participants, Or Partnerships, Also Being Exercised.***

Each offsetting option pair consisted of a long digital currency option (purchased by a Participant) and a short digital currency option (sold by the same Participant). Both component options were based on the same underlying

[18] In "exchange funds," the investor may contribute marketable securities. The investors in exchange funds typically own large blocks of stock in a company by virtue of being a corporate founder or insider. In making a contribution to such an exchange fund the investor gets the benefits of diversification while preserving the tax-deferred status of his or her investment in the original company.

currency. All options expired on June 13, 2000, at 10:00am EST. Their strike prices were always exactly a mere 2 pips apart.

I have been asked to opine whether there was any chance for the long option to have been at- or in-the-money, and therefore exercised at expiration, and at the same time the short option to have been out-of-the-money, and therefore not exercised by DEUTSCHE BANK. For this to have occurred the spot price at expiration would have had to have been exactly at the long option strike price, or between both the option strike prices, allowing the exercise of only the participant's long option without the counterparty's exercising the short option. In this completely hypothetical situation the long option would have paid its lump-sum payoff, but the short option would have finished worthless, out-of-the-money. As discussed, I call this hypothetical situation "hitting the sweet spot." For the larger of the WHM Ventures, LLC EUR/USD offsetting options, hitting the sweet spot would have resulted in a $52,800,000 payoff from the long option.

In this WHM Ventures, LLC EUR/USD transaction, the difference between the strikes of the offsetting options

was 2 pips, or two one-hundredths of a U.S. cent. This narrowness is extraordinary. In my opinion, the narrow range of the strike spread guaranteed that hitting the sweet spot was never a possibility. It is also my opinion that there were only two outcomes for the offsetting options: either both component options would have been worthless, out-of-the-money at expiration, or both options would have had full payouts, meaning both would have been at- or in-the-money at expiration. Had both expired in-the-money, DEUTSCHE BANK would have paid the holder of the offsetting options the net difference in the payoff amounts ($1,782,000 in the case of these WHM Ventures, LLC EUR/USD options).

Table 9 illustrates the long, short, and net payoffs if the Partnerships' offsetting options had expired at-, or in-the-money. If the offsetting options had expired out-of-the-money, they would have been worthless.

**Murphy Partnerships**
At-, or In-the-Money Payoffs

| | Long Option Payoff | Short Option Payout | Net |
|---|---|---|---|
| MURFAM Farms, LLC | $123,400.000 | ($119,235,250) | $4,164,750 |
| Murphy Pork Partners, LLC | $28,000,000 | ($27,055,000) | $945,000 |
| PSM Farms, LLC | $49,200,000 | ($47,539,500) | $1,660,500 |
| TOTAL | $200,600,000 | ($193,829,750) | $6,770,250 |

Table 9

One reason why the sweet spot would not have been realized has to do with the decentralized nature of foreign exchange trading. As I discussed in Section II, there is no physical, central place where currencies are traded. By way of contrast, the stock market has physical locations where equity shares are traded, such as on exchanges like the New York Stock Exchange (NYSE). The foreign exchange market only consists of a network of dealing banks and other institutions that are spread around the world. Foreign exchange market participants are connected by telephones and computer networks, but seldom meet in person to trade.

In the foreign exchange market, a trade begins when a client contacts one or more dealing institutions about a

possible foreign exchange transaction of a specified size. Each dealer responds with a bid price and an ask price -- the dealer is prepared to buy at the bid price or sell at the ask price. No two dealers are likely to quote the exact same bid and ask, simultaneously - and for this reason it can pay to shop around.

As mentioned earlier, spot trading of major currencies features bid-ask spreads that are at least 2 pips wide. An example of a 2 pip wide quotation on EUR/USD would be 1.0185 bid, 1.0187 ask.

After a dealer has given a quote, the client must say at once whether it wants to buy (on the ask) or sell (on the bid), or do nothing. Even when a transaction is done, there is no public record of the event, as there is on the NYSE, where every purchase or sale of shares is recorded on a public medium referred to as the "tape." Because DEUTSCHE BANK was the designated calculation agent for each offsetting option pair it had total authority to determine whether the options were in-, at-, or out-of-the-money at expiration. Indeed, DEUTSCHE BANK had broad powers in making this determination, and the lack of transparency in

the foreign exchange market put the Participants at a profound disadvantage.

Moreover, the confirmations were silent as to the manner in which DEUTSCHE BANK would determine the final (10:00am EST on expiration date) spot rate. The confirmations do not indicate whether DEUTSCHE BANK, in determining the state of an option at expiration, was to use the bid side or ask side of the spot market. Given that the difference in the strike prices of the component digital currency options was only 2 pips wide, and that the bid-ask spread on the currency itself was at least equal to, if not larger than 2 pips, there was a guarantee that the sweet spot would never materialize. DEUTSCHE BANK could select either the bid side or the ask side of the market. This would allow DEUTSCHE BANK to avoid the sweet spot. For example, the WHM Ventures, LLC offsetting option strikes were 0.9207 on the long EUR/USD component and 0.9205 on the short EUR/USD component. DEUTSCHE BANK would have been within its rights to declare both options at- or in-the-money if the EUR/USD bid were 0.9205 or lower, and both options out-of-the-money if the EUR/USD ask were 0.9208 or higher. Table 10 illustrates this point for the digital currency options with strikes equal to 0.9205 and 0.9207.

| BID | ASK | |
|---|---|---|
| 0.9207 | 0.9209 | Both Out-of-Money |
| 0.9206 | 0.9208 | Both Out-of-Money |
| 0.9205 | 0.9207 | Both In-The-Money |
| 0.9204 | 0.9206 | Both In-The-Money |

**Table 10**

For every bid or ask value where the sweet spot could theoretically be hit, DEUTSCHE BANK could select the bid or ask price where the sweet spot would not be hit. The circled prices are the spot prices DEUTSCHE BANK would select to avoid hitting the sweet spot.

There are no intermediate cases because of the 2 pip bid/ask spread. For example, if the EUR/USD spot were quoted 0.9205 bid, 0.9207 ask, the Bank could determine the relevant spot rate to be 0.9205, making both options in-the-money; if the EUR/USD spot were quoted 0.9206 bid, 0.9208 ask the bank could chose 0.9208, the ask side, and determine both options to be worthless. Moreover, a wider than 2 pip wide bid/ask spread on spot would not save the sweet spot from being impossible for the same reasons, because the Participants and Partnerships were stuck with the 2 pip wide strike spread on the offsetting options.

The extent of DEUTSCHE BANK's latitude in determining the relevant spot rate, and hence the options' in- or out-of-the-moneyness, is revealed in the following email correspondence from Tom Tahl (or Perry Parker) to R. Craig Brubaker, both at DEUTSCHE BANK:

> Calculation agent is Deutsche Bank. The Calculation agent is clearly specified in the trade confirmation documents. In the event of any question you might have as to the rate that Deutsche Bank sets. The practice we follow (which is industry standard) is as follows: We poll 5 interbank FX participants at 10:00 a.m. on determination date for their spot FX dealing rate. Deutsche Bank chooses 1 of those rates and a specific price on or within that quote. The counterparties we currently use are:
>
> Chase
> Citibank
> Union Bank of Switzerland
> Morgan Stanley
> Barclays
>
> For example this morning Wednesday Aug. 02 10:00 a.m. Their respective dealing quotes in usd/jpy were
>
> Chase 109.05/08
> Citibank 109.03/06
> UBS 109.05/08
> Morgan Stanley 109.06/09
> Barclays 109.05/08
>
> Deutsche Bank chose to use the Barclays quote and our determination rate today was 109.06. We will provide a printed record of the counterparty quote we choose upon your request. Any further information that you need I will be happy to provide.
>
> Perry Parker[19]

[19] DB-DOJ-COBRA-00052674.

Additionally, I should mention that a large, powerful foreign exchange dealer such as DEUTSCHE BANK has, at times, the ability to force small (albeit temporary) price changes on the foreign exchange market. As illustrated in the following email from Craig Brubaker (DEUTSCHE BANK sales) to Erwin Mayer (Jenkens & Gilchrist), DEUTSCHE BANK contemplated the use of this tactic to navigate around the possibility of a sweet spot payout.

> ..is it imperative that the long and short options have different strikes, which generates the lotto payout? The fx markets are much less regulated, trade 24 hours, etc., and it its much easier for those guys to move the market off those strikes.[20]

The WHM Ventures, LLC EUR/USD options were struck at 0.9207 (long option) and 0.9205 (short option). Suppose that, immediately prior to 10:00am EST on the day of expiration, DEUTSCHE BANK felt the 10:00am EST EUR/USD spot rate would fall in the sweet spot range. DEUTSCHE BANK could sell a large amount of euros, so as to push the spot rate below the short option strike price of 0.9205, thereby putting both options in-the-money. Alternatively, DEUTSCHE BANK could buy a large amount of euros, so as to pull the spot

---

[20] The Brubaker email goes on to say, "That can't be done on the equity market side with its regulation, therefore, there is real exposure to the possibility, albeit small, of having to pay out the lottery. If we could eliminate that possibility without destroying the integrity of your transaction, that would help." This reveals DEUTSCHE BANK's concern regarding a sweet spot payout and explains their willingness to use offsetting digital currency options in the COBRA trade structure. Bates document DB-DOJ-COBRA-00049603.

rate above the long option strike price of 0.9207, thereby edging both options out-of-the-money. Either way, DEUTSCHE BANK would ensure the EUR/USD spot rate not to be in the sweet spot at exactly 10:00am EST. This is yet another reason why the sweet spot would never materialize.

A presentation by Chuck Binder, a DEUTSCHE BANK employee, supports the idea that DEUTSCHE BANK had no intention of allowing for a long option payoff without the corresponding short option payoff. Mr. Binder wrote:

> Binary defined as either pay a fixed amt or zero. Payoff not related to level of appreciation over the strike price.[21]

and

> Strikes on both options are about the same. Any spread must fall within DB's ability to set a bid/ask spread. Both options must either pay off or not.[22]

Mr. Binder's remarks clearly show that the sweet spot was an illusion; something that would never materialize. In fact DEUTSCHE BANK's own hedging did not take the sweet spot into account, as illustrated in Section III.E.

---

[21] DB-DOJ-COBRA-00030721.
[22] DB-DOJ-COBRA-00030723.

### *III.C. An Objective Analysis Of The Transaction Reveals That The Offsetting Options Did Not Provide The Participants, Or The Partnerships, With a Reasonable Possibility For Achieving a Non-Tax Profit.*

Modern financial theory posits that reasonably prudent investors seek out investments with positive rates of return and that have a reasonable possibility of achieving a profit. One of the most effective ways to evaluate an investment for these criteria is through an expected rate of return analysis. The expected rate of return is the probability weighted sum of the rates of return across all possible economic outcomes of an investment.

Because the offsetting options were binary investments, the economic outcomes were a function of the in- or out-of-the-moneyness of the options. For the out-of-the-money state the net payoff was zero because both components would have expired worthless. For the at- or in-the-money state the net payoff was the net difference between the payoff received from the exercised long option and the payoff delivered on the exercised short option.

I calculated the probability of the offsetting options finishing out-of-the-money, on one hand, and at- or in-the-money on the other hand, using option pricing theory. I used the data from the DEUTSCHE BANK ODET printouts in my probability calculations, specifically the mid-level volatilities and deposit rates.[23]

As discussed in Section III B. above, I do not believe that a "sweet spot" scenario (a situation where the long component option was in-the-money, while the short component option was out-of-the-money) would ever occur.

The stated premium payable by WHM Ventures, LLC for the long EUR/USD option was $26,400,000 and the stated premium receivable from DEUTSCHE BANK for the short option was $25,608,000. These amounts result in a net stated premium of $792,000 - the net cost of the offsetting options. At expiration, if both offsetting options were out of the money, there would be no payments. By contrast, if both EUR/USD offsetting options were at- or in-the-money, MURFAM Farms, LLC would receive from DEUTSCHE BANK $52,800,000 on the long option and pay $51,018,000 to DEUTSCHE BANK on the

[23] Mid-level volatilities and deposit (depo) rates are taken from an average of the bid and ask levels provided in the Deutsche Bank ODET (Option Deal Entry Tool) printouts, which provide trade details for all of the offsetting digital currency options discussed in this analysis.

short option. If this occurred, MURFAM Farms, LLC would receive a net payout of $1,782,000. I calculated the probability of the WHM Ventures, LLC EUR/USD offsetting options being at- or, in-the-money to be 20.88%. For the USD/CHF options it was 27.66% (over 10% lower than the 38% probability reference in the COBRA marketing materials (2003EY001581)). The probability of an out-of-the-money result would be 79.12%. The expected dollar return is equal to the sum of each payoff multiplied by its probability of occurrence. The expected dollar return on the WHM Ventures, LLC EUR/USD offsetting options was $372,082 ([$0 x 79.12%] + [$1,782,000 x 20.88%]).

Dividing the expected dollar return by the net premium payment of $792,000, and then subtracting one, results in an expected rate of return for WHM EUR/USD offsetting options of -53.02%. This number is not annualized.[24] The expected rate of return calculations for the other Partnerships' options were also -53.07% for the other EUR/USD pairs, and -37.77% for the USD/CHF pairs.

[24] It is conventional to annualize returns, but in this case it would magnify the negative expected returns beyond reason.

Table 11 provides an expected rate of return analysis for the Participants' offsetting option pairs.

**Murphy Participants**
Expected Rates of Return if Held to Expiration

| | OTM Probability | OTM Net Payoff | ITM Probability | ITM Net Payoff | Expected Dollar Return | Stated Net Premium | Expected Rate of Return |
|---|---|---|---|---|---|---|---|
| HDM, LLC EUR/USD | 79 12% | 0.00 | 20.88% | $810,000 | $169.128 | ($360.000) | -53 02% |
| WHM Ventures. LLC EUR/USD | 79.12% | 0 00 | 20.88% | $540.000 | $112.752 | ($240,000) | -53 02% |
| WHM Ventures, LLC EUR/USD | 79 12% | 0.00 | 20.88% | $1.782,000 | $372,082 | ($792.000) | -53 02% |
| WMC. LLC EUR/USD | 79.12% | 0.00 | 20 88% | $357.750 | $74.698 | ($159.000) | -53 02% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27 66% | $1.167,750 | $323.000 | ($519.000) | -37 77% |
| WHMJ, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $270,000 | $74,682 | ($120,000) | -37 77% |
| JMN Ventures. LLC USD/CHF | 72.34% | 0 00 | 27 66% | $654,750 | $181,104 | ($291,000) | -37 77% |
| HDM, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $135,000 | $37,341 | ($60.000) | -37 77% |
| ANB. LLC USD/CHF | 72 34% | 0 00 | 27 66% | $202,500 | $56.012 | ($90,000) | -37 77% |
| MDM Ventures, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $425,250 | $117,624 | ($189,000) | -37 77% |
| SKM Ventures. LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | -37 77% |
| TOTALS | | | | | **$1,636,046** | **($3,009,000)** | **-45.63%** |

**ITM - In-The-Money**
**OTM - Out-of-The-Money**

Table 11

These calculations do not account for all of the costs associated with the trades. The Participants paid substantial fees for accounting and legal advice in connection with these transactions. The net cost to the

Participants of implementing the offsetting option strategy includes both the net premium payments for the purchase and sale of the offsetting option components plus the fees paid to Ernst & Young, and to Proskauer Rose LLP.

Table 12 illustrates the component costs related to one of the WHM Ventures, LLC EUR/USD options transactions:

**WHM Ventures, LLC**
Contributed to MURFAM Farms, LLC

Net Transaction Cost

| | Long Option Premium | Short Option Premium | E&Y Fees | PR LLP Fees | Net Transaction Cost |
|---|---|---|---|---|---|
| EUR/USD | ($26,400,000) | $25,608,000 | ($528,000) | ($107.268) | ($1,427.268) |

Table 12

WHM Ventures, LLC's net transaction cost of the EUR/USD investment (adjusting the net premium to include accounting and legal fees) was $1,427,268. As discussed at various points in this report, the offsetting options have only two outcomes at expiration. In the out-of-the-money scenario both component options would be worthless at expiration. In the other scenario both options would be at- or in-the-money at expiration, paying $1,782,000. To arrive at the

net expected rate of return we simply divided the expected dollar return by the net transaction cost (including fees) of the options, and then subtract 1.00.

Table 13 provides a net expected rate of return analysis for each of the Participants.

**Murphy Participants**
Net Expected Rates of Return

| | OTM Probability | OTM Net Payoff | ITM Probability | ITM Net Payoff | Expected Return | Net Premium | Net Fees | Net Expected Rate of Return |
|---|---|---|---|---|---|---|---|---|
| HDM, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $810.000 | $169,128 | ($360,000) | ($288,900) | -73.94% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $540,000 | $112.752 | ($240,000) | ($192,505) | -73.93% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $1,782,000 | $372,082 | ($792,000) | ($635,268) | -73.93% |
| WMC, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $357,750 | $74,698 | ($159,000) | ($127,598) | -73.94% |
| WHMJ. LLC USD/CHF | 72.34% | 0.00 | 27.66% | $1.167.750 | $323,000 | ($519,000) | ($416.167) | -65.46% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $270.000 | $74,682 | ($120,000) | ($96,223) | -65.46% |
| JMN Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $654,750 | $181,104 | ($291,000) | ($233,120) | -65.45% |
| HDM, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $135,000 | $37.341 | ($60,000) | ($48,150) | -65.47% |
| ANB. LLC USD/CHF | 72.34% | 0.00 | 27.66% | $202,500 | $56,012 | ($90,000) | ($72,225) | -65.47% |
| MDM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | ($151.672) | -65.47% |
| SKM Ventures. LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | ($151.672) | -65.47% |
| TOTALS | | | | | $1,636,046 | ($3,009,000) | ($2,413,500) | -69.83% |

ITM - In-The-Money
OTM - Out-of-The-Money

Table 13

The net expected rate of return on the WHM Ventures, LLC's EUR/USD offsetting options was -73.93%. The net expected rate of return on the other Partnerships' offsetting options were also approximately -74% for the other EUR/USD pairs, and approximately -65% for the USD/CHF pairs.

Appendix VI provides the expected return, and net expected return, calculations for the 1999 COBRA Transactions. The 2000 Murphy transactions follow the same methodology. The expected rates of return on the offsetting option transactions ranged from -5.22% to -53.02%, while the net expected rates of return ranged from -50.12% to -73.94%.

An alternative methodology calculates the expected returns if the Participants had acquired the offsetting options without considering the tax-related expenses (Ernst & Young and legal fees) as part of the investment. Under this methodology, the fees are subtracted from the expected returns on the offsetting options to arrive at an expected rate of return on the stated net premium of the offsetting options.[25] The advantage of this methodology is that it

[25] Under this methodology the fees are subtracted from the expected returns on the options. The resultant number is then divided by the net cost of the options, and the number one is subtracted to arrive at the expected rate of return.

allows a comparison of this transaction to a transaction without the costs associated with the potential tax benefits.

Under this methodology, provided in Table 14, the net expected rate of return on the WHM Ventures, LLC EUR/USD offsetting options was -133.23%. The net expected rates of return on the other Partnerships' offsetting options were approximately -133% for the other EUR/USD pairs, and approximately -118% for the USD/CHF pairs.

**Murphy Participants**
Net Expected Rates of Return - Methodology 2

| | OTM Probability | OTM Net Payoff | ITM Probability | ITM Net Payoff | Expected Return | Net Premium | Net Fees | Net Expected Rate of Return |
|---|---|---|---|---|---|---|---|---|
| HDM, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $810,000 | $169,128 | ($360,000) | ($288,900) | -133.27% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $540,000 | $112,752 | ($240,000) | ($192,505) | -133.23% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $1,782,000 | $372,082 | ($792,000) | ($635,268) | -133.23% |
| WMC, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $357,750 | $74,698 | ($159,000) | ($127,598) | -133.27% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $1,167,750 | $323,000 | ($519,000) | ($416,167) | -117.95% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $270,000 | $74,682 | ($120,000) | ($96,223) | -117.95% |
| JMN Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $654,750 | $181,104 | ($291,000) | ($233,120) | -117.87% |
| HDM, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $135,000 | $37,341 | ($60,000) | ($48,150) | -118.02% |
| ANB, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $202,500 | $56,012 | ($90,000) | ($72,225) | -118.02% |
| MDM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | ($151,672) | -118.01% |
| SKM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | ($151,672) | -118.01% |
| TOTALS | | | | | $1,636,046 | ($3,009,000) | ($2,413,500) | -125.84% |

ITM - In-The-Money
OTM - Out-of-The-Money

Table 14

Applying this methodology to the 1999 COBRA transactions and the 2000 Murphy transactions provides expected rates of return that range from -95.2% to -135.8%.

My calculations reveal that the Participant's investments in the offsetting options had negative expected returns,

both including and excluding the accounting and legal fees. Ernst & Young's Jerred Blanchard reinforces this finding by stating in an internal opinion on COBRA transactions that:

> it would appear that the value of the downside risk ($2.945 million, or 62% of $4.75 million) exceeds the value of the upside opportunity ($2.375 million, or 38% of $6.25 million) by $570,000.[26]

He goes on to further state in footnote three:

> In order for the Taxpayer's "bet" to be breakeven, the total cost of the transaction would have to be $3.831 million (62% of $3.831 million equals 38% of $6.25 million), meaning the "tax structuring" or "investment banking" fees would have to be limited to $1.331 million (2.66% of the cost of the Long Option). Thus, one approach to improving the opportunity for earning pre-tax profit on the transaction would be to reduce the fees from 4.5% to 2.5%, which would constitute a $1 million reduction in fees.[27]

Unlike Ernst & Young's COBRA marketing materials Blanchard attempted to analyze the offsetting option transactions taking into account not only their upside potential, but also their far greater downside risk. If he had used the correct probabilities, meaning 28% rather than his 38%, his conclusion regarding the negative expected profitability of the offsetting options would have been even more pronounced.

---

[26] JG-NC037429.
[27] JG-NC037429.

The offsetting options, whether viewed singularly as individual option pairs or collectively as the assets of the Partnerships, did not have a reasonable possibility of achieving a non-tax profit. Consequently the Partnerships had no reasonable possibility of achieving a non-tax profit.

### *III.D. Each Offsetting Option The Participants Purchased, Sold, Or Contributed To The Partnerships Represented A Component Element Of A Single Transaction Structure.*

#### *III.D.i. Each offsetting option was designed to be inextricably related.*

As stated earlier, on April 14, 2000 each Participant entered into offsetting options with DEUTSCHE BANK as their counterparty. The transactions were comprised of two components: a long digital currency option and a short digital currency option, which were purchased and sold simultaneously. The payout amount of each short option component was 96.625% of the payoff of its corresponding long option component. The premium received for each short option component was 97% of that of its corresponding long option component. The strike price on each short option

component was 2 pips below the strike for its corresponding long option component. Finally, the expiration for all of the component options was June 13, 2000 (60 days after the trade date).

Table 15 provides the trade details of one set of the WHM Ventures, LLC EUR/USD offsetting options.

**WHM Ventures, LLC**
Contributed to MURFAM Farms, LLC

Offsetting Options

| | Long Option | Short Option | Net |
|---|---|---|---|
| Currency Pair | EUR/USD | EUR/USD | |
| Trade Date | 14-Apr-00 | 14-Apr-00 | |
| Expiration Date | 13-Jun-00 | 13-Jun-00 | |
| Option Type | EUR Put / USD Call | EUR Put / USD Call | |
| Strike Price | 0 9207 | 0 9205 | |
| Stated Premium | ($26,400,000) | $25,608,000 | ($792,000) |
| USD Payoff | $52,800,000 | ($51,018,000) | $1,782,000 |
| Counterparty | DEUTSCHE BANK | DEUTSCHE BANK | |

Table 15

I reviewed 52 1999 COBRA offsetting options (Appendix VII), as well as the eleven 2000 Murphy transactions. In each of these transactions, the long and short options had strike prices that were 2 pips apart. Given this design structure, it is my opinion that the offsetting options

were inextricably related components of a single transaction.

***III.D.ii. DEUTSCHE BANK considered the offsetting options traded with the Participants to have created no credit or counterparty risk.***

Because the offsetting options were elements of a single transaction structure, DEUTSCHE BANK could regard them as risk-free from a credit exposure perspective.

In Craig Brubaker's (of DEUTSCHE BANK Alex Brown) email he states that,

> There is no credit involved in this transaction, therefore, credit approval procedures will not be required.[28]

Furthermore, Chuck Binder's previously referenced presentation states,

> FX desk will not accept an order unless both trades are requested at the same time.[29]

And,

> No credit risk on these trades when executed as per the strategy.[30]

---

[28] DB-DOJ-COBRA-00030131.
[29] DB-DOJ-COBRA-00030721.
[30] DB-DOJ-COBRA-00030725.

And,

> Since options will either each pay a fixed amount or zero, the option purchased will always be worth more than the option sold to DB by the CP. This translates to zero credit risk based on netting under the ISDAs required.[31]

These comments indicate that credit analysis was not necessary because the offsetting options could never be split. By marrying structurally similar offsetting component options together and establishing a razor-thin strike spread, DEUTSCHE BANK was able to eliminate counterparty credit risk with respect to the Participants. DEUTSCHE BANK would be paid the net premium for the offsetting options and would not owe any money if the options expired out-of-the-money. If the offsetting options expired in-the-money, DEUTSCHE BANK would owe money to the Participants or the Partnerships. Under no circumstance would DEUTSCHE BANK be owed money beyond the initial payment of the net option premium.

Hence I conclude DEUTSCHE BANK had no credit risk exposure to the Participants or the Partnerships. The Bank would have been able to preserve its risk-free credit position by requiring the component pieces to always remain together.

[31] DB-DOJ-COBRA-00030724.

Said another way, each pair of offsetting options would never be split into separate component options.

***III.D.iii. Separation of the offsetting options would have required the Participants, or the Partnerships, to post a massive amount of margin collateral.***

It is the industry practice for Master Trading Agreements (and related Credit Support Annexes) to establish margin requirements for foreign exchange and foreign exchange options, either held as long or short positions. None of the documents I have reviewed stated the margin requirements for the offsetting options. The absence of such an agreement is evidence that DEUTSCHE BANK never intended for the offsetting options to be separated. Indeed, from an internal email by R. Craig Brubaker of DEUTSCHE BANK Alex. Brown, client credit was never an issue.

> We understand that there is no credit involved with this transaction, therefore, credit approval procedures will not be required.[32]

Nonetheless, some basic facts about margin can be understood from industry standards for foreign exchange and

[32] DB-DOJ-COBRA-00030349

options on foreign exchange and a discussion is relevant to my opinions.

Typical master trading agreements establish margin requirements for both long and short positions in currency options, and by extension, offsetting options. These requirements would have applied if DEUTSCHE BANK had ever allowed the offsetting long and short option pairs to be split into stand-alone individual options. Separating these offsetting options from each other would have meant the Participants or the Partnerships would have been outright long one option, with no offsetting short option (case #1), or outright short one option, with no offsetting long option (case #2). This would have created a massive margin requirement. The significant margin resulting from splitting the transaction is a convincing reason why the offsetting option pairs would never be separated.

Although there appears to be no documented margin requirements, based on my experience in the financial industry, I can estimate the margin required to split the offsetting options. In case #1, the margin requirement for purchasing a digital currency option is the entire long option premium. For example, in the MURFAM Farms, LLC

offsetting option pairs, WHM Ventures, LLC purchased a digital currency option on EUR/USD struck at 0.9207 and sold a digital currency option on EUR/USD struck at 0.9205, for a net premium payable to DEUTSCHE BANK of $792,000. If WHM Ventures, LLC wished to purchase the long option by itself (case 1) it would have been required to pay the stated premium in full -- in other words pay $26,400,000 in cash. The other Participants, likewise, would have been required to pay the full premium amounts of $73,900,000 for the long component USD/CHF and the other EUR/USD options.

In case #2, the margin requirement calculation for a stand-alone short digital currency option is more complex. Given no offsetting long option, industry standard margin convention would have required considerable initial margin collateral. This would be necessary to ensure performance by the Participant or the Partnerships on the option sold to the Bank. Any such margin would have to account for the risk of potentially adverse market fluctuations and for the possibility of counterparty non-performance.

It is industry standard practice that the investor is required to keep the full short premium received from his option sale on deposit with the custodian. It does not

count for margin purposes. The appropriate margin on a short digital currency option is difficult to calculate, especially when the digital currency options are only 30 days from expiration, as was the case for the Participants' transactions. The problem with a single digital is that its value can swing violently up or down with small changes in the spot exchange rate. As the exchange rate moves, the probability that the option will be at- or in-the-money at expiration can change dramatically. More specifically, as the exchange rate trades around the strike price, and the time value of the option decays, the value of the option can swing so dramatically that any system of assessing and collecting current margin collateral may be insufficient to keep pace with a firm's current exposure. This is due in large part to the fact that digital options feature a large, all-or-nothing lump-sum payoff that is triggered by the option being at- or in-the-money at expiration. With spot trading at or around the strike, as an option converges on expiration, a few pips movement up or down could be the difference between a large payout and no payout at all. For this reason, a bank would be well within rights to simply demand that the full in-the-money payout be kept on deposit.

In fact, the only way that the bank could ensure that its digital currency option client would perform is to demand all of the lump-sum payout as margin collateral. That is to say that the difference between the lump-sum payout of the WHM Ventures, LLC EUR/USD short option of $51,018,000 and the premium of $25,608,000 (equal to $25,410,000) could have been demanded as collateral by DEUTSCHE BANK. Under similar requirements the other Participants would have had to post margin on their stand-alone short digital currency option of between $1,925,000 and $16,651,250, for a total of $96,538,750.

In summary, if WHM Ventures, LLC had entered separate stand-alone long and short EUR/USD options with different brokers, according to the above analysis it would have had to deposit a total of $51,810,000 (the $26,400,000 long premium plus the $25,410,000 difference between the payoff on the short digital and the short digital's premium). This margin requirement would be in excess of 65 times the value of the net premium of $792,000 WHM Ventures, LLC paid to DEUTSCHE BANK to enter into the EUR/USD options as offsetting options.

Table 16 compares the margin requirements in a scenario where the long and short options were netted, versus a scenario where they received stand-alone treatment. The Partnerships would have been required to post $193,829,750 more in cash had the options received stand-alone margin treatment. It is my opinion that the Participants could not have done these transactions if the long and short options had been separated.

**Murphy Participants**

Margin Comparison

| | Long Option Premium | Short Option Premium | Premium Requirement (Netting Treatment) | Premium Requirement Stand-Alone Long Option | Premium Requirement Stand-Alone Short Option | Net Premium Requirement (Stand-Alone Treatment) | Additional Premium Due (Stand-Alone vs Net Treatment) |
|---|---|---|---|---|---|---|---|
| HDM, LLC EUR | ($12,000,000) | $11,640,000 | ($360,000) | ($12,000,000) | ($11,550,000) | ($23,550,000) | ($23,190,000) |
| WHM Ventures, | ($26,400,000) | $25,608,000 | ($792,000) | ($26,400,000) | ($25,410,000) | ($51,810,000) | ($51,018,000) |
| WHM Ventures, | ($8,000,000) | $7,760,000 | ($240,000) | ($8,000,000) | ($7,700,000) | ($15,700,000) | ($15.460,000) |
| WMC, LLC EUF | ($5,300,000) | $5,141,000 | ($159,000) | ($5,300,000) | ($5,101,250) | ($10,401,250) | ($10,242,250) |
| WHMJ, LLC US | ($17,300,000) | $16,781,000 | ($519,000) | ($17,300,000) | ($16,651,250) | ($33,951,250) | ($33,432,250) |
| WHMJ, LLC US | ($4,000,000) | $3,880,000 | ($120,000) | ($4,000,000) | ($3,850,000) | ($7,850,000) | ($7,730,000) |
| JMN Ventures, I | ($9,700,000) | $9,409,000 | ($291,000) | ($9,700,000) | ($9,336,250) | ($19,036,250) | ($18,745,250) |
| HDM, LLC USD | ($2,000,000) | $1,940,000 | ($60,000) | ($2,000,000) | ($1,925,000) | ($3,925,000) | ($3,865,000) |
| ANB, LLC USD/ | ($3,000,000) | $2,910,000 | ($90,000) | ($3,000,000) | ($2,887,500) | ($5,887,500) | ($5,797,500) |
| MDM Ventures, | ($6,300,000) | $6,111,000 | ($189,000) | ($6,300,000) | ($6,063,750) | ($12,363,750) | ($12,174,750) |
| SKM Ventures, | ($6,300,000) | $6,111,000 | ($189,000) | ($6,300,000) | ($6,063,750) | ($12,363,750) | ($12,174,750) |
| TOTAL | ($100,300,000) | $97,291,000 | ($3,009,000) | ($100,300,000) | ($96,538,750) | ($196,838,750) | ($193,829,750) |

Table 16

Appendix VIII provides an analysis of all margin requirements for the 1999 COBRA offsetting options. The same margin requirements apply to the eleven Murphy transactions.

***III.D.iv. DEUTSCHE BANK documentation originally identified the offsetting options as components of a single structured transaction.***

On July 14, 1999 DEUTSCHE BANK AG London created a "prototype confirmation" (DB-DOJ-COBRA-00030054 through 00030057) for a Foreign Exchange Linked Swap Transaction. The participating counterparties were identified only as Party A and Party B. The economic structure of the trade described in the prototype confirmation is identical in practically every respect to that used in the confirmations pertaining to the Participant's offsetting options. The only differences between the confirmations were:

- The prototype confirmation referred to a certain transaction as a "Foreign Exchange Linked Swap Transaction." That name was changed to "Foreign Exchange Digital Currency Option Transaction" in the current transaction.
- The prototype confirmation referred to certain transactions as a "First Swap Transaction" and "Second Swap Transaction." Those names were changed to "First Digital Currency Option Transaction" and "Second Digital Currency Option Transaction" in the current transactions.

- The prototype confirmation referred to certain events as a "First Swap Trigger Event" and "Second Swap Trigger Event." These names were changed to "First Digital Currency Option Trigger Event" and "Second Digital Currency Option Trigger Event" in the current transaction.

The "Linked Swap Transaction" (singular) was composed of two legs identified as "First Swap Transaction" and "Second Swap Transaction," which incidentally correspond with the component digital currency options in the Participants' COBRA transactions. In the "First Swap Transaction" Party A was a seller to Party B. In the "Second Swap Transaction" Party A was a buyer from Party B. As explained in III.D.iii, if these transactions stand-alone they would have specific margin requirements that may prohibit participation in larger notional values. However, if they are brought together under one single and unique structured transaction, then the benefits of netting could provide the parties with access to notional values that they would otherwise not be approved. In my opinion one of the principal purposes in designing the Foreign Exchange Linked Swap Transaction was to create a single transaction

structure from which DEUTSCHE BANK could take advantage of this netting benefit.

DEUTSCHE BANK essentially married the two offsetting swap transactions under a single transaction structure through two specific text references in the Foreign Exchange Linked Swap Transaction confirmation. In the introductory paragraph of the confirmation DEUTSCHE BANK describes the transaction (structure) as consisting,

> ..of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii), and Section 4. The details of each component swap transaction are listed individually in Section 1.

The plain meaning of this passage indicates that the foreign exchange linked swaps couple together as components in a single transaction structure.

My reading of this language is further supported in Section 2(i) - Other Provisions, which covers payment and settlement netting.

> For the purpose of this Transaction only, the following provisions shall apply: Subparagraph (ii) of

> Section 2 (c) of the ISDA Form[33] shall not apply to the First Swap Transaction and the Second Swap Transaction.[34]

Subparagraph (ii) of the Section 2(c) of the ISDA Master Agreement (Multicurrency Cross Border)[35] provides that payments could only be netted for a single transaction. Since each swap leg is in form a single transaction this provision would have prevented the swap leg payments from being netted. By electing that single transaction netting will not apply, DEUTSCHE BANK is able to combine its two offsetting swap transactions together, creating a separate and unique singular investment structure which takes advantage of this payment netting feature.

DEUTSCHE BANK's Foreign Exchange Linked Swap Transaction links its individual swap component transactions together under one single structure. The structural similarities between its prototype confirmation and the COBRA trade confirmations, in my opinion, demonstrate that DEUTSCHE BANK's architects understood the offsetting options' design

[33] If the parties executed an ISDA Form, then the language in DEUTSCHE BANK's prototypical confirmation would be subject to the relevant ISDA interpretation. Even if they had not executed an ISDA Form, the clear language in the prototypical confirmation specifies that, "Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute, and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency Cross Border) (the "ISDA Form") with such modifications as Party A and Party B will in good faith agree."
[34] DB-DOJ-COBRA-00030056.
[35] The ISDA Master Agreement can be found at www.isda.org.

should be similar to that of the foreign exchange linked swaps. As such, in DEUTSCHE BANK's eyes the offsetting option components, like the foreign exchange linked swaps, were also interrelated, and indeed comprised a single structured transaction.

***III.D.v. Neither the Participants nor DEUTSCHE BANK sought to separate the offsetting options.***

The offsetting option components were paired together and remained paired together when they were:

- Entered into by the Participants,
- Contributed to the Partnerships,
- Closed out in the Partnerships.

I am unaware of any effort by the Participants, the Partnerships or DEUTSCHE BANK to separate these pairs into their individual digital currency option components. The Participants entered into offsetting long and short options. They contributed the offsetting options to the Partnerships. At no time were the offsetting options split apart. Also supporting this opinion is Chuck Binder's presentation which states:

> Each transaction consists of two trades. One long and the other short on the same underlying.[36]

And,

> FX Desk will not accept an order unless both trades are requested at the same time.[37]

As such, the Participants treated the offsetting options as a single transaction structure.

***III.D.vi. The plain language references of the COBRA trade confirmations indicate DEUTSCHE BANK's intention to regard each offsetting option as a component element in a single transaction structure.***

The plain language references in every COBRA trade confirmation issued by DEUTSCHE BANK reflect that the offsetting options were components of a single transaction structure. All of the Participants' trade confirmations read as follows:

> The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option transaction… The transaction consists of a *number* of elements as detailed below in Sections a, 2(i) and (ii), 3(i) and (ii), Section 4. Certain definitions and provisions which are applicable to more that one element of the transaction are detailed in Section 1. The terms of the transaction to which this Confirmation relates are as follows.[38]

[36] DB-DOJ-COBRA-00030721.
[37] DB-DOJ-COBRA-00030721.
[38] DB-DOJ-COBRA-00043552

DEUTSCHE BANK's intent to package the two offsetting options components into a single transaction structure is evidenced by the specific reference to a singular Foreign Exchange Digital Option transaction, entered into by the two parties. Further reading the confirmation reveals the individual offsetting options are each elements of a transaction detailed within Section 1, and that the terms of the singular "Transaction" (not of each transaction) are contained in the body of the confirmation.

Furthermore, Section 2 of the Trade Confirmation specifically states that,

> For purposes of this Transaction only, the following provision shall apply: Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.[39]

This passage specifically refers to the singular structured transaction, and clearly differentiates it from the component offsetting option transactions (First Digital and Second Digital option transactions) that comprise it.

[39] DB-DOJ-COBRA-00043579

Finally, Section 4 of the Trade Confirmation claims that if the Participants and DEUTSCHE BANK are not parties to an ISDA Interest Rate and Currency Exchange Agreement or an ISDA Master Agreement then the trade confirmation:

> ...evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.[40]

This implies that if the confirmation references two or more transactions within its text then these transactions are looked upon as comprising component terms of a singular transaction structure, the terms of which are contained in the confirmation.

All of the above passages repeatedly refer to a single confirmation, and the singular transaction structure that the confirmation pertains too. This further emphasizes that it was DEUTSCHE BANK's intention to treat these offsetting options as being within a single transaction structure.

In addition to the compelling text within the trade confirmation of each offsetting option transaction, page 22 of Paul Harding's, "Mastering the ISDA Agreement," provides

[40] DB-DOJ-COBRA-00043552

us with a definition of "trade confirmation" that is also useful in identifying each combination of offsetting options as a single transaction structure. He defines a trade confirmation as,

> specifying the economic terms of a transaction (e.g. trade effective and maturity dates, payment calculation terms, timing and mechanics, and Offices through which payments are to be made.)[41]

The confirmation is described as specifying the economic terms of a transaction (singular). There is no implication that a single confirmation refers to the economic terms of several different transactions. Rather the plain language meaning is that all of the component elements listed within a single confirmation represent component parts of the economic terms of a single ("specified") transaction structure.

***III.D.vii. The irregular pricing of the offsetting options supports the single transaction opinion.***

Also arguing for my single transaction opinion are the pricing irregularities of the offsetting options, as was reported in Section III.A. Consider the parts. If the long option were a separate transaction, the pricing would

[41] Reference: Harding, Paul. "Mastering the ISDA Master Agreement." Prentice Hall. 2002, pg. 22

squarely fall under the heading of an unfairly valued derivative. Deutsche Bank's Policies and Procedures manual speaks to this issue:

> For all brokered deals, Trade Support calculates a reasonable Options price using FENICS to verify broker's price is fair (Traders perform this calculation themselves for non-brokered trades). Any Options mispricing discovered by Trade Support is directed to the trader responsible for the options position to investigate the discrepancy.[42]

The long option positions were priced, meaning stated premium, more than 95% over theoretical value - an egregious overpricing that could never be considered fair in any market situation. The short options were similarly overpriced.

There is also no doubt that DEUTSCHE BANK wildly mispriced the short position. If it were a separate transaction, then there would have been no worldly reason why DEUTSCHE BANK would have done the trade. Banks do not voluntarily overpay for options they themselves are dealing.

The only way to understand the gap between the stated premiums and theoretical values for the long and short

[42] DB-DOJ-COBRA 00046981.

positions would be to realize the truth of the situation: that the overpricing of the two sides was meant to more or less wash out on a net basis. That said, the options taken as a single transaction were still overpriced.

For all of the reasons detailed in Sections D.i-vii, it is clear that each offsetting digital option the Participants purchased, sold, or contributed to the Partnerships represented a component element of a single transaction structure.

***III.E. An Analysis of the Hedging Transactions Done By DEUTSCHE BANK Supports My Single Transaction Opinion.***

My opinion that the two component options in each Partnership transaction comprise a single transaction is supported by an in-depth analysis of DEUTSCHE BANK's hedging transactions.

First, I must add some background on the nature and practices of option dealing and hedging. In the foreign exchange market large dealing banks, such as DEUTSCHE BANK, make markets in currency options and in exotic currency options. Digital options, which have already been described, are a type of exotic option. In essence the Black-Scholes revolution was contained in a mathematical model for option pricing that allowed option dealers to replicate synthetically long or short positions in options for purchase or sale. As a result, the modern options world consists of counterparties, such as the Participants, who buy and sell options to dealing banks who in turn replicate option exposures using mathematical models. These banks, including DEUTSCHE BANK, run what are known as risk books containing a large variety of plain

and exotic options. A basic tenet of the business of running an option risk book is to keep the book hedged, or "flat," with respect to movements in exchange rates. Options desks hedge their risk by taking positions in spot and forward foreign exchange. Hence an option that is a call or a put on the euro can be hedged with transactions in spot and forward euros. The "recipe" for the hedge comes from the mathematics of the Black-Scholes family of models. The original Black-Scholes model was for put and call options on shares of stock. It has been modified to work for currency options and exotic currency options, as was noted above.

A typical option desk at a dealing bank is organized by currency. There are traders who do the euro against the dollar, the dollar against the yen, and the dollar against the Swiss franc, to take some examples. There are also option dealers who buy and sell options and exotic options on currencies. Finally there are "sales-traders" who bridge between the banks' customers and the traders who make the markets in spot, forward, and options.

In the normal sequence of events, a customer of the dealing bank asks his assigned sales-trader for a bid

price and an ask price for an option. Say, he inquires about a call on the euro (which can also be called a put on the dollar). The sales-trader obtains bids and asks for the option from his trader. Suppose the customer agrees to buy at the price. The sales-trader informs the option dealer at once. In the case of DEUTSCHE BANK we know that this triggers the recording of the option that the bank has sold through a software program called ODET, described earlier in my report.

When an option dealer like DEUTSCHE BANK buys or sells an option, it immediately does an offsetting hedge in the foreign exchange market. I will refer to this as the "initial hedge." In this example, the bank sells a call on the euro. To hedge itself against moves in the euro, the bank must buy some number of euros against dollars immediately - the exact amount is provided by the bank's software that incorporates the mathematical machinery of the Black-Scholes family of models. Typically, the option desk will buy the requisite number of euros from the bank's own spot dealing desk. This would be an "internal hedge." What has happened in this case is that the spot desk has sold euros to the options desk. Next, the spot desk itself has to go outside of the bank to replenish its