currency. All options expired on June 13, 2000, at 10:00am EST. Their strike prices were always exactly a mere 2 pips apart.

I have been asked to opine whether there was any chance for the long option to have been at- or in-the-money, and therefore exercised at expiration, and at the same time the short option to have been out-of-the-money, and therefore not exercised by DEUTSCHE BANK. For this to have occurred the spot price at expiration would have had to have been exactly at the long option strike price, or between both the option strike prices, allowing the exercise of only the participant's long option without the counterparty's exercising the short option. In this completely hypothetical situation the long option would have paid its lump-sum payoff, but the short option would have finished worthless, out-of-the-money. As discussed, I call this hypothetical situation "hitting the sweet spot." For the larger of the WHM Ventures, LLC EUR/USD offsetting options, hitting the sweet spot would have resulted in a $52,800,000 payoff from the long option.

In this WHM Ventures, LLC EUR/USD transaction, the difference between the strikes of the offsetting options

was 2 pips, or two one-hundredths of a U.S. cent. This narrowness is extraordinary. In my opinion, the narrow range of the strike spread guaranteed that hitting the sweet spot was never a possibility. It is also my opinion that there were only two outcomes for the offsetting options: either both component options would have been worthless, out-of-the-money at expiration, or both options would have had full payouts, meaning both would have been at- or in-the-money at expiration. Had both expired in-the-money, DEUTSCHE BANK would have paid the holder of the offsetting options the net difference in the payoff amounts ($1,782,000 in the case of these WHM Ventures, LLC EUR/USD options).

Table 9 illustrates the long, short, and net payoffs if the Partnerships' offsetting options had expired at-, or in-the-money. If the offsetting options had expired out-of-the-money, they would have been worthless.

**Murphy Partnerships**
At-, or In-the-Money Payoffs

| | Long Option Payoff | Short Option Payout | Net |
|---|---|---|---|
| MURFAM Farms, LLC | $123,400,000 | ($119,235,250) | $4,164,750 |
| Murphy Pork Partners, LLC | $28,000,000 | ($27,055,000) | $945,000 |
| PSM Farms, LLC | $49,200,000 | ($47,539,500) | $1,660,500 |
| TOTAL | $200,600,000 | ($193,829,750) | $6,770,250 |

Table 9

One reason why the sweet spot would not have been realized has to do with the decentralized nature of foreign exchange trading. As I discussed in Section II, there is no physical, central place where currencies are traded. By way of contrast, the stock market has physical locations where equity shares are traded, such as on exchanges like the New York Stock Exchange (NYSE). The foreign exchange market only consists of a network of dealing banks and other institutions that are spread around the world. Foreign exchange market participants are connected by telephones and computer networks, but seldom meet in person to trade.

In the foreign exchange market, a trade begins when a client contacts one or more dealing institutions about a

possible foreign exchange transaction of a specified size. Each dealer responds with a bid price and an ask price -- the dealer is prepared to buy at the bid price or sell at the ask price. No two dealers are likely to quote the exact same bid and ask, simultaneously - and for this reason it can pay to shop around.

As mentioned earlier, spot trading of major currencies features bid-ask spreads that are at least 2 pips wide. An example of a 2 pip wide quotation on EUR/USD would be 1.0185 bid, 1.0187 ask.

After a dealer has given a quote, the client must say at once whether it wants to buy (on the ask) or sell (on the bid), or do nothing. Even when a transaction is done, there is no public record of the event, as there is on the NYSE, where every purchase or sale of shares is recorded on a public medium referred to as the "tape." Because DEUTSCHE BANK was the designated calculation agent for each offsetting option pair it had total authority to determine whether the options were in-, at-, or out-of-the-money at expiration. Indeed, DEUTSCHE BANK had broad powers in making this determination, and the lack of transparency in

the foreign exchange market put the Participants at a profound disadvantage.

Moreover, the confirmations were silent as to the manner in which DEUTSCHE BANK would determine the final (10:00am EST on expiration date) spot rate. The confirmations do not indicate whether DEUTSCHE BANK, in determining the state of an option at expiration, was to use the bid side or ask side of the spot market. Given that the difference in the strike prices of the component digital currency options was only 2 pips wide, and that the bid-ask spread on the currency itself was at least equal to, if not larger than 2 pips, there was a guarantee that the sweet spot would never materialize. DEUTSCHE BANK could select either the bid side or the ask side of the market. This would allow DEUTSCHE BANK to avoid the sweet spot. For example, the WHM Ventures, LLC offsetting option strikes were 0.9207 on the long EUR/USD component and 0.9205 on the short EUR/USD component. DEUTSCHE BANK would have been within its rights to declare both options at- or in-the-money if the EUR/USD bid were 0.9205 or lower, and both options out-of-the-money if the EUR/USD ask were 0.9208 or higher. Table 10 illustrates this point for the digital currency options with strikes equal to 0.9205 and 0.9207.

| BID | ASK | |
|---|---|---|
| 0.9207 | 0.9209 | Both Out-of-Money |
| 0.9206 | 0.9208 | Both Out-of-Money |
| 0.9205 | 0.9207 | Both In-The-Money |
| 0.9204 | 0.9206 | Both In-The-Money |

**Table 10**

For every bid or ask value where the sweet spot could theoretically be hit, DEUTSCHE BANK could select the bid or ask price where the sweet spot would not be hit. The circled prices are the spot prices DEUTSCHE BANK would select to avoid hitting the sweet spot.

There are no intermediate cases because of the 2 pip bid/ask spread. For example, if the EUR/USD spot were quoted 0.9205 bid, 0.9207 ask, the Bank could determine the relevant spot rate to be 0.9205, making both options in-the-money; if the EUR/USD spot were quoted 0.9206 bid, 0.9208 ask the bank could chose 0.9208, the ask side, and determine both options to be worthless. Moreover, a wider than 2 pip wide bid/ask spread on spot would not save the sweet spot from being impossible for the same reasons, because the Participants and Partnerships were stuck with the 2 pip wide strike spread on the offsetting options.

The extent of DEUTSCHE BANK's latitude in determining the relevant spot rate, and hence the options' in- or out-of-the-moneyness, is revealed in the following email correspondence from Tom Tahl (or Perry Parker) to R. Craig Brubaker, both at DEUTSCHE BANK:

> Calculation agent is Deutsche Bank. The Calculation agent is clearly specified in the trade confirmation documents. In the event of any question you might have as to the rate that Deutsche Bank sets. The practice we follow (which is industry standard) is as follows: We poll 5 interbank FX participants at 10:00 a.m. on determination date for their spot FX dealing rate. Deutsche Bank chooses 1 of those rates and a specific price on or within that quote. The counterparties we currently use are:
>
> Chase<br>
> Citibank<br>
> Union Bank of Switzerland<br>
> Morgan Stanley<br>
> Barclays
>
> For example this morning Wednesday Aug. 02 10:00 a.m. Their respective dealing quotes in usd/jpy were
>
> Chase 109.05/08<br>
> Citibank 109.03/06<br>
> UBS 109.05/08<br>
> Morgan Stanley 109.06/09<br>
> Barclays 109.05/08
>
> Deutsche Bank chose to use the Barclays quote and our determination rate today was 109.06. We will provide a printed record of the counterparty quote we choose upon your request. Any further information that you need I will be happy to provide.<br>
> Perry Parker[19]

[19] DB-DOJ-COBRA-00052674.

Additionally, I should mention that a large, powerful foreign exchange dealer such as DEUTSCHE BANK has, at times, the ability to force small (albeit temporary) price changes on the foreign exchange market. As illustrated in the following email from Craig Brubaker (DEUTSCHE BANK sales) to Erwin Mayer (Jenkens & Gilchrist), DEUTSCHE BANK contemplated the use of this tactic to navigate around the possibility of a sweet spot payout.

> ..is it imperative that the long and short options have different strikes, which generates the lotto payout? The fx markets are much less regulated, trade 24 hours, etc., and it its much easier for those guys to move the market off those strikes.[20]

The WHM Ventures, LLC EUR/USD options were struck at 0.9207 (long option) and 0.9205 (short option). Suppose that, immediately prior to 10:00am EST on the day of expiration, DEUTSCHE BANK felt the 10:00am EST EUR/USD spot rate would fall in the sweet spot range. DEUTSCHE BANK could sell a large amount of euros, so as to push the spot rate below the short option strike price of 0.9205, thereby putting both options in-the-money. Alternatively, DEUTSCHE BANK could buy a large amount of euros, so as to pull the spot

[20] The Brubaker email goes on to say, "That can't be done on the equity market side with its regulation, therefore, there is real exposure to the possibility, albeit small, of having to pay out the lottery. If we could eliminate that possibility without destroying the integrity of your transaction, that would help." This reveals DEUTSCHE BANK's concern regarding a sweet spot payout and explains their willingness to use offsetting digital currency options in the COBRA trade structure. Bates document DB-DOJ-COBRA-00049603.

rate above the long option strike price of 0.9207, thereby edging both options out-of-the-money. Either way, DEUTSCHE BANK would ensure the EUR/USD spot rate not to be in the sweet spot at exactly 10:00am EST. This is yet another reason why the sweet spot would never materialize.

A presentation by Chuck Binder, a DEUTSCHE BANK employee, supports the idea that DEUTSCHE BANK had no intention of allowing for a long option payoff without the corresponding short option payoff. Mr. Binder wrote:

> Binary defined as either pay a fixed amt or zero. Payoff not related to level of appreciation over the strike price.[21]

and

> Strikes on both options are about the same. Any spread must fall within DB's ability to set a bid/ask spread. Both options must either pay off or not.[22]

Mr. Binder's remarks clearly show that the sweet spot was an illusion; something that would never materialize. In fact DEUTSCHE BANK's own hedging did not take the sweet spot into account, as illustrated in Section III.E.

---

[21] DB-DOJ-COBRA-00030721.
[22] DB-DOJ-COBRA-00030723.

### *III.C. An Objective Analysis Of The Transaction Reveals That The Offsetting Options Did Not Provide The Participants, Or The Partnerships, With a Reasonable Possibility For Achieving a Non-Tax Profit.*

Modern financial theory posits that reasonably prudent investors seek out investments with positive rates of return and that have a reasonable possibility of achieving a profit. One of the most effective ways to evaluate an investment for these criteria is through an expected rate of return analysis. The expected rate of return is the probability weighted sum of the rates of return across all possible economic outcomes of an investment.

Because the offsetting options were binary investments, the economic outcomes were a function of the in- or out-of-the-moneyness of the options. For the out-of-the-money state the net payoff was zero because both components would have expired worthless. For the at- or in-the-money state the net payoff was the net difference between the payoff received from the exercised long option and the payoff delivered on the exercised short option.

I calculated the probability of the offsetting options finishing out-of-the-money, on one hand, and at- or in-the-money on the other hand, using option pricing theory. I used the data from the DEUTSCHE BANK ODET printouts in my probability calculations, specifically the mid-level volatilities and deposit rates.[23]

As discussed in Section III B. above, I do not believe that a "sweet spot" scenario (a situation where the long component option was in-the-money, while the short component option was out-of-the-money) would ever occur.

The stated premium payable by WHM Ventures, LLC for the long EUR/USD option was $26,400,000 and the stated premium receivable from DEUTSCHE BANK for the short option was $25,608,000. These amounts result in a net stated premium of $792,000 - the net cost of the offsetting options. At expiration, if both offsetting options were out of the money, there would be no payments. By contrast, if both EUR/USD offsetting options were at- or in-the-money, MURFAM Farms, LLC would receive from DEUTSCHE BANK $52,800,000 on the long option and pay $51,018,000 to DEUTSCHE BANK on the

[23] Mid-level volatilities and deposit (depo) rates are taken from an average of the bid and ask levels provided in the Deutsche Bank ODET (Option Deal Entry Tool) printouts, which provide trade details for all of the offsetting digital currency options discussed in this analysis.

short option. If this occurred, MURFAM Farms, LLC would receive a net payout of $1,782,000. I calculated the probability of the WHM Ventures, LLC EUR/USD offsetting options being at- or, in-the-money to be 20.88%. For the USD/CHF options it was 27.66% (over 10% lower than the 38% probability reference in the COBRA marketing materials (2003EY001581)). The probability of an out-of-the-money result would be 79.12%. The expected dollar return is equal to the sum of each payoff multiplied by its probability of occurrence. The expected dollar return on the WHM Ventures, LLC EUR/USD offsetting options was $372,082 ([$0 x 79.12%] + [$1,782,000 x 20.88%]).

Dividing the expected dollar return by the net premium payment of $792,000, and then subtracting one, results in an expected rate of return for WHM EUR/USD offsetting options of -53.02%. This number is not annualized.[24] The expected rate of return calculations for the other Partnerships' options were also -53.07% for the other EUR/USD pairs, and -37.77% for the USD/CHF pairs.

---

[24] It is conventional to annualize returns, but in this case it would magnify the negative expected returns beyond reason.

Table 11 provides an expected rate of return analysis for the Participants' offsetting option pairs.

**Murphy Participants**

Expected Rates of Return if Held to Expiration

| | OTM Probability | OTM Net Payoff | ITM Probability | ITM Net Payoff | Expected Dollar Return | Stated Net Premium | Expected Rate of Return |
|---|---|---|---|---|---|---|---|
| HDM, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $810,000 | $169,128 | ($360,000) | -53.02% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $540,000 | $112,752 | ($240,000) | -53.02% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $1,782,000 | $372,082 | ($792,000) | -53.02% |
| WMC, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $357,750 | $74,698 | ($159,000) | -53.02% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $1,167,750 | $323,000 | ($519,000) | -37.77% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $270,000 | $74,682 | ($120,000) | -37.77% |
| JMN Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $654,750 | $181,104 | ($291,000) | -37.77% |
| HDM, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $135,000 | $37,341 | ($60,000) | -37.77% |
| ANB, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $202,500 | $56,012 | ($90,000) | -37.77% |
| MDM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | -37.77% |
| SKM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | -37.77% |
| **TOTALS** | | | | | **$1,636,046** | **($3,009,000)** | **-45.63%** |

**ITM - In-The-Money**
**OTM - Out-of-The-Money**

**Table 11**

These calculations do not account for all of the costs associated with the trades. The Participants paid substantial fees for accounting and legal advice in connection with these transactions. The net cost to the

Participants of implementing the offsetting option strategy includes both the net premium payments for the purchase and sale of the offsetting option components plus the fees paid to Ernst & Young, and to Proskauer Rose LLP.

Table 12 illustrates the component costs related to one of the WHM Ventures, LLC EUR/USD options transactions:

**WHM Ventures, LLC**
Contributed to MURFAM Farms, LLC

Net Transaction Cost

| | Long Option Premium | Short Option Premium | E&Y Fees | PR LLP Fees | Net Transaction Cost |
|---|---|---|---|---|---|
| EUR/USD | ($26,400,000) | $25,608,000 | ($528,000) | ($107.268) | ($1,427.268) |

**Table 12**

WHM Ventures, LLC's net transaction cost of the EUR/USD investment (adjusting the net premium to include accounting and legal fees) was $1,427,268. As discussed at various points in this report, the offsetting options have only two outcomes at expiration. In the out-of-the-money scenario both component options would be worthless at expiration. In the other scenario both options would be at- or in-the-money at expiration, paying $1,782,000. To arrive at the

net expected rate of return we simply divided the expected dollar return by the net transaction cost (including fees) of the options, and then subtract 1.00.

Table 13 provides a net expected rate of return analysis for each of the Participants.

**Murphy Participants**
Net Expected Rates of Return

| | OTM Probability | OTM Net Payoff | ITM Probability | ITM Net Payoff | Expected Return | Net Premium | Net Fees | Net Expected Rate of Return |
|---|---|---|---|---|---|---|---|---|
| HDM, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $810,000 | $169,128 | ($360,000) | ($288,900) | -73.94% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $540,000 | $112,752 | ($240,000) | ($192,505) | -73.93% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $1,782,000 | $372,082 | ($792,000) | ($635,268) | -73.93% |
| WMC, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $357,750 | $74,698 | ($159,000) | ($127,598) | -73.94% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $1,167,750 | $323,000 | ($519,000) | ($416,167) | -65.46% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $270,000 | $74,682 | ($120,000) | ($96,223) | -65.46% |
| JMN Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $654,750 | $181,104 | ($291,000) | ($233,120) | -65.45% |
| HDM, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $135,000 | $37,341 | ($60,000) | ($48,150) | -65.47% |
| ANB, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $202,500 | $56,012 | ($90,000) | ($72,225) | -65.47% |
| MDM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | ($151,672) | -65.47% |
| SKM Ventures, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $425,250 | $117,624 | ($189,000) | ($151,672) | -65.47% |
| TOTALS | | | | | $1,636,046 | ($3,009,000) | ($2,413,500) | -69.83% |

ITM - In-The-Money
OTM - Out-of-The-Money

Table 13

The net expected rate of return on the WHM Ventures, LLC's EUR/USD offsetting options was -73.93%. The net expected rate of return on the other Partnerships' offsetting options were also approximately -74% for the other EUR/USD pairs, and approximately -65% for the USD/CHF pairs.

Appendix VI provides the expected return, and net expected return, calculations for the 1999 COBRA Transactions. The 2000 Murphy transactions follow the same methodology. The expected rates of return on the offsetting option transactions ranged from -5.22% to -53.02%, while the net expected rates of return ranged from -50.12% to -73.94%.

An alternative methodology calculates the expected returns if the Participants had acquired the offsetting options without considering the tax-related expenses (Ernst & Young and legal fees) as part of the investment. Under this methodology, the fees are subtracted from the expected returns on the offsetting options to arrive at an expected rate of return on the stated net premium of the offsetting options.[25] The advantage of this methodology is that it

[25] Under this methodology the fees are subtracted from the expected returns on the options. The resultant number is then divided by the net cost of the options, and the number one is subtracted to arrive at the expected rate of return.

allows a comparison of this transaction to a transaction without the costs associated with the potential tax benefits.

Under this methodology, provided in Table 14, the net expected rate of return on the WHM Ventures, LLC EUR/USD offsetting options was -133.23%. The net expected rates of return on the other Partnerships' offsetting options were approximately -133% for the other EUR/USD pairs, and approximately -118% for the USD/CHF pairs.

**Murphy Participants**
Net Expected Rates of Return - Methodology 2

| | OTM Probability | OTM Net Payoff | ITM Probability | ITM Net Payoff | Expected Return | Net Premium | Net Fees | Net Expected Rate of Return |
|---|---|---|---|---|---|---|---|---|
| HDM, LLC EUR/USD | 79 12% | 0.00 | 20.88% | $810,000 | $169,128 | ($360,000) | ($288,900) | -133.27% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $540,000 | $112.752 | ($240,000) | ($192,505) | -133.23% |
| WHM Ventures, LLC EUR/USD | 79.12% | 0.00 | 20.88% | $1.782,000 | $372,082 | ($792,000) | ($635,268) | -133.23% |
| WMC, LLC EUR/USD | 79.12% | 0.00 | 20 88% | $357,750 | $74.698 | ($159.000) | ($127,598) | -133.27% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27.66% | $1.167.750 | $323,000 | ($519,000) | ($416,167) | -117 95% |
| WHMJ, LLC USD/CHF | 72.34% | 0.00 | 27 66% | $270,000 | $74,682 | ($120,000) | ($96,223) | -117 95% |
| JMN Ventures, LLC USD/CHF | 72.34% | 0.00 | 27 66% | $654,750 | $181.104 | ($291.000) | ($233,120) | -117 87% |
| HDM, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $135.000 | $37,341 | ($60.000) | ($48.150) | -118 02% |
| ANB, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $202,500 | $56,012 | ($90.000) | ($72,225) | -118 02% |
| MDM Ventures, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $425,250 | $117,624 | ($189,000) | ($151.672) | -118.01% |
| SKM Ventures, LLC USD/CHF | 72 34% | 0.00 | 27 66% | $425,250 | $117.624 | ($189,000) | ($151.672) | -118.01% |
| TOTALS | | | | | $1,636,046 | ($3,009,000) | ($2,413,500) | -125.84% |

ITM - In-The-Money
OTM - Out-of-The-Money

Table 14

Applying this methodology to the 1999 COBRA transactions and the 2000 Murphy transactions provides expected rates of return that range from -95.2% to -135.8%.

My calculations reveal that the Participant's investments in the offsetting options had negative expected returns,

both including and excluding the accounting and legal fees. Ernst & Young's Jerred Blanchard reinforces this finding by stating in an internal opinion on COBRA transactions that:

> it would appear that the value of the downside risk ($2.945 million, or 62% of $4.75 million) exceeds the value of the upside opportunity ($2.375 million, or 38% of $6.25 million) by $570,000.[26]

He goes on to further state in footnote three:

> In order for the Taxpayer's "bet" to be breakeven, the total cost of the transaction would have to be $3.831 million (62% of $3.831 million equals 38% of $6.25 million), meaning the "tax structuring" or "investment banking" fees would have to be limited to $1.331 million (2.66% of the cost of the Long Option). Thus, one approach to improving the opportunity for earning pre-tax profit on the transaction would be to reduce the fees from 4.5% to 2.5%, which would constitute a $1 million reduction in fees.[27]

Unlike Ernst & Young's COBRA marketing materials Blanchard attempted to analyze the offsetting option transactions taking into account not only their upside potential, but also their far greater downside risk. If he had used the correct probabilities, meaning 28% rather than his 38%, his conclusion regarding the negative expected profitability of the offsetting options would have been even more pronounced.

---

[26] JG-NC037429.
[27] JG-NC037429.

The offsetting options, whether viewed singularly as individual option pairs or collectively as the assets of the Partnerships, did not have a reasonable possibility of achieving a non-tax profit. Consequently the Partnerships had no reasonable possibility of achieving a non-tax profit.

### *III.D. Each Offsetting Option The Participants Purchased, Sold, Or Contributed To The Partnerships Represented A Component Element Of A Single Transaction Structure.*

#### *III.D.i. Each offsetting option was designed to be inextricably related.*

As stated earlier, on April 14, 2000 each Participant entered into offsetting options with DEUTSCHE BANK as their counterparty. The transactions were comprised of two components: a long digital currency option and a short digital currency option, which were purchased and sold simultaneously. The payout amount of each short option component was 96.625% of the payoff of its corresponding long option component. The premium received for each short option component was 97% of that of its corresponding long option component. The strike price on each short option

component was 2 pips below the strike for its corresponding long option component. Finally, the expiration for all of the component options was June 13, 2000 (60 days after the trade date).

Table 15 provides the trade details of one set of the WHM Ventures, LLC EUR/USD offsetting options.

**WHM Ventures, LLC**
Contributed to MURFAM Farms, LLC

Offsetting Options

| | Long Option | Short Option | Net |
|---|---|---|---|
| Currency Pair | EUR/USD | EUR/USD | |
| Trade Date | 14-Apr-00 | 14-Apr-00 | |
| Expiration Date | 13-Jun-00 | 13-Jun-00 | |
| Option Type | EUR Put / USD Call | EUR Put / USD Call | |
| Strike Price | 0.9207 | 0.9205 | |
| Stated Premium | ($26,400,000) | $25,608,000 | ($792,000) |
| USD Payoff | $52,800,000 | ($51,018,000) | $1,782,000 |
| Counterparty | DEUTSCHE BANK | DEUTSCHE BANK | |

Table 15

I reviewed 52 1999 COBRA offsetting options (Appendix VII), as well as the eleven 2000 Murphy transactions. In each of these transactions, the long and short options had strike prices that were 2 pips apart. Given this design structure, it is my opinion that the offsetting options

were inextricably related components of a single transaction.

***III.D.ii. DEUTSCHE BANK considered the offsetting options traded with the Participants to have created no credit or counterparty risk.***

Because the offsetting options were elements of a single transaction structure, DEUTSCHE BANK could regard them as risk-free from a credit exposure perspective.

In Craig Brubaker's (of DEUTSCHE BANK Alex Brown) email he states that,

> There is no credit involved in this transaction, therefore, credit approval procedures will not be required.[28]

Furthermore, Chuck Binder's previously referenced presentation states,

> FX desk will not accept an order unless both trades are requested at the same time.[29]

And,

> No credit risk on these trades when executed as per the strategy.[30]

[28] DB-DOJ-COBRA-00030131.
[29] DB-DOJ-COBRA-00030721.
[30] DB-DOJ-COBRA-00030725.

And,

> Since options will either each pay a fixed amount or zero, the option purchased will always be worth more than the option sold to DB by the CP. This translates to zero credit risk based on netting under the ISDAs required.[31]

These comments indicate that credit analysis was not necessary because the offsetting options could never be split. By marrying structurally similar offsetting component options together and establishing a razor-thin strike spread, DEUTSCHE BANK was able to eliminate counterparty credit risk with respect to the Participants. DEUTSCHE BANK would be paid the net premium for the offsetting options and would not owe any money if the options expired out-of-the-money. If the offsetting options expired in-the-money, DEUTSCHE BANK would owe money to the Participants or the Partnerships. Under no circumstance would DEUTSCHE BANK be owed money beyond the initial payment of the net option premium.

Hence I conclude DEUTSCHE BANK had no credit risk exposure to the Participants or the Partnerships. The Bank would have been able to preserve its risk-free credit position by requiring the component pieces to always remain together.

---

[31] DB-DOJ-COBRA-00030724.

Said another way, each pair of offsetting options would never be split into separate component options.

***III.D.iii. Separation of the offsetting options would have required the Participants, or the Partnerships, to post a massive amount of margin collateral.***

It is the industry practice for Master Trading Agreements (and related Credit Support Annexes) to establish margin requirements for foreign exchange and foreign exchange options, either held as long or short positions. None of the documents I have reviewed stated the margin requirements for the offsetting options. The absence of such an agreement is evidence that DEUTSCHE BANK never intended for the offsetting options to be separated. Indeed, from an internal email by R. Craig Brubaker of DEUTSCHE BANK Alex. Brown, client credit was never an issue.

> We understand that there is no credit involved with this transaction, therefore, credit approval procedures will not be required.[32]

Nonetheless, some basic facts about margin can be understood from industry standards for foreign exchange and

[32] DB-DOJ-COBRA-00030349

options on foreign exchange and a discussion is relevant to my opinions.

Typical master trading agreements establish margin requirements for both long and short positions in currency options, and by extension, offsetting options. These requirements would have applied if DEUTSCHE BANK had ever allowed the offsetting long and short option pairs to be split into stand-alone individual options. Separating these offsetting options from each other would have meant the Participants or the Partnerships would have been outright long one option, with no offsetting short option (case #1), or outright short one option, with no offsetting long option (case #2). This would have created a massive margin requirement. The significant margin resulting from splitting the transaction is a convincing reason why the offsetting option pairs would never be separated.

Although there appears to be no documented margin requirements, based on my experience in the financial industry, I can estimate the margin required to split the offsetting options. In case #1, the margin requirement for purchasing a digital currency option is the entire long option premium. For example, in the MURFAM Farms, LLC

offsetting option pairs, WHM Ventures, LLC purchased a digital currency option on EUR/USD struck at 0.9207 and sold a digital currency option on EUR/USD struck at 0.9205, for a net premium payable to DEUTSCHE BANK of $792,000. If WHM Ventures, LLC wished to purchase the long option by itself (case 1) it would have been required to pay the stated premium in full -- in other words pay $26,400,000 in cash. The other Participants, likewise, would have been required to pay the full premium amounts of $73,900,000 for the long component USD/CHF and the other EUR/USD options.

In case #2, the margin requirement calculation for a stand-alone short digital currency option is more complex. Given no offsetting long option, industry standard margin convention would have required considerable initial margin collateral. This would be necessary to ensure performance by the Participant or the Partnerships on the option sold to the Bank. Any such margin would have to account for the risk of potentially adverse market fluctuations and for the possibility of counterparty non-performance.

It is industry standard practice that the investor is required to keep the full short premium received from his option sale on deposit with the custodian. It does not

count for margin purposes. The appropriate margin on a short digital currency option is difficult to calculate, especially when the digital currency options are only 30 days from expiration, as was the case for the Participants' transactions. The problem with a single digital is that its value can swing violently up or down with small changes in the spot exchange rate. As the exchange rate moves, the probability that the option will be at- or in-the-money at expiration can change dramatically. More specifically, as the exchange rate trades around the strike price, and the time value of the option decays, the value of the option can swing so dramatically that any system of assessing and collecting current margin collateral may be insufficient to keep pace with a firm's current exposure. This is due in large part to the fact that digital options feature a large, all-or-nothing lump-sum payoff that is triggered by the option being at- or in-the-money at expiration. With spot trading at or around the strike, as an option converges on expiration, a few pips movement up or down could be the difference between a large payout and no payout at all. For this reason, a bank would be well within rights to simply demand that the full in-the-money payout be kept on deposit.

In fact, the only way that the bank could ensure that its digital currency option client would perform is to demand all of the lump-sum payout as margin collateral. That is to say that the difference between the lump-sum payout of the WHM Ventures, LLC EUR/USD short option of $51,018,000 and the premium of $25,608,000 (equal to $25,410,000) could have been demanded as collateral by DEUTSCHE BANK. Under similar requirements the other Participants would have had to post margin on their stand-alone short digital currency option of between $1,925,000 and $16,651,250, for a total of $96,538,750.

In summary, if WHM Ventures, LLC had entered separate stand-alone long and short EUR/USD options with different brokers, according to the above analysis it would have had to deposit a total of $51,810,000 (the $26,400,000 long premium plus the $25,410,000 difference between the payoff on the short digital and the short digital's premium). This margin requirement would be in excess of 65 times the value of the net premium of $792,000 WHM Ventures, LLC paid to DEUTSCHE BANK to enter into the EUR/USD options as offsetting options.

Table 16 compares the margin requirements in a scenario where the long and short options were netted, versus a scenario where they received stand-alone treatment. The Partnerships would have been required to post $193,829,750 more in cash had the options received stand-alone margin treatment. It is my opinion that the Participants could not have done these transactions if the long and short options had been separated.

**Murphy Participants**
Margin Comparison

| | Long Option Premium | Short Option Premium | Premium Requirement (Netting Treatment) | Premium Requirement Stand-Alone Long Option | Premium Requirement Stand-Alone Short Option | Net Premium Requirement (Stand-Alone Treatment) | Additional Premium Due (Stand-Alone vs Net Treatment) |
|---|---|---|---|---|---|---|---|
| HDM, LLC EUR | ($12,000,000) | $11,640,000 | ($360,000) | ($12,000,000) | ($11,550,000) | ($23,550,000) | ($23,190,000) |
| WHM Ventures, | ($26,400,000) | $25,608,000 | ($792,000) | ($26,400,000) | ($25,410,000) | ($51,810,000) | ($51,018,000) |
| WHM Ventures, | ($8,000,000) | $7,760,000 | ($240,000) | ($8,000,000) | ($7,700,000) | ($15,700,000) | ($15,460,000) |
| WMC, LLC EUF | ($5,300,000) | $5,141,000 | ($159,000) | ($5,300,000) | ($5,101,250) | ($10,401,250) | ($10,242,250) |
| WHMJ, LLC US | ($17,300,000) | $16,781,000 | ($519,000) | ($17,300,000) | ($16,651,250) | ($33,951,250) | ($33,432,250) |
| WHMJ, LLC US | ($4,000,000) | $3,880,000 | ($120,000) | ($4,000,000) | ($3,850,000) | ($7,850,000) | ($7,730,000) |
| JMN Ventures, I | ($9,700,000) | $9,409,000 | ($291,000) | ($9,700,000) | ($9,336,250) | ($19,036,250) | ($18,745,250) |
| HDM, LLC USD | ($2,000,000) | $1,940,000 | ($60,000) | ($2,000,000) | ($1,925,000) | ($3,925,000) | ($3,865,000) |
| ANB, LLC USD/ | ($3,000,000) | $2,910,000 | ($90,000) | ($3,000,000) | ($2,887,500) | ($5,887,500) | ($5,797,500) |
| MDM Ventures, | ($6,300,000) | $6,111,000 | ($189,000) | ($6,300,000) | ($6,063,750) | ($12,363,750) | ($12,174,750) |
| SKM Ventures, | ($6,300,000) | $6,111,000 | ($189,000) | ($6,300,000) | ($6,063,750) | ($12,363,750) | ($12,174,750) |
| TOTAL | ($100,300,000) | $97,291,000 | ($3,009,000) | ($100,300,000) | ($96,538,750) | ($196,838,750) | ($193,829,750) |

Table 16

Appendix VIII provides an analysis of all margin requirements for the 1999 COBRA offsetting options. The same margin requirements apply to the eleven Murphy transactions.

***III.D.iv. DEUTSCHE BANK documentation originally identified the offsetting options as components of a single structured transaction.***

On July 14, 1999 DEUTSCHE BANK AG London created a "prototype confirmation" (DB-DOJ-COBRA-00030054 through 00030057) for a Foreign Exchange Linked Swap Transaction. The participating counterparties were identified only as Party A and Party B. The economic structure of the trade described in the prototype confirmation is identical in practically every respect to that used in the confirmations pertaining to the Participant's offsetting options. The only differences between the confirmations were:

- The prototype confirmation referred to a certain transaction as a "Foreign Exchange Linked Swap Transaction." That name was changed to "Foreign Exchange Digital Currency Option Transaction" in the current transaction.
- The prototype confirmation referred to certain transactions as a "First Swap Transaction" and "Second Swap Transaction." Those names were changed to "First Digital Currency Option Transaction" and "Second Digital Currency Option Transaction" in the current transactions.

- The prototype confirmation referred to certain events as a "First Swap Trigger Event" and "Second Swap Trigger Event." These names were changed to "First Digital Currency Option Trigger Event" and "Second Digital Currency Option Trigger Event" in the current transaction.

The "Linked Swap Transaction" (singular) was composed of two legs identified as "First Swap Transaction" and "Second Swap Transaction," which incidentally correspond with the component digital currency options in the Participants' COBRA transactions. In the "First Swap Transaction" Party A was a seller to Party B. In the "Second Swap Transaction" Party A was a buyer from Party B. As explained in III.D.iii, if these transactions stand-alone they would have specific margin requirements that may prohibit participation in larger notional values. However, if they are brought together under one single and unique structured transaction, then the benefits of netting could provide the parties with access to notional values that they would otherwise not be approved. In my opinion one of the principal purposes in designing the Foreign Exchange Linked Swap Transaction was to create a single transaction

structure from which DEUTSCHE BANK could take advantage of this netting benefit.

DEUTSCHE BANK essentially married the two offsetting swap transactions under a single transaction structure through two specific text references in the Foreign Exchange Linked Swap Transaction confirmation. In the introductory paragraph of the confirmation DEUTSCHE BANK describes the transaction (structure) as consisting,

> ..of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii), and Section 4. The details of each component swap transaction are listed individually in Section 1.

The plain meaning of this passage indicates that the foreign exchange linked swaps couple together as components in a single transaction structure.

My reading of this language is further supported in Section 2(i) - Other Provisions, which covers payment and settlement netting.

> For the purpose of this Transaction only, the following provisions shall apply: Subparagraph (ii) of

> Section 2 (c) of the ISDA Form[33] shall not apply to the First Swap Transaction and the Second Swap Transaction.[34]

Subparagraph (ii) of the Section 2(c) of the ISDA Master Agreement (Multicurrency Cross Border)[35] provides that payments could only be netted for a single transaction. Since each swap leg is in form a single transaction this provision would have prevented the swap leg payments from being netted. By electing that single transaction netting will not apply, DEUTSCHE BANK is able to combine its two offsetting swap transactions together, creating a separate and unique singular investment structure which takes advantage of this payment netting feature.

DEUTSCHE BANK's Foreign Exchange Linked Swap Transaction links its individual swap component transactions together under one single structure. The structural similarities between its prototype confirmation and the COBRA trade confirmations, in my opinion, demonstrate that DEUTSCHE BANK's architects understood the offsetting options' design

---

[33] If the parties executed an ISDA Form, then the language in DEUTSCHE BANK's prototypical confirmation would be subject to the relevant ISDA interpretation. Even if they had not executed an ISDA Form, the clear language in the prototypical confirmation specifies that, "Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute, and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency Cross Border) (the "ISDA Form") with such modifications as Party A and Party B will in good faith agree."
[34] DB-DOJ-COBRA-00030056.
[35] The ISDA Master Agreement can be found at www.isda.org.

should be similar to that of the foreign exchange linked swaps. As such, in DEUTSCHE BANK's eyes the offsetting option components, like the foreign exchange linked swaps, were also interrelated, and indeed comprised a single structured transaction.

***III.D.v. Neither the Participants nor DEUTSCHE BANK sought to separate the offsetting options.***

The offsetting option components were paired together and remained paired together when they were:

- Entered into by the Participants,
- Contributed to the Partnerships,
- Closed out in the Partnerships.

I am unaware of any effort by the Participants, the Partnerships or DEUTSCHE BANK to separate these pairs into their individual digital currency option components. The Participants entered into offsetting long and short options. They contributed the offsetting options to the Partnerships. At no time were the offsetting options split apart. Also supporting this opinion is Chuck Binder's presentation which states:

> Each transaction consists of two trades. One long and the other short on the same underlying.[36]

And,

> FX Desk will not accept an order unless both trades are requested at the same time.[37]

As such, the Participants treated the offsetting options as a single transaction structure.

***III.D.vi. The plain language references of the COBRA trade confirmations indicate DEUTSCHE BANK's intention to regard each offsetting option as a component element in a single transaction structure.***

The plain language references in every COBRA trade confirmation issued by DEUTSCHE BANK reflect that the offsetting options were components of a single transaction structure. All of the Participants' trade confirmations read as follows:

> The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option transaction… The transaction consists of a *number* of elements as detailed below in Sections a, 2(i) and (ii), 3(i) and (ii), Section 4. Certain definitions and provisions which are applicable to more that one element of the transaction are detailed in Section 1. The terms of the transaction to which this Confirmation relates are as follows.[38]

[36] DB-DOJ-COBRA-00030721.
[37] DB-DOJ-COBRA-00030721.
[38] DB-DOJ-COBRA-00043552

DEUTSCHE BANK's intent to package the two offsetting options components into a single transaction structure is evidenced by the specific reference to a singular Foreign Exchange Digital Option transaction, entered into by the two parties. Further reading the confirmation reveals the individual offsetting options are each elements of a transaction detailed within Section 1, and that the terms of the singular "Transaction" (not of each transaction) are contained in the body of the confirmation.

Furthermore, Section 2 of the Trade Confirmation specifically states that,

> For purposes of this Transaction only, the following provision shall apply: Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.[39]

This passage specifically refers to the singular structured transaction, and clearly differentiates it from the component offsetting option transactions (First Digital and Second Digital option transactions) that comprise it.

---

[39] DB-DOJ-COBRA-00043579

Finally, Section 4 of the Trade Confirmation claims that if the Participants and DEUTSCHE BANK are not parties to an ISDA Interest Rate and Currency Exchange Agreement or an ISDA Master Agreement then the trade confirmation:

> ...evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.[40]

This implies that if the confirmation references two or more transactions within its text then these transactions are looked upon as comprising component terms of a singular transaction structure, the terms of which are contained in the confirmation.

All of the above passages repeatedly refer to a single confirmation, and the singular transaction structure that the confirmation pertains too. This further emphasizes that it was DEUTSCHE BANK's intention to treat these offsetting options as being within a single transaction structure.

In addition to the compelling text within the trade confirmation of each offsetting option transaction, page 22 of Paul Harding's, "Mastering the ISDA Agreement," provides

[40] DB-DOJ-COBRA-00043552

us with a definition of "trade confirmation" that is also useful in identifying each combination of offsetting options as a single transaction structure. He defines a trade confirmation as,

> specifying the economic terms of a transaction (e.g. trade effective and maturity dates, payment calculation terms, timing and mechanics, and Offices through which payments are to be made.)[41]

The confirmation is described as specifying the economic terms of a transaction (singular). There is no implication that a single confirmation refers to the economic terms of several different transactions. Rather the plain language meaning is that all of the component elements listed within a single confirmation represent component parts of the economic terms of a single ("specified") transaction structure.

***III.D.vii. The irregular pricing of the offsetting options supports the single transaction opinion.***

Also arguing for my single transaction opinion are the pricing irregularities of the offsetting options, as was reported in Section III.A. Consider the parts. If the long option were a separate transaction, the pricing would

[41] Reference: Harding, Paul. "Mastering the ISDA Master Agreement." Prentice Hall. 2002, pg. 22

squarely fall under the heading of an unfairly valued derivative. Deutsche Bank's Policies and Procedures manual speaks to this issue:

> For all brokered deals, Trade Support calculates a reasonable Options price using FENICS to verify broker's price is fair (Traders perform this calculation themselves for non-brokered trades). Any Options mispricing discovered by Trade Support is directed to the trader responsible for the options position to investigate the discrepancy.[42]

The long option positions were priced, meaning stated premium, more than 95% over theoretical value – an egregious overpricing that could never be considered fair in any market situation. The short options were similarly overpriced.

There is also no doubt that DEUTSCHE BANK wildly mispriced the short position. If it were a separate transaction, then there would have been no worldly reason why DEUTSCHE BANK would have done the trade. Banks do not voluntarily overpay for options they themselves are dealing.

The only way to understand the gap between the stated premiums and theoretical values for the long and short

[42] DB-DOJ-COBRA 00046981.

positions would be to realize the truth of the situation: that the overpricing of the two sides was meant to more or less wash out on a net basis. That said, the options taken as a single transaction were still overpriced.

For all of the reasons detailed in Sections D.i-vii, it is clear that each offsetting digital option the Participants purchased, sold, or contributed to the Partnerships represented a component element of a single transaction structure.

### *III.E. An Analysis of the Hedging Transactions Done By DEUTSCHE BANK Supports My Single Transaction Opinion.*

My opinion that the two component options in each Partnership transaction comprise a single transaction is supported by an in-depth analysis of DEUTSCHE BANK's hedging transactions.

First, I must add some background on the nature and practices of option dealing and hedging. In the foreign exchange market large dealing banks, such as DEUTSCHE BANK, make markets in currency options and in exotic currency options. Digital options, which have already been described, are a type of exotic option. In essence the Black-Scholes revolution was contained in a mathematical model for option pricing that allowed option dealers to replicate synthetically long or short positions in options for purchase or sale. As a result, the modern options world consists of counterparties, such as the Participants, who buy and sell options to dealing banks who in turn replicate option exposures using mathematical models. These banks, including DEUTSCHE BANK, run what are known as risk books containing a large variety of plain

and exotic options. A basic tenet of the business of running an option risk book is to keep the book hedged, or "flat," with respect to movements in exchange rates. Options desks hedge their risk by taking positions in spot and forward foreign exchange. Hence an option that is a call or a put on the euro can be hedged with transactions in spot and forward euros. The "recipe" for the hedge comes from the mathematics of the Black-Scholes family of models. The original Black-Scholes model was for put and call options on shares of stock. It has been modified to work for currency options and exotic currency options, as was noted above.

A typical option desk at a dealing bank is organized by currency. There are traders who do the euro against the dollar, the dollar against the yen, and the dollar against the Swiss franc, to take some examples. There are also option dealers who buy and sell options and exotic options on currencies. Finally there are "sales-traders" who bridge between the banks' customers and the traders who make the markets in spot, forward, and options.

In the normal sequence of events, a customer of the dealing bank asks his assigned sales-trader for a bid

price and an ask price for an option. Say, he inquires about a call on the euro (which can also be called a put on the dollar). The sales-trader obtains bids and asks for the option from his trader. Suppose the customer agrees to buy at the price. The sales-trader informs the option dealer at once. In the case of DEUTSCHE BANK we know that this triggers the recording of the option that the bank has sold through a software program called ODET, described earlier in my report.

When an option dealer like DEUTSCHE BANK buys or sells an option, it immediately does an offsetting hedge in the foreign exchange market. I will refer to this as the "initial hedge." In this example, the bank sells a call on the euro. To hedge itself against moves in the euro, the bank must buy some number of euros against dollars immediately - the exact amount is provided by the bank's software that incorporates the mathematical machinery of the Black-Scholes family of models. Typically, the option desk will buy the requisite number of euros from the bank's own spot dealing desk. This would be an "internal hedge." What has happened in this case is that the spot desk has sold euros to the options desk. Next, the spot desk itself has to go outside of the bank to replenish its

own euro position. Whatever the exact process, we know in this example that the bank must buy euros and sell dollars, regardless of whether there is an intermediate step of doing the internal trade with the bank's spot desk.

This then is the drill for all option dealing: The bank buys or sells an option, or group of options, and immediately does a one-off transaction in the spot market to create the initial hedge against short-term movements in the relevant exchange rate. Both the option and its hedge are booked in the option risk book.

In the case of offsetting pairs of digital options the ODET function is spread across "legs."

ODET Legs

Leg 0: Common Terms

Leg 1: Long Option

Leg 2: Short Option

Leg 3: Initial Hedging

Leg zero is a recording of the common terms of the entire transaction. Leg one is the long digital option. Leg two

is the short option. Legs one and two contain the stated premium, the theoretical price, the option parameters, such as the strike, the face amount, trade date, expiration date plus several pricing factors, such as interest rates and volatility. Moreover, legs one and two show the recommended hedging amounts from the bank's option model for each option under the captions of buy and sell currency amounts. Leg 3 contains information about the exact hedging transaction that was done. Since there is a long option and a short option the individual component hedging amounts partially offset each other. The leg 3 data shows the actual initial hedging transaction.

It is my understanding that the ODET program, upon receiving a command signifying the option or options that have been dealt, generates the client's confirmations. It also posts the options and any hedges to the option risk book.

With the passage of time and movements in exchange rates (and other parameters), the correct hedge for an option changes. Once an option has been booked any changes to its hedge will be addressed only in context of the larger book. In other words, options are created with their own

hedge, but thereafter the entire book of options is re-hedged as needed (i.e. the hedge is adjusted en bloc). This is referred to as "re-hedging the book." Re-hedging the book, as opposed to the re-hedging separately each of the individual options that make up the book, achieves considerable economies of scale in hedging. This is because the book typically consists of both puts and calls held in either long or short positions, meaning that some portion of the risks cancel each other out across the entire book. The book as a whole will be re-hedged daily or over shorter intervals as needed to address market volatility.

DEUTSCHE BANK's aggregate risk position is managed with another software program called RMS. RMS contains all of the ODET entries plus it allows for direct modification to the positions without going back to ODET.

Now I turn to the particular problem of hedging digital and pairs of digital options that concern the Participants. A single digital option is relatively simple to value but, ironically, difficult to hedge. The hedging difficulty comes from the fact that at expiration the option either pays nothing or pays a lump sum of money.

This all-or-none payoff feature is strictly a function of what the dealing bank, as calculation agent, determines to be the in-the-money or out-of-the-money status of the option at exactly 10 AM in New York on expiration date. The complexity of the hedging comes from the fact that if the spot exchange rate is hovering around the strike close to expiration a small movement in the exchange rate, flipping the option in- or out-of-the money will have a profound effect for the option owner and the dealing bank. By way of analogy, the hedge will have to do a huge amount of work over a small change in exchange rates if it is going to immunize the dealer from the risk of making the lump sum payoff. For this reason digital option hedging is notoriously tricky.

This situation is made more complex when there are two digital options, one long and the other short but with only a razor-thin difference in strike prices. Effectively the offsetting digital options create a three-part payoff matrix. Payoff number one is zero, as both options are out-of-the-money; payoff number two is equal to the net difference between the payoffs of the long and short options. This is equal to $1,782,000 in the case of one set of the WHM Ventures, LLC EUR/USD offsetting options.

So far in this discussion the payoffs one and two create a small digital option.

The complexity comes when we look at the potential third payoff, for what I call the payoff from hitting the sweet spot. This is the case where the long option is in-the-money but the short option is out-of-the money. For the WHM Ventures, LLC EUR/USD offsetting options this would pay a sum of $52,800,000.[43]

I have discussed in this report that DEUTSCHE BANK would never have allowed this outcome to occur. Yet if it did occur, and this is completely hypothetical, it would mean a huge binary payoff inside the gap between the two strikes.

There is evidence that DEUTSCHE BANK did not hedge the risk of the sweet spot.

The deposition of Jeanette Michaels (DEUTSCHE BANK middle office) reveals that the DEUTSCHE BANK option traders utilized two separate trading systems: the ODET system

[43] Even assuming that DEUTSCHE BANK would have allowed the sweet spot to be realized the sweet spot payoff does not figure largely in the initial price of the options because of the possibility of landing at expiration between the strikes is mathematically remote.

(system used to capture the details of each trade) and the RMS system (system used to manage trading risks). She further explains that the trades would be processed into the ODET system and then,

> The traders would just hit a button and it [the trade] would feed into RMS from the ODET system. (page 23)

And

> Trading would make the change in RMS…If there was a change in ODET, I would tell the trader, and he would look at the trade before it was changed and see what the change did to his risk. (page 33)

The case documents show that DEUTSCHE BANK entered the offsetting options via the ODET software at the correct strikes. ODET then generated the confirmations that were sent to the Participants.

However, the story did not end there. Ordinarily, the options desk would have executed its hedging transaction based on the total risk of the options it had just dealt.

As the prior paragraphs indicate, there were two types of hedging involved when DEUTSCHE BANK entered into an option transaction: the initial or "cash" hedge and an ongoing re-hedging of the risk book.

In the case at hand, I have seen no "Leg 3" (indicating a cash hedge) for any of the offsetting options in this case. The 1999 COBRA transactions typically involved an initial cash hedge that was put on when DEUTSCHE BANK entered into COBRA transactions. In the transactions for which I have records, DEUTSCHE BANK's initial cash hedges did not hedge the risk that the sweet spot would be hit.

Similarly for the Murphy transaction, as previous discussed in III.A, there is evidence which indicates that DEUTSCHE BANK did not hedge the possibility of the sweet spot being hit.[44]

According to the trade confirmations for the WHM Ventures, LLC EUR/USD offsetting options mentioned above, the long component had a strike of 0.9207, and the short component had a strike of 0.9205. Therefore, the sweet spot would have been between these strikes. However, when these options were entered into ODET, the strike price on the short component options was changed to 0.9207, which was the strike price on the long component option. A comment was inserted into the "Confirmation Details" field

[44] In the 1999 COBRA transactions, there is also evidence that the sweet spot was not hedged in the risk book. However, this is demonstrated in the transition to the RMS report as well as in the initial hedge.

indicating "Strike on Leg is 0.9205" (DB-DOJ-COBRA-00240762 and DB-DOJ-COBRA-00240764,6).

In other words, when DEUTSCHE BANK entered the offsetting options transactions into ODET, they included a comment indicating that the strike confirmation for the short offsetting option should be different from the strike that was being entered into ODET. As discussed, when entered into ODET, the strike prices of the short options were changed to the strike prices of the longs. As I have not been provided Leg 3 records, I do not know if DEUTSCHE BANK did an initial cash hedge. However, given that the strike prices of the longs and shorts were the same, if they did enter into an initial cash hedge, it would not have taken the sweet spot into account.

These strikes were then carried into the option risk book, as evidenced in DEUTSCHE BANK's Risk Reports that continue to show the same strike of 0.9207 for both options (DB-DOJ-COBRA-00241737-9).

By changing the strike of the short option, DEUTSCHE BANK's trading room removed the theoretical risk of the sweet spot and accordingly no longer maintained an

internal hedge for the theoretical risk of hitting the sweet spot. Hedging the sweet spot would not have been without cost. Moreover the cost of maintaining a hedge for the sweet spot would have grown large and difficult to manage if the spot exchange rate at the end of the transaction's life were in the proximity of the strikes. Setting the strikes equal precluded the need to run a costly, albeit unnecessary, hedge.

The same is true of the other sets of EUR/USD options (DB-DOJ-COBRA-00240773,777,784,788,795,799). Moreover, the USD/CHF options received the same treatment (DB-DOJ-COBRA-00240685,689,696,700,707,711,718,722,729,733,740,744,751, 755).

Unlike the 1999 COBRA transactions which were entered into ODET correctly, and whose strikes were subsequently changed on the RMS reports, the Murphy transactions were entered into ODET with the same strike price for both offsetting component options.

In my opinion there is strong evidence showing that in the case of the Partnerships' options, DEUTSCHE BANK did not – nor did it ever intend to – hedge the sweet spot.

DEUTSCHE BANK of course had every right to hedge the Partnerships' transactions in any way that it wished. What this analysis shows however is that as far as the DEUTSCHE BANK was concerned the sweet spot was an illusion, meaning something never to be attained. DEUTSCHE BANK's apparent failure to hedge the sweet spot supports my opinion that the offsetting options were a single transaction, and provides further evidence of the lack of a reasonable possibility of economic profit for the Partnerships' transactions.

### *III.F. The Participants Had No Non-Tax Business Purpose In Contributing Their Offsetting Options To The Partnerships, And Therefore The Partnerships Had No Non-Tax Business Purpose.*

In my opinion, the Participants received no additional non-tax financial benefit by contributing their offsetting options to the Partnerships.

When the Participants contributed their offsetting options to the Partnerships they gave up their economic interest in the EUR/USD and USD/CHF offsetting options. In exchange, they received partial interest in a pool, or pools, which contained both the same offsetting options. Thus, the Participants' interest in the Partnerships was essentially a share in portfolios containing a series of separate offsetting pairs of options, each of which had a significantly negative expected return.

Although it seems as though the partnership structure may have offered the benefit of diversification, any of the Participants could have achieved the same economic exposures in their own portfolios on the trade date by having requested a combination of offsetting options on the euro and the Swiss franc. Alternatively, each Participant could have opted to sell off part of its offsetting options and establish new offsetting option positions in the other currency pair. Given these realities the Participants never needed to be invested in the Partnerships to achieve diversification.

Moreover, and more importantly, by exchanging their individual offsetting options for a share in the

Partnerships' portfolios containing both the EUR/USD and USD/CHF offsetting options, each Participant decreased its probability of achieving a profit on the transactions. This is because after the contribution of the options to the Partnerships each Participant's probability of achieving a profit depended on the less likely outcome that all the offsetting option pairs would finish in the money. Before the contributions, the attainment of profitability depended on the individual probability of each pair of offsetting options finishing in the money. After the contributions, all of the options had to finish in the money for any Participant to achieve a profit.

In addition, it is my opinion that the Participants gained no centralized management benefits from contributing their offsetting options to the Partnerships.

Additionally, DEUTSCHE BANK included a "Non-Reliance" clause in all of its trade confirmations stipulating that the investor:

> ..is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party

> (DEUTSCHE BANK) including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction…[45]

And,

> The other party (DEUTSCHE BANK) is not acting as a fiduciary for or adviser to it (Taxpayer) in respect of this Transaction.[46]

Given this combination of technical market inexperience and the lack of any advisory assistance, it is my opinion that benefits related to centralized management could not be a valid business purpose for the Participants to contribute their offsetting options to the Partnerships.

Furthermore, it is my opinion that there were no "leveraging" benefits derived from pooling the assets of the Participants into the Partnerships. By leveraging benefits I refer specifically to the ability of the partnership to borrow cash based on the value of its assets. Given the characteristics of the offsetting options (including the short maturity and volatility) I conclude that DEUTSCHE BANK would not have allowed the Participants to borrow money against the collateral of these option pairs, regardless of the size of the positions

[45] DB COBRA 02443
[46] DB COBRA 02444