highlights a general lack of understanding about the actual education funding levels in this appropriations bill.

My votes on these Sense of the Senate amendments simply express my preference for spending reductions versus raising taxes or spending the Social Security surplus. In that there are many specific areas of federal spending that in my view can and should be cut back, I would prefer to see us balance the budget with reductions of that type. Unfortunately, gaining consensus on such reductions will be difficult, although I will continue to press for this type of approach. Failing that, some type of across-the-board reductions may be the last resort.

As I mentioned earlier, the education funding in this bill exceeds the levels requested by the Administration on many fronts. While it is impossible at this point to know exactly what the final spending level will be at the end of the day, even after including all of the President's emergency spending and a possible Balanced Budget Act of 1997 (BBA) pay-back bill, an across-the-board reduction, designed to protect Social Security, would result in approximately a 1.4 percent decrease.

Mr. President, even with a 1.4 percent reduction in discretionary funding, I would further note that special education and education impact aid would have funding levels $521 million and $143 million above the President's request levels, respectively. In addition, the Department of Education would be funded $10.6 million over that which the President requested. Far from under-funding education, this bill continues to provide strong support for our schools and our students.

We have almost completed our appropriations work this year, and I applaud the effort and dedication demonstrated by my colleagues on the Senate Appropriations Committee and in the Senate as whole. I hope, as we go into the final stages of this process, we will continue to abide by the ideals of responsibility, accountability and flexibility by upholding our promise to protect Social Security and by producing a final package which will serve Americans well.

I yield the floor.

---

## TAX RELIEF EXTENSION ACT OF 1999

Mr. LOTT. Mr. President, we have some very important extenders in the Tax Code that need to be acted on before the end of this year or they will expire. The Finance Committee, in a broad bipartisan way, reported out the bill. We have now cleared it on both sides. So this is very important to get it into conference with the House quickly so we can get this legislation completed before the year's legislative end.

Mr. President, I ask unanimous consent that the Senate now turn to the consideration of Calendar No. 346, S. 1792, the so-called Finance Committee extenders bill, and there be 10 minutes for debate, with no amendments or motions in order.

The PRESIDING OFFICER. The clerk will report the bill by title.

The legislative clerk read as follows:

A bill (S. 1792) to amend the Internal Revenue Code of 1986 to extend expiring provisions, to fully allow the nonrefundable personal credits against regular tax liability, and for other purposes.

There being no objection, the Senate proceeded to consider the bill.

Mr. BAUCUS. Mr. President, I express my support for this bill.

This bill is not perfect. There are many of us in the Senate who have hoped we could have done more. I have argued that the Research and Development tax credit should be made permanent for many years. Companies plan their research many years in advance, and we don't get the full benefit of the R&D credit by allowing it to expire so frequently.

I also support making the AMT exclusion in the bill permanent. Taxpayers should be assured they will receive the full benefits of the personal credits that we enacted with such fanfare just last session.

There are other credits in this bill that should be made permanent, such as the Work Opportunities and Welfare to Work tax credits. These credits help compensate companies for hiring those employees that are the hardest to employ and train—those coming off the welfare rolls.

But we cannot allow the perfect to be the enemy of the good. We stand here in the waning days of this session, and it appears as though enacting legislation that would make these credits permanent is simply not in the cards. They are expensive, and it is not possible to enact major tax legislation that uses a substantial portion of the surplus unless it is in the context of a comprehensive bill.

Above all, we must be fiscally responsible, and protect the surplus for our children and grandchildren.

This bill has been reviewed by all Senators and has received unanimous consent to proceed. I hope the Conferees on the bill will work out the differences between the House and Senate quickly, and send us back a bill the President can sign into law. Doing otherwise risks getting nothing at all, and allowing the gap since these important credits lapsed to grow. This would further undermine their effectiveness, and leave thousands of businesses and individuals with tremendous uncertainty about their tax liabilities for this year.

We cannot and should not leave this important work undone. We should restore these credits as soon as possible, even if that means leaving the debate about permanence for these credits for another day.

Mr. LOTT. Mr. President, I ask consent that following the conclusion or yielding back of time, the bill be advanced to third reading and passed and the motion to reconsider be laid upon the table. I further ask consent that the bill remain at the desk, and once the Senate receives the House companion bill, the Senate proceed to its immediate consideration and all after the enacting clause be stricken, the text of the Senate bill be inserted, the bill be advanced to third reading and passed. I further ask consent that the Senate insist on its amendment, request a conference with the House, and the Chair be authorized to appoint conferees on the part of the Senate, and passage of the Senate bill be vitiated and it be placed back on the calendar.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

The bill (S. 1792) was read the third time and passed, as follows:

S. 1792

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; ETC.**

(a) SHORT TITLE.—This Act may be cited as the "Tax Relief Extension Act of 1999".

(b) AMENDMENT OF 1986 CODE.—Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1986.

(c) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; etc.

TITLE I—EXTENSION OF EXPIRED AND EXPIRING PROVISIONS

Sec. 101. Extension of minimum tax relief for individuals.
Sec. 102. Extension of exclusion for employer-provided educational assistance.
Sec. 103. Extension of research and experimentation credit and increase in rates for alternative incremental research credit.
Sec. 104. Extension of exceptions under subpart F for active financing income.
Sec. 105. Extension of suspension of net income limitation on percentage depletion from marginal oil and gas wells.
Sec. 106. Extension of work opportunity tax credit and welfare-to-work tax credit.
Sec. 107. Extension and modification of tax credit for electricity produced from certain renewable resources.
Sec. 108. Expansion of brownfields environmental remediation.
Sec. 109. Temporary increase in amount of rum excise tax covered over to Puerto Rico and Virgin Islands.
Sec. 110. Delay requirement that registered motor fuels terminals offer dyed fuel as a condition of registration.
Sec. 111. Extension of production credit for fuel produced by certain gasification facilities.

PENGAD-Bayonne, N.J.
GOVERNMENT EXHIBIT
Appendix A5

"A payment shall be treated as directly secured by an interest in an installment obligation to the extent an arrangement allows the taxpayer to satisfy all or a portion of the indebtedness with the installment obligation."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to sales or other dispositions occurring on or after the date of the enactment of this Act.

**SEC. 211. LIMITATION ON USE OF NONACCRUAL EXPERIENCE METHOD OF ACCOUNTING.**

(a) IN GENERAL.—Section 448(d)(5) (relating to special rule for services) is amended—

(1) by inserting "in fields described in paragraph (2)(A)" after "services by such person", and

(2) by inserting "CERTAIN PERSONAL" before "SERVICES" in the heading.

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply to taxable years ending after the date of the enactment of this Act.

(2) CHANGE IN METHOD OF ACCOUNTING.—In the case of any taxpayer required by the amendments made by this section to change its method of accounting for its first taxable year ending after the date of the enactment of this Act—

(A) such change shall be treated as initiated by the taxpayer,

(B) such change shall be treated as made with the consent of the Secretary of the Treasury, and

(C) the net amount of the adjustments required to be taken into account by the taxpayer under section 481 of the Internal Revenue Code of 1986 shall be taken into account over a period (not greater than 4 taxable years) beginning with such first taxable year.

**SEC. 212. DENIAL OF CHARITABLE CONTRIBUTION DEDUCTION FOR TRANSFERS ASSOCIATED WITH SPLIT-DOLLAR INSURANCE ARRANGEMENTS.**

(a) IN GENERAL.—Subsection (f) of section 170 (relating to disallowance of deduction in certain cases and special rules) is amended by adding at the end the following new paragraph:

"(10) SPLIT-DOLLAR LIFE INSURANCE, ANNUITY, AND ENDOWMENT CONTRACTS.—

"(A) IN GENERAL.—Nothing in this section or in section 545(b)(2), 556(b)(2), 642(c), 2055, 2106(a)(2), or 2522 shall be construed to allow a deduction, and no deduction shall be allowed, for any transfer to or for the use of an organization described in subsection (c) if in connection with such transfer—

"(i) the organization directly or indirectly pays, or has previously paid, any premium on any personal benefit contract with respect to the transferor, or

"(ii) there is an understanding or expectation that any person will directly or indirectly pay any premium on any personal benefit contract with respect to the transferor.

"(B) PERSONAL BENEFIT CONTRACT.—For purposes of subparagraph (A), the term 'personal benefit contract' means, with respect to the transferor, any life insurance, annuity, or endowment contract if any direct or indirect beneficiary under such contract is the transferor, any member of the transferor's family, or any other person (other than an organization described in subsection (c)) designated by the transferor.

"(C) APPLICATION TO CHARITABLE REMAINDER TRUSTS.—In the case of a transfer to a trust referred to in subparagraph (E), references in subparagraphs (A) and (F) to an organization described in subsection (c) shall be treated as a reference to such trust.

"(D) EXCEPTION FOR CERTAIN ANNUITY CONTRACTS.—If, in connection with a transfer to or for the use of an organization described in subsection (c), such organization incurs an obligation to pay a charitable gift annuity (as defined in section 501(m)) and such organization purchases any annuity contract to fund such obligation, persons receiving payments under the charitable gift annuity shall not be treated for purposes of subparagraph (B) as indirect beneficiaries under such contract if—

"(i) such organization possesses all of the incidents of ownership under such contract,

"(ii) such organization is entitled to all the payments under such contract, and

"(iii) the timing and amount of payments under such contract are substantially the same as the timing and amount of payments to each such person under such obligation (as such obligation is in effect at the time of such transfer).

"(E) EXCEPTION FOR CERTAIN CONTRACTS HELD BY CHARITABLE REMAINDER TRUSTS.—A person shall not be treated for purposes of subparagraph (B) as an indirect beneficiary under any life insurance, annuity, or endowment contract held by a charitable remainder annuity trust or a charitable remainder unitrust (as defined in section 664(d)) solely by reason of being entitled to any payment referred to in paragraph (1)(A) or (2)(A) of section 664(d) if—

"(i) such trust possesses all of the incidents of ownership under such contract, and

"(ii) such trust is entitled to all the payments under such contract.

"(F) EXCISE TAX ON PREMIUMS PAID.—

"(i) IN GENERAL.—There is hereby imposed on any organization described in subsection (c) an excise tax equal to the premiums paid by such organization on any life insurance, annuity, or endowment contract if the payment of premiums on such contract is in connection with a transfer for which a deduction is not allowable under subparagraph (A), determined without regard to when such transfer is made.

"(ii) PAYMENTS BY OTHER PERSONS.—For purposes of clause (i), payments made by any other person pursuant to an understanding or expectation referred to in subparagraph (A) shall be treated as made by the organization.

"(iii) REPORTING.—Any organization on which tax is imposed by clause (i) with respect to any premium shall file an annual return which includes—

"(I) the amount of such premiums paid during the year and the name and TIN of each beneficiary under the contract to which the premium relates, and

"(II) such other information as the Secretary may require.

The penalties applicable to returns required under section 6033 shall apply to returns required under this clause. Returns required under this clause shall be furnished at such time and in such manner as the Secretary shall by forms or regulations require.

"(iv) CERTAIN RULES TO APPLY.—The tax imposed by this subparagraph shall be treated as imposed by chapter 42 for purposes of this title other than subchapter B of chapter 42.

"(G) SPECIAL RULE WHERE STATE REQUIRES SPECIFICATION OF CHARITABLE GIFT ANNUITANT IN CONTRACT.—In the case of an obligation to pay a charitable gift annuity referred to in subparagraph (D) which is entered into under the laws of a State which requires, in order for the charitable gift annuity to be exempt from insurance regulation by such State, that each beneficiary under the charitable gift annuity be named as a beneficiary under an annuity contract issued by an insurance company authorized to transact business in such State, the requirements of clauses (i) and (ii) of subparagraph (D) shall be treated as met if—

"(i) such State law requirement was in effect on February 8, 1999,

"(ii) each such beneficiary under the charitable gift annuity is a bona fide resident of such State at the time the obligation to pay a charitable gift annuity is entered into, and

"(iii) the only persons entitled to payments under such contract are persons entitled to payments as beneficiaries under such obligation on the date such obligation is entered into.

"(H) MEMBER OF FAMILY.—For purposes of this paragraph, an individual's family consists of the individual's grandparents, the grandparents of such individual's spouse, the lineal descendants of such grandparents, and any spouse of such a lineal descendant.

"(I) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this paragraph, including regulations to prevent the avoidance of such purposes."

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as otherwise provided in this section, the amendment made by this section shall apply to transfers made after February 8, 1999.

(2) EXCISE TAX.—Except as provided in paragraph (3) of this subsection, section 170(f)(10)(F) of the Internal Revenue Code of 1986 (as added by this section) shall apply to premiums paid after the date of the enactment of this Act.

(3) REPORTING.—Clause (iii) of such section 170(f)(10)(F) shall apply to premiums paid after February 8, 1999 (determined as if the tax imposed by such section applies to premiums paid after such date).

**SEC. 213. PREVENTION OF DUPLICATION OF LOSS THROUGH ASSUMPTION OF LIABILITIES GIVING RISE TO A DEDUCTION.**

(a) IN GENERAL.—Section 358 (relating to basis to distributees) is amended by adding at the end the following new subsection:

"(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY.—

"(1) IN GENERAL.—If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability—

"(A) which is assumed in exchange for such property, and

"(B) with respect to which subsection (d)(1) does not apply to the assumption.

"(2) EXCEPTION.—Paragraph (1) shall not apply to any liability if the trade or business giving rise to the liability is transferred to the person assuming the liability as part of the exchange.

"(3) LIABILITY.—For purposes of this subsection, the term 'liability' shall include any obligation to make payment, without regard to whether the obligation is fixed or contingent or otherwise taken into account for purposes of this title.

"(4) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of this subsection."

Case 1:06-cv-00245-EJD Document 57-6 Filed 04/21/2008 Page 3 of 3



(b) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS.—The Secretary of the Treasury or his delegate shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code (as added by subsection (a)) in transactions involving partnerships.

(c) EFFECTIVE DATES.—

(1) IN GENERAL.—The amendments made by this section shall apply to assumptions of liability after October 18, 1999.

(2) RULES.—The rules prescribed under subsection (b) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

**SEC. 214. CONSISTENT TREATMENT AND BASIS ALLOCATION RULES FOR TRANSFERS OF INTANGIBLES IN CERTAIN NONRECOGNITION TRANSACTIONS.**

(a) TRANSFERS TO CORPORATIONS.—Section 351 (relating to transfer to corporation controlled by transferor) is amended by redesignating subsection (h) as subsection (i) and by inserting after subsection (g) the following new subsection:

"(h) TREATMENT OF TRANSFERS OF INTANGIBLE PROPERTY.—

"(1) TRANSFERS OF LESS THAN ALL SUBSTANTIAL RIGHTS.

"(A) IN GENERAL.—A transfer of an interest in intangible property (as defined in section 936(h)(3)(B)) shall be treated under this section as a transfer of property even if the transfer is of less than all of the substantial rights of the transferor in the property.

"(B) ALLOCATION OF BASIS.—In the case of a transfer of less than all of the substantial rights of the transferor in the intangible property, the transferor's basis immediately before the transfer shall be allocated among the rights retained by the transferor and the rights transferred on the basis of their respective fair market values.

"(2) NONRECOGNITION NOT TO APPLY TO INTANGIBLE PROPERTY DEVELOPED FOR TRANSFEREE.—This section shall not apply to a transfer of intangible property developed by the transferor or any related person if such development was pursuant to an arrangement with the transferee."

(b) TRANSFERS TO PARTNERSHIPS.—Subsection (d) of section 721 is amended to read as follows:

"(d) TRANSFERS OF INTANGIBLE PROPERTY.—

"(1) IN GENERAL.—Rules similar to the rules of section 351(h) shall apply for purposes of this section.

"(2) TRANSFERS TO FOREIGN PARTNERSHIPS.—For regulatory authority to treat intangibles transferred to a partnership as sold, see section 367(d)(3)."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to transfers on or after the date of the enactment of this Act.

**SEC. 215. DISTRIBUTIONS BY A PARTNERSHIP TO A CORPORATE PARTNER OF STOCK IN ANOTHER CORPORATION.**

(a) IN GENERAL.—Section 732 (relating to basis of distributed property other than money) is amended by adding at the end the following new subsection:

"(f) CORRESPONDING ADJUSTMENT TO BASIS OF ASSETS OF A DISTRIBUTED CORPORATION CONTROLLED BY A CORPORATE PARTNER.—

"(1) IN GENERAL.—If—

"(A) a corporation (hereafter in this subsection referred to as the 'corporate partner') receives a distribution from a partnership of stock in another corporation (hereafter in this subsection referred to as the 'distributed corporation'),

"(B) the corporate partner has control of the distributed corporation immediately after the distribution or at any time thereafter, and

"(C) the partnership's adjusted basis in such stock immediately before the distribution exceeded the corporate partner's adjusted basis in such stock immediately after the distribution,

then an amount equal to such excess shall be applied to reduce (in accordance with subsection (c)) the basis of property held by the distributed corporation at such time (or, if the corporate partner does not control the distributed corporation at such time, at the time the corporate partner first has such control).

"(2) EXCEPTION FOR CERTAIN DISTRIBUTIONS BEFORE CONTROL ACQUIRED.—Paragraph (1) shall not apply to any distribution of stock in the distributed corporation if—

"(A) the corporate partner does not have control of such corporation immediately after such distribution, and

"(B) the corporate partner establishes to the satisfaction of the Secretary that such distribution was not part of a plan or arrangement to acquire control of the distributed corporation.

"(3) LIMITATIONS ON BASIS REDUCTION.—

"(A) IN GENERAL.—The amount of the reduction under paragraph (1) shall not exceed the amount by which the sum of the aggregate adjusted bases of the property and the amount of money of the distributed corporation exceeds the corporate partner's adjusted basis in the stock of the distributed corporation.

"(B) REDUCTION NOT TO EXCEED ADJUSTED BASIS OF PROPERTY.—No reduction under paragraph (1) in the basis of any property shall exceed the adjusted basis of such property (determined without regard to such reduction).

"(4) GAIN RECOGNITION WHERE REDUCTION LIMITED.—If the amount of any reduction under paragraph (1) (determined after the application of paragraph (3)(A)) exceeds the aggregate adjusted bases of the property of the distributed corporation—

"(A) such excess shall be recognized by the corporate partner as long-term capital gain, and

"(B) the corporate partner's adjusted basis in the stock of the distributed corporation shall be increased by such excess.

"(5) CONTROL.—For purposes of this subsection, the term 'control' means ownership of stock meeting the requirements of section 1504(a)(2).

"(6) INDIRECT DISTRIBUTIONS.—For purposes of paragraph (1), if a corporation acquires (other than in a distribution from a partnership) stock the basis of which is determined in whole or in part by reference to subsection (a)(2) or (b), the corporation shall be treated as receiving a distribution of such stock from a partnership.

"(7) SPECIAL RULE FOR STOCK IN CONTROLLED CORPORATION.—If the property held by a distributed corporation is stock in a corporation which the distributed corporation controls, this subsection shall be applied to reduce the basis of the property of such controlled corporation. This subsection shall be reapplied to any property of any controlled corporation which is stock in a corporation which it controls.

"(8) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection, including regulations to avoid double counting and to prevent the abuse of such purposes."

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in paragraph (2), the amendment made by this section shall apply to distributions made after July 14, 1999.

(2) PARTNERSHIPS IN EXISTENCE ON JULY 14, 1999.—In the case of a corporation which is a partner in a partnership as of July 14, 1999, the amendment made by this section shall apply to distributions made to such partner from such partnership after the date of the enactment of this Act.

**SEC. 216. PROHIBITED ALLOCATIONS OF STOCK IN S CORPORATION ESOP.**

(a) IN GENERAL.—Section 409 (relating to qualifications for tax credit employee stock ownership plans) is amended by redesignating subsection (p) as subsection (q) and by inserting after subsection (o) the following new subsection:

"(p) PROHIBITED ALLOCATIONS OF SECURITIES IN AN S CORPORATION.—

"(1) IN GENERAL.—An employee stock ownership plan holding employer securities consisting of stock in an S corporation shall provide that no portion of the assets of the plan attributable to (or allocable in lieu of) such employer securities may, during a nonallocation year, accrue (or be allocated directly or indirectly under any plan of the employer meeting the requirements of section 401(a)) for the benefit of any disqualified person.

"(2) FAILURE TO MEET REQUIREMENTS.—

"(A) IN GENERAL.—If a plan fails to meet the requirements of paragraph (1), the plan shall be treated as having distributed to any disqualified person the amount allocated to the account of such person in violation of paragraph (1) at the time of such allocation.

"(B) CROSS REFERENCE.—

**"For excise tax relating to violations of paragraph (1) and ownership of synthetic equity, see section 4979A.**

"(3) NONALLOCATION YEAR.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'nonallocation year' means any plan year of an employee stock ownership plan if, at any time during such plan year—

"(i) such plan holds employer securities consisting of stock in an S corporation, and

"(ii) disqualified persons own at least 50 percent of the number of shares of stock in the S corporation.

"(B) ATTRIBUTION RULES.—For purposes of subparagraph (A)—

"(i) IN GENERAL.—The rules of section 318(a) shall apply for purposes of determining ownership, except that—

"(I) in applying paragraph (1) thereof, the members of an individual's family shall include members of the family described in paragraph (4)(D), and

"(II) paragraph (4) thereof shall not apply.

"(ii) DEEMED-OWNED SHARES.—Notwithstanding the employee trust exception in section 318(a)(2)(B)(i), individual shall be treated as owning deemed-owned shares of the individual.

Solely for purposes of applying paragraph (5), this subparagraph shall be applied after the attribution rules of paragraph (5) have been applied.

"(4) DISQUALIFIED PERSON.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'disqualified person' means any person if—

"(i) the aggregate number of deemed-owned shares of such person and the members of such person's family is at least 20 percent of the number of deemed-owned shares of stock in the S corporation, or