# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## Nos. 06-245T, 06-246T, and 06-247T
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

______________

## UNITED STATES' ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6

Pursuant to RCFC 56(h)(2), the United States submits the following additional Proposed Findings of Uncontroverted Facts in further support of its opposition to Plaintiffs' Motion for Partial Summary Judgment as to the Validity of Treasury Regulation § 1.752-6.

1. COBRA is an acronym for Currency Options Bring Reward Alternatives. See e.g., COBRA Powerpoint, Govt. App. A at pp.126-144, Govt. Ex. 9.

2. The COBRA transaction was designed in the months of September and October of 1999 by the national accounting firm Ernst & Young, LLP ("E&Y"), with the assistance of the Chicago law firm of Jenkens & Gilchrist ("J&G") and Deutsche Bank A.G. ("DB"). See e.g., Govt. App. A at pp.1-278 and 291-345, Govt. Exs. 1-13 and 17-24.

3. J&G and DB were already marketing a similar product known as the Option Partnership Strategy ("OPS") structured with a net premium to DB equal to 1% of the desired tax loss and a potential payoff equal to 2 X the net premium, or 2% of the desired tax loss. See Govt. App. A at pp.243-290, Govt. Exs. 13 and 16.

4. The OPS strategy and its genesis are described in *The Diversified Group, Incorporated v. Daugerdas*, 139 F.Supp.2d 445 (2001 S.D.N.Y.), in which The Diversified Group, alleged that Paul Daugerdas, the newly-appointed head of J&G's recently- formed Chicago office, had stolen its tax shelter product. *See The Diversified Group, Incorporated v. Daugerdas*, 139 F.Supp.2d 445 (2001 S.D.N.Y.),

5. In its suit against J&G, DGI broadly defined its stolen OPS product as follows: "The option partnership strategy is a tax-saving strategy wherein a taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increased basis in the partnership interest. As a result of these trades and transfer, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of purchased call options, but is not reduced as a result of the

partnership's assumption of the taxpayer's obligation with respect to the written call options." *See The Diversified Group, Incorporated v. Daugerdas*, 139 F.Supp.2d at 449.

6. The COBRA and OPS transactions are both predicated upon the use of nearly off-setting digital option contracts. See Govt. App. A at pp.243-290, Govt. Exs. 13 and 16.

7. In the late fall of 1999, J&G and DB implemented 105 OPS transactions. See Govt. App. A at pp.243-290, Govt. Exs. 13 and 16.

8. Concurrently, J&G and DB also implemented 15 COBRA transactions for E&Y. See Govt. App. A at pp.243-290, Govt. Exs. 13 through16.

9. The 15 1999 COBRA transactions generated noneconomic tax losses totaling $834 million. See Govt. App. A at pp.1-144 and 243-286, Govt. Exs. 1 through 9 and 13 through 15.

10. The OPS and COBRA transactions were designed to accomplish the same tax-driven objective and differed only slightly in their terms. The engine driving both transactions was offsetting foreign currency digital options: a purchased (or long) option and a sold (or short) option. See Govt. App. A at pp.1-399, Govt. Exs. 1 through 30.

11. As structured, the offsetting digital options of both OPS and COBRA provided a net payoff at a pre-agreed upon multiple of the net premium. See Govt. App. A at pp.1-399, Govt. Exs. 1 through 30.

12. In the instance of the OPS transactions, the net premium was equal to 1% of the desired loss, with the possibility of a payoff equal to 2 X the net premium. See Govt. App. A at pp.243-278, Govt. Ex. 13.

13. In the case of COBRA, the net premium was equal to 5% of the desired loss, with a possibility of a payoff equal to 2.5 X the net premium. See Govt. App. A at pp.126-144, 271-278, and 470-475,Govt. Exs. 9, 13 and 41.

14. At the end of 1999, E&Y decided to implement its COBRA product in 2000 without J&G. Notwithstanding these cosmetic changes, these offsetting option transactions were both designed to generate an artificially-inflated basis of a taxpayer's partnership interest, which, in turn, could be used to generate massive tax losses, and thereby eliminate a wealthy taxpayer's unrelated taxable income. However, on January 5, 1999, E&Y decided that it would no longer market its COBRA product in light of IRS Notice 99-59 and the likely issuance of retroactive Treasury Regulations. See Govt. App. A at pp.350-352, Govt. Ex. 27. Nevertheless, E&Y decided to allow the Murphy COBRA transaction, for which COBRA engagement letters had already been signed in December, to proceed, subject to Addendum to those engagement letters dated February 4, 2000, under which the Murphy participant agreed, *inter alia*, that

> The client will to hold Ernst & Young or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering the COBRA strategy.

Govt. App. A at pp.400-440, Govt. Exs. 31 and 32. For the 2000 COBRA structure implemented without J&G the net premium was reduced from 5% to 3% of the desired loss, with a possibility of a net payoff also reduced from 2.5 times the net premium (or 2.5:1) to 2.25 times the net premium (or 2.25:1). See 1999 COBRA Powerpoint, Govt. App. A at pp.126-144, Govt. Ex. 9; 2000 COBRA Powerpoint, Govt. App. A at pp.126-

144, Govt. Exs. 29 and 30; and Lindquist Declaration ¶34, summarizing Plaintiff Exs. A15 to A24, Plaintiff's Appendix, pp. 45-71.

15. E&Y began marketing the COBRA transaction in the fall of 1999. See Govt. App. A at pp.1-399, Govt. Exs. 1 through 30.

16. Both E&Y and J&G required so-called "targets" (potential COBRA purchasers) to sign a non-disclosure agreement ("NDAs"). See Govt. App. A at pp.218-242, 341-343, and 456-457, Govt. Exs. 12, 23 and 24, 36.

17. The J&G NDA expressly disclosed J&G's role as a promoter and disclaimed any fiduciary relationship with the target. See Govt. App. A at pp.221-223 at p.223 ¶6.

18. In addition to being required to sign NDAs, targets were not allowed to retain any of the marketing materials. See COBRA Action Workplan, Govt. App. A at pp.291-314, Govt. Exs. 17 through 20.

19. Both of these limitations appear to have been imposed upon potential clients in order to minimize the possibility that the COBRA transactions might be disclosed to the IRS. See Govt. App. A at pp.348-349, Govt. Ex.26.

20. In the marketing of the program, targets were typically shown a template J&G draft legal opinion blessing the transaction for federal income tax purposes. See J&G draft legal opinion dated November 5, 1999, Govt. App. A at pp.400-426, Govt. Ex. 31.

21. To assist in choreographing the intricately sequenced steps of this transaction, the promoters not only developed a COBRA power point, but a "COBRA Client Questionnaire" and a "COBRA Action Workplan." See Govt. App. A at pp.1-22, 236-244, 291-314, Govt. Exs. 1 through 3, 9, and 17 through 20.

22. The COBRA Power Point was used to market the product to potential clients and generally details the overall steps, with particular focus on the planned tax benefits. See Govt. App. A at pp.318-340, Govt. Ex. 9.

23. The COBRA Client Questionnaire was designed to provide J&G the necessary information to implement the transaction, detailing both the amount and the character of the desired tax loss. See Govt. App. A at pp.315-340 and 348-445, Govt. Exs. 21-22, and 34.

24. The COBRA Action Workplan was then to be used by E&Y to monitor the planned choreography. See Govt. App. A at pp.291-314, Govt. Ex. 17-20.

25. The COBRA Power Point provides a good overview of the transaction, which slides can be briefly summarized as follows:

   a. Step One: Purchase/Sale of Offsetting Option Contracts. Each individual simultaneously buys (goes long) and sells (goes short) digital foreign currency options at nearly identical strike prices, creating a position consisting of two offsetting options. See Govt. App. A at pp.126-144 at 130, Govt. Ex. 9.

   b. Step Two: Transfer of Offsetting Options to Partnership. The individuals transfer the offsetting foreign currency option positions to a "newly formed general partnership." In calculating their basis in the partnership, the taxpayers take into account the stated premium of the long option and ignore the offsetting stated premium received for the short option. In addition, the individuals contribute cash equal to two per cent of the "desired loss" (i.e., the stated premium on the

long option) to the partnership. See Govt. App. A at pp.126-144 at 131, Govt. Ex. 9.

c. Step Three: Termination of Options and Acquisition of Assets. The digital foreign currency options expire either in or out of the money, resulting in a gain or loss. The COBRA Presentation then states, “[i]f ordinary loss is desired, spot foreign currency will be purchased by the partnership. If capital loss is desired, capital assets will be purchased.” See Govt. App. A at pp.126-144 at 132, Govt. Ex. 9.

d. Step Four: Transfer of Partnership Interests to S Corp. The individuals transfer their entire interest in the partnership to a newly formed S corporation, which results in the technical termination of the partnership for federal income tax purposes. See Govt. App. A at pp.126-144 at 133, Govt. Ex. 9.

e. Step Five: Distribution of Partnership Assets to S Corp and Their Sale. The partnership liquidates and distributes its assets to the S corporation. Under I.R.C. § 362(a), the taxpayers’ artificially-inflated outside basis in the now-dissolved partnership carries over and becomes the basis of the distributed stock and/or foreign currency distributed to the S corporation. The S corporation then “sells the stepped-up assets [i.e. the foreign currency or securities] to an unrelated third party, generating a loss for tax purposes.” See Govt. App. A at pp.126-144 at 134, Govt. Ex. 9.

f. Although not specified on the COBRA Powerpoint, the final step of the transaction was the payment of fees and preparation and issuance to the taxpayers

in the following tax year of two separate legal opinions to support COBRA's claimed tax benefits. See Govt. App. A at pp.427-433 and 446-455, Govt. Ex. 32 and 35.

26. E&Y charged a fee of 1.5.% of the taxpayers' desired loss and J&G charged a fee equal to 3% of the taxpayers' desired loss, net of the fee to be charged by Brown & Wood. See COBRA Engagement Letter, Govt. App. A at pp.279-282 and 446-455, Govt. Exs. 14 and 35.

27. J&G prepared one of the two legal opinions and because of J&G's status as a co-promoter, E&Y recruited the law firm of Brown & Wood, L.L.P. ("B&W") to prepare a second legal opinion. See Govt. App. A at pp.28-125 and 145-214, Govt. Exs. 6-8 and 10.

28. E&Y substituted the law firm of Proskauer Rose ("PR") for the law firms of J&G and B&W at a substantially reduced fee E&Y and PR charged the Murphy family an aggregate fee equal to 2.5% of $100,300,000, the amount of the tax loss that they claimed from their COBRA transaction. Of this amount, E&Y first billed amounts totaling 2%. PR then billed amounts totaling .41%. Then E&Y billed the S-Corporations an additional .09%. See E&Y and PR invoices, Govt. App. A at pp.472-501, Govt. Exs. 36 and 37; Table 5, Summary of Transaction Related Legal and Accounting Fees, prepared by Government Expert David LaRue, Ph.D., Dkt. 46-6, page 87 of 233, Pltf's. App. Ex. 3, p.170. PR was involved in the implementation of the 2000 COBRA transactions, including the formation of the entities and the drafting of the implementing

documents, upon which it then issued purported legal opinions blessing its implementation of the transaction. See Pltf. App. A, Exs. A1-A16., A29-A36.

29. The steps to the implementation of the Murphy transaction otherwise follow the same structure as the 1999 COBRA transactions. See Expert Report prepared by Government Expert David LaRue, Ph.D. See pp.15-78, Dkt. 46-6, pp.21-84 of 233, Pltf's. App. Ex. 3, pp.104-167.

Respectfully submitted,

/s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2008, I electronically filed the foregoing **UNITED STATES' ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Joel N. Crouch
Texas State Bar No. 05144220
Meadows, Collier, Reed
Cousins & Blau, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

s/ John A. Lindquist
John A. Lindquist
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
(202) 307-5892