# EXHIBIT G10

**Burnside, Sandra L.**

| | |
|---|---|
| **From:** | Robert B. Coplan [robert.coplan@ey.com] |
| **Sent:** | Friday, November 12, 1999 8:50 AM |
| **To:** | PDaugerdas@jenkens.com |
| **Cc:** | Richard J. Shapiro; Brian L. Vaughn |
| **Subject:** | Brown & Wood Involvement |

Brown & Wood COLTA Opinion 11-...

May I send a copy of your opinion letter to RJ Ruble at Brown & Wood, so that he can begin checking issues for consistency of treatment? Do you need a NDA from him or is there mutual respect among opinion writers? He asked me to send the attached copy of his opinion to you, which describes the basic option spread strategy, but of course he has not had the facts tailored for our particular structure yet.

We still need to agree on the way that the fees will be billed from the three parties. We are wondering if the LLC is a good candidate. We realize that this will not support an above-the-line deduction of fees, but we are generally uncomfortable with the 162 approach using the S corp. Our fees are hard to charge to the S corp since it is not in existence when our services are rendered (except for the possible audit representation, which will really be for the individuals).

Also, the 2-partner AOL deal out of DC with Charlie Paul will come in at $200M and I believe is already in process with Donna. RJ agreed to a fee for that transaction of $150K. Grady is fine with that fee. I will try to pull together the list of known deals with the opinion letter fees and send to you with a copy to RJ so there will not be any misunderstandings.

GOVERNMENT EXHIBIT 10

PENGAD 800-631-6989





Confidential J&G Docs
JG-NC047817
JG013324_0001

**THIS MODEL OPINION ADDRESSES CERTAIN U.S. FEDERAL INCOME TAX ISSUES SOLELY FOR THE PURPOSE OF FACILITATING AN ANALYSIS OF THE ISSUES, BASED ON THE HYPOTHETICAL FACT PATTERN SET FORTH BELOW. THIS MODEL IS NOT ADDRESSED TO ANY PARTICULAR PARTY AND DOES NOT ADDRESS THE FACTS OF ANY PARTICULAR TRANSACTION. THE ACTUAL FACTS AND CIRCUMSTANSCE OF A PARTICULAR TRANSACTION OR A PARTICULAR INVESTOR CANNOT BE KNOWN IN ADVANCE, AND MAY SUBSTANTIALLY ALTER THE ANALYSIS SET FORTH BELOW. THUS, THIS DRAFT CANNOT, AND IS NOT INTENEDED, TO CONSTITIUTE AN OPINION OR TO MEET THE REQUIREMENTS OF TREASURY DEPARTMENT CIRCULAR 230 REGARDING OPINIONS BY TAX PRACTITONERS. A PROSPECTIVE INVESTOR SHOULD BE AWARE THAT, WITH RESPECT TO ANY POTENTIAL TRANSACTION IN CONNECTION WITH WHICH THIS DRAFT IS REVIEWED OR TAX ADVICE OF THIS FIRM IS OTHERWISE REFERRED TO IN COMMUNICATIONS, AN OPINION SATISFYING THE REQUIREMENTS OF TREASURY DEPARTMENT 230 MUST BE ISSUED BY THIS FIRM OR ANOTHER COMPETENT TAX PRACTITIONER, INCLUDING BUT NOT LIMITED TO COUNSEL TO THE PROSPECTIVE INVESTOR, AS THE FACTS RELEVENT TO SUCH OPINION BECOME AVAILABLE.**

[Date], 1999

[Addressee]
[Address]

Re: Investments in Foreign Currency

Ladies and Gentlemen:

Addressee ("Investor") has requested our opinion regarding certain U.S. Federal income tax consequences of various investment transactions ("Transactions"), described more fully below, that it has made in foreign currency, directly and through the use of options.

I. Summary of the Transactions

A. Fund

[Investment Fund], a domestic limited liability company that we have assumed has not and will not elect to be treated as a corporation for U.S. Federal income tax purposes, ("Fund") was formed on [date]. Fund was formed for the purpose of acquiring financial investments, buying and selling options on foreign currency, and conducting other investment activities. Fund initially had two members, A, Inc., a domestic corporation, ("A")[1] and D Incorporated, a domestic corporation, ("D"). A and D were both Managers of Fund. (A and D are hereinafter collectively referred to as the "Managers".) On [date], the Managers each contributed $_______ for a 50% membership interest in the Fund.

---

1 Based on materials provided by the Managers, A was formed in 1999. Prior to forming A principals of A were portfolio managers to hedge funds having approximately $30 billion in assets.



Confidential J&G Docs
JG-NC047818
JG013325_0001

B. Investment in Foreign Currency Options

On [date], Investor entered into a series of four over-the-counter, non-publicly traded foreign currency option transactions with an independent financial institution ("Bank"). The first was the purchase of a European-style foreign currency I ("FC I")-settled digital put option on FC I, [date] Expiration Date, [date] Settlement Date, reference number _______, for a premium of $_______ ("FC I Long Option"). The second was the sale of a European-style FC I-settled digital put option on FC I, [date] Expiration Date, [date] Settlement Date, reference number _______, for a premium of $_______ ("FC I Short Option"). The third was the purchase of a European-style foreign currency II ("FC II")-settled digital put option on FC II, [date] Expiration Date, [date] Settlement Date, reference number _______ for a premium of $_______ ("FC II Long Option"). The fourth was the sale of a European-style FC II-settled digital put option, [date] Expiration Date, [date] Settlement Date, for a premium of $_______ ("FC II Short Option"). (The forgoing transactions are hereinafter individually refered as an "Option" and collectively as the "Options".) The aggregate net cost to Investor from entering into the Options was $_______. Investor paid D an Investment banking fee of $_______ in connection with the transactions described herein.

Investor advised us in connection with rendering this opinion that, based upon advice Investor received from the Managers, although the Options by their terms did not provide for transferability, it was and is common market practice for options such as the Options to be sold or otherwise transferred.

C. Contribution to Fund

On [date], Investor contributed the Options to Fund in exchange for a __% membership interest in Fund. We have been advised by the Managers that at the time of such contribution the net value of the Options was $_______.

D. Fund Investments

In addition to the Options contributed by Investor, Fund entered into a series of similar foreign currency options involving foreign currency III and foreign currency IV.

E. Withdrawal from Fund



Confidential J&G Docs
JG-NC047819
JG013325_0002

On [date], Investor withdrew from Fund. In exchange for its membership interest Investor receive FC I _______ and FC II _______ having an aggregate U.S. dollar equivalent value of $_______. We have been advised by the Managers that such amounts equaled the fair market value of Investor's membership interest in Fund.

Managers have advised that following the withdrawal of Investor, Fund remained in existence and continued its investment activities.

F. Sale of Foreign Currency

On [date], Investor sold the foreign currency it had received upon its withdrawal from Fund for an aggregate consideration of $_______ based on then current spot rates. The sale settled on [date]. This compares to a net investment on [date] of $_______.

II. Representations:

A. Investor Representations:

For purpose of rendering our opinion, Investor has represented as follows:

1. Investor entered into the Options for substantial non-tax business reasons, including to produce an overall economic profit from the movement of FC I and FC II against the U.S. dollar.

2. Based upon Investor's own independent evaluation and upon the advice of Managers, Investor believed that by entering into the Options Investor could significantly leverage its investment in such currencies.

3. Based upon advice of the Managers as to the probability of the FC I and the FC II reaching certain levels upon which the Options were based, and upon Investor's own independent evaluation, Investor believed that Investor had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the transactions described herein, without regard to tax benefits.

4. Based on the advice of the Managers, and upon Investor's own independent evaluation, Investor had an opportunity to make an aggregate gross return of $_______ from its investment in the Options, but could suffer a loss equal to the Options' aggregate net cost of $_______ and the investment banking fee of $_______.

5. Investor contributed the Options to Fund for substantial non-tax business reasons, including diversification of its portfolio without the need for additional investment the professional management provided by the Managers, and the desire to create larger pool of capital through the involvement of other investors such as the Managers.

6. Each of the Long Options and the Short Options was entered into as a separate contract; there is no contractual obligation to net transactions with respect to the Options, although in certain instances the parties thereto have the right to do so; and each of the Options can be assigned or liquidated independently of the other, upon the satisfaction of certain credit terms.

7. Based upon the advice of Managers, (x) the Options are not regulated futures contracts within the meaning of Code Section 1256(g)(1), (y) the Options are not listed options within the meaning of Code Section 1256(g)(5), and, (z)the price of the Options was not determined by reference to the price in the interbank market.

8. Investor uses the U.S. dollar as its functional currency.

9. Investor is not related to the other members of Fund.

10. Whether and when Investor terminated Investor's investment in Fund was within Investor's sole discretion and control.

11. There existed no understanding, agreement, obligation, or arrangement pursuant to which any of the parties described herein committed to undertake all or any of the transactions described above upon the happening of any other transaction, except to the extent that Investor (and Fund as transferee of Investor) and Bank were contractually obligated to perform under the Options in accordance with their stated terms.

12. Investor has not entered into a confidentiality agreement, or otherwise agreed (orally or in writing) to any obligations of confidentiality with respect to the transactions described herein.

11. Investor has reviewed the description of the transactions contained herein and such description is accurate and complete.

B. Fund Representations:

For purpose of rendering our opinion, Fund has represented as follows:

1. Fund has not made an election under Code Section 754 and will not do so for the taxable year in which the transactions described above occur.

2. Fund entered into the transactions described above for substantial non-tax business reasons, including to produce an overall profit from investments in foreign and foreign currency options.

## III. Conclusions

In rendering our opinions, we have reviewed representations and advice, including financial information, from various parties to the transactions described herein and made certain assumptions, which representations, advice and assumptions are referred to below. In rendering our opinions, we have also examined such agreements, certificates, instruments, and documents, and we have made such other inquires of officers, owners and representatives of the entities involved in the transactions described herein as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, records, agreements, certificates, instruments, documents, and responses to such inquiries. If any such representations, advice, assumptions, records, agreements, certificates, instruments, documents, or responses is inaccurate in any material respect, or any such agreements, certificates, instruments, and documents prove not to be authentic the opinions contained herein may not be relied upon. In rendering our opinion, we have reviewed the applicable provisions of the Code and of the final, temporary, and proposed Treasury Regulations ("Treas. Reg." or "Treasury Regulations") promulgated thereunder; relevant decisions of the U.S. Federal courts; published Revenue Rulings ("Rev. Rul.") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service ("IRS"); and such other materials as we have considered relevant. In certain instances we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

Although we are not representing D in connection with the transactions described herein, in the past we have represented D and persons affiliated with D with respect to certain matters and may continue to do so in the future. You have agreed to waive any legal conflict that may arise from such past or future representation.

Based on and subject to the summary set out at I above and the analysis of the pertinent statutory provisions at Sections IV. A-H below, as affected by the analysis of the statutory

provisions and legal doctrines at IV. I below, all as of the date hereof, we are of the opinion that for U.S. Federal income tax purposes it is more likely than not that:

1. Fund would be classified as a partnership;

2. The Options would be treated as separate instruments;

3. Investor would not recognize material taxable gain or any taxable loss upon the contribution of the Options to Fund;

4. At the time of the contribution of the Options to the Fund, the Short Options would not be considered liabilities for purposes of Code Section 752 and would not be considered liabilities within the meaning of Section 213 of S. 1792, the Tax Relief Extension Act of 1999 ("S. 1792");

5. Investor's basis in its interest in Fund would be equal to Investor's basis in the Long Options, reduced by the amount of liabilities as determined for purposes of Code Section 752 assumed by Fund and increased by Investor's share of such liabilities;

6. Investor would not recognize gain or loss on the receipt of foreign currency from Fund in exchange for its membership interest in Fund;

7. The basis of the foreign currency received in liquidation of Investor's interest in Fund would equal Investor's basis in its interest in Fund immediately before the liquidating distribution; and

8. The gain or loss recognized by Investor on the sale of the foreign currency would be treated as ordinary income or loss.

We wish to point out that our opinion is not binding upon the IRS or a court of law.

## IV. Analysis

### A. Fund as a Partnership

Treas. Reg. §301.7701-2(b)(1)-(8) describes certain entities that are classified as corporations for U.S. Federal income tax purposes. Treas. Reg. § 301.7701-3 provides that an entity not described in Teas. Reg. §301.7701-2(b)(1), (3), (4), (5), (6), (7), or (8) is considered to be an "eligible entity", which may elect to be classified as a corporation or, if it has 2 or more owners, a partnership. Treas. Reg. §301.7701-(3)(b)(1) provides that a domestic eligible entity



Confidential J&G Docs
JG-NC047823
JG013325_0006

that has two or more members and does not elect to be classified as a corporation will be classified as a partnership for U.S. Federal income tax purposes.

Based on the facts set forth above, it is more likely than not that Fund would constitute a domestic eligible entity. Consequently, if Fund does not elect to be classified as a corporation, it is more likely than not that Fund would be treated as a partnership for U.S. Federal income tax purposes.[2]

**B. Options as Separate Instruments**

In determining the U.S. Federal income tax consequences of the transactions, it must be determined whether each of the Long Options and the Short Options would be treated as separate instruments or the Options would be integrated in some way.

---

[2] We have been advised that Fund will maintain capital accounts and make allocations of items of income, gain, deduction, loss and credit in accordance with Code Section 704 and the Treasury Regulations promulgated thereunder. It should be noted that a partner's basis in his or her partnership interest and the partner's capital account in the partnership are not necessarily the same. See, Willis, Pennel, Postlewaite, Partnership Taxation, Vol. 1, ¶5.02 (6th Ed. 1997). See, also, Treas. Reg. §1.704-1(b)(2)(4)(g)(1), which reflects this rationale.

Establishment and maintenance is of a partnership's capital accounts is governed by the rules of Treas. Reg. §1.704-1(b)(2)(iv). Treas. Reg. §1.704-1(b)(2)(iv)(b)(2) provides that a partner's capital account is increased by "the fair market value of property contributed by him to the partnership (net of liabilities secured by such contributed property that the partnership is considered to assume or take subject to under section 752)". Treas. Reg. §1.704-1(b)(2)(iv)(b) provides:

> For purposes of this paragraph (b)(2)(4), the fair market value assigned to property contributed to a partnership... will be regarded as correct, provided that (1) such value is reasonably agreed to among the partners in arm's-length negotiations, and (2) the partners have sufficiently adverse interests. Valuation of property contributed to the partnership... shall be on a property-by-property basis....

We assume that the amount of a partner's capital account affects the amount that a partner will receive on liquidation of the partnership or his or her interest therein, the partners have adverse interests.

Although the short position is not a liability, by accepting it represents the assumption of the partnership of an economic undertaking. In that regard it is analogous to assuming a Code Section 752 liability and furthermore is consistent with establishing a capital account for Investor that reflects Investor's economic interest in the partnership. Lastly, nothing in Treas. Reg. §1.704-1(b)(2)(iv)(b) would appear to prevent the partners from agreeing to a negative value for an item of contributed property if in fact that item of property reflects a real economic cost to the partnership. Such an approach appears to be consistent with the revaluation rules of Treas. Reg. §1.704-1(b)(2)(iv)(f) and the book value adjustment rules of Treas. Reg. §1.704-1(b)(2)(iv)(g).

Each Option can be transferred or assigned independently, an important factor in determining if two instruments should be treated as one. For example, Congress needed to add Code Section 269B to the Code to provide special rules for the treatment of a stapled entity. A stapled entity is one where the stock of one entity cannot be traded without trading the stock of the other entity. The legislative history of this provision indicates that the law in this regard was unclear. Staff of the Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Tax Reform Act of 1984, 98th Cong., 2d Sess., 454 (1984). We are not aware of any efforts by Congress to treat non-stapled entities as a single entity.

Further, both Fund and Bank retain real net economic risk which they will not hedge with each other. Treas. Reg. §1.446-4 provides that the timing of income, gains, deduction and losses from a heDng transaction match those of the hedged transaction. A hedge is a transaction entered into in the normal course of a taxpayer's trade or business. It is more likely than not that Treas. Reg. §1.446-4 would not apply to the Long Options and the Short Options, because these Options were entered into as an investment activity, not as a trade or business. Treas. Reg. §1.446-4(a) and Treas. Reg. §1.1221-2(b).

Third, the Treasury has issued detailed, complex rules governing foreign currency transactions. Under these Regulations, Code Section 988 transactions may not be integrated. Treas. Reg. §1.988-1(e) provides in relevant part:

> [T]he amount of exchange gain or loss from a section 988 transaction shall be separately computed for each section 988 transaction, and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the section 988 transaction).

As discussed below, the acquisition and disposition of each of the Long Options and the Short Options are Code Section 988 transactions.

In addition, Congress has recognized that separate instruments are generally given separate effect, even when one transaction may significantly offset the risk of the other. See, e.g., Code Section 1092 (loss on one position of a straddle is deferred until gain is recognized on the offsetting position; the offsetting positions are not netted); Code Section 1258 (recharacterizing certain gain attributable to the time value of a taxpayer's investment as ordinary income, not purporting to recharacterize the transaction as a borrowing) and Code Section 1259 (constructive sale provision).



Confidential J&G Docs
JG-NC047825
JG013325_0008

Finally, case law recognizes that a taxpayer can hold long and short positions in property at the same time, and that each position is a separate property. In Smith v. Commissioner, 78 T.C. 350 (1982), aff'd, 820 F.2d 1220 (4th Cir. 1987), the court held that each leg of a straddle should be treated as separate property, whether the legs were acquired at different times or at the same time. See also, Stoller v. Commissioner, 994 F.2d 855 (DC Cir. 1993) aff'g in part and rev'g in part, 60 TCM (CCH) 1554 (1990) (separate contracts were respected); Richardson v. Commissioner, 121 F.2d 1 (2d Cir. 1941) (can hold long and short positions at the same time). See, also, Rev. Proc.65-29, 1965-2 CB 1023; Rev. Rul. 78-182, 1978-1 CB 265.

Consequently, based on the foregoing, it is more likely than not that the Options would be treated as separate instruments.

C. Contribution of the Options to Fund

1. General Rule

Code Section 721 (a) and Treas. Reg. §1.721-1 generally provide that no gain or loss is recognized by either the partnership or any partner in the case of a contribution of property to the partnership in exchange for a partnership interest. Although the term "property" is not defined in subchapter K of the Code, its common meaning implies that to be property an asset or right must involve some potential economic return (even if that return would not generate a profit). For example in Dillon v. U.S., an unreported District Court case unofficially reported at 84-2 USTC ¶9921 (S.D. Tex, 1981), the Court held that a contractual right to participate as a partner in a second partnership constituted property contributed to the first partnership for purposes of Code Section 721. Furthermore, although neither the Code nor the Regulations define the term "property" under Code Section 721, that section is similar to Code Section 351 in the corporate context, where the term "property" is given a broad interpretation, and serves to distinguish services from property. See also, Stafford v. U.S., 611 F.2d 990 (5th Cir. 1980); PLR 8225069 (3/24/82).

Consequently, it is more likely than not that the Long Options would qualify as property for purposes of Code Section 721 and that Code Section 721 would generally apply to the contribution of the Long Options by Investor to Fund. There is less certainty regarding whether the Short Options also constitute property or rather represent undertakings of Investor assumed by Fund. However, as discussed above, the concept of property for this purpose is very broad and could be read to include a contractual arrangement endowing the taxpayer with the

opportunity to realize an economic return. See, Dillon v. U.S., supra, As discussed below, even if the Short Options were not property for purposes of Code Section 721, , it is more likely than not that they would not constitute liabilities of Investor within the meaning of Code Section 752.

2. Investment Partnership Rules

Notwithstanding that Code Section 721(a) generally provides for non recognition of gain or loss upon the contribution of property to a partnership. Code Section 721(b) provides that the nonrecognition rule of Code Section 721(a) does not apply to gain realized on a transfer of property to a partnership that would be treated as an investment company within the meaning of Code Section 351. Thus, gain, but not loss, will be recognized, if the partnership would be an investment company within the meaning of Code Section 351 were it incorporated.

Code Section 351(e) merely provides that gain will be recognized on a transfer of property to an investment company. Treas. Reg. §1.351-1(c)(1) elaborates on this provision by providing that property will be considered transferred to an investment company if:

(i) The transfer results, directly or indirectly, in diversification of the transferors' interests, and

(ii) The transferee is (a) a regulated investment company, (b) a real estate investment trust, or (c) a corporation more than 80% of the value of whose assets (excluding cash and nonconvertible debt obligations from consideration) are held for investment and are readily marketable stocks or securities, or interests in regulated investment companies or real estate investment trusts.

Treas. Reg. §1.351-1 (c)(5) clarifies that diversification occurs if two or more persons transfer nonidentical assets to the corporation, unless these assets are an insignificant portion of the total value of the assets transferred.

The second requirement is that the transferee must be a regulated investment company, a real estate investment trust, or a company more than 80% of the value of whose assets are held for investment. This determination is generally made immediately after the transfer. Treas. Reg. §1.351-1(c)(2).

Code Section 351(e), as amended by the Taxpayer Relief Act of 1997 ("Act") provides that the determination of whether a company is an investment company is made by taking into account all stock and securities held by the company, and by treating as stock and securities for

this purpose, among other things, money, stocks and other equity interests in a corporation, evidences of indebtedness, options, forwards or futures contracts, derivatives, foreign currency, any other asset specified in Treasury Regulations and, equity interests in non-corporate entities that are readily convertible into or exchangeable for such assets. To date, the IRS has not issued any such Regulations.

Based on the expanded definition provide by the Act, it is more likely than not that Fund would qualify as an investment company within the meaning of Code Section 351(e), because its assets consist of cash, foreign currency and derivative contracts on foreign currency, including options on foreign currency. Fund would thus satisfy the asset test. Investor's contribution of the Options will diversify Investor's interests because Investor will share in the other investments of Fund, rather than merely Investor's own foreign currency investments. Consequently, under Code Section 721(b), it is more likely than not that Investor would recognize gain to the extent of any appreciation in the value of any of the Options at the time of its contribution to Fund, but would not recognize any loss with respect to any depreciation in value. Given the fact that each of the Options was contributed to Fund shortly after its acquisition, it is more likely than not that any such gain would not be material and, under Code Section 722, would increase investor's basis in its membership interest in Fund.

3. Code Section 1256

Code Section 1256(c)(1) provides that the mark-to-market rules of Code Section 1256(a) apply to the termination or transfer of a taxpayer's rights or obligations with respect to a "section 1256 contract" during the year by assignment, lapse, or otherwise. The contribution of the Options to Fund could trigger gain or loss recognition under the Code Section 1256(a) mark-to-market rules were the Option's section 1256 contracts, notwithstanding the rules of Code Section 721. However, given the fact that the Options were contributed to Fund shortly after their acquisition, it is more likely than not that any such gain would not be material.

Code Section 1256(b) defines a "section 1256 contract" as (i) a regulated futures contract within the meaning of Code Section 1256(g)(1), (ii) a nonequity option within the meaning of Code Section 1256(g)(3), (iii) a dealer equity option within the meaning of Code Section 1256(g)(4), and (iv) a foreign currency contract within the meaning of Code Section 1256(g)(2). As set forth above, Investor has represented based on the advice of the Managers that the Options are not regulated futures contracts within the meaning of Code Section 1256(g)(1).

Code Section 1256(g)(3) defines a nonequity option as any listed option, within the meaning of Code Section (g)(5) that is not an equity option. Code Section 1256(g)(6) defines an equity option as an option to buy or sell stock or an option the value of which is directly or indirectly determined by reference to one or more stocks or a stock index. It is more likely than not that the Options would not be equity options under this definition. Code Section 1256(g)(5) defines a listed option as any option listed on, or subject to the rules of, a qualified board or exchange. Code Section 1256(g)(7) defines a qualified board or exchange as a national securities exchange that is registered with the SEC; a domestic board of trade designated as a contract market by the CFTC; or any other exchange, board of trade or other market that the Treasury determines has certain rules. In the instant case, the Options are not listed on a CFTC-designated contract market, and based upon the advice of Managers, Investor has represented to us that the Options are not listed options within the meaning of Code Section 1256(g)(5). Consequently, it is more likely than not that the Options would not be nonequity options within the meaning of Code Section 1256(g)(3).

Code Section 1256(g)(4) defines a dealer equity option as, among other things, an equity option. As discussed above, it is more likely than not that the Options would not be equity options, and therefor it is more likely than not that the Options would not be dealer equity options within the meaning of Code Section 1256(g)(4).

Code Section 1256(g)(2)(A) defines a foreign currency contract to mean a contract that (i) settles in or with reference to a currency in which positions are traded through regulated futures contracts; (ii) is traded in the interbank market; and (iii) is entered into at an arm's length price determined by reference to the price in such market. The legislative history of Code Section 1256 assumed that the IRS would provide guidance through Revenue Rulings, Notices, etc. as to the types of contracts that would fall within this definition. H.R. Conf. Rpt. No. 986, 97th Cong., 2d Sess., 25 (1982). No such guidance has yet been published.

Although one of the parties to the Options, Bank, is a person who is eligible to participate in the interbank market, the Options themselves are not ones that are so traded and Investor has represented, based upon the advice of the Managers that the price of the Options was not determined by reference to the price in the interbank market. The scope of this provision regarding foreign currency contracts is evidenced in the legislative history, which reflects the fact that interbank trading was substantially similar to regulated futures contracts:



Confidential J&G Docs
JG-NC047829
JG013325_0012

> Trading in foreign currency for future delivery is conducted through regulated futures contracts, and is also conducted through contracts negotiated with any one of a number of commercial banks which comprise an informal market for such trading (bank forward contracts). . . . Although bank forward contracts differ from regulated futures contracts, the volume of trading through forward contracts in foreign currency in the interbank market is substantially greater than foreign currency trading on futures exchanges, and prices are readily available.

S. Rep. No. 475, 97th Cong., 2d Sess. 26 (1982).

The conference report further emphasized the requirement of pricing the option with reference to the interbank market by stating:

> The [Conference Committee] amendment provides that these contracts *must be entered into* at arm's length *at a price determined by reference to the price in the interbank market* ....[emphasis added]

H.R. Conf. Rep. No. 986, 97th Cong., 2d Sess. 25 (1982).

Consequently, although there is no authority on point, it is more likely than not that the Options would not be considered foreign currency contracts within the meaning of Code Section 1256(g)(2).

Based upon the foregoing, it is more likely than not that the contribution of the Options by Investor to Fund would not be a transaction subject to the mark-to-market rules of Code Section 1256.

4. Code Section 1234(b)

Code Section 1234(b) provides that gain or loss with respect to any "closing transaction" with respect to the option by the grantor of an option will be treated as short-term capital gain or loss. Code Section 1234(b)(2)(A) broadly defines a "closing transaction" as any termination of the taxpayer's obligation under an option, other than through the exercise or lapse of the option. Code Section 1234(b)(2)(A) was enacted as part of the Tax Reform Act of 1976. According to the legislaive history, the purpose of enacting such subsection was to eliminate the ability of taxpayers from entering into certain tax strategies that would permit them to obtain ordinary and

capital gain through the use of certain transactions in which the taxpayer had the right to treat the acquisition of an offsetting option as a "closing transaction" which caused the recognition of income. See, H. Rpt. No. 94-1192, 94th Cong., 2d Sess., 5 (5/26/76). The closing transactions that were intended to be addressed were those described in a series of widely circulated private letter rulings issued to the Chicago Board Options Exchange ("CBOE"). In these, the IRS, among other things, that certain set off transactions that the taxpayer elected to treated as "closing transactions" under the CBOE rules were recognition events.[3] Consequently, it appears that Code Section 1234(b) merely determines character of recognized gain or loss and does not itself create a recognition event.

As discussed above, Code Section 721(a) generally provides that no gain or loss is recognized upon the transfer of property to a partnership and it is more likely than not that the Options would be property for this purpose. Consequently, because it is more likely than not that the transfer of the Options by Investor to Fund would be a nonrecognition event under Code Section 721, it is more likely than not that Code Section 1234(b)(2) would not independently cause gain or loss to be recognized by Investor on the transfer.

In the context of non-traded options, the IRS has ruled that the assumption by an acquiring corporation in a corporate reorganization of warrants to purchase the target company's stock does not constitute a closing transaction, because the option did not lapse nor did the grantor's obligation terminate. Rather, the grantor's to issue stock pursuant to the warrants was assumed by the acquiror. PLR 8038087 (6/26/80) and PLR 79038018 (6/19/79)[4]. Although not directly on point such private letter rulings support the proposition that the assumption of an obligation to perform under an option in the context of a nonrecognition transaction is not a transaction on gain or loss is recognized under Code Section 1234(b).

---

[3] Although the legislative history did not cite such private letter rulings, one appears to be 7404080200A. Subsequently, in Rev. Rul. 78-182, 1978-1 CB 265, the IRS described the U.S. Federal income tax treatment of transactions in options traded over the Chicago Board Options Exchange, Incorporated ("CBOE"). The IRS pointed out that if a taxpayer acquired an offsetting option and declared the transaction a "closing transaction", under the CBOE rules the taxpayer would be released from liability to settle closed option. In the Ruling the IRS treated such a release from liability as a recognition event. See, Rev. Rul. 78-182, B.2.

[4] Code Section 6110(j)(3) provides that a written determination, (e.g., a private ruling, determination letter, or technical advice memorandum), may not be used or cited as precedent. However, in Xerox Corp. v. U.S., 656 F.2d 659 (Ct. Cl. 1931), the court noted that although private letter rulings have no precedential value, "they are helpful, in general, in ascertaining the scope of the ... doctrine adopted by the Service and in

D. Basis of Partnership Interest

1. In General

Code Section 722 provides, in general, that the basis of a partnership interest to the partner is equal to the amount of money plus the adjusted basis of the property contributed to the partnership, increased by the amount of gain, if any, recognized by the partner on the contribution. Consequently, it is more likely than not that Investor's basis in Fund would be equal to the basis of the Long Options, increased by the gain recognized on the contribution.

It is more likely than not that the transfer would be viewed as a contribution of the Long Options to Fund and Fund's assumption of the Short Options. The IRS might assert that Investor acquired an economic unit and that its basis should be its net cost or $_______. In addition, the IRS might assert that Investor acquired the Long Options in exchange, in part, for undertaking the obligations under the Short Options. The IRS would then assert that the obligation is too contingent to provide basis in the Long Options, leaving Investor with a basis of $_______. As discussed at B., above, such positions are not supported by case law, which, as discussed above, recognizes and respects the separate nature of the transactions. In Smith v. Commissioner, supra, the court held that straddle legs should be treated as separate property whether acquired at different times or at the same time. See also, Stoller v. Commissioner, supra; Arnall v. United States, a District Court case unofficially reported at 59-2 USTC ¶9779 (ND Ga. 1959). As discussed above, it is more likely than not that the Options would be treated as separate instruments.

Code Section 752(b) provides that any decrease in a partner's share of the partnership liabilities or the assumption by the partnership of a partner's individual liabilities is treated as a distribution of money from the partnership to the partner. Under Code Section 733, a partner's basis in the partnership interest is decreased by the amount of money and the adjusted basis of property other than money distributed to a partner other than in liquidation of the partner's interest. Thus, if the potential claims by Bank against Investor under the Short Options were considered liabilities for purposes of Code Section 752, Investor's basis in Fund would be reduced by such, but would be increased by Investor's share, as determined under Code Section 752, of the liabilities of Fund, including the Short Options. In addition, the amount of such

---

showing that the doctrine has been regularly considered and applied by the Service."

liabilities would be treated as additional consideration received by Investor on the sale or redemption of its interest in Fund. See, Code Section 752(d).

2. **Short Options as Liabilities**

(a) **Code Section 752 In General**

Code Section 752 itself does not define the term "liabilities." In 1988, the IRS issued temporary and proposed Regulations under Code Section 752 (T.D. 8237, December 30, 1988), concerning the treatment of partnership liabilities. In Temp. Treas. Reg. §1.752-1T(g) the IRS defined the term "liability" for purposes of Code Section 752 as follows:

> an ***obligation is a liability*** of the obligor for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such liability gives rise to -
>
> (1) The creation of, or increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
>
> (2) A deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3) An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital. [emphasis added]

In 1991, the IRS replaced these temporary and proposed Regulations with permanent Regulations. These new Regulations (T.D. 8380, 12/23/91) eliminated, without explanation, the definition of "liability" that was contained in the temporary and proposed Regulations. Nevertheless, because the definition in the 1988 temporary and proposed Regulations was based on pre-existing interpretations, and is supported by the legislative history of the Deficit Reduction Act of 1984, it may still be viewed as applicable.

The IRS's Revenue Rulings defining the term "liability" in the context of Code Section 752 tend to be consistent with the definition in the 1988 Regulations, requiring both an obligation and the creation of either basis, a deduction, or an expenditure that is neither deductible or chargeable to capital. However, it does not appear that the IRS has taken the position that a liability arises prior to the time an obligation would be considered to a rise under the general Federal income tax principles.



Confidential J&G Docs
JG-NC047833
JG013325_0016

The view that that the IRS has taken the position that a liability does not arise prior to the time an obligation would be considered to a rise under the general Federal income tax principles is confirmed in Revenue Ruling 73-301, 1973-2 CB 215. In the Ruling, the IRS ruled that interim payments received by a partnership for services rendered in connection with a long-term contract reported on the completed contract method do not constitute liabilities for purposes of Code Section 752. Instead, the ruling characterizes such payments as "unrealized receivables", the income from which increases the basis of partners' interest only when recognized by the partnership for tax purposes. The Ruling emphasizes that the partnership had fully earned the payments and was under no obligation to return them or perform additional services to retain them. Although the partnership received money, there was no attendant legally binding obligation to repay and, consequently, no liability. See also, Kovtan v. Comm'r, 54 T.C. 331, 338 (1970), aff'd per curiam, 448 F.2d 1268 (9th Cir. 1971);[5] Rev. Rul. 81-241, 1981-2 CB 146. The IRS's position in Revenue Ruling 73-301 is consistent with the position of the Tax Court in Helmer v. Commissioner, T.C. Memo. 1975-160, discussed below.

The courts have also held that unmatured claims are not liabilities under Code Section 752. In Long v. Comm'r, 71 T.C. 1 (1978), aff'd and remanded, 660 F.2d 416 (10th Cir. 1981), the court considered whether contested liabilities were liabilities within the meaning of Code Section 752. The partnership in this case was in the construction business and was sued for defects in a building. The suits were pending when one of the partners died, raising the question of the partnership basis. The court rejected the argument that the contingent claims were liabilities for purposes of Code Section 752, stating:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life-TWA and USF&G claims are not "liabilities" for partnership basis purposes at least until they have become fixed or liquidated. This Court has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. . . . We think that partnership liabilities should be treated in the same manner. . . . We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and

---

5 In Kovtan v. Comm'r, no interest deduction was allowed to a partnership where a note was found to be unenforceable. This implies that the note was not an obligation of the partnership.



Confidential J&G Docs
JG-NC047834
JG013325_0017

> neither party suggests such a distinction. Those liabilities should be taken into account only when they are fixed or paid. . . .
>
> The Kansas City Life-TWA and USF&G claims were too contingent at the death of the decedent to be included in the estate's initial computation of its basis in the decedent's partnership interest. Liability for those claims had not been established and was in fact contested. Moreover, the amounts of damages sought were by no means definite or fixed.

71 T.C. at 7-8 [Citations omitted].

The Tax Court again held contingent claims are not liabilities within the meaning of Code Section 752 in La Rue v. Commissioner, 90 T.C. 465 (1988). The taxpayers in this case were general partners of Goodbody & Co., a stock brokerage firm. Because of its inability to keep up with the trading volume, Goodbody incurred large "back-office" liabilities due to the following types of transactions: (i) the failure to purchase securities at a stated price; (ii) the failure to sell securities at a stated price; (iii) differences between the securities actually held and the securities the partnership should have held; and (iv) the failure to receive dividends or interest on securities held for customers. Goodbody was fully liable for the losses represented by these errors. Another firm acquired the assets and assumed the liabilities of Goodbody for an amount equal to the difference between the fair market value of the assets and the liabilities. In an attempt to minimize their gain, the partners sought to increase their basis in Goodbody by including the reserves for the back office claims as partnership liabilities under Code Section 752. The court rejected this attempt, noting that the reserves were for potential liabilities, and that the amount of the liabilities was speculative and could not be determined with reasonable accuracy.

> Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. Essentially, Goodbody's books were in error because of the back office problems, and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no

> way of determining the amount of loss, or in some circumstances, gain.
>
> Petitioners have not shown that these amounts were determinable with reasonable accuracy. As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. In addition, the exact amount of loss or gain was not determinable until actual purchase or sale. Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs. The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with "reasonable accuracy." A loss is not determinable until the securities are actually purchased or sold and the transaction closed. We accordingly hold that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970, they cannot be included in the partners' bases in that year.

90 TC at 479.

The court stated that the "all events" test of Code Section 461 (a), which is used to determine when an expense can be accrued for deduction purposes, should also be applied to determine when a liability is fixed or definite and thus includible in basis. In La Rue, the claims or obligations were too speculative and contingent to be accrued as an expense, and therefore could not be included in basis. In the present situation, at the time of the transfer the claims of Bank against Investor under the Short Options are entirely speculative and contingent, and the amount thereof cannot be determined.

By analogy, under Code Section 246(c)(4) and its predecessors, the IRS has ruled that the rights of a counterparty against the writer of an out-of-the-money call option do not mature into a legal obligation, until the counterparty exercises its rights under the option. Code Section 246 deals with the ability of a corporation to claim a dividends received deduction with respect to a

dividend received from another corporation if the recipient has held the payor's stock for a requisite period of time. Code Section 246(c)(4) states in relevant part:

> The holding periods determined for purposes of the subsection shall be appropriately reduced...for any period in which –
>
> (A) the taxpayer has an option to sell, is under a contractual obligation to sell, or has made (and not closed) a short sale of, substantially identical stock or securities....

As noted, the statute itself distinguishes between a "contractual obligation to sell" and an "option to sell", implying that an option is not such an obligation. Furthermore, the IRS has specifically recognized this distinction and has ruled in Rev. Rul. 80-238, 1980-2 CB 96, that the writing of a call that is not in-the-money[6] does not create an obligation to sell the referenced stock or security for purposes of the predecessor of Code Section 246(c)(4). This analysis was elaborated upon in G.C.M. 38305 (3/12/80), issued in connection with Rev. Rul. 80-238, which states in part:

> The writing of a call on stock owned as in the present case provides the purchaser of the call with an option to buy the underlying at a specified price within a stated period of time. See, Rev. Rul. 58-234, 1958-1 C.B. 279. If the market price of the stock were to fall during such period, reasonable business practise would dictate that the call holder not exercise his option to obtain the underlying stock since the same stock could be purchased on the open market at the lower figure. See, Rev. Rul. 78-128, 1978-1 C.B.

Thus, the IRS appears to take the position for purpose of Code Section 264(c)(4) that until the purchaser of the call option exercises his option, the writer of the call option is under no obligation to sell the referenced stock or security and that the writer does not take the option into account for purposes of Code Section 246(c)(4) prior to that time.

In Old Harbor Native Corp. v. Comm'r, the Tax Court analyzed an option contract as having two elements: "(1) a continuing offer to do an act, or to forbear from doing an act, which

---

6 See, Progressive Corp. v. U.S., 970 F.2d 188 (6th Cir. 1992), which cites Rev. Rul. 80-238 for this proposition and distinguishes in-the-money call options.



Confidential J&G Docs
JG-NC047837
JG013325_0020

does not ripen until the contract is accepted; and (2) an agreement to leave the offer open for a specified or reasonable period of time." See also, Rev. Rul. 58-234, 1958-1 CB 279. This analysis is also consistent with the view expressed in Rev. Rul. 80-238, supra, that the writer of a call option is obligated to perform if and when the holder exercises his or her option.[7] This position is also consistent with Long v. Comm'r, supra, in which claims were not recognized as a liability where liability for the claims had not been established and was contested.

Bank's claims against Investor under the Short Options is similar to the back office claims in La Rue, but is even less certain. Investor only has an obligation to make a payment under the Short Options if the value of the foreign currency exceeds the strike price on the expiration date. Whereas in La Rue, Goodbody had an obligation to its customers for its back office failures at the time they occurred and was merely waiting to see if claims would be filed to determine the extent and amount of its liability. More analogous is Long, where liability for the claims had not been established and was contested. Furthermore, under Rev. Rul. 80-238, supra, and G.C.M. 38305 (3/12/80), it appears that the IRS view is that the obligation of the writer of a call option that is not in-the-money does not arise prior to the exercise of the option by the holder. Accordingly, it is more likely than not that Bank's claim against Investor under a Short Option would not be considered a liability of Investor at the time of the transfer of the Options to Fund for purposes of Code Section 752.

(b) The Helmer Case

In what appears to be the only decided case on point, the Tax Court agreed with the IRS that the holder's claim against the grantor of an option is not a liability within the meaning of Code Section 752. In Helmer v. Commissioner, T.C. Memo. 1975-160, a partnership sold an option to purchase land that it owned and distributed the premium to the partners. The taxpayer asserted that the holder's claim against the partnership to perform under the option was a liability for purposes of Code Section 752, and thus increased his basis in his partnership interest. If the option were not considered a liability, then the amount of the premium distributed would exceed the partner's basis in the partnership, and the partner would recognize gain on the excess under Code Section 731. The court agreed with the IRS that the holder's claim against the partnership to perform under the option did not create a liability to the partnership. The partnership had no

7 See, FSA 199904033. Although an FSA does not constitute authority that can be relied upon by a taxpayer, it is useful in understanding the author's position on issues the addressed therein.

obligation to return the premium, and the premium had no restriction on its use, other than that it would be credited against the purchase price if the option were exercised.

> The option agreement, however, created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future. Therefore we hold that no liability arose under Code Section 752 and the partners' bases cannot be increased by such amounts. 34 TCM (CCH) at 731.

Likewise, a Short Option contract creates no obligation to return the premium to the purchaser. Indeed, the premium represents deferred income to the seller and is not a liability.

Consequently, based upon the Helmer case, it is more likely than not that a Short Option would not be considered a "liability" for purposes of Code Section 752.

(c) Treatment of Short Sales

In Revenue Ruling 95-26, 1995-1 CB 131, the IRS ruled that a partnership obligation to return securities sold short creates a partnership liability for purposes of Code Section 752. The Ruling addressed each prong of the obligation/deduction-basis-capital test. First, it maintained that a short sale created an obligation to return the securities borrowed to effect the sale. Second, the ruling maintains that the cash proceeds of the short sale create a partnership asset, thereby increasing basis and bringing the obligation within the definition of liability based upon the logic of Revenue Ruling 88-77.[8]

---

8 Revenue Ruling 95-45, 1995-1 CB 53 applies a similar analysis to characterize the short-sale obligation of a shareholder who contributes its interest in the sales proceeds, in conjunction with a Code Section 351 incorporation of a going business, as a liability for purposes of Code Section 357 (which treats liabilities transferred in incorporations as taxable "boot" to the extent in excess of the basis of the transferred property) and Code Section 358 (which treats transferred liabilities as money received in calculating the basis of the transferor's stock). Applying the same reasoning as in Revenue Ruling 95-26, Revenue Ruling 95-45 cites Deputy v. du Pont for the proposition that a short sale creates an obligation to return the borrowed securities. Because that obligation results in an increase in asset basis, the ruling concludes that the obligation constitutes a "liability," even though acknowleDng that the sales proceeds are not currently taxable. In contrast, Revenue Ruling 95-8, although issued in conjunction with the other two rulings, holds that an exempt organization's income from a short sale does not result in unrelated business taxable income under Code Section 511 from "debt-financed property" under Code Sections 512(b)(4) and 514(a) and (b). Its rationale is that there is no "acquisition indebtedness" within section 514(c) because under Deputy v. du Pont, 308 U.S. 488 (1940) a short-sale obligation creates an "obligation" but not an "indebtedness."

A holder's claim against the writer of an out-of-the-money call option is clearly distinguishable from the obligation created under a short sale. As discussed above, a short sale must always be closed through the seller purchasing and delivering the borrowed securities. The uncertain features are the price at which the securities will be acquired, and when the short sale will be closed. In contrast, the seller of an option does not know whether he will ever be called on to perform under the option. Options often expire unexercised. The seller's obligation is uncertain and speculative, similar to the obligations in Long, and as recognized in Rev. Rul. 80-238, supra, and G.C.M. 38305 (3/12/80). Even in the case of a cash-settled option, such as the Short Options, the obligation of the writer to make a payment, which is analogous to the consummation of the stock sale described in Rev. Rul. 80-238, supra, and G.C.M. 38305 (3/12/80) is dependent upon price movement of the asset subject to the contract over the term of the contract, or in the case of a European style option, at the option's termination date.

Based upon the foregoing, it is more likely than not that Rev. Rul. 95-26, supra, would be distinguishable from sale of a Short Option, because the short sale creates a legally enforceable obligation to deliver securities. It is the creation of such an enforceable obligation, coupled with the receipt of sale proceeds by the partnership allowed the IRS to bootstrap itself into the liability conclusion reached by the Ruling. See, also Rev. Rul. 88-77, 1988-2 CB 129, cited in the Ruling, that also involved noncontingent, legally enforceable obligations. As discussed above, the obligation to perform under an option is not treated as fixed or legally enforceable at the time the option is entered into.[9]

---

[9] Rev. Rul. 95-74, 1995-2 CB 36, the IRS concluded that contingent environmental liabilities are not liabilities for purposes of Code Section 358/357(c), but, while admitting that the liabilities were not fixed or enforceable, the Ruling reached its conclusion by relying on Code Section 357(c)(3)(A), which excludes deductible liabilities from Code Section 357(c). This Ruling could be read as treating contingent liabilities as liabilities under Code Section 357(c) (and presumably the partnership analog of Code Section 752) unless they do not give rise to an asset, are deductible, or otherwise fit within an exception under Code Section 357(c)(3). However, this reading is belied by a recent FSA in which the Service issue of whether a contingent liability is the type of liability that is to be taken into account for purposes of I.R.C. sections 357 and 358. However, because of the specific language of I.R.C. sections 357(c)(3) and 358(d) (2), as interpreted by Rev. Rul. 95-74, 1995-2 C.B. 36, we do not believe that it is necessary to address this broader issue. That is, we will assume for purposes of the following discussion that such contingent liability is the type of liability to be taken into account currently under I.R.C. sections 357 and 358.9" The FSA then goes on to analyze the obligations under Code Section 357(c)(3). However, this reading is belied by a recent FSA in which the Service faced the issue of whether a contingent liability is the type of liability that is to be taken into account for purposes of I.R.C. sections 357 and 358. The FSA stated: "However, because of the specific language of I.R.C. sections 357(c)(3) and 358(d)(2), as interpreted by Rev. Rul. 95-74, 1995-2 C.B. 36, we do not believe that it is necessary to address this broader issue. That is, we will

(d) S. 1792

(i) Background

On October 19, 1999, the Joint Committee on Taxation released its "Description of Modified Chairman's Mark Relating to Expiring Tax Provisions" ("Description"). Section II of the Description described the Revenue Offset Provisions. Subsection M of Section II, was entitled "Prevent Duplication or Acceleration of Loss Through Assumption of Liabilities" ("Proposal") and proposed legislation to halt this perceived abuse.

On October 26, 1999 the Senate Finance Committee Chair, William Roth, introduced S. 1792. Act Section 213 adopted statutory language implementing the Proposal by amending Section 358 of the Internal Revenue Code of 1986, as amended ("Code"). To accompany the Act, the Senate Finance Committee prepared Report 106, "REPORT of the COMMITTEE ON FINANCE UNITED STATES SENATE to accompany S.____" ("Report"), which includes an explanation of each of the provisions of the Act, including Act Section 213.

Act Section 213 states:

> (a) IN GENERAL. – Section 358 (relating to basis to distributees) is amended by adding at the end the following new subsection:
>
> "(h) SPECIAL RULES FOR ASSUMPTION OF LIABILITIES TO WHICH SUBSECTION (d) DOES NOT APPLY. –
>
> "(1) IN GENERAL. – If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection

---

assume for purposes of the following discussion that such contingent liability is the type of liability to be taken into account currently under I.R.C. sections 357 and 358." The FSA goes on to analyze the obligations under Code Section 357(c)(3). See, 199905003 (10/29/98). Consequently, it appears that the Service has not reached the conclusion that contingencies themselves do not keep the obligation from being a "liability" for purposes of Code Sections 357/752.

The IRS has asserted its theory that a short sale creates a liability for Code Section 752 purposes in Salomon Financial Partners v. Comm'r, No. 3944-96 (Tax Court filed 3/5/96) and FFP Acquisition Partners, L.P. v. Comm'r, No. 3943-96 (Tax Court, filed 3/5/96). In each of these cases, the issue was whether a short sale obligation was a liability within the meaning of Code Section 752. The taxpayers have argued that the obligation is a contingent amount that could not be determined. The IRS used the same analysis as in Rev. Rul. 95-26. FFP Acquisition Partners was dismissed on May 22, 1997, because of jurisdictional issues.

(a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability –

"(A) which is assumed in exchange for such property, and

"(B) with respect to which subsection (d)(1) does not apply to the assumption.

"(2) EXCEPTION. – Paragraph (1) shall not give rise to any liability if the trade or business giving to the liability is transferred to the person assuming the liability as part of the exchange.

"(3) LIABILITY. – For purposes of this subsection, the term "liability" shall include any obligation to make payment, without regard to whether the obligation is fixed or contingent or otherwise taken into account for purposes of this title.

"(4) REGULATIONS. – The Secretary shall prescribe such regulations as may be necessary to carry our the provisions of the subsection."

(b) APPLICATION OF COMPARABLE RULES TO PARTNERSHIPS. – The Secretary of the Treasury or his delegate shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(b)(3) of such Code (as added by subsection (a)) in transactions involving partnerships.

(c) EFFECTIVE DATES. –

(1) IN GENERAL. – The amendments made by this section shall apply to assumptions of liability after October 18, 1999.

(2) RULES. – The rules prescribed under subsection (b) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules.

The Report follows the description of present law contained in the Proposal. The Report, however, provides more insight into the purpose of the amendment when it discusses the reason for the change. It states:

> The Committee is concerned about a type of transaction in which taxpayers seek to accelerate, and potentially duplicate, deductions involving certain liabilities. As an example, assume a transferor corporation transfers assets with a fair market

> value basis in exchange for preferred stock of the transferee corporation, plus the transferee's assumption of a contingent liability that is deductible in the future. The transferor claims a basis for the stock equal to the basis of transferred assets. However, the value of the stock is reduced by the amount of the liability, creating a potential loss. The transferor may then attempt to accelerate the deduction that would be attributable to the liability by selling or exchanging the stock. Furthermore, the transferee might take the position that it is entitled to deduct the payments on the liability, effectively duplicating the deduction attributable to the liability. [emphasis added]
>
> The conference report to the Taxpayer Refund and Relief Act of 1999 contained a provision that would have amended the "principal purpose" aspect of the anti-abuse rule. The Committee believes that a different approach is more appropriate; one that eliminates any loss on the sale of stock attributable to such liabilities.

In its explanation of the amendment, the Report generally follows the Proposal[10], but provides an illustration of the effect of the amendment in an example. The example provides:

> Assume a taxpayer transfers assets with an adjusted basis and fair market value of $100 to its wholly-owned corporation and the corporation assumes $40 of liabilities (the payment of which would give rise to a deduction). Thus, the value of the stock received by the transferor is $60. Under present law, the basis of the stock would be $100. The provision requires that the basis of the stock be reduced to $60 (i.e., a reduction of $40). The basis reduction would not be required if the transferred assets consisted of the trade or business with respect to which the liability arose. [emphasis added]

(ii) **Targeted Abuse: Transactions Relying Upon Revenue Ruling 95-74**

From the text of the Proposal and the Report, it appears that the target of the proposed legislation are tax strategies that make affirmative use of Code Section 357(c)(3), i.e. liabilities that give rise to a deduction and consequently are not taken into account for purpose of Code

---

10 The Report adds clarity to the Proposal in stating, after describing the fact that the provision does not apply where the trade or business giving rise to the liability is transferred as part of the exchange: "Nor does the provision change the tax treatment with respect to the transferee corporation."



Confidential J&G Docs
JG-NC047843
JG013325_0026

Sections 357 and 358. Such liabilities were addressed in Rev. Rul 95-74, 1995-2 CB 36, which was specifically referred in footnote 19 of the Proposal.

Code Section 357(c)(3)(A) provides that for purposes of Code Section 357(c), the term "liability" does not include any liability the payment of which would give rise to a deduction.[11] When Code Section 357(c) was amended by adding Section 357(c)(3), Code Section 358(d) was also amended by adding Code Section 358(d)(2). Code Section 358(d)(2) provides that liabilities excluded under Code Section 357(c)(3) will not be treated as money received by the transferor under Code Section 358(d)(1).[12] The IRS specifically addressed a transaction involving such liabilities in Rev. Rul. 95-74, supra.

Rev. Rul. 95-74, supra, involved the transfer by a corporation ("P") of an ongoing business to a newly formed subsidiary ("S") in an exchange governed by Code Section 351. In connection with the transfer S agreed to assume certain contingent environmental liabilities associated with the transferred business assets. The Ruling provided that P had no plan or intention to dispose of the S stock it received in the exchange. Rev. Rul. 95-74 addressed two issues:

(i) Whether contingent environmental liabilities assumed by S should be treated as liabilities for purposes of Code Section 357(c)(1) and Code Section 358(d); and

(ii) Whether S properly could deduct or capitalize any of the expenses it subsequently incurred in connection with the assumed contingent environmental liabilities?

The IRS ruled that because the contingent environmental liabilities had not been taken into account by P (i.e., had not given rise to a deduction or resulted in the creation of or increase in the basis of any property) prior to the transfer, they were not liabilities for purposes of Code

---

11 Code Section 357(c)(3)(A) states that if a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which either (i) would give rise to a deduction, or (ii) would be described in section 736(a), then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed or to which the property transferred is subject.

12 Code Section 358(a)(1) provides that the basis in the transferee stock received by the transferor is equal to the basis of the property transferred, decreased by the amount of money received by the transferor in the transaction. Code Section 358(d)(1) provides that for this purpose, liabilities assumed in the transaction are treated as money received by the transferor. Accordingly, to the extent liabilities are assumed by the transferee, the transferor's basis in the transferee stock is correspondingly decreased.



Confidential J&G Docs
JG-NC047844
JG013325_0027

Sections 357(c)(1) and 358(d). The IRS also ruled that the liabilities assumed by the new subsidiary in the Code Section 351 exchange were deductible by it as business expenses under Code Section 162 or were capital expenditures under Code Section 263, as appropriate, under its method of accounting.

The Ruling assumed a business purpose for the transfer, which included "all the assets of an entire business," so that Code Section 357(b)(1) would not be a question. The Ruling effectively concluded that because the liabilities were inchoate, i.e., they had not yet been taken into account by the transferor, they were not sufficiently "real" to be taken into as account under Code Sections 357 and 358.[13] The Ruling provided that in enacting Code Section 357(c)(3) Congress was concerned about the overstatement of liabilities and the consequent over-taxation in the context of an incorporation of an ongoing business. As a result, Code Section 357(c)(3) was adopted to exclude liabilities from the calculation of gain recognition and basis if the liabilities would not give rise to a deduction. The Ruling explicitly expanded that concept to liabilities that would give rise to capital expenditures as well.

The fact pattern contained in Revenue Ruling 95-74 is that of a transfer of a complete and ongoing business unit. In the Ruling, the IRS permitted the transferee to deduct or capitalize expenses arising from such liabilities and stated that it would not follow Holdcroft Transportation Co. v. Comm'r, 153 F.2d 323 (1946), in situations described in the Ruling. In Holdcroft, the court held that the transferee corporation which assumed the transferor partnership's contingent and unliquidated tort liabilities could not deduct the settlement of those claims because they did not arise out of the transferee's business. Rather than being deductions, the assumed liabilities became part of the transferee's capitalized cost of the transferred assets, in the court's view, even though those assets represented the transferor's business from which the tort claims arose. It did not matter to the court that the liabilities were contingent in the hands of the transferor. What the court found critical was that "The events fixing the liability and making it the liability of the predecessor partnership had already occurred and were in no way changed by or after the transaction between the petitioner and its predecessor."[14] As a result the court treated the assumption of such "fixed" liabilities as additional purchase price. In this regard, the Ruling's facts were similar to those in Holdcroft. This is because the facts of the Ruling indicated

---

13 Before the transfer, the parent had neither deducted nor capitalized any of the new subsidiary's environmental liabilities.

14 Holdcroft Transportation Co. v. Comm'r, 4 T.C.M. 503, 510 (1945).



Confidential J&G Docs
JG-NC047845
JG013325_0028

that events fixing the existence of the environmental liabilities had already occurred prior to the transfer, although the events fixing the amount and timing of the liabilities in terms of permitting the transferor to claim a deduction for or capitalize the expenses arising therefrom had not yet occurred.

The principal reviewer of Rev. Rul. 95-74, Victor Penico, chief of IRS Corporate Branch 3, told the ABA Corporate Tax Committee that Rev. Rul. 95-74 should not be read to allow the creation of a double deduction when less than an entire business is being transferred. He stated that, when the Ruling was drafted, the drafters were aware of the transaction that Congress is worried about, and took care to limit the benefit of the Ruling to transfers of entire businesses. In its concluding paragraph, he noted, the Ruling picks up the clear reflection of income concept, signaling the IRS' disapproval of transactions that dissociate the deductions for payments of liabilities from the underlying business assets from which the liabilities arose. In cases of dissociation, Penico warned, the IRS will continue to take the position that the transferee subsidiary does not get a deduction for payments of contingent liabilities according to Holdcroft.

Notwithstanding the premise of Rev. Rul. 95-74 and such warnings, it appears that transactions have been undertaken in the absence of the transfer of an ongoing business to achieve the same results. An example of what appears to be such a Code Section 357(c)(3) tax strategy that is targeted by the Proposal and Act Section 213 is as follows:

> An accrual method corporation has a contingent liability estimated to be $90 million and transfers the liability to a newly formed subsidiary. The transferor also contributes a tradable debt security, issued by another group member and having a face amount and purchase price of $ 100 million, to the new subsidiary in a Code Section 351 transfer. The transferor's basis in its subsidiary shares would be $ 100 million, because Code Section 357(c) disregards the contingent liability. The transferor receives common and preferred shares in the Code Section 351 exchange. The transferor immediately sells the preferred shares at a loss, because their value is much less than the transferor's basis, which does not take the contingent liability into account. (The transferor avoids the loss disallowance rule of Treas. Reg. Section 1.1502-20 by funding the new subsidiary with the debt and shares of other members, which are not part of the duplicated

loss calculation.) The subsidiary would then claim a deduction for the contingent environmental liabilities when they were paid.[15]

Such a transaction enables the transferor corporation to both accelerate through a built-in loss, and duplicate, in the hands of the subsidiary, its deduction for payment of the contingent liability.

The Proposal and Act Section 213 effectively provide for a two-step analysis to determine whether it is necessary to adjust a shareholder's or partner's basis in its stock or partnership interest. The taxpayer must first determine whether the basis of stock (or partnership interest) received as part of a tax-free exchange exceeds its fair market value. If a shareholder's (or partner's) basis in its stock or (partnership interest) exceeds its fair market value, the shareholder (or partner) must adjust basis by the amount of any "liability" that is assumed in exchange for stock (or partnership interest) and does not otherwise reduce the transferor's basis by reason of the assumption. Under the Proposal and S. 1792 Section 213, the term "liability" includes any obligation to make payment, without regard to whether the obligation is fixed or contingent or otherwise taken into account under the Code.

It is unclear whether the expanded definition of liability contained in the Proposal and S. 1792 Section 213 is intended to apply beyond the Holdcroft/Rev. Rul. 95-74 situation in which "[t]he events fixing the liability and making it the liability of the predecessor partnership had already occurred and were in no way changed by or after the transaction between the petitioner and its predecessor"[16] It appears that it does not. Thus, the obligation must be one that would be "taken into account under the Code" by the transferor.[17] Such obligations are distinguishable from obligations of the transferor that do not arise until a future date. It is more likely than not that such future obligations would fall outside of the scope of the Proposal and S.1792 Section 213, because they have not matured to the level of the obligations described in Rev. Rul. 95-74.

(iii) Application to the Transactions

---

15 The example was described in a TNT article by Lee Sheppard entitled "News Analysis—Tinkering with Assumption of Liabilities", 1999 TNT 172-2, dated September 7, 1999.

16 Holdcroft Transportation Co. v. Comm'r, 4 T.C.M. 508, 510 (1945).

17 The Proposal and S. 1792 Section 213 both exclude the situation described in Rev. Rul. 95-74, where the trade or business giving rise to the liability is transferred to a corporation as part of the exchange.

As discussed above, it is more likely than not that the Short Option does not create an obligation on the part of the writer until the time the writer is required to settle the Option pursuant to its terms. As such, it is more likely than not that the Short Option would not create an obligation under the Holdcroft/Rev. Rul. 95-74 approach prior to the time at which it is settled. Consequently, it is more likely than not that the Short Option would not be considered to be an obligation of Investor that would be a liability within the meaning of Section 213 of S. 1792 at the time the Options are contributed to the Fund.

(e) Summation

At the time of the contribution of the Options to the Fund, the Short Options would not be considered liabilities for purposes of Code Section 752 and would not be considered liabilities within the meaning of Section 213 of S. 1792.

(f) Amount of Liability

Even if the obligation under the Short Options is considered a liability, it is more likely than not that Investor's basis in Fund and the amount realized by Investor upon the disposition of its interest in Fund would not be affected. This is because it is more likely than not that the amount of the "liability" would be considered zero. In Rev. Rul. 95-45, 1995-1 CB 53, the taxpayer sold securities short and contributed the $ 1,000x proceeds and the short sale obligation to a corporation in exchange for stock in a Code Section 351 transfer. At the time of the transfer, the value of the securities was $800x. The IRS concluded that the short sale obligation was a liability, and that the amount of the liability was $ 1,000x.

If the IRS is correct that the amount of the liability is determined by the original value of the securities to be delivered, the Short Options are distinguishable. We have been advised by Manager that at the time that the Short Options were created, they were out of the money. Consequently, Investor would not have to transfer anything to satisfy the obligation. By contrast the short seller would have to transfer securities worth $1,000x. The IRS might assert that the amount of the liability is not the actual amount of the liability but the amount included in basis. This argument produces an incorrect result in other contexts, and should be rejected here. To illustrate, assume that a taxpayer purchases an asset with $ 1,000x of borrowed funds, repays a portion of the loan with other assets, and then contributes the property and the liability to a corporation. Under the IRS approach, the taxpayer's basis under Code Section 358 in the stock received would be reduced by $ 1,000x, the original amount of the loan included in basis. This is

clearly the incorrect result, and it is more likely than not that basis would be reduced only by the actual amount of the liability. In the case of an out of the money option, this must be zero.

E. Withdrawal from Fund

1. Recognition of Gain or Loss

When Investor withdrew from Fund, Investor received a liquidating distribution of Fund assets with a value equal to the then value of Investor's Fund interest. Code Section 731 (a) provides that a partner does not recognize gain on the distribution of property from a partnership, except to the extent that the amount of money received exceeds the partner's adjusted basis for the partnership interest. Loss is recognized only if the property distributed consists solely of money, unrealized receivables and inventory. Code Section 731(b) provides that a partnership does not recognize gain or loss on the distribution to a partner of property, including money.

On Investor's withdrawal from Fund, Investor received a distribution of foreign currency. Under the tax law, foreign currency is generally considered to be property and not money. See, Rev. Rul. 74-7, 1974-1 CB 198. However, in 1994, Congress amended Code Section 731 to provide that the term "money" would include "marketable securities," which is defined to include foreign currency, options, forward or futures contracts, notional principal contracts, and derivatives.

However, Code Section 731 (c)(3) provides that this special definition will not apply if Fund is an "investment partnership" and each partner is an "eligible partner." Code Section 731(c)(3)(C)(i) defines an "investment partnership" as any partnership that has never been engaged in a trade or business and substantially all of the assets of which consists of money, stock, notes, bonds, debentures, interest rate, currency or equity notional principal contracts, foreign currencies, and specified other marketable securities. An "eligible partner" is any partner who has not contributed to the partnership any property other than that described in Code Section 731(c)(3)(C)(i).

Because Fund is not engaged in any trade or business except investing in the types of securities listed in Code Section 731 (c)(3)(C)(i), it is more likely than not that distributions to Investor would not be considered money for purposes of Code Section 731 (a), and that Investor would not recognize gain on the distribution of the foreign currency. Under Code Section 731(b),

it is more likely than not that Fund would not recognize gain or loss on the distribution of the foreign currency.

2. Basis of Foreign Currency Distributed

Code Section 732(b) provides that the basis of property distributed to a partner in liquidation of a partnership interest is equal to the partner's adjusted basis in the partnership interest, reduced by the amount of any money distributed. As discussed above, foreign currency is property, but is not considered money.

In Rev. Rul. 74-7, 1974-1 CB 198, a US citizen converted dollars into a foreign currency, and at the end of his trip, converted the foreign currency back to dollars. The IRS held that the foreign currency was a capital asset, and that any gain or loss on reconversion is capital gain or loss. Code Section 1221 defines the term "capital asset" as property held by the taxpayer with certain exceptions. In Rev. Rul. 87-124, 1987-2 CB 205, the IRS cited Rev. Rul. 74-7 for the proposition that foreign currency is property to a United States resident. See also, American Home Products Corp. v. United States, 601 F.2d 540 (Ct. Cl. 1979); B. F. Goodrich Co. v. Commissioner, 1 T.C. 1098, 1104 (1943), acq., 1943 CB 10.

Congress implicitly agreed with the rule that foreign currency is not money when it amended Code Section 731(c) to provide that, for purposes of Code Sections 731(a)(1) and 737 the term "money" includes marketable securities, which is then defined to include foreign currency and options, forward or futures contracts notional principal contracts and derivatives. The language of Code Section 731(c) clearly limits the change to Code Section 731(a)(1) and Code Section 737, and the rule cannot be applied to other Sections of the Code. The legislative history of the change confirms this: "While the bill generally (subject to exceptions provided in the bill) treats marketable securities as money where the term is used in sections 731 (a)(1) and 737, the bill does not change the treatment of marketable securities as property where the term property is used (for example, in determining a partner's net pre-contribution gain under section 737(b)). H.R. Rep. _, 103rd Cong., 2d Sess. _, fn. 9 (1994).

Consequently, it is more likely than not that foreign currency would be treated as property for purposes of Code Section 732, and that the basis of the foreign currency received in liquidation of Investor's interest in Fund would equal Investor's basis in its interest in Fund immediately before the liquidating distribution.



Confidential J&G Docs
JG-NC047850
JG013325_0033

3. Consequences to Fund

The general rule is that a partnership does not adjust the basis of its remaining assets to reflect the distribution of property to a partner. Code Section 734(a). However, a special election is available under Code Section 754 that would allow such an adjustment. Fund has represented that it not made this election, and thus will not adjust the basis of its assets to reflect the distribution to Investor of the foreign currency.

In the Administration's 1999 budget proposal, the President proposed to modify these rules by requiring a partnership to adjust the basis of its assets following the distribution of property to a partner. The proposal would require the partnership to increase the basis of its remaining property by the excess of (1) the amount of money and the basis the property distributed, over (2) the amount by which the distributee partner's share of the partnership's basis in its assets and money is reduced by the distribution. The partnership would reduce the basis of its property by the excess of the amount in (2) over the amount in (1).

Under the Administration's proposal, the adjustment to basis would be made to the basis of the partnership's nondepreciable capital assets held after the distribution. The description of the proposal specifically notes that "unrealized receivables" are included in the term nondepreciable capital asset. If the required positive basis adjustment cannot be made because the partnership does not own any nondepreciable capital assets, then the partnership will recognize a long-term capital loss. In the case of a required negative adjustment, the adjustment is first made to the basis of nondepreciable capital assets, and then to the basis of other assets. If the partnership cannot make the required adjustment because it has insufficient basis in its assets, the partnership would recognize a long-term capital gain.

Under the Administration's proposal, the proposed changes would be effective for distributions made after the date of enactment and, consequently, would have no effect on the transactions described herein.

F. Disposition of the Foreign Currency

Code Section 985(a) generally requires that all income tax determinations with respect to a taxpayer be made in the taxpayer's functional currency. Code Section 985(b)(1) generally provides that a taxpayer's functional currency is the U.S. dollar, although a qualified business unit, or QBU, of a taxpayer may use another currency as its functional currency if certain



Confidential J&G Docs
JG-NC047851
JG013325_0034

conditions are met. Treas. Reg. §1.988-1(c) provides that any currency of a taxpayer or a QBU other than its functional currency is a "nonfunctional currency".

Code Section 988 governs the U.S. Federal income tax treatment of certain transactions in foreign currency, described as "section 988 transactions", and governs such transactions notwithstanding any other provisions of Chapter 1 (Sections 1 through 1400) of the Code. Furthermore, in the case of transactions by individuals, Code Section 988(e) limits the applicability of the Code Section 988 rules to transactions other than those the expenses of which meet the requirements of Code Section 162 or Code Section 212. Code Section 988(e)(3); Treas. Reg. §1.998-1(a)(9). As discussed below, it is more likely than not would met these standards.

Code Section 988(a) provides:

> Notwithstanding any other provision of this chapter [i.e., Sections 1 - 1400]
>
> (1) TREATMENT AS ORDINARY GAIN OR LOSS. —
>
> (A) IN GENERAL. -- Except as otherwise provided in this section, any foreign currency gain or loss attributable to a section 988 transaction shall be computed separately and treated as ordinary income or loss (as the case may be).

Code Section 988(c)(1) provides:

> (A) GENERAL. --The term "section 988 transaction" any transaction described in subparagraph (B) if the amount which the taxpayer is entitled to receive (or is required to pay) by reason of such transaction --
>
> (i) is denominated in terms of a nonfunctional currency , or
>
> (ii) is determined by reference to the value of 1 or more nonfunctional currencies.
>
> (B) DESCRIPTION OF TRANSACTIONS. -- For purposes of subparagraph (A), the following transactions are described in this subparagraph:...
>
> (iii) Entering into or acquiring any...option....

Section 988(a)(1)(C)(i) further provides that in the case of any disposition of nonfunctional currency, the disposition is treated as a section 988 transaction and any gain or

loss from such transaction is treated as foreign currency gain or loss. See also, Treas. Regs. §§1.988-1(a)(2)(iii), 1.988-2(d)(1), 1.988-2(d)(4) and 1.988-3(a).

The acquisition of nonfunctional currency is also treated as a section 988 transaction for purposes of determining the taxpayer's basis in such currency and determining exchange gain or loss thereon. Treas. Reg. §1.988-1(a)(1).

Treas. Reg. §1.988-2(a)(1)(i) provides that the recognition of exchange gain or loss upon the sale or other disposition of nonfunctional currency is governed by the recognition provisions of the Code that apply to the sale or disposition of property, such as Code Section 1001.[18] Treas. Reg. §1.988-2(a)(2)(i) provides that exchange gain or loss realized from the disposition of a nonfunctional currency is determined by reference to the taxpayer's basis in such currency and the amount realized. Treas. Reg. §1.988-2(a)(2)(ii)(B) provides that the exchange of nonfunctional currency for property is treated as an exchange of such currency for units of functional currency at the then spot rate and the purchase of the property for such units of functional currency. Treas. Reg. §1.988-2(a)(2)(ii)(C) provides an example that involves the use of a nonfunctional currency to purchase items of equipment. The example concludes that such purchase is a disposition of such currency with the amount realized measured by reference to the spot price of the currency on the date of purchase and the use of such functional currency to purchase the equipment.

Based upon Investor's representation it is more likely than not that the U.S. dollar would be treated as Investor's functional currency. Consequently, it is more likely than not that the disposition[19] of the FC I and FC II received by Investor as liquidating distribution from Fund

---

18 Treas. Reg. §1.988-2(a)(1)(iii) provides, however, that no gain or loss is recognized with respect to: (i) an exchange of units of a nonfunctional currency for different units of the same currency, (ii) the deposit of a nonfunctional currency in a demand or time deposit or similar instrument (including a certificate of deposit) issued by a bank or other financial institution if such instrument is denominated in the same currency; (iii) the withdrawal of nonfunctional currency from a demand or time deposit or similar instrument issued by a bank or other financial institution if such instrument is denominated in the same currency, (iv) the receipt of nonfunctional currency from a bank or other financial institution from which the taxpayer purchased a certificate of deposit or similar instrument denominated in such currency by reason of the maturing or other termination of such instrument, and (v) the transfer of nonfunctional currency from a demand or time deposit or similar instrument issued by a bank or other financial institution to another demand or time deposit or similar instrument denominated in the same currency issued by a bank or other financial institution.

19 See footnote 4, which describes certain transactions that are not treated as dispositions of foreign currency for this purpose.

would be a transaction that is treated a "section 988 transaction" on which gain or loss is recognized. Code Section 988(c)(1)(C). Under Code Section 988(a)(1) and Treas. Reg. §1.988-3(a), such gain or loss is treated as ordinary income or loss.

Treas. Reg. §1.988-2 provides rules for determining the amount of gain or loss that arises from a section 988 transaction and that is characterized as ordinary under Treas. Reg. §1.988-3. Treas. Reg. §1.988-2(a)(2)(i) provides that on a disposition of non-functional currency exchange gain is the entire amount of the excess of the amount realized on its disposition over the taxpayer's adjusted basis in the currency and the amount of exchange loss is the entire amount of the excess of the taxpayer's adjusted basis in the currency over the amount realized on its disposition. Treas. Reg. §1.988-2(a)(2)(ii) provides that the amount realized on the disposition of non-functional currency is determined under Code Section 1001(b), and Treas. Reg. §1.988-2(c)(2)(iii)(A) provides that the adjusted basis of non-functional currency is determined under the applicable provisions of the Code. Neither such Treasury Regulation nor the preamble thereto limits the amount of exchange gain or loss on the disposition of nonfunctional foreign currency to that portion of the gain or loss attributable to a change in exchange rates. Instead, such Treasury Regulation simply applies the mechanical provisions of other Code Sections in order to determine the amount of gain or loss and then characterize all of such gain or loss as exchange gain or loss.[20]

Treas. Reg. §1.988-1(a)(11) gives the IRS the power to exclude a transaction from the provisions of Code Section 988 if the substance of the transaction or transactions indicates that the transactions are not properly considered section 988 transactions. There is no guidance under Treas. Reg. §1.988-1(a)(11) as to what would not properly be considered a section 988 transaction. Some insight may be gained from the example in the Regulation, which deals with the reverse situation. In the example, the taxpayer transfers nonfunctional currency to a newly-formed corporation with no other assets and sells the stock claiming that the transaction is not a section 988 transaction. In the example, the Commissioner recharacterized the transaction as

---

[20] Code Section 988(b)(1). It appears that this regulatory approach was adopted based upon the legislative history of the amendments made to Code Sections 988(b) and (c) in the Technical and Miscellaneous Revenue Act of 1988. The House, Senate and Conference Committees each included identical language in their reports describing the measurement and recognition of foreign currency gain or loss. The Committees said: "Further, any gain or loss on a nonfunctional currency disposition is foreign currency gain or loss regardless of whether the difference between acquisition and disposition prices is due to spot rate movements between acquisition and disposition dates, forward discount or premium, bid-asked spreads, or other factors". Treasury's all gain/loss approach would appear to be based upon this directive.



Confidential J&G Docs
JG-NC047854
JG013325_0037

being a section 988 transaction because an asset not subject to Code Section 988, the stock, was substituted for an asset that is subject to Code Section 988. In the instant case, Investor acquired the FC I and FC II in a transaction described in Treas. Reg. §1.988-1(a)(1) and -2(a)(1). The acquisition of the FC I and FC II is not the surrogate for a transaction involving an asset not described in Code Section 988. Based on the foregoing, it is more likely than not that the IRS would not be successful were it to attempt to recharacterize the transaction under Treas. Reg. §1.988-1(a)(11).

Treas. Reg. §1.988-2(f) gives the Commissioner the power to recharacterize the timing, source, and character of gains and losses with respect to a section 988 transaction in accordance with its substance. The example in the Regulation involves a taxpayer who denominated a transaction that was in substance a forward sales contract as a notional principal contract and who attempted to apply the rules relating to notional principal contracts to the transactions. In the instant case, the acquisition and disposition of the FC I and FC II are reported consistently with the form of the transactions and consistently with their economic substance. Consequently, it is more likely than not that the IRS would not be successful were it to attempt to change the timing, character or source of the loss recognized by Investor from the disposition of the FC I and FC II.

Treas. Reg. §1.988-2(a)(1)(i) provides that the recognition of gain or loss from the sale or disposition of a nonfunctional currency is governed by the other provisions of the Code that apply to the sale or disposition of property, and cites Code Section 1001 and 1092 as examples of such provisions. Treas. Reg. §1.988-2 does not, however, specifically refer to Code Section 165 in connection with the allowance of a deduction of a loss sustained under Code Section 988. Consequently, there is some uncertainty as to whether Code Section 988 independently provides for the allowance of a loss sustained in a Section 988 transaction or whether such loss must also be tested under Code Section 165. The language of Code Section 988(a)(1) to the effect that notwithstanding any other provisions of the Code a loss sustained in a Section 988 transaction shall be treated as an ordinary loss, supports the view that Code Section 988 provides an independent allowance. This position is further supported by Code Section 988(e) which limits the loss incurred by an individual to those incurred in transactions in which expenses allocable to the transaction would be deductible under Code Section 162 or 212. Because the individual loss allowance rules of Code Section 165(c) contain provisions that are substantially the same, if Code Section 988 losses of an individual were subject to Code Section 165(c) there would have been no need to include similar limitations with Code Section 988(c). Thus, although the law is

not entirely clear, Code Section 988 could be viewed as providing for the deduction of a loss from a Code Section 988 transaction independently of Code Section 165.

Even were the IRS to successfully contend that a loss recognized under Code Section 988 must meet the requirements of Code Section 165, it is more likely than not that the loss would still be deductible in the instant case. This is because Code Section 165(b) calculates the amount of deduction based on the adjusted basis rules of Code Section 1011, which equally apply under Treas. Reg. §1.988-2(a). Furthermore, as discussed below, were the loss claimed by Investor in Investor's individual return, we believe that it is more likely than not that Code Section 165(c) standard would be met.

Notwithstanding this general statutory language relating to Code Section 165, Treas. Reg. §1.165-1 (b) provides that for the loss to be allowable under Code Section 165(a) the loss must be evidenced by closed and completed transactions, fixed by identifiable events, and be actually sustained during the taxable year; that the loss be a bona fide loss; and that substance rather than form should govern. As discussed above, the loss on the sale of the FC I and FC II is evidenced by closed and completed events and fixed by an identifiable event, their sale. Consequently, it is more likely than not that the IRS would be unsuccessful were it to attempt to deny under Code Section 165 the deduction of a loss recognized by Investor with respect to the Options or the foreign currency under Code Section 988.

Based on the forgoing, it is more likely than not that the entire amount of loss recognized by Investor on its disposition of foreign currency would constitute an ordinary loss under Code Section 988 and Treas. Reg. §1.988-3(a). Further, it is more likely than not that such ordinary loss would be treated as derived from U.S. sources. Code Section 988(a)(3); Treas. Reg. §1.988-2(a).

### G. Rules Relating to the Limitation of Deductions

It is possible that the IRS also may attempt to assert that one or more of the following apply to the transactions described herein.

#### 1. Business Purpose and Economic Substance

##### (a) In General



Confidential J&G Docs
JG-NC047856
JG013325_0039

It is well established that a transaction or series of transactions will not be respected for tax purposes unless the transaction or transactions have economic substance separate and distinct from the economic benefit derived from tax reduction. Gregory v. Helvering, 293 U.S. 465 (1935). Transactions failing to meet this standard are referred to as "sham transactions" or transactions that lack "economic substance." However, the Supreme Court has held that a transaction should not be disregarded if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). If a transaction is entered into for no other purpose or effect other than the reduction of taxes, it will not be respected for tax purposes. As discussed below, if a transaction has a substantial business purpose and economic substance it will be respected, regardless of a taxpayer's additional motive of reducing taxes.

Interpretation of this standard has resulted in holdings that, to be respected for tax purposes, a transaction must have a business purpose apart from the tax benefits and must have economic substance (a reasonable possibility of profit). "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985). A transaction will be held to have a business purpose unless "the only purpose for entering into the transaction was the tax consequences." Friedman v. Commissioner, 869 F.2d 785, 792 (4th Cir. 1989).

"A transaction has economic substance when it is the kind of transaction that some people enter into without a tax motive, even though the people fighting to defend the tax advantages of the transaction might not or would not have undertaken it but for the prospect of such advantages—may indeed have had no other interest in the transaction." Yosha v. Commissioner, 861 F.2d 494, 499 (7th Cir. 1988).

In the first instance it is possible that the IRS might contend that Fund should be disregarded for lack of an independent business purpose, with the result that the all of the transactions would be treated as having been made directly to Investor. Were the IRS successful in making such contention, the basis of the DEM and JPY ultimately distributed to Investor would not be computed under the Subchapter K rules. The IRS recently made such a contention in a field service advice regarding so-called lease stripping transactions. The IRS determined that

certain transactions by intermediary persons should be disregarded essentially because the intermediary had no economic stake in the transaction, i.e. had no economic risk and no opportunity to make a profit from its role. In the instant case, based on Fund's representation in II relating to its non-tax objectives relating to the transactions, it is more likely than not that the IRS would be unsuccessful were it to attempt to disregard Fund. See, e.g., Northern Indiana Public Service Company v. Comm'r, 105 T.C. 341 (1995), aff'd 115 F.3d 506 (7th Cir. 1997).

With respect to Investor, it engaged in these transactions in the expectation that a change in the exchange rates of the currencies would provide it with the opportunity to earn a reasonable profit. In Frank Lyon Co. v. U.S., supra, the Supreme Court concluded that the tax benefits of a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities should not be disregarded where the transaction was not shaped solely by tax-avoidance features that have meaningless labels attached.

After Lyon, the courts created a two-part test to determine whether a transaction should be disregarded as a sham. In order for a transaction to be disregarded, "the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction, and that the transaction has no economic substance because no possibility of profit exists." Rice's Toyota World, Inc. v. Comm'r, supra. Although the test laid down in Rice's Toyota World is a two-part test, taxpayers typically have been unsuccessful in merely showing that a transaction had some business purpose where the transaction lacked economic substance. Thus, in general, the courts have respected transactions having a reasonable profit potential.

A taxpayer need not be correct in its judgment of possible economic benefits, only reasonable or rational. Profit motive depends on the taxpayer's subjective and good-faith intent to earn a profit. Finoli v. Commissioner, 86 T.C. 697, 722 (1986). The fact that a venture fails to produce a profit in the anticipated amount or at all does not indicate that the venture was not profit-motivated. King v. United States, 545 F.2d 700, 708 (10th Cir. 1976). A transaction can have economic substance if it is entered into for the purpose of furthering the taxpayer's business interests, even if not directly producing income. Id. at 708.

Based on Investor's representations in II relating to its non-tax objectives relating to the transactions, it is more likely than not that the transactions described herein and engaged in by Investor would not be struck down as a sham.



Confidential J&G Docs
JG-NC047858
JG013325_0041

Despite being inconsistent with the bulk of sham transaction cases, one case has suggested that there must be not only a reasonable possibility of making a profit, but the possibility must relate to a profit that is greater than de minimis. See, Sheldon v. Commissioner, 94 T.C. 738 (1990). The facts present in the instant case indicate that it is more likely than not that this standard would also be met. See also; Seykota v. Comm'r, T.C. Memo 1991-234, supp. op. T.C. Memo 1991-541; Leema Enterprises Inc. v. Comm'r, T.C. Memo 1999-18.[21]

Some courts have indicated that they would consider whether the profit motive for a transaction was greater or less than the tax motive. See, Fox v. Comm'r, 82 T.C. 1001 (1994); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), aff'd, 798 F.2d 65 (2d Cir. 1986). However, a transaction should not be disregarded merely because its principal purpose was to avoid or evade tax. Congress has precluded such a broad test for all disallowance by incorporating such a principal purpose test into specific Code Sections such as Code Section 269. Long-standing judicial authority has also recognized that "any one may so arrange his affairs that his taxes shall be as low as possible" Helvering v. Gregory, 69 F. 2d 809 (2d Cir. 1934). See, also Cottage Savings Association v. Comm'r, discussed above, involving a transaction executed solely for tax purposes.

ACM Partnership v. Comm'r, T.C.M. 1997-115, aff'd in part and rev'd in part on another issue, 157 F.3rd 231 (3rd Cir. 1998), has certain parallels to, and significant distinctions from, the present situation.[22] ACM involved a foreign partnership that engaged in contingent installment sales transactions of certain notes that shifted income to a foreign partner and generated a capital loss to its U.S. partner, Colgate-Palmolive, which incurred all the costs. The Tax Court found that at the time it entered into the partnership, Colgate's only real opportunity to earn a profit was through an increase in the credit quality of the issuers of the notes, or a 400-500 basis point increase in 3-month LIBOR interest rates. The court found no impact of credit quality was possible as the lenders were extremely highly rated at the time of the transaction. Moreover,

21 On December 23, 1997, the IRS issued Notice 98-5, announcing that the IRS will issue Regulations effective on and after such date dealing with foreign taxes paid or accrued in connection with certain abusive transactions. Such transactions were described as those in which the anticipated economic benefits are insubstantial in relationship to the anticipated tax benefits. It is currently uncertain as to when or whether such Regulations will be issued, the criteria they will establish with respect to the insubstantiality of anticipated economic benefits, or whether such Regulations will have application beyond the area of foreign taxes.

22 A case involving similar transactions, ASA Investerings Partnership, T.C. Memo. 1998-305, was decided on different grounds.



Confidential J&G Docs
JG-NC047859
JG013325_0042

the court did a 6-year review of 3-month LIBOR rates and did not find an increase of even 300 basis points in the necessary time frame. Since the analysis of the historical data showed no reasonable basis for expecting a profit, the court ruled against ACM. "We do not suggest that a taxpayer refrain from using the tax laws to the taxpayer's advantage. In this case, however, the taxpayer desired to take advantage of a loss that was not economically inherent in the object of the sale, but which the taxpayer created artificially through the manipulation and abuse of the tax laws. A taxpayer is not entitled to recognize a phantom loss from a transaction that lacks economic substance".

In its analysis, the Third Circuit focused upon the foregoing finding of the Tax Court, stating that: "Tax losses such as these, which are purely an artifact of tax accounting methods and which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations." The Third Circuit also noted, "on November 3, 1989, [the partnership] invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes. These transactions . . . offset one another and with no net effect on ACM's financial position." See , similarly, Merryman v. Comm'r, 873 F.2d 879 (5th Cir. 1989) (conduit partnership without economic substance disregarded).

Unlike ACM, the facts demonstrate that the transactions described herein have economic substance and reveal that each party had a distinct profit motive to its participation in such transactions. As discussed above, the Options are bona fide contracts between Investor (and subsequently Fund) and an unrelated party entered into at arm's length. Furthermore, we have been advised that each of Investor and Fund reviewed the economics underlying each of the transactions described herein, and concluded that it had a reasonable chance to earn a reasonable profit from these transactions, in excess of all associated fees and costs and not including any tax benefits. Thus, we believe that under the present state of law, it is more likely than not that the sham transaction doctrine would not apply and that based on the representations of Investor it is more likely than not that the requisite economic substance would exist under the preceding authority, because Investor reasonably believed Investor had a opportunity of making a reasonable profit.

(b) Code Section 165(c)(2)

Notwithstanding that the transactions described herein have the requisite economic substance, where applicable, Code Section 165(c) imposes additional limitations on the ability of individuals to claim losses.[23] Because Investor is an individual these rules must be taken into account for determining whether such losses would be available to Investor.

If an individual incurs a loss from the disposition of the assets in the individual's trade or business, Code Section 165(c)(1) generally permits the allowance of such loss. In determining whether such a business exists, the courts have required that the criteria of Code Section 183 be met. See, Farmer v. Comm'r, T.C. Memo 1994-342.

Code Section 183(a) and Treas. Reg. §1.183-1 requires that the activities with respect to which the loss relates be activities engaged in for profit. There has been substantial litigation regarding whether such motive exists. These cases have established that a taxpayer need only have a good faith expectation of earning a profit from the activities undertaken. See, e.g., Burger v. Comm'r, 809 F.2d 355 (7th Cir. 1987); Johnson v. U.S., 11 Cl. Ct. 17 (1986).

If an individual incurs a loss from the assets in a transaction which does not involve the individual's trade or business, Code Section 165(c)(2) and Treas. Reg. §1.165-1(e) require, like Code Section 183(a) and Treas. Reg. §1.183-1, that the loss be incurred in a transaction entered into for profit. Thus, these statutory and regulatory provisions mirror the Code Section 183 standard.

Notwithstanding the parallel nature of Code Section 183(a) and Code Section 165(c)(2), the courts have imposed a judicial gloss that appears to create a standard higher than that imposed by the statutes, i.e., that the taxpayer's profit motive be the "primary" motive for entering into the transaction. The first case that did so was Fox v. Comm'r, 82 T.C. 1001 (1987). The Tax Court in Fox derived this primary profit motive test from a footnote in Helvering v. National Grocery Co., 304 U.S. 282, 289 n.5, reh'g denied, 305 U.S. 669 (1938), which involved the constitutionality of the imposition of the accumulated earnings tax. The footnote stated in relevant part:

---

23 In the case of a partnership (or entity treated as a partnership) this test is applied at the partnership level.



Confidential J&G Docs
JG-NC047861
JG013325_0044

> Similarly, the deductibility of losses under [Code Section 165(c)(2)] may depend upon whether the taxpayer's motive in entering into the transaction was *primarily profit*. [emphasis added].

In addition, the Tax Court in Fox relied on an earlier Tax Court case involving the deductibility of a loss under Code Section 165(c)(2), Smith v. Comm'r, 78 T.C. 350 (1982). In Smith, however, the Tax Court did not impose the "primary" test articulated in Fox, but rather stated at p. 391:

> The mere fact that petitioners may have had a strong tax avoidance motive in entering into their commodity tax straddles does not in itself result in a disallowance of petitioners' losses under Section 165(c)(2), provided petitioners also had a non-tax profit motive for their investments at the time, See, Knetsch v. U. S., 172 Ct. Cl. 378, 348, F. 2d 932, 936-937 (1965). Such hope of deriving an economic profit aside from the tax benefits *need not be reasonable so long as it is bona fide*. See, Bessenyey v. Comm'r, 45 T.C. 261, 274 (1965), aff'd 379 F.2d 252 (2nd Cir. 1967). [emphasis added].

Both the Fox and Smith cases, as well as the bulk of subsequent cases involving the application of the "primary" standard, arose in connection with commodities straddle transactions in which looking at the transactions as a whole, the taxpayer had little or no opportunity to earn any meaningful profit.[24] In addition many of the decisions were Memoranda decisions of the Tax Court.[25] Neither the Knetsch case nor the Bessenyey case cited by the Tax Court in Smith required the profit motive of the taxpayer to be the primary standard for engaging in the transactions in issue, although the Knetsch decision did refer to the National Grocery Co. Supreme Court decision discussed above.

---

24 The Tax Court in Sheldon v. Comm'r, 94 T.C. 738 (1990) applied these principles wherein certain of the transactions before the Court the taxpayer demonstrated that it could have made a profit. The Tax Court denied the claimed deductions stating that: "[i]n instances where intermediate repos would have or did generate some form of [positive] carry, these amounts were nominal, either fixed or short term and stable and, in any event merely reduced the fixed losses by relatively insignificant amounts." It is uncertain whether the Sheldon case has added an additional dimension to the economic profit motive analysis by, effectively, requiring a profit to be greater than "de minimus" or "nominal". In assessing this point it should be noted that the Tax Court ultimately found that even what nominal profit there was in Sheldon was absorbed by losses on related and, arguably, integrated transactions. 94 T.C. 738, 768 and 769. See also, Est. of Baron v. Comm'r, 83 T.C. 542, aff'd 798 F.2d 65 (2d Cir. 1986).

25 In assessing whether the requisite profit motive exists, all of the fees incurred in engaging in the transactions will have to be taken into account. See, ACM Partnership v. Comm'r, supra.



Confidential J&G Docs
JG-NC047862
JG013325_0045

When a court has thoughtfully attempted to deal with the primary standard, the results have often yielded confusion. For example in Nickson v. Comm'r, 962 F.2d 973, 976 (10th Cir. 1992), a case involving the application of Code Section 183, the court first appeared to apply the primary standard by requiring that the taxpayer engage in the transaction with the "dominant hope and intent to realizing a profit", but then went on to provide that "the determination crucial to the instant case [is]-whether the taxpayers had an actual and honest profit objective." See also, Nickerson v. Comm'r, 700 F.2d 402, 404 (7th Cir. 1973). This confusion in part may be due to the fact that in Fox v. Comm'r, supra, which first applied the primary standard in the context of Code Section 162(c)(2), the taxpayer's had little or no opportunity to make more than a relatively small fixed economic profit from the commodity straddle transactions into which the taxpayer entered. Such a situation is unlike the instant case in which, based on the advice we have Investor entered into the transactions with the reasonable possibility of making a reasonable profit from investment in Fund. Such a profit potential is more analogous to the situation in Smith v. Comm'r on which the Fox case relies. Although the matter cannot be exactly free from doubt because of the factual nature of the inquiry, on balance, it is more likely than not that the requisite profit motive exists to support the deduction of any loss on the disposition of the foreign currency under Code Section 165(c)(2).

2. Step Transaction Doctrine

In determining the tax consequences of a series of events, the courts use a step transaction analysis to determine what is the transaction to which the tax law should be applied. The step transaction doctrine combines and treats a series of separate steps "as a single transaction if they are in substance integrated, interdependent, and focused toward a particular end result." Bittker & Lokken, Federal Taxation of Income, Estates and Gifts (2d ed.), ¶4.3.5. The courts have articulated three different formulations of the step transaction doctrine: the "binding commitment" test, the "interdependence" test, and the "end result" test. Penrod v. Commissioner, 88 T.C. 1415, 1429 (1987).

Under the "binding commitment" test, a series of transactions is amalgamated only if there is a binding legal commitment to undertake each of the steps. Commissioner v. Gordon, 391 U.S. 83, 96 (1968). It is more likely than not that this formulation would not apply to the transactions above, because Investor was not bound in any way to purchase or sell the Options, to contribute any of the Long Options or Short Options to Fund, or to withdraw from Fund.

Under the "interdependence" test, a series of transactions are integrated only if the steps are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Manhattan Building Co. v. Commissioner, 27 T.C. 1032, 1042 (1957), acq., 1957-2 CB 5. The interdependence test focuses on the relationship between the steps, and whether the first step would have occurred without the second. For example, in Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517 (10th Cir. 1991), the court applied the interdependence test to integrate two purportedly independent transactions and deny the claimed loss because the two agreements were, by their terms, dependent on each other. Unlike the factual situation in Associated Wholesale Grocers, each transaction set out above (Investor's purchase of the Options, Investor's investment in Fund, and Investor's withdrawal from Fund) was independently undertaken by Investor, and each transaction presented Investor with the potential for economic gain or loss. See also, McDonalds Restaurants of Illinois, Inc. v. Commissioner, 688 F.2d 520, 524 (7th Cir. 1982); Security Industrial Insurance Co. v. United States, 702 F.2d 1234 (5th Cir. 1983). Where each step has independent economic significance, the courts will not integrate the steps. Redding v. Commissioner, 630 F.2d 1169 (7th Cir. 1980), cert. denied, 450 U.S. 913 (1981). In Rev. Rul. 79-250, 1979-2 CB 256, the IRS agreed, but also inserted a requirement that each step must be "undertaken for valid business purposes and not mere avoidance of taxes."

Based upon the foregoing, it is more likely than not that each step undertaken by Investor would be viewed as independent from the others and, consequently, it is more likely than not that the "interdependence" formulation of the step transaction doctrine would not be applicable to the transactions. Furthermore, even adopting the position of the IRS in Rev. Rul. 79-250, based on the representations made to us, each of the transactions undertaken by you and Fund will be supported by a reasonable expectation of profit.

The "end-result" formulation integrates a series of transactions into a single transaction "when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." King Enterprises, Inc. v United States, 418 F.2d 511, 516 (Ct. Cl. 1969). The courts, however, have limited the expansive scope of the end-result test.

In Esmark, Inc. v. Commissioner, 90 T.C. 171 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989), the taxpayer wanted to dispose of certain businesses owned by one of its subsidiaries. Mobil, an unrelated company, acquired a portion of Esmark's outstanding

shares from the public in a tender offer, and then tendered these shares to Esmark in exchange for stock of a wholly-owned subsidiary of Esmark. Under the law at the time, the exchange of the subsidiary's stock for the Esmark shares was tax-free at the corporate level. By contrast, a sale of the subsidiary's stock for cash, which could then have been used to buy back the Esmark shares, was taxable at the corporate level.

Although it recognized that the reduction of taxes was a significant factor in structuring the transaction, that Mobil's tender offer was part of an overall plan, and that Mobil, not Esmark, had borne the economic cost of the tender offer, the Tax Court held that Mobil's ownership of the Esmark shares, "however transitory," must be respected, and the transaction treated as a redemption of the Esmark shares. In rejecting the IRS's attempt to apply the step transaction doctrine to recast the transactions, the court stated:

> That Mobil's tender offer was but part of an overall plan is not in dispute. The existence of an overall plan does not alone, however, justify application of the step-transaction doctrine. Whether invoked as a result of the "binding commitment," "interdependence," or "end result" tests, the doctrine combines a series of individually meaningless steps into a single transaction. In this case, respondent has pointed to no meaningless or unnecessary steps that should be ignored.
>
> Respondent proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. This recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner.

90 T.C. at 195-197. (Emphasis added.) The court further noted that each of the steps "had permanent economic consequences," and could not be combined. 90 T.C. at 198.See also, Grove v. Comm'r, 490 F2d 241 (2d Cir. 1973) and Carrington v. Comm'r, 476 F2d 704 (5th Cir. 1973). The Tax Court recently reaffirmed the Esmark step transaction analysis. Turner Broadcasting Company v. Comm'r, 111 T.C. 315 (December 23, 1998).[25]

---

[25] The IRS agrees that the step transaction doctrine does not permit the creation of new steps or the reordering of existing steps. See, Rev. Rul. 78-197, 1978-1 CB 83. In each of PLR 8815003 (December 11, 1987); PLR 8735003 (May 22, 1987); PLR 8735007 (May 18, 1987); and PLR 8735006 (May 18, 1987), an



Confidential J&G Docs
JG-NC047865
JG013325_0048

More recently, in True v. U.S., __ F.3rd ___ (10th Cir. 9/9/99) the Court of Appeals affirmed a the District Court's summary judgement in favor of the IRS regarding the integration of one series of transactions under the "end result" formulation of the step transaction, where the evidence clearly showed that the end result was the sole outcome intended to be achieved by entering into the transactions from the outset. With respect to such series of transactions, the Court of Appeals also concluded that such integration would be appropriate under the "mutual interdependence" formulation as well, because the facts showed that each of the steps would have been fruitless without the others. The Court of Appeals, however, reversed the District Court's summary judgement integrating another series of transactions. The Court of Appeals concluded that there was a factual issue under the "end result" formulation, because the evidence created a genuine factual issue as to whether the end result achieved was the sole intended result from the outset. The Court of Appeals concluded that there similarly was a factual issue under the "mutual interdependence" formulation, because it appeared that the each of the steps might have economic significance on its own. The conclusion that can be drawn from the True decision appears to be that if the facts demonstrate that at the time of entering into series of transactions an investor has in mind a sole outcome and no other outcome can be discerned, a court can apply the "end-result" formulation of the step transaction doctrine to disregard intermediate steps, particularly if those intermediate steps had so little economic significance on their own to fall within the "mutual interdependence" formulation.

In both Salomon, Inc v. United States, 976 F.2d 837 (2d Cir. 1992) and Walt Disney, Inc. v. United States, 4 F.3d 735 (9th Cir. 1993), the issue was whether a transfer of assets to a subsidiary as part of a divisive "D" reorganization resulted in the recapture of investment credit. While both courts seemed to apply the "end result" formulation to integrate the transfer of assets and subsequent spin-off, each court cited facts that would indicate a "binding commitment" or "mutual independence" test. In Walt Disney, the court cited an overall intention for the steps to occur, and the fact that the company had a legal obligation to transfer the assets and distribute the stock. In Salomon, the court besed its conclusion in part on the fact that at the time of the asset transfer the taxpayer intended to spin-off the stock, establishing the interdependent nature of the

---

unrelated underwriter acquired a corporation's outstanding debt, exchanged that debt for other securities of the corporation, and then sold such other securities to the public. In each technical advice memorandum, the IRS held that the step transaction doctrine cannot be applied to reverse the order of the transactions.

steps. The District Court concluded that such interdependent relationship also existed in the series of transaction integrated under the step transaction doctrine in True.

Investor was placed at risk with respect to each of its foreign currency investments. Investor bore the risk that the Long Options or the Short Options might decline in value while it owned them prior to contributing them to Fund. Similarly Fund bore the risk of the Options while it owned them. Thus, the transactions had the type of economic significance lacking in the integrated transactions in True and in Salomon. Investor also had a number of alternative transactions available to Investor with respect to both the Options and the investment in Fund. Consequently, although the issue is inherently a factual one, based on Esmark it is more likely than not that the "end result" formulation of the step-transaction doctrine would not apply to the transactions described above.

Based on this the foregoing analysis, it is more likely than not that the step transaction doctrine would not apply to the transactions described above. Each transaction undertaken by Investor had independent economic significance and placed Investor at risk.

3. Disguised Sale Provisions

Code Section 707(a)(2)(B) provides rules for distinguishing sales of property to a partnership from bona-fide contributions distributions. If (i) there is a transfer of money or other property to a partnership; (ii) there is a related transfer of money or other property from the partnership to the partner, and (iii) the transfers when viewed together are properly characterized as a sale or exchange of property, the transfers are treated as occurring between the partnership and a person not a partner. Treas. Reg. § 1.707-3(b)(1) provides that a contribution of property and a distribution will be treated as a sale only if, based on all the facts and circumstances, the distribution would not have been made but for the contribution, and, if the transfers are not simultaneous, the distribution is not dependent on the entrepreneurial risks of the partnership.

Treas. Reg. §1.707-3(b)(2) states that the determination of whether a disguised sale has occurred is based on all the facts and circumstances, and that generally the facts and circumstances existing on the date of the first transfer are considered. The Regulations then provide a list of ten factors that tend to prove that a sale has occurred.

1. The timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of the earlier transfer.



Confidential J&G Docs
JG-NC047867
JG013325_0050

2. The transferor has a legally enforceable right to the subsequent transfer.

3. The partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured.

4. Any person has made or is legally obligated to make contributions to the partnership in order to permit the partnership to make the transfer of money or other consideration.

5. Any person has loaned or has agreed to loan the partnership the money or other consideration required to enable the partnership to make the transfer, taking into account whether the obligation is subject to contingencies related to the results of the partnership operations.

6. The partnership has incurred or is obligated to incur debt to acquire the money or other consideration necessary to permit it to make the transfer, taking into account the likelihood that the partnership will be able to incur that debt (considering such factors as whether any person has agreed to guarantee or otherwise assume personal liability for that debt).

7. The partnership holds money or other liquid assets, beyond the reasonable needs of the business, that are expected to be available to make the distribution, taking into account the income that will be earned from those assets.

8. The partnership distributions, allocations, or control of operations is designed to effect an exchange of the burdens and benefits of ownership of property.

9. The transfer of money or other consideration by the partnership to the partner is disproportionately large in relation to the partner's general and continuing interest in partnership profits.

10. The partner has no obligation to return or repay the money or other consideration to the partnership, or has such an obligation but it is likely to become due at such a distant point in the future that the present value of the obligation is small in relation to the amount of money or other consideration transferred by the partnership to the partner.

Treas. Reg. §1.707-3(c) contains a presumption that contributions and distributions within two years are part of a sale unless the facts and circumstances clearly establish that the transfers do not constitute a sale.

While the Regulations do not list factors that would indicate a sale has not occurred, the examples indicate that the absence of these factors is evidence that a sale has not occurred. See, e.g. Treas. Reg. § 1.707-3(f), Example 3.

None of these factors are present in Investor's transfer of the Long Options and Short Options to Fund, and Fund's distribution of property to Investor in liquidation of its interest in Fund. Investor did not have a legally enforceable right to a particular amount of a subsequent distribution; Investor had only that every partner had to withdraw from Fund. The timing of the distribution to Investor was not set, but was based on Investor's decision, and the amount of the distribution was based on the value of Investor's interest in Fund at that time. Investor's right to receive the distribution was not secured in any manner; no person was obligated to make contributions to Fund so that it could make the distribution to Investor; no person loaned or agreed to loan money to Fund so that it could make the distribution to Investor; and Fund was not obligated to incur debt to make the distribution. Fund did will not hold liquid assets beyond the reasonable needs of its activities, and the distributions, allocations and control were not be designed to shift the benefits and burdens of ownership. The distribution from Fund reflected the value of Investor's Fund interest.

Consequently, it is more likely than not that the contribution of the Options and the subsequent liquidating distribution to Investor would not be treated as a sale under Code Section 707.

### 4. The Partnership Anti-Abuse Regulations; Disregard of Fund under Common Law

In December 1994, the IRS issued Treas. Reg. § 1.701-2 (the "Anti-Abuse Regulations") in an effort to stop what it perceived were abuses of the partnership form. These Regulations consist of two broad rules: the "abuse of subchapter K rule" and the "abuse of entity rule."

Notwithstanding literal compliance with the Code and Regulations, the IRS is authorized to recast the transaction for federal tax purposes as it deems appropriate if the requirements of the anti-abuse Regulations are satisfied. The IRS can (1) disregard the partnership in whole or in part; (2) treat one or more partners as not partners; (3) adjust the method of accounting used by the partnership or a partner to clearly reflect the partnership's or the partner's income; (4) reallocate the partnership's income, gain, loss, credit, or deduction; or (5) otherwise adjust or modify the claimed tax treatment. Treas. Reg. § 1.701-2(b).



Confidential J&G Docs
JG-NC047869
JG013325_0052

(a) Validity of the Regulations

These Regulations were severely criticized by practitioners and commentators when they were adopted as being invalid, and the controversy has not been resolved. It is reasonable to believe that the validity of these Regulations will be challenged in court.

The commentators have argued that the Regulations are invalid because they are vague and lack clear and workable standards.[27] The language of the Regulations is exceedingly broad, and even the inclusion of examples in the final Regulations does not help to elucidate the meaning of the broad terms. Further, it has been argued that the Regulations are invalid as they were adopted in violation of Executive Order 12866. This Executive Order applies to all significant regulatory actions, which includes a Treasury Regulation, that is likely to result in a rule that may (i) have an annual effect on the economy of $ 100 million or more; (ii) adversely affect in a material way the economy or a sector; or (iii) raise novel legal or policy issues. The partnership anti-abuse Regulations satisfy each of these requirements.

Commentators have also asserted that the Regulations are invalid because they are an unconstitutional usurpation of legislative and judicial powers. The Regulations grant the IRS the power to disregard the language of the statute when literal compliance with specific provisions is not consistent with the "intent" of subchapter K, and then creates that intent without relying on anything of Congressional origin. In adopting subchapter K as part of the Internal Revenue Code of 1954 Congress specifically considered and rejected the type of tax avoidance test that appears in the Regulation. See, S. Rep. No.938, 94th Cong., 2d Sess 100 (1976). The courts have held that the IRS does not have the authority to disregard statutory provisions merely to reach the result that the IRS desires. See, Crooks v. Harrelson, 282 U.S. 55 (1930); Comm'r v. Brown, 380 U.S. 504 (1940); Busse v. U.S., 479 F2d 1147 (7th Cir. 1973); Woods Investment Co. v. Comm'r, 85 T.C. 274 (1985). See also, RLC Industries Co. v. Comm'r, 98 T.C. 457 (1992), aff'd 58 F3rd 413 (9th Cir. 1995). Furthermore, the Regulation attempts to supersede the statute and add restrictions not found in subchapter K.

---

27 See, e.g., McKee, supra, at ¶1.05; Banoff, Anatomy of an Anti-Abuse Rule: What's Really Wrong with Reg. Section 1.701-2, 66 Tax Notes 1859 (March 20, 1995); Gouwar, The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority, 11, No.4 Journal of Partnership Taxation 287 (Winter 1995).



Confidential J&G Docs
JG-NC047870
JG013325_0053

Moreover, the Regulation is not based on any specific legislative grant of authority. Consequently, the Regulation would appear to be invalid under Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) and Rowan Cos. v. United States, 452 U.S. 247 (1981). The Regulation usurps judicial power by granting the IRS the power to apply the substantive law on a case by case basis, which is a judicial function. The courts are thus relegated to the role of determining whether the IRS has abused its discretion, rather than hearing the case de novo where the IRS and the taxpayer are on an equal footing.

**(b) Abuse of Subchapter K Rule**

Treas. Reg. § 1.701-2(b), the abuse of subchapter K rule, provides that:

> If a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances.

Thus, two requirements must be met to invoke this rule: a principal purpose of the transaction must be to reduce the present value of the partners' aggregate tax liability, and the tax reduction must be inconsistent with the intent of subchapter K.

**(c) Intent of Subchapter K**

The Regulations state that the intent of subchapter K is to permit the conduct of business and investment activities without incurring an entity level tax. Treas. Reg. §1.701-2(a) then provides that the following requirements are implicit in the intent of subchapter K:

1. The partnership must be bona fide and each partnership transaction or series of related transactions must be entered into for a substantial business purpose.[23]

[23] See, Statement of John Rooney, attorney advisor in the Treasury's Office of Tax Legislative Counsel to the ABA Tax Section on January 29, 1995, reprinted in Sheppard, 66 Tax Notes 776, 778, that "[s]ubstantial business purpose and principal purpose of tax avoidance cannot co-exist."

2. The form of each partnership transaction must be respected under substance over form principles.

3. The tax consequences to each partner of partnership operations and of transactions between the partner and partnership must accurately reflect the partners' economic agreement and clearly reflect the partners' income.

However, because certain provisions of the Code and Regulations were adopted for administrative convenience and other policy objectives, this test will be satisfied if the ultimate results are clearly contemplated by that provision.

The first implicit intent of subchapter K, that a partnership is bona fide and that transactions be entered into for a business purpose, seems to be a restatement of well established principles. See, e.g., Culbertson, supra, Gregory, supra, and Rice's Toyota World, supra. However, the Regulations do not elaborate on what is meant by these terms, and also insert the term "substantial" in the business purpose requirement. Culbertson held that a partnership would be respected for tax purposes if the parties had joined together to jointly conduct a business and share the profits. As Justice Frankfurter expressed in his concurring opinion:

> In plain English, if an arrangement among men is not an arrangement which puts them all in the same business boat, then they cannot get into the same boat merely to seek the benefits of [partnership tax provisions]. But if they are in the same business boat, although they may have varying rewards and responsibilities, they do not cease to be in it when the tax collector appears.

337 U.S. at 753.

The determination of whether the abuse of subchapter K rule is applicable is based on all of the facts and circumstances, including a comparison of the business purpose for the transaction and the tax benefit. Treas. Reg. § 1.701-2(c) contains a non-exclusive list of factors that indicate, but do not establish, that a partnership was formed or availed of with a principal purpose of tax reduction in a manner inconsistent with the intent of subchapter K. The factors are:

1. The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's business directly.



Confidential J&G Docs
JG-NC047872
JG013325_0055

2. The present value of the partners' aggregate federal tax liability is substantially less than if purportedly separate transactions that are designed to achieve a particular end result are treated as steps in a single transaction. For example, the analysis may show that that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest was liquidated or disposed of would be a partner only temporarily in order to provide the tax benefits to the remaining partners.

3. One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities, or have little or no participation in the profits from the partnership's activities other than a preferred return in the nature of a payment for the use of capital.

4. Substantially all of the partners are related.

5. Partnership items are allocated in accordance with the literal language of Treas. Reg. §§ 1.704-1 and 1.704-2 but the results are inconsistent with the purpose of Code Section 704(b).

6. The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained by the contributing partner.

7. The benefits and burdens of ownership of partnership property are in substantial part shifted to the distributee partner before or after the property is actually distributed to the distributee partner.

These factors are difficult to apply, even with the aide of the examples. The first factor appears to be a restatement of the substantiality test of Treas. Reg. §1.704-1(b)(2)(iii). In the instant case, it is difficult to determine how the activities within and without Fund would be characterized in order to apply this test.

The second factor appears to be a restatement of the "end-result" formulation of the step transaction doctrine. As discussed above, each transaction was undertaken for independent reasons, no step was dependent on another step, and you were at risk with respect to each transaction. Consequently, it is more likely than not that this factor would not be present.

The third factor is not present in this case, as no partner has a nominal interest in Fund. Treas. Reg. § 1.701-2(d)(1), Ex. 1 holds that a 1% interest in a partnership is not nominal. All of the members of Fund have interests significantly in excess of 1%. Further, each member shares

proportionately in all items of Fund income, gain or loss, and no partner is substantially protected from risk of loss from the partnership's activities.

The fourth factor is also not present. We have been informed that none of the partners are related.

The fifth factor relates to the allocation of partnership income. Each item of Fund income, gain, loss, or deduction will be allocated in accordance with the interests in Fund, and each partner's capital account will be appropriately charged. There will be no special allocations of any item of income, gain, loss, credit, or deduction.

The sixth factor is also not present in this case. There is no property that has been "nominally" contributed to Fund by any partner. Further, all property contributed to Fund is owned by Fund, and no partner has in substantial part retained the benefits and burdens of ownership of the contributed property. Any assets that you receive from Fund will not be the same assets that you contributed.

Finally, seventh factor is also not present. The benefits and burdens of ownership of Fund property will not be shifted to any distributee partner before or after the property is actually distributed.

Based on the foregoing it is more likely than not that the IRS would be unsuccessful were it to assert that the transactions described herein were inconsistent with the intent of subchapter K.

(d) *Abuse of Entity Rule*

The other part of the anti-abuse Regulations, the abuse of entity rule, is found in Treas. Reg. § 1.701-2(e). This Regulation provides that the IRS can treat a partnership as an aggregate of its partners "as appropriate to carry out the purpose of any provision" of the Code or Regulations. However, this rule will not apply to the extent that (a) a provision of the Code or Regulations prescribes the treatment of a partnership as an entity and (b) entity treatment and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. Thus, under Treas. Reg. §1.701-2(e)(2) a partnership may not be so disregarded when a provision of the Code prescribes entity treatment for such a partnership

and that treatment and the ultimate tax results, taking into account all relevant facts and circumstances, are clearly contemplated by that provision.

Although there is no authority in point, as discussed above, the partnership provisions themselves (including the Treas. Reg. §1.701-2(a) intent of subchapter K anti-abuse rules) contemplate the use of a partnership as a vehicle to permit taxpayers to conduct joint activities; Code section 722 by its terms contemplates a that a partner's tax basis in the partner's partnership interest is determined with reference to the tax basis of property contributed by the partner; and the partnership provisions contemplate that there can be disparities between a partner's tax basis in its partnership interest and the partnership's tax basis in its assets (see, e.g., Code Section 754). Furthermore, the examples contained in Treas. Reg. §1.702-1(f) relate to the use of the partnership to gain advantage of its entity status outside of subchapter K. Consequently, although the matter cannot be free from doubt because of the absence of direct authority, it is more likely than not that the IRS would not be successful were it to attempt to disregard Fund as an entity under Treas. Reg. §1.701-2(e).

**(e) Disregard of Fund under Common Law**

In appropriate circumstances, a partnership can be ignored for U.S. Federal income tax purposes although a valid partnership was formed under local law. In Comm'r v. Culbertson, 337 U.S. 733, 741 (1949), the Court stated that whether a partnership existed for tax purposes depends on "whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both."

In PLR 9914006 (12/23/98), a limited liability company ("LLC") was owned by a partnership and a corporation all of the stock of which was owned by the partnership. Under the LLC agreement, the corporation was not entitled to receive any distributions, and did not receive any allocations of income, gain, profit, loss, deduction, credit, or other amount from the LLC. One of the issues in the ruling was whether the LLC was a partnership for tax purposes. The IRS cited Culbertson, supra, and Comm'r v. Tower, 327 U.S. 280 (1946) for the general principles to determine if a partnership exists. The ruling states that "The primary inquiry is whether the parties intended to join together to operate a business and share in its profits and losses." Because the corporation in the ruling had no interest in the profits and losses of the LLC, the IRS concluded that the corporation was not a partner, and that therefore the partnership was the sole owner of the LLC. Under Treas. Reg. §301.7701-3, a single member entity is ignored for tax

purposes. The critical issue in this ruling was whether the purported partners joined together to conduct a business and share the profits and losses. In the present situation, Investor and the other members invested in Fund with the intent of jointly conducting an activity (investing) and sharing the profits and losses therefrom.

ASA Investerings Partnership v. Comm'r, T.C. Memo. 1998-305, appeal pending (DC Cir. December 7, 1998), concerned a substantially similar transaction as in ACM, supra. In ASA Investerings, Allied Signal became a partner in the partnership and claimed a capital loss. The court found that the partnership formed by Allied Signal and ABN, the foreign partner, was not a valid partnership arrangement for U.S. Federal income tax purposes. The court based its holding, in part, on what it viewed as the two party's different investment objectives. In the court's view, Allied Signal only wanted the capital losses while ABN was only interested in earning a specified rate of return on its investment. ABN did not want to share in any losses. The court found that Allied Signal was obligated to pay all expenses and guarantee ABN a minimum profit and made all the critical management decisions. As a result, the court concluded that ABN was not a partner in a partnership, but rather was a mere lender. The court noted that Allied Signal agreed to enter into the transaction before it even knew that ABN would be involved.

The Allied Signal case is distinguishable from the transactions undertaken described herein in several key respects. Each member invested in Fund in anticipation of realizing profits from Fund's investment activities. Investor and Managers all have the potential for profit or loss in respect of their collective investment in Fund. No member was guaranteed a particular minimum profit. Each member shares proportionately in the income, gain, loss and deductions of Fund, so that there is no issue of recharacterization as in the Allied Signal case. Finally, Investor is not a party to the critical management decisions of Fund.

Based upon the foregoing, it is more likely than not that the IRS would be unsuccessful were it to attempt to disregard Fund as an entity under the common law principles contained in these cases.

5. Code Section 1092

Code Section 1092(a)(1) provides that any loss on one or more "positions" is taken into account for any taxable year only to the extent that the loss exceeds the unrecognized gain (if any) on "offsetting positions" held by the taxpayer or a related party. Code Section 1092(d)(2) defines a "position" as an interest (including an option) in "personal property", defined in Code

Section 1092(d)(1) as any personal property "of a type that is actively traded". Code Section 1092(d)(7)(B) states that foreign currency for which an active interbank marker exists is presumed to be actively traded.

In the instant case, the Option positions will have terminated by the end of Investor's taxable year. As a result, there will be no unrealized gain in any such position at that time, and based on the foregoing, no related person with respect to Investor, within the meaning of Code Section 1092 (d)(4), would hold an offsetting position with respect to the positions held by Corp. Accordingly, it is more likely than not that any loses that Investor incurs from the transferred Options would not be limited by Code Section 1092.

6. Code Section 465

Generally, the "at risk" provisions limit the ability of certain taxpayers, including Investor, to currently deduct the losses attributable to certain activities to the extent those losses exceed the taxpayer's "amount at risk" in the "activity". Code Section 465(a) provides that in the case of certain taxpayers engaged in an "activity" to which the section applies, any "loss from such activity" for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is "at risk for such activity" at the close of the taxable year.

For purposes of Code Section 465, a taxpayer is considered "at risk" for an activity with respect to the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. Code Section 465(b) and Prop. Treas. Reg. §1.425-23(a)(1). Based upon the foregoing, it is more likely than not that any loss that Investor incurs upon the distribution of the foreign currency distributed by Fund would not be limited by the "at risk" rules, because it is more likely than not that such loss would not exceed Investor's tax basis in such foreign currency, determined as discussed above.

7. Code Section 469

Conceptually similar to the application of the Code Section 465 "at risk" rules, the passive activity loss rules of Code Section 469 apply to certain taxpayers, such as Investor. The aggregate amount of deductions disallowed for the taxable year under Code Section 469 is generally equal to a net amount designated as the "passive activity loss." A taxpayer's passive activity loss for any taxable year is the excess of the taxpayer's passive activity deductions for the taxable year over the taxpayer's passive activity gross income for the taxable year. Treas.

Reg. §1.469-2T(b)(1). Under the Regulations, in order to compute a taxpayer's passive activity gross income and passive activity deductions, the taxpayer must first determine the items of gross income "from a passive activity" and the items of deduction that "arise in connection with a passive activity."

Code Section 469(c) states that for purposes of this section the term "passive activity" means any activity which involves the conduct of any trade or business in which the taxpayer does not materially participate.[29] Code Section 469(c)(6) further provides that, to the extent provided in regulations, the term "trade or business" includes any activity in connection with a trade or business or any activity with respect to which expenses are allowable as a deduction under Code Section 212. Treas. Reg. Sections 1.469-1(e)(2) and 1.469-4(b)(1)(i) provide that the term "trade or business activity" includes any activity that involves the conduct of a trade or business within the meaning of Code Section 162.

Treas. Reg. Section 1.469-1T(e)(6) provides that the activity of trading personal property for the account of owners of interests in the activity is not a passive activity, regardless of whether the activity is a trade or business and regardless of a partner's level of participation. Treas. Reg. Section 1.469-1T(e)(6) provides an example of "trading for the account of owners of interests in the activity." This example indicates that a partnership's trading activities consists of "trading for the account of its partners" where the capital employed by the partnership in the trading activity consists of amounts contributed by the partners in exchange for their partnership interests.

The term "personal property" is defined in the regulations to have the same meaning as under Code Section 1092(d), but without regard to Code Section 1092(d)(3) which generally excludes stock from the definition. As discussed above, it is more likely than not that the Options and similar options traded by Fund would qualify as personal property under this definition.

With respect to the instant case, it is more likely than not that Investor's participation in Fund would constitute an activity that is not a passive activity based upon the exception for the "activity of trading personal property for the account of owners of interests in the activity"

---

29 Under Code Section 469(h)(2), a limited partner is presumed not to materially participate in a limited partnership.



Confidential J&G Docs
JG-NC047878
JG013325_0061

described in Treas. Reg. Section 1.469-1T(e)(6). Accordingly, it is more likely than not that the income (or loss) generated by Fund would not be subject to the limitations under Code Section 469. Similarly, it is more likely than not that such conclusion would extend to the losses from the disposition of any property received upon liquidation of Trust's interest in Fund since the assets were not used in a passive activity. Accordingly, it is more likely than not that income (or loss) of Fund and the loss upon disposition of the assets received by Investor upon redemption of its interest would interest in Fund would not be subject to the limitations under Code Section 469.

8. *Code Section 482*

Code Section 482 gives the IRS the power to, among other things, reallocate income and deductions, among "two or more organizations, trades, or businesses... owned or controlled directly or indirectly by the same interests...." Treas. Reg. §1.482-1(i)(1) provides that an organization for this purpose includes an organization of any kind, including a sole proprietorship. For example, in a recently published field service advise the IRS took the position that Code Section 482 could be used to reallocate a general partner's share of partnership income, even if the allocation otherwise met the requirement as set out in the Code and Treasury Regulations. Treas. Reg. §1.482-1(a)(2) gives the IRS the power allocate "income, deductions, credits, allowances, basis, or any other item or element affecting taxable income" among members of a controlled group.

It unclear how the IRS could apply Code Section 482 to deny any loss Investor recognizes upon the disposition for the FC I and FC II that Investor receives upon the redemption of its interest in Fund. This is because such disposition by Investor is independent of and separate from the activities of the Managers and Fund. Furthermore, if such loss were reallocated to Fund under Code Section 482, it is more likely than not that Investor would be entitled to its share of such loss as a member of Fund. Lastly, were the IRS to assert that Code Section 482 applies to the transactions described herein, for the reasons discussed below it is more likely than not that the IRS would not be successful in making such assertion.

The Code does not define the requisite ownership or control necessary to fall within Code Section 482. Treas. Reg. §1.482-1(i)(4), defines "controlled" as follows:

> Controlled includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised,

> including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.[30]

In a recent field service advice relating to a so-called lease stripping transaction the IRS contended that it can apply Code section 482 to transactions between a non-controlling party and a corporation if the non-controlling party acts in concert with a controlling party. As discussed below, the existing case law does not support such a contention.

We have been advised that there is no agreement pursuant to which Investor has the right to control Fund or vice versa. Consequently, it is more likely than not that Investor and Fund would not be treated as within the relationship described in Code Section 482. The IRS might contend that because of the fact that Investor discussed its investment in Fund with the Managers, Investor and Managers, are acting in concert within the meaning of Code Section 482 and the Regulations promulgated thereunder.

It is more likely than not that such an argument would not succeed. As discussed above, the concept of "acting in concert" in the context of Treas. Reg. §1.482-1(i)(4) relates to two or more person so acting to exercise control over a third person. Any other interpretation would subject any arm's length commercial transactions undertaken pursuant to a contract to Code Section 482. The only case which appears to deal with the "acting in concert" element of Code Section 482 is B. Forman Co., Inc. v. Comm'r, 453 F.2d 1144 (2d Cir. 1972), cert. denied 407 U.S. 934, reh'g denied, 409 U.S. 899 (1972), which is factually distinguishable from the instant situation. In Forman, two corporations acquired equal interests in a third corporation, neither individually having the requisite voting power to control the third, but having a written agreement and jointly appointed officers and directors pursuant to which they mutually exercised control over the third. In the instant case no such agreement or mutual exercise of control exists. This situation is markedly different from the instant situation in which Investor and Managers are not acting in concert to control any third party, i.e. Fund, because Investor has no power to control Fund. Consequently, it is more likely than not that there would be no concerted action of

---

30 No case addresses facts specifically like the instant case. The Fifth Circuit Court of Appeals has held in a different factual context that the burden of proof is upon the government to demonstrate the appropriateness of the presumption. See Dallas Ceramic Co. v. U.S., 598 F.2d 1382 (5th Cir. 1979). Once the presumption has been established, however, the burden of proof would appear to fall on the taxpayer.

the type required so as to permit the IRS to reallocate income or deductions between the two under Code Section 482.

In Notice 95-53, 1995-2 CB 334, the IRS raises the possibility that a noncontrolling and controlling party could be considered "acting in concert" for purpose of applying Code Section 482 in the context of a tax-advantaged transaction. Here again, however, the acting in concert aspect of Code Section 482, was asserted with respect to a noncontrolling party exercising control over a third party. Furthermore, Proposed Treasury Regulations issued pursuant to the Notice were issued under Code Section 7701(l) and not under Code Section 482. To our knowledge, the position has not been reviewed by a court, and we believe that the decision of B. Forman Co., Inc. v. Comm'r, supra, is the appropriate standard. As discussed above, under such standard it is more likely than not that Code Section 482 would not be applicable to the transactions described herein.

## V. Application of Code Section 6662

### A. Substantial Understatement of Taxable Income

Code Section 6662(b)(2) provides for a 20% underpayment penalty for taxpayers if there is a substantial understatement of income tax on a return. For non-corporate taxpayers, an understatement is considered substantial for this purpose if it exceeds the greater of 10% of the correct tax or $5,000. See Code Section 6662(d)(1). An understatement generally does not include deficiency amounts attributable to a position that is supported by "substantial authority"[31] or for which there is adequate disclosure.

Substantial authority for a position exists if the weight of authorities supporting the position is substantial in relation to the weight of authorities against the position. See, Treas. Reg. §1.6662-4(d). Authorities for this purpose include (but are not limited to) applicable provisions of the Code; proposed, temporary and final regulations; revenue rulings and revenue procedures; court cases; Congressional intent as reflected in committee reports; private letter rulings and technical advice memoranda issued after October 31, 1976; and actions on decision and general counsel memoranda issued after March 12, 1981. The weight of an authority

---

31 There is considered to be substantial authority for a return position if substantial authority is present either on the last day of the taxable period covered by the taxpayer's return, or on the date the return is filed. Treas. Reg. §1.6662-4(g)(1)(i)(A) and §1.6662-4(d)(3)(iv)(C).



Confidential J&G Docs
JG-NC047881
JG013325_0064

depends upon its relevance and persuasiveness, and the type of document. See, Treas. Reg. §1.6662-4(d)(3).

The "substantial authority" standard is higher than the "reasonable basis" standard but generally below "more likely than not". See, Treas. Reg. §1.6662-4(d)(2). The "reasonable basis" standard has been recently defined in Treas. Reg. §1.6662-3(b)(3) as a position that is significantly higher than not frivolous or not patently improper. The Internal Revenue Manual ("IRM") states that the standard is one where a position is arguable but fairly unlikely to prevail in court. The Internal Revenue Manual further states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in- three likelihood of being sustained on the issue." See, IRM (20)535 (1997). The "more likely than not" standard is one where there is a greater than 50 percent likelihood that a position will be upheld if challenged by the IRS. See, Treas. Reg. §1.6662-4(d)(2).

If the position involves a tax shelter[32], there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed that the tax position was more likely than not the proper treatment". The "reasonable belief" requirement can be satisfied if the taxpayer reasonably relies in good faith (i.e., the taxpayer discloses all the facts it knows or should know) on the opinion of a qualified tax professional that unambiguously states there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the IRS.

B. Substantial Valuation Misstatement

Code Section 6662(b)(3) provides for a 20% underpayment penalty for taxpayers if there is a substantial understatement of income tax on a return. Code Section 6662(e) provides that there is a substantial valuation statement if, among other things, the value/adjusted basis of any property claimed on any income tax return is 200% or more of the amount determined to be the correct amount of such valuation/adjusted basis. Code Section 6662(h)(1) increases the penalty to 40% in the case of any gross valuation misstatement. Code Section 6662(h)(2) provides that there is a substantial valuation statement if, among other things, the value/adjusted basis of any

---

32 Prior to the Taxpayer Relief Act of 1997, a tax shelter was generally defined as any plan or arrangement the principal purpose of which was the avoidance or evasion of U.S. federal income tax. Tax avoidance or evasion was considered the principal purpose if that purpose exceeded any other purpose. The 1997 Tax Act modified the definition of tax shelter by requiring only a "significant" (rather than principal) tax avoidance or evasion purpose.

property claimed on any income tax return is 400% or more of the amount determined to be the correct amount of such valuation/adjusted basis. The penalty does not apply, however, if the reasonable cause exception of Code Section 6664(c) and Treas. Reg. §1.6664-4, discussed below applies.

C. Code Section 6664(c)

Code Section 6664(c) provides a general exception to Code Section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the extent of the taxpayer's effort to assess proper tax liability. See, Treas. Reg. §1.6664-4(b). Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good faith" if the advice is based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. All facts that are relevant to the tax treatment of a transaction must be disclosed. See, Treas. Reg. §1.6664-4(c).

The regulations also set forth certain general opinion requirements ("General Opinion Requirements") that must be satisfied in order for reliance on tax advice, including opinion letters, to be considered reasonable and in good faith. Treas. Reg. §1.6664-4(c)(1). The General Opinion Requirements (all of which must be satisfied) are as follows:

(i) The opinion was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight of such purposes) for entering into the transaction and for structuring the transaction in a particular manner. In addition, reliance on an opinion will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item.

(ii) The opinion was based on the law as it relates to those facts and circumstances.

(iii) The opinion was not based on any unreasonable factual or legal assumptions (including assumptions as to future events).

(iv) The opinion did not unreasonably rely upon the representations, statements, findings or agreements of the taxpayer or any other person. For example, the opinion must not

> be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

Although we have found no court case that has construed the General Opinion Requirements (which were issued in August of 1995; see, T.D. 8617), numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty. See, e.g., Mauerman v. Comm'r, 22 F.3d 1001 (10th Cir. 1994) (the substantial understatement penalty was not imposed where a physician reasonably relied in good faith upon his independent tax advisor); Vorsheck v. Comm'r, 933 F.2d 757 (9th Cir. 1991) (the taxpayers' reliance on their tax accountants precluded imposition of the substantial understatement penalty); Heasley v. Comm'r, 902 F.2d 380 (5th Cir. 1990) (the taxpayers' efforts to assess their proper tax liability by consulting an accountant and their limited experience in tax matters precluded the application of the substantial understatement penalty); Daoust v. Comm'r, 67 T.C.M. (CCH) 2914 (1994) (the negligence and substantial understatement penalties were not imposed where the taxpayers reasonably relied upon professional advisors); and English v. Comm'r, 65 T.C.M. (CCH) 2160 (1993) (the negligence and substantial understatement penalties were not imposed where the taxpayers relied upon the advice of their accountants on a complex tax matter).

The U.S. Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of the taxpayer's accountant or attorney to avoid penalties in U.S. v. Boyle, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on professionals as to questions of substantive law, which would). According to Boyle:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. Id. at p. 251.

This opinion does not address, and is not intended to address any tax issues, whether U.S. Federal, state, local or foreign, other than those specifically addressed herein. This opinion is being issued to the addressee solely for the addressee's use and the use of the addressee's professional advisors to determine the amount, if any, of the addressee's U.S. Federal income liability. The addressee or the addressee's professional advisors may not use this opinion for any other purpose without our prior written consent.

Very truly yours,



Confidential J&G Docs
JG-NC047885
JG013325_0068

# EXHIBIT G11

# Discussion Main Topic

| | |
|---|---|
| Title: | COBRA - Two Currency Unit |
| Project: | COBRA |
| Category: | Implementation |
| Author: | Melinda S. Mark |

Topic:
The following message was sent by Richard Shapiro to the Quickstrike Team on 11/15/99:

As a result of further discussions today with Jenkens & Gilchrist and Deutsche Bank, we have concluded that in general the most viable structure for the COBRA strategy will involve the use of ONLY 2 currencies, even with more than 2 partners. The use of fewer currencies results in a higher probability of making a profit at the partnership level, while still providing diversification.

If you have any questions, please contact me at 212-773-2740, or Bob Coplan, Martin Nissenbaum or Brian Vaughn.

Edit History

| | | | | | |
|---|---|---|---|---|---|
| Melinda | S. | Mark | 11/15/99 | 10:37:05 | AM |

2003EY000864

GOVERNMENT EXHIBIT 11

GOVERNMENT EXHIBIT 2357

Richard J. Shapiro

11/15/1999 04:04 PM

To: Charles R. Kowal/Southeast/TAX/EYLLP/US@EY-Namerica, Michael K. Szalkowski/Southeast/TAX/EYLLP/US@EY-NAmerica, Robert Johnson/GulfCoast/TAX/EYLLP/US@EY-Namerica, Richard W Jones/GulfCoast/TAX/EYLLP/US, Richard J Joyner/Southwest/TAX/EYLLP/US@EY-NAmerica, Victoria R Matalon/Southwest/TAX/EYLLP/US@EY-NAmerica, Alan M. Harbour/Chicago/TAX/EYLLP/US@EY-NAmerica, Michael S Friedlander/SCalifornia/TAX/EYLLP/US@EY-NAmerica, James A. Cox/NCalifornia/TAX/EYLLP/US@EY-Namerica, Robert M Haynie/NCalifornia/TAX/EYLLP/US@EY-NAmerica, Michael Reed/MissouriKansas/TAX/EYLLP/US@EY-NAmerica, Richard F. Kramer/MissouriKansas/TAX/EYLLP/US@EY-Namerica, Brian W. Upchurch/SOhioKentuckyIndiana/TAX/EYLLP/US@EY-Namerica, Carl A. Rhodes/SOhioKentuckyIndiana/TAX/EYLLP/US@EY-NAmerica, Jeff Brodsky/Chicago/TAX/EYLLP/US@EY-NAmerica, Gary M. Duboff/Chicago/TAX/EYLLP/US@EY-Namerica, David G. Johnson/NOhioEMichigan/TAX/EYLLP/US@EY-NAmerica, William P Murphy/NOhioEMichigan/TAX/EYLLP/US@EY-NAmerica, Charles R. Cangro/NewYork/TAX/EYLLP/US@EY-Namerica, Glenn H. Hatcher/Connecticut/TAX/EYLLP/US@EY-Namerica, Robert L. Carson/NewEngland/TAX/EYLLP/US@EY-Namerica, Andrew Kyriacou/NewEngland/TAX/EYLLP/US@EY-Namerica, Charles W. Paul/Washington/TAX/EYLLP/US@EY-NAmerica, Michael F. Beamer/Washington/TAX/EYLLP/US@EY-Namerica, Mark A. Troconi/Pittsburgh/TAX/EYLLP/US@EY-Namerica, James A Hutchinson/Philadelphia/TAX/EYLLP/US@EY-NAmerica, Robert C. Schlemmer/SOhioKentuckyIndiana/TAX/EYLLP/US@EY-Namerica, Brian L Vaughn/Southeast/TAX/EYLLP/US@EY-NAmerica, Martin Nissenbaum/NewYork/TAX/EYLLP/US, Peter D Locito/NewYork/TAX/EYLLP/US@EY-Namerica, Melinda S. Merk/National/TAX/EYLLP/US, Robert B. Coplan/National/TAX/EYLLP/US@EY-NAmerica, David Gerson/NewYork/TAX/EYLLP/US@EY-Namerica, Ray Knight/Carolinas/TAX/EYLLP/US@EY-NAmerica, Richard J. Shapiro/NewYork/TAX/EYLLP/US@EY-Namerica, Robert J Garner/NewYork/TAX/EYLLP/US, Robert J Garner/NewYork/TAX/EYLLP/US

cc:

Subject: COBRA——IMPORTANT

As a result of further discussions today with Jenkens & Gilchrist and Deutsche Bank, we have concluded that in general the most viable structure for the COBRA strategy will involve the use of ONLY 2 currencies, even with more than 2 partners. The use of fewer currencies results in a higher probability of making a profit at the partnership level, while still providing diversification.

If you have any questions, please contact me at 212-773-2740, or Bob Coplan, Martin Nissenbaum or Brian Vaughn.

2003EY010642