# EXHIBIT G28

**From:** Michael Lowengrub
**Sent:** Thursday, July 20, 2000 5:36 PM
**To:** Linnae Latessa; Vincent Tricarico
**Subject:** PBA JV programs with Structured Transactions Group of GCI
**Attach:** Binary Options-Boyle.doc; BOPS strategy.ppt; FX strategy in custody.doc; cards summary.doc; cards schematic.ppt

---

FYI.....

Michael Lowengrub
Private Bank - Americas Controlling
280 Park Ave, Flr 6W
MS #1066
Tel # (212) 454-1671
Fax# (212) 454-0203

---------------------- Forwarded by Michael Lowengrub on 07/20/2000 06:36 PM ---------------------------

From: Charles.R.Binder@db.com on 07/20/2000 07:00 PM GMT
To: Christof Fritzen/AM/Zentrale/DeuBa@Zentrale
cc: Paul W Higgins@Bankers_Trust; Michael Lowengrub/NewYork/DBNA/DeuBa@DBNA
Subject: PBA JV programs with Structured Transactions Group of GCI

Chris,

It's time for me to summarize the various programs that are being implemented in a JV type format between the PBA and the Structured Transactions Group [STG] of GCI. The STG is the tax structuring group on the trading floor. Bill Boyle heads up that function and has been working with both John Rolfes in NY and Mark Westoff and Mike Jacoby in Chicago on separate yet somewhat similar strategies for HNW clients in the US that have been proposed by tow different fx consulting firms working in conjunction with two big 8 accounting firms.

As you and I discussed today, I will endeavor to have Paul, Bill Boyle and I meet with John Ross to confirm his approval of the amounts and types of these programs, and the degree of controls we have built around implementation.

1. The original Blips program designed by Presidio Advisors [the fx consulting firm] is back. An additional $1bn is anticipated, with the PB acting as custodian for the transaction. GCI has all the execution, market and credit risk. Credit officer in GCI is Paul McHugh. The one change this time around is that John Wadsworth in tax made it a requirement to have the loan required for the structure outsourced. Therefore the loans will be

GOVERNMENT EXHIBIT 28
PENGAD 800-631-6989



DB-DOJ-COBRA-00030714

made to each LLC involved by Hypoverinsbank. The depositis created therefrom will be held in a custody account and secure the Hypo loan. Therefore DB will be the bailee for Hypo and i have requested Rolfes insure that I see the bailment agreement before it is signed.

The PB will also do the KYC processing that is prepared by the acctg firm on their client.

The PB will receive 20 bpts on the volume of fx trading done by DB. On $1bn volume this would be $2mm in revenue.

2. Binary Options Strategy

This is also a Presidio advisors strategy coordinated through John Rolfes and Bill Boyle. We spoke of this strategy while you were in NY last. Paul higgins is also familiar with the structure as I presented it to you and Paul on a flip chart schematic. It involves the creation of an LLC which buys an fx or other option and simultaneously sells the same underlying through a second option. Because these are binary, they each either pay or not. The tax treatment is opined on by an outside law firm and the big 8 acctg firm for the benefit of it's client. I am attaching two files here. One is writeup sent to me by Bill Boyle and the other is my writeup hitting on the salient points for the PB.

(See attached file: Binary Options-Boyle.doc)(See attached file: BOPS strategy.ppt)

The PB to make minimum 20 bpts on anticipated $2.5bn in premiums paid by cps. This would amount to revenue of $5mm.

3. Prepaid Forward Agreements

Again for clients of Presidio/KPMG. This is not fulled vetted yet. I actually just got wind of this when I asked Rolfes for a listing of all the programs he is working on. From what he tells me these will be up to $1bn of Variable Delivery Forward Agreements, which will be used in conjunction with a Presidio/KPMG tax strategy for their clients. This is a possible PB deal and does not involve the STG. Therefore, since it is a product that we currently offer through the PB SPG in NY [Maryann Coleman's group] and is an equity monetization product used to diverisfy low basis stock positions by selling the stock forward and DB prepaying the net present value using a loan rate as the discount factor, these will be treated as any other VDF capital markets trades. The cps will have to be credit cleared and the stocks involved will have to qualify for short sales that the bank will have to make in order to collar the stock. Rolfes has indicated that if we do $1bn of these VDFs that we will earn 25 bpts which is $2.5mm. That seems low to me since our traditional pricing for a VDF is based on a Libor+100-125 bpts. Maryann tells me we probably can't get more than the 25 bpts for the PB piece since this is only a one year trade and the desk will have to make at least the other 25 bpts.

4. Bricolage Capital fx strategy-PB custody

The PBA Chicago Office has implemented, with my prior approval, handling the custody for approximately 35 clients of Arthur Andersen and BDO Seidman that are also being advised on fx trading by Bricolage Capital, an fx advisory firm. All internal approvals were already obtained by Bill Boyle in STG. The trades will again relatively short term, maxing out at 9 months. The size of this program [see attached file containing Bill Boyle's writeup in LN] is estimated to be 100 clients averaging $25-50mm in trades for a total program of $3-5 bn during yr 2000. The PBA custody group has priced this busines based on it's reveiw of the required work by custody. For reference I am attaching Bill Wyman's writeup [as a file] describing his understanding of the PBA custody group's role. the custody group has agreed to charge $10m for a single account for an individual and $20m for any spv used. Currently we have 35 custody accounts which would generate $700m if all were spvs. If we actually opened 100 accounts @ $20m that would be $2mm for the PBA. Assuming that the fx desk was able to make 10 bpts through the middle they would make $5mm on the trading. I would be surprised if they would be making more than that and probably somewhat less.

(See attached file: FX strategy in custody.doc)

5. Custom Adjustable Rate Debt Facility ["CARDS"]

Bill Boyle is working with the family office known as MY CFO.com to structure a tax advantaged program that was originally created by the BT tax structuring group in 1998. The structure requires a UK based investor as welll as the US based investor who receives the tax benefit. The structure involves DB making a loan, whose proceeds are used to purchase a deposit, both in Euros. Part of the deposit, as outlined in the writeup on the product by Bill Boyle, is then sold to the US investor [through a second LLC] by his LLC #2 taking on a joint and several liability on the entire loan that DB made to the LLC. The US investor pledges the "purchased" deposit back to DB. His tax basis in the asset purchased becomes the entire amount of the loan for which he is now liable. Upon sale of that portion of the total deposit which he [LLC#2] purchased, he has a tax loss which he can use against his income in the US. The sale takes place by liquidating the Euro based deposit and converting it into a US dollars [deposit], which remains pledged to the DB loan. The cross currency risk on the smaller portion of the deposit which is converted into the dollar based deposit, will be hedged by GCI. All credit, opertional and market risk in the structure is for GCI's account. The credit officer in GCI is Paul McHugh. PBA will do the KYC on participating investors, and will custody the deposits created from the loan proceeds. The tenor of the transactions is expected to be relatively short, max 6-9 months. However, the actual loan will be set up for a 30 year term. The interest rate on the loan however, will be reset annually. Remarketing period for the interest rate will be annually.

After the smaller deposit is converted into USDs [with the bank maintaining a security interest in those USDs], by LLC# 2, it may request that those deposits be placed in a different asset class and substitute those assets as collateral for the loan. The substitute assets must be haircut for collateral purposes, and this should require equity be put into the LLC# 2, by the US based investor at the time of substitution. GCI credit will be responsible for establishing the appropriate haircut on the collateral proposed for substitution. PBA Credit Risk Management will assist in establishing the appropriate haircut if requested to do so. When this

product arose during the BT time frame, gilts were also proposed as the collateral. The haircut for short term British government obligations was approximately 5%, and would have to be mtm requlariy, with top ups required if the margin was not maintained.

Attached are two files prepared by Bil Boyle etal. One is a draft writeup on the product with schematic, and the other is a draft summary of the the background on the product and the various key issues that have heretofore been addressed. It covers legal advice DB is taking in it's role to execute, as well as the seperate legal firms advising the UK and the US investors respectively. It also lists the approval groups whose must sign off prior to any executions of the strategy. Since these are drafts they should not be considered final works.

Program size could be upwards of $1bn. PBA revenue has not been finalized, but Mark Westoff mentioned GCI non-interest revenue to STG in the range of 100 bpts in structuring fees on the loaned amounts, with PB receiving 10-20 bpts or $1-2mm per $1bn of loan volume. This has not yet been finalized between PBA and STG.

(See attached file: cards summary.doc) (See attached file: cards schematic.ppt)

Best regards

Chuck

- Binary Options-Boyle.doc
- BOPS strategy.ppt
- FX strategy in custody.doc
- cards summary.doc
- cards schematic.ppt

<<...>> <<...>> <<...>> <<...>> <<...>>

To: Charles R Binder@Bankers_Trust
cc: john.rolfes@db.com@HUB
Subject: Approval for PBA to be custodian for Presidio FX trades

The Structured Transactions Group ("STG") and the Private Bank ("PB") has the opportunity to execute a number of foreign exchange ("FX") investment strategies (the "Strategies") through the DB FX desk on behalf of clients, primarily individuals, of KPMG. These strategies are similar to the FX transactions we had approved earlier for the clients of several accounting firms (i.e. Arthur Andersen & BDO Seidman). Similar to the earlier deals where these accounting firms are introducing Bricolage Capital, L.L.C. ("Bricolage") to their clients to promote their FX investment strategies, KPMG will introduce Presidio Advisors ("Presidio") to its clients. Clients may participate in the Strategies through either/both: 1) segregated investment accounts ("Managed Accounts") managed by Presidio in close coordination with the Investor; or 2) discretionary investment partnerships ("Investment Partnerships") managed by Prsidio with multiple investors. It is anticipated that the clients may participate in the first part of the Strategy through a newly-created LLC of which the client is the sole member.

**Strategy**

Presidio is a registered investment advisor that has devised a FX investment program which combines fundamental macroeconomic research on foreign currencies with the structuring of options that refine and enhance the risk-reward characteristics of short-term and long-term directional investment strategies. Presidio believes that the combination of the aforementioned analytical techniques creates the opportunity for high risk-adjusted returns over time. Due to the relatively esoteric nature of the investment program, Presidio has developed a two-step process to familiarize potential investors with Presidio and its investment strategies. First, investors can create a Managed Account, for which Presidio will work with the investor to develop a tailored investment program that meets the investor's risk-reward profile. Second, as the investor attains comfort with the investment strategy, he/she can enter an investment partnership and benefit from its lower fee structure and diversification.

**Legal Counsel and Professional Advice to Investor**

In evaluating the tax consequences to the investor of participating in the Strategies, Brown & Wood will provide tax opinions to the investors addressing the potential tax consequences to the investors of participating in the Strategies. In addition, the KPMG may provide separate or concurring opinions or advice to its clients regarding the tax consequences to the investors from participating in the Strategies.

**DB's Role in the Strategies**

DB's role in the strategies is simply executing the FX trades on behalf of the investors based upon orders given to DB by the investors, Presidio acting on behalf of the investors through the Managed Accounts or for the Investment Partnerships managed by Presidio. In addition to any profit the FX desk generates through the pricing on the FX trades, DB will also receive a fee for executing and processing information related to the trades. In addition, we understand that a number of other commercial and investment banks have played a similar role in executing these type of trading strategies, in significant size, on behalf of their clients. In this deal with Presidio, we understand that AIG will also be executing a significant portion of the deals.

**Investor and Investment Advisor Representation Letters and Trading Confirms**

Consistent with our sole role in executing the trades, we will receive representations from: 1) Presidio that we are acting solely in our capacity of executing the trades and have no role in the marketing of any of the transactions; and 2) the investor that we are acting solely in our capacity of executing the trades, we have no role in marketing the Strategies to the investor, we have not provided any investment, legal, accounting or tax advice to the investors regarding any investment in the strategies and that the investor

is represented by counsel regarding the legal consequences of their participation in the Strategies. In addition, the trading confirms will contain language which provides we have not provided any investment, legal, accounting or tax advice regarding the execution of the trades. The representation letters have been prepared by Shearman & Sterling and reviewed by the legal department (See the representation letters provided in the 1999 year end BDO Seidman trade). In addition, the legal department has reviewed the trading confirms created by the FX desk for these types of transactions (See the confirms used inthe 1999 BTAB FX trades).

**Private Bank Role**

PB will open the client custody accounts through which the Strategies will be executed. The FX desk and RVG will provide the mark-to-market reporting on the investment positions to Presidio and the clients. PB will provide reporting on the opening and closing cash positions in the client accounts. In addition, similar to the 1999 BLIP's deals, the client accounts may hold a small amount of FX or equity upon conclusion of the underlying trading strategy. Such amounts are expected to be disposed of within a short period subsequent to their receipt in the accounts. As part of the account opening process, the Private Bank will provide the "know your client" review and obtain the KYC approval to open the accounts.

**Transactions/Approvals**

We anticipate our role in executing this strategy may be in the $1-2 billion range. These transactions will be part of the similar FX transactions approval we have received from the Tax Department and the New Products Commitee. Currently, we have appoval from Tax to execute up to $3 billion of these transactions. As we approach that amount, we will need to revisit with Tax to reevaluate the program and determine additional amounts we may be interested in executing. Tax and New Products have met with John Ross regarding the execution of these transactions.

We would like PB's approval for it to participate in the aforementioned roles. Should you have any questions, please give me a call.

Best regards,

Bill

# Binary Options Strategy: Credit Risk Mgmt PBA summary

This document sets forth the respective understandings of the PBA and STG on the strategy implementation

prepared by Chuck Binder MD and SCO PBA

2/4/2005

GOVERNMENT'S EXHIBIT 828



DB-DOJ-COBRA-00030720

# Binary Options Strategy

- Binary defined as either pay a fixed amt or zero. Payoff not related to level of appreciation over the strike price.
- Each transaction consists of two trades. One long the other short on the same underlying.
- Underlyings may be fx, or other so long as both trades are on the same underlying
- FX desk will not accept an order unless both trades are requested at the same time.





DB-DOJ-COBRA-00030721

# Page 2

- An LLC to be established for each client
- PB to KYC and have subsequent access
- Amount of option premium paid by cp to DB related to amount of income of cp
- step 1: DB buys option from cp for 98% of the option premium to be paid by cp to DB
- step 2: CP buys option from DB for 102% of premium received from DB





DB-DOJ-COBRA-00030722

- CP must infuse the premium difference into the LLC at time of execution of the two simultaneous trades. [2% of prem paid by cp]
- Strikes on both options are about the same. Any spread must fall within DB's ability to set a bid/ask spread. Both options must either pay off or not. Market risk/ops risk on execution is for account of GCI desk executing.



DB-DOJ-COBRA-00030723

Page 4

- Options the cp purchases will always pay off more than what the cp owes on the option sold to DB. [eg. 4 x premium rec'd vs 5 x premium paid]
- Since options will either each pay a fixed amount or zero, the option purchased will always be worth more than the option sold to DB by the cp.
- This translates to zero credit risk based on netting under the ISDAs required.

- There are no notionals attributable to the trades, only premium amts.
- Hedges on the options are the risk of GCI
- No credit risk on these trades when executed as per the strategy.
- Tax opinions and any supporting approvals for new product purposes to be provided to PBA Risk Mgmt prior to execution.
- DB docs to reflect no advisory relationship between DB and cp.

- Documentation for LLC and client disclosures to be approved by GCI/legal/outside counsel. Including confirms and ISDA's.
- List of all approved cps and their LLC entities to be maintained in ORM for the PBA.
- Any limits needed for any cp entity to be approved by PBA CRM. Limits required to be provided by STG prior to trading.

Page 7

- Program limit = $2.5 bn in premiums bought by cps. This limit is aggregate for this strategy. Excess to be approved by PBA CRM and Head of PBA.....notice to CRO PB
- JV income split: PB min 20 bpts of fees paid by cps to GCI. Potentially $ 5mm
- Financials on the cps and the LLC
- tax dept sign off on level of strategy limit and tax opinions being provided by outside law firms to the cps





DB-DOJ-COBRA-00030727

- Simultaneous trades must have matching maturities.
- Max tenor for the strategy implementation for any given LLC to be 60 business days. After the execution period is over , no additional trades need be booked.
- STG will monthly send a spreadsheet listing the aggregate trades, both long and short that are outstanding with maturity dates, aggregate premiums paid to date for each LLC.





DB-DOJ-COBRA-00030728

I approve the change to include the forwards. Thanks for your confirmation Bill W.
[this duplicates a message I sent on 4-28-2000, which was subsequently deleted. That is why this message has the date of 7-19-2000 on it]

---------------------- Forwarded by Charles R Binder on 07/19/2000 03:17 PM ---------------------------

# Reply to Message

**To:** Charles R Binder@Bankers_Trust
**cc:** William Boyle@Bankers_Trust
Mark R Westhoff@Bankers_Trust
**From:** William S Wyman
**Date:** 04/28/2000 05:05:08 PM
**Subject:** Re: Approval for PBA to be custodian for fx trades under the struture proposed.

Chuck,

As Mark indicated, what the Custody product has agreed to related to this client has nothing to do with trust reporting or monitoring, preparation of any tax reports or returns, or any limitations for the recording of fx transactions or holdings since these accounts would be held on our Global Plus system which is multi-currency and can hold such instruments (e.g., fx forwards, options).

At the bottom of this note, I still stand behind the details as outlined in my original 2/4 note. I hope this help. Please let me know if you have any further queries.

Regards,

Bill

To: Charles R Binder@Bankers_Trust

cc: William S Wyman@Bankers_Trust, William Boyle@Bankers_Trust, William J Wilkie@Bankers_Trust, Michael S Jacoby@Bankers_Trust, Cari LaRose@Bankers_Trust
Subject: Re: Approval for PBA to be custodian for fx trades under the struture proposed.

Chuck,

I just spoke to Bill Wyman regarding the attached and he has given his verbal approval for this transaction. Bill Wyman is on the West coast today and will have access to e-mail tomorrow at which point he will document his approval. Also note that these accounts are maintained on our Global+ system which is a multi-currency system and can handle fx reporting. I believe Bill Wilkie was referring to our AIMS system which is a domestic system that can not handle fx reporting.

Regards, Mark

---------------------- Forwarded by Mark R Westhoff on 04/26/2000 02:29 PM ---------------------------

To: William Boyle@Bankers_Trust
cc: Michael S Jacoby@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, francesco.piovanetti@db.com@HUB, William S Wyman@Bankers_Trust, William J Wilkie@Bankers_Trust, Lori Callahan@Bankers_Trust
Subject: Re: Approval for PBA to be custodian for fx trades under the struture proposed.

Bill, I have no problem with forwards [although I am not approving the trade side for credit], however there was a question raised as to our ability to handle certain aspects of the acctg in these custody accounts. I would therefore like to have Bill Wyman opine on this aspect prior to providing PB signoff. Bill Wilke indicated to me that the trust acctg system is somehow linked into the custody product's providing this service and raised a reservation to me the other day.
regards
Chuck

To: Charles R Binder@Bankers_Trust
cc: Michael S Jacoby@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, francesco.piovanetti@db.com@HUB
Subject: Approval for PBA to be custodian for fx trades under the structure proposed.

Chuck,

As we discussed earlier, the Private Bank is acting as custodian for certain FX transactions the FX desk is executing on behalf of clients of Arthur Andersen and BDO Seidman through Bricolage. The clients are referred to Bricolage by Arthur Andersen and BDO Seidman and will be represented in the transactions by the law firms Curtis-Provost, Colt & Mosle ("Curtis Mallet") or Arnold & Porter ("A&P"). In addition to acting as custodian on the transactions, the Private Bank is also completing the KYC process. The FX trades in the transaction involved long and short positions in FX options. In addition to the FX option trades, Bricolage would like to take certain positions in a series of forward FX trades with Deutsche Bank. These FX Forward trades will be, in effect, like yield curve trades. For example, the client will typically be long a 9 month forward vs short a 9.5 month forward. The trades will be executed in the G7 currencies as well as in the Scandi currencies (DKK, SEK, NOK). The addition of these trades to the transactions has been reviewed and aproved by legal, credit and tax. Similar to the option trades in the transaction, the Private Banks involvement continues to be limited to acting as custodian and providing the KYC approval and will continue to have no credit exposure.

I wanted to inform of these additional trades and would appreciate it if you could forward to me for our files and new products committee files your ok with the Private Banks role in the forward FX trades similar to the role in the FX option trades for the transactions.

Thanks,

Bill

---------------------- Forwarded by William Boyle on 04/16/2000 12:42 PM ---------------------------

To: William Boyle@Bankers_Trust
cc: Paul W Higgins@Bankers_Trust, Alfred Dengler@HUB, William S Wyman@Bankers_Trust, Paul Glover@Bankers_Trust, francesco.piovanetti@db.com@HUB, Michael S Jacoby@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust, Paul Mchugh@HUB
Subject: Approval for PBA to be custodian for fx trades under the structure proposed.

Subject to adhering to my comments and in light of the fact that the last section has been accomplished with the product people in custody, I am approving the PB's participation as custodian for these transactions. I understand that the KYC process is underway and needs to be completed in order to start any trading in the accounts.

---------------------- Forwarded by Charles R Binder on 02/01/2000 09:40 AM ---------------------------

To: Charles R Binder@Bankers_Trust, Allan Cutle@Bankers_Trust
cc: higgins, dengler, wyman, Paul Glover@Bankers_Trust, francesco.piovanetti@db.com@HUB, Michael S Jacoby@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust
Subject: Approval for Execution of FX Transactions

**[Bill, my comments are in bold.]**

The Structured Transactions Group ("STG") has the opportunity to execute a number of foreign exchange ("FX") investment strategies (the "Strategies") through the DB FX desk on behalf of clients, primarily individuals, of several accounting firms (i.e. Arthur Andersen, BDO Seidman & Ernst & Young). These accounting firms are introducing Bricolage Capital, L.L.C. ("Bricolage") to their clients to promote their FX investment strategies. Clients may participate in the Strategies through either/both: 1) segregated investment accounts ("Managed Accounts") managed by Bricolage in close coordination with the Investor; or 2) discretionary investment partnerships ("Investment Partnerships") managed by Bricolage with multiple investors. It is anticipated that the clients may participate in the first part of the Strategy through a newly-created LLC of which the client is the sole member.

Strategy
Bricolage is a registered investment advisor that has devised a FX investment program which combines fundamental macroeconomic research on foreign currencies with the structuring of options that refine and enhance the risk-reward characteristics of short-term and long-term directional investment strategies. Bricolage believes that the combination of the aforementioned analytical techniques creates the opportunity for high risk-adjusted returns over time. Due to the relatively esoteric nature of the investment program, Bricolage has developed a two-step process to familiarize potential investors with Bricolage and its investment strategies. First, investors can create a Managed Account, for which Bricolage will work with the investor to develop a tailored investment program that meets the investor's risk-reward profile. Second, as the investor attains comfort with the investment strategy, he/she can enter an investment partnership and benefit from its lower fee structure and diversification.

Legal Counsel and Professional Advice to Investor
In evaluating the tax consequences to the investor of participating in the Strategies, Curtis, Mallet-Provost, Colt & Mosle ("Curtis Mallet") and potentially Arnold & Porter ("A&P") are available to provide tax opinions to the investors addressing the potential tax consequences to the investors of participating in the

Strategies. In addition, the accounting firms may provide separate or concurring opinions to its clients regarding the tax consequences to the investors from participating in the Strategies.

**CB note : Every new client we accept must have been provided a tax opinion from either C+M or A+P or the respective acctg firms whose clients these are.**

**DB's Role in the Strategies**
DB's role in the strategies is simply executing the FX trades on behalf of the investors based upon orders given to DB by the investors, Bricolage acting on behalf of the investors through the Managed Accounts or for the Investment Partnerships managed by Bricolage. In addition to any profit the FX desk generates through the pricing on the FX trades, DB will also receive a fee for executing and processing information related to the trades. In addition, we understand that a number of other commercial and investment banks have played a similar role in executing these type of trading strategies, in significant size, on behalf of their clients.

**Investor and Investment Advisor Representation Letters and Trading Confirms**
Consistent with our sole role in executing the trades, we will receive representations from: 1) Bricolage that we are acting solely in our capacity of executing the trades and have no role in the marketing of any of the transactions; and 2) the investor that we are acting solely in our capacity of executing the trades, we have no role in marketing the Strategies to the investor, we have not provided any investment, legal, accounting or tax advice to the investors regarding any investment in the strategies and that the investor is represented by counsel regarding the legal consequences of their participation in the Strategies. In addition, the trading confirms will contain language which provides we have not provided any investment, legal, accounting or tax advice regarding the execution of the trades. The representation letters have been prepared by Shearman & Sterling and reviewed by the legal department (See the representation letters provided in the 1999 year end BDO Seidman trade). In addition, the legal department has reviewed the trading confirms created by the FX desk for these types of transactions (See the confirms used inthe 1999 BTAB FX trades).

**Private Bank Role**
The Private will open the trading accounts through which the Strategies will be executed. In addition, the Private Bank will provide information reporting to the investors based upon mark-to-market reporting provided to the Private Bank by the FX Desk. As part of the account opening process, the Private Bank will provide the "know your client" review and obtain the KYC approval to open the accounts.

**CB note: to be specific....the PB has been requested to open custody accounts not trading accounts in which will be reflected the fx positions being directed by the investment advisor, Bricolage. Trading accounts require ISDAs to be put in place for the cps under which fx trades will be executed. The advisor is to be KYC'd before we begin to open any accounts. The KYC forms are to be approved by the PB Risk Management function in conjunction withm the assistance of the Operating Risk Management Group run by Allan Cuttle. Any trading account documentation is to be approved by the Credit Function in GCI assigned to cover the STG. I understand that Credit Officer will be Paul Mchugh. The trading account docs are separate and apart from the custody docs being signed up by the PB. [just like an ISDA would be separate from a custody account doc.]**
**STG will also be responsible for insuring that the advisor Bricolage has the appropriate authorities provided to it by the account owner in a form satisfactory to the bank's legal counsel giving the advisor authority to direct the bank to make the trades that comprise the strategies. The trading agreement may or may not require collateral, but that also will be determined by Paul Mchugh in Credit. It will also be GCI Credit's responsibility to evaluate the creditworthiness of the spvs set up for each client and the credit requirements attached thereto.**
**GCI Credit will also be assuming the margin monitoring role should Credit require the trades to be collateralized.**

**Transactions**
We anticipate a potential market for this particular transaction through the aforementioned accounting firms to be in the $3-5 billion range with an average transaction size of approximately $25-50 million for the 2000 calendar year.

**CB note: STG will be responsible for obtaining from GCI Credit any limits to be applied to the program in order to insure prudent levels of control. Individual limits per counterparty are the more practical application. However, since this is a tax oriented strategy being reccommended by an outside advisory firm to the clients of several major acctg firms, DB's involvement as cusotidan and as the fx strategy execution party, should maintain some level of measured control over the ultimate size of the program.**

**Approval**
We met with Ted Dengler and Mike Crimmins of the New Products Committee to discuss the sign offs they would like for 2000. Based upon the fact that these trades are similar to the earlier BTAB type trades and that legal and compliance reviewed the FX desk role in those transactions, Ted and Mike have requested that we recieve sign-off from tax, compliance, legal, Private Bank and BAC. STG would like to obtain approval from you, in your respective roles for the Private Bank,for the Private Bank to provide the information reporting and account opening roles described above as part of the execution of the FX trades by DB in the aforementioned Strategies.

**CB note: Bill Wyman should be signing off for the PB cusotdy product as they are being asked to provide certain reporting on the fx positions etc. I would like to know that Bill is agreeable to taking on this role and is satisfied with his ability to provide this level of reporting.**
**I also want to know that Paul Higgins, Head of the PB Americas, has given his final approval for the PB to be handling this type of program. After Messrs Wyman and Higgins have given their approvals, I am prepared to provide PB risk Management approval for hte PB's role here.**

Best Regards,

Bill

**cc:** Charles R Binder@Bankers_Trust
William S Wyman@Bankers_Trust
William Boyle@Bankers_Trust
Michael S Jacoby@Bankers_Trust
Cari LaRose@Bankers_Trust

**To:** Charles R Binder@Bankers_Trust
**cc:** See the mailing list below.
**From:** William S Wyman
**Local Date:**02/04/2000 08:07:37 AM
Sender's Date: 02/04/2000 07:31:52 AM EST
**Subject:** Re: Approval for PBA to be custodian for fx trades under the struture proposed.

Chuck,

I discussed your note with Marguerite Van Wowk and Ann Aziz who have been doing the legwork on the custody side. We would like to convey the following:

Our responsibilities as custodian have not been documented and we believe they should be appropriately communicated to interested parties to ensure our understanding of the tasks (e.g., being "agreeable to taking on this role and is satisfied with his (Custody's) ability to provide this level of reporting") matches theirs. In summary, we believe Custody has been asked and is pleased to:

- open and custodize Managed (LLCs and Grantor Trusts) and Investment Partnership accounts. Assets in these accounts will include US & Non-US cash, non-US long & short options in G7 and emerging market countries structured by the Structured Transactions Group (STG), U.S. Treasury Bills, and US Equities.
- obtain month-end and key date prices for the options.
- provide month-end statement(s) detailing transactions and holdings valuations.
- process inter-account transfers of securities.
- complete option processing (knock-out feature).
- prepare 1099s and 1099Bs.
- include "partnership redemption" in transaction text when securities are being transferred to Managed account.

However, as custodian, we do not believe it is our role and would not accept responsibility for "maintaining some level of measured control over the ultimate size of the program." We have agreed to perform certain tasks for a specified fee. We have also included in the fee proposal our right to review the process flow in six months to assess the process. Perhaps all interested parties should convene and take the opportunity at that time to review and satisfy this concern.

We also expect STG and Bricolage to agree to certain responsibilities. They include:

***Structured Transactions Group's responsibilities:***

- pricing of options
- forward option prices on an excel spreadsheet to Private Banking pricing area for input into Global Plus
- notify Private Banking of options transactions on trade date
- notify Trade Support Team when an option expires or is knocked-out

***Bricolage's responsibilities***

- maintain accounting for Investment Partnership accounts.
- obtain intra-month account valuations from Bankers Trust InSight. In their use of such information, Bricolage must realize prices or positions obtained on InSight through the export function do not represent representations of actual prices or positions and are not considered official records of the bank. Only our monthly statements should be referred to as official bank records.
- forward letter authorizing the transfer of assets and/or cash between the Managed and Investment Partnership accounts to Worldwide Custody on a timely basis.
- notify Worldwide Custody of incoming funds.
- instruct Worldwide Custody as to the number of Investment Partnership units to be held in each Managed account.
- provide Worldwide Custody with a client letter of authorization when instructing Custody to transfer assets/cash to/from the managed account to/from the Investment Partnership Account. The documentation needed to open the managed accounts is our Worldwide Custody Agreement, an LLC Agreement or copy of the Trust Agreement, and the Partnership Agreements.

In summary, the custody product agrees to perform the tasks we understand have been asked of us and expect the Structured Transactions Group and Bricolage to deliver what we need to perform our duties (all of which are outlined in this note). If that is the case, then I approve and accept this role.

Let me know if you need anything else.

Regards,

Bill

**Original Message from Charles R Binder on 02/01:**
Subject to adhering to my comments and in light of the fact that the last section has been accomplished with the product people in custody, I am approving the PB's participation as custodian for these transactions. I understand that the KYC process is underway and needs to be completed in order to start any trading in the accounts.

---------------------- Forwarded by Charles R Binder on 02/01/2000 09:40 AM ---------------------------

To: Charles R Binder@Bankers_Trust, Allan Cuttle@Bankers_Trust
cc: higgins, dengler, wyman, Paul Glover@Bankers_Trust, francesco.piovanetti@db.com@-UB, Michael S Jacoby@Bankers_Trust, Mark R Westhoff@Bankers_Trust, Cari LaRose@Bankers_Trust
Subject: Approval for Execution of FX Transactions

**[Bill, my comments are in bold.]**

The Structured Transactions Group ("STG") has the opportunity to execute a number of foreign exchange ("FX") investment strategies (the "Strategies") through the DB FX desk on behalf of clients, primarily individuals, of several accounting firms (i.e. Arthur Andersen, BDO Seidman & Ernst & Young). These accounting firms are introducing Bricolage Capital, L.L.C. ("Bricolage") to their clients to promote their FX investment strategies. Clients may participate in the Strategies through either/both: 1) segregated investment accounts ("Managed Accounts") managed by Bricolage in close coordination with the Investor; or 2) discretionary investment partnerships ("Investment Partnerships") managed by Bricolage with multiple investors. It is anticipated that the clients may participate in the first part of the Strategy through a newly-created LLC of which the client is the sole member.

**Strategy**
Bricolage is a registered investment advisor that has devised a FX investment program which combines fundamental macroeconomic research on foreign currencies with the structuring of options that refine and enhance the risk-reward characteristics of short-term and long-term directional investment strategies. Bricolage believes that the combination of the aforementioned analytical techniques creates the opportunity for high risk-adjusted returns over time. Due to the relatively esoteric nature of the investment program, Bricolage has developed a two-step process to familiarize potential investors with Bricolage and its investment strategies. First, investors can create a Managed Account, for which Bricolage will work with the investor to develop a tailored investment program that meets the investor's risk-reward profile. Second, as the investor attains comfort with the investment strategy, he/she can enter an investment partnership and benefit from its lower fee structure and diversification.

**Legal Counsel and Professional Advice to Investor**
In evaluating the tax consequences to the investor of participating in the Strategies, Curtis, Mallet-Provost, Colt & Mosle ("Curtis Mallet") and potentially Arnold & Porter ("A&P") are available to provide tax opinions to the investors addressing the potential tax consequences to the investors of participating in the Strategies. In addition, the accounting firms may provide separate or concurring opinions to its clients regarding the tax consequences to the investors from participating in the Strategies.

**CB note : Every new client we accept must have been provided a tax opinion from either C+M or A+P or the respective acctg firms whose clients these are.**

DB's Role in the Strategies

DB's role in the strategies is simply executing the FX trades on behalf of the investors based upon orders given to DB by the investors, Bricolage acting on behalf of the investors through the Managed Accounts or for the Investment Partnerships managed by Bricolage. In addition to any profit the FX desk generates through the pricing on the FX trades, DB will also receive a fee for executing and processing information related to the trades. In addition, we understand that a number of other commercial and investment banks have played a similar role in executing these type of trading strategies, in significant size, on behalf of their clients .

Investor and Investment Advisor Representation Letters and Trading Confirms

Consistent with our sole role in executing the trades, we will receive representations from: 1) Bricolage that we are acting solely in our capacity of executing the trades and have no role in the marketing of any of the transactions; and 2) the investor that we are acting solely in our capacity of executing the trades, we have no role in marketing the Strategies to the investor, we have not provided any investment, legal, accounting or tax advice to the investors regarding any investment in the strategies and that the investor is represented by counsel regarding the legal consequences of their participation in the Strategies. In addition, the trading confirms will contain language which provides we have not provided any investment, legal, accounting or tax advice regarding the execution of the trades. The representation letters have been prepared by Shearman & Sterling and reviewed by the legal department (See the representation letters provided in the 1999 year end BDO Seidman trade). In addition, the legal department has reviewed the trading confirms created by the FX desk for these types of transactions (See the confirms used inthe 1999 BTAB FX trades).

Private Bank Role

The Private will open the trading accounts through which the Strategies will be executed. In addition, the Private Bank will provide information reporting to the investors based upon mark-to-market reporting provided to the Private Bank by the FX Desk. As part of the account opening process, the Private Bank will provide the "know your client" review and obtain the KYC approval to open the accounts.

**CB note: to be specific....the PB has been requested to open custody accounts not trading accounts in which will be reflected the fx positions being directed by the investment advisor, Bricolage. Trading accounts require ISDAs to be put in place for the cps under which fx trades will be executed. The advisor is to be KYC'd before we begin to open any accounts. The KYC forms are to be approved by the PB Risk Management function in conjunction withm the assistance of the Operating Risk Management Group run by Allan Cuttle. Any trading account documentation is to be approved by the Credit Function in GCI assigned to cover the STG. I understand that Credit Officer will be Paul Mchugh. The trading account docs are separate and apart from the custody docs being signed up by the PB. [just like an ISDA would be separate from a custody account doc.]**
**STG will also be responsible for insuring that the advisor Bricolage has the appropriate authorities provided to it by the account owner in a form satisfactory to the bank's legal counsel giving the advisor authority to direct the bank to make the trades that comprise the strategies. The trading agreement may or may not require collateral, but that also will be determined by Paul Mchugh in Credit. It will also be GCI Credit's responsibility to evaluate the creditworthiness of the spvs set up for each client and the credit requirements attached thereto.**
**GCI Credit will also be assuming the margin monitoring role should Credit require the trades to be collateralized.**

Transactions

We anticipate a potential market for this particular transaction through the aforementioned accounting firms to be in the $3-5 billion range with an average transaction size of approximately $25-30 million for the 2000 calendar year.

**CB note: STG will be responsible for obtaining from GCI Credit any limits to be applied to the program in order to insure prudent levels of control. Individual limits per counterparty are the more practical application. However, since this is a tax oriented strategy being reccommended by an outside advisory firm to the clients of several major acctg firms, DB's involvement as cusotidan and as the fx strategy execution party, should maintain some level of measured control over the ultimate size of the program.**

**Approval**

We met with Ted Dengler and Mike Crimmins of the New Products Committee to discuss the sign offs they would like for 2000. Based upon the fact that these trades are similar to the earlier BTAB type trades and that legal and compliance reviewed the FX desk role in those transactions, Ted and Mike have requested that we recieve sign-off from tax, compliance, legal, Private Bank and BAC. STG would like to obtain approval from you, in your respective roles for the Private Bank,for the Private Bank to provide the information reporting and account opening roles described above as part of the execution of the FX trades by DB in the aforementioned Strategies.

**CB note: Bill Wyman should be signing off for the PB cusotdy product as they are being asked to provide certain reporting on the fx positions etc. I would like to know that Bill is agreeable to taking on this role and is satisfied with his ability to provide this level of reporting.**
**I also want to know that Paul Higgins, Head of the PB Americas, has given his final approval for the PB to be handling this type of program. After Messrs Wyman and Higgins have given their approvals, I am prepared to provide PB risk Management approval for hte PB's role here.**

Best Regards,

Bill

cc: William Boyle@Bankers_Trust
Paul W Higgins@Bankers_Trust
Alfred Dengler@HUB
Paul Glover@Bankers_Trust
francesco.piovanetti@db.com@HUB
Michael S Jacoby@Bankers_Trust
Mark R Westhoff@Bankers_Trust
Cari LaRose@Bankers_Trust
Paul Mchugh@HUB
Marguerite Van Wowk@Bankers_Trust
Ann V Aziz@Bankers_Trust

DRAFT 1: 07/20/00

# CUSTOM ADJUSTABLE RATE DEBT ("CARDS") FACILITY

The Structured Transactions Group ("STG") and the Private Bank ("PB") has been developing a strong relationship with myCFO.com. myCFO.com effectively operates as a family office for wealthy high-tech entrepreneurs. The board of myCFO.com reads as a who's who of Silicon Valley (i.e. Chambers of Cisco; Clark and Barksdale formerly of Netscape; Tom Jermoluk former chairman of excite@home; and John Doerr – venture capitalist) and has enabled myCFO.com to develop a clientele of 100 entrepreneurs with an average net worth of $260 m. We are currently developing with myCFO.com a high-tech investment structure which will likely be limited to investments by members of their board. By virtue of our discussions on this structure, we have developed relationships with the most senior members of myCFO.com, which should position ourselves to generate other types of flowthrough work.

One such opportunity has arisen for us to loan into a structured transaction proposed to clients of myCFO.com by Chenery Associates Incorporated ("Chenery"). Chenery will act as the arranger of the transaction. Both Deutsche Bank and Bankers Trust has successfully participated in this transaction previously by lending into the structure. This structure differs from the earlier deals primarily by the potential ownership of LLC 2 by an individual rather than a corporation.

**Strategy**

The strategy involves STG, through Bankers Trust Company ("BTCo"), providing a loan denominated in Euros (the "Loan") to a newly formed special purpose Delaware limited liability company ("LLC #1"). Initially, Deutsche Bank AG (NY branch) ("DB NY") time deposits, government securities and/or other high credit quality assets will serve as collateral for the Loan (We anticipate at least 85% of the collateral to be in thew form of DB NY time deposits). LLC #1 will have the right to have another party ("LLC #2, a newly formed special purpose Delaware limited liability company") become a co-obligor on the Loan, provided that (i) the LLC #2 is acceptable to DB, (ii) LLC #2 provides acceptable collateral for the Loan and (iii) LLC #1 and LLC #2 remain liable under the Loan as joint and several obligors. The interest rate on the Loan will float based on Libor plus an appropriate credit spread. While the Loan has a stated maturity date of 30 years, it will be subject to a periodic credit spread remarketing, and in the event that the remarketing fails, LLC #1 and LLC #2 will be required to repay the Loan prior to its stated maturity date. The first remarketing date is scheduled

to be approximately one year from the date of the Loan origination. (See the attached book which more fully describes our role in financing the transaction)

**Legal Counsel and Professional Advice**

We are working with Michelle Cenis of DB legal and Akin Gump Hauer Strauss & Feld ("Akin Gump") to review DB's role executing the transaction from a legal perspective. Brown & Wood will represent the U.K. individual and the related wholly owned LLC #1. Le Bouef, Lamb, Greene & McRae, L.L.P. will represent the U.S. individual and the related wholly owned LLC #2. Le Bouef, Lamb, Greene & McRae, L.L.P. will provide the U.S. individual with a tax opinion addressing the tax consequences to the U.S. individual and LLC #2 from participation in the transaction.

**DB's Role in the Strategies**

DB's role in the strategy involves making the Loan to LLC #1 and accepting time deposits from LLC #2. In addition, DB may allow LLC #2 to become a joint obligor on the Loan and to substitute collateral for the Loan with new collateral which is acceptable to DB. DB will receive an origination fee for making the Loan. In addition, DB will need to monitor the collateral provided by LLC #1 and LLC #2 to secure the Loan. Depending upon the type of collateral provided, the PB and /or Equities Division may be required to monitor the collateral or provide credit support.

**Investor and Investment Advisor Representation Letters and Trading Confirms**

Consistent with our sole role in executing the trades, we will receive representations from: 1) Chenery and myCFO.com that we are acting solely in our capacity of extending the Loan and accepting the Deposits and have no role in the marketing of any of the transactions; and 2) the Borrowers that we are acting solely in our capacity of providing the Loan and accepting the Deposit, we have no role in marketing the Strategy to the investor, we have not provided any investment, legal, accounting or tax advice to the investors regarding any investment in the strategies and that the investor is represented by counsel regarding the legal consequences of their participation in the Strategies. The representation letters have been prepared by Shearman & Sterling and reviewed by Akin Gump and the legal department (See the representation letters provided in the 1999 year end BDO Seidman trade).

**Private Bank Role**

PB will open the accounts for LLC #1 and LLC #2 to which the Loan will be made and from which the deposit and/or other securities will provide collateral for the Loan. As part of the account opening process, the PB will provide the "know your client" review and obtain the KYC approval to open the accounts. In addition, PB may act as custodian for any securities which will serve as collateral on the loan.

**Transactions**

We anticipate a potential market for lending into this particular transaction to be in the $1-2 billion range with an average transaction size of approximately $100-150 million for the 2000 calendar year.

**Approval**

We are currently in the process of obtaining approval from the following people:
Tax – John Wadsworth;
Legal – Michelle Cenis;
Credit – Paul McHugh;
Private Banking – Chuck Binder;
Compliance – Alan Cutile;
Product Controllers – David Hogarth/Stephanie Tang;
Treasury – Donna Milrod
Operations – Steve Jankovitz
New Products – Michael Crimmins

L

DISCUSSION MATERIAL RELATING TO

# Customized Adjustable Rate Debt Facility ("CARDs")

**Bankers Trust Company**

**A Wholly-Owned Subsidiary of Bankers Trust Corporation**

**July 2000**



DB-DOJ-COBRA-00030742

## Transaction Structure

# Initial Structure




- One or more individuals of the United Kingdom own 100% of the interests in a limited liability company ("LLC #1") organized under the laws of Delaware.

## Transaction Structure

# Step 1 - Leveraged Purchase of Foreign Currency




- On or about July 24, 2000 Bankers Trust Company ("BTCo") loans approximately 105 million Euros (100 million equivalent US dollars) (the "Loan") to the LLC #1 which LLC #1 uses to purchase (1) 89 million Euros foreign currency (the "Foreign Currency") (85 million equivalent US dollars) which is put on deposit with Deutsche Bank AG (NY branch) ("DB NY") (the "Deposit Account #1"). and (2) 16 million Foreign Currency (15 million equivalent US dollars) which is put on deposit with DB NY (the "Deposit Account #2"). The Foreign Currency provides collateral support for the Loan from BTCo which has a perfected security interest in the DB NY deposits. The Loan has a term of 30 years, principal payable at maturity and carries an annual coupon interest payment. The Loan is subject to a periodic credit spread remarketing arrangement under which BTCo conducts an auction of the Loan in the bank market requesting specific interest rate bids from others to assume the Loan at par. If the remarketing fails or the borrower(s) reject all bids, the borrower(s) must repay the Loan. The first remarketing date is approximately 1 year from issuance of the note (e.g., July 23, 2001).

## Transaction Structure

# Step 2(a) - Purchase of Foreign Currency Deposit by LLC #2




- On or about August 8, 2000, after at least two weeks from the initial loan, LLC #2, a single member LLC organized under the laws of Delaware owned by a U.S. individual, may acquire 16 million Euros from LLC #1 in exchange for the addition of LLC #2 as a co-obligor on the Loan. While LLC #2 is legally a co-obligor on the entire Loan, as between themselves, as part of the purchase agreement, the LLC #1 undertakes to pay only the interest on the Loan and LLC #2 undertakes to pay only the principal and any shortfall of other amounts due on the Loan.

## Transaction Structure

### Step 2(b) - New Deposit




- On or about August 8, 2000 the LLC #1 may use the proceeds from the maturity of Deposit #1 to make a new deposit with DB NY (the "Deposit #3") which matures close to the first interest remarketing date on the Loan (i.e., July 23, 2001).

## Transaction Structure

# Step 3 - Subsequent Disposition of Foreign Currency




- LLC #2 may sell the Euros from Deposit #2 in the market to purchase $U.S. dollars. The $U.S. dollars will remain as collateral on the loan and be deposited with DB NY ("Deposit #4").

## Transaction Structure

# Step 4 - Substitution of Collateral




- At some subsequent point in time, LLC #2 intends to approach BTCo to request that substitute collateral be provided (in place of the Deposit #4), such as a Security Interest in a Customer/Trading Account which contains Securities (assume that thesecurities will consist primarily of equity securities, that majority of which will be actively traded in the markets). The Customer/Trading Account may be with DB AG, another DB related entity or a third party. DB will have sole discretion in determining whether to accept the substitute collateral.
- In any event, Deposit #3 held by LLC #1would continue to provide collateral on the Loan as well.

## Transaction Structure

# Summary of Transaction








DB-DOJ-COBRA-00030749

# EXHIBIT G29

# Discussion Main Topic

| | |
|---|---|
| Title: | COBRA Matters - URGENT |
| Project: | COBRA |
| Category: | Implementation |
| Author: | Melinda S. Mark |

Topic:
**The following message was sent by Bob Coplan to the Quickstrike Team on 12/05/99:**

This email discusses three items of importance to the COBRA transaction – two relating to completed transactions, and one related to COBRA 2000.

1) Trading activity in the partnerships.
As you know, in addition to the transfer of the option spread to the partnership, the clients transferred cash equal to two percent of the loss amount to the partnership. There has been some confusion as to what type of trading is expected to be done with this cash during the life of the partnership. The trading activity is important to the maintainance of a business purpose for the partnership – i.e., investment activity. We have not developed precise rules for the investment of the funds, but here are some guidelines. The money should not sit in a money market account. The more trading activity the better, and preferably in an investment that can reasonably be expected to provide a potential for a good return, although "speculative" investments are not encouraged. If one wanted to move in and out of different market indexes, that would be acceptable. Because there are only about three weeks left till the liquidation of the partnerships, it is essential that if no activity has yet commenced, that it be begun immediately through David Parse at Alex Brown. Investment in foreign currencies is not necessary at this time – even in the ordinary loss partnerships. That will be done just prior to the termination of the partnerships after the assets remaining in the trading account have been liquidated.

2) Closing out profitable currency option positions.
This has been an unusually favorable time for many of our clients to have embarked upon these types of trades, given the recent extreme volatility in the currency markets. Several of our clients are holding currency options that are in the money already, either due to their own savvy selections or to the guidance provided by David Parse. That is leading some to ask whether it is appropriate for them to grab a profit by having Deutsche Bank buy out their positions. (Remember – these are European options and cannot be exercised before the term of the option expires in 30 days.) This is not a simple decision. First, keep in mind that a "profit" on these transactions means receiving back more from the option spreads than the sum of the amount invested (e.g., $2.5M on a $50M loss transaction) and the related fees ($2.25M on a $50M loss transaction). Second, because there are still several weeks to go before the options expire and can be exercised, a buyer of an option will insist on a discount to reflect the fact that currency movements could well cause the option to end up out of the money. Therefore, if the discount on the options exceeds the potential profit (e.g., $1.5M on a $50M loss transaction), then cashing out of the options now would mean the client has produced an economic profit on the option, but has prevented himself from making an overall profit on the transaction. If the options continue to move deeper in the money as time elapses on the options, the discount will shrink, and locking in a true profit may become more feasible. Clients with partnerships holding two spreads that are both in the money (there are a couple of these), may find this possible in the near future, but the point is that jumping out too early may lock in a sizeable discount on the option.

In any event, the favorable movement in the currency markets at the time our trades were put on, means that we have clear evidence that the option structure arranged by Richard Shapiro with DB in fact produced a reasonable expectation of making a profit on the options, since many of the options were in the money after such a short period of time.

2003EY000866

GOVERNMENT EXHIBIT 29
PENGAD 800-631-6989

3) COBRA 2000
We are carefully reviewing the possibility of joining with a promoter for 2000 other than Jenkens & Gilchrist with whom to implement COBRA. We have not previously worked with this promoter before, but they have been selling the transaction before in a manner compatible with the economics we have instituted. Advantages of changing to the new promoter would include: 1) a higher fee for E&Y (2%) and a lower overall fee for the transaction (4%) allowing the client to have a greater probability of profiting on the option trade, and 2) a structure that would include a general partner investor that (a) means we can implement the transaction with a single client who need not be paired up, (b) facilitates a supervised trading account, and (c) allows the partnership to remain in existence after the investor/client has been redeemed out. This would mean switching the option trading from Deutsche Bank to other brokers, such as either Lehman Brothers or Sumitomo. However, we would stay with the Brown & Wood opinion. Although National will be trying hard to conclude this decision during the next couple days, it means that any COBRA discussions with potential clients for 2000 should not indicate that our implementation partners are completely set.

Questions on these issues may be directed to any member of the VIPER team.

Edit History

| | | | | | |
|---|---|---|---|---|---|
| Melinda | S. | Merk | 12/03/99 | 01:04:59 | PM |
| Melinda | S. | Merk | 12/08/99 | 01:03:28 | PM |

2003EY000867

# EXHIBIT G30

Robert M. Hayrale
12/21/1999 08:46 AM

To: Elise Rees/Tax/ErnstYoung/CA @ EY-Canada, Jas S Hayre/Tax/ErnstYoung/CA @ EY-Canada, Philip C. Grad/NCalifornia/TAX/EYLLP/US @ EY-Namerica, Kenneth L. Tracy/NCalifornia/TAX/EYLLP/US @ EY-Namerica, Richard E. Jones/NCalifornia/TAX/EYLLP/US @ EY-Namerica, James A. Cox/NCalifornia/TAX/EYLLP/US @ EY-Namerica
cc: Jason B. Rydberg/NCalifornia/TAX/EYLLP/US @ EY-NAmerica, Francis M. Yung/NCalifornia/TAX/EYLLP/US @ EY-NAmerica, Michael B. Hobson/NCalifornia/TAX/EYLLP/US @ EY-NAmerica
Subject: COBRA - Latest Slides

Thanks for all of your interest in COBRA for 2000. Attached are the latest revised 2000 slides and Excel worksheet for COBRA. Clients must sign an NDA before reviewing it, and it is best for Brian Vaughn or me to walk through the presentation with the client because we know what should be covered.

Robert

cobra2000rev.ppt COBRA 2000.xls

PENGAD 800-631-6989
GOVERNMENT
EXHIBIT
30

DOJ 009395

**C.O.B.R.A.**
**(Currency Options Bring Reward Alternatives)**

## What is COBRA?

- Foreign currency derivative transaction
- 90-day investment strategy
- Utilizes options to generate a possible return of approximately 39% in 90 days with about a 34% probability of success
- Participation in general partnership with other partners with similar investment interests













DOJ 009396


Step Five - Distribution
S Corp
Third Party Buyer
General Partnership


COBRA
Executive Summary
Option spread may be bullish or bearish


COBRA
Executive Summary (Continued)
In the aggregate, the "other" partners' investment in partnership must be at least 10%


COBRA
Executive Summary (Continued)
After 30 days, options expire either in or out of the money
Partnership recognizes economic gain or loss on the spread, which will be ordinary income or loss
Transfer of 100% GP interest to S Corp causes technical termination of partnership
In liquidation of partnership interest, S Corp receives equivalent fair value amount of foreign currency or capital assets
S Corp sells the assets generating ordinary or capital income/loss for tax purposes


COBRA
Currency Linked Digital Swap Example


COBRA
Currency Linked Digital Swap Example (Continued)
Approximately 34% chance client will make $1.375 million profit on $1.25 million investment

DOJ 009397

# COBRA

## Economic Summary

- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

[illegible]

DOJ 009398

# EXHIBIT G31

**ERNST & YOUNG**

Ernst & Young LLP
[illegible] Independence Center
Suite 1100
[illegible] North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

***PERSONAL AND CONFIDENTIAL***

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Wendell H. Murphy
P.O. Box 280
Rose Hill, North Carolina 28458

Dear Wendell:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $540,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 3.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in



GOVERNMENT EXHIBIT 1603

GOVERNMENT EXHIBIT 31

DOJ 040262

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Wendell Murphy
Date: 12-21-99

DOJ 040263

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

_Mediation_

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

_Arbitration_

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 040264

ERNST & YOUNG

Ernst & Young LLP
[illegible] Independence Center
Suite 1400
[illegible] North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Stratton K. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Stratton:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $60,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in



DOJ 040321

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Stratton K. Murphy
Date: 12-23-99

DOJ 040322

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 040323

**ERNST & YOUNG**

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

***PERSONAL AND CONFIDENTIAL***

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Wendell H. Murphy, Jr.
P.O. Box 280
Rose Hill, North Carolina 28458

Dear Dell:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $380,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment

Agreed to by:

Name: W-H. Murphy Jr.

Date: ____________________

DOJ 040266

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("Dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*
A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*
If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 040267

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Harry D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Pete:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $120,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 3.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the contents of any oral or written communication made by us in

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Harry D. Murphy

Date: ______________

DOJ 040349

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("Dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*
A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*
If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 040350

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Marc D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Marc:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $60,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the contents of any oral or written communication made by us in

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication
Privileged And Confidential**

December 13, 1999

Mr. Harry D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Pete:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $120,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Harry D. Murphy

Date: ____________________

DOJ 049814

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*
A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*
If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

**ERNST & YOUNG**

Ernst & Young LLP
[illegible] Independence Center
Suite [illegible]
[illegible] North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

***PERSONAL AND CONFIDENTIAL***

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Ms. Wendy M. Crumpler
P.O. Box 280
Rose Hill, North Carolina 28458

Dear Wendy:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $100,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 3.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the contents of any oral or written communication made by us in



GOVERNMENT EXHIBIT 1606

DOJ 040345

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1935. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Wendy M. Cr[illegible]
Date: 12-22-99

DOJ 040346

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

Mediation

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

Arbitration

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 040347

ERNST & YOUNG

Ernst & Young LLP
[illegible] Independence Center
Suite [illegible]
[illegible] North Tryon Street
Charlotte, North Carolina [illegible]

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Ms. Joyce Murphy Norman
Route 2, Box 176A
Rose Hill, North Carolina 28458

Dear Joyce:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $200,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in



GOVERNMENT EXHIBIT 1667

DOJ 040280

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1953. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Joyce Murphy Noonan
Date: 12-22-99

DOJ 040281

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Ms. Angela N. Brown
152 River Ridge
Wallace, North Carolina 28466

Dear Angela:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $60,000 on a total investment in the Partnership by you and other individual(s) in the amount of $5.32 million. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Angela N. Brown
Date: 12/22/99

DOJ 049820

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

ERNST & YOUNG


- Ernst & Young LLP
  100 Independence Center
  Suite 1100
  101 North Tryon Street
  Charlotte, North Carolina 28246
- Phone: (704) 372-6300
  www.ey.com


*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Stratton K. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Stratton:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $70,000 on a total investment in the Partnership by you and other individual(s) in the amount of $980,000. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in

Ernst & Young LLP is a member of Ernst & Young International, Ltd.

DOJ 040277

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Stratton K. Murphy
Date: 12-23-99

DOJ 040278

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 040279

**ERNST & YOUNG**

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Harry D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Pete:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $140,000 on a total investment in the Partnership by you and other individual(s) in the amount of $980,000. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in

Ernst & Young LLP is a member of Ernst & Young International, Ltd.

GOVERNMENT EXHIBIT 1602

DOJ 040318

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment

Agreed to by:

Name: Harry D. Murphy

Date: 12-22-99

DOJ 040319

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or IAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1100
100 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

*PERSONAL AND CONFIDENTIAL*

**Tax Advisor/Client Communication**
**Privileged And Confidential**

December 13, 1999

Mr. Marc D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

Dear Marc:

This letter will confirm our engagement to provide tax advice to you concerning the implementation of the COBRA strategy we have discussed with you. This strategy will involve the creation of a Partnership by you and third parties. Our work will include assisting in the tax planning aspects of this transaction, working with counsel and other third parties in reviewing the tax aspects of the entities and other consulting services as required. If necessary, we also agree to represent you before the Internal Revenue Service with respect to tax issues associated with this strategy up to and including the appellate level. If you would like us to represent you with regard to other tax issues in the event of an audit, we would charge our normal fees for time and expenses in connection with such representation.

In this engagement, we will be using information provided by you and the Partnership and will be relying upon you and the Partnership for the accuracy and completeness of this information. We will maintain the information provided to us in confidence within our firm and will not disclose to others such confidential information except with your consent or as required by law or permitted under professional standards.

Our fee for providing the professional services referred to above will be $70,000 on a total investment in the Partnership by you and other individual(s) in the amount of $980,000. Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss. We will invoice you for our fee after the foreign currency option contracts and required amount of cash have been contributed to the Partnership. In the event you later decide not to implement the technique described above, our fee will be paid by you and will be limited to our time incurred from the date this letter is signed up to the date we receive written notification of your decision not to proceed, and will be billed at our standard hourly rates. In addition to bills for our hourly fees, an administrative expense charge of 8.5% of our standard fees will be billed at the same time.

All advice and other services we provide pursuant to this arrangement are intended to be solely for your benefit and that of the Partnership and are not for the benefit of anyone else. Accordingly, our advice may not be relied upon by any other person or persons, used in connection with any other transaction, or used for any other purpose without our prior written consent. Furthermore, the content of any oral or written communication made by us in

connection with this engagement shall not be communicated to the public or otherwise publicized in any manner without our prior written consent.

Ernst & Young LLP will not be liable for any claim for damages arising out of or in connection with any tax services provided to you in an amount greater than the amount of fees actually paid to Ernst & Young LLP with respect to the services directly relating to and forming the basis of such claim.

Any controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of Ernst & Young LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the Attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Except as expressly provided herein, this engagement letter does not modify the terms or provisions of any engagement letter for other professional services which were agreed to prior to the date noted below.

Information relating to federal tax advice we provide to you, including communications between us and material we create in the course of providing that advice, may be privileged and protected from disclosure to the Internal Revenue Service. Should the Internal Revenue Service seek disclosure from you or us of written or oral communications relating to such advice, we will discuss with you whether and how you assert, or waive, the privilege.

If any portion of this letter is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

If these arrangements are acceptable, please sign one copy of this letter and return it to me in the enclosed self-addressed envelope. If you have any questions concerning our engagement, please call me at 704/331-1933. We appreciate the opportunity to work with you.

Very truly yours,

Ernst + Young LLP

Attachment
Agreed to by:
Name: Marc D. Murphy
Date: 12-22-99

DOJ 049808

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in our engagement letter of July 23, 1998. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

*Mediation*

A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

*Arbitration*

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA as in effect on the date of the engagement letter ("AAA Rules"). In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the AAA Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

DOJ 049809

**EXHIBIT G32**

ERNST & YOUNG

Ernst & Young LLP
1?? Independence Center
Suite 1100
100 North Tryon Street
Charlotte, North Carolina 28245

Phone: (704) 372-6300
www.ey.com

February 4, 2000

Mr. Harry D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28453

ADDENDUM TO ENGAGEMENT LETTER DATED DECEMBER 13, 1999

The client will not hold Ernst & Young LLP or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering into the COBRA strategy. However, Ernst & Young LLP will be held responsible for any preparer penalties assessed by the IRS due to the strategy.

Sincerely,

Ernst + Young LLP

Harry D. Murphy
Harry D. Murphy

2-9-2000
Date

GOVERNMENT EXHIBIT 1609



DOJ 040335

GOVERNMENT EXHIBIT 32

ERNST & YOUNG

Ernst & Young LLP
[illegible] Independence Center
Suite [illegible]
[illegible] North Tryon Street
Charlotte, North Carolina 28246

Phone (704) 372-6300
www.ey.com

February 4, 2000

Mr. Harry D. Murphy
P.O. Box 607
Rose Hill, North Carolina 28458

**ADDENDUM TO ENGAGEMENT LETTER DATED DECEMBER 13, 1999**

The client will not hold Ernst & Young LLP or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering into the COBRA strategy. However, Ernst & Young LLP will be held responsible for any preparer penalties assessed by the IRS due to the strategy.

Sincerely,

Ernst + Young LLP

Harry D. Murphy
Harry D. Murphy

2-9-2000
Date



DOJ 040336

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1000
100 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

February 4, 2000

Mr. Wendell H. Murphy
P.O. Box 280
Rose Hill, North Carolina 28458

ADDENDUM TO ENGAGEMENT LETTER DATED DECEMBER 13, 1999

The client will not hold Ernst & Young LLP or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering into the COBRA strategy. However, Ernst & Young LLP will be held responsible for any preparer penalties assessed by the IRS due to the strategy.

Sincerely,

Ernst + Young LLP

Wendell H. Murphy
Wendell H. Murphy

2-9-2000
Date

Ernst & Young LLP is a member of Ernst & Young International, Ltd.

DOJ 040260

ERNST & YOUNG

Ernst & Young LLP
100 Independence Center
Suite 1100
101 North Tryon Street
Charlotte, North Carolina 28245

Phone: (704) 372-6300
www.ey.com

February 4, 2000

Mr. Wendell H. Murphy
P.O. Box 280
Rose Hill, North Carolina 28458

**ADDENDUM TO ENGAGEMENT LETTER DATED DECEMBER 13, 1999**

The client will not hold Ernst & Young LLP or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering into the COBRA strategy. However, Ernst & Young LLP will be held responsible for any preparer penalties assessed by the IRS due to the strategy.

Sincerely,

Ernst + Young LLP

Wendell H. Murphy
Wendell H. Murphy

2-9-2000
Date

Ernst & Young LLP is a member of Ernst & Young International, Ltd.

DOJ 040334

ERNST & YOUNG

Ernst & Young LLP
121 Independence Center
Suite 1000
121 North Tryon Street
Charlotte, North Carolina 28246

Phone: (704) 372-6300
www.ey.com

February 4, 2000

Mr. Wendell H. Murphy, Jr.
P.O. Box 280
Rose Hill, North Carolina 28458

**ADDENDUM TO ENGAGEMENT LETTER DATED DECEMBER 13, 1999**

The client will not hold Ernst & Young LLP or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering into the COBRA strategy. However, Ernst & Young LLP will be held responsible for any preparer penalties assessed by the IRS due to the strategy.

Sincerely,

Ernst + Young LLP

Wendell H. Murphy Jr.

2-9-2000
Date