C
2005 WL 43711 (I.R.S.)

Internal Revenue Service (I.R.S)

Industry Specialization Program Coordinated Issue
All Industries

NOTIONAL PRINCIPAL CONTRACTS UIL NO: 9300.20-00

Effective Date: January 6, 2005

Section 9300 -- Tax Shelters - Listed Transactions and Other Abusive Transactions9300.00-00 Tax Shelters - Listed Transactions and Other Abusive Transactions

9300.20-00 Notional Principal Contracts Generating Current Deductions

## INTRODUCTION

On May 28, 2002, the Service issued Notice 2002-35, 2002-1 C.B. 992 announcing that the Service will challenge transactions involving the use of a notional principal contract ("NPC") to claim current deductions for periodic payments made by a taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. The taxpayer using this type of NPC, also referred to as a swap, is typically a limited partnership.

## ISSUES

1. Is the Partnership required to accrue, and include in income, a payment ratably over the term of the NPC under Treas. Reg. § 1.446-3(f)(2)(i)?

2. Should the NPC payment received by the Partnership on the early termination date of an NPC be treated by the Partnership as ordinary income or capital gain?

3. Should the Partnership's loan be disregarded for federal income tax purposes?

4. Does I.R.C. § 465 limit the Investor's amount at risk?

5. Is the Investor entitled to deductions under I.R.C. § 162 for payments made by the Partnership on the NPC?

6. Do the Partnership's transactions lack economic substance?

7. Should the Investor be allowed to take deductions attributable to his investment

**EXHIBIT E**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the Partnership under I.R.C. § 183(a) if the Partnership's expenditures deducted under I.R.C. § 162 were primarily incurred for the purposes of creating tax benefits?

8. Should the Service assert the appropriate section 6662 accuracy-related penalties against taxpayers who entered into these NPC transactions?

9. Should tax adjustments in these NPC cases be determined at the partnership level pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA")?

SUMMARY OF CONCLUSIONS

1. The Partnership is required to accrue and include in income, a payment ratably over the term of the NPC under Treas. Reg. § 1.446-3(f)(2)(i).

2. The NPC payment received by the Partnership on the early termination date of an NPC should be treated by the Partnership as ordinary income as opposed to capital gain.

3. The Partnership's loan is not bona fide debt. As a result, no deduction for interest claimed to be paid on the loan should be permitted under I.R.C. § 163(a). Furthermore, the Investor's basis in the Partnership should not be increased by the amount of the loan.

4. The Investor's at-risk amount under I.R.C. § 465 excludes amounts borrowed from the counterparty in the NPC and, therefore, is less than the amount claimed as a deduction.

5. The Investor is not entitled to deductions under I.R.C. § 162 for payments made in the NPC transactions because the NPC transactions are not part of a trade or business activity. In this connection, depending upon the facts and circumstances of each case, one of the following arguments justifies this conclusion.

(a) In appropriate cases, the partnership can be viewed as created solely to achieve tax benefits then the Partnership should be disregarded. For further guidance, see Issue 6, discussed below. If the Partnership is disregarded, all expenses are characterized at the Partner level. Since the Partner was not engaged in the trade or business of trading securities, expenses associated with the NPCs are deductible under I.R.C. § 212, if at all.

(b) Assuming the Partnership is a bona fide joint venture, the Partnership was not engaged in the trade or business of trading securities and its expenses relating to the NPC transactions are deductible under I.R.C. § 212, if at all.

(c) Assuming the Partnership is a bona fide joint venture engaged in trading securities, the NPC transactions are not part of that trade or business and any expenses related to the NPC are deductible under I.R.C. § 212, if at all.

6. Each case must be evaluated to determine whether the NPC transactions lacked economic substance and should be disregarded for federal income tax purposes.

7. The Investor should not be allowed to take deductions attributable to his investment in the Partnership under I.R.C. § 183(a) because the Partnership's expenditures were incurred for the purposes of creating tax benefits.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8. On a case-by-case basis, the Service should consider asserting the applicable I.R.C. § 6662 accuracy-related penalties.

9. TEFRA procedures should be applied in making adjustments in these NPC cases.

FACTS

1. **Overview of the Transaction**
The taxpayer in these cases is typically a limited partnership (hereinafter the "Partnership"). The general partner in the Partnership is usually the promoter and has a less than 1% interest in the Partnership. The limited partner in the Partnership is one or more individuals (hereinafter the "Investor") and will own the remaining over 99% interest in the Partnership. While there may be some variations, the standard transaction involves NPCs between the Partnership and a foreign bank ("FB") as the counterparty.

These transactions are typically promoted to high wealth individuals as a tax advantaged transaction that can generate a pre-determined amount of ordinary losses in the first year and long-term capital gains in the second year. Investors who partake in this tax shelter are usually individuals who have to report a large sum of ordinary income from exercising stock options or other forms of compensation and use this transaction as a method to generate an ordinary loss that will partially or completely offset this income.

To implement the tax strategy, the Investor has to make a capital contribution to fund a newly created Partnership. The Investor's capital contribution is based on a percentage (usually 1/3) of the amount of loss the Investor requests from the promoter. For example, an Investor that requests the transaction generate a $20 million loss will be required to make a capital contribution of $6,666,666 to fund a Partnership. The Investor will be made the 99% or more limited partner of the newly formed Partnership in return for his capital contribution.

The general partner in the Partnership holds the remaining 1% or less interest in the Partnership. Typically, the general partner makes a minimal or no capital contribution to the Partnership. The general partner typically receives a management fee from the Partnership. The general partner in these Partnerships as well as two accounting firms registered as Promoters of these transactions pursuant to the requirements under I.R.C. §§ 6111 and 6112. The accounting firms that promoted these transactions often also served as the tax preparer for the Partnership and the Investor and as the auditor for the Partnership.

In furtherance of the tax strategy, the Partnership will then structure swaps, both short-term (junior) and long-term (senior) with FB that will generate the amount of desired ordinary losses in year one. The swaps are arranged so that in year two the Partnership will receive swap payments from FB on the early termination date for the swaps. The Partnership will account for the swap payments it receives in year two from FB on the long-term swaps as a long-term capital gain.

The Partnership also typically enters into a loan agreement with FB. The loan proceeds are held in a deposit or escrow account with FB. The Investor will claim

he is at risk for this loan and that it increases his basis in the Partnership.

The Internal Revenue Service issued Notice 2002-35 on May 28, 2002 notifying taxpayers and their representatives that the tax benefits purportedly generated by the use of NPCs in these transactions are not allowable for federal tax purposes. Transactions that are the same as, or substantially similar to, the transaction described in Notice 2002-35 are identified as "listed transactions" for purposes of I.R.C. § 1.6011-4T(b)(2) of the Temporary Income Tax Regulations and Treas. Reg. § 301.6111-2T(b)(2) of the Temporary Procedure and Administrative Regulations.

2. Notional Principal Contracts

A NPC is defined by regulation as "a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount, in exchange for specified consideration or a promise to pay similar amounts." Treas. Reg. § 1.446-3(c)(1)(i). NPCs include swaps.

In general, the transaction involves the Partnership's use of NPCs to claim current deductions for periodic payments made by the Partnership while disregarding the accrual of its right to receive offsetting payments in the future from FB. The NPCs generally have a stated term of eighteen months. The NPCs all have early termination clauses that permit either party to terminate the NPCs on an Early Termination Date. There is no penalty on either side for terminating early.

In some cases, the Partnership used a series of swaps, referred to as the short-term and long-term swaps or the junior and senior swaps. The difference is that the early termination date for the short-term or junior swaps was less than one year, while the early termination date for the long-term or senior swaps was always over one year. In some cases, the short-term or junior swaps were not terminated early.

Under the NPCs, the Partnership is required to make periodic payments to FB at regular intervals of one year or less based on a fixed or floating rate index. In return, FB is required to make a single payment at the end of the term of the NPC that consists of a noncontingent component and a contingent component. The noncontingent component, which is relatively large in comparison to the contingent component, may be based upon a fixed or floating interest rate. The contingent component may reflect changes in the value of a stock index or a currency. The noncontingent component of FB's payment is determined based upon an interest rate (fixed or floating) times 92% of the notional amount of the NPC. The contingent component of FB's payment is determined based upon a percentage change in the value of a stock index or a currency times only 8% of the notional amount of the NPC (contingent notional principal amount).

3. Collars and Hedges

In most cases, if the Partnership's payments to FB are based upon a floating interest rate, an interest rate collar limits the Partnership's economic exposure, i.e. the amount the Partnership will have to pay FB. The interest rate collars always expire on the early termination dates of the NPC. The Partnership pays FB for using any collars.

In addition, the contingent component of FB's payment on the NPCs (that portion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

indexed to the Standard and Poor's 500 ("S&P") or movements in a currency) is also typically collared with a cap and a floor. This collar is often included in a separate NPC or in the terms of the NPC itself through the use of tranches. The collar typically limits the potential downside to a maximum of a 10% downward movement in the S&P or currency index and caps its upside to a 10% or 15% upward movement in the S&P or currency index. The collars on the contingent component of the NPCs terminate on the date the swap ends, be it the maturity date or the early termination date.

In addition, in many cases the promoter advises Investors to consider entering into hedges on their own that will reduce their economic exposure from investing in the Partnership. Thus, if an Investor is long on the S&P based on the Partnership's NPCs then the Promoter may advise the Investor to consider entering an option on his own that will be short on the S&P to eliminate or mitigate his exposure from the Partnership's position.

**4. Early Termination**

The NPCs that have a stated term of eighteen months also have an early termination date typically set at slightly more than one year. The NPCs can only be terminated on the early termination date or at maturity. There are typically numerous factors indicating that the Partnership and FB agreed at the inception of the transactions that the NPCs will always terminate on the early termination dates.

**5. Loan Agreement**

The Partnership typically borrows funds from FB for a period of eighteen months pursuant to a Loan Agreement. The Loan Agreement provides for an early payment date that coincides with the early termination date of the Partnership's NPCs.

Simultaneously with the execution of the Loan Agreement, the Partnership enters into a Deposit Agreement with FB. In some cases, Partnerships enter into Collateral Agreements instead of Deposit Agreements. The Collateral Agreements have terms similar to the Deposit Agreements. Under the Deposit Agreement, the loan proceeds received by the Partnership are required to be deposited by the Partnership with FB. As a condition to the Partnership drawing down on the loan, the Partnership is required to deposit with FB any drawdown of the loan.

Under the Deposit Agreement, the Partnership has no right to withdraw or call for payment to a third party any part of the funds deposited or any additional funds that may have been credited to the Partnership's deposit account under the Deposit Agreement or under the NPCs. Any amount FB is required to pay to the Partnership under the Deposit Agreement or any of the NPCs is credited to the Partnership's deposit account with FB. Only on the deposit repayment date and subject to certain setoff provisions is FB required to repay the Partnership the deposit account balance. FB, through its control of the funds in the deposit account, has the right to use the funds in the deposit account to discharge any obligation that the Partnership has to FB under the Loan Agreement or the NPCs.

In addition, the Partnership is required under its Deposit Agreement with FB to deposit with FB the amount of funds it sent to FB to collateralize the NPCs. For example, if the Partnership borrows $15 million from FB and transfers $5 million to FB to collateralize the NPCs it will be required to deposit the entire $20 million

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with FB as collateral for the loan and its obligations under the NPCs.

The Deposit Agreement typically has a clause that provides mutual rights of set-off for any obligations of the Partnership and FB that the parties would be required to perform under the Deposit Agreement. If FB is the Defaulting Party, the clause will usually state:

> Upon the designation or occurrence of an Early Termination Date under the Master Agreement in relation to which FB is the Defaulting Party, FB will be obliged to pay forthwith to the Partnership the Deposit Balance together with interest accrued. Upon payment by FB of the foregoing amount, this Agreement will terminate and neither party will have any further obligation to the other hereunder, but without prejudice to any right either party may have against the other under any other agreement. This clause establishes rights of set-off only and does not confer on either party any proprietary interest by way of security.

A Partnership Agreement may provide that a Limited Partner will agree in writing to be liable with recourse with respect to the Partnership's indebtedness in an amount greater than the lesser of (A) an amount equal to the product of the Limited Partner's percentage interest in the Partnership multiplied by the unpaid amount of the Partnership's indebtedness or (B) an amount equal to the product of the aggregate capital contribution of such Limited Partner multiplied by 2.25.[FN1] (Some Partnership Agreements may use different language or formulas concerning a Limited Partner's recourse liability with respect to the Partnership's indebtedness.)

The Partnership's projections indicate that the Partnership can never owe FB an amount in excess of the amount sent to collateralize the swaps. Accordingly, the loan is guaranteed to always be fully collateralized since the amount on deposit with FB will never be less than the loan amount at the termination of the transaction. FB's own credit documents indicate that the loan is never at risk for this very reason. Moreover, if FB were to default on its payment obligation on the NPC, the n any amount that FB owes the Partnership on the NPC would be offset against the amount the Partnership owes FB on the loan.

6. Trading Activity

The Partnership may also engage in short-term trading activity in foreign currencies and other securities with a view to establishing a trade or business. A trading account is generally opened offshore, usually in Bermuda, in order to allegedly actively trade financial instruments. However, some Partnerships use domestic accounts. The trading account is funded with a portion of the Investor's capital contribution.

The trading activity is typically controlled by a fund manager (or managers) hired by the Partnership. The fund manager will usually use the Partnership's trading account to conduct thousands of foreign currency trades and other security trades. These trades are often offsetting and may result in only a small amount of I.R.C. § 988 income or loss from foreign currency transactions and a nominal amount of interest income. The trading activity ceases at the same time the swaps are terminated at the early termination date and the account balance is transferred to the Partnership. Typically, the account balance returned to the Partnership approximates the amount originally used to open the trading account.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7. **Transaction Costs**
The transaction costs for these cases vary. Fees will usually be paid to a law firm for a tax opinion and to an accounting firm for its services. There is also generally a brokerage or management fee paid to the general partner by the Partnership. Fees paid to FB are built into the NPC transactions.

8. **Economics of the Transaction**
The transaction is promoted to potential investors as a strategy that will generate ordinary losses in year one and capital gains in year two. The ordinary losses are used by the Investor to offset unrelated income. In the second year of the transaction the Partnership reports income it receives from the NPCs as long-term capital gains. The Partnership's projections show that the transactions are guaranteed to be profitable on an after tax basis as a result of the tax benefits of the transaction. The tax benefits of the transaction stem from deducting ordinary losses in the first year of the transaction and reporting long-term capital gains in the second year of the transaction. The Partnership's projections demonstrate that assuming ordinary tax rates of 39.6% and long-term capital gains tax rates of 19% that the Partnership is guaranteed to be profitable on an after tax basis in every situation including if the Partnership losses the maximum amount of money possible on the NPCs transactions.

The Partnership's projections also indicate the transactions may or may not be profitable on a before tax basis. The Partnership receives a non-periodic NPC payment from FB that consists of a noncontingent and contingent component. The Partnership's potential for profit generally relies on its position on this small contingent component of the NPCs. For example, if the Partnership takes a bullish position on the expected movement of the S&P and the S&P rises before the swap matures, the Partnership will achieve a profit. Alternatively, if the S&P drops before the swap matures, the Partnership will experience losses. The potential profit or loss is typically hedged through the use of a put/call collar on a portion of the contingent notional principal amount and through offsetting positions between the Partnership and FB on the remaining contingent notional principal amount. There may also be some profit potential on the interest rate float between the fixed and floating payments due on the noncontingent component of the swaps. However, as a result of the structure of the parties' offsetting NPCs, any economic profit or loss from the noncontingent component of the swaps is typically minimal.

The promoter's projections indicate that gains and losses resulting from the NPC transactions will not exceed the Investor's contribution to the swap transaction. For example, if the Investor contributed $6.6 million to the Partnership and $6 million was used to collateralize the swaps then the Partnership's projections indicate that the maximum gain from the swaps would not exceed $6 million and the maximum loss from the swaps would not exceed $6 million. The Partnership's projections always assume the long-term swaps will terminate on their early termination dates.

9. **Tax Returns**
The Partnership deducts the ratable daily portion of each NPC periodic payment it makes to FB for the taxable year to which that portion relates. However, the Partnership does not accrue income with respect to the payment owed to the Partnership by FB. The Partnership only reports income from the NPCs in the second

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

year when the NPC payment is made by FB on the early termination date. Thus, the Partnership reports on its first year tax return only ordinary losses from the NPCs and not ordinary income. In the second year, the Partnership reports as capital gain the net payment it receives from FB on the early termination date.

10 Life of the Partnership
Some of the Partnerships will invest only in the NPCs described in Notice 2002-35. These Partnerships terminate in their second year of existence. Other Partnerships will invest in the "Son of Boss" transaction described in Notice 2000-44 in their second year and continue in existence past their second year. The Partnerships that enter into the "Son of Boss" transaction in the second year do so presumably to generate a capital loss to offset the capital gain produced by the Notice 2002-35 transactions in the second year.

DISCUSSION[FN2]

**1. Is the Partnership required to accrue, and include in income, a payment ratably over the term of the NPC under Treas Reg § 1.446-3(f)(2)(i)?**
The IRS legal position concerning this issue is stated in Rev. Rul. 2002-30, 2002-1 C.B. 971 and Notice 2002-35, 2002-1 C.B. 992.

Under section 446 generally, taxable income is required to be computed in a manner that clearly reflects income. Section 446(c) permits a taxpayer to use any method of accounting permitted under the income tax regulations. Treas. Reg. § 1.446-3 provides rules concerning the timing of inclusion of income and deductions for amounts paid or received pursuant to NPCs.

Treas. Reg. § 1.446-3(c)(1)(i) defines an NPC as a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount, in exchange for specified consideration or a promise to pay similar amounts. Payments made pursuant to NPCs are divided into three categories, periodic, nonperiodic and termination payments.

Treas. Reg. § 1.446-3(e)(2) provides that all taxpayers regardless of their accounting method must recognize the ratable daily portion of a periodic payment for the taxable year to which that portion relates. Treas. Reg. § 1.446-3(e)(1) defines periodic payments as payments made or received pursuant to an NPC that are payable at intervals of one year or less during the entire term of the contract, that are based on a specified index and that are based on a notional principal amount. Treas. Reg. § 1.446-3(h)(1) defines a termination payment as a payment made or received to extinguish or assign all or a proportionate part of the remaining rights and obligations of any party under an NPC. Treas. Reg. § 1.446-3(f)(1) defines a nonperiodic payment as any payment made or received with respect to an NPC that is not a periodic payment or a termination payment.

Treas. Reg. § 1.446-3(f)(2)(i)requires all taxpayers, regardless of their accounting methods to recognize ratably the daily portion of a nonperiodic payment for the taxable year to which it relates. Treas. Reg. §1.446-3(f)(2)(i) generally requires a nonperiodic payment to be recognized over the term of the NPC in a manner that reflects the economic substance of the contract.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Generally, the allocation required to reflect the economic substance of the contract can be met by allocating it in accordance with the forward rates of a series of cash-settled forward contracts that reflect the specified index and the notional principal amount. Treas. Reg. §1.446-3(f)(2)(ii). Treas. Reg. § 1.446-3(f)(2)(iii)(A) provides that an upfront payment may be amortized by assuming that the nonperiodic payment represents the present value of a series of equal payments made throughout the term of the swap contract under what is known as the "level payment method." Treas. Reg. § 1.446-3(f)(2)(iii)(B) provides that nonperiodic payments other than an upfront payment may be amortized by treating the contract as if it provided for a single upfront payment (equal to the present value of the nonperiodic payments) and a loan between the parties. The single upfront payment is then amortized under the level payment method described above. The time value component of the loan is not treated as interest, but together with the amortized amount of the deemed upfront payment is recognized as a periodic payment. See, e.g., Treas. Reg. §1.446-3(f)(4), Example 6, for an illustration of these rules.

Treas. Reg. § 1.446-3(g)(2) provides that if a taxpayer, either directly or through a related person reduces risk with respect to an NPC by purchasing, selling, or otherwise entering into other NPCs, futures, forwards, options, or other financial contracts (other than debt instruments), the taxpayer may not use the alternative methods provided in paragraphs (f)(2)(iii) and (v) of § 1.446-3. Moreover, where such positions are entered into to avoid the appropriate timing or character of income from the contracts taken together, the Commissioner may require that amounts paid to or received by the taxpayer under the notional principal contract be treated in a manner that is consistent with the economic substance of the transaction as a whole.

Treas. Reg. § 1.446-3(g)(4) provides that a swap with a significant nonperiodic payment is treated as two separate transactions consisting of an on-market level payment swap and a loan. The loan must be accounted for by the parties to the contract independently from the swap. The time value component associated with the loan is not included in the net income or net deduction from the swap under Treas. Reg. § 1.446-3(d) but is recognized as interest for all purposes of the Internal Revenue Code.

Treas. Reg. § 1.446-3(d) provides that the net income or net deduction from a n NPC for a taxable year is included in, or deducted from, gross income for that taxable year. The net income or the net deduction from a n NPC for a taxable year equals the total of all the periodic payments that are recognized from that contract for the taxable year under Treas. Reg. §1.446-3(e), and all of the nonperiodic payments that are recognized from that contract for the taxable year under Treas. Reg. § 1.446-3(f). Each party to the NPC determines its payments and receipts attributable to the taxable year and takes into account, as net income or net deduction the results of those payments and receipts.

It is the Service's position that the amount required to be paid by FB on the early termination date is a nonperiodic payment within the meaning of Treas. Reg. § 1.446-3(f)(1). In accordance with Treas. Reg. § 1.446-3(f)(2)(i) the Partnership is required to recognize over the term of the NPC the amount of the nonperiodic payment in a manner that reflects the economic substance of the NPC. Under these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts, the nonperiodic payment required to be paid by FB to the Partnership consists of the sum of two independent components, one that is contingent and one that is noncontingent.

In order to reflect the economic substance of the NPC, each component must be treated separately for purposes of applying the rules of Treas. Reg. § 1.446-3. As a result, the noncontingent amount due on the early termination date must be recognized over the term of the NPC in a manner consistent with Treas. Reg. § 1.446-3(f)(2)(iii). This treatment of the noncontingent amount payable by FB is not affected by the possibility the Partnership may be required to pay a depreciation amount to FB that, under the terms of the NPC, will be netted against FB's obligation to pay the noncontingent amount. If FB's payment to the Partnership is significant, the Partnership must accrue interest income pursuant to Treas. Reg. § 1.446-3(g)(4).

The Partnership contends that the inability to determine the economic result of the swap transaction until maturity due to the contigent nature of FB's NPC payment obligation and the omission of contigent nonperiodic payment guidance in the Section 446 regulations are sufficient grounds to conclude that no accrual over the term of the swap transaction should be required for FB's payments to the Partnership. In the typical case, the nonperiodic payment made by FB consists of a large noncontingent component (roughly 92% of the notional amount of the NPC) and a small contingent component (roughly 8% of the notional amount of the NPC). Hence, the Partnership fails to accrue as income over the life of the NPC the large noncontingent component it receives from FB because there is a small contingent component which amount cannot be known until it is paid. This method allows the Partnership to defer recognizing as income the large noncontingent payment it is owed from FB until FB makes its final payment.

The Partnership's method of accounting for the NPC payment it receives does not clearly reflect income because it results in the Partnership deferring income from the entire NPC payment from FB. For the aforementioned reasons, the Partnership should be required to accrue the noncontingent component of the nonperiodic payment it receives from FB ratably over the term of the NPC under Treas. Reg. §1.446-3(f)(2)(i) notwithstanding that the payment is not contractually due until the end of the term.

Taxpayers have claimed that the NPC rules allow a wait and see approach for contingent nonperiodic payments. The Service acknowledges lack of guidance in this area and even assuming that the rule is wait and see, as taxpayers contend, under the anti-abuse rule of 1.446-3, the Service we can depart from the rules in 1.446-3 as necessary to achieve the correct tax result. In this case, the correct tax result would require that the nonperiodic payment be treated as consisting of two components -- a noncontingent component and a contingent component. The noncontingent component would be spread over the term of the NPC consistent with the rules in 1.446-3(f). Given the lack of specific guidance relating to contingent nonperiodic payments, taxpayer can use the wait and see method for the contingent component.

The terms of specific NPC transactions will vary and it is therefore important to obtain from the Partnerships the confirmations of the NPCs. The confirmations will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be used to determine the noncontingent and contingent components of the nonperiodic payments. This information will be needed to implement the Service's position that the Partnership should be required to accrue the noncontingent component of the nonperiodic payment it receives from FB ratably over the term of the NPC under Treas. Reg. §1.446-3(f)(2)(i).

The use of an Internal Revenue Financial Products Specialist is recommended in assisting with developing this position.

**2. Should the NPC payment received by the Partnership on the early termination date be included by the Partnership as ordinary income or capital gain?**
The Partnership and FB enter into NPCs with an eighteen month term. However, each of these NPCs also provides for an early termination date usually at one year and 5 days. The Partnership includes the NPC payment it receives from FB in income as capital gain in its second year on the basis that this payment constitutes a termination payment. However, the facts in these cases do not support characterizing this payment as a termination payment.

Contractual payments payable at intervals of more than one year, and made at the maturity of NPCs, are nonperiodic payments because they are neither periodic payments nor termination payments. See Treas. Reg. § 1.446-3(f)(1). Nonperiodic payments are includable as ordinary income under Section 61. In contrast, termination payments received to terminate an interest in a swap are treated as capital gains under section 1234A.

The NPC timing regulations under Treas. Reg. § 1.446-3 suggest that periodic and nonperiodic payments are ordinary in character. First, the NPC regulations cross-reference Section 162, not Section 1001 or Section 165. See Treas. Reg. §1.162-1(b)(8). Second, the regulations apply accrual and estimation principles where the payment relates to a period that spans more than one year. Treas. Reg. §§ 1.446-3(e)(2)(i) and 1.446-(f)(2)(i). Such treatment is inconsistent with realization based reporting for capital gains and losses (i.e., gains are not prorated or estimated but are fully reported when the sale or exchange occurs). Periodic and nonperiodic payments under a swap give rise to ordinary income or expense, not capital gain or loss, on the ground that no sale or exchange of a capital asset occurs when a periodic or nonperiodic payment is made. Section 1234A does not confer sale or exchange treatment, because such payments under a swap, including the final periodic or nonperiodic payment, are not made as a result of the cancellation, lapse, expiration, or other termination of a right or obligation with respect to property which is a capital asset in the hands of the taxpayer. Section 1234A is reserved for unscheduled payments made to terminate a contract.

Taxpayers are likely to argue that the payment the Partnership received from FB was a termination payment and accordingly is subject to capital asset treatment under Section 1234A. There are, however numerous facts that support that in substance the payment the Partnership received on the early termination date was in fact a maturity payment. Facts that support this position and should be included in the file may consist of the following:

1. FB's documents that state that the swaps will always terminate early.
2. Promoter's documents that show that Investors were told upfront that the transactions would generate capital gains in year two. (In order to make this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim the Partnerships had to know at the inception of the transactions that the NPCs would terminate early.)
3. NPC confirmations indicating there is no penalty for either party for terminating the swaps early.
4. An analysis of the NPCs and Loan Agreement to determine whether the Partnerships had to terminate the NPCs early in order to receive funds from FB and avoid defaulting on their loans with FB.
5. An analysis of whether the interest rate caps and collars used as hedges on the NPCs expired on the early termination dates.
6. An analysis of the partnership's projections to determine if the projections assume the NPCs will terminate on the early termination date.

Under the "substance over form" doctrine, the true nature of a transaction will not be allowed to be disguised by mere formalisms, existing solely to alter tax liabilities. Commissioner v. Court Holding Company, 324 U.S. 331, 334 (1945). The substance over form doctrine is "concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S. 252, 255 (1939).

Accordingly, evidence developed in these cases, should indicate that the "termination payments" were in substance scheduled payments made at the maturity date of the contract which are not entitled to capital gain treatment under section 1234A. If payments made by FB on the Early Termination dates are considered final payments made at the maturity of the NPCs then such payments should be treated as ordinary income by the Partnership.

Taxpayers may also claim that even if the payment made to the Partnership is a maturity payment it still should qualify as a termination payment entitled to capital asset treatment because Section 1234A applies to "cancellation, lapse, expiration or other termination." This interpretation of Section 1234A is unfounded and inconsistent with its meaning and intent. Periodic and nonperiodic payments made pursuant to a swap qualify for ordinary treatment and are deductible as ordinary business expenses under section 162 and includible in income by the recipient under section 61. The final periodic or nonperiodic payment on a swap is accounted for as ordinary income or expense in the same manner as all other periodic or nonperiodic payments made or received on a swap. See PLR 9730007 (Apr. 10, 1997); Prop. Treas. Reg. § 1.1234A-1(b).

**3. Whether the Partnership's loan should be disregarded for federal income tax purposes.**

A. Consequences of disregarding Partnership's loan

If a Partnership's loan is not true indebtedness, a deduction for interest paid on the loan under I.R.C. § 163(a) is not allowed. A seminal case interpreting I.R.C. § 163 is Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), aff'g, 44 T.C. 284 (1965) in which the appellate court, found that § 163 did not permit a deduction for interest paid or accrued in loan arrangements without purpose, substance, or utility apart from their anticipated tax consequences. An arrangement that purports to be a loan may not be true indebtedness even if the underlying transaction has economic substance. Lee v. Commissioner, 155 F.3d 584 (2d Cir. 1998), aff'g and remanding, T.C. Memo. 1997-172. (The court, in discussing Jacobson v.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Commissioner, 364 F.2d 734 (2d Cir. 1966), said, "Having found that there was economic substance in the overall deal, and hence that the taxpayer's interest deductions were presumptively valid, the court went on to consider whether one of several debts the taxpayer had incurred was itself real or sham. For, obviously, even a finding that an underlying transaction has economic substance cannot be sufficient to sustain deductions for interest expenses if the debt itself is nothing but a sham." Id. at 587.)

Second, if the loan is disregarded, the Investor will not have basis in the Partnership attributable to the loan. A partner's distributive share of partnership loss is allowed only to the extent of the adjusted basis of the partner's interest in the partnership at the end of the partnership year in which such loss occurred. I.R.C. § 704(d). Under I.R.C. § 722, a partner's basis in a partnership acquired by the contribution of property, including money, shall be the amount of such money and the adjusted basis of the property in the hands of the contributing partner at the time of the contribution, increased by the amount (if any) of gain recognized to the contributing partner. For purposes of I.R.C. § 722, a contribution of money includes "[a]ny increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities." Section 752(a).

Rev. Rul. 88-77, 1988-2 C.B. 128, provides that an obligation is a liability for purposes of section 752 and the regulations thereunder to the extent, but only to the extent, that incurring or holding such obligation gives rise to:

i. The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
ii. A deduction that is taken into account in computing the taxable income of the obligor; or
iii. An expenditure that is not deductible in computing the taxable income and is not properly chargeable to capital.

In this case, the "liability" under consideration is the purported loan by FB to the Partnership. If the loan is disregarded, then there is no "liability" for purposes of I.R.C. § 752. Accordingly, the Investor's basis in the Partnership is not increased by reason of the loan and any loss claimed against such disallowed basis is disallowed.

Finally, if the Partnership's loan is disregarded, it is unclear whether any funds were actually paid by the Partnership to FB in year one under the NPCs. If no payments were made on the NPCs, no loss was generated in year one.

B. Partnership's loan was not valid indebtedness

I.R.C. § 163(a) generally provides that a deduction is allowed for interest paid or accrued within the taxable year on indebtedness. However, no deduction is permitted for interest paid or accrued on loan arrangements that lack economic substance apart from anticipated tax consequences. Goldstein v. Commissioner, 364 F.2d 734, 740, cert. denied, 385 U.S. 1005 (1967); Knetsch v. United States, 364 U.S. 361, 366; United States v. Wexler, 31 F.3d 117, 125-26 (3rd Cir. 1994), cert. Denied, 513 U.S. 1190 (1995); Saba Partnership v. Commissioner T.C. Memo. 2003-31; Seykota v. Commissioner, T.C. Memo. 1991-541.

A loan is disregarded for federal tax purposes where there is no genuine indebtedness. In Knetsch, 364 U.S. 361, the Supreme Court held that no valid indebtedness existed where the taxpayer never acquired a meaningful beneficial interest in the loan. Similarly, in Bridges v. Commissioner, 39 T.C. 1064, aff'd 325 F.2d 180 (4th Cir. 1963), the court disregarded the loan where there was no genuine indebtedness stating, "We doubt that the bank at any time actually had a ny of its money out on loan or that its portfolio of Treasury notes actually changed. The transaction merely provided the 'facade' of a loan." Bridges, 39 T.C. 1064, 1077.

In transactions involving circular flows of funds there is no genuine indebtedness. A circular flow of funds exists where the lender's funds are returned to the lender by the borrower at the time the loan is made. Courts disregard loans for federal tax purposes in such cases because there was no investment outlay by the lender. Felcyn v. United States, 691 F. Supp. 205 (C.D. Cal. 1988) quoting Old Colony Railroad Co. v. Commissioner, 284 U.S. 552, 560 (1932) and Deputy v. Dupont, 308 U.S. 488, 498 (1940); Oren v. Commissioner, T.C. Memo 2002-172. "Financial gymnastics" such as taking a piece of paper and assigning it around in a circle does not constitute a loan for tax purposes. Felcyn, 691 F. Supp. 205, 212-213.

In the Notice 2002-35 cases, FB retains control of the loan proceeds. The Partnership typically borrows funds from FB for a period of eighteen months pursuant to a Loan Agreement, and, simultaneously with the execution of the Loan Agreement, deposits the funds with FB under the Deposit agreement. Under the Deposit Agreement, the Partnership has no right to withdraw or call for payment to a third party any part of the loan proceeds or any additional funds that may have been credited to the Partnership's deposit account under the Deposit Agreement or under the NPCs. Only on the deposit repayment date and subject to certain setoff provisions is FB required to repay the Partnership the deposit account balance. FB, through its control of the funds in the deposit account, has the right to use the funds in the deposit account to discharge any obligation that the Partnership has to FB under the Loan Agreement or the NPCs.

Moreover, a transaction that appears to be a loan may be recast in accordance with the economic substance of the transaction. In Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970), and Greenfield v. Commissioner, T.C. Memo. 1982-617, the courts looked at loans undertaken in connections with a lease (Blue Flame at 596) and a sale (Greenfield) and found that the loan was so interdependent with the lease and sale that what purported to be a loan was in fact rent or sale proceeds. These courts found it significant that the parties structured the transaction so that the loan was "repaid" by mere bookkeeping entries. "The fact that no repayment would ultimately be necessary, due to the contemporaneous obligations incurred ...severely undercuts [taxpayers'] characterization of the cash receipt as a loan." Greenfield, supra. See also Blue Flame, supra (alleged loan not respected where payments took the form of bookkeeping entries, the loan was in the exact amount of the rent due under the leases, and repayment dates of the loan and rent payments were intentionally designed to coincide).

In this case, the loan and the NPCs are interdependent and the amount of the loan is entirely determined by the amount of loss the taxpayer requested for the first year of the transaction. The loan proceeds can be used only to make payments on the NPC in year one (and thus generate a year one ordinary loss for tax purposes) and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

loan repayment is conditioned on receipt of NPC payments from FB in year two. Economically, the Partnership and FB simultaneously accrue rights to payment from the counterparty of substantially the same amounts as they are obligated to pay to the counterparty. To the extent the Partnership's and FB's rights and obligations under the loan and the NPCs are legally interdependent and substantively offsetting, there is no advance of funds from a lender to a borrower with an unconditional obligation to repay on the part of the borrowe r. See e.g. Haag v. Commissioner, 88 T.C. 604, 619 (1987), aff'd 855 F.2d 855 (8th Cir. 1988) ("For disbursements to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the party of the transferee to repay the money and an unconditional intention on the part of the transferor to secure repayment."); Geftman v. Commissioner, 154 F.3d 61 (3d Cir. 1998).

The loan was intended to provide tax benefits without the economic consequences of true debt. Such a loan is not respected as valid indebtedness. See Knetsch v. United States, supra; Goldstein v. Commissioner, supra.

C. Evidence to be developed

Before asserting that the loan should be disregarded, evidence should be gathered in each case to demonstrate the following: (1) that the Partnership had no control over the loan proceeds and no risk of loss from repayment of the loan if FB defaulted on the NPC; (2) that FB had no risk of loss with respect to the loan because of the contractual agreements, including the Deposit Agreement; (3) that none of the participants expected that any funds other than those in the deposit account would be used to repay the loan amount; (4) that the "transfers" of funds pursuant to the loan agreement and the NPC were simply book entries relating to funds in the deposit account over which FB retained full control at all times.

Evidence that should be analyzed in developing this position includes the following:

1. The Loan Agreement;
2. The Deposit or Collateral Agreement;
3. Projections concerning the NPC transactions;
4. FB's internal credit department reports concerning the loan.

**4. Does I.R.C § 465 limit the Investor's at risk amount?**

I.R.C. § 465 generally limits deductions for losses in certain activities to the amount for which the taxpayer is at risk. In the case of an individual taxpayer or a C corporation with respect to which the stock ownership requirement of paragraph (2) of I.R.C. § 542(a) is met, I.R.C. § 465(a)(1) limits the taxpayer's losses to the amount for which the taxpayer is at risk in the activity. I.R.C. § 465(c)(3)(A) provides that section 465 applies to all activities engaged in by the taxpayer in carrying on a trade or business or for the production of income. Assuming arguendo that the NPC is an activity entered into for profit or a trade-or-business activity, Investors are individuals who are subject to I.R.C. § 465.

I.R.C. § 465(b)(1) provides that the amount at risk includes the amount of money and the adjusted basis of any property contributed by the taxpayer to the activity. Under I.R.C. § 465(b)(2), a taxpayer is also at risk for amounts borrowed for use in the activity to the extent that the taxpayer is personally liable to repay the amount. Funds are not at risk if the taxpayer is "protected against such loss

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

through nonrecourse financing, guarantees, stop loss arrangements, or other similar arrangements" under I.R.C. § 465(b)(4). The Senate report promulgated in connection with section 465 states in pertinent part that "a taxpayer's capital is not 'at risk' in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer." S.Rept. No. 94-938, pt. 1 AT 49, 94TH Cong., 2d Sess. (1976).

I.R.C. § 465(b)(4) prohibits a taxpayer from treating borrowed funds as at risk where a transaction is structured to remove any realistic possibility that the taxpayer will suffer an economic loss that would place the borrowed funds at risk. Moser v. Commissioner, 914 F.2d 1040,1048 - 49 (8th Cir. 1990); Baldwin v. United States, 904 F.2d 477, 483 (9th Cir. 1990). Loaned funds are not at risk under Section 465(b)(4) where a circular flow of funds protects the taxpayer from any risk of being liable for the loan. See Moser, 914 F.2d 1040, 1049.

If the loan is not valid debt, it cannot be taken into account in determining the Investor's at-risk amount. Even if the loan is valid indebtedness, however, in the typical Notice 2002-35 NPC transaction, the NPC agreements and the Partnership's loan and deposit account agreements eliminated the Investor's risk of loss from the loan. As discussed under Issue 3, the maximum amount the Investor could lose from the NPC transactions is limited to the amount of funds the Partnership sent to FB to collateralize the swaps. These were funds originally contributed by the Investor to the Partnership. Analysis of the Partnership's projections and FB's credit reports should be performed in developing this position.

Some Investors may have executed an agreement pursuant to the Partnership Agreement stating that FB had recourse against them with respect to the Partnership's indebtedness in an amount greater than the lesser[FN3] of (A) an amount equal to the product of the Limited Partner's percentage interest in the Partnership multiplied by the unpaid amount of the Partnership's indebtedness or (B) an amount equal to the product of the aggregate capital contribution of such Limited Partner multiplied by 2.25. (Some Partnership Agreements may use different language or formulas concerning a Limited Partner's recourse liability with respect to the Partnership's indebtedness.) Such agreements are meaningless, however, if the transaction is structured to eliminate any possibility that the Investor will have to satisfy the loan with personal funds. The simple expedient of drawing up papers has never been recognized as controlling for tax purposes when the objective economic realities are to the contrary. Frank Lyon, 435 U.S. at 573 (quoting Commissioner v. Tower, 327 U.S. 280, 291 (1946)).

**5. Is the Investor entitled to deductions under I.R.C § 162 for payments made by the Partnership on the notional principal contract (NPC)?**

A. The consequences of failure to qualify as I.R.C. § 162 deductions

- If expenses are deductible as trade or business expenses under I.R.C. § 162(a), they are deductible "above-the-line" in computing adjusted gross income, whereas the same expenses paid or incurred for the production of income (but not in a trade or business) are deductible under I.R.C. § 212 as itemized deductions deducted "below-the line" in computing taxable income. Assuming arguendo that the NPC transaction was entered into for profit, deductions under I.R.C. § 212 are characterized as miscellaneous itemized deductions (I.R.C. § 67(b)). See

I.R.C. §§ 62(a)(1) and 63(d).

- I.R.C. § 67(a) provides that miscellaneous itemized deductions are allowed only to the extent that the aggregate of such deductions exceeds 2% of adjusted gross income (AGI) and I.R.C. § 68(a) provides that itemized deductions are also reduced by the lesser of 3% of the excess of AGI over $100,000 or 80% of the amount of the itemized deductions.
- In addition, I.R.C. § 56(b)(1) provides that, for purposes of determining alternative minimum taxable income, miscellaneous itemized deductions are not allowed as a deduction.

As a result, for individuals, the benefits of deductions properly taken under I.R.C. § 212 may be significantly more limited than the benefits of deductions properly taken under I.R.C. § 162.

B. The partnership should be disregarded

I.R.C. § 7701(a)(2) defines a partnership as a syndicate, group, pool, joint venture, or other unincorporated organization, through which any business, financial operation, or venture is carried on, and which is not a trust or estate or a corporation.

In Moline Properties, Inc. v. Comm'r, 319 U.S. 436 (1943), the Court noted that a formal corporate entity fills a useful purpose in business and, to the extent an entity allows the owners to gain an advantage under state law or to comply with the demands of creditors or even to meet the personal or undisclosed convenience of the owner, so long as the entity's purpose "is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate entity." Id. at 439. However, the Court continued:

> To this rule there are recognized exceptions ...A particular legislative purpose, such as the development of the merchant marine, whatever the corporate device for ownership, may call for the disregarding of the separate entity... as may the necessity of striking down frauds on the tax statute... In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. [Citations omitted.] Id. at 440.

In a similar vein, the Court in Comm'r v Culbertson, 337 U.S. 733 (1949), stated that the question of whether a partnership is real for income-tax purposes depends upon "'whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or loss or both."' Id. at 742, quoting Comm'r v. Tower, 327 U.S. 280, 287 (1946).

In ASA Investerings P'ship v. Comm'r, 201 F.3d 505, 512, (D.C. Cir. 2000), cert. Denied, 531 U.S. 871 (2000), the Court of Appeals found that a partnership formed for a tax purpose and which engaged in de minimis business activity in furtherance of that tax purpose is not a valid partnership. The taxpayer argued that the partnership which was formed to engage in transactions involving certain private placement notes should be respected under Moline Properties because its purpose was the equivalent of business activity or it conducted a business activity. Id. at 512 [emphasis added]. However, in explaining Moline Properties, the Court of Appeals recognized that "the business activity reference in Moline [was intended] to exclude [an] activity whose sole purpose was tax avoidance." Id. "Thus, what the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

taxpayer [in ASA] allege[d] to be a two-prong inquiry [was] in fact a unitary test... under which the absence of a nontax business purposes is fatal. Id. See also Boca Investerings v. United States, 314 F.3d 625 (D.C. Cir. 2003) (partnership disregarded where court found no evidence of a non-tax purpose for creating the partnership.); Saba Partnership v. Comm'r, T.C. Memo. 2003-31 (court rejected taxpayer's contentions that the partnerships were operated to achieve a non-tax business purpose and disregarded the partnerships).

If a partnership engages in short-term trading for profit, that activity may be evidence of the bona fide nature of the partnership. In that case, there is authority for looking at the frequency and nature of the partnership's trades to characterize the activity as either a trade or business or investment activity. (See discussion below.) On the other hand, if the short-term trading is not intended to produce a profit or other business advantage (such as hedging other investments), but rather is intended to assist the partner in avoiding investor status, the activity will not be evidence of the bona fide nature of the entity. The facts and circumstances of these cases support the conclusion that the Partnership's activity was intended to be offsetting and to produce little or no I.R.C. § 988 gains or losses, and that the portion of the taxpayer's investment allocated to the offshore activity neither increased in value nor suffered losses (other than de minimis amounts) as a result of the trading activity. Under these circumstances, the activity provides evidence of a tax purpose, rather than a business purpose, for use of a partnership.

The tax purpose for conducting the activity through a partnership is the partner's ability to take the position that the partnership's activities can be attributed to a limited partner for purposes of characterizing expenses as deductible under I.R.C. § 162 rather than under I.R.C. § 212. As a general rule, "traders" can claim a § 162 deduction for their ordinary and necessary expenses connected with the activity, whereas "investors" can claim the same expenses under I.R.C. § 212. The fundamental distinction between a trader (who engages in the trade or business of buying and selling securities on an exchange) and a n investor depends upon the type and frequency of trades made by the taxpayer. A taxpayer is characterized as a trader if the taxpayer engages in transactions (1)that attempt to profit from short-term market swings with income principally from selling on an exchange rather than from interest, dividends, or long-term appreciation (King v. Comm'r, 89 T.C. 445, 458 (1987)) and (2) that are frequent and substantial, undertaken with continuity and regularity, such that the activity absorbs a major portion of the taxpayer's time and are conducted for the purpose of making a livelihood (Comm'r v. Groetzinger, 480 U.S. 23 (1987) and Snyder v. Comm'r, 295 U.S. 134 (1935)). In this case, if the taxpayer is not characterized as a trader, the taxpayer is treated as an investor.[FN4]

Moreover, the taxpayer must be personally involved in the trading activities in order to be treated as being in the trade or business of trading; the activities may not be delegated to an agent. Mayer v. United States, 32 Fed. Cl. 149 (1994). Cf. Higgins v. Comm'r, 312 U.S. 212, 218 (1941) "[M]erely [[keeping] records and [collecting] interest and dividends from his securities, through managerial attention for...investments" is insufficient to constitute carrying on a business.); Rev. Rul. 75-523, 1975-2 C.B. 257 (Expenses relating to the management of one's investment in stocks and bonds, even though the activities include the buying and selling of securities, as well as owning and holding them for production

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of income, are not expenses incurred in the carrying on of a trade or business).

In order to constitute the carrying on of a trade or business under § 162(a), the activity must be "'entered into, in good faith, with the dominant hope and intent or realizing a profit, i.e. taxable income, therefrom."' Brannen v. Comm'r, 78 T.C. 471, 501 (1992), quoting Hirsch v. Comm'r, 315 F.2d 731, 736 (9th Cir. 1963). Generally, characterization of activity as a trade or business is made at the partnership level. Brannen v. Comm'r, Id. at 504.

On the other hand, if the trading activity is a mere sham, not entered into for profit but rather to obtain a tax advantage, then the partnership must be disregarded unless there is other evidence of business activity or business purpose for the partnership. The only other activity of the Partnerships in these cases was to enter into NPCs with the Bank. The NPCs produced losses in the first year and a gain in the second year. This timing was a tax purpose. Moreover, while certain NPC transactions may have resulted in a net profit for the taxpayer/investor, use of a partnership was unnecessary to achieve that profit. The Partnership was formed solely for a tax purpose to provide grounds for claiming the expenses associated with the NPCs as expenses deductible under I.R.C. § 162 rather than under I.R.C. § 212.

If the partnership is disregarded, the taxpayer's activities must be characterized at the individual level. The individual taxpayers did not engage in trading activities with the frequency and quality that qualify as engaging in a trade or business. As a result, any expenses that are associated with an activity entered into for profit are deductible only under I.R.C. § 212.

C. If the Partnership is not disregarded, the Partnership expenses are deductible under I.R.C. § 212, if at all.
Even if the partnership is not disregarded, I.R.C. § 67(a) applies to any expenses because the Partnership is an investor, not a dealer or trader in securities.

The issue of whether securities trading activities constitute a trade or business, or are merely those of an investor, requires an examination of the facts in each case. Higgins, 312 U.S. at 217. In such factual examination, three nonexclusive factors are considered: (1) the taxpayer's investment intent, (2) the nature of the income derived from the trading activity, and (3) the frequency, extent and regularity of the trades. Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983). From these three nonexclusive factors, a two part test has developed which requires that in order for a taxpayer's trading activities to be considered a trade or business, (1) the taxpayer's trading must be substantial, and (2) the taxpayer must intend to profit from short term market swings rather than derive income from interest, dividends and long-term appreciation. Mayer v. Comm'r, T.C. Memo. 1994-209. In determining whether a taxpayer is a trader or an investor, the taxpayer may not rely on the acts of agents, but must personally engage in (or direct) the trading. Mayer v. Comm'r, 32 Fed. Cl. 149, 155 (Cl. Ct. 1994).

The facts and circumstances here indicate that the Partnership may not have actually engaged or directed in the trading activities of its offshore account. The Partnership engaged a manager for its offshore account and facts should be developed relating to whether and to what extent the general partner in Partnership

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

personally managed the trading activities. If the general partner's involvement was not regular and continuous and did not involve personal direction of the trading, the Partnership is not engaged in the trade or business of trading.

D. The NPCs cannot be properly classified as part of any trading activity and expenses related to the NPCs are deductible under I.R.C. § 212, if at all.

The NPCs are private swap contracts that were approximately one year in length and that were based upon the movement of the S&P or of the Japanese yen. The offshore trading activity involved day-trading of a variety currency futures (not related to movement in the yen) on a currency exchange. A gain or loss on the NPC did not hedge or otherwise affect the positions taken in or the economic results of the trading account. The two activities are unrelated. Moreover, because a participant in the NPCs is clearly an investor, it would be inappropriate under Higgins v. Comm'r, supra, and related precedent, to group the NPC transactions with the activity of trading and characterize the NPC expenses as deductible under I.R.C. § 162.

In Higgins, the taxpayer had extensive investment in real estate, bonds, and stocks, and devoted a considerable portion of his time to the oversight of his interests. He hired others to assist him with his investments. The Court held that there was no reason why expenses not attributable to carrying on a business cannot be apportioned. 312 U.S. at 218. Likewise, expenses in this case can easily be apportioned between the offshore trading activities and the NPC activities.

Moreover, King v. Comm'r, 89 T.C. 445 (1987), does not provide authority for grouping the NPC with the trading activity of the Partnership. In King, the Tax Court held that the activity of trading commodities and taking delivery of gold in settlement of a futures contract were part of the same trade or business. The taxpayer in King was clearly a commodities futures trader and periodically took delivery of commodities (including but not limited to the gold). As a result, the court found there was an interrelationship between the holding of the commodity (gold) and the taxpayer's trading in commodity futures and thereby distinguished the facts in King from those in Higgins.

If the NPCs are analyzed separately, it is clear that the Partnership's activities involving the NPC transactions do not constitute a trade or business. Under the two part test developed in Mayer for a taxpayer's trading activities to be considered a trade or business, (1) the taxpayer's trading must be substantial, and (2) the taxpayer must intend to profit from short term market swings rather than derive income from interest, dividends and long-term appreciation. Mayer, T.C. Memo. 1994-209. The Partnership fails both part of this test. First, the Partnership typically only entered into 4 NPCs over the course of the year and the swings in the markets made absolutely no difference in determining the Partnership's positions in the NPCs. The Partnership terminated the NPCs on their early termination dates without any regard to the movement in the market.

As a result, the NPC transactions are a separate activity from the offshore trading activities of the Partnership and do not qualify as a trade or business activity. If the Partnership is recognized and it is determined that the transactions were intended to make a profit, its activities with respect to the NPCs are those of an investor, not a trader. Accordingly, any ordinary and necessary expenses associated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with the NPCs are deductible under I.R.C. § 212 and are subject to I.R.C. § 67(a) at the partner level.

**6. Do the Partnership's transactions lack economic substance?**

Discretion must be exercised in determining whether to utilize an economic substance argument[FN5] in any case. The doctrine of economic substance should be considered, but only in cases where the facts show that the transaction at issue was primarily designed to generate the tax losses, with little if any possibility for profit, and that such was the expectation of all the parties. Specifically, in a Notice 2002-35 transaction, the argument should not be raised when taxpayers can objectively demonstrate that the structure of the transaction, particularly the contingent component of the swap payment due from FB at the end of the term of the NPC, has the real potential to allow the partnerships to realize substantial economic returns and substantial pre-tax profits. Moreover, even in those cases when it is appropriate to raise the argument, economic substance should only be asserted as a secondary or tertiary argument, following any appropriate technical arguments.

The wide variety of facts required to support its application should be developed at the Exam level before this argument can be made. The sources for these facts will be similar: documents obtained from taxpayers, the promoter and other third parties; interviews with the same; and expert analysis of financial data and industry practices. Summonses should be promptly issued whenever necessary.

A. Background

In order to be respected, a transaction must have economic substance separate and distinct from the economic benefit achieved solely by tax reduction. See Frank Lyon Co. v. U.S., 435 U.S. 561, 583-84 (1977). A transaction has economic substance if it is rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and economic situation and the transaction has a reasonable possibility of profit. See Rice's Toyota World v. Comm'r, 752 F.2d 89 (4th Cir. 1993); Pasternak v. Comm'r, 990 F.2d 893 (6th Cir. 1993); ACM P'ship v. Comm'r, 157 F.3d 231 (3d Cir. 1998).

A transaction's economic substance is determined by analyzing the *subjective intent* of the taxpayer entering into the transaction and the *objective economic substance* of the transaction. The various United States Courts of Appeals differ on whether the economic substance analysis requires the application of a two-prong test or is a facts and circumstances analysis regarding whether the transaction had a "practical economic effect", taking into account both subjective and objective aspects of the transaction. Compare Rice's Toyota World and Pasternak at 898 (applying the two -pronged test) with Sacks v. Comm'r, 69 F.3d 982 (9th Cir. 1995)(applying the facts and circumstances analysis).[FN6] See also Gilman v. Commissioner, 933 F.2d 143, 148 (2d Cir. 1991)("The nature of the economic substance analysis is flexible...").

Moreover, among the United States Courts of Appeals that apply a two-prong test, there is disagreement as to whether the test is disjunctive or conjunctive. For example, the Fourth Circuit Court of Appeals applies the test disjunctively: a transaction will have economic substance if the taxpayer had either a nontax business purpose or the transaction had objective economic substance. Rice's Toyota

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

World at 91-92.[FN7] However, the Sixth Circuit Court of Appeals and Eleventh Circuit Court of Appeals apply the test conjunctively: a transaction will have economic substance only if the taxpayer had both a nontax business purpose and the transaction had objective economic substance. See Pasternak at 898 and United Parcel Service of America v. Commissioner, 254 F.3d 1014, 1018 (11th Cir. 2001)(citing Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989)).

B. Subjective Intent - Business Purpose

The subjective business purpose inquiry "examines whether the taxpayer was induced to commit capital for reasons relating only to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved." Shriver v. Comm'r, 899 F.2d 724, 726 (8th Cir. 1990)(citing Rice's Toyota World, supra). To determine that intent, the following credible evidence is considered: (i) whether a profit was possible;[FN8] (ii) whether the taxpayer had a nontax business purpose;[FN9] (iii) whether the taxpayer, or its advisors, considered or investigated the transaction, including market risk;[FN10] (iv) whether the entities involved in the transaction were entities separate and apart from the taxpayer doing legitimate business before and after the transaction;[FN11] (v) whether all the purported transactions were engaged in at arms-length with the parties doing what the parties intended to do;[FN12] and (vi) whether the transaction was marketed as a tax shelter in which the purported tax benefit significantly exceeded the taxpayer's actual investment.[FN13]

Taxpayers engaging in the NPC transaction will likely assert either a profit objective or diversification (or both) as the nontax business purpose. Although it will be necessary to address both purposes, the focus should be on diversification because the lack of economic substance argument should be asserted only in transactions where it can be established that the transaction did not have a realistic pre-tax profit potential. Thus, in addition to evidence that shows a lack of pre-tax profit potential, evidence should be sought to rebut the diversification argument and demonstrate that the taxpayer and the promoter primarily planned the transaction for tax purposes.

Such evidence should include any and all of the following: (i) documents or other evidence that the swap transactions were sold as tax shelters with limited consideration of the underlying economics of the transaction; (ii) independent analysis establishing that diversification was not achieved by the NPC transaction; (iii) evidence that the taxpayer, or its advisors, did not investigate the market risk prior to entering into the NPC transaction; (iv) evidence that the independent parts making up the NPC transaction, such as the loans, were not entered into at arm's length or that the partnership or FB did not act as independent entities while engaging in the NPC transaction, and (v) evidence that a prudent investor would have chosen a direct investment rather than choosing to indirectly invest through Partnership.[FN14]

A direct source of such evidence regarding the taxpayer's contention of a non-tax business purpose is correspondence between the promoter and the taxpayer, including, but not limited to, offering memos, letters identifying tax goals, emails and in-house communications at the offices of both the promoter and the accommodating parties. Written correspondence is the best evidence, but evidence of oral communications regarding tax goals is also useful. Indirect sources of the same include correlations between tax losses generated and tax losses requested, and between the taxpayer's income and the tax losses generated, particularly if it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

can be shown that the income to be sheltered was attributable to an unusual windfall, like the liquidation of stock options, or sale of a business. Demonstrations of similarities of the nature and extent of tax losses acquired by other clients of the promoter in this shelter (the "universe") can be very important as well.

C. Objective Economic Substance

Courts have used different measures to determine whether a transaction has objective economic substance. These measures include whether there is a potential for profit, and whether the transaction otherwise altered the economic relationships of the parties.

This determination is generally made by reference to whether there was a reasonable or realistic possibility of profit.[FN15] See e.g., Gilman v. Commissioner, 933 F.2d 143, 146 (2d Cir. 1991)(determine economic substance based on "if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.") The amount of profit potential necessary to demonstrate objective economic substance may vary by jurisdiction.[FN16] However, a transaction is not required to result in a profit and similar transactions do not need to be profitable in order for the taxpayer's transaction to have economic substance. See Cherin v. Comm'r, 89 T.C. 986, 994 (1987). See also Abramson v. Comm'r, 86 T.C. 360 (1986)(holding that potential for profit is found when a transaction is carefully conceived and planned in accordance with standards applicable to a particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment).

To determine whether a transaction has a realistic possibility of profit, courts have used both a cash flow analysis and a net present value analysis. Compare James v. Comm'r, 899 F.2d 905 (10th Cir. 1990); Casebeer v. Comm'r, 909 F.2d 1360 (9th Cir 1990); Winn-Dixie, Inc. v. Comm'r, 113 T.C. 254 (1999) aff'd in part Winn-Dixie Stores, Inc. v. Comm'r, 254 F.3d 1313 (11th Cir. 2001) with ACM P'Ship v. Comm'r, T.C. Memo 1997-115 aff'd in part and rev'd in part 157 F.3d 231 (3d Cir. 1998); Soriano v. Comm'r, 90 T.C. 44, 54-57 (1988); Walford v. Comm'r, T.C. Memo 2003-296. Although it is unclear whether a court would find that a transaction lacked economic substance if it had a negative net present value but a positive cash flow potential, courts that have utilized the cash flow method have appeared willing to find objective economic substance in transactions with a positive cash flow potential. See e.g. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir 1990). In addition, it does not appear that any court has specifically repudiated the cash flow method in favor of the net present value method. See e.g. ACM P'Ship v. Comm'r, T.C. Memo 1997-115 aff'd in part and rev'd in part 157 F.3d 231, 259 (3d Cir. 1998).[FN17] Because it is unclear whether the net present value method or the cash flow method would be more acceptable, an NPC transaction under review should be analyzed using both the cash flow method and the net present value method. In addition, because transactions that have negative net present values can be financially reasonable and current business theory is moving away from analyzing the reasonableness of transactions based solely on their net present value,[FN18] economic substance should generally not be asserted unless it can be established that the profitable nature of transaction is so improbable as to be unrealistic. See Winn-Dixie, Inc. v. Comm'r, 113 T.C. 254 (1999), aff'd in part, Winn-Dixie Stores, Inc. v. Comm'r, 254 F.3d 1313 (11th Cir. 2001).[FN19] See also Rothschild v. U.S., 186 Ct. Cl. 709 (Ct. Cl. 1969); Cohen v. Comm'r, 44 B.T.A. 709 (1941).[FN20]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In developing this prong of the argument, it is not enough to show that the transaction was not profitable or was only nominally profitable. The facts must support a conclusion that the taxpayer could not profit from the transaction or, at best, could realize only a nominal profit. All direct and indirect fees and costs paid by the taxpayer, any offsetting positions related to the overall transaction, and any indemnity agreements between the accommodating parties and the promoter should be determined. It is essential that the accommodating parties be interviewed carefully in this regard, for any actual economic gain of the taxpayer would be their economic loss, which is unlikely. Evidence of circular flows of money and the invalidity of the loans must be fully developed. Similarly the roles of the collars and floors in these transactions must be thoroughly analyzed.

Should it be shown that a significant percentage of NPC transactions were profitable, economic substance should only be asserted if those profitable transactions are fundamentally distinct from the transaction under review. See Larsen v. Comm'r, aff'd. in part and rev'd. in part sub. nom. Casebeer v. Comm'r, 909 F.2d 1360 (9th Cir. 1990); Prager v. Comm'r, T.C. Memo 1993-452. A transaction should not necessarily be viewed as fundamentally distinct merely because different objective economic index were used to determine FB's contingent payment, or different percentages were applied to the fixed-to-floating non-contingent component, or the terms of the caps and collars; instead, distinctions should be based on whether the economics of the transaction as a whole eliminate the taxpayer's opportunity for profit.

Certain courts have been willing to recognize the economic substance of a transaction when, in lieu of a reasonable possibility of profit, the taxpayer establishes that the transaction altered the economic relationships of the parties. See Knetsch v. United States, 364 U.S. 361 (1960). For example, courts have found that objective economic substance existed where the transaction created a genuine obligation enforceable by an unrelated party. See United Parcel Services, supra, at 1018; Sacks, supra, at 988-990 (the use of recourse debt created a genuine obligation for the taxpayer and this illustrated a genuine economic effect); Black and Decker Corp. v. U.S., No. WDQ-02-2070 (D. Md. Aug. 3, 2004) ("The court may not ignore a transaction that has economic substance, even if the motive for the transaction is to avoid taxes.")(citing *Rice's Toyota*, supra, at 96).[FN21] However, it does not appear that this secondary standard has been universally accepted. Specifically, the Second Circuit Court of Appeals appears unwilling to find that a transaction has economic substance based on the taxpayer's claim that it altered the economic relationships of the parties. See Gilman v. Commissioner, 933 F.2d 143, 147-48 (2d Cir. 1991) in which the court rejected the taxpayer's argument that the relevant standard for determining economic substance is whether the transaction may cause any change in the economic positions of the parties (other than tax savings) and that where a transaction changes the beneficial and economic rights of the parties it cannot be a sham. See also Long Term Capital Holdings' v. United States, 2004 U.S. Dist. LEXIS 17159 (D. Conn. 2004) quoting Gilman v. Commissioner.

In determining in which cases an economic substance argument should be advanced, it would be helpful to prove that the promoter controlled all critical phases of the underlying transaction, from the formation of the necessary entities, through coordination with the accommodating parties (particularly in regard to the loans), to the timing and structure of the trades themselves. Direct sources of such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence will be primarily from the transactional documents as well as correspondence from, and interviews with, all the parties. The scope of the promoter's control must be shown to be broader than in otherwise legitimate investments. To the extent that any witness provides some rationalization for having surrendered control of virtually all critical aspects of the transaction, that should be memorialized. Similarities between the structure of the taxpayer's transaction and the "universe" of other participants in the shelter may be important.

D. Other Considerations
If it is determined that it is appropriate to assert economic substance with respect to an NPC transaction, consideration must be given to appellate venue. As discussed above, the various Courts of Appeals apply different standards in determining whether a transaction lacks economic substance. Prior to asserting economic substance, seek Counsel assistance to determined the appropriate standard. Moreover, although certain Courts of Appeals might view a nominally profitable transaction as lacking economic substance, based on the taxpayer's subjective intent of tax avoidance with no other non-tax purpose, an economic substance argument generally should not be asserted in such cases because it will be extremely difficult to establish that the taxpayer lacked the requisite pretax profit motive.

**7. Should the Investor be allowed to take deductions attributable to his investment in the Partnership under I.R.C § 183(a) if the Partnership's expenditures deducted under I.R.C § 162 were primarily incurred for the purposes of creating tax benefits?**
Congress allows deductions under I.R.C. § 162 for expenses of carrying on activities that constitute a taxpayer's trade or business. Expenditures may only be deducted under I.R.C. § 162 if the facts and circumstances indicate that the taxpayer incurred the expenses in connection with activities which are engaged in for profit. Treas. Reg. § 1.183-2(a). Case law has interpreted this requirement to mean that the taxpayer was engaged in activities primarily in furtherance of a bona fide profit objective independent of tax consequences. See Argo v. Commissioner, 934 F.2d 573 (5th Cir. 1991), cert. Denied, 502 U.S. 907 (1991); Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271, 276 (1993); Beck v. Commissioner, 85 T.C. 557 (1985); Herrick v. Commissioner, 85 T.C. 237, 254-255 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983).

When an individual is claiming deductions through a partnership, a court generally looks to the actions and expertise of the promoters and the general partner of the partnership for purposes of determining whether a bona fide profit objective exists. Cannon v. Commissioner, 949 F.2d 345, 349 (10th Cir. 1991), cert. denied, 505 U.S. 1120 (1992); Hutler v. Commissioner, 91 T.C. 371, 393 (1988); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984); Walford v. Commissioner, T.C. Memo. 2003-296. Courts have consistently held that under Section 183(a) individuals were not entitled to deduct losses attributable to their investments in partnerships, when the partnership was primarily engaged in activities intended to produce tax savings. See Soriano, 90 T.C. 44, 54-57 (1988); Walford, T.C. Memo. 2003-296; Gianaris, T.C. Memo. 1992-642.

The determination of whether an activity is engaged in for profit is made by reference to objective standards, taking into account all of the facts and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circumstances of each case. Brannen v. Commissioner, 78 T.C. 471, 506 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984). The objective facts are to be accorded greater weight than petitioner's own statements. Brannen, 78 T.C. 506. Recent court cases have used a net present value analysis as a factor in determining if an activity was engaged in for profit within the meani ng of section 183. See Soriano, 90 T.C. 44, 54-57 (1988); Walford, T.C. Memo. 2003-296; Gianaris, T.C. Memo. 1992-642; Keenan v. Commissioner, T.C. Memo. 1989-300. However, as discussed above, because transactions which have a negative net present value can be financially reasonable and current business theory is moving away from analyzing the reasonableness of transactions based solely on their net present value, negative net present value should not be the only evidence considered in concluding that the NPC transaction lacked the requisite profit objective within the meaning of section 183.

The following additional objective factors, listed in Treas. Reg. § 1.183-2(b), should be also be considered: (1) the extent to which a taxpayer carries on the activity in a businesslike manner; (2) the taxpayer's expertise or reliance on the advice of experts; (3) the time and effort the taxpayer expends in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the taxpayer's success in similar activities; (6) the taxpayer's history of income or loss from the activity; (7) the amount of occasional profits, if any; (8) the taxpayer's financial status; and (9) the elements of personal pleasure or recreation. Not all of these factors are applicable in every case, and no one factor is controlling.

A determination of whether a Partnership engaged in the NPC transaction for profit should be made by reference to objective standards, taking into account all of the facts and circumstances of each case. A net present value analysis of the Partnership's transaction should be considered in each case as well as any other relevant objective factors. However, the argument that the transaction was not engaged in for profit should not be based solely on the fact that the transaction had a negative net present value. If it is determined a Partnership was not engaged in activities to achieve an economic profit independent of tax considerations then the Investor should be denied all deductions attributable to his investment in the Partnerships under Section 183(a).

**8. Whether the Service should assert the appropriate I.R.C § 6662 accuracy-related penalties against Investors who entered into the NPC transactions.**

I.R.C. § 6662 imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment[FN22] attributable to, among other things: (1) negligence or disregard of rules or regulations and (2) any substantial understatement of income tax. Treas. Reg. § 1.6662-2(c) provides that there is no stacking of the accuracy-related penalty components. Thus, the maximum accuracy-related penalty imposed on any portion of an underpayment is 20 percent (40 percent in the case of a gross valuation misstatement), even if that portion of the underpayment is attributable to more than one type of misconduct (e.g., negligence and substantial valuation misstatement). See D.H.L. Corp. v. Commissioner, T.C. Memo. 1998-461, aff'd in part and rev'd on other grounds, remanded by, 285 F.3d 1210 (9th Cir. 2002) (The Service alternatively determined that either the 40-percent accuracy-related penalty attributable to a gross valuation misstatement under I.R.C. § 6662(h) or the 20-percent accuracy-related penalty attributable to negligence was applicable).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Negligence or Disregard of Rules or Regulations**

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. See I.R.C. § 6662(c) and Treas. Reg. § 1.6662-3(b)(1). Negligence also includes the failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. See Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967), aff'g 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Treas. Reg. § 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.

If, therefore, a taxpayer reported losses from a transaction that lacked economic substance without making a reasonable attempt to ascertain the correctness of the claimed losses, then the accuracy related penalty attributable to negligence may be appropriate. For example, in Compaq v. Commissioner, 113 T.C. 214 (1999), rev'd on other grounds, 277 F.3d 778 (5th Cir. 2001), the Service argued that Compaq was liable for the accuracy-related penalty because Compaq disregarded the economic substance of the transaction. The court agreed with the Service's position and asserted the accuracy-related penalty for negligence because Compaq failed to "investigate the details of the transaction, the entity it was investing in, the parties it was doing business with, or the cash-flow implications of the transaction." Compaq v Commissioner, 113 T.C. at 227.

"Disregard of rules and regulations" includes any careless, reckless, or intentional disregard of rules and regulations. A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence in determining the correctness of a position taken on its return that is contrary to the rule or regulation. A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances demonstrating a substantial deviation from the standard of conduct observed by a reasonable person. Additionally, disregard of the rules and regulations is "intentional" where the taxpayer has knowledge of the rule or regulation that it disregards. Treas. Reg. § 1.6662-3(b)(2).

"Rules and regulations" includes the provisions of the Internal Revenue Code and revenue rulings or notices issued by the Internal Revenue Service and published in the Internal Revenue Bulletin. Treas. Reg. § 1.6662-3(b)(2). Therefore, if the facts indicate that a taxpayer took a return position contrary to any published notice or revenue ruling, the taxpayer may be subject to the accuracy-related penalty for an underpayment attributable to disregard of rules and regulations, if the return position was taken subsequent to the issuance of the notice or revenue ruling.

The accuracy-related penalty for disregard of rules and regulations will not be imposed on any portion of underpayment due to a position contrary to rules and regulations if: (1) the position is disclosed on a properly completed Form 8275 or Form 8275-R (the latter is used for a position contrary to regulations) and (2), in the case of a position contrary to a regulation, the position represents a good

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

faith challenge to the validity of a regulation. This adequate disclosure exception applies only if the taxpayer has a reasonable basis for the position and keeps adequate records to substantiate items correctly. Treas. Reg. § 1.6662-3(c)(1). Moreover, a taxpayer who takes a position contrary to a revenue ruling or a notice has not disregarded the ruling or notice if the contrary position has a realistic possibility of being sustained on its merits. Treas. Reg. § 1.6662-3(b)(2).

Taxpayer has the ultimate burden of overcoming the presumption that the IRS' determination of negligence is correct. Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967). Under section 7491(c), however, in connection with examinations commencing after July 22, 1998, the Service must first meet the burden of production with respect to negligence. See Higbee v. Commissioner, 116 T.C. 438 (2002).

**Substantial Understatement**

A substantial understatement of income tax exists for a taxable year if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 for a corporation, other than an S corporation or a personal holding company). I.R.C. § 6662(d)(1). There are specific rules that apply to the calculation of the understatement when any portion of the understatement arises from an item attributable to a tax shelter. For purposes of § 6662(d)(2)(C), a tax shelter is a partnership or other entity, an investment plan or arrangement, or other plan or arrangement where a significant purpose of such partnership, entity, plan or arrangement is the avoidance or evasion of federal income tax. I.R.C. § 6662(d)(2)(C)(iii). Because a significant purpose of the notional principal contracts in question is tax avoidance, it is a tax shelter pursuant to section 6662(d)(2)(C). Different rules apply however, depending upon whether the taxpayer is a corporation or an individual or entity other than a corporation.

In the case of any item of a taxpayer other than a corporation, which is attributable to a tax shelter, understatements are generally reduced by the portion of the understatement attributable to: (1) the tax treatment of items for which there was substantial authority[FN23] for such treatment, if (2) the taxpayer reasonably believed that the tax treatment of the item was more likely than not the proper treatment. I.R.C. § 6662(d)(2)(C)(i). A taxpayer is considered to have reasonably believed that the tax treatment of an item is more likely than not the proper tax treatment if (1) the taxpayer analyzes the pertinent facts and authorities, and based on that analysis reasonably concludes, in good faith, that there is a greater than fifty-percent likelihood that the tax treatment of the item will be upheld if the Service challenges it, or (2) the taxpayer reasonably relies, in good faith, on the opinion of a professional tax advisor, which clearly states (based on the advisor's analysis of the pertinent facts and authorities) that the advisor concludes there is a greater than fifty percent likelihood the tax treatment of the item will be upheld if the Service challenges it. Treas. Reg. § 1.6662-4(g)(4).

It is well established that taxpayers generally cannot "reasonably rely" on the professional advice of a tax shelter promoter. See Neonatology Associates, P.A., v. Commissioner, 299 F.2d 221 (3rd Cir. 2002) (citing Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner, T.C. Memo. 1995-610). ("Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about."); Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) ("Appellants cannot reasonably rely for professional advice on someone they know to be burdened with an inherent conflict of interest."), aff'g T.C. Memo 1993-480; Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), aff'd without published opinion, 921 F.2d 280 (9th Cir. 1991). Such reliance is especially unreasonable when the advice would seem to a reasonable person to be "too good to be true". Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), aff'g Donahue v. Commissioner, T.C. Memo. 1991-181; Gale v. Commissioner, T.C. Memo. 2002-54; Elliott v. Commissioner, 90 T.C. 960, 974 (1988), aff'd without published opinion, 899 F.2d 18 (9th Cir. 1990). Treas. Reg. § 1.6662-3(b)(2). Thus, if the taxpayer claimed to have relied on a tax opinion from a promoter, the understatement penalty would likely apply. Further, if the taxpayer did not receive the opinion until after filing the return, the taxpayer could not have relied upon the tax opinion in taking a position on the return. Thus, the understatement could not be reduced.

In the case of items of corporate taxpayers no provision applies to reduce the understatement on the basis of the taxpayer's position or disclosure of items. I.R.C. § 6662(d)(2)(C)(ii). Therefore, if a corporate taxpayer has a substantial understatement that is attributable to a tax shelter item (such as arising from the use of the notional principal contracts in question), the accuracy related penalty applies to the underpayment arising from the understatement unless the reasonable cause and good faith exception applies.

**Reasonable Cause Pursuant to I.R.C § 6664**

Section 6664(c) provides an exception, applicable to all types of taxpayers, to the imposition of any accuracy-related penalty if the taxpayer shows that there was reasonable cause and the taxpayer acted in good faith. Special rules apply to items of a corporation attributable to a tax shelter resulting in a substantial understatement.

The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all relevant facts and circumstances. See Treas. Reg. § 1.6664-4(b)(1) and (f)(1). All relevant facts, including the nature of the tax investment, the complexity of the tax issues, issues of independence of a tax advisor, the competence of a tax advisor, the sophistication of the taxpayer, and the quality of an opinion, must be developed to determine whether the taxpayer was reasonable and acted in good faith.

On December 30, 2003, Treasury and the Service amended the section 6664 regulations to provide that the failure to disclose a reportable transaction, on Form 8886, "Reportable Transaction Disclosure Statement," is a strong indication that the taxpayer did not act in good faith with respect to the portion of an underpayment attributable to a reportable transaction, as defined under section 6011. While this amendment applies to returns filed after December 31, 2003, with respect to transactions entered into on or after January 1, 2003, the logic of this provision applies to reportable transactions occurring prior to that effective date: failure to comply with the disclosure provisions of the law is a strong indication of bad faith.

Generally, the most important factor in determining whether the taxpayer has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reasonable cause and acted in good faith is the extent of the taxpayer's effort to assess the proper tax liability. See Treas. Reg. § 1.6664-4(b)(1); see also Larson v. Commissioner, T.C. Memo 2002-295; Estate of Simplot v. Commissioner, 112 T.C. 130, 183 (1999) (citing Mandelbaum v. Commissioner, T.C. Memo. 1995-255), rev'd on other grounds, 249 F.3d 1191 (9th Cir. 2001). For example, reliance on erroneous information reported on an information return indicates reasonable cause and good faith, provided that the taxpayer did not know or have reason to know that the information was incorrect. Similarly, an isolated computational or transcription error is not inconsistent with reasonable cause and good faith.

Circumstances that may suggest reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the facts, including the experience, knowledge, sophistication and education of the taxpayer. The taxpayer's mental and physical condition, as well as sophistication with respect to the tax laws, at the time the return was filed, are relevant in deciding whether the taxpayer acted with reasonable cause. See Kees v. Commissioner, T.C. Memo. 1999-41. If the taxpayer is misguided, unsophisticated in tax law, and acts in good faith, a penalty is not warranted. See Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988); cf. Spears v. Commissioner, T.C. Memo. 1996-341 (court was unconvinced by the claim of highly sophisticated, able, and successful investors that they acted reasonably in failing to inquire about their investment and simply relying on offering circulars and accountant, despite warnings in offering materials and explanations by accountant about limitations of accountant's investigation).

Reliance upon a tax opinion provided by a professional tax advisor may serve as a basis for the reasonable cause and good faith exception to the accuracy-related penalty. The reliance, however, must be objectively reasonable, as discussed more fully below. For example, the taxpayer must supply the professional with all the necessary information to assess the tax matter. The advice also must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances.

The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. See Treas. Reg. § 1.6662-4(g)(4)(ii).

In Long Term Capital Holdings v. United States, 2004 U.S. Dist. Lexis 17159 (D. Conn. 2004), the court concluded that a legal opinion did not provide a taxpayer with reasonable cause where (1) the taxpayer did not receive the written opinion prior to filing its tax return, and the record did not establish the taxpayer's receipt of an earlier oral opinion upon which it would have been reasonable to rely; (2) the opinion was based upon unreasonable assumptions; (3) the opinion did not adequately analyze the applicable law; and (4) the taxpayer's partners did not adequately review the opinion to determine whether it would be reasonable to rely on it. In addition, the court concluded that the taxpayer's lack of good faith was evidenced by its decision to attempt to conceal the losses reported from the transaction by netting them against gains on its return.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Where a tax benefit depends on nontax factors, the taxpayer has a duty to investigate the underlying factors rather than simply relying on statements of another person, such as a promoter. See Novinger v. Commissioner, T.C. Memo. 1991-289. Further, if the tax advisor is not versed in these nontax matters, mere reliance on the tax advisor does not suffice. See Addington v. United States, 205 F.3d 54 (2d Cir. 2000); Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988) Freytag v. Commissioner, 89 T.C. 849 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990).

Although a professional tax advisor's lack of independence is not alone a basis for rejecting a taxpayer's claim of reasonable cause and good faith, the fact that a taxpayer knew or should have known of the advisor's lack of independence is strong evidence that the taxpayer may not have relied in good faith upon the advisor's opinion. Goldman v. Commissioner, 39 F.3d 402 (2nd Cir. 1994). See also Neonatology Associates, P.A. v. Commissioner, 299 F.3d 221 (3rd Cir. 2002)(reliance may be unreasonable when placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about); Gilmore & Wilson Construction Co. v. Commissioner, 99-1 U.S.T.C. 50,186 (10th Cir. 1999) (taxpayer liable for negligence since reliance on representations of the promoters and offering materials unreasonable); Roberson v. Commissioner, 98-1 U.S.T.C. 50,269 (6th Cir. 1998) (court dismissed taxpayer's purported reliance on advice of tax professional because of professional's status as "promoter with a financial interest" in the investment); Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993) (finding reliance on promoters or their agents unreasonable, as "advice of such persons can hardly be described as that of 'independent professionals"'); Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992) (taxpayer found negligent; reliance upon professional with personal stake in venture not reasonable); Rybak v. Commissioner, 91 T.C. 524, 565 (1988) (negligence penalty sustained where taxpayers relied only upon advice of persons who were not independent of promoters).

Similarly, the fact that a taxpayer consulted an independent tax advisor is not, standing alone, conclusive evidence of reasonable cause and good faith if additional facts suggest that the advice is not dependable. Edwards v. Commissioner, T.C. Memo. 2002-169; Spears v. Commissioner, T.C. Memo. 1996-341, aff'd. 98-1 USTC ¶ 50,108 (2d Cir. 1997). For example, a taxpayer may not rely on an independent tax adviser if the taxpayer knew or should have known that the tax adviser lacked sufficient expertise, the taxpayer did not provide the advisor with all necessary information, the information the advisor was provided was not accurate, or the taxpayer knew or had reason to know that the transaction was "too good to be true." Baldwin v. Commissioner, T.C. Memo. 2002-162; Spears v. Commissioner, T.C. Memo. 1996-341, aff'd. 98-1 USTC ¶ 50,108 (2d Cir. 1997).

If a corporate taxpayer has a substantial understatement that is attributable to a tax shelter item, the accuracy-related penalty applies to that portion of the understatement unless the reasonable cause and good faith exception applies. The determination of whether a corporation acted with reasonable cause and good faith is based on all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(f)(1).

A corporation's legal justification may be taken into account in establishing that the corporation acted with reasonable cause and in good faith in its treatment of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tax shelter item, but only if there is substantial authority within the meaning of Treas. Reg. § 1.6662-4(d) for the treatment of the item and the corporation reasonably believed, when the return was filed, that such treatment was more likely than not the proper treatment. Treas. Reg. § 1.6664-4(f)(2)(i)(B).

The reasonable belief standard is met if:

- the corporation analyzed pertinent facts and relevant authorities to conclude in good faith that there would be a greater than 50 percent likelihood ("more likely than not") that the tax treatment of the item would be upheld if challenged by the IRS; or
- the corporation reasonably relied in good faith on the opinion of a professional tax advisor who analyzed all the pertinent facts and authorities, and who unambiguously states that there is a greater than 50 percent likelihood that the tax treatment of the item will be upheld if challenged by IRS. (See Treas. Reg. § 1.6664-4(c) for requirements with respect to the opinion of a professional tax advisor upon which the foregoing discussion elaborates).

Satisfaction of the minimum requirements for legal justification is an important factor in determining whether a corporation acted with reasonable cause and in good faith, but is not necessarily dispositive. See Treas. Reg. § 1.6664-4(f)(3). For example, the taxpayer's participation in a tax shelter lacking a significant business purpose or whether the taxpayer claimed benefits that are unreasonable in comparison to the taxpayer's investment should be considered in your determination. Failure to satisfy the minimum standards will, however, preclude a finding of reasonable cause and good faith based (in whole or in part) on a corporation's legal justification. See Treas. Reg. § 1.6664-4(f)(2)(i).

Other facts and circumstances also may be taken into account regardless of whether the minimum requirements for legal justification are met. See Treas. Reg. § 1.6664-4(f)(4).

**Special Rules for Partnerships Subject to Unified Partnership Audit and Litigation Procedures of Sections 6221 through 6234**

Special rules apply in transactions involving a partnership subject to the unified partnership audit and litigation procedures of sections 6221 through 6234 (which may occur, for example, where Taxpayer forms a partnership that participates directly in the transaction). For taxable years ending after August 5, 1997, penalties may be determined at the partnership level. I.R.C. § 6221. Treas. Reg. § 301.6221-1, effective for years ending after October 3, 2001[FN24], provides as follows.

> (c) Penalties determined at partnership level. Any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be determined at the partnership level. Partner-level defenses to such items can only be asserted through refund actions following assessment and payment. Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty, addition to tax, or additional amount, other than partner-level defenses specified in paragraph (d) of this section.
>
> (d) Partner-level defenses. Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment. See section 6230(c)(4). Partner-level defenses are limited to those that are personal to the partner or dependent upon the partner's separate return and cannot be determined at the partnership level. Examples of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of section 6664(b)(penalties applicable only where return is filed), or section 6664(c)(1)(reasonable cause exception) subject to partnership-level determinations as to the applicability of section 6664(c)(2).

Following prior partnership law with respect to partnership items, relevant inquiries into tax motivation and negligence with respect to partnership level determinations of penalties should be determined with reference to the state of mind of the general partner. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993); Fox v. Commissioner, 80 T.C. 972, 1008 (1983), aff'd 742 F.2d 1441 (2nd Cir. 1984); aff'd sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984). Nevertheless, to the extent the general partner essentially acted as the alter ego of the taxpayer, the taxpayer's intent is relevant in this context.

Partner-level defenses may only be raised through subsequent partner-level refund suits. See Treas. Reg. §§ 301.6221-1(d) and 301.6231(a)(6)-3. Good faith and reasonable cause of individual investors pursuant to I.R.C. § 6664 would be the type of partner level defense that can be raised in a subsequent partner-level refund suit. However, to the extent that the taxpayer effectively acted as the general partner and that the intent of the general partner is determined at the partnership level, it is likely that such partnership level determinations may also dispose of partner-level defenses under the unique facts of each case.

**9. Whether the unified partnership audit and litigation procedures of I.R.C sections 6221 through 6234 apply to the tax shelter adjustments.**
Under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") all adjustments to "partnership items" are determined in a single proceeding at the partnership level rather than at the partner level. I.R.C. § 6221. A partnership item is any item required to be taken into account for the partnership's taxable year under subtitle A to the extent provided by regulations. I.R.C. § 6231(a)(3). The end result is consistent treatment of the partnership items on each partner's return.

Certain small partnerships are not subject to unified proceedings under TEFRA unless they elect to be subject to them. For taxable years ending after August 5, 1997, a "small partnership" excluded from the TEFRA provisions is defined as a partnership in which there are ten or fewer partners and each partner is an individual (other than a nonresident alien), C corporation, or an estate. I.R.C. § 6231(a)(1)(B). The partnerships generating tax benefits by using the NPCs described in Notice 2002-35 are generally subject to TEFRA because they often have flow-through entity partners. These include LLCs treated as a disregarded entities, partnerships, S corporations, and trusts.

A. Notices and Adjustments
The Service adjusts partnership items by issuing a Notice of Final Administrative

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Adjustment (FPAA) to the Tax Matters Partner (TMP) and all notice partners. The Service cannot adjust items which are affected by partnership items ("affected items") prior to the completion of the TEFRA partnership proceeding. See GAF Corp v. Commissioner, 114 T.C. 519, 528 (2000). Affected items requiring non-computational partner-level determinations must be assessed through the issuance of an affected item notice of deficiency after the conclusion of the TEFRA proceeding.

The adjustments being considered in these cases will involve both partnership items and affected items. Examples of partnership items are:

- The amount of partnership liabilities under § 752, whether such liabilities are recourse or non-recourse, or give the partners an amount at risk
- The amount and character of partner contributions to the partnership
- Whether the partnership transactions are a sham or have economic substance
- Whether the partnership had a profit motive under § 165(c)(2)

Examples of affected items requiring a partner-level determination include:

- A partner's outside basis in his partnership interest to the extent it is not comprised of partnership items
- An investor's ultimate amount at-risk under § 465
- Whether an individual partner had a profit motive under § 165(c)(2)
- Whether the loss had economic substance from the perspective of the partner

The treatment of a deduction for professional fees associated with participation in a NPC transaction will vary based on the facts and circumstances of a particular case. Fees can be treated as a partnership item (if deducted by the partnership), or an affected item (if added to the basis of property or separately deducted by the partner or a related entity), and should be addressed in an FPAA or affected items notice of deficiency as appropriate.

A non-TEFRA statutory notice of deficiency may also be required prior to the expiration of the statute of limitations for the investors' personal returns. A non-TEFRA statutory notice of deficiency, in conjunction with an FPAA, will be required if there are adjustments on the individual return unrelated to the NPC transaction. Issuing a non-TEFRA statutory notice of deficiency may also be appropriate if there is a dispute or uncertainty as to whether a particular partnership is appropriately governed by TEFRA, or whether a particular item is an affected item or a non-partnership item.

B. Statute of Limitations

Section 6229(a) sets forth a minimum period during which the § 6501 period for assessing each partner will not expire with respect to partnership items. Specifically, § 6229(a) provides that the period for assessing partnership items shall not expire before three years after the partnership return is filed or due to be filed, whichever is later. Because income taxes are assessed against the partners, it is their respective § 6501 periods for assessment that control, except to the extent these periods are extended by § 6229. See Rhone-Poulenc v. Commissioner, 114 T.C. 533, 551 (2001). The normal period for assessment under § 6501 for each partner may be longer than the minimum period for assessment under § 6229.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

If the minimum period for assessment under § 6229 has expired, the government may still proceed against any partners whose original unextended § 6501 statute has not expired.[FN25]

The TMP or other authorized person can extend the minimum period for assessing tax attributable to partnership items and affected items with respect to all partners on Form 872-P. See I.R.C. § 6229(b)(1)(B). The TMP is, in effect, authorized to extend each partner's § 6501 period for assessing partnership items as their agent. In addition, each respective partner may extend his own § 6501 period for assessing partnership and affected items on Form 872-I. I.R.C. § 6229(b)(1)(A) and (b)(3). It is particularly useful to have the partner extend his own period for assessment using the Form 872-I when there is a question as to the TMP's status. There is no requirement that the TMP must extend the period for assessing each partner rather than having each partner do so directly.

If the Service issues an FPAA to the TMP, the period for assessing partnership items and affected items is suspended for the period during which an action may be brought under § 6226 (and if a petition is filed until the decision becomes final) and for 1 year thereafter. I.R.C. § 6229(d). Hence, the Service may issue an affected item notice of deficiency within this one-year period.

Any questions on the application of the procedural provisions in this paper should be coordinated with the Administrative Provisions and Judicial Practice Division of Chief Counsel.

FN1. Although a partnership agreement may technically provide for liability in an amount *greater than the lesser of*, we assume the partners intended for liability to attach only to the *greater of the lesser of*.

FN2. The arguments in this paper may be made, assuming the facts in any particular case support them.

FN3. Although the partnership's documents include provisions providing that the partner would be liable for amounts *greater than the lesser of*, we believe that once executed the language would provide that the partner would be liable for amounts *equal to the greater of the lesser*.

FN4. A dealer engages in trades for the accounts of others. King v. Comm'r, 89 T.C. 445, 457 (1987). A taxpayer who is a dealer can claim business expenses under § 162 and must also treat gains and losses on the stock dealings as ordinary rather than capital. There are no facts to suggest that any of the partners or the Partnership is a dealer.

FN5. This doctrine is also referred to by the courts as the "sham transaction" or "sham in substance" doctrine. For purposes of this document, the doctrine is referred to as the "economic substance" doctrine.

FN6. In the Third Circuit, in determining "whether the taxpayer's transactions had sufficient economic substance to be respected for tax purposes", the analysis "turns on both the 'objective economic substance of the transactions' and the 'subjective business motivation' behind them. ACM Partnership v. Commissioner, 157

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.3d 231, 247 (3d Cir. 1998), aff'g in part and rev'g in part, T.C. Memo. 1997-115, cert. denied, 526 U.S. 1017 (1999)(citing Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990) [other citations omitted]. See also In re: CM Holdings, Inc., 301 F.3d 96, 102 (3rd Cir. 2002). However, this analysis does not require a rigid two-step analysis. See id. Similarly, in the Tenth Circuit, although the court recognized the two-prong test from Rice's Toyota, the court held "The better approach, in our view, holds that 'the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses." James v. Comm'r, 899 F.2d 905, 908-9 (10th Cir. 1990) (citation omitted).

FN7. The Eighth Circuit appears to apply the disjunctive test provided in Rice's Toyota, but indicates that the rigid two-part test may not be required. Shriver v. Comm'r, 899 F.2d 724, 725-8 (8th Cir. 1990). The DC Circuit and Federal Circuit apply the disjunctive test. See Horn v. Comm'r, 968 F.2d 1229, 1236 (DC Cir. 1992); Drobny v. U.S., 86 F.3d 1174 (Fed. Cir. 1996)(unpublished opinion). It is unclear whether the Second Circuit applies the test disjunctively or under a facts and circumstances analysis. Compare Gilman, supra, at 148 (citing Jacobson v. Comm'r, 915 F.2d 832, 837 (2d Cir. 1990) (additional citations omitted))("A transaction is a sham if it is fictitious or if it has no business purpose or economic effect.") with TIFD III-E Inc. v. U.S., 2004 WL 2471581, *12+ (D.Conn. Nov 01, 2004) ("The decisions in this circuit are not perfectly explicit on the subject. Recently, for example, Judge Arterton adopted the more flexible standard, but acknowledged some potentially contrary, or at least ambiguous, language in Gilman. Long Term Capital Holdings v. United States, 2004 WL 1924931, *39 n. 68 (D.Conn. Aug.27, 2004). That ambiguity, however, does not affect the decision of this case. As I will explain, under either reading I would conclude that the Castle Habour transaction was not a 'sham.' The transaction had both a non-tax economic effect and a non-tax business motivation, satisfying both tests and requiring that it be given effect under any reading of the law.") Similarly, in Compaq Computer Corp. v. Commissioner, 277 F.3d 778 (5th Cir. 2001), the Fifth Circuit considered both the standard in Rice's Toyota World (that there be *no business purpose* and *no reasonable possibility of a profit*) [emphasis added] and the test in ACM (that these are mere factors in determining economic substance) and declined to accept one standard over the other.

FN8. See Goldstein v. Comm'r, 364, F.2d 734 (2d Cir. 1966); Sacks v. Comm'r, 69 F.3d 982 (9th Cir. 1995); Winn-Dixie, Inc. v. Comm'r, 113 T.C. 254 (1999) aff'd in part Winn-Dixie Stores, Inc. v. Comm'r, 254 F.3d 1313 (11th Cir. 2001), cert. denied, 535 U.S. 986 (2002).

FN9. See Rose v. Comm'r, 868 F.2d 851 (6th Cir. 1989); Casebeer v. Comm'r, 909 F.2d 1360 (9th Cir 1990); Newman v. Comm'r, 894 F.2d 560, 563 (2d Cir. 1990); Winn-Dixie, Inc. v. Comm'r, 113 T.C. 254 (1999) aff'd in part Winn-Dixie Stores, Inc. v. Comm'r, 254 F.3d 1313 (11th Cir. 2001); Salina Partnership v. Comm'r, T.C. Memo 2000-352 (2000).

FN10. See Rose v. Comm'r, 868 F.2d 851 (6th Cir. 1989); Kirchman v. Comm'r, 862 F.2d 1486 (11th Cir. 1989); Casebeer v. Comm'r, 909 F.2d 1360 (9th Cir 1990); Salina Partnership v. Comm'r, T.C. Memo 2000-352 (2000); Nicole Rose Corp. v. Comm'r, 117 TC 328 (2001).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN11. See IES Industries Inc. v. Comm'r, 253 F.3d 350, 355 - 56 (8th Cir. 2001).

FN12. See Rose v. Comm'r, 868 F.2d 851 (6th Cir. 1989); Kirchman v. Comm'r, 862 F.2d 1486 (11th Cir. 1989); James v. Comm'r, 899 F.2d 905 (10th Cir. 1990); Pasternak v. Comm'r, 990 F.2d 893 (6th Cir. 1993); IES Industries Inc. v. Comm'r, 253 F.3d 350, 356 (8th Cir. 2001).

FN13. See Pasternak v. Comm'r, 990 F.2d 893 (6th Cir. 1993).

FN14. In Long Term Capital Holdings' v. United States, 2004 U.S. Dist. LEXIS 17159 at 165 (D. Conn. 2004) the District Court explained that evidence that the prudent economic actor would have invested directly in the portfolio rather than indirectly through OTC because direct investment "permitted much greater participation in the reasonably expected profit from the investment" was relevant in determining whether the transaction had economic substance.

FN15. The appropriate inquiry is not whether the taxpayer made a profit but whether there was an objective reasonable possibility that the taxpayer could earn a pre-tax profit from the transaction.

FN16. In assessing the role of profit in determining whether a transaction has economic substance, the Third Circuit has held, based on Sheldon, that "a prospect of a nominal, incidental pre-tax profit which would not support a finding that the transaction was designed to serve a non-tax profit motive." ACM, supra, at 258 (citing Sheldon v. Commissioner, 94 T.C. 738, 768 (1990)). In making this determination, the court took into account transaction costs. Id. at 257. In this evaluation, some courts have considered a small chance of a large payoff to support a finding of economic substance. See Jacobson v. Commissioner, 915 F.2d 832 (2d Cir. 1990)(citing §1.183-2(a) (1990)).

FN17. In ACM, the Appellate Court held that it was not reversible error for the Tax Court to reduce the income expected to be generated to its net present value, but did not hold that a net present value analysis was the only appropriate manner for determining the profit potential of the particular transaction so long as the method adopted serves as an accurate gauge of the reasonably expected economic consequences of a transaction.

FN18. See e.g. Damodaran, Aswath, The Dark Side of Valuation (Prentice Hall 2001).

FN19. The present value of any asset is equal to the expected future cash flows that the holder of the asset will receive, discounted at the rate of return offered by comparable investment alternatives. Future cash flows are discounted to take into account the time value of money and risk. The net present value of an investment is calculated by subtracting the cost of the investment from its present value. An investment is considered profitable under an out-of-pocket cash flow analysis if the cash flows obtained from holding the investment exceed the costs of making the investment. The out-of-pocket profit calculation does not take into account the time value of money or the risk of future cash flows.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN20. Cf. Comm'r v. Groetzinger, 480 U.S. 23 (1987). In Groetzinger, the United States Supreme Court recognized that gambling may be a trade or business for purposes of § 162.

FN21. The court in Coltec Industries, Inc. v. U.S., No. 01-072T (Ct. Cl. October 29, 2004), cites Black and Decker, supra, (and other cases) for the premise that satisfaction of the tax avoidance and business purpose tests of section 357(b) means that the economic substance test is satisfied. Coltec Industries, Inc. (citing Black and Decker, supra, at *6) [citations omitted].

FN22. For purposes of section 6662, the term "underpayment" is generally the amount by which the taxpayer's correct tax is greater than the tax reported on the return. See I.R.C. § 6664(a).

FN23. There is substantial authority for the tax treatment of an item only if the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. All authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists. Treas. Reg. 1.6662-3(d)(i). On the basis of the substantive discussion of the use of NPCs in the foregoing pages of this document, it is unlikely that the tax treatment of these transactions would meet the substantial authority test.

FN24. Although the regulation is effective for years ending after October 3, 2001, it reflects Service litigating position for prior years.

FN25. An unmodified Form 872 does not extend a partner's § 6501 period for assessing partnership items. Such form is treated as a restricted consent by operation of § 6229(b)(3). See Rhone-Poulenc, 114 T.C. at 549-550.

2005 WL 43711 (I.R.S.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.