C
2002 WL 32351285 (I.R.S.)

Internal Revenue Service (I.R.S)

Industry Specialization Program Coordinated Issue
All Industries

"BASIS SHIFTING" TAX SHELTER UIL NO: 9300.18-00

Effective Date: December 3, 2002

Section 9300 -- Tax Shelters - Listed Transactions and Other Abusive Transactions9300.00-00 Tax Shelters - Listed Transactions and Other Abusive Transactions

9300.18-00 Basis Shifting Transactions

INTRODUCTION
On July 26, 2001, the Service issued Notice 2001-45, 2001-33 I.R.B. 129, announcing that the Service will challenge transactions identified as "basis shifting" tax shelters and disallow the capital losses purportedly derived from such transactions. These transactions are arranged by promoters and are often marketed as either Foreign Leverage Investment Portfolio ("FLIP") or Offshore Portfolio Investment Strategy ("OPIS") transactions. The transactions rely upon the interplay between I.R.C. § 302 (relating to distributions in redemption of stock) and I.R.C. § 318 (relating to constructive ownership of stock).

ISSUES
1. Whether Foreign Corporation ever had an ownership interest in the shares of Foreign Bank stock that were purportedly redeemed.

2. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock, whether, under Zenz, Foreign Bank's "redemption" of such stock is treated as an exchange or a distribution to which I.R.C. § 301 applies.

3. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's "redemption" of such stock is not treated as an exchange under § 302(a), whether Taxpayer's purported loss was a bona fide loss allowable as a deduction under of I.R.C. § 165.

4. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's "redemption" of such stock is not treated as a sale or exchange under § 302(a), whether Taxpayer acquired control of Foreign Corporation with a principal purpose of avoiding or evading federal income tax with the result

**EXHIBIT F**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the purported loss is disallowed under I.R.C. § 269.

5.If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's "redemption" of such stock is not treated as an exchange under § 302(a), whether the at-risk provisions of I.R.C. § 465 limit Taxpayer's capital losses claimed.

6.Should Taxpayer's claimed loss on Foreign Bank stock and options be disallowed because the transaction as a whole lacks economic substance and business purpose apart from tax savings.

7.Should the Service assert the appropriate I.R.C. § 6662 accuracy-related penalties against taxpayers who entered into the "basis shifting" transactions.

8.Should the unified partnership audit and litigation procedures of I.R.C. §§ 6221 through 6234 apply to the tax shelter adjustments.

SUMMARY OF CONCLUSIONS

1. Foreign Corporation and Foreign Bank entered into a forward contract for Foreign Corporation to purchase Foreign Bank bearer shares from Foreign Bank on the settlement date. However, Foreign Corporation never purchased or owned Foreign Bank shares. Thus, Foreign Corporation never owned the shares of Foreign Bank stock that were purportedly redeemed.

2. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock, the redemption should be treated as a payment in exchange for the stock, not as a dividend distribution.

3. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's "redemption" of such stock is not treated as an exchange under § 302(a), Taxpayer's loss was not a bona fide loss allowable under I.R.C. § 165.

4. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's "redemption" of such stock is not treated as an exchange under § 302(a), a facts and circumstances determination must be made as to whether Taxpayer acquired control of Foreign Corporation with a principal purpose of avoiding or evading federal income tax under I.R.C. § 269.

5. Taxpayer was only at-risk as to amounts paid for Foreign Bank shares and Foreign Bank options it acquired. Accordingly, Taxpayer's losses are limited under I.R.C. § 465(b) to the amounts it paid to purchase Foreign Bank stock and options.

6. Taxpayer's loss on Foreign Bank stock and options may be disallowed because the transaction as a whole lacks economic substance and business purpose apart from tax savings.

7. Depending on the facts of each transaction, and on a case-by-case basis, the Service should consider asserting the applicable I.R.C. § 6662 accuracy-related penalties.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8. The unified partnership audit and litigation procedures of I.R.C. §§ 6221 through 6234 apply to the tax shelter adjustments.

FACTS

While there may be some variations, the standard transaction involves a taxpayer with substantial capital gains. Taxpayer takes part in a planned series of steps in an attempt to generate capital losses to offset these capital gains. The typical pattern involves a number of steps. First, Taxpayer purchases shares of Foreign Bank. Second, Taxpayer contributes cash to Foreign Corporation in exchange for warrants entitling Taxpayer to acquire a specified number of newly issued shares of Foreign Corporation. If the warrant is exercised, Taxpayer would own more than 50 percent in value of the stock of Foreign Corporation. Third, Foreign Corporation enters into a contractual obligation to buy a specified number of Foreign Bank bearer shares for a fixed price at a future settlement date. Contemporaneously with entering into this contract, the parties enter into call and put options. The call option (written by Foreign Corporation and held by Foreign Bank) is a European-style option that is exercisable either days before or on the settlement date of Foreign Corporation's purported purchase of Foreign Bank stock. The strike price is set at 95 percent of Foreign Corporation's purported stock purchase price. The strike price, however, will be adjusted downward to 90 percent (strike reset price) if the actual stock price ever equals or falls below the barrier price, which is calculated to be 95 percent of the stock purchase price. The call option also has an integrated forward feature. Under this feature, Foreign Bank is required to pay a fixed amount to Foreign Corporation if the share price exceeds certain levels during specific time periods. If at any time the share price falls below the strike reset price, Foreign Bank would pay to Foreign Corporation an amount equal to a fixed amount multiplied by the number of days prior to the share price falling below the strike reset price. The put option (written by Foreign Bank and held by Foreign Corporation) is also a European-style option exercisable on the same date as the call option. The strike price is 90 percent of Foreign Corporation's purported stock purchase price.

Fourth, Foreign Bank purportedly exercises the call option and "reacquires" the shares purportedly sold to Foreign Corporation. On or about the same day, Taxpayer also purchases options to acquire shares of Foreign Bank stock equal to the number of shares purportedly purchased by Foreign Corporation. Treating the redemption as a distribution to which I.R.C. § 301 applies as described below, Taxpayer adds Foreign Corporation's basis in its "redeemed" Foreign Bank stock to Taxpayer's Foreign Bank stock and options. Fifth, Taxpayer sells its Foreign Bank shares and options, the basis of which Taxpayer increased by Foreign Corporation's purported basis in Foreign Bank stock, and claims significant capital losses upon the disposition of the stock and options. Lastly, Taxpayer sells the warrant to purchase Foreign Corporation stock back to Foreign Corporation or lets the warrant expire.

Taxpayer takes the position that Foreign Corporation purchased Foreign Bank stock and Foreign Bank redeemed that stock. Taxpayer argues that the proper analysis and tax consequences of the transaction are as follows. Under I.R.C. § 318(a)(4), Taxpayer is treated as owning the stock that would be received upon the exercise of the Foreign Corporation warrant and Foreign Bank options. Under I.R.C. § 318(a)(3)(C), Foreign Corporation is treated as owning the stock owned and treated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as owned by Taxpayer. Taxpayer argues that the attribution rules treat Foreign Corporation as owning the same number of Foreign Bank shares before and after the redemption. Taxpayer argues the redemption fails to satisfy any of the criteria of I.R.C. § 302(b), and under I.R.C. § 302(d), the purported redemption is treated as a distribution of property to which I.R.C. § 301 dividend treatment applies. Dividend treatment is inconsequential to Foreign Corporation because it is not subject to U.S. tax. Because Foreign Corporation holds no Foreign Bank stock directly after the purported redemption, Taxpayer claims that Foreign Corporation's alleged basis in its Foreign Bank stock is added to Taxpayer's basis in its Foreign Bank stock and options, relying on Treas. Reg. § 1.302-2(c). Treas. Reg. § 1.302-2(c) provides that in any case in which an amount received in redemption of stock is treated as a distribution of a dividend, proper adjustment of the basis of the remaining stock will be made with respect to the stock redeemed.

DISCUSSION[FN1]

**1. Whether Foreign Corporation ever had an ownership interest in the shares of Foreign Bank stock that were purportedly redeemed.**

A. *Foreign Corporation and Foreign Bank had a Forward Contract*
The facts indicate Foreign Corporation did not purchase Foreign Bank shares. Instead, Foreign Corporation and Foreign Bank entered into an arrangement having the characteristics of a forward contract that obligated Foreign Corporation to pay for, and Foreign Bank to deliver, Foreign Bank bearer shares on a future settlement date.

A forward contract is a transaction in which two parties agree to the purchase and sale of a security, financial instrument, commodity or other property at a future date, known as the settlement date. See Freytag v. Commissioner, 89 T.C. 849, 851-852 (1987), aff'd 904 F.2d 1011 (5th Cir 1990), aff'd 501 U.S. 868 (1991). There are no federal income tax consequences when a forward contract is executed. A forward contract is generally treated as an "open transaction." As a result, the tax consequences are deferred until the property subject to the contract is delivered, or the contract is otherwise "closed" or settled. See e.g., Rev. Rul. 69-93, 1969-1 C.B. 139, Rev. Rul. 81-167, 1981-2 C.B. 45 (ownership did not pass to the future purchaser of property on the date on which the executory contract was executed, but rather, on the settlement date on which the purchaser paid for the property and obtained title and possession); Freytag, 89 T.C. at 856-857; STEVEN D. CONLON & VINCENT M. AQUILINO, PRINCIPLES OF FINANCIAL DERIVATIVES, U.S. AND INTERNATIONAL TAXATION, ¶B1.02 [1] (1999). The forward purchaser is not treated as purchasing and owning the property under the forward contract until delivery (if any) of that property under the forward contract.

In these cases, no consideration for the shares was to pass from Foreign Corporation to Foreign Bank until the settlement date, at which time Foreign Bank was to deliver Foreign Bank shares.[FN2] As of the purported redemption date, Foreign Corporation had not delivered and did not own Foreign Bank shares. The purchase and sale of Foreign Bank shares was to occur (if at all) through the delivery of the shares on the settlement date. If Foreign Bank did not deliver Foreign Bank shares on the settlement date, Foreign Corporation did not own Foreign Bank shares even on this date, and, in fact, never owned Foreign Bank shares.[FN3] Cf Modesto Dry Yard,

Inc. v. Commissioner, 14 T.C. 374 (1950), acq. 1950-2 C.B. 3 (partial prepayments for future delivery of raisins did not cause tax ownership of raisins to transfer earlier than delivery).

B. *Obligation to Deliver under the Forward Contract Offset Against Obligation to Deliver under the Call -- The Two Obligations Cancelled*

The obligations under a forward contract may be cancelled before delivery of the underlying property, and the contract may "close" without delivery of the underlying property. See e.g Freytag 89 T.C. at 856-857; STEVEN D. CONLON & VINCENT M. AQUILINO at ¶B1.02[2][a] (1999). The call (and put) option that Foreign Corporation and Foreign Bank created at the time of entering into the forward contract provided that Foreign Corporation's obligation under the call (or put) option could be discharged against and in satisfaction of Foreign Bank's obligation to deliver bearer shares under the forward contract arrangement. Foreign Bank purportedly exercised the call on the exercise date. Foreign Bank's obligation to deliver Foreign Bank shares under the forward contract was cancelled through Foreign Bank's exercise of the call. In this case, Foreign Bank's obligation to deliver Foreign Bank shares to Foreign Corporation under the forward contract was cancelled before Foreign Bank delivered shares to Foreign Corporation, and the contract "closed" without delivery of any shares. In substance, the effect of the exercise of the call was that the obligations of Foreign Corporation and Foreign Bank were settled by paying a net cash amount.

In summary, Foreign Bank's obligation to deliver Foreign Bank shares to Foreign Corporation was cancelled before Foreign Bank ever delivered any Foreign Bank bearer shares to Foreign Corporation. Foreign Bank's obligation to deliver Foreign Bank shares to Foreign Corporation was cancelled by the purported exercise date of the call (or by the purported settlement date of the call). As a result, Foreign Bank never delivered any shares to Foreign Corporation and Foreign Corporation never purchased or owned any Foreign Bank shares.

C. *Any Purported Interest Foreign Corporation Had in Foreign Bank Shares Was, At Best, Transitory and Should Not Be Respected As an Ownership Interest*

Moreover, *if* Foreign Corporation "purchased" Foreign Bank shares on the settlement date, Foreign Corporation's interest, if any, in Foreign Bank shares was, at best, a transitory interest that should not be respected as an ownership interest.

Courts opine that a transaction should be taxed according to its substance. Gregory v. Helvering, 293 U.S. 465 (1935). Courts apply the step transaction doctrine as a rule of substance over form that treats a series of formally separate steps as a single transaction if the steps are in substance integrated, interdependent, and focused toward a particular result. Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987). Where a taxpayer embarks on a series of transactions that are in substance a single, unitary, or indivisible transaction, the courts disregard the intermediary steps and have given credence only to the completed transaction. See Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 654 (5th Cir. 1968). Federal income tax liability should be based on a realistic view of the entire transaction, not by viewing interdependent steps in isolation. Commissioner v. Clark, 489 U.S. 726 (1989).

Courts have developed three tests in applying the step transaction doctrine. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

most limited is the "binding commitment" test. If, when the first transaction was entered into, there was a binding commitment to undertake the later transaction, the transactions are aggregated. Commissioner v. Gordon, 391 U.S. 83 (1968); Penrod, 88 T.C. at 1429. If, however, there was a moment in the series of transactions during which the parties were not under a binding obligation, the steps cannot be integrated using the binding commitment test, regardless of the parties' intent.

Under the "end result" test, if a series of formally separate steps are prearranged parts of a single transaction intended from the outset to achieve the final result, the transactions are combined. Penrod, 88 T.C. at 1429. This test relies on the parties' intent at the time of the transactions, which can be derived from the actions surrounding the transactions. For example, a short time interval suggests the intervening transactions were transitory and tax-motivated.

A third test is the "interdependence" test, which considers whether the steps are so interdependent that the legal relations created by one transaction would have been fruitless without completing the series of transactions. Greene v. United States, 13 F.3d 577, 584 (2d Cir. 1994); Penrod, 88 T.C. at 1430. One way to show interdependence is to show that certain steps would not have been taken in the absence of the other steps.

Even assuming Foreign Corporation "purchased" Foreign Bank bearer shares and that Foreign Bank immediately "redeemed" those shares, Foreign Corporation's acquisition and disposition (by redemption) of Foreign Bank bearer shares were interdependent and transitory steps of an integrated transaction that should be disregarded under step transaction doctrine and substance-over-form principles. Any interest Foreign Corporation had in Foreign Bank shares was, at best, transitory and should not be respected as an ownership interest. If Foreign Corporation "purchased" the shares and Foreign Bank immediately redeemed them, the consideration Foreign Corporation used to purchase the stock from Foreign Bank was the proceeds it obtained from selling that same stock back to Foreign Bank. Alternatively, the corresponding payment and delivery obligations of Foreign Corporation and Foreign Bank were offsetting legal obligations that did not confer tax ownership of Foreign Bank bearer shares to Foreign Corporation. Cf. Rev. Rul. 83-142, 1983-2 C.B. 68; Rev. Rul. 78-397, 1978-2 C.B. 150 (circular flows of cash were transitory steps having no federal income tax consequences); Rev. Rul. 99-14, 1991-1 C.B. 835 (offsetting legal obligations, or circular cash flows, eliminated any real economic significance); Bussing v. Commissioner, 89 T.C. 1050 (1987) (party's blink-of-any eye interest in transaction involving property purportedly purchased and immediately resold was not an ownership interest); Andantech LLC, et al v. Commissioner, T.C. Memo. 2002-97 (purported ownership of equipment disregarded where, through prearranged steps, purported ownership "passed" through an entity in an attempt to create high tax basis).

Furthermore, *if* Foreign Corporation "acquired" Foreign Bank shares from Foreign Bank on the settlement date, Foreign Corporation "acquired" Foreign Bank shares from Foreign Bank while under an obligation to "sell" Foreign Bank shares to Foreign Bank. A party that receives property while under an obligation to sell the property received should not be treated as the tax owner of the property received. Cf Intermountain Lumber Co. v. Commissioner, 65 T.C. 1025 (1975) (where, in determining ownership and control for purposes of sections 368(c) and 351, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

party receiving shares was not treated as the owner of the shares because, by entering into a binding obligation to sell the shares, the party had relinquished the legal right and freedom of action to determine whether to keep the shares).

In summary, Foreign Corporation never purchased or owned Foreign Bank shares because Foreign Bank's obligation to deliver shares was cancelled before Foreign Bank ever delivered any shares to Foreign Corporation. Alternatively, *if* Foreign Corporation "purchased" Foreign Bank shares, Foreign Corporation had, at best, a transitory interest in the shares that should not be respected as an ownership interest. Under either view, Foreign Corporation never owned, and consequently never had any tax basis in, any Foreign Bank shares. On the settlement date, the parties transferred to each other only the net difference in their respective payment obligations.

D. *Even if Foreign Corporation could be viewed as having "purchased" Foreign Bank bearer shares, Foreign Corporation should not be viewed as having owned the shares.* First, even if Foreign Corporation could be viewed as having "purchased" Foreign Bank bearer shares either on the date the forward contract was entered into or the settlement date, Foreign Corporation still could not be treated as the owner of Foreign Bank shares under the traditional benefits and burdens of ownership test. That is, Foreign Corporation could not be treated as the owner of Foreign Bank shares, for federal tax purposes, unless Foreign Corporation had the benefits and burdens of ownership of Foreign Bank shares. See Highland Farms, Inc. v. Commissioner, 106 T.C. 237, 253 (1996); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981).

In determining whether a party has the benefits and burdens of ownership, courts have considered various factors. These factors include: (1) whether the sale price was fixed; (2) whether a significant amount of the agreed price has been paid; (3) the descriptive terms used in the agreement; (4) whether an effective date has been agreed upon fixing a specific time for recognition of the rights and obligations of the party; (5) whether the purchaser bears the risk of loss and opportunity for gain; (6) whether legal title has passed; (7) the intent of the parties; and (8) the probability that the transaction would be consummated. See Grodt & McKay Realty, Inc., 77 T.C. at 1237-38; Clodfelter v. Commissioner, 48 T.C. 694, 700-01 (1967), aff'd, 426 F.2d 1391 (9th Cir. 1970); Maher v. Commissioner, 55 T.C. 441, 451-52 (1970), aff'd in part and remanded in part, 469 F.2d 225 (8th Cir. 1972), nonacq. 1977-2 C.B. 2. Not all listed factors must be present for the transaction to be treated as a sale. Maher, 55 T.C. at 452.

A benefits and burdens analysis leads to the conclusion that Foreign Corporation, did not, in substance, own Foreign Bank shares. First, it did not appear that Foreign Corporation (the purchaser) bore the risk of loss and opportunity for gain. The simultaneous put and call options effectively collared Foreign Corporation's potential risk of loss and opportunity for gain. When the options were created, the spread of the collars was only five-percent of the share price. Furthermore, since the strike price of the call was below the then current price of Foreign Bank shares, Foreign Corporation forfeited opportunity for gain outside the spread. The put also limited Foreign Corporation's risk of loss.

It is clear that Foreign Corporation and Foreign Bank did not intend for sales of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Foreign Bank shares to occur. The strike prices of the put and call options between Foreign Bank and Foreign Corporation were set so that the parties knew at the inception of the options that one would be exercised,[FN4] resulting in the virtual certainty that Foreign Bank would "reacquire" its own shares.

In addition to the general benefits and burdens of ownership case law, there is specific authority that a collar on shares may act to transfer ownership of those shares. See Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837 (1978). In Penn-Dixie, the taxpayer sought to treat a collar transaction as a sale, in part, because the possibility that a put and call would not be exercised was so remote that it should be ignored. The taxpayer had purchased stock and then sold a put and bought a call on the stock. The court disagreed with the taxpayer but assumed, without deciding, that there may have been a different result had the put and call both been exercisable and expired on the same date. The court also indicated that if the term of the put and call had been shorter, the result may have been different. Id. at 844. In a subsequent case, the Tax Court concluded that because there was only a remote possibility that neither a put nor a call would be exercised, the put and call had resulted in a shift of the burdens and benefits of ownership. See Kwiat v. Commissioner, 64 T.C.M. (CCH) 327 (1992).

Foreign Corporation had an opportunity for gain from the embedded or integrated forward feature terms of the call options. According to these provisions, the embedded forward feature (or recap) terms gave Foreign Corporation limited opportunity to benefit from the appreciation of Foreign Bank stock during the fixed term of the calls and puts. Under the terms of the call options, Foreign Bank would pay Foreign Corporation additional amounts for any trading day during that term when the price of Foreign Bank appreciated to certain preset prices. There were typically four increasingly higher pricing levels for four consecutive periods. In the event the price of Foreign Bank fell to the barrier strike price during the fixed term, additional amounts would only be paid for days prior to that event. However, in order for Foreign Corporation, and ultimately Taxpayer, to benefit from these terms, Foreign Bank stock would have to appreciate significantly over the term without ever dipping to the barrier strike price.

Further evidencing Foreign Corporation's lack of intent to purchase the shares is the fact that Foreign Corporation did not have the financial ability to purchase Foreign Bank shares. At or about the settlement date, Foreign Corporation had a minimal or nonexistent net worth, even before taking into account certain fees to be paid to Foreign Bank or the promoter.

Moreover, certain documents indicate Foreign Bank was just an accommodation party not at risk in the transaction. These documents indicate the promoter (or a party related to the promoter) agreed to reimburse Foreign Bank for -- or provide Foreign Bank with -- whatever amounts Foreign Bank would be required to make to Foreign Corporation in the transaction.

**2. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock that were purportedly redeemed, whether, under Zenz, Foreign Bank's "redemption" of its stock held by Foreign Corporation is an exchange or a distribution to which I.R.C § 301 applies.**

A redemption of stock is an acquisition by a corporation of its stock from a

shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock. I.R.C. § 317(b). If the redemption is any one of the four conditions described in I.R.C. § 302(b), the redemption will be treated as a distribution in part or full payment in exchange for the stock. I.R.C. § 302(a). If the redemption fails to satisfy any of these tests, I.R.C. § 302(d) provides that the redemption will be treated as a distribution of property governed by I.R.C. § 301.

I.R.C. § 302(b) provides sale or exchange treatment for redemptions that (1) are not essentially equivalent to a dividend; (2) are substantially disproportionate; or (3) completely terminate a shareholder's interest in the corporation. I.R.C. § 302(b)(1)-(3).[FN5]

I.R.C. § 302(c) provides that the stock attribution rules of I.R.C. § 318 apply in determining whether a redemption qualifies for sale or exchange treatment. I.R.C. § 318(a)(2) provides constructive ownership rules from partnerships, estates, trusts, and corporations. I.R.C. § 318(a)(2)(A) provides that stock owned directly or indirectly by or for a partnership shall be considered as owned proportionately by its partners. Pursuant to I.R.C. § 318(a)(2)(C), if any person owns, directly or indirectly, 50 percent or more in value of a corporate stock, such person is deemed to own the stock that such corporation owns, directly or indirectly, in that proportion which the value of the stock which such person so owns, bears to the value of all the stock in such corporation. I.R.C. § 318(a)(3) provides constructive ownership rules for partnerships, estates, trusts, and corporations. Under I.R.C. § 318(a)(3)(A), stock owned directly or indirectly by or for a partner shall be considered owned by the partnership. Pursuant to I.R.C. § 318(a)(3)(C), a corporation is deemed to own all of the stock owned by a shareholder of the corporation who owns 50 percent or more of the corporation's stock. I.R.C. § 318(a)(4) provides that a person who has an option to acquire stock shall be considered as owning such stock.

Taxpayer is treated as actually owning Foreign Corporation shares that Taxpayer has the right to acquire under the warrant discussed above. Taxpayer is treated as actually owning the number of shares it has the right to acquire under the option it purchases. Foreign Corporation is deemed to own all of the stock owned by Taxpayer since Taxpayer would have more than 50 percent ownership interest in Foreign Corporation if the warrant were exercised. Taxpayer argues that, after the call option is exercised by Foreign Bank, Foreign Corporation is deemed to own at least as many Foreign Bank shares as it owned prior to the "redemption." Taxpayer argues that, under the I.R.C. § 318 attribution rules, the redemption is treated as a dividend and therefore, is neither a complete termination of Foreign Corporation's interest in Foreign Bank under I.R.C. § 302(b)(3) nor a substantially disproportionate redemption of Foreign Corporation's interest in Foreign Bank under I.R.C. § 302(b)(2).

However, in the case of a complete termination of the shareholder's interest, the termination need not result solely from the redemption, but rather can result from a combination of the redemption and other stock dispositions. See Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954) (holding that the redemption of the stock was not a dividend to the shareholder because the redemption, coupled with the earlier sale, extinguished the shareholder's interest in the corporation); See also Rev. Rul. 77-226, 1977-2 C.B. 90 (holding that an integrated plan comprised of the

partial redemption of stock, followed by the sale of the remainder of the stock to an unrelated third party, was a complete termination under I.R.C. § 302(b)(3)). The Zenz rationale is also applicable in determining whether a redemption is essentially equivalent to a dividend under section 302(b)(1). McDonald v. Commissioner, 52 T.C. 82, 87 (1969). Finally, the Service has approved the Zenz approach to section 302(b)(2) analyses. See Rev. Rul. 75-447, 1975-2 C.B. 113. The Zenz approach should also apply to a related termination of the stock ownership of a person whose stock ownership is attributed to the redeemed shareholder.

The Zenz doctrine applies to integrated plans. See Monson v. Commissioner, 79 T.C. 827 (1982); Rev. Rul. 75-447. Applying the Zenz analysis in this case, Taxpayer, as part of the integrated plan, sold its Foreign Bank stock and options shortly after the redemption and sold/put its warrants in Foreign Corporation within the same taxable year.[FN6] Indeed, the termination of these interests is the purpose of all the steps. The individual steps of the transaction took place according to a prearranged plan and required careful timing and documentation. Various steps were carefully timed to trigger artificial attribution (e.g., Taxpayer's acquisition of options to acquire the same number of Foreign Bank shares as the number of Foreign Bank shares purportedly redeemed). Detailed instructions were given to each participant to execute various steps of the transaction. Furthermore, the combination of all steps in this transaction occurs within a few months. Foreign Corporation and Taxpayer intended to dispose of their respective Foreign Bank shares and options after a relatively short, but coordinated, holding period, while Taxpayer intended to dispose of Foreign Corporation warrants after the artificial attribution was arguably no longer required to assert the benefit of dividend treatment for Foreign Corporation. Foreign Corporation typically did not engage in any further business activity after the transaction.

Applying the Zenz rationale to the facts of this transaction, the redemption of Foreign Bank shares and Taxpayer's sales of Foreign Bank options and stock, and sale/put of the warrants back to Foreign Corporation were undertaken pursuant to an integrated plan. The Zenz doctrine applies, in this case, to integrate the redemption and sales because Taxpayer intended to effectuate a separation of its interest in Foreign Bank (as well as in Foreign Corporation) at the time of the redemption, and carried out this plan. Under Zenz, the individual steps of the integrated plan need to be characterized with consideration to the entire transaction, not in isolation. The redemption and sales combined either completely terminate Foreign Corporation's interest in Foreign Bank within the meaning of I.R.C. § 302(b)(3) or should be considered a substantially disproportionate distribution within the meaning of I.R.C. § 302(b)(2).[FN7] See Zenz; Rev. Rul. 77-226; Rev. Rul. 75-447. The fact that the redemption occurs before the sales is irrelevant. As a result, Foreign Corporation's "redemption" is a sale or exchange under I.R.C. § 1001 and not a dividend distribution. Accordingly, there would be no basis to shift under Treas. Reg. § 1.302-2(c).

**3. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's "redemption" of such stock is not treated as an exchange under § 302(a), whether Taxpayer's purported stock loss was a bona fide loss allowable as a deduction under of I .R .C § 165.**

I.R.C. § 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Treas. Reg. § 1.165-1(b) provides that to be allowable as a deduction

under I.R.C. § 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in I.R.C. § 165(h) and Treas. Reg. § 1.165-11 (relating to disaster losses), actually sustained during the taxable year. Treas. Reg. § 1.165-1(b) further states that only a bona fide loss is allowable and that substance and not mere form shall govern in determining a deductible loss. See also ACM Partnership v. Commissioner, 157 F.3d 231, 252 (3d Cir. 1998), cert. denied, 526 U.S. 1017 (1999) ("Tax losses such as these ... which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations").

Here, the transaction is no more than a series of contrived steps that affect an artificial loss on U.S. Taxpayer's disposition of Foreign Bank stock. The stock loss does not reflect real economic loss. Accordingly, the loss should be disallowed under I.R.C. § 165.

**4. If Foreign Corporation is treated as having owned the shares of Foreign Bank stock and Foreign Bank's redemption of such stock is not treated as a sale or exchange under § 302(a), whether Taxpayer acquired control of Foreign Corporation with a principal purpose of avoiding or evading federal income tax with the result that the purported stock loss is disallowed under I .R .C § 269.**

I.R.C. § 269 provides that, if any person acquires, directly or indirectly, control of a corporation and the principal purpose for which such acquisition was made is evasion or avoidance of federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit or other allowance may be disallowed.

For this purpose, "person" is broadly defined as an individual, trust, estate, partnership, association, company, or corporation. Treas. Reg. §1.269-1(d). Taxpayer is clearly a "person" for purposes of I.R.C. § 269.

One requirement is that the person acquires control of a corporation. I.R.C. § 269(a) defines "control" as the ownership of stock representing at least 50 percent of the total combined voting power of all classes of stock or at least 50 percent of the value of all classes of stock. The "acquisition of control", however, may be direct or indirect. Acquisition of control occurs when one or more persons acquire beneficial ownership of stock representing the requisite control. Treas. Reg. § 1.269-5(a). That is, so long as the person has beneficial ownership of the equity of the corporation, record ownership is unnecessary. See Ach v. Commissioner, 358 F.2d 342, 346 (6th Cir. 1966) (holding that beneficial ownership constituted ownership within I.R.C. § 269 and record ownership was unnecessary); Intermountain Lumber Co. v. Commissioner, 65 T.C. 1025, 1031 (1976) (finding that traditional ownership attributes such as legal title, voting rights, and possession of stock certificates were not conclusive as to the ownership of stock). The determination of when a sale is complete and beneficial ownership has shifted is essentially a question of fact, taking into account all the facts and circumstances and viewing the transaction in its entirety. See Tennessee Natural Gas Lines v. Commissioner, 71 T.C. 74, 83 (1978), acq., 1979-2 C.B. 2. This is because the acquisition of stock means that the purchaser has assumed the risks of an investor in equity. See John Kelly Co. v. Commissioner, 326 U.S. 521, 530 (1946); Zilkha and Sons, Inc. v. Commissioner, 52 T.C. 607, 613 (1969), acq., 1971-1 C.B. xvi.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The issue of whether Taxpayer acquired the requisite control of the corporation, through its acquisition of the warrant, is essentially a facts and circumstances test that may be used, if appropriate, under the facts of any particular case. Depending on the facts, one may be able to raise an argument that Taxpayer acquired beneficial ownership of at least 50 percent of the value of all classes of stock.

If Taxpayer acquired the requisite control of the corporation, the acquisition of control must have occurred for the principal purpose of evasion or avoidance of federal income tax. If the purpose to evade or avoid federal income tax exceeds in importance any other purpose, it is the principal purpose. Treas. Reg. § 1.269-3(a). This determination is factual in nature. See Briarcliff Candy Corp. v. Commissioner, T.C. Memo. 1987-487.

**5. Whether the at-risk provisions of I .R .C § 465 limit Taxpayer's capital losses claimed.**

Even if Foreign Corporation has an increase in its basis of Foreign Bank stock, and Foreign Corporation's basis increase shifts to Taxpayer, Taxpayer's losses may be disallowed, in whole or in part, by I.R.C. § 465.

I.R.C. § 465(a)(1)(A) provides that in the case of an individual engaged in an activity to which I.R.C. § 465 applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of I.R.C. § 465(b)) for such activity at the close of the taxable year. I.R.C. § 465(c)(3)(A) provides that I.R.C. § 465 applies to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income. Thus, because Taxpayer is an individual,[FN8] I.R.C. § 465 is applicable to the basis shifting transactions if they are undertaken for the production of income. Solely for purposes of this section, it is assumed that Taxpayer entered into the transaction for the production of income, and that the limitations of I.R.C. § 465 apply to the transaction. Thus, whether it is appropriate for Taxpayer to treat this as an activity entered into for the production of income is not addressed.

I.R.C. § 465(b)(1) provides that a taxpayer is considered at risk for an activity with respect to amounts including (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity as determined under I.R.C. §465(b)(2).

I.R.C. § 465(b)(2) provides that for purposes of I.R.C. § 465, a taxpayer is considered at risk with respect to amounts borrowed for use in an activity to the extent that taxpayer (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). No property is taken into account as security if such property is directly or indirectly financed by indebtedness that is secured by property described in I.R.C. § 465(b)(1).

I.R.C. § 465(b)(4) provides that notwithstanding any other provision of I.R.C. § 465, a taxpayer is not considered to be at risk with respect to amounts protected against loss through non-recourse financing, guarantees, stop loss agreements, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other similar arrangements. The Senate report indicates that this provision is applicable to equity capital.

> A taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. (S. Rept. No. 938, 94th Cong., 2d Sess. 49 (1976))

Prop. Treas. Reg. § 1.465-22(a) provides that a taxpayer's at risk amount in an activity is increased by the amount of personal funds the taxpayer contributes to the activity.

Prop. Treas. Reg § 1.465-22(c)(1) provides that a taxpayer's at risk amount in an activity is increased by an amount equal to the excess of the taxpayer's share of all items of income received or accrued from the activity during the taxable year over the taxpayer's share of allowable deductions which are allocable to the activity for the taxable year. A taxpayer's at risk amount in an activity shall also be increased by the taxpayer's share of tax-exempt receipts of the activity.

Prop. Treas. Reg. § 1.465-68(a) applies to any transfer or disposition (except a transfer at death) in which (1) the taxpayer transfers or disposes of its entire interest in the activity or the entity conducting the activity; (2) the basis of the transferee is determined in whole or in part by reference to the basis of the transferor; and (3) the transferor has an at risk amount which is in excess of losses from the activity.

Prop. Treas. Reg. § 1.465-68(b) provides that at the close of the transferor's taxable year in which the transfer or disposition occurs, the transferor's at risk amount in the activity (after being reduced by the transferor's losses from that activity for that taxable year) shall be added to the transferee's at risk amount. In addition, the transferee's at risk amount shall be increased by the amount that the transferee's basis is increased under I.R.C. § 1015(d) (relating to gift tax paid by the transferor).

Prop. Treas. Reg. § 1.465-68(c) provides that the amount by which the transferee's at risk amount is increased under paragraph (b) is limited to the amount of the transferee's basis which exceeds the amount considered paid by the transferee at the time of the transfer. For this purpose, the amount considered paid by the transferee includes the amount of liabilities to which the transferred property is subject.

The reported cases applying I.R.C. § 465 typically involve non-recourse liabilities. However, the statutory language of I.R.C. § 465 and the Senate Report language from the I.R.C. § 465 legislative history do not limit the application of I.R.C. § 465 to those types of cases. Senate Report No. 94-938, at page 47, provides that "a significant problem in tax shelters is the use of non-recourse financing *or other devices* as a result of which the taxpayer is not personally liable for amounts which are attributed to his basis for purposes of the tax benefits from the investments" (emphasis added).

The legislative history provides that the purpose of the at risk rules is to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"prevent a situation where the taxpayer may deduct a loss in excess of his economic investment in certain types of activities ...." Senate Report No. 94-938, page 48. In enacting I.R.C. § 465, Congress was concerned about situations resulting in basis inflation beyond a taxpayer's true economic exposure.

In the basis shifting transactions, Taxpayer makes an investment by purchasing stock and options to acquire additional stock in Foreign Bank. Under I.R.C. § 465(b)(1), Taxpayer's investment is considered to be at risk to the extent of money, and the adjusted basis of other property contributed, and amounts borrowed with respect to such activity (as determined under I.R.C. § 465(b)(2)). Taxpayer is not considered to be at risk for any part of the purchase price that was financed through liabilities for which Taxpayer is not personally liable, or if there were arrangements in place that protected the investor from loss. Section 465(b)(2), (3), and (4).

Taxpayer asserts that as a result of a deemed dividend to Foreign Corporation, an entity not subject to U.S. tax, income is created, and Taxpayer relies on language in Prop. Treas. Reg. § 1.465-22(c)(1) to assert that Foreign Corporation's at risk amount also is increased by that income. The Service disagrees with Taxpayer's assertions.

Assuming Foreign Corporation actually acquired shares in Foreign Bank, Foreign Corporation received a dividend as a result of the redemption, and the basis shifted to Taxpayer, the transaction should be treated as an *other device* under I.R.C. § 465 that is used to obtain an artificial increase in basis beyond true economic exposure. Congress enacted I.R.C. § 465 to address situations resulting in basis inflation beyond a taxpayer's true economic exposure and to prevent those situations where a taxpayer may deduct a loss in excess of that taxpayer's economic investment in certain types of activities. In this case, Taxpayer's attempt to increase its at risk amount through a redemption of Foreign Bank stock held by Foreign Corporation is merely the use of a *device* to shift a basis amount for which neither Foreign Corporation nor Taxpayer had any economic investment solely for the purpose of receiving tax benefits. Thus, the I.R.C. § 465 at risk rules are applied in this case to prevent Taxpayer from deducting a loss in excess of Taxpayer's true economic investment.

Furthermore, Prop. Treas. Reg. § 1. 465-22 does not provide authority for Taxpayer to argue that the income Foreign Corporation's receives from the redemption of Foreign Bank shares should be treated as the type of income that increases Foreign Corporation's § 465 at risk amount. Under Prop. Treas. Reg. § 1.465-22(c)(1), a taxpayer's at risk amount in an activity is increased by an amount equal to the excess of the taxpayer's share of all items of income received or accrued from the activity during the taxable year over the taxpayer's share of allowable deductions that are allocable to the activity for the taxable year. In addition, a taxpayer's at risk amount in an activity is increased by the taxpayer's share of tax-exempt receipts of the activity. The income Foreign Corporation receives from the redemption of Foreign Bank stock is not the type of income described in the proposed regulation and thus, the income does not increase Foreign Corporation's at risk amount. In this case, Foreign Corporation is an entity not subject to U.S. tax and is wholly indifferent to the U.S. tax treatment of the redemption.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Moreover, while the term "tax exempt receipts" is not defined in the regulation or otherwise, the term tax-exempt income generally refers to income derived from an exempt organization or income specifically excluded from gross income. Tax-exempt income is a matter of legislative grace generally based on the advancement of certain social policies. Foreign Corporation's income is not subject to U.S. tax, is not a "receipt" of Taxpayer, and is not taxed to Taxpayer. There is no support for the argument that income not subject to U.S. tax is equivalent to tax-exempt receipts. Thus, in this case, Foreign Corporation income not subject to U.S. tax is not treated as an item of income or a tax-exempt receipt that increases Foreign Corporation's or Taxpayer's at risk amount. Prop. Treas. Reg. § 1.465-22 does not provide authority for Taxpayer to argue Foreign Corporation's at risk amount increases as a result of the redemption of Foreign Bank stock.

Assuming, for discussion purposes, that Foreign Corporation actually acquired shares in Foreign Bank, Foreign Corporation had a dividend as a result of the redemption, and the basis shifted to Taxpayer, Taxpayer relies on Prop. Treas. Reg. § 1.465-68 to assert that the at risk amount attributed to Foreign Corporation's shares of stock redeemed is shifted to Taxpayer in a manner similar to the Treas. Reg. § 1.302-2(c) basis shift. The Service disagrees with this interpretation of the proposed regulation.

The statutory language of I.R.C. § 465 does not permit the shifting of at risk amounts to another taxpayer. Furthermore, Prop. Treas. Reg. § 1.465-68 does not provide support for the shifting of at risk amounts to another taxpayer in transfers like the basis shifting transactions addressed in Notice 2001-45. In Prop. Treas. Reg. § 1.465-68, Treasury and the Service have provided for the shifting of at risk amounts in specific types of transactions subject to the limitations provided in Prop. Treas. Reg. § 1.465-68(c).

For an at risk amount to be transferred from one taxpayer to another taxpayer, Prop. Treas. Reg. § 1.465-68(a) requires a transfer or disposition (except a disposition at death) in which a taxpayer transfers or disposes of that taxpayer's entire interest in the activity, that the basis of the transferee is determined in whole or in part by reference to the basis of the transferor, and that the transferor has an at risk amount which is in excess of losses from the activity. In addition, under Prop. Treas. Reg. § 1.465-68(c), the transferee's increased at risk amount is limited to the amount of the transferee's basis that exceeds the amount the transferee is considered to have paid for the interest at the time of the transfer including the amount of liabilities to which the transferred property is subject. In this case, Foreign Corporation disposes of its entire interest in Foreign Bank stock in a redemption. Taxpayer relies on Prop. Treas. Reg. §1.465-68 to argue that Foreign Corporation's increased at risk amount, if any, from the dividend income as a result of the redemption should transfer to Taxpayer in a manner similar to the basis shift under Treas. Reg. § 1.302-2(c). The Service disagrees with Taxpayer's interpretation of Prop. Treas. Reg. § 1.465-68.

Assuming, for discussion purposes, that Taxpayer is treated as the owner of Foreign Corporation stock under the I.R.C. § 318 attribution rules and Treas. Reg. § 1.302-2(c) for purposes of the basis shift, Prop. Treas. Reg. § 1.465-68 does not apply to basis shifting transactions. Taxpayer did not purchase an interest in the activity or in the entity conducting the activity from Foreign Corporation and Foreign Corporation did not transfer an interest in the activity or the entity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conducting the activity to Taxpayer. Thus, Taxpayer is not a transferee as described in Prop. Treas. Reg. § 1.465-68(c).

Further, in Prop. Treas. Reg. § 1.465-68, Treasury and the Service intended to provide relief in situations where the transferee acquires an interest in the activity and would suffer an economic detriment if the at risk amount was not transferred with the interest in the activity. In these transactions, however, Taxpayer is attempting to use a redemption of stock from a related taxpayer to inflate Taxpayer's basis and at risk amount in order to deduct a loss in excess of Taxpayer's true economic investment. Thus, Prop. Treas. Reg. § 1.465-68 does not apply to the transaction in this case. See Senate Report No. 94-938, page 48.

In conclusion, even if Foreign Corporation actually acquired shares in Foreign Bank, Foreign Corporation received a dividend as a result of the redemption, and the basis shifted to Taxpayer, I.R.C. § 465 would limit Taxpayer's deductions to Taxpayer's at risk amount, and Taxpayer's at risk amount would not be increased by the shifted basis amount.

**6. Whether the stock loss may be disallowed because the transaction as a whole lacks economic substance and business purpose apart from tax savings.**

To be respected, a transaction must have economic substance separate and distinct from the economic benefit achieved solely by tax reduction. If a taxpayer seeks to claim tax benefits, which were not intended by Congress, by means of transactions that serve no economic purpose other than tax savings, the doctrine of economic substance is applicable. Winn-Dixie Stores, Inc. v. Commissioner, 254 F.3d 1313 (11th Cir. 2001), **aff'g** 113 T.C. 254 (1999); United States v. Wexler, 31 F.3d 117, 122, 124 (3rd Cir. 1994); Yosha v. Commissioner, 861 F.2d 494, 498-99 (7th Cir. 1988), **aff'g** Glass v. Commissioner, 87 T.C. 1087 (1986); Goldstein v. Commissioner, 364 F.2d 734 (2nd Cir. 1966), **aff'g** 44 T.C. 284 (1965); Weller v. Commissioner, 31 T.C. 33 (1958), **aff'd** 270 F.2d 294 (3rd Cir. 1959); Nicole Rose Corp. v. Commissioner, 117 T.C. No. 27 (2001); ACM Partnership v. Commissioner, T.C. Memo. 1997-115, **aff'd in part and rev'd in part** 157 F.3d 231 (3rd Cir. 1998).

In determining whether a transaction has economic substance so as to be respected for tax purposes, both the objective economic substance of the transaction and the subjective business motivation must be determined. ACM Partnership, 157 F.3d at 247; Horn v. Commissioner, 968 F.2d 1229, 1237 (D.C. Cir. 1992); Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990). The two inquiries are not separate prongs, but are interrelated factors used to analyze whether the transaction has economic substance, apart from its tax consequences, to be respected for tax purposes. ACM Partnership, 157 F.3d at 247; Casebeer, 909 F.2d at 1363.

Courts have recognized that offsetting legal obligations, or circular cash flows, may effectively eliminate any real economic significance of the transaction. Knetsch v. United States, 364 U.S. 361 (1960). In Knetsch, the taxpayer repeatedly borrowed against increases in the cash value of a bond. Thus, the bond and the taxpayer's borrowings constituted offsetting obligations. As a result, the taxpayer could never derive any significant benefit from the bond. The Supreme Court found the transaction to be a sham, as it produced no significant economic effect and had been structured only to provide the taxpayer with interest deductions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In Sheldon v. Commissioner, 94 T.C. 738 (1990), the Tax Court denied the taxpayer the tax benefits of a series of Treasury bill sale-repurchase transactions because they lacked economic substance. In the transactions, the taxpayer bought Treasury bills that matured shortly after the end of the tax year and funded the purchase by borrowing against the Treasury bills. The taxpayer accrued the majority of its interest deduction on the borrowings in the first year while deferring the inclusion of its economically offsetting interest income from the Treasury bills until the second year. The transactions lacked economic substance because the economic consequence of holding the Treasury bills was largely offset by the economic cost of the borrowings. The taxpayer was denied the tax benefit of the transactions because the real economic impact of the transactions was "infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions." Sheldon, 94 T.C. at 769.

In ACM Partnership, the taxpayer entered into a near-simultaneous purchase and sale of debt instruments. Taken together, the purchase and sale "had only nominal, incidental effects on [the taxpayer's] net economic position." ACM Partnership, 157 F.3d at 250. The taxpayer claimed that, despite the minimal net economic effect, the transaction had economic substance. The court held that transactions that do not "appreciably" affect a taxpayer's beneficial interest, except to reduce tax, are devoid of substance and are not respected for tax purposes. Id. at 248. But Cf Compaq Computer Corp v. Commissioner, No. 00-60648, 2001 U.S. App. Lexis 27297, at 15 (5th Cir. Dec. 28, 2001) (stating that a "taxpayer's subjective intent to avoid taxes ... will not by itself determine whether there was a business purpose to a transaction" and that steps to avoid risk may show "good business judgment consistent with a subjective intent to treat ... trade as a money-making transaction.") The court denied the taxpayer the purported tax benefits of the transaction because the transaction lacked any significant economic consequences other than the creation of tax benefits.

The transaction fails the objective prong of the economic substance doctrine. For example, Taxpayer had large capital gains, which were totally unrelated to the transaction. Through participation in this transaction, Taxpayer was able to sell their Foreign Bank options to acquire bearer shares of Foreign Bank stock as well as their relatively small amount of Foreign Bank bearer shares for purported total tax losses of approximately equal to the unrelated capital gain. The close relationship between the original tax gain and the total purported losses suggests that Taxpayer did not enter into this transaction for a business purpose. As the Tenth Circuit has recognized, "correlation of losses to tax needs coupled with a general indifference to, or absence of, economic profits may reflect a lack of economic substance." Keeler v. Commissioner, 243 F.3d 1212, 1218 (10th Cir. 2001), citing Freytag v. Commissioner, 89 T.C. 849, 877-878 (1987).

Generally, the transaction also fails the subjective economic substance prong because there does not seem to have been any useful non-tax purpose for entering into the transaction or certain steps thereof. For example, in some cases, Taxpayer's acquisition of Foreign Corporation warrants seems to have no useful business purpose, as it was highly unlikely that Taxpayer would exercise the warrants to acquire a controlling interest in Foreign Corporation. In addition, Foreign Corporation's acquisition of Foreign Bank stock with an equity collar around a price that is lower than the purchase price serves no useful purpose and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Foreign Corporation's profit potential on this transaction is limited, as noted above, after fees and expenses. In summary, there does not seem to have been any practical economic effects of the transaction, in whole or in part, other than the creation of a tax loss for Taxpayer.

The series of transactions, which may be disregarded under the economic substance test, include the formation of Foreign Corporation, as there is no business purpose for the creation of the offshore corporation. The only day-to-day activities of Foreign Corporation were those related to the transaction. In addition, the written investment advisory agreement between Foreign Corporation and the Promoter typically set hefty fees for Foreign Corporation's involvement in the transaction. The transactions may be viewed as shams in substance, and any tax benefits, fees or expenses, related thereto, may be disallowed.

**7. Whether the Service should assert the appropriate I .R .C § 6662 accuracy-related penalties against taxpayers who entered into the "basis shifting" transactions.**

I.R.C. § 6662 imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment attributable to, among other things: (1) negligence or disregard of rules or regulations, (2) any substantial understatement of income tax, and (3) any substantial valuation misstatement under chapter 1. Treas. Reg. § 1.6662-2(c) provides that there is no stacking of the accuracy-related penalty components. Thus, the maximum accuracy-related penalty imposed on any portion of an underpayment is 20 percent (40 percent in the case of a gross valuation misstatement), even if that portion of the underpayment is attributable to more than one type of misconduct (e.g., negligence and substantial valuation misstatement). See D.H.L. Corp. v. Commissioner, T.C. Memo. 1998-461, *aff'd in part and rev'd on other grounds, remanded by*, 285 F.3d 1210 (9th Cir. 2002) [The Service alternatively determined that either the 40-percent accuracy-related penalty attributable to a gross valuation misstatement penalty under I.R.C. § 6662(h) or the 20-percent accuracy-related penalty attributable to negligence was applicable].

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. See I.R.C. § 6662(c) and Treas. Reg. § 1.6662-3(b)(1). Negligence also includes the failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. See Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967), aff'g 43 T.C. 168 (1964). Treas. Reg. § 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. In Compaq v. Commissioner, 113 T.C. 214 (1999), rev'd on other grounds 277 F.3d 778 (5th Cir. 2001), the Service argued that Compaq was liable for the accuracy-related penalty because Compaq disregarded the economic substance of the transaction. The court agreed with the Service's position and asserted the accuracy-related penalty for negligence because Compaq failed to "investigate the details of the transaction, the entity it was investing in, the parties it was doing business with, or the cash-flow implications of the transaction." Compaq v Commissioner, 113 T.C. at 227. Where a taxpayer reported losses from a transaction that lacked economic substance and reported capital losses that would have seemed, to a reasonable and prudent person, to be "too good to be true," then the accuracy-related penalty attributable to negligence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

may be appropriate. If Taxpayer reasonably relied upon a tax opinion provided by a professional tax advisor, then it will be difficult to assert the negligence penalty. On the other hand, if correspondence indicates Taxpayer's knowledge of the "too good to be true," aspects of this transaction, the negligence penalty may be applicable.[FN9]

A substantial understatement of income tax exists for a taxable year if the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 for a corporation, other than an S corporation or a personal holding company). I.R.C. § 6662(d)(1). In the case of any item of a taxpayer other than a corporation which is attributable to a tax shelter, understatements are generally reduced by the portion of the understatement attributable to: (1) the tax treatment of items for which there was substantial authority for such treatment, if (2) the taxpayer reasonably believed that the tax treatment of the item was more likely than not the proper treatment. I.R.C. § 6662(d)(2)(C)(i). For purposes of § 6662(d)(2)(C), a tax shelter is a partnership or other entity, an investment plan or arrangement, or other plan or arrangement where a significant purpose of such partnership, entity, plan or arrangement is the avoidance or evasion of federal income tax. I.R.C. § 6662(d)(2)(C)(iii). A taxpayer is considered to have reasonably believed that the tax treatment of an item is more likely than not the proper tax treatment if 1) the taxpayer analyzes the pertinent facts and authorities, and based on that analysis reasonably concludes, in good faith, that there is a greater than fifty-percent likelihood that the tax treatment of the item will be upheld if the Service challenges it, or 2) the taxpayer reasonably relies, in good faith, on the opinion of a professional tax advisor, which clearly states (based on the advisor's analysis of the pertinent facts and authorities) that the advisor concludes there is a greater than fifty percent likelihood the tax treatment of the item will be upheld if the Service challenges it. Treas. Reg. § 1.6662-4(g)(4). Usually, the understatement attributable to the disallowance of the capital losses claimed exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 for a corporation, other than an S corporation or a personal holding company). Therefore, a substantial understatement penalty may be applicable. The understatement penalty would apply when Taxpayer claims to have relied upon a tax opinion from the Promoter or a law firm. However, in some cases, the legal opinions were not provided until after the Taxpayer committed funds to this shelter. In such cases, Taxpayer could not have reasonably relied upon a tax opinion, if entering the transaction without it.

For the accuracy-related penalty attributable to a substantial valuation misstatement to apply, the portion of the underpayment attributable to a substantial valuation misstatement must exceed $5,000 ($10,000 for a corporation, other than an S corporation or a personal holding company). A substantial valuation misstatement exists if the value or adjusted basis of any property claimed on a return is 200 percent or more of the amount determined to be the correct amount of such value or adjusted basis. I.R.C. § 6662(e)(1)(A). If the value or adjusted basis of any property claimed on a return is 400 percent or more of the amount determined to be the correct amount of such value or adjusted basis, the valuation misstatement constitutes a "gross valuation misstatement." I.R.C. § 6662(h)(2)(A). If there is a gross valuation misstatement, then the 20 percent penalty under I.R.C. § 6662(a) is increased to 40 percent. I.R.C. § 6662(h)(1). One of the circumstances in which a valuation misstatement may exist is when a taxpayer's claimed basis is disallowed for lack of economic substance. Gilman v. Commissioner,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 143 (2d Cir. 1991), cert. denied, 502 U.S. 1031 (1992) (applying §6659, repealed and replaced by §6662). If the adjusted basis of Foreign Bank stock and options is 200 percent or more of the correct amount, then a substantial valuation misstatement exists; if the adjusted basis of Foreign Bank stock and options is 400 percent or more of the correct amount, then a gross valuation misstatement exists. In many cases, the basis overstatement will be of such a magnitude that a gross valuation accuracy related penalty will be appropriate. Again, this penalty will only be appropriate if Taxpayer did not reasonably rely on a tax opinion.

I.R.C. § 6664 provides an exception to the imposition of accuracy-related penalties if the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. See I.R.C. § 6664(c); United States v. Boyle, 469 U.S. 241 (1985). Whether a taxpayer acted with reasonable cause and in good faith is a factual question. Treas. Reg. § 1.6664-4(b)(1)(C)(1)(i) and § 1.6662-4(e)(1). Generally, the most important factor is the extent to which the taxpayer exercised ordinary business care and prudence in attempting to assess his or her proper tax liability. See Estate of Simplot v. Commissioner, 112 T.C. 130, 183 (1999) (citing Mandelbaum v. Commissioner, T.C. Memo. 1995-255), rev'd on other grounds, 249 F.3d 1191 (9th Cir. 2001).

(i) *Whether penalties apply to the underpayment attributable to the disallowance of capital losses claimed from the transaction must be determined on a case-by-case basis depending on the specific facts and circumstances of each case.*

Special rules apply in transactions involving a partnership subject to the unified partnership audit and litigation procedures of sections 6221 through 6234 (which may occur, for example, where Taxpayer forms a partnership that participates directly in the transaction). For taxable years ending after August 5, 1997, penalties may be determined at the partnership level. I.R.C. § 6221. Treas. Reg. § 301.6221-1, effective for years ending after October 3, 2001, provides as follows.

(c) Penalties determined at partnership level. Any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be determined at the partnership level. Partner-level defenses to such items can only be asserted through refund actions following assessment and payment. Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty, addition to tax, or additional amount, other than partner-level defenses specified in paragraph (d) of this section.

(d) Partner-level defenses. Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment. See section 6230(c)(4). Partner-level defenses are limited to those that are personal to the partner or dependent upon the partner's separate return and cannot be determined at the partnership level. Examples of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of section 6664(b)(penalties applicable only where return is filed), or section 6664(c)(1)(reasonable cause exception) subject to partnership-level determinations as to the applicability of section 6664(c)(2).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

Following prior partnership law with respect to partnership items, relevant inquiries into tax motivation and negligence with respect to partnership level determinations of penalties should be determined with reference to the state of mind of the general partner. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993); Fox v. Commissioner, 80 T.C. 972, 1008 (1983), aff'd 742 F.2d 1441 (2nd Cir. 1984); aff'd sub nom Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984); Zemel v. Commissioner, 734 F.2d 5-9 (3rd Cir. 1984). Nevertheless, to the extent the general partner essentially acted as the alter ego of Taxpayer, Taxpayer's intent is relevant in this context.

Partner-level defenses may only be raised through subsequent partner-level refund suits. See Treas. Reg. §§ 301.6221-1(d) and 301.6231(a)(6)-3. Good faith and reasonable cause of individual investors pursuant to I.R.C. § 6664 would be the type of partner level defense that can be raised in a subsequent partner-level refund suit. However, to the extent that Taxpayer effectively acted as the general partner and that the intent of the general partner is determined at the partnership level, it is likely that such partnership level determinations may also dispose of partner-level defenses under the unique facts of each case.

**8. Whether the unified partnership audit and litigation procedures of I .R . C § § 6221 through 6234 apply to the tax shelter adjustments.**

If the shelter adjustments at issue are generated by a TEFRA partnership, then the income and deductions of the partnership can only be adjusted under the unified partnership audit and litigation procedures of I.R.C. §§ 6221 through 6234. In addition to income, deductions and credits of the partnership, the TEFRA procedures would also apply to any reallocation of partnership items including any reallocation under section 482. See Treas. Reg. § 301.6231(a)(3)-1(a); Blonien v. Commissioner, 118 T.C. No. 34 (June 12, 2002).

Even if the deductions at issue do not flow directly from the partnership, if the taxpayer at issue is a partner in a TEFRA partnership, and received a distribution from a TEFRA partnership, the partner's carryover basis in the distributed asset is a partnership item, which must be determined under the TEFRA procedures. See Treas. Reg. § 301.6231(a)(3)-1(c)(3)(iii). Similarly, the partnership's carryover basis in any asset contributed by a partner is a partnership item. Treas. Reg. § 301.6231(a)(3)-1(c)(2)(iv).

Based on the above, if a TEFRA partnership is used to implement a "basis shifting" tax shelter, the various components of the transactions should be reviewed to determine if any portion of the adjustments will require the initiation of a TEFRA partnership proceeding.

If the TEFRA partnership procedures apply, certain adjustments may constitute "affected items" which cannot be adjusted prior to the completion of the TEFRA partnership proceeding. See GAF Corp v. Commissioner, 114 T.C. 519, 528 (2000). Affected items which must be asserted through an affected item notice of deficiency after the conclusion of the TEFRA proceeding include limitations of losses to a partner's basis in his partnership interest under section 704(d), or amount at risk under section 465. For corporate taxpayers, the corporation's motive under section 269 in acquiring the partnership interest is also an affected item.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Any questions on the application of the procedural provisions in this paper (including Section 8) should be coordinated with the Administrative Provisions and Judicial Practice Division of Chief Counsel.

FN1. The arguments in this paper may be made, assuming the facts in any particular case support them.

FN2. See e.g., The Deposit Agreement (indicating the settlement of the "purchase" of the bearer shares, though payment and delivery, was "deferred" until the settlement date).

FN3. Consistent with this analysis, the facts indicate that any dividend paid on the shares would not be paid to Foreign Corporation.

FN4. If the price of Foreign Bank stock exceeded the applicable strike price, Foreign Bank would act in its economic interest to acquire the shares for the lower strike price. If the price of Foreign Bank stock was less than the lower strike price, CHF 1174.50, Foreign Corporation would exercise the put. If the price of Foreign Bank stock equaled the lower strike price, i.e., CHF 1174.50, either Foreign Corporation would exercise the put or Foreign Bank would exercise the call. Only in the unlikely event that Foreign Bank stock approximately equaled the strike price, e.g., CHF 1239.76, 1174.51, or 1174.50 might Foreign Bank arguably not have an economic interest in exercising the call. However, even under those circumstances, Foreign Corporation would exercise the put at CHF 1174.50. Foreign Corporation arguably would have been unable to borrow the funds necessary to purchase the shares. Furthermore, either the call or the put had to be exercised to effect the purported redemption necessary to assert the alleged basis shift.

FN5. The fourth type of redemption that qualifies for exchange treatment is in connection with a partial liquidation by a corporation. I.R.C. § 302(b)(4). This type of redemption is not applicable in "basis shifting" transactions.

FN6. In cases where the warrants expire unexercised, the expiration date may extend into the subsequent taxable year.

FN7. In some cases, Taxpayer may wait to sell a small percentage (two to ten percent) of its Foreign Bank stock until a later taxable year.

FN8. In some variants on the transaction, the basis shifting transactions may be undertaken by a partnership. Even if the party claiming an increase in basis under Treas. Reg. § 1.302-2(c) is a partnership, the I.R.C. § 465 rules are applied at the partner level. If Taxpayer is a TEFRA partnership, then a partner's at risk amount under I.R.C. § 465 is not, in and of itself, a "partnership item" for purposes of the unified partnership audit procedures (although partnership items may affect each partner's at risk amount). Thus, each partner's at risk amount would not be determined in a partnership-level proceeding, but would be determined in a subsequent "affected item" partner-level proceeding.

FN9. In some cases, the legal opinions were not provided until after the Taxpayer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

committed funds to the shelter.

2002 WL 32351285 (I.R.S.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.