# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**Nos. 06-245T, 06-246T, and 06-247T**
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

## APPENDIX TO UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO CONFIRM JURISDICTION

| # | Description | Pages |
|---|---|---|
| A1 | Various pages of the Deposition of Wendell H. Murphy, Sr. | 001-004 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

IN RE:

COBRA TAX SHELTERS LITIGATION

| | |
|---|---|
| MURPHY FARMS, LLC, by and through Wendell H. Murphy, Jr., partner other than tax matters partner; PSM FARMS, LLC, by and through Stratton K. Murphy, a partner other than tax matters partner; MURPHY PORK PARTNERS, LLC, by and through Wendell H. Murphy, Jr., a partner other than tax matters partner, | No. 06245T<br>No. 06246T<br>No. 06247T<br>(Consolidated) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

***********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

WENDELL H. MURPHY, SR.

June 26, 2007

***********************************************

ORAL AND VIDEOTAPED DEPOSITION OF WENDELL H. MURPHY, SR., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 26th day of June, 2007, from 11:20 a.m. to 3:41 p.m., before Dawn K. Larson, Registered Diplomate Reporter and CSR in and for the State of Texas, reported by machine shorthand, at 5752 Highway 117 South, Wallace, North Carolina, pursuant to the Federal Rules of Civil Procedure and the provisions stated



24e45979-c2b0-4961-baae-94854c773695

A. I mean, well, I remember -- I don't remember what they were actually now. At that time I'm sure -- I mean, I would have known that fees were what they said they were going to be.
Q. Do you recall whether you were involved in any decision making with respect to the strategy, investment strategy after you decided to go ahead with it?
MR. CROUCH: Objection, vague.
Q. (BY MR. LINDQUIST) Well, I'll ask it this way to clarify. Did you at some point make a decision to go forward with this investment strategy that Mr. Knight had proposed --
A. Yes.
Q. -- in December of 1999?
A. Yes.
Q. And when was that?
A. I don't remember.
Q. Was there any type of a change to the strategy that had originally been proposed by Mr. Knight in December of 1999 that was discussed in early 2000?
A. I don't recall any.



Q. After -- you indicated that there was a point when you made a decision to go forward with the strategy. After you made that decision to go forward with the strategy, did you have to make any further decisions with respect to the strategy?
A. I don't remember any.
Q. Did you delegate any decision making to anybody with respect to the strategy?
A. Well, that was with Ernst & Young, and Brewer Ezzell.
Q. Was Brewer Ezzell in 2000 an employee of Murphy Farms, Inc.?
A. I honestly don't remember. I know he was with us and then he left for a while and then came back, and I can't remember exactly what the dates on that were.
Q. Okay. I've seen a card that has -- purports to indicate that he was a vice-president. Is it possible that he was at that time a vice-president of Murphy Farms, Inc.?
A. I just don't remember what his title was.
Q. What were his duties when he was -- in



2000 with respect to you, your family and your businesses?
A. He was our chief financial officer and in charge of all of our accounting.
MR. LINDQUIST: Before we start into the exhibits, when is lunch going to be ready?
MR. CROUCH: What did they say, 12:15?
MR. DADDINO: 12:15.
MR. LINDQUIST: I need to take a break. So let's go off the record.
THE VIDEOGRAPHER: This concludes tape 1 of the deposition of Wendell Murphy, Sr. The time is 11:57 a.m.
(Recess taken from 11:57 a.m. to 11:59 a.m.)
THE VIDEOGRAPHER: On the record at 11:59 a.m.
Q. (BY MR. LINDQUIST) At the time that you made the decision to go forward with the investment strategy, did you understand it to have the name COBRA?
A. Did I understand what?
Q. Did you understand that the strategy had been given the name COBRA by Ernst & Young?
A. I had heard that word.



Q. And did you know what COBRA stood for?
A. No, sir.
Q. At the time that you decided to go forward with the COBRA strategy, did you have any understanding as to how the strategy could generate money?
A. No.
Q. Was there any discussion that you had with Ray Knight where he told you what percentage of probability there might be that you would make money?
A. Not that I recall.
Q. Was there any discussion with Ray Knight concerning any percent or probability that you would lose your entire investment?
A. I don't remember that.
Q. What did you understand to be the risks associated with the COBRA strategy?
A. I didn't understand it.
Q. You didn't?
A. I did not understand it.
Q. Was there anyone in your family who you believe understood the COBRA strategy?
A. No.
THE VIDEOGRAPHER: Mr. Lindquist, put







24e45979-c2b0-4961-baae-94854c773695

MR. CROUCH: Yeah, 1617. You got it right. 1617.
A. Oh, yeah.
Q. (BY MR. LINDQUIST) There's some handwriting on this document on the left side, capital loss. And on the second page, ordinary income. Is that your handwriting?
A. It doesn't appear to be.
Q. Do you know whose handwriting that is?
A. I have no idea.
Q. Have you ever seen this document before?
A. No, sir.
Q. It reflects here that MURFAM Farms, LLC was going to be used to generate a capital loss, and on the second page that Murphy Pork Partners, LLC was to generate an ordinary loss.
Do you recall that division between the two partnerships?
A. I've never heard of Murphy Pork Partners.
Q. You've never heard of it?
A. No, sir.
Q. It's Murphy Pork Partners, LLC. You've never heard of it?



A. I don't recall it.
Q. If you take a look at Exhibit 1638, 1638.
A. 1638. Let's see. Is this way in the back of the book?
Q. There's an entity referenced here, "Certificate of Formation of WHM Ventures, LLC."
Do you know what WHM Ventures, LLC is?
A. I'm not certain.
Q. Can you hazard a guess --
MR. CROUCH: Objection. Calls --
Q. (BY MR. LINDQUIST) -- based upon any type of other than mere speculation?
A. Well, obviously WHM stands -- could stand for Wendell Holmes Murphy, and that would be me, but I have no knowledge of this.
Q. There's a person listed there who's a Matthew Sablauf.
Do you know who Matthew Sablauf is?
A. Absolutely not.
Q. Did you ever have any discussions with Matthew Sabloff?
A. Not that I recall.
Q. Did you authorize Matthew Sabloff to



form an entity LLC on your behalf?
A. I don't recall.
Q. If you turn to Exhibit 1619.
1619 is a fax from Ira Axlerod of Proskauer to Ray Knight.
Do you know who Ira Axlerod is?
A. No, sir.
Q. Do you recall ever having any discussions with a person by the name of Ira Axlerod?
A. No, sir.
Q. Did you ever have any discussions with the person who issued -- you understand issued an opinion on the transactions known as COBRA?
A. No, sir.
Q. Do you know whether Mr. Knight ever referenced the law firm of Proskauer Rose to you?
A. I believe that someone from Ernst & Young did.
Q. Do you know when?
A. No.
Q. There's a name on here of David Parse that's referenced. It says, "please prepare and sign and then fax to David Parse."



Do you know who David Parse is?
A. No, sir.
Q. Have you ever seen this fax before?
A. No.
Q. If you turn to the second and third pages of this document, there's some handwriting.
Is any of this your handwriting?
A. It doesn't appear to be.
Q. Have you ever seen an opinion letter that was written to Deutsche bank with respect to your COBRA transaction?
A. No, sir.
Q. Did you ever have any discussions with anyone from Deutsche bank with respect to your COBRA transaction?
A. No, sir.
Q. There's a person, Alex Alexander referenced here.
Did you ever have any discussions with Alex Alexander?
A. I don't recognize that name.
Q. If you turn to Exhibit 1621.
The law firm of Burroughs & Hall is writing a letter to you and your brother and to

which has the reference number at the top of EX24631. On the third page of that --
MR. CROUCH: Just a second, counsel.
Do you see where he's talking about?
A. No. Where are you looking?
Q. (BY MR. LINDQUIST) For speed, I'll point. There's the reference number.
A. Okay.
Q. If you turn to the third page of that confirmation, is that your signature?
A. Yes, it appears to be.
Q. Well, is it your signature or is it not?
A. It looks like it to me.
Q. Did you have anybody else signing your signature on your behalf?
A. Well, that has been done, but I don't believe it was here. I believe that's my signature, but I'm not absolutely certain.
Q. Was there any type of practice where you had authorized people to sign your name?
A. No.
Q. Was Brewer Ezzell authorized to sign your name?
A. No.



Q. Now, the reason why I ask is because the two signatures appear a little bit different.
A. That's what I was looking at. They're probably the same.
Q. So you have reason to question whether that's your signature on the left or the right? Which one do you think is your signature?
A. I think they both probably are, but the one on the right looks more like the way I usually would sign it.
Q. Do you recall signing this document?
A. No, sir.
Q. Was there any type of document signing ceremony where a whole bunch of documents were put in front of you to sign for purposes of implementing this transaction?
A. None that I recall.
Q. Do you know if you ever engaged the law firm of Proskauer Rose to -- with respect to the COBRA transactions?
A. Yeah. Well, I heard their name mentioned.
Q. Well --
A. My -- personally was not involved in



hiring them.
Q. Do you recall whether they -- whether you or anyone on your behalf ever hired them? I mean, they could have been hired by somebody else. So do you recall whether you ever hired them?
A. I'm not sure just exactly how you're asking what you're asking. But the answer I'm trying to give you is -- what was the name -- Proskauer Rose -- they were recommended to us by Ernst & Young, and I was aware of that, but I never talked to anybody at Proskauer Rose, never.
Q. Did you ever see a draft of their opinion?
A. No.
Q. Were you ever told that there was a draft of their opinion?
A. I don't recall. I mean, I don't recall being told.
Q. Did you ever rely upon a draft of their opinion?
A. Not that I recall.
Q. Do you have any knowledge as to how it would be determined as to whether or not these



options that you were purchasing, whether they would or would not be in the money, how that was going to be determined?
A. No, sir.
Q. And Mr. Ezzell, he didn't have any prior experience in currency options, did he?
A. Limited, if any.
Q. So you weren't relying upon Brewer Ezzell?
A. I relied on him in his conversations with Ernst & Young.
Q. Do you know if -- whether you asked anybody to review these currency options for you?
A. I do not recall.
Q. If you take a look at -- well, before we go on, besides Ernst & Young, was there anybody else that you ever consulted concerning the COBRA transactions? And I'll say during 1999 through 2001.
A. No, sir, none that I recall.
Q. If you take a look at Exhibit 1627.
This is an assignment agreement that's been marked up.
Is this your handwriting?







24e45979-c2b0-4961-baae-94854c773695