# In the United States Court of Federal Claims

Nos. 05-748T & 07-520T
(Filed July 31, 2008)

* * * * * * * * * * * * * * * * * * * * * * * * * *

**STOBIE CREEK INVESTMENTS, LLC, JFW ENTERPRISES, INC., Tax Matters and Notice Partner,**

Plaintiffs,

v.

**THE UNITED STATES,**

Defendant.

___________________________________

**STOBIE CREEK INVESTMENTS, LLC, by and through JFW INVESTMENTS, LLC, Tax Matters and Notice Partner,**

Plaintiffs,

v.

**THE UNITED STATES,**

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * *

Tax; tax refund; partnership-level proceedings for readjustment of partnership items; Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), 26 U.S.C. ("I.R.C.") §§ 6221-6234 (2000); RCFC App. F; validity of retroactive application of Treasury regulation; Coltec Indus., Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1261 (2007); economic substance doctrine; step transaction doctrine; tax shelter; accuracy-related penalties, I.R.C. § 6662; reasonable cause and good faith, I.R.C. § 6664.

Robert E. Kolek, Chicago, IL, for plaintiffs. Thomas R. Wechter, Matthew C. Crowl, Colleen M. Feeney, and Ayad P. Jacob, Schiff Hardin, LLP, of counsel.

Stuart D. Gibson, Washington, DC, with whom was Acting Assistant Attorney General John A. Dicicco, for defendant. Cory A. Johnson and Jacob E. Christensen, U.S. Department of Justice, of counsel.

## OPINION AND ORDER

**MILLER**, Judge.

In May 2000 members of the Welles family sold half of their stock in the family business, Therma-Tru Corporation ("Therma-Tru") of Toledo, Ohio. That portion of the Therma-Tru stock was held by Stobie Creek Investments, LLC ("Stobie Creek"), a partnership controlled by members of the Welles family. These cases, before the court after trial, are complaints for readjustment of partnership items filed by plaintiffs Stobie Creek, JFW Enterprises, Inc., and JFW Investments, LLC (collectively, "plaintiffs"), 1/ pursuant to 26 U.S.C. ("I.R.C.") § 6226(b) (2000), 2/ and RCFC App. F. 3/

---

1/ Stobie Creek and JFW Enterprises, Inc., are the named plaintiffs in No. 05-748T; JFW Investments, LLC, a named plaintiff in No. 07-520T, was the tax matters partner for the tax return for the earlier period. Whereas the current members of Stobie Creek (a number of single-member S-Corporations) statutorily are parties, see 26 U.S.C. ("I.R.C.") § 6226(c) (2000); RCFC App. F. Rule 6(a), only Stobie Creek, JFW Enterprises, Inc., and JFW Investments, LLC, are participating parties. See RCFC App. F. Rule 6(b). The litigants have disagreed about whether the members of Stobie Creek are or are not "parties" to the proceeding. See Supp. Order entered Apr. 30, 2008, at 7-8 (vacating order entered Mar. 10, 2008, as corrected by order entered Mar. 13, 2008, and denying motion to adjudicate liability for penalties of partners at partnership-level proceeding). This distinction does not pertain to the issues before the court and is not relevant to the court's findings or conclusions. In this opinion the term "plaintiffs" refers to Stobie Creek, JFW Enterprises, Inc., and JFW Investments, LLC.

2/ All citations to the Internal Revenue Code ("I.R.C."or "Code") and to Treasury regulations refer to the provisions in effect at the relevant periods addressed in this opinion. The opinion notes, when relevant, provisions or regulations that later were amended or revised.

3/ Although the court has considered the testimony of every witness, discussion of each is not necessary in order to render a comprehensive decision. Plaintiffs presented three expert witnesses: (1) Robert W. Kolb, Ph.D., Professor of Finance and Frank W. Considine Chair of Applied Ethics at Loyola University Chicago. Dr. Kolb holds Ph.D.s in Philosophy and in Finance from the University of North Carolina at Chapel Hill. Dr. Kolb was qualified to give his opinions regarding foreign currency, foreign exchange options, economic analysis of foreign currency option financial derivatives, and currency markets generally. (2) Richard M. Levich, Ph.D., Professor of Finance and International Business at New York University's Stern School of Business. Prof. Levich holds an M.B.A. and a Ph.D. from the University of Chicago. Prof. Levich was qualified to give his opinions regarding international financial markets, currency trading, models of exchange rate determination, exchange rate forecasting, and pricing of currency derivatives. (3) Jeffrey A. Frankel, Ph.D., James W. Harpel

3/ (Cont'd from page 2.)

Professor of Capital Formation and Growth at Harvard University's Kennedy School of Government. Prof. Frankel holds a Ph.D. in Economics from the Massachusetts Institute of Technology. Prof. Frankel was qualified to give his opinions regarding economics, foreign exchange rates, international financial markets, and international macroeconomics.

The following fact witnesses testified for plaintiffs: (1) David A. Herpe, a partner in the private-client department at the law firm of McDermott, Will & Emery, LLP ("McDermott"), who previously had represented the Welles family and provided advice regarding the formation of Stobie Creek; (2) David F. Waterman, a partner at the law firm of Shumaker, Loop & Kendrick, LLP ("SLK"), and chair of its management committee, who had a long history representing the Welles family and Therma-Tru and its shareholders, and provided advice regarding the Jenkens & Gilchrist, P.C. ("J&G") Tax Opinion issued to Welles family members and Stobie Creek; (3) Jeffrey F. Welles, the central figure in this litigation, a member of the Welles family, the managing partner of North Channel, LLC ("North Channel"), the entity that serves as managing partner of Stobie Creek, and owner of JFW Enterprises, Inc.; (4) Frank H. Edwards, managing partner of Aqueduct Capital Group, formerly a broker in the private client services group at Morgan Stanley. Mr. Edwards discussed Morgan Stanley products with Jeffrey Welles in connection to the sale of the Therma-Tru stock and introduced Jeffrey Welles to individuals affiliated with Morgan Stanley who were familiar with foreign exchange transactions; (5) Thomas A. Cotter, a partner in the tax and estate planning departments at SLK, who, at the direction of Mr. Waterman, engaged in tax analysis regarding the tax reporting position taken by the Welles family and Stobie Creek; (6) Lawrence W. Goldstein, Chief Financial Officer of North Channel; (7) William L. Chung, Chief Operating Officer and portfolio manager of North Channel; and (8) Robert J. Floyd, a CPA who handled tax preparation for the Welles family, North Channel, and Stobie Creek.

Testifying for defendant was one expert witness, David F. DeRosa, Ph.D., President and owner of DeRosa Research and Trading, Inc., Adjunct Professor of Finance at the Yale School of Management, and Adjunct Associate Professor of Industrial Engineering and Operations Research at Columbia University. Dr. DeRosa holds a Ph.D. in Finance and Economics from the University of Chicago. Dr. DeRosa was qualified to give his opinions regarding foreign exchange, foreign exchange option trading, foreign exchange option valuation, foreign exchange option markets, investment management, investment and financial analysis, economic analysis, and general finance.

The following fact witnesses testified for defendant: (1) Neil F. Bresolin, Vice President of Investment Management Services at Goldman Sachs Group, Inc., who discussed the possibility of foreign exchange transactions with Jeffrey Welles; (2) Richard S.

Plaintiffs contest the Notice of Final Partnership Administrative Adjustment (the "FPAA") dated March 9, 2005 (the "2005 FPAA"), issued for the tax year ended December 31, 2000 (the "2000 tax year"), and the FPAA dated February 23, 2007 (the "2007 FPAA"), issued for the tax year ended April 30, 2000 (the "2000 stub tax year"). Compl. ¶ 1, Stobie Creek Invs., LLC v. United States, No. 05-748T (Fed. Cl. July 12, 2005); Compl. ¶ 1, Stobie Creek Invs., LLC v. United States, No. 07-520T (Fed. Cl. July 11, 2007). The 2005 and 2007 FPAAs disregarded Stobie Creek for tax purposes as a sham; disallowed the stated basis of Therma-Tru stock because it was attributable to transactions entered into for the purposes of tax avoidance; and increased the partnership's capital gain income with respect to the sale of the Therma-Tru stock. Plaintiffs seek a refund (with interest as provided by law) of $4,149,521.35 for the 2000 tax year and $58,149.14 for the 2000 stub tax year.

---

3/ (Cont'd from page 3.)

Pychewicz, Vice President in the operational control unit of Deutsche Bank, AG ("DB" or "Deutsche Bank"); (3) Carrie M. Yackee, Assistant to David Parse at Deutsche Bank Alex Brown, LLC ("DB Alex Brown"); and (4) Barbara S. Aprile, Senior Financial Product Specialist with the Internal Revenue Service ("IRS").

Defendant offered deposition testimony of the following individuals: (1) Stephen J. Bores, President of Therma-Tru until 1999 and part shareholder of Therma-Tru, who also sold his Therma-Tru stock in May 2000 and engaged SLK and J&G regarding strategies to reduce his capital gains taxes, albeit separately from plaintiffs and without plaintiffs' knowledge; (2) Donna Guerin, formerly a partner at J&G and the principal J&G attorney involved in connection with the Tax Opinion issued to the Welleses; (3) David Parse, then of DB Alex Brown, who was the primary point of contact for the Welleses' transactions; (4) John V. Ivsan, an associate at SLK, who conducted a significant portion of SLK's legal work pertaining to the Welleses' transactions and was the primary point of contact between SLK and J&G; (5) William F. Vogel, currently of Deutsche Bank London, who in 1999 worked in Deutsche Bank's New York office and was involved in handling trade booking responsibilities for transactions, including the Welleses' transactions; and (6) Paul M. Daugerdas, formerly a partner at J&G who, along with Ms. Guerin, was one of the two engagement partners involved in issuance of the J&G Tax Opinion for the Welleses. Plaintiffs counter-designated testimony. The court admitted only the depositions of Messrs. Bores and Vogel. See Transcript of Proceedings at 1399, 1681-82, 2127-53, Stobie Creek Invs., LLC v. United States, Nos. 05-748T & 07-520T (Fed. Cl. Apr. 9-23, 2008) ("Tr.") (admitting depositions of Messrs. Bores and Vogel, the two deponents who offered substantive testimony, but excluding other depositions due to lack of relevance and unfair prejudice to plaintiffs).

## BACKGROUND AND FACTS 4/

Therma-Tru was a corporation engaged primarily in the business of manufacturing and selling residential entry doors. See Transcript of Proceedings at 411 (Jeffrey Welles), Stobie Creek Invs., LLC v. United States, Nos. 05-748T & 07-520T (Fed. Cl. Apr. 9-23, 2008) ("Tr."). 5/ In 1962 David K. Welles Sr. ("David Welles"), who died in late December 2007, left Owens Corning Fiberglass and purchased a lumber yard that would later become Therma-Tru. Assisting him with that purchase were attorneys from Shumaker, Loop & Kendrick, LLP ("SLK"). See Tr. at 157 (Waterman), 411-12 (Jeffrey Welles). David Welles was the patriarch of an unusually close, functional, inter-dependent, and loyal family consisting of David Welles's wife Georgia E. Welles, their sons David K. Welles, Jr. ("Deke"), Jeffrey F. Welles, Christopher S. Welles, and Peter C. Welles and their daughter Virginia Welles Jordan. See Tr. at 394-97 (Jeffrey Welles). The Welles family would continue to engage SLK for a variety of legal matters, and the Welleses maintained a close relationship with individual SLK partners. See Tr. at 158-60 (Waterman), 412-16 (Jeffrey Welles).

By 1987 Therma-Tru had grown substantially, becoming one of the leading firms in the insulated door market. That year David Welles was diagnosed with bone cancer and explored the sale of Therma-Tru. David Welles considered selling the family business to a number of bidders, including Masco Corporation ("Masco"), but he abandoned the plan to sell Therma-Tru after the stock market collapse on October 19, 1987 (known as "Black Monday"). See Tr. at 161 (Waterman), 416-19 (Jeffrey Welles). By 1999 Therma-Tru had grown even larger and more successful, attaining the leadership position in its industry. David Welles earlier had passed management of the company to his son Deke. See Tr. at 159 (Waterman). Jeffrey Welles served as the primary investment advisor to Therma-Tru and to the Welles family generally, after working for many years in investment banking, first at the

---

4/ The facts set forth in the Facts section of this opinion, together with those included in the Discussion section, constitute the court's findings of fact pursuant to RCFC 52(a). The court's rulings on mixed questions of fact and law are set forth in the Discussion section.

5/ Events not within control of the court required the official transcription duties for the trial proceedings to pass from Heritage Court Reporting to Merrill Legal Solutions in the afternoon of day two of the proceedings, April 10, 2008. Transcripts on file include day one and day two, in full, as reported by Heritage Court Reporting, and day two commencing with the afternoon session through day eleven, as reported by Merrill Legal Solutions. Due to minor page numbering discrepancies in the transcripts, all citations to the official transcript reflect the page numbering recorded by Merrill Legal Solutions commencing with the direct examination of Jeffrey Welles at page 394. All previous transcript citations up to and including the cross-examination of Mr. Waterman reflect the page numbering recorded by Heritage Court Reporting.

Goldman Sachs Group, Inc. ("Goldman Sachs"), and then at Lazard Frères & Co. ("Lazard"). See Tr. at 400-11 (Jeffrey Welles).

Jeffrey Welles left Lazard in 1999 and established an office in New York City at 445 Park Avenue to concentrate his full efforts on providing investment and financial advice to the Welles family. See Tr. at 409-10, 443. During summer 1999 Jeffrey Welles had a conversation in Toledo with his parents, David and Georgia Welles, regarding establishing a family office for the Welles family. In order to pursue this objective, Jeffrey Welles contacted David A. Herpe, partner in the private client department of the law firm McDermott, Will & Emery, LLP ("McDermott") in its Chicago office. See Tr. at 437-40. Mr. Herpe, who had handled tax matters for the family and Therma-Tru, characterized a family office as

> an entity that performs certain functions collectively for family members that can range from something fairly simple like recordkeeping, paying bills, cash management on the one end. The other end it could be investment oversight, tax compliance, coordinating estate planning work and actually serving as a fiduciary for trusts and foundations.

Tr. at 81. Mr. Herpe rendered legal advice and services to Jeffrey Welles in connection with forming the family office that would come to be named North Channel, LLC ("North Channel"), as well as forming an investment entity to manage the family's investments that later took the name Stobie Creek. In September 1999 Jeffrey Welles established North Channel, and North Channel maintained its offices at 445 Park Avenue. See Tr. at 89-91 (Herpe), 438-40 (Jeffrey Welles).

By 1999 David and Georgia Welles had transferred a significant portion of their Therma-Tru holdings to their children. By mid-summer 1999 the Welleses again were interested in selling a substantial portion of Therma-Tru. Masco became aware that Therma-Tru was on the market and made a bid for the company. Masco proposed a stock transaction in which the shareholders of Therma-Tru would receive approximately $825 million in restricted Masco shares. The transaction progressed through summer and early fall 1999. While this transaction would be tax-free (because it was a stock transaction and not a redemption or cash transaction), the restrictions on the Masco shares would inhibit liquidity. See Tr. at 420-23 (Jeffrey Welles). Jeffrey Welles was concerned that this illiquidity would hinder his family's financial and philanthropic goals and sought "techniques . . . to borrow against those shares or to assign the holding period." Tr. at 423. Jeffrey Welles's research included contacting Frank H. Edwards, now managing partner of Aqueduct Capital Group, then a broker at Morgan Stanley in the private client services group. Jeffrey Welles and Mr. Edwards discussed Morgan Stanley products that might help the Welleses with illiquidity. See Tr. at 423-25 (Jeffrey Welles), 852-55 (Edwards). The transaction with Masco, however,

derailed when the Welleses and Masco could not reach a consensus on company management following the planned acquisition. See Tr. at 426-27 (Jeffrey Welles).

A Therma-Tru board member, Larry Solari, suggested that the Welleses contact Kenner and Company ("Kenner"), a private equity firm, as a potential buyer. See Tr. at 427. Following a series of negotiations, bids, and renegotiations, the parties struck a tentative deal on December 8, 1999. See Tr. at 427-28. The principal attorney representing the Welleses in this matter, as well as a variety of other matters, was David F. Waterman, partner and chair of SLK's management committee, who had a long history representing the Welles family and Therma-Tru. The Welles family has been a client of SLK for over forty-five years. SLK has provided the Welleses and Therma-Tru with estate planning, real estate, tax, and litigation services. Mr. Waterman began working on matters for the Welleses in his capacity as an attorney with SLK in the mid-1980s. Until 1992 the "relationship partner" at SLK responsible for the Welleses was Greg Alexander. See Tr. at 159 (Waterman). As Mr. Alexander was planning on retiring, Mr. Waterman stepped into that role. In addition to being the relationship partner for the Welleses and providing them with legal services, Mr. Waterman also joined the board of Therma-Tru as a director. See Tr. at 157-61.

The transaction that SLK helped negotiate between Therma-Tru and Kenner differed from the stock transfer that the Welleses had considered with Masco. The structure of the Kenner sale contemplated that Kenner would infuse cash into Therma-Tru for a 50% equity position at the same time that the current shareholders would redeem 50% of their stock in Therma-Tru for cash. See Tr. at 432-33 (Jeffrey Welles). The December 8, 1999 Kenner proposal and non-binding letter of intent valued 50% of Therma-Tru at nearly $425 million. See PX 61 at 1. Therma-Tru, the stockholders of Therma-Tru (consisting of the Welleses and various non-family Therma-Tru employees), and KT Holdings, LP (an investment vehicle created and controlled by Kenner), finalized a structured sale that was embodied in an Amended and Restated Recapitalization and Stock Purchase Agreement on May 9, 2000. See PX 62 (embodying final agreement; PX 314 is earlier draft version of agreement dated February 8, 2000).

This transaction differed from the one that the Welleses considered with Masco in another important respect. Because a redemption, and therefore a payment of cash for stock, was contemplated, the transaction would be a taxable transaction for the Therma-Tru shareholders. See Tr. at 432-34 (Jeffrey Welles). Based on the long relationship of the Welleses and Mr. Waterman, whose firm had a history of rendering tax advice to the family and Therma-Tru, in late October or early November 1999, David, Deke, and Jeffrey Welles approached Mr. Waterman to inquire whether he or another attorney at SLK was "familiar with any strategies that could reduce taxes in connection with the [Kenner] transaction." Tr. at 181 (Waterman); see also Tr. at 434-35 (Jeffrey Welles). Mr. Waterman testified that he "was not directly involved" in such strategies, but knew that SLK "had assisted . . . at least

two clients . . . in connection with a strategy that had been developed by . . . a Dallas-based law firm." Tr. at 181. That firm was Jenkens & Gilchrist, P.C. ("J&G").

The Welleses indicated an interest in learning more about this strategy, and Mr. Waterman put them in contact with John V. Ivsan, an associate in SLK's tax department working out of SLK's Toledo, Ohio office. Mr. Waterman characterized Mr. Ivsan as "a conduit, if you will, between the client and [J&G]." Tr. at 183. Because Mr. Ivsan was a "conduit" and "the thought and the judgment that was being exercised and the strategy itself was being created by [J&G]," Mr. Waterman was comfortable in referring the Welleses to Mr. Ivsan. Id. On December 9, 1999, Mr. Ivsan e-mailed Donna Guerin, a partner at J&G's Chicago office and one of the two principal attorneys involved in implementing the J&G strategy. 6/ Mr. Ivsan informed Ms. Guerin that he had "a $450 million transaction" (referring to the contemplated sale of 50% of the Welleses' Therma-Tru stock) and that "the clients have been brought lightly up to speed" (referring to the J&G strategy), but he sought "confidentiality agreements signed by them before going further" and asked Ms. Guerin to prepare appropriate agreements for the three individuals, David, Deke, and Jeffrey Welles. DX 326.

David and Jeffrey Welles signed these confidentiality agreements and returned them via facsimile transmission to SLK on December 28, 1999. See PX 134. During fall 1999 Jeffrey Welles met with Ms. Guerin in Chicago. Mr. Ivsan also e-mailed Ms. Guerin on December 14, 1999, to indicate that he would be meeting with the Welles family to discuss the J&G strategy in connection with the Therma-Tru transaction and to propose to Ms. Guerin that J&G "be compensated an amount equal to 2% of the deal" and that the "overall fee quote, inclusive of advisory fees, [be] 5%." DX 327 (family name redacted from e-mail, but offered by defendant and admitted as pertaining to the Welles family); see Tr. at 344-47 (Waterman). Jeffrey Welles already was quite interested in pursuing the strategy and sought to convince his family that it was the right move.

The Welleses were sophisticated individuals who had engaged not only in complex business transactions for years, but who also had engaged a number of attorneys to provide tax-planning services and to implement strategies that would minimize their tax burdens. This background is significant because no opprobrium attaches to creative tax planning;

---

6/ Plaintiffs' pretrial brief referred to the strategy as the "Digital Options Investment Strategy" ("DOIS"). See, e.g., Pls.' Br. filed Feb. 7, 2008, at 4. The name is accurate inasmuch as the strategy involved investments consisting of digital options. In order to emphasize the basis-enhancing tax characteristics of the strategy, defendant denominated the strategy as the "Basis Enhancing Derivatives Structure" ("BEDS"), a descriptor used by J&G in its memoranda, both internal and external (options are a form of derivative). See, e.g., Def.'s Br. filed Mar. 12, 2008, at 4 & n.5. This opinion refers to the strategy itself – apart from documents bearing the BEDS appellation – as "the J&G strategy."

because the Welleses had sheltered millions of dollars guided by Mr. Herpe; and because the concept of legitimate tax minimization or avoidance was – and continues to be – an acceptable tool for business and estate financial management. See Gregory v. Helvering, 293 U.S. 465, 469 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.").

Mr. Herpe began working with the Welles family in 1993, while at the law firm of Schiff, Hardin & Waite. In October 1993 Mr. Herpe first met with David and Georgia Welles to discuss estate-planning strategies and charitable giving. At that time Mr. Herpe explained to them a mechanism known as a "Grantor-Retained Annuity Trust," or "GRAT." See Tr. at 83-34. Mr. Herpe described the GRAT as "a leveraged gift technique, it's a trust which is used to transfer assets at a greatly reduced gift tax value, and as a means, therefore, to save transfer taxes." Tr. at 83. Mr. Herpe described the GRAT structure, as follows:

> When you create a GRAT you are exchanging an asset for a fixed annuity, a series of fixed-annuity payments over a term. The GRAT is set up so that the annuity payments are a more or less equal exchange for the asset put in. Based on tables that the government publishes you can value that annuity interest.
>
> The gift that you make when you create the GRAT is the value of the asset you put in minus the value of the annuity stream. So the gift is only a fraction, and it can approach zero of the actual asset you put in. To the extent assets remain in the GRAT when the term ends, those pass on with no further transfer tax.
>
> Q. [by plaintiffs' counsel] So in essence, you can avoid having to pay a gift tax?
>
> A. Correct.

Tr. at 84-85.

With Mr. Herpe's assistance, the Welleses would create two such GRATs: the Georgia E. Welles 1994 Qualified Annuity Trust ("GEW 1994 QAT") and the David K. Welles 1994 Qualified Annuity Trust ("DKW 1994 QAT," also known as the "Welles Family Trust"). Tr. at 85; see PX 16 (DKW 1994 QAT formation document). These trusts provided for a four-year annuity whereby

> each of the trusts were funded with shares of stock in Therma-Tru, nonvoting stock. Therma-Tru paid a dividend on its stock periodically, the dividends were used to fund the annuity payments.
>
> So by the time we actually got to the end of the four years we hadn't had to distribute anything other than the dividend cash back to David and Georgia. And the result was that all of the stock was still in the trust at the end of the four-year period.

Tr. at 86. At the end of this four-year annuity term, the stock that the trusts held was valued at approximately $56 million. That $56 million worth of stock passed to the beneficiaries of the trusts – the Welles children – free of any gift or estate tax. Mr. Herpe recounted that "[t]he tax rate at that time was 55 percent at the high end, so the tax savings was approximately $30 million." Tr. at 87. Based on his experience, Mr. Herpe considered this transaction appropriate under the Internal Revenue Code.

On January 23 and 24, 2000, the Welles family met at David and Georgia's home in Vero Beach, Florida, to discuss a variety of matters pertaining to the pending Therma-Tru deal with Kenner, formation of a family office (North Channel), formation of a family pooled investment vehicle (Stobie Creek), formation of a private family foundation to fulfill the Welleses' charitable goals, tax issues, and a strategy to deal with the capital gains associated with the contemplated sale of Therma-Tru to Kenner. See PX 111 (Welles Family Meeting Documents compiled by Mr. Herpe); PX 113 (Welles Family Meeting Agenda drafted by Mr. Herpe); PX 117 (Welles Family Meeting Minutes prepared by Mr. Herpe). During the first session, on January 23, restricted to members of the Welles family, David and Georgia Welles discussed the family philosophy and philanthropic pursuits. See Tr. at 449-51 (Jeffrey Welles). During the morning session on January 24, Jeffrey Welles and Mr. Herpe spoke at length to the family about the concept of a family office and the benefits to the Welles family from forming such an office. They discussed North Channel's intended business purpose and sketched out the job descriptions of the positions in which North Channel would employ people. See Tr. at 99-103 (Waterman); 451-54 (Jeffrey Welles). Jeffrey Welles already had planned on hiring William F. Chung as Chief Operating Officer of North Channel and discussed Mr. Chung's background with the family. Mr. Chung had worked with Jeffrey Welles at Lazard for over four and one-half years and directly for Jeffrey Welles for two of those years. See Tr. at 1311-13 (Chung). The family also discussed the idea of forming the pooled investment vehicle that would become Stobie Creek to help the family pursue its investment goals. See Tr. at 455-60 (Jeffrey Welles).

Mr. Herpe was neither involved in nor present during the afternoon session during which Mr. Waterman gave his presentation on tax strategy, nor did Mr. Herpe have any role in the tax planning that culminated in these refund actions. To prepare for his presentation at the Vero Beach meeting, Mr. Waterman reviewed a copy of a J&G tax opinion that was

issued to a Tampa-based SLK client, Larry Morgan, in connection with a series of transactions utilizing the short sale of Treasury securities as the investment vehicle, obtained from Thomas A. Cotter, a partner in the tax and estate planning departments at SLK. See Tr. at 189-90 (Waterman); PX 228 (Morgan J&G opinion letter dated April 8, 1999). During the afternoon session that date, Mr. Waterman presented the J&G strategy to the family, including an executive summary of the strategy prepared by J&G. See PX 111 at 24; PX 111B (copy of executive summary bearing Jeffrey Welles's fax line). The executive summary described six steps that were to be engaged in a particular order and read, in full:

> 1. Taxpayer, through a single member limited liability company treated as a disregarded entity for tax purposes, enters into (writes) a short option position on foreign currency. Such transaction is a nontaxable event until exercise, assignment, lapse or termination notwithstanding the receipt of the cash premium for the option. Additionally, a long option position is purchased, using the short option premium and taxpayer cash equity. A business and/or investment reason for this investment strategy must exist (e.g., a belief or view that the currency price will move in the desired direction). The option spread may be bullish (call spread) or bearish (put spread).
>
> 2. Taxpayer forms a partnership (the "Partnership") with a third party or with his wholly owned S Corporation ("S Corp."), in which the Taxpayer is a 99% partner.
>
> 3. Taxpayer contributes the option spread position to the Partnership. This contribution should result in Taxpayer's tax basis in the Partnership interest being equal to the cost of the long option contributed. The short option is, more likely than not, not treated as a liability for tax purposes, thus achieving this result.
>
> 4. At an appropriate time, the Partnership closes the option positions based on market timing factors, or the options expire, and the Partnership recognizes economic gain or loss on the transaction.
>
> 5. The Taxpayer contributes his stepped-up Partnership interest to S Corp., resulting in the Partnership having only one partner and therefore liquidating, distributing all of its assets to the S Corp. partner. In such case, there is a step-up in the tax basis of the assets held by the Partnership to the stepped-up outside basis of the S Corp. partner. Alternatively, if a third party is the other partner in the Partnership, the Taxpayer may be redeemed from the partnership in exchange for a distribution of an equivalent fair value amount of such assets, which take on the Taxpayer's high outside basis in the Partnership.

6. The distributee of the Partnership assets (i.e., the S Corp. or the Taxpayer) sells them at their stepped-up basis.

PX 111 at unnumbered page 24; PX 111B.

Per the executive summary, the ultimate goal of stepping-up the basis of the assets is to report that stepped-up basis on the partnership's tax return, which passes through to each partner's tax return, thereby reducing the capital gain reported and the attendant capital gains tax. Later drafts of this J&G executive summary made this point explicit. See DX 707 (J&G BEDS Executive Summary containing seven steps; final step reading, in its entirety, "Partnership sells the stepped-up capital assets generating a reduced gain for tax purposes."). Mr. Waterman reaffirmed at trial that this was the goal of pursuing the strategy: "Q. [by defense counsel] The purpose of the [J&G] strategy is to boost the basis and then reduce the capital gain? A. That's it's fundamental purpose[], yes." Tr. at 323.

When Virginia Welles Jordan asked Mr. Waterman at the Vero Beach meeting if he would engage in the J&G strategy were he in the Welleses' situation, he stated that he would. See Tr. at 463-64 (Jeffrey Welles); see also Tr. at 223 (Mr. Waterman testifying that "the comment that I left them at the Vero Beach meeting was if I were they I would pursue this transaction.")

After the Vero Beach meeting, the Welles family expressed great interest in following Jeffrey Welles and Mr. Herpe's suggestions to form a family office, pooled investment vehicle, and charitable foundation. They also expressed interest in pursuing the J&G strategy. The family and their representatives and agents proceeded to work on these pursuits in parallel.

Jeffrey Welles began researching the investment aspects of the option transactions that were part of the J&G strategy. He described his research as "do[ing] some diligence on the options transactions." Tr. at 467. He began by contacting people he knew in the investment industry to develop ideas on which currencies would be worthwhile investments. He first contacted David Parse of Deutsche Bank Alex Brown, LLC ("DB Alex Brown"), 7/ at the suggestion of Ms. Guerin of J&G. See Tr. at 467-68. Jeffrey Welles conducted a series of telephone conversations with Mr. Parse in late March 2000 regarding foreign exchange options. Jeffrey Welles's handwritten notes, taken during the course of one such conversation, indicate that the discussion concerned options involving the euro, the Swiss

7/ The brokerage firm DB Alex Brown formerly was known as Alex Brown, then BT Alex Brown, before being acquired by Deutsche Bank. DB Alex Brown acted as the broker for the transactions that the Welleses entered as part of the J&G strategy. See Tr. at 1512-14 (proffer of defense counsel accepted by court).

franc, and a variety of spot prices. See Tr. at 476-77; see also PX 154 at 1-2 (document containing two pages of handwritten notes spanning three conversations, the first with Neil F. Bresolin, and the remaining two with Mr. Parse). Jeffrey Wells also engaged Neil F. Bresolin, Vice President of Investment Management Services at Goldman Sachs Group, Inc. ("Goldman Sachs"), in a conversation about foreign exchange options. See Tr. at 471-75; see also PX 154 at 1. Although Jeffrey Welles discussed foreign exchange options generally with Mr. Bresolin, he did not tell Mr. Bresolin or anyone else at Goldman Sachs the terms of the options that he was considering. See Tr. at 804 (Jeffrey Welles). Jeffrey Welles also spoke with Mr. Edwards at Morgan Stanley. Tr. at 478-79. Mr. Edwards put Jeffrey Welles in touch with a trader at Morgan Stanley's foreign exchange desk where Jeffrey Welles discussed foreign exchange options generally, but did not mention the particular terms of the options that he was considering. See Tr. at 855-60, 866-76 (Edwards).

Stobie Creek was formed on March 3, 2000. See PX 57 Tab 9 (Delaware certificate of good standing dated October 24, 2007, indicating formation of Stobie Creek on March 3, 2000). The Welleses planned on forming a single-member LLC for each family member and for the DKW 1994 QAT, each designated by the initials of the respective family member or trust that would be the sole member of that LLC, i.e., JFW Investments, LLC; DKW Senior Investments, LLC; DKW Junior Investments, LLC; etc. (the "single-member LLCs"). The Welleses then planned on having each of those single-member LLCs join Stobie Creek as members. Attorneys at SLK prepared schedules to that effect, comprising a Member Signature Page, Joinder Agreement, and New Investment Request in Stobie Creek, for each of the single-member LLCs on March 3, 2000. See, e.g., PX 57 Tabs 2-8. 8/

On March 3, 2000, Mr. Herpe sent Jeffrey Welles a Cash Handling Agency Agreement for Stobie Creek that would "allow Stobie Creek to receive all of the cash proceeds from the Therma-Tru Sale." DX 548 (letter from Mr. Herpe to Jeffrey Welles); DX 424 (the Cash Handling Agency Agreement). On March 6, 2000, Mr. Herpe forwarded to Jeffrey Welles a draft of the Stobie Creek company agreement for review and further discussion. Mr. Herpe instructed that, once Jeffrey Welles had "completed [his] review of the documents," he was to give Mr. Herpe a call, and Mr. Herpe would have "drafts of the foundation documents available for [Jeffrey Welles and his parents'] review shortly." DX 40.

---

8/ For the sake of clarity and brevity, the opinion will refer to those formation documents and other LLC or S-Corporation documents associated with Jeffrey Welles, i.e., JFW Investments, LLC; JFW Enterprises, Inc. The findings apply just as readily to any of the other single-member LLCs or S-Corporations and the documents pertaining to those entities that were admitted into evidence. The opinion will cite to these other documents where appropriate to highlight important distinctions regarding the timing of the individual steps.

On March 6, 2000, Mr. Waterman sent a letter, copied to each of the Welleses,

> confirm[ing] and correct[ing] certain information that we provided to you [at the Vero Beach Meeting] in connection with a proposed investment in so-called digital foreign currency options, the consolidation of such options together with Therma-Tru stock in an investment partnership, the closing of such option positions, the termination of the investment partnership and subsequent sale of Therma-Tru stock.

PX 152 at 1-2. Mr. Waterman enclosed "a redacted version of a draft opinion issued by J&G in connection with a similar transaction together with supporting legal memoranda." PX 152 at 2. That draft opinion was the one issued to Larry Morgan regarding a similarly structured transaction that involved the short sale of certain Treasury securities, rather than foreign currency options, as proposed at the Vero Beach meeting. See PX 228 (J&G tax opinion letter dated Apr. 8, 1999, for Larry Morgan regarding Treasury security investment strategy); PX 151 (one related J&G memorandum). Mr. Waterman's letter described the opinion that J&G would issue for the Welleses as an opinion that it was "more likely than not" that the recommended transactions would be respected for federal income tax purposes. PX 152 at 2.

Mr. Waterman discussed some government efforts to attack tax shelters generally, but opined that then recently issued regulations "do not appear to apply to you in your particular situation, since the investment strategy under consideration does not reduce corporate tax liability. Rather the proposed strategy will result in a reduction of your individual income tax liability." PX 152 at 3. Mr. Waterman also clarified his earlier comments at the Vero Beach meeting about the possibility that, in the event the IRS did not recognize the Welleses' tax treatment of the transaction, the Welleses ultimately could be required to pay penalties in addition to the unpaid tax. Mr. Waterman noted that J&G had offered to SLK "a portion of its fee for [SLK's] assistance in creating and implementing the investment vehicles and documenting the transfers of assets." Id. Mr. Waterman indicated that, contrary to what he might have said at the Vero Beach meeting,

> I believe we have been clear that were are not recommending that you pursue [J&G's] proposal. In fact, we have advised you that our knowledge of J&G's proposal was obtained in confidence under a confidentiality agreement similar to the one you have executed, that we are therefore unable to issue the opinion being offered by J&G and that we have not determined that we would be prepared to issue such an opinion even if permitted under our confidentiality restrictions.

Id. Mr. Waterman also asked the Welleses to

> note that the enclosed opinion states, and the opinion to you will state, that it is based on certain representations made by you in connection with the transactions, namely that you will enter into the option agreements with a profit motive, that your contributions of the options and the Therma-Tru stock to the investment partnership will have substantial non-tax business reasons and that each transaction described at the beginning of this correspondence will be undertaken separately without any binding commitment to do so. *Of particular importance are the representations that you have substantial non-tax business purposes to convey the options and the Therma-Tru stock to the partnership, since that is one of the more likely grounds on which the IRS could challenge the arrangement and the resulting tax consequences.*

PX 152 at 4 (emphasis added).

Jeffrey Welles testified that he had not received this letter from Mr. Waterman, nor any other Waterman letter of significance. See Tr. at 595-96. The court charges Jeffrey Welles with knowledge of the contents of these attorney communications. It is not likely that Jeffrey Welles was unaware of a key letter that his counsel wrote, especially after he admitted receiving the J&G Morgan tax opinion letter by mail after the Vero Beach meeting and before he engaged in the foreign currency options transactions. See Tr. at 689 (witness caveated that he was not positive about how he received it), 740. Jeffrey Welles's disinclination to recall receiving key letters from Mr. Waterman – the only communications to the Welleses that memorialized Mr. Waterman's legal advice on this crucial tax matter – tarnished the plausibility of Jeffrey Welles's testimony. That said, Mr. Waterman's effort to distance himself from his promotion of the J&G strategy does not shield Mr. Waterman's legal advice from the taint of self-interest. SLK was a broker for J&G's strategy.

JFW Investments, LLC, a Delaware Limited Liability Corporation, was formed on March 17, 2000. See PX 36 Tab 1. Jeffrey Welles's S-Corporation, JFW Enterprises, Inc., was formed on March 17, 2000, as well. See PX 36 Tab 4.

On March 20, 2000, Mr. Ivsan sent Ms. Guerin an e-mail requesting her to instruct Deutsche Bank AG ("DB" or "Deutsche Bank") to open accounts for each of the Welleses' single-member LLCs and S-Corporations. See DX 156. Mr. Ivsan's e-mail copied David Parse of DB Alex Brown. Mr. Parse would be the individual at DB Alex Brown primarily responsible for managing the creation of each of the option contracts between Deutsche Bank and the Welleses that were integral to the J&G strategy. In an e-mail dated March 22, 2000, Mr. Ivsan sent Ms. Guerin and Mr. Parse a list reflecting the amount of the respective capital gain that each of the Welleses expected to realize through redemption of the Therma-Tru stock. See DX 304.

In an Assignment Separate From Certificate dated March 24, 2000, Jeffrey Welles transferred 50% of his Therma-Tru stock to Stobie Creek. See DX 712. Jeffrey Welles continued his research regarding foreign currencies and markets. See Tr. at 519-22; see, e.g., PX 159 (Deutsche Bank Weekly Reports dated March 27, 2000). On March 27, 2000, Mr. Parse and Rod Mackay, also of DB Alex Brown, sent by fax to Jeffrey Welles "sample" option confirmations, reflecting another entity's transactions, that were indicative of the type of digital options that Jeffrey Welles was planning on acquiring as part of the J&G strategy. See DX 376. On the same date, March 27, 2000, Jeffrey Welles filed Form 2553 with the IRS, electing to treat JFW Enterprises, Inc. as an S-Corporation. See PX 36 Tab 10.

On March 28, 2000, David and Georgia Welles, as trustees of the Welles Family Trust (the DKW 1994 QAT), signed Guaranty Agreements with DB Alex Brown for the trading accounts that the Welleses opened. See PX 163; PX 164. On March 30, 2000, Jeffrey Welles by fax directed Susan Madden of Northern Trust Corporation ("Northern Trust"), the trust company managing the Welles Family Trust, to wire $2,045,750.00 from the Welles Family Trust to seven separate accounts at DB Alex Brown. See DX 518. This reflects a loan from the Welles Family Trust to the single-member LLCs to pay the premiums for the options that each of the single-member LLCs would acquire. Lawrence W. Goldstein, Chief Financial Officer of North Channel, prepared a record of these loans and their eventual repayment. See PX 141. Jeffrey Welles authorized these wire transfers, along with the transfer of funds from the single-member LLCs to DB Alex Brown. See PX 218; PX 518.

On March 31, 2000, each of the single-member LLCs entered into two pairs of option contracts: the first pair, an option collar involving a long option and a short option on the value of the Swiss franc ("CHF") versus the United States dollar (the "dollar"); the second pair, an option collar involving a long option and a short option on the value of the dollar versus the euro (referred to collectively as the Foreign Exchange Digital Options Transactions, or "FXDOTs"). Both pairs of options would close on April 17, 2000. See DX 212-225 (Deutsche Bank trade confirmations dated and faxed April 3, 2000, indicating trade date of March 31, 2000); see also PX 243-256 (same confirmations, except that PX 247 (corresponding to DX 216) and PX 256 (corresponding to DX 225) have handwritten corrections made to initial exchange amount). On April 3, 2000, JFW Investments, LLC, transferred its option contracts to Stobie Creek. See PX 123. The other single-member LLCs followed suit.

Each option was a digital option. A digital option is one in which the payoff is either some fixed amount of some asset or nothing at all. Each pair of option contracts included the purchase of a long option and the sale of a short option on a currency pairing. Together, these contracts constituted an option collar. See PX 293 at 4-6 (expert report of Robert W. Kolb, Ph.D., testifying for plaintiffs).

The single-member LLCs each purchased a long euro digital option with a strike price of $0.9912 per euro; sold a short euro digital option with a strike price of $0.9914 per euro; purchased a long Swiss franc digital option with a strike price of CHF 1.7027 per dollar; and sold a short Swiss franc digital option with a strike price of CHF 1.7029 per dollar. Considering the pair of euro digital options together, if, at option close on April 17, 2000, the euro traded at less than $0.9912 per euro, Jeffrey Welles (as an example) would lose $96,625.00; if the euro traded at more than $0.9914 per euro, Jeffrey Welles would gain $96,625.00; and if the euro traded in between the two strike prices, Jeffrey Welles would gain $19,228,375.00. The range within this two-pip (two-thousands of a unit) spread was referred to as the "sweet spot." Similarly, considering the pair of Swiss franc digital options, if, at option close on April 17, 2000, the Swiss franc traded at less than CHF 1.7027 per dollar, Jeffrey Welles (as an example) would lose $96,625.00; if the Swiss franc traded at more than CHF 1.7029 per dollar, Jeffrey Welles would gain $96,625.00; and if the Swiss franc traded in between the two strike prices, hitting the sweet spot, Jeffrey Welles would gain $19,228,375.00. See Tr. at 569-74 (Jeffrey Welles); see also DX 293 at 7-11 & exs. 9 & 10 (expert report of Dr. Kolb); DX 307 at 3-4 (expert report of Richard M. Levich, Ph.D., testifying for plaintiffs).

Looking to the aggregate of the single-member LLCs' investments, combining the two options resulted in nine possible outcomes: in one outcome hitting both sweet spots would result in an over $407 million return; in two outcomes hitting either sweet spot would result in an over $202-204 million return; in one outcome finishing in the money in both options would result in a $2 million gain, doubling the investment; in two outcomes finishing in the money in one option but out of the money 9/ in another would result in no net gain or loss, *i.e.* zero profit; and in one outcome finishing out of the money in both options would result in a loss of $2 million, the entire investment. See PX 293 at 7-11 & ex. 11; DX 307 at 3-4. Represented in a tabular format, the matrix of outcomes can be displayed, as follows:

---

9/ If the price of the underlying commodity is lower at the expiry of an option than the price of exercising an option to buy the commodity (a call option), exercising the option would result in a loss, and the option itself would be worthless. Similarly, if the price of the underlying commodity is higher at the expiry of an option than the price of exercising an option to sell the commodity (a put option), exercising the option would result in a loss, and the option itself would be worthless. In both of these scenarios, the option is considered to have expired "out of the money," and the investor has lost the premium paid for the option. See, e.g., Tr. at 800 (Jeffrey Welles), 909-10 (Dr. Kolb), 1330 (Chung), 1967 (Dr. DeRosa).

**Profit or Loss Outcomes for FXDOTs**

| | | | |
|---|---|---|---|
| \$1 < CHF 1.7027 | **-\$2,045,750.00** | **\$202,529,250.00** | **\$0** |
| \$1 ≥ CHF 1.7027 and \$1 < CHF 1.7029 | **\$202,529,250.00** | **\$407,104,250.00** | **\$204,555,000.00** |
| \$1 ≥ CHF 1.7029 | **\$0** | **\$204,555,000.00** | **\$2,045,750.00** |
| | EUR 1 < \$0.9912 | EUR 1 ≥ \$0.9912 and EUR 1 < \$0.9914 | EUR 1 ≥ \$0.9914 |

See also PX 293 ex. 11 (table in Dr. Kolb's expert report).

It is important to note that these outcomes decidedly were not each equally likely to occur. The court examines the expert witnesses' analyses of the probability of a given result in the Discussion section of this opinion.

Over the lifetime of the options, Jeffrey Welles monitored on a regular basis the spot exchange rates of the dollar versus the euro and Swiss franc versus the dollar. See Tr. at 580-81 (Jeffrey Welles). He also directed Mr. Chung to monitor on a regular basis these spot exchange rates and other macroeconomic indicators. See Tr. at 1318-30 (Chung). On April 17, 2000, each of the options expired out of the money, resulting in a loss of the entire investment. See Tr. at 596 (Jeffrey Welles), 1330 (Chung). On May 9, 2000, the Therma-Tru transaction with Kenner closed. See PX 62 (Amended and Restated Recapitalization and Stock Purchase Agreement).

After the close of the Therma-Tru transaction and well after the expiry of the options, a flurry of e-mails and faxes passed among the Welleses and their family office, attorneys at SLK, and attorneys at J&G regarding the dating of certain foundation and assignment documents. On April 4, 2000, Mr. Ivsan of SLK sent Ms. Guerin at J&G an e-mail indicating that he had prepared contribution and joinder agreements for each Welles family member and the Welles Family Trust based on the LLC operating agreement and had prepared joinder forms drafted by McDermott for Stobie Creek. He advised that "[f]orms have been sent out for execution; they are undated. I will provide the original executed copies to you to fill in the dates." DX 305. Mr. Ivsan stated that Ms. Guerin was to "fill in the dates based on the assignment dates for the digital option contracts." Id. Mr. Ivsan also prepared undated forms of assignment/joinder transferring the Stobie Creek membership interests from the single-member LLCs to the Welleses' single-member S-Corporations and indicated that Ms. Guerin should similarly fill in the dates. See id. On the same date, April 4, 2000, Ms. Guerin faxed "numerous documents" to Jeffrey Welles for his signature, including option contracts, wire transfer authorizations, and assignment agreements. DX

333. On the same date, Mr. Chung, now Chief Operating Officer of North Channel, sent Ms. Guerin a fax with the subject "Signature pages." DX 711.

Exhibits admitted at trial include copies of these documents – the schedules consisting of a Member Signature Page, Joinder Agreement, and New Investment Request in Stobie Creek – in signed and unsigned forms, undated or dated with a variety of dates. Some bore the date April 7, 2000. See, e.g., DX 79 (assignment of membership interest and joinder agreement for PCW Investments, LLC, to PCW Enterprises, Inc.); DX 91 (assignment of membership interest and joinder agreement for CSW Investments, LLC, to CSW Enterprises, Inc.). The capital-contribution documents for these entities reflected the dates April 4 and 5, 2000, and were included in a letter sent by Susan E. Monro, legal assistant to Messrs. Ivsan and Waterman, to Ms. Guerin at J&G on April 13, 2000. See DX 93 at 1, 8, 12. Some were undated, but included in a letter sent by Ms. Monro to Ms. Guerin on April 10, 2000. See DX 684; DX 400-402 (undated assignment of membership interest and joinder agreement for DKW Junior Investments, LLC, to DKW Junior Enterprises, Inc.; DKW Senior Investments, LLC, to DKW Senior Enterprises, Inc.; and VJ Investments, LLC, to VJ Enterprises, Inc.).

In an e-mail dated April 13, 2000, Mr. Ivsan informed Ms. Guerin that Therma-Tru declared a $90 million distribution "and the treasurer is telling me that I can date the [Therma-Tru] stock certificates for Stobie Creek . . . only as of April 14, 2000." DX 488. Mr. Ivsan asked Ms. Guerin if this posed "a timing issue," indicating his "impression . . . that the April 14 date poses no threat." Id. By "threat," the court infers that Mr. Ivsan alluded to a threat to the order in which the transactions took place that was necessary to achieve the beneficial tax treatment that was the underlying purpose of the J&G strategy. A fax transmittal dated July 17, 2000, by Mr. Ivsan to John Beery of J&G attached copies of the signed Assignments Separate from Certificate of Therma-Tru stock to Stobie Creek, each bearing the date April 14, 2000. See PX 184 at 2-16. Previous versions of these assignments did not reflect this date; rather, they read March 24, 2000. See, e.g., DX 712 (Assignment Separate from Certificate for Jeffrey Welles). The cover letter accompanying Mr. Ivsan's April 14, 2000 fax transmittal indicated that "[t]he company recorded the stock transfers as taking effect on April 14, 2000, in order to accommodate a AAA distribution on April 11." PX 184 at 1.

On May 15, 2000, Mr. Ivsan of SLK sent Ms. Guerin at J&G an e-mail stating that the "Welles transaction finally closed" and that "it may be wise to document the shift of LLC ownership interests from the individuals to their S corporations as of April 30, 2000, so that we can file a partnership tax return for the short year ending on that date." DX 319. On May 18 and 19, 2000, Mr. Goldstein faxed David and Georgia Welles a request to sign attached Stobie Creek member signature pages "to establish your interest in Stobie." DX 295 at 1-2; DX 296 at 1-2. On May 19, 2000, Mr. Goldstein forwarded those signed pages by letter to Mr. Herpe at McDermott. See DX 41. On June 13, 2000, Carrie M. Yackee, Assistant to

Mr. Parse at DB Alex Brown, asked Richard S. Pychewicz, Vice President in the operational control unit of Deutsche Bank, to correct the option trade confirmations for two of the options, so that the date under the logo read April 3, 2000, instead of the current date. Ms. Yackee then e-mailed those confirmations to Ms. Guerin at J&G. See DX 481.

The confusion over the dating of these documents persisted for many months – at least. In an e-mail dated December 28, 2000, Mr. Beery of J&G queried Mr. Ivsan of SLK about "the dates of the filing of the Certificate of Formation and the execution of the Operating Agreement for Stobie Creek." DX 320. On the same date, Mr. Ivsan replied by e-mail that "[m]y notes indicate that [Stobie Creek] was organized on March 3, 2000. The individual members, however, did not join until the dates provided on their subscription agreements, the execution pages of which were all provided to Donna Guerin (*I don't know if they were dated*)." Id. (emphasis added).

During summer 2000 the process of preparing the Welleses' federal income tax returns began. On June 23, 2000, Mr. Ivsan sent "a sample set of tax returns" to Robert J. Floyd, CPA, the tax preparer for the Welles family, North Channel, and Stobie Creek. DX 273. The sample set included "a tax return for an Electing Small Business Trust, an S Corporation return, and a Partnership return. . . . Included with the Partnership return is an election under Code Section 754 and a basis adjustment under Code Section 743(b)." Id. On July 19, 2000, Mr. Ivsan sent Mr. Floyd his comments and those of J&G attorneys pertaining to the tax returns that Mr. Floyd had prepared. Among other matters, Mr. Ivsan advised that the returns should not be marked "final," that J&G suggested that the LLCs be treated as the partners of Stobie Creek, and that Jeffrey Welles's LLC be designated as the Tax Matters Partner. See DX 258.

On August 9, 2000, Mr. Waterman sent each of the Welleses a letter of congratulation on the successful completion of the Kenner transaction. He understood from Mr. Ivsan that

> [Mr.] Floyd with [SLK's] assistance and in reliance on the [J&G] opinion, is nearly ready to file the Stobie Creek partnership return reporting the stock redemption at the elevated tax basis, and therefore lower gain, produced by the tax strategy that was developed by [J&G] and implemented with our help earlier this year.

PX 108 at 1-2. He reminded the Welleses that, "[a]s we have discussed, the aggregate fee payable for this opinion and all work in connection with implementing the strategy is 3% of the gain to be sheltered," whereby the fee would be shared by J&G and SLK in the ratio of two-thirds to one-third. PX 108 at 2. The fee that would be allocated to SLK, one percent "of the gain to be sheltered," amounted to $2,045,750.00. Id.

Mr. Waterman reaffirmed his and SLK's earlier expressed willingness to "waive, perhaps not all, but substantially all of this extraordinary fee." Id. While Mr. Waterman did "not mean to suggest that [SLK was] not financially motivated," he stated that SLK had "been very fairly compensated for [its] work in connection with this transaction." Id. Mr. Waterman did offer to donate all, or a portion, of this fee to charity in the event that J&G would insist on recouping any "amount waived by SLK." Id. Mr. Waterman set forth his understanding that "[J&G] has insisted upon payment of one-half of its fee upon rendering the opinion necessary to file the Stobie Creek return," the balance of its fee "payable next year when the individual returns are filed." Id. He reassured the Welleses that SLK would not require any payment until the next year, "consistent with our position that if for any reason [the Welleses] elect not to pursue reporting the transaction on the basis of the [J&G] opinion [SLK] will not charge the extraordinary percentage fee." Id.

Jeffrey Welles disavowed receiving this letter from Mr. Waterman, along with the first Waterman letter dated March 6, 2000, see PX 152. See Tr. at 602-03 (Jeffrey Welles). As stated previously, the court does not credit this testimony and charges Jeffrey Welles with knowledge of the contents of these communications from his attorney. Mr. Waterman's offer to forgo a finder's fee (ultimately SLK took its entire fee, save $150,000.00 that was donated to charity in SLK's name, see Tr. at 362-63 (Waterman)), similar to his attempt in his March 6, 2000 letter to distance himself from his personal recommendation at the Vero Beach meeting, does not eliminate the conflict-of-interest that inhered in his and SLK's brokering the J&G strategy.

On August 13, 2000, the IRS released Notice 2000-44, titled "Tax Avoidance Using Artificially High Basis." I.R.S. Notice 2000-44, 2000-2 C.B. 255 ("Notice 2000-44"or the "Notice") (also admitted as DX 715). The Notice addressed "transactions that purport to generate tax losses for taxpayers." Id. The Notice reiterated the background principle that "a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable." Id. The Notice represented that both the IRS and United States Department of the Treasury ("Treasury") had "become aware of . . . arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests." Id. Notice 2000-44 addressed two variations of loss-generating transactions that the IRS and Treasury both argued lacked economic substance.

______The first variation involved "a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness." Id. The example given posited a taxpayer who received cash from a lender under a loan agreement that provides for an inflated stated rate of interest and a stated principal amount that is less than the cash the taxpayer actually receives from the lender. The taxpayer contributes the cash to the partnership; the

partnership thereafter engages in investment activities; and on a later date, the taxpayer sells the partnership interest. The taxpayer then claims "that only the stated principal amount of the indebtedness . . . is considered a liability assumed by the partnership . . . that reduces the basis of the taxpayer's partnership interest under [I.R.C.] § 752." Id. The taxpayer thereafter "purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero." Id. Once the taxpayer disposes of his partnership interest, "the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss." Id.

The second variation described by Notice 2000-44 involved the purchase and writing of options and the transfer of those option positions to a partnership, redolent of the J&G strategy. This variation involved the taxpayer "claim[ing] that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under [I.R.C.] § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options." Id. Following disposition of the partnership interest, "the taxpayer claims a tax loss." Id. Notice 2000-44 announced the position that "[t]he purported losses resulting from the transactions described . . . do not represent bona fide losses reflecting actual economic consequences as required for purposes of [I.R.C.] § 165," the portion of the Internal Revenue Code concerning losses. Id. The IRS and Treasury also noted that the "purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes" and that such "purported tax benefits . . . may also be subject to disallowance under other provisions of the Code and regulations." Id. Notice 2000-44 identified "[t]ransactions that are the same as or substantially similar to" those transactions described in the Notice as "'listed transactions' for the purposes" of Temp. Treas. Reg. § 1.6011-4T(b)(2). Id. at 256. Listing these transactions required taxpayers who employed these tax strategies to register their use of the strategies with the IRS. See id.

Messrs. Cotter and Ivsan of SLK brought Notice 2000-44 to Mr. Waterman's attention. Mr. Waterman was concerned because Notice 2000-44 described "two or three different types of investment structures, one of which at least looked similar to the transaction that had been engaged in or pursued by the Welles family." Tr. at 238-39. Mr. Waterman asked Messrs. Ivsan and Cotter to "research this further, talk to the [J&G] people and get back to me as to what effect they collectively thought this might have on our reporting the transaction on the basis of the expected opinion from [J&G]." Tr. at 239. Messrs. Ivsan and Cotter responded to his request in a memorandum dated August 18, 2000. See PX 259.

The August 18, 2000 memorandum was marked "DRAFT NOT FOR CIRCULATION" and reflected the date of September 1, 2000. PX 259 at 1. According to Mr. Cotter, the document was never finalized. See Tr. at 1133. Mr. Waterman recalled that he conversed with Messrs. Cotter and Ivsan about the memorandum some time early in September and that the draft dated September 1, 2000, was "probably the draft [that he] got." Tr. at 240-41. The memorandum addressed temporary and proposed regulations issued by Treasury on August 11, 2000, concerning confidential corporate tax shelters and requiring both promoters of and participants in such shelters to register with the IRS. The memorandum also analyzed Notice 2000-44 as it related to those regulations and to the transactions that comprised the J&G strategy. See PX 259 at 1.

Mr. Waterman was not impressed with some aspects of the his colleagues' analysis. In a comment box addressing whether the "Evaluated Transaction" (the J&G strategy) lacked economic substance, the memorandum expressed that "the Evaluated Transaction consisted of an investment strategy intended to generate a pre-tax profit that far exceeds any 'expected' tax savings." PX 259 at 13. Mr. Waterman's handwritten annotation reads "B.S." Id. Mr. Waterman testified that he thought that Messrs. Cotter and Ivsan "overstated the case. Again, the large return I knew was a narrow opportunity. And this would suggest that there was no motivation to obtain the tax benefits." Tr. at 248.

Another paragraph titled "Tax-Structured Transaction" stated that "[o]ne may infer that the Evaluated Transaction qualifies for [an exception from a registration requirement] because (i) the trade constitutes a standard trade for the vehicle used and (ii) the tax consequences of the trade are fairly well established." PX 259 at 14. Mr. Waterman added another handwritten "B.S." below that paragraph. Id. Page 20 of the memorandum explored these points in some more detail and Mr. Waterman's handwritten annotation next to those bullet points read, "[W]e don't qualify." PX 259 at 20. Mr. Waterman testified that he "didn't think it was longstanding and generally accepted that we would obtain this [favorable tax] result. We were, after all, receiving or expecting to receive an opinion to the effect that it was more likely than not that these tax consequences would be realized." Tr. at 249.

The second major portion of Messrs. Cotter and Ivsan's August 18, 2000 memorandum related to Notice 2000-44 and its potential application to or impact on the J&G strategy. The memorandum advanced the position that Notice 2000-44 addressed transactions that were intended to generate I.R.C. § 165 losses that did not reflect an economic reality. See PX 259 at 26-33. In particular, the memorandum concluded that

> the Notice does not appear to describe any transactions that involve a mere adjustment in basis of one or more assets. Rather the Notice seems to direct its attention toward transactions designed to produce a high basis in a partnership interest followed by the disposition of that partnership interest at a tax loss.

PX 259 at 30. Mr. Waterman's handwritten annotations indicated that he was not convinced. Beside two paragraphs recounting the second variation of transaction described in Notice 2000-44, Mr. Waterman wrote, "[L]ooks like us." Id. Next to the quoted portion of the memorandum concluding that Notice 2000-44 was addressed only to transactions designed to produce a high basis that later resulted in an I.R.C. § 165 loss, Mr. Waterman wrote, "I wouldn't count on this." Id. If a document can bear the indices of credibility, the "B.S. memo" certainly reflects a lawyerly reaction to the SLK tax attorneys' expression of comfort.

Mr. Waterman also discussed Notice 2000-44 in a telephone conference call with Jeffrey Welles after it had been released and either just before or just after Messrs. Cotter and Ivsan drafted the August 18, 2000 memorandum. See Tr. at 252 (Waterman). Mr. Waterman informed Jeffrey Welles about the issuance of Notice 2000-44, shared his concerns about the Notice, and related Messrs. Cotter and Ivsan's analysis. Mr. Waterman also advised that he "wanted a conference call with Donna Guerin to be arranged so that we could hear what [J&G] has to say about it." Id. Some time in late October, Mr. Waterman scheduled that conference call with Ms. Guerin. The participants included Mr. Waterman, Ms. Guerin, David Welles, Deke Welles, Jeffrey Welles, Larry Goldstein, and John Ivsan.

During the conference call, Mr. Waterman asked Ms. Guerin "what the opinion of [J&G] was or would be regarding the applicability of [Notice 2000-44] to the Welles[es]' transaction and the effect on their reporting the transaction as the opinion was expected to indicate. And actually, their willingness to continue giving that opinion." Tr. at 253. According to Mr. Waterman, Ms. Guerin stated "that [J&G's] opinion committee had reviewed the matter." Id. Mr. Waterman considered this statement to be "a comforting thought" because, in the context of a large law firm, he was assured that it "[took] a determination of that sort out of the hands of an individual . . . it went to the full committee." Id. Ms. Guerin related to Mr. Waterman that J&G's opinion committee "had determined that [Notice 2000-44] did not affect transactions of the type that the Welles[es] had engaged in and that they would opine to that effect in their final opinion." Tr. at 253-54. When Mr. Waterman asked Ms. Guerin "if she was sure about that," Ms. Guerin replied that "we're not about to commit malpractice." Tr. at 254 (Waterman); see also Tr. at 635-38 (Jeffrey Welles). Mr. Goldstein recalled that Mr. Waterman "did virtually all of the talking," and he did not recall whether Ms. Guerin had said anything during the conference. Tr. at 1229-31. The court finds Mr. Waterman's testimony to be plausible.

According to Mr. Waterman, Ms. Guerin also stated that other taxpayers were continuing to pursue the J&G strategy on the basis of J&G's advice. Tr. at 254. Mr. Waterman recounted that Ms. Guerin presented three main reasons as to why she and J&G concluded that Notice 2000-44 had no effect on the Welleses' pursuing the J&G strategy. First "she concurred with [Messrs.] Cotter and Ivsan that the [I.R.C. §] 165 loss generator was different, fundamentally different from a basis enhancement strategy" and that the J&G opinion ultimately included that reasoning. Tr. at 254-55. Second, Ms. Guerin asserted that,

"even if [Notice 2000-44] [was] arguably applicable to the Welleses' transaction, it did not affect [J&G's] opinion because it did not affect the legal principles on which [J&G] relied in issuing that opinion, in the past or in the future." Tr. at 255. Finally, Ms. Guerin "said, at that time, that the Welles[es] had already engaged in their transaction and that was the third reason why the notice would not apply to them." Id. At the conclusion of the conference call, David Welles expressed that he had heard enough and was satisfied with Ms. Guerin's opinion. See Tr. at 254.

On August 21, 2000, before this conference call, Mr. Ivsan had provided Jeffrey Welles with a draft of the tax opinion that J&G intended to issue with regard to the Welleses pursuit of the J&G strategy. See PX 149. Mr. Ivsan's letter reminded Jeffrey Welles that, "as a draft, the opinion may be subject to certain changes after further review." Id. The core of the opinion letter was an exhaustive analysis of the statutes, regulations, and case law relevant to the J&G strategy. The opinion letter was premised on a series of representations that "[y]ou and/or partners of the Partnership [Stobie Creek] and/or partners of JFW INC have represented" to J&G. PX 149 at 6. Chief among the representations called for in the opinion letter were that Jeffrey Welles had "*substantial nontax business reasons*" for contributing the options to Stobie Creek and for contributing the partnership interests in Stobie Creek from the single-member LLCs to the single-member S-Corporations. PX 149 at 6-7 (emphasis added). The opinion letter also recited representations that the partners were not obligated to engage in any of the transactions and that they had provided all necessary facts and circumstances to J&G. See id.

Jeffrey Welles indicated that he discussed these representations with Mr. Ivsan shortly after receiving this draft and that he believed the representations to be true and accurate. See Tr. at 620-21. On page K-22 of the draft opinion letter, J&G represented that it had

> been informed that an objective investment analysis of the instant option positions at the time of your investment in such option positions, using generally accepted models employing standard option pricing theories and methodologies, indicated a substantial probability that the long option strike price level would be reached and that profitability would be achieved. With a payoff amount as a multiple of the investment amount of 2.0 with respect to the Swiss Francs options, and 2.0 with respect to the Euros options, it is objectively demonstrable that a realistic possibility of economic profit existed.

PX 149 at K-22. Jeffrey Welles testified that he never informed anyone at J&G with respect to an objective investment analysis. See Tr. at 629-30. He believed, as he read that paragraph, "that there had been an objective analysis, it wasn't by me, so presumably by others, that there was a reasonable profit in the trade." Id. When Mr. Cotter reviewed the draft with Mr. Ivsan, he asked Mr. Ivsan about the nature of the "objective investment analysis" to which J&G's draft letter referred. From his conversation with Mr. Ivsan, Mr.

Cotter understood that the "objective investment analysis" was an analysis provided to J&G by Mr. Parse or by someone at Deutsche Bank, but he did not inquire further. Mr. Cotter could not recall whether this "objective investment analysis" was provided to J&G or to SLK in the form of a written document. See Tr. at 1172-75 (Cotter).

Mr. Floyd continued his preparation of the tax returns for Stobie Creek, each of the single-member LLCs, and the single-member S-Corporations. His preparation included consulting with Mr. Ivsan of SLK. On December 12, 2000, Mr. Ivsan sent Mr. Floyd a letter including comments on a draft tax return that Mr. Floyd had sent him. See DX 260 at 1. "Following several discussions with representatives of [J&G]," Mr. Ivsan reported his "suggestions concerning a few minor modifications to the information contained in this initial tax return." Id. Mr. Ivsan's comments "center[ed] on the treatment of assets held by [Stobie Creek] as of the date of termination." Id. Mr. Ivsan recounted how the transfer of all of the ownership interests in Stobie Creek on April 30, 2000, resulted in the termination of Stobie Creek for the purposes of I.R.C. § 708(b)(1)(B). Mr. Ivsan indicated that this termination for tax purposes caused the "old" Stobie Creek to be deemed to have contributed all of its assets, i.e., Therma-Tru stock, to a "new" Stobie Creek in exchange for partnership interests in the "new" Stobie Creek that are distributed to members of the "old" Stobie Creek in exchange for their interests in that "old" partnership. See DX 260 at 1.

Mr. Ivsan then suggested, based on the advice of J&G attorneys, a series of specific adjustments to the draft tax return that would indicate that "there are no assets on the books of [Stobie Creek] at the moment of its termination." DX 260 at 2. Moreover, Mr. Ivsan made suggestions pertaining to specific portions of the tax return, including reporting the outside basis of the partnership interest to reflect "the cost of the long option contract position (unreduced by the proceeds of any short option contract position) and . . . the Transferee Partner's basis in his, her, or its Therma-Tru stock contributed to [Stobie Creek]." Id.

On January 25, 2001, Mr. Ivsan sent Mr. Goldstein "a draft tax opinion governing the transactions conducted by Jeff Welles inside [Stobie Creek]" authored by J&G; the draft itself was undated. PX 240 at 1. Mr. Ivsan noted that "the initial partnership tax return for [Stobie Creek] is due February 15, 2001. Accordingly, you and I should both plan to complete our review as soon as possible." Id. The enclosed draft J&G opinion contained substantially the same representations that were recited in the August 21, 2000 draft.

On February 9, 2001, Ms. Guerin sent Jeffrey Welles an engagement letter on behalf of J&G. The letter contained the "terms applicable to the engagement of Jenkens & Gilchrist to represent you [Stobie Creek and the seven members of Stobie Creek identified on an attached schedule, *i.e.,* the Welles family members] as your lawyers in connection with certain financial markets and federal income tax issues." PX 140 at 1. The letter cautioned:

> Any expressions on our part concerning the probable outcome of our representation reflect our best professional judgment, but are not guarantees, as they are limited by our knowledge of the facts and are based on the state of the law and our interpretation thereof at the time they are expressed.

PX 140 at 1-2. The engagement letter stated that Ms. Guerin and Paul M. Daugerdas, a partner at J&G and, along with Ms. Guerin, one of the principal J&G attorneys responsible for implementing the J&G strategy, would be "the principal attorneys handling your tax matters." PX 140 at 2. The letter also represented that the Welleses

> specifically agree to pay the sum of $4,091,500.00 as a fixed fee for a tax opinion letter and related consultation concerning the material tax issues surrounding the investment . . . in a financial market transaction and the related drafting of documents and implementation of such transaction. You hereby acknowledge that you and/or your advisors have reviewed a draft of our tax opinion letter, and such draft is satisfactory and meets your expectations and needs. Jenkens & Gilchrist agrees to deliver its tax opinion letter in substantially the same form of such draft to each of [the Welles family members] on or before February 15, 2001, and your acceptance thereof will constitute your agreement to make payment therefor as provided.

Id.

A final tax opinion letter dated January 2, 2001 (the "J&G Tax Opinion"), was sent to Jeffrey Welles, see PX 143, although Mr. Welles testified that he received an original of this letter only in February 2001. See Tr. at 626. Evidence admitted at trial also indicates that on February 13, 2001, J&G sent a final copy of its Tax Opinion to Virginia Welles Jordan. See DX 64. The representations section remained substantially similar to that of the draft opinions, reciting:

> You and/or partners of [Stobie Creek] and/or officers of JFW INC. have represented the following:
>
> a. You entered into the purchase and sale of the Options for substantial nontax business reasons, including (i) to produce overall economic profits . . . and (ii) your belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the Options.
>
> b. You contributed the Options to [Stobie Creek] for substantial nontax business reasons, including, but not limited to, potential

diversification of the risks of certain investments, the desire to co-invest as partners with the other members and for your convenience.

c. Your contribution of your interest in JFWLLC to JFW INC. was made for substantial nontax business reasons, including, but not limited to, the ability to engage in estate planning, shared investment management, ownership with other anticipated shareholders, and asset protection planning.

d. Neither you, JFWLLC, [Stobie Creek], nor JFW INC. were obligated to engage in any transaction to which our opinions herein relate upon the completion of any other of such transactions.

e. To the best of your knowledge, you have provided to us all the facts and circumstances necessary for us to form our opinion.

PX 143 at 7-8. On page K-23 of the J&G Tax Opinion appeared the following:

> We have been informed that an objective investment analysis of the instant option positions at the time of your investment in such option positions, using generally accepted models employing standard option pricing theories and methodologies, indicated a substantial probability that the long option strike price level would be reached and that profitability would be achieved. With a payoff amount as a multiple of the investment amount of 2.0 with respect to the Swiss Franc options, and 2.0 with respect to the Euro options, it is objectively demonstrable that a realistic possibility of economic profit existed.

PX 143 at K-23.

On February 15, 2001, Stobie Creek filed its federal income tax return for the tax period commencing on March 3, 2000, the formation date of Stobie Creek, and ending on April 30, 2000, the date upon which the ownership interests were documented as passing from the single-member LLCs to the single-member S-Corporations. Mr. Floyd prepared the return and signed it. See DX 124. On February 2, 2002, Stobie Creek filed its return for the tax period commencing on May 1, 2000, and ending on December 31, 2000. Mr. Floyd prepared the return and signed it. See PX 68.

On March 9, 2005, the IRS issued the 2005 FPAA for the 2000 tax year. The IRS issued the 2007 FPAA for the 2000 stub tax year on February 23, 2007.

## PROCEDURAL HISTORY

On July 12, 2005, the complaint in No. 05-748T was filed in the United States Court of Federal Claims, and the case was assigned to Judge Lawrence J. Block. Following a series of status conferences and some preliminary discovery, on February 27, 2007, this case was transferred to the undersigned pursuant to RCFC 40.1(b). Discovery, including depositions and various motions to compel, followed. On July 11, 2007, the complaint was filed in No. 07-520T, the companion case. On August 27, 2007, the court granted plaintiffs' motion to consolidate that case with No. 05-748T. Discovery proceeded; a pretrial order on November 5, 2007, scheduled trial for January 7, 2008. Following a status conference during which defense counsel informed the court that one of its expert witnesses was scheduled to testify before the United States District Court for the District of Colorado on dates that conflicted with this trial, and plaintiffs' counsel indicated that one of their experts would be testifying at the same trial, the court on December 10, 2007, rescheduled trial to commence on April 7, 2008.

On January 16, 2008, plaintiffs filed their Motion for an Order Confirming Jurisdiction To Decide the Applicability of Penalties and Any Defenses Thereto. Plaintiffs had planned to raise affirmative defenses to penalties imposed, including reasonable cause and good faith under I.R.C. § 6664(c). 10/ Plaintiffs intended to address any and all partner-level defenses in the consolidated proceedings and asked the court to "enter an order ruling that it has jurisdiction to determine penalties and partner-level defenses at this trial." Pls.' Br. filed Jan. 16, 2008, at 15. After briefing concluded on February 25, 2008, the court held argument on February 29, 2008. Plaintiffs took the position that this partnership-level proceeding was the proper forum for resolving all partner-level defenses to penalties because, plaintiffs proffered, the member partners would defend against penalties on the basis that they acted in "good faith" and upon "reasonable cause" in relying on the advice and actions of Jeffrey Welles. The affirmative defenses of each of the individual partners likely will succeed or fail based on Jeffrey Welles's personal defenses as managing partner of North Channel (itself the managing partner of Stobie Creek), so plaintiffs argued that the partnership-level trial should resolve conclusively the reasonable cause defenses of each of the individual partners. The court denied plaintiffs' motion by supplemental order entered

---

10/ I.R.C. § 6664(c)(1) provides that "No penalty shall be imposed under [I.R.C. §§] 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." An analysis of the law on reasonable cause and findings on plaintiffs' showings to avail themselves of the affirmative defense follow in part IV.5 of the Discussion section.

on April 30, 2008, 11/ observing that TEFRA establishes a two-tiered process for resolving challenges to FPAAs that explicitly disallows adjudication of partner-level defenses in a partnership-level proceeding. The court acknowledged that jurisdiction was present to determine whether the partnership could avail itself of the reasonable cause and good faith defense. Defendant conceded, and the court agreed, that "in making the determination of reasonable cause and other defenses at the partnership level, courts look to the conduct of the managing partner of the partnership." Supp. Order entered Apr. 30, 2008, at 3 (internal quotation marks omitted) (citing Def.'s Br. filed Feb. 11, 2008, at 15 n.1).

On February 19, 2008, plaintiffs filed four motions *in limine* to exclude evidence or testimony: (1) To Exclude the Expert Report, Rebuttal Report, and Amendment to Expert Report of Dr. David F. DeRosa, defendant's expert witness; (2) To Exclude Non-party "Pattern" Evidence or, in the Alternative, Motion To Compel, referring to one of defendant's proposed exhibits; (3) To Exclude Evidence of Settlement and Settlement Negotiations; and (4) To Exclude Testimony Regarding Blanket Assertions of the Fifth Amendment. On March 5, 2008, plaintiffs also filed a Motion To Compel Production of Documentary Support for "Summary Chart" Provided by Defendant, which sought documents that were the source of defendant's proposed "pattern evidence" exhibit.

Plaintiffs' first motion sought to exclude Dr. DeRosa's testimony as deficient under the standards for the admissibility of expert testimony established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Plaintiffs charged that Dr. DeRosa's testimony propounded a theory that is not associated with a methodology recognized within the financial community. By order entered on March 25, 2008, the court denied plaintiffs' motion, ruling that Dr. DeRosa presented "the academic credentials and background to testify as an expert in the structure of complex financial transactions" and that he would be "applying that expertise in analyzing the investment plan in question." Order entered Mar. 25, 2008, at 5. The court acknowledged that plaintiffs' objections properly would be considered in the court's assessment of the weight to be accorded to Dr. DeRosa's testimony. See id.

Plaintiffs' second motion sought to exclude DX 649, a spreadsheet prepared by Barbara S. Aprile, Senior Financial Product Specialist with the IRS, that summarized hundreds of transactions that defendant characterized as tax shelters, analogous to the transactions in which plaintiffs engaged, and that was offered for the purpose of demonstrating that plaintiffs' transactions were based on a predetermined template and lacked economic substance. Plaintiffs argued that the proposed exhibit was based on incomplete material regarding the motives and conduct of hundreds of people and entities

---

11/ The order was initially entered on March 10, 2008, and later corrected by an order entered on March 13, 2008. The court then vacated the order on April 30, 2008, and entered that date a supplemental order updating and correcting the pretrial ruling.

unrelated to plaintiffs and was based on unauthenticated papers that lack adequate foundation as to their creation or relevance to the transactions at issue. The court observed that plaintiffs intended to introduce evidence that the subject transactions were designed or structured for plaintiffs; and, in any case, that they were not based on a template that was marketed to many other individuals and entities; and that this exhibit properly was offered as evidence to rebut these positions. By order entered on March 20, 2008, the court ruled that the summary chart could be offered to support defendant's case that the transactions lacked economic substance and denied plaintiffs' motion to exclude DX 649. The same order also denied plaintiffs' March 5, 2008 motion to compel production of documents, except insofar as plaintiffs were allowed to examine Ms. Aprile regarding the preparation of the summary chart, the nature and character of the data that served as its foundation, and any extrapolations that she had made from source data. The court reminded the parties that plaintiffs' examination of Ms. Aprile properly would explore the qualification of DX 649 as an admissible summary under Fed. R. Evid. 1006, as well as challenge its weight if admitted into evidence. See Order entered Mar. 20, 2008, at 2-3.

Plaintiffs' third motion sought to exclude evidence relating to settlement and settlement negotiations that the IRS entered into with parties and non-parties under IRS Announcement 2004-46, including Stephen J. Bores, president of Therma-Tru until 1999 and part shareholder of Therma-Tru, who sold his interests in Therma-Tru stock and engaged SLK and J&G to utilize the J&G strategy, albeit separately from plaintiffs and without plaintiffs' knowledge. Plaintiffs also sought to exclude any testimony pertaining to the Non-Prosecution Agreement that the IRS entered into with J&G on March 27, 2007. By order entered March 24, 2008, the court granted plaintiffs' motion with respect to the Non-Prosecution Agreement, excepting the J&G press release attached to the Non-Prosecution Agreement 12/ if plaintiffs should rely on evidence of advice from J&G or that of another

---

12/ The press release, titled "U.S. Enters Non-Prosecution Agreement with Jenkens & Gilchrist in Connection with its Fraudulent Tax Shelter Activity," announced that the office of the United States Attorney for the Southern District of New York had entered into non-prosecution cooperation agreement with J&G for "criminal tax violations arising from J&G's tax shelter activities." DX 453 at 1. The press release characterized the decision to enter into the agreement with J&G as

> based on four principal factors: J&G's inability to continue practicing law as a firm; J&G's acceptance of responsibility for developing and marketing fraudulent tax shelters, and for rendering fraudulent opinions in connection with those shelters; J&G's cooperation with the Government's investigation into the tax shelter activities of the firm and its individual lawyers; and J&G's entry into an agreement with the [IRS] to resolve the IRS's promoter penalty audit of J&G, including the payment of a civil penalty.

attorney or law firm approving or evaluating the reasonableness of relying on the J&G Tax Opinion. See Order entered Mar. 24, 2008 at 2.

Plaintiffs' fourth and final motion *in limine* sought to exclude deposition testimony by Mr. Daugerdas, Ms. Guerin, Mr. Ivsan, Mr. Parse, Perry E. Parker, and Craig Brubaker 13/ that consisted, according to plaintiffs, almost entirely of blanket invocations of the Fifth Amendment privilege against self-incrimination. Plaintiffs argued that non-party witnesses' assertions of the privilege were not relevant evidence of wrongdoing by plaintiffs and urged that the court decline to draw a negative inference from blanket assertions of the privilege. Plaintiffs also argued that no evidentiary basis could be established for attributing to plaintiffs the non-party witnesses' assertions of the privilege, that plaintiffs lacked any control over the witnesses, and that the Government knew that the witnesses would invoke the privilege to any and all deposition questions and was posing damaging questions as the predicate for asking the court to draw negative inferences from the witnesses' invocation of the privilege. Plaintiffs presented a four-factor test formulated by the United States Court of Appeals for the Second Circuit in LiButti v. United States, 107 F.3d 110, 123-24 (2d Cir. 1997), that, they argued, the court should employ to determine whether it would be permissible to draw negative inferences from the deponents' invocation of the privilege.

In its order entered on March 21, 2008, granting plaintiffs' motion in part, the court ruled that three of the four LiButti factors favored exclusion. See Order entered Mar. 21, 2008, at 4-5. The court cautioned plaintiffs that "[t]he extent to which plaintiffs' motion *in limine* should be granted, however, is not without qualification." Id. at 5. The court recognized that plaintiffs could not use the motion "as both a sword and a shield." Id. If plaintiffs elicited testimony from Jeffrey Welles or any other witness concerning the conversations between Mr. Welles and any of these deponents, "it would be unfair to disallow defendant from introducing the deposition testimony of that witness." Id. If plaintiffs were to "adduce testimony as to the substance of conversations that Mr. Welles had

12/ (Cont'd from page 31.)

Id. The press release also included a statement that J&G made to the U.S. Attorney's Office concerning the criminal investigation, in which J&G stated that it "believe[d that] certain J&G attorneys developed and marketed fraudulent tax shelters, with fraudulent opinions, that wrongly deprived the U.S. Treasury of significant tax revenues." DX 453 at 2.

13/ According to defendant, Mr. Parker, formerly a currency trader at Deutsche Bank, was principally responsible for executing digital options transactions pursuant to the J&G strategy at Deutsche Bank. See Def.'s Br. filed Mar. 19, 2008, at 6. Mr. Brubaker, formerly an account representative at Deutsche Bank in Texas, according to defendant, is one of the two principal architects (along with Mr. Daugerdas) of the J&G strategy. See id. Ultimately, defendant did not offer the deposition testimony of either Mr. Parker or Mr. Brubaker.

with any of these third parties. . . . defendant may introduce the deposition testimony of that third party." Id. This ruling did not apply "to the introduction of opinion letters and related documents constituting information or advice." Id.

On March 28, 2008, plaintiffs moved for partial reconsideration of the court's March 21, 2008 order granting their motion to exclude the deposition testimony. Plaintiffs questioned the qualifying language whereby defendant would be permitted to introduce the deposition testimony if plaintiffs adduced testimony as to the substance of conversations that Mr. Welles had with the deponents. See Pls.' Br. filed Mar. 28, 2008, at 3-5. Defendant countered that it would be inequitable to allow plaintiffs to testify with impunity about the communications with the deponents when defendant was not able to introduce the deposition testimony to rebut any such testimony. By order entered on April 3, 2008, following the pretrial conference of the same date, the court denied plaintiffs' motion for reconsideration based on the reasons stated in defendant's April 2, 2008 response. 14/

On February 19, 2008, defendant filed one motion *in limine* to exclude the reports and testimony of Ira Shepard and Stuart Smith, two of plaintiffs' designated expert witnesses. Defendant objected to the expert reports of Prof. Shepard, a tax law professor, and Mr. Smith, a tax attorney, on the grounds that the expert opinions constituted legal testimony not within the scope of Fed. R. Evid. 702 and testimony that improperly usurped the role of the court. By order entered on April 1, 2008, the court granted defendant's motion, *inter alia*, because the United States Court of Appeals for the Federal Circuit considered testimony on questions of law inadmissible as expert testimony. See Order entered Apr. 1, 2008, at 4 (citing Mola Dev. Corp. v. United States, 516 F.3d 1370, 1379 n.6 (Fed. Cir. 2008), and Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1369 (Fed. Cir. 2003)). The court also observed that each of the regional circuits expressed a similar view of such testimony. See id. at 5 & n.*.

On March 11, 2008, the court rescheduled the commencement of trial to April 9, 2008. Trial commenced in Chicago, Illinois, on April 9, 2008, and concluded on April 23, 2008. At the outset of proceedings on April 23, 2008, the last day of trial, plaintiffs' counsel provided the court and defense counsel with the trial court's opinion in Sala v. United States, 552 F. Supp. 2d 1167 (D. Colo. 2008). Counsel did not argue the case during closing.

---

14/ At trial defendant offered the depositions of Mr. Daugerdas, Ms. Guerin, and Messrs. Ivsan and Parse (additionally, although not the subject of the motion *in limine*, defendant offered the depositions of Messrs. Bores and Vogel). Ultimately, the court excluded the deposition testimony of these four deponents because the potential for unfair prejudice to plaintiffs and confusion of the issues outweighed the relevance of the evidence. See Tr. at 2140-53; see also Fed. R. Evid. 403.

In its pretrial brief, defendant had listed the following as an issue of law that the court should resolve: "Whether Treas. Reg. § 1.752-6 is valid as applied retroactively, and disallows all but $2 million of the $204 million increase in the outside basis of Stobie Creek['s] partners that plaintiffs claim resulted from the contribution of the options." Def.'s Br. filed Mar. 12, 2008, at 29. Given the holding of the Federal Circuit in Coltec Industries, Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1261 (2007), defendant may have been correct that "the regulation is simply a backdrop to the result that otherwise obtains under the existing law of economic substance and substance-over-form." Def.'s Br. filed Mar. 12, 2008, at 36 n.25. Significantly, the Federal Circuit in Coltec did not rule on the validity of the regulation or its retroactive effect. Coupled with the 2006 summary judgment opinion in Klamath Strategic Investment Fund, LLC v. United States, 440 F. Supp. 2d 608, 623-25 (E.D. Tex. 2006) (granting partial summary judgment on invalidity of retroactive application of regulation); see also Klamath Strategic Inv. Fund, LLC v. United States, 472 F. Supp. 2d 885, 895 (E.D. Tex. 2007), appeals docketed, Nos. 07-40861 & 07-40915 (5th Cir. Sept. 6 and 14, 2007), Sala lends support to plaintiffs' argument that Treasury Regulation § 1.752-6 cannot be applied retroactively.

By order entered on April 30, 2008, the court stated that its opinion would rule on the applicability of Treasury Regulation § 1.752-6 (and the applicability of I.R.C. § 358(h)(3)); the parties were directed to file supplemental post-trial briefs addressing the regulation and the opinions in Klamath, Sala, and Cemco Investors, LLC v. United States, 515 F.3d 749 (7th Cir. 2008), as they relate to retroactive application. Limited post-trial briefing was completed on May 30, 2008.

## DISCUSSION

Plaintiffs' complaints seek readjustment of partnership items for the 2000 tax year and the 2000 stub tax year. Plaintiffs seek a refund in taxes deposited (with interest as provided by law) of $4,149,521.35 for the 2000 tax year and $58,149.14 for the 2000 stub tax year.

### I. Jurisdiction

The United States Court of Federal Claims is empowered "to hear and to render judgment upon any petition under [I.R.C. §§] 6226 or 6228(a)." 28 U.S.C. § 1508 (2000). Under I.R.C. § 6226, part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), see I.R.C. §§ 6221-6234 (2000), 15/ the Court of Federal Claims has

---

15/ Prior to the passage of TEFRA, tax liability adjustments of individual partners based on the operations of the partnership were rendered at the partner level, often creating inconsistent and duplicative results among partners in the auditing process. See Callaway v. Comm'r, 231 F.3d 106, 107 (2d Cir. 2000). With the enactment of TEFRA came a "single

> jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

I.R.C. § 6226(f).

Partnerships themselves do not pay federal income taxes. I.R.C. § 701. Instead, TEFRA requires a partnership to file an annual information return (Form 1065) that reports its partners' distributive shares of income, gains, deductions, and credits. Partners are responsible individually for reporting their pro rata share of tax on their own income tax returns. See Weiner v. United States, 389 F.3d 152, 154 (5th Cir. 2004).

The IRS may seek to challenge the reporting of any partnership item on a partnership tax return by issuing an FPAA. I.R.C. § 6223(a)(2). Once the FPAA has been issued, the Tax Matters Partner ("TMP") may file within ninety days a petition for a readjustment of the partnership items for the taxable year at issue with the United States Tax Court, the United States Court of Federal Claims, or the United States district court in which the partnership's principal place of business is located. I.R.C. § 6226(a). If the TMP does not file a petition for readjustment within ninety days, other "notice" partners have sixty days within which to file a petition for a readjustment of the partnership items for the taxable year. I.R.C. § 6226(b)(1). As long as they have an interest in the outcome of the action, all partners are treated as parties to the petition, whether it is filed by the TMP or by a notice partner. I.R.C. § 6226(c), (d).

A "partnership item" is "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent . . . such item is more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3). Treasury Regulation § 301.6231(a)(3)-1(a) sets forth the following items, among others, as "partnership items":

---

15/ (Cont'd from page 34.)

unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level." Id. at 108; see also I.R.C. § 6221. This treatment allows for one proceeding to determine all partnership items that binds each individual partner in any subsequent partner-level proceedings, absent an agreement to the contrary. See Crnkovich v. United States, 202 F.3d 1325, 1328 (Fed. Cir. 2000) (citing I.R.C. § 6226(c)); see also AD Global Fund, LLC v. United States, 481 F.3d 1351, 1355 (Fed. Cir. 2007) ("[TEFRA] contemplates that adjustments to partnership items are made in one proceeding before assessments are made at the individual partner level.").

(1) The partnership aggregate and each partner's share of each of the following:

(i) Items of income, gain, loss, deduction, or credit of the partnership;

. . . .

(v) Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year);

. . . .

(3) Optional adjustments to the basis of partnership property pursuant to an election under section 754 (including necessary preliminary determinations, such as the determination of a transferee partner's basis in a partnership interest); and

(4) Items relating to the following transactions, to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for purposes of the partnership books and records or for purposes of furnishing information to a partner:

(i) Contributions to the partnership;

(ii) Distributions from the partnership . . . .

The concept of "partnership items" also embraces "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)-1(b).

The adjustments made in the 2005 FPAA and 2007 FPAA concern, among other items, the contribution of Therma-Tru stock to Stobie Creek, the contribution of digital foreign currency options to Stobie Creek, Stobie Creek's basis in the Therma-Tru stock, qualification of the sold digital foreign currency short options as "liabilities," characterization of the digital foreign currency options purchased and sold as separate transactions, the basis of the partnership interests transferred to the Welleses' single-member LLCs, and the election to increase the cost basis of the partnership assets pursuant to I.R.C. § 754. These matters relate to partnership items that properly are addressed in a partnership-level proceeding over which the Court of Federal Claims has jurisdiction. Accord Jade Trading, LLC v. United

States, 80 Fed. Cl. 11, 43 (2007), appeal docketed, No. 08-5045 (Fed. Cir. Feb. 26, 2008); Nussdorf v. Comm'r, 129 T.C. 30, 44 (2007). 16/

II. Standard of review

Plaintiffs seek a refund of taxes assessed and paid for the 2000 tax year and the 2000 stub tax year. "In a refund suit the question of overpayment involves two elements: (1) has there been an overpayment and (2) if so, how much." Fisher v. United States, 80 F.3d 1576, 1580 (Fed. Cir. 1996). The court tries factual issues *de novo* in tax refund suits; no weight is given to the factual findings made by the IRS during administrative proceedings. See George E. Warren Corp. v. United States, 141 F. Supp. 935, 940 (Ct. Cl. 1956) ("The tax laws contemplate a trial de novo . . . ."); see also Litman v. United States, 78 Fed. Cl. 90, 107 (2007). Generally, in a tax refund suit, "the taxpayer bears the burden of establishing the right to a refund." Abrahamsen v. United States, 228 F.3d 1360, 1364 (Fed. Cir. 2000); see also Helvering v. Taylor, 293 U.S. 507, 514 (1935); Litman, 78 Fed. Cl. at 107 ("'[I]n a refund suit the assessment made by the Service is presumed to be correct and this places an obligation on the taxpayer to come forward with evidence to rebut the presumption.'" (quoting Cook v. United States, 46 Fed. Cl. 110, 113 (2000))). However, under I.R.C. § 7491, "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue," provided that the taxpayer establishes the enumerated prerequisites. I.R.C. § 7491(a)(1)-(2); see also Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 166 (D. Conn. 2004) (noting burden of proof on taxpayer to establish that requirements of I.R.C. § 7491 have been met). 17/

---

16/ I.R.C. § 6226(e)(1) sets forth as a jurisdictional prerequisite that the partner filing the petition for readjustment must deposit with the Secretary of the Department of the Treasury "the amount by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the final partnership administrative adjustment." Plaintiffs satisfied this jurisdictional requirement by depositing on account of JFW Investments, LLC, $4,149,521.35, received on July 11, 2005, and $58,149.14, received on July 10, 2007. See PX 6; PX 12.

17/ Invocation of burden-shifting under I.R.C. § 7491 is conditioned on the taxpayers demonstrating that

> (A) the taxpayer has complied with the requirements under this title to substantiate any item;
>
> (B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses,

Although plaintiffs assert in their complaints that "Defendant bears the burden of proof with respect to any issue set forth in the FPAA pursuant to Code Section 7491," Compl. ¶ 7(c)(ii), Stobie Creek Invs., No. 05-748T; Compl. ¶ 7(c)(ii), Stobie Creek Invs., No. 07-520T, they stop short of establishing the prerequisites for invoking I.R.C. § 7491. Plaintiffs' pretrial brief setting forth their contentions of fact and law makes no mention of I.R.C. § 7491, and plaintiffs did not adduce evidence in recognition of the burden-shifting effect of I.R.C. § 7491. Plaintiffs' counsel only mentioned I.R.C. § 7491 during closing arguments, 18/ at which time defense counsel questioned whether plaintiffs could qualify under the statute, as well as surmised that the result would be the same based on the weight of the evidence. 19/ Given the dearth of argument on the subject and the failure of plaintiffs to demonstrate that they have satisfied the prerequisites for shifting the burden under I.R.C

---

17/ (Cont'd from page 37.)

information, documents, meetings, and interviews; and

> (C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

I.R.C. § 7491(a)(2).

18/ Prompting this renewed interest in burden-shifting, plaintiffs presented the court during closing argument with a copy of the decision issued in Sala, 552 F. Supp. 2d at 1185, which applied I.R.C. § 7491.

19/ Defense counsel stated:

> I also want to point out, especially on the taxes, one of the limitations on the burden of proof issue is that the taxpayer has to have under a certain net worth. And that's tied to EAJA. The net worth requirement on the day the complaint was filed was $7 million. The complaint was filed in 2005. There's been no testimony as to what their net worth was then, but we know they have a half a billion dollars under management now. . . .
>
> . . . . Finally, your Honor, the plaintiffs have not established that they fully cooperated. . . .
>
> Now, having said that, I don't think the case turns on who has the burden of proof. As a matter of fact, I don't think it's even close to turning on who has the burden of proof.

Tr. at 2256-57.

§ 7491(a)(2), the court rules that the burden of proof remains with plaintiffs to establish their entitlement to a refund of taxes. 20/

III. Compliance with the Internal Revenue Code

Defendant has asserted that plaintiffs' transactions and reporting do not comply with the Code's basis rules for partnerships in the first instance and that Treasury Regulation § 1.752-6 (2005), retroactively applied to transactions occurring after October 19, 1999, precludes the claimed basis increase on the Therma-Tru stock. These arguments are addressed in turn.

1. The Code and the Helmer doctrine

The United States Court of Appeals for the Federal Circuit charted in Coltec Industries Inc. v. United States, 454 F.3d 1340, 1347 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1261 (2007), that the first issue to address is whether the partnership's transactions and reporting were in literal compliance with the Internal Revenue Code. A review of the transactions to be scrutinized provides the context for this analysis.

As discussed more fully in the recitation of facts, beginning in March 2000, the Welles family members and their investment entities set into motion a series of transactions undertaken pursuant to the J&G strategy that purported to reduce the gain recognized on the sale of Therma-Tru stock – a sale that yielded over $211 million to Stobie Creek – to just over $5.4 million. First, the Welleses entered the FXDOTs. Geared to a date of March 31, 2000, the single-member LLCs simultaneously purchased foreign currency digital long options and sold foreign currency digital short options involving the dollar/euro and the Swiss franc/dollar. Although the total stated premiums to be paid by the single-member LLCs for the purchase of the long options was $204,575,000.00, the long option premiums were netted against the short option premiums to be paid by Deutsche Bank, resulting in a net premium actually paid by each single-member LLC totaling $2,045,750.00 – 1% of the stated premiums for the long options.

Pegged to a date of April 3, 2000, the single-member LLCs contributed both the long and short digital options to Stobie Creek, in exchange for interests in the partnership. Pegged to a date of April 14, 2000, each family member and the DKW 1994 QAT transferred 50% of his/her/its shares in Therma-Tru to Stobie Creek. On April 17, 2000, the long and short digital options expired worthless, without being exercised. Pegged to a date of April 30, 2000, the family members then contributed their separate LLC interests (which now held only their membership interests in Stobie Creek) to corresponding single-member S-

20/ The shift in the burden of proof under I.R.C. § 7491 would have applied only to factual issues, not legal issues. See Jade, 80 Fed. Cl. at 47.

Corporations, causing an over 50% transfer of ownership in Stobie Creek and ending the partnership's first tax year on that date. See I.R.C. § 708(b)(1)(B). 21/ Pursuant to I.R.C. §§ 743 and 754, 22/ the partnership purported to adjust the basis in the property that it held

---

21/ I.R.C. § 708(b)(1)(B) provides, in pertinent part:

(1) General rule.– For purposes of subsection (a), a partnership shall be considered as terminated only if–

. . . .

(B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

22/ I.R.C. § 743(b) provides, in pertinent part:

(b) Adjustment to basis of partnership property.– In the case of a transfer of an interest in a partnership by sale or exchange or upon the death of a partner, a partnership with respect to which the election provided in section 754 is in effect or which has a substantial built-in loss immediately after such transfer shall–

(1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property, or

(2) decrease the adjusted basis of the partnership property by the excess of the transferee partner's proportionate share of the adjusted basis of the partnership property over the basis of his interest in the partnership.

. . . .

I.R.C. § 754, provides, in full:

If a partnership files an election, in accordance with regulations prescribed by the Secretary, the basis of partnership property shall be adjusted, in the case of a distribution of property, in the manner provided in section 734 and, in the case of a transfer of a partnership interest, in the manner provided in section 743. Such an election shall apply with respect to all distributions of property by the partnership and to all transfers of interests in the partnership during the taxable year with respect to which such election was filed and all subsequent taxable years. Such election may be revoked by the partnership,

(the Therma-Tru stock) by the $204,575,000.00 in stated premiums for the long options (not offset by the premiums to be paid by Deutsche Bank for the short options). On May 9, 2000, the sale of Therma-Tru to Kenner was finalized, and Stobie Creek received $211,151,677.00 in exchange for its shares in Therma-Tru. The proceeds were offset by a claimed cost basis of $205,709,374.00, resulting in a reported gain on Stobie Creek's return for the tax year ended December 31, 2000, of $5,442,303.00.

Plaintiffs take the position that the basis in the Therma-Tru stock held by Stobie Creek was increased by the stated premium for the purchased long options, but was not decreased by the value of the sold short options assumed by Stobie Creek. Generally, when a partner contributes property to a partnership in exchange for a partnership interest, no gain or loss is recognized on the transaction. See I.R.C. § 721(a) ("No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."). I.R.C. § 722 stipulates that a partner's basis in a partnership interest (termed "outside basis"), acquired by contributing property and/or any money to the partnership, "shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution." Similarly, I.R.C. § 752(b) provides that the assumption by a partnership of a partner's liability decreases the partner's outside basis in the partnership interest.

Plaintiffs argue that they were not required to reduce the basis in the partnership interests by the value of the sold short options assumed by Stobie Creek "because the short option positions were contingent liabilities." Pls.' Br. filed Feb. 7, 2008, at 13. Plaintiffs draw support for this position from Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975). In Helmer the Tax Court adopted the position advanced by the IRS in ruling that option payments did not constitute liabilities for purposes of I.R.C. § 752 when the partnership's obligation under the option agreements would not become fixed until the options were exercised. Plaintiffs also cite similar decisions of the Tax Court, as well as IRS Revenue Rulings, to demonstrate that contingent obligations do not constitute "liabilities" for purposes of I.R.C. § 752. See Pls.' Br. filed Feb. 7, 2008, at 16. Because the sold short options were digital options exercised only on their expiration date, whether the options would be exercised could not be known prior to that time. Consequently, based on Helmer and its progeny, plaintiffs maintain that they were not required under I.R.C. § 752 to include the short option premiums in the calculation of basis.

Defendant charges that plaintiffs' failure to reduce the basis by the sold short option values contravenes the provisions of the Internal Revenue Code. According to defendant,

---

21/ (Cont'd from page 40.)

subject to such limitations as may be provided by regulations prescribed by the Secretary.

the FXDOTs must be treated as a single transaction – the long and short options cannot be considered separate components, such that plaintiffs may disregard the "contingent" short options in determining basis. Plaintiffs respond that I.R.C. § 988(a)(1)(A) expressly provides that "any foreign currency gain or loss attributable to a section 988 transaction shall be computed separately and treated as ordinary income or loss (as the case may be)." Treasury Regulation § 1.988-1(e) prescribes accordingly: "[T]he amount of exchange gain or loss from a section 988 transaction shall be separately computed for each section 988 transaction, and such amount shall not be integrated with gain or loss recognized on another transaction (whether or not such transaction is economically related to the section 988 transaction)." Based on these provisions, plaintiffs contend that a transaction falling within I.R.C. § 988 "necessarily requires the separate computation of basis." Pls.' Br. filed Feb. 7, 2008, at 15. Defendant rejoins by interposing Treasury Regulation § 1.988-2(f), which provides that "[i]f the substance of a transaction described in § 1.988-1(a)(1) differs from its form, the timing, source, and character of gains or losses with respect to such transaction may be recharacterized by the Commissioner in accordance with its substance." Defendant bolsters its statutory argument with I.R.C. § 988(d)(1), establishing that "hedging transactions" shall be treated as a single transaction.

Defendant's attempt to characterize the FXDOTs as a single unified transaction under the literal application of the Internal Revenue Code is unavailing. Defendant's expert, Dr. David F. DeRosa, testified that the long and short option components constituted a single transaction that could not be separated in reality and therefore should not be separated for purposes of calculating basis. 23/ Plaintiffs' expert, Dr. Robert W. Kolb, on the other hand, disagreed with Dr. DeRosa, opining that the "four options [the two pairs of FXDOTs that each Welles entity transacted] are separate and distinct instruments, that they can be traded separately, that they are identifiable as typical options. And I think pretty much without controversy, one should be able to recognize them as four distinct, separate options." Tr. at 931; see PX 293 at 7 ("These two options [speaking of a single pair] are separate and

---

23/ It was Dr. DeRosa's opinion that the FXDOT long and short components constituted a single transaction for three principal reasons: first, Deutsche Bank would not voluntarily overpay for the short position on a stand-alone basis; the overpricing of the two sides, the long and short, was meant to more or less wash out on a net basis. See Tr. at 1964; DX 516 at 77-78. Second, separating the long and short options from one another would have required payment of the option premiums in full and enormous margin deposits with the broker; as no evidence indicates that Deutsche Bank required any margin agreements or deposits on the FXDOTs, Dr. DeRosa sponsored an inference that separating the offsetting options from one another was never contemplated. See Tr. at 1965-66; DX 516 at 61-67. Third, evidence suggests that Deutsche Bank never considered that the offsetting options created any credit risk; Dr. DeRosa suggested that only by marrying the short and long positions of the FXDOTs and establishing a two-pip spread between the options could Deutsche Bank eliminate the counterparty credit risk. See Tr. at 1965-66; DX 516 at 60-61.

distinct financial instruments. They are priced separately; they can be traded separately."). 24/

Regardless of the conflicting expert opinions on this issue, the court finds the analysis provided in Helmer and its progeny to be the most significant factor controlling the legal status of the options as either a single transaction or separate transactions. Defendant does not avoid this legal analysis, citing Helmer in its pretrial brief only in a footnote to its argument on penalties. See Def.'s Br. filed Mar. 12, 2008, at 38 n.28. Nor does Dr. DeRosa's dissection of the factual circumstances of the transactions undercut the long-accepted legal analysis reflected in Helmer. When the FXDOTs were undertaken, plaintiffs' non-inclusion of the sold short options in the calculation of basis was supported in the case law regarding "contingent" liabilities. See, e.g., La Rue v. Comm'r, 90 T.C. 465, 479-80 (1988) (holding obligations not fixed in amount owing cannot be included in partners' bases); Long v. Comm'r, 71 T.C. 1, 7-8 (1978) (holding contingent or contested liabilities like lawsuit claims not "liabilities" that would reduce basis in partnership interest within meaning of I.R.C. § 752); Helmer, 34 T.C.M. (CCH) at 727.

Defendant's invocation of I.R.C. § 988(d)(1) is similarly unpersuasive, as defendant did not establish that the Welleses' FXDOTs qualify as "988 hedging transactions." Defendant adduces no evidence to establish that the FXDOTs at issue were "identified by the Secretary or taxpayer as being a 988 hedging transaction," I.R.C. § 988(d)(2)(B), or to qualify the FXDOTs as entered into by the taxpayer primarily to "(i) to manage risk of currency fluctuations with respect to property which is held or to be held by the taxpayer, or (ii) to manage risk of currency fluctuations with respect to borrowings made or to be made, or obligations incurred or to be incurred, by the taxpayer." I.R.C. § 988(d)(2)(A). In fact, it is defendant's contention that plaintiffs' FXDOTs were entered into with a primary motivation of tax avoidance, not risk management. See Def.'s Br. filed Mar. 12, 2008, at 31 ("The Welleses' implementation of the [J&G strategy] consisted of an artificial and prepackaged set of transactions designed for the specific purpose of generating a tax benefit."). 25/

---

24/ Dr. Kolb recognized that practical limitations would play a role in attempting to purchase only one of the options in a given pair, including margin requirements imposed by a counterparty like Deutsche Bank. See Tr. at 931-32. He also testified that certain "special situations . . . would require a substantial deposit of new funds in order to trade some of these options in particular ways" that might implicate practical wealth limitations. Tr. at 932. These limitations, however, did not change Dr. Kolb's expert opinion that the options were themselves separate financial instruments.

25/ Jeffrey Welles testified on cross-examination:

The legal doctrines delineated in Helmer and its progeny plainly apply to the Welleses' FXDOTs. Thus, for defendant to prevail on the ground that plaintiffs' tax reporting position was not in literal compliance with the Code, defendant must rest on its remaining argument that recently enacted Treasury Regulation § 1.752-6 applies retroactively to plaintiffs' transactions in 2000, an argument analyzed in the next section. Defendant, however, correctly points out that literal compliance alone with the Code is not sufficient to validate the tax reporting position taken by plaintiffs. As the Federal Circuit recently confirmed in Coltec, defendant's appeal to doctrines such as "substance-over-form," "step transaction," and "economic substance" must be considered before a tax reporting position can stand. See 454 F.3d at 1351. These doctrines will be addressed in parts IV and V.

2. Retroactive application of Treasury Regulation § 1.752-6

On June 24, 2003, Treasury proposed regulations relating to the definition of liabilities under I.R.C. § 752, i.e., in the partnership context. See Assumption of Partner Liabilities, 68 Fed. Reg. 37,434 (June 24, 2003) (Prop. Treas. Reg. §§ 1.752-0 to -7). Included in the

---

25/ (Cont'd from page 43.)

> Q. [by defense counsel] And you asked [SLK] about tax strategies because you were anticipating selling your Therma-Tru stock, correct?
>
> A. Yes.
>
> Q. That was the point of asking about tax strategies, right?
>
> A. Yes.
>
> Q. And that's why you implemented the [J&G] strategy, to reduce the taxes on the Therma-Tru stock, correct?
>
> A. If we in fact did close on the transaction to sell Therma-Tru, yes.
>
> Q. The reason you entered into the [J&G strategy] was to reduce the taxes on the Therma-Tru stock, isn't that correct? Isn't that the whole point of the [J&G] strategy?
>
> A. The point is to step up the basis and pay a smaller debt on the remaining stock, yes.

Tr. at 672-73.

proposed regulations was temporary Treasury Regulation § 1.752-6, titled "Partnership assumption of partner's section 358(h)(3) liability after October 18, 1999, and before June 24, 2003." Treas. Reg. § 1.752-6; see 68 Fed. Reg. at 37,441. On May 26, 2005, these temporary regulations became final and Treasury specified that Treasury Regulation § 1.752-6 would apply retroactively. See 70 Fed. Reg. 30,334, 30,335 (May 26, 2005). Treasury Regulation § 1.752-6 created a framework for defining liabilities within the context of I.R.C. § 752 that applied from October 18, 1999, to June 24, 2003. See Treas. Reg. § 1.752-6(d). Treasury Regulation § 1.752-7 set forth the framework that would apply after June 24, 2003, although taxpayers could elect to apply it to transactions occurring between October 18, 1999, and June 24, 2003. Treas. Reg. § 1.752-7(k).

By reference to I.R.C. § 358(h)(3), which, in the context of setting forth rules for determining basis on corporate transactions, defines liabilities as including "any fixed or contingent obligation to make payment," Treasury Regulation § 1.752-6 requires a partner to reduce his basis in a partnership interest by the value of contingent liabilities assumed by the partnership – contrary to the then existing policy to exclude contingent liabilities from the computation of partnership basis. See Helmer, 34 T.C.M. (CCH) at 727. Treasury recognized that a definition of liability that would include contingent obligations would effect a change in the law. See 68 Fed. Reg. at 37,436 (stating in context of proposed Treasury Regulation § 1.752-1(a)(1) that "[t]he definition of a liability contained in these proposed regulations does not follow Helmer").

On the last day of trial, plaintiffs advised the court of the District of Colorado's decision in Sala, issued on the date prior, concerning the retroactive application of Treasury Regulation § 1.752-6. See Sala, 552 F. Supp. 2d at 1185. This court ordered the parties to file supplemental post-trial briefs addressing Treasury Regulation § 1.752-6 and the opinions in Cemco Investors, LLC v. United States, 515 F.3d 749 (7th Cir. 2008); Sala; Klamath Strategic Investment Fund, LLC v. United States, 440 F. Supp. 2d 608 (E.D. Tex. 2006) (denying summary judgment on issue of retroactive application of Treas. Reg. § 1.752-6); and Klamath Strategic Investment Fund, LLC v. United States, 472 F. Supp. 2d 885, 895 (E.D. Tex. 2007), appeals docketed, Nos. 07-40861 & 07-40915 (5th Cir. Sept. 6 and 14, 2007), as they relate to the retroactive application of the Treasury Regulation.

In Cemco the United States Court of Appeals for the Seventh Circuit observed that Treasury Regulation § 1.752-6 was "explicit" in stating that it applied retroactively to assumptions of liabilities occurring before its enactment. Cemco, 515 F.3d at 752. While the Cemco court reviewed the trial court's findings regarding economic substance, it did not offer a thorough analysis of the validity of retroactively applying Treasury Regulation § 1.752-6. The court merely observed that the effect of the regulation was to "instantiate the pre-existing norm that transactions with no economic substance don't reduce people's taxes."

Cemco, 515 F.3d at 752 (contractions in original). 26/ If the regulation's retroactive application is valid, the short foreign currency digital options that the single-member LLCs contributed to Stobie Creek – each a "contingent" obligation – constituted liabilities for the purposes of I.R.C. § 752 requiring a corresponding reduction in the basis claimed. Given those circumstances, plaintiffs' refund action could not succeed under the literal application of the Code and Treasury regulations. Because the retroactive application of Treasury Regulation § 1.752-6 to plaintiffs' transactions occurring in early 2000 has been placed before the court as an issue for trial, see Def.'s Br. filed Mar. 12, 2008, at 35-36, an analysis of the controlling provisions and regulations follows.

In reviewing the applicability of a Treasury regulation, courts must first determine whether the regulation is legislative in character or interpretive. See Schuler Indus., Inc. v. United States, 109 F.3d 753, 754-55 (Fed. Cir. 1997). Legislative regulations are promulgated pursuant to Congress's direct grant of authority. The United States Supreme Court has directed courts to apply a deferential standard of review to such legislative regulations, according them "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). By contrast, an interpretive regulation is promulgated by the Treasury pursuant to I.R.C. § 7805(a), by which "the Secretary shall prescribe all needful rules and regulations for the enforcement of" the Code. Such interpretive regulations are afforded less deference, but nevertheless are valid and applicable if they are reasonable interpretations of a statute and if they "'harmonize[] with the plain language of the statute, its origin, and its purpose.'" Rowan Cos. v. United States, 452 U.S. 247, 252 (1981) (quoting Nat'l Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477 (1979)).

In general, Congress has prohibited Treasury from issuing regulations that apply retroactively. See I.R.C. § 7805(b)(1). Regulations are retroactive when they apply to taxable periods ending before the earliest of

> (A) [t]he date on which such regulation is filed with the Federal Register[;]
>
> (B) [i]n the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register[; or]

---

26/ The Cemco court's observation highlights that, even if the regulation cannot be applied retroactively, plaintiffs must discharge their burden to prove that the transactions in which they engaged pursuant to the J&G strategy had economic substance, or those transactions are disregarded for tax purposes. Long recognized by courts, an analysis of whether a transaction or set of transactions has economic substance is wholly separate from an analysis of whether the retroactive application of a Treasury regulation is valid.

(C) [t]he date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

I.R.C. § 7805(b)(1)(A)-(C). I.R.C. § 7805 enumerates exceptions, two of which are relevant: (1) "The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse," I.R.C. § 7805(b)(3); and (2) "The limitation [against retroactive application] may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation," I.R.C. § 7805(b)(6).

Defendant contends that Congress, by section 309 of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, § 309, 114 Stat. 2763A-587, -638 ("Section 309"), expressly authorized Treasury to promulgate Treasury Regulation § 1.752-6 and enforce it retroactively. See Def.'s Br. filed May 15, 2008, at 3-8. In the alternative, defendant argues that the regulation is proper under I.R.C. § 7805(b)(3) to prevent abuse, even in the absence of specific congressional delegation of authority and authorization of retroactive application. See id. at 16-18.

Section 309, titled "Prevention of Duplication of Loss Through Assumption of Liabilities Giving Rise to a Deduction," adopted a basis-reduction rule, codified in I.R.C. § 358(h), that applies to a transferee corporation's assumption of "any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." I.R.C. § 358(h)(3). Congress directed that "amendments made by this section shall apply to assumptions of liability after October 18, 1999." § 309(d)(1), 114 Stat. 2763A-638. Section 309 concerns transactions undertaken by corporations and the tax treatment of corporate entities. Although the text of Section 309 includes no reference to I.R.C. § 752, the Code provision addressing assumptions of liability by a partnership, subsection (c) of Section 309, titled "Application of Comparable Rules to Partnerships and S Corporations," directs that Treasury "shall prescribe such rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 [*i.e.* the portion of the Internal Revenue Code pertaining to partnerships] *to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) of such Code* . . . ." § 309(c)(1), 114 Stat. 2763A-638 (emphasis added). 27/ Subsection (d)(2) of Section 309 allows for the retroactive application of Treasury's prescribed rules, stating "The rules prescribed under

---

27/ Subsection (c)(2) of Section 309 provides that Treasury "may prescribe rules which provide appropriate adjustments under subchapter S of chapter 1 of such Code [*i.e.* the portion of the Code pertaining to S-Corporations] in transactions described in paragraph (1) involving S corporations rather than partnerships." § 309(c)(2), 114 Stat. 2763A-638. Because the application of regulations pertaining to S-Corporations is not an issue in these cases, the court does not analyze the permissive nature of this second instruction.

subsection (c) shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules." § 309(d)(2), 114 Stat. 2763A-638.

Section 309, codified as I.R.C. § 358(h), sets forth the rule governing the assumption of liabilities by a corporation not already covered by I.R.C. § 358(d). I.R.C. § 358(d)(1) provides that a shareholder must reduce his basis in corporate stock when the corporation assumes a shareholder's liability because that assumption of liability constitutes "money received by the taxpayer on the exchange." Before the enactment of I.R.C. § 358(h), Congress took the position that certain contingent liabilities assumed by a corporation were not considered by the IRS to constitute liabilities within the meaning of I.R.C. § 358(d)(1). See Staff of J. Comm. on Taxation, 107th Cong., General Explanation of Tax Legislation Enacted in the 106th Congress 154 (J. Comm. Print 2001) (citing Rev. Rul. 95-74, 1995-2 C.B. 36 (holding parent corporation's basis in stock of subsidiary would not be reduced by subsidiary's assumption of contingent environmental remediation liabilities)). The Joint Committee on Taxation's General Explanation of the change made by adding I.R.C. § 358(h) described the type of transaction that Congress was seeking to address:

> The Congress was concerned about a type of transaction in which taxpayers seek to *accelerate*, and potentially *duplicate*, deductions involving certain liabilities. . . . [A]ssume a transferor corporation transfers assets with a fair market value basis in exchange for preferred stock of the transferee corporation, plus the transferee's assumption of a contingent liability that is deductible in the future. The transferor claims a basis in the stock received equal to the basis of the assets. However, the value of the stock is reduced by the amount of the liability, creating a potential loss. The transferor may then attempt to accelerate the deduction that would be attributable to the liability by selling or exchanging the stock. Furthermore, the transferee might take the position that it is entitled to deduct the payments on the liability, effectively duplicating the deduction attributable to the liability.

Staff of J. Comm. on Taxation, 107th Cong., General Explanation of Tax Legislation Enacted in the 106th Congress 154 (J. Comm. Print 2001) (emphases added).

When Congress directed Treasury to prescribe "Comparable Rules [for] Partnerships," it intended that Treasury promulgate rules that would address transactions involving the possible acceleration and/or duplication of losses – the type of transactions to which Congress directed its concern. Congress was explicit in this regard. Treasury Regulation § 1.752-6 cannot assume the status of a comparable rule or regulation when it does not speak to transactions involving the possible acceleration and/or duplication of losses. Defendant admits that the regulation is not "restricted in its application to any particular species of abusive transactions (*e.g.* an acceleration or duplication of losses)." Def.'s Br. filed May 15, 2008, at 7. Yet, defendant argues, in the following paragraph, that

"Treas. Reg. § 1.752-6 carries out the mandate of Congress by precluding the artificial inflation of a partner's partnership interest (outside basis) through the contribution of contingent liabilities, just as § 358 precludes an artificial inflation of the basis in stock through the contribution of contingent liabilities to a corporation." Id. at 7-8. Defendant certainly characterizes plaintiffs' transactions as causing "artificial" inflation of their outside basis, and defendant advances as its litigation position that the IRS does not recognize inflation of the outside basis in this manner. The mandate of Congress to the Treasury in Section 309(c)(1), however, was not to combat inflation of basis – artificial or otherwise – rather, to preclude the acceleration and/or duplication of losses.

The transfers of the contingent liabilities in the cases at bar resulted in increasing each partner's outside basis, but did not cause any acceleration or duplication of losses. Moreover, I.R.C. § 358(h)(3) only defines liabilities that are assumed in exchanges or series of exchanges between a corporation and its shareholders. Treasury Regulation § 1.752-6 addresses any transaction whereby a partner contributes property to a partnership in exchange for a partnership interest and the partnership assumes a contingent liability of the partner, regardless of whether it accelerates or duplicates losses. The lack of correspondence in the reach of the Treasury Regulation relative to the statutory mandate is apparent.

Although Congress enacted Section 309 to provide a basis rule for contingent liabilities in the corporate context, it did not make a comparable change to the Code in the partnership basis rules of I.R.C. § 752. Treasury Regulation § 1.752-6 constitutes an attempt to do so by regulation, and Treasury has acknowledged as much. Congress grants agencies the authority to promulgate regulations that have the force of law, but agencies do not have the authority to promulgate such regulations absent a congressional mandate. See Rite Aid Corp. v. United States, 255 F.3d 1357, 1359-60 (Fed. Cir. 2001) (statutory authorization to correct instances of tax avoidance created by filing consolidated returns does not give Treasury broad authority to change application of other Code provisions); Union Carbide Corp. v. United States, 612 F.2d 558, 563 (Ct. Cl. 1979) (regulations "must be within the scope of the authority vested in the Treasury by the enabling act"). Because Treasury Regulation § 1.752-6 exceeds the scope of Congress's specific authorization of retroactivity in Section 309, its retroactive application cannot stand, see I.R.C. § 7805(b)(6), and the regulation properly cannot be considered a legislative regulation due the considerable deference afforded by Chevron.

Defendant alternatively argues that the retroactive application of Treasury Regulation § 1.752-6 is appropriate pursuant to I.R.C. § 7805(b)(3) in order "to prevent abuse." "Abuse" is not defined in I.R.C. § 7805. However, it would be an incongruous result to defer to Treasury's determination that a particular regulation must apply retroactively in order to prevent abuse, when Congress saw fit to decree the end of one named abuse on a retroactive basis (acceleration and duplication of losses), but not all potential abuses related to transfers of partnership assets. Because Treasury Regulation § 1.752-6 exceeds the congressional

mandate to address transactions that accelerate and duplicate losses, this broad "abuse prevention" authority cannot serve as an alternate ground for validating retroactive application.

Defendant also suggests that Notice 2000-44 served to put plaintiffs (and other similarly situated taxpayers) "on notice that the transactions it described would be scrutinized and penalized." Def.'s Br. filed May 15, 2008, at 10. Defendant argues:

> Because Notice 2000-44 was issued in August 2000, and notified taxpayers that the contribution of paired long and short options to partnerships in order to artificially increase outside basis were abusive, and would not be allowed, the Secretary's exclusion of these transactions from the exceptions in Treas. Reg. § 1.752-6(b) could not have been a surprise.

Id. at 13. This argument misunderstands the import of IRS notices. As a general proposition, IRS notices are press releases stating the IRS's position on a particular issue and informing the public of its intentions; such notices do not constitute legal authority. See Samonds v. Comm'r, 66 T.C.M. (CCH) 235 (1993) (holding that IRS notice "is an administrative pronouncement which like a revenue ruling or revenue procedure does not constitute authority for deciding a case in this Court"). IRS notices are not promulgated pursuant to a notice-and-comment period, the process which gives regulations their legal authority and entitles them to Chevron deference. Whether plaintiffs had "notice" that their transactions would be subject to scrutiny has no bearing on whether a Treasury regulation, seeking retroactively to effect a change in the law, can serve to disallow plaintiffs' reporting position.

This determination that Treasury Regulation § 1.752-6 cannot apply retroactively to plaintiffs' transactions does not equate to a ruling that plaintiffs have discharged their burden to establish their entitlement to a refund. The IRS disregarded for tax purposes the transactions that plaintiffs entered into pursuant to the J&G strategy because, the IRS further asserted, they lacked economic substance. The court discusses the economic substance doctrine and its application to plaintiffs' transactions in the following section.

## IV. Economic substance doctrine

Having determined that plaintiffs' calculation of basis complies with the literal requirements of the Internal Revenue Code, the next issue is whether the transactions and reporting engaged in by plaintiffs satisfy the doctrines developed to implement the statutory purpose of the Code. Defendant has enlisted multiple, and complementary, doctrines in arguing that plaintiffs' transactions should be disregarded: "[T]he BEDS shelter [the J&G strategy] and the options it relies upon[] lack economic substance[;]" "Under the step transaction doctrine Stobie Creek cannot claim the inflated stock basis[;]" "Under the substance-over-form doctrine . . . each FXDOT must be treated as a single transaction."

Def.'s Br. filed Mar. 12, 2008, at 30, 32, 34. 28/ Whether defendant intended to present different theories or sought to invoke different "tests" for the court to apply, the Federal Circuit set the binding standard in Coltec: "[T]he economic substance doctrine has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." 454 F.3d at 1352. The economic substance doctrine "prevent[s] taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." Id. at 1353-54. If plaintiffs' transactions do not pass muster under the economic substance doctrine, the court must disregard the transactions for tax purposes, and the assessments made in the 2005 and 2007 FPAAs will flow to the individual partners.

1. Coltec analysis

The Federal Circuit in Coltec enumerated five principles that must be considered in analyzing a transaction or series of transactions under the economic substance doctrine: (1) a taxpayer may not reap tax benefits from a transaction that lacks economic reality; (2) a taxpayer bears the burden of proving that a transaction is imbued with economic substance; (3) the economic substance of a transaction must be viewed from an objective standpoint; (4) the transaction which gave rise to the alleged tax benefit is the one to be examined; and (5) arrangements or transactions that do not affect the economic interests of independent third parties deserve close scrutiny. See id. at 1355-57; Jade, 80 Fed. Cl. at 45. Accordingly, plaintiffs bear the burden of showing, from an objective perspective, that the series of transactions that increased the basis of the Therma-Tru stock by $204,575,000.00 had economic reality.

In evaluating a transaction's economic reality, the Supreme Court and the Federal Circuit, along with other courts of appeals, look for a business purpose, beyond reducing taxes, to support a transaction; a transaction without a business purpose lacks economic reality and must be disregarded. See Coltec 454 F.3d at 1355 (citing Higgins v. Smith, 308 U.S. 473, 476 (1940); Gregory v. Helvering, 293 U.S. 465, 469 (1935); Dow Chem. Co. v.

---

28/ These doctrines vary in origin and somewhat in application, yet apply to the same analysis. See King Enters., Inc. v. United States, 418 F.2d 511, 516 n.6 (Ct. Cl. 1969) ("[C]ourts have enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences."); H.J. Heinz Co. & Subsidiaries v. United States, 76 Fed. Cl. 570, 583-85 (2007) (discussing multiple formulations employed by courts to consider whether transaction has economic substance or whether it is a "sham"). While the court need not disengage these concepts to articulate separate tests, the step transaction doctrine does have a sufficiently distinct application to warrant separate consideration.

United States, 435 F.3d 594, 599 (6th Cir. 2006); Boca Investerings P'ship v. United States, 314 F.3d 625, 631 (D.C. Cir. 2003); *In re* CM Holdings, Inc., 301 F.3d 96, 102 (3d Cir. 2002); United Parcel Serv. of Am., Inc. v. Comm'r, 254 F.3d 1014, 1018 (11th Cir. 2001); Terry Haggerty Tire Co. v. United States, 899 F.2d 1199, 1201 n.2 (Fed. Cir. 1990); Holiday Vill. Shopping Ctr. v. United States, 773 F.2d 276, 280 (Fed. Cir. 1985); Basic, Inc. v. United States, 549 F.2d 740, 745-46 (Ct. Cl. 1977); Rothschild v. United States, 407 F.2d 404, 417 (Ct. Cl. 1969); Ballagh v. United States, 331 F.2d 874, 875-76 (Ct. Cl. 1964)).

Courts have found a legitimate business purpose beyond tax avoidance where the taxpayer demonstrates that a reasonable possibility of profit exists separate and apart from the tax benefits created by the transactions. See, e.g., Coltec, 454 F.3d at 1356 (citing Black & Decker Corp. v. United States, 436 F.3d 431, 441-42 (4th Cir. 2006) (noting that economic substance inquiry requires "objective determination of whether a reasonable possibility of profit from the transaction existed" (internal quotation marks and emphasis omitted))); Gilman v. Comm'r, 933 F.2d 143, 146-47 (2d Cir. 1991) (requiring taxpayer to demonstrate that prudent investor could have concluded that "realistic potential for economic profit" existed (internal quotation marks omitted)); Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91 (4th Cir. 1985) (equating lack of economic substance with finding that "no reasonable possibility of a profit exists"); Long Term Capital, 330 F. Supp. 2d at 172 (finding that transaction lacked economic substance because, "at the time the transaction was entered into, a prudent investor would have concluded that there was no chance to earn a non-tax based profit return in excess of the costs of the transaction"); Estate of Strober v. Comm'r, 63 T.C.M. (CCH) 3158, 3160 (1992) ("We conclude that . . . a prudent investor, relying upon independently obtained appraisals and research, would not have concluded that [the] transaction offered a reasonable opportunity for economic gain exclusive of tax benefits.").

Plaintiffs posit that the FXDOTs were entered into with profit motive as the valid business purpose. The FXDOTs were motivated by plaintiffs' "desire and understanding that large speculative profits could be made by investing in foreign currencies." Pls.' Br. filed Feb. 7, 2008, at 24. Jeffrey Welles testified that he engaged in the FXDOTs as an investment to make a profit and that he conducted "due diligence" before investing in the FXDOTs. Jeffrey Welles spoke numerous times with Mr. Parse at DB Alex Brown regarding different currencies for investment. See Tr. at 467-70, 479-82 (Jeffrey Welles). Jeffrey Welles also contacted Mr. Bresolin at Goldman Sachs, New York, to discuss various currency crosses and volatility levels. See Tr. at 471-72. He also spoke with Mr. Edwards at Morgan Stanley regarding foreign currencies. See Tr. at 478. Jeffrey Welles also had access to his personal Bloomberg Service, and he reviewed research reports from Deutsche Bank and Goldman Sachs regarding foreign currencies. See Tr. at 482-83, 519, 522-26, 527, 531-37 (Jeffrey Welles); PX 159; PX 160.

Mr. Bresolin emphasized the word "vaguely" in qualifying his recollection of conversations with Jeffrey Welles, Tr. at 1354, 1367, further stating that he had no memory of whether or not he may have put Jeffrey Welles in contact with the foreign currency desk. His testimony did not corroborate Jeffrey Welles's. Mr. Edwards, definitely a friend of Jeffrey Welles, testified persuasively that he spoke approximately "five or six" times, Tr. at 852, with Jeffrey Welles concerning the available investment strategies, including foreign exchange options, and that he put a specialist from the foreign currency desk on a conference call with Jeffrey Welles. Mr. Edward's advice was "very minimal." Tr. at 856.

Mr. Parse is among the disgraced brokers at DB Alex Brown whose role was displayed in documentary evidence introduced by the Government. Although the court declined to admit his deposition transcript, self-limited to invocations of the Fifth Amendment, other documents showed Mr. Parse of DB Alex Brown to be enmeshed in similar options pairings for the purpose of implementing the J&G strategy with a large number of J&G clients. See, e.g., DX 521 (DB Alex Brown's internal memorandum stating that Mr. Parse would be managing half the total of one hundred transactions); DX 171 (DB Alex Brown's internal memorandum copied to Mr. Parse noting one hundred transactions to be implemented with J&G and mentioning payment of settlement proceeds in FXDOT trades as extremely critical step for tax transactions to accomplish purpose); DX 185 (Mr. Parse's outline of the digital options process consistent with the J&G strategy).

Jeffrey Welles originally was directed to Mr. Parse by Ms. Guerin. Mr. Parse was J&G's point-man at DB Alex Brown. Plaintiffs suggested that, because Jeffrey Welles had worked previously with Mr. Parse at Goldman Sachs, Jeffrey Welles reasonably would have relied on his advice. Mr. Parse, and DB Alex Brown generally, are so thoroughly discredited in defendant's exhibits that the court declines to find that Mr. Parse provided investment analysis to Jeffrey Welles that was not geared solely toward implementing the J&G strategy. See, e.g., DX 168 at 2 (DB Alex Brown's closeout indicating that Mr. Parse earned over $3 million in commissions on FXDOTs for the first eleven months of 2000).

The court finds that Jeffrey Welles's investigation was consistent with his tolerance of high risk, i.e., because it was superficial, he only confirmed the structure of the transaction and the possibility of a return, not the magnitude of the risk relative to its cost and potential return. Based on his investigation, Jeffrey Welles, however, reached a number of conclusions about the FXDOTs. Jeffrey Welles concluded that FXDOTs involving the euro, the Swiss franc, and the dollar had an opportunity to produce a reasonable profit. See Tr. at 580. He believed that the European Central Bank would issue favorable reports that would cause the euro to rise against the dollar and volatility in the currency market to increase. See Tr. at 525-37. He formed the belief that an "uncoupling" would occur in the historical relationship between movement of the euro and Swiss franc. Tr. at 525, 537. Based on his conversations with Mr. Parse at DB Alex Brown, Jeffrey Welles believed that the FXDOTs that he was considering had a 30% chance of doubling his money. See Tr. at

508-09. Jeffrey Welles and his family also were drawn to the transaction by the small chance that a large profit could be made if the "sweet spot" hit on the options. See Tr. at 466-67. Having formed these impressions, Jeffrey Welles directed the Welleses' single-member LLCs into the FXDOTs involving the euro, the Swiss franc, and the dollar. After executing the trades, he continued to monitor through his Bloomberg service the currency market during the period that the FXDOTs were active. See Tr. at 580. Mr. Chung monitored the FXDOTs, as instructed by Jeffrey Welles. See Tr. at 580-81 (Jeffrey Welles), 1318-30 (Chung). Ultimately, the options expired out of the money, resulting in loss of the full premiums paid. Jeffrey Welles was disappointed with the result. See Tr. at 1330 (Chung).

2. Expert analyses of profit potential

As the Federal Circuit directed in Coltec, the trial court must analyze, from an objective viewpoint, whether the FXDOTs had economic reality and were motivated by a business purpose. To this end, plaintiffs offered the testimony and reports of three experts, Dr. Robert W. Kolb, Prof. Richard M. Levich, and Prof. Jeffrey A. Frankel, to support their argument that the FXDOTs were entered with the valid business purpose of making a profit. Defendant responded with the testimony and report of one expert, Dr. David F. DeRosa, to undermine plaintiffs' claim that the FXDOTs had valid tax-independent business purpose and to demonstrate that no reasonable possibility of profit existed. The testimony and reports of each expert relevant to the issue of profit potential are discussed below.

1) Dr. Robert W. Kolb

Plaintiffs' first expert witness was Robert W. Kolb, Ph.D., Professor of Finance and Frank W. Considine Chair of Applied Ethics at Loyola University Chicago. Dr. Kolb holds Ph.D.s in Philosophy and in Finance from the University of North Carolina at Chapel Hill. Dr. Kolb was qualified to give his opinions regarding foreign currency, foreign exchange options, economic analysis of foreign currency option financial derivatives, and currency markets generally. Tr. at 900-01. 29/ Plaintiffs engaged Dr. Kolb "to analyze the option

---

29/ Defendant's voir dire focused on Dr. Kolb's academic qualifications and established that he never worked at a money center bank, as an options trader dealing with foreign exchange or in any other capacity, in a back office of any entity that trades in foreign exchange, at any entity that extends credit as a regular part of its business, or in the examination or review of credit applications. See Tr. at 895-96. Defendant emphasized these points to highlight the expert's limitations to opine on the proper allocation of costs that the Welleses incurred for the J&G Tax Opinion. See Tr. at 896-97.

trading [of the Welles family members]" and to "examine the potential profitability of the option positions for each [of the Welles family members], as well as the overall profit potential for the aggregate [of all of the family members' trades.]" PX 293 at 2.

Dr. Kolb has been teaching at Loyola University Chicago since 2007. From 2003 to 2006, he was associated with the University of Colorado at Boulder as its Assistant Dean for Business and Society, as the Director of its Center for Business and Society, and as a Professor of Finance. Dr. Kolb worked as an independent author and consultant from 1995-2003. See PX 293 app. at 1 (curriculum vitae of Dr. Kolb).

Dr. Kolb has authored over fifty academically refereed (peer-reviewed) articles pertaining to finance, over half of which concentrated on derivatives. See PX 293 app. at 2-5; Tr. at 889. He has also authored or co-authored over twenty books, including a financial textbook titled Futures, Options, and Swaps, with James A. Overdahl, Chief Economist for the Securities and Exchange Commission. Futures, Options, and Swaps is currently in its fifth edition. See Tr. at 889; Robert W. Kolb & James A. Overdahl, Futures, Options, and Swaps (5th ed. 2003). Dr. Kolb recently was appointed Series Editor of Blackwell's Companions to Finance Series, "which will entail commissioning nearly 65 volumes to cover every area of finance." PX 293 at 1.

Dr. Kolb has testified in two other cases involving the tax consequences of transactions similar to those involved in the cases at bar: Jade, 80 Fed. Cl. at 32-33 and Sala, 552 F. Supp. 2d. at 1185.

Dr. Kolb undertook to determine what the profit potential was of the FXDOTs that were an essential component of the J&G strategy and whether the long and short options

---

29/ (Cont'd from page 54.)

Defendant also pressed Dr. Kolb on his expertise in testifying on margin requirements:

> Q. [by defense counsel] . . . . And is it accurate to say, Dr. Kolb, that you do not claim any special expertise to opine on margin requirements that banks impose on their customers?
>
> A. Well, again, I certainly have expertise, I believe, about margins, the purpose that they serve. In fact, I've written a good bit in my books and also in some research papers on that. But as far as the exact procedures for setting margins with this or that particular bank, I don't plan to opine on that.

Tr. at 899.

constituted separate transactions. See Tr. at 901-02; PX 293 at 7-11. Dr. Kolb's essential conclusions were that

> 1. each option is a separate instrument readily distinguishable from the others and perfectly capable of being traded as such; 2. the investment of each of [the Welles family entities] was a speculative investment; 3. the option trading by each of the [Welles family] entities had significant profit potential; and 4. the history of price movements in the euro and the Swiss franc (when viewed from the perspective of late March 2000) had sufficient volatility such that it was reasonable for the investors to anticipate a profitable investment outcome, especially given their view of the market.

PX 293 at 3.

Dr. Kolb's report was submitted originally on September 11, 2007. The report as admitted into evidence includes revisions dated October 6, 2007. See PX 293 at unnumbered pages 1-2. Dr. Kolb submitted the revisions because he "read three numbers incorrectly from the copies of the [Deutsche Bank] trade confirmations. These were the sales prices of the [Swiss franc] options for three of the investors. As a result, in each instance I recorded the sales proceeds as being $20,000 higher than they actually were." PX 293 at unnumbered page 1; see also Tr. at 886. Testimony adduced at trial and the court's discussion of that testimony and Dr. Kolb's report reflect these revisions.

i) FXDOT potential investment outcomes

Dr. Kolb's analysis focused on the transactions of JFW Investments, LLC, "as representative of each of the other six [investment entities] held by [Welles family members]," turning then to an aggregate analysis of all seven positions. PX 293 at 4. Dr. Kolb described generally four kinds of derivatives commonly traded in financial markets: forwards, futures, swaps, and options. See Tr. at 903-05. The witness discussed options in more detail, focusing particularly on digital options, the type of option that the Welles entities traded as part of the J&G strategy. See Tr. at 905-12; PX 293 at 4-11.

A digital option is one in which the payoff is either some fixed amount of some asset or nothing at all. JFW Investments, LLC, purchased two pairs of option contracts: one pair of options for the dollar versus the euro, and one pair for the Swiss franc versus the dollar. Each pair included the purchase of a long option and the sale of a short option on the currency pairing. The strike prices of each long and short option were separated by two thousandths of a unit ("two pips"). The difference in strike prices is referred to as a "spread." Together, these contracts constituted an option collar. See Tr. at 906-12; PX 293 at 4-6.

Dr. Kolb analyzed the possible investment outcomes at the expiration of the pair of options that JFW Investments, LLC, purchased involving the dollar versus the euro. He identified three distinct possibilities:

> So if the Euro at expiration is less than .9912, then the net outcome for JFW is a loss of $96,625. At the other extreme for the values of the Euro that matter, if the Euro is .9914 or higher, JFW will have a total profit of $96,625 . . . . [A] loss in one case and a modest profit or – well, it's modest perhaps in dollars but large in percentage terms.
>
> But there's also a third possibility. And that is that the value of the Euro at expiration .9912 or higher but also that it's less than, not equal to, .9914. And I think the expert for the Government, Dr. DeRosa, and I both independently characterize this situation as hitting the sweet spot. And in that event, JFW will have a total profit of $19,228,375.
>
> So there are three possibilities: JFW loses 96,000, JFW makes 96,000, or possibly JFW could make 19.2 million.

Tr. at 911-12. Dr. Kolb denominated the analysis of possible outcomes for the options involving the Swiss franc and the dollar pairing as substantially identical, substituting the appropriate strike prices and premiums. See Tr. at 912.

Dr. Kolb also prepared a matrix cataloging the possible investment outcomes when considering both pairs of options:

> And so the cells of this graph show the profit or loss for JFW in each of those nine possible situations. And so in the upper left corner is the worst outcome, and that is that JFW would lose its total net investment of $193,250. On the other hand, they could break even as is shown in the northeast and southwest cells, the zeros. They could – JFW could double its money. That's shown in the southeast corner of the graph. So those are some of the possibilities, ranging from losing 193 to zero to making 193.
>
> However, there are other possibilities. And that is that either the Euro options or the Swiss franc options hit the sweet spot or that both of them hit the sweet spot, in which case the profits are quite a bit larger. And so for instance, if just one of the two hits a sweet spot, that's shown in the four cells at the north center, south center, west center, and east center. And you can see that they're all in the range of 19 million. There's a slight difference, but basically $19 million. And those are the outcomes if either one of the pairs hits the sweet spot.

> The very central cell of the matrix shows the profit for JFW if both of the options hit their respective sweet spots, in which case JFW would make 38 million.

Tr. at 913-14; see PX 293 at ex. 8 (matrix of all possible investment outcomes for Jeffrey Welles).

ii) Outcome probabilities

Dr. Kolb took pains to note, both in his testimony and in his expert report, that the probability of any one of the particular outcomes occurring was not equal. See Tr. at 914-15 ("[I]t's certainly my opinion that some of them are much more likely to be hit than others. And in particular, hitting the sweet spots, in my judgment, is quite a bit less likely than any of the other outcomes."); PX 293 at 11 ("Of course, not all of the outcomes in [this matrix] are equally probable."). Dr. Kolb did not include a computation of the probability that any particular outcome would occur. When asked by plaintiffs whether he computed probabilities "in the sense of running [the FXDOTs] through the Black-Scholes model," he replied, "I did not mention that in my report. At one stage, I made a variety of such computations, but I did not report those in my report." Tr. at 940. When asked why he did not include this information, he replied:

> Well, essentially I didn't think it was very relevant. And let me explain. The Black-Scholes probabilities fall out just from the mathematics of the model. And again, the model is constructed under that set of pretty strong assumptions of perfect markets and the assumption that the underlying security follows a particular stochastic process.
>
> Furthermore, it doesn't pertain to what any particular individual is thinking. Rather, it's in some way an aggregation of all the market participants. So if we perhaps had an idea what Mr. Welles' opinions were about what the probabilities were, that might be of interest, but I did not see that was relevant to compute the Black-Scholes probability. So I did it as, I suppose, part of my due diligence.
>
> I guess economists like to fool around with things like the Black-Scholes model, so I did it, but I didn't put it in my report.

Tr. at 940-41. 30/

---

30/ Dr. Kolb's testimony regarding probability was a major focus of defendant's cross-examination, as will be discussed.

iii) Dr. Kolb's conclusions on profitability

When asked whether he had "an opinion with respect to the profit potential of" the FXDOTs, Dr. Kolb testified that

> these options have very substantial profit potential. And we've covered that to some extent already. For instance, with respect to the pair of options traded by JFW, we saw that the range of possible profit and loss outcomes ranged from losing the entire net investment of 96,000 to making a profit of 96,000 or if the sweet spot were hit of making $19 million.
>
> And so in aggregate across all of the 28 options in this case, there was enormous profit potential.

Tr. at 939; see PX 293 at 11 ("With a modest movement in either exchange rate, JFW would make a profit. With the right move in either or both exchange rates, JFW had an outside possibility of a truly enormous payoff relative to its investment. This highlights the speculative nature of the investment."). Dr. Kolb based this assessment on his "training in economics in general and options in particular, my familiarity with the markets, the transaction documents in this case, and an understanding of the economic conditions that prevailed in early 2000." Tr. at 944.

According to Dr. Kolb, historical data have no use in pricing options, because, while "sometimes people use historical data to try and estimate what that future volatility is going to be," options pricing is "forward looking" and "in terms of pricing the options, it's all focused really toward the future." Tr. at 943. Dr. Kolb, however, did include in his report what he called "Historical Investment Outcomes and Alternative Results." PX 293 at 14-18. He was interested in determining whether the FXDOTs were "doomed from the start." Tr. at 944; see PX 293 at 15. In order to do so, he engaged in what he called a "*post mortem* inquiry," PX 293 at 15, that looked at the investment outcomes of the FXDOTs if the Welleses had purchased options for a different seventeen-day period. Based on this inquiry, he testified that

> if the Welles family entities had waited a week or so to institute their Swiss strategy, they would have had profits instead of losses. More specifically, had [Jeffrey Welles] traded the same Swiss francs from any of the five days from April 9th to April 13th, 2000, the investment would have been profitable with corresponding expiration dates of April 26th to April 30th, i.e., the same 17-day period.

Tr. at 945; see PX 293 at 16-18. 31/

Dr. Kolb's expert opinion trembles on a slender reed of his own caveats and the testing that he decided to omit from his report. The court would have given it limited weight, even if defendant had waived cross-examination. But that was not to come to pass, for defendant proceeded to dissect in a particularly skilled cross-examination what little Dr. Kolb had brought to bear. Defendant began with two hypotheticals intended to highlight the low probabilities of positive investment outcomes for the FXDOTs. The first scenario involved two flips of a coin:

> Q. [by defense counsel] I have a fairly simple proposition, and I'd like your view. Suppose I were to tell you that if you gave me 50 cents, you could flip a coin twice and if it came up heads twice, I'd give you $1. Is that something a reasonable person would take?
>
> A. With no other facts?
>
> Q. Yes, a regular two-sided American coin, like a quarter.
>
> A. I would not be interested in that proposition.
>
> Q. And that's because the odds on your flipping two heads in a row are 1 in 4, right?
>
> A. Exactly, because in this case we know exactly what the odds are going forward, assuming that it's a fair coin.
>
> Q. Okay. If I were to – and by the way, the view on whether that is a reasonable proposition to accept wouldn't depend on whether the person had an advanced degree in statistics or a third grade education, would it? The same answer, right?
>
> A. Depends – different people with different educations might make different decisions about it. . . . I'm not sure what you're asking beyond that.
>
> Q. Accepting the proposition is not a rational decision regardless of your education level?

---

31/ Although, as Dr. Kolb noted during cross-examination, if the Welleses entered into their dollar/euro FXDOTs over that alternative timeframe, those euro options would have expired out of the money, see Tr. at 983-84, resulting in zero profit in the aggregate.

A. I suppose that depends what you mean by "rational."

Q. No reasonable person would take that bet. How is that?

A. Let me say that no reasonable person fully understanding the probabilities would take that bet, if that's what you're driving at.

Q. If an eight-year-old thought he or she was particularly lucky that day, that still wouldn't be a good bet for that person, right?

A. No, but it wouldn't necessarily be irrational for an eight-year-old to make that mistake.

Q. I think your use of the word "mistake" says it all.

Tr. at 949-50. The second hypothetical scenario involved a roulette wheel with thirty-six numbers, half red, half black, and no zeros. When asked, "If you decided to take half of your money and put it on red and half of your money and put it on black, you would have no reasonable expectation of making a profit from those two bets, would you?" Dr. Kolb replied that he would not have a reasonable expectation of making a profit. Tr. at 950-51.

These hypothetical scenarios underscored the importance of probabilities to an analysis of profit potential. Specifically, the probability of the FXDOTs resulting in a profitable investment outcome was very low because a favorable investment outcome would have required the value of the Swiss franc and the euro to move in opposite directions with respect to the dollar, even though the values of those two currencies historically had been highly correlated with one another. See Tr. at 952-54.

Defendant also introduced work papers produced from spreadsheets that Dr. Kolb created for his expert report. See DX 542. Those work papers included a series of columns tracking whether, over all 349 possible seventeen-day periods over the course of one year, the euro had moved sufficiently with respect to the dollar to result in a profitable investment outcome for the euro FXDOTs. The spreadsheet also included a series of columns examining the same with respect to the Swiss franc versus the dollar. See DX 542 at 1-8. While the euro moved enough with respect to the dollar to result in a profitable investment outcome in thirty-five of the periods, and the Swiss franc moved with respect to the dollar to result in a profitable investment outcome in twenty-three, zero periods recorded simultaneous movement of both the euro and the Swiss franc for both pairs of the FXDOTs to result in a profitable investment outcome. See Tr. at 977-84; DX 542 at 1-8.

2) Prof. Richard M. Levich

Richard M. Levich, Ph.D., Professor of Finance and International Business at the Stern School of Business at New York University, was plaintiffs' second expert. Prof. Levich holds an M.B.A. and a Ph.D. from the University of Chicago. Prof. Levich was qualified to give his opinions regarding international financial markets, currency trading, models of exchange rate determinations, exchange rate forecasting, and pricing of currency derivatives. See Tr. at 1001. Prof. Levich characterized the purpose of his expert report as "summariz[ing] various calculations and economic analysis I made regarding [the FXDOTs]." PX 307 at 2.

Prof. Levich has been teaching at New York University in since 1975, before he obtained his Ph.D. See Tr. at 988. He currently serves as Deputy Chairman of the Department of Finance at New York University's Stern School of Business. See PX 307 app. at 1 (curriculum vitae of Prof. Levich). At the time he testified, Prof. Levich was on a sabbatical leave of absence from New York University to work on a research paper concerning performance of professional currency hedge fund managers; a research paper regarding forward-grade bias, the predictive ability of the forward exchange rate; and revisions to produce the third edition of his textbook in International Financial Markets. See Tr. at 990.

Prof. Levich has consulted for financial institutions, including Morgan Guaranty Trust Company in New York, as it formerly was known, dealing with off-shore capital markets and issues surrounding euro bond markets and regulation of domestic markets, and the Bank of New York in London, dealing with the design of currency trading models and evaluation of whether those models could be designed to result in profits or hedging possibilities for their clients. Prof. Levich served for several years as a trustee for a mutual fund that was sponsored by a French institution known as CDC. See Tr. at 993.

Prof. Levich has authored over forty monographs or articles that have appeared in academically refereed journals and reviewed as part of collected monographs. See Tr. at 994-95; PX 307 app. at 4-10. One of his textbooks is titled International Financial Markets: Prices and Policies (2d ed. 2001). He is the founding co-editor of an academic journal, the "Journal of International Financial Management and Accounting."

i) Macroeconomic and monetary policymaking climate in early 2000

Prof. Levich observes in his report that through the 1980s and 1990s "Germany was viewed as the dominant economy in the region. Germany developed a reputation for policy credibility and keeping its currency, the deutsche mark (DM), as a stable monetary unit." PX 307 at 4. For that reason Prof. Levich opined, "Swiss monetary policy tended to mimic German policy, resulting in a stable Swiss-German cross exchange rate that traded in a

narrow band and with low volatility as compared to other currency pairs involving the US dollar." Id. The launch of the European Monetary Union and the introduction of the euro in 1999, however, replaced a number of currencies, including the deutsche mark. The introduction of the euro also transferred monetary policy from Germany to the European Central Bank. Prof. Levich opined that this shift to a new central bank, along with other macroeconomic factors, increased the potential volatility of the euro/dollar and Swiss franc/dollar exchange rates, increasing the probability of a profitable investment outcome for the FXDOTs. See PX 307 at 4-7.

ii) Outcome probabilities

Prof. Levich's assessment of the profitability of the FXDOTs was much more modest than that of Jeffrey Welles. The Welleses' trading strategy would have been profitable only if both pairs of FXDOTs were profitable. Prof. Levich determined that both pairs of FXDOTs would have been profitable if the dollar/euro exchange rate appreciated by 3.54% or more and if the Swiss franc/dollar exchange rate appreciated by 2.39% or more over the eleven trading days from March 31 to April 17, 2000 (the seventeen-day period of the options). See Tr. at 1005-07; PX 307 at 8. If both exchange rates appreciated by at least those amounts over this period, the FXDOTs would have produced a two-to-one return. See PX 307 at 8. Prof. Levich characterized such an appreciation as "not a particularly large movement." Tr. at 1007. He also identified the narrow price interval for each of the exchange rates that would cause the FXDOTs to hit the "sweet spot" (0.9912-0.9914 for the dollar/euro and 1.7027-1.7029 for the Swiss franc/dollar). See PX 307 at 9.

Prof. Levich then estimated the probability of making a profit on each of the FXDOTs by employing a Black-Scholes continuous time lognormal option pricing model. See PX 307 at 7. Prof. Levich ran the model with differing inputs for the spot exchange rates for each currency pair on March 31, 2000, and differing volatilities for the currency pairs, including market quotations on implied volatilities and a range of other volatilities (12.5%, 15%, 17.5%, and 20%). See id.; Tr. at 1015-20. Based on this model and these inputs, Prof. Levich estimated that the probability of the dollar/euro FXDOT hitting the two-to-one payout ranged from 9-21%; he estimated that the probability of the Swiss franc/dollar FXDOT hitting the two-to-one payout ranged from 15-27%. See PX 307 at 8-9. 32/ Prof. Levich also

32/ During cross-examination defendant reminded Prof. Levich that the Welleses' strategy would only be profitable if both FXDOTs resulted in a profitable investment outcome. When defense counsel asked Prof. Levich if he calculated the joint probability of both pairs of FXDOTs' hitting the two-to-one payout, Prof. Levich responded that he had not done so. See Tr. at 1081-83. Prof. Levich opined that the probability of their both hitting the two-to-one payout "would be no higher than any of them [doing so], but it could be lower or, in fact, zero." Tr. at 1082. Defendant also asked Prof. Levich if he took into account any transaction costs involved in entering the FXDOTs when determining the potential profitability of the FXDOTs, and he testified that he had not. See Tr. at 1082-83.

estimated the probability that either pair of FXDOTs would hit the "sweet spot," which he characterized as a "relatively rare occurrence." Tr. at 1003. He estimated the probability of the pair of dollar/euro options hitting the sweet spot as between 0.13-0.15%, and the probability of the Swiss franc/dollar pair hitting the sweet spot as between 0.09-0.11%. See Tr. at 1003-04; PX 307 at 9. 33/

3) Prof. Jeffrey A. Frankel

Jeffrey A. Frankel, Ph.D., the James W. Harpel Professor of Capital Formation and Growth at the Kennedy School of Government at Harvard University, was plaintiffs' third expert. Prof. Frankel holds a Ph.D. in Economics from the Massachusetts Institute of Technology. The witness was qualified to give his opinions regarding economics, foreign exchange rates, international financial markets, and international macroeconomics. See Tr. at 1419. Prof. Frankel's report was styled as an "analysis of the economic factors present in the spring of 2000 that could have been expected to have an effect on the exchange rates of the euro and Swiss franc, respectively, against the U.S. Dollar, which were relevant to the values of the options contracts undertaken by Stobie Creek Investments." PX 279 at 1.

Prof. Frankel described his report as answering two questions:

> First, going back to March 31st, 2000, and based on information available as of that date, were there good reasons to go long in the Euro, to be bullish about the Euro, take a long position in the Euro. And, second, again, based on information available as of March 31st, 2000, were there reasons to expect a decoupling or reduction in the correlation between the Swiss franc and the Euro and on that basis take a short position in the Swiss franc.

Tr. at 1420.

Prof. Frankel has been teaching at Harvard's Kennedy School of Government since 1999. He currently teaches courses in Advanced Macroeconomics for Open Economies and Economics of International Financial Policy. Prof. Frankel was Professor of Economics at the University of California at Berkeley from 1979 to 1999. See PX 279 at 18-19 (curriculum vitae of Prof. Frankel).

---

33/ On cross-examination defendant emphasized that the higher volatilities that Prof. Levich used in his model, which produced the higher end of the profitable probability ranges, were higher than the implied volatilities that Prof. Levich retrieved from a JP Morgan database. See Tr. at 1073-75. Prof. Levich had to concede, based on these implied volatilities, that the value of each of the options that JFW Investments, LLC, purchased was $1.8 million (using the 12.5% volatility) – much lower than the actual price paid for each of the options, $9 million. See Tr. at 1073.

During the course of his academic career, Prof. Frankel has taken leaves of absence to serve as an economic advisor. He served from 1983 to 1984, as a Senior Staff Economist on the Council of Economic Advisers, Executive Office of the President, where many of his responsibilities included dealing with foreign currency issues. See Tr. at 1410-11; PX 279 at 19. Prof. Frankel again took leave in 1996 when he was nominated by former President Clinton to serve as one of the three members of the Council of Economic Advisors from April 1997 to March 1999. See Tr. at 1411-12; PX 279 at 19.

Prof. Frankel has authored or co-authored over twenty books or other monographs pertaining to international economics generally and international financial markets in particular. One textbook is in its tenth edition. Richard E. Caves, Jeffrey A. Frankel & Ronald W. Jones, World Trade and Payments: An Introduction (10th ed. 2007). He has published over three hundred articles, the majority of which deal with international financial markets and foreign exchange rates. See Tr. at 1414-15; PX 279 at 25-56. Prof. Frankel testified as an expert, like Dr. Kolb, in Jade, 80 Fed. Cl. at 11.

After first indicating that macroeconomic and monetary policy factors suggested that he could see especially large movements in the value of the euro with respect to the dollar, see Tr. at 1422-24; PX 279 at 6-7, Prof. Frankel opined that, from the perspective of an investor making decisions on or around March 31, 2000, numerous indications were present that the euro would appreciate against the dollar. Prof. Frankel derived his opinion from an analysis of four major sources of data: formal econometric models; macroeconomic factors discussed contemporaneously by prominent economists and commentators; comments and analysis produced by important market participants, primarily large investment banks; and the foreign exchange forward exchange market. See Tr. at 1424-25; PX 279 at 7-12. Prof. Frankel also observed that the exchange rates of the Swiss franc and the euro with respect to the dollar were closely correlated from the inception of the euro in 1999 through late-March/early-April 2000. From the same perspective of an investor making decisions on or around March 31, 2000, he saw substantial indications that a decoupling or reduction in the correlation of those exchange rates could occur. See Tr. at 1436-38; PX 279 at 12-15. However, his opinion concerning the movement of the euro against the dollar ultimately was not persuasive once defendant's cross-examination elicited testimony that the percentage chances of movement up or down were 50/50. See Tr. at 1457.

At trial plaintiffs asked Prof. Frankel, "[A]round the time of March of 2000, [were] there reasons to expect a depreciation in the Swiss franc?" Tr. at 1438. Defendant objected to an opinion from Prof. Frankel "about depreciation of the Swiss franc as against the dollar." Defendant explained:

> Three times in his deposition the witness declined to express a view on this and declined to express a view on this in his report. . . . I have no objection to the witness testifying as to an expectation of a depreciation between the Euro

> and the Swiss franc, but as between the Swiss franc and dollar, this has not been explored and it's not in his report and the witness specifically declined to express an opinion.

Tr. at 1438-39. Plaintiffs narrowed the question by asking Prof. Frankel to comment on the likelihood that the Swiss franc would depreciate with respect to the euro. Prof. Frankel indicated that it was likely, based on an analysis of the same four data sources that he used in his analysis of the likelihood that the dollar would depreciate with respect to the euro. See Tr. at 1439-40. When plaintiffs queried Prof. Frankel whether he examined some of these data sources with respect to the relationship of the value of the Swiss franc versus the dollar, defendant commenced voir dire. See Tr. at 1441-42.

Defendant objected both to the conclusion that Prof. Frankel would offer, as well as to its foundation. In section 4.5 of his report, Prof. Frankel indicated that

> [t]he common view among market participants in the spring of 2000 was not an expectation that the Swiss franc would appreciate against the dollar to the same extent as they expected the euro to appreciate. In other words, the average forecast was for the Swiss franc to *depreciate* vis-à-vis the euro.

PX 279 at 14. Section 4.7 of his report opined:

> Thus a reasonable and well-founded expectation in March/April 2000 was that the Swiss franc would not exhibit the same future upward trend against the dollar that the euro was expected to show, but rather would depreciate against the euro. The factors and conclusions considered in this section 4 are also reasons to have figured, as of March 31, 2000, that the likelihood that the Swiss franc would in the future depreciate against the dollar, as well, was higher.

PX 279 at 15.

Plaintiffs argued that section 4.7 of Prof. Frankel's report discloses his expert opinion on whether the Swiss franc was expected to depreciate versus the dollar and serves as a sufficient foundation for that opinion. See Tr. at 1439.

Prof. Frankel was deposed on October 16, 2007, over one month after he submitted his expert report. See PX 722 (excerpts of Prof. Frankel's deposition testimony); PX 279 at 1 (cover letter to Prof. Frankel's expert report dated September 14, 2007). During that deposition defendant inquired as to the significance of the change in the wording of section 4.7 from the initial draft to the final draft of Prof. Frankel's expert report:

Q. [by defense counsel] . . . . Now, in your initial draft, you wrote "Thus, a reasonable and well-founded expectation in April 2000 was that the Swiss Franc would not exhibit the same future upward trend against the dollar that the Euro was expected to show."

A. [by Prof. Frankel] Yes.

Q. Now, in the final version, the clause is added, "but rather would depreciate against the Euro"; is that right?

A. Right

Q. Now, why did you add that clause?

A. For clarification. I think that the sentence, as it stood, was a little incomplete.

Q. You were not trying to say that you thought the Euro – that the Swiss Franc was going to depreciate against the dollar; did you?

A. No, I didn't say that.

PX 722 at 4-5.

Prof. Frankel repeatedly would refuse during his deposition to take a position regarding how the value of the Swiss franc would vary with respect to the dollar.

Q. [by defense counsel] But it wasn't your opinion that [the Swiss franc] would move in the opposite direction [than the dollar?]

A. Sufficiently – sufficiently great uncertainty that I didn't really have a position . . . . And so, I didn't really have a view, or wouldn't have felt comfortable expressing a view as to which way I thought the Swiss Franc would move against the dollar.

I – I did feel I'm able to do that against the Euro.

Q. Okay. So you don't have an opinion in this case about whether it was reasonable to expect the Swiss Franc to move up or down against the dollar in March of 2000?

A. There's all kinds of things that are reasonable.

Q. Well, I'm asking whether you have an opinion.

A. I – I didn't and don't have an opinion as to whether there was a substantially greater chance the Swiss Franc would move up or down against the dollar.

PX 722 at 7-8.

Defendant's principal objection was that Prof. Frankel during his deposition had declined to express an opinion on whether the Swiss franc would depreciate versus the dollar. Although defendant acknowledged ambiguity in the portion of section 4.7 of Prof. Frankel's expert report that read "the likelihood that the Swiss franc would in the future depreciate against the dollar, as well, was higher," see Tr. at 1453-54, Prof. Frankel declined even at trial to take a firm position regarding how the value of the Swiss franc would vary with respect to the dollar as he had offered for the euro. See Tr. at 1454-57.

The court sustained defendant's objection to an opinion from the witness with respect to movement of the Swiss franc against the dollar. See Tr. at 1461. The testimony offered was Prof. Frankel's expert opinion, as opposed to a general statement of the common view among market participants. Prof. Frankel declined explicitly to take such a position when asked to do so during his deposition, and he declined to do so at trial when prompted by defendant during voir dire.

RCFC 26(a)(2)(B) stipulates that an expert report shall contain a complete statement of all opinions to be expressed and the reasons and basis therefor. RCFC 26(b)(4)(A) provides for the right to depose an expert upon his complete report. Prof. Frankel's opinion concerning the movement of the Swiss franc against the dollar was not disclosed during the deposition following his report, as required by rule. Moreover, defendant has demonstrated that it would be unfairly prejudiced by allowing Prof. Frankel's testimony to embrace an opinion on which he avoided examination during deposition. See Tr. at 1461-62; Fed. R. Civ. P. 403 (testimony that would unfairly prejudice party may be excluded). Due to the anecdotal information that formed the basis of Prof. Frankel's opinion on the movement of the euro against the dollar and his ready admission that he did not consider the profitability of the FXDOTs or their value, the court gave more weight to the synthesis by defendant's expert of market trends in the context of the Welleses' FXDOTs. 34/

---

34/ A judge sometimes makes an infelicitous evidentiary ruling, and this court scrambled one concerning whether Prof. Frankel in deposition testified that Jeffrey Welles told him that he did not rely on a report from Deutsche Bank, as opposed to telling him that Jeffrey Welles relied on advice or information from Deutsche Bank. Tr. at 1483-85. Upon review of the deposition transcript admitted as DX 722, the court reaffirms its ruling that the material is not impeaching. See Tr. at 1485.

4) Dr. David F. DeRosa

Dr. David F. DeRosa was defendant's expert in foreign exchange, foreign exchange option trading, foreign option valuation, foreign exchange option markets, investment management, investment and financial analysis, economic analysis, and general finance. See Tr. at 1924, 1930, 1936. He analyzed the FXDOTs that the Welleses executed through their investment entities. No shrinking violet, Dr. DeRosa has a distinguished background that he obviously relishes drawing upon. His self-congratulation was woven so inextricably with a gusto for applying his analytical skills to an assignment that his high-self-regard only gave an amusing aspect to the expert's testimony. Cross-examination will reveal if an ego betrays the integrity of an opinion. The jousting between Dr. DeRosa and plaintiffs' counsel netted plaintiffs only a few minor points. 35/

Dr. DeRosa is the President and owner of DeRosa Research and Trading, Inc., 36/ the platform for all of his activities, including his membership on the Board of Directors for five hedge fund groups, his consulting, and his writing. See DX 516 app. I at 1 (curriculum vitae of Dr. DeRosa); Tr. at 1893, 1913-14. Among book chapters, articles, and seminar papers, Dr. DeRosa has authored four books, including: In Defense of Free Capital Markets: The Case Against a New International Financial Architecture (Bloomberg Press, 2001); Options on Foreign Exchange (2d ed. John Wiley & Sons, 2000); Currency Derivatives (John Wiley & Sons, 1998); and, Managing Foreign Currency Exchange Risk (Rev. ed. Irwin/McGraw-Hill, 1996). See DX 516 app. I at 3; Tr. at 1905-06, 1911-13. Dr. DeRosa holds a Ph.D. in Finance and Economics from the University of Chicago, Graduate School of Business.

Dr. DeRosa boasts an extensive professional and academic background in economics and investment, with emphasis on foreign markets, foreign currency exchange, and specifically digital options and option pricing theory. Currently, Dr. DeRosa is a director for five hedge funds with over thirty billion dollars under management. See DX 516 app. I at 1; Tr. at 1908-09. He also serves as an Adjunct Professor of Finance at the Yale School of Management, and as an Adjunct Associate Professor in Industrial Engineering and

---

35/ For example, plaintiffs elicited that Dr. DeRosa, who opined on the expected-rate-of-return for the Welleses' FXDOTs, did not give testimony in the Jade, Sala, or Klamath cases on the expected-rate-of-return. See Tr. at 2068-70. However, Dr. DeRosa explained on re-direct that another expert retained by the Government had performed the expected-rate-of-return analysis in Jade. See Tr. at 2087-88. This putative inconsistency, of course, is bogus.

36/ Dr. DeRosa established DeRosa Research and Trading, Inc., as a hedge fund, although it has not traded in years. The company is a member of the National Futures Association and is registered with the Commodities Futures Trading Commission. See DX 516 at 3; Tr. at 1913-14.

Operations Research at Columbia University. 37/ See DX 516 app. I at 1; Tr. at 1910. Dr. DeRosa has been qualified as an expert witness in civil and criminal actions. Much to plaintiffs' consternation, he has become associated with testifying on behalf of the United

37/ Dr. DeRosa explained why he teaches out of the Engineering School at Columbia University: "[T]he Engineering School has a Master's degree in financial engineering, Master's of – and what this is is the more rigorous computational mathematical aspects of modern finance. And at that school, that Master's program, I teach my foreign exchange and related derivative instruments course . . . ." Tr. at 1910.

States in the recent tax cases involving Son of BOSS shelters. 38/ DX

38/ Plaintiffs made much of Dr. DeRosa's repeated retention by the Government as an expert witness in similar cases. See Tr. at 2033-37. Whether Dr. DeRosa qualified as an independent expert (given his serial appearances as the Government's expert witness in these cases) had been the subject of an unsuccessful motion *in limine* filed by plaintiffs. See Order entered Mar. 25, 2008 (denying plaintiffs' motion *in limine* to exclude testimony and exhibits of Dr. DeRosa and ruling that plaintiffs' "objections go to the weight that the court will accord Dr. DeRosa's testimony"). Dr. DeRosa, however, adequately explained why he had become an expert witness identified with the Government:

> Q. [by defense counsel] You seem to have a lot of engagements listed in your CV and also that you've just talked about for the government. Do you limit yourself to just representing – just testifying on behalf of the government as an expert witness?
>
> A. No, not at all. But there have been a lot of government cases, and there's a simple reason for that. And the reason is as follows: Look, I'm an expert in finance and economics, but I have – I have a rare subspecialty in foreign exchange and derivatives. There just aren't a lot of people who have the general background who are academics by training but have professional experience. And if they have that, chances are they don't spend their time being expert witnesses. They're hedge fund managers.
>
> And so, all of these cases are foreign exchange-related or something related to another area that I'm interested in of securities lending, like short sales. A lot of these cases just happen to be in my area.
>
> And I've gotten calls from the other side, not in – not in the present case, but I was getting telephone calls from people who wanted to sue the government or the IRS on these cases, and I wouldn't have had a problem with taking them except when I look at the transactions I come up with some fairly clear analysis in my mind. I mean, they speak rather loudly. And the side that it turns out on happens to be the side of the government, which in a sense is wonderful because I like – I like that. But in another sense it's not so wonderful because the other side would pay me a lot more.
>
> But this is where the analysis takes me. And the reason there are so many of these cases is simply because they're almost all foreign exchange-related. And that happens to be one of my subspecialties.
>
> THE COURT: In those cases where you have been approached by, I guess, would it be fair to say the taxpayers involved?

516 app. I at 4; Tr. at 1914-23.

Defendant retained Dr. DeRosa to determine whether a reasonable possibility existed that the Welleses' FXDOTs could return a profit. See Tr. at 1936-37. Dr. DeRosa reviewed the Deutsche Bank confirmations and other trading documents for the necessary information to conduct his analyses. See Tr. at 1937-39. He evaluated whether the options used in the FXDOTs were priced fairly. He also considered the probabilities of the various outcomes of the FXDOTs, including the probability of hitting the "sweet spot." Finally, he conducted an expected-rate-of-return analysis to reach his ultimate conclusion that the FXDOTs did not have a reasonable possibility of making a profit.

i) Options pricing

Dr. DeRosa first inquired whether the options were fairly priced. To make this determination, he "employed an adaptation of the Black-Scholes model that is derived for digital options on foreign exchange." DX 516 at 39-40; see also Tr. at 1938-39. 39/ Dr.

---

38/ (Cont'd from page 71.)

THE WITNESS: Yes.

THE COURT: Have you actually gone so far as to conduct one of your analyses that speaks rather loudly with respect to the prospective engagement before it was decided that you wouldn't proceed working for the plaintiff?

THE WITNESS: Well, your Honor, it was like this: I would say to them, "Tell me the structure of your transaction."

And invariably they would say, "Well, we bought an option and we sold another option with identical terms but a very tight strike price."

And my answer to that is that's one transaction. That's not two transactions.

And at that point they say, "Well, thank you very much for your time."

And then, your Honor, the Jade Trading case, since that's come out and my name is all through it, right, no one calls me up and asks me.

Tr. at 1920-23.

39/ On cross-examination Dr. DeRosa admitted that the Black-Scholes model that he used assumed no transaction costs and a constant interest rate, although in the real world,

DeRosa explained, "Black-Scholes models are used to calculate the price of an option where the volatility of exchange rates is known, or at least assumed." DX 516 at 40. Having run the Black-Scholes model on the FXDOTs at issue, Dr. DeRosa concluded that "the offsetting option components were priced at levels that far exceeded their theoretical value [a number derived from the option pricing theory that represents the fair value of the option before consideration of its bid-ask spread]," DX 516 at 27, and that "the net stated premium of each combination of offsetting options was also considerably overvalued when compared to the theoretical values." DX 516 at 31.

In pricing the FXDOTs by the Black-Scholes model, Dr. DeRosa used a Bloomberg database to obtain the historical spot exchange rates on the euro against the dollar and the dollar against the Swiss franc, the interest rate on the dollar for each pair of options, and the short-term interest rate on the euro and the Swiss franc. See Tr. at 1939-40. While Dr. DeRosa gleaned the remaining terms from the confirmations, he required one more unknown term to complete the formula – the quoted volatility or implied volatility of the exchange rate. See Tr. at 1940. Dr. DeRosa used two sources for implied volatilities. The Bloomberg database provided historical implied volatilities by currency and by the terms of the options. See Tr. at 1940-41. Also, Dr. DeRosa reviewed Deutsche Bank's internal documents related to the FXDOTs, called Option Deal Entry Tool or "ODETs." See DX 516 at 26 & n.12; Tr. at 1943. The ODETs for each FXDOT reflected the interest rates and implied volatilities used by Deutsche Bank for the FXDOTs, which Dr. DeRosa testified "were very close to what Bloomberg had." Tr. at 1943; see also DX 516 at 26. Dr. DeRosa used the inputs from the ODETs for each FXDOT in order to make his calculations with the Black-Scholes model. See Tr. at 1943.

Based on these inputs, Dr. DeRosa calculated the theoretical values of each of the option positions for the Welleses' FXDOTS. On the euro/dollar long positions, Dr. DeRosa calculated a theoretical value of $23,346,255.00, and on the short positions, a value of $22,832,588.00. See DX 516 at 27. Dr. DeRosa's calculations correspond closely with the theoretical values reflected on the Deutsche Bank ODETs of $23,126,078.00 and $22,616,509.00, respectively. See DX 516 at 28. Yet, these calculated theoretical values are dwarfed by the stated premiums on the confirmations for the FXDOTs of $102,287,500.00 on the euro/dollar long positions, and $101,264,625.00 for the short positions – reflecting a pricing for the FXDOTs approximately 3.4 times higher than that derived under the Black-Scholes pricing model. See DX 516 at 27-28.

---

39/ (Cont'd from page 72.)

these assumptions do not hold true. See Tr. at 2044-45. The court finds that these facts do not undermine the magnitude of the discrepancy between costs and probability of positive yield.

Dr. DeRosa found similar overpricing on the Swiss franc/dollar options. Employing the Black-Scholes model, Dr. DeRosa determined the theoretical value of the Swiss franc/dollar long positions to be $40,668,325.00 and $40,025,738.00 for the short positions. See DX 516 at 29 & T.3, 33 & T.5. Not appreciably different, the Deutsche Bank ODETs for the FXDOTs stated a theoretical value for the Swiss franc/dollar long positions of $41,112,234.00 and $40,463,653.00 for the short positions. See DX 516 at 33 & T.5. The stated premiums from the confirmations for the FXDOTs, however, were $102,287,500.00 for the long positions and $101,264,625.00 for the short positions – a pricing difference approximately 149% greater than the theoretical values of the options. See DX 516 at 33 & T.5. Totaling the long and short option values, Dr. DeRosa concluded that the stated premiums for both sets of options, the dollar/euro and Swiss franc/dollar, "was on average approximately 220% greater than [the] theoretical values." DX 516 at 29.

Dr. DeRosa discovered an additional pricing anomaly when analyzing the net premium paid by the Welleses to Deutsche Bank. The total net premium paid for the FXDOTs was $2,045,750.00, a figure calculated as 1% of the long option stated premium. See DX 516 at 31, 36. However, upon netting the theoretical values, both for the figures Dr. DeRosa derived in his analysis, as well as those recorded by Deutsche Bank on the ODETs, the premiums calculate to $1,156,254.00 and $1,158,150.00, respectively – yielding a difference between the stated net premiums and the netted theoretical values of 176%. 40/ See DX 516 at 32 & T.4 to 33 & T.5. Dr. DeRosa opined that

> the stated premium of an option may vary marginally from its theoretical value. That said, I can think of no market-related explanation to account for the significant pricing differences between the stated premiums and the theoretical valuations derived by both DEUTSCHE BANK and myself. Thus in my opinion, the stated and net stated prices were materially overstated.

DX 438 at 4 (correction to expert report); see also DX 516 at 36. 41/

---

40/ Dr. DeRosa also derived theoretical values and net theoretical values in calculations involving removal of the "sweet spot," on his theory that the "sweet spot will never be hit." DX 516 at 34 (to be discussed in the body of this section). With the removal of the sweet spot, the net theoretical value calculated by Dr. DeRosa reduces by $516,058.00 to $640,196.00, thereby rendering the stated net premium 3.1 times greater than the theoretical net value calculated based on the Black-Scholes model. DX 438 at 3-4 (corrected pages 35-36 to DX 516).

41/ To emphasize the point, Dr. DeRosa also performed the reverse analysis by using the inputs from the confirmations and ODETs to derive the implied volatility through the Black-Scholes model:

ii) Outcome probabilities and the "sweet spot"

Dr. DeRosa offered his opinion on the probabilities of the possible outcomes of the FXDOTs determined through the Black Scholes model, concluding that an 11.43% probability existed that the two-to-one payoff on the euro would occur and a 19.95% probability existed that the two-to-one payoff on the Swiss franc would occur. See DX 516 at 54-55 & T.10. Dr. DeRosa did not derive probabilities on the "sweet spot," because he concluded that the "sweet spot" could never be attained. To illustrate how he reached this conclusion, Dr. DeRosa explained how the quote is determined on expiration day at 10:00 a.m. New York time (the "New York cut"). According to Dr. DeRosa, it is Deutsche Bank, as calculation agent, that determines whether the options are in the money or out of the money at that time. See Tr. at 1967-70. The FXDOT contracts themselves do not specify the method by which the quote must be determined, except to state that it must be done in a commercially reasonable way. See Tr. at 1968. At the New York cut, both a bid and ask price are quoted, and Deutsche Bank may determine to use either one of those numbers or another of its choosing between them. See Tr. at 1969-70. Dr. DeRosa confirmed this method by consulting the Deutsche Bank mechanism for determining the quote at the New York cut:

> [T]hey choose five reference banks. Currently they're doing Chase, Citibank, UBS, Morgan Stanley and Barclay's, all major foreign exchange banks.
>
> Now, you have to understand that if you go to these banks simultaneously, they're not going to give you the same bid-ask for the euro or for dollar Swiss or for anything else. There'll be small differences in the quotes. So, here he's [Perry Parker of Deutsche Bank] got an example from that day of August 2nd. They had an expiration on August 2nd, and you see the quotes. So, this is dollar yen, but the same principle works for the euro or dollar Swiss or anything else.

---

41/ (Cont'd from page. 74.)

> The volatility implied by the dollar price of the USD/CHF options was in excess of 100%, a number that is monstrously large and totally unrealistic. By any basis for the exchange rate of the dollar and Swiss franc this is completely out of the range from the numbers in the Bloomberg database. The EUR/USD case is even more absurd because no implied volatility makes the theoretical value match the stated premium. These digital options are priced at levels antithetical to Black-Scholes analysis.

DX 516 at 40-41 (footnote omitted).

> And they're getting quotes three pips wide, 5-8, 3-6, 5-8, 6-9, 5-8. Deutsche Bank chose to use the Barclay's quote. They didn't have to use the Barclay's quote. That was their idea. They just decided to do it.
>
> So, let's look at the Barclay's quote 109.05-08, right? Our determination of the rate was 109.06. They didn't even take the bid or the ask. They chose something in between. But they could have added more banks to it. They could have gone 10 banks if they wanted to. And clearly they have wide latitude within this pricing mechanism to declare options out of the money or in the money.
>
> Now, I look at this, and I say, "Gee, there's no way that they're gonna declare a sweet spot having hit."

Tr. at 1971-73; see also DX 516 at 47-49; DX 184 (e-mail from Perry Parker of Deutsche Bank describing above method for determining the quote). Dr. DeRosa also opined that a party could influence the exchange rate at the New York cut to avoid the sweet spot being hit simply by buying or selling a massive amount of currency at that time. See Tr. at 1973-74; DX 516 at 49-51; see also DX 200 (e-mail from Mr. Brubaker to Erwin Mayer at J&G describing manipulability of foreign exchange market and ability to "move the market off the strikes" in order to avoid sweet spot payout). 42/

As further evidence that even Deutsche Bank itself did not conduct its normal business consistent with the possibility that the sweet spot would be hit on the FXDOTs, Dr. DeRosa reviewed Deutsche Bank's internal risk management procedures. After examining Deutsche Bank's central risk management book (the "RMS"), he concluded that Deutsche Bank hedged the FXDOTs in that system as though the sweet spot would not be hit. Each time the FXDOTs were input into the ODET, the strike prices for the long and short were correct; yet, when the information passed into the RMS, the short component strike price was manually changed to replicate the long component, thereby eliminating any need for an internal hedge in the RMS for the theoretical risk of hitting the sweet spot. See Tr. at 1976-80; see also DX 720 at 32-60 (designated portions of deposition of William F. Vogel, who handled trade booking at Deutsche Bank, confirming practice of manually changing short and long strike prices in RMS to match one another at the request of "traders," and affirming that this was done for the Welleses' FXDOTs). Dr. DeRosa drew an inference that this "rebooking" signaled that Deutsche Bank did not believe such a hedge was necessary; that

---

42/ On cross-examination plaintiffs questioned Dr. DeRosa about the feasibility and propriety of Deutsche Bank's seeking to influence the exchange rate for the day or of Deutsche Bank's using a different spot rate for the Welleses' trades than for other trades, thereby implying that other trades could be affected by such a move. See Tr. at 2061-64. Dr. DeRosa responded that the question was beyond his ken. See id.

is, no risk was present that the sweet spot would be hit, and thus no need to hedge that possibility. See Tr. at 1976-80 ("So, what that means is that they're hedging this in their master risk book as though the sweet spot can never be hit. . . . . [43/] They went out of their way to do it. They took an extraordinary step of rebooking the option in the risk management system."); DX 516 at 79-89 ("In my opinion there is strong evidence showing that in the case of the Stobie Creek options, DEUTSCHE BANK did not – nor did it ever intend to – hedge the sweet spot."). 44/ Given his opinion that the sweet spot was unattainable, Dr. DeRosa adjusted his calculations to reflect the removal of the possibility of the sweet spot. See Tr. at 1980.

iii) Expected-rate-of-return

Dr. DeRosa evaluated the profit potential of the FXDOTs by analyzing the concept of expected-rate-of-return. 45/ See Tr. at 1985-86; DX 516 at 52-58. His analysis calculated only the probabilities of two outcomes: the offsetting options finishing in the money, resulting in a doubling of the premium paid on the long option; and the offsetting options finishing out of the money, resulting in zero payout (Dr. DeRosa's analysis of expected-rate-of-return did not include the sweet spot outcome). See DX 516 at 52-53; Tr. at 1986. He calculated the probabilities for the two outcomes using the data from the ODETs and information on the mid-level volatilities and deposit rates to determine that the probability for doubling the money on the euro was 11.43% and 19.95% on the Swiss franc. See DX 516 at 54.

Having derived the probabilities, Dr. DeRosa calculated the expected dollar return by multiplying the sum of each payoff by its probability of occurrence. See DX 516 at 54-55 & T.10. To determine the expected-rate-of-return, Dr. DeRosa then divided the expected dollar return by the net premium payment for each set of offsetting options and subtracted one. See id. Based solely on the net premiums paid, and not including any other fees

---

43/ His testimony and report confirm that Dr. DeRosa misspoke in the following sentence, which the court has omitted.

44/ On cross-examination Dr. DeRosa admitted that changing the strike price in the RMS also has the effect of marginally increasing the cost to Deutsche Bank of the hedge on the two-to-one payoff outcome. See Tr. at 2060.

45/ Because the expected-rate-of-return concept relies on the probabilities calculated in the Black-Scholes analysis, the same underlying assumptions of Black-Scholes, which do not hold constant in the real world, carry forward into the expected-rate-of-return analysis. See Tr. at 2070-71. Again, despite this limited weakness, the court finds that the magnitude of the differential still would be huge. See supra note 39.

associated with these transactions, the expected-rate-of-return on the dollar/euro options was -77.14% and on the Swiss franc/dollar options was -60.10%. 46/

iv) Dr. DeRosa's conclusions on profitability

Having calculated the expected-rates-of-return on the FXDOTs, Dr. DeRosa concluded that no reasonable possibility existed that the Welleses could have earned a profit on the FXDOTs. 47/ He opined:

---

46/ In a separate calculation of expected-rate-of-return, Dr. DeRosa accounted for the fees paid to the various purveyors of the J&G strategy, including $2,045,750.00 paid to J&G, and $1,022,875.00 paid to SLK for each offsetting set of options. Including these fees in the calculation lowered Dr. DeRosa's expected-rate-of-return figures to -94.29% for the euro options and to -90.03% for the Swiss franc options. See DX 516 at 55-57 & T. 2.

Dr. DeRosa also performed his expected-rate-of-return calculations using the best-case scenario probabilities from the reports of plaintiffs' experts, Dr. Kolb and Prof. Levich. For Dr. Kolb's report, using a probability of 10% for the dollar/euro pair, and 6.6% for the Swiss franc/dollar pair, Dr. DeRosa calculated expected rates of return of -80% and -86.80%, respectively. Including the transaction fees paid to J&G and SLK in this calculation, Dr. DeRosa derived expected rates of return on the options of -95% and -96.70%, respectively.

For Prof. Levich's probability calculations, using a probability of 21.41% on the dollar/euro options and 27.77% on the Swiss franc/dollar options, Dr. DeRosa calculated an expected-rate-of-return of -57.18% and -44.46%, respectively. Adjusting the calculations so as to include the J&G and SLK fees, these expected-rates-of-return decreased to -89.30% and -86.12%, respectively.

Dr. DeRosa performed an expected-rate-of-return analysis on Prof. Levich's probability calculations for the sweet spot. Given Prof. Levich's calculations of the probability of hitting the sweet spot on the dollar/euro pair of 0.1469% and on the Swiss franc/dollar pair of 0.1143%, Dr. DeRosa calculated an expected-rate-of-return of -27.72% and -21.60%, respectively. Adjusting the calculations so as to include the J&G and SLK fees, the expected-rate-of-return on each offsetting set of options decreased to -81.93% and -80.40%, respectively. See DX 515 at 5-9; Tr. at 1990-93.

47/ In forming his opinion that no realistic opportunity to earn a profit on the FXDOTs existed, Dr. DeRosa relied on the historical trading patterns of the euro and Swiss franc. See Tr. at 2001-06. He testified to a historical positive correlation between the euro and the Swiss franc as against the dollar of 0.97 (thus, when the euro rises against the dollar, so does the Swiss franc). See Tr. at 2012; DX 515 at 13. Accordingly, Dr. DeRosa found it to be "a rare event at best" that a decoupling would occur between the tightly correlated

> [I]f you start out and you're overpaying three to four times for the options, that translates to an expected rate of return of minus 70 percent. I think you have no expectation of making a profit. These are terrible transactions. And then it's worse because the illusion of the sweet spot, that doesn't hold water.
>
> So, not only are they overpriced with the sweet spot, they're horribly overpriced. So, that takes a bad investment and makes it into an atrocious one.

Tr. at 1995; see also Tr. at 2023-24 ("There is no reasonable expectation of profit. . . . [T]he options were purchased for egregiously overpriced values that bear no relationship to trading reality and that once they had overpaid by such a wild amount, there was no way to dig themselves out of the hole. . . . A reasonable person isn't going to overpay by three and a half times what is available commonly on the street."); DX 516 at 57-58 ("The offsetting options, whether viewed singularly as option pairs, or collectively as the assets of Stobie Creek, did not have a reasonable possibility of achieving a profit."); DX 515 at 9-10 ("[A] prospective investor would reasonably expect a negative return on these options, given the cost of the options, the likelihood of possible outcomes, and the possible payoffs. Accordingly, no investor would have had a reasonable expectation of earning a profit on these options, and no reasonable investor seeking to earn a profit would have entered into these transactions."). 48/

5) Import of expert opinion on economic substance

The crux of the court's objective inquiry into plaintiffs' asserted business purpose of making a profit is whether a reasonable possibility of profit exists. While the experts offered

---

47/ (Cont'd from page 78.)

euro and Swiss franc. Tr. at 2005. He viewed the Welleses' positions in their FXDOTs to be even more unlikely to return a profit than his expected-rate-of-return analysis suggests, because "[f]or both options, both pairs to pay off, you would have to have, like, a catastrophic breakdown of a historical trading pattern that the euro and the Swiss franc are very tightly – are very closely tied together." Tr. at 2001.

48/ Dr. DeRosa also opined that no economic or financial benefit accrued in using single-member LLCs to engage in the FXDOTs and then to contribute them to the partnership. See Tr. at 2021-22; DX 516 at 91 & n.40. This is not to suggest that Stobie Creek, as the family investment vehicle, lacked a valid business purpose. However, plaintiffs did not prove a valid business purpose of the single-member LLCs apart from facilitating the J&G strategy. Mr. Waterman assumed that the LLCs served as a "little liability protection device" or a "little liability shield," Tr. at 343, and Mr. Herpe only speculated to the use of LLCs as separate entities within a pooled-investment vehicle. See Tr. at 123-25.

different approaches for evaluating profit potential, the court found that Dr. DeRosa's analysis provided the most convincing and complete methodology to approximate how a reasonable investor would judge potential for profit.

As noted by Dr. Kolb, nine possible outcomes could obtain at the expiration date of the FXDOTs. In one outcome plaintiffs could double their investment premium. In a narrow set of outcomes, plaintiffs could reap a potential lottery strike if the "sweet spot" were to hit, particularly if the sweet spot on both options pairs struck. In all remaining outcomes, the Welleses would either break even, making a profit of zero, or would lose their entire investment. See PX 293 at T.11. Dr. Kolb testified, that on the basis of these outcomes an "enormous profit potential" existed. Tr. at 939.

Dr. Kolb's analysis was selective and incomplete. Dr. Kolb testified that each of these outcomes were not equally probable, yet did not calculate the probabilities across each outcome. His dismissal of the Black-Scholes model for calculating probabilities was disingenuous, after he saw fit to make the calculations in connection with an earlier draft of his expert report, an inquiry that he unsuccessfully discounted as an intellectual curiosity of an economist. His explanation of the irrelevance of the Black-Scholes model to his analysis did not impress the court. Although his criticism that the model involves assumptions of perfect and static markets certainly is valid, he could not offer a more appropriate substitute for determining the probabilities – a matter of which he does admit the pertinence. See Tr. at 914-15 ("[I]t's certainly my opinion that some of them are much more likely to be hit than others. And in particular, hitting the sweet spots, in my judgment, is quite a bit less likely than any of the other outcomes."). That the Black-Scholes model "doesn't pertain to what any particular individual is thinking," Tr. at 940, hardly constitutes a formidable criticism when the function of his expert analysis was to evaluate whether, on an objective basis, a reasonable possibility of profit existed, not to divine whether an individual investor subjectively believed there to be such a possibility.

Plaintiffs' second expert, Prof. Levich relied on the Black-Scholes model to estimate the probability of making a profit, thereby lending credence to its usefulness. See PX 307 at 7 ("In order to estimate the probability of making a profit in an option contact, we need to use an option pricing model. . . . I utilized the Black-Scholes continuous time lognormal model . . . ."). Furthermore, Jeffrey Welles himself testified that determining probabilities, including running the Black-Scholes model, was a tool that he previously used with options investments, although he did not use it with the FXDOTs. See Tr. at 809-16. The court consequently finds ample justification to consider the probabilities determined through the Black-Scholes model, along with the other information that the model supplies, as an approximation of what a reasonable investor would consider in evaluating profit potential. Dr. Kolb's failure to include this information in his report and testimony left a gaping hole for Dr. DeRosa to walk through.

Prof. Levich's analysis demonstrates a similar lack of completeness. Using a Black-Scholes model and varying volatility inputs, ranging from the actual volatilities for seven-day or one-month maturity periods, and assumed inputs of 12.5%, 15%, 17.5%, and 20%, Prof. Levich estimated the probabilities of attaining the two-to-one payoff outcome to be 9-21% on the dollar/euro and 15-27% on the Swiss franc/dollar. Prof. Levich's higher-end probability estimates derived from these higher estimated volatility inputs, even though, admittedly, only the seven-day and one-month figures of 12.2% and 15.25% actually had documentary support, having been retrieved from a JP Morgan database. The higher estimated volatility figures, according to Prof. Levich, "account for uncertainty in estimating volatility or potential jumps in the spot series," PX 307 at 7, but the witness made no case for why the court should credit a higher figure of probability on the basis of a higher assumed volatility estimate where the volatility figure, on the date of the trade, could be ascertained from the JP Morgan database, as Prof. Levich did; from the Bloomberg database, as Dr. DeRosa did; or from Deutsche Bank, which recorded the implied volatility on its ODETs.

Further clouding Prof. Levich's probability estimates is the nature of the trades engaged in by the Welleses. As the experts acknowledged, the Welleses' FXDOTs required two historically correlated currencies to decouple and move in opposite directions in order to return any profitable outcome; that is, if the currencies moved in the same direction relative to the dollar, the most favorable outcome that the Welleses could hope for would be to break-even, a zero profit. Prof. Frankel testified regarding the market expectations on the rate of movement of the euro against the dollar, but his truncated opinion confined to the euro could not establish that it was reasonable to expect that the euro and Swiss franc would move in opposite directions relative to the dollar – the only scenario under which the options considered in tandem could produce a profitable outcome for the Welleses.

Dr. DeRosa credibly testified that the unlikelihood of this movement would decrease further the probabilities of returning any profit at all on the total investment. See supra note 47. Dr. Kolb's work papers illustrated this point succinctly: While, over 349 possible seventeen-day periods in the span of one year, the euro moved sufficiently with respect to the dollar to result in a profitable investment outcome in thirty-five of the periods, and the Swiss franc moved with respect to the dollar to result in a profitable investment outcome in twenty-three of the periods, the euro and the Swiss franc both moved enough, simultaneously, for both pairs of the FXDOTs to result in any profit in exactly zero periods. See Tr. at 977-84; DX 542 at 1-8. Prof. Levich failed to calculate the probability that both option pairs would hit the two-to-one payout and acknowledged that the probabilities he derived for each currency would lower as the correlation between the currencies became higher – a result that he admitted could lower the probability of returning any profit at all to zero. See Tr. at 1081-82.

Dr. DeRosa's analysis offered a more complete picture of the potential profitability of the FXDOTs. The court finds that derivation of the probabilities of each outcome's

obtaining is a necessary component to an evaluation of whether profit potential exists. No reasonable person would make an investment, no matter what the stated return, if the probability of achieving that return were zero. Dr. DeRosa calculated a two-to-one payoff outcome probability of 11.43% on the dollar/euro pair and 19.95% on the Swiss franc/dollar pair using a generally accepted options pricing model, the Black-Scholes model. The court accords these probability figures greater weight, recognizing that they fall within the probability ranges derived by Prof. Levich using the JP Morgan data for implied volatilities and that they were derived using the implied volatilities recorded by Deutsche Bank on its ODETs, figures that closely matched volatilities listed by Bloomberg. The court also credits Dr. DeRosa's opinion, confirmed by the testimony of Prof. Levich, that the low (if not nonexistent) probabilities that both of the paired options would achieve a favorable outcome simultaneously – a result requiring an unlikely decoupling of the two currencies – would decrease substantially the possibility of achieving any profit at all on the Welleses' FXDOTs.

Dr. DeRosa took his analysis a step further than any of plaintiffs' experts by including the costs associated with executing the FXDOTs and performing an expected-rate-of-return analysis. Neither Dr. Kolb nor Prof. Levich considered the effect of the transaction costs on the profit potential of the transactions. Including only the net premium paid by the Welleses for the long options, Dr. DeRosa calculated the expected rates of return to be -77.14% on the dollar/euro options and -60.10% on the Swiss franc/dollar options. See DX 516 at 54-55 & T.10. Dr. DeRosa arrived at even greater negative expected-rates-of-return when including the fees paid to J&G and SLK. Dr. DeRosa also calculated the expected-rate-of-return using Dr. Kolb's and Prof. Levich's best-case scenario numbers, each calculation producing a large negative expected rate of return. The court is persuaded that a reasonable investor would take into account the costs and fees associated with entering and completing a transaction in evaluating whether an investment has a reasonable possibility of making a profit. The costs and fees associated with the FXDOTs dwarf what little profit potential the investments were capable of returning.

A corollary factor to the high negative expected-rate-of-return on the FXDOTs is the overpricing of the FXDOTs revealed by Dr. DeRosa's Black-Scholes option pricing model. Not one of plaintiffs' experts adequately addressed the salient point made by Dr. Derosa: why would any reasonable investor overpay for the options? 49/ As Prof. Levich acknowledged, having used the Black-Scholes analysis himself, and in view of the Deutsche Bank ODETs that he reviewed, the Welleses paid a premium on the order of $9 million for each option with a value of no more than $2.7 million. See Tr. at 1073. Plaintiffs' experts have not satisfied the court that overpaying for these options, in the circumstances at the time of the

49/ Notably, an earlier draft of Prof. Levich's expert report included a section on the "appropriate" pricing of the FXDOTs. This section was later removed and not included in the final expert report. See Tr. at 1065-67; DX 354 (e-mail from Prof. Levich to plaintiffs' counsel dated July 29, 2007, containing draft report).

investment, would be reasonable – or even excusable – under an objective standard. The cost of the options, the stated premiums, is a component of the calculation of the expected-rate-of-return; the overpricing of the options emerges as a prominent reason for the extremely negative rates-of-return on the FXDOTs and surely would dissuade a reasonable investor from entering the FXDOTs with a reasonable expectation of achieving a profit.

The recent opinion issued in Sala, 552 F. Supp. 2d at 1185, found the testimony of the Government's expert, Dr. DeRosa, unconvincing. The case involved a loss-generating tax shelter referred to as the "Deerhurst Program." Disagreeing with the Government's position, and that advanced by Dr. DeRosa, the court found that a "significant" potential to earn profits existed. Id. at 1190. The facts and circumstances that undergird the district court's evaluation of Dr. DeRosa's testimony in Sala do not counsel in favor of discrediting Dr. DeRosa's testimony in the cases at bar. The Deerhurst Program in Sala involved a five-year investment strategy with significant features of investment and a profit-motivated business purpose supporting its continued, long-term trading activities. See id. at 1179, 1186-90. The court found a 50% probability of achieving maximum profitability within one year and a 45% potential profit net of fees. See id. at 1185, 1190. The probability of achieving profit on either option pair purchased by the Welleses was in the range of less than 12% on the dollar/euro and less than 20% on the dollar/Swiss franc. The probability figures slip lower than even these numbers suggest, given that profitability could not be achieved unless both currency options finished in the money, a result requiring an unlikely decoupling of historically highly correlated currencies.

It is unclear whether the district court in Sala was presented with, or considered, an expected-rate-of-return analysis. However, this court finds the expected-rate-of-return analysis instructive in accounting for the costs and fees of participating in the FXDOTs. The fees in Sala associated with the transactions were calculated as a percentage of the profits realized from the options trades, see id. at 1185; 50/ in these cases fees were calculated as a percentage of the gains to be sheltered by the J&G strategy and without regard to any profit produced on the FXDOTs. See discussion infra part IV.3. The fees related to the implementation of the J&G strategy exclusive of the options premiums paid on the order of over $6 million, further overwhelm what little possibility of profit could have been produced by the FXDOTs.

---

50/ The Sala decision refers to "fees for executing the trades" charged by the Beckenham Trading Company, the entity that executed trades on behalf of the Deerhurst Program. 552 F. Supp. 2d at 1192. The reference does not describe with any particularity the nature and amounts of the fees, and it is not certain whether this reference is to fees that were charged separate and apart from the percentage fees discussed in the court's discussion of economic substance. The Sala opinion is factually ungenerous.

No pricing anomalies inhere in the options at issue in Sala, whereas the demonstrable overpricing of the options purchased by Jeffrey Welles raised the costs of the FXDOTs, decreased the expected-rate-of-return, and cannot be justified as what a reasonable investor would tolerate. Moreover, the options transactions in Sala were profitable, unlike the Welleses' FXDOTs, a fact that appears to have influenced heavily the district court's determination of profit potential and its rejection of Dr. DeRosa's testimony. See id. at 1186 ("Although Dr. DeRosa testified 'it would be impossible to ever obtain' even a ten percent return using the investment strategy . . . [,] the actual results show DeRosa's testimony to be inaccurate in this regard. . . . In 24 days, Sala's $728,000 investment yielded a profit of between $90,000 and $110,000 . . . .").

Objectively, the expert testimony counsels that the Welleses' FXDOTs did not have a reasonable possibility of returning a profit. The probability of obtaining a profitable outcome at the end of the investment period was minimal, if not nonexistent, given the nature of the market (the high positive correlation between the movement of the euro and Swiss franc) and the structure of the investment (the necessity that the currencies decouple, and the narrow range of the strike prices, all but eliminating the "sweet spot"). Beyond the structural and market limitations on the profit potential, the FXDOTs also entailed costs well beyond what a reasonable investor would expect to incur. The implementation of the J&G strategy, which called for the FXDOTs, carried with it a hefty price tag of over $6 million in fees paid to SLK and J&G. The options premiums paid to Deutsche Bank were calculated based on the gains to be sheltered, and, as evaluated by Dr. DeRosa, were substantially higher than what a reasonable investor could be expected to pay for similarly structured options. That the options were drastically overpriced relative to their value hamstrung the FXDOTs' profit potential and led to large negative expected-rates-of-return. The court finds that, objectively, the FXDOTs had no reasonable possibility of returning a profit.

3. Jeffrey Welles's claim of business purpose

The court's evaluation and weighing of the expert analyses suggests that no reasonable and prudent investor would have expected a possibility of a profit on these transactions. Plaintiffs nonetheless urge that Jeffrey Welles, a reasonable investor who is not risk-averse, and has a tolerance for more risky investing, made a reasonable assessment regarding profitability and entered the transactions with that legitimate business purpose in mind. In evaluating plaintiffs' contentions, the court cannot ignore the functional and historical reality that the FXDOTs were part of the prepackaged J&G strategy marketed to shelter taxable gains. The Welleses were well aware of this objective and result at the time the strategy was presented during the Vero Beach meeting. See Tr. at 461-63 (Jeffrey Welles).

It is beyond dispute that a taxpayer may structure *bona fide* transactions in a manner that reduces tax liability or produces a tax benefit. See Coltec, 454 F.3d at 1355; see also

Gregory, 293 U.S. at 469. Yet, the tax-avoidance motive in the instant cases preceded the "investment" strategy and any evaluation of profit potential. Inquiries regarding tax planning in preparation of the potential sale of Therma-Tru stock date back to October or November 1999. See Tr. at 181 (Waterman). Thus, plaintiffs did not portray a taxpayer who structured his transactions and ordered his affairs in a way so as to reduce his liability for taxes or to achieve the greatest tax benefits; rather, the tax benefits shaped the structure of the investment in order to achieve the goal of tax avoidance. As the Federal Circuit in Coltec recognized, "[T]here is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)." 454 F.3d at 1357.

With these considerations in mind, the court finds that the preponderance of objective evidence undermines Jeffrey Welles's claim that he entered the FXDOTs with a profit-motive business purpose. First, the structuring of the FXDOTs proceeded according to the J&G strategy, and not with regard for tax-independent profit or investment considerations. The premiums paid, i.e., the amount paid on behalf of each LLC, were calculated according to the amount of gain to be sheltered on the sale of Therma-Tru stock and were not based on tax-independent considerations, such as amount to risk on an investment. 51/ Moreover, the

---

51/ Jeffrey Welles testified on cross-examination:

Q. [by defense counsel] Mr. Welles, before we broke we were talking about the amounts of the options and where the money came from. And I believe you told me that at some point you told your siblings and your parents the amounts of the options that were taken out in their LLC's names?

A. Yes.

Q. Was that after the options were entered into?

A. Yes.

Q. And you were the one involved in determining the amounts of the options, right?

A. Yes.

Q. And you were involved in calculating the anticipated capital gain on the Therma-Tru stock that each one of your siblings and parents would enjoy?

A. Yes.

Welleses' FXDOTs precisely mimicked the sample digital options transactions sent to Jeffrey Welles by Deutsche Bank. See DX 376. For example, the FXDOTs were all two pips apart with a seventeen-day time span preceding the exercise date. Each FXDOT carried a 1% premium payable to Deutsche Bank. Jeffrey Welles testified that he did not independently request or negotiate any of these features of the FXDOTs; instead, Deutsche Bank prescribed these terms in accord with similar digital options transactions entered by other clients of Deutsche Bank participating in the J&G strategy. See Tr. at 744-53 (Jeffrey Welles); see, e.g., DX 171; DX 185; DX 321. The prepackaged structure of these transactions detracts from plaintiffs' insistence that these were investments with notable tax-independent features.

Second, that commissions and fees were paid to all the purveyors involved in the transactions on the basis of a percentage of the gains to be sheltered undermines plaintiffs' characterizations that the FXDOTs were handled as investments for a profit. See Tr. at 602-16, 664-67 (Jeffrey Welles); PX 108; PX 140. Separate and apart from the legal fees related to the sale of 50% of the Therma-Tru stock to Kenner, SLK received a fee from the Welleses on the order of $2 million, equivalent to 1% of the gains to be sheltered by the J&G strategy. See Tr. at 610-12, 664-67. Additionally J&G received a fee on the order of $4 million, or 2% of the gains to be sheltered by the J&G strategy. 52/ See PX 140; Tr. at 612-16, 664-67.

---

51/ (Cont'd from page 85.)

Q. And then you used that number to help you pick the amount of the options, correct?

A. Yes, that's correct.

Q. And that was because the amount of the options went into determining, in your understanding, the amount of the basis boost?

A. That's correct.

Tr. at 718-19.

52/ Jeffrey Welles explained his reaction to the fees set by J&G:

Q. [by plaintiffs' counsel] When did you agree, when did you agree with Ms. Guerin to pay a fee of $4,091,500 for a tax opinion letter?

A. After the tax opinion letter was issued.

Q. When you heard that the fee that was involved in this matter, I understand that there was a fee of $4 million that was paid to Jenkens &

Deutsche Bank's premium for executing the FXDOTs also related to the basis-boost effect of the J&G strategy because it was calculated as 1% of the FXDOT long premiums that were themselves equivalent to the amount of gains to be sheltered. See Tr. at 747-49 (Jeffrey Welles). Not only did the fees and costs associated with the FXDOTs far surpass what normally would be associated with foreign currency options investments, they all but obliterated any profit potential on the options transactions. See DX 516 at 56-57; DX 515 at 5-10 (Dr. DeRosa's expert reports factoring the fees into his expected-rate-of-return analyses). The willingness on the part of Jeffrey Welles and his family to pay the high fees, calculated as a percentage of the gains to be sheltered by the J&G strategy, reveals a predominant intention to avoid taxes, not to return profits.

Third, several aspects to the remaining steps of the J&G strategy unnecessarily increased the transaction costs of executing the FXDOTs. For example, the Welles Family Trust was instructed to wire the funds necessary to complete the FXDOTs into each single-member LLC's account at Deutsche Bank. See Tr. at 719-22; DX 518. Each single-member LLC, on the same date it entered the FXDOTs, assigned the options to Stobie Creek. See Tr. at 720-22. This series of routings through the various investment vehicles (from the individual accounts of the LLCs for purchase to the same-day transfer of all digital options held into the single pooled account in Stobie Creek) did not affect the investment aspects or profit potential of the FXDOTs, yet it had the effect of increasing the transaction costs associated with executing the transactions. These unnecessary steps, nevertheless, were an integral requirement for achieving the basis-enhancing effects of the J&G strategy, demonstrating the primary structure and function of these FXDOTs as tax-planning instruments over their nominal structure and function as investments.

---

52/ (Cont'd from page 86.)

> Gilchrist and there was also a fee of $2 million plus that was paid to Shumaker Loop & Kendrick, didn't that sound like an awful lot of money to you for a legal opinion?
>
> A. Absolutely, it sounded like a lot of money.
>
> Q. What was your reaction to that?
>
> A. Well, as I said, it sounded like a lot of money. I have to say that I'm familiar with very large fees, having worked in Wall Street and seeing what is charged for fairness opinions and other things. So while it sounded like a lot of money, it was in the context of what I knew to be expensive advice.

Tr. at 615-16.

Finally, the transaction documents throughout the Welleses' execution of the J&G strategy were post-dated to conform to the J&G strategy's preconceived plan and did not reflect the actual dates on which the transactions occurred. Without a doubt, the investment could have been – and in reality was (prior to the backdating) – structured in a way that it did not follow the mandated chronological steps of the J&G strategy. Defendant summarized the chronology of the steps as they actually occurred and the exhibits that memorialize the behind-the-scenes backdating of the transactions:

- STEP 2 of J&G strategy: Stobie Creek partnership formed on March 3, 2000. PX 57.

- STEP 4 of J&G strategy: letter dated April 4, 2000, from Mr. Ivsan to Ms. Guerin stating that all shareholders have assigned their Therma-Tru stock to Stobie Creek. DX 305.

- STEPS 1 & 3 of J&G strategy: on April 4, 2000, option contracts sent to Jeffrey Welles for signature and returned by fax the same date, including: Deutsche Bank option confirmations, assignment of options from single-member LLCs to Stobie Creek and notice of assignment to Deutsche Bank, and letters to Deutsche Bank instructing it to withdraw the money from each LLC's account to pay for the options by Jeffrey Welles. DX 333, 711.

- STEP 5 of J&G strategy: April 10, 2000 letter from Ms. Munro to J&G discussing transfer of ownership in Stobie Creek from LLCs to S-Corporations and sending related documents. DX 684.

- STEP 2 of J&G strategy: letter dated April 13, 2000, from Ms. Munro to Ms. Guerin at J&G with attached Schedule As to make single-member LLCs initial members of Stobie Creek. DX 93.

- STEP 4 of J&G strategy: letter from Mr. Ivsan to Ms. Guerin dated April 28, 2000, informing that stock certificates for Therma-Tru held by Stobie Creek would be dated as of April 14, 2000. DX 488.

- STEP 1 of J&G strategy: e-mail from Ms. Yackee dated June 13, 2000, two months after options expired out of the money, directing Mr. Pychewicz to correct the dates on two options confirmations and date all options confirmations for April 3, 2000. DX 481.

- STEP 6 of J&G strategy: e-mail from Mr. Ivsan to Ms. Guerin dated May 15, 2000, stating that Therma-Tru sale had closed and shift in LLC ownership in Stobie Creek to S-corporations should be dated as of April 30, 2000, in order to file the partnership tax return for the 2000 stub tax year. DX 319.

- STEP 2 of J&G strategy: December 28, 2000 e-mail from Mr. Ivsan to Mr. Beery at J&G discussing formation of Stobie Creek on March 3, 2000, and indicating that individual members did not join Stobie Creek until later dates by execution agreements that may have not been dated. DX 320.

See Tr. at 2262-73 (closing by defense counsel) (summarizing exhibits that establish dating of steps in J&G strategy, DX 244 at 3). 53/

The dates of each step in the series were not relevant to the investment and profit capability, if any, of the FXDOTs, yet absolutely were required by the J&G strategy to achieve the desired basis enhancement and tax benefits. The backdating of the legal documents, creating the structures through which Jeffrey Welles carried out his transactions, reveals an intentional emphasis on ensuring the proper implementation of the J&G strategy, rather than a motive of turning over an economic profit on an investment that could have been executed outside of the order required by the J&G strategy. 54/ This focus on the sheltering aspect of the transactions by backdating the order in which the transactions actually occurred further belies the claim that the FXDOTs were motivated by a business purpose of making a profit.

4. Synthesis of evidence and expert testimony

While none of this evidence considered alone relegates the Welleses' FXDOTs to economic nullities, the weight of the evidence overwhelms plaintiffs' claim that the transactions were investments motivated by a business purpose to return a profit. Jeffrey

---

53/ DX 244, a composite exhibit, includes three versions of the executive summary of the J&G strategy, admitted as page 24 of PX 111, the version presented to the Welles family at the Vero Beach meeting. Page 3 of DX 244 is identical in substance, but is formulated in seven, rather than six, steps.

54/ Although plaintiffs correctly observe that in the world of commerce, documents frequently are post-dated for convenience or uniformity, documents admitted into evidence from J&G, Deutsche Bank, DB Alex Brown, and SLK establish that the precise dating was orchestrated by J&G to replicate the exact order of the transactional steps listed in the J&G strategy. See, e.g., DX 521 (DB Alex Brown lists all steps of J&G strategy with actions by the client, J&G, DB Alex Brown, and Deutsche Bank).

As noted previously, the law permits taxpayers to structure their transactions so as to reduce tax liability. However, the evidence calls into question plaintiffs' *bona fides* in entering into the FXDOTs. The structuring of the FXDOTs therefore is an appropriate factor to be weighed by the court.

Welles nominally treated the transactions as an investment – he investigated them to a limited extent, he monitored them, he was disappointed that they expired without a positive return – but he "picked" an investment vehicle that was hardwired to do minimal financial harm, while generating a basis transfer of enormous magnitude. Most importantly, plaintiffs' attempts to establish a legitimate profit motive wither against the devastating, much more credible expert testimony that established the objective economic reality that the FXDOTs were severely over-priced, had a negative expected-rate-of-return, and consequently had scant profit potential.

In Coltec the Federal Circuit endorsed an objective inquiry into economic reality that would ask "'whether a *reasonable* possibility of profit from *the transaction* existed,'" 454 F.3d at 1356 (quoting Black & Decker, 436 F.3d at 441), and "whether the transaction has '*realistic* financial benefit.'" Id. at 1356 n.16 (quoting Rothschild, 407 F.2d at 411). The weight of evidence, including persuasive expert testimony, established that the Welleses' FXDOTs had no reasonable possibility of generating a profit. The inquiry focuses on whether the transactions objectively could make a profit, not on what Jeffrey Welles subjectively believed. That plaintiffs have advanced legitimate business purposes for creating Stobie Creek, such as pooling assets and taking advantage of economies of scale, does not save the FXDOTs, or any other steps consummated pursuant to the J&G strategy, from the finding that they lacked objective economic substance. As Coltec emphasized, the transaction to be analyzed is the one that gave rise to the alleged tax benefit. Id. at 1356. Plaintiffs' valid business reasons for forming Stobie Creek focus on the wrong transaction.

Justifying even closer scrutiny of the FXDOTs is the final admonition in Coltec: "[A]rrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." Id. at 1357. The Federal Circuit deemed noteworthy that the transactions at issue in other cases finding a lack of economic substance were part of "'a preconceived plan'" or were "'a foregone conclusion.'" Id. (quoting Gregory, 293 U.S. at 469, and Basic, 549 F.2d at 746). The FXDOTs represented one of several steps in the preconceived J&G strategy to shelter from tax the capital gains resulting from the sale of Therma-Tru stock. Moreover, to the extent that Deutsche Bank, a third party, was involved in these transactions, its exposure was limited to the premium paid; it had nothing to gain or lose beyond its fee. See Tr. at 659-60 (Jeffrey Welles). 55/

---

55/ Whether Deutsche Bank can be characterized as "independent," given the substantial fees earned in executing the FXDOTs and other foreign currency options trades for J&G clients, can also be called into question. See, e.g., DX 203 (Deutsche Bank endorses foreign digital options transactions after Notice 2000-44 as long as, *inter alia*, no Deutsche Bank entity employee discusses tax aspects of transaction); DX 209 (Deutsche Bank confirms that foreign digital options transactions made around $9 million in 2000).

Plaintiffs have failed to carry their burden of showing that the FXDOTs, or any of the other transactions undertaken pursuant to the J&G strategy, had economic substance beyond creating a tax advantage. The court finds and concludes that the FXDOTs and the various transactions that the Welleses engaged in pursuant to the J&G strategy lacked objective economic reality. As a consequence, the transactions must be disregarded for tax purposes. When the FXDOTs are disregarded, the basis in the Therma-Tru stock is unaffected by the transfer of the long options to the partnership.

5. Subjective factors in the economic substance analysis

While plaintiffs acknowledge that Coltec sets forth the formulation of the economic substance doctrine employed by the Federal Circuit, they assert that a "conjunctive test" of economic substance, adopted by the United States Court of Appeals for the Fourth Circuit, "*should* govern this case" in this court and at the Federal Circuit. Pls.' Br. filed Feb. 7, 2008, at 23 & n.2 (emphasis added). Plaintiffs rely on the Fourth Circuit opinions in Rice's Toyota World, 752 F.2d at 89, and Black & Decker, 436 F.3d at 431, that adopt a two-prong conjunctive test of economic substance: "To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, *and* that the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota World, 752 F.2d at 91 (emphasis added); see also Black & Decker, 436 F.3d at 441 (same). Thus, under the Fourth Circuit's formulation, a transaction will be disregarded as a sham only if both a sole subjective motivation of tax avoidance is shown and the transaction objectively lacks economic substance. Plaintiffs also cite the Federal Circuit's unpublished table decision in Drobny v. United States, 86 F.3d 1174, at *1 (Fed. Cir. 1996) (unpubl.), which quoted with approval the conjunctive test set forth in Rice's Toyota World.

Although in Coltec the Federal Circuit did not address Drobny, an unpublished decision, the court was unequivocal in addressing the role of a subjective component in the Supreme Court's economic substance doctrine: "We think that the rule adopted by the Fourth Circuit and reiterated in Black & Decker – that a transaction will be disregarded only if it both lacks economic substance and is motivated solely by tax avoidance – is not consistent with the Supreme Court's pronouncements in cases such as Frank Lyon [Co. v. United States, 435 U.S. 561 (1978)]." Coltec, 454 F.3d at 1355 n.14. The Federal Circuit stated: "While the [economic substance] doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance." Id. at 1355 (footnote omitted).

The Federal Circuit thus adopted a disjunctive test for determining whether a transaction should be disregarded as an economic sham: the doctrine should apply and a transaction should be disregarded either if the transaction lacks objective economic substance

or if it is subjectively shaped solely by tax avoidance motivations. Accord United Parcel Serv. of Am., 254 F.3d at 1018 & n.2 (disagreeing with Rice's Toyota World and endorsing disjunctive test for economic substance that disregards transaction "when it has no economic effects other than the creation of tax benefits," or when "it has no business purpose and its motive is tax avoidance" (internal quotation marks omitted)); James v. Comm'r, 899 F.2d 905, 908-10 (10th Cir. 1990) (rejecting Fourth Circuit's conjunctive formulation and holding that "[t]he better approach, in our view, holds that 'the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses.'" (second alteration in original) (quoting Sochin v. Comm'r, 843 F.2d 351, 354 (9th Cir. 1988))); Sochin, 843 F.2d at 354 (clarifying that disjunctive test that considers both subjective and objective factors, rather than "rigid two-step analysis," is correct standard for economic substance doctrine), rev'd on other grounds, Keane v. Comm'r, 865 F.2d 1088 (9th Cir. 1989); see also H.J. Heinz Co. & Subsidiaries v. United States, 76 Fed. Cl. 570, 583-84 & n.26 (2007).

Beyond its status as binding precedent in this circuit, the Federal Circuit's disjunctive approach reflects the more flexible and considered approach to the Supreme Court's economic substance doctrine as set forth in Frank Lyon. Accord H.J. Heinz, 76 Fed. Cl. at 584 n.26. The Supreme Court in Frank Lyon held that "where . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features," the transaction will be respected. 435 U.S. at 583-84. The Supreme Court's enumeration of these factors in a conjunctive formulation readily can be stated in the converse disjunctively: the economic substance doctrine disregards a transaction that is lacking either in economic substance because it is not a genuine multiple-party transaction compelled by a business purpose, or because it is shaped solely by tax-avoidance features. In reducing these factors into a conjunctive two-prong inquiry – one objective and one subjective – the Fourth Circuit's conjunctive test gratuitously reformulated the Supreme Court's pronouncements.

Contrary to plaintiffs' argument, the Federal Circuit decision in Coltec did not render subjective considerations immaterial. As the court explained, "[T]he doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance . . . ." Coltec, 454 F.3d at 1355, and so "the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose . . . ." Id. at 1356. In Coltec plaintiff admitted to a tax avoidance purpose, and thus the Federal Circuit only examined the objective component of the doctrine. Id. at 1357 ("Coltec had the burden of proving that this transaction, which admittedly had a tax avoidance purpose, had an economic reality."). An appropriate reading of Coltec is that both issues may be relevant to whether a transaction should be disregarded as an economic sham, but neither operates as a trump. If the court finds that a transaction is wholly lacking in economic reality, such that no

realistic financial benefit inures to the taxpayer beyond the tax features, or that no reasonable possibility of profit is present, the court need not engage in the subjective inquiry. Conversely, if a transaction was shaped solely by a tax-avoidance purpose, the fact that the transaction may have some objective economic reality cannot save it from being disregarded as an economic sham. See id. at 1355.

The series of transactions at issue falls into the former category of the contemplated analysis. Notwithstanding Jeffrey Welles's testimony that he believed a 30% chance of doubling his investment existed, the FXDOTs had no objectively reasonable possibility of returning a profit and therefore lacked an objective business purpose. The transactions were integral to a "preconceived" tax shelter scheme that was not structured to create a viable profit-producing investment, but, rather, to inflate the basis in an unrelated asset that would yield large capital gains upon sale. See id. at 1357. The end result was a "foregone conclusion." Id.

Plaintiffs implore the court to find that tax avoidance was not Jeffrey Welles's sole subjective motivation in entering the FXDOTs. While the court is persuaded that some of the evidence indicates that Jeffrey Welles regarded the FXDOTs as an investment, these factors are not sufficient to overcome the evidence that the FXDOTs were economic nullities beyond producing the claimed tax benefits. This court is satisfied that the relevant transactions lacked objective economic reality. Plaintiffs' limited evidence of non-tax avoidance subjective motivation does not imbue the transactions with economic substance. Therefore, the transactions must be disregarded under the prevailing economic substance doctrine.

V. Step transaction doctrine

Defendant alternatively has sought to invalidate the tax effects claimed by plaintiffs under the step transaction doctrine. The steps taken by the Welleses through their various entities pursuant to the J&G strategy "were merely component parts of an interconnected, pre-planned series of artificial steps, undertaken . . . for tax purposes." Def.'s Br. filed Mar. 12, 2008, at 33. As the Federal Circuit wrote in The Falconwood Corp. v. United States, "[t]he Supreme Court has expressly sanctioned the step transaction doctrine, noting that 'interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction.'" 422 F.3d 1339, 1349 (2005) (quoting Comm'r v. Clark, 489 U.S. 726, 738 (1989)). "[T]he objective of the doctrine is to 'give tax effect to the substance, as opposed to the form of a transaction, by ignoring for tax purposes, steps of an integrated transaction that separately are without substance.'" Id. (quoting Dietzsch v. United States, 498 F.2d 1344, 1346 (Ct. Cl. 1974)); see also King Enters., Inc. v. United States, 418 F.2d 511, 516-17 (Ct. Cl. 1969). Because defendant has interposed this theory, the court will analyze its application to the facts as an alternative holding. See Falconwood, 422 F.3d at 1350-51 (surveying application by various courts of step transaction doctrine and

noting overlaps with business purpose inquiry and economic substance doctrine, but no clear and absolute line between these tests); see also supra note 28.

Although "'there is no universal test applicable to step transaction situations,'" Falconwood, 422 F.3d at 1349 (quoting King, 418 F.2d at 516), the Federal Circuit has endorsed two primary formulations of the step transaction doctrine – the "interdependence test" and the "end result test." See id. at 1349 & n.5. 56/ The interdependence test asks "'whether . . . the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'" Id. at 1349 (omission in original) (quoting King, 418 F.2d at 516). The end result test "examines whether it appears that separate transactions were 'really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.'" Id. (quoting King, 418 F.2d at 516). Despite the different formulations, both tests are aimed at implementing "the central purpose of the step transaction doctrine; that is, to assure that tax consequences turn on the substance of a transaction rather than on its form." King, 418 F.2d at 517. Each will be considered in turn.

1. Interdependence test

The interdependence formulation of the step transaction doctrine requires an inquiry into whether the individual transactions in the series would be "fruitless" without completion of the series. Falconwood, 422 F.3d at 1349. Underlying this approach are the court's earlier findings regarding lack of business purpose for the individual steps undertaken by the Welleses in pursuit of the J&G strategy. While plaintiffs successfully have asserted valid business purposes for the formation of Stobie Creek, the court finds that plaintiffs' asserted business purpose of making a profit on the FXDOTs is unsupported, given the economic realties of that investment. See supra part IV. Furthermore, plaintiffs could not establish any business purpose for the other steps of the J&G strategy that the Welleses pursued, such as purchasing the FXDOTs through single-member LLCs, transferring the options to Stobie

---

56/ The Falconwood court noted that a third test, the "binding commitment test," has also been articulated by courts, inquiring "whether there was a 'binding commitment to undertake the later step' in a series of transactions." 422 F.3d at 1349 (quoting Penrod v. Comm'r, 88 T.C. 1415, 1429 (1987)). However, the Federal Circuit cautioned that courts rarely apply this test and that "the binding commitment test was squarely rejected by our predecessor court in King." Id. at 1349 n.5 (citing King, 418 F.2d at 518 (stating that "the step transaction doctrine would be a dead letter if restricted to situations where the parties were bound to take certain steps" and refusing to apply the test)). Accordingly, the "binding commitment" test need not be considered.

Creek, transferring the Therma-Tru stock to Stobie Creek, and later transferring the partnership interests to the single-member S-Corporations. 57/

---

57/ Regarding the use of single-member LLCs and the transfer of the options to Stobie Creek, Jeffrey Welles testified on cross-examination:

> Q. [by defense counsel] In terms of the protections you had in your mind with regard to an LLC form, was there any difference between your individual LLC and Stobie Creek as an LLC?
>
> . . . .
>
> A. I don't know that I know a distinction between them.

Tr. at 713.

> Q. [by defense counsel] In light of the fact that it was your intention immediately upon entering the options to have them assigned to Stobie and the funding for the options all came from one central pool of money, the family trust, why didn't you just have Stobie enter into the options?
>
> A. I understood there were reasons to, was advised to use the individual LLC's for individual family members.
>
> Q. You had to use the individual LLC's because that's what [J&G] told you to do pursuant to the tax strategy, right? That was one of the elements of –
>
> A. They may have been the ones who told me, yes.

Tr. at 721.

Regarding the transfer of partnership interests from the LLCs to the S-Corporations, Jeffrey Welles testified on cross-examination:

> Q. [by defense counsel] And this is a document that you were asked to execute in connection with the implementation of the [J&G] strategy, right?
>
> A. It was a document to transfer my interest into the S corp.
>
> Q. Okay. But was it done as part of the implementation of the [J&G] strategy?

57/ (Cont'd from page 95.)

A. It was consistent with the, one of the elements of the strategy.

Q. Okay.

A. Yes.

Q. You understood that one of the elements of the strategy was to change the membership of the partnership, right?

A. Yes, I understood that.

Tr. at 728.

Regarding the transfer of the Therma-Tru stock into Stobie Creek, Jeffrey Welles testified on cross-examination:

Q. [by defense counsel] Now, I think in the previous exhibit, we looked at a document that you were sent to sign that would transfer some of your stock in Therma-Tru to Stobie, right?

A. Yes.

. . . .

Q. And that contribution of the stock to Stobie, that was again one of the elements of the [J&G] strategy?

A. It was a capital contribution. I'm not certain, but that's what I did. I contributed this from Therma-Tru.

Q. Well, we talked earlier about the purpose of the [J&G] strategy as being the enhancement of the basis of the Therma-Tru stock. Do you recall that?

A. Yes.

Q. And was it your recollection that in order to obtain that enhancement, the stock had to be put into Stobie?

Each of these steps produced the tax effects that plaintiffs claim as the result of the series, yet none is supported by any tax-independent business purpose. In fact, these steps increased the transaction costs to the Welleses. The otherwise "fruitless" steps of passing ownership of the options from the single-member LLCs to Stobie Creek and passing ownership of the partnership interests to the S-Corporations undisputably were undertaken pursuant to the J&G strategy and have no purpose other than producing the claimed tax benefits upon completion of the entire series. The transactions making up the steps of the J&G strategy pursued by the Welleses are interdependent and have no independent functional justification outside of the series. Under the interdependence test, the individual steps must be disregarded and collapsed into a single transaction.

2. End result test

The end result test is also satisfied under the facts presented at trial. Evidence shows that the sale of the Therma-Tru stock was always intended to be the end result of the series of transactions executed pursuant to the J&G strategy. Jeffrey Welles testified that Therma-Tru had received several proposals from Kenner regarding the purchase of Therma-Tru prior to receiving the proposal and letter of intent dated December 8, 1999. See Tr. at 427-29; PX 61 (proposal and letter of intent from Kenner to purchase Therma-Tru). Jeffrey Welles emphasized that no binding commitment to sell the Therma-Tru stock existed prior to the contract of sale executed on May 9, 2000. See Tr. at 429-31; PX 61 at 2 (stating that neither party shall be bound until a formal agreement is executed). 58/ However, the testimony and other evidence confirm that all parties were proceeding as though the Kenner transaction would be completed and culminate in the redemption of the Therma-Tru stock. See, e.g., Tr. at 461-64 (Jeffrey Welles) (testifying regarding discussion of capital gains and tax strategies at Vero Beach family meeting), 1251 (Goldstein) (relating January 24, 2000 Vero Beach family meeting discussions regarding "very large infusion of cash" "after Stobie [sells] the Therma-Tru shares in the Kenner transaction").

With respect to the transactions leading to this end result, it is undisputed that the Welleses approached SLK in October or November 1999 regarding "strategies that could reduce taxes in connection with the . . . Kenner transaction." Tr. at 181 (Waterman); see also

---

57/ (Cont'd from page 96.)

A. Yes.

Tr. at 729-30.

58/ The court reemphasizes that the "binding commitment test" is not the applicable standard under the controlling precedent. See supra note 56.

Tr. at 440 (Jeffrey Welles). On the date that the letter of intent was signed, December 9, 1999, see Tr. at 676 (Jeffrey Welles), Mr. Ivsan at SLK e-mailed Ms. Guerin at J&G indicating that David, Deke, and Jeffrey Welles were pursuing a "$450 million transaction" for which they wished to sign confidentiality agreements with J&G. DX 326. From that point forward, all the remaining transactions – the formation of Stobie Creek, the formation of the single-member LLCs and S-Corporations, the contributions of the options and ownership interests in Stobie Creek between the entities, as well as the FXDOTs themselves – conformed to the steps outlined in the J&G strategy. See, e.g., DX 111 at 24; DX 244 at 3. Jeffrey Welles, on cross-examination, confirmed that the J&G strategy was pursued with the sale of Therma-Tru stock in mind:

> Q. [by defense counsel] And you asked [SLK] about tax strategies because you were anticipating selling your Therma-Tru stock, correct?
>
> A. Yes.
>
> Q. That was the point of asking about tax strategies, right?
>
> A. Yes.
>
> Q. And that's why you implemented the [J&G] strategy, to reduce the taxes on the Therma-Tru stock, correct?
>
> A. If we in fact did close on [the] transaction to sell Therma-Tru, yes.
>
> Q. The reason you entered into the [J&G strategy] was to reduce the taxes on the Therma-Tru stock, isn't that correct? Isn't that the whole point of the [J&G] strategy?
>
> A. The point is to step up the basis and pay a smaller debt on the remaining stock, yes.

Tr. at 672-73.

The evidence establishes that, from the outset, all the steps undertaken pursuant to the J&G strategy were structured and implemented to reach a single result – the sale of the Therma-Tru stock and avoidance of tax liability on the resulting capital gains. The creation of the single-member LLCs and the S-Corporations, the FXDOTs, and the series of transactions in which the Welleses directed the entities to transfer the options and partnership interests in Stobie Creek between one another were "component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." King, 418 F.2d at 516-17. Had Stobie Creek directly engaged in the FXDOTs, or had the

partnership interests not been transferred to S-Corporations, the basis-enhancing effects of the series of transactions would not have obtained, and the Welleses would have incurred large capital gains on the sale of the Therma-Tru stock. The end result test proscribes giving effect to those transactions that avoid the resultant tax liability when they merely mask a single transaction intended to reach a predetermined result. Accordingly, under the end result formulation of the step transaction doctrine, the purportedly separate transactions executed by the Welleses pursuant to the J&G strategy must be amalgamated into a single transaction.

3. Analysis/step transaction redux

Plaintiffs' attempts to interject the Welleses' valid business purposes in establishing Stobie Creek do not immunize the series of transactions undertaken pursuant to the J&G strategy from the step transaction doctrine. The Federal Circuit noted in Falconwood that the circuits have reached no definitive conclusions about the relationship between the business purpose test and the step transaction doctrine. However, the appeals court indicated that a court should consider what "weight [is] to be given that independent purpose in determining whether to ignore for tax purposes certain steps of the [transaction being analyzed]." 422 F.3d at 1351. Falconwood held that the step transaction doctrine would not apply to the series of transactions at issue because the taxpayer had an independent business purpose for the initial step and thereafter was bound by regulation to follow the remaining steps that the Government had sought to collapse. Id. at 1351-52 ("Upon completing a downstream merger for independent business reasons, Falconwood therefore had little choice in the face of quasi-legislative mandates but to file a final consolidated tax return for the group that covered Falconwood's operations for its entire taxable year."). The Federal Circuit stated: "In this context, we thus place great weight on the existence of a business purpose independent of the associated tax consequences, for pursuit of that purpose led Falconwood down a regulatory path from which there were no exits." Id. at 1352.

Plaintiffs cannot align themselves with the factual circumstances presented in Falconwood. Plaintiffs were not bound by any legislative or regulatory mandate to proceed along the tortuous steps that resulted in the claimed basis enhancement. Also, while the formation of Stobie Creek may be supportable by non-tax business purposes, the other steps of the J&G strategy executed by the Welleses lack tax-independent business purpose. Little weight, therefore, is accorded to the legitimate business purposes advanced for forming Stobie Creek, and plaintiffs cannot avoid the inexorable step transaction analysis. Accord H.J. Heinz, 76 Fed. Cl. at 590-91 (citing Aeroquip-Vickers, Inc. v. Comm'r, 347 F.3d 173, 183 (6th Cir. 2003); Kuper v. Comm'r, 533 F.2d 152, 158 (5th Cir. 1976); S. Bay Corp. v. Comm'r, 345 F.2d 698, 704 (2d Cir. 1965)).

Trial established that, under either the interdependence test or the end result test, the step transaction doctrine applies to plaintiffs' transactions. Accordingly, the tax consequences must turn on the substance of the transaction and not on the form by which

plaintiffs engaged in it. In disregarding the predetermined steps of the J&G strategy, Stobie Creek is unable to claim a basis increase in the Therma-Tru stock, and the capital gains must be taxed according to the reality of the transaction.

VI. Penalties

The 2005 and 2007 FPAAs imposed four accuracy-related penalties pursuant to I.R.C. § 6662:

> A. a 40 percent penalty shall be imposed on the portion of any underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e), and 6662(h) of the Internal Revenue Code.
>
> B. a 20 percent penalty shall be imposed on the portion of any underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.
>
> C. a 20 percent penalty shall be imposed on the portion of any underpayment attributable to the substantial understatement of income tax as provided by Sections 6662(a), 6662(b)(2), and 6662(d) of the Internal Revenue Code.
>
> D. a 20 percent penalty shall be imposed on the portion of any underpayment attributable to the substantial valuation misstatement as provided by Sections 6662(a), 6662(b)(3), and 6662(e) of the Internal Revenue Code.

Compl. Ex. A at unnumbered page 14, Stobie Creek Invs., No. 05-748T; Compl. Ex. A at unnumbered page 12, Stobie Creek Invs., No. 07-520T.

Accuracy-related penalties are not cumulative, i.e., the maximum accuracy-related penalty imposed on any portion of an underpayment may not exceed 20% (or 40% on the portion attributable to a gross valuation misstatement), regardless of whether the underpayment is attributable to multiple types of misconduct. See Treas. Reg. § 1.6662-2(c) (as amended in 2003). Thus, each of the penalties is asserted in the alternative, with the maximum potential penalty equal to 40%. As will be discussed in further detail, I.R.C. § 6664(c)(1) provides an absolute defense to accuracy-related penalties assessed "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

1. Jurisdiction over penalties

I.R.C. § 6221 requires that "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an

adjustment to a partnership item) shall be determined at the partnership level." I.R.C. § 6226(e) authorizes the Court of Federal Claims to conduct partnership-level proceedings and determine "the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item," I.R.C. § 6226(f). Generally under temporary Treasury Regulation § 301.6221-1T (1999), applicable to the 2000 tax year, assessment of penalties or any addition to tax related to partnership items are to be determined at the partnership level, and "[p]artner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment." Temp. Treas. Reg. § 301.6221-1T(c)-(d). The regulation includes as partner-level defenses "those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level. . . . [including] . . . whether the partner has met the criteria of . . . section 6664(c)(1) (reasonable cause exception)." Temp. Treas. Reg. § 301.6221-1T(d).

This court's pretrial ruling on plaintiffs' motion to confirm jurisdiction, see Supp. Order entered Apr. 30, 2008, at 3, recognized that an exception to the exclusion of the reasonable cause and good faith defense from the partnership-level proceeding is recognized when the partnership itself offers the defense. In such instances courts look to the actions of the partnership through its managing partner. See, e.g., Klamath, 472 F. Supp. 2d at 902-04 (considering reasonable cause and good faith defense at partnership level by looking to actions of managing member); Long Term Capital, 330 F. Supp. 2d at 205-12 (considering partnership's reasonable cause and good faith defense at partnership level by looking to actions of general partner); Santa Monica Pictures, LLC v. Comm'r, 89 T.C.M. (CCH) 1157, 1229-30 (2005) (looking to actions of partnership through managing member in considering partnership's reasonable cause and good faith defense). Here, the managing partner of Stobie Creek is North Channel, and the manager of North Channel is Jeffrey Welles. Consequently, the actions and conduct of Jeffrey Welles are relevant to determining whether Stobie Creek can substantiate a reasonable cause and good faith defense to the assessment of accuracy-related penalties.

While the partners of Stobie Creek have urged the court to determine their personal partner-level reasonable cause and good faith defenses to penalties, 59/ jurisdiction of this

---

59/ Plaintiffs proffer that member partners will defend against penalties on the basis that they acted in "good faith" based upon "reasonable cause" in relying on the advice of Jeffrey Welles. Thus, the member partners argue that trial should resolve conclusively the pending partnership-level adjustments that will be binding upon them, as well as the "reasonable cause" defenses of member partners to penalties in order to promote judicial economy. See Pls.' Br. filed Feb. 25, 2008, at 10-11; Pls.' Br. filed Jan. 16, 2008, at 12-14. The court's April 30, 2008 supplemental order, rejecting plaintiffs' efforts to obtain rulings on individual partner defenses, reiterated that TEFRA contemplates two proceedings, one at

partnership-level proceeding does not extend to issuing binding judgments on the partner-level defenses for the not-yet-filed partner-level proceedings. See Supp. Order entered Apr. 30, 2008, at 7. Partners may raise any particular defenses at the partner level, including the reasonable cause and good faith exception to the imposition of penalties. Jurisdiction of the Court of Federal Claims extends to determining whether penalties are applicable to the partnership items at issue and whether reasonable cause and good faith on behalf of the partnership, acting through its managing partner, and in turn through Jeffrey Welles, serves as a defense to the imposition of those penalties.

As with the Commissioner's determination that tax is owing, the determination that plaintiffs are liable for penalties enjoys a presumption of correctness, and thus the burden falls on the taxpayer to prove that it is entitled to a refund. See Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir. 2003). The court has ruled that plaintiffs may not invoke the burden-shifting provisions of I.R.C. § 7491. See supra part II. Accordingly, plaintiffs must discharge the burden of proving that they are entitled to a refund of penalties.

2. Valuation misstatement

I.R.C. § 6662(b)(3) and (h) imposes a penalty "to the portion of any underpayment which is attributable to . . . any substantial [or gross] valuation misstatement." I.R.C. § 6662, in effect at the time plaintiffs filed the applicable tax returns, imposes two distinct penalties for a valuation misstatement: (1) a 20% "substantial valuation misstatement" penalty in the event that the adjusted basis of any property claimed is 200% or more of the amount determined to be the correct amount, or (2) a 40% "gross valuation misstatement" penalty in the event that the adjusted basis of any property claimed is 400% or more of the amount determined to be correct. I.R.C. § 6662(e)(1)(A), (h)(1)-(2). 60/ Application of the penalty is mandatory and applies mechanically if either threshold is met. See Long Term Capital, 330 F. Supp. at 204; Jade, 80 Fed. Cl. at 53.

---

59/ (Cont'd frm page 101.)

the partnership level and another at the partner level. The defense of reasonable cause and good faith is considered unique to each partner, even if the partner intends to assert reliance exclusively on the managing partner's actions and conduct; therefore, the defense is restricted to the partner-level proceedings, should they be brought.

60/ I.R.C. § 6662(e)(1)(A) and (h)(2) were amended in 2006 to provide for a 150% threshold for a substantial valuation misstatement and a 200% threshold for a gross valuation misstatement. See Pub. L. No. 109-280, § 1219(a)(1)(A), (a)(2)(A), 120 Stat. 780, 1083 (2006).

Plaintiffs claimed a basis in the Therma-Tru stock of over $205 million on the partnership's tax returns. The court has determined that the transactions used to increase the basis of the Therma-Tru stock by over $204 million lacked economic substance, or alternatively must be collapsed under the step transaction doctrine, such that they must be disregarded for tax purposes. Because the adjusted basis claimed by plaintiffs in the Therma-Tru stock on their tax returns exceeded the adjusted basis determined to be correct by more than 400%, the 40% gross valuation misstatement penalty applies.

No valuation misstatement penalty is imposed "unless the portion of the underpayment for the taxable year attributable to substantial valuation misstatements under chapter 1 exceeds $5,000." I.R.C. § 6662(e)(2); see also Treas. Reg. § 1.6662-5(b). Although the determination of whether a substantial or gross valuation misstatement exists is made at the entity level, whether the dollar limitation has been exceeded is applied at the taxpayer level, so the issue is reserved for individual partner proceedings, should they be brought. See Treas. Reg. § 1.6662-5(h)(1).

Plaintiffs have asserted no grounds to prevent the application of the gross valuation misstatement penalty beyond assertion of the reasonable cause and good faith exception. See Pls.' Br. filed Feb. 7, 2008, at 29-32. If plaintiffs successfully can substantiate the reasonable cause and good faith exception to penalties found in I.R.C. § 6664, the gross valuation misstatement penalty may be defeated. See Treas. Reg. § 1.6662-5(a). Whether the partnership can assert this exception through the actions of its managing partner, Jeffrey Welles, will be considered below; the partners may assert their individual reasonable cause and good faith defenses at separate and subsequent partner-level proceedings, should they be brought.

3. Substantial understatement of income tax

The IRS alternatively asserted a 20% penalty against plaintiffs for a "substantial understatement of income tax," which occurs when the understatement of income tax on the applicable returns exceeds 10% of the correct tax or $5,000. I.R.C. § 6662(d)(1)(A). The calculations necessary to determine the amount of an understatement are conducted at the partner level for each of the taxpayers. See I.R.C. § 6662(d)(1) - (2)(A); Treas. Reg. § 301.6221-1(d); see also Long Term Capital, 330 F. Supp. 2d at 200 n.100. However, because the tax treatment at issue was claimed by the partnership, the Court of Federal Claims can determine at the entity level whether a reduction in any understatement is warranted for the reasons set forth in I.R.C. § 6662(d)(2)(B) (allowing for reduction in amount of understatement if tax treatment claimed is based upon "substantial authority," or if taxpayer demonstrates "reasonable basis" for claimed tax treatment, coupled with "adequate disclosure" of relevant facts). For the tax year at issue, I.R.C. § 6662(d)(2)(C) calls for a further layer of analysis concerning the provision, stating that, when a

"tax shelter" 61/ is involved, the adequate disclosure defense does not apply, and, that, in addition to showing substantial authority, the taxpayer must demonstrate that it "reasonably believed that the tax treatment of such item . . . was more likely than not the proper treatment." I.R.C. § 6662(d)(2)(C)(i). 62/

Defendant argues that substantial authority did not exist for the tax treatment that plaintiffs claimed. Defendant also denominates the J&G strategy a "tax shelter" within the meaning of I.R.C. § 6662(d)(2)(C)(iii) and therefore subject to the heightened requirement that plaintiffs demonstrate a reasonable belief that the tax treatment was "more likely than not the proper treatment." Defendant attempts to distinguish on the facts plaintiffs' claimed tax treatment from that upheld in Helmer. Further, defendant reminds that "Helmer does not negate the substance-over-form doctrine, . . . the economic substance doctrine, . . . and the step transaction doctrine, all fundamental parts of the tax law that clearly precluded that tax treatment claimed for the [J&G strategy] transactions. Helmer, by itself, does not define the relevant tax law." Def.'s Br. filed Mar. 12, 2008, at 38 n.28.

Plaintiffs, on the other hand, proffer that substantial authority existed for the tax treatment claimed in their returns and that "[t]he opinions offered by J&G comported with the likely or expected result required by the Code and were amply supported by applicable statutes, regulation and judicial precedent." Pls.' Br. filed Feb. 7, 2008, at 33. They further appeal to the reasonable cause and good faith exception to penalties, an issue to be analyzed. Plaintiffs have not argued the protections of adequate disclosure and reasonable basis set forth in I.R.C. § 6662(d)(2)(B)(ii), so the court need not address that defense.

As discussed in detail above, the transactions that the Welleses engaged in pursuant to the J&G strategy lacked economic reality because they were unsupported by a tax-independent business purpose. Because those transactions had as a significant purpose "the avoidance or evasion of Federal income tax," the transactions fall within the statutory definition of a "tax shelter." I.R.C. § 6662(d)(2)(C)(iii). Plaintiffs consequently must prove both that the tax treatment claimed was supported by "substantial authority" and that they "reasonably believed that the tax treatment . . . was more likely than not the proper treatment." I.R.C. § 6662(d)(2)(C)(i).

---

61/ I.R.C. § 6662(d)(2)(C)(iii) defines a "tax shelter" as "a partnership or other entity," "any investment plan or arrangement, or" "any other plan or arrangement," "if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax."

62/ I.R.C. § 6662(d)(2)(C) was amended in 2004 to eliminate completely any reduction under section 6662(d)(2)(B) in the case of tax shelters. See American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 812(d), 118 Stat. 1418, 1577-81.

1) Substantial authority

The substantial authority standard is an objective standard: the taxpayer's subjective belief that substantial authority exists for the tax treatment of an item is not relevant. See Treas. Reg. § 1.6662-4(d)(2), (3)(i). 63/ Substantial authority exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i). The types of authorities to be considered include the Internal Revenue Code, as well as other statutory provisions, treasury regulations, revenue rulings and the like; case law; congressional intent; and other IRS memoranda, notices, and publications. See Treas. Reg. § 1.6662-4(d)(3)(iii).

Plaintiffs assert Helmer and its progeny as substantial authority for the position that they took on their tax returns. These cases do provide support for the position that a taxpayer may ignore contingent liabilities in the calculation of basis; but that observation stops short of a full analysis of the applicable law and authorities. The substantial authority analysis must also include the long-standing doctrines developed to achieve the purposes of the tax law, including the economic substance doctrine and the step transaction doctrine. The Federal Circuit's pronouncements in Coltec leave no room for argument that, "[o]ver the last seventy years, the economic substance doctrine has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." 454 F.3d at 1352. These doctrines have been applied repeatedly by the Supreme Court, the

---

63/ Treas. Reg. § 1.6662-4(d)(2) expands on the substantial authority standard:

> The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662-3(b)(3).

Treas. Reg. § 1.6662-3(b)(3) calibrates reasonable basis in this context:

> Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. If a return position is reasonably based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662-4(d)(2).

Federal Circuit, and its predecessor, the Court of Claims, see id., and may not be ignored in evaluating whether substantial authority exists for the position that plaintiffs took on their returns.

The court has found that the transactions having the effect of artificially inflating the basis of the Therma-Tru stock lacked a business purpose beyond producing the tax benefits claimed by plaintiffs and objectively lacked economic substance. Alternatively, the court has found that the transactions failed to pass muster under the step transaction doctrine and must be collapsed to correspond to their substance. Under either formulation the transactions, as structured, are ignored for tax purposes, and, as a matter of law, the tax treatment claimed by plaintiffs on the partnership returns fails. As confirmed by the court's rejection of plaintiffs' factual and legal contentions regarding business purpose and economic reality, the authorities mandating that tax treatment turn on the substance rather than the form of the transactions displace Helmer and its progeny. 64/ See Long Term Capital, 330 F. Supp. 2d at 204-05 (holding that, when underlying merits determination is that transaction lacks economic substance, taxpayer cannot cite authority, much less substantial authority, to support claimed tax treatment); Santa Monica Pictures, 89 T.C.M. (CCH) at 1229 (finding no substantial authority when transactions had no economic substance beyond creation of tax benefits).

Furthermore, whereas the Tax Opinion provided by J&G may have been "amply supported by applicable statutes, regulations and judicial precedent," Pls.' Br. filed Feb. 7, 2008, at 33, the factual contentions underlying that opinion were not supported. The representations section of the J&G Tax Opinion states that the partnership has engaged in each of the transactions – steps of the J&G strategy – for "substantial nontax business reasons." PX 143 at 7. The J&G Tax Opinion further recites that "[w]e have been informed that an objective investment analysis . . . of such option positions, using generally accepted models employing standard option pricing theories and methodologies, indicated a substantial probability that the long option strike price level would be reached and that profitability would be achieved." PX 143 at K-23. On the basis of these assumed representations, the J&G Tax Opinion concluded that "there is substantial evidence and authority for concluding that the Options transactions at issue had economic substance and were entered into for business purposes." PX 143 at K-24. Based on similar factual assumptions, the J&G Tax Opinion concluded that the sham transaction doctrine would not apply to the transactions. See PX 143 at K-24 to -36.

---

64/ Stated another way, no substantial authority exists to support recognition of tax results that are premised on transactions with no appreciable business purpose beyond conferring tax benefits. Given this court's findings that plaintiffs' transactions lack economic substance, or must be disregarded pursuant to the step transaction doctrine, plaintiffs cannot contend successfully that substantial authority supported the tax treatment claimed based on the form of their transactions rather than their substance.

The testimony and other evidence directly contradicts the representations upon which the J&G Tax Opinion based its conclusions. This court determined, from an objective standpoint, that substantial non-tax business purpose did not exist to support the transactions engaged in by Jeffrey Welles on behalf of the various entities. Furthermore, no evidence was offered to show that an "objective investment analysis" took place prior to Jeffrey Welles's entering the FXDOTs. The only relevant objective investment analysis conducted "using generally accepted models employing standard option pricing theories and methodologies" was performed by Dr. DeRosa in connection with his expert report and testimony, and he unequivocally reached the opposite conclusion – that the FXDOTs had no appreciable possibility of making a profit. The court gives no weight to the conclusions reached in the J&G Tax Opinion because the authorities underlying that opinion are not applicable to the facts of these cases. See Treas Reg. § 1.6662-4(d)(3)(iii) ("Conclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority. The authorities underlying such expressions of opinion *where applicable to the facts of a particular case*, however, may give rise to substantial authority for the tax treatment of an item." (emphasis added)). 65/

Because the court finds that substantial authority does not support the tax treatment claimed by plaintiffs in their returns, the court need not address whether plaintiffs reasonably believed that the tax treatment claimed was more likely than not the proper treatment. To the extent that the substantial understatement penalty is to be calculated at subsequent partner-level proceedings, the taxpayers are not entitled to a reduction for an understatement that is attributable to substantial authority. Whether the reasonable cause and good faith exception, as asserted through the actions of the managing partner Jeffrey Welles, applies to defeat the substantial understatement penalty is addressed in a later section.

4. Negligence and disregard of rules

I.R.C. § 6662(a) and (b)(1) impose a 20% penalty to the portion of an underpayment that is attributable to "[n]egligence or disregard of rules or regulations." 66/ The provision

---

65/ While the court acknowledges that taxpayers relied for years on Helmer, Coltec instructs that the Tax Court opinion did not displace the primacy of economic substance. See Coltec, 454 F.3d at 1352.

66/ Treasury Regulation § 1.6662-3(c)(1) allows that, in the case of "any portion of an underpayment that is attributable to a position contrary to a rule or regulation," no penalty is imposed

> if the position is disclosed in accordance with the rules of paragraph (c)(2) of this section and, in case of a position contrary to a regulation, the position represents a good faith challenge to the validity of the regulation. This

defines "negligence" as "any failure to make a reasonable attempt to comply with the provisions of this title," and "disregard" as "any careless, reckless, or intentional disregard." Treasury Regulation § 1.6662-3(b) provides further guidance on negligence, stating that

> negligence includes any failure to . . . exercise ordinary and reasonable care in the preparation of a tax return. . . .[and] is strongly indicated where . . . . [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.

Negligence will not be found where a position taken on a tax return has a "reasonable basis," defined as a standard "significantly higher than not frivolous or not patently improper." Treas. Reg. § 1.6662-3(b)(3). 67/ As with all the accuracy-related penalties, the penalty for negligence or disregard of rules and regulations can be defeated if the reasonable cause and good faith exception of I.R.C. § 6664 applies, an issue resolved in the next section. See Treas. Reg. § 1.6662-3(a) ("The penalty for disregarding rules or regulations does not apply, however, . . . to the extent that the reasonable cause and good faith exception to this penalty set forth in § 1.6664-4 applies.").

---

66/ (Cont'd from page 107.)

> disclosure exception does not apply, however, in the case of a position that does not have a reasonable basis or where the taxpayer fails to keep adequate books and records or to substantiate items properly.

Id. (amended in 2003 to provide for additional disclosure requirements for "reportable transaction[s] as defined in § 1.6011-4(b) (or § 1.6011-4T(b), as applicable)").

Intending to anticipate plaintiffs' invocation of this exception for adequate disclosure, defendant contended in its pretrial brief that plaintiffs "disregarded Notice 2000-44, which made the BEDS shelter a listed transaction under § 6011, and did not report the transaction as required by the Code and regulations." Def.'s Br. filed Mar. 12, 2008, at 39. Temporary Treasury Regulation § 1.6011-4T was issued on March 2, 2000, providing for designation of certain "listed transactions," and Notice 2000-44 was published on September 5, 2000. The IRS received Stobie Creek's tax return for the 2000 stub tax year on February 1, 2001, and received the tax return for the 2000 tax year on February 4, 2002.

Because plaintiffs have not asserted this exception to the penalty for adequate disclosure, the court need not address this argument.

67/ See supra note 63.

Plaintiffs contend that they "exercised ordinary care in determining their tax liability," arguing that they are "entitled to rely on the expertise of tax professionals and financial advisors." Pls.' Br. filed Feb. 7, 2008, at 32. They cite cases holding that the negligence penalty will not be imposed upon taxpayers who rely on professional advice. See United States v. Boyle, 469 U.S. 241, 250-51 (1985); Estate of Monroe v. Comm'r, 124 F.3d 699, 714-15 (5th Cir. 1997); Durrett v. Comm'r, 71 F.3d 515, 517-18 (5th Cir. 1996); Chamberlain v. Comm'r, 66 F.3d 729, 733 (5th Cir. 1995); Betson v. Comm'r, 802 F.2d 365, 372 (9th Cir. 1986).

Defendant insists that plaintiffs fail to meet the objective standard of a reasonably prudent person, because plaintiffs "did not obtain any *independent, objective* advice" about the tax benefits, or substance of the transactions. Def.'s Br. filed Mar. 12, 2008, at 38-39 (emphasis added). Defendant marshals other cases for the holding that reliance on professional advice does not prevent the imposition of a negligence penalty when that advice comes from a source manifesting a "conflict-of-interest," or when the advice itself is based upon unreasonable assumptions or representations. See Neonatalogy Assocs., P.A. v. Comm'r, 299 F.3d 221, 233 (3d Cir. 2002); Pasternak v. Comm'r, 990 F.2d 893, 903 (6th Cir. 1993); Illes v. Comm'r, 982 F.2d 163, 164-66 (6th Cir. 1992); Santa Monica Pictures, 89 T.C.M. (CCH) at 1228; Novinger v. Comm'r, 61 T.C.M (CCH) 3024, 3027-28 (1991). Regarding the "too good to be true" standard, defendant chides: "Stobie Creek was allegedly told by the promoters of the shelter, who were charging a[] $6 million fee for the shelter – calculated as 3% of the income to be sheltered from taxation – that the purchase of options costing $2 million would result in avoiding tax on a $204 million gain." Def.'s Br. filed Mar. 12, 2008, at 38.

1) Case law dynamics

Significant overlap exists between the defense to the negligence penalty based on reasonable reliance on the advice of professionals and the reasonable cause and good faith exception to all accuracy-related penalties, which is often substantiated by a showing that the taxpayer relied on tax advice. 68/ Reliance on the advice of professionals has been touted as a defense to the negligence penalty premised on the Supreme Court's pronouncements in Boyle, 469 U.S. 241, addressing "reasonable cause." See, e.g., Conway, 326 F.3d at 1278-79 (citing Boyle for proposition that advice from accountant or attorney on matter of tax law can negate finding of negligence); Neonatology, 299 F.3d at 234 (same); Durrett, 71 F.3d at 518 (same); Chamberlain, 66 F.3d at 732 (same); Betson, 802 F.2d at 372 (same).

---

68/ To the extent that plaintiffs' arguments overlap the standard enunciated for reasonable cause and good faith, they will inform the discussion in the following section. See also discussion at infra note 75.

Boyle concerned whether a taxpayer could avoid the penalty for filing a late tax return by showing that the failure to file timely was "'due to reasonable cause and was not due to willful neglect.'" 469 U.S. at 243 (emphasis omitted) (quoting I.R.C. § 6651(a)(1)). The taxpayer argued that he was excused from the penalty because he relied on the advice of his attorney concerning the deadline for filing. See id. at 244. The Supreme Court acknowledged that "'reasonable cause' is established when a taxpayer shows that he *reasonably relied* on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." Id. at 250 (emphasis added). The Supreme Court reasoned:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.

Id. at 251.

The Court drew a fine line between reliance on advice involving a question of law and reliance on advice not involving matters requiring any expertise. See id. at 251-52. The Court concluded that "no special training or effort [is required] to ascertain a deadline and make sure that it is met," and so reliance on an attorney did not constitute reasonable cause that would excuse the taxpayer from the penalty for late filing. Id. at 252.

The cases cited by plaintiffs draw upon the foundation laid by Boyle. In Betson the United States Court of Appeals for the Ninth Circuit upheld the Tax Court's disallowance of deductions claimed by a taxpayer because they arose in the ordinary course of business and could be claimed only by the corporation, not the individual. 802 F.2d at 372-73. In considering whether the taxpayer would be held liable for a negligence penalty, the court remarked that the taxpayer's position, although incorrect, was "reasonably debatable." Id. at 372. The Ninth Circuit stated, citing Boyle, that "the record indicates that the taxpayer relied in good faith on the substantive advice of his accountant. No facts disclosed in the record were sufficient to charge the taxpayer with notice of the erroneous legal position asserted in his return." Id. On this basis the court reversed the imposition of the negligence penalty. See id.

In Chamberlain the United States Court of Appeals for the Fifth Circuit addressed the defense of good faith reliance on professional advice to the imposition of a negligence penalty following a determination that the taxpayers' transaction was a sham. 66 F.3d at 731. The Fifth Circuit cited Boyle for the proposition that good faith reliance on professional

advice is a defense to a charge of negligence, but qualified the standard: "The reliance must be objectively reasonable; taxpayers may not rely on someone with an inherent conflict of interest, or someone with no knowledge concerning that matter upon which the advice is given." Id. at 732 (footnotes omitted). The court noted that the taxpayers had consulted a "tax expert," who had advised that "there was 'a good faith, supportable position' concerning the deductibility of the loss." Id. at 733. Although the subject transaction was disregarded for tax purposes as a sham, the Tax Court erred in imposing the negligence penalty because the "record reflect[ed] no basis for a finding or conclusion that it was not reasonable for taxpayers to rely on the expert's advice." Id.

Similarly, in Durrett the Fifth Circuit revisited the application of a negligence penalty following a determination that the taxpayers' transaction (the same tax shelter program as that considered in Chamberlain) would be disregarded as an economic sham. 71 F.3d at 517. The taxpayers sought professional advice from their attorney, a tax accountant, and the vice president of finance for the parent corporation of the subsidiary that employed one of the taxpayers. See id. at 518. Relying on Boyle, the Fifth Circuit stated that "[g]ood faith reliance on professional advice concerning tax laws is a defense," and plaintiffs were not required to seek a second opinion when relying on a tax expert. Id. The court held "that the record adequately establishes that it was reasonable for the Durretts to rely on the advice of these experts," and, therefore, that "the imposition of the negligence penalty must be reversed." Id.

In Estate of Monroe the Fifth Circuit determined that "no negligence penalty should have been or is warranted" in a case challenging a taxpayer's claim of a marital deduction on an estate tax return following execution of bequest disclaimers. 124 F.3d at 714. The court noted that the taxpayer had been advised by an accounting firm that gift-giving to the disclaimants was allowed as long as no promises were made to induce the disclaimers. The court concluded that, "[b]ased on that advice, it was not unreasonable for Monroe [the taxpayer], who was 93 years old at the time the disclaimers were made," to make the gifts. Id. Even though the taxpayer did not inform his accountants that he intended to make gifts shortly after execution of the disclaimers, the accountants testified that this disclosure would have had no significant substantive effect on their advice. See id. at 714-15 ("[T]he only additional advice that Monroe would have heard had he told his accountants that he decided to make the gifts was that, although it would not change the substance of the transaction, it would make the transactions look more suspicious, and might subject the estate's return to increased I.R.S. scrutiny. Otherwise, the accountants testified that they would not have changed the advice they gave."). Under the circumstances presented, the court held that the negligence penalty was inapplicable.

The cases cited by plaintiffs selectively construct a rule that any reliance on professional advice negates a finding of negligence. The case law should be considered as a whole. The law on point instructs that the standard of "reasonable reliance" is not as broad

as plaintiffs advocate; additional indicia either can support or detract from the reasonableness of the advice given and/or the reasonableness of the taxpayer's reliance on that advice. For example, lack of investigation, dependence on unfounded assumptions or representations, conflict of interest, or the experience and knowledge of a taxpayer can undercut a claim of reasonable reliance. The cases cited by defendant illustrate the impact of these qualifications.

Courts do not consider reliance on advice to be reasonable when neither the taxpayer nor the professional dispensing advice has investigated the profit potential of the transaction. In Novinger the Tax Court considered the application of a negligence penalty to taxpayers who conceded their liability for the tax deficiency assessed on transactions that produced a tax benefit to cost ratio of five to one. 61 T.C.M. (CCH) at 3026. Addressing the defense of reliance on professional advice, the Tax Court emphasized: "Reliance upon professional advice is not an absolute defense to negligence. It must first be established that such reliance was reasonable." Id. at 3027. The court did not credit the taxpayers' reliance as reasonable where the tax advisors made no meaningful investigation beyond looking to the promotional materials supplied by sales people and offered advice on the assumption that "the facts presented are true." Id. The attorney and accountant consulted by the taxpayers had no expertise in the field of investment (micro-electronics) and did not undertake any independent investigation into the concepts presented in the materials furnished by the promoters. See id. at 3027-28. The court found that, had the taxpayers "made a bona fide investigation for purposes of evaluating the profit potential of their investment, they would have discerned strong reasons to conclude that such profit potential did not exist," and that "[t]heir lack of concern belies a bona fide objective of engaging in a legitimate business operation." Id. at 3028. The Tax Court held that the taxpayers had failed to carry their burden of establishing reasonable reliance on tax advice.

Courts also do not credit reliance as reasonable when the professional dispensing advice is tainted by a conflict-of-interest. In Illes the United States Court of Appeals for the Sixth Circuit considered the application of a negligence penalty following a determination that a taxpayer's transaction would be disregarded because it lacked economic substance. 982 F.2d at 166. The promoter of the shelter, Thomas A. Graham, persuaded the taxpayer to invest in the shelter. The taxpayer then hired Graham as his accountant. At trial and on appeal, the taxpayer asserted that the he reasonably relied on the professional advice of his accountant, Graham. See id. In addition to noting that the taxpayer had not presented any specific evidence of advice given by his accountant, the court deemed significant that the taxpayer had "offered no proof that he ever investigated the investment or sought independent professional advice on the validity and viability of the investments." Id. Moreover, reasonable reliance could not be demonstrated because the accountant himself was "not a disinterested source," as he had persuaded the taxpayer to invest in the shelter of which he was the promoter. Id. at 164-65, 166.

Similarly, in Pasternak, after upholding the Tax Court's determination that the transactions at issue lacked economic substance, the Sixth Circuit considered the taxpayers' liability for a negligence penalty. 990 F.2d at 902. The taxpayers relied on the advice of financial advisors, industry experts, and professionals. See id. at 903. The Sixth Circuit, however, sustained the negligence penalty, observing that "the purported experts were either the promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of 'independent professionals.'" Id.

In Neonatology the United States Court of Appeals for the Third Circuit upheld the imposition of a negligence penalty where the owners, in order to net a personal tax savings, caused a corporation to overpay considerably for term life insurance. 299 F.3d at 233-35. The court rejected the defense of reliance on professional tax advice, explaining:

> While it is true that actual reliance on the tax advice of an independent, competent professional may negate a finding of negligence, see, e.g., [Boyle, 469 U.S. at 250], the reliance itself must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about.

Neonatology, 299 F.3d at 234. The court did not credit the taxpayers' reliance as objectively reasonable because they only received advice from an insurance agent who stood to make a considerable profit on the transactions, "rather than from a competent, independent tax professional with sufficient expertise to warrant reliance." Id. In a footnote, the court observed:

> It well may be that reliance on the advice of a professional should only be a defense when the professional's fees are not dependent on his opinion. For example, it is not immediately evident why a taxpayer should be able to take comfort in the advice of a professional promoting a tax shelter for a fee. After all, that professional would have an interest in his opinion.

Id. at 234 n.22.

Finally, in determining whether a partnership is liable for the negligence penalty, courts also evaluate the knowledge and experience of the managing partner. In Santa Monica Pictures, the Tax Court applied the negligence penalty to a taxpayer, Perry Lerner, who had orchestrated a series of transactions that yielded approximately $379 million in tax losses to two companies. 89 T.C.M. (CCH) at 1228. The court held that, "[u]nder the circumstances, we believe that a reasonable and prudent person would recognize that these tax losses were 'too good to be true,' especially given that [none of the entities involved] bore the economic

loss associated with these tax losses." Id. (internal quotation marks omitted). The Tax Court rejected the managing member and tax matters partner's defense that he formally complied with the requirements of the partnership tax rules, explaining that, "[a]s an experienced tax attorney, Mr. Lerner should have known that mere formal compliance with statutory provisions would not sustain economic transactions that have no economic substance and that are mere contrivances designed solely to exploit tax benefits." Id.

The Third Circuit in Neonatology also considered the knowledge and experience of the managing partner as relevant to whether a reasonable and prudent person would consider the transaction to be "too good to be true":

> When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril. In this case, [the purveyors] devised a program which [they] marketed as "creat[ing] a tax deduction for the contributions to the employee welfare benefit plan going in and a permanent tax deferral coming out." As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves.

299 F.3d at 234 (third alteration in original). Similarly, in Jade, the Court of Federal Claims placed weight on the fact that the entity's principal had a background as a CPA with tax experience and considerable hedge-fund and market experience in concluding that the partnership itself could not avoid the negligence penalty when the transactions at issue had no profit potential and yielded tax benefits that were "too good to be true." See 80 Fed. Cl at 56.

2) Application to Jeffrey Welles

Case law allows plaintiffs to avoid the negligence penalty only if their principal exercised the care of a reasonably prudent person. The cases cited by plaintiffs illustrate that reliance on the advice of a professional can negate a negligence penalty. Yet, as the cases cited by defendant illustrate, the defense of reliance on professional advice prevails only if, under all the circumstances, (1) the advice itself is reasonable (because it is based on accurate information and representations supplied by the taxpayer, follows reasonable investigation into the transactions, and does not make unreasonable or unsupported assumptions), and (2) the taxpayer's reliance thereon is reasonable (because the professional is not tainted with a conflict-of-interest, and, given the taxpayer's knowledge and experience, the transactions are not "too good to be true").

Plaintiffs' cases are distinguishable on their facts and do not counsel in favor of a finding that plaintiffs have supported a defense that the partnership reasonably relied on advice. In Betson, Chamberlain, and Durrett, the courts emphasized, without further analysis or discussion, that the facts in the record did not impugn the reasonableness of the advice or the reasonableness of taxpayer reliance. Durrett, 71 F.3d at 518 ("[T]he record adequately establishes that it was reasonable for the Durretts to rely on the advice of these experts."); Chamberlain, 66 F.3d at 733 ("The record reflects no basis for a finding or conclusion that it was not reasonable for taxpayers to rely on the expert's advice."); Betson, 802 F.2d at 372 ("No facts, disclosed in the record, were sufficient to charge the taxpayer with notice of the erroneous legal position asserted in his return."). In contrast, the record in the instant cases undermines the reasonableness of both the advice itself and Jeffrey Welles's reliance thereon. The weight of the evidence must control whether the partnership has carried its burden.

i) Reasonableness of the advice

In Novinger and Illes, reliance on professional advice did not defeat the negligence penalty because the taxpayers had not made an investigation into the validity or viability of the investment program/shelter. Jeffrey Welles, however, made efforts to investigate both the validity and viability of the J&G strategy and the FXDOTs. Jeffrey Welles vetted the viability of the J&G strategy through his law firm, SLK, and his attorney, Mr. Waterman. At the Vero Beach meeting, Mr. Waterman made a presentation regarding the J&G strategy. When asked by a Welles family member whether he personally would pursue the strategy, Mr. Waterman responded that he would. See Tr. at 223 (Waterman), 463-64 (Jeffrey Welles). 69/ After the meeting Jeffrey Welles also reviewed a J&G tax opinion letter issued to Larry Morgan. See PX 228 (Morgan J&G opinion letter dated April 8, 1999).

The partnership is entitled to the benefit of all legal advice funneled into Mr. Waterman and thence to Jeffrey Welles. Mr. Cotter, an SLK tax partner upon whom Mr. Waterman relied, was a convincing fact witness, principally because he was direct and forthcoming. While he had shepherded successfully other transactions based on the J&G strategy through SLK, and was "comfortable" with the conclusions reached in the J&G Tax Opinion, Tr. at 1102-03, Mr. Cotter lacked knowledge of the particulars of the FXDOTs, see Tr. at 1106, 1154-56, i.e., the "real profit potential," which was "very important to the tax treatment." Tr. at 1104. Mr. Cotter had only a general understanding, based on conversations

---

69/ Mr. Waterman later attempted to distance himself from this purported recommendation in a letter sent on March 6, 2000, that Jeffrey Welles does not recall having received. See Tr. at 595-96 (Jeffrey Welles). As noted earlier, the court was not persuaded by this testimony. Regardless of this discrepancy, Mr. Waterman's personal recommendation voiced at the Vero Beach meeting forms a component of the investigation conducted by Jeffrey Welles on the viability of the J&G strategy and represents advice upon which Jeffrey Welles relied.

with Messrs. Ivsan of SLK and Parse of DB Alex Brown, of the nature of any profit potential. See Tr. at 1104-05.

Although Mr. Cotter accredited himself in terms of earnestness, the court noted that the comfort that he had with the J&G Tax Opinion was sourced in his appreciation of the wrong transaction. He emphasized the genuine and undisputed investment activities of Stobie Creek and the single-member LLCs as genuine investment vehicles. See Tr. at 1116-17, 1120-21. It is the FXDOTs themselves that constitute the transactions that must pass muster, and Mr. Cotter's uninformed opinion of their profit potential did not have a reasonable basis.

The investigation into the validity of the J&G strategy continued even after the completion of the FXDOTs and prior to the filing of the partnership's tax returns. Following issuance of Notice 2000-44, Mr. Waterman instructed Messrs. Cotter and Ivsan of SLK's tax department to evaluate the effect of the Notice and proposed Treasury regulations on the Welleses' transactions. See Tr. at 239; PX 259 (SLK memorandum dated Aug. 18, 2000) Mr. Waterman also informed Jeffrey Welles of the Notice and arranged a telephone conference call with Ms. Guerin, David Welles, Deke Welles, Jeffrey Welles, and Messrs. Goldstein and Ivsan. Mr. Waterman related that, during the conference call, Ms. Guerin stated that a committee at J&G had reviewed the effect of the Notice and that it was J&G's position that the Notice did not appear to apply to the type of transactions that the Welleses had engaged in. See Tr. at 253-54. Mr. Cotter plausibly testified to the same effect and previously had so advised Mr. Waterman. See Tr. at 1133-34.

As discussed above, Jeffrey Welles also made efforts to investigate the viability of the FXDOTs. He made inquiries with his contacts at Goldman Sachs and Morgan Stanley regarding foreign exchange options investing, and upon the advice of Ms. Guerin at J&G, Jeffrey Welles also made contact with advisors at DB Alex Brown. He relied on sources of information from Deutsche Bank and Bloomberg before investing in the dollar/euro and Swiss franc/dollar options. Once the options were purchased, Jeffrey Welles continued to monitor the investments during the life of the options.

This investigation was selective. Testimony and other evidence establish that no genuine investigation was made into the profit potential of the FXDOTs. Although Jeffrey Welles testified that he recalled being told by advisors at DB Alex Brown that he had a 30% chance of doubling his money and an outside chance of hitting the "sweet spot," no evidence was offered by plaintiffs to substantiate that this "potential" was investigated or confirmed by any financial advisor or by Jeffrey Welles himself. The J&G Tax Opinion stated (as had all drafts submitted to Jeffrey Welles) that "an objective investment analysis of the instant option positions . . . using generally accepted models employing standard option pricing theories and methodologies, indicated a substantial probability that the long option strike price level would be reached and that profitability would be achieved." PX 143 at K-23. In

fact, neither Jeffrey Welles nor any financial or legal advisor upon whom he relied performed this objective investment analysis.

Dr. DeRosa analyzed the profit-potential of the FXDOTs using the generally accepted Black-Scholes model and determined that, given the severe overpricing of the options, no reasonable possibility existed of achieving a profit and no reasonable investor would have invested in the options. See DX 515 at 9-10 ("[A] prospective investor would reasonably expect a negative return on these options, given the cost of the options, the likelihood of possible outcomes, and the possible payoffs. Accordingly, no investor would have had a reasonable expectation of earning a profit on these options, and no reasonable investor seeking to earn a profit would have entered into these transactions."). The court credits Dr. DeRosa's testimony as establishing a real-world touchstone for entering into these foreign exchange options transactions. Had Jeffrey Welles or any of his financial advisors made a *bona fide* investigation into the profit potential of the FXDOTs, the court finds that they would have come to the conclusion that such profit potential did not exist. On this point the investigation into the viability of the investment vehicle stipulated under the J&G strategy was deficient and undermines the reasonableness of relying on advice that failed to substantiate this primary consideration.

One other consideration in assessing whether the advice itself was reasonable and thus qualifies for reasonable reliance is whether the advice is based upon any unreasonable assumptions or representations by the taxpayer that all the facts presented are true. See Novinger, 61 T.C.M. (CCH) at 3028. The J&G Tax Opinion, as discussed in detail above, concluded that it was "more likely than not" that the J&G strategy could withstand the economic substance and step transaction analyses on the basis of the taxpayer's (the partnership's) representations that each transaction was supported by "substantial nontax business reasons" and that an "objective investment analysis" confirmed the profitability of the transactions. PX 143 at 7, K-23. Not only was no investigation made into the validity of these representations (they were presumed to be true and formed the basis of the opinion offered), but the representations were demonstrably false, a fact that could not have been doubted by any sentient person involved. 70/ A "bury your head in the sand" approach –

---

70/ Another case cited by plaintiff, Estate of Monroe readily can be distinguished. Although the taxpayer had failed to tell his advisor all of the information in seeking advice, the court in Estate of Monroe found that the omitted information would not have changed the substance of the advice given. 124 F.3d at 714-15. This is not the situation with the representations memorialized in the J&G Tax Opinion. Had the lack of profitability of the transactions been acknowledged, J&G could not have offered a legal opinion that the transactions would "more likely than not" be upheld under the economic substance and step transaction doctrines. The substance of the advice was dependent upon the representations concerning the FXDOTs and the partnership's motivations recited in the Tax Opinion (which were the responsibility of Jeffrey Welles), and so the reasonableness of relying on advice that

where a genuine investigation of the FXDOTs would have revealed their lack of profitability – does not commend the reasonableness of advice based on unsupportable assumptions.

ii) Reasonableness of reliance

Illes, Pasternak, Chamberlain, and Neonatology all counsel that reliance on professional advice is unreasonable where the advisor lacks expertise or suffers from a conflict-of-interest of which the taxpayer knows or should know. Neonatology, 299 F.3d at 234 ("[T]he reliance itself must be objectively reasonable in the sense that . . . the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about."); Chamberlain, 66 F.3d at 732 ("The reliance must be objectively reasonable; taxpayers may not rely on someone with an inherent conflict of interest, or someone with no knowledge concerning that matter upon which the advice is given." (footnotes omitted)); Pasternak, 990 F.2d at 903 ("[T]he purported experts were either the promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of 'independent professionals.'"); Illes, 982 F.2d at 164-66 (reasonable reliance precluded where accountant was "not a disinterested source," because he was tax shelter promoter). The advisors upon whom Jeffrey Welles relied had the requisite expertise. The premier legal reputation of SLK is well established, and the Welles family had relied upon their attorneys at SLK, including legal advice on tax issues, for many years prior to the implementation of the J&G strategy. Also, prior to the events leading to its public disgrace and dissolution of the law firm, and during the relevant time period, J&G enjoyed a vaunted reputation in legal and tax matters. The exquisite clarity and ethical posturing that retrospective examination allows of the latest sacrilege committed in the name of tax avoidance cannot minimize the fact that Jeffrey Welles obtained top legal advice, even if that advice was, as Mr. Waterman agreed, to endorse the probable acceptance of a tax strategy whose fundamental purpose was "to boost [the partnership's] basis and reduce [its] capital gain." Tr. at 323.

The evidence nonetheless unequivocally establishes that both J&G and SLK were tainted by conflict-of-interest. The proprietary nature of the confidentiality agreements required by J&G and the calculation of the fee for its Tax Opinion based on a percentage of the gains to be sheltered by the implementation of the J&G strategy confirm that J&G can be characterized accurately as the promoter of the shelter. SLK, and its attorneys, although one step removed from the promoter of the shelter, also suffer from a similar conflict-of-interest. Having been approached by Welles family members regarding strategies to reduce capital gains taxes on the proceeds of the Kenner transaction, Mr. Waterman placed Jeffrey

---

70/ (Cont'd from page 117.)

is premised on false or unsupported representations is called into question – a situation not presented in Estate of Munroe.

Welles in contact with Mr. Ivsan in the SLK tax department regarding a "strategy" that at least two other clients of SLK had implemented. Mr. Ivsan then brokered contact between Jeffrey Welles and Ms. Guerin at J&G, a firm with which SLK had similar arrangements for the two previous clients.

Although ultimately deciding not to render a separate tax opinion, SLK remained intimately involved throughout the implementation of the J&G strategy, including conducting its own vetting of the viability of the strategy in light of Notice 2000-44. Importantly, SLK received a large "aggregate fee" of over $2 million for its involvement in the J&G strategy – separate and apart from its legal fees related to the Kenner transaction – calculated as a percentage of the capital gains to be sheltered. See PX 108 at 2. 71/ As both SLK and J&G had financial interests in the promotion and implementation of the strategy – a fact known by Jeffrey Welles, who paid the fees – the reasonableness in relying on their advice is diminished.

Another factor that the court must consider in weighing the reasonableness of a taxpayer's reliance on professional advice is his knowledge and experience in judging whether a strategy is "too good to be true." Jeffrey Welles is not the experienced tax attorney or CPA seen in cases such as Santa Monica Pictures, 89 T.C.M. (CCH) at 1228, or Jade, 80 Fed. Cl. at 56. Nonetheless, Jeffrey Welles is a highly educated professional. Following extensive experience as an investment banker at Goldman Sachs and Lazard, he served as the primary investment advisor to Therma-Tru and continues to serve as the investment advisor to his family. Over the years the Welles family has engaged a number of attorneys to provide tax-planning services and to implement tax-planning strategies that minimize their tax burdens – an acceptable tool for business and estate financial management. See Gregory, 293 U.S. at 469 ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). The Welleses' successful experience with the GRAT strategy to minimize taxes, discussed in the Facts section, also informs this court's judgment of Jeffrey Welles's experience in assessing when a strategy may be "too good to be true." Moreover, Mr. Welles's tolerance of impressive legal fees was well-grounded even before this engagement. See Tr. at 615-16 (Jeffrey Welles).

The court evaluates the family's experience with the GRAT strategy as fundamentally different from the Welleses' implementation of the J&G strategy. With the GRAT the transaction at issue – the end result – was the transfer of the assets, the shares of Therma -Tru stock, from one generation of the family to the next. The family employed the tax-advantageous GRAT as the vehicle to make the transfer, resulting in avoidance of

---

71/ After Mr. Waterman, on behalf of SLK, offered to waive the fee or donate the fee to charity, the firm accepted the full amount of the percentage fee, save $150,000.00 donated in SLK's name to a Toledo charity. See Tr. at 362-63 (Waterman)

approximately $30 million in taxes, achieved over a four-year period. The J&G strategy, in contrast, did not operate as a vehicle to facilitate the sale or transfer of the Therma-Tru stock – the end result at issue and the transaction that had economic reality. Rather, the sale of Therma-Tru stock, which yielded the capital gains to the Welles family, was conducted entirely separate and apart from the transactions orchestrated to relieve the Welleses of their tax obligations arising from that sale. 72/ Nor did the J&G strategy require the family members to commit their gains for a number of years in an illiquid investment vehicle in order to achieve the tax advantages. 73/ Jeffrey Welles directed the partnership into a series of transactions, taking place over a five-month period, that purported to create a basis boost on the order of $204 million to offset approximately $211 million of capital gains. The cost of this strategy was approximately $8 million in fees and options premiums, yet it yielded a tax savings of over $40 million – tax benefits on a magnitude of five to one. As a long-time investor and manager of his family's finances, Jeffrey Welles is a professional who can be presumed to recognize when an opportunity presented is "too good to be true." The J&G strategy fits the bill. See Neonatology, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."). 74/

---

72/ The court looks to a pithy quotation from Coltec: "[T]here is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)." 454 F.3d at 1357. A taxpayer with the knowledge and experience of Jeffrey Welles can recognize this difference, as well.

73/ Initially, Mr. Herpe had drafted a Cash Handling Agency Agreement that would enable North Channel to hold proceeds from the sale of Therm-Tru stock in a single account. See DX 424; Tr. 136-38 (Herpe). The draft agreement contemplated that the proceeds would be held for a sixty-day period during which the trust and the Welles family members would determine how much of the contributors' cash would be committed to the partnership and how much would be taken out for themselves and taxed on the stock's original basis. See Tr. at 138-43. The Welles family elected to pursue the J&G strategy, which had the effect of minimizing the amount of capital gains by inflating asset basis.

74/ Jeffrey Welles recognized this risk before consummating the transactions. See Tr. at 209-10 (Mr. Waterman stating that he discussed worst-case scenario with family at Vero Beach meeting – liability for full amount of capital gains, interest, and penalties), 463 (Jeffrey Welles stating that in response to family member's question at Vero Beach family meeting about "downside of the strategy not working," Mr. Waterman, "talked about paying the capital gains. If the basis wasn't successfully stepped up there would be substantial capital gains and interest and [he] talked about penalties."), 776 (Jeffrey Welles asking Mr. Goldstein to calculate amount of tax due if J&G strategy did not work).

3) Analysis

Given the weight of the evidence, this court must conclude that the partnership has failed to establish by a preponderance of the evidence that its reliance (that of Jeffrey Welles) on the advice of professionals was reasonable. The partnership is liable for the 20% negligence penalty. Accordingly, plaintiffs may only defeat the application of the negligence penalty at the partnership level by appeal to the exception for reasonable cause and good faith, a position analyzed in the next section.

5. Reasonable cause and good faith

I.R.C. § 6664(c)(1) provides a defense to the imposition of any accuracy-related penalty, stating that "[n]o penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." As discussed above, the Court of Federal Claims has jurisdiction in this partnership-level proceeding to determine whether the partnership, Stobie Creek, can substantiate a reasonable cause and good faith defense to accuracy-related penalties through an evaluation of the actions of its managing partner, Jeffrey Welles.

The most important factor in determining whether the taxpayer acted with reasonable cause and good faith is the extent to which the taxpayer made efforts to assess his proper tax liability. See Treas. Reg. § 1.6664-4(b)(1). In order to appraise the taxpayer's efforts, the court "tak[es] into account all pertinent facts and circumstances." Id. Treasury Regulation § 1.6664-4(b)(1) instructs that circumstances which may support a reasonable cause and good faith defense include "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id. As with the standards for the negligence penalty, the concept of reliance on the advice of professionals is a hallmark of the exception for reasonable cause and good faith. However, "[r]eliance on . . . the advice of a professional tax advisor . . . does not necessarily demonstrate reasonable cause and good faith." Id. The reliance on professional advice must, under all the circumstances, be reasonable. See id. ("Reliance on . . . professional advice, or other facts . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."). 75/

---

75/ Jeffrey Welles's argument that he acted with reasonable cause and good faith focuses on his reliance on professional advice, Pls.' Br. filed Feb. 7, 2008, at 29-32, an argument significantly overlapping the law pertinent to the negligence penalty, discussed above. This is not to say that in all cases the analysis relevant to the reasonable cause and good faith defense will be coincident with the law relevant to the negligence penalty. Treasury Regulation § 1.6664-4(b)(1) details numerous other circumstances, beyond

When a taxpayer argues that reasonable cause and good faith is demonstrated by his reliance on professional advice, certain minimum requirements must be satisfied:

> (i) *All facts and circumstances considered.* The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or should know, to be relevant to the proper tax treatment of an item.
>
> (ii) *No unreasonable assumptions.* The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the

---

75/ (Cont'd from page 121.)

reasonable reliance on the advice of a professional, that may demonstrate reasonable cause and good faith, for example:

- "reliance on erroneous information (such as an error relating to the cost or adjusted basis of property, the date property was placed in service, or the amount of opening or closing inventory) inadvertently included in data compiled by the various divisions of a multidivisional corporation or in financial books and records prepared by those divisions . . . , provided the corporation employed internal controls and procedures, reasonable under the circumstances, that were designed to identify such factual errors."

- obtaining an "appraisal of the value of property" if other factors such as "methodology and assumptions underlying the appraisal, the appraised value, the relationship between appraised value and purchase price, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer or to the activity in which the property is used" suggest reasonable cause and good faith.

- "reliance on erroneous information reported on a Form W-2, Form 1099, or other information return . . . , provided the taxpayer did not know or have reason to know that the information was incorrect."

> advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

Treas. Reg. § 1.6664-4(c)(1)(i)-(ii).

Plaintiffs argue that the exception for reasonable cause and good faith should shield the partnership from accuracy-related penalties because the partnership, through Jeffrey Welles, was entitled to rely on the advice of its professional tax advisors. See Pls.' Br. filed Feb. 7, 2008, at 29-32. Plaintiffs quote the Supreme Court:

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence" do not demand such actions.

Boyle, 469 U.S. at 251. Plaintiffs further urge that a finding that a transaction lacks economic substance does not foreclose the reasonable cause and good faith defense when the taxpayer has relied on professional tax advice. See Pls.' Br. filed Feb. 7, 2008, at 31 (citing Durrett, 71 F.3d at 517-18 (upholding Tax Court determination that taxpayers lacked profit motive but reversing determination of negligence because taxpayers relied in good faith upon professional tax advice)). Plaintiffs invoke the excellent reputations in the legal community of J&G and SLK at the time of the transactions. They also cite Mr. Waterman's personal approval of the strategy, and add that Mr. Goldstein reviewed the transactions and did not raise any issues of caution.

In arguing that plaintiffs cannot meet the standards for reasonable reliance on tax professionals, defendant highlights that both J&G and SLK were promoters of the tax shelter and stood to collect percentage fees for the implementation of the J&G strategy. In addition, defendant contends that the J&G Tax Opinion itself was based upon unreasonable and erroneous representations and assumptions of fact. Given this factual foundation, defendant urges that plaintiffs could not reasonably rely on the tax advice they received.

1) Case law dynamics

The case law reviewed in connection with discussion of the negligence penalty that examined reliance on professional advice applies in analyzing this exception. "Reasonable reliance"on professional advice exists when (1) the advice itself is reasonable (in that it is

based upon accurate information and representations supplied by the taxpayer, reflects reasonable investigation into the transactions, and does not make unreasonable or unsupported assumptions), see Illes, 982 F.2d at 166; Novinger, 61 T.C.M. (CCH) at 3028-29; and (2) the taxpayer's reliance thereon is reasonable (in that the professional does not manifest a conflict-of-interest, and, given the taxpayer's knowledge and experience, the transactions are not "too good to be true"), see Neonatology, 299 F.3d at 234; Chamberlain, 66 F.3d at 732; Pasternak, 990 F.2d at 903; Illes, 982 F.2d at 164-65, 166; Jade, 80 Fed. Cl at 56; Santa Monica Pictures, 89 T.C.M. (CCH) at 1228. Plaintiffs and defendant appeal to cases applying the standard of reasonable cause and good faith to give context to the application of these principles.

In Stanford v. Commissioner, 152 F.3d 450 (5th Cir. 1998), cited by plaintiffs, the Fifth Circuit considered the reasonable cause and good faith defense to the 20% accuracy-related penalty for substantial understatement of income tax where the taxpayer's reporting did not comply with the Code. The Fifth Circuit agreed with the Tax Court that the taxpayers were liable for an understatement, see id. at 457-59, but reversed the finding that they were liable for the accuracy-related penalty. The taxpayers had relied on the advice of an attorney who was an expert in international banking law. See id. at 461. Also, the tax preparer was an experienced CPA, who previously had prepared their returns and had prior experience in international tax. See id. Significantly, the Fifth Circuit stated, "Nothing in the record indicates that the heeded advice, which called for the utilization of a tripartite corporate structure . . . had as a purpose the facilitation of tax avoidance." Id. The court also noted that "the Commissioner does not allege that the Stanfords failed to advise [their tax preparer] of any facts material to the determination of their 1990 tax liability or limited the scope of his research in any way." Id. Given these facts, the court concluded that the taxpayers' failure to monitor their independent advisors or to seek a second opinion did not defeat a showing of reasonable cause:

> Although [the tax preparer's] legal interpretation of section 952(c)(1)(C) turned out ultimately to be incorrect – and indeed gave rise to a substantial understatement of tax on the Stanfords' 1990 joint return – we find that the Stanfords' reliance on that interpretation constitutes "reasonable cause" for purposes of precluding the penalty imposed against them for that understatement.

Id.

Defendant's riposte is Long Term Capital, in which, following a determination that the taxpayer's tax treatment was predicated on transactions to be disregarded as lacking economic substance, the trial court considered whether the taxpayer could avoid the imposition of accuracy-related penalties on the basis of the reasonable cause and good faith exception. Citing Treasury Regulation § 1.6664-4(c)(1), the court distilled that reliance on

the advice of a professional can constitute reasonable cause and good faith only if two threshold requirements are met:

> (1) the advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances, including taking into account the taxpayer's purpose for entering into a transaction and for structuring a transaction in a particular manner, and is not adequate if the taxpayer fails to disclose a fact that it knows, or should know, to be relevant to the proper tax treatment of an item; and (2) the advice must not be based on unreasonable factual and legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person, including a representation or assumption the taxpayer knows, or has reason to know, is unlikely to be true, such as, an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

Long Term Capital, 330 F. Supp. 2d at 206.

The court turned to the taxpayer's claim that it reasonably relied on professional advice and concluded that the taxpayer had not carried its burden of proving reasonable cause and good faith for four reasons. See id. First, the taxpayer had not met its burden of proving that the advice was received prior to April 15, 1998, the date on which the taxpayer claimed its losses on its 1997 tax return. See id. at 208. Second, the tax opinion at issue was prepared as part of a litigation strategy, thus casting doubt on its contents to serve the purpose as a reasoned opinion on the application of tax law to the facts of the transactions. Although the tax opinion recited that it relied on representations of the taxpayer that tax-independent business purposes motivated the transactions, the opinion made "no effort to demonstrate, factually or analytically, why it was reasonable to rely on those assumptions and representations." Id. at 209. The court found that a "reasonably diligent analysis of all facts and circumstances would have revealed at least some of those assumptions to be unreasonable and unsupportable" and thus that the tax opinion was not reasonably reliable. Id. Third, legal analysis regarding the economic substance and step transaction doctrines was thin and general, rather than specific to the facts of the taxpayer's transactions or to the case law of the Second Circuit where the taxpayer resided. See id. at 209-10. Finally, the court mentioned that the taxpayer had made efforts to conceal in its tax returns the tax losses generated through its disregarded transactions, a finding incompatible with good faith. See id. at 211.

Defendant also relies on Santa Monica Pictures, 89 T.C.M. (CCH) at 1157. While the managing partner asserted that he had conducted due diligence, the court found that exercise not to pertain to the issues most germane to tax liability or to the particulars of the

transactions at issue. See id. at 1229-30. The managing partner also trumpeted his reliance on the opinions of "outside" professional tax advisors. The court considered seven documents and memoranda from various advisors that the managing partner offered as tax advice upon which he reasonably relied. The court rejected the assertion of reasonable reliance because each opinion offered (1) was based on hypothetical transactions or otherwise was inapplicable to the actual transaction; (2) was a "draft" memorandum or memorandum labeled for internal use; (3) was based upon "faulty factual assumptions" that the taxpayer failed to establish were accurate; (4) only addressed a limited issue or failed to give a full legal analysis, cite any statutes, regulations, or case law or to consider the application of the economic substance or step transaction doctrines; or (5) was not prepared in connection with the taxpayer's filing of returns. Id. at 1229-36. The court ruled that plaintiff could not reasonably rely on the advice offered in any of these circumstances.

2) Application to Jeffrey Welles

As in the previous discussion of the negligence penalty, the court must assess whether it can credit Jeffrey Welles's reliance on professional advice as reasonable given the weight of the evidence presented at trial. The court supplements its findings with regard to the reasonableness of the advice and Jeffrey Welles's reliance thereon, in the context of assessing liability for the negligence penalty, with the analyses of the cases addressing the reasonable cause and good faith defense.

The trial court in Long Term Capital was faced with substantial evidence to discount the taxpayer's reliance on professional advice that is not present in these cases. For example, no dispute exists between the parties that the J&G Tax Opinion was issued prior to the filing of the partnership tax returns, and the court finds, based on Mr. Floyd's testimony, see Tr. at 1564-66, 1589-95, that the J&G Tax Opinion was relied upon to prepare those returns, even post facto. Thus, the J&G Tax Opinion is not suspect at the outset. See Long Term Capital, 330 F. Supp. 2d at 206-09 (questioning whether opinion was received by taxpayer prior to filing return and implying that opinion was rendered in connection with "litigation strategy"). Furthermore, the J&G Tax Opinion, a 111-page document, is replete with legal analysis and presents a full recitation and explanation of applicable case law, statutes, rules, and regulations, as well as the economic substance and the step transaction doctrines. The J&G Tax Opinion does not stand accused of providing "minimal legal analysis." Id. at 209-10 (stating that tax was opinion based on "unreasonable legal assumption" when no citation to case law of applicable jurisdiction and little analysis of economic substance and step transaction doctrines). Long Term Capital, however, does consider the reasonableness of the advice itself to assess whether reasonable cause and good faith is established:

> While the opinion states that it relies on assumptions and representations expressly made by Long Term, including that Long Term entered the OTC

> transaction for business purposes other than tax avoidance and reasonably expected to derive a material pre-tax profit from it and that there was no preexisting agreement on the part of OTC to sell its partnership interest to LTCM, it makes no effort to demonstrate, factually or analytically, why it was reasonable to rely on those assumptions and representations.

Id. at 209; see also Novinger, 61 T.C.M. (CCH) at 3028-29.

The J&G Tax Opinion relied on similar representations to those found "unreasonable and unsupportable" in Long Term Capital: that the transactions – the steps in the J&G strategy – were each pursued with "substantial nontax business reasons." PX 143 at 6-7. Regarding any efforts to verify the accuracy of these representations or to demonstrate why it was reasonable to rely upon them, the J&G Tax Opinion similarly disclaims responsibility for the validity of the factual representations, stating: "For purposes of all of the above opinions, we are relying on the truth of the representations of you and/or partners or representatives of the Partnership or partners or representatives of JFW INC." PX 143 at 6.

The record discloses evidence contrary to the representations made, and ultimately relied upon, in the J&G Tax Opinion. Given that a *bona fide* examination of the profit potential of these transactions would have revealed these assumptions and representations unsupportable, it is appropriate to charge the taxpayer and his advisors with that knowledge. See Treas. Reg. § 1.6664-4(c)(1) ("[T]he advice must not be based upon a representation or assumption which the taxpayer knows, *or has reason to know*, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner." (emphasis added)). In this context the advice given by Jeffrey Welles's tax advisors does not satisfy the minimum requirements set forth in Treasury Regulation § 1.6664-4(c)(1) to qualify it as reasonable.

Again, as in Santa Monica Pictures, while Jeffrey Welles conducted a degree of "due diligence," by researching the foreign currency market and inquiring about the legitimacy of foreign currency options as an investment vehicle, his investigative efforts failed to make the most salient inquiry in ascertaining his tax liability: whether any reasonable possibility of profit existed so as to confirm that his transactions had a tax-independent business purpose. Jeffrey Welles confirmed only the validity of foreign currency digital options as an investment vehicle and the illusion of a pay-off, without vetting whether the investment vehicle specified (and required) by the J&G strategy offered the possibility of a profit commensurate with its cost. Although the advice relied on by Jeffrey Welles is not deficient in the many ways that the opinions in Santa Monica Pictures, 89 T.C.M. (CCH) at 1228-30, were found to be, the failure of the J&G Tax opinion to substantiate the reasonableness of the representations relied upon through any investigation into the profit potential of the transactions (the business purpose asserted) undermines the reasonableness of relying on the advice offered by the J&G Tax Opinion.

Plaintiffs' interjection of the Fifth Circuit decision in Stanford gives no refuge because it is factually distinguishable. While the court does not question SLK's and J&G's substantial expertise in legal and tax matters, plaintiffs have not mounted a case where "[n]othing in the record indicates that the heeded advice . . . had as a purpose the facilitation of tax avoidance." Stanford, 152 F.3d at 461. To the contrary, the weight of evidence shows that tax avoidance was precisely the goal pursued in execution of the J&G strategy – a purpose acknowledged on repeated occasions by Jeffrey Welles and the principals at SLK and J&G. Given the purpose to execute a series of transactions that enhance the basis of a separate asset and shield resultant capital gains, the advice given to endorse those transactions, and any reliance thereon, is deserving of a higher level of critical evaluation than that exercised by the court in Stanford. Coupled with the complete failure to support the reasonableness of the representations relied on in the advice, and the evidence revealing that the "due diligence" performed by Jeffrey Welles and his advisors into the validity and viability of the transactions stopped short of verifying profit potential – the issue most apposite to ascertaining tax liability – the court finds that Jeffrey Welles could not reasonably rely on the advice given by his advisors. Consequently, the court finds that the partnership, through Jeffrey Welles, did not act with reasonable cause and good faith in regard to any portion of the underpayment determined.

## CONCLUSION

The court finds and concludes that the adjustments in the FPAAs were proper as supported by the facts and law based on a preponderance of evidence and that the partnership is liable for the penalties assessed. Plaintiffs' petition for readjustment of the partnership items of Stobie Creek is denied. The Commissioner's application of penalties at the partnership level is affirmed without consideration of the reasonable cause defenses that may be raised in any future partner-level proceedings. Accordingly, based on the foregoing,

The Clerk of the Court shall enter judgment for defendant on plaintiffs' petition for readjustment of partnership items for Stobie Creek.

**IT IS SO ORDERED**.

s/ Christine O.C. Miller

________________________________

**Christine Odell Cook Miller**
Judge