# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## Nos. 06-245T, 06-246T, and 06-247T
**(Consolidated)**

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

_____

**UNITED STATES' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6**

_____

DENNIS M. DONOHUE
Chief Senior Litigation Counsel
U.S. Department of Justice, Tax Division
Post Office Box 403
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6492

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

HOW ARE THE TAX LOSSES IN THIS CASE DUPLICATIVE, FOR PURPOSES OF
SECTION 309 OF THE COMMUNITY RENEWAL TAX RELIEF ACT OF 2000,
IF AT ALL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IS A FINDING BY THE COURT ON THE VALIDITY OF TREAS. REG. §1.752-6 RIPE?
WOULD SUCH A FINDING BE MOOT IF THE COURT WERE TO FIND AFTER TRIAL
THAT THE TRANSACTION AT ISSUE IN THIS CASE LACKED ECONOMIC
SUBSTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

HOW IS "PREVENTION OF ABUSE" UNDER 26 U.S.C. § 7805(b) TO BE DEFINED?  ARE
"ABUSE" AND LACK OF ECONOMIC SUBSTANCE SYNONYMOUS . . . . . . . . . . . . . . . 14

PLEASE COMMENT ON THE FOLLOWING ASSERTION IN *CEMCO INVESTORS v.
UNITED STATES*, 515 F.3d 749, 752 (7th Cir. 2008): "ALL THE REGULATION DOES IS
INSTANTIATE THE PRE-EXISTING NORM THAT TRANSACTIONS WITH NO
ECONOMIC SUBSTANCE DON'T REDUCE PEOPLE'S TAXES . . . . . . . . . . . . . . . . . . . . 16

IF THE COURT WERE TO FIND AFTER TRIAL TRIAL THAT THE TRANSACTION AT
ISSUE IN THIS CASE IN FACT DID NOT LACK ECONOMIC SUBSTANCE, COULD THE
COURT THE COURT STILL SUSTAIN THE FPAAs UNDER A RETROACTIVE
APPLICATION OF TREAS. REG. § 1.752-6?  HOW WOULD THE *CHEVRON* DOCTRINE
APPLY IN SUCH A CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PLEASE EXPLAIN WHETHER THE FOLLOWING ASSERTION IN *STOBIE CREEK* IS
CORRECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                     **Page(s)**

*CEMCO INVESTORS v. UNITED STATES*, 515 F.3d 749 (7th Cir. 2008) . . . . . . . . . . . . . . . 16

*Coltec Industrial, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1261 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 16

*IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 254 B.R. 578 (D. Del. 2000), affirmed, *IRS v. CM Holdings, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Klamath Strategic Inventment Fund v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2007), *appeal pending*, No. 2008-5053 (5th Cir) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Klamath Strategic Investment Fund v. United States*, 472 F. Supp. 2d 885 (E.D. Tex. 2007), *appeal pending*, No. 2008-5053 (5th Cir) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004), *aff'd*, (unpublished order)(2d Cir. Sept. 27, 2005). . . . . . . . . . . . . . . . . . . . . . . . 11

*Stobie Creek v. United States*, 82 Fed. Cl. 636 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

## FEDERAL STATUTES AND REGULATIONS

Section 309 of the Community Renewal Tax Relief Act of 2000 . . . . . . . . . . . . . . . 2, 17, 19, 20

26 U.S.C. § 357(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.R.C. § 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.R.C. § 358(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IRC § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

IRC § 7805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Treas. Reg. § 1.701-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Treas. Reg. 1.752-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 18, 22

## LEGISLATIVE HISTORY

*General Explanation of Tax Legislation Enacted in the 106th Congress,*
JCS-2-01 at 153-54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

H.R. Conf. Rep. No. 105-220, at 525 n.8 (1997), *reprinted in* 1997-4 (vol. 2) C.B. 1457, 1995  15

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## Nos. 06-245T, 06-246T, and 06-247T
### (Consolidated)

| | |
|---|---|
| **MURFAM FARMS, LLC,** | § |
| **By and Through Wendell H. Murphy, Jr.,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **PSM FARMS, LLC,** | § |
| **By and Through Stratton K. Murphy,** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **MURPHY PORK PARTNERS, LLC** | § |
| **By and Through Wendell H. Murphy, Jr.** | § |
| **a Partner Other Than Tax Matters Partner,** | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **UNITED STATES OF AMERICA,** | § |
| | § |
| **Defendant.** | § |

_____

## UNITED STATES' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6

_____

The United States submits this memorandum in conformance with the Court's order of September 25, 2008, DE #85, ordering the parties to submit supplemental briefing. The Court has ordered the parties to be specific and concise in its answers to six specific questions. Therefore, the responses by the United States assumes the Court's familiarity with facts and arguments already presented to this Court.

3659987.1

1.      **HOW ARE THE TAX LOSSES IN THIS CASE DUPLICATIVE, FOR PURPOSES OF SECTION 309 OF THE COMMUNITY RENEWAL TAX RELIEF ACT OF 2000, IF AT ALL?**

Section 309(a) of the Community Renewal Tax Relief Act of 2000 added Section 358(h) to the Internal Revenue Code which, in general, reduces the basis of property in certain corporate transactions by the amount of any contingent liability.  This provision was designed to combat tax-avoidance abuse arising from so-called corporate contingent liability schemes.  *See*, *Coltec Indus., Inc. v. United States,* 454 F.3d 1340, 1348, fn.7 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1261 (2007)  (involving a contingent liability transaction occurring prior to the effective (retroactive) date of Section 358(h)).  The legislative history of Section 309 describes how such corporate tax avoidance schemes can produce a duplicated loss – *i.e.*, the transferee entity takes a deduction in addition to the deduction realized when the taxpayer sells his stock in the transferee entity at a loss.  *See General Explanation of Tax Legislation Enacted in the 106th Congress*, JCS-2-01 at 153-54 (Joint Committee on Taxation, April 19, 2001).

This duplicated loss can be illustrated as follows: A taxpayer would transfer property and future liabilities, such as environmental claims (*e.g.*, asbestos claims) or healthcare liabilities, to a special purpose entity in exchange for stock in the entity.[1]  The stock would be treated as having a tax basis equal to the basis of the property transferred, unreduced by the assumed liabilities.[2]  The taxpayer would then sell the stock to an accommodating third party at a

---

[1]The exchange is intended to qualify as a tax-free exchange of property for stock under I.R.C. § 351.

[2]Liabilities that give rise to a tax deduction are not treated as money received and therefore do not reduce the taxpayer's basis in his stock. I.R.C. § 358(d)(2).

3659987.1

significant tax loss. The tax loss would be purely a non-economic paper loss calculated by reference to the difference between the low fair market value of the stock (due to the assumption of the future liabilities by the special purpose entity) and the stock's purported high tax basis reflecting the transferred property (unreduced by the assumed liabilities). A second loss would then occur in future years when the corporation deducted the liabilities when paid or accrued.

A duplicated loss can also occur in Son of BOSS transactions involving paired options, including the COBRA paired option transactions here. In these cases, the duplicated loss can occur once at the partnership level when the option expires or are terminated, and again when the S Corporation sells its assets whose artificially inflated bases were derived with reference to the alleged contingent liabilities arising from the paired option transactions.  This duplicated loss can be illustrated with respect to the facts of this case as follows:

First, just like the corporate contingent liability transactions, an enormous non-economic paper loss was also generated by the taxpayers here – the Murphy family members – on the sale of property whose bases had been artificially inflated by alleged contingent liabilities. Here, individual members of the Murphy family, through single member LLCs, purchased and sold offsetting options on the Swiss Franc and Euro currencies.

For example, in the MURFAM Farms transaction, four members of the Murphy family purchased and sold offsetting options[3] for an aggregate net premium of $1,851,000 but claimed an aggregate basis ("outside basis") from the currency transactions of $61,700,000 in their

---

[3]The partnership's calculations assume – as the partners have argued all along (contrary to the Government's position) – that the long option and the short option comprising each pair of the options contributed to the partnership were separate instruments (and that the partners actually paid and received the indicated premiums and payout amounts, which were in fact netted).

3659987.1

partnership.  In calculating their artificially inflated bases, the Murphy family claimed that the proceeds debited to them on the sale of the short options could be disregarded in determining their outside bases in the partnership. On the preplanned transfer of their partnership interests to an S Corporation, and the simultaneous liquidation of the partnership, they claimed that the artificially inflated bases in their partnership interests then carried over and attached to the non-cash partnership assets, consisting of North Carolina State municipal bonds, which assets were now in the hands of the S Corporation.  On its Form 1120S for its 2000 tax year, the S Corporation reported a long term capital loss of $61,543,012 from the sale of the municipal bonds. On their respective 2000 Form 1040s, the Murphy family members, as the stockholders of the S Corporation, then reported their alleged pro rata shares of these non-economic losses. Again, just like the non-economic paper losses occurring on the sale of the corporate stock in the contingent liability shelter, the Murphy's non-economic losses were similarly attributable to their use of allegedly contingent liabilities in these COBRA transactions.

The COBRA taxpayers also claimed another loss on the expiration or early termination of the options.[4] These losses occurred in the purported partnerships and were reported on the partnerships returns, which, in turn, were allocated to the partners based on their pro rata interests in the purported partnerships. These losses occurred because most or all of the options expired "out of the money," or were terminated when their then value was less than the net premium. Specifically, the partnership here recognized the following losses upon expiration of

---

[4]As the evidence at trial will show, as structured, it was all but impossible to make an economic profit on the COBRA option transactions, and, in fact, no investor in the 16 COBRA transactions in 1999 and 2000, each of which involved several individual investors, actually made any profit.

the paired options, all of which expired out of the money:[5]

1.    USD/EUR (long) option #1: ($26,000,000) ($0 payout from Deutsche Bank (DB)) less $26,000,000 premium paid to DB)

2.    USD/EUR (long) option #2: ($5,300,000) ($0 payout from Deutsche Bank (DB)) less $5,300,000 premium paid to DB)

3.    CHF/USD (long) option #1: ($17,300,000) ($0 payout from DB) less $17,300,000 premium paid to DB

4.    CHF/USD (long) option #2: ($9,700,000) ($0 payout from DB) less $9,700,000 premium paid to DB

5.    CHF/USD (long) option #3: ($3,000,000) ($0 payout from DB) less $3,000,000 premium paid to DB

The partnership used these losses ($61,700,000 in the aggregate) to offset all the following

premiums received ($59,849,000 in the aggregate) on the sale of the short options:

6.    USD/EUR (short) option #1: $25,608,000 ($25,608,000 premium received from DB less $0 payout to DB)

7.    USD/EUR (short) option #2: $5,141,000 ($5,141,000 premium received from DB less $0 payout to DB)

8.    CHF/USD (short) option #1: $16,781,000 ($16,781,000 premium received from DB less $0 payout to DB)

9.    CHF/USD (short) option #2: $9,409,000 ($9,409,000 premium received from DB less $0 payout to DB)

10.    CHF/USD (short) option #3: $2,910,000 ($2,910,000 premium received from DB less $0 payout to DB)

---

[5]The partnership's calculations assume – as the partners have argued all along (contrary to the Government's position) – that the long option and the short option comprising each pair of the options contributed to the partnership were separate instruments (and that the partners actually paid and received the indicated premiums and payout amounts, which were in fact netted).

Simply looking at the paired options on a net basis, the partnership incurred $61,700,000 in expenses on the long options which it realized on the purchase of options which did not hit, which it used to offset against $59,849,000 in profit realized on sale of the short options, leaving the partnership with a reported net loss of 1,851,000.[6]

Consequently, duplicated losses to the extent of $1,851,000 also took place on the option transactions here, which losses had the effect of reducing the income reported by the taxpayers on the option transactions. But, as in the corporate contingent liability shelter, there is only one loss on this transaction which has real economic consequences, and thus is a deductible loss for tax purposes. That loss is the $1,851,000 realized when the options expired out of the money. The loss of $61,543,012, is a fictitious loss having no real economic consequence.

The PSM Farms transaction was similar.  Three members of the Murphy family purchased and sold offsetting options for an aggregate net option premium of $738,000, but claimed an aggregate outside basis in their partnership of $24,600,000 from the offsetting transactions.  In calculating their artificially inflated bases, the Murphy family claimed that the proceeds debited to them on the sale of the short options could be disregarded in determining their outside bases in the partnership. On the preplanned transfer of their partnership interests to an S Corporation, and the simultaneous liquidation of the partnership, they claimed that the artificially inflated bases in their partnership interests then carried over and attached to the non-cash partnership assets, consisting of North Carolina State municipal bonds, which assets were

---

[6]The taxpayers in fact still lost considerable money on their option transactions after taking into account the huge costs and fees paid by them to Jenkens & Gilchrist and Ernst & Young LLP. As the evidence at trial will show, such losses were virtually inevitable given the structure of these transactions.

3659987.1

now in the hands of the S Corporation. On its Form 1120S for its 2000 tax year, the S

Corporation reported a long term capital loss of $24,531,884 from the sale of the municipal

bonds. On their respective 2000 Form 1040s, the Murphy family members, as the stockholders of

the S Corporation, then reported their alleged pro rata shares of these non-economic losses.

Again, just like the non-economic paper losses occurring on the sale of the corporate stock in the

contingent liability shelter, the Murphy's non-economic losses were similarly attributable to their

use of allegedly contingent liabilities in these COBRA transactions.

      The COBRA taxpayers also claimed another loss on the expiration or early termination of

the options.  Specifically, PSM LLC here recognized the following losses upon expiration of the

paired options:

- USD/EUR (long) option: ($12,000,000) ($0 payout from Deutsche Bank (DB) less $12,000,000 premium paid to DB)

- CHF/USD (long) option #1: ($6,300,000) ($0 payout from DB less $6,300,000 paid to DB)

- CHF/USD (long) option #2: ($6,300,000) ($0 payout from DB less $6,300,000 payout from DB)

The partnership used these losses ($24,600,000 in the aggregate) to offset all of the following

stated premiums  ($23,862,000 in the aggregate) received on the sale of the short options:

- USD/EUR (short) option: $11,640,000 ($11,640,000 premium received from DB less $0 payout to DB)

- CHF/USD (short) option #1: $6,111,000 ($6,111,000 premium received from DB less $0 payout from DB)

- CHF/USD (short) option #1: $6,111,000 ($6,111,000 premium received from DB less $0 payout from DB)

      Simply looking at the paired options on a net basis, the partnership incurred $24,600,000

3659987.1

in expenses on the long options which it realized on the purchase of options which expired out of the money, which it used to offset against $23,862,000 in profit realized on sale of the short options, leaving the partnership with a reported net loss of 738,000.[7]

Consequently, duplicated losses to the extent of $738,000 also took place on the option transactions here, which losses had the effect of reducing the income reported by the taxpayers on the option transactions. But, as in the corporate contingent liability shelter, there is only one loss on this transaction which has real economic consequences, and thus is a deductible loss for tax purposes. That loss is the $738,000 realized when the options expired out of the money. The loss of $24,531,884, is a fictitious loss having no real economic consequence.

Finally, we shall examine Murphy Pork Partners, LLC.  Three members of the Murphy family purchased and sold offsetting options for an aggregate net option premium of $420,000, but claimed an aggregate outside basis in their partnership of $14,000,000 from the offsetting transactions.  In calculating their artificially inflated bases, the Murphy family claimed that the proceeds debited to them on the sale of the short options could be disregarded in determining their outside bases in the partnership. On the preplanned transfer of their partnership interests to an S Corporation, and the simultaneous liquidation of the partnership, they claimed that the artificially inflated bases in their partnership interests then carried over and attached to the non-cash partnership assets, consisting of Euros, which assets were now in the hands of the S Corporation. On its Form 1120S for its 2000 tax year, the S Corporation reported an ordinary

---

[7]The taxpayers in fact still lost considerable money on their option transactions after taking into account the huge costs and fees paid by them to Jenkens & Gilchrist and Ernst & Young LLP. As the evidence at trial will show, such losses were virtually inevitable given the structure of these transactions.

loss of $13,919,961 from the sale of the Euros. On their respective 2000 Form 1040s, the

Murphy family members, as the stockholders of the S Corporation, then reported their alleged

pro rata shares of these non-economic losses. Again, just like the non-economic paper losses

occurring on the sale of the corporate stock in the contingent liability shelter, the Murphy's non-

economic losses were similarly attributable to their use of allegedly contingent liabilities in these

COBRA transactions.

      The COBRA taxpayers also claimed another loss on the expiration or early termination of

the options.  Specifically, the partnership here recognized the following losses upon expiration of

the paired options:

- USD/EUR (long) option: ($8,000,000) ($0 payout from Deutsche Bank (DB) less $8,000,000 premium paid to DB)

- CHF/USD (long) option #1: ($4,000,000) ($0 payout from DB less $4,000,000 premium paid to DB)

- CHF/USD (long) option #2: ($2,000,000) ($0 payout from DB less $2,000,000 premium paid to DB)

The partnership used these losses ($14,000,000 in the aggregate) to offset all of the following

stated premiums ($13,580,000 in the aggregate) received on the sale of the short options:

- USD/EUR (short) option: $7,760,000 ($7,760,000 premium received from DB less $0 payout to DB)

- CHF/USD (short) option #1: $3,880,000 ($3,880,000 premium received from DB less $0 payout to DB)

- CHF/USD (short) option #2: $1,940,000 ($1,940,000 premium received from DB less $0 payout to DB)

      Simply looking at the paired options on a net basis, the partnership incurred $14,000,000

in expenses on the long options which it realized on the purchase of options which did not hit,

which it used to offset against $13,580,000 in profit realized on sale of the short options, leaving the partnership with a reported net loss of 420,000.

Consequently, viewing the losses incurred on the expiration of the Murphy taxpayers' option transactions in the aggregate, the taxpayers claimed duplicated losses to the extent of $3,009,000, which losses had the effect of reducing the income reported by them on the option transactions. But, as in the corporate contingent liability shelter, there is only one loss on this transaction which has real economic consequences, and thus is a deductible loss for tax purposes. That loss is the $3,009,0000 realized when the options expired out of the money. The combined losses of the three S Corporations to which the Murphy family members contributed their partnership shares, claimed an aggregate long term capital loss of $86,074,896 from the sale of the municipal bonds and an ordinary loss of $13,919,961 upon the sale of Euros which the partners had contributed.  These huge losses, caused by hugely inflated bases having nothing to do with the fair market value of these assets, are fictitious losses having no real economic consequence.

To be sure, the duplicated losses here arose in a different way than in the corporate contingent liability scheme.  But, as we emphasized in our opening brief, just because artificially inflating outside basis with contingent liabilities in a partnership, which is a passthrough entity, produces a slightly different non-economic result than artificially inflating a shareholder's stock interest in a corporation, which is a taxable entity, does not mean that Congress did not intend the Treasury, acting under its express mandate, to prevent such abuse.  Opening Br. at 31.

2.      IS A FINDING BY THE COURT ON THE VALIDITY OF TREAS. REG. §1.752-6
        RIPE?  WOULD SUCH A FINDING BE MOOT IF THE COURT WERE TO FIND
        AFTER TRIAL THAT THE TRANSACTION AT ISSUE IN THIS CASE LACKED
        ECONOMIC SUBSTANCE?

        The Court has asked two separate questions here.  The answer to the first question, is a

finding on the validity of the Treas. Reg. §1.752-6 (the "Regulation")  ripe, is yes. As to the

second question, would such a finding be moot if the Court were to find, after trial, that the

transaction at issue in this case lacked economic substance, the answer is no. This is because a

finding that the Regulation was valid could constitute an alternative holding of the Court in the

event of an appeal.[8]  Thus, the validity of the Regulation issue is ripe for decision and would not

be moot even if the Court found the transaction at issue was without economic substance.

        However, a decision that the Regulation is valid and applies retroactively would still not

eliminate the need for a trial on the economic substance issue.  This is because a finding that the

transaction lacked economic substance would produce a different tax consequence than a finding

that the Regulation was valid and applied retroactively.  On the one hand, a finding that a

transaction lacked economic substance would require that the transaction be disregarded

altogether for tax purposes, which would require the taxpayers's outside basis to be reduced to

zero.[9] On the other, a finding that the Regulation is valid and applies retroactively would not

_____

        [8]Apart from the applicability of the Regulation here, the Government has raised a number
of other alternative factual and mixed fact and law positions, including, among others, that the
steps of the transaction should be collapsed under the step transaction doctrine (thereby requiring
the taxpayers' basis in their partnership interest to equal no more than the net premiums paid by
them for the options); that the paired options constituted, in substance, a single position (also
requiring their outside basis to equal the net premiums); that Section 165(c) applies to disallow
the losses, and that Section 465(a) applies to disregard the contingent liabilities.

        [9]*See,* for example, *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122,
199, n.99 (D. Conn. 2004), *aff'd* (unpublished order) (2d Cir. Sept. 27, 2005).

3659987.1

fully sustain the FPAA because it would not require the taxpayers' outside basis to be reduced to zero.[10]  Rather such a finding would require their outside basis to equal the aggregate net premiums of their paired options.[11]  In this regard, the Regulation would provide the same outside basis if the Court found, after trial, that the step transaction applied or that the paired options constituted a single position. See note 6, *supra*. Because a finding that the Regulation would not eliminate the need for a trial on the economic substance issue, the United States did not move for partial summary judgement on the validity of the Regulation issue (which itself has a factual subsidiary issue, see note 9, *supra*.)  We initially intended to raise this issue in our trial or post-trial papers.  Of course, if the Court did find, after trial, the transaction lacked economic substance, it would be within the Court's discretion as to which, if any, of the Government's alternative positions the Court may wish to address.

    The government also notes that a finding that the Regulation is valid would not obviate

---

[10]While outside basis is not a partnership item but an affected item to be determined following a final decision in these cases, the taxpayers' outside bases here are determined almost exclusively with respect to various partnership item issues – *e.g.*, whether the option transactions held by the partnership lacked economic substance and, as a consequence, reduce the taxpayers' outside bases to zero.  Moreover, the issue whether the Regulation as well as whether various other Government alterative positions apply here are also partnership item issues. As discussed in note 9, *infra*, the consequence of findings in the Government's favor on these alternative issues would require the taxpayers' outside bases to be reduced to the net premiums paid by them for the paired options.

[11]Under the Regulation, the short options would constitute a liability for purposes of Section 752, and would therefore reduce the taxpayers' inflated outside basis by the amount of the stated premiums "received" for the short options. The Regulation also provides that a partner's outside basis cannot be reduced below the adjusted value of his partnership interest, which is defined as "the fair market value of ... [the] interest increased by the partner's share of the partnership liabilities under §§ 1.752-1 through 1.752-5." *See* Treas. Reg. 1.752-6(a). Here, however, the taxpayers' adjusted basis would be no higher than the net premiums paid by them for the paired options because the evidence at trial will show that the options' gross and net premiums were considerably overvalued.

3659987.1

the need for trial on the issue of whether the FPAA correctly applied penalties at the partnership

level.

3.      HOW IS "PREVENTION OF ABUSE" UNDER 26 U.S.C. § 7805(b) TO BE
        DEFINED?  ARE "ABUSE" AND LACK OF ECONOMIC SUBSTANCE
        SYNONYMOUS?

IRC § 7805(b)(3) allows the Secretary of the Treasury to promulgate retroactive

regulations in order to prevent abuse.  Neither Section 7805(b)(3) nor its legislative history

define the word "abuse."  The term abuse, however, is used elsewhere in the Code and does have

a defined meaning.  For example, IRC §357(c)(1) does not apply when a tax-free exchange

triggers Section 357(b)(1)'s anti-abuse provision.  *See* 26 U.S.C. § 357(c)(2).[12]  Section

357(b)(1)'s anti-abuse provision defines the term "abuse" to occur where liabilities are assumed

"principally for tax avoidance purposes or lack a bona fide business purpose."[13] This definition is

particularly apt here which also involves abuse arising with respect to liabilities. Thus, the Code

has defined the term abuse quite broadly to capture transactions principally entered into for tax

avoidance purposes.

Moreover, Congress' perception of the term "abuse" in the context of partnerships would

certainly also be informed by Treas. Reg. § 1.701-2 (the "anti-abuse" regulation), which the

---

[12]Section 357(c)(1) "sets forth a gain-recognition calculation where one of the variables is
the 'amount of liabilities assumed.'" *See, Coltec v. United States*, 454 F.3d 1340, 1350 (Fed. Cir.
2006), *cert. denied*, 127 S.Ct. 1261 (2007).

[13]Section 357(b)(1)'s anti-abuse provision is triggered as follows:
(1) In general.-If, taking into consideration the nature of the liability and the circumstances in the
light of which the arrangement for the assumption or acquisition was made, it appears that the
principal purpose of the taxpayer with respect to the assumption or acquisition described in
subsection (a)-
(A) was a purpose to avoid Federal income tax on the exchange, or
(B) if not such purpose, was not a bona fide business purpose, then such assumption or
acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange)
shall, for purposes of section 351 or 361 (as the case may be), be considered as money received
by the taxpayer on the exchange.

3659987.1

Secretary adopted approximately 18 months prior to the 1996 enactment of Section 7805(b)(3).

*Cf.* H.R. Conf. Rep. No. 105-220, at 525 n.8 (1997), *reprinted in* 1997-4 (vol.2) C.B. 1457, 1995

(referencing Section 1.701-2(f), ex. 2, in connection with amendment of IRC § 1059(e)(1)).  The

anti-abuse regulation makes clear that "[t]he partnership must be bona fide and each partnership

transaction or series of transactions . . . must be entered into for a substantial business purpose."

Treas. Reg. § 1.701-2(a)(1).  In addition, a partnership must not be "formed or availed of in

connection with a transaction a principal purpose of which is to reduce substantially the present

value of the partners' aggregate federal tax liability. . . ."  Treas. Reg. § 1-701-2(b).  In sum, the

term "prevention of abuse" would certainly reach transactions that were entered into principally

for tax avoidance purposes or lack a bona fide business purpose.

     In response to the Court's second question as to whether  "abuse" and "lack of economic

substance" are synonymous, the answer is no.  Section 7805(b)(3) certainly includes transactions

devoid of economic substance, but abuse is not limited to such activity.  Section 7805(b)(3)

provides a mechanism for sanctioning retroactive regulations throughout the entire Internal

Revenue Code.  And, various statutes can be manipulated to produce an array of different types

of abuse.  Indeed, the U.S. Treasury is engaged "in a perpetual game of catch up with the

innovative geniuses" who seek to subvert the tax system and Congressional intent.[14]

Consequently, Congress certainly intended the term "abuse" to have an expansive meaning.

---

[14]*See IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 254 B.R. 578, 624 (D. Del.
2000), affirmed, *IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 301 F.3d 96 (3d Cir. 2002).

3659987.1

4.      **PLEASE COMMENT ON THE FOLLOWING ASSERTION IN *CEMCO
        INVESTORS v. UNITED STATES*, 515 F.3d 749, 752 (7th Cir. 2008): "ALL THE
        REGULATION DOES IS INSTANTIATE THE PRE-EXISTING NORM THAT
        TRANSACTIONS WITH NO ECONOMIC SUBSTANCE DON'T REDUCE
        PEOPLE'S TAXES."**

The Seventh Circuit was simply concluding that the Regulation, in essence, deems

transactions to be without economic substance to the extent they artificially inflate basis in order

to create non economic tax losses. *CEMCO*, 515 F.3d at 751.  Thus, the Court was observing that

the Regulation is consistent with the fundamental purpose of the economic substance doctrine

which, as recently described in *Coltec*, exists to "prevent taxpayers from subverting the

legislative purpose of the tax code by engaging in transactions that are fictitious or lack

economic reality simply to reap a tax benefit." *Coltec*, 454 F.3d at 1353-54.  Further, the effect

of the Regulation, as the Seventh Circuit aptly emphasized, was to "avoid the need to litigate,

one tax shelter at a time, whether any real economic transaction is in the box." *CEMCO*, 515

F.3d at 751.

3659987.1

**5.      IF THE COURT WERE TO FIND AFTER TRIAL THAT THE TRANSACTION AT ISSUE IN THIS CASE IN FACT DID NOT LACK ECONOMIC SUBSTANCE, COULD THE COURT STILL SUSTAIN THE FPAAs UNDER A RETROACTIVE APPLICATION OF TREAS. REG. § 1.752-6?  HOW WOULD THE *CHEVRON* DOCTRINE APPLY IN SUCH A CASE?**

If the Court were to find that the transaction at issue had economic substance, the Court could still apply the Regulation retroactively to sustain, in part, the FPAAs. As discussed in our response to Question 2, a finding that the Regulation is valid and applies retroactively would be an alternative holding by the Court if it were to find the transaction lacked economic substance. On the other hand, such a finding would be a primary holding by the Court if it were to find that the transaction had economic substance.

Regarding the second question, the *Chevron* doctrine would be relevant in determining whether the Regulation may apply retroactively.  It is now the law in nearly all circuits that *Chevron* applies to all Treasury Regulations,  "whether "legislative"or "interpretive", and that under *Chevron* such Treasury Regulations are valid unless they are arbitrary, capricious or manifestly contrary to the statute.[15] Contrary to the recent spate of lower court decisions[16] holding that the Regulation is not consistent with Section 309(c) of the Community Renewal Tax Relief Act of 2000, as more fully explained in our response to Question 6, these decisions are wrong. But, even assuming *arguendo*, as these courts so hold, that the Regulation was inconsistent with Section 309(c), as also explained in our response to Question 6, the Regulation

---

[15]*See* authorities cited in the United States' Sur-Reply Memorandum of Law in Opposition to the Plaintiff's Motion for Partial Summary Judgment, part G, pp. 10-13.

[16]*Klamath Strategic Investment Fund v. United States*, 472 F.Supp.2d 885 (E.D. Tex. 2007), *on appeal*, Nos. 07-40861, 40915 (5th Cir.); *Stobie Creek v. United States*, 82 Fed.Cl. 636, 671 (2008); *Stobie Creek Investments v. United States*, 82 Fed.Cl. 636 (2008), *on appeal*, (Fed. Cir., notice of appeal filed September 29, 2008).

would still be valid as a properly issued regulation under Section 7805(a). That statute provides, in pertinent part, that the "Secretary shall prescribe all needful rules and regulations for the enforcement of this title.." To be sure, if treated as issued under this statute, the Regulation would constitute an "interpretative" regulation – interpreting the term liability in Section 752. But, even if viewed as an interpretative regulation, *Chevron* would still apply to this Regulation and would require it to be given retroactive effect under Section 7805(b)(3) to prevent abuse.[17] Put another way, it certainly cannot be said that the Regulation, in seeking to prevent a type of abuse where enormous non-economic losses are created through artificially inflated partnership bases, is arbitrary, capricious or manifestly contrary to *Section 752*.  This critical issue was ignored by the court in *Stobie Creek* and incorrectly decided, as discussed in our response to Question 6, by the court in *Klamath*.

---

[17]The Treasury published Temp. Treas. Reg. § 1.752-6T in the Federal Register on June 24, 2003. 68 Fed. Reg. 37,414 (2003).  In this publication, Treasury stated that "these temporary regulations are necessary to prevent abusive transactions of the type described in Notice 2000-44." 68 Fed. Reg. at 37,416.

3659987.1

6.     **PLEASE EXPLAIN WHETHER THE FOLLOWING ASSERTION IN** *STOBIE CREEK* **IS CORRECT:**

> **It would be an incongruous result to defer to Treasury's determination that a particular regulation must apply retroactively in order to prevent abuse, when Congress saw fit to decree the end of one named abuse on a retroactive basis (acceleration and duplication of losses), but not all potential abuses related to transfers of partnership assets.  Because Treasury Regulation § 1.752-6 exceeds the congressional mandate to address transactions that accelerate and duplicate losses, this broad "abuse prevention" authority cannot serve as an alternate ground for validating retroactive application.**

*Stobie Creek v. United States*, 82 Fed.Cl. 636, 671 (2008).

The Court's assertion is incorrect.  As already explained in the Government's opening and sur-reply memoranda, Section 309(c) of the Community Renewal Tax Relief Act of 2000 does indeed authorize the Regulation.  Moreover, as explained in Question 1 of this memorandum, the Regulation does indeed address duplication of losses, and more importantly, does seek to prevent tax avoidance arising from the same type of abuse as in the corporate contingent liability shelter – *i.e.*, non economic paper losses arising from transactions using contingent liabilities. Therefore, the Regulation is perfectly consonant with its congressional mandate.  Consequently, as discussed in our memoranda, IRC § 7805(b)(3) and (b)(6) both apply to validate the retroactivity of the Regulation for purposes of Section 309(c).

But even assuming, *arguendo*, that the Regulation is inconsistent with Section 309(c) because it does not address transactions that accelerate or duplicate losses,  *Stobie*'s finding would still be incorrect.  This is because *Stobie* failed to consider that the Regulation was also authorized by IRC § 7805(a).  The Treasury was clearly authorized to issue the Regulation under this statute as an interpretation of *IRC § 752*.  As such, the validity of the retroactivity of the

Regulation would be governed by IRC § 7805(b)(3) without regard to the "acceleration or duplication of loss" language of Section 309(c).  *Stobie*, however, failed to consider this additional authorization of the Regulation and, as a consequence,  improperly limited the "abuse" referred to in IRC § 7805(b)(3) to the type of abuse referred to in Section 309.  But Section 7805(b)(3) contains no such limitation.  As explained in our response to Question 3, the term "abuse" in this statute has a much wider meaning.

A fuller explanation of this point may be helpful.  The above-quoted statement in *Stobie* is based on the false assumption that "[b]ecause Treasury Regulation § 1.752-6 exceeds the scope of Congress's specific authorization of retroactivity in Section 309, its retroactive application cannot stand . . . and the regulation cannot be considered a legislative regulation due the considerable deference afforded by *Chevron*."  *Stobie Creek* at 671. But even if Section 309 did not authorize the Regulation and the Regulation were not, therefore, "legislative", it would still be valid as a regulation "interpretive" of IRC § 752.  As fully explained in Part G of the government's sur-reply memorandum in this matter, all Treasury Regulations, and not just "legislative" regulations, must be afforded *Chevron* deference.  As the Court in *Klamath* noted, a finding that the regulation exceeds Section 309's grant of authority "would not, *ipso facto*, invalidate the Regulation.  Instead to the extent that Congress' grant of authority was exceeded, the Regulation should be reviewed as an 'interpretive regulation' rather than a 'legislative regulation.'" *Klamath Strategic Investment Fund, LLC v. United States*, 440 F.Supp.2d 608, 622 (E.D. Tex. 2006), *appeal pending*, No. 2008-5053 (5th Cir.).  The mistake made by both *Klamath* and *Stobie* was to assume that "interpretive" regulations receive less deference than do "legislative" regulations.  But as explained in the government's sur-reply brief, all Treasury

regulations are entitled to *Chevron* deference.  Accordingly, given that the term "liability" is undefined in IRC § 752, the Regulation's definition of that term to include "contingent liabilities" certainly cannot be said to be arbitrary, capricious or manifestly contrary to IRC § 752.  As such, the Regulation is in all events valid under IRC § 7805(a) and its retroactivity is expressly authorized by IRC §7805(b)(3) to prevent abuse, which is the very purpose of the Regulation.

## CONCLUSION

For the reasons described above, Treas. Reg. § 1.752-6 is valid.  The United States respectfully requests that the Court deny plaintiffs' motion for partial summary judgment.

Respectfully submitted,


 /s/ Dennis M. Donohue
DENNIS M. DONOHUE
CHIEF SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6492
Facsimile: (202) 307-2504
E-mail: dennis.donohue@usdoj.gov


DAVID M. STEINER
JOHN A. LINDQUIST
JOE PITZINGER
JONATHAN BLACKER
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044

3659987.1

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15th, 2008, I electronically filed the foregoing **UNITED STATES' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

> Joel N. Crouch
> Texas State Bar No. 05144220
> Meadows, Collier, Reed
>    Cousins & Blau, L.L.P.
> 901 Main Street, Suite 3700
> Dallas, Texas 75202


> s/ David M. Steiner
> David M. Steiner
> Trial Attorney, Tax Division
> U.S. Department of Justice
> Post Office Box 55
> Ben Franklin Station
> Washington, D.C. 20044
> (202) 307-5892

3659987.1