## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### Nos. 06-245T, 06-246T, and 06-247T
### (Consolidated)

| | |
|---|---|
| MURFAM FARMS, LLC, <br> By and Through Wendell H. Murphy Jr., <br> a Partner Other Than Tax Matters Partner, <br><br> PSM FARMS, LLC, <br> By and Through Stratton K. Murphy, <br> a Partner Other Than Tax Matters Partner, <br><br> MURPHY PORK PARTNERS, LLC, <br> By and Through Wendell H. Murphy, Jr., <br> a Partner Other Than Tax Matters Partner, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

### SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION AS TO THE VALIDITY OF TREASURY REGULATION § 1.752-6

Pursuant to the Court's Order dated September 25, 2008, the above-named Plaintiffs file this Supplemental Brief and show the Court as follows:

1. **How are the tax losses at issue in this case duplicative, for purposes of Section 309 of the Community Renewal Tax Relief Act of 2000, if at all?**

They are not. In short, the type of duplicative losses that Section 309 spoke to can only occur in corporate transactions, where there is an entity-level tax and no adjustment to the shareholder's stock basis to reflect the corporation's recognized loss.[1] In the partnership context, the partnership's loss flows through to the partners, resulting in a single level of tax and an adjustment to the partners' basis that prevents the partnership's loss from being duplicated.

---

[1] For a complete discussion of how losses are duplicated in the corporate context, see pages 15-16 of Plaintiffs' Supporting Memorandum.

The transactions at issue illustrate this point. Briefly, the partners acquired long and short option positions on foreign currency, which they contributed to the partnerships. The partners increased their outside basis under IRC § 722 by the cost of the long options. They did not adjust their basis for the contributed short options, based on advice that such options were contingent, non-IRC § 752 liabilities. The partners' basis in the options carried over to the partnerships under IRC § 723.

When the options expired, the partnerships recognized an overall loss. This loss flowed through to the partners, which, under IRC § 705(a)(2)(A), reduced the partners' outside basis in their partnership interests. From this point forward the partnerships' losses were forever preserved in the partners' outside basis and thus could never be duplicated. Upon the contribution of the partnership interests to the S corporations, the partners' (reduced) outside basis carried over to the S corporations under IRC § 362, and later attached to the partnerships' assets upon the partnerships' liquidation. *See* IRC § 732(b). When the S corporations later sold the partnership assets, the outside basis directly impacted (i.e., reduced) the amount of the loss recognized. Loss duplication therefore did <u>not</u> occur.

The Court of Federal Claims reached the identical conclusion in *Stobie Creek*, holding that the transfer of long and short foreign-currency digital options to a partnership "resulted in increasing each partner's outside basis, but did not cause any acceleration or duplication of losses."[2]  The *Stobie Creek* Court further declared that the Regulation "does not speak to transactions involving the acceleration and/or duplication of losses."[3]

---

[2] *Stobie Creek Investments, LLC v. U.S.*, 102 AFTR 2d 2008-5442, 5470 (Ct. Cl. 2008).
[3] *Id*.

2. **Is a finding by the Court on the validity of Treas. Reg. § 1.752-6 ripe? Would such a finding be moot if the Court were to find after trial that the transactions at issue in this case lacked economic substance?**

The validity of § 1.752-6 (the "Regulation") is a ripe issue, as the Government has alleged its application to the transactions at issue in these proceedings. And while an adverse ruling on economic substance would encompass the effects of a ruling on the Regulation's validity, a pre-trial determination of the latter is significant because it would (i) limit the issues for trial, and (ii) more fully develop the case in the event of an appeal.

3. **How is "prevention of abuse" under 26 U.S.C. § 7805(b) to be defined?  Are "abuse" and lack of economic substance synonymous?**

A workable definition of "prevention of abuse" may be gleaned from the three decisions addressing this issue – *Klamath*, *Sala*, and *Stobie Creek*.[4]  These decisions intimate that a regulation is for the "prevention of abuse" where (i) the Treasury issued it with legitimate purpose and without ulterior motive, (ii) the regulation fills a gap that Congress did <u>not</u> intend to leave open, *and* (iii) the regulation is consistent with the named abuse it purports to curb.   All three courts were guided by the overarching principle that there must be some "check" on the Treasury's ability to declare something abusive.

The legitimate-purpose requirement has roots in *Klamath* and *Sala*.  Those courts impliedly tested for a legitimate purpose by applying an abuse-of-discretion standard based on pre-1996 case law.[5]  Under such standard, the courts analyzed the following relevant factors:

---

[4] *Klamath Strategic Investment Fund, LLC* v. U.S., 98 AFTR 2d 2006-5495 (E.D. Tex. 2006); *Sala v. U.S.*, 552 F. Supp. 2d 1167 (D. Co. 2008); *Stobie Creek Investments, LLC v. U.S.*, 102 AFTR 2d 2008-5442, 5470 (Ct. Cl. 2008). The Seventh Circuit did not address this issue in the *Cemco* decision.
[5] *Klamath*, 98 AFTR 2d at 5506-5508; *Sala*, 552 F. Supp. at 1202-1203.

- Whether the taxpayer justifiably relied on settled prior law and whether the putatively retroactive regulation altered that law.

- The extent, if any, that Congress implicitly approved the prior law.

- Whether retroactivity would advance or frustrate equal treatment among similarly-situated taxpayers.

- Whether the retroactive effect would produce an inordinately harsh result.[6]

The courts also looked for any hidden agenda by the Treasury in issuing the Regulation (i.e., bootstrapping a litigation position), which is consistent with the legitimate-purpose requirement.[7]

The unintended-gap requirement stems from *Stobie Creek*. The Court held that the Regulation did not satisfy the anti-abuse exception because it filled a gap that Congress *purposefully* left behind:

> However, it would be an incongruous result to defer to Treasury's determination that a particular regulation must apply retroactively in order to prevent abuse, when Congress saw fit to decree the end of one named abuse on a retroactive basis (acceleration and duplication of losses), but not all potential abuses related to transfers of partnership assets.[8]

The *Stobie Creek* Court was apparently troubled by the fact that Congress was cognizant of the tax treatment of contingent-liability assumptions, but only sought to change the treatment of transactions involving the acceleration and duplication of losses. It therefore reasoned that "prevention of abuse" could <u>not</u> mean a transaction that Congress had the opportunity to address but decided not to do so.[9]

Lastly, the consistency requirement arises from the *Sala* decision. The *Sala* Court observed that the Regulation named the abuse it intended to address: "the same types of abuses

---

[6] *Id*.
[7] *Klamath*, 98 AFTR 2d at 5508-5509; *Sala*, 552 F. Supp. 2d at 1203.
[8] *Stobie Creek,* 102 AFTR 2d at 4569.
[9] *Id*.

that section 358(h) was designed to deter."[10] The court therefore tested whether the Regulation's provisions were consistent with deterring such abuse. The *Sala* Court found that the Regulation was not consistent, providing for rules that (i) were not "comparable" to rules for corporations under IRC § 358(h), (ii) did not address the acceleration and duplication of losses, and (iii) did not apply to liabilities described in IRC § 358(h)(3) of the Code.[11]

The Government would have this Court ignore all judicial interpretations of the abuse exception and instead define "abuse" with reference to IRC § 357 and the Treas. Reg. § 1.701-2.[12] Such pleas are without merit, as the word "abuse" does not appear in IRC § 357 and, obviously, § 1.701-2 is a manifestation of *executive* – not *legislative* – intent. The mere fact that Treasury issued that regulation 18 months prior to Congress' enactment of the abuse exception does nothing to link the two. Moreover, interpreting "abuse" with reference to executive intent would give free rein to the Treasury to declare something abusive.

Finally, the terms abuse and lack-of-economic-substance are not synonymous. The economic-substance doctrine evaluates both (i) the taxpayer's subjective non-tax purposes for entering into the transaction, and (ii) the objective profitability of the transaction.[13] Abuse, on the other hand, connotes a tax-avoidance purpose. *See, e.g.*, *U.S. v. Kaun*, 827 F.2d 1144, 1149 (7th Cir. 1987) (defining an IRC § 6700 "abusive tax shelter" as "any entity whose principal purpose is the avoidance or evasion of federal income tax."); *see also* Treas. Reg. § 301.6112-1(b), prior to amendment by T.D. 9295 (Nov. 2, 2006) (defining "potentially abusive tax shelter" as that which has the "potential for tax avoidance or evasion"); IRC § 1274(b)(3) (defining potentially abusive situation as "having potential for tax avoidance"). Thus, a transaction may

---

[10] *Sala*, 552 F. Supp. 2d at 1202 (quoting 20 Fed. Reg. 30335).
[11] *Id*. at 119-1201. For a complete analysis of the *Sala* decision and its significance to the present motion, see Plaintiff's Reply at p. 10-13.
[12] Government's Suppl. Memo. at 14-15.
[13] *See, e.g., Stobie Creek*, 102 AFTR 2d at 5470-73.

lack economic substance, based on profit potential, but not be abusive because the taxpayer entered into the transaction with a non-tax purpose. Abusive transactions are therefore a subset of transactions that lack economic substance.

4. **Please comment on the following assertion in *Cemco Investors v. United States*, 515 F.3d 749, 752 (7th Cir. 2008): "all the regulation does is instantiate the pre-existing norm that transactions with no economic substance don't reduce people's taxes."**

With all due respect to the Seventh Circuit, this comment is best characterized as impassioned rhetoric in a result-driven decision. The two courts addressing the Regulation's validity following *Cemco* (including the Court of Federal Claims) struck down the Regulation,[14] with one court criticizing *Cemco* as "lacking substantive analysis."[15] Moreover, reading this statement literally, the Seventh Circuit glosses over a fatal separation-of-powers issue. The Treasury has no authority to adopt and apply the economic-substance doctrine against taxpayer transactions. Until Congress codifies the economic-substance doctrine and tasks the Treasury with enforcement, such power lays exclusively with the judiciary.

5. **If the Court were to find after trial that the transactions at issue in this case in fact did not lack economic substance, could the Court still sustain the FPAAs under a retroactive application of Treas. Reg. § 1.752-6? How would the *Chevron* doctrine apply in such a case?**

The Court could sustain the FPAAs in part based on a retroactive application of the Regulation. The FPAAs, however, contain adjustments that could not be sustained by application of the Regulation alone, such as (i) the deductibility of transaction costs, and (ii) the deductions resulting from the losses generated on the digital-option transactions. Moreover, a determination on the Regulation would not resolve the issue of accuracy-related penalties asserted by the FPAA.

---

[14] *Stobie Creek*, 102 AFTR 2d at 5470; *Sala*, 552 F. Supp. 2d at 1203.
[15] *Sala*, 552 F. Supp. 2d at 1203.

Regarding the *Chevron* doctrine, the Court only reaches this issue if it determines the Regulation satisfies an exception to the statutory bar to retroactive regulations under IRC § 7805. Otherwise, the Regulation can not apply to the transactions at issue.

Assuming the Regulation overcomes the statutory bar, the *Chevron* doctrine would apply to determine whether the Regulation prescribes rules that reasonably reflect Congressional intent. The Court would undertake a two-part inquiry to determine first, "whether Congress has spoke to the precise question at issue," and second, "if the statute is silent or ambiguous… whether the agency's answer is based on a permissible construction of the statute."[16]  As set forth in Plaintiffs' Supporting Memorandum, the Regulation fails both prongs of this test:  (i) the Regulation contravenes discernable legislative intent, as Congress explicitly authorized *comparable* rules that make *appropriate adjustments* to prevent loss duplication/acceleration in the transfer of liabilities by a partnership to a *corporation*, none of which is embodied in the Regulation, and (ii) the Regulation is not a permissible construction of IRC § 752 because it purports to overrule 25 years of settled case law that created an unambiguous definition of "liability" that Congress left undisturbed.[17]

6. **Please explain whether the following assertion in *Stobie Creek* is correct:**

> **It would be an incongruous result to defer to Treasury's determination that a particular regulation must apply retroactively in order to prevent abuse, when Congress saw fit to decree the end of one named abuse on a retroactive basis (acceleration and duplication of losses), but not all potential abuses related to transfers of partnership assets.  Because Treasury Regulation § 1.752-6 exceeds the congressional mandate to address transactions that accelerate and duplicate losses, this broad "abuse prevention" authority cannot serve as an alternate ground for validating retroactive application.**

---

[16] *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).
[17] *See* discussion in Plaintiffs' Supporting Memorandum at 24-28.

*Stobie Creek*, **slip op. at 49-50.**

The above excerpt from *Stobie Creek* is correct. As discussed in the response to Question 3 above, the *Stobie Creek* Court was seemingly troubled by the fact that Congress was cognizant of the tax treatment of contingent-liability assumptions, but only sought to change the treatment of transactions involving the acceleration and duplication of losses. The Court therefore reasoned that "prevention of abuse" could <u>not</u> mean a transaction that Congress had the opportunity to address but decided not to do so. To hold otherwise would vest the Treasury with plenary power to declare something abusive.

Respectfully submitted,

By:   s/Joel N. Crouch
     Joel N. Crouch
     Texas State Bar No. 05144220

MEADOWS, COLLIER, REED,
 COUSINS & BLAU, L.L.P.
901 Main Street, Suite 3700
Dallas, TX 75202
(214) 744-3700 Telephone
(214) 747-3732 Facsimile

jcrouch@meadowscollier.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2008, a copy of the foregoing Supplemental Brief in Support of Plaintiffs' Motion for Partial Summary Judgment as to the Validity of Treasury Regulation § 1.752-6 was served upon counsel listed below via electronic means.

Dennis Donahue, Esq.
John Lindquist, Esq.
David M. Steiner, Esq.
United States Department of Justice
Tax Division
P.O. Box 55 Ben Franklin Station
Washington, D.C. 20044

Joseph Pitzinger, Esq.
United States Department of Justice
Tax Division
717 North Harwood
Suite 400
Dallas, Texas 75201

***Attorneys for the United States***

s/Joel N. Crouch
Joel N. Crouch