# In the United States Court of Federal Claims

Nos. 06-245T, 06-246T, and 06-247T (Consolidated)
(Filed: August 16, 2010)

******************************************  *
                                            *
**MURFAM FARMS, LLC,**                      *
**By and Through Wendell H. Murphy, Jr.,**  *
**A Partner Other than Tax Matters Partner,**  *
                                            *
**PSM FARMS, LLC,**                         *
**By and Through Stratton K. Murphy,**      *
**a Partner Other than Tax Matters Partner,**  *   Tax; partnership-level proceeding;
                                            *   Son of BOSS tax shelter; accuracy-
**MURPHY PORK PARTNERS, LLC,**              *   related penalties, I.R.C. § 6662;
**By and Through Wendell H. Murphy, Jr.,**  *   reasonable cause and good faith,
**A Partner Other than Tax Matters Partner,**  *   I.R.C. § 6664.
                                            *
          Plaintiffs,                       *
                                            *
   v.                                       *
                                            *
**THE UNITED STATES**,                      *
                                            *
          Defendant.                        *
                                            *
******************************************  *

*Joel N. Crouch* and *Anthony P. Daddino*, Meadows, Collier, Reed, Cousins, Crouch & Ungerman, L.L.P., Dallas, TX, for Plaintiffs.

*Dennis M. Donohue, John A. Lindquist, Joseph Pitzinger, David M. Steiner,* and *Jonathan Blacker*, Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant.

_____

**OPINION**
_____

**DAMICH, Judge**

In this partnership tax case, Plaintiffs MURFAM Farms, LLC, PSM Farms, LLC, and Murphy Pork Partners, LLC (collectively "Murfam" or "the partnerships") challenge the accuracy-related penalties the Internal Revenue Service ("IRS") assessed against them due to the partnerships' participation in a tax sham called COBRA.  COBRA was one of several "Son of

BOSS" tax shelters designed to generate artificial losses by claiming an inflated basis in assets without recognizing an associated contingent liability.

In this case, the Murfam partnerships have conceded that the transactions lacked economic substance and the adjustments made by the IRS in Notices of Final Partnership Administrative Adjustments ("the FPAAs") issued to each partnership are correct.  Stip. of Settled Issues, Sept. 29, 2009.  The only issue remaining for the Court's review is whether the accuracy-related penalties asserted in those FPAAs are applicable.  Murfam argues that a reasonable-cause-and-good-faith defense renders the penalties inapplicable.  However, at trial the Murfam partnerships failed to establish that there was reasonable cause for their understatements of tax or that they acted in good faith.  Accordingly, the Court finds that the accuracy-related penalties asserted in the FPAAs do apply and grants judgment in favor of the Government.

## I.    Background

On September 2, 1999, family-owned Murphy Farms,[1] based in Rose Hill, North Carolina, agreed to be acquired by Smithfield Foods, Inc. ("Smithfield").  Joint Findings of Fact ("JFOF") ¶ 8(b), Jan. 27, 2010.  The acquisition was to be structured as a tax free merger, whereby the Murphy family members would exchange their shares in Murphy Farms for shares of Smithfield stock.  JFOF ¶ 8(c).  However, Smithfield did not want to acquire certain assets of Murphy Farms.  Id. ¶ 8(g).  Those unwanted assets were to be excluded from the merger and instead distributed to the Murphys beforehand.  Id.  It came as quite a "rude awakening" to the Murphys that the distribution of those excluded assets would cause them to recognize capital gains and trigger a substantial tax liability.  Tr. 1286:2-8, 1287:1-5 (Wendell Murphy).[2]  In an effort to avoid that tax liability, the Murphys participated in the COBRA scheme for which the IRS later asserted penalties against them.  Tr. 743:18-23 (Ezzell).

### A.    The Murphy Family

For purposes of this case, the Murphy family consists of eight individuals: (1) Wendell H. Murphy and his two children (2) Wendell "Dell" Murphy Jr. and (3) Wendy Crumpler; (4) Harry "Pete" Murphy and his two sons, (5) Stratton Murphy and (6) Marc Murphy; and (7) Joyce Minchew and her daughter, (8) Angela Brown.  (To avoid ambiguity, the Court refers to each of the Murphys by his or her first name or, in the case of Dell and Pete, their nicknames.)  Each of them held ownership interests in Murphy Farms.  JFOF ¶ 3(f).  However, only Wendell Murphy and Pete Murphy were called to testify at trial, and the evidence suggested that they were the only two family members actively involved in the day-to-day affairs of Murfam Farms.

Wendell, in particular, normally made decisions for the whole family.  Id. ¶ 6(d).  Wendell was college-educated, at one time a teacher and a state legislator, and clearly a

---

[1] The Court refers collectively to Murphy Farms, Inc. and Quarter M Farms as "Murphy Farms."

[2] All citations to the trial transcript appear as "Tr. Page #: Line # (Witness name)."  Plaintiffs' exhibits are referred to as "PX ___," Defendant's exhibits as "DX ___," and Joint exhibits as "JX ___."

successful businessman.  In 1960, he earned a degree in agricultural education from North Carolina State University and then went on to teach high school agriculture.  *Id.*  ¶ 2(a).  While teaching, Wendell started a livestock feed business named Murphy Milling in 1962.  *Id.* ¶ 2(b).  As the business grew, he left teaching to work full-time in the grain milling business.  *Id.*  The milling business often produced excess feed, which Wendell used to feed pigs of his own.  *Id.* ¶ 2(c).  By 1968, the milling company stopped selling grain to other hog farmers and used it exclusively to feed its own pigs.  *Id.* ¶ 2(d).  In or around 1969, Murphy Milling became Murphy Farms, Inc.  *Id.* ¶ 2(e).

Wendell served as CEO of Murphy Farms, Inc. through the time of its merger with Smithfield.  *Id.*  ¶ 2(i).  In addition, between 1983 and 1992 he served a total of five terms in the North Carolina House and Senate.  *Id.* ¶ 5(a)(v).  From 1991 to 1998, Wendell also served as a director of Smithfield.  *Id.* ¶ 5(a)(vi).

Pete, Wendell's younger brother, attended college and has extensive experience in various businesses, in addition to pork production.  He attended Campell University for two years and East Carolina University for three years.  *Id.* ¶ 5(d)(iii).  When he left East Carolina University, he had completed the requirements for a business major although not for a degree.  *Id.*  After college, Pete helped operate Murphy Milling.  *Id.* ¶ 5(d)(iv).  He also formed Quarter M Farms, Inc., for which he served as President and Operations Manager from 1969 until the merger.  *Id.*  Pete was also Vice President and Operations Manager of Murphy Farms, Inc.  *Id.*  In the 1990s, Pete took on projects in commercial and residential real estate, including one large residential development with golf courses, restaurants, and a hotel.  *Id.* ¶ (5)(d)(vii).

**B.    Reliance on Skilled Professionals**

The Murphys have often relied on skilled professionals.  To help run Murphy Farms, the Murphys hired the best professionals they could.  Tr. 1219:2-4 (Wendell Murphy).  These professionals included former officers or employees of companies such as General Electric and Hershey Foods.  JFOF ¶ 2(h).  The Murphy family has always relied on professional advisors to prepare their tax returns.  *Id.* ¶ 6(b).  No member of the family has ever prepared a return.  *Id.*

One skilled professional they relied on heavily through the years was Brewer Ezzell.  Ezzell graduated from Wake Forest University with degrees in physics and accounting.  *Id.* ¶ 7(a)(ii).  In 1974, he received a CPA license.  *Id.* ¶ 7(a)(iii).  From 1972 to 1977, Ezzell worked in the audit department of PriceWaterhouse.  *Id.*  ¶ 7(a)(iv).  He then joined a sole CPA practitioner, R. Harvey Squires, whose clients included Murphy Farms.  When Mr. Squires died ten months later, Ezzell purchased the practice.  *Id.* ¶ 7(a)(v); Tr. 295:14-16 (Ezzell).  Ezzell continued in the practice until 1985, when he joined Murphy Farms, Inc.  Tr. 295:19 to 296:10 (Ezzell).

Beginning in 1985, Ezzell held key positions within Murphy Farms, Inc., such as Controller and Chief Financial Officer.  Tr. 297:13-18 (Ezzell).  Although Ezzell was employed by Murphy Farms, Inc., he provided services to all of the Murphy family members and their businesses.  JFOF ¶ 7(a)(xiii).  Whether it was a business matter or a personal one, the Murphys

routinely turned to Ezzell for advice.  Tr. 1163:2-3 (Pete Murphy).  "Brewer almost became like one of the family," Pete recalled.  Tr. 1162:22-23 (Pete Murphy).

Under Wendell and Pete's leadership, Murphy Farms grew into the largest pork production company in the world.  Tr. 258:17-18.  As early as the 1980s, Murphy Farms, Inc. had grown to the point where Ezzell advised that it should retain a national CPA firm to handle its audit and tax work.  Tr. 296:14-297:12 (Ezzell).  From 1981 to 2007, Ernst & Young ("E&Y") served as the Murphys' tax preparers and auditors.  JFOF ¶ 7(b)(i).  Over the course of the two decades leading up to the Smithfield merger, E&Y gained the Murphys' trust.

For the Murhpys, E&Y's guidance on the deductibility of one particular expense—prepaid feed—was particularly instrumental in building trust.  For tax years 1993, 1994, and 1995, Murphy Farms deducted—rather than inventoried—prepaid feed purchases.  JFOF ¶ 7(b)(x).  The strategy was recommended by Dan Slagle, an E&Y partner responsible for the Murphys' account.  *Id.*  The IRS audited Murphy Farms and challenged the prepaid feed deduction.  Murphy Farms prevailed on appeal, with the assistance of E&Y.  Tr. 330:6 to Tr. 334:23 (Ezzell).

## C.   Ernst & Young Invited to Rose Hill, North Carolina to Pitch COBRA

By 1999, Murphy Farms was selling six million pigs per year.  JFOF ¶ 8(a).  Despite the size of their operations, the Murphys did not have a processing plant of their own.  This created a significant risk for Murphy Farms and left the Murphys dependent on Smithfield.  *Id.*  After years of informal discussions, Murphy Farms agreed to be acquired by Smithfield in the fall of 1999.  *Id.* ¶ 8(b).  When the Murphys realized that the distribution of the excluded assets would lead to a large tax liability, Ezzell was charged with finding ways to obtain tax savings on the transaction.  Tr. 492:1-5 (Ezzell).

At one point, Ezzell received a phone call from the Chief Financial Officer of a competitor, Carroll's Foods, who suggested that Ezzell look into a transaction that Carroll's Foods' auditing firm had available.  Tr. 492:11 to 493:8 (Ezzell).  At least one firm provided information to Ezzell about strategies that would generate a tax loss to offset the anticipated capital gains.  JFOF ¶ 9(c).  Ezzell asked Slagle of E&Y whether Slagle knew about the strategy.  Slagle told Ezzell that E&Y also had ways of saving taxes on the transaction and introduced Ezzell to Ray Knight, an E&Y principal and subject matter specialist in the relevant area.  Tr. 493:9 to 494:2 (Ezzell), 958:13-15 (Slagle).

On November 12, 1999, Slagle and Knight met with Ezzell.  Tr. 495:3-9 (Ezzell).  Approximately three weeks before the November 12, 1999, meeting, E&Y had begun selling a "loss generator" named COBRA, an acronym standing for Currency Options Bring Reward Alternatives.  JFOF ¶ 10(c)(ii); Tr. 2053:8-12 (Kolbe).  COBRA was designed to generate a loss that would offset ordinary income or capital gains.  *See* JFOF ¶ 10(c)(ii).

E&Y policies communicated internally required prospective COBRA clients to need a desired loss of at least $50 million. DX 488.1; DX 567.2.  No marketing documentation could be left with the client.  DX488.1.  Clients were required to sign nondisclosure agreements.  JFOF ¶

10(c)(iv)(c).  At one point, fees were to total 9.5% of their desired loss.  *Id.*  ¶ 10(c)(iv)(d).  E&Y was arranging to have law firms issue legal opinions that it believed would provide clients with "penalty protection."  DX 754.2; DX 555.2.  Prospective COBRA clients had to be "[a]ggressive, willing to assume tax risk."  DX 500.12.

After meeting with Ezzell on November 12, 1999, Knight was invited back to Rose Hill, North Carolina on December 2, 1999 to present the COBRA strategy to Wendell and some of the other family members, along with Ezzell.  JFOF ¶ 11(a)(i)(b).  By this time, the Murphys were in the final stages of selling their hog-farming business.  *Id.* ¶ 11(a)(i)(c).  The Murphys understood that the fees for COBRA would be 4.5% of the tax savings produced by the transaction.  *Id.* ¶ 11(a)(iii)(a).

COBRA involved foreign currency options.  The strategy called for at least two individuals to each simultaneously sell a short option and purchase a long option at a different strike price.  *Id.* ¶ 12(b)(i).  The individuals then transfer the option contracts along with cash to a newly formed general partnership, receiving in return an interest in the partnership.  *Id.* ¶ 12(b)(ii).  So long as the options expired out of the money, the partnership recognizes a loss.  *Id.* ¶ 12(b)(iii).  The individuals then transfer the entire partnership interest to a newly formed S corporation, which causes the partnership to be terminated.  *Id.* ¶ 12(b)(iv).  The partnership liquidates and distributes its investments to the S corporation.  *Id.* ¶ 12(b)(v).  The S corporation sells its assets to an unrelated third party, generating a loss for tax purposes.  *Id.*

### D.      IRS Issues Notice 99-59; Ernst & Young Stops Marketing COBRA

On December 9, 1999 the IRS issued Notice 99-59.  JFOF ¶ 21(a).  Notice 99-59 warned taxpayers and their advisors that certain transactions generating losses which did not amount to actual economic losses were not allowable and may subject the taxpayer to penalties.  *Id.*; DX 711.  Shortly thereafter, on December 13, 1999, E&Y provided COBRA engagement letters to each of the Murphys, which they signed and returned.  JFOF ¶¶ 13(d), 22.  The engagement letters each refer to a "desired loss."  JX 2198; JX 2199; JX 2200; JX 2202; JX 2203; JX 2204; JX 2206; JX 2208.

On December 23, 1999, Robert Coplan, the head of the E&Y group marketing COBRA, wrote an email to Knight and other E&Y personnel attaching a statement from the American Bar Association Tax Section regarding Notice 99-59.  JFOF ¶ 61(a).  According to the email, the American Bar Association "applauded the IRS for 'putting an end to a particularly troublesome category of tax shelter transactions.'"  *Id.*; DX 747.1-.3.

On January 5, 2000, E&Y held a meeting to address the impact of Notice 99-59 on COBRA.  JFOF ¶ 23(a).  At the meeting, firm officials decided that COBRA would not be marketed further.  *Id.* ¶ 23(d).  On January 10, 2000, Coplan informed E&Y personnel via email, explain that "[t]he primary reasons for this [decision] involved the perceived changes in the landscape now being faced by tax-advantaged strategies after the issuance of Notice 99-59 last month and the publication of the PWC BOSS opinion and scathing commentary of BOSS in Tax Notes."  DX 782.2; DX 936.  An internal E&Y email indicated that "[t]he problem that we [E&Y officials] had with COBRA was that we perceived there to be a lack of any meaningful potential

for an economic profit or other business purpose to justify the transaction . . . ."  DX 808. Coplan instructed E&Y personnel to contact any client who had shown willingness to implement a 2000 COBRA transaction.  JFOF ¶ 23(f).  Such clients were to be advised of the heightened penalty risk in entering into permanent loss generator transactions.  *Id.*

> A January 17, 2000, email from Coplan to Knight and others at E&Y stated:

> One point Mike Kelly stressed is that we should be very certain that the individuals [you] approach with this transaction are sophisticated investors who fully understand the economic and tax risks of the transaction, and would not be likely to seek compensation from us if the anticipated tax benefits are not ultimately realized.

DX 799.2.  Although Ezzell painted Murfam as unaware of the very risky nature of COBRA, Slagle's testimony suggested that Ezzell had a considerable appetite for risk.  "I did express to him [Ezzell] that it was an aggressive transaction," Slagle recalled.  Tr. 1004:11-12 (Slagle). "And Brewer responded that, well, I can either do something with you guys or I can do something with all these other people that I have stuff stacked up on the floor."  Tr. 1004:16-20 (Slagle).

### E.   The Murphys Sign Addenda to Engagement Letters and Proceed With COBRA

The merger closed on January 28, 2000.  JFOF ¶ 26(a).  In order to proceed with COBRA despite E&Y's decision to stop selling the transaction, each of the Murphys was required to sign an addendum to his or her engagement letter.  In the addendum, the Murphys agreed to hold E&Y harmless from penalties that might be assessed against them.  JX 2250; JX 2251; JX 2252; JX 2253; JX 2254; JX 2257; JX 2258.  In March of 2000, Knight made another presentation regarding COBRA.  JFOF ¶ 12(a).  On March 29, 2000, Slagle sent Ezzell summaries of the three planned COBRA transactions.  *Id.* ¶ 28(b)(i)(a).  They reflected an E&Y fee equal to 2.5% of the $100 million in tax losses the transactions were to produce.  *Id.*

Early in April 2000, Proskauer Rose helped E&Y form three multi-member LLCs (the partnerships) and eight single-member LLCs for the Murphys' COBRA transactions.  *Id.* ¶ 32(a). Two of the multi-member LLCs, MURFAM Farms and PSM Farms, were identified as "capital loss" partnerships, while the other, Murphy Pork Partners, was referred to as an "ordinary income" partnership.  *Id.* ¶ 32(a)(v)(a)-(b). All three of the multi-member LLCs were member-managed partnerships where each partner had equal management power.  *Id.* ¶ 32(b)-(d). MURFAM Farms, LLC was a partnership consisting of Wendell, Dell, Wendy, Joyce, and Angela.  *Id.* ¶ 32(b)(ii).  PSM Farms, LLC consisted of Pete, Marc, and Stratton.  *Id.* ¶ 32(c)(ii). Murphy Pork Partners, LLC consisted of Wendell, Dell, and Pete.  *Id.* ¶ 32(d)(ii).  The eight single-member LLCs were named using the individual's initials and were classified as disregarded entities for federal income tax purposes.  *Id.* ¶ 32(e)-(l).

On April 7, 2000, Deutsche Bank faxed documents to Ezzell for the Murphys to sign to open accounts at Deutsche Bank Alex Brown for each of the LLCs.  *Id.* 33(a).  Ezzell signed

documents for Marc Murphy and Stratton Murphy under a power of attorney they had granted him.  *Id.* ¶ 33(b)-(c).  The account opening documents for all eight single-member LLCs authorized Ezzell to act on behalf of each of the Murphys.  *Id.* ¶ 33(e).  Ezzell also arranged for one of the Murphys' local attorneys to prepare a letter to Deutsche Bank indicating that the Murphys understood the uncertainties of the economic and tax consequences and ramifications of COBRA.  *Id.*  ¶ 37(a); JX 84.

On April 14, 2000, Ezzell directed the single-member LLCs to buy and sell pairs of European digital foreign currency options with Deutsche Bank.  JFOF ¶ 40(a)(ii).  On April 17, 2000, Ezzell wire transferred from each single-member LLC to Deutsche Bank the net cost of the options, totaling $3,009,000.  *Id.* ¶ 40(a)(iii).  For each pair of options, the strike price of the put option purchased was 0.0002 greater than the put option that was sold.  *Id.* ¶ 40(b)-(d).  This tiny window defined the "sweet spot"—if, at exactly 10:00 a.m. the day the options expired, the price of the relevant currency was inside this range, the bets would pay out large amounts to the Murphys.

However, the evidence showed that the sweet spot could never be hit.  Tr. 1918:7 to 1962:7 (DeRosa).  As one of the Government's experts, Dr. David DeRosa, observed, under the terms of the option contracts, "[t]hey [Deutsche Bank] can do anything they want in terms of deciding whether you're in-the-money or out-of-the-money."  Tr. 1921:10-12 (DeRosa).  "And there is just . . . no way that a trader at 10:00 o'clock [when the options expired] says the sweet spot is hit and then he is still on the job at noon," Dr. DeRosa testified.  Tr. 1921:13-17.  Indeed, Deutsche Bank recorded the option pairs in its hedging books as if they had no sweet spot at all.  Tr. 1956:13-18 (DeRosa).  Dr. DeRosa explained, "I found that Deutsche Bank did not hedge the sweet spot, that they very cleverly in their trading book entered the trades as having the same strike.  And by doing that, it meant they were hedging them as though the sweet spot could not be hit."  *Id.*  As anticipated by at least some of those involved in the transactions, all of the Murphys' option positions ultimately expired out of the money.  JFOF ¶ 47(a).

In mid-April 2000, the single-member LLCs transferred the options they had just purchased to the multi-member LLCs.  *Id.* ¶¶ 41, 42.  The purpose of this step was to "step up the bases of the partners' partnership interests ('outside basis') which stepped-up bases would ultimately carry over to the assets destined to give rise to the capital and ordinary tax losses."  *Id.* ¶ 41(a)(ii).  Wendell, Dell, Wendy, Joyce, and Angela contributed the option positions entered into by their single-member LLCs to MURFAM Farms, LLC.  *Id.* ¶ 41(b)(i).  Each then took the position, based on advice from E&Y, that as a result of these contributions, his or her basis in MURFAM Farms, LLC was increased by the cost basis of their purchased options without any reduction for the obligation underlying their sold options.  *Id.* ¶ 41(b)(ii).  MURFAM Farms, LLC meanwhile did not reduce the basis of the purchased options that were contributed by the amount of any obligation underlying the sold options contributed.  *Id.* ¶ 41(b)(iii).  The same was done by Pete, Marc, and Stratton though PSM Farms, LLC, and by Wendell, Dell, and Pete with respect to Murphy Pork Partners, LLC.  *Id.* ¶ 41(c)-(d).

On April 26, 2000, Ezzell arranged to pay a fee to E&Y of $2,006,000, equal to 2% of the tax loss to be generated by the Murphys' three COBRA transactions.  *Id.* ¶ 43(a)-(b).  On May 1, 2000, Coplan sent an email indicating that the options had been assigned and that he now

wanted the partnerships to engage in some trading activity in the partnership accounts at Deutsche Bank. *Id.* ¶ 42(f); JX 2602; DX 2603. Later that month, Ezzell arranged to pay fees totaling $200,000 to Proskauer Rose, the law firm that was to issue a legal opinion for the Murphys. JFOF ¶ 44(a). Ezzell later authorized an additional payment of $207,500 to Proskauer Rose on September 29, 2000. *Id.* ¶ 48(e). Despite paying Proskauer Rose's entire fee, Ezzell had not yet received a legal opinion from the firm. Tr. 673:2-10 (Ezzell). In fact, Ezzell never communicated with Proskauer Rose at all. Tr. 623:12-13, 730:5-7 (Ezzell). He did not actually receive Proskauer Rose's legal opinion until at least August 15, 2001. Tr. 734:9-16 (Ezzell).

### F.      Escalating Scrutiny and Unease

Meanwhile, scrutiny of the transaction was increasing, as was E&Y's unease with it. On June 9, 2000, Coplan sent an email to E&Y personnel including Knight regarding a forthcoming Wall Street Journal article about "the COYNS strategy, which was the name used by Arthur Andersen (and certain others) for the currency option strategy [E&Y] called COBRA." JFOF ¶ 61(f); DX 977.1. Coplan noted, "our clients are already aware of the reasonably high risk of having an IRS audit." DX 977.1. By June 14, 2000, even Coplan was not shy about expressing his "preference . . . not to do any more of these deals." DX 986.[3]

On August 11, 2000, the IRS announced and, on August 13, 2000, the IRS released, Notice 2000-44, "Tax Avoidance Using Artificially High Basis." JFOF ¶ 50(a). One of the examples in the Notice referred to a taxpayer transferring paired options to a partnership where the taxpayer claims that only the purchased option should be taken into account in calculating his basis in the partnership. *Id.*; DX 1017; DX 1018; JX 1019. In the example, the taxpayer took the position that the sold option could be ignored because it was not a liability under Section 752. JX 1019.2. The IRS announced that its position that purported losses resulting from such transactions do not represent bona fide losses reflecting actual economic consequences and were not allowable for federal income tax purposes. *Id.* The Notice also expressly warned that penalties may be imposed on participants in these transactions, including accuracy-related penalties. *Id.*

On August 22, 2000, Coplan wrote in response to concerns from higher-ups about the Murphy transactions:

---

[3] Eventually Coplan became considerably more concerned about the existence of any evidence of the COBRA transactions E&Y had done. On the afternoon of July 17, 2001, he sent an email to E&Y personnel with the subject line "Purge of all COBRA Documents." JFOF ¶ 60(c); DX 1214. In that email, he asked personnel to "immediately delete and dispose of any and all materials in your drawers and on your computers related to the COBRA transaction" with some exceptions. DX 1214.2. The next morning, Coplan followed up with instructions to cancel that request. DX 1215. "Based on some information I just received from our general counsel's office, I must ask you all NOT to purge ANY COBRA documents to the extent you have not done so already," Coplan wrote. DX 1215.3. For one of Coplan's colleagues, the cancellation request came "[t]oo late! I burned my office to the ground," the colleague reported. DX 1215.1.

> Also, I believe you expressed some concern . . . about those straggling COBRA transactions we discussed earlier this year.  There was in fact only one done (for $2 million E&Y fee), and that client agreed in writing to hold E&Y harmless from penalties that might be assessed against him.  That transaction was completed a while ago, and the attorney at Proskauer Rose is planning to issue his opinion shortly based on facts in existence prior to release of Notice 2000-44.

DX 1023.2; JFOF ¶ 50(d).

On August 30, 2000, Coplan received an email that a different client was "now interested in COBRA."  JFOF ¶ 25(p).  He replied:

> They must be joking.  I suppose this gives us the rare opportunity to tell them for the second time that we are not doing this transaction . . . .  Bottom line is that we are definitely not doing COBRA with them or anyone else. . . .  Why wouldn't we explain the risks of doing the strategy spelled out in Notice 2000-44 re list maintenance?  The Service has stated their clear intention to go after penalties for anyone who does this transaction.  Risks have increased – I would say dramatically.

DX 1030.

### G.     The Murphys File Tax Returns Claiming Benefits of COBRA

In November and December of 2000 the Murphys continued with the COBRA strategy by contributing bonds to the multi-member LLCs, via the single-member LLCs.  JFOF ¶ 51(d).  These bonds constituted long term capital assets, the sale of which was to generate long term capital losses.  *Id.*  In December 2000, the interests held in MURFAM Farms, LLC were contributed to MURFAM, Inc., causing MURFAM Farms, LLC to liquidate for federal income tax purposes.  *Id.* ¶ 52(a).  The same was done for PSM Farms, LLC and PSM, Inc. as well as Murphy Pork Partners, LLC and Murphy Pork, Inc.  *Id.* ¶ 52(b)-(c).  In late December 2000, E&Y invoiced and received payment of $94,000.  *Id.* ¶ 53(d).  That payment increased the Murphys' total payments to E&Y to $2,507,500, or 2.5 % of their $100.3 million desired tax loss.  *Id.*

On December 29, 2000, MURFAM, Inc. sold its bonds, generating a long-term capital loss for federal income tax purposes of $61,543,012.  *Id.* ¶ 54(a)(i).  MURFAM, Inc. reported that loss on Form 1120S for tax year 2000 and allocated it pro rata among its shareholders.  *Id.* ¶ 54(a)(ii).  PSM, Inc. did the same with respect to a $24,531,884 loss.  *Id.* ¶ 54(b).  Murphy Pork, Inc. sold an earlier investment in EURO Dollars, generating an ordinary loss of $13,919,961, which it also allocated pro rata among its shareholders.  *Id.* ¶ 54(c).

For tax year 2000, MURFAM, Inc., PSM, Inc., and Murphy Pork, Inc. claimed capital or ordinary losses totaling approximately $100 million.  *Id.* ¶ 28(c).  The partnerships' year 2000 Form 1065s were signed by Knight as the preparer on March 1, 2001.  *Id.* ¶ 56(b).  On March 14, 2001, Wendell signed the forms for MURFAM Farms, LLC and Murphy Pork Partners, LLC,

while Pete signed for PSM Farms, LLC. *Id.* ¶ 56(b)(i)-(iii). The attestation just above their signatures indicated that they were signing under penalties of perjury that they had examined the returns and attachments. JX 267; JX 268; JX 269. However, neither Wendell nor Pete reviewed the returns before signing them. JFOF ¶ 56(c).

IRS eventually audited the Murphys' returns and in December 2005 issued the FPAAs to each of the partnerships. *Id.* ¶ 71; JX 281; JX 282; JX 283. The FPAAs asserted that the COBRA transactions constituted a sham for tax purposes and made adjustments necessary to disallow the tax savings that had been claimed as a result of the Murphys' participation in the transactions. The FPAAs also asserted accuracy-related penalties. On September 29, 2009, the parties filed a Joint Stipulation of Settled Issues in which the Plaintiff partnerships conceded that the adjustments made in the FPAAs were correct. As a result of that stipulation the only issue remaining before the Court is whether the accuracy-related penalties asserted by the IRS apply.

## II.    Jurisdiction

In this partnership-level proceeding, the Court has "jurisdiction to determine . . . the applicability of any penalty . . . which relates to an adjustment to a partnership item." I.R.C. § 6226(f); *Stobie Creek Invs. LLC* v. *United States*, 608 F.3d 1366, 1380 (Fed. Cir. 2010). Thus, the Court must ensure that the penalties it has been asked to review here relate to adjustments to partnership items. A partnership item is "any item required to be taken into account for the partnership's taxable year . . . to the extent . . . such item is more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3).

In this case, both parties advise the Court that the FPAAs' adjustments were to partnership items. Pls.' Post-Trial Br. 35 ("All of the corrections identified relate to partnership items."); Def.'s Post-Trial Br. 94. In the FPAAs, the IRS adjusted to zero the following items: net loss, ordinary dividends, net short term gain, investment income (for PSM Farms, LLC only), and interest income. JX 281; JX 282; JX 283.

The FPAAs also indicated—without assigning a monetary value—that the IRS would disallow the partners' claimed outside basis. JX 281; JX 282; JX 283. Outside basis refers to the partner's basis in his or her partnership interest, while inside basis refers to the partnership's basis in its own assets. *See Kornman & Assocs., Inc.* v. *United States*, 527 F.3d 443, 456 n.12 (5th Cir. 2008). "Outside basis is an affected item, not a partnership item." *Jade Trading, LLC* v. *United States*, 598 F.3d 1372, 1380 (Fed. Cir. 2010). Lacking jurisdiction to determine affected items or penalties related to them in this partnership-level proceeding, the Court has not considered the IRS's disallowance of the partners' outside basis or the applicability of any penalty resulting from inflated outside basis. *See id.*

However, in these transactions the partners' aggregate outside basis happens to mirror the inside basis claimed by their partnerships. Inside basis is a partnership item. *See Stobie Creek*, 608 F.3d at 1380 ("The partnership's basis in contributed property is a partnership item."). As part of the sequence of steps COBRA entailed, the Murphys each made a cash contribution to that family member's single-member LLC. Tr. 2309:22 to 2310:10 (LaRue). The single-member LLCs in turn purchased currency options and then transferred those options to the

Murfam partnerships.  *Id.*  When a partner contributes property to a partnership, the partnership ordinarily takes a carryover basis equal to the basis that the partner had held in the property. I.R.C. § 721.  "Thus, under Section 721, the contributed options now in the hands of the Murphy partnerships took on the same inflated basis as the Murphy partners' outside inflated basis," the Government explains.  Def.'s Post-Trial Br. 96.  When the options expired out of the money, the Murfam partnerships reported a loss, inaccurately claiming an inflated inside basis in the now-worthless options in an amount equal to the partners' aggregate inflated outside basis.  JX 267.10; JX 268.10; JX 269.12; Tr. 2321:3 to 2329:10 (LaRue).

The IRS disallowed that loss and made other related adjustments to correct other items of gain, loss, and dividends reported inaccurately by the partnerships as a result of the COBRA transactions.  JX 281; JX 282; JX 283.  These are undoubtedly partnership items, as were the partnerships' determinations of their inside basis in the contributed options.  Treas. Reg. § 301.6231(a)(3)-1(a).  Because it was adjustments to these partnership items that triggered the penalties asserted in the FPAAs, the Court has jurisdiction to review the applicability of those penalties.

## III.    Accuracy-Related Penalties

Section 6662 of the Internal Revenue Code provides for penalties to be assessed against taxpayers who file returns containing substantial inaccuracies.  Application of these penalties "is mandatory and applies mechanically."  *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 704 (2008).  Under § 6662(b), a 20% penalty "shall apply to the portion of any underpayment which is attributable to 1 or more of the following: (1) [n]egligence or disregard of rules or regulations[,] (2) [a]ny substantial understatement of income tax[,] (3) [a]ny substantial valuation misstatement . . . ."  I.R.C. § 6662(b).  Moreover, if a valuation misstatement qualifies as a gross valuation misstatement, a heightened penalty of 40% applies.  *Id.* § 6662(h)(1).  These penalties cannot be stacked on top of one another; if the 40% penalty applies, the 20% penalties cannot also be assessed.  Treas. Reg. § 1.6662-2(c); *Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 531 n.26 (2009).

In this case, the FPAAs asserted four alternative penalties: (1) a 40% gross valuation misstatement penalty, (2) a 20% negligence penalty, (3) a 20% substantial understatement of income tax penalty, or (4) a 20% substantial valuation misstatement penalty.  JX 281; JX 282; JX 283.  Although Murfam initially advanced an argument that if penalties did apply no more than a 20% penalty was appropriate, it has since abandoned that argument in post-trial briefing.  Pls.' Mem. of Fact and Law 25, Feb. 5, 2010.  As was explained in *Clearmeadow*, "[i]n the case of an adjusted basis whose correct value is zero, long-standing Treasury Regulations provide that any higher basis claimed on a return is considered to be a gross valuation misstatement, triggering the 40 percent penalty."  87 Fed. Cl. at 531 (citing Treas. Reg. § 1.6662-5(g).  If accuracy-related penalties apply, it is the 40% gross valuation misstatement penalty that applies here.

## IV.    Reasonable-Cause-and-Good-Faith Defense Not Established

Murfam presented only one defense to the accuracy-related penalties asserted by the IRS. According to Murfam, the partnerships had reasonable cause to understate their tax liabilities and

they acted with good faith.  Such a defense presents questions of fact which the Court tries de novo; that is, "no weight is given to the factual findings made by the IRS during administrative proceedings."  *Stobie Creek*, 82 Fed. Cl. at 663.

## A.        The Reasonable-Cause-and-Good-Faith Defense

The reasonable-cause-and-good-faith defense Murfam relies upon is codified in § 6664(c) of the Internal Revenue Code and provides: "No penalty shall be imposed under section 6662 . . . if it is shown [1] that there was a reasonable cause for [the underpayment] and [2] that the taxpayer acted in good faith."  I.R.C. § 6664(c)(1).  "A reasonable-cause defense under 26 U.S.C. § 6664(c) may be a partner- or partnership-level defense, depending on who is asserting it."  *Stobie Creek*, 608 F.3d at 1380.  Here, the Murfam partnerships are asserting the defense, so it is a partnership-level defense which the Court has jurisdiction to consider.  *See id.* ("We have jurisdiction because here the partnership (Stobie Creek) is claiming it had reasonable cause based on the actions of its managing partner, Jeffrey Welles.").  Murfam carries the burden of establishing this defense.  *Conway v. United States*, 326 F.3d 1268, 1278 (Fed. Cir. 2003).

The Court determines "whether a taxpayer acted with reasonable cause and in good faith . . . on a case-by-case basis, taking into account all pertinent facts and circumstances."  Treas. Reg. § 1.6664-4(b)(1).  The reasonable-cause-and-good-faith defense acknowledges that penalties are inappropriate when a taxpayer underpays as a result of "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances."  Treas. Reg. § 1.6664-4(b)(1).  Accuracy-related penalties would not serve their purpose in such an event because a penalty is unlikely to deter an underpayment resulting from an honest misunderstanding.  *Cf. Kluener v. Commissioner*, 154 F.3d 630, 637 (6th Cir. 1998) ("This penalty deters taxpayers from playing the 'audit lottery.'").

In determining whether the underpayment at issue was the result of an honest misunderstanding, the most important factor ordinarily is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability," Treas. Reg. § 1.6664-4(b)(1), judged in light of the taxpayer's "experience, knowledge, and education."  *Stobie Creek*, 608 F.3d at 1381.  In evaluating Murfam's efforts to assess its proper tax liability, the Court considers everything its partners knew or should have known at the time the inaccurate tax filings were made.  *See* I.R.C. § 6664(c).

## B.        Reliance on Professional Advice Must Be Reasonable

According to the Murfam partners who testified, they had little knowledge of the transactions, and they did not personally engage in an extensive investigation of them, because they relied on the advice of Brewer Ezzell and Ernst & Young ("E&Y").  *E.g.*, Tr. 1317:8 (Wendell Murphy: "I relied 100 percent on Ernst & Young.").  In Murfam's view, it is exactly this reliance on E&Y's advice that demonstrates that the partnerships had reasonable cause for the underpayments and acted in good faith.  Certainly, "[o]ne way to show reasonable cause is to show *reasonable* reliance on the advice of a competent and *independent* professional advisor."  *Stobie Creek*, 608 F.3d at 1381 (emphasis added).

However, "[r]eliance on . . . the advice of a professional tax advisor . . . does not necessarily demonstrate reasonable cause and good faith." Treas. Reg. § 1.6664-4(b)(1). In *Stobie Creek*, the Federal Circuit identified several requirements for determining whether reliance is reasonable:

> First, the taxpayer must show that the advice was based on "all pertinent facts and circumstances and the law as it relates to those facts and circumstances." Treas. Reg. § 1.6664-4(c)(1)(i). Second, the advice relied upon must not be based on any "unreasonable factual or legal assumptions," and must not "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Id. § 1.6664-4(c)(1)(ii). Third, the taxpayer's reliance on the advice must itself be objectively reasonable. The reasonableness of any reliance turns on the quality and objectivity of the advice. Reliance is not reasonable, for example, if the adviser has an inherent conflict of interest about which the taxpayer knew or should have known. Treas. Reg. § 1.6664-4(c). Nor is it reasonable if the taxpayer knew or should have known that the transaction was "too good to be true," based on all the circumstances, including the taxpayer's education, sophistication, business experience, and purposes for entering into the transaction. Treas. Reg. § 1.6664-4(c).

*Stobie Creek*, 608 F.3d at 1381-82 (citations omitted).

## C. Imputation of Ezzell's Knowledge and Experience to the Murphys

Although both Ezzell and E&Y advised the Murfam partners, Ezzell's role as a Murphy Farms, Inc. employee and *consiglieri* to the Murphy family puts him in a different category than E&Y. The parties agree that Ezzell was the partnerships' authorized agent on the COBRA transactions. JFOF ¶ 31(a)(v); *see also* Pl.'s Post-Trial Br. 14 ("They traditionally relied on Ernst & Young and Brewer Ezzell to handle such matters, and true to this tradition, they did so with respect to COBRA."). As the Government explains, "[u]nder fundamental agency principles, the partners are imputed to have the same knowledge of and involvement in the COBRA transactions as their authorized agent, Brewer Ezzell." Def.'s Post-Trial Br. 104 (citing *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76-77 (2d Cir. 1999). The Restatement of Agency further elaborates:

> Imputation charges a principal with the legal consequences of having notice of a material fact, whether or not such fact would be useful and welcome. If an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having reason to know the fact. . . . Imputation thus reduces the risk that a principal may deploy agents as a shield against the legal consequences of facts the principal would prefer not to know.

Restatement (Third) of Agency, § 5.03 (2008). As the Government points out, "[i]mputation is clearly critical to the applicability of tax penalties because otherwise partnerships could easily avoid accuracy-related penalties simply by claiming that the managing partners' authorized agent furnished them with little or no knowledge of the tax-avoidance nature of the transaction."

13

Def.'s Post-Trial Br. 105.  In this case, Ezzell was so intimately involved in these transactions that his knowledge, experience, and sophistication must be imputed to the Murfam partners.

### D.    Reliance on Ernst & Young Unreasonable Given the Firm's Inherent Conflict of Interest

In the circumstances presented here, reliance on E&Y's advice was not reasonable.  As the Federal Circuit stated in *Stobie Creek*: "Reliance is not reasonable, for example, if the adviser has an inherent conflict of interest about which the taxpayer knew or should have known."  608 F.3d at 1381.  The Murphys could not reasonably have expected to receive independent advice from the same firm that was selling them COBRA.  Because E&Y had a financial interest in having the Murphys participate in COBRA, the firm had an inherent conflict of interest in advising on the legitimacy of that transaction.

That conflict of interest was exacerbated by the fee structure.  The Murphys have conceded that from the beginning they understood that E&Y's fee would be a percentage of their desired tax loss.  JFOF ¶ 11(a)(iii)(a) ("The Murphys believed initially that the fees for COBRA were to be 4.5% of the tax benefits or tax savings from the COBRA transaction.").  In other words, the Murphys understood that the more taxes they avoided by following E&Y's advice the more they would pay E&Y in fees.  The Murphys knew that E&Y stood to earn millions by advising them to participate in COBRA, and they therefore knew or should have known that E&Y's advice lacked the trustworthiness of an impartial opinion.  Given E&Y's obvious conflict of interest, reliance on its advice does not demonstrate that Murfam acted with reasonable cause or in good faith.

The Federal Circuit in *Stobie Creek* also stated: "Nor is it reasonable if the taxpayer knew or should have known that the transaction was 'too good to be true,' based on all the circumstances, including the taxpayer's education, sophistication, business experience, and purposes for entering into the transaction."  608 F.3d at 1382.  Wendell and Pete were experienced, educated and successful businessmen; Ezzell was a CPA and had served as Controller and Chief Financial Officer of Murphy Farms.  Tr. 295:14 to 296:10 (Ezzell).  Persons of their background would have known that sheltering nearly the exact amount of capital gains that they received from the Smithfield merger, in a barely comprehensible, complicated transaction, in which there was no real chance of profit, was "too good to be true."  This was probably true under the circumstances of the original pitch, but surely was true when the circumstances changed, that is, after the IRS notices, E&Y's termination of marketing COBRA, and the "hold harmless" agreements that the Murphys signed.

Apparently as a way to justify as reasonable their alleged blind faith in E&Y, the Murphys introduced evidence of a previous difficulty with the IRS, an audit regarding a deduction for prepaid feed, in which they faithfully followed E&Y's advice and were vindicated.  That case, however, concerned a comparatively simple matter of complying with the elements of Revenue Ruling 79-229, although a large amount of money was at stake.  Tr. 1090:22 to

1091:6.[4]  The witnesses' memories were somewhat hazy on the particulars of the dispute—they remembered that the IRS had conceded but they weren't sure about the Government's assertion that the Murphys had conceded on other issue(s) in the audit.  In addition, although the witnesses could not remember, Government counsel indicated that the IRS conceded after new evidence was brought to light.  Tr. 1087:2-23 (Slagle).  In any event, Slagle had read the Revenue Ruling, and he thought that Ezzell had as well.  Tr. 1084:25 to 1085:2, 1086:7-13 (Slagle).  (In contrast, Ezzell claimed that he never read the IRS Notices regarding the BOSS transactions and related ones, such as COBRA.  Tr. 551:3 (Ezzell).)  Most importantly, E&Y charged on an hourly basis for its assistance in the audit dispute; it did not charge as a percentage of the tax loss to be generated by the prepaid fee strategy.  Tr. 1084:1-8 (Slagle).  The Court does not believe that the prepaid feed dispute with the IRS compares to the COBRA strategy.  The Court also finds it noteworthy that Ezzell seemingly got more into the details of this dispute than he did in the COBRA strategy.  *See* Tr. 764:3-18 (Ezzell).

### E.  The State of Mind of Wendell and Pete and of Ezzell

Having concluded that the reliance of the Murphys on advice from E&Y was not reasonable, the Court now examines the state of mind of Wendell and Pete and of Ezzell.  Although this case involves three partnerships, the Court will evaluate the reasonable-cause-and-good-faith defense of all three partnerships collectively because the evidence showed that they acted collectively.  *See* JFOF ¶¶ 5(a), 6(a), 6(d).  The evidence produced at trial indicated that there was no distinction as to what each partnership knew about COBRA or the manner in which the partnership decided to undertake the transaction.  Furthermore, despite the plethora of Murphy partners, the Court has before it only the testimony of Wendell and Pete and the testimony of Ezzell, whose knowledge is imputed to the partnerships.  Because the Plaintiffs have the burden of proof on the defense of reasonable cause and good faith and have chosen to call only these three witnesses, the state of mind of the partnerships boils down to the states of mind of Wendell and Pete and Ezzell.

Both Wendell and Pete seemed to have minimal recollection of the events surrounding the transactions.  The tenor of their testimony was that they knew nothing of the details of the transactions, that they relied on Ezzell and E&Y, and that they basically signed whatever Ezzell put in front of them.  Wendell and Pete, however, were very successful, educated businessmen, whose companies together eventually became the largest pork producer in the world.  Although not necessarily sophisticated in tax matters, they are clearly astute.

Ezzell is also "very astute at his business, and [] is willing to work hard."  Tr. 1452:1-2 (Abbott).  He is also quite sophisticated when it comes to tax and financial matters, having spent several years operating a CPA practice before joining Murphy Farms, Inc. as Controller and then Chief Financial Officer.  Tr. 295:19 to 297:18 (Ezzell).  Multiple witnesses assured the Court that Ezzell is very smart.  "Brewer is one of the smartest people I have ever met," E&Y CPA Caroline Abbott testified.  Tr. 1451:25-1452:2 (Abbott).  Wendell similarly described Ezzell as

---

[4] Slagle testified that prepaid feed deductions reached as high as $75 to $85 million per year, Tr. 825:23 to 826:1 (Slagle), while Ezzell recalled a figure "over $100 million," Tr. 330:19-20 (Ezzell).

"one of the brightest people that I have ever been associated with in my entire life. . . . [H]e was really good." Tr. 1278:4-14 (Wendell Murphy).  Ezzell had taken courses in federal income taxation.  Tr. 470:46 (Ezzell).  He knew about the economic substance doctrine.  Tr. 470:8 to 471:18 (Ezzell).  He was well aware that one cannot enter into transactions solely to obtain tax benefits.  *Id.*

As the Background section of this opinion relates, the motivation for the Murphys to participate in COBRA was to shelter from capital gains taxes the assets excluded from the merger with Smithfield.  The record indicates that the value of these assets was approximately $100 million.  Tr. 615:16 to 616:9 (Ezzell).  Given the amount of money involved, it is easy to appreciate the temptation to grasp at straws.

It appears from the record that most of the Murphys were first introduced to the COBRA transaction at a meeting on December 2, 1999.  Ezzell too was present at that meeting, but he had been introduced to COBRA earlier at a meeting with Slagle and Knight on November 12, 1999.  Tr. 495:6-14 (Ezzell).  At the December 2nd meeting, Knight, on behalf of E&Y, made a white board presentation of the complicated transaction.  Tr. 1169:7-23 (Pete Murphy).  It seems that none of the Murphys or even Ezzell fully understood the transaction—and the Court, having studied the intricacies of the COBRA transaction, has some sympathy with the Murphy witnesses' assertions.  The Murphys, however, asked specific questions, although which specific ones remain a mystery, except for Pete's recollection that the Murphys repeatedly asked whether the transaction was legitimate.  Tr. 1172:10-23 (Pete Murphy).  It appears that their doubts were allayed by E&Y's assurances, although it would seem that experienced businessmen such as Wendell and Pete would have lingering doubts about the legitimacy of a transaction that was aimed at sheltering the entire value of the excluded assets, that had only an incidental relation to making a profit, that included the concept of a "desired loss," and that was characterized (at this meeting or later on) as "aggressive."  This observation holds a fortiori for Ezzell, who, the Court has determined, was quite sophisticated in tax matters and who was aware of the economic substance doctrine.  As a CPA, one would think that he would have been able to understand the steps and the thrust of the COBRA transaction.  There was a subsequent meeting of the Murphy family to discuss COBRA, which included at least Wendell, Pete and Ezzell, and it is hard to imagine that Ezzell was not asked for his assessment.  Tr. 370:2-10 (Ezzell).  That is, it is hard to imagine that the Murphys would be content with the mere assertion on the part of Ezzell that he trusted E&Y.

Even if Wendell and Pete and Ezzell were clueless and credulous, the two-page long COBRA engagement letters that Ezzell *reviewed* and the Murphys signed in December 1999 alluded to a "desired loss." JX 2198.1 ("Investment in partnership equals Cost of long option contract equal to 5% of desired loss, plus cash equal to 2% of the desired loss.")  Regardless what was said in meetings between E&Y and Ezzell and the Murphys, an engagement letter that expressly refers to a "desired loss" must indicate to someone of Ezzell's experience that the transaction does not truly aim to produce a profit and therefore is highly suspect when it comes to tax compliance.  The decision to rely on the advice of the firm pitching this suspect transaction and the failure to look elsewhere for independent advice does not demonstrate the type of investigation that would show good faith and provide for reasonable cause.

Yet even if Murfam genuinely overlooked the red flag produced by the use of the term "desired loss," Murfam's supposed naivete regarding COBRA cannot be justified in light of all the other warning signs that the partners knew or had reason to know about.  By the time the tax returns were filed, there had been numerous unmistakable indications that COBRA was not legitimate.  For example, shortly before the Murphys received and signed their COBRA engagement letters, the IRS had issued Notice 99-59, warning taxpayers that artificial losses were not properly allowable.  Notice 99-59 began:

> The Internal Revenue Service and Treasury Department have become aware of certain types of transactions, as described below, that are being marketed to taxpayers for the purpose of generating tax losses.  This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for federal income tax purposes.

DX 711.1.  After describing a transaction entailing steps that, although not exactly the same as those called for in COBRA, nevertheless, evoked it, the Notice continued:

> A loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences.  An artificial loss lacking economic substance is not allowable. . . .

> In the view of the Service and the Treasury Department, the arrangement described above (or any similar arrangement) does not produce an allowable loss.  Through a series of contrived steps, taxpayers claim tax losses for capital outlays that they have in fact recovered.  Such artificial losses are not allowable for federal income tax purposes.

> . . .

> Additionally, the Service may impose penalties on participants in these transactions . . . including the accuracy-related penalty under § 6662 . . . .

DX 711.2.

The connection between COBRA and the transactions described in Notice 99-59 was quickly grasped by E&Y.  On December 16, 1999, Robert Coplan wrote to E&Y personnel involved in the marketing of COBRA, including Knight, the following email, with subject line, "URGENT – Reexamination of COBRA in Light of IRS Notice:"

> In light of the issuance of Notice 99-59 and the publicity surrounding the BOSS transaction, we will be reexamining the focus of our VIPER program and particularly COBRA.  The Notice, which is reproduced below, is aimed at the competing PWC BOSS strategy "and any similar transaction" which produces "an artificial loss lacking economic substance."  Firm leadership has scheduled a meeting to discuss the continued sale of the COBRA and CDS strategies in light

of the current climate. Unfortunately, the meeting set to discuss these issues is not going to occur until January 5, 2000.

Therefore, it is important that we do not continue teeing up transactions for 2000 until these matters have been resolved. Furthermore, we should contact prospective clients with whom we have already spoken about the strategy to alert them to the recent developments . . . .

DX 713.1-2.

The day after the January 5, 2000 meeting, Coplan sent an email to Knight and others informing them of the results of that meeting:

After a lengthy discussion of the issues involved in the marketing of COBRA, the conclusion reached by Mike Kelley, Ron Friedman and others yesterday was that the firm would not market this strategy in 2000. The primary reasons for this involved the perceived changes in the landscape now being faced by tax-advantaged strategies after the issuance of Notice 99-59 last month and the publication of the PWC BOSS opinion and scathing commentary of BOSS in Tax Notes.

We are well aware that many of you had tee'd up COBRA opportunities late last year for execution in 2000. It will be necessary to advise clients ASAP that we have decided not to sell this strategy. We should indicate to these clients that the issuance of Notice 99-59 on December 3, 1999 signals the increased level of scrutiny that will be brought to bear on transactions like BOSS, that generate permanent ordinary losses, and the heightened penalty risk that will be faced by clients (and our firm) after issuance of the Notice. Specifically, it is not uncommon for the IRS to follow up the issuance of a Notice with the issuance of regulations that adopt the Notice publication date as the effective date of the regulation. Thus, transactions done in 2000 may bear a higher risk of being attacked and of being subjected to penalties than ones done before issuance of the Notice. This explanation of our decision should not raise questions about the 16 transactions that were completed in November 1999.

You may be faced with a situation whereby clients to whom you have already described the transaction specifically ask who else they could go to in order to implement it. We should first reiterate our concerns about the heightened risks associated with the transaction. If the client insists he understands the risks, and continues to push us for a way to implement the transaction, we should avoid making an outright referral.

DX 782.2.

The extent to which these concerns reached Murfam is a matter of some dispute. Knight refused to testify. Ezzell insisted that E&Y either never communicated these concerns to him or

18

that they downplayed the significance of the developments.  Ezzell admits that he was told that Notice 99-59 had been issued.  Tr. 547:3-4 (Ezzell).  But his testimony as to what he was told about Notice 99-59 seemed to oscillate and lack credibility.  At one point, Ezzell admitted that Knight told him that the notice "had the effect of disallowing any losses in connection with transactions that did not produce an economic loss."  Tr. 545:10-17 (Ezzell).  A few minutes later in his testimony, Ezzell denied that "Mr. Knight [told him] that this notice . . . was aimed at transactions which . . . produce artificial losses on transactions which lack economic substance."  Tr. 549:10-14 (Ezzell).  Yet later on Ezzell agreed that Knight "probably" made it clear that the transaction at issue in the notice "addressed losses that the Internal Revenue Service viewed as generating an artificial loss."  Tr. 600:16-21 (Ezzell).

According to Ezzell, he asked pointedly whether COBRA was subject to this ruling, Slagle replied that it was not, and that assurance was good enough for Ezzell.  Tr. 545:20 to 550:19 (Ezzell).  Despite his previous background as a professional tax preparer, Ezzell insists that he did not think it was important to read Notice 99-59 himself.  Tr. 550:3-19 (Ezzell).  In fact, Ezzell maintains that to this day he has never seen Notice 99-59.  Tr. 551:3 (Ezzell: "No, I have never seen this notice.").  For the Court, this was but one of many parts of Ezzell's testimony that drew into doubt his credibility.  If it is true that Ezzell never felt the need to read Notice 99-59 and make his own determination as to its implications, that is not at all indicative of a good faith effort to assess one's proper tax liability.

Neither did the Court find credible Ezzell's claims that he was never informed that E&Y had decided to stop selling COBRA or that E&Y believed a heightened penalty risk had materialized.  Tr. 559:17 to 561:12 (Ezzell).  Slagle and Knight spent the entire day of February 3, 2000 traveling to and meeting with Ezzell in Rose Hill, North Carolina.  JX 2462.15 (Slagle's time records); JX 2460.24 (Knight's time records); Tr. 879:11-14 (Slagle), 598:24 to 599:23 (Ezzell).  Ezzell admits that Notice 99-59 was discussed at the February 3, 2000 meeting.  Tr. 600:4-6 (Ezzell).  The Court finds it overwhelmingly likely that Ezzell knew or should have known by the conclusion of this meeting that E&Y leadership was no longer comfortable with COBRA and that the firm was no longer marketing the transaction.

Regardless of what was actually said at the meeting, Ezzell was presented with addenda to be signed for each of the Murphys' COBRA engagement letters stating that they would hold E&Y harmless from any penalties assessed.  The idea for such an addendum had originated with Mike Kelley, the second highest ranking partner in E&Y's tax group at the time.  According to his testimony, which the Court found highly credible, there came "a time when [he] was asked to make an exception to the . . . prohibition on any more [COBRA] transactions."  Tr. 1737:21-24, 1715:2-4 (Kelley).  In Kelley's view, "almost all individual clients were not capable of assessing the technical merits of [COBRA a]nd, therefore, were not in a position to fully appreciate the risks they were taking if they were to go forward."  Tr. 1758:14-18 (Kelley).  "[I]f an individual taxpayer has to write a hold harmless agreement," Kelley thought, "that should cause them to be concerned that this is not an ordinary transaction, maybe they ought to double back and take another look at it and determine whether or not this is something they actually want to enter into."  Tr. 1759:13-21 (Kelley).  E&Y allowed a select few COBRA transactions to be completed during 2000, but only if the clients signed a hold harmless agreement.  JFOF ¶ 25.

19

Shortly after the February 3, 2000 meeting, each of the Murphys signed the required hold harmless addendum, which consisted of a single paragraph:

> The client will not hold Ernst & Young LLP or all successors and assigns responsible for any penalties assessed by the Internal Revenue Service due to entering into the COBRA strategy.  However, Ernst & Young LLP will be held responsible for any preparer penalties assessed by the IRS due to the strategy.

JX 2250; JX 2251; JX 2252; JX 2253; JX 2254; JX 2257; JX 2258.  The Court finds that being required to sign this addendum should have done exactly what Mike Kelley intended it to do.  By early February 2000, Ezzell and the Murphys knew or should have known that E&Y no longer felt comfortable with COBRA and that the firm believed COBRA carried an exceedingly high risk of penalties.

Even after February 2000, glaring warning signs that COBRA was abusive continued to appear.  On August 11, 2000, the IRS announced and, on August 13, 2000, the IRS released Notice 2000-44, "Tax Avoidance Using Artificially High Basis."  JFOF ¶ 50(a).  One of the examples in the Notice referred to a taxpayer transferring paired options to a partnership where the taxpayer claims that only the purchased option should be taken into account in calculating his basis in the partnership.  *Id.*; DX 1017; DX 1018; JX 1019.  In the example, the taxpayer took the position that the sold option could be ignored because it was not a liability under Section 752.  JX 1019.2.  The IRS announced its position that purported losses resulting from such transactions do not represent bona fide losses reflecting actual economic consequences and were not allowable for federal income tax purposes.  *Id.*  The Notice also expressly warned that penalties may be imposed on participants in these transactions, including accuracy-related penalties.  *Id.*

An August 11, 2000, an email from Coplan stated that "Notice 2000-44 essentially describes the COBRA transaction."  DX 1017.2; JFOF ¶ 50(b).  A few hours later, at 10:49 a.m., Coplan sent another email to Knight and other E&Y personnel with the subject line "Client Followup in light of Notice 2000-44."  *Id.* ¶ 50(c).  That email stated:

> Perhaps I should have been explicit in my earlier email in suggesting that you call all clients ASAP that have done COBRA or the CDS Add-On strategy (either for a 1999 or a 2000 CDS transaction).  We want to be (sorry) "proactive" in communicating about this news, and not wait for them to call us.

> The message we should deliver to them is that the IRS has issued a Notice that describes the essence of the transaction involving the short option strategy.  We have seen the Treasury release but the IRS Notice is not yet available Friday [sic].  We will be analyzing its possible impact on the client's transaction and will be back in touch with them.  However, the Notice only represents the Service's views, which we knew would not be favorable as to the strategy.  For the COBRA transactions completed last year, no real action should be contemplated since the opinions have been issued and returns filed.

DX 1018.2.

At this time, questions about the legitimacy of COBRA and similar transactions, heretofore seemingly confined to tax professionals, crossed over into the general business press. On August 21, 2000, the Wall Street Journal published "Written Off: How New Tax Shelter Promised Big Savings But Finally Fell Apart – For PriceWaterhouseCoopers, Complex Plan Ultimately Proved an Embarrassment – The Old Paper-Clip Trick."  DX 3523.2.  Coplan sent an email advising others at E&Y to be aware of this article on August 29, 2000.  JFOF ¶ 61(j).  At the end of August, Coplan was informed that somebody else was interested in doing COBRA.  He responded, "they must be joking."  DX 1030.  The Court cannot believe that, other than by willful ignorance, Ezzell had no sense of the scrutiny tax shelters like COBRA were facing by August 2000.

More than six months later, in March 2001, Murfam made tax filings claiming the benefits of COBRA.  Moreover, where there were opportunities to include in the tax filings disclosures of the COBRA strategy that might have prevented the application of accuracy-related penalties, such disclosures were not made.  Tr. 2452:5 to 2457:10 (LaRue), 1079:2-21 (Slagle).

Murfam's efforts to assess the legitimacy of COBRA were grossly insufficient to establish the reasonable-cause-and-good-faith defense.  The advice they supposedly relied upon was severely tainted by E&Y's inherent conflict of interest.  A good faith investigation by a reasonable taxpayer with half the sophistication of Ezzell would have easily uncovered the abusive nature of COBRA, well in advance of the March 2001 tax filings.  In short, Murfam did not come close to carrying its burden to show that it acted with reasonable cause and in good faith.

**V.     Conclusion**

Plaintiffs failed to establish the applicability of the reasonable-cause-and-good-faith defense.  The adjustments to partnership items asserted in the FPAAs properly trigger a 40% gross valuation penalty.  The Clerk of the Court shall enter judgment in favor of Defendant.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge